**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALTA WIND I OWNER LESSOR C, | ) | |
| | ) | |
| *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Nos. 13-402, 13-917, 13-972, 13-935, |
| | ) | 14-174, 14-93, 14-175, and 14-47 |
| v. | ) | |
| | ) | Judge Wheeler |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

---

**APPENDIX TO PLAINTIFFS' CONTENTIONS OF FACT AND PROPOSED
CONCLUSIONS OF LAW**

---

Steven J. Rosenbaum
(srosenbaum@cov.com)
*Counsel of Record*
Dennis B. Auerbach
Thomas R. Brugato
Margaret H. Brennan

One CityCenter
850 10th Street, NW
Washington, DC  20001-4956
(202) 662-5568
(202) 778-5568 fax

Dated:  March 31, 2016                    *Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

**Statutes**

Am. Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 1603 ...............................0001

26 U.S.C. § 45(d)(1) ...................................................................................................................0005

26 U.S.C. § 48(a) ........................................................................................................................0022

26 U.S.C. § 263A(f)(2)(A)(i).......................................................................................................0032

26 U.S.C. § 1012..........................................................................................................................0038

15 U.S.C. § 790a(a)(3)..................................................................................................................0040

15 U.S.C. § 790f(b)......................................................................................................................0042

42 U.S.C. § 7135(a)(1)..................................................................................................................0044

**Regulations**

26 C.F.R. § 1.263A-1(c)(3)..........................................................................................................0050

26 C.F.R. § 1.263(a)-4(b)(3).........................................................................................................0076

26 C.F.R. § 1.1012-1(a) ...............................................................................................................0105

26 C.F.R. § 1.1060-1.....................................................................................................................0121

Treas. Reg. § 1.48-1(d)(4).............................................................................................................0131

Treas. Reg. § 1.148-5(d)(6)...........................................................................................................0141

Treas. Reg. § 1.167(a)-5 ...............................................................................................................0153

Treas. Reg. § 1.170A-1(c)(2).........................................................................................................0155

Treas. Reg. § 1.197-2(b) ...............................................................................................................0162

Treas. Reg. § 1.338-6(b)(2)...........................................................................................................0208

Treas. Reg. § 1.467-1.....................................................................................................................0216

Treas. Reg. § 1.467-3(a) ...............................................................................................................0231

Treas. Reg. § 1.704-4(a)(3)...........................................................................................................0240

Treas. Reg. § 1.897-1(o)(2)............................................................................................0248

**Legislative History**

The 111th Congress 109-110 (Mar. 2011),
     JCS-2-11 NO 6 (I.R.S.), 2011 WL 940372  ..............................................................0267

**California Executive Order**

Cal. Executive Order S-14-08 § 1 (Nov. 17, 2008) ...................................................0294

**Cases**

US Courts of Appeal

*Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971)................................0297

*Malik v. Falcon Holdings, LLC,* 675 F.3d 646 (7th Cir. 2012) ................................................0304

*Miami Valley Broadcasting Corp. v. United States,*
     499 F.2d 677 (Ct. Cl 1974)................................................................................................0309

*Pac. Far. E. Lines, Inc. v. United States*, 544 F.2d 478 (Ct. Cl. 1976) ...................................0321

US Court of Federal Claims

*ARRA Energy Co v. United States,* 97 Fed. Cl. 21 (2011).........................................................0337

*Hermes Consol. Inc. & Consol. Subs. v. United States,*
     19 Ct. Cl. 398 (1988)........................................................................................................0355

US District Courts

*MacKenzie v. United States,* 714 F. Supp. 268, 271 (E.D. Mich. 1989) ..................................0373

*Washington Mutual, Inc. v. United States*,
     996 F. Supp. 2d 1095 (W.D. Wash. 2014) ......................................................................0378

Other Cases

*Corbin West Ltd. P'ship v. Commissioner,* T.C. Memo. 1999-7 (1999) ..................................0404

*Fieland v. Comm'r*, 73 T.C. 743 (1980) ...................................................................................0409

*In re Creekside Sr. Apartments, LP*, 477 B.R. 40  (B.A.P. 6th Cir. 2012) ...............................0417

*In re Lewis & Clark Apartments, LP*, 479 B.R. 47 (B.A.P. 8th Cir. 2012) ..............................0445

*IT&S of Iowa, Inc. v. Comm'r*, 97 T.C. 496 (1991)..................................................................0454

*Ithaca Indus., Inc. v. Comm'r*, 97 T.C. 253 (1991) ....................................................0473

*Little v. Comm'r,* T.C. Memo 1996-270, 1996 Tax Ct. Memo LEXIS 285
    (June 12, 1996) ..........................................................................................0486

*Peters v. Comm'r*, 4 T.C. 1236 (1945) ......................................................................0499

*Schubert v. Comm'r*, 33 T.C. 1048 (1960), *aff'd*, 286 F.2d 573 (4th Cir. 1961).......................0503

*Solitron Devices v. Comm'r,* 80 T.C. 1 (1983) ............................................................0511

*Utilicorp United, Inc. v. Comm'r*, T.C. Memo 1997-47, 1997 Tax Ct. Memo.
    LEXIS 60 (Jan. 27, 1997)...........................................................................0525

*Van Duzer v. Commissioner*,
    61 T.C.M. (CCH) 249 (1991), *aff'd*, 9 F.3d 1555 (9th Cir. 1993) ...................................0533

*Von-Lusk v. Comm'r*, 104 T.C. 207, 214 (1995) ..........................................................0550

## Treasury and IRS Rulings and Guidance

Department of Treasury, Payments for Specified Energy Property In Lieu of Tax
    Credits under the American Recovery and Reinvestment Act of 2009.............................0558

Department of Treasury, Frequently Asked Questions and Answers, Question 40 .................0579

IRS Chief Counsel Advisory, 2010 WL 3937045 (June 24, 2010) .........................................0589

IRS Depreciation Frequently Asked Questions, FAQ 3 .............................................0593

IRS Field Service Advisory, 1992 WL 1355768....................................................0599

IRS Notice 2013-29 (May 13, 2013) .........................................................................0607

IRS Tech. Adv. Mem. 200907024 (Feb. 13, 2009) ................................................0610

IRS Tech. Adv. Mem. 9317001, 1993 WL 134598, at *8, 12-13 (Jan. 12, 1993)....................0625

IRS Priv. Ltr. Rul. 201214007, 2012 PLR LEXIS 11 (Apr. 6, 2012) ......................................0631

IRS Priv. Ltr. Rul. 200215037 (Apr. 12, 2002) ........................................................0636

H. R. 1

# One Hundred Eleventh Congress
## of the
## United States of America

**AT THE FIRST SESSION**

*Begun and held at the City of Washington on Tuesday,*
*the sixth day of January, two thousand and nine*

## An Act

Making supplemental appropriations for job preservation and creation, infrastructure investment, energy efficiency and science, assistance to the unemployed, and State and local fiscal stabilization, for the fiscal year ending September 30, 2009, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "American Recovery and Reinvestment Act of 2009".

**SEC. 2. TABLE OF CONTENTS.**

The table of contents for this Act is as follows:

DIVISION A—APPROPRIATIONS PROVISIONS

TITLE I—AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMIN-ISTRATION, AND RELATED AGENCIES
TITLE II—COMMERCE, JUSTICE, SCIENCE, AND RELATED AGENCIES
TITLE III—DEPARTMENT OF DEFENSE
TITLE IV—ENERGY AND WATER DEVELOPMENT
TITLE V—FINANCIAL SERVICES AND GENERAL GOVERNMENT
TITLE VI—DEPARTMENT OF HOMELAND SECURITY
TITLE VII—INTERIOR, ENVIRONMENT, AND RELATED AGENCIES
TITLE VIII—DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES, AND EDUCATION, AND RELATED AGENCIES
TITLE IX—LEGISLATIVE BRANCH
TITLE X—MILITARY CONSTRUCTION AND VETERANS AFFAIRS AND RE-LATED AGENCIES
TITLE XI—STATE, FOREIGN OPERATIONS, AND RELATED PROGRAMS
TITLE XII—TRANSPORTATION, HOUSING AND URBAN DEVELOPMENT, AND RELATED AGENCIES
TITLE XIII—HEALTH INFORMATION TECHNOLOGY
TITLE XIV—STATE FISCAL STABILIZATION FUND
TITLE XV—ACCOUNTABILITY AND TRANSPARENCY
TITLE XVI—GENERAL PROVISIONS—THIS ACT

DIVISION B—TAX, UNEMPLOYMENT, HEALTH, STATE FISCAL RELIEF, AND OTHER PROVISIONS

TITLE I—TAX PROVISIONS
TITLE II—ASSISTANCE FOR UNEMPLOYED WORKERS AND STRUGGLING FAMILIES
TITLE III—PREMIUM ASSISTANCE FOR COBRA BENEFITS
TITLE IV—MEDICARE AND MEDICAID HEALTH INFORMATION TECH-NOLOGY; MISCELLANEOUS MEDICARE PROVISIONS
TITLE V—STATE FISCAL RELIEF
TITLE VI—BROADBAND TECHNOLOGY OPPORTUNITIES PROGRAM
TITLE VII—LIMITS ON EXECUTIVE COMPENSATION

**SEC. 3. PURPOSES AND PRINCIPLES.**

(a) STATEMENT OF PURPOSES.—The purposes of this Act include the following:

H. R. 1—250

of liens or such other methods as the Secretary of the Treasury determines appropriate.

(d) RETURN OF UNUSED GRANT FUNDS.—Any grant funds not used to make subawards under this section before January 1, 2011, shall be returned to the Secretary of the Treasury on such date. Any subawards returned to the State housing credit agency on or after such date shall be promptly returned to the Secretary of the Treasury. Any amounts returned to the Secretary of the Treasury under this subsection shall be deposited in the general fund of the Treasury.

(e) DEFINITIONS.—Any term used in this section which is also used in section 42 of the Internal Revenue Code of 1986 shall have the same meaning for purposes of this section as when used in such section 42. Any reference in this section to the Secretary of the Treasury shall be treated as including the Secretary's delegate.

(f) APPROPRIATIONS.—There is hereby appropriated to the Secretary of the Treasury such sums as may be necessary to carry out this section.

**SEC. 1603. GRANTS FOR SPECIFIED ENERGY PROPERTY IN LIEU OF TAX CREDITS.**

(a) IN GENERAL.—Upon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b). No grant shall be made under this section with respect to any property unless such property—

(1) is placed in service during 2009 or 2010, or

(2) is placed in service after 2010 and before the credit termination date with respect to such property, but only if the construction of such property began during 2009 or 2010.

(b) GRANT AMOUNT.—

(1) IN GENERAL.—The amount of the grant under subsection (a) with respect to any specified energy property shall be the applicable percentage of the basis of such property.

(2) APPLICABLE PERCENTAGE.—For purposes of paragraph (1), the term "applicable percentage" means—

(A) 30 percent in the case of any property described in paragraphs (1) through (4) of subsection (d), and

(B) 10 percent in the case of any other property.

(3) DOLLAR LIMITATIONS.—In the case of property described in paragraph (2), (6), or (7) of subsection (d), the amount of any grant under this section with respect to such property shall not exceed the limitation described in section 48(c)(1)(B), 48(c)(2)(B), or 48(c)(3)(B) of the Internal Revenue Code of 1986, respectively, with respect to such property.

(c) TIME FOR PAYMENT OF GRANT.—The Secretary of the Treasury shall make payment of any grant under subsection (a) during the 60-day period beginning on the later of—

(1) the date of the application for such grant, or

(2) the date the specified energy property for which the grant is being made is placed in service.

(d) SPECIFIED ENERGY PROPERTY.—For purposes of this section, the term "specified energy property" means any of the following:

**0002**

H. R. 1—251

(1) QUALIFIED FACILITIES.—Any qualified property (as defined in section 48(a)(5)(D) of the Internal Revenue Code of 1986) which is part of a qualified facility (within the meaning of section 45 of such Code) described in paragraph (1), (2), (3), (4), (6), (7), (9), or (11) of section 45(d) of such Code.

(2) QUALIFIED FUEL CELL PROPERTY.—Any qualified fuel cell property (as defined in section 48(c)(1) of such Code).

(3) SOLAR PROPERTY.—Any property described in clause (i) or (ii) of section 48(a)(3)(A) of such Code.

(4) QUALIFIED SMALL WIND ENERGY PROPERTY.—Any qualified small wind energy property (as defined in section 48(c)(4) of such Code).

(5) GEOTHERMAL PROPERTY.—Any property described in clause (iii) of section 48(a)(3)(A) of such Code.

(6) QUALIFIED MICROTURBINE PROPERTY.—Any qualified microturbine property (as defined in section 48(c)(2) of such Code).

(7) COMBINED HEAT AND POWER SYSTEM PROPERTY.—Any combined heat and power system property (as defined in section 48(c)(3) of such Code).

(8) GEOTHERMAL HEAT PUMP PROPERTY.—Any property described in clause (vii) of section 48(a)(3)(A) of such Code. Such term shall not include any property unless depreciation (or amortization in lieu of depreciation) is allowable with respect to such property.

(e) CREDIT TERMINATION DATE.—For purposes of this section, the term "credit termination date" means—

(1) in the case of any specified energy property which is part of a facility described in paragraph (1) of section 45(d) of the Internal Revenue Code of 1986, January 1, 2013,

(2) in the case of any specified energy property which is part of a facility described in paragraph (2), (3), (4), (6), (7), (9), or (11) of section 45(d) of such Code, January 1, 2014, and

(3) in the case of any specified energy property described in section 48 of such Code, January 1, 2017.

In the case of any property which is described in paragraph (3) and also in another paragraph of this subsection, paragraph (3) shall apply with respect to such property.

(f) APPLICATION OF CERTAIN RULES.—In making grants under this section, the Secretary of the Treasury shall apply rules similar to the rules of section 50 of the Internal Revenue Code of 1986. In applying such rules, if the property is disposed of, or otherwise ceases to be specified energy property, the Secretary of the Treasury shall provide for the recapture of the appropriate percentage of the grant amount in such manner as the Secretary of the Treasury determines appropriate.

(g) EXCEPTION FOR CERTAIN NON-TAXPAYERS.—The Secretary of the Treasury shall not make any grant under this section to—

(1) any Federal, State, or local government (or any political subdivision, agency, or instrumentality thereof),

(2) any organization described in section 501(c) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code,

(3) any entity referred to in paragraph (4) of section 54(j) of such Code, or

(4) any partnership or other pass-thru entity any partner (or other holder of an equity or profits interest) of which is described in paragraph (1), (2) or (3).

(h) DEFINITIONS.—Terms used in this section which are also used in section 45 or 48 of the Internal Revenue Code of 1986 shall have the same meaning for purposes of this section as when used in such section 45 or 48. Any reference in this section to the Secretary of the Treasury shall be treated as including the Secretary's delegate.

(i) APPROPRIATIONS.—There is hereby appropriated to the Secretary of the Treasury such sums as may be necessary to carry out this section.

(j) TERMINATION.—The Secretary of the Treasury shall not make any grant to any person under this section unless the application of such person for such grant is received before October 1, 2011.

**SEC. 1604. INCREASE IN PUBLIC DEBT LIMIT.**

Subsection (b) of section 3101 of title 31, United States Code, is amended by striking out the dollar limitation contained in such subsection and inserting "$12,104,000,000,000".

# Subtitle H—Prohibition on Collection of Certain Payments Made Under the Continued Dumping and Subsidy Offset Act of 2000

**SEC. 1701. PROHIBITION ON COLLECTION OF CERTAIN PAYMENTS MADE UNDER THE CONTINUED DUMPING AND SUBSIDY OFFSET ACT OF 2000.**

(a) IN GENERAL.—Notwithstanding any other provision of law, neither the Secretary of Homeland Security nor any other person may—

(1) require repayment of, or attempt in any other way to recoup, any payments described in subsection (b); or

(2) offset any past, current, or future distributions of antidumping or countervailing duties assessed with respect to imports from countries that are not parties to the North American Free Trade Agreement in an attempt to recoup any payments described in subsection (b).

(b) PAYMENTS DESCRIBED.—Payments described in this subsection are payments of antidumping or countervailing duties made pursuant to the Continued Dumping and Subsidy Offset Act of 2000 (section 754 of the Tariff Act of 1930 (19 U.S.C. 1675c; repealed by subtitle F of title VII of the Deficit Reduction Act of 2005 (Public Law 109–171; 120 Stat. 154))) that were—

(1) assessed and paid on imports of goods from countries that are parties to the North American Free Trade Agreement; and

(2) distributed on or after January 1, 2001, and before January 1, 2006.

(c) PAYMENT OF FUNDS COLLECTED OR WITHHELD.—Not later than the date that is 60 days after the date of the enactment of this Act, the Secretary of Homeland Security shall—

(1) refund any repayments, or any other recoupment, of payments described in subsection (b); and

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle A. Income Taxes (Refs & Annos)
      Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
        Subchapter A. Determination of Tax Liability (Refs & Annos)
          Part IV. Credits Against Tax (Refs & Annos)
            Subpart D. Business Related Credits (Refs & Annos)

26 U.S.C.A. § 45

§ 45. Electricity produced from certain renewable resources, etc.

Currentness

**(a) General rule.**--For purposes of section 38, the renewable electricity production credit for any taxable year is an amount equal to the product of--

(1) 1.5 cents, multiplied by

(2) the kilowatt hours of electricity--

(A) produced by the taxpayer--

(i) from qualified energy resources, and

(ii) at a qualified facility during the 10-year period beginning on the date the facility was originally placed in service, and

(B) sold by the taxpayer to an unrelated person during the taxable year.

**(b) Limitations and adjustments.--**

**(1) Phaseout of credit.**--The amount of the credit determined under subsection (a) shall be reduced by an amount which bears the same ratio to the amount of the credit (determined without regard to this paragraph) as--

(A) the amount by which the reference price for the calendar year in which the sale occurs exceeds 8 cents, bears to

(B) 3 cents.

**(2) Credit and phaseout adjustment based on inflation.**--The 1.5 cent amount in subsection (a), the 8 cent amount in paragraph (1), the $4.375 amount in subsection (e)(8)(A), the $2 amount in subsection (e)(8)(D)(ii)(I), and in subsection (e)(8)(B)(i) the reference price of fuel used as a feedstock (within the meaning of subsection (c)(7)(A)) in 2002 shall each be adjusted by multiplying such amount by the inflation adjustment factor for the calendar year in which the sale occurs. If any amount as increased under the preceding sentence is not a multiple of 0.1 cent, such amount shall be rounded to the nearest multiple of 0.1 cent.

**(3) Credit reduced for grants, tax-exempt bonds, subsidized energy financing, and other credits.**--The amount of the credit determined under subsection (a) with respect to any project for any taxable year (determined after the application of paragraphs (1) and (2)) shall be reduced by the amount which is the product of the amount so determined for such year and the lesser of ½ or a fraction--

**(A)** the numerator of which is the sum, for the taxable year and all prior taxable years, of--

**(i)** grants provided by the United States, a State, or a political subdivision of a State for use in connection with the project,

**(ii)** proceeds of an issue of State or local government obligations used to provide financing for the project the interest on which is exempt from tax under section 103,

**(iii)** the aggregate amount of subsidized energy financing provided (directly or indirectly) under a Federal, State, or local program provided in connection with the project, and

**(iv)** the amount of any other credit allowable with respect to any property which is part of the project, and

**(B)** the denominator of which is the aggregate amount of additions to the capital account for the project for the taxable year and all prior taxable years.

The amounts under the preceding sentence for any taxable year shall be determined as of the close of the taxable year. This paragraph shall not apply with respect to any facility described in subsection (d)(2)(A)(ii).

**(4) Credit rate and period for electricity produced and sold from certain facilities.--**

**(A) Credit rate.**--In the case of electricity produced and sold in any calendar year after 2003 at any qualified facility described in paragraph (3), (5), (6), (7), (9), or (11) of subsection (d), the amount in effect under subsection (a)(1) for such calendar year (determined before the application of the last sentence of paragraph (2) of this subsection) shall be reduced by one-half.

**(B) Credit period.--**

**(i) In general.**--Except as provided in clause (ii) or clause (iii), in the case of any facility described in paragraph (3), (4), (5), (6), or (7) of subsection (d), the 5-year period beginning on the date the facility was originally placed in service shall be substituted for the 10-year period in subsection (a)(2)(A)(ii).

**(ii) Certain open-loop biomass facilities.**--In the case of any facility described in subsection (d)(3)(A)(ii) placed in service before the date of the enactment of this paragraph, the 5-year period beginning on January 1, 2005, shall be substituted for the 10-year period in subsection (a)(2)(A)(ii).

**(iii) Termination.**--Clause (i) shall not apply to any facility placed in service after the date of the enactment of this clause.

**(5) Phaseout of credit for wind facilities.**--In the case of any facility using wind to produce electricity, the amount of the credit determined under subsection (a) (determined after the application of paragraphs (1), (2), and (3) and without regard to this paragraph) shall be reduced by--

**(A)** in the case of any facility the construction of which begins after December 31, 2016, and before January 1, 2018, 20 percent,

**(B)** in the case of any facility the construction of which begins after December 31, 2017, and before January 1, 2019, 40 percent, and

**(C)** in the case of any facility the construction of which begins after December 31, 2018, and before January 1, 2020, 60 percent.

**(c) Resources.**--For purposes of this section:

**(1) In general.**--The term "qualified energy resources" means--

**(A)** wind,

**(B)** closed-loop biomass,

**(C)** open-loop biomass,

**(D)** geothermal energy,

**(E)** solar energy,

**(F)** small irrigation power,

**(G)** municipal solid waste,

**(H)** qualified hydropower production, and

**(I)** marine and hydrokinetic renewable energy.

**(2) Closed-loop biomass.**--The term "closed-loop biomass" means any organic material from a plant which is planted exclusively for purposes of being used at a qualified facility to produce electricity.

**(3) Open-loop biomass.--**

**(A) In general.**--The term "open-loop biomass" means--

**(i)** any agricultural livestock waste nutrients, or

**(ii)** any solid, nonhazardous, cellulosic waste material or any lignin material which is derived from--

**(I)** any of the following forest-related resources: mill and harvesting residues, precommercial thinnings, slash, and brush,

**(II)** solid wood waste materials, including waste pallets, crates, dunnage, manufacturing and construction wood wastes (other than pressure-treated, chemically-treated, or painted wood wastes), and landscape or right-of-way tree trimmings, but not including municipal solid waste, gas derived from the biodegradation of solid waste, or paper which is commonly recycled, or

**(III)** agriculture sources, including orchard tree crops, vineyard, grain, legumes, sugar, and other crop by-products or residues.

Such term shall not include closed-loop biomass or biomass burned in conjunction with fossil fuel (cofiring) beyond such fossil fuel required for startup and flame stabilization.

**(B) Agricultural livestock waste nutrients.--**

**(i) In general.**--The term "agricultural livestock waste nutrients" means agricultural livestock manure and litter, including wood shavings, straw, rice hulls, and other bedding material for the disposition of manure.

(ii) **Agricultural livestock.**--The term "agricultural livestock" includes bovine, swine, poultry, and sheep.

**(4) Geothermal energy.**--The term "geothermal energy" means energy derived from a geothermal deposit (within the meaning of section 613(e)(2)).

**(5) Small irrigation power.**--The term "small irrigation power" means power--

(A) generated without any dam or impoundment of water through an irrigation system canal or ditch, and

(B) the nameplate capacity rating of which is not less than 150 kilowatts but is less than 5 megawatts.

**(6) Municipal solid waste.**--The term "municipal solid waste" has the meaning given the term "solid waste" under section 2(27) of the Solid Waste Disposal Act (42 U.S.C. 6903), except that such term does not include paper which is commonly recycled and which has been segregated from other solid waste (as so defined).

**(7) Refined coal.--**

**(A) In general.**--The term "refined coal" means a fuel--

(i) which--

(I) is a liquid, gaseous, or solid fuel produced from coal (including lignite) or high carbon fly ash, including such fuel used as a feedstock,

(II) is sold by the taxpayer with the reasonable expectation that it will be used for purpose [1] of producing steam, and

(III) is certified by the taxpayer as resulting (when used in the production of steam) in a qualified emission reduction. [2]

(ii) which is steel industry fuel.

**(B) Qualified emission reduction.**--The term "qualified emission reduction" means a reduction of at least 20 percent of the emissions of nitrogen oxide and at least 40 percent of the emissions of either sulfur dioxide or mercury released when burning the refined coal (excluding any dilution caused by materials combined or added during the production process), as compared to the emissions released when burning the feedstock coal or comparable coal predominantly available in the marketplace as of January 1, 2003.

**(C) Steel industry fuel.--**

(i) **In general.**--The term "steel industry fuel" means a fuel which--

(I) is produced through a process of liquifying coal waste sludge and distributing it on coal, and

(II) is used as a feedstock for the manufacture of coke.

(ii) **Coal waste sludge.**--The term "coal waste sludge" means the tar decanter sludge and related byproducts of the coking process, including such materials that have been stored in ground, in tanks and in lagoons, that have been treated as hazardous wastes under applicable Federal environmental rules absent liquefaction and processing with coal into a feedstock for the manufacture of coke.

**(8) Qualified hydropower production.**--

(A) **In general.**--The term "qualified hydropower production" means--

(i) in the case of any hydroelectric dam which was placed in service on or before the date of the enactment of this paragraph, the incremental hydropower production for the taxable year, and

(ii) in the case of any nonhydroelectric dam described in subparagraph (C), the hydropower production from the facility for the taxable year.

(B) **Determination of incremental hydropower production.**--

(i) **In general.**--For purposes of subparagraph (A), incremental hydropower production for any taxable year shall be equal to the percentage of average annual hydropower production at the facility attributable to the efficiency improvements or additions of capacity placed in service after the date of the enactment of this paragraph, determined by using the same water flow information used to determine an historic average annual hydropower production baseline for such facility. Such percentage and baseline shall be certified by the Federal Energy Regulatory Commission.

(ii) **Operational changes disregarded.**--For purposes of clause (i), the determination of incremental hydropower production shall not be based on any operational changes at such facility not directly associated with the efficiency improvements or additions of capacity.

(C) **Nonhydroelectric dam.**--For purposes of subparagraph (A), a facility is described in this subparagraph if--

(i) the hydroelectric project installed on the nonhydroelectric dam is licensed by the Federal Energy Regulatory Commission and meets all other applicable environmental, licensing, and regulatory requirements,

**(ii)** the nonhydroelectric dam was placed in service before the date of the enactment of this paragraph and operated for flood control, navigation, or water supply purposes and did not produce hydroelectric power on the date of the enactment of this paragraph, and

**(iii)** the hydroelectric project is operated so that the water surface elevation at any given location and time that would have occurred in the absence of the hydroelectric project is maintained, subject to any license requirements imposed under applicable law that change the water surface elevation for the purpose of improving environmental quality of the affected waterway.

The Secretary, in consultation with the Federal Energy Regulatory Commission, shall certify if a hydroelectric project licensed at a nonhydroelectric dam meets the criteria in clause (iii). Nothing in this section shall affect the standards under which the Federal Energy Regulatory Commission issues licenses for and regulates hydropower projects under part I of the Federal Power Act.

**(9) Indian coal.**--

**(A) In general.**--The term "Indian coal" means coal which is produced from coal reserves which, on June 14, 2005--

**(i)** were owned by an Indian tribe, or

**(ii)** were held in trust by the United States for the benefit of an Indian tribe or its members.

**(B) Indian tribe.**--For purposes of this paragraph, the term "Indian tribe" has the meaning given such term by section 7871(c)(3)(E)(ii).

**(10) Marine and hydrokinetic renewable energy.**--

**(A) In general.**--The term "marine and hydrokinetic renewable energy" means energy derived from--

**(i)** waves, tides, and currents in oceans, estuaries, and tidal areas,

**(ii)** free flowing water in rivers, lakes, and streams,

**(iii)** free flowing water in an irrigation system, canal, or other man-made channel, including projects that utilize nonmechanical structures to accelerate the flow of water for electric power production purposes, or

**(iv)** differentials in ocean temperature (ocean thermal energy conversion).

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  **0011**

**(B) Exceptions.**--Such term shall not include any energy which is derived from any source which utilizes a dam, diversionary structure (except as provided in subparagraph (A)(iii)), or impoundment for electric power production purposes.

**(d) Qualified facilities.**--For purposes of this section:

**(1) Wind facility.**--In the case of a facility using wind to produce electricity, the term "qualified facility" means any facility owned by the taxpayer which is originally placed in service after December 31, 1993, and the construction of which begins before January 1, 2020. Such term shall not include any facility with respect to which any qualified small wind energy property expenditure (as defined in subsection (d)(4) of section 25D) is taken into account in determining the credit under such section.

**(2) Closed-loop biomass facility.--**

**(A) In general.**--In the case of a facility using closed-loop biomass to produce electricity, the term "qualified facility" means any facility--

**(i)** owned by the taxpayer which is originally placed in service after December 31, 1992, and the construction of which begins before January 1, 2017, or

**(ii)** owned by the taxpayer which before January 1, 2017, is originally placed in service and modified to use closed-loop biomass to co-fire with coal, with other biomass, or with both, but only if the modification is approved under the Biomass Power for Rural Development Programs or is part of a pilot project of the Commodity Credit Corporation as described in 65 Fed. Reg. 63052.

For purposes of clause (ii), a facility shall be treated as modified before January 1, 2017, if the construction of such modification begins before such date.

**(B) Expansion of facility.**--Such term shall include a new unit placed in service after the date of the enactment of this subparagraph in connection with a facility described in subparagraph (A)(i), but only to the extent of the increased amount of electricity produced at the facility by reason of such new unit.

**(C) Special rules.**--In the case of a qualified facility described in subparagraph (A)(ii)--

**(i)** the 10-year period referred to in subsection (a) shall be treated as beginning no earlier than the date of the enactment of this clause, and

**(ii)** if the owner of such facility is not the producer of the electricity, the person eligible for the credit allowable under subsection (a) shall be the lessee or the operator of such facility.

**(3) Open-loop biomass facilities.--**

**(A) In general.**--In the case of a facility using open-loop biomass to produce electricity, the term "qualified facility" means any facility owned by the taxpayer which--

   **(i)** in the case of a facility using agricultural livestock waste nutrients--

      **(I)** is originally placed in service after the date of the enactment of this subclause and the construction of which begins before January 1, 2017, and

      **(II)** the nameplate capacity rating of which is not less than 150 kilowatts, and

   **(ii)** in the case of any other facility, the construction of which begins before January 1, 2017.

**(B) Expansion of facility.**--Such term shall include a new unit placed in service after the date of the enactment of this subparagraph in connection with a facility described in subparagraph (A), but only to the extent of the increased amount of electricity produced at the facility by reason of such new unit.

**(C) Credit eligibility.**--In the case of any facility described in subparagraph (A), if the owner of such facility is not the producer of the electricity, the person eligible for the credit allowable under subsection (a) shall be the lessee or the operator of such facility.

**(4) Geothermal or solar energy facility.**--In the case of a facility using geothermal or solar energy to produce electricity, the term "qualified facility" means any facility owned by the taxpayer which is originally placed in service after the date of the enactment of this paragraph and which--

   **(A)** in the case of a facility using solar energy, is placed in service before January 1, 2006, or

   **(B)** in the case of a facility using geothermal energy, the construction of which begins before January 1, 2017.

   Such term shall not include any property described in section 48(a)(3) the basis of which is taken into account by the taxpayer for purposes of determining the energy credit under section 48.

**(5) Small irrigation power facility.**--In the case of a facility using small irrigation power to produce electricity, the term "qualified facility" means any facility owned by the taxpayer which is originally placed in service after the date of the enactment of this paragraph and before October 3, 2008.

**(6) Landfill gas facilities.**--In the case of a facility producing electricity from gas derived from the biodegradation of municipal solid waste, the term "qualified facility" means any facility owned by the taxpayer which is originally placed in service after the date of the enactment of this paragraph and the construction of which begins before January 1, 2017.

**(7) Trash facilities.**--In the case of a facility (other than a facility described in paragraph (6)) which uses municipal solid waste to produce electricity, the term "qualified facility" means any facility owned by the taxpayer which is originally placed in service after the date of the enactment of this paragraph and the construction of which begins before January 1, 2017. Such term shall include a new unit placed in service in connection with a facility placed in service on or before the date of the enactment of this paragraph, but only to the extent of the increased amount of electricity produced at the facility by reason of such new unit.

**(8) Refined coal production facility.**--In the case of a facility that produces refined coal, the term "refined coal production facility" means--

**(A)** with respect to a facility producing steel industry fuel, any facility (or any modification to a facility) which is placed in service before January 1, 2010, and

**(B)** with respect to any other facility producing refined coal, any facility placed in service after the date of the enactment of the American Jobs Creation Act of 2004 and before January 1, 2012.

**(9) Qualified hydropower facility.**--

**(A) In general.**--In the case of a facility producing qualified hydroelectric production described in subsection (c)(8), the term "qualified facility" means--

**(i)** in the case of any facility producing incremental hydropower production, such facility but only to the extent of its incremental hydropower production attributable to efficiency improvements or additions to capacity described in subsection (c)(8)(B) placed in service after the date of the enactment of this paragraph and before January 1, 2017, and

**(ii)** any other facility placed in service after the date of the enactment of this paragraph and the construction of which begins before January 1, 2017.

**(B) Credit period.**--In the case of a qualified facility described in subparagraph (A), the 10-year period referred to in subsection (a) shall be treated as beginning on the date the efficiency improvements or additions to capacity are placed in service.

**(C) Special rule.**--For purposes of subparagraph (A)(i), an efficiency improvement or addition to capacity shall be treated as placed in service before January 1, 2017, if the construction of such improvement or addition begins before such date.

**(10) Indian coal production facility.**--The term "Indian coal production facility" means a facility that produces Indian coal.

**(11) Marine and hydrokinetic renewable energy facilities.**--In the case of a facility producing electricity from marine and hydrokinetic renewable energy, the term "qualified facility" means any facility owned by the taxpayer--

**(A)** which has a nameplate capacity rating of at least 150 kilowatts, and

**(B)** which is originally placed in service on or after the date of the enactment of this paragraph and the construction of which begins before January 1, 2017.

**(e) Definitions and special rules.**--For purposes of this section--

**(1) Only production in the United States taken into account.**--Sales shall be taken into account under this section only with respect to electricity the production of which is within--

**(A)** the United States (within the meaning of section 638(1)), or

**(B)** a possession of the United States (within the meaning of section 638(2)).

**(2) Computation of inflation adjustment factor and reference price.--**

**(A) In general.**--The Secretary shall, not later than April 1 of each calendar year, determine and publish in the Federal Register the inflation adjustment factor and the reference price for such calendar year in accordance with this paragraph.

**(B) Inflation adjustment factor.**--The term "inflation adjustment factor" means, with respect to a calendar year, a fraction the numerator of which is the GDP implicit price deflator for the preceding calendar year and the denominator of which is the GDP implicit price deflator for the calendar year 1992. The term "GDP implicit price deflator" means the most recent revision of the implicit price deflator for the gross domestic product as computed and published by the Department of Commerce before March 15 of the calendar year.

**(C) Reference price.**--The term "reference price" means, with respect to a calendar year, the Secretary's determination of the annual average contract price per kilowatt hour of electricity generated from the same qualified energy resource and sold in the previous year in the United States. For purposes of the preceding sentence, only contracts entered into after December 31, 1989, shall be taken into account.

**(3) Production attributable to the taxpayer.**--In the case of a facility in which more than 1 person has an ownership interest, except to the extent provided in regulations prescribed by the Secretary, production from the facility shall be allocated among such persons in proportion to their respective ownership interests in the gross sales from such facility.

**(4) Related persons.**--Persons shall be treated as related to each other if such persons would be treated as a single employer under the regulations prescribed under section 52(b). In the case of a corporation which is a member of an affiliated group of corporations filing a consolidated return, such corporation shall be treated as selling electricity to an unrelated person if such electricity is sold to such a person by another member of such group.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  **0015** 11

**(5) Pass-thru in the case of estates and trusts.**--Under regulations prescribed by the Secretary, rules similar to the rules of subsection (d) of section 52 shall apply.

[**(6) Repealed.** Pub.L. 109-58, Title XIII, § 1301(f)(3), Aug. 8, 2005, 119 Stat. 990]

**(7) Credit not to apply to electricity sold to utilities under certain contracts.--**

**(A) In general.**--The credit determined under subsection (a) shall not apply to electricity--

**(i)** produced at a qualified facility described in subsection (d)(1) which is originally placed in service after June 30, 1999, and

**(ii)** sold to a utility pursuant to a contract originally entered into before January 1, 1987 (whether or not amended or restated after that date).

**(B) Exception.**--Subparagraph (A) shall not apply if--

**(i)** the prices for energy and capacity from such facility are established pursuant to an amendment to the contract referred to in subparagraph (A)(ii),

**(ii)** such amendment provides that the prices set forth in the contract which exceed avoided cost prices determined at the time of delivery shall apply only to annual quantities of electricity (prorated for partial years) which do not exceed the greater of--

**(I)** the average annual quantity of electricity sold to the utility under the contract during calendar years 1994, 1995, 1996, 1997, and 1998, or

**(II)** the estimate of the annual electricity production set forth in the contract, or, if there is no such estimate, the greatest annual quantity of electricity sold to the utility under the contract in any of the calendar years 1996, 1997, or 1998, and

**(iii)** such amendment provides that energy and capacity in excess of the limitation in clause (ii) may be--

**(I)** sold to the utility only at prices that do not exceed avoided cost prices determined at the time of delivery, or

**(II)** sold to a third party subject to a mutually agreed upon advance notice to the utility.

For purposes of this subparagraph, avoided cost prices shall be determined as provided for in 18 CFR 292.304(d)(1) or any successor regulation.

**(8) Refined coal production facilities.--**

**(A) Determination of credit amount.**--In the case of a producer of refined coal, the credit determined under this section (without regard to this paragraph) for any taxable year shall be increased by an amount equal to $4.375 per ton of qualified refined coal--

**(i)** produced by the taxpayer at a refined coal production facility during the 10-year period beginning on the date the facility was originally placed in service, and

**(ii)** sold by the taxpayer--

**(I)** to an unrelated person, and

**(II)** during such 10-year period and such taxable year.

**(B) Phaseout of credit.**--The amount of the increase determined under subparagraph (A) shall be reduced by an amount which bears the same ratio to the amount of the increase (determined without regard to this subparagraph) as--

**(i)** the amount by which the reference price of fuel used as a feedstock (within the meaning of subsection (c)(7)(A)) for the calendar year in which the sale occurs exceeds an amount equal to 1.7 multiplied by the reference price for such fuel in 2002, bears to

**(ii)** $8.75.

**(C) Application of rules.**--Rules similar to the rules of the subsection (b)(3) and paragraphs (1) through (5) of this subsection shall apply for purposes of determining the amount of any increase under this paragraph.

**(D) Special rule for steel industry fuel.**--

**(i) In general.**--In the case of a taxpayer who produces steel industry fuel--

**(I)** this paragraph shall be applied separately with respect to steel industry fuel and other refined coal, and

**(II)** in applying this paragraph to steel industry fuel, the modifications in clause (ii) shall apply.

**(ii) Modifications.**--

**(I) Credit amount.**--Subparagraph (A) shall be applied by substituting "$2 per barrel-of-oil equivalent" for "$4.375 per ton".

**(II) Credit period.**--In lieu of the 10-year period referred to in clauses (i) and (ii)(II) of subparagraph (A), the credit period shall be the period beginning on the later of the date such facility was originally placed in service, the date the modifications described in clause (iii) were placed in service, or October 1, 2008, and ending on the later of December 31, 2009, or the date which is 1 year after the date such facility or the modifications described in clause (iii) were placed in service.

**(III) No phaseout.**--Subparagraph (B) shall not apply.

**(iii) Modifications.**--The modifications described in this clause are modifications to an existing facility which allow such facility to produce steel industry fuel.

**(iv) Barrel-of-oil equivalent.**--For purposes of this subparagraph, a barrel-of-oil equivalent is the amount of steel industry fuel that has a Btu content of 5,800,000 Btus.

**(9) Coordination with credit for producing fuel from a nonconventional source.**--

**(A) In general.**--The term "qualified facility" shall not include any facility which produces electricity from gas derived from the biodegradation of municipal solid waste if such biodegradation occurred in a facility (within the meaning of section 45K) the production from which is allowed as a credit under section 45K for the taxable year or any prior taxable year.

**(B) Refined coal facilities.**--

**(i) In general.**--The term "refined coal production facility" shall not include any facility the production from which is allowed as a credit under section 45K for the taxable year or any prior taxable year (or under section 29, as in effect on the day before the date of enactment of the Energy Tax Incentives Act of 2005, for any prior taxable year).

**(ii) Exception for steel industry coal.**--In the case of a facility producing steel industry fuel, clause (i) shall not apply to so much of the refined coal produced at such facility as is steel industry fuel.

**(10) Indian coal production facilities.**--

**(A) Determination of credit amount.**--In the case of a producer of Indian coal, the credit determined under this section (without regard to this paragraph) for any taxable year shall be increased by an amount equal to the applicable dollar amount per ton of Indian coal--

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  **0018** 14

**(i)** produced by the taxpayer at an Indian coal production facility during the 11-year period beginning on January 1, 2006, and

**(ii)** sold by the taxpayer--

**(I)** to an unrelated person (either directly by the taxpayer or after sale or transfer to one or more related persons), and

**(II)** during such 11-year period and such taxable year.

**(B) Applicable dollar amount.**--

**(i) In general.**--The term "applicable dollar amount" for any taxable year beginning in a calendar year means--

**(I)** $1.50 in the case of calendar years 2006 through 2009, and

**(II)** $2.00 in the case of calendar years beginning after 2009.

**(ii) Inflation adjustment.**--In the case of any calendar year after 2006, each of the dollar amounts under clause (i) shall be equal to the product of such dollar amount and the inflation adjustment factor determined under paragraph (2)(B) for the calendar year, except that such paragraph shall be applied by substituting "2005" for "1992".

**(C) Application of rules.**--Rules similar to the rules of the subsection (b)(3) and paragraphs (1), (3), (4), and (5) of this subsection shall apply for purposes of determining the amount of any increase under this paragraph.

[**(D) Repealed.** Pub.L. 114-113, Div. Q, Title I, § 186(d)(2), Dec. 18, 2015, 129 Stat. 3074]

**(11) Allocation of credit to patrons of agricultural cooperative.**--

**(A) Election to allocate.**--

**(i) In general.**--In the case of an eligible cooperative organization, any portion of the credit determined under subsection (a) for the taxable year may, at the election of the organization, be apportioned among patrons of the organization on the basis of the amount of business done by the patrons during the taxable year.

**(ii) Form and effect of election.**--An election under clause (i) for any taxable year shall be made on a timely filed return for such year. Such election, once made, shall be irrevocable for such taxable year. Such election shall not take effect unless the organization designates the apportionment as such in a written notice mailed to its patrons during the payment period described in section 1382(d).

**(B) Treatment of organizations and patrons.**--The amount of the credit apportioned to any patrons under subparagraph (A)--

**(i)** shall not be included in the amount determined under subsection (a) with respect to the organization for the taxable year, and

**(ii)** shall be included in the amount determined under subsection (a) for the first taxable year of each patron ending on or after the last day of the payment period (as defined in section 1382(d)) for the taxable year of the organization or, if earlier, for the taxable year of each patron ending on or after the date on which the patron receives notice from the cooperative of the apportionment.

**(C) Special rules for decrease in credits for taxable year.**--If the amount of the credit of a cooperative organization determined under subsection (a) for a taxable year is less than the amount of such credit shown on the return of the cooperative organization for such year, an amount equal to the excess of--

**(i)** such reduction, over

**(ii)** the amount not apportioned to such patrons under subparagraph (A) for the taxable year,

shall be treated as an increase in tax imposed by this chapter on the organization. Such increase shall not be treated as tax imposed by this chapter for purposes of determining the amount of any credit under this chapter.

**(D) Eligible cooperative defined.**--For purposes of this section the term "eligible cooperative" means a cooperative organization described in section 1381(a) which is owned more than 50 percent by agricultural producers or by entities owned by agricultural producers. For this purpose an entity owned by an agricultural producer is one that is more than 50 percent owned by agricultural producers.

## CREDIT(S)

(Added Pub.L. 102-486, Title XIX, § 1914(a), Oct. 24, 1992, 106 Stat. 3020; amended Pub.L. 106-170, Title V, § 507(a) to (c), Dec. 17, 1999, 113 Stat. 1922; Pub.L. 106-554, § 1(a)(7) [Title III, § 319(1)], Dec. 21, 2000, 114 Stat. 2763, 2763A-646; Pub.L. 107-147, Title VI, § 603(a), Mar. 9, 2002, 116 Stat. 59; Pub.L. 108-311, Title III, § 313(a), Oct. 4, 2004, 118 Stat. 1181; Pub.L. 108-357, Title VII, § 710(a) to (f), Oct. 22, 2004, 118 Stat. 1552 to 1557; Pub.L. 109-58, Title XIII, §§ 1301(a) to (e), (f) (1) to (4), 1302(a), 1322(a)(3)(C), Aug. 8, 2005, 119 Stat. 986, 990, 1011; Pub.L. 109-135, Title IV, §§ 402(b), 403(t), 412(j), Dec. 21, 2005, 119 Stat. 2610, 2628, 2637; Pub.L. 109-432, Div. A, Title II, § 201, Dec. 20, 2006, 120 Stat. 2944; Pub.L. 110-172, §§ 7(b), 9(a), Dec. 29, 2007, 121 Stat. 2482, 2484; Pub.L. 110-343, Div. B, Title I, §§ 101(a) to (e), 102(a) to (e), 106(c)(3)(B), 108(a) to (d)(1), Oct. 3, 2008, 122 Stat. 3808, 3810, 3815, 3819; Pub.L. 111-5, Div. B, Title I, § 1101(a), (b), Feb. 17, 2009, 123 Stat. 319; Pub.L. 111-312, Title VII, § 702(a), Dec. 17, 2010, 124 Stat. 3311; Pub.L. 112-240, Title IV, §§ 406(a), 407(a), Jan. 2, 2013, 126 Stat. 2340; Pub.L. 113-295, Div. A, Title I, §§ 154(a), 155(a), Title II, § 210(g)(1), Dec. 19, 2014, 128 Stat. 4021, 4032; Pub.L. 114-113, Div. P, Title III, § 301(a), Div. Q, Title I, §§ 186(a) to (c), (d)(2), 187(a), Dec. 18, 2015, 129 Stat. 3038, 3073, 3074.)

Footnotes

1    So in original. Probably should be preceded by "the".

2    So in original. Prior to amendment by Pub.L. 110-343, Div. B, § 101(b)(1), cl. (i) of subsec. (c)(7)(A) ended with ", or".

26 U.S.C.A. § 45, 26 USCA § 45

Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2016 Thomson Reuters. No claim to original U.S. Government Works.    **0021** 17

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

> United States Code Annotated
>    Title 26. Internal Revenue Code (Refs & Annos)
>       Subtitle A. Income Taxes (Refs & Annos)
>          Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
>             Subchapter A. Determination of Tax Liability (Refs & Annos)
>                Part IV. Credits Against Tax (Refs & Annos)
>                   Subpart E. Rules for Computing Investment Credit

26 U.S.C.A. § 48

§ 48. Energy credit

Currentness

**(a) Energy credit.--**

**(1) In general.**--For purposes of section 46, except as provided in paragraphs (1)(B), (2)(B), (3)(B), and (4)(B) of subsection (c), the energy credit for any taxable year is the energy percentage of the basis of each energy property placed in service during such taxable year.

**(2) Energy percentage.--**

  **(A) In general.**--Except as provided in paragraph (6), the energy percentage is--

   **(i)** 30 percent in the case of--

    **(I)** qualified fuel cell property,

    **(II)** energy property described in paragraph (3)(A)(i) but only with respect to property the construction of which begins before January 1, 2022,

    **(III)** energy property described in paragraph (3)(A)(ii), and

    **(IV)** qualified small wind energy property, and

   **(ii)** in the case of any energy property to which clause (i) does not apply, 10 percent.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**(B) Coordination with rehabilitation credit.**--The energy percentage shall not apply to that portion of the basis of any property which is attributable to qualified rehabilitation expenditures.

(3) **Energy property.**--For purposes of this subpart, the term "energy property" means any property--

(A) which is--

(i) equipment which uses solar energy to generate electricity, to heat or cool (or provide hot water for use in) a structure, or to provide solar process heat, excepting property used to generate energy for the purposes of heating a swimming pool,

(ii) equipment which uses solar energy to illuminate the inside of a structure using fiber-optic distributed sunlight but only with respect to periods ending before January 1, 2017,

(iii) equipment used to produce, distribute, or use energy derived from a geothermal deposit (within the meaning of section 613(e)(2)), but only, in the case of electricity generated by geothermal power, up to (but not including) the electrical transmission stage,

(iv) qualified fuel cell property or qualified microturbine property,

(v) combined heat and power system property,

(vi) qualified small wind energy property, or

(vii) equipment which uses the ground or ground water as a thermal energy source to heat a structure or as a thermal energy sink to cool a structure, but only with respect to periods ending before January 1, 2017,

(B)(i) the construction, reconstruction, or erection of which is completed by the taxpayer, or

(ii) which is acquired by the taxpayer if the original use of such property commences with the taxpayer,

(C) with respect to which depreciation (or amortization in lieu of depreciation) is allowable, and

(D) which meets the performance and quality standards (if any) which--

(i) have been prescribed by the Secretary by regulations (after consultation with the Secretary of Energy), and

(ii) are in effect at the time of the acquisition of the property.

Such term shall not include any property which is part of a facility the production from which is allowed as a credit under section 45 for the taxable year or any prior taxable year.

**(4) Special rule for property financed by subsidized energy financing or industrial development bonds.--**

**(A) Reduction of basis.**--For purposes of applying the energy percentage to any property, if such property is financed in whole or in part by--

**(i)** subsidized energy financing, or

**(ii)** the proceeds of a private activity bond (within the meaning of section 141) the interest on which is exempt from tax under section 103,

the amount taken into account as the basis of such property shall not exceed the amount which (but for this subparagraph) would be so taken into account multiplied by the fraction determined under subparagraph (B).

**(B) Determination of fraction.**--For purposes of subparagraph (A), the fraction determined under this subparagraph is 1 reduced by a fraction--

**(i)** the numerator of which is that portion of the basis of the property which is allocable to such financing or proceeds, and

**(ii)** the denominator of which is the basis of the property.

**(C) Subsidized energy financing.**--For purposes of subparagraph (A), the term "subsidized energy financing" means financing provided under a Federal, State, or local program a principal purpose of which is to provide subsidized financing for projects designed to conserve or produce energy.

**(D) Termination.**--This paragraph shall not apply to periods after December 31, 2008, under rules similar to the rules of section 48(m) (as in effect on the day before the date of the enactment of the Revenue Reconciliation Act of 1990).

**(5) Election to treat qualified facilities as energy property.**--

**(A) In general.**--In the case of any qualified property which is part of a qualified investment credit facility--

**(i)** such property shall be treated as energy property for purposes of this section, and

**(ii)** the energy percentage with respect to such property shall be 30 percent.

**(B) Denial of production credit.**--No credit shall be allowed under section 45 for any taxable year with respect to any qualified investment credit facility.

**(C) Qualified investment credit facility.**--For purposes of this paragraph, the term "qualified investment credit facility" means any facility--

   **(i)** which is a qualified facility (within the meaning of section 45) described in paragraph (1), (2), (3), (4), (6), (7), (9), or (11) of section 45(d),

   **(ii)** which is placed in service after 2008 and the construction of which begins before January 1, 2017 (January 1, 2020, in the case of any facility which is described in paragraph (1) of section 45(d)), and

   **(iii)** with respect to which--

      **(I)** no credit has been allowed under section 45, and

      **(II)** the taxpayer makes an irrevocable election to have this paragraph apply.

**(D) Qualified property.**--For purposes of this paragraph, the term "qualified property" means property--

   **(i)** which is--

      **(I)** tangible personal property, or

      **(II)** other tangible property (not including a building or its structural components), but only if such property is used as an integral part of the qualified investment credit facility,

   **(ii)** with respect to which depreciation (or amortization in lieu of depreciation) is allowable,

   **(iii)** which is constructed, reconstructed, erected, or acquired by the taxpayer, and

   **(iv)** the original use of which commences with the taxpayer.

**(E) Phaseout of credit for wind facilities.**--In the case of any facility using wind to produce electricity, the amount of the credit determined under this section (determined after the application of paragraphs (1) and (2) and without regard to this subparagraph) shall be reduced by--

**(i)** in the case of any facility the construction of which begins after December 31, 2016, and before January 1, 2018, 20 percent,

**(ii)** in the case of any facility the construction of which begins after December 31, 2017, and before January 1, 2019, 40 percent, and

**(iii)** in the case of any facility the construction of which begins after December 31, 2018, and before January 1, 2020, 60 percent.

**(6) Phaseout for solar energy property.**--

**(A) In general.**--Subject to subparagraph (B), in the case of any energy property described in paragraph (3)(A)(i) the construction of which begins before January 1, 2022, the energy percentage determined under paragraph (2) shall be equal to--

**(i)** in the case of any property the construction of which begins after December 31, 2019, and before January 1, 2021, 26 percent, and

**(ii)** in the case of any property the construction of which begins after December 31, 2020, and before January 1, 2022, 22 percent.

**(B) Placed in service deadline.**--In the case of any property energy property described in paragraph (3)(A)(i) the construction of which begins before January 1, 2022, and which is not placed in service before January 1, 2024, the energy percentage determined under paragraph (2) shall be equal to 10 percent.

**(b) Certain progress expenditure rules made applicable.**--Rules similar to the rules of subsections (c)(4) and (d) of section 46 (as in effect on the day before the date of the enactment of the Revenue Reconciliation Act of 1990) shall apply for purposes of subsection (a).

**(c) Definitions.**--For purposes of this section--

**(1) Qualified fuel cell property.**--

**(A) In general.**--The term "qualified fuel cell property" means a fuel cell power plant which--

**(i)** has a nameplate capacity of at least 0.5 kilowatt of electricity using an electrochemical process, and

**(ii)** has an electricity-only generation efficiency greater than 30 percent.

**(B) Limitation.**--In the case of qualified fuel cell property placed in service during the taxable year, the credit otherwise determined under subsection (a) for such year with respect to such property shall not exceed an amount equal to $1,500 for each 0.5 kilowatt of capacity of such property.

**(C) Fuel cell power plant.**--The term "fuel cell power plant" means an integrated system comprised of a fuel cell stack assembly and associated balance of plant components which converts a fuel into electricity using electrochemical means.

**(D) Termination.**--The term "qualified fuel cell property" shall not include any property for any period after December 31, 2016.

**(2) Qualified microturbine property.**--

**(A) In general.**--The term "qualified microturbine property" means a stationary microturbine power plant which--

**(i)** has a nameplate capacity of less than 2,000 kilowatts, and

**(ii)** has an electricity-only generation efficiency of not less than 26 percent at International Standard Organization conditions.

**(B) Limitation.**--In the case of qualified microturbine property placed in service during the taxable year, the credit otherwise determined under subsection (a) for such year with respect to such property shall not exceed an amount equal [1] $200 for each kilowatt of capacity of such property.

**(C) Stationary microturbine power plant.**--The term "stationary microturbine power plant" means an integrated system comprised of a gas turbine engine, a combustor, a recuperator or regenerator, a generator or alternator, and associated balance of plant components which converts a fuel into electricity and thermal energy. Such term also includes all secondary components located between the existing infrastructure for fuel delivery and the existing infrastructure for power distribution, including equipment and controls for meeting relevant power standards, such as voltage, frequency, and power factors.

**(D) Termination.**--The term "qualified microturbine property" shall not include any property for any period after December 31, 2016.

**(3) Combined heat and power system property.**--

**(A) Combined heat and power system property.**--The term "combined heat and power system property" means property comprising a system--

**(i)** which uses the same energy source for the simultaneous or sequential generation of electrical power, mechanical shaft power, or both, in combination with the generation of steam or other forms of useful thermal energy (including heating and cooling applications),

**(ii)** which produces--

**(I)** at least 20 percent of its total useful energy in the form of thermal energy which is not used to produce electrical or mechanical power (or combination thereof), and

**(II)** at least 20 percent of its total useful energy in the form of electrical or mechanical power (or combination thereof),

**(iii)** the energy efficiency percentage of which exceeds 60 percent, and

**(iv)** which is placed in service before January 1, 2017.

**(B) Limitation.**--

**(i) In general.**--In the case of combined heat and power system property with an electrical capacity in excess of the applicable capacity placed in service during the taxable year, the credit under subsection (a)(1) (determined without regard to this paragraph) for such year shall be equal to the amount which bears the same ratio to such credit as the applicable capacity bears to the capacity of such property.

**(ii) Applicable capacity.**--For purposes of clause (i), the term "applicable capacity" means 15 megawatts or a mechanical energy capacity of more than 20,000 horsepower or an equivalent combination of electrical and mechanical energy capacities.

**(iii) Maximum capacity.**--The term "combined heat and power system property" shall not include any property comprising a system if such system has a capacity in excess of 50 megawatts or a mechanical energy capacity in excess of 67,000 horsepower or an equivalent combination of electrical and mechanical energy capacities.

**(C) Special rules.**--

**(i) Energy efficiency percentage.**--For purposes of this paragraph, the energy efficiency percentage of a system is the fraction--

**(I)** the numerator of which is the total useful electrical, thermal, and mechanical power produced by the system at normal operating rates, and expected to be consumed in its normal application, and

**(II)** the denominator of which is the lower heating value of the fuel sources for the system.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 33 of 651

**(ii) Determinations made on Btu basis.**--The energy efficiency percentage and the percentages under subparagraph (A)(ii) shall be determined on a Btu basis.

**(iii) Input and output property not included.**--The term "combined heat and power system property" does not include property used to transport the energy source to the facility or to distribute energy produced by the facility.

**(D) Systems using biomass.**--If a system is designed to use biomass (within the meaning of paragraphs (2) and (3) of section 45(c) without regard to the last sentence of paragraph (3)(A)) for at least 90 percent of the energy source--

**(i)** subparagraph (A)(iii) shall not apply, but

**(ii)** the amount of credit determined under subsection (a) with respect to such system shall not exceed the amount which bears the same ratio to such amount of credit (determined without regard to this subparagraph) as the energy efficiency percentage of such system bears to 60 percent.

**(4) Qualified small wind energy property.**--

**(A) In general.**--The term "qualified small wind energy property" means property which uses a qualifying small wind turbine to generate electricity.

**(B) Qualifying small wind turbine.**--The term "qualifying small wind turbine" means a wind turbine which has a nameplate capacity of not more than 100 kilowatts.

**(C) Termination.**--The term "qualified small wind energy property" shall not include any property for any period after December 31, 2016.

**(d) Coordination with Department of Treasury grants.**--In the case of any property with respect to which the Secretary makes a grant under section 1603 of the American Recovery and Reinvestment Tax Act of 2009--

**(1) Denial of production and investment credits.**--No credit shall be determined under this section or section 45 with respect to such property for the taxable year in which such grant is made or any subsequent taxable year.

**(2) Recapture of credits for progress expenditures made before grant.**--If a credit was determined under this section with respect to such property for any taxable year ending before such grant is made--

**(A)** the tax imposed under subtitle A on the taxpayer for the taxable year in which such grant is made shall be increased by so much of such credit as was allowed under section 38,

**(B)** the general business carryforwards under section 39 shall be adjusted so as to recapture the portion of such credit which was not so allowed, and

**(C)** the amount of such grant shall be determined without regard to any reduction in the basis of such property by reason of such credit.

**(3) Treatment of grants.**--Any such grant shall--

**(A)** not be includible in the gross income or alternative minimum taxable income of the taxpayer, but

**(B)** shall be taken into account in determining the basis of the property to which such grant relates, except that the basis of such property shall be reduced under section 50(c) in the same manner as a credit allowed under subsection (a).

## CREDIT(S)

(Added Pub.L. 87-834, § 2(b), Oct. 16, 1962, 76 Stat. 967; amended Pub.L. 88-272, Title II, § 203(a)(1), (3)(A), (b), (c), Feb. 26, 1964, 78 Stat. 33, 34; Pub.L. 89-800, § 1, Nov. 8, 1966, 80 Stat. 1508, 1513; Pub.L. 89-809, Title II, § 201(a), Nov. 13, 1966, 80 Stat. 1575; Pub.L. 90-26, §§ 1, 2(a), 3, June 13, 1967, 81 Stat. 57, 58; Pub.L. 91-172, Title I, § 121(d)(2)(A), Title IV, § 401(e) (2) to (4), Dec. 30, 1969, 83 Stat. 547, 603; Pub.L. 92-178, Title I, §§ 102(a)(2), 103, 104(a)(1), (b) to (f)(1), (g), 108(b), (c), Dec. 10, 1971, 85 Stat. 499 to 502, 507; Pub.L. 94-12, Title III, §§ 301(c)(1), 302(c)(3), Title VI, § 604(a), Mar. 29, 1975, 89 Stat. 38, 44, 65; Pub.L. 94-455, Title VIII, §§ 802(b)(6), 804(a), Title X, § 1051(h)(1), Title XIX, §§ 1901(a)(5), (b)(11)(A), 1906(b)(13)(A), Title XXI, § 2112(a)(1), Oct. 4, 1976, 90 Stat. 1583, 1591, 1647, 1764, 1795, 1834, 1905; Pub.L. 95-473, § 2(a)(2)(A), Oct. 17, 1978, 92 Stat. 1464; Pub.L. 95-600, Title I, § 141(b), Title III, §§ 312(c) (1) to (3), 314(a), (b), 315(a) to (c), Title VII, § 703(a)(3), (4), Nov. 6, 1978, 92 Stat. 2791, 2826 to 2829, 2939; Pub.L. 95-618, Title III, § 301(b), (d)(1), (2), Nov. 9, 1978, 92 Stat. 3195, 3199, 3200; Pub.L. 96-222, Title I, §§ 101(a)(7)(G), (H), (L)(i)(I) to (IV), (ii)(III) to (VI), (iii)(II), (III), (v)(II) to (V), (M)(ii), (iii), 103(a)(2)(A), (4)(B), 108(c)(6), Apr. 1, 1980, 94 Stat. 198 to 201, 208, 209, 228; Pub.L. 96-223, Title II, §§ 221(b), 222(a) to (e)(1), (f) to (i), 223(a)(1), (c)(1), Apr. 2, 1980, 94 Stat. 261 to 266; Pub.L. 96-451, Title III, § 302(a), Oct. 14, 1980, 94 Stat. 1991; Pub.L. 96-605, Title I, § 109(a), Title II, § 223(a), Dec. 28, 1980, 94 Stat. 3525, 3528; Pub.L. 97-34, Title II, §§ 211(a)(2), (c), (e)(3), (4), (h), 212(a)(3), (b), (c), (d)(2)(A), 213(a), 214(a), (b), Title III, § 332(b), Aug. 13, 1981, 95 Stat. 227 to 229, 235, 236, 239, 240, 296; Pub.L. 97-248, Title II, §§ 205(a)(1), (4), (5)(A), 209(c), Sept. 3, 1982, 96 Stat. 427, 429, 447; Pub.L. 97-354, §§ 3(d), 5(a)(7), (8), Oct. 19, 1982, 96 Stat. 1689, 1692; Pub.L. 97-362, Title I, § 104(a), Oct. 25, 1982, 96 Stat. 1729; Pub.L. 97-424, Title V, § 546(a), Jan. 6, 1983, 96 Stat. 2198; Pub.L. 97-448, Title I, § 102(e)(2)(A), (f)(2), (3), (6), Title II, § 202(c), Title III, § 306(a)(3), Jan. 12, 1983, 96 Stat. 2371, 2372, 2396, 2400; Pub.L. 96-223, Title II, § 223(a)(1), as amended Pub.L. 97-448, Title II, § 202(c), Jan. 12, 1983, 96 Stat. 2396; Pub.L. 98-369, Div. A, Title I, §§ 11, 31(b), (c), 111(e)(8), 113(a)(1), (b)(3), (4), 114(a), Title IV, §§ 431(c), 474(o)(10) to (18), Title VII, §§ 712(b), 721(x)(1), 735(c)(1), Title X, § 1043(a), July 18, 1984, 98 Stat. 503, 517, 518, 633, 635, 637, 638, 808, 836, 837, 946, 971, 981, 1044; Pub.L. 99-121, Title I, § 103(b)(5), Oct. 11, 1985, 99 Stat. 510; Pub.L. 99-514, Title II, § 251(b), (c), Title VII, § 701(e)(4)(C), Title VIII, § 803(b)(2)(B), Title XII, §§ 1272(d)(5), 1275(c)(5), Title XV, § 1511(c)(3), Title XVIII, §§ 1802(a)(4)(C), (5)(B), (9)(A), (B), 1809(d)(2), (e), 1847(b)(6), 1879(j)(1), Oct. 22, 1986, 100 Stat. 2184, 2186, 2343, 2355, 2594, 2599, 2745, 2788, 2789, 2821, 2856, 2908; Pub.L. 100-647, Title I, §§ 1002(a)(14), (16)(A), (20), (29), (30), 1013(a) (41), Nov. 10, 1988, 102 Stat. 3355 to 3357, 3544; Pub.L. 101-508, Title XI, §§ 11801(c)(6)(A), 11813(a), Nov. 5, 1990, 104 Stat. 1388-523, 1388-541; Pub.L. 102-227, Title I, § 106, Dec. 11, 1991, 105 Stat. 1687; Pub.L. 102-486, Title XIX, § 1916(a), Oct. 24, 1992, 106 Stat. 3024; Pub.L. 108-357, Title III, § 322(d)(2)(A), (B), Title VII, § 710(e), Oct. 22, 2004, 118 Stat. 1475, 1557; Pub.L. 109-58, Title XIII, §§ 1336(a) to (d), 1337(a) to (c), Aug. 8, 2005, 119 Stat. 1036, 1038; Pub.L. 109-135, Title IV, § 412(m), (n), Dec. 21, 2005, 119 Stat. 2638; Pub.L. 109-432, Div. A, Title II, § 207, Dec. 20, 2006, 120 Stat. 2945; Pub.L. 110-172, § 11(a)(8), (9), Dec. 29, 2007, 121 Stat. 2485; Pub.L. 110-343, Div. B, Title I, §§ 103(a), (c) to (e), 104(a) to (d), 105(a), Oct. 3, 2008, 122 Stat. 3811, 3813, 3814; Pub.L. 111-5, Div. B, Title I, §§ 1102(a), 1103(a), (b)(1), 1104, Feb. 17, 2009,

123 Stat. 319, 320, 321; Pub.L. 112-240, Title IV, § 407(b), (c)(1), Jan. 2, 2013, 126 Stat. 2341; Pub.L. 113-295, Div. A, Title I, § 155(b), Title II, § 209(d), Dec. 19, 2014, 128 Stat. 4021, 4028; Pub.L. 114-113, Div. P, Title III, §§ 302(a), (b), 303(a) to (c), Div. Q, Title I, § 187(b), Dec. 18, 2015, 129 Stat. 3038, 3039, 3074.)

Footnotes

1        So in original. Probably should be followed by "to".

26 U.S.C.A. § 48, 26 USCA § 48

Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle A. Income Taxes (Refs & Annos)
      Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
        Subchapter B. Computation of Taxable Income
          Part IX. Items Not Deductible (Refs & Annos)

26 U.S.C.A. § 263

§ 263. Capital expenditures

Effective: December 19, 2014
Currentness

**(a) General rule.**--No deduction shall be allowed for--

**(1)** Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. This paragraph shall not apply to--

**(A)** expenditures for the development of mines or deposits deductible under section 616,

**(B)** research and experimental expenditures deductible under section 174,

**(C)** soil and water conservation expenditures deductible under section 175,

**(D)** expenditures by farmers for fertilizer, etc., deductible under section 180,

**(E)** expenditures for removal of architectural and transportation barriers to the handicapped and elderly which the taxpayer elects to deduct under section 190,

**(F)** expenditures for tertiary injectants with respect to which a deduction is allowed under section 193; [1]

**(G)** expenditures for which a deduction is allowed under section 179; [1]

[**(H) Repealed.** Pub.L. 113-295, Div. A, Title II, § 221(a)(34)(D), Dec. 19, 2014, 128 Stat. 4042]

**(I)** expenditures for which a deduction is allowed under section 179B,

**(J)** expenditures for which a deduction is allowed under section 179C,

**(K)** expenditures for which a deduction is allowed under section 179D, or

**(L)** expenditures for which a deduction is allowed under section 179E.

**(2)** Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made.

**[(b) Repealed.** Pub.L. 101-508, Title XI, § 11801(a)(16), Nov. 5, 1990, 104 Stat. 1388-520]

**(c) Intangible drilling and development costs in the case of oil and gas wells and geothermal wells.**--Notwithstanding subsection (a), and except as provided in subsection (i), regulations shall be prescribed by the Secretary under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress. Such regulations shall also grant the option to deduct as expenses intangible drilling and development costs in the case of wells drilled for any geothermal deposit (as defined in section 613(e)(2)) to the same extent and in the same manner as such expenses are deductible in the case of oil and gas wells. This subsection shall not apply with respect to any costs to which any deduction is allowed under section 59(e) or 291.

**(d) Expenditures in connection with certain railroad rolling stock.**--In the case of expenditures in connection with the rehabilitation of a unit of railroad rolling stock (except a locomotive) used by a domestic common carrier by railroad which would, but for this subsection, be properly chargeable to capital account, such expenditures, if during any 12-month period they do not exceed an amount equal to 20 percent of the basis of such unit in the hands of the taxpayer, shall, at the election of the taxpayer, be treated (notwithstanding subsection (a)) as deductible repairs under section 162 or 212. An election under this subsection shall be made for any taxable year at such time and in such manner as the Secretary prescribes by regulations. An election may not be made under this subsection for any taxable year to which an election under subsection (e) applies to railroad rolling stock (other than locomotives).

**[(e) Repealed.** Pub.L. 97-34, Title II, § 201(c), Aug. 13, 1981, 95 Stat. 219]

**(f) Railroad ties.**--In the case of a domestic common carrier by rail (including a railroad switching or terminal company) which uses the retirement-replacement method of accounting for depreciation of its railroad track, expenditures for acquiring and installing replacement ties of any material (and fastenings related to such ties) shall be accorded the same tax accounting treatment as expenditures for replacement ties of wood (and fastenings related to such ties).

**(g) Certain interest and carrying costs in the case of straddles.--**

**(1) General rule.**--No deduction shall be allowed for interest and carrying charges properly allocable to personal property which is part of a straddle (as defined in section 1092(c)). Any amount not allowed as a deduction by reason of the preceding sentence shall be chargeable to the capital account with respect to the personal property to which such amount relates.

**(2) Interest and carrying charges defined.**--For purposes of paragraph (1), the term "interest and carrying charges" means the excess of--

  **(A)** the sum of--

    **(i)** interest on indebtedness incurred or continued to purchase or carry the personal property, and

    **(ii)** all other amounts (including charges to insure, store, or transport the personal property) paid or incurred to carry the personal property, over

  **(B)** the sum of--

    **(i)** the amount of interest (including original issue discount) includible in gross income for the taxable year with respect to the property described in subparagraph (A),

    **(ii)** any amount treated as ordinary income under section 1271(a)(3)(A), 1276, or 1281(a) with respect to such property for the taxable year,

    **(iii)** the excess of any dividends includible in gross income with respect to such property for the taxable year over the amount of any deduction allowable with respect to such dividends under section 243 or 245, and

    **(iv)** any amount which is a payment with respect to a security loan (within the meaning of section 512(a)(5)) includible in gross income with respect to such property for the taxable year.

    For purposes of subparagraph (A), the term "interest" includes any amount paid or incurred in connection with personal property used in a short sale.

**(3) Exception for hedging transactions.**--This subsection shall not apply in the case of any hedging transaction (as defined in section 1256(e)).

**(4) Application with other provisions.**--

  **(A) Subsection (c).**--In the case of any short sale, this subsection shall be applied after subsection (h).

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 39 of 651

**(B) Section 1277 or 1282.**--In the case of any obligation to which section 1277 or 1282 applies, this subsection shall be applied after section 1277 or 1282.

**(h) Payments in lieu of dividends in connection with short sales.**--

**(1) In general.**--If--

**(A)** a taxpayer makes any payment with respect to any stock used by such taxpayer in a short sale and such payment is in lieu of a dividend payment on such stock, and

**(B)** the closing of such short sale occurs on or before the 45th day after the date of such short sale,

then no deduction shall be allowed for such payment. The basis of the stock used to close the short sale shall be increased by the amount not allowed as a deduction by reason of the preceding sentence.

**(2) Longer period in case of extraordinary dividends.**--If the payment described in paragraph (1)(A) is in respect of an extraordinary dividend, paragraph (1)(B) shall be applied by substituting "the day 1 year after the date of such short sale" for "the 45th day after the date of such short sale".

**(3) Extraordinary dividend.**--For purposes of this subsection, the term "extraordinary dividend" has the meaning given to such term by section 1059(c); except that such section shall be applied by treating the amount realized by the taxpayer in the short sale as his adjusted basis in the stock.

**(4) Special rule where risk of loss diminished.**--The running of any period of time applicable under paragraph (1)(B) (as modified by paragraph (2)) shall be suspended during any period in which--

**(A)** the taxpayer holds, has an option to buy, or is under a contractual obligation to buy, substantially identical stock or securities, or

**(B)** under regulations prescribed by the Secretary, a taxpayer has diminished his risk of loss by holding 1 or more other positions with respect to substantially similar or related property.

**(5) Deduction allowable to extent of ordinary income from amounts paid by lending broker for use of collateral.**--

**(A) In general.**--Paragraph (1) shall apply only to the extent that the payments or distributions with respect to any short sale exceed the amount which--

**(i)** is treated as ordinary income by the taxpayer, and

    **(ii)** is received by the taxpayer as compensation for the use of any collateral with respect to any stock used in such short sale.

    **(B) Exception not to apply to extraordinary dividends.**--Subparagraph (A) shall not apply if one or more payments or distributions is in respect of an extraordinary dividend.

  **(6) Application of this subsection with subsection (g).**--In the case of any short sale, this subsection shall be applied before subsection (g).

**(i) Special rules for intangible drilling and development costs incurred outside the United States.**--In the case of intangible drilling and development costs paid or incurred with respect to an oil, gas, or geothermal well located outside the United States--

  **(1)** subsection (c) shall not apply, and

  **(2)** such costs shall--

    **(A)** at the election of the taxpayer, be included in adjusted basis for purposes of computing the amount of any deduction allowable under section 611 (determined without regard to section 613), or

    **(B)** if subparagraph (A) does not apply, be allowed as a deduction ratably over the 10-taxable year period beginning with the taxable year in which such costs were paid or incurred.

This subsection shall not apply to costs paid or incurred with respect to a nonproductive well.

**CREDIT(S)**

    (Aug. 16, 1954, c. 736, 68A Stat. 77; Sept. 14, 1960, Pub.L. 86-779, § 6(c), 74 Stat. 1001; Oct. 16, 1962, Pub.L. 87-834, § 21(b), 76 Stat. 1064; Sept. 2, 1964, Pub.L. 88-563, § 4, 78 Stat. 845; Oct. 9, 1965, Pub.L. 89-243, § 4(p)(1), (2), 79 Stat. 964; Dec. 30, 1969, Pub.L. 91-172, Title VII, § 706(a), 83 Stat. 674; Dec. 10, 1971, Pub.L. 92-178, Title I, § 109(b), (c), 85 Stat. 509; Oct. 4, 1976, Pub.L. 94-455, Title XVII, § 1701(a), Title XIX, §§ 1904(b)(10)(A)(i), 1906(b)(13)(A), Title XXI, § 2122(b)(2), 90 Stat. 1759, 1817, 1834, 1915; Nov. 9, 1978, Pub.L. 95-618, Title IV, § 402(a), 92 Stat. 3201; Apr. 2, 1980, Pub.L. 96-223, Title II, § 251(a)(2)(B), 94 Stat. 287; Aug. 13, 1981, Pub.L. 97-34, Title II, §§ 201(c), 202(d)(1), Title V, § 502, 95 Stat. 219, 221, 327; Sept. 3, 1982, Pub.L. 97-248, Title II, § 204(c)(1), 96 Stat. 426; Jan. 12, 1983, Pub.L. 97-448, Title I, § 105(b)(1), Title III, § 306(a)(9)(A), 96 Stat. 2385, 2403; July 18, 1984, Pub.L. 98-369, Div. A, Title I, §§ 56(a), 102(e)(7), (8), 98 Stat. 573, 624, 625; Oct. 22, 1986, Pub.L. 99-514, Title IV, §§ 402(b)(1), 411(b)(1), Title VII, § 701(e)(4)(D), Title XVIII, § 1808(b), 100 Stat. 2221, 2225, 2343, 2817; Nov. 10, 1988, Pub.L. 100-647, Title I, § 1007(g)(5), 102 Stat. 3435; Nov. 5, 1990, Pub.L. 101-508, Title XI, §§ 11801(a)(16), 11815(b)(3), 104 Stat. 1388-520, 1388-558; Aug. 5, 1997, Pub.L. 105-34, Title XVI, § 1604(a)(1), 111 Stat. 1097; Oct. 4, 2004, Pub.L. 108-311, Title IV, § 408(a)(10), 118 Stat. 1191; Oct. 22, 2004, Pub.L. 108-357, Title III, § 338(b)(1), 118 Stat. 1481; Aug. 8, 2005, Pub.L. 109-58, Title XIII, §§ 1323(b)(2), 1331(b)(4), 119 Stat. 1015, 1024; Dec. 20, 2006, Pub.L. 109-432, Div. A, Title IV, § 404(b)(1), 120 Stat. 2956; Pub.L. 113-295, Div. A, Title II, § 221(a)(34)(D), (41)(G), Dec. 19, 2014, 128 Stat. 4042, 4044.)

Notes of Decisions (320)

Footnotes

1       So in original. The semicolon probably should be a comma.

26 U.S.C.A. § 263, 26 USCA § 263

Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle A. Income Taxes (Refs & Annos)
      Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
        Subchapter O. Gain or Loss on Disposition of Property
          Part II. Basis Rules of General Application (Refs & Annos)

26 U.S.C.A. § 1012

§ 1012. Basis of property--cost

Currentness

**(a) In general.**--The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses).

**(b) Special rule for apportioned real estate taxes.**--The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.

**(c) Determinations by account.**--

**(1) In general.**--In the case of the sale, exchange, or other disposition of a specified security on or after the applicable date, the conventions prescribed by regulations under this section shall be applied on an account by account basis.

**(2) Application to certain regulated investment companies.**--

**(A) In general.**--Except as provided in subparagraph (B), any stock for which an average basis method is permissible under this section which is acquired before January 1, 2012, shall be treated as a separate account from any such stock acquired on or after such date.

**(B) Election for treatment as single account.**--If a regulated investment company described in subparagraph (A) elects to have this subparagraph apply with respect to one or more of its stockholders--

**(i)** subparagraph (A) shall not apply with respect to any stock in such regulated investment company held by such stockholders, and

**(ii)** all stock in such regulated investment company which is held by such stockholders shall be treated as covered securities described in section 6045(g)(3) without regard to the date of the acquisition of such stock.

A rule similar to the rule of the preceding sentence shall apply with respect to a broker holding such stock as a nominee.

Case 1:13-cv-00402-RTH Document 111-1 Filed 03/31/16 Page 43 of 651

**(3) Definitions.**--For purposes of this section, the terms "specified security" and "applicable date" shall have the meaning given such terms in section 6045(g).

**(d) Average basis for stock acquired pursuant to a dividend reinvestment plan.**--

**(1) In general.**--In the case of any stock acquired after December 31, 2011, in connection with a dividend reinvestment plan, the basis of such stock while held as part of such plan shall be determined using one of the methods which may be used for determining the basis of stock in a regulated investment company.

**(2) Treatment after transfer.**--In the case of the transfer to another account of stock to which paragraph (1) applies, such stock shall have a cost basis in such other account equal to its basis in the dividend reinvestment plan immediately before such transfer (properly adjusted for any fees or other charges taken into account in connection with such transfer).

**(3) Separate accounts; election for treatment as single account.**--

**(A) In general.**--Rules similar to the rules of subsection (c)(2) shall apply for purposes of this subsection.

**(B) Average basis method.**--Notwithstanding paragraph (1), in the case of an election under rules similar to the rules of subsection (c)(2)(B) with respect to stock held in connection with a dividend reinvestment plan, the average basis method is permissible with respect to all such stock without regard to the date of the acquisition of such stock.

**(4) Dividend reinvestment plan.**--For purposes of this subsection--

**(A) In general.**--The term "dividend reinvestment plan" means any arrangement under which dividends on any stock are reinvested in stock identical to the stock with respect to which the dividends are paid.

**(B) Initial stock acquisition treated as acquired in connection with plan.**--Stock shall be treated as acquired in connection with a dividend reinvestment plan if such stock is acquired pursuant to such plan or if the dividends paid on such stock are subject to such plan.

**CREDIT(S)**

(Aug. 16, 1954, c. 736, 68A Stat. 296; Oct. 3, 2008, Pub.L. 110-343, Div. B, Title IV, § 403(b), 122 Stat. 3857; Pub.L. 113-295, Div. A, Title II, §§ 210(f)(1) to (3), 220(n), Dec. 19, 2014, 128 Stat. 4031, 4036.)

26 U.S.C.A. § 1012, 26 USCA § 1012
Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 15. Commerce and Trade
        Chapter 16B. Federal Energy Administration (Refs & Annos)
            Subchapter II. Office of Energy Information and Analysis (Refs & Annos)

15 U.S.C.A. § 790a

§ 790a. National Energy Information System; information required to be maintained

Currentness

**(a)** It shall be the duty of the Director to establish a National Energy Information System (hereinafter referred to in this chapter as the "System"), which shall be operated and maintained by the Office. The System shall contain such information as is required to provide a description of and facilitate analysis of energy supply and consumption within and affecting the United States on the basis of such geographic areas and economic sectors as may be appropriate to meet adequately the needs of--

**(1)** the Federal Energy Administration in carrying out its lawful functions;

**(2)** the Congress;

**(3)** other officers and employees of the United States in whom have been vested, or to whom have been delegated energy-related policy decisionmaking responsibilities; and

**(4)** the States to the extent required by the Natural Gas Act [15 U.S.C.A. § 717 et seq.] and the Federal Power Act [16 U.S.C.A. § 791a et seq.].

**(b)** At a minimum, the System shall contain such energy information as is necessary to carry out the Administration's statistical and forecasting activities, and shall include, at the earliest date and to the maximum extent practical subject to the resources available and the Director's ordering of those resources to meet the responsibilities of his Office, such energy information as is required to define and permit analysis of--

**(1)** the institutional structure of the energy supply system including patterns of ownership and control of mineral fuel and nonmineral energy resources and the production, distribution, and marketing of mineral fuels and electricity;

**(2)** the consumption of mineral fuels, nonmineral energy resources, and electricity by such classes, sectors, and regions as may be appropriate for the purposes of this chapter;

**(3)** the sensitivity of energy resource reserves, exploration, development, production, transportation, and consumption to economic factors, environmental constraints, technological improvements, and substitutability of alternate energy sources;

**(4)** the comparability of energy information and statistics that are supplied by different sources;

**(5)** industrial, labor, and regional impacts of changes in patterns of energy supply and consumption;

**(6)** international aspects, economic and otherwise, of the evolving energy situation; and

**(7)** long-term relationships between energy supply and consumption in the United States and world communities.

## CREDIT(S)

(Pub.L. 93-275, § 52, as added Pub.L. 94-385, Title I, § 142, Aug. 14, 1976, 90 Stat. 1135; amended Pub.L. 95-91, Title VII, § 709(a)(3), Aug. 4, 1977, 91 Stat. 608.)

15 U.S.C.A. § 790a, 15 USCA § 790a
Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

| United States Code Annotated |
| --- |
|   Title 15. Commerce and Trade |
|     Chapter 16B. Federal Energy Administration (Refs & Annos) |
|       Subchapter II. Office of Energy Information and Analysis (Refs & Annos) |

15 U.S.C.A. § 790f

§ 790f. Reports by Director

Currentness

**(a) Periodic and special reports by Director to Congress and public; contents**

The Director shall make periodic reports and may make special reports to the Congress and the public, including but not limited to--

**(1)** such reports as the Director determines are necessary to provide a comprehensive picture of the quarterly, monthly, and, as appropriate, weekly supply and consumption of the various nonmineral energy resources, mineral fuels, and electricity in the United States; the information reported may be organized by company, by States, by regions, or by such other producing and consuming sectors, or combinations thereof, and shall be accompanied by an appropriate discussion of the evolution of the energy supply and consumption situation and such national and international trends and their effects as the Director may find to be significant; and

**(2)** an annual report which includes, but is not limited to, a description of the activities of the Office and the National Energy Information System during the preceding year; a summary of all special reports published during the preceding year; a summary of statistical information collected during the preceding year; short-, medium-, and long-term energy consumption and supply trends and forecasts under various assumptions; and, to the maximum extent practicable, a summary or schedule of the amounts of mineral fuel resources, nonmineral energy resources, and mineral fuels that can be brought to market at various prices and technologies and their relationship to forecasted demands.

**(b) Duty of Director to insure adequate documentation of forecasts and reports; periodic audit and validation of analytical methodologies; availability of information to public**

**(1)** The Director, on behalf of the Administrator, shall insure that adequate documentation for all statistical and forecast reports prepared by the Director is made available to the public at the time of publication of such reports. The Director shall periodically audit and validate analytical methodologies employed in the preparation of periodic statistical and forecast reports.

**(2)** The Director shall, on a regular basis, make available to the public information which contains validation and audits of periodic statistical and forecast reports.

**(c) Approval prior to publication of forecasts and reports**

Prior to publication, the Director may not be required to obtain the approval of any other officer or employee of the United States with respect to the substance of any statistical or forecasting technical reports which he has prepared in accordance with law.

**CREDIT(S)**

(Pub.L. 93-275, § 57, as added Pub.L. 94-385, Title I, § 142, Aug. 14, 1976, 90 Stat. 1139.)

15 U.S.C.A. § 790f, 15 USCA § 790f
Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**                                         © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

> United States Code Annotated
>   Title 42. The Public Health and Welfare
>     Chapter 84. Department of Energy (Refs & Annos)
>       Subchapter II. Establishment of Department

42 U.S.C.A. § 7135

§ 7135. Energy Information Administration

Effective: January 17, 2014

Currentness

(a) Establishment; appointment of Administrator; compensation; qualifications; duties

**(1)** There shall be within the Department an Energy Information Administration to be headed by an Administrator who shall be appointed by the President, by and with the advice and consent of the Senate, and who shall be compensated at the rate provided for in level IV of the Executive Schedule under section 5315 of Title 5. The Administrator shall be a person who, by reason of professional background and experience, is specially qualified to manage an energy information system.

**(2)** The Administrator shall be responsible for carrying out a central, comprehensive, and unified energy data and information program which will collect, evaluate, assemble, analyze, and disseminate data and information which is relevant to energy resource reserves, energy production, demand, and technology, and related economic and statistical information, or which is relevant to the adequacy of energy resources to meet demands in the near and longer term future for the Nation's economic and social needs.

(b) Delegation of functions

The Secretary shall delegate to the Administrator (which delegation may be on a nonexclusive basis as the Secretary may determine may be necessary to assure the faithful execution of his authorities and responsibilities under law) the functions vested in him by law relating to gathering, analysis, and dissemination of energy information (as defined in section 796 of Title 15) and the Administrator may act in the name of the Secretary for the purpose of obtaining enforcement of such delegated functions.

(c) Functions of Director of Office of Energy Information and Analysis

In addition to, and not in limitation of the functions delegated to the Administrator pursuant to other subsections of this section, there shall be vested in the Administrator, and he shall perform, the functions assigned to the Director of the Office of Energy Information and Analysis under part B of the Federal Energy Administration Act of 1974 [15 U.S.C.A. § 790 et seq.], and the provisions of sections 53(d) and 59 thereof [15 U.S.C.A. §§ 790b(d), 790h] shall be applicable to the Administrator in the performance of any function under this chapter.

(d) Collection or analysis of information and preparation of reports without approval

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 49 of 651

The Administrator shall not be required to obtain the approval of any other officer or employee of the Department in connection with the collection or analysis of any information; nor shall the Administrator be required, prior to publication, to obtain the approval of any other officer or employee of the United States with respect to the substance of any statistical or forecasting technical reports which he has prepared in accordance with law.

(e) Annual audit

The Energy Information Administration shall be subject to an annual professional audit review of performance as described in section 55 of part B of the Federal Energy Administration Act of 1974.

(f) Furnishing information or analysis to any other administration, commission, or office within Department

The Administrator shall, upon request, promptly provide any information or analysis in his possession pursuant to this section to any other administration, commission, or office within the Department which such administration, commission, or office determines relates to the functions of such administration, commission, or office.

(g) Availability of information to public

Information collected by the Energy Information Administration shall be cataloged and, upon request, any such information shall be promptly made available to the public in a form and manner easily adaptable for public use, except that this subsection shall not require disclosure of matters exempted from mandatory disclosure by section 552(b) of Title 5. The provisions of section 796(d) of Title 15, and section 5916 of this title, shall continue to apply to any information obtained by the Administrator under such provisions.

(h) Identification and designation of "major energy producing companies"; format for financial report; accounting practices; filing of financial report; annual report of Department; definitions; confidentiality

(1)(A) In addition to the acquisition, collection, analysis, and dissemination of energy information pursuant to this section, the Administrator shall identify and designate "major energy-producing companies" which alone or with their affiliates are involved in one or more lines of commerce in the energy industry so that the energy information collected from such major energy-producing companies shall provide a statistically accurate profile of each line of commerce in the energy industry in the United States.

(B) In fulfilling the requirements of this subsection the Administrator shall--

(i) utilize, to the maximum extent practicable, consistent with the faithful execution of his responsibilities under this chapter, reliable statistical sampling techniques; and

(ii) otherwise give priority to the minimization of the reporting of energy information by small business.

(2) The Administrator shall develop and make effective for use during the second full calendar year following August 4, 1977, the format for an energy-producing company financial report. Such report shall be designed to allow comparison on a

uniform and standardized basis among energy-producing companies and shall permit for the energy-related activities of such companies--

> **(A)** an evaluation of company revenues, profits, cash flow, and investments in total, for the energy-related lines of commerce in which such company is engaged and for all significant energy-related functions within such company;

> **(B)** an analysis of the competitive structure of sectors and functional groupings within the energy industry;

> **(C)** the segregation of energy information, including financial information, describing company operations by energy source and geographic area;

> **(D)** the determination of costs associated with exploration, development, production, processing, transportation, and marketing and other significant energy-related functions within such company; and

> **(E)** such other analyses or evaluations as the Administrator finds is necessary to achieve the purposes of this chapter.

**(3)** The Administrator shall consult with the Chairman of the Securities and Exchange Commission with respect to the development of accounting practices required by the Energy Policy and Conservation Act [42 U.S.C.A. § 6201 et seq.] to be followed by persons engaged in whole or in part in the production of crude oil and natural gas and shall endeavor to assure that the energy-producing company financial report described in paragraph (2) of this subsection, to the extent practicable and consistent with the purposes and provisions of this chapter, is consistent with such accounting practices where applicable.

**(4)** The Administrator shall require each major energy-producing company to file with the Administrator an energy-producing company financial report on at least an annual basis and may request energy information described in such report on a quarterly basis if he determines that such quarterly report of information will substantially assist in achieving the purposes of this chapter.

**(5)** A summary of information gathered pursuant to this section, accompanied by such analysis as the Administrator deems appropriate, shall be included in the annual report of the Department required by subsection (a) [1] of section 7267 of this title.

**(6)** As used in this subsection the term--

> **(A)** "energy-producing company" means a person engaged in:

>> **(i)** ownership or control of mineral fuel resources or nonmineral energy resources;

>> **(ii)** exploration for, or development of, mineral fuel resources;

>> **(iii)** extraction of mineral fuel or nonmineral energy resources;

**(iv)** refining, milling, or otherwise processing mineral fuels or nonmineral energy resources;

**(v)** storage of mineral fuels or nonmineral energy resources;

**(vi)** the generation, transmission, or storage of electrical energy;

**(vii)** transportation of mineral fuels or nonmineral energy resources by any means whatever; or

**(viii)** wholesale or retail distribution of mineral fuels, nonmineral energy resources or electrical energy;

**(B)** "energy industry" means all energy-producing companies; and

**(C)** "person" has the meaning as set forth in section 796 of Title 15.

**(7)** The provisions of section 1905 of Title 18 shall apply in accordance with its terms to any information obtained by the Administration pursuant to this subsection.

(i) Manufacturers energy consumption survey

**(1)** The Administrator shall conduct and publish the results of a survey of energy consumption in the manufacturing industries in the United States at least once every four years and in a manner designed to protect the confidentiality of individual responses. In conducting the survey, the Administrator shall collect information, including--

**(A)** quantity of fuels consumed;

**(B)** energy expenditures;

**(C)** fuel switching capabilities; and

**(D)** use of nonpurchased sources of energy, such as solar, wind, biomass, geothermal, waste by-products, and cogeneration.

**(2)** This subsection does not affect the authority of the Administrator to collect data under section 52 of the Federal Energy Administration Act of 1974 (15 U.S.C. 790a).

(j) Collection and publication of survey results

**(1)** The Administrator shall annually collect and publish the results of a survey of electricity production from domestic renewable energy resources, including production in kilowatt hours, total installed capacity, capacity factor, and any other measure of production efficiency. Such results shall distinguish between various renewable energy resources.

**(2)** In carrying out this subsection, the Administrator shall--

**(A)** utilize, to the maximum extent practicable and consistent with the faithful execution of his responsibilities under this chapter, reliable statistical sampling techniques; and

**(B)** otherwise take into account the reporting burdens of energy information by small businesses.

**(3)** As used in this subsection, the term "renewable energy resources" includes energy derived from solar thermal, geothermal, biomass, wind, and photovoltaic resources.

(k) Survey procedure

Pursuant to section 52(a) of the Federal Energy Administration Act of 1974 (15 U.S.C. 790a(a)), the Administrator shall--

**(1)** conduct surveys of residential and commercial energy use at least once every four years, and make such information available to the public;

**(2)** when surveying electric utilities, collect information on demand-side management programs conducted by such utilities, including information regarding the types of demand-side management programs being operated, the quantity of measures installed, expenditures on demand-side management programs, estimates of energy savings resulting from such programs, and whether the savings estimates were verified; and

**(3)** in carrying out this subsection, take into account reporting burdens and the protection of proprietary information as required by law.

(l) Data collection

In order to improve the ability to evaluate the effectiveness of the Nation's energy efficiency policies and programs, the Administrator shall, in carrying out the data collection provisions of subsections (i) and (k) of this section, consider--

**(1)** expanding the survey instruments to include questions regarding participation in Government and utility conservation programs;

**(2)** expanding fuel-use surveys in order to provide greater detail on energy use by user subgroups; and

(3) expanding the scope of data collection on energy efficiency and load-management programs, including the effects of building construction practices such as those designed to obtain peak load shifting.

(m) Renewable fuels survey

(1) In order to improve the ability to evaluate the effectiveness of the Nation's renewable fuels mandate, the Administrator shall conduct and publish the results of a survey of renewable fuels demand in the motor vehicle fuels market in the United States monthly, and in a manner designed to protect the confidentiality of individual responses. In conducting the survey, the Administrator shall collect information both on a national and regional basis, including each of the following:

(A) The quantity of renewable fuels produced.

(B) The quantity of renewable fuels blended.

(C) The quantity of renewable fuels imported.

(D) The quantity of renewable fuels demanded.

(E) Market price data.

(F) Such other analyses or evaluations as the Administrator finds are necessary to achieve the purposes of this section.

(2) The Administrator shall also collect or estimate information both on a national and regional basis, pursuant to subparagraphs (A) through (F) of paragraph (1), for the 5 years prior to implementation of this subsection.

(3) This subsection does not affect the authority of the Administrator to collect data under section 52 of the Federal Energy Administration Act of 1974 (15 U.S.C. 790a).

**CREDIT(S)**

(Pub.L. 95-91, Title II, § 205, Aug. 4, 1977, 91 Stat. 572; Pub.L. 99-509, Title III, § 3101(a), Oct. 21, 1986, 100 Stat. 1888; Pub.L. 102-486, Title I, § 171, Oct. 24, 1992, 106 Stat. 2864; Pub.L. 109-58, Title XV, § 1508, Aug. 8, 2005, 119 Stat. 1083; Pub.L. 113-76, Div. D, Title III, § 315, Jan. 17, 2014, 128 Stat. 177.)

Footnotes

1        So in original. Section 7267 of this title was enacted without a subsec. (a).

42 U.S.C.A. § 7135, 42 USCA § 7135

Current through P.L. 114-115 (excluding 114-94 and 114-95) approved 12-28-2015

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.     **0049**  6

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Computation of Taxable Income
              Items Not Deductible

26 C.F.R. § 1.263A–1, Treas. Reg. § 1.263A–1

§ 1.263A–1 Uniform capitalization of costs.

Effective: July 21, 2014
Currentness

**(a) Introduction—(1) In general.** The regulations under §§ 1.263A–1 through 1.263A–6 provide guidance to taxpayers that are required to capitalize certain costs under section 263A. These regulations generally apply to all costs required to be capitalized under section 263A except for interest that must be capitalized under section 263A(f) and the regulations thereunder. Statutory or regulatory exceptions may provide that section 263A does not apply to certain activities or costs; however, those activities or costs may nevertheless be subject to capitalization requirements under other provisions of the Internal Revenue Code and regulations.

**(2) Effective dates. (i)** In general, this section and §§ 1.263A–2 and 1.263A–3 apply to costs incurred in taxable years beginning after December 31, 1993. In the case of property that is inventory in the hands of the taxpayer, however, these sections are effective for taxable years beginning after December 31, 1993. Changes in methods of accounting necessary as a result of the rules in this section and §§ 1.263A–2 and 1.263A–3 must be made under terms and conditions prescribed by the Commissioner. Under these terms and conditions, the principles of § 1.263A–7 must be applied in revaluing inventory property.

**(ii)** For taxable years beginning before January 1, 1994, taxpayers must take reasonable positions on their federal income tax returns when applying section 263A. For purposes of this paragraph (a)(2)(iii), a reasonable position is a position consistent with the temporary regulations, revenue rulings, revenue procedures, notices, and announcements concerning section 263A applicable in taxable years beginning before January 1, 1994. See § 601.601(d)(2)(ii)(b) of this chapter.

**(3) General scope—(i) Property to which section 263A applies.** Taxpayers subject to section 263A must capitalize all direct costs and certain indirect costs properly allocable to—

(A) Real property and tangible personal property produced by the taxpayer; and

(B) Real property and personal property described in section 1221(1), which is acquired by the taxpayer for resale.

**(ii) Property produced.** Taxpayers that produce real property and tangible personal property (producers) must capitalize all the direct costs of producing the property and the property's properly allocable share of indirect costs (described in

paragraphs (e)(2)(i) and (3) of this section), regardless of whether the property is sold or used in the taxpayer's trade or business. See § 1.263A–2 for rules relating to producers.

**(iii) Property acquired for resale.** Retailers, wholesalers, and other taxpayers that acquire property described in section 1221(1) for resale (resellers) must capitalize the direct costs of acquiring the property and the property's properly allocable share of indirect costs (described in paragraphs (e)(2)(ii) and (3) of this section). See § 1.263A–3 for rules relating to resellers. See also section 263A(b)(2)(B), which excepts from section 263A personal property acquired for resale by a small reseller.

**(iv) Inventories valued at market.** Section 263A does not apply to inventories valued at market under either the market method or the lower of cost or market method if the market valuation used by the taxpayer generally equals the property's fair market value. For purposes of this paragraph (a)(3)(iv), the term fair market value means the price at which the taxpayer sells its inventory to its customers (e.g., as in the market value definition provided in § 1.471–4(b)) less, if applicable, the direct cost of disposing of the inventory. However, section 263A does apply in determining the market value of any inventory for which market is determined with reference to replacement cost or reproduction cost. See §§ 1.471–4 and 1.471–5.

**(v) Property produced in a farming business.** Section 263A generally requires taxpayers engaged in a farming business to capitalize certain costs. See sections 263A(d) and 263A(e) and § 1.263A–4 for rules relating to taxpayers engaged in a farming business.

**(vi) Creative property.** Section 263A generally requires taxpayers engaged in the production and resale of creative property to capitalize certain costs.

**(vii) Property produced or property acquired for resale by foreign persons.** Section 263A generally applies to foreign persons.

**(b) Exceptions—(1) Small resellers.** See section 263A(b)(2)(B) for the $10,000,000 gross receipts exception for small resellers of personal property. See § 1.263A–3(b) for rules relating to this exception. See also the exception for small resellers with de minimis production activities in § 1.263A–3(a)(2)(ii) and the exception for small resellers that have property produced under contract in § 1.263A–3(a)(3).

**(2) Long-term contracts.** Except for certain home construction contracts described in section 460(e)(1), section 263A does not apply to any property produced by the taxpayer pursuant to a long-term contract as defined in section 460(f), regardless of whether the taxpayer uses an inventory method to account for such production.

**(3) Costs incurred in certain farming businesses.** See section 263A(d) for an exception for costs paid or incurred in certain farming businesses. See § 1.263A–4 for specific rules relating to taxpayers engaged in the trade or business of farming.

**(4) Costs incurred in raising, harvesting, or growing timber.** See section 263A(c)(5) for an exception for costs paid or incurred in raising, harvesting, or growing timber and certain ornamental trees. See § 1.263A–4, however, for rules relating to taxpayers producing certain trees to which section 263A applies.

**(5) Qualified creative expenses.** See section 263A(h) for an exception for qualified creative expenses paid or incurred by certain free-lance authors, photographers, and artists.

**(6) Certain not-for-profit activities.** See section 263A(c)(1) for an exception for property produced by a taxpayer for use by the taxpayer other than in a trade or business or an activity conducted for profit. This exception does not apply, however, to property produced by an exempt organization in connection with its unrelated trade or business activities.

**(7) Intangible drilling and development costs.** See section 263A(c)(3) for an exception for intangible drilling and development costs. Additionally, section 263A does not apply to any amount allowable as a deduction under section 59(e) with respect to qualified expenditures under sections 263(c), 616(a), or 617(a).

**(8) Natural gas acquired for resale.** Under this paragraph (b)(8), section 263A does not apply to any costs incurred by a taxpayer relating to natural gas acquired for resale to the extent such costs would otherwise be allocable to cushion gas.

**(i) Cushion gas.** Cushion gas is the portion of gas stored in an underground storage facility or reservoir that is required to maintain the level of pressure necessary for operation of the facility. However, section 263A applies to costs incurred by a taxpayer relating to natural gas acquired for resale to the extent such costs are properly allocable to emergency gas.

**(ii) Emergency gas.** Emergency gas is natural gas stored in an underground storage facility or reservoir for use during periods of unusually heavy customer demand.

**(9) Research and experimental expenditures.** See section 263A(c)(2) for an exception for any research and experimental expenditure allowable as a deduction under section 174 or the regulations thereunder. Additionally, section 263A does not apply to any amount allowable as a deduction under section 59(e) with respect to qualified expenditures under section 174.

**(10) Certain property that is substantially constructed.** Section 263A does not apply to any property produced by a taxpayer for use in its trade or business if substantial construction occurred before March 1, 1986.

**(i)** For purposes of this section, substantial construction is deemed to have occurred if the lesser of—

    (A) 10 percent of the total estimated costs of construction; or

    (B) The greater of $10 million or 2 percent of the total estimated costs of construction, was incurred before March 1, 1986.

**(ii)** For purposes of the provision in paragraph (b)(10)(i) of this section, the total estimated costs of construction shall be determined by reference to a reasonable estimate, on or before March 1, 1986, of such amount. Assume, for example, that on March 1, 1986, the estimated costs of constructing a facility were $150 million. Assume that before March 1, 1986, $12 million of construction costs had been incurred. Based on the above facts, substantial construction would be deemed to have occurred before March 1, 1986, because $12 million (the costs of construction incurred before such date) is greater

than $10 million (the lesser of $15 million; or the greater of $10 million or $3 million). For purposes of this provision, construction costs are defined as those costs incurred after construction has commenced at the site of the property being constructed (unless the property will not be located on land and, therefore, the initial construction of the property must begin at a location other than the intended site). For example, in the case of a building, construction commences when work begins on the building, such as the excavation of the site, the pouring of pads for the building, or the driving of foundation pilings into the ground. Preliminary activities such as project engineering and architectural design do not constitute the commencement of construction, nor are such costs considered construction costs, for purposes of this paragraph (b)(10).

**(11) Certain property provided incident to services—(i) In general.** Under this paragraph (b)(11), section 263A does not apply to property that is provided to a client (or customer) incident to the provision of services by the taxpayer if the property provided to the client is—

(A) De minimis in amount; and

(B) Not inventory in the hands of the service provider.

**(ii) Definition of services.** For purposes of this paragraph (b)(11), services is defined with reference to its ordinary and accepted meaning under federal income tax principles. In determining whether a taxpayer is a bona-fide service provider under this paragraph (b)(11), the nature of the taxpayer's trade or business and the facts and circumstances surrounding the taxpayer's trade or business activities must be considered. Examples of taxpayers qualifying as service providers under this paragraph include taxpayers performing services in the fields of health, law, engineering, architecture, accounting, actuarial science, performing arts, or consulting.

**(iii) De minimis property provided incident to services.** In determining whether property provided to a client by a service provider is de minimis in amount, all facts and circumstances, such as the nature of the taxpayer's trade or business and the volume of its service activities in the trade or business, must be considered. A significant factor in making this determination is the relationship between the acquisition or direct materials costs of the property that is provided to clients and the price that the taxpayer charges its clients for its services and the property. For purposes of this paragraph (b)(11), if the acquisition or direct materials cost of the property provided to a client incident to the services is less than or equal to five percent of the price charged to the client for the services and property, the property is de minimis. If the acquisition or direct materials cost of the property exceeds five percent of the price charged for the services and property, the property may be de minimis if additional facts and circumstances so indicate.

**(12) De minimis rule for certain producers with total indirect costs of $200,000 or less.** See § 1.263A–2(b)(3)(iv) for a de minimis rule that treats producers with total indirect costs of $200,000 or less as having no additional section 263A costs (as defined in paragraph (d)(3) of this section) for purposes of the simplified production method.

**(13) Exception for the origination of loans.** For purposes of section 263A(b)(2)(A), the origination of loans is not considered the acquisition of intangible property for resale. (But section 263A(b)(2)(A) does include the acquisition by a taxpayer of pre-existing loans from other persons for resale.)

**(c) General operation of section 263A—(1) Allocations.** Under section 263A, taxpayers must capitalize their direct costs and a properly allocable share of their indirect costs to property produced or property acquired for resale. In order to determine these

capitalizable costs, taxpayers must allocate or apportion costs to various activities, including production or resale activities. After section 263A costs are allocated to the appropriate production or resale activities, these costs are generally allocated to the items of property produced or property acquired for resale during the taxable year and capitalized to the items that remain on hand at the end of the taxable year. See however, the simplified production method and the simplified resale method in §§ 1.263A–2(b) and 1.263A–3(d).

**(2) Otherwise deductible. (i)** Any cost which (but for section 263A and the regulations thereunder) may not be taken into account in computing taxable income for any taxable year is not treated as a cost properly allocable to property produced or acquired for resale under section 263A and the regulations thereunder. Thus, for example, if a business meal deduction is limited by section 274(n) to 80 percent of the cost of the meal, the amount properly allocable to property produced or acquired for resale under section 263A is also limited to 80 percent of the cost of the meal.

**(ii)** The amount of any cost required to be capitalized under section 263A may not be included in inventory or charged to capital accounts or basis any earlier than the taxable year during which the amount is incurred within the meaning of § 1.446–1(c)(1)(ii).

**(3) Capitalize.** Capitalize means, in the case of property that is inventory in the hands of a taxpayer, to include in inventory costs and, in the case of other property, to charge to a capital account or basis.

**(4) Recovery of capitalized costs.** Costs that are capitalized under section 263A are recovered through depreciation, amortization, cost of goods sold, or by an adjustment to basis at the time the property is used, sold, placed in service, or otherwise disposed of by the taxpayer. Cost recovery is determined by the applicable Internal Revenue Code and regulation provisions relating to use, sale, or disposition of property.

**(5) Costs allocable to property sold.** A cost that is allocated under this section, § 1.263A–2, or § 1.263A–3 entirely to property sold must be included in cost of goods sold and may not be included in determining the cost of goods on hand at the end of the taxable year.

**(d) Definitions—(1) Self-constructed assets.** Self-constructed assets are assets produced by a taxpayer for use by the taxpayer in its trade or business. Self-constructed assets are subject to section 263A.

**(2) Section 471 costs—(i) In general.** Except as otherwise provided in paragraphs (d)(2)(ii) and (iii) of this section, for purposes of the regulations under section 263A, a taxpayer's section 471 costs are the costs, other than interest, capitalized under its method of accounting immediately prior to the effective date of section 263A. Thus, although section 471 applies only to inventories, section 471 costs include any non-inventory costs, other than interest, capitalized or included in acquisition or production costs under the taxpayer's method of accounting immediately prior to the effective date of section 263A.

**(ii) New taxpayers.** In the case of a new taxpayer, section 471 costs are those acquisition or production costs, other than interest, that would have been required to be capitalized by the taxpayer if the taxpayer had been in existence immediately prior to the effective date of section 263A.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 59 of 651

**(iii) Method changes.** If a taxpayer included a cost described in § 1.471–11(c)(2)(iii) in its inventoriable costs immediately prior to the effective date of section 263A, that cost is included in the taxpayer's section 471 costs under paragraph (d)(2)(i) of this section. Except as provided in the following sentence, a change in the financial reporting practices of a taxpayer for costs described in § 1.471–11(c)(2)(iii) subsequent to the effective date of section 263A does not affect the classification of these costs as section 471 costs. A taxpayer may change its established methods of accounting used in determining section 471 costs only with the consent of the Commissioner as required under section 446(e) and the regulations thereunder.

**(3) Additional section 263A costs.** Additional section 263A costs are defined as the costs, other than interest, that were not capitalized under the taxpayer's method of accounting immediately prior to the effective date of section 263A (adjusted as appropriate for any changes in methods of accounting for section 471 costs under paragraph (d)(2)(iii) of this section), but that are required to be capitalized under section 263A. For new taxpayers, additional section 263A costs are defined as the costs, other than interest, that the taxpayer must capitalize under section 263A, but which the taxpayer would not have been required to capitalize if the taxpayer had been in existence prior to the effective date of section 263A.

**(4) Section 263A costs.** Section 263A costs are defined as the costs that a taxpayer must capitalize under section 263A. Thus, section 263A costs are the sum of a taxpayer's section 471 costs, its additional section 263A costs, and interest capitalizable under section 263A(f).

**(e) Types of costs subject to capitalization—(1) In general.** Taxpayers subject to section 263A must capitalize all direct costs and certain indirect costs properly allocable to property produced or property acquired for resale. This paragraph (e) describes the types of costs subject to section 263A.

**(2) Direct costs—(i) Producers.** Producers must capitalize direct material costs and direct labor costs.

(A) Direct material costs. Direct materials costs include the cost of those materials that become an integral part of specific property produced and those materials that are consumed in the ordinary course of production and that can be identified or associated with particular units or groups of units of property produced. For example, a cost described in § 1.162–3, relating to the cost of a material or supply, may be a direct material cost.

(B) Direct labor costs include the costs of labor that can be identified or associated with particular units or groups of units of specific property produced. For this purpose, labor encompasses full-time and part-time employees, as well as contract employees and independent contractors. Direct labor costs include all elements of compensation other than employee benefit costs described in paragraph (e)(3)(ii)(D) of this section. Elements of direct labor costs include basic compensation, overtime pay, vacation pay, holiday pay, sick leave pay (other than payments pursuant to a wage continuation plan under section 105(d) as it existed prior to its repeal in 1983), shift differential, payroll taxes, and payments to a supplemental unemployment benefit plan.

**(ii) Resellers.** Resellers must capitalize the acquisition costs of property acquired for resale. In the case of inventory, the acquisition cost is the cost described in § 1.471–3(b).

**(3) Indirect costs—**

**(i) In general.** (A) Indirect costs are defined as all costs other than direct material costs and direct labor costs (in the case of property produced) or acquisition costs (in the case of property acquired for resale). Taxpayers subject to section 263A must capitalize all indirect costs properly allocable to property produced or property acquired for resale. Indirect costs are properly allocable to property produced or property acquired for resale when the costs directly benefit or are incurred by reason of the performance of production or resale activities. Indirect costs may directly benefit or be incurred by reason of the performance of production or resale activities even if the costs are calculated as a percentage of revenue or gross profit from the sale of inventory, are determined by reference to the number of units of property sold, or are incurred only upon the sale of inventory. Indirect costs may be allocable to both production and resale activities, as well as to other activities that are not subject to section 263A. Taxpayers must make a reasonable allocation of indirect costs between production, resale, and other activities.

(B) Example. The following example illustrates the provisions of this paragraph (e)(3)(i):

**Example.** (i) Taxpayer A manufactures tablecloths and other linens. A enters into a licensing agreement with Company L under which A may label its tablecloths with L's trademark if the tablecloths meet certain specified quality standards. In exchange for its right to use L's trademark, the licensing agreement requires A to pay L a royalty of $X for each tablecloth carrying L's trademark that A sells. The licensing agreement does not require A to pay L any minimum or lump-sum royalties.

The licensing agreement provides A with the right to use L's intellectual property, a trademark. The licensing agreement also requires A to conduct its production activities according to certain standards as a condition of exercising that right. Thus, A's right to use L's trademark under the licensing agreement is directly related to A's production of tablecloths. The royalties the licensing agreement requires A to pay for using L's trademark are the costs A incurs in exchange for these rights. Therefore, although A incurs royalty costs only when A sells a tablecloth carrying L's trademark, the royalty costs directly benefit production activities and are incurred by reason of production activities within the meaning of paragraph (e)(3)(i)(A) of this section.

**(ii) Examples of indirect costs required to be capitalized.** The following are examples of indirect costs that must be capitalized to the extent they are properly allocable to property produced or property acquired for resale:

(A) Indirect labor costs. Indirect labor costs include all labor costs (including the elements of labor costs set forth in paragraph (e)(2)(i) of this section) that cannot be directly identified or associated with particular units or groups of units of specific property produced or property acquired for resale (e.g., factory labor that is not direct labor). As in the case of direct labor, indirect labor encompasses full-time and part-time employees, as well as contract employees and independent contractors.

(B) Officers' compensation. Officers' compensation includes compensation paid to officers of the taxpayer.

(C) Pension and other related costs. Pension and other related costs include contributions paid to or made under any stock bonus, pension, profit-sharing or annuity plan, or other plan deferring the receipt of compensation, whether or not the plan qualifies under section 401(a). Contributions to employee plans representing past services must be capitalized in the same manner (and in the same proportion to property currently being acquired or produced) as amounts contributed for current service.

(D) Employee benefit expenses. Employee benefit expenses include all other employee benefit expenses (not described in paragraph (e)(3)(ii)(C) of this section) to the extent such expenses are otherwise allowable as

deductions under chapter 1 of the Internal Revenue Code. These other employee benefit expenses include: worker's compensation; amounts otherwise deductible or allowable in reducing earnings and profits under section 404A; payments pursuant to a wage continuation plan under section 105(d) as it existed prior to its repeal in 1983; amounts includible in the gross income of employees under a method or arrangement of employer contributions or compensation that has the effect of a stock bonus, pension, profit-sharing or annuity plan, or other plan deferring receipt of compensation or providing deferred benefits; premiums on life and health insurance; and miscellaneous benefits provided for employees such as safety, medical treatment, recreational and eating facilities, membership dues, etc. Employee benefit expenses do not, however, include direct labor costs described in paragraph (e)(2)(i) of this section.

(E) Indirect material costs. Indirect material costs include the cost of materials that are not an integral part of specific property produced and the cost of materials that are consumed in the ordinary course of performing production or resale activities that cannot be identified or associated with particular units of property. Thus, for example, a cost described in § 1.162–3, relating to the cost of a material or supply, may be an indirect cost.

(F) Purchasing costs. Purchasing costs include costs attributable to purchasing activities. See § 1.263A–3(c)(3) for a further discussion of purchasing costs.

(G) Handling costs. Handling costs include costs attributable to processing, assembling, repackaging and transporting goods, and other similar activities. See § 1.263A–3(c)(4) for a further discussion of handling costs.

(H) Storage costs. Storage costs include the costs of carrying, storing, or warehousing property. See § 1.263A–3(c)(5) for a further discussion of storage costs.

(I) Cost recovery. Cost recovery includes depreciation, amortization, and cost recovery allowances on equipment and facilities (including depreciation or amortization of self-constructed assets or other previously produced or acquired property to which section 263A or section 263 applies).

(J) Depletion. Depletion includes allowances for depletion, whether or not in excess of cost. Depletion is, however, only properly allocable to property that has been sold (i.e., for purposes of determining gain or loss on the sale of the property).

(K) Rent. Rent includes the cost of renting or leasing equipment, facilities, or land.

(L) Taxes. Taxes include those taxes (other than taxes described in paragraph (e)(3)(iii)(F) of this section) that are otherwise allowable as a deduction to the extent such taxes are attributable to labor, materials, supplies, equipment, land, or facilities used in production or resale activities.

(M) Insurance. Insurance includes the cost of insurance on plant or facility, machinery, equipment, materials, property produced, or property acquired for resale.

(N) Utilities. Utilities include the cost of electricity, gas, and water.

(O) Repairs and maintenance. Repairs and maintenance include the cost of repairing and maintaining equipment or facilities.

(P) Engineering and design costs. Engineering and design costs include pre-production costs, such as costs attributable to research, experimental, engineering, and design activities (to the extent that such amounts are not research and experimental expenditures as described in section 174 and the regulations thereunder).

(Q) Spoilage. Spoilage includes the costs of rework labor, scrap, and spoilage.

(R) Tools and equipment. Tools and equipment include the costs of tools and equipment which are not otherwise capitalized.

(S) Quality control. Quality control includes the costs of quality control and inspection.

(T) Bidding costs. Bidding costs are costs incurred in the solicitation of contracts (including contracts pertaining to property acquired for resale) ultimately awarded to the taxpayer. The taxpayer must defer all bidding costs paid or incurred in the solicitation of a particular contract until the contract is awarded. If the contract is awarded to the taxpayer, the bidding costs become part of the indirect costs allocated to the subject matter of the contract. If the contract is not awarded to the taxpayer, bidding costs are deductible in the taxable year that the contract is awarded to another party, or in the taxable year that the taxpayer is notified in writing that no contract will be awarded and that the contract (or a similar or related contract) will not be rebid, or in the taxable year that the taxpayer abandons its bid or proposal, whichever occurs first. Abandoning a bid does not include modifying, supplementing, or changing the original bid or proposal. If the taxpayer is awarded only part of the bid (for example, the taxpayer submitted one bid to build each of two different types of products, and the taxpayer was awarded a contract to build only one of the two types of products), the taxpayer shall deduct the portion of the bidding costs related to the portion of the bid not awarded to the taxpayer. In the case of a bid or proposal for a multi-unit contract, all bidding costs must be included in the costs allocated to the subject matter of the contract awarded to the taxpayer to produce or acquire for resale any of such units. For example, where the taxpayer submits one bid to produce three similar turbines and the taxpayer is awarded a contract to produce only two of the three turbines, all bidding costs must be included in the cost of the two turbines. For purposes of this paragraph (e)(3)(ii)(T), a contract means—

> (1) In the case of a specific unit of property, any agreement under which the taxpayer would produce or sell property to another party if the agreement is entered into before the taxpayer produces or acquires the specific unit of property to be delivered to the party under the agreement; and

> (2) In the case of fungible property, any agreement to the extent that, at the time the agreement is entered into, the taxpayer has on hand an insufficient quantity of completed fungible items of such property that may be used to satisfy the agreement (plus any other production or sales agreements of the taxpayer).

(U) Licensing and franchise costs. (1) Licensing and franchise costs include fees incurred in securing the contractual right to use a trademark, corporate plan, manufacturing procedure, special recipe, or other similar right associated with property produced or property acquired for resale. These costs include the otherwise deductible portion (such

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 63 of 651

as amortization) of the initial fees incurred to obtain the license or franchise and any minimum annual payments and any royalties that are incurred by a licensee or a franchisee. These costs also include fees, payments, and royalties otherwise described in this paragraph (e)(3)(ii)(U) that a taxpayer incurs (within the meaning of section 461) only upon the sale of property produced or acquired for resale.

(2) If a taxpayer incurs (within the meaning of section 461) a fee, payment, or royalty described in this paragraph (e)(3)(ii)(U) only upon the sale of property produced or acquired for resale and the cost is required to be capitalized under this paragraph (e)(3), the taxpayer may properly allocate the cost entirely to property produced or acquired for resale by the taxpayer that has been sold.

(V) Interest. Interest includes interest on debt incurred or continued during the production period to finance the production of real property or tangible personal property to which section 263A(f) applies.

(W) Capitalizable service costs. Service costs that are required to be capitalized include capitalizable service costs and capitalizable mixed service costs as defined in paragraph (e)(4) of this section.

**(iii) Indirect costs not capitalized.** The following indirect costs are not required to be capitalized under section 263A:

(A) Selling and distribution costs. These costs are marketing, selling, advertising, and distribution costs.

(B) Research and experimental expenditures. Research and experimental expenditures are expenditures described in section 174 and the regulations thereunder.

(C) Section 179 costs. Section 179 costs are expenses for certain depreciable assets deductible at the election of the taxpayer under section 179 and the regulations thereunder.

(D) Section 165 losses. Section 165 losses are losses under section 165 and the regulations thereunder.

(E) Cost recovery allowances on temporarily idle equipment and facilities—(1) In general. Cost recovery allowances on temporarily idle equipment and facilities include only depreciation, amortization, and cost recovery allowances on equipment and facilities that have been placed in service but are temporarily idle. Equipment and facilities are temporarily idle when a taxpayer takes them out of service for a finite period. However, equipment and facilities are not considered temporarily idle—

(i) During worker breaks, non-working hours, or on regularly scheduled non-working days (such as holidays or weekends);

(ii) During normal interruptions in the operation of the equipment or facilities;

(iii) When equipment is enroute to or located at a job site; or

(iv) When under normal operating conditions, the equipment is used or operated only during certain shifts.

(2) Examples. The provisions of this paragraph (e)(3)(iii)(E) are illustrated by the following examples:

**Example 1.** Equipment operated only during certain shifts. Taxpayer A manufactures widgets. Although A's manufacturing facility operates 24 hours each day in three shifts, A only operates its stamping machine during one shift each day. Because A only operates its stamping machine during certain shifts, A's stamping machine is not considered temporarily idle during the two shifts that it is not operated.

**Example 2.** Facility shut down for retooling. Taxpayer B owns and operates a manufacturing facility. B closes its manufacturing facility for two weeks to retool its assembly line. B's manufacturing facility is considered temporarily idle during this two-week period.

(F) Taxes assessed on the basis of income. Taxes assessed on the basis of income include only state, local, and foreign income taxes, and franchise taxes that are assessed on the taxpayer based on income.

(G) Strike expenses. Strike expenses include only costs associated with hiring employees to replace striking personnel (but not wages of replacement personnel), costs of security, and legal fees associated with settling strikes.

(H) Warranty and product liability costs. Warranty costs and product liability costs are costs incurred in fulfilling product warranty obligations for products that have been sold and costs incurred for product liability insurance.

(I) On-site storage costs. On-site storage costs are storage and warehousing costs incurred by a taxpayer at an on-site storage facility, as defined in § 1.263A–3(c)(5)(ii)(A), with respect to property produced or property acquired for resale.

(J) Unsuccessful bidding expenses. Unsuccessful bidding costs are bidding expenses incurred in the solicitation of contracts not awarded to the taxpayer.

(K) Deductible service costs. Service costs that are not required to be capitalized include deductible service costs and deductible mixed service costs as defined in paragraph (e)(4) of this section.

**(4) Service costs—(i) Introduction.** This paragraph (e)(4) provides definitions and categories of service costs. Paragraph (g)(4) of this section provides specific rules for determining the amount of service costs allocable to property produced or property acquired for resale. In addition, paragraph (h) of this section provides a simplified method for determining the amount of service costs that must be capitalized.

(A) Definition of service costs. Service costs are defined as a type of indirect costs (e.g., general and administrative costs) that can be identified specifically with a service department or function or that directly benefit or are incurred by reason of a service department or function.

(B) Definition of service departments. Service departments are defined as administrative, service, or support departments that incur service costs. The facts and circumstances of the taxpayer's activities and business organization control whether a department is a service department. For example, service departments include personnel, accounting, data processing, security, legal, and other similar departments.

**(ii) Various service cost categories**—(A) Capitalizable service costs. Capitalizable service costs are defined as service costs that directly benefit or are incurred by reason of the performance of the production or resale activities of the taxpayer. Therefore, these service costs are required to be capitalized under section 263A. Examples of service departments or functions that incur capitalizable service costs are provided in paragraph (e)(4)(iii) of this section.

(B) Deductible service costs. Deductible service costs are defined as service costs that do not directly benefit or are not incurred by reason of the performance of the production or resale activities of the taxpayer, and therefore, are not required to be capitalized under section 263A. Deductible service costs generally include costs incurred by reason of the taxpayer's overall management or policy guidance functions. In addition, deductible service costs include costs incurred by reason of the marketing, selling, advertising, and distribution activities of the taxpayer. Examples of service departments or functions that incur deductible service costs are provided in paragraph (e)(4)(iv) of this section.

(C) Mixed service costs. Mixed service costs are defined as service costs that are partially allocable to production or resale activities (capitalizable mixed service costs) and partially allocable to non-production or non-resale activities (deductible mixed service costs). For example, a personnel department may incur costs to recruit factory workers, the costs of which are allocable to production activities, and it may incur costs to develop wage, salary, and benefit policies, the costs of which are allocable to non-production activities.

**(iii) Examples of capitalizable service costs.** Costs incurred in the following departments or functions are generally allocated among production or resale activities:

(A) The administration and coordination of production or resale activities (wherever performed in the business organization of the taxpayer).

(B) Personnel operations, including the cost of recruiting, hiring, relocating, assigning, and maintaining personnel records or employees.

(C) Purchasing operations, including purchasing materials and equipment, scheduling and coordinating delivery of materials and equipment to or from factories or job sites, and expediting and follow-up.

(D) Materials handling and warehousing and storage operations.

(E) Accounting and data services operations, including, for example, cost accounting, accounts payable, disbursements, and payroll functions (but excluding accounts receivable and customer billing functions).

(F) Data processing.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

(G) Security services.

(H) Legal services.

**(iv) Examples of deductible service costs.** Costs incurred in the following departments or functions are not generally allocated to production or resale activities:

(A) Departments or functions responsible for overall management of the taxpayer or for setting overall policy for all of the taxpayer's activities or trades or businesses, such as the board of directors (including their immediate staff), and the chief executive, financial, accounting, and legal officers (including their immediate staff) of the taxpayer, provided that no substantial part of the cost of such departments or functions benefits a particular production or resale activity.

(B) Strategic business planning.

(C) General financial accounting.

(D) General financial planning (including general budgeting) and financial management (including bank relations and cash management).

(E) Personnel policy (such as establishing and managing personnel policy in general; developing wage, salary, and benefit policies; developing employee training programs unrelated to particular production or resale activities; negotiating with labor unions; and maintaining relations with retired workers).

(F) Quality control policy.

(G) Safety engineering policy.

(H) Insurance or risk management policy (but not including bid or performance bonds or insurance related to activities associated with property produced or property acquired for resale).

(I) Environmental management policy (except to the extent that the costs of any system or procedure benefits a particular production or resale activity).

(J) General economic analysis and forecasting.

(K) Internal audit.

(L) Shareholder, public, and industrial relations.

(M) Tax services.

(N) Marketing, selling, or advertising.

**(f) Cost allocation methods—(1) Introduction.** This paragraph (f) sets forth various detailed or specific (facts-and-circumstances) cost allocation methods that taxpayers may use to allocate direct and indirect costs to property produced and property acquired for resale. Paragraph (g) of this section provides general rules for applying these allocation methods to various categories of costs (i.e., direct materials, direct labor, and indirect costs, including service costs). In addition, in lieu of a facts-and-circumstances allocation method, taxpayers may use the simplified methods provided in §§ 1.263A–2(b) and 1.263A–3(d) to allocate direct and indirect costs to eligible property produced or eligible property acquired for resale; see those sections for definitions of eligible property. Paragraph (h) of this section provides a simplified method for determining the amount of mixed service costs required to be capitalized to eligible property. The methodology set forth in paragraph (h) of this section for mixed service costs may be used in conjunction with either a facts-and-circumstances or a simplified method of allocating costs to eligible property produced or eligible property acquired for resale.

**(2) Specific identification method.** A specific identification method traces costs to a cost objective, such as a function, department, activity, or product, on the basis of a cause and effect or other reasonable relationship between the costs and the cost objective.

**(3) Burden rate and standard cost methods—(i) Burden rate method—**(A) In general. A burden rate method allocates an appropriate amount of indirect costs to property produced or property acquired for resale during a taxable year using predetermined rates that approximate the actual amount of indirect costs incurred by the taxpayer during the taxable year. Burden rates (such as ratios based on direct costs, hours, or similar items) may be developed by the taxpayer in accordance with acceptable accounting principles and applied in a reasonable manner. A taxpayer may allocate different indirect costs on the basis of different burden rates. Thus, for example, the taxpayer may use one burden rate for allocating the cost of rent and another burden rate for allocating the cost of utilities. Any periodic adjustment to a burden rate that merely reflects current operating conditions, such as increases in automation or changes in operation or prices, is not a change in method of accounting under section 446(e). A change, however, in the concept or base upon which such rates are developed, such as a change from basing the rates on direct labor hours to basing them on direct machine hours, is a change in method of accounting to which section 446(e) applies.

(B) Development of burden rates. The following factors, among others, may be used in developing burden rates:

(1) The selection of an appropriate level of activity and a period of time upon which to base the calculation of rates reflecting operating conditions for purposes of the unit costs being determined.

(2) The selection of an appropriate statistical base, such as direct labor hours, direct labor dollars, machine hours, or a combination thereof, upon which to apply the overhead rate.

(3) The appropriate budgeting, classification, and analysis of expenses (for example, the analysis of fixed versus variable costs).

(C) Operation of the burden rate method. The purpose of the burden rate method is to allocate an appropriate amount of indirect costs to production or resale activities through the use of predetermined rates intended to approximate the actual amount of indirect costs incurred. Accordingly, the proper use of the burden rate method under this section requires that any net negative or net positive difference between the total predetermined amount of costs allocated to property and the total amount of indirect costs actually incurred and required to be allocated to such property (i.e., the under or over-applied burden) must be treated as an adjustment to the taxpayer's ending inventory or capital account (as the case may be) in the taxable year in which such difference arises. However, if such adjustment is not significant in amount in relation to the taxpayer's total indirect costs incurred with respect to production or resale activities for the year, such adjustment need not be allocated to the property produced or property acquired for resale unless such allocation is made in the taxpayer's financial reports. The taxpayer must treat both positive and negative adjustments consistently.

(ii) Standard cost method—(A) In general. A standard cost method allocates an appropriate amount of direct and indirect costs to property produced by the taxpayer through the use of preestablished standard allowances, without reference to costs actually incurred during the taxable year. A taxpayer may use a standard cost method to allocate costs, provided variances are treated in accordance with the procedures prescribed in paragraph (f)(3)(ii)(B) of this section. Any periodic adjustment to standard costs that merely reflects current operating conditions, such as increases in automation or changes in operation or prices, is not a change in method of accounting under section 446(e). A change, however, in the concept or base upon which standard costs are developed is a change in method of accounting to which section 446(e) applies.

(B) Treatment of variances. For purposes of this section, net positive overhead variance means the excess of total standard indirect costs over total actual indirect costs and net negative overhead variance means the excess of total actual indirect costs over total standard indirect costs. The proper use of a standard cost method requires that a taxpayer must reallocate to property a pro rata portion of any net negative or net positive overhead variances and any net negative or net positive direct cost variances. The taxpayer must apportion such variances to or among the property to which the costs are allocable. However, if such variances are not significant in amount relative to the taxpayer's total indirect costs incurred with respect to production and resale activities for the year, such variances need not be allocated to property produced or property acquired for resale unless such allocation is made in the taxpayer's financial reports. A taxpayer must treat both positive and negative variances consistently.

(4) Reasonable allocation methods. A taxpayer may use the methods described in paragraph (f)(2) or (3) of this section if they are reasonable allocation methods within the meaning of this paragraph (f)(4). In addition, a taxpayer may use any other reasonable method to properly allocate direct and indirect costs among units of property produced or property acquired for resale during the taxable year. An allocation method is reasonable if, with respect to the taxpayer's production or resale activities taken as a whole—

(i) The total costs actually capitalized during the taxable year do not differ significantly from the aggregate costs that would be properly capitalized using another permissible method described in this section or in §§ 1.263A–2 and 1.263A–3, with appropriate consideration given to the volume and value of the taxpayer's production or resale activities, the availability of costing information, the time and cost of using various allocation methods, and the accuracy of the allocation method chosen as compared with other allocation methods;

**(ii)** The allocation method is applied consistently by the taxpayer; and

**(iii)** The allocation method is not used to circumvent the requirements of the simplified methods in this section or in § 1.263A–2, § 1.263A–3, or the principles of section 263A.

**(g) Allocating categories of costs—(1) Direct materials.** Direct material costs (as defined in paragraph (e)(2) of this section) incurred during the taxable year must be allocated to the property produced or property acquired for resale by the taxpayer using the taxpayer's method of accounting for materials (e.g., specific identification; first-in, first-out (FIFO); or last-in, first-out (LIFO)), or any other reasonable allocation method (as defined under the principles of paragraph (f)(4) of this section).

**(2) Direct labor.** Direct labor costs (as defined in paragraph (e)(2) of this section) incurred during the taxable year are generally allocated to property produced or property acquired for resale using a specific identification method, standard cost method, or any other reasonable allocation method (as defined under the principles of paragraph (f)(4) of this section). All elements of compensation, other than basic compensation, may be grouped together and then allocated in proportion to the charge for basic compensation. Further, a taxpayer is not treated as using an erroneous method of accounting if direct labor costs are treated as indirect costs under the taxpayer's allocation method, provided such costs are capitalized to the extent required by paragraph (g)(3) of this section.

**(3) Indirect costs.** Indirect costs (as defined in paragraph (e)(3) of this section) are generally allocated to intermediate cost objectives such as departments or activities prior to the allocation of such costs to property produced or property acquired for resale. Indirect costs are allocated using either a specific identification method, a standard cost method, a burden rate method, or any other reasonable allocation method (as defined under the principles of paragraph (f)(4) of this section).

**(4) Service costs—(i) In general.** Service costs are a type of indirect costs that may be allocated using the same allocation methods available for allocating other indirect costs described in paragraph (g)(3) of this section. Generally, taxpayers that use a specific identification method or another reasonable allocation method must allocate service costs to particular departments or activities based on a factor or relationship that reasonably relates the service costs to the benefits received from the service departments or activities. For example, a reasonable factor for allocating legal services to particular departments or activities is the number of hours of legal services attributable to each department or activity. See paragraph (g)(4)(iv) of this section for other illustrations. Using reasonable factors or relationships, a taxpayer must allocate mixed service costs under a direct reallocation method described in paragraph (g)(4)(iii)(A) of this section, a step-allocation method described in paragraph (g)(4)(iii)(B) of this section, or any other reasonable allocation method (as defined under the principles of paragraph (f)(4) of this section).

**(ii) De minimis rule.** For purposes of administrative convenience, if 90 percent or more of a mixed service department's costs are deductible service costs, a taxpayer may elect not to allocate any portion of the service department's costs to property produced or property acquired for resale. For example, if 90 percent of the costs of an electing taxpayer's industrial relations department benefit the taxpayer's overall policy-making activities, the taxpayer is not required to allocate any portion of these costs to a production activity. Under this election, however, if 90 percent or more of a mixed service department's costs are capitalizable service costs, a taxpayer must allocate 100 percent of the department's costs to the production or resale activity benefitted. For example, if 90 percent of the costs of an electing taxpayer's accounting department benefit the taxpayer's manufacturing activity, the taxpayer must allocate 100 percent of the costs of the accounting department to the manufacturing activity. An election under this paragraph (g)(4)(ii) applies to all of

a taxpayer's mixed service departments and constitutes the adoption of a (or a change in) method of accounting under section 446 of the Internal Revenue Code.

**(iii) Methods for allocating mixed service costs**—(A) Direct reallocation method. Under the direct reallocation method, the total costs (direct and indirect) of all mixed service departments are allocated only to departments or cost centers engaged in production or resale activities and then from those departments to particular activities. This direct reallocation method ignores benefits provided by one mixed service department to other mixed service departments, and also excludes other mixed service departments from the base used to make the allocation.

(B) Step-allocation method. (1) Under a step-allocation method, a sequence of allocations is made by the taxpayer. First, the total costs of the mixed service departments that benefit the greatest number of other departments are allocated to—

(i) Other mixed service departments;

(ii) Departments that incur only deductible service costs; and

(iii) Departments that exclusively engage in production or resale activities.

(2) A taxpayer continues allocating mixed service costs in the manner described in paragraph (g)(4)(iii)(B) (1) of this section (i.e., from the service departments benefitting the greatest number of departments to the service departments benefitting the least number of departments) until all mixed service costs are allocated to the types of departments listed in this paragraph (g)(4)(iii). Thus, a step-allocation method recognizes the benefits provided by one mixed service department to another mixed service department and also includes mixed service departments that have not yet been allocated in the base used to make the allocation.

(C) Examples. The provisions of this paragraph (g)(4)(iii) are illustrated by the following examples:

**Example 1.** Direct reallocation method. (i) Taxpayer E has the following five departments: the Assembling Department, the Painting Department, and the Finishing Department (production departments), and the Personnel Department and the Data Processing Department (mixed service departments). E allocates the Personnel Department's costs on the basis of total payroll costs and the Data Processing Department's costs on the basis of data processing hours.

(ii) Under a direct reallocation method, E allocates the Personnel Department's costs directly to its Assembling, Painting, and Finishing Department, and not to its Data Processing department.

| Department | Total dept. costs | Amount of payroll costs | Allocation ratio | Amount allocated |
|---|---|---|---|---|
| Personnel........................................................................................... | $ 500,000 | $ 50,000 | .............. | < $500,000> |
| Data Proc'g.......................................................................................... | 250,000 | 15,000 | .............. | ........... |

| | | | | |
|---|---|---|---|---|
| Assembling................................................................... | 250,000 | 15,000 | 15,000/285,000 | 26,315 |
| Painting...................................................................... | 1,000,000 | 90,000 | 90,000/285,000 | 157,895 |
| Finishing..................................................................... | 2,000,000 | 180,000 | 180,000/285,000 | 315,790 |
| Total.......................................................................... | $4,000,000 | $350,000 | .............. | ........... |

(iii) After E allocates the Personnel Department's costs, E then allocates the costs of its Data Processing Department in the same manner.

| Department | Total dept. cost after initial allocation | Total data proc. hours | Allocation ratio | Amount allocated | Total dept. cost after final allocation |
|---|---|---|---|---|---|
| Personnel................................................ | 0 | 2,000 | ........... | ........... | 0 |
| Data Proc'g............................................. | $ 250,000 | ...... | ........... | < $250,000> | ......... |
| Assembling.............................................. | 276,315 | 2,000 | 2,000/10,000 | 50,000 | $ 326,315 |
| Painting.................................................. | 1,157,895 | 0 | 0/10,000 | 0 | 1,157,895 |
| Finishing................................................. | 2,315,790 | 8,000 | 8,000/10,000 | 200,000 | 2,515,790 |
| Total....................................................... | $4,000,000 | 12,000 | ........... | ........... | $4,000,000 |

**Example 2.** Step-allocation method. (i) Taxpayer F has the following five departments: the Manufacturing Department (a production department), the Marketing Department and the Finance Department (departments that incur only deductible service costs), the Personnel Department and the Data Processing Department (mixed service departments). F uses a step-allocation method and allocates the Personnel Department's costs on the basis of total payroll costs and the Data Processing Department's costs on the basis of data processing hours. F's Personnel Department benefits all four of F's other departments, while its Data Processing Department benefits only three departments. Because F's Personnel Department benefits the greatest number of other departments, F first allocates its Personnel Department's costs to its Manufacturing, Marketing, Finance and Data Processing departments, as follows:

| Department | Total cost of dept. | Total payroll costs | Allocation ratio | Amount allocated |
|---|---|---|---|---|
| Personnel...................................................................... | $ 500,000 | $ 50,000 | .............. | < $500,000> |
| Data Proc'g................................................................... | 250,000 | 15,000 | 15,000/300,000 | 25,000 |
| Finance......................................................................... | 250,000 | 15,000 | 15,000/300,000 | 25,000 |
| Marketing...................................................................... | 1,000,000 | 90,000 | 90,000/300,000 | 150,000 |
| Manufac'g...................................................................... | 2,000,000 | 180,000 | 180,000/300,000 | 300,000 |

| | | | | | |
|---|---|---|---|---|---|
| ................................................................................................ | 4,000,000 | 350,000 | .............. | .......... |

(ii) Under a step-allocation method, the denominator of F's allocation ratio includes the payroll costs of its Manufacturing, Marketing, Finance, and Data Processing departments.

(iii) Next, F allocates the costs of its Data Processing Department on the basis of data processing hours. Because the costs incurred by F's Personnel Department have already been allocated, no allocation is made to the Personnel Department.

| Department | Total dept. cost after initial allocation | Total data proc. hours | Allocation ratio | Amount allocated | Total dept. cost after final allocation |
|---|---|---|---|---|---|
| Personnel.................................................................... | $ 0 | 2,000 | ........... | ........... | $ 0 |
| Data Proc'g............................................................... | 275,000 | ...... | ........... | < $275,000> | 0 |
| Finance.................................................................... | 275,000 | 2,000 | 2,000/10,000 | 55,000 | 330,000 |
| Marketing................................................................ | 1,150,000 | 0 | 0/10,000 | 0 | 1,150,000 |
| Manufac'g................................................................ | 2,300,000 | 8,000 | 8,000/10,000 | 220,000 | 2,520,000 |
| ................................................................................ | 4,000,000 | 12,000 | ........... | ........... | 4,000,000 |

(iv) Under the second step of F's step-allocation method, the denominator of F's allocation ratio includes the data processing hours of its Manufacturing, Marketing, and Finance Departments, but does not include the data processing hours of its Personnel Department (the other mixed service department) because the costs of that department have previously been allocated.

**(iv) Illustrations of mixed service cost allocations using reasonable factors or relationships.** This paragraph (g)(4) (iv) illustrates various reasonable factors and relationships that may be used in allocating different types of mixed service costs. Taxpayers, however, are permitted to use other reasonable factors and relationships to allocate mixed service costs. In addition, the factors or relationships illustrated in this paragraph (g)(4)(iv) may be used to allocate other types of service costs not illustrated in this paragraph (g)(4)(iv).

(A) Security services. The costs of security or protection services must be allocated to each physical area that receives the services using any reasonable method applied consistently (e.g., the size of the physical area, the number of employees in the area, or the relative fair market value of assets located in the area).

(B) Legal services. The costs of legal services are generally allocable to a particular production or resale activity on the basis of the approximate number of hours of legal service performed in connection with the activity, including research, bidding, negotiating, drafting, reviewing a contract, obtaining necessary licenses and permits, and resolving disputes. Different hourly rates may be appropriate for different services. In determining the number of hours allocable to any activity, estimates are appropriate, detailed time records are not required to be kept, and insubstantial amounts of services provided to an activity by senior legal staff (such as administrators or reviewers) may be ignored. Legal costs may also be allocated to a particular production or resale activity based on the ratio of the total direct costs incurred for the activity to the total direct costs incurred with respect to all production or resale activities. The taxpayer

must also allocate directly to an activity the cost incurred for any outside legal services. Legal costs relating to general corporate functions are not required to be allocated to a particular production or resale activity.

(C) Centralized payroll services. The costs of a centralized payroll department or activity are generally allocated to the departments or activities benefitted on the basis of the gross dollar amount of payroll processed.

(D) Centralized data processing services. The costs of a centralized data processing department are generally allocated to all departments or activities benefitted using any reasonable basis, such as total direct data processing costs or the number of data processing hours supplied. The costs of data processing systems or applications developed for a particular activity are directly allocated to that activity.

(E) Engineering and design services. The costs of an engineering or a design department are generally directly allocable to the departments or activities benefitted based on the ratio of the approximate number of hours of work performed with respect to the particular activity to the total number of hours of engineering or design work performed for all activities. Different services may be allocated at different hourly rates.

(F) Safety engineering services. The costs of a safety engineering departments or activities generally benefit all of the taxpayer's activities and, thus, should be allocated using a reasonable basis, such as: the approximate number of safety inspections made in connection with a particular activity as a fraction of total inspections, the number of employees assigned to an activity as a fraction of total employees, or the total labor hours worked in connection with an activity as a fraction of total hours. However, in determining the allocable costs of a safety engineering department, costs attributable to providing a safety program relating only to a particular activity must be directly assigned to such activity. Additionally, the cost of a safety engineering department only responsible for setting safety policy and establishing safety procedures to be used in all of the taxpayer's activities is not required to be allocated.

**(v) Accounting method change.** A change in the method or base used to allocate service costs (such as changing from an allocation base using direct labor costs to a base using direct labor hours), or a change in the taxpayer's determination of what functions or departments of the taxpayer are to be allocated, is a change in method of accounting to which section 446(e) and the regulations thereunder apply.

**(h) Simplified service cost method—(1) Introduction.** This paragraph (h) provides a simplified method for determining capitalizable mixed service costs incurred during the taxable year with respect to eligible property (i.e., the aggregate portion of mixed service costs that are properly allocable to the taxpayer's production or resale activities).

**(2) Eligible property—(i) In general.** Except as otherwise provided in paragraph (h)(2)(ii) of this section, the simplified service cost method, if elected for any trade or business of the taxpayer, must be used for all production and resale activities of the trade or business associated with any of the following categories of property that are subject to section 263A:

(A) Inventory property. Stock in trade or other property properly includible in the inventory of the taxpayer.

(B) Non-inventory property held for sale. Non-inventory property held by a taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business.

(C) Certain self-constructed assets. Self-constructed assets substantially identical in nature to, and produced in the same manner as, inventory property produced by the taxpayer or other property produced by the taxpayer and held primarily for sale to customers in the ordinary course of the taxpayer's trade or business.

(D) Self-constructed tangible personal property produced on a routine and repetitive basis—(1) In general. Self-constructed tangible personal property produced by the taxpayer on a routine and repetitive basis in the ordinary course of the taxpayer's trade or business. Self-constructed tangible personal property is produced by the taxpayer on a routine and repetitive basis in the ordinary course of the taxpayer's trade or business when units of tangible personal property (as defined in § 1.263A–10(c)) are mass-produced, that is, numerous substantially identical assets are manufactured within a taxable year using standardized designs and assembly line techniques, and either the applicable recovery period of the property determined under section 168(c) is not longer than 3 years or the property is a material or supply that will be used and consumed within 3 years of being produced. For purposes of this paragraph (h)(2)(i)(D), the applicable recovery period of the assets will be determined at the end of the taxable year in which the assets are placed in service for purposes of § 1.46–3(d). Subsequent changes to the applicable recovery period after the assets are placed in service will not affect the determination of whether the assets are produced on a routine and repetitive basis for purposes of this paragraph (h)(2)(i)(D).

(2) Examples. The following examples illustrate this paragraph (h)(2)(i)(D):

**Example 1.** Y is a manufacturer of automobiles. During the taxable year Y produces numerous substantially identical dies and molds using standardized designs and assembly line techniques. The dies and molds have a 3–year applicable recovery period for purposes of section 168(c). Y uses the dies and molds to produce or process particular automobile components and does not hold them for sale. The dies and molds are produced on a routine and repetitive basis in the ordinary course of Y's business for purposes of this paragraph because the dies and molds are both mass-produced and have a recovery period of not longer than 3 years.

**Example 2.** Z is an electric utility that regularly manufactures and installs identical poles that are used in transmitting and distributing electricity. The poles have a 20–year applicable recovery period for purposes of section 168(c). The poles are not produced on a routine and repetitive basis in the ordinary course of Z's business for purposes of this paragraph because the poles have an applicable recovery period that is longer than 3 years.

**(ii) Election to exclude self-constructed assets.** At the taxpayer's election, the simplified service cost method may be applied within a trade or business to only the categories of inventory property and non-inventory property held for sale described in paragraphs (h)(2)(i)(A) and (B) of this section. Taxpayers electing to exclude the self-constructed assets described in paragraphs (h)(2)(i)(C) and (D) of this section from application of the simplified service cost method must, however, allocate service costs to such property in accordance with paragraph (g)(4) of this section.

**(3) General allocation formula. (i)** Under the simplified service cost method, a taxpayer computes its capitalizable mixed service costs using the following formula:

Allocation ratio x total mixed service costs

**(ii)** A producer may elect one of two allocation ratios, the labor-based allocation ratio or the production cost allocation ratio. A reseller that satisfies the requirements for using the simplified resale method of § 1.263A–3(d) (whether or not that method is elected) may elect the simplified service cost method, but must use a labor-based allocation ratio. (See §

1.263A–3(d) for labor-based allocation ratios to be used in conjunction with the simplified resale method.) The allocation ratio used by a trade or business of a taxpayer is a method of accounting which must be applied consistently within the trade or business.

**(4) Labor-based allocation ratio. (i)** The labor-based allocation ratio is computed as follows:

$$\frac{\text{Section 263A labor costs}}{\text{Total labor costs}}$$

**(ii)** Section 263A labor costs are defined as the total labor costs (excluding labor costs included in mixed service costs) allocable to property produced and property acquired for resale under section 263A that are incurred in the taxpayer's trade or business during the taxable year. Total labor costs are defined as the total labor costs (excluding labor costs included in mixed service costs) incurred in the taxpayer's trade or business during the taxable year. Total labor costs include labor costs incurred in all parts of the trade or business (i.e., if the taxpayer has both property produced and property acquired for resale, the taxpayer must include labor costs from resale activities as well as production activities). For example, taxpayer G incurs $1,000 of total mixed service costs during the taxable year. G's section 263A labor costs are $5,000 and its total labor costs are $10,000. Under the labor-based allocation ratio, G's capitalizable mixed service costs are $500 (i.e., $1,000 x ($5,000 divided by $10,000)).

**(5) Production cost allocation ratio. (i)** Producers may use the production cost allocation ratio, computed as follows:

$$\frac{\text{Section 263A production costs}}{\text{Total costs}}$$

**(ii)** Section 263A production costs are defined as the total costs (excluding mixed service costs and interest) allocable to property produced (and property acquired for resale if the producer is also engaged in resale activities) under section 263A that are incurred in the taxpayer's trade or business during the taxable year. Total costs are defined as all costs (excluding mixed service costs and interest) incurred in the taxpayer's trade or business during the taxable year. Total costs include all direct and indirect costs allocable to property produced (and property acquired for resale if the producer is also engaged in resale activities) as well as all other costs of the taxpayer's trade or business, including, but not limited to: salaries and other labor costs of all personnel; all depreciation taken for federal income tax purposes; research and experimental expenditures; and selling, marketing, and distribution costs. Such costs do not include, however, taxes described in paragraph (e)(3)(iii) (F) of this section. For example, taxpayer H, a producer, incurs $1,000 of total mixed service costs in the taxable year. H's section 263A production costs are $10,000 and its total costs are $20,000. Under the production cost allocation ratio, H's capitalizable mixed service costs are $500 (i.e., $1,000 X ($10,000 divided by $20,000)).

**(6) Definition of total mixed service costs.** Total mixed service costs are defined as the total costs incurred during the taxable year in all departments or functions of the taxpayer's trade or business that perform mixed service activities. See paragraph (e)(4)(ii)(C) of this section which defines mixed service costs. In determining the total mixed service costs of a trade or business, the taxpayer must include all costs incurred in its mixed service departments and cannot exclude any otherwise deductible service costs. For example, if the accounting department within a trade or business is a mixed service department, then in determining the total mixed service costs of the trade or business, the taxpayer cannot exclude the costs of personnel in the accounting department that perform services relating to non-production activities (e.g., accounts

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

receivable or customer billing activities). Instead, the entire cost of the accounting department must be included in the total mixed service costs.

**(7) Costs allocable to more than one business.** To the extent mixed service costs, labor costs, or other costs are incurred in more than one trade or business, the taxpayer must determine the amounts allocable to the particular trade or business for which the simplified service cost method is being applied by using any reasonable allocation method consistent with the principles of paragraph (f)(4) of this section.

**(8) De minimis rule.** If the taxpayer elects to apply the de minimis rule of paragraph (g)(4)(ii) of this section to any mixed service department, the department is not considered a mixed service department for purposes of the simplified service cost method. Instead, the costs of such department are allocated exclusively to the particular activity satisfying the 90–percent test.

**(9) Separate election.** A taxpayer may elect the simplified service cost method in conjunction with any other allocation method used at the trade or business level, including the simplified methods described in §§ 1.263A–2(b) and 1.263A–3(d). However, the election of the simplified service cost method must be made independently of the election to use those other simplified methods.

**(i)** [Reserved]

**(j) Special rules—(1) Costs provided by a related person—(i) In general.** A taxpayer subject to section 263A must capitalize an arm's-length charge for any section 263A costs (e.g., costs of materials, labor, or services) incurred by a related person that are properly allocable to the property produced or property acquired for resale by the taxpayer. Both the taxpayer and the related person must account for the transaction as if an arm's-length charge had been incurred by the taxpayer with respect to its property produced or property acquired for resale. For purposes of this paragraph (j)(1)(i), a taxpayer is considered related to another person if the taxpayer and such person are described in section 482. Further, for purposes of this paragraph (j)(1)(i), arm's-length charge means the arm's-length charge (or other appropriate charge where permitted and applicable) under the principles of section 482. Any correlative adjustments necessary because of the arm's-length charge requirement of this paragraph (j)(1)(i) shall be determined under the principles of section 482.

**(ii) Exceptions.** The provisions of paragraph (j)(1)(i) of this section do not apply if, and to the extent that—

(A) It would be inappropriate under the principles of section 482 for the Commissioner to adjust the income of the taxpayer or the related person with respect to the transaction at issue; or

(B) A transaction is accounted for under an alternative Internal Revenue Code section resulting in the capitalization (or deferral of the deduction) of the costs of the items provided by the related party and the related party does not deduct such costs earlier than the costs would have been deducted by the taxpayer if the costs were capitalized under section 263A. See § 1.1502–13.

**(2) Optional capitalization of period costs—(i) In general.** Taxpayers are not required to capitalize indirect costs that do not directly benefit or are not incurred by reason of the production of property or acquisition of property for resale (i.e., period costs). A taxpayer may, however, elect to capitalize certain period costs if: The method is consistently applied;

is used in computing beginning inventories, ending inventories, and cost of goods sold; and does not result in a material distortion of the taxpayer's income. A material distortion relates to the source, character, amount, or timing of the cost capitalized or any other item affected by the capitalization of the cost. Thus, for example, a taxpayer may not capitalize a period cost under section 263A if capitalization would result in a material change in the computation of the foreign tax credit limitation under section 904. An election to capitalize a period cost is the adoption of (or a change in) a method of accounting under section 446 of the Internal Revenue Code.

**(ii) Period costs eligible for capitalization.** The types of period costs eligible for capitalization under this paragraph (j)(2) include only the types of period costs (e.g., under paragraph (e)(3)(iii) of this section) for which some portion of the costs incurred is properly allocable to property produced or property acquired for resale in the year of the election. Thus, for example, marketing or advertising costs, no portion of which are properly allocable to property produced or property acquired for resale, do not qualify for elective capitalization under this paragraph (j)(2).

**(3) Trade or business application.** Notwithstanding the references generally to taxpayer throughout this section and §§ 1.263A–2 and 1.263A–3, the methods of accounting provided under section 263A are to be elected and applied independently for each separate and distinct trade or business of the taxpayer in accordance with the provisions of section 446(d) and the regulations thereunder.

**(4) Transfers with a principal purpose of tax avoidance.** The District Director may require appropriate adjustments to valuations of inventory and other property subject to section 263A if a transfer of property is made to another person for a principal purpose of avoiding the application of section 263A. Thus, for example, the District Director may require a taxpayer using the simplified production method of § 1.263A–2(b) to apply that method to transferred inventories immediately prior to a transfer under section 351 if a principal purpose of the transfer is to avoid the application of section 263A.

**(k) Change in method of accounting—(1) In general.** A change in a taxpayer's treatment of mixed service costs to comply with paragraph (h)(2)(i)(D) of this section is a change in method of accounting to which the provisions of sections 446 and 481 and the regulations under those sections apply. See § 1.263A–7. For a taxpayer's first taxable year ending on or after August 2, 2005, the taxpayer is granted the consent of the Commissioner to change its method of accounting to comply with paragraph (h)(2)(i)(D) of this section, provided the taxpayer follows the administrative procedures, as modified by paragraphs (k)(2) through (4) of this section, issued under § 1.446–1(e)(3)(ii) for obtaining the Commissioner's automatic consent to a change in accounting method (for further guidance, for example, see Rev. Proc. 2002–9 (2002–1 CB 327), as modified and clarified by Announcement 2002–17 (2002–1 CB 561), modified and amplified by Rev. Proc. 2002–19 (2002–1 CB 696), and amplified, clarified, and modified by Rev. Proc. 2002–54 (2002–2 CB 432), and § 601.601(d)(2)(ii)(b) of this chapter). For purposes of Form 3115, "Application for Change in Accounting Method," the designated number for the automatic accounting method change authorized by this paragraph (k) is "95." If Form 3115 is revised or renumbered, any reference in this section to that form is treated as a reference to the revised or renumbered form. Alternatively, notwithstanding the provisions of any administrative procedures that preclude a taxpayer from requesting the advance consent of the Commissioner to change a method of accounting that is required to be made pursuant to a published automatic change procedure, for its first taxable year ending on or after August 2, 2005, a taxpayer may request the advance consent of the Commissioner to change its method of accounting to comply with paragraph (h)(2)(i)(D) of this section, provided the taxpayer follows the administrative procedures, as modified by paragraphs (k)(2) through (5) of this section, for obtaining the advance consent of the Commissioner (for further guidance, for example, see Rev. Proc. 97–27 (1997–1 CB 680), as modified and amplified by Rev. Proc. 2002–19 (2002–1 CB 696), as amplified and clarified by Rev. Proc. 2002–54 (2002–2 CB 432), and § 601.601(d)(2)(ii)(b) of this chapter). For the taxpayer's second and subsequent taxable years ending on or after August 2, 2005, requests to secure the consent of the

Commissioner must be made under the administrative procedures, as modified by paragraphs (k)(3) and (4) of this section, for obtaining the Commissioner's advance consent to a change in accounting method.

**(2) Scope limitations.** Any limitations on obtaining the automatic consent or advance consent of the Commissioner do not apply to a taxpayer seeking to change its method of accounting to comply with paragraph (h)(2)(i)(D) of this section for its first taxable year ending on or after August 2, 2005.

**(3) Audit protection.** A taxpayer that changes its method of accounting in accordance with this paragraph (k) to comply with paragraph (h)(2)(i)(D) of this section does not receive audit protection if its method of accounting for mixed service costs is an issue under consideration at the time the application is filed with the national office.

**(4) Section 481(a) adjustment.** A change in method of accounting to conform to paragraph (h)(2)(i)(D) of this section requires a section 481(a) adjustment. The section 481(a) adjustment period is two taxable years for a net positive adjustment for an accounting method change that is made to conform to paragraph (h)(2)(i)(D) of this section.

**(5) Time for requesting change.** Notwithstanding the provisions of § 1.446–1(e)(3)(i) and any contrary administrative procedure, a taxpayer may submit a request for advance consent to change its method of accounting to comply with paragraph (h)(2)(i)(D) of this section for its first taxable year ending on or after August 2, 2005, on or before the date that is 30 days after the end of the taxable year for which the change is requested.

**(l) Effective/applicability date—(1) In general.** Except as provided in (l)(2), (l)(3), and (l)(4) of this section, the effective dates for this section are provided in paragraph (a)(2) of this section.

**(2) Mixed service costs; self-constructed tangible personal property produced on a routine and repetitive basis.** Paragraphs (h)(2)(i)(D), (k), and (l)(2) of this section apply for taxable years ending on or after August 2, 2005.

**(3) Costs allocable to property sold; indirect costs; licensing and franchise costs.** Paragraphs (c)(5), (e)(3)(i), and (e)(3)(ii)(U) of this section apply for taxable years ending on or after January 13, 2014.

**(4) Materials and supplies—(i) In general.** The last sentence of paragraphs (e)(2)(i)(A) and (e)(3)(ii)(E) of this section, and paragraph (l)(4) of this section apply to amounts paid (to acquire or produce property) in taxable years beginning on or after January 1, 2014.

**(ii) Early application of this section.** A taxpayer may choose to apply the last sentence of paragraphs (e)(2)(i)(A) and (e)(3)(ii)(E) of this section, and paragraph (l)(4) of this section to amounts paid (to acquire or produce property) in taxable years beginning on or after January 1, 2012.

**(iii) Optional application of TD 9564.** A taxpayer may choose to apply § 1.263A–1T(b)(14), the introductory phrase of § 1.263A–1T(c)(4), the last sentence of § 1.263A–1T(e)(2)(i)(A), the last sentence of § 1.263A–1T(e)(3)(ii)(E), § 1.263A–1T(l), and § 1.263A–1T(m)(2), as these provisions are contained in TD 9564 (76 FR 81060) December 27, 2011, to amounts paid (to acquire or produce property) in taxable years beginning on or after January 1, 2012, and before January 1, 2014.

**(m)** [Reserved by 78 FR 57745]

**Credits**

[T.D. 8482, 58 FR 42209, Aug. 9, 1993; T.D. 8559, 59 FR 39961, Aug. 5, 1994; T.D. 8584, 59 FR 67197, Dec. 29, 1994; T.D. 8597, 60 FR 36680, July 18, 1995; T.D. 8728, 62 FR 42054, Aug. 5, 1997; T.D. 8729, 62 FR 44546, Aug. 22, 1997; T.D. 8897, 65 FR 50644, Aug. 21, 2000; 65 FR 61092, Oct. 16, 2000; T.D. 9217, 70 FR 44468, Aug. 3, 2005; T.D. 9318, 72 FR 14676, March 29, 2007; T.D. 9564, 76 FR 81126, Dec. 27, 2011; T.D. 9636, 78 FR 57745, Sept. 19, 2013; T.D. 9652, 79 FR 2097, Jan. 13, 2014; 79 FR 42192, July 21, 2014]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

AUTHORITY: Sections 1.909–1 through 1.906–6 also issued under 26 U.S.C. 909(e).

Current through March 24, 2016; 81 FR 16051.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Computation of Taxable Income
              Items Not Deductible

26 C.F.R. § 1.263(a)–4, Treas. Reg. § 1.263(a)–4

§ 1.263(a)–4 Amounts paid to acquire or create intangibles.

Currentness

**(a) Overview.** This section provides rules for applying section 263(a) to amounts paid to acquire or create intangibles. Except to the extent provided in paragraph (d)(8) of this section, the rules provided by this section do not apply to amounts paid to acquire or create tangible assets. Paragraph (b) of this section provides a general principle of capitalization. Paragraphs (c) and (d) of this section identify intangibles for which capitalization is specifically required under the general principle. Paragraph (e) of this section provides rules for determining the extent to which taxpayers must capitalize transaction costs. Paragraph (f) of this section provides a 12–month rule intended to simplify the application of the general principle to certain payments that create benefits of a brief duration. Additional rules and examples relating to these provisions are provided in paragraphs (g) through (n) of this section. The applicability date of the rules in this section is provided in paragraph (o) of this section. Paragraph (p) of this section provides rules applicable to changes in methods of accounting made to comply with this section.

**(b) Capitalization with respect to intangibles—(1) In general.** Except as otherwise provided in this section, a taxpayer must capitalize—

**(i)** An amount paid to acquire an intangible (see paragraph (c) of this section);

**(ii)** An amount paid to create an intangible described in paragraph (d) of this section;

**(iii)** An amount paid to create or enhance a separate and distinct intangible asset within the meaning of paragraph (b)(3) of this section;

**(iv)** An amount paid to create or enhance a future benefit identified in published guidance in the Federal Register or in the Internal Revenue Bulletin (see § 601.601(d)(2)(ii) of this chapter) as an intangible for which capitalization is required under this section; and

**(v)** An amount paid to facilitate (within the meaning of paragraph (e)(1) of this section) an acquisition or creation of an intangible described in paragraph (b)(1)(i), (ii), (iii) or (iv) of this section.

**(2) Published guidance.** Any published guidance identifying a future benefit as an intangible for which capitalization is required under paragraph (b)(1)(iv) of this section applies only to amounts paid on or after the date of publication of the guidance.

**(3) Separate and distinct intangible asset—(i) Definition.** The term separate and distinct intangible asset means a property interest of ascertainable and measurable value in money's worth that is subject to protection under applicable State, Federal or foreign law and the possession and control of which is intrinsically capable of being sold, transferred or pledged (ignoring any restrictions imposed on assignability) separate and apart from a trade or business. In addition, for purposes of this section, a fund (or similar account) is treated as a separate and distinct intangible asset of the taxpayer if amounts in the fund (or account) may revert to the taxpayer. The determination of whether a payment creates a separate and distinct intangible asset is made based on all of the facts and circumstances existing during the taxable year in which the payment is made.

**(ii) Creation or termination of contract rights.** Amounts paid to another party to create, originate, enter into, renew or renegotiate an agreement with that party that produces rights or benefits for the taxpayer (and amounts paid to facilitate the creation, origination, enhancement, renewal or renegotiation of such an agreement) are treated as amounts that do not create (or facilitate the creation of) a separate and distinct intangible asset within the meaning of this paragraph (b)(3). Further, amounts paid to another party to terminate (or facilitate the termination of) an agreement with that party are treated as amounts that do not create a separate and distinct intangible asset within the meaning of this paragraph (b)(3). See paragraphs (d)(2), (d)(6), and (d)(7) of this section for rules that specifically require capitalization of amounts paid to create or terminate certain agreements.

**(iii) Amounts paid in performing services.** Amounts paid in performing services under an agreement are treated as amounts that do not create a separate and distinct intangible asset within the meaning of this paragraph (b)(3), regardless of whether the amounts result in the creation of an income stream under the agreement.

**(iv) Creation of computer software.** Except as otherwise provided in the Internal Revenue Code, the regulations thereunder, or other published guidance in the Federal Register or in the Internal Revenue Bulletin (see § 601.601(d)(2)(ii) of this chapter), amounts paid to develop computer software are treated as amounts that do not create a separate and distinct intangible asset within the meaning of this paragraph (b)(3).

**(v) Creation of package design.** Amounts paid to develop a package design are treated as amounts that do not create a separate and distinct intangible asset within the meaning of this paragraph (b)(3). For purposes of this section, the term package design means the specific graphic arrangement or design of shapes, colors, words, pictures, lettering, and other elements on a given product package, or the design of a container with respect to its shape or function.

**(4) Coordination with other provisions of the Internal Revenue Code—(i) In general.** Nothing in this section changes the treatment of an amount that is specifically provided for under any other provision of the Internal Revenue Code (other than section 162(a) or 212) or the regulations thereunder.

**(ii) Example.** The following example illustrates the rule of this paragraph (b)(4):

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 82 of 651

**Example.** On January 1, 2004, G enters into an interest rate swap agreement with unrelated counterparty H under which, for a term of five years, G is obligated to make annual payments at 11% and H is obligated to make annual payments at LIBOR on a notional principal amount of $100 million. At the time G and H enter into this swap agreement, the rate for similar on-market swaps is LIBOR to 10%. To compensate for this difference, on January 1, 2004, H pays G a yield adjustment fee of $3,790,786. This yield adjustment fee constitutes an amount paid to create an intangible and would be capitalized under paragraph (d)(2) of this section. However, because the yield adjustment fee is a nonperiodic payment on a notional principal contract as defined in § 1.446–3(c), the treatment of this fee is governed by § 1.446–3 and not this section.

**(c) Acquired intangibles—(1) In general.** A taxpayer must capitalize amounts paid to another party to acquire any intangible from that party in a purchase or similar transaction. Examples of intangibles within the scope of this paragraph (c) include, but are not limited to, the following (if acquired from another party in a purchase or similar transaction):

**(i)** An ownership interest in a corporation, partnership, trust, estate, limited liability company, or other entity.

**(ii)** A debt instrument, deposit, stripped bond, stripped coupon (including a servicing right treated for federal income tax purposes as a stripped coupon), regular interest in a REMIC or FASIT, or any other intangible treated as debt for federal income tax purposes.

**(iii)** A financial instrument, such as—

(A) A notional principal contract;

(B) A foreign currency contract;

(C) A futures contract;

(D) A forward contract (including an agreement under which the taxpayer has the right and obligation to provide or to acquire property (or to be compensated for such property, regardless of whether the taxpayer provides or acquires the property));

(E) An option (including an agreement under which the taxpayer has the right to provide or to acquire property (or to be compensated for such property, regardless of whether the taxpayer provides or acquires the property)); and

(F) Any other financial derivative.

**(iv)** An endowment contract, annuity contract, or insurance contract.

**(v)** Non-functional currency.

**(vi)** A lease.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 83 of 651

**(vii)** A patent or copyright.

**(viii)** A franchise, trademark or tradename (as defined in § 1.197–2(b)(10)).

**(ix)** An assembled workforce (as defined in § 1.197–2(b)(3)).

**(x)** Goodwill (as defined in § 1.197–2(b)(1)) or going concern value (as defined in § 1.197–2(b)(2)).

**(xi)** A customer list.

**(xii)** A servicing right (for example, a mortgage servicing right that is not treated for Federal income tax purposes as a stripped coupon).

**(xiii)** A customer-based intangible (as defined in § 1.197–2(b)(6)) or supplier-based intangible (as defined in § 1.197–2(b)(7)).

**(xiv)** Computer software.

**(xv)** An agreement providing either party the right to use, possess or sell an intangible described in paragraphs (c)(1)(i) through (v) of this section.

**(2) Readily available software.** An amount paid to obtain a nonexclusive license for software that is (or has been) readily available to the general public on similar terms and has not been substantially modified (within the meaning of § 1.197–2(c)(4)) is treated for purposes of this paragraph (c) as an amount paid to another party to acquire an intangible from that party in a purchase or similar transaction.

**(3) Intangibles acquired from an employee.** Amounts paid to an employee to acquire an intangible from that employee are not required to be capitalized under this section if the amounts are includible in the employee's income in connection with the performance of services under section 61 or 83. For purposes of this section, whether an individual is an employee is determined in accordance with the rules contained in section 3401(c) and the regulations thereunder.

**(4) Examples.** The following examples illustrate the rules of this paragraph (c):

**Example 1.** Debt instrument. X corporation, a commercial bank, purchases a portfolio of existing loans from Y corporation, another financial institution. X pays Y $2,000,000 in exchange for the portfolio. The $2,000,000 paid to Y constitutes an amount paid to acquire an intangible from Y and must be capitalized.

**Example 2.** Option. W corporation owns all of the outstanding stock of X corporation. Y corporation holds a call option entitling it to purchase from W all of the outstanding stock of X at a certain price per share. Z corporation acquires the call option from

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 84 of 651

Y in exchange for $5,000,000. The $5,000,000 paid to Y constitutes an amount paid to acquire an intangible from Y and must be capitalized.

**Example 3.** Ownership interest in a corporation. Same as Example 2, but assume Z exercises its option and purchases from W all of the outstanding stock of X in exchange for $100,000,000. The $100,000,000 paid to W constitutes an amount paid to acquire an intangible from W and must be capitalized.

**Example 4.** Customer list. N corporation, a retailer, sells its products through its catalog and mail order system. N purchases a customer list from R corporation. N pays R $100,000 in exchange for the customer list. The $100,000 paid to R constitutes an amount paid to acquire an intangible from R and must be capitalized.

**Example 5.** Goodwill. Z corporation pays W corporation $10,000,000 to purchase all of the assets of W in a transaction that constitutes an applicable asset acquisition under section 1060(c). Of the $10,000,000 consideration paid in the transaction, $9,000,000 is allocable to tangible assets purchased from W and $1,000,000 is allocable to goodwill. The $1,000,000 allocable to goodwill constitutes an amount paid to W to acquire an intangible from W and must be capitalized.

**(d) Created intangibles—(1) In general.** Except as provided in paragraph (f) of this section (relating to the 12–month rule), a taxpayer must capitalize amounts paid to create an intangible described in this paragraph (d). The determination of whether an amount is paid to create an intangible described in this paragraph (d) is to be made based on all of the facts and circumstances, disregarding distinctions between the labels used in this paragraph (d) to describe the intangible and the labels used by the taxpayer and other parties to the transaction.

**(2) Financial interests—(i) In general.** A taxpayer must capitalize amounts paid to another party to create, originate, enter into, renew or renegotiate with that party any of the following financial interests, whether or not the interest is regularly traded on an established market:

(A) An ownership interest in a corporation, partnership, trust, estate, limited liability company, or other entity.

(B) A debt instrument, deposit, stripped bond, stripped coupon (including a servicing right treated for federal income tax purposes as a stripped coupon), regular interest in a REMIC or FASIT, or any other intangible treated as debt for Federal income tax purposes.

(C) A financial instrument, such as—

(1) A letter of credit;

(2) A credit card agreement;

(3) A notional principal contract;

(4) A foreign currency contract;

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 85 of 651

(5) A futures contract;

(6) A forward contract (including an agreement under which the taxpayer has the right and obligation to provide or to acquire property (or to be compensated for such property, regardless of whether the taxpayer provides or acquires the property));

(7) An option (including an agreement under which the taxpayer has the right to provide or to acquire property (or to be compensated for such property, regardless of whether the taxpayer provides or acquires the property)); and

(8) Any other financial derivative.

(D) An endowment contract, annuity contract, or insurance contract that has or may have cash value.

(E) Non-functional currency.

(F) An agreement providing either party the right to use, possess or sell a financial interest described in this paragraph (d)(2).

**(ii) Amounts paid to create, originate, enter into, renew or renegotiate.** An amount paid to another party is not paid to create, originate, enter into, renew or renegotiate a financial interest with that party if the payment is made with the mere hope or expectation of developing or maintaining a business relationship with that party and is not contingent on the origination, renewal or renegotiation of a financial interest with that party.

**(iii) Renegotiate.** A taxpayer is treated as renegotiating a financial interest if the terms of the financial interest are modified. A taxpayer also is treated as renegotiating a financial interest if the taxpayer enters into a new financial interest with the same party (or substantially the same parties) to a terminated financial interest, the taxpayer could not cancel the terminated financial interest without the consent of the other party (or parties), and the other party (or parties) would not have consented to the cancellation unless the taxpayer entered into the new financial interest. A taxpayer is treated as unable to cancel a financial interest without the consent of the other party (or parties) if, under the terms of the financial interest, the taxpayer is subject to a termination penalty and the other party (or parties) to the financial interest modifies the terms of the penalty.

**(iv) Coordination with other provisions of this paragraph (d).** An amount described in this paragraph (d)(2) that is also described elsewhere in paragraph (d) of this section is treated as described only in this paragraph (d)(2).

**(v) Coordination with § 1.263(a)–5.** See § 1.263(a)–5 for the treatment of borrowing costs and the treatment of amounts paid by an option writer.

**(vi) Examples.** The following examples illustrate the rules of this paragraph (d)(2):

**Example 1.** Loan. X corporation, a commercial bank, makes a loan to A in the principal amount of $250,000. The $250,000 principal amount of the loan paid to A constitutes an amount paid to another party to create a debt instrument with that party under paragraph (d)(2)(i)(B) of this section and must be capitalized.

**Example 2.** Option. W corporation owns all of the outstanding stock of X corporation. Y corporation pays W $1,000,000 in exchange for W's grant of a 3–year call option to Y permitting Y to purchase all of the outstanding stock of X at a certain price per share. Y's payment of $1,000,000 to W constitutes an amount paid to another party to create an option with that party under paragraph (d)(2)(i)(C)(7) of this section and must be capitalized.

**Example 3.** Partnership interest. Z corporation pays $10,000 to P, a partnership, in exchange for an ownership interest in P. Z's payment of $10,000 to P constitutes an amount paid to another party to create an ownership interest in a partnership with that party under paragraph (d)(2)(i)(A) of this section and must be capitalized.

**Example 4.** Take or pay contract. Q corporation, a producer of natural gas, pays $1,000,000 to R during 2005 to induce R corporation to enter into a 5–year "take or pay" gas purchase contract. Under the contract, R is liable to pay for a specified minimum amount of gas, whether or not R takes such gas. Q's payment of $1,000,000 is an amount paid to another party to induce that party to enter into an agreement providing Q the right and obligation to provide property or be compensated for such property (regardless of whether the property is provided) under paragraph (d)(2)(i)(C)(6) of this section and must be capitalized.

**Example 5.** Agreement to provide property. P corporation pays R corporation $1,000,000 in exchange for R's agreement to purchase 1,000 units of P's product at any time within the three succeeding calendar years. The agreement describes P's $1,000,000 as a sales discount. P's $1,000,000 payment is an amount paid to induce R to enter into an agreement providing P the right and obligation to provide property under paragraph (d)(2)(i)(C)(6) of this section and must be capitalized.

**Example 6.** Customer incentive payment. S corporation, a computer manufacturer, seeks to develop a business relationship with V corporation, a computer retailer. As an incentive to encourage V to purchase computers from S, S enters into an agreement with V under which S agrees that, if V purchases $20,000,000 of computers from S within 3 years from the date of the agreement, S will pay V $2,000,000 on the date that V reaches the $20,000,000 threshold. V reaches the $20,000,000 threshold during the third year of the agreement, and S pays V $2,000,000. S is not required to capitalize its payment to V under this paragraph (d)(2) because the payment does not provide S the right or obligation to provide property and does not create a separate and distinct intangible asset for S within the meaning of paragraph (b)(3)(i) of this section.

**(3) Prepaid expenses—(i) In general.** A taxpayer must capitalize prepaid expenses.

**(ii) Examples.** The following examples illustrate the rules of this paragraph (d)(3):

**Example 1.** Prepaid insurance. N corporation, an accrual method taxpayer, pays $10,000 to an insurer to obtain three years of coverage under a property and casualty insurance policy. The $10,000 is a prepaid expense and must be capitalized under this paragraph (d)(3). Paragraph (d)(2) of this section does not apply to the payment because the policy has no cash value.

**Example 2.** Prepaid rent. X corporation, a cash method taxpayer, enters into a 24–month lease of office space. At the time of the lease signing, X prepays $240,000. No other amounts are due under the lease. The $240,000 is a prepaid expense and must be capitalized under this paragraph (d)(3).

**(4) Certain memberships and privileges—(i) In general.** A taxpayer must capitalize amounts paid to an organization to obtain, renew, renegotiate, or upgrade a membership or privilege from that organization. A taxpayer is not required to

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 87 of 651

capitalize under this paragraph (d)(4) an amount paid to obtain, renew, renegotiate or upgrade certification of the taxpayer's products, services, or business processes.

**(ii) Examples.** The following examples illustrate the rules of this paragraph (d)(4):

**Example 1.** Hospital privilege. B, a physician, pays $10,000 to Y corporation to obtain lifetime staff privileges at a hospital operated by Y. B must capitalize the $10,000 payment under this paragraph (d)(4).

**Example 2.** Initiation fee. X corporation pays a $50,000 initiation fee to obtain membership in a trade association. X must capitalize the $50,000 payment under this paragraph (d)(4).

**Example 3.** Product rating. V corporation, an automobile manufacturer, pays W corporation, a national quality ratings association, $100,000 to conduct a study and provide a rating of the quality and safety of a line of V's automobiles. V's payment is an amount paid to obtain a certification of V's product and is not required to be capitalized under this paragraph (d)(4).

**Example 4.** Business process certification. Z corporation, a manufacturer, seeks to obtain a certification that its quality control standards meet a series of international standards known as ISO 9000. Z pays $50,000 to an independent registrar to obtain a certification from the registrar that Z's quality management system conforms to the ISO 9000 standard. Z's payment is an amount paid to obtain a certification of Z's business processes and is not required to be capitalized under this paragraph (d)(4).

**(5) Certain rights obtained from a governmental agency—(i) In general.** A taxpayer must capitalize amounts paid to a governmental agency to obtain, renew, renegotiate, or upgrade its rights under a trademark, trade name, copyright, license, permit, franchise, or other similar right granted by that governmental agency.

**(ii) Examples.** The following examples illustrate the rules of this paragraph (d)(5):

**Example 1.** Business license. X corporation pays $15,000 to state Y to obtain a business license that is valid indefinitely. Under this paragraph (d)(5), the amount paid to state Y is an amount paid to a government agency for a right granted by that agency. Accordingly, X must capitalize the $15,000 payment.

**Example 2.** Bar admission. A, an individual, pays $1,000 to an agency of state Z to obtain a license to practice law in state Z that is valid indefinitely, provided A adheres to the requirements governing the practice of law in state Z. Under this paragraph (d)(5), the amount paid to state Z is an amount paid to a government agency for a right granted by that agency. Accordingly, A must capitalize the $1,000 payment.

**(6) Certain contract rights—(i) In general.** Except as otherwise provided in this paragraph (d)(6), a taxpayer must capitalize amounts paid to another party to create, originate, enter into, renew or renegotiate with that party—

(A) An agreement providing the taxpayer the right to use tangible or intangible property or the right to be compensated for the use of tangible or intangible property;

(B) An agreement providing the taxpayer the right to provide or to receive services (or the right to be compensated for services regardless of whether the taxpayer provides such services);

(C) A covenant not to compete or an agreement having substantially the same effect as a covenant not to compete (except, in the case of an agreement that requires the performance of services, to the extent that the amount represents reasonable compensation for services actually rendered);

(D) An agreement not to acquire additional ownership interests in the taxpayer; or

(E) An agreement providing the taxpayer (as the covered party) with an annuity, an endowment, or insurance coverage.

**(ii) Amounts paid to create, originate, enter into, renew or renegotiate.** An amount paid to another party is not paid to create, originate, enter into, renew or renegotiate an agreement with that party if the payment is made with the mere hope or expectation of developing or maintaining a business relationship with that party and is not contingent on the origination, renewal or renegotiation of an agreement with that party.

**(iii) Renegotiate.** A taxpayer is treated as renegotiating an agreement if the terms of the agreement are modified. A taxpayer also is treated as renegotiating an agreement if the taxpayer enters into a new agreement with the same party (or substantially the same parties) to a terminated agreement, the taxpayer could not cancel the terminated agreement without the consent of the other party (or parties), and the other party (or parties) would not have consented to the cancellation unless the taxpayer entered into the new agreement. A taxpayer is treated as unable to cancel an agreement without the consent of the other party (or parties) if, under the terms of the agreement, the taxpayer is subject to a termination penalty and the other party (or parties) to the agreement modifies the terms of the penalty.

**(iv) Right.** An agreement does not provide the taxpayer a right to use property or to provide or receive services if the agreement may be terminated at will by the other party (or parties) to the agreement before the end of the period prescribed by paragraph (f)(1) of this section. An agreement is not terminable at will if the other party (or parties) to the agreement is economically compelled not to terminate the agreement until the end of the period prescribed by paragraph (f)(1) of this section. All of the facts and circumstances will be considered in determining whether the other party (or parties) to an agreement is economically compelled not to terminate the agreement. An agreement also does not provide the taxpayer the right to provide services if the agreement merely provides that the taxpayer will stand ready to provide services if requested, but places no obligation on another person to request or pay for the taxpayer's services.

**(v) De minimis amounts.** A taxpayer is not required to capitalize amounts paid to another party (or parties) to create, originate, enter into, renew or renegotiate with that party (or those parties) an agreement described in paragraph (d)(6)(i) of this section if the aggregate of all amounts paid to that party (or those parties) with respect to the agreement does not exceed $5,000. If the aggregate of all amounts paid to the other party (or parties) with respect to that agreement exceeds $5,000, then all amounts must be capitalized. For purposes of this paragraph (d)(6), an amount paid in the form of property is valued at its fair market value at the time of the payment. In general, a taxpayer must determine whether the rules of this paragraph (d)(6)(v) apply by accounting for the specific amounts paid with respect to each agreement. However, a taxpayer that reasonably expects to create, originate, enter into, renew or renegotiate at least 25 similar agreements during the taxable year may establish a pool of agreements for purposes of determining the amounts paid with respect to the agreements in the pool. Under this pooling method, the amount paid with respect to each agreement included in the pool is equal to the average amount paid with respect to all agreements included in the pool. A taxpayer computes the average amount paid with respect to all agreements included in the pool by dividing the sum of all amounts paid with respect to all agreements included in the pool by the number of agreements included in the pool. See paragraph (h) of this section for additional rules relating to pooling.

**(vi) Exception for lessee construction allowances.** Paragraph (d)(6)(i) of this section does not apply to amounts paid by a lessor to a lessee as a construction allowance to the extent the lessee expends the amount for the tangible property that is owned by the lessor for Federal income tax purposes (see, for example, section 110).

**(vii) Examples.** The following examples illustrate the rules of this paragraph (d)(6):

**Example 1.** New lease agreement. V seeks to lease commercial property in a prominent downtown location of city R. V pays Z, the owner of the commercial property, $50,000 in exchange for Z entering into a 10–year lease with V. V's payment is an amount paid to another party to enter into an agreement providing V the right to use tangible property. Because the $50,000 payment exceeds $5,000, no portion of the amount paid to Z is de minimis for purposes of paragraph (d)(6)(v) of this section. Under paragraph (d)(6)(i)(A) of this section, V must capitalize the entire $50,000 payment.

**Example 2.** Modification of lease agreement. Partnership Y leases a piece of equipment for use in its business from Z corporation. When the lease has a remaining term of 3 years, Y requests that Z modify the existing lease by extending the remaining term by 5 years. Y pays $50,000 to Z in exchange for Z's agreement to modify the existing lease. Y's payment of $50,000 is an amount paid to another party to renegotiate an agreement providing Y the right to use property. Because the $50,000 payment exceeds $5,000, no portion of the amount paid to Z is de minimis for purposes of paragraph (d)(6)(v) of this section. Under paragraph (d)(6)(i)(A) of this section, Y must capitalize the entire $50,000 payment.

**Example 3.** Modification of lease agreement. In 2004, R enters into a 5–year, non-cancelable lease of a mainframe computer for use in its business. R subsequently determines that the mainframe computer that R is leasing is no longer adequate for its needs. In 2006, R and P corporation (the lessor) agree to terminate the 2004 lease and to enter into a new 5–year lease for a different and more powerful mainframe computer. R pays P a $75,000 early termination fee. P would not have agreed to terminate the 2004 lease unless R agreed to enter into the 2006 lease. R's payment of $75,000 is an amount paid to another party to renegotiate an agreement providing R the right to use property. Because the $75,000 payment exceeds $5,000, no portion of the amount paid to P is de minimis for purposes of paragraph (d)(6)(v) of this section. Under paragraph (d)(6)(i)(A) of this section, R must capitalize the entire $75,000 payment.

**Example 4.** Modification of lease agreement. Same as Example 3, except the 2004 lease agreement allows R to terminate the lease at any time subject to a $75,000 early termination fee. Because R can terminate the lease without P's approval, R's payment of $75,000 is not an amount paid to another party to renegotiate an agreement. Accordingly, R is not required to capitalize the $75,000 payment under this paragraph (d)(6).

**Example 5.** Modification of lease agreement. Same as Example 4, except P agreed to reduce the early termination fee to $60,000. Because R did not pay an amount to renegotiate the early termination fee, R's payment of $60,000 is not an amount paid to another party to renegotiate an agreement. Accordingly, R is not required to capitalize the $60,000 payment under this paragraph (d)(6).

**Example 6.** Covenant not to compete. R corporation enters into an agreement with A, an individual, that prohibits A from competing with R for a period of three years. To encourage A to enter into the agreement, R agrees to pay A $100,000 upon the signing of the agreement. R's payment is an amount paid to another party to enter into a covenant not to compete. Because the $100,000 payment exceeds $5,000, no portion of the amount paid to A is de minimis for purposes of paragraph (d)(6)(v) of this section. Under paragraph (d)(6)(i)(C) of this section, R must capitalize the entire $100,000 payment.

**Example 7.** Standstill agreement. During 2004 through 2005, X corporation acquires a large minority interest in the stock of Z corporation. To ensure that X does not take control of Z, Z pays X $5,000,000 for a standstill agreement under which X agrees not to acquire any more stock in Z for a period of 10 years. Z's payment is an amount paid to another party to enter into an

agreement not to acquire additional ownership interests in Z. Because the $5,000,000 payment exceeds $5,000, no portion of the amount paid to X is de minimis for purposes of paragraph (d)(6)(v) of this section. Under paragraph (d)(6)(i)(D) of this section, Z must capitalize the entire $5,000,000 payment.

**Example 8.** Signing bonus. Employer B pays a $25,000 signing bonus to employee C to induce C to come to work for B. C can leave B's employment at any time to work for a competitor of B and is not required to repay the $25,000 bonus to B. Because C is not economically compelled to continue his employment with B, B's payment does not provide B the right to receive services from C. Accordingly, B is not required to capitalize the $25,000 payment.

**Example 9.** Renewal. In 2000, M corporation and N corporation enter into a 5–year agreement that gives M the right to manage N's investment portfolio. In 2005, N has the option of renewing the agreement for another three years. During 2004, M pays $10,000 to send several employees of N to an investment seminar. M pays the $10,000 to help develop and maintain its business relationship with N with the expectation that N will renew its agreement with M in 2005. Because M's payment is not contingent on N agreeing to renew the agreement, M's payment is not an amount paid to renew an agreement under paragraph (d)(6)(ii) of this section and is not required to be capitalized.

**Example 10.** De minimis payments. X corporation is engaged in the business of providing wireless telecommunications services to customers. To induce customer B to enter into a 3–year non-cancelable telecommunications contract, X provides B with a free wireless telephone. The fair market value of the wireless telephone is $300 at the time it is provided to B. X's provision of a wireless telephone to B is an amount paid to B to induce B to enter into an agreement providing X the right to provide services, as described in paragraph (d)(6)(i)(B) of this section. Because the amount of the inducement is $300, the amount of the inducement is de minimis under paragraph (d)(6)(v) of this section. Accordingly, X is not required to capitalize the amount of the inducement provided to B.

**(7) Certain contract terminations—(i) In general.** A taxpayer must capitalize amounts paid to another party to terminate—

(A) A lease of real or tangible personal property between the taxpayer (as lessor) and that party (as lessee);

(B) An agreement that grants that party the exclusive right to acquire or use the taxpayer's property or services or to conduct the taxpayer's business (other than an intangible described in paragraph (c)(1)(i) through (iv) of this section or a financial interest described in paragraph (d)(2) of this section); or

(C) An agreement that prohibits the taxpayer from competing with that party or from acquiring property or services from a competitor of that party.

**(ii) Certain break-up fees.** Paragraph (d)(7)(i) of this section does not apply to the termination of a transaction described in § 1.263(a)–5(a) (relating to an acquisition of a trade or business, a change in the capital structure of a business entity, and certain other transactions). See § 1.263(a)–5(c)(8) for rules governing the treatment of amounts paid to terminate a transaction to which that section applies.

**(iii) Examples.** The following examples illustrate the rules of this paragraph (d)(7):

**Example 1.** Termination of exclusive license agreement. On July 1, 2005, N enters into a license agreement with R corporation under which N grants R the exclusive right to manufacture and distribute goods using N's design and trademarks for a period of

10 years. On June 30, 2007, N pays R $5,000,000 in exchange for R's agreement to terminate the exclusive license agreement. N's payment to terminate its license agreement with R constitutes a payment to terminate an exclusive license to use the taxpayer's property, as described in paragraph (d)(7)(i)(B) of this section. Accordingly, N must capitalize its $5,000,000 payment to R.

**Example 2.** Termination of exclusive distribution agreement. On March 1, 2005, L, a manufacturer, enters into an agreement with M granting M the right to be the sole distributor of L's products in state X for 10 years. On July 1, 2008, L pays M $50,000 in exchange for M's agreement to terminate the distribution agreement. L's payment to terminate its agreement with M constitutes a payment to terminate an exclusive right to acquire L's property, as described in paragraph (d)(7)(i)(B) of this section. Accordingly, L must capitalize its $50,000 payment to M.

**Example 3.** Termination of covenant not to compete. On February 1, 2005, Y corporation enters into a covenant not to compete with Z corporation that prohibits Y from competing with Z in city V for a period of 5 years. On January 31, 2007, Y pays Z $1,000,000 in exchange for Z's agreement to terminate the covenant not to compete. Y's payment to terminate the covenant not to compete with Z constitutes a payment to terminate an agreement that prohibits Y from competing with Z, as described in paragraph (d)(7)(i)(C) of this section. Accordingly, Y must capitalize its $1,000,000 payment to Z.

**Example 4.** Termination of merger agreement. N corporation and U corporation enter into an agreement under which N agrees to merge into U. Subsequently, N pays U $10,000,000 to terminate the merger agreement. As provided in paragraph (d)(7)(ii) of this section, N's $10,000,000 payment to terminate the merger agreement with U is not required to be capitalized under this paragraph (d)(7). In addition, N's $10,000,000 does not create a separate and distinct intangible asset for N within the meaning of paragraph (b)(3)(i) of this section. (See § 1.263(a)–5 for additional rules regarding termination of merger agreements).

**(8) Certain benefits arising from the provision, production, or improvement of real property—(i) In general.** A taxpayer must capitalize amounts paid for real property if the taxpayer transfers ownership of the real property to another person (except to the extent the real property is sold for fair market value) and if the real property can reasonably be expected to produce significant economic benefits to the taxpayer after the transfer. A taxpayer also must capitalize amounts paid to produce or improve real property owned by another (except to the extent the taxpayer is selling services at fair market value to produce or improve the real property) if the real property can reasonably be expected to produce significant economic benefits for the taxpayer.

**(ii) Exclusions.** A taxpayer is not required to capitalize an amount under paragraph (d)(8)(i) of this section if the taxpayer transfers real property or pays an amount to produce or improve real property owned by another in exchange for services, the purchase or use of property, or the creation of an intangible described in paragraph (d) of this section (other than in this paragraph (d)(8)). The preceding sentence does not apply to the extent the taxpayer does not receive fair market value consideration for the real property that is relinquished or for the amounts that are paid by the taxpayer to produce or improve real property owned by another.

**(iii) Real property.** For purposes of this paragraph (d)(8), real property includes property that is affixed to real property and that will ordinarily remain affixed for an indefinite period of time, such as roads, bridges, tunnels, pavements, wharves and docks, breakwaters and sea walls, elevators, power generation and transmission facilities, and pollution control facilities.

**(iv) Impact fees and dedicated improvements.** Paragraph (d)(8)(i) of this section does not apply to amounts paid to satisfy one-time charges imposed by a State or local government against new development (or expansion of existing development) to finance specific offsite capital improvements for general public use that are necessitated by the new or expanded development. In addition, paragraph (d)(8)(i) of this section does not apply to amounts paid for real property or improvements to real property constructed by the taxpayer where the real property or improvements benefit new

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 92 of 651

development or expansion of existing development, are immediately transferred to a State or local government for dedication to the general public use, and are maintained by the State or local government. See section 263A and the regulations thereunder for capitalization rules that apply to amounts referred to in this paragraph (d)(8)(iv).

**(v) Examples.** The following examples illustrate the rules of this paragraph (d)(8):

**Example 1.** Amount paid to produce real property owned by another. W corporation operates a quarry on the east side of a river in city Z and a crusher on the west side of the river. City Z's existing bridges are of insufficient capacity to be traveled by trucks in transferring stone from W's quarry to its crusher. As a result, the efficiency of W's operations is greatly reduced. W contributes $1,000,000 to city Z to defray in part the cost of constructing a publicly owned bridge capable of accommodating W's trucks. W's payment to city Z is an amount paid to produce or improve real property (within the meaning of paragraph (d)(8)(iii) of this section) that can reasonably be expected to produce significant economic benefits for W. Under paragraph (d)(8)(i) of this section, W must capitalize the $1,000,000 paid to city Z.

**Example 2.** Transfer of real property to another. K corporation, a shipping company, uses smaller vessels to unload its ocean-going vessels at port X. There is no natural harbor at port X, and during stormy weather the transfer of freight between K's ocean vessels and port X is extremely difficult and sometimes impossible, which can be very costly to K. Consequently, K constructs a short breakwater at a cost of $50,000. The short breakwater, however, is inadequate, so K persuades the port authority to build a larger breakwater that will allow K to unload its vessels at any time of the year and during all kinds of weather. K contributes the short breakwater and pays $200,000 to the port authority for use in building the larger breakwater. Because the transfer of the small breakwater and $200,000 is reasonably expected to produce significant economic benefits for K, K must capitalize both the adjusted basis of the small breakwater (determined at the time the small breakwater is contributed) and the $200,000 payment under this paragraph (d)(8).

**Example 3.** Dedicated improvements. X corporation is engaged in the development and sale of residential real estate. In connection with a residential real estate project under construction by X in city Z, X is required by city Z to construct ingress and egress roads to and from its project and immediately transfer the roads to city Z for dedication to general public use. The roads will be maintained by city Z. X pays its subcontractor $100,000 to construct the ingress and egress roads. X's payment is a dedicated improvement within the meaning of paragraph (d)(8)(iv) of this section. Accordingly, X is not required to capitalize the $100,000 payment under this paragraph (d)(8). See section 263A and the regulations thereunder for capitalization rules that apply to amounts referred to in paragraph (d)(8)(iv) of this section.

**(9) Defense or perfection of title to intangible property—(i) In general.** A taxpayer must capitalize amounts paid to another party to defend or perfect title to intangible property if that other party challenges the taxpayer's title to the intangible property.

**(ii) Certain break-up fees.** Paragraph (d)(9)(i) of this section does not apply to the termination of a transaction described in § 1.263(a)–5(a) (relating to an acquisition of a trade or business, a change in the capital structure of a business entity, and certain other transactions). See § 1.263(a)–5 for rules governing the treatment of amounts paid to terminate a transaction to which that section applies. Paragraph (d)(9)(i) of this section also does not apply to an amount paid to another party to terminate an agreement that grants that party the right to purchase the taxpayer's intangible property.

**(iii) Example.** The following example illustrates the rules of this paragraph (d)(9):

**Example.** Defense of title. R corporation claims to own an exclusive patent on a particular technology. U corporation brings a lawsuit against R, claiming that U is the true owner of the patent and that R stole the technology from U. The sole issue in

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 93 of 651

the suit involves the validity of R's patent. R chooses to settle the suit by paying U $100,000 in exchange for U's release of all future claim to the patent. R's payment to U is an amount paid to defend or perfect title to intangible property under paragraph (d)(9) of this section and must be capitalized.

**(e) Transaction costs—(1) Scope of facilitate—(i) In general.** Except as otherwise provided in this section, an amount is paid to facilitate the acquisition or creation of an intangible (the transaction) if the amount is paid in the process of investigating or otherwise pursuing the transaction. Whether an amount is paid in the process of investigating or otherwise pursuing the transaction is determined based on all of the facts and circumstances. In determining whether an amount is paid to facilitate a transaction, the fact that the amount would (or would not) have been paid but for the transaction is relevant, but is not determinative. An amount paid to determine the value or price of an intangible is an amount paid in the process of investigating or otherwise pursuing the transaction.

**(ii) Treatment of termination payments.** An amount paid to terminate (or facilitate the termination of) an existing agreement does not facilitate the acquisition or creation of another agreement under this section. See paragraph (d)(6)(iii) of this section for the treatment of termination fees paid to the other party (or parties) of a renegotiated agreement.

**(iii) Special rule for contracts.** An amount is treated as not paid in the process of investigating or otherwise pursuing the creation of an agreement described in paragraph (d)(2) or (d)(6) of this section if the amount relates to activities performed before the earlier of the date the taxpayer begins preparing its bid for the agreement or the date the taxpayer begins discussing or negotiating the agreement with another party to the agreement.

**(iv) Borrowing costs.** An amount paid to facilitate a borrowing does not facilitate an acquisition or creation of an intangible described in paragraphs (b)(1)(i) through (iv) of this section. See §§ 1.263(a)–5 and 1.446–5 for the treatment of an amount paid to facilitate a borrowing.

**(v) Special rule for stock redemption costs of open-end regulated investment companies.** An amount paid by an open-end regulated investment company (within the meaning of section 851) to facilitate a redemption of its stock is treated as an amount that does not facilitate the acquisition of an intangible under this section.

**(2) Coordination with paragraph (d) of this section.** In the case of an amount paid to facilitate the creation of an intangible described in paragraph (d) of this section, the provisions of this paragraph (e) apply regardless of whether a payment described in paragraph (d) is made.

**(3) Transaction.** For purposes of this section, the term transaction means all of the factual elements comprising an acquisition or creation of an intangible and includes a series of steps carried out as part of a single plan. Thus, a transaction can involve more than one invoice and more than one intangible. For example, a purchase of intangibles under one purchase agreement constitutes a single transaction, notwithstanding the fact that the acquisition involves multiple intangibles and the amounts paid to facilitate the acquisition are capable of being allocated among the various intangibles acquired.

**(4) Simplifying conventions—(i) In general.** For purposes of this section, employee compensation (within the meaning of paragraph (e)(4)(ii) of this section), overhead, and de minimis costs (within the meaning of paragraph (e)(4)(iii) of this section) are treated as amounts that do not facilitate the acquisition or creation of an intangible.

**(ii) Employee compensation—**(A) In general. The term employee compensation means compensation (including salary, bonuses and commissions) paid to an employee of the taxpayer. For purposes of this section, whether an individual is an employee is determined in accordance with the rules contained in section 3401(c) and the regulations thereunder.

(B) Certain amounts treated as employee compensation. For purposes of this section, a guaranteed payment to a partner in a partnership is treated as employee compensation. For purposes of this section, annual compensation paid to a director of a corporation is treated as employee compensation. For example, an amount paid to a director of a corporation for attendance at a regular meeting of the board of directors (or committee thereof) is treated as employee compensation for purposes of this section. However, an amount paid to a director for attendance at a special meeting of the board of directors (or committee thereof) is not treated as employee compensation. An amount paid to a person that is not an employee of the taxpayer (including the employer of the individual who performs the services) is treated as employee compensation for purposes of this section only if the amount is paid for secretarial, clerical, or similar administrative support services. In the case of an affiliated group of corporations filing a consolidated Federal income tax return, a payment by one member of the group to a second member of the group for services performed by an employee of the second member is treated as employee compensation if the services provided by the employee are provided at a time during which both members are affiliated.

**(iii) De minimis costs—**(A) In general. Except as provided in paragraph (e)(4)(iii)(B) of this section, the term de minimis costs means amounts (other than employee compensation and overhead) paid in the process of investigating or otherwise pursuing a transaction if, in the aggregate, the amounts do not exceed $5,000 (or such greater amount as may be set forth in published guidance). If the amounts exceed $5,000 (or such greater amount as may be set forth in published guidance), none of the amounts are de minimis costs within the meaning of this paragraph (e)(4)(iii)(A). For purposes of this paragraph (e)(4)(iii), an amount paid in the form of property is valued at its fair market value at the time of the payment. In determining the amount of transaction costs paid in the process of investigating or otherwise pursuing a transaction, a taxpayer generally must account for the specific costs paid with respect to each transaction. However, a taxpayer that reasonably expects to enter into at least 25 similar transactions during the taxable year may establish a pool of similar transactions for purposes of determining the amount of transaction costs paid in the process of investigating or otherwise pursuing the transactions in the pool. Under this pooling method, the amount of transaction costs paid in the process of investigating or otherwise pursuing each transaction included in the pool is equal to the average transaction costs paid in the process of investigating or otherwise pursuing all transactions included in the pool. A taxpayer computes the average transaction costs paid in the process of investigating or otherwise pursuing all transactions included in the pool by dividing the sum of all transaction costs paid in the process of investigating or otherwise pursuing all transactions included in the pool by the number of transactions included in the pool. See paragraph (h) of this section for additional rules relating to pooling.

(B) Treatment of commissions. The term de minimis costs does not include commissions paid to facilitate the acquisition of an intangible described in paragraphs (c)(1)(i) through (v) of this section or to facilitate the creation, origination, entrance into, renewal or renegotiation of an intangible described in paragraph (d)(2)(i) of this section.

**(iv) Election to capitalize.** A taxpayer may elect to treat employee compensation, overhead, or de minimis costs paid in the process of investigating or otherwise pursuing a transaction as amounts that facilitate the transaction. The election is made separately for each transaction and applies to employee compensation, overhead, or de minimis costs, or to any combination thereof. For example, a taxpayer may elect to treat overhead and de minimis costs, but not employee compensation, as amounts that facilitate the transaction. A taxpayer makes the election by treating the amounts to which the election applies as amounts that facilitate the transaction in the taxpayer's timely filed original Federal income tax return (including extensions) for the taxable year during which the amounts are paid. In the case of an affiliated group of corporations filing a consolidated return, the election is made separately with respect to each member of the group, and

not with respect to the group as a whole. In the case of an S corporation or partnership, the election is made by the S corporation or by the partnership, and not by the shareholders or partners. An election made under this paragraph (e)(4) (iv) is revocable with respect to each taxable year for which made only with the consent of the Commissioner.

**(5) Examples.** The following examples illustrate the rules of this paragraph (e):

**Example 1.** Costs to facilitate. In December 2005, R corporation, a calendar year taxpayer, enters into negotiations with X corporation to lease commercial property from X for a period of 25 years. R pays A, its outside legal counsel, $4,000 in December 2005 for services rendered by A during December in assisting with negotiations with X. In January 2006, R and X finalize the terms of the lease and execute the lease agreement. R pays B, another of its outside legal counsel, $2,000 in January 2006 for services rendered by B during January in drafting the lease agreement. The agreement between R and X is an agreement providing R the right to use property, as described in paragraph (d)(6)(i)(A) of this section. R's payments to its outside counsel are amounts paid to facilitate the creation of the agreement. As provided in paragraph (e)(4)(iii)(A) of this section, R must aggregate its transaction costs for purposes of determining whether the transaction costs are de minimis. Because R's aggregate transaction costs exceed $5,000, R's transaction costs are not de minimis costs within the meaning of paragraph (e) (4)(iii)(A) of this section. Accordingly, R must capitalize the $4,000 paid to A and the $2,000 paid to B under paragraph (b) (1)(v) of this section.

**Example 2.** Costs to facilitate. Partnership X leases its manufacturing equipment from Y corporation under a 10–year lease. During 2005, when the lease has a remaining term of 4 years, X enters into a written agreement with Z corporation, a competitor of Y, under which X agrees to lease its manufacturing equipment from Z, subject to the condition that X first successfully terminates its lease with Y. X pays Y $50,000 in exchange for Y's agreement to terminate the equipment lease. Under paragraph (e)(1)(ii), X's $50,000 payment does not facilitate the creation of the new lease with Z. In addition, X's $50,000 payment does not terminate an agreement described in paragraph (d)(7) of this section. Accordingly, X is not required to capitalize the $50,000 termination payment under this section.

**Example 3.** Costs to facilitate. W corporation enters into a lease agreement with X corporation under which W agrees to lease property to X for a period of 5 years. W pays its outside counsel $7,000 for legal services rendered in drafting the lease agreement and negotiating with X. The agreement between W and X is an agreement providing W the right to be compensated for the use of property, as described in paragraph (d)(6)(i)(A) of this section. Under paragraph (e)(1)(i) of this section, W's payment to its outside counsel is an amount paid to facilitate the creation of that agreement. As provided by paragraph (e)(2) of this section, W must capitalize its $7,000 payment to outside counsel notwithstanding the fact that W made no payment described in paragraph (d)(6)(i) of this section.

**Example 4.** Costs to facilitate. U corporation, which owns a majority of the common stock of T corporation, votes its controlling interest in favor of a perpetual extension of T's charter. M, a minority shareholder in T, votes against the extension. Under applicable state law, U is required to purchase the stock of T held by M. When U and M are unable to agree on the value of M's shares, U brings an action in state court to appraise the value of M's stock interest. U pays attorney, accountant and appraisal fees of $25,000 for services rendered in connection with the negotiation and litigation with M. Because U's attorney, accountant and appraisal costs help establish the purchase price of M's stock, U's $25,000 payment facilitates the acquisition of stock. Accordingly, U must capitalize the $25,000 payment under paragraph (b)(1)(v) of this section.

**Example 5.** Costs to facilitate. For several years, H corporation has provided services to J corporation whenever requested by J. H wants to enter into a multiple-year contract with J that would give H the right to provide services to J. On June 10, 2004, H starts to prepare a bid to provide services to J and pays a consultant $15,000 to research potential competitors. On August 10, 2004, H raises the possibility of a multi-year contract with J. On October 10, 2004, H and J enter into a contract giving H the right to provide services to J for five years. During 2004, H pays $7,000 to travel to the city in which J's offices are located to continue providing services to J under their prior arrangement and pays $6,000 for travel to the city in which J's offices are located to further develop H's business relationship with J (for example, to introduce new employees, update J on current

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 96 of 651

developments and take J's executives to dinner). H also pays $8,000 for travel costs to meet with J to discuss and negotiate the contract. Because the contract gives H the right to provide services to J, H must capitalize amounts paid to facilitate the creation of the contract. The $7,000 of travel expenses paid to provide services to J under their prior arrangement does not facilitate the creation of the contract and is not required to be capitalized, regardless of when the travel occurs. The $6,000 of travel expenses paid to further develop H's business relationship with J is paid in the process of pursuing the contract (and therefore must be capitalized) only to the extent the expenses relate to travel on or after June 10, 2004 (the date H begins to prepare a bid) and before October 11, 2004 (the date after H and J enter into the contract). The $8,000 of travel expenses paid to meet with J to discuss and negotiate the contract is paid in the process of pursuing the contact and must be capitalized. The $15,000 of consultant fees is paid to investigate the contract and also must be capitalized.

**Example 6.** Costs that do not facilitate. X corporation brings a legal action against Y corporation to recover lost profits resulting from Y's alleged infringement of X's copyright. Y does not challenge X's copyright, but argues that it did not infringe upon X's copyright. X pays its outside counsel $25,000 for legal services rendered in pursuing the suit against Y. Because X's title to its copyright is not in question, X's action against Y does not involve X's defense or perfection of title to intangible property. Thus, the amount paid to outside counsel does not facilitate the creation of an intangible described in paragraph (d)(9) of this section. Accordingly, X is not required to capitalize its $25,000 payment under this section.

**Example 7.** De minimis rule. W corporation, a commercial bank, acquires a portfolio containing 100 loans from Y corporation. As part of the acquisition, W pays an independent appraiser a fee of $10,000 to appraise the portfolio. The fee is an amount paid to facilitate W's acquisition of an intangible. The acquisition of the loan portfolio is a single transaction within the meaning of paragraph (e)(3) of this section. Because the amount paid to facilitate the transaction exceeds $5,000, the amount is not de minimis as defined in paragraph (e)(4)(iii)(A) of this section. Accordingly, W must capitalize the $10,000 fee under paragraph (b)(1)(v) of this section.

**Example 8.** Compensation and overhead. P corporation, a commercial bank, maintains a loan acquisition department whose sole function is to acquire loans from other financial institutions. As provided in paragraph (e)(4)(i) of this section, P is not required to capitalize any portion of the compensation paid to the employees in its loan acquisition department or any portion of its overhead allocable to the loan acquisition department.

**(f) 12–month rule—(1) In general.** Except as otherwise provided in this paragraph (f), a taxpayer is not required to capitalize under this section amounts paid to create (or to facilitate the creation of) any right or benefit for the taxpayer that does not extend beyond the earlier of—

**(i)** 12 months after the first date on which the taxpayer realizes the right or benefit; or

**(ii)** The end of the taxable year following the taxable year in which the payment is made.

**(2) Duration of benefit for contract terminations.** For purposes of this paragraph (f), amounts paid to terminate a contract or other agreement described in paragraph (d)(7)(i) of this section prior to its expiration date (or amounts paid to facilitate such termination) create a benefit for the taxpayer that lasts for the unexpired term of the agreement immediately before the date of the termination. If the terms of a contract or other agreement described in paragraph (d)(7)(i) of this section permit the taxpayer to terminate the contract or agreement after a notice period, amounts paid by the taxpayer to terminate the contract or agreement before the end of the notice period create a benefit for the taxpayer that lasts for the amount of time by which the notice period is shortened.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 97 of 651

**(3) Inapplicability to created financial interests and self-created amortizable section 197 intangibles.** Paragraph (f)(1) of this section does not apply to amounts paid to create (or facilitate the creation of) an intangible described in paragraph (d)(2) of this section (relating to amounts paid to create financial interests) or to amounts paid to create (or facilitate the creation of) an intangible that constitutes an amortizable section 197 intangible within the meaning of section 197(c).

**(4) Inapplicability to rights of indefinite duration.** Paragraph (f)(1) of this section does not apply to amounts paid to create (or facilitate the creation of) an intangible of indefinite duration. A right has an indefinite duration if it has no period of duration fixed by agreement or by law, or if it is not based on a period of time, such as a right attributable to an agreement to provide or receive a fixed amount of goods or services. For example, a license granted by a governmental agency that permits the taxpayer to operate a business conveys a right of indefinite duration if the license may be revoked only upon the taxpayer's violation of the terms of the license.

**(5) Rights subject to renewal—(i) In general.** For purposes of paragraph (f)(1) of this section, the duration of a right includes any renewal period if all of the facts and circumstances in existence during the taxable year in which the right is created indicate a reasonable expectancy of renewal.

**(ii) Reasonable expectancy of renewal.** The following factors are significant in determining whether there exists a reasonable expectancy of renewal:

(A) Renewal history. The fact that similar rights are historically renewed is evidence of a reasonable expectancy of renewal. On the other hand, the fact that similar rights are rarely renewed is evidence of a lack of a reasonable expectancy of renewal. Where the taxpayer has no experience with similar rights, or where the taxpayer holds similar rights only occasionally, this factor is less indicative of a reasonable expectancy of renewal.

(B) Economics of the transaction. The fact that renewal is necessary for the taxpayer to earn back its investment in the right is evidence of a reasonable expectancy of renewal. For example, if a taxpayer pays $14,000 to enter into a renewable contract with an initial 9–month term that is expected to generate income to the taxpayer of $1,000 per month, the fact that renewal is necessary for the taxpayer to earn back its $14,000 payment is evidence of a reasonable expectancy of renewal.

(C) Likelihood of renewal by other party. Evidence that indicates a likelihood of renewal by the other party to a right, such as a bargain renewal option or similar arrangement, is evidence of a reasonable expectancy of renewal. However, the mere fact that the other party will have the opportunity to renew on the same terms as are available to others is not evidence of a reasonable expectancy of renewal.

(D) Terms of renewal. The fact that material terms of the right are subject to renegotiation at the end of the initial term is evidence of a lack of a reasonable expectancy of renewal. For example, if the parties to an agreement must renegotiate price or amount, the renegotiation requirement is evidence of a lack of a reasonable expectancy of renewal.

(E) Terminations. The fact that similar rights are typically terminated prior to renewal is evidence of a lack of a reasonably expectancy of renewal.

**(iii) Safe harbor pooling method.** In lieu of applying the reasonable expectancy of renewal test described in paragraph (f)(5)(ii) of this section to each separate right created during a taxable year, a taxpayer that reasonably expects to enter into at least 25 similar rights during the taxable year may establish a pool of similar rights for which the initial term does not extend beyond the period prescribed in paragraph (f)(1) of this section and may elect to apply the reasonable expectancy of renewal test to that pool. See paragraph (h) of this section for additional rules relating to pooling. The application of paragraph (f)(1) of this section to each pool is determined in the following manner:

(A) All amounts (except de minimis costs described in paragraph (d)(6)(v) of this section) paid to create the rights included in the pool and all amounts paid to facilitate the creation of the rights included in the pool are aggregated.

(B) If less than 20 percent of the rights in the pool are reasonably expected to be renewed beyond the period prescribed in paragraph (f)(1) of this section, all rights in the pool are treated as having a duration that does not extend beyond the period prescribed in paragraph (f)(1) of this section, and the taxpayer is not required to capitalize under this section any portion of the aggregate amount described in paragraph (f)(5)(iii)(A) of this section.

(C) If more than 80 percent of the rights in the pool are reasonably expected to be renewed beyond the period prescribed in paragraph (f)(1) of this section, all rights in the pool are treated as having a duration that extends beyond the period prescribed in paragraph (f)(1) of this section, and the taxpayer is required to capitalize under this section the aggregate amount described in paragraph (f)(5)(iii)(A) of this section.

(D) If 20 percent or more, but 80 percent or less, of the rights in the pool are reasonably expected to be renewed beyond the period prescribed in paragraph (f)(1) of this section, the aggregate amount described in paragraph (f)(5)(iii)(A) of this section is multiplied by the percentage of the rights in the pool that are reasonably expected to be renewed beyond the period prescribed in paragraph (f)(1) of this section and the taxpayer must capitalize the resulting amount under this section by treating such amount as creating a separate intangible. The amount determined by multiplying the aggregate amount described in paragraph (f)(5)(iii)(A) of this section by the percentage of rights in the pool that are not reasonably expected to be renewed beyond the period prescribed in paragraph (f)(1) of this section is not required to be capitalized under this section.

**(6) Coordination with section 461.** In the case of a taxpayer using an accrual method of accounting, the rules of this paragraph (f) do not affect the determination of whether a liability is incurred during the taxable year, including the determination of whether economic performance has occurred with respect to the liability. See § 1.461–4 for rules relating to economic performance.

**(7) Election to capitalize.** A taxpayer may elect not to apply the rule contained in paragraph (f)(1) of this section. An election made under this paragraph (f)(7) applies to all similar transactions during the taxable year to which paragraph (f)(1) of this section would apply (but for the election under this paragraph (f)(7)). For example, a taxpayer may elect under this paragraph (f)(7) to capitalize its costs of prepaying insurance contracts for 12 months, but may continue to apply the rule in paragraph (f)(1) to its costs of entering into non-renewable, 12–month service contracts. A taxpayer makes the election by treating the amounts as capital expenditures in its timely filed original federal income tax return (including extensions) for the taxable year during which the amounts are paid. In the case of an affiliated group of corporations filing a consolidated return, the election is made separately with respect to each member of the group, and not with respect to the group as a whole. In the case of an S corporation or partnership, the election is made by the S corporation or by the

partnership, and not by the shareholders or partners. An election made under this paragraph (f)(7) is revocable with respect to each taxable year for which made only with the consent of the Commissioner.

**(8) Examples.** The rules of this paragraph (f) are illustrated by the following examples, in which it is assumed (unless otherwise stated) that the taxpayer is a calendar year, accrual method taxpayer that does not have a short taxable year in any taxable year and has not made an election under paragraph (f)(7) of this section:

**Example 1.** Prepaid expenses. On December 1, 2005, N corporation pays a $10,000 insurance premium to obtain a property insurance policy (with no cash value) with a 1–year term that begins on February 1, 2006. The amount paid by N is a prepaid expense described in paragraph (d)(3) of this section and not paragraph (d)(2) of this section. Because the right or benefit attributable to the $10,000 payment extends beyond the end of the taxable year following the taxable year in which the payment is made, the 12–month rule provided by this paragraph (f) does not apply. N must capitalize the $10,000 payment.

**Example 2.** Prepaid expenses. (i) Assume the same facts as in Example 1, except that the policy has a term beginning on December 15, 2005. The 12–month rule of this paragraph (f) applies to the $10,000 payment because the right or benefit attributable to the payment neither extends more than 12 months beyond December 15, 2005 (the first date the benefit is realized by the taxpayer) nor beyond the end of the taxable year following the taxable year in which the payment is made. Accordingly, N is not required to capitalize the $10,000 payment.

(ii) Alternatively, assume N capitalizes prepaid expenses for financial accounting and reporting purposes and elects under paragraph (f)(7) of this section not to apply the 12–month rule contained in paragraph (f)(1) of this section. N must capitalize the $10,000 payment for Federal income tax purposes.

**Example 3.** Financial interests. On October 1, 2005, X corporation makes a 9–month loan to B in the principal amount of $250,000. The principal amount of the loan to B constitutes an amount paid to create or originate a financial interest under paragraph (d)(2)(i)(B) of this section. The 9–month term of the loan does not extend beyond the period prescribed by paragraph (f)(1) of this section. However, as provided by paragraph (f)(3) of this section, the rules of this paragraph (f) do not apply to intangibles described in paragraph (d)(2) of this section. Accordingly, X must capitalize the $250,000 loan amount.

**Example 4.** Financial interests. X corporation owns all of the outstanding stock of Z corporation. On December 1, 2005, Y corporation pays X $1,000,000 in exchange for X's grant of a 9–month call option to Y permitting Y to purchase all of the outstanding stock of Z. Y's payment to X constitutes an amount paid to create or originate an option with X under paragraph (d)(2)(i)(C)(7) of this section. The 9–month term of the option does not extend beyond the period prescribed by paragraph (f)(1) of this section. However, as provided by paragraph (f)(3) of this section, the rules of this paragraph (f) do not apply to intangibles described in paragraph (d)(2) of this section. Accordingly, Y must capitalize the $1,000,000 payment.

**Example 5.** License. (i) On July 1, 2005, R corporation pays $10,000 to state X to obtain a license to operate a business in state X for a period of 5 years. The terms of the license require R to pay state X an annual fee of $500 due on July 1, 2005, and each of the succeeding four years. R pays the $500 fee on July 1 as required by the license.

(ii) R's payment of $10,000 is an amount paid to a governmental agency for a license granted by that agency to which paragraph (d)(5) of this section applies. Because R's payment creates rights or benefits for R that extend beyond 12 months after the first date on which R realizes the rights or benefits attributable to the payment and beyond the end of 2006 (the taxable year following the taxable year in which the payment is made), the rules of this paragraph (f) do not apply to R's payment. Accordingly, R must capitalize the $10,000 payment.

(iii) R's payment of each $500 annual fee is a prepaid expense described in paragraph (d)(3) of this section. R is not required to capitalize the $500 fee in each taxable year. The rules of this paragraph (f) apply to each such payment because each payment provides a right or benefit to R that does not extend beyond 12 months after the first date on which R realizes the rights or

benefits attributable to the payment and does not extend beyond the end of the taxable year following the taxable year in which the payment is made.

**Example 6.** Lease. On December 1, 2005, W corporation enters into a lease agreement with X corporation under which W agrees to lease property to X for a period of 9 months, beginning on December 1, 2005. W pays its outside counsel $7,000 for legal services rendered in drafting the lease agreement and negotiating with X. The agreement between W and X is an agreement providing W the right to be compensated for the use of property, as described in paragraph (d)(6)(i)(A) of this section. W's $7,000 payment to its outside counsel is an amount paid to facilitate W's creation of the lease as described in paragraph (e)(1)(i) of this section. The 12–month rule of this paragraph (f) applies to the $7,000 payment because the right or benefit that the $7,000 payment facilitates the creation of neither extends more than 12 months beyond December 1, 2005 (the first date the benefit is realized by the taxpayer) nor beyond the end of the taxable year following the taxable year in which the payment is made. Accordingly, W is not required to capitalize its payment to its outside counsel.

**Example 7.** Certain contract terminations. V corporation owns real property that it has leased to A for a period of 15 years. When the lease has a remaining unexpired term of 5 years, V and A agree to terminate the lease, enabling V to use the property in its trade or business. V pays A $100,000 in exchange for A's agreement to terminate the lease. V's payment to A to terminate the lease is described in paragraph (d)(7)(i)(A) of this section. Under paragraph (f)(2) of this section, V's payment creates a benefit for V with a duration of 5 years, the remaining unexpired term of the lease as of the date of the termination. Because the benefit attributable to the expenditure extends beyond 12 months after the first date on which V realizes the rights or benefits attributable to the payment and beyond the end of the taxable year following the taxable year in which the payment is made, the rules of this paragraph (f) do not apply to the payment. V must capitalize the $100,000 payment.

**Example 8.** Certain contract terminations. Assume the same facts as in Example 7, except that the lease is terminated when it has a remaining unexpired term of 10 months. Under paragraph (f)(2) of this section, V's payment creates a benefit for V with a duration of 10 months. The 12–month rule of this paragraph (f) applies to the payment because the benefit attributable to the payment neither extends more than 12 months beyond the date of termination (the first date the benefit is realized by V) nor beyond the end of the taxable year following the taxable year in which the payment is made. Accordingly, V is not required to capitalize the $100,000 payment.

**Example 9.** Certain contract terminations. Assume the same facts as in Example 7, except that either party can terminate the lease upon 12 months notice. When the lease has a remaining unexpired term of 5 years, V wants to terminate the lease, however, V does not want to wait another 12 months. V pays A $50,000 for the ability to terminate the lease with one month's notice. V's payment to A to terminate the lease is described in paragraph (d)(7)(i)(A) of this section. Under paragraph (f)(2) of this section, V's payment creates a benefit for V with a duration of 11 months, the time by which the notice period is shortened. The 12–month rule of this paragraph (f) applies to V's $50,000 payment because the benefit attributable to the payment neither extends more than 12 months beyond the date of termination (the first date the benefit is realized by V) nor beyond the end of the taxable year following the taxable year in which the payment is made. Accordingly, V is not required to capitalize the $50,000 payment.

**Example 10.** Coordination with section 461. (i) U corporation leases office space from W corporation at a monthly rental rate of $2,000. On August 1, 2005, U prepays its office rent expense for the first six months of 2006 in the amount of $12,000. For purposes of this example, it is assumed that the recurring item exception provided by § 1.461–5 does not apply and that the lease between W and U is not a section 467 rental agreement as defined in section 467(d).

(ii) Under § 1.461–4(d)(3), U's prepayment of rent is a payment for the use of property by U for which economic performance occurs ratably over the period of time U is entitled to use the property. Accordingly, because economic performance with respect to U's prepayment of rent does not occur until 2006, U's prepaid rent is not incurred in 2005 and therefore is not properly taken into account through capitalization, deduction, or otherwise in 2005. Thus, the rules of this paragraph (f) do not apply to U's prepayment of its rent.

(iii) Alternatively, assume that U uses the cash method of accounting and the economic performance rules in § 1.461–4 therefore do not apply to U. The 12–month rule of this paragraph (f) applies to the $12,000 payment because the rights or benefits attributable to U's prepayment of its rent do not extend beyond December 31, 2006. Accordingly, U is not required to capitalize its prepaid rent.

**Example 11.** Coordination with section 461. N corporation pays R corporation, an advertising and marketing firm, $40,000 on August 1, 2005, for advertising and marketing services to be provided to N throughout calendar year 2006. For purposes of this example, it is assumed that the recurring item exception provided by § 1.461–5 does not apply. Under § 1.461–4(d)(2), N's payment arises out of the provision of services to N by R for which economic performance occurs as the services are provided. Accordingly, because economic performance with respect to N's prepaid advertising expense does not occur until 2006, N's prepaid advertising expense is not incurred in 2005 and therefore is not properly taken into account through capitalization, deduction, or otherwise in 2005. Thus, the rules of this paragraph (f) do not apply to N's payment.

**(g) Treatment of capitalized costs—(1) In general.** An amount required to be capitalized by this section is not currently deductible under section 162. Instead, the amount generally is added to the basis of the intangible acquired or created. See section 1012.

**(2) Financial instruments.** In the case of a financial instrument described in paragraph (c)(1)(iii) or (d)(2)(i)(C) of this section, notwithstanding paragraph (g)(1) of this section, if under other provisions of law the amount required to be capitalized is not required to be added to the basis of the intangible acquired or created, then the other provisions of law will govern the tax treatment of the amount.

**(h) Special rules applicable to pooling—(1) In general.** Except as otherwise provided, the rules of this paragraph (h) apply to the pooling methods described in paragraph (d)(6)(v) of this section (relating to de minimis rules applicable to certain contract rights), paragraph (e)(4)(iii)(A) of this section (relating to de minimis rules applicable to transaction costs), and paragraph (f) (5)(iii) of this section (relating to the application of the 12–month rule to renewable rights).

**(2) Method of accounting.** A pooling method authorized by this section constitutes a method of accounting for purposes of section 446. A taxpayer that adopts or changes to a pooling method authorized by this section must use the method for the year of adoption and for all subsequent taxable years during which the taxpayer qualifies to use the pooling method unless a change to another method is required by the Commissioner in order to clearly reflect income, or unless permission to change to another method is granted by the Commissioner as provided in § 1.446–1(e).

**(3) Adopting or changing to a pooling method.** A taxpayer adopts (or changes to) a pooling method authorized by this section for any taxable year by establishing one or more pools for the taxable year in accordance with the rules governing the particular pooling method and the rules prescribed by this paragraph (h), and by using the pooling method to compute its taxable income for the year of adoption (or change).

**(4) Definition of pool.** A taxpayer may use any reasonable method of defining a pool of similar transactions, agreements or rights, including a method based on the type of customer or the type of product or service provided under a contract. However, a taxpayer that pools similar transactions, agreements or rights must include in the pool all similar transactions, agreements or rights created during the taxable year. For purposes of the pooling methods described in paragraph (d)(6)(v) of this section (relating to de minimis rules applicable to certain contract rights) and paragraph (e)(4)(iii)(A) of this section (relating to de minimis rules applicable to transaction costs), an agreement (or a transaction) is treated as not similar to other agreements (or transactions) included in the pool if the amount at issue with respect to that agreement (or transaction)

is reasonably expected to differ significantly from the average amount at issue with respect to the other agreements (or transactions) properly included in the pool.

**(5) Consistency requirement.** A taxpayer that uses the pooling method described in paragraph (f)(5)(iii) of this section for purposes of applying the 12–month rule to a right or benefit—

**(i)** Must use the pooling methods described in paragraph (d)(6)(v) of this section (relating to de minimis rules applicable to certain contract rights) and paragraph (e)(4)(iii)(A) of this section (relating to de minimis rules applicable to transaction costs) for purposes of determining the amount paid to create, or facilitate the creation of, the right or benefit; and

**(ii)** Must use the same pool for purposes of paragraph (d)(6)(v) of this section and paragraph (e)(4)(iii)(A) of this section as is used for purposes of paragraph (f)(5)(iii) of this section.

**(6) Additional guidance pertaining to pooling.** The Internal Revenue Service may publish guidance in the Internal Revenue Bulletin (see § 601.601(d)(2) of this chapter) prescribing additional rules for applying the pooling methods authorized by this section to specific industries or to specific types of transactions.

**(7) Example.** The following example illustrates the rules of this paragraph (h):

**Example.** Pooling. (i) In the course of its business, W corporation enters into 3–year non-cancelable contracts that provide W the right to provide services to its customers. W generally pays certain amounts in the process of pursuing an agreement with a customer, including amounts paid to credit reporting agencies to verify the credit history of the potential customer and commissions paid to the independent sales agent who secures the agreement with the customer. In the case of agreements that W enters into with customers who are individuals, the agreements contain substantially similar terms and conditions and W typically pays between $100 and $200 in the process of pursuing each transaction. During 2005, W enters into agreements with 300 individuals. Also during 2005, W enters into an agreement with X corporation containing terms and conditions that are substantially similar to those contained in the agreements W enters into with its customers who are individuals. W pays certain amounts in the process of pursuing the agreement with X that W would not typically incur in the process of pursuing an agreement with its customers who are individuals. For example, W pays amounts to prepare and submit a bid for the agreement with X and amounts to travel to X's headquarters to make a sales presentation to X's management. In the aggregate, W pays $11,000 in the process of obtaining the agreement with X.

(ii) The agreements between W and its customers are agreements providing W the right to provide services, as described in paragraph (d)(6)(i)(B) of this section. Under paragraph (b)(1)(v) of this section, W must capitalize transaction costs paid to facilitate the creation of these agreements. Because W enters into at least 25 similar transactions during 2005, W may pool its transactions for purposes of determining whether its transaction costs are de minimis within the meaning of paragraph (e)(4)(iii)(A) of this section. W adopts a pooling method by establishing one or more pools of similar transactions and by using the pooling method to compute its taxable income beginning in its 2005 taxable year. If W adopts a pooling method, W must include all similar transactions in the pool. Under paragraph (h)(4) of this section, the transaction with X is not similar to the transactions W enters into with its customers who are individuals. While the agreement with X contains terms and conditions that are substantially similar to those contained in the agreements W enters into with its customers who are individuals, the transaction costs paid in the process of pursuing the agreement with X are reasonably expected to differ significantly from the average transaction costs attributable to transactions with its customers who are individuals. Accordingly, W may not include the transaction with X in the pool of transactions with customers who are individuals.

**(i)** [Reserved]

**(j) Application to accrual method taxpayers.** For purposes of this section, the terms amount paid and payment mean, in the case of a taxpayer using an accrual method of accounting, a liability incurred (within the meaning of § 1.446–1(c)(1)(ii)). A liability may not be taken into account under this section prior to the taxable year during which the liability is incurred.

**(k) Treatment of related parties and indirect payments.** For purposes of this section, references to a party other than the taxpayer include persons related to that party and persons acting for or on behalf of that party (including persons to whom the taxpayer becomes obligated as a result of assuming a liability of that party). For this purpose, persons are related only if their relationship is described in section 267(b) or 707(b) or they are engaged in trades or businesses under common control within the meaning of section 41(f)(1). References to an amount paid to or by a party include an amount paid on behalf of that party.

**(l) Examples.** The rules of this section are illustrated by the following examples in which it is assumed that the Internal Revenue Service has not published guidance that requires capitalization under paragraph (b)(1)(iv) of this section (relating to amounts paid to create or enhance a future benefit that is identified in published guidance as an intangible for which capitalization is required):

**Example 1.** License granted by a governmental unit. (i) X corporation pays $25,000 to state R to obtain a license to sell alcoholic beverages in its restaurant. The license is valid indefinitely, provided X complies with all applicable laws regarding the sale of alcoholic beverages in state R. X pays its outside counsel $4,000 for legal services rendered in preparing the license application and otherwise representing X during the licensing process. In addition, X determines that $2,000 of salaries paid to its employees is allocable to services rendered by the employees in obtaining the license.

(ii) X's payment of $25,000 is an amount paid to a governmental unit to obtain a license granted by that agency, as described in paragraph (d)(5)(i) of this section. The right has an indefinite duration and constitutes an amortizable section 197 intangible. Accordingly, as provided in paragraph (f)(3) of this section, the provisions of paragraph (f) of this section (relating to the 12–month rule) do not apply to X's payment. X must capitalize its $25,000 payment to obtain the license from state R.

(iii) As provided in paragraph (e)(4) of this section, X is not required to capitalize employee compensation because such amounts are treated as amounts that do not facilitate the acquisition or creation of an intangible. Thus, X is not required to capitalize the $2,000 of employee compensation allocable to the transaction.

(iv) X's payment of $4,000 to its outside counsel is an amount paid to facilitate the creation of an intangible, as described in paragraph (e)(1)(i) of this section. Because X's transaction costs do not exceed $5,000, X's transaction costs are de minimis within the meaning of paragraph (e)(4)(iii)(A) of this section. Accordingly, X is not required to capitalize the $4,000 payment to its outside counsel under this section.

**Example 2.** Franchise agreement. (i) R corporation is a franchisor of income tax return preparation outlets. V corporation negotiates with R to obtain the right to operate an income tax return preparation outlet under a franchise from R. V pays an initial $100,000 franchise fee to R in exchange for the franchise agreement. In addition, V pays its outside counsel $4,000 to represent V during the negotiations with R. V also pays $2,000 to an industry consultant to advise V during the negotiations with R.

(ii) Under paragraph (d)(6)(i)(A) of this section, V's payment of $100,000 is an amount paid to another party to enter into an agreement with that party providing V the right to use tangible or intangible property. Accordingly, V must capitalize its $100,000 payment to R. The franchise agreement is a self-created amortizable section 197 intangible within the meaning of

section 197(c). Accordingly, as provided in paragraph (f)(3) of this section, the 12–month rule contained in paragraph (f)(1) of this section does not apply.

(iii) V's payment of $4,000 to its outside counsel and $2,000 to the industry consultant are amounts paid to facilitate the creation of an intangible, as described in paragraph (e)(1)(i) of this section. Because V's aggregate transaction costs exceed $5,000, V's transaction costs are not de minimis within the meaning of paragraph (e)(4)(iii)(A) of this section. Accordingly, V must capitalize the $4,000 payment to its outside counsel and the $2,000 payment to the industry consultant under this section into the basis of the franchise, as provided in paragraph (g) of this section.

**Example 3.** Covenant not to compete. (i) On December 1, 2005, N corporation, a calendar year taxpayer, enters into a covenant not to compete with B, a key employee that is leaving the employ of N. The covenant not to compete is not entered into in connection with the acquisition of an interest in a trade or business. The covenant not to compete prohibits B from competing with N for a period of 9 months, beginning December 1, 2005. N pays B $25,000 in full consideration for B's agreement not to compete. In addition, N pays its outside counsel $6,000 to facilitate the creation of the covenant not to compete with B. N does not have a short taxable year in 2005 or 2006.

(ii) Under paragraph (d)(6)(i)(C) of this section, N's payment of $25,000 is an amount paid to another party to induce that party to enter into a covenant not to compete with N. However, because the covenant not to compete has a duration that does not extend beyond 12 months after the first date on which N realizes the rights attributable to its payment (*i.e.*, December 1, 2005) or beyond the end of the taxable year following the taxable year in which payment is made, the 12–month rule contained in paragraph (f)(1) of this section applies. Accordingly, N is not required to capitalize its $25,000 payment to B or its $6,000 payment to facilitate the creation of the covenant not to compete.

**Example 4.** Demand-side management. (i) X corporation, a public utility engaged in generating and distributing electrical energy, provides programs to its customers to promote energy conservation and energy efficiency. These programs are aimed at reducing electrical costs to X's customers, building goodwill with X's customers, and reducing X's future operating and capital costs. X provides these programs without obligating any of its customers participating in the programs to purchase power from X in the future. Under these programs, X pays a consultant to help industrial customers design energy-efficient manufacturing processes, to conduct "energy efficiency audits" that serve to identify for customers inefficiencies in their energy usage patterns, and to provide cash allowances to encourage residential customers to replace existing appliances with more energy efficient appliances.

(ii) The amounts paid by X to the consultant are not amounts to acquire or create an intangible under paragraph (c) or (d) of this section or to facilitate such an acquisition or creation. In addition, the amounts do not create a separate and distinct intangible asset within the meaning of paragraph (b)(3) of this section. Accordingly, the amounts paid to the consultant are not required to be capitalized under this section. While the amounts may serve to reduce future operating and capital costs and create goodwill with customers, these benefits, without more, are not intangibles for which capitalization is required under this section.

**Example 5.** Business process re-engineering. (i) V corporation manufactures its products using a batch production system. Under this system, V continuously produces component parts of its various products and stockpiles these parts until they are needed in V's final assembly line. Finished goods are stockpiled awaiting orders from customers. V discovers that this process ties up significant amounts of V's capital in work-in-process and finished goods inventories. V hires B, a consultant, to advise V on improving the efficiency of its manufacturing operations. B recommends a complete re-engineering of V's manufacturing process to a process known as just-in-time manufacturing. Just-in-time manufacturing involves reconfiguring a manufacturing plant to a configuration of "cells" where each team in a cell performs the entire manufacturing process for a particular customer order, thus reducing inventory stockpiles.

(ii) V incurred three categories of costs to convert its manufacturing process to a just-in-time system. First, V paid B, a consultant, $250,000 in professional fees to implement the conversion of V's plant to a just-in-time system. Second, V paid C, a contractor,

$100,000 to relocate and reconfigure V's manufacturing equipment from an assembly line layout to a configuration of cells. Third, V paid D, a consultant, $50,000 to train V's employees in the just-in-time manufacturing process.

(iii) The amounts paid by V to B, C, and D are not amounts to acquire or create an intangible under paragraph (c) or (d) of this section or to facilitate such an acquisition or creation. In addition, the amounts do not create a separate and distinct intangible asset within the meaning of paragraph (b)(3) of this section. Accordingly, the amounts paid to B, C, and D are not required to be capitalized under this section. While the amounts produce long term benefits to V in the form of reduced inventory stockpiles, improved product quality, and increased efficiency, these benefits, without more, are not intangibles for which capitalization is required under this section.

**Example 6.** Defense of business reputation. (i) X, an investment adviser, serves as the fund manager of a money market investment fund. X, like its competitors in the industry, strives to maintain a constant net asset value for its money market fund of $1.00 per share. During 2005, in the course of managing the fund assets, X incorrectly predicts the direction of market interest rates, resulting in significant investment losses to the fund. Due to these significant losses, X is faced with the prospect of reporting a net asset value that is less than $1.00 per share. X is not aware of any investment adviser in its industry that has ever reported a net asset value for its money market fund of less than $1.00 per share. X is concerned that reporting a net asset value of less than $1.00 per share will significantly harm its reputation as an investment adviser, and could lead to litigation by shareholders. X decides to contribute $2,000,000 to the fund in order to raise the net asset value of the fund to $1.00 per share. This contribution is not a loan to the fund and does not give X any ownership interest in the fund.

(ii) The $2,000,000 contribution is not an amount paid to acquire or create an intangible under paragraph (c) or (d) of this section or to facilitate such an acquisition or creation. In addition, the amount does not create a separate and distinct intangible asset within the meaning of paragraph (b)(3) of this section. Accordingly, the amount contributed to the fund is not required to be capitalized under this section. While the amount serves to protect the business reputation of the taxpayer and may protect the taxpayer from litigation by shareholders, these benefits, without more, are not intangibles for which capitalization is required under this section.

**Example 7.** Product launch costs. (i) R corporation, a manufacturer of pharmaceutical products, is required by law to obtain regulatory approval before selling its products. While awaiting regulatory approval on Product A, R pays to develop and implement a marketing strategy and an advertising campaign to raise consumer awareness of the purported need for Product A. R also pays to train health care professionals and other distributors in the proper use of Product A.

(ii) The amounts paid by R are not amounts paid to acquire or create an intangible under paragraph (c) or (d) of this section or to facilitate such an acquisition or creation. In addition, the amounts do not create a separate and distinct intangible asset within the meaning of paragraph (b)(3) of this section. Accordingly, R is not required to capitalize these amounts under this section. While the amounts may benefit R by creating consumer demand for Product A and increasing awareness of Product A among distributors, these benefits, without more, are not intangibles for which capitalization is required under this section.

**Example 8.** Stocklifting costs. (i) N corporation is a wholesale distributor of Brand A aftermarket automobile replacement parts. In an effort to induce a retail automobile parts supply store to stock only Brand A parts, N offers to replace all of the store's inventory of other branded parts with Brand A parts, and to credit the store for its cost of other branded parts. The store is under no obligation to continue stocking Brand A parts or to purchase a minimum volume of Brand A parts from N in the future.

(ii) The amount paid by N as a credit to the store for the cost of other branded parts is not an amount paid to acquire or create an intangible under paragraph (c) or (d) of this section or to facilitate such an acquisition or creation. In addition, the amount does not create a separate and distinct intangible asset within the meaning of paragraph (b)(3) of this section. Accordingly, N is not required to capitalize the amount under this section. While the amount may create a hope or expectation by N that the store will continue to stock Brand A parts, this benefit, without more, is not an intangible for which capitalization is required under this section.

(iii) Alternatively, assume that N agrees to credit the store for its cost of other branded parts in exchange for the store's agreement to purchase all of its inventory requirements for such parts from N for a period of at least 3 years. The amount paid by N as a credit to the store for the cost of other branded parts is an amount paid to induce the store to enter into an agreement providing R the right to provide property. Accordingly, R must capitalize its payment.

**Example 9.** Package design costs. (i) Z corporation manufactures and markets personal care products. Z pays $100,000 to a consultant to develop a package design for Z's newest product, Product A. Z also pays a fee to a government agency to obtain trademark and copyright protection on certain elements of the package design. Z pays its outside legal counsel $10,000 for services rendered in preparing and filing the trademark and copyright applications and for other services rendered in securing the trademark and copyright protection.

(ii) The $100,000 paid by Z to the consultant for development of the package design is not an amount paid to acquire or create an intangible under paragraph (c) or (d) of this section or to facilitate such an acquisition or creation. In addition, as provided in paragraph (b)(3)(v) of this section, amounts paid to develop a package design are treated as amounts that do not create a separate and distinct intangible asset. Accordingly, Z is not required to capitalize the $100,000 payment under this section.

(iii) The amounts paid by Z to the government agency to obtain trademark and copyright protection are amounts paid to a government agency for a right granted by that agency. Accordingly, Z must capitalize the payment. In addition, the $10,000 paid by Z to its outside counsel is an amount paid to facilitate the creation of the trademark and copyright. Because the aggregate amounts paid to facilitate the transaction exceed $5,000, the amounts are not de minimis as defined in paragraph (e)(4)(iii)(A) of this section. Accordingly, Z must capitalize the $10,000 payment to its outside counsel under paragraph (b)(1)(v) of this section.

(iv) Alternatively, assume that Z acquires an existing package design for Product A as part of an acquisition of a trade or business that constitutes an applicable asset acquisition within the meaning of section 1060(c). Assume further that $100,000 of the consideration paid by N in the acquisition is properly allocable to the package design for Product A. Under paragraph (c)(1) of this section, Z must capitalize the $100,000 payment.

**Example 10.** Contract to provide services. (i) Q corporation, a financial planning firm, provides financial advisory services on a fee-only basis. During 2005, Q and several other financial planning firms submit separate bids to R corporation for a contract to become one of three providers of financial advisory services to R's employees. Q pays $2,000 to a printing company to develop and produce materials for its sales presentation to R's management. Q also pays $6,000 to travel to R's corporate headquarters to make the sales presentation, and $20,000 of salaries to its employees for services performed in preparing the bid and making the presentation to R's management. Q's bid is successful and Q enters into an agreement with R in 2005 under which Q agrees to provide financial advisory services to R's employees, and R agrees to pay Q's fee on behalf of each employee who chooses to utilize such services. R enters into similar agreements with two other financial planning firms, and R's employees may choose to use the services of any one of the three firms. Based on its past experience, Q reasonably expects to provide services to at least 5 percent of R's employees.

(ii) Q's agreement with R is not an agreement providing Q the right to provide services, as described in paragraph (d)(6)(i)(B) of this section. Under paragraph (d)(6)(iv) the agreement places no obligation on another person to request or pay for Q's services. Accordingly, Q is not required to capitalize any of the amounts paid in the process of pursuing the agreement with R.

**Example 11.** Mutual fund distributor. (i) D incurs costs to enter into a distribution agreement with M, a mutual fund. The initial term of the distribution agreement is two years, and afterwards must be approved annually by M. The distribution agreement can be terminated by either party on 60 days notice. Although distribution agreements are rarely terminated in the mutual fund industry, M is not economically compelled to continue D's distribution agreement. Under the distribution agreement, D has the exclusive right to sell shares of M and agrees to use its best efforts to solicit orders for the sale of shares of M. D sells shares in M directly to the general public as well as through brokers. When an investor places an order for M shares with a broker, D pays the

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 107 of 651

broker a commission for selling the shares to the investor. Under the distribution agreement, D receives compensation from M in the form of 12b–1 fees (which equal a percentage of M's net asset value attributable to investors that have held their shares for up to 6 years) and contingent deferred sales charges (which are paid if the investor redeems the purchased shares within 6 years).

(ii) The distribution agreement is not an agreement providing D with the right to provide services, as described in paragraph (d)(6)(i)(B) of this section, because the distribution agreement can be terminated by M at will upon 60 days notice and M is not economically compelled to continue the distribution agreement. Accordingly, D is not required to capitalize the costs of creating (or facilitating the creation of) the distribution agreement under paragraphs (b)(1)(ii) or (v) of this section. In addition, as provided in paragraph (b)(3)(ii) of this section, amounts paid to create an agreement are treated as amounts that do not create a separate and distinct intangible asset. Accordingly, D also is not required to capitalize the costs of creating (or facilitating the creation of) the distribution agreement under paragraph (b)(1)(iii) or (v) of this section.

(iii) Under paragraph (b)(3)(iii), the broker commissions paid by D in performing services under the distribution agreement do not create (or facilitate the creation of) a separate and distinct intangible asset. In addition, the broker commissions do not create an intangible described in paragraph (d) of this section. Accordingly, D is not required to capitalize the broker commissions under this section.

**(m) Amortization.** For rules relating to amortization of certain intangibles, see § 1.167(a)–3.

**(n) Intangible interests in land.** [Reserved]

**(o) Effective date.** This section applies to amounts paid or incurred on or after December 31, 2003.

**(p) Accounting method changes—(1) In general.** A taxpayer seeking to change a method of accounting to comply with this section must secure the consent of the Commissioner in accordance with the requirements of § 1.446–1(e). For the taxpayer's first taxable year ending on or after December 31, 2003, the taxpayer is granted the consent of the Commissioner to change its method of accounting to comply with this section, provided the taxpayer follows the administrative procedures issued under § 1.446–1(e)(3)(ii) for obtaining the Commissioner's automatic consent to a change in accounting method (for further guidance, for example, see Rev. Proc. 2002–9 (2002–1 C.B. 327) and § 601.601(d)(2)(ii)(b) of this chapter).

**(2) Scope limitations.** Any limitations on obtaining the automatic consent of the Commissioner do not apply to a taxpayer seeking to change to a method of accounting to comply with this section for its first taxable year ending on or after December 31, 2003.

**(3) Section 481(a) adjustment.** With the exception of a change to a pooling method authorized by this section, the section 481(a) adjustment for a change in method of accounting to comply with this section for a taxpayer's first taxable year ending on or after December 31, 2003 is determined by taking into account only amounts paid or incurred in taxable years ending on or after January 24, 2002. A taxpayer seeking to change to a pooling method authorized by this section on or after the effective date of these regulations must change to the method using a cut-off method.

**Credits**

[T.D. 9107, 69 FR 446, Jan. 5, 2004]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

AUTHORITY: Sections 1.909–1 through 1.906–6 also issued under 26 U.S.C. 909(e).

Notes of Decisions (23)

Current through March 24, 2016; 81 FR 16051.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

> Code of Federal Regulations
>   Title 26. Internal Revenue
>     Chapter I. Internal Revenue Service, Department of the Treasury
>       Subchapter A. Income Tax
>         Part 1. Income Taxes (Refs & Annos)
>           Normal Taxes and Surtaxes
>             Gain or Loss on Disposition of Property
>               Basis Rules of General Application

26 C.F.R. § 1.1012−1, Treas. Reg. § 1.1012−1

§ 1.1012−1 Basis of property.

Effective: October 18, 2010
Currentness

**(a) General rule.** In general, the basis of property is the cost thereof. The cost is the amount paid for such property in cash or other property. This general rule is subject to exceptions stated in subchapter O (relating to gain or loss on the disposition of property), subchapter C (relating to corporate distributions and adjustments), subchapter K (relating to partners and partnerships), and subchapter P (relating to capital gains and losses), chapter 1 of the code.

**(b) Real estate taxes as part of cost.** In computing the cost of real property, the purchaser shall not take into account any amount paid to the seller as reimbursement for real property taxes which are treated under section 164(d) as imposed upon the purchaser. This rule applies whether or not the contract of sale calls for the purchaser to reimburse the seller for such real estate taxes paid or to be paid by the seller. On the other hand, where the purchaser pays (or assumes liability for) real estate taxes which are treated under section 164(d) as imposed upon the seller, such taxes shall be considered part of the cost of the property. It is immaterial whether or not the contract of sale specifies that the sale price has been reduced by, or is in any way intended to reflect, real estate taxes allocable to the seller under section 164(d). For illustrations of the application of this paragraph, see paragraph (b) of § 1.1001−1.

**(c) Sale of stock—(1) In general. (i)** Except as provided in paragraph (e)(2) of this section (dealing with stock for which the average basis method is permitted), if a taxpayer sells or transfers shares of stock in a corporation that the taxpayer purchased or acquired on different dates or at different prices and the taxpayer does not adequately identify the lot from which the stock is sold or transferred, the stock sold or transferred is charged against the earliest lot the taxpayer purchased or acquired to determine the basis and holding period of the stock. If the earliest lot purchased or acquired is held in a stock certificate that represents multiple lots of stock, and the taxpayer does not adequately identify the lot from which the stock is sold or transferred, the stock sold or transferred is charged against the earliest lot included in the certificate. See paragraphs (c)(2), (c)(3), and (c)(4) of this section for rules on what constitutes an adequate identification.

**(ii)** A taxpayer must determine the basis of identical stock (within the meaning of paragraph (e)(4) of this section) by averaging the cost of each share if the stock is purchased at separate times on the same calendar day in executing a single trade order and the broker executing the trade provides a single confirmation that reports an aggregate total cost or an average cost per share. However, the taxpayer may determine the basis of the stock by the actual cost per share if the taxpayer notifies the broker in writing of this intent. The taxpayer must notify the broker by the earlier of the date of the sale of any of the stock for which the taxpayer received the confirmation or one year after the date of the confirmation. A broker may extend the one-year period but the taxpayer must notify the broker no later than the date of sale of any of the stock.

---

**(2) Identification of stock.** An adequate identification is made if it is shown that certificates representing shares of stock from a lot which was purchased or acquired on a certain date or for a certain price were delivered to the taxpayer's transferee. Except as otherwise provided in subparagraph (3) or (4) of this paragraph, such stock certificates delivered to the transferee constitute the stock sold or transferred by the taxpayer. Thus, unless the requirements of subparagraph (3) or (4) of this paragraph are met, the stock sold or transferred is charged to the lot to which the certificates delivered to the transferee belong, whether or not the taxpayer intends, or instructs his broker or other agent, to sell or transfer stock from a lot purchased or acquired on a different date or for a different price.

**(3) Identification on confirmation document. (i)** Where the stock is left in the custody of a broker or other agent, an adequate identification is made if—

(a) At the time of the sale or transfer, the taxpayer specifies to such broker or other agent having custody of the stock the particular stock to be sold or transferred, and

(b) Within a reasonable time thereafter, confirmation of such specification is set forth in a written document from such broker or other agent.

Stock identified pursuant to this subdivision is the stock sold or transferred by the taxpayer, even though stock certificates from a different lot are delivered to the taxpayer's transferee.

**(ii)** Where a single stock certificate represents stock from different lots, where such certificate is held by the taxpayer rather than his broker or other agent, and where the taxpayer sells a part of the stock represented by such certificate through a broker or other agent, an adequate identification is made if—

(a) At the time of the delivery of the certificate to the broker or other agent, the taxpayer specifies to such broker or other agent the particular stock to be sold or transferred, and

(b) Within a reasonable time thereafter, confirmation of such specification is set forth in a written document from such broker or agent.

Where part of the stock represented by a single certificate is sold or transferred directly by the taxpayer to the purchaser or transferee instead of through a broker or other agent, an adequate identification is made if the taxpayer maintains a written record of the particular stock which he intended to sell or transfer.

**(4) Stock held by a trustee, executor, or administrator. (i)** A trustee or executor or administrator of an estate holding stock (not left in the custody of a broker) makes an adequate identification if the trustee, executor, or administrator—

(a) Specifies in writing in the books and records of the trust or estate the particular stock to be sold, transferred, or distributed;

(b) In the case of a distribution, furnishes the distributee with a written document identifying the particular stock distributed; and

(c) In the case of a sale or transfer through a broker or other agent, specifies to the broker or agent the particular stock to be sold or transferred, and within a reasonable time thereafter the broker or agent confirms the specification in a written document.

**(ii)** The stock the trust or estate identifies under paragraph (c)(4)(i) of this section is the stock treated as sold, transferred, or distributed, even if the trustee, executor, or administrator delivers stock certificates from a different lot.

**(5) Subsequent sales.**If stock identified under subparagraph (3) or (4) of this paragraph as belonging to a particular lot is sold, transferred, or distributed, the stock so identified shall be deemed to have been sold, transferred, or distributed, and such sale, transfer, or distribution will be taken into consideration in identifying the taxpayer's remaining stock for purposes of subsequent sales, transfers, or distributions.

**(6) Bonds.** Paragraphs (1) through (5), (8), and (9) of this section apply to the sale or transfer of bonds.

**(7) Book–entry securities. (i)** In applying the provisions of subparagraph (3)(i)(a) of this paragraph in the case of a sale or transfer of a book–entry security (as defined in subdivision (iii)(a) of this subparagraph) which is made after December 31, 1970, pursuant to a written instruction by the taxpayer, a specification by the taxpayer of the unique lot number which he has assigned to the lot which contains the securities being sold or transferred shall constitute specification as required by such subparagraph. The specification of the lot number shall be made either—

(a) In such written instruction, or

(b) In the case of a taxpayer in whose name the book entry by the Reserve Bank is made, in a list of lot numbers with respect to all book–entry securities on the books of the Reserve Bank sold or transferred on that date by the taxpayer, provided such list is mailed to or received by the Reserve Bank on or before the Reserve Bank's next business day.

This subdivision shall apply only if the taxpayer assigns lot numbers in numerical sequence to successive purchases of securities of the same loan title (series) and maturity date, except that securities of the same loan title (series) and maturity date which are purchased at the same price on the same date may be included within the same lot.

**(ii)** In applying paragraph (c)(3)(i)(b) of this section to a sale or transfer of a book-entry security pursuant to a taxpayer's written instruction, a confirmation is made by furnishing to the taxpayer a written advice of transaction from the Reserve Bank or other person through whom the taxpayer sells or transfers the securities. The confirmation document must describe the securities and specify the date of the transaction and amount of securities sold or transferred.

**(iii)** For purposes of this paragraph (c)(7):

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

(a) The term book-entry security means a transferable Treasury bond, note, certificate of indebtedness, or bill issued under the Second Liberty Bond Act (31 U.S.C. 774(2)), as amended, or other security of the United States (as defined in paragraph (c)(7)(iii)(b) of this section) in the form of an entry made as prescribed in 31 CFR Part 306, or other comparable Federal regulations, on the records of a Reserve Bank.

(b) The term other security of the United States means a bond, note, certificate of indebtedness, bill, debenture, or similar obligation which is subject to the provisions of 31 CFR part 306 or other comparable Federal regulations and which is issued by (1) any department or agency of the Government of the United States, or (2) the Federal National Mortgage Association, the Federal Home Loan Banks, the Federal Home Loan Mortgage Corporation, the Federal Land Banks, the Federal Intermediate Credit Banks, the Banks for Cooperatives, or the Tennessee Valley Authority;

(c) The term serially-numbered advice of transaction means the confirmation (prescribed in 31 CFR 306.116) issued by the Reserve Bank which is identifiable by a unique number and indicates that a particular written instruction to the Reserve Bank with respect to the deposit or withdrawal of a specified book–entry security (or securities) has been executed; and

(d) The term Reserve Bank means a Federal Reserve Bank and its branches acting as Fiscal Agent of the United States.

**(8) Time for making identification.** For purposes of this paragraph (c), an adequate identification of stock is made at the time of sale, transfer, delivery, or distribution if the identification is made no later than the earlier of the settlement date or the time for settlement required by Rule 15c6–1 under the Securities Exchange Act of 1934, 17 CFR 240.15c6–1 (or its successor). A standing order or instruction for the specific identification of stock is treated as an adequate identification made at the time of sale, transfer, delivery, or distribution.

**(9) Method of writing. (i)** A written confirmation, record, document, instruction, notification, or advice includes a writing in electronic format.

**(ii)** A broker or agent may include the written confirmation required under this paragraph (c) in an account statement or other document the broker or agent periodically provides to the taxpayer if the broker or agent provides the statement or other document within a reasonable time after the sale or transfer.

**(10) Method for determining basis of stock.** A method of determining the basis of stock, including a method of identifying stock sold under this paragraph (c) and the average basis method described in paragraph (e) of this section, is not a method of accounting. Therefore, a change in a method of determining the basis of stock is not a change in method of accounting to which sections 446 and 481 apply.

**(11) Effective/applicability date.** Paragraphs (c)(1), (c)(4), (c)(6), (c)(7)(ii), (c)(7)(iii)(a), (c)(8), (c)(9), and (c)(10) of this section apply for taxable years beginning after October 18, 2010.

**(d) Obligations issued as part of an investment unit.** For purposes of determining the basis of the individual elements of an investment unit (as defined in paragraph (b)(2)(ii)(a) of § 1.1232–3) consisting of an obligation and an option (which is not an excluded option under paragraph (b)(1)(iii)(c) of § 1.1232–3), security, or other property, the cost of such investment unit shall

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 113 of 651

be allocated to such individual elements on the basis of their respective fair market values. In the case of the initial issuance of an investment unit consisting of an obligation and an option, security, or other property, where neither the obligation nor the option, security, or other property has a readily ascertainable fair market value, the portion of the cost of the unit which is allocable to the obligation shall be an amount equal to the issue price of the obligation as determined under paragraph (b)(2)(ii)(a) of § 1.1232–3.

**(e) Election to use average basis method—(1) In general.** Notwithstanding paragraph (c) of this section, and except as provided in paragraph (e)(8) of this section, a taxpayer may use the average basis method described in paragraph (e)(7) of this section to determine the cost or other basis of identical shares of stock if—

**(i)** The taxpayer leaves shares of stock in a regulated investment company (as defined in paragraph (e)(5) of this section) or shares of stock acquired after December 31, 2010, in connection with a dividend reinvestment plan (as defined in paragraph (e)(6) of this section) with a custodian or agent in an account maintained for the acquisition or redemption, sale, or other disposition of shares of the stock; and

**(ii)** The taxpayer acquires identical shares of stock at different prices or bases in the account.

**(2) Determination of method. (i)** If a taxpayer places shares of stock described in paragraph (e)(1)(i) of this section acquired on or after January 1, 2012, in the custody of a broker (as defined by section 6045(c)(1)), including by transfer from an account with another broker, the basis of the shares is determined in accordance with the broker's default method, unless the taxpayer notifies the broker that the taxpayer elects another permitted method. The taxpayer must report gain or loss using the method the taxpayer elects or, if the taxpayer fails to make an election, the broker's default method. See paragraphs (e)(9)(i) and (e)(9)(v), Example 2, of this section.

**(ii)** The provisions of this paragraph (e)(2) are illustrated by the following example:

**Example.** (i) In connection with a dividend reinvestment plan, Taxpayer B acquires 100 shares of G Company in 2012 and 100 shares of G Company in 2013, in an account B maintains with R Broker. B notifies R in writing that B elects to use the average basis method to compute the basis of the shares of G Company. In 2014, B transfers the shares of G Company to an account with S Broker. B does not notify S of the basis determination method B chooses to use for the shares of G Company, and S's default method is first-in, first-out. In 2015, B purchases 200 shares of G Company in the account with S. In 2016, B instructs S to sell 150 shares of G Company.

(ii) Because B does not notify S of a basis determination method for the shares of G Company, under paragraph (e)(2)(i) of this section, the basis of the 150 shares of G Company S sells for B in 2016 must be determined under S's default method, first-in, first-out.

**(3) Shares of stock.** For purposes of this paragraph (e), securities issued by unit investment trusts described in paragraph (e)(5) of this section are treated as shares of stock and the term share or shares includes fractions of a share.

**(4) Identical stock.** For purposes of this paragraph (e), identical shares of stock means stock with the same Committee on Uniform Security Identification Procedures (CUSIP) number or other security identifier number as permitted in published guidance of general applicability, see § 601.601(d)(2) of this chapter.

**(5) Regulated investment company. (i)** For purposes of this paragraph, a regulated investment company means any domestic corporation (other than a personal holding company as defined in section 542) which meets the limitations of section 851(b) and § 1.851–2, and which is registered at all times during the taxable year under the Investment Company Act of 1940, as amended (15 U.S.C. 80a–1 to 80b–2), either as a management company, or as a unit investment trust.

**(ii)** Notwithstanding subdivision (i), this paragraph shall not apply in the case of a unit investment trust unless it is one—

(a) Substantially all of the assets of which consist (1) of securities issued by a single management company (as defined in such Act) and securities acquired pursuant to subdivision (b) of this subdivision (ii), or (2) securities issued by a single other corporation, and

(b) Which has no power to invest in any other securities except securities issued by a single other management company, when permitted by such Act or the rules and regulations of the Securities and Exchange Commission.

**(6) Dividend reinvestment plan—(i) In general.** For purposes of this paragraph (e), the term dividend reinvestment plan means any written plan, arrangement, or program under which at least 10 percent of every dividend (within the meaning of section 316) on any share of stock is reinvested in stock identical to the stock on which the dividend is paid. A plan is a dividend reinvestment plan if the plan documents require that at least 10 percent of any dividend paid is reinvested in identical stock even if the plan includes stock on which no dividends have ever been declared or paid or on which an issuer ceases paying dividends. A plan that holds one or more different stocks may permit a taxpayer to reinvest a different percentage of dividends in the stocks held. A dividend reinvestment plan may reinvest other distributions on stock, such as capital gain distributions, non-taxable returns of capital, and cash in lieu of fractional shares. The term dividend reinvestment plan includes both issuer administered dividend reinvestment plans and non-issuer administered dividend reinvestment plans.

**(ii) Acquisition of stock.** Stock is acquired in connection with a dividend reinvestment plan if the stock is acquired under that plan, arrangement, or program, or if the dividends and other distributions paid on the stock are subject to that plan, arrangement, or program. Shares of stock acquired in connection with a dividend reinvestment plan include the initial purchase of stock in the dividend reinvestment plan, transfers of identical stock into the dividend reinvestment plan, additional periodic purchases of identical stock in the dividend reinvestment plan, and identical stock acquired through reinvestment of the dividends or other distributions paid on the stock held in the plan.

**(iii) Dividends and other distributions paid after reorganization.** For purposes of this paragraph (e)(6), dividends and other distributions declared or announced before or pending a corporate action (such as a merger, consolidation, acquisition, split-off, or spin-off) involving the issuer and subsequently paid and reinvested in shares of stock in the successor entity or entities are treated as reinvested in shares of stock identical to the shares of stock of the issuer.

**(iv) Withdrawal from or termination of plan.** If a taxpayer withdraws stock from a dividend reinvestment plan or the plan administrator terminates the dividend reinvestment plan, the shares of identical stock the taxpayer acquires after the withdrawal or termination are not acquired in connection with a dividend reinvestment plan. The taxpayer may not use the average basis method after the withdrawal or termination but may use any other permissible basis determination method. See paragraph (e)(7)(v) of this section for the basis of the shares after withdrawal or termination.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**(7) Computation of average basis—(i) In general.** Average basis is determined by averaging the basis of all shares of identical stock in an account regardless of holding period. However, for this purpose, shares of stock in a dividend reinvestment plan are not identical to shares of stock with the same CUSIP number that are not in a dividend reinvestment plan. The basis of each share of identical stock in the account is the aggregate basis of all shares of that stock in the account divided by the aggregate number of shares. Unless a single-account election is in effect, see paragraph (e)(11) of this section, a taxpayer may not average together the basis of identical stock held in separate accounts that the taxpayer sells, exchanges, or otherwise disposes of on or after January 1, 2012.

**(ii) Order of disposition of shares sold or transferred.** In the case of the sale or transfer of shares of stock to which the average basis method election applies, shares sold or transferred are deemed to be the shares first acquired. Thus, the first shares sold or transferred are those with a holding period of more than 1 year (long-term shares) to the extent that the account contains long-term shares. If the number of shares sold or transferred exceeds the number of long-term shares in the account, the excess shares sold or transferred are deemed to be shares with a holding period of 1 year or less (short-term shares). Any gain or loss attributable to shares held for more than 1 year constitutes long-term gain or loss, and any gain or loss attributable to shares held for 1 year or less constitutes short-term gain or loss. For example, if a taxpayer sells 50 shares from an account containing 100 long-term shares and 100 short-term shares, the shares sold or transferred are all long-term shares. If, however, the account contains 40 long-term shares and 100 short-term shares, the taxpayer has sold 40 long-term shares and 10 short-term shares.

**(iii) Transition rule from double-category method.** This paragraph (e)(7)(iii) applies to stock for which a taxpayer uses the double-category method under § 1.1012–1(e)(3) (April 1, 2010), that the taxpayer acquired before April 1, 2011, and that the taxpayer sells, exchanges, or otherwise disposes of on or after that date. The taxpayer must calculate the average basis of this stock by averaging together all identical shares of stock in the account on April 1, 2011, regardless of holding period.

**(iv) Wash sales.** A taxpayer must apply section 1091 and the associated regulations (dealing with wash sales of substantially identical securities) in computing average basis regardless of whether the stock or security sold or otherwise disposed of and the stock acquired are in the same account or in different accounts.

**(v) Basis after change from average basis method.** Unless a taxpayer revokes an average basis method election under paragraph (e)(9)(iii) of this section, if a taxpayer changes from the average basis method to another basis determination method (including a change resulting from a withdrawal from or termination of a dividend reinvestment plan), the basis of each share of stock immediately after the change is the same as the basis immediately before the change. See paragraph (e)(9)(iv) of this section for rules for changing from the average basis method.

**(vi)** The provisions of this paragraph (e)(7) are illustrated by the following examples:

**Example 1.** (i) In 2011, Taxpayer C acquires 100 shares of H Company and enrolls them in a dividend reinvestment plan administered by T Custodian. C elects to use the average basis method for the shares of H Company enrolled in the dividend reinvestment plan. T also acquires for C's account 50 shares of H Company and does not enroll these shares in the dividend reinvestment plan.

(ii) Under paragraph (e)(7)(i) of this section, the 50 shares of H Company not in the dividend reinvestment plan are not identical to the 100 shares of H Company enrolled in the dividend reinvestment plan, even if they have the same CUSIP number. Accordingly, under paragraphs (e)(1) and (e)(7)(i) of this section, C may not average the basis of the 50 shares of H Company

with the basis of the 100 shares of H Company. Under paragraph (e)(1)(i) of this section, C may not use the average basis method for the 50 shares of H Company because the shares are not acquired in connection with a dividend reinvestment plan.

**Example 2.** (i) Taxpayer D enters into an agreement with W Custodian establishing an account for the periodic acquisition of shares of L Company, a regulated investment company. W acquires for D's account shares of L Company stock on the following dates and amounts:

| Date | Number of shares | Cost |
|------|------------------|------|
| January 8, 2010.......................................... | 25 | $200 |
| February 8, 2010......................................... | 24 | 200 |
| March 8, 2010............................................. | 20 | 200 |
| April 8, 2010.............................................. | 20 | 200 |

(ii) At D's direction, W sells 40 shares from the account on January 15, 2011, for $10 per share or a total of $400. D elects to use the average basis method for the shares of L Company. The average basis for the shares sold on January 15, 2011, is $8.99 (total cost of shares, $800, divided by the total number of shares, 89).

(iii) Under paragraph (e)(7)(ii) of this section, the shares sold are the shares first acquired. Thus, D realizes $25.25 ($1.01 * 25) long-term capital gain for the 25 shares acquired on January 8, 2010, and $15.15 ($1.01 * 15) short-term capital gain for 15 of the shares acquired on February 8, 2010.

**Example 3.** (i) The facts are the same as in Example 2, except that on February 8, 2011, D changes to the first-in, first-out basis determination method. W purchases 25 shares of L Company for D on March 8, 2011, at $12 per share. D sells 40 shares on May 8, 2011, and 34 shares on July 8, 2012.

(ii) Because D uses the first-in, first-out method, the 40 shares sold on May 8, 2011 are 9 shares purchased on February 8, 2010, 20 shares purchased on March 8, 2010, and 11 shares purchased on April 8, 2010. Because, under paragraph (e)(7)(v) of this section, the basis of the shares D owns when D changes from the average basis method remains the same, the basis of the shares sold on May 8, 2011, is $8.99 per share, not the original cost of $8.33 per share for the shares purchased on February 8, 2010, or $10 per share for the shares purchased on March 8, 2010, and April 8, 2010. The basis of the shares sold on July 8, 2012, is $8.99 per share for 9 shares purchased on April 8, 2010, and $12 per share for 25 shares purchased on March 8, 2011.

**Example 4.** (i) The facts are the same as in Example 2, except that D uses the first-in, first-out method for the 40 shares sold on January 15, 2011. W purchases 25 shares of L Company for D on March 8, 2011, at $12 per share. D sells 40 shares on May 8, 2011, and elects the average basis method.

(ii) Because D uses the first-in, first-out method for the sale on January 15, 2011, the 40 shares sold are the 25 shares acquired on January 8, 2010, for $200 (basis $8 per share) and 15 of the 24 shares purchased on February 8, 2010, for $200 (basis $8.33 per share).

(iii) Under paragraph (e)(7)(i) of this section, under the average basis method, the basis of all of the shares of identical stock in D's account is averaged. Thus, the basis of each share D sells on May 8, 2011, after electing the average basis method, is $10.47. This figure is the total cost of the shares in D's account ($74.97 for the 9 shares acquired on February 8, 2010, $200 for the 20 shares acquired on March 8, 2010, $200 for the 20 shares acquired on April 8, 2010, and $300 for the 25 shares acquired on March 8, 2011) divided by 74, the total number of shares ($774.97/74).

**(8) Limitation on use of average basis method for certain gift shares. (i)** Except as provided in paragraph (e)(8)(ii) of this section, a taxpayer may not use the average basis method for shares of stock a taxpayer acquires by gift after December 31, 1920, if the basis of the shares (adjusted for the period before the date of the gift as provided in section 1016) in the hands of the donor or the last preceding owner by whom the shares were not acquired by gift was greater than the fair market value of the shares at the time of the gift. This paragraph (e)(8)(i) does not apply to shares the taxpayer acquires as a result of a taxable dividend or capital gain distribution on the gift shares.

**(ii)** Notwithstanding paragraph (e)(8)(i) of this section, a taxpayer may use the average basis method if the taxpayer states in writing that the taxpayer will treat the basis of the gift shares as the fair market value of the shares at the time the taxpayer acquires the shares. The taxpayer must provide this statement when the taxpayer makes the election under paragraph (e)(9) of this section or when transferring the shares to an account for which the taxpayer has made this election, whichever occurs later. The statement must be effective for any gift shares identical to the gift shares to which the average basis method election applies that the taxpayer acquires at any time and must remain in effect as long as the election remains in effect.

**(iii)** The provisions of this paragraph (e)(8) are illustrated by the following examples:

**Example 1.** (i) Taxpayer E owns an account for the periodic acquisition of shares of M Company, a regulated investment company. On April 15, 2010, E acquires identical shares of M Company by gift and transfers those shares into the account. These shares had an adjusted basis in the hands of the donor that was greater than the fair market value of the shares on that date. On June 15, 2010, E sells shares from the account and elects to use the average basis method.

(ii) Under paragraph (e)(8)(ii) of this section, E may elect to use the average basis method for shares sold or transferred from the account if E includes a statement with E's election that E will treat the basis of the gift shares in the account as the fair market value of the shares at the time E acquired them. See paragraph (e)(9)(ii) of this section.

**Example 2.** (i) The facts are the same as in Example 1, except E acquires the gift shares on April 15, 2012, transfers those shares into the account, and used the average basis method for sales of shares of M Company before acquiring the gift shares. E sells shares of M Company on June 15, 2012.

(ii) Under paragraph (e)(8)(ii) of this section, the basis of the gift shares may be averaged with the basis of the other shares of M Company in E's account if, when E transfers the gift shares to the account, E provides a statement to E's broker that E will treat the basis of the gift shares in the account as the fair market value of the shares at the time E acquired them. See paragraph (e)(9)(i) of this section.

**(9) Time and manner for making the average basis method election—(i) In general.** A taxpayer makes an election to use the average basis method for shares of stock described in paragraph (e)(1)(i) of this section that are covered securities (within the meaning of section 6045(g)(3)) by notifying the custodian or agent in writing by any reasonable means. For purposes of this paragraph (e), a writing may be in electronic format. A taxpayer has not made an election within the meaning of this section if the taxpayer fails to notify a broker of the taxpayer's basis determination method and basis is determined by the broker's default method under paragraph (e)(2) of this section. A taxpayer may make the average basis method election at any time, effective for sales or other dispositions of stock occurring after the taxpayer notifies the custodian or agent. The election must identify each account with that custodian or agent and each stock in that account to which the election applies. The election may specify that it applies to all accounts with a custodian or agent, including accounts the taxpayer later establishes with the custodian or agent. If the election applies to gift shares, the taxpayer must

provide the statement required by paragraph (e)(8)(ii) of this section, if applicable, to the custodian or agent with the taxpayer's election.

**(ii) Average basis method election for securities that are noncovered securities.** A taxpayer makes an election to use the average basis method for shares of stock described in paragraph (e)(1)(i) of this section that are noncovered securities (as described in § 1.6045–1(a)(16)) on the taxpayer's income tax return for the first taxable year for which the election applies. A taxpayer may make the election on an amended return filed no later than the time prescribed (including extensions) for filing the original return for the taxable year for which the election applies. The taxpayer must indicate on the return that the taxpayer used the average basis method in reporting gain or loss on the sale or other disposition. A taxpayer must attach to the return the statement described in paragraph (e)(8)(ii) of this section, if applicable. A taxpayer making the election must maintain records necessary to substantiate the average basis reported.

**(iii) Revocation of election.** A taxpayer may revoke an election under paragraph (e)(9)(i) of this section by the earlier of one year after the taxpayer makes the election or the date of the first sale, transfer, or disposition of that stock following the election. A custodian or agent may extend the one-year period but a taxpayer may not revoke an election after the first sale, transfer, or disposition of the stock. A revocation applies to all stock the taxpayer holds in an account that is identical to the shares of stock for which the taxpayer revokes the election. A revocation is effective when the taxpayer notifies, in writing by any reasonable means, the custodian or agent holding the stock to which the revocation applies. After revocation, the taxpayer's basis in the shares of stock to which the revocation applies is the basis before averaging.

**(iv) Change from average basis method.** A taxpayer may change basis determination methods from the average basis method to another method prospectively at any time. A change from the average basis method applies to all identical stock the taxpayer sells or otherwise disposes of before January 1, 2012, that was held in any account. A change from the average basis method applies on an account by account basis (within the meaning of paragraph (e)(10) of this section) to all identical stock the taxpayer sells or otherwise disposes of on or after January 1, 2012. The taxpayer must notify, in writing by any reasonable means, the custodian or agent holding the stock to which the change applies. Unless paragraph (e)(9)(iii) of this section applies, the basis of each share of stock to which the change applies remains the same as the basis immediately before the change. See paragraph (e)(7)(v) of this section.

**(v) Examples.** The provisions of this paragraph (e)(9) are illustrated by the following examples:

**Example 1.** (i) Taxpayer F enters into an agreement with W Custodian establishing an account for the periodic acquisition of shares of N Company, a regulated investment company. W acquires for F's account shares of N Company on the following dates and amounts:

| Date | Number of shares | Cost |
|---|---|---|
| January 8, 2012......................................... | 25 | $200 |
| February 8, 2012........................................ | 24 | 200 |
| March 8, 2012............................................ | 20 | 200 |

(ii) F notifies W that F elects, under paragraph (e)(9)(i) of this section, to use the average basis method for the shares of N Company. On May 8, 2012, under paragraph (e)(9)(iii) of this section, F notifies W that F revokes the average basis method election. On June 1, 2012, F sells 60 shares of N Company using the first-in, first-out basis determination method.

(iii) Under paragraph (e)(9)(iii) of this section, the basis of the N Company shares upon revocation, and for purposes of determining gain on the sale, is $8.00 per share for each of the 25 shares purchased on January 8, 2012, $8.34 per share for each of the 24 shares purchased on February 8, 2012, and $10 per share for the remaining 11 shares purchased on March 8, 2012.

**Example 2.** (i) The facts are the same as in Example 1, except that F does not notify W that F elects a basis determination method. W's default basis determination method is the average basis method and W maintains an averaged basis for F's shares of N Company on W's books and records.

(ii) F has not elected the average basis method under paragraph (e)(9)(i) of this section. Therefore, F's notification to W on May 8, 2012, is not an effective revocation under paragraph (e)(9)(iii) of this section. F's attempted revocation is, instead, notification of a change from the average basis method under paragraph (e)(9)(iv) of this section. Accordingly, the basis of each share of stock F sells on June 1, 2012, is the basis immediately before the change, $8.70 (total cost of shares, $600, divided by the total number of shares, 69).

**(10) Application of average basis method account by account—(i) In general.** For sales, exchanges, or other dispositions on or after January 1, 2012, of stock described in paragraph (e)(1)(i) of this section, the average basis method applies on an account by account basis. A taxpayer may use the average basis method for stock in a regulated investment company or stock acquired in connection with a dividend reinvestment plan in one account but use a different basis determination method for identical stock in a different account. If a taxpayer uses the average basis method for a stock described in paragraph (e)(1)(i) of this section, the taxpayer must use the average basis method for all identical stock within that account. The taxpayer may use different basis determination methods for stock within an account that is not identical. Except as provided in paragraph (e)(10)(ii) of this section, a taxpayer must make separate elections to use the average basis method for stock held in separate accounts.

**(ii) Account rule for stock sold before 2012.** A taxpayer's election to use the average basis method for shares of stock described in paragraph (e)(1)(i) of this section that a taxpayer sells, exchanges, or otherwise disposes of before January 1, 2012, applies to all identical shares of stock the taxpayer holds in any account.

**(iii) Separate account.** Unless the single-account election described in paragraph (e)(11)(i) of this section applies, stock described in paragraph (e)(1)(i) of this section that is a covered security (within the meaning of section 6045(g)(3)) is treated as held in a separate account from stock that is a noncovered security (as described in § 1.6045–1(a)(16)), regardless of when acquired.

**(iv) Examples.** The provisions of this paragraph (e)(10) are illustrated by the following examples:

**Example 1.** (i) In 2012, Taxpayer G enters into an agreement with Y Broker establishing three accounts (G–1, G–2, and G–3) for the periodic acquisition of shares of P Company, a regulated investment company. Y makes periodic purchases of P Company for each of G's accounts. G elects to use the average basis method for account G–1. On July 1, 2013, G sells shares of P Company from account G–1.

(ii) G is not required to use the average basis method for the shares of P Company that G holds in accounts G–2 and G–3 because, under paragraph (e)(10)(i) of this section, the average basis method election applies to shares sold after 2011 on an account by account basis.

**Example 2.** The facts are the same as in Example 1, except that G also instructs Y to acquire shares of Q Company, a regulated investment company, for account G–1. Under paragraph (e)(10)(i) of this section, G may use any permissible basis determination method for the shares of Q Company because, under paragraph (e)(4) of this section, the shares of Q Company are not identical to the shares of P Company.

**Example 3.** (i) The facts are the same as in Example 1, except that G establishes the accounts in 2011 and Y sells shares of P Company from account G–1 on July 1, 2011.

(ii) For sales before 2012, under paragraph (e)(10)(ii) of this section, G's election applies to all accounts in which G holds identical stock. G must average together the basis of the shares in all accounts to determine the basis of the shares sold from account G–1.

**Example 4.** (i) In 2011, Taxpayer H acquires 80 shares of R Company and enrolls them in R Company's dividend reinvestment plan. In 2012, H acquires 50 shares of R Company in the dividend reinvestment plan. H elects to use the average basis method for the shares of R Company in the dividend reinvestment plan. R Company does not make the single-account election under paragraph (e)(11)(i) of this section.

(ii) Under section 6045(g)(3) and § 1.6045–1(a)(16), the 80 shares acquired in 2011 are noncovered securities and the 50 shares acquired in 2012 are covered securities. Therefore, under paragraph (e)(10)(iii) of this section, the 80 shares are treated as held in a separate account from the 50 shares. H must make a separate average basis method election for each account and must average the basis of the shares in each account separately from the shares in the other account.

**Example 5.** (i) B Broker maintains an account for Taxpayer J for the periodic acquisition of shares of S Company, a regulated investment company. In 2013, B purchases shares of S Company for J's account that are covered securities within the meaning of section 6045(g)(3). On April 15, 2014, J inherits shares of S Company that are noncovered securities and transfers the shares into the account with B.

(ii) Under paragraph (e)(10)(iii) of this section, J must treat the purchased shares and the inherited shares of S Company as held in separate accounts. J may elect to apply the average basis method to all the shares of S Company, but must make a separate election for each account, and must average the basis of the shares in each account separately from the shares in the other account.

**Example 6.** (i) In 2010, Taxpayer K purchases stock in T Company in an account with C Broker. In 2012, K purchases additional T Company stock and enrolls that stock in a dividend reinvestment plan maintained by C. K elects the average basis method for the T Company stock. In 2013, K transfers the T Company stock purchased in 2010 into the dividend reinvestment plan.

(ii) Under paragraphs (e)(1)(i) and (e)(6)(ii) of this section, the stock purchased in 2010 is not stock acquired after December 31, 2010, in connection with a dividend reinvestment plan before transfer into the dividend reinvestment plan. Therefore, the stock is not eligible for the average basis method at that time.

(iii) Once transferred into the dividend reinvestment plan in 2013, the stock K purchased in 2010 is acquired after December 31, 2010, in connection with a dividend reinvestment plan within the meaning of paragraph (e)(6)(ii) of this section and is eligible for the average basis method. Because stock purchased in 2010 is a noncovered security under § 1.6045–1(a)(16), under paragraph (e)(10)(iii) of this section, the 2010 stock and the 2012 stock must be treated as held in separate accounts. Under paragraph (e)(7)(i) of this section, the basis of the 2010 shares may not be averaged with the basis of the 2012 shares.

**Example 7.** The facts are the same as in Example 6, except that K purchases the initial T Company stock in January 2011. Because this stock is a covered security under section 6045(g)(3) and § 1.6045–1(a)(15)(iv)(A), the 2011 stock and the 2012

stock are not required under paragraph (e)(10)(iii) of this section to be treated as held in separate accounts. Under paragraph (e)(7)(i) of this section, the basis of the 2011 shares must be averaged with the basis of the 2012 shares.

**Example 8.** (i) The facts are the same as in Example 7, except that K purchases the additional T Company stock and enrolls in the dividend reinvestment plan in March 2011. In September 2011, K transfers the T Company stock purchased in January 2011 into the dividend reinvestment plan. K sells some of the T Company stock in 2012.

(ii) Under section 6045(g)(3) and § 1.6045–1(a)(16), the stock K purchases in January 2011 is a covered security at the time of purchase but the stock K purchases and enrolls in the dividend reinvestment plan in March 2011 is a noncovered security. However, under § 1.6045–1(a)(15)(iv)(A), the stock purchased in January 2011 becomes a noncovered security after it is transferred to the dividend reinvestment plan. Because all the shares in the dividend reinvestment plan in September 2011 are noncovered securities, when K sells stock in 2012, the January 2011 stock and the March 2011 stock are not required under paragraph (e)(10)(iii) of this section to be treated as held in separate accounts. Under paragraph (e)(7)(i) of this section, the basis of the January 2011 shares must be averaged with the basis of the March 2011 shares.

**(11) Single-account election—(i) In general.** Paragraph (e)(10)(iii) of this section does not apply if a regulated investment company or dividend reinvestment plan elects to treat all identical shares of stock described in paragraph (e)(1)(i) of this section as held in a single account (single-account election). The single-account election applies only to stock for which a taxpayer elects to use the average basis method that is held in separate accounts or treated as held in separate accounts maintained for the taxpayer and only to accounts with the same ownership. If a broker (as defined by section 6045(c)(1)) holds the stock as a nominee, the broker, and not the regulated investment company or dividend reinvestment plan, makes the election. The single-account election is irrevocable, but is void if the taxpayer revokes the average basis election under paragraph (e)(9)(iii) of this section.

**(ii) Scope of election.** A company, plan, or broker may make a single-account election for one or more taxpayers for which it maintains an account, and for one or more stocks it holds for a taxpayer. The company, plan, or broker may make the election only for the shares of stock for which it has accurate basis information. A company, plan, or broker has accurate basis information if the company, plan, or broker neither knows nor has reason to know that the basis information is inaccurate. See also section 6724 and the associated regulations regarding standards for relief from information reporting penalties. Stock for which accurate basis information is unavailable may not be included in the single-account election and must be treated as held in a separate account.

**(iii) Effect of single-account election.** If a company, plan, or broker makes the single-account election, the basis of all identical shares of stock to which the election applies must be averaged together regardless of when the taxpayer acquires the shares, and all the shares are treated as covered securities. The single-account election applies to all identical stock a taxpayer later acquires in the account that is a covered security (within the meaning of section 6045(g)(3)). A company, plan, or broker may make another single-account election if, for example, the broker later acquires accurate basis information for a stock, or a taxpayer acquires identical stock in the account that is a noncovered security (as described in § 1.6045–1(a)(16)) for which the company, plan, or broker has accurate basis information.

**(iv) Time and manner for making the single-account election.** A company, plan, or broker makes the single-account election by clearly noting it on its books and records. The books and records must reflect the date of the election; the taxpayer's name, account number, and taxpayer identification number; the stock subject to the election; and the taxpayer's basis in the stock. The company, plan, or broker must provide copies of the books and records regarding the election to the taxpayer upon request. A company, plan, or broker may make the single-account election at any time.

**(v) Notification to taxpayer.** A company, plan, or broker making the single-account election must use reasonable means to notify the taxpayer of the election. Reasonable means include mailings, circulars, or electronic mail sent separately to the taxpayer or included with the taxpayer's account statement, or other means reasonably calculated to provide actual notice to the taxpayer. The notice must identify the securities subject to the election and advise the taxpayer that the securities will be treated as covered securities regardless of when acquired.

**(vi) Examples.** The provisions of this paragraph (e)(11) are illustrated by the following examples:

**Example 1.** (i) E Broker maintains Accounts A and B for Taxpayer M for the acquisition and disposition of shares of T Company, a regulated investment company. In 2011, E purchases 100 shares of T Company for M's Account A. E has accurate basis information for these shares. In 2012, E purchases 150 shares of T Company for M's Account A and 80 shares of T Company for M's Account B. M elects to use the average basis method for all shares of T Company. E makes a single-account election for M's T Company stock.

(ii) The shares of T Company in Accounts A and B are held in separate accounts. Under section 6045(g)(3) and § 1.6045–1(a)(16), of the shares purchased in Account A, the 100 shares purchased in 2011 are noncovered securities and the 150 shares purchased in 2012 are covered securities. Under paragraph (e)(10)(iii) of this section, the 100 shares are treated as held in a separate account from the 150 shares. Under paragraph (e)(11)(i) of this section, the single-account election applies to all 330 shares of T Company in Accounts A and B. Thus, under paragraph (e)(11)(iii) of this section, the basis of the 330 shares of stock is averaged together and all the shares are treated as covered securities.

**Example 2.** The facts are the same as in Example 1, except that M owns Account B jointly with Taxpayer N. E may make a single-account election for the 250 shares of stock in M's Account A. However, under paragraph (e)(11)(i) of this section, E may not make a single-account election for Accounts A and B because the accounts do not have the same ownership.

**Example 3.** (i) C Broker maintains an account for Taxpayer K for the acquisition and disposition of shares of T Company, a regulated investment company, and shares of V Company that K enrolls in C's dividend reinvestment plan. In 2011, C purchases for K's account 100 shares of T Company in multiple lots and 80 shares of V Company in multiple lots that are enrolled in the dividend reinvestment plan. C has accurate basis information for all 100 shares of T Company and 80 shares of V Company. In 2012, C acquires for K's account 150 shares of T Company and 160 shares of V Company that are enrolled in the dividend reinvestment plan. K elects to use the average basis method for all the shares of T Company and V Company.

(ii) Under paragraphs (e)(11)(i) and (ii) of this section, C may make a single-account election for the T Company stock or the V Company stock, or both. After making a single-account election for each stock, under paragraph (e)(11)(iii) of this section, the basis of all T Company stock is averaged together and the basis of all V Company stock is averaged together, regardless of when acquired, and all the shares of T Company and V Company are treated as covered securities.

**Example 4.** The facts are the same as in Example 3, except that K transfers the 100 shares of T Company acquired in 2011 from an account with another broker into K's account with C. C does not have accurate basis information for 30 of the 100 shares of T Company, which K had acquired in two lots. Under paragraph (e)(11)(ii) of this section, C may make the single-account election only for the 70 shares of T Company stock for which C has accurate basis information. C must treat the 30 shares of T Company for which C does not have accurate basis information as held in a separate account. K may use the average basis method for the 30 shares of T Company, but must make a separate average basis method election for these shares and must average the basis of these shares separately from the 70 shares subject to C's single-account election.

**Example 5.** The facts are the same as in Example 3, except that C has made the single-account election and in 2013 K acquires additional shares of T Company that are covered securities in K's account with C. Under paragraph (e)(11)(iii) of this section, these shares of T Company are subject to C's single-account election.

**Example 6.** The facts are the same as in Example 3, except that C has made the single-account election and in 2013 K inherits shares of T Company that are noncovered securities and transfers the shares into the account with C. C has accurate basis information for these shares. Under paragraph (e)(11)(iii) of this section, C may make a second single-account election to include the inherited T Company shares.

**Example 7.** (i) Between 2002 and 2011, Taxpayer L acquires 1,500 shares of W Company, a regulated investment company, in an account with D Broker, for which L uses the average basis method, and sells 500 shares. On January 5, 2012, based on accurate basis information, the averaged basis of L's remaining 1,000 shares of W Company is $24 per share. On January 5, 2012, L acquires 100 shares of W Company for $28 per share and makes an average basis election for those shares under paragraph (e)(9)(i) of this section.

(ii) On February 1, 2012, D makes a single-account election that includes all 1,100 of L's shares in W Company. Thereafter, the basis of L's shares of W Company is $24.36 per share (($24,000 + $2,800)/1,100). On September 12, 2012, under paragraph (e)(9)(iii) of this section, L revokes the average basis election for the 100 shares acquired on January 5, 2012.

(iii) Under paragraph (e)(11)(i) of this section, D's single-account election is void. Therefore, the basis of the 1,000 shares of W Company that L acquires before 2012 is $24 per share and the basis of the 100 shares of W Company that L acquires in 2012 is $28 per share.

> **(12) Effective/applicability date.** Except as otherwise provided in paragraphs (e)(1), (e)(2), (e)(7), (e)(9), and (e)(10) of this section, this paragraph (e) applies for taxable years beginning after October 18, 2010.

**(f) Special rules.** For special rules for determining the basis for gain or loss in the case of certain vessels acquired through the Maritime Commission (or its successors) or pursuant to an agreement with the Secretary of Commerce, see sections 510, 511, and 607 of the Merchant Marine Act, 1936, as amended (46 U.S.C. 1160, 1161) and parts 2 and 3 of this chapter. For special rules for determining the unadjusted basis of property recovered in respect of war losses, see section 1336. For special rules with respect to taxable years beginning before January 1, 1964, for determining the basis for gain or loss in the case of a disposition of a share of stock acquired pursuant to the timely exercise of a restricted stock option where the option price was between 85 percent and 95 percent of the fair market value of the stock at the time the option was granted, see paragraph (b) of § 1.421–5. See section 423(c)(1) or 424(c)(1), whichever is applicable, for special rules with respect to taxable years ending after December 31, 1963, for determining the basis for gain or loss in the case of the disposition of a share of stock acquired pursuant to the timely exercise of a stock option described in such sections. See section 422(c)(1) for special rules with respect to taxable years ending after December 31, 1963, for determining the basis for gain or loss in the case of an exercise of a qualified stock option.

**(g) Debt instruments issued in exchange for property—(1) In general.** For purposes of paragraph (a) of this section, if a debt instrument is issued in exchange for property, the cost of the property that is attributable to the debt instrument is the issue price of the debt instrument as determined under § 1.1273–2 or § 1.1274–2, whichever is applicable. If, however, the issue price of the debt instrument is determined under section 1273(b)(4), the cost of the property attributable to the debt instrument is its stated principal amount reduced by any unstated interest (as determined under section 483).

> **(2) Certain tax–exempt obligations.** This paragraph (g)(2) applies to a tax–exempt obligation (as defined in section 1275(a)(3)) that is issued in exchange for property and that has an issue price determined under § 1.1274–2(j) (concerning tax–exempt contingent payment obligations and certain tax–exempt variable rate debt instruments subject to section 1274). Notwithstanding paragraph (g)(1) of this section, if this paragraph (g)(2) applies to a tax–exempt obligation, for purposes

of paragraph (a) of this section, the cost of the property that is attributable to the obligation is the sum of the present values of the noncontingent payments (as determined under § 1.1274–2(c)).

**(3) Effective date.** This paragraph (g) applies to sales or exchanges that occur on or after August 13, 1996.

**Credits**

[T.D. 6500, 25 FR 11910, Nov. 26, 1960, as amended by T.D. 6837, 30 FR 8787, July 13, 1965; T.D. 6887, 31 FR 8814, June 24, 1966; T.D. 6934, 32 FR 15671, 15676, Nov. 14, 1967; T.D. 6984, 33 FR 19176, Dec. 21, 1968; T.D. 7015, 34 FR 9672, June 20, 1969; T.D. 7081, 35 FR 19996, Dec. 31, 1970; T.D. 7129, 36 FR 12736, July 7, 1971; T.D. 7154, 36 FR 24997, Dec. 28, 1971; 36 FR 13208, July 16, 1971; 36 FR 24997, Dec. 28, 1971; T.D. 7213, 37 FR 21992, Oct. 18, 1972; T.D. 7568, 43 FR 47505, Oct. 16, 1978; T.D. 7728, 45 FR 72650, Nov. 3, 1980; T.D. 8517, 59 FR 4807, Feb. 2, 1994; T.D. 8674, 61 FR 30139, June 14, 1996; T.D. 9504, 75 FR 64084, Oct. 18, 2010]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

Current through March 24, 2016; 81 FR 16051.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Gain or Loss on Disposition of Property
              Special Rules

26 C.F.R. § 1.1060–1, Treas. Reg. § 1.1060–1

§ 1.1060–1 Special allocation rules for certain asset acquisitions.

Effective: March 18, 2008
Currentness

**(a) Scope—(1) In general.** This section prescribes rules relating to the requirements of section 1060, which, in the case of an applicable asset acquisition, requires the transferor (the seller) and the transferee (the purchaser) each to allocate the consideration paid or received in the transaction among the assets transferred in the same manner as amounts are allocated under section 338(b)(5) (relating to the allocation of adjusted grossed-up basis among the assets of the target corporation when a section 338 election is made). In the case of an applicable asset acquisition described in paragraph (b)(1) of this section, sellers and purchasers must allocate the consideration under the residual method as described in §§ 1.338–6 and 1.338–7 in order to determine, respectively, the amount realized from, and the basis in, each of the transferred assets. For rules relating to distributions of partnership property or transfers of partnership interests which are subject to section 1060(d), see § 1.755–2T.

**(2) Effective dates—(i) In general.** The provisions of this section apply to any asset acquisition occurring after March 15, 2001. However, paragraphs (b)(9) and (c)(5) of this section apply only to applicable asset acquisitions occurring on or after April 10, 2006. A purchaser or a seller may make an irrevocable election to apply the rules in § 1.338-11 (including the applicable provisions in §§ 1.197–2(g)(5), 1.381(c)(22)–1, 846 and 1060) to an applicable asset acquisition occurring before April 10, 2006. Paragraph (a)(2)(ii) of this section describes the time and manner of the election for the purchaser and paragraph (a)(2)(iii) of this section prescribes the time and manner of the election for the seller. The seller may make the election to apply the regulations retroactively without regard to whether the purchaser also makes the election. For rules applicable to asset acquisitions on or before March 15, 2001, see § 1.1060–1T in effect before March 16, 2001 (see 26 CFR part 1 revised April 1, 2000).

**(ii) Time and manner of making the election for the purchaser.** The purchaser may make an election described in this paragraph (a)(2) by attaching a statement to its original or amended income tax return for the taxable year that includes the applicable asset sale. The statement must be entitled "Election to Retroactively Apply the Rules in § 1.338-11 (Including the Applicable Provisions in §§ 1.197–2(g)(5), 1.381(c)(22)–1, 846 and 1060) to an Applicable Asset Acquisition Completed Before April 10, 2006" and must include the following information—

(A) The name and E.I.N. for the purchaser; and

(B) The following declaration (or a substantially similar declaration): The purchaser has amended its income tax returns for the taxable year that includes the applicable asset acquisition and for all affected subsequent years to reflect the rules in § 1.338-11 (Including the Applicable Provisions in §§ 1.197–2(g)(5), 1.381(c)(22)–1,846 and 1060).

**(iii) Time and manner of making the election for the seller.** The seller may make an election described in this paragraph (a)(2) by attaching a statement to its original or amended income tax return for the taxable year that includes the applicable asset sale. The statement must be entitled "Election to retroactively apply the rules in § 1.338–11 (including the applicable provisions in §§ 1.197–2(g)(5), 1.381(c)(22)–1, 846 and 1060) to an applicable asset acquisition completed before April 10, 2006" and must include the following information—

(A) The name and E.I.N. for the seller; and

(B) The following declaration (or a substantially similar declaration): The seller has amended its income tax returns for the taxable year that includes the applicable asset acquisition and for all affected subsequent years to reflect the rules in § 1.338-11 (including the applicable provisions in §§ 1.197–2(g)(5), 1.381(c)(22)–1, 846 and 1060).

**(3) Outline of topics.** In order to facilitate the use of this section, this paragraph (a)(3) lists the major paragraphs in this section as follows:

(a) Scope.

(1) In general.

(2) Effective date.

(3) Outline of topics.

(b) Applicable asset acquisition.

(1) In general.

(2) Assets constituting a trade or business.

(i) In general.

(ii) Goodwill or going concern value.

(iii) Factors indicating goodwill or going concern value.

(3) Examples.

(4) Asymmetrical transfers of assets.

(5) Related transactions.

(6) More than a single trade or business.

(7) Covenant entered into by the seller.

(8) Partial non-recognition exchanges.

(9) Insurance business.

(c) Allocation of consideration among assets under the residual method.

(1) Consideration.

(2) Allocation of consideration among assets.

(3) Certain costs.

(4) Effect of agreement between parties.

(5) Insurance business.

(d) Examples.

(e) Reporting requirements.

(1) Applicable asset acquisitions.

(i) In general.

(ii) Time and manner of reporting.

(A) In general.

(B) Additional reporting requirement.

(C) Election described in § 1.338–6(c)(5).

(2) Transfers of interests in partnerships.

**(b) Applicable asset acquisition—(1) In general.** An applicable asset acquisition is any transfer, whether direct or indirect, of a group of assets if the assets transferred constitute a trade or business in the hands of either the seller or the purchaser and, except as provided in paragraph (b)(8) of this section, the purchaser's basis in the transferred assets is determined wholly by reference to the purchaser's consideration.

    **(2) Assets constituting a trade or business—(i) In general.** For purposes of this section, a group of assets constitutes a trade or business if—

        (A) The use of such assets would constitute an active trade or business under section 355; or

(B) Its character is such that goodwill or going concern value could under any circumstances attach to such group.

**(ii) Goodwill or going concern value.** Goodwill is the value of a trade or business attributable to the expectancy of continued customer patronage. This expectancy may be due to the name or reputation of a trade or business or any other factor. Going concern value is the additional value that attaches to property because of its existence as an integral part of an ongoing business activity. Going concern value includes the value attributable to the ability of a trade or business (or a part of a trade or business) to continue functioning or generating income without interruption notwithstanding a change in ownership. It also includes the value that is attributable to the immediate use or availability of an acquired trade or business, such as, for example, the use of the revenues or net earnings that otherwise would not be received during any period if the acquired trade or business were not available or operational.

**(iii) Factors indicating goodwill or going concern value.** In making the determination in this paragraph (b)(2), all the facts and circumstances surrounding the transaction are taken into account. Whether sufficient consideration is available to allocate to goodwill or going concern value after the residual method is applied is not relevant in determining whether goodwill or going concern value could attach to a group of assets. Factors to be considered include—

(A) The presence of any intangible assets (whether or not those assets are section 197 intangibles), provided, however, that the transfer of such an asset in the absence of other assets will not be a trade or business for purposes of section 1060;

(B) The existence of an excess of the total consideration over the aggregate book value of the tangible and intangible assets purchased (other than goodwill and going concern value) as shown in the financial accounting books and records of the purchaser; and

(C) Related transactions, including lease agreements, licenses, or other similar agreements between the purchaser and seller (or managers, directors, owners, or employees of the seller) in connection with the transfer.

**(3) Examples.** The following examples illustrate paragraphs (b)(1) and (2) of this section:

**Example 1.** S is a high grade machine shop that manufactures microwave connectors in limited quantities. It is a successful company with a reputation within the industry and among its customers for manufacturing unique, high quality products. Its tangible assets consist primarily of ordinary machinery for working metal and plating. It has no secret formulas or patented drawings of value. P is a company that designs, manufactures, and markets electronic components. It wants to establish an immediate presence in the microwave industry, an area in which it previously has not been engaged. P is acquiring assets of a number of smaller companies and hopes that these assets will collectively allow it to offer a broad product mix. P acquires the assets of S in order to augment its product mix and to promote its presence in the microwave industry. P will not use the assets acquired from S to manufacture microwave connectors. The assets transferred are assets that constitute a trade or business in the hands of the seller. Thus, P's purchase of S's assets is an applicable asset acquisition. The fact that P will not use the assets acquired from S to continue the business of S does not affect this conclusion.

**Example 2.** S, a sole proprietor who operates a car wash, both leases the building housing the car wash and sells all of the car wash equipment to P. S's use of the building and the car wash equipment constitute a trade or business. P begins operating a car wash in the building it leases from S. Because the assets transferred together with the asset leased are assets which constitute a trade or business, P's purchase of S's assets is an applicable asset acquisition.

**Example 3.** S, a corporation, owns a retail store business in State X and conducts activities in connection with that business enterprise that meet the active trade or business requirement of section 355. P is a minority shareholder of S. S distributes to P all the assets of S used in S's retail business in State X in complete redemption of P's stock in S held by P. The distribution of S's assets in redemption of P's stock is treated as a sale or exchange under sections 302(a) and 302(b)(3), and P's basis in the assets distributed to it is determined wholly by reference to the consideration paid, the S stock. Thus, S's distribution of assets constituting a trade or business to P is an applicable asset acquisition.

**Example 4.** S is a manufacturing company with an internal financial bookkeeping department. P is in the business of providing a financial bookkeeping service on a contract basis. As part of an agreement for P to begin providing financial bookkeeping services to S, P agrees to buy all of the assets associated with S's internal bookkeeping operations and provide employment to any of S's bookkeeping department employees who choose to accept a position with P. In addition to selling P the assets associated with its bookkeeping operation, S will enter into a long term contract with P for bookkeeping services. Because assets transferred from S to P, along with the related contract for bookkeeping services, are a trade or business in the hands of P, the sale of the bookkeeping assets from S to P is an applicable asset acquisition.

**(4) Asymmetrical transfers of assets.** A purchaser is subject to section 1060 if—

**(i)** Under general principles of tax law, the seller is not treated as transferring the same assets as the purchaser is treated as acquiring;

**(ii)** The assets acquired by the purchaser constitute a trade or business; and

**(iii)** Except as provided in paragraph (b)(8) of this section, the purchaser's basis in the transferred assets is determined wholly by reference to the purchaser's consideration.

**(5) Related transactions.** Whether the assets transferred constitute a trade or business is determined by aggregating all transfers from the seller to the purchaser in a series of related transactions. Except as provided in paragraph (b)(8) of this section, all assets transferred from the seller to the purchaser in a series of related transactions are included in the group of assets among which the consideration paid or received in such series is allocated under the residual method. The principles of § 1.338–1(c) are also applied in determining which assets are included in the group of assets among which the consideration paid or received is allocated under the residual method.

**(6) More than a single trade or business.** If the assets transferred from a seller to a purchaser include more than one trade or business, then, in applying this section, all of the assets transferred (whether or not transferred in one transaction or a series of related transactions and whether or not part of a trade or business) are treated as a single trade or business.

**(7) Covenant entered into by the seller.** If, in connection with an applicable asset acquisition, the seller enters into a covenant (e.g., a covenant not to compete) with the purchaser, that covenant is treated as an asset transferred as part of a trade or business.

**(8) Partial non-recognition exchanges.** A transfer may constitute an applicable asset acquisition notwithstanding the fact that no gain or loss is recognized with respect to a portion of the group of assets transferred. All of the assets transferred,

including the non-recognition assets, are taken into account in determining whether the group of assets constitutes a trade or business. The allocation of consideration under paragraph (c) of this section is done without taking into account either the non-recognition assets or the amount of money or other property that is treated as transferred in exchange for the non-recognition assets (together, the non-recognition exchange property). The basis in and gain or loss recognized with respect to the non-recognition exchange property are determined under such rules as would otherwise apply to an exchange of such property. The amount of the money and other property treated as exchanged for non-recognition assets is the amount by which the fair market value of the non-recognition assets transferred by one party exceeds the fair market value of the non-recognition assets transferred by the other (to the extent of the money and the fair market value of property transferred in the exchange). The money and other property that are treated as transferred in exchange for the non-recognition assets (and which are not included among the assets to which section 1060 applies) are considered to come from the following assets in the following order: first from Class I assets, then from Class II assets, then from Class III assets, then from Class IV assets, then from Class V assets, then from Class VI assets, and then from Class VII assets. For this purpose, liabilities assumed (or to which a non-recognition exchange property is subject) are treated as Class I assets. See Example 1 in paragraph (d) of this section for an example of the application of section 1060 to a single transaction which is, in part, a non-recognition exchange.

**(9) Insurance business.** The mere reinsurance of insurance contracts by an insurance company is not an applicable asset acquisition, even if it enables the reinsurer to establish a customer relationship with the owners of the reinsured contracts. However, a transfer of an insurance business is an applicable asset acquisition if the purchaser acquires significant business assets, in addition to insurance contracts, to which goodwill and going concern value could attach. For rules regarding the treatment of an applicable asset acquisition of an insurance business, see paragraph (c)(5) of this section.

**(c) Allocation of consideration among assets under the residual method—(1) Consideration.** The seller's consideration is the amount, in the aggregate, realized from selling the assets in the applicable asset acquisition under section 1001(b). The purchaser's consideration is the amount, in the aggregate, of its cost of purchasing the assets in the applicable asset acquisition that is properly taken into account in basis.

**(2) Allocation of consideration among assets.** For purposes of determining the seller's amount realized for each of the assets sold in an applicable asset acquisition, the seller allocates consideration to all the assets sold by using the residual method under §§ 1.338–6 and 1.338–7, substituting consideration for ADSP. For purposes of determining the purchaser's basis in each of the assets purchased in an applicable asset acquisition, the purchaser allocates consideration to all the assets purchased by using the residual method under §§ 1.338–6 and 1.338–7, substituting consideration for AGUB. In allocating consideration, the rules set forth in paragraphs (c)(3) and (4) of this section apply in addition to the rules in §§ 1.338–6 and 1.338–7.

**(3) Certain costs.** The seller and purchaser each adjusts the amount allocated to an individual asset to take into account the specific identifiable costs incurred in transferring that asset in connection with the applicable asset acquisition (e.g., real estate transfer costs or security interest perfection costs). Costs so allocated increase, or decrease, as appropriate, the total consideration that is allocated under the residual method. No adjustment is made to the amount allocated to an individual asset for general costs associated with the applicable asset acquisition as a whole or with groups of assets included therein (e.g., non-specific appraisal fees or accounting fees). These latter amounts are taken into account only indirectly through their effect on the total consideration to be allocated. If an election described in § 1.338–6(c)(5) is made with respect to an applicable asset acquisition, any allocation of costs pursuant to this paragraph (c)(3) shall be made as if such election had not been made. The preceding sentence applies to applicable asset acquisitions occurring on or after September 11, 2007. For applicable asset acquisitions occurring before September 11, 2007, and on or after September 15, 2004, see § 1.1060–

1T as contained in 26 CFR Part 1 in effect on April 1, 2007. For applicable asset acquisitions occurring before September 15, 2004, see §§ 1.338–6 and 1.1060–1 as contained in 26 CFR Part 1 in effect on April 1, 2004.

**(4) Effect of agreement between parties.** If, in connection with an applicable asset acquisition, the seller and purchaser agree in writing as to the allocation of any amount of consideration to, or as to the fair market value of, any of the assets, such agreement is binding on them to the extent provided in this paragraph (c)(4). Nothing in this paragraph (c)(4) restricts the Commissioner's authority to challenge the allocations or values arrived at in an allocation agreement. This paragraph (c) (4) does not apply if the parties are able to refute the allocation or valuation under the standards set forth in Commissioner v. Danielson, 378 F.2d 771 (3d Cir.), cert. denied, 389 U.S. 858 (1967) (a party wishing to challenge the tax consequences of an agreement as construed by the Commissioner must offer proof that, in an action between the parties to the agreement, would be admissible to alter that construction or show its unenforceability because of mistake, undue influence, fraud, duress, etc.).

**(5) Insurance business.** If the trade or business transferred is an insurance business, the rules of this paragraph (c) are modified by the principles of § 1.338–11(a) through (d). However, in transactions governed by section 1060, such principles apply even if the transfer of the trade or business is effected in whole or in part through indemnity reinsurance rather than assumption reinsurance, and, for the insurer or reinsurer, an insurance contract (including an annuity or reinsurance contract) is a Class VI asset regardless of whether it is a section 197 intangible. In addition, the principles of § 1.338–11(f) through (h) apply if the transfer occurs in connection with the complete liquidation of the transferor.

**(d) Examples.** The following examples illustrate this section:

**Example 1.** (i) On January 1, 2001, A transfers assets X, Y, and Z to B in exchange for assets D, E, and F plus $1,000 cash.

(ii) Assume the exchange of assets constitutes an exchange of like-kind property to which section 1031 applies. Assume also that goodwill or going concern value could under any circumstances attach to each of the DEF and XYZ groups of assets and, therefore, each group constitutes a trade or business under section 1060.

(iii) Assume the fair market values of the assets and the amount of money transferred are as follows:

| Asset | Fair market value |
|---|---|
| By A: | |
| X. | $400 |
| Y. | 400 |
| Z. | 200 |
| Total. | 1,000 |
| By B: | |
| D. | 40 |
| E. | 30 |

| | | |
|---|---|---:|
| F.......................................................................................................................................... | | 30 |
| Cash (amount)..................................................................................................................... | | 1,000 |
| Total.................................................................................................................. | | 1,100 |

(iv) Under paragraph (b)(8) of this section, for purposes of allocating consideration under paragraph (c) of this section, the like-kind assets exchanged and any money or other property that are treated as transferred in exchange for the like-kind property are excluded from the application of section 1060.

(v) Since assets X, Y, and Z are like-kind property, they are excluded from the application of the section 1060 allocation rules.

(vi) Since assets D, E, and F are like-kind property, they are excluded from the application of the section 1060 allocation rules. Thus, the allocation rules of section 1060 do not apply in determining B's gain or loss with respect to the disposition of assets D, E, and F, and the allocation rules of section 1060 and paragraph (c) of this section are not applied to determine A's bases of assets D, E, and F. In addition, $900 of the $1,000 cash B gave to A for A's like-kind assets (X, Y, and Z) is treated as transferred in exchange for the like-kind property in order to equalize the fair market values of the like-kind assets. Therefore, $900 of the cash is excluded from the application of the section 1060 allocation rules.

(vii) $100 of the cash is allocated under section 1060 and paragraph (c) of this section.

(viii) A received $100 that must be allocated under section 1060 and paragraph (c) of this section. Since A transferred no Class I, II, III, IV, V, or VI assets to which section 1060 applies, in determining its amount realized for the part of the exchange to which section 1031 does not apply, the $100 is allocated to Class VII assets (goodwill and going concern value).

(ix) B gave A $100 that must be allocated under section 1060 and paragraph (c) of this section. Since B received from A no Class I, II, III, IV, V, or VI assets to which section 1060 applies, the $100 consideration is allocated by B to Class VII assets (goodwill and going concern value).

**Example 2.** (i) On January 1, 2001, S, a sole proprietor, sells to P, a corporation, a group of assets that constitutes a trade or business under paragraph (b)(2) of this section. S, who plans to retire immediately, also executes in P's favor a covenant not to compete. P pays S $3,000 in cash and assumes $1,000 in liabilities. Thus, the total consideration is $4,000.

(ii) On the purchase date, P and S also execute a separate agreement that states that the fair market values of the Class II, Class III, Class V, and Class VI assets S sold to P are as follows:

| Asset class | Asset | Fair market value |
|---|---|---:|
| II................................. | Actively traded securities................................................................................... | $500 |
| | Total Class II................................................................................................. | 500 |
| III................................. | Accounts receivable............................................................................................ | 200 |
| | Total Class III.............................................................................................. | 200 |
| V................................. | Furniture and fixtures........................................................................................ | 800 |

| | |
|---|---|
| Building.......................................................................................................... | 800 |
| Land.............................................................................................................. | 200 |
| Equipment...................................................................................................... | 400 |
|     Total Class V.......................................................................................... | 2,200 |
| VI.................................Covenant not to compete.......................................................................... | 900 |
|     Total Class VI......................................................................................... | 900 |

(iii) P and S each allocate the consideration in the transaction among the assets transferred under paragraph (c) of this section in accordance with the agreed upon fair market values of the assets, so that $500 is allocated to Class II assets, $200 is allocated to the Class III asset, $2,200 is allocated to Class V assets, $900 is allocated to Class VI assets, and $200 ($4,000 total consideration less $3,800 allocated to assets in Classes II, III, V, and VI) is allocated to the Class VII assets (goodwill and going concern value).

(iv) In connection with the examination of P's return, the Commissioner, in determining the fair market values of the assets transferred, may disregard the parties' agreement. Assume that the Commissioner correctly determines that the fair market value of the covenant not to compete was $500. Since the allocation of consideration among Class II, III, V, and VI assets results in allocation up to the fair market value limitation, the $600 of unallocated consideration resulting from the Commissioner's redetermination of the value of the covenant not to compete is allocated to Class VII assets (goodwill and going concern value).

**(e) Reporting requirements—(1) Applicable asset acquisitions—(i) In general.** Unless otherwise excluded from this requirement by the Commissioner, the seller and the purchaser in an applicable asset acquisition each must report information concerning the amount of consideration in the transaction and its allocation among the assets transferred. They also must report information concerning subsequent adjustments to consideration.

**(ii) Time and manner of reporting—**(A) In general. The seller and the purchaser each must file asset acquisition statements on Form 8594, "Asset Allocation Statement," with their income tax returns or returns of income for the taxable year that includes the first date assets are sold pursuant to an applicable asset acquisition. This reporting requirement applies to all asset acquisitions described in this section. For reporting requirements relating to asset acquisitions occurring before March 16, 2001, as described in paragraph (a)(2) of this section, see the temporary regulations under section 1060 in effect prior to March 16, 2001 (see 26 CFR part 1 revised April 1, 2000).

(B) Additional reporting requirement. When an increase or decrease in consideration is taken into account after the close of the first taxable year that includes the first date assets are sold in an applicable asset acquisition, the seller and the purchaser each must file a supplemental asset acquisition statement on Form 8594 with the income tax return or return of income for the taxable year in which the increase (or decrease) is properly taken into account.

(C) Election described in § 1.338–6(c)(5)—(1) Availability. The election described in § 1.338–6(c)(5) is available in respect of an applicable asset acquisition provided that the requirements of that section are satisfied. Such election may be made by the seller, regardless of whether the purchaser also makes the election, and may be made by the purchaser, regardless of whether the seller also makes the election.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 134 of 651

(2) Time and manner of making election. The election described in § 1.338–6(c)(5) is made by taking a position on a timely filed original tax return for the taxable year of the applicable asset acquisition that is consistent with having made the election.

(3) Irrevocability of election. The election described in § 1.338–6(c)(5) is irrevocable.

(4) Effective/applicability date. This paragraph (e)(1)(ii)(C) applies to applicable asset acquisitions occurring on or after September 11, 2007. For applicable asset acquisitions occurring before September 11, 2007 and on or after September 15, 2004, see § 1.1060–1T as contained in 26 CFR Part 1 in effect on April 1, 2007. For applicable asset acquisitions occurring before September 15, 2004, see §§ 1.338–6 and 1.1060–1 as contained in 26 CFR Part 1 in effect on April 1, 2004.

**(2) Transfers of interests in partnerships.** For reporting requirements relating to the transfer of a partnership interest, see § 1.755–1(d).

**Credits**

[T.D. 8940, 66 FR 9954, Feb. 13, 2001; T.D. 9059, 68 FR 34299, June 9, 2003; T.D. 9158, 69 FR 55742, Sept. 16, 2004; T.D. 9257, 71 FR 18006, April 10, 2006; T.D. 9358, 72 FR 51706, Sept. 11, 2007; T.D. 9377, 73 FR 3873, Jan. 23, 2008; 73 FR 14386, March 18, 2008]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

AUTHORITY: Sections 1.909–1 through 1.906–6 also issued under 26 U.S.C. 909(e).

Current through March 24, 2016; 81 FR 16051.

**End of Document**　　　　　　　　　　　　　　　　© 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    **0130** 10

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 135 of 651

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Determination of Tax Liability
              Credits Against Tax
                Rules for Computing Credit for Investment in Certain Depreciable Property

26 C.F.R. § 1.48–1, Treas. Reg. § 1.48–1

§ 1.48–1 Definition of section 38 property.

Currentness

(a) **In general.** Property which qualifies for the credit allowed by section 38 is known as "section 38 property". Except as otherwise provided in this section, the term "section 38 property" means property (1) with respect to which depreciation (or amortization in lieu of depreciation) is allowable to the taxpayer, (2) which has an estimated useful life of 3 years or more (determined as of the time such property is placed in service), and (3) which is (i) tangible personal property, (ii) other tangible property (not including a building and its structural components) but only if such other property is used as an integral part of manufacturing, production, or extraction, or an integral part of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services by a person engaged in a trade or business of furnishing any such service, or is a research or storage facility used in connection with any of the foregoing activities, (iii) an elevator or escalator which satisfies the conditions of section 48(a)(1)(C), or (iv) in the case of a qualified rehabilitated building, that portion of the basis which is attributable to qualified rehabilitation expenditures. The determination of whether property qualifies as section 38 property in the hands of the taxpayer for purposes of the credit allowed by section 38 must be made with respect to the first taxable year in which such property is placed in service by the taxpayer. See paragraph (d) of § 1.46–3. For the meaning of "estimated useful life", see paragraph (e) of § 1.46–3. In the case of property which is not described in section 50, this paragraph shall be applied by substituting "4 years" for "3 years".

(b) **Depreciation allowable. (1)** Property (with the exception of property described in section 48(a)(1)(F) and paragraph (p) of this section) is not section 38 property unless a deduction for depreciation (or amortization in lieu of depreciation) with respect to such property is allowable to the taxpayer for the taxable year. A deduction for depreciation is allowable if the property is of a character subject to the allowance for depreciation under section 167 and the basis (or cost) of the property is recovered through a method of depreciation, including, for example, the unit of production method and the retirement method as well as methods of depreciation which measure the life of the property in terms of years. If property is placed in service (within the meaning of paragraph (d) of § 1.46–3) in a trade or business (or in the production of income), but under the taxpayer's depreciation practice the period for depreciation with respect to such property begins in a taxable year subsequent to the taxable year in which such property is placed in service, then a deduction for depreciation shall be treated as allowable with respect to such property in the earlier taxable year (or years). Thus, for example, if a machine is placed in service in a trade or business in 1963, but the period for depreciation with respect to such machine begins in 1964, because the taxpayer uses an averaging convention (see § 1.167(a)–10) in computing depreciation, then, for purposes of determining whether the machine qualifies as section 38 property, a deduction for depreciation shall be treated as allowable in 1963.

(2) If, for the taxable year in which property is placed in service, a deduction for depreciation is allowable to the taxpayer only with respect to a part of such property, then only the proportionate part of the property with respect to which such

deduction is allowable qualifies as section 38 property for the purpose of determining the amount of credit allowable under section 38. Thus, for example, if property is used 80 percent of the time in a trade or business and is used 20 percent of the time for personal purposes, only 80 percent of the basis (or cost) of such property qualifies as section 38 property. Further, property does not qualify to the extent that a deduction for depreciation thereon is disallowed under section 274 (relating to disallowance of certain entertainment, etc., expenses).

**(3)** If the cost of property is not recovered through a method of depreciation but through a deduction of the full cost in one taxable year, for purposes of subparagraph (1) of this paragraph a deduction for depreciation with respect to such property is not allowable to the taxpayer. However, if an adjustment with respect to the income tax return for such taxable year requires the cost of such property to be recovered through a method of depreciation, a deduction for depreciation will be considered as allowable to the taxpayer.

**(4)** If depreciation sustained on property is not an allowable deduction for the taxable year but is added to the basis of property being constructed, reconstructed, or erected by the taxpayer, for purposes of subparagraph (1) of this paragraph a deduction for depreciation shall be treated as allowable for the taxable year with respect to the property on which depreciation is sustained. Thus, if $1,000 of depreciation sustained with respect to property No. 1, which is placed in service in 1964 by taxpayer A, is not allowable to A as a deduction for 1964 but is added to the basis of property being constructed by A (property no. 2), for purposes of subparagraph (1) of this paragraph a deduction for depreciation shall be treated as allowable to A for 1964 with respect to property no. 1. However, the $1,000 amount is not included in the basis of property no. 2 for purposes of determining A's qualified investment with respect to property no. 2. See paragraph (c)(1) of § 1.46–3.

**(c) Definition of tangible personal property.** If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal". Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

**(d) Other tangible property—(1) In general.** In addition to tangible personal property, any other tangible property (but not including a building and its structural components) used as an integral part of manufacturing, production, or extraction, or as an integral part of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services by a person engaged in a trade or business of furnishing any such service, or which constitutes a research or storage facility used in connection with any of the foregoing activities, may qualify as section 38 property.

**(2) Manufacturing, production, and extraction.** For purposes of the credit allowed by section 38, the terms "manufacturing", "production", and "extraction" include the construction, reconstruction, or making of property out of

scrap, salvage, or junk material, as well as from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles, and include the cultivation of the soil, the raising of livestock, and the mining of minerals. Thus, section 38 property would include, for example, property used as an integral part of the extracting, processing, or refining of metallic and nonmetallic minerals, including oil, gas, rock, marble, or slate; the construction of roads, bridges, or housing; the processing of meat, fish or other foodstuffs; the cultivation of orchards, gardens, or nurseries; the operation of sawmills, the production of lumber, lumber products or other building materials; the fabrication or treatment of textiles, paper, leather goods, or glass; and the rebuilding, as distinguished from the mere repairing, of machinery.

**(3) Transportation and communications businesses.** Examples of transportation businesses include railroads, airlines, bus companies, shipping or trucking companies, and oil pipeline companies. Examples of communications businesses include telephone or telegraph companies and radio or television broadcasting companies.

**(4) Integral part.** In order to qualify for the credit, property (other than tangible personal property and research or storage facilities used in connection with any of the activities specified in subparagraph (1) of this paragraph) must be used as an integral part of one or more of the activities specified in subparagraph (1) of this paragraph. Property such as pavements, parking areas, inherently permanent advertising displays or inherently permanent outdoor lighting facilities, or swimming pools, although used in the operation of a business, ordinarily is not used as an integral part of any of such specified activities. Property is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity. Thus, for example, in determining whether property is used as an integral part of manufacturing, all properties used by the taxpayer in acquiring or transporting raw materials or supplies to the point where the actual processing commences (such as docks, railroad tracks and bridges), or in processing raw materials into the taxpayer's final product, would be considered as property used as an integral part of manufacturing. Specific examples of property which normally would be used as an integral part of one of the specified activities are blast furnaces, oil and gas pipelines, railroad tracks and signals, telephone poles, broadcasting towers, oil derricks, and fences used to confine livestock. Property shall be considered used as an integral part of one of the specified activities if so used either by the owner of the property or by the lessee of the property.

**(5) Research or storage facilities. (i)** If property (other than a building and its structural components) constitutes a research or storage facility and if it is used in connection with an activity specified in subparagraph (1) of this paragraph, such property may qualify as section 38 property even though it is not used as an integral part of such activity. Examples of research facilities include wind tunnels and test stands. Examples of storage facilities include oil and gas storage tanks and grain storage bins. Although a research or storage facility must be used in connection with, for example, a manufacturing process, the taxpayer-owner of such facility need not be engaged in the manufacturing process.

**(ii)** In the case of property described in section 50, property will constitute a storage facility only if the facility is used principally for the bulk storage of fungible commodities. Bulk storage means the storage of a commodity in a large mass prior to its consumption or utilization. Thus, if a facility is used to store oranges that have been sorted and boxed, it is not used for bulk storage.

**(e) Definition of building and structural components. (1)** Generally, buildings and structural components thereof do not qualify as section 38 property. See, however, section 48(a)(1)(E) and (g), and § 1.48–11 (relating to investment credit for qualified rehabilitated building). The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by,

or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

(2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components". For special rules with respect to an elevator or escalator, the construction, reconstruction, or erection of which is completed by the taxpayer after June 30, 1963, or which is acquired after June 30, 1963, and the original use of which commences with the taxpayer and commences after such date, see section 48(a)(1)(C) and paragraph (m) of this section.

(f) Intangible property. Intangible property, such as patents, copyrights, and subscription lists, does not qualify as section 38 property. The cost of intangible property, in the case of a patent or copyright, includes all costs of purchasing or producing the item patented or copyrighted. Thus, in the case of a motion picture or television film or tape, the cost of the intangible property includes manuscript and screenplay costs, the cost of wardrobe and set design, the salaries of cameramen, actors, directors, etc., and all other costs properly includible in the basis of such film or tape. In the case of a book, the cost of the intangible property includes all costs of producing the original copyrighted manuscript, including the cost of illustration, research, and clerical and stenographic help. However, if tangible depreciable property is used in the production of such intangible property, see paragraph (b)(4) of this section.

(g) Property used outside the United States—(1) General rule. (i) Except as provided in subparagraph (2) of this paragraph, the term "section 38 property" does not include property which is used predominantly outside the United States (as defined in section 7701(a)(9)) during the taxable year. The determination of whether property is used predominantly outside the United States during the taxable year shall be made by comparing the period of time in such year during which the property is physically located outside the United States with the period of time in such year during which the property is physically located within the United States. If the property is physically located outside the United States during more than 50 percent of the taxable year, such property shall be considered used predominantly outside the United States during that year. If property is placed in service after the first day of the taxable year, the determination of whether such property is physically located outside the United States during more than 50 percent of the taxable year shall be made with respect to the period beginning on the date on which the property is placed in service and ending on the last day of such taxable year.

**(ii)** Since the determination of whether a credit is allowable to the taxpayer with respect to any property may be made only with respect to the taxable year in which the property is placed in service by the taxpayer, property used predominantly outside the United States during the taxable year in which it is placed in service cannot qualify as section 38 property with respect to such taxpayer, regardless of the fact that the property is permanently returned to the United States in a later year. Furthermore, if property is used predominantly in the United States in the year in which it is placed in service by the taxpayer, and a credit under section 38 is allowed with respect to such property, but such property is thereafter in any one year used predominantly outside the United States, such property ceases to be section 38 property with respect to the taxpayer and is subject to the application of section 47.

**(iii)** This subparagraph applies whether property is used predominantly outside the United States by the owner of the property, or by the lessee of the property. If property is leased and if the lessor makes a valid election under § 1.48–4 to treat the lessee as having purchased such property for purposes of the credit allowed by section 38, the determination of whether such property is physically located outside the United States during more than 50 percent of the taxable year shall be made with respect to the taxable year of the lessee; however, if the lessor does not make such an election, such determination shall be made with respect to the taxable year of the lessor.

**(2) Exceptions.** The provisions of subparagraph (1) of this paragraph do not apply to—

**(i)** Any aircraft which is registered by the Administrator of the Federal Aviation Agency, and which (a) is operated, whether on a scheduled or nonscheduled basis, to and from the United States, or (b) is placed in service by the taxpayer during a taxable year ending after March 9, 1967, and is operated under contract with the United States: Provided, That use of the aircraft under the contract constitutes its principal use outside the United States during the taxable year. The term "to and from the United States" is not intended to exclude an aircraft which makes flights from one point in a foreign country to another such point, as long as such aircraft returns to the United States with some degree of frequency;

**(ii)** Rolling stock, of a domestic railroad corporation subject to part I of the Interstate Commerce Act, which is used within and without the United States. For purposes of this subparagraph, the term "rolling stock" means locomotives, freight and passenger train cars, floating equipment, and miscellaneous transportation equipment on wheels, the expenditures for which are chargeable (or, in the case of leased property, would be chargeable) to the equipment investment accounts in the uniform system of accounts for railroad companies prescribed by the Interstate Commerce Commission;

**(iii)** Any vessel documented under the laws of the United States which is operated in the foreign or domestic commerce of the United States. A vessel is documented under the laws of the United States if it is registered, enrolled, or licensed under the laws of the United States by the Commandant, U.S. Coast Guard. Vessels operated in the foreign or domestic commerce of the United States include those documented for use in foreign trade, coastwise trade, or fisheries;

**(iv)** Any motor vehicle of a United States person (as defined in section 7701(a)(30)) which is operated to and from the United States with some degree of frequency;

**(v)** Any container of a United States person which is used in the transportation of property to and from the United States;

**(vi)** Any property (other than a vessel or an aircraft) of a U.S. person which is used for the purpose of exploring for, developing, removing, or transporting resources from the outer Continental Shelf (within the meaning of section 2 of the

Outer Continental Shelf Lands Act, as amended and supplemented; 43 U.S.C. 1331). Thus for example, offshore drilling equipment may be section 38 property;

(vii) Any property placed in service after December 31, 1965 which (a) is owned by a domestic corporation (other than a corporation entitled to the benefits of section 931 or 934(b)) or by a United States citizen (other than a citizen entitled to the benefits of section 931, 932, 933, or 934(c)), and (b) is used predominantly in a possession of the United States during the taxable year by such a corporation or such a citizen, or by a corporation created or organized in, or under the law of, a possession of the United States. Thus, property placed in service after December 31, 1965, which is owned by a domestic corporation not entitled to the benefits of section 931 or 934(b), which is leased to a corporation organized under the laws of a U.S. possession, and which is used by such lessee predominantly in a possession of the United States may qualify as section 38 property. However, property which is owned by a corporation not entitled to the benefits of section 931 or 934(b) but which is leased to a domestic corporation entitled to such benefits would not qualify as section 38 property. The determination of whether property is used predominantly in a possession of the United States during the taxable year shall be made under principles similar to those described in subparagraph (1) of this paragraph. For example, if a machine is placed in service in a possession of the United States on July 1, 1966, by a calendar year taxpayer and if it is physically located in such a possession during more than 50 percent of the period beginning on July 1, 1966 and ending on December 31, 1966, then such machine shall be considered used predominantly in a possession of the United States during the taxable year 1966;

(viii) Any communications satellite (as defined in section 103(3) of the Communications Satellite Act of 1962, 47 U.S.C., sec. 702(3)), or any interest therein, of a U.S. person;

(ix) Any cable which is property described in section 50, or any interest therein, of a domestic corporation engaged in furnishing telephone service to which section 46(c)(3)(B)(iii) applies (or of a wholly owned domestic subsidiary of such corporation), if such cable is part of a submarine cable system which constitutes part of a communications link exclusively between the United States and one or more foreign countries; and

(x) Any property described in section 50 (other than a vessel or an aircraft) of a U.S. person which is used in international or territorial waters for the purpose of exploring for, developing, removing, or transporting resources from ocean waters or deposits under such waters.

(h) **Property used for lodging—(1) In general. (i)** Except as provided in subparagraph (2) of this paragraph, the term "section 38 property" does not include property which is used predominantly to furnish lodging or is used predominantly in connection with the furnishing of lodging during the taxable year. Property used in the living quarters of a lodging facility, including beds and other furniture, refrigerators, ranges, and other equipment, shall be considered as used predominantly to furnish lodging. The term "lodging facility" includes an apartment house, hotel, motel, dormitory, or any other facility (or part of a facility) where sleeping accommodations are provided and let, except that such term does not include a facility used primarily as a means of transportation (such as an aircraft, vessel, or a railroad car) or used primarily to provide medical or convalescent services, even though sleeping accommodations are provided.

(ii) Property which is used predominantly in the operation of a lodging facility or in serving tenants shall be considered used in connection with the furnishing of lodging, whether furnished by the owner of the lodging facility or another person. Thus, for example, lobby furniture, office equipment, and laundry and swimming pool facilities used in the operation of an apartment house or in serving tenants would be considered used predominantly in connection with the furnishing of lodging. However, property which is used in furnishing, to the management of a lodging facility or its tenants, electrical

energy, water, sewage disposal services, gas, telephone service, or other similar services shall not be treated as property used in connection with the furnishing of lodging. Thus, such items as gas and electric meters, telephone poles and lines, telephone station and switchboard equipment, and water and gas mains, furnished by a public utility would not be considered as property used in connection with the furnishing of lodging.

**(iii)** Notwithstanding any other provision of this paragraph (h), in the case of a qualified rehabilitated building (within the meaning of section 48(g)(1) and § 1.48–12(b)), expenditures for property resulting in basis described in section 48(a)(1)(E) shall not be treated as section 38 property to the extent that such property is attributable to a portion of the building that is used for lodging or in connection with lodging. For example, if expenditures are incurred to rehabilitate a five story qualified rehabilitated building, three floors of which are used for apartments and two floors of which are used as commercial office space, the portion of the basis of the building attributable to qualified rehabilitated expenditures attributable to the commercial part of the building shall not be considered to be expenditures for property, or in connection with property, used predominantly for lodging. Allocation of expenditures between the two portions of the building are to be made using the principles contained in § 1.48–12(C)(10)(ii).

**(2) Exceptions—(i) Nonlodging commercial facility.** A nonlodging commercial facility which is available to persons not using the lodging facility on the same basis as it is available to the tenants of the lodging facility shall not be treated as property which is used predominantly to furnish lodging or predominantly in connection with the furnishing of lodging. Examples of non-lodging commercial facilities include restaurants, drug stores, grocery stores, and vending machines located in a lodging facility.

**(ii) Property used by a hotel or motel.** Property used by a hotel, motel, inn, or other similar establishment, in connection with the trade or business of furnishing lodging shall not be considered as property which is used predominantly to furnish lodging or predominantly in connection with the furnishing of lodging, provided that the predominant portion of the living accommodations in the hotel, motel, etc., is used by transients during the taxable year. For purposes of the preceding sentence, the term "predominant portion" means "more than one-half". Thus, if more than one-half of the living quarters of a hotel, motel, inn, or other similar establishment is used during the taxable year to accommodate tenants on a transient basis, none of the property used by such hotel, motel, etc., in the trade or business of furnishing lodging shall be considered as property which is used predominantly to furnish lodging or predominantly in connection with the furnishing of lodging. Accommodations shall be considered used on a transient basis if the rental period is normally less than 30 days.

**(iii) Coin-operated machines.** In the case of property which is described in section 50, coin-operated vending machines and coin-operated washing machines and dryers shall not be considered as property which is used predominantly to furnish lodging or predominantly in connection with the furnishing of lodging.

**(iv) Certified historic structures.** For purposes of this paragraph (h), regardless of the actual use of a certified historic structure, that portion of the basis of such certified historic structure which is attributable to qualified rehabilitation expenditures (as defined in § 1.48–12(c)) shall not be considered as property which is either used predominantly to furnish lodging or predominantly in connection with the furnishing of lodging. Accordingly, such portion of the basis may qualify as section 38 property. (For the definition of "certified historic structure," see section 48(g)(3) and § 1.48–12(d).)

**(i)** [Reserved]

**(j) Property used by certain tax-exempt organizations.** The term "section 38 property" does not include property used by an organization (other than a cooperative described in section 521) which is exempt from the tax imposed by chapter 1 of the Code unless such property is used predominantly in an unrelated trade or business the income of which is subject to tax under section 511. If such property is debt-financed property as defined in section 514(b), the basis or cost of such property for purposes of computing qualified investment under section 46(c) shall include only that percentage of the basis or cost which is the same percentage as is used under section 514(a), for the year the property is placed in service, in computing the amount of gross income to be taken into account during such taxable year with respect to such property. The term "property used by an organization" means (1) property owned by the organization (whether or not leased to another person), and (2) property leased to the organization. Thus, for example, a data processing or copying machine which is leased to an organization exempt from tax would be considered as property used by such organization. Property (unless used predominantly in an unrelated trade or business) leased by another person to an organization exempt from tax or leased by such an organization to another person is not section 38 property to either the lessor or the lessee, and in either case the lessor may not elect under § 1.48–4 to treat the lessee of such property as having purchased such property for purposes of the credit allowed by section 38. This paragraph shall not apply to property leased on a casual or short-term basis to an organization exempt from tax.

**(k) Property used by governmental units.** The term "section 38 property" does not include property used by the United States, any State (including the District of Columbia) or political subdivision thereof, any international organization (as defined in section 7701(a)(18)) other than the International Telecommunications Satellite Consortium or any successor organization, or any agency or instrumentality of the United States, of any State or political subdivision thereof, or of any such international organization. The term "property used by the United States, etc." means (1) property owned by any such governmental unit (whether or not leased to another person), and (2) property leased to any such governmental unit. Thus, for example, a data processing or copying machine which is leased to any such governmental unit would be considered as property used by such governmental unit. Property leased by another person to any such governmental unit or leased by such governmental unit to another person is not section 38 property to either the lessor or the lessee, and in either case the lessor may not elect under § 1.48–4 to treat the lessee of such property as having purchased such property for purposes of the credit allowed by section 38. This paragraph shall not apply to property leased on a casual or short-term basis to any such governmental unit.

**(l)** [Reserved]

**(m) Elevators and escalators—(1) In general.** Under section 48(a)(1)(C), an elevator or escalator qualifies as section 38 property if—

> **(i)** The construction, reconstruction, or erection of the elevator or escalator is completed by the taxpayer after June 30, 1963, or

> **(ii)** The elevator or escalator is acquired after June 30, 1963, and the original use of such elevator or escalator commences with the taxpayer and commences after such date.

> In the case of construction, reconstruction, or erection of an elevator or escalator commenced before January 1, 1962, and completed after June 30, 1963, there shall be taken into account in determining the qualified investment under section 46(c) only that portion of the basis which is properly attributable to construction, reconstruction, or erection after December 31, 1961. Further, if the construction, reconstruction, or erection of such property is commenced after December 31, 1961, and is completed after June 30, 1963, the entire basis of the elevator or escalator shall be taken into account in determining qualified investment under section 46(c). Also, if an elevator or escalator is reconstructed by the taxpayer after June 30, 1963, the basis attributable to such reconstruction may be taken into account in determining the qualified investment under

section 46(c), irrespective of the fact that the original construction or erection of such elevator or escalator may have occurred before January 1, 1962. Paragraph (b) of § 1.48–2 shall be applied in determining the date of acquisition, original use, and basis attributable to construction, reconstruction, or erection.

(2) **Definition of elevators and escalators.** For purposes of this section the term "elevator" means a cage or platform and its hoisting machinery for conveying persons or freight to or from different levels and functionally related equipment which is essential to its operation. The term includes, for example, guide rails and cables, motors and controllers, control panels and landing buttons, and elevator gates and doors, which are essential to the operation of the elevator. The term "elevator" does not, however, include a structure which is considered a building for purposes of the investment credit. The term "escalator" means a moving staircase and functionally related equipment which is essential to its operation. For purposes of determining qualified investment under section 46(c) and § 1.46–3, the basis of an elevator or escalator does not include the cost of any structural alterations to the building, such as the cost of constructing a shaft or of making alterations to the floor, walls, or ceiling, even though such alterations may be necessary in order to install or modernize the elevator or escalator.

(3) **Examples.** The provisions of this paragraph may be illustrated by the following examples:

**Example 1.** If an elevator with a total basis of $100,000 is completed after June 30, 1963, and the portion attributable to construction by the taxpayer after December 31, 1961, is determined by engineering estimates or by cost accounting records to be $30,000, only the $30,000 portion may be taken into account as an investment in new section 38 property in computing qualified investment.

**Example 2.** If construction of an elevator with a total basis of $90,000 is commenced by the taxpayer after December 31, 1961, and is completed after June 30, 1963, the entire basis of $90,000 may be taken into account as an investment in new section 38 property.

**Example 3.** The facts are the same as in example 2 except that construction of the elevator was completed before June 30, 1963. The elevator is not considered to be section 38 property.

**Example 4.** In 1964, a taxpayer reconditions an elevator, which had been constructed and placed in service in 1962 and which had an adjusted basis in 1964 of $75,000. The cost of reconditioning amounts to an additional $50,000. The basis of the elevator which may be taken into account in computing qualified investment in section 38 property is $50,000, irrespective of whether the taxpayer contracts to have it reconditioned or reconditions it himself, and irrespective of whether the materials used in the process are new in use.

(n) **Amortized property.** Any property with respect to which an election under 167(k), 169, 184, 187, or 188 applies shall not be treated as section 38 property. In the case of any property to which section 169 applies, the preceding sentence shall apply only to so much of the adjusted basis of the property as (after the application of section 169(f)) constitutes the amortizable basis for purposes of section 169. This paragraph shall not apply to property with respect to which an election under section 167(k), 184, 187, or 188 applies unless such property is described in section 50.

(o) [Reserved]

(p) **Qualified timber property.** (1) Qualified timber property (within the meaning of section 194(c)(1)) shall be treated as section 38 property to the extent of the portion of the basis of such property which is the amortizable basis (as defined in § 1.194–3(b)) acquired during the taxable year and taken into account under section 194 (after applying the limitation of section 194(b)

(1)). Such amortizable basis shall qualify as section 38 property whether or not an election is made under section 194. However, any portion of such amortizable basis which is attributable to property which otherwise qualifies as section 38 property shall not be treated as section 38 property under section 48(a)(1)(F) and this paragraph. For example, amortizable basis attributable to depreciation on equipment would not qualify as section 38 property under this paragraph if such equipment qualifies as section 38 property under sections 48(a)(1)(A) or (B). In determining the portion of amortizable basis which qualifies as section 38 property under this paragraph, the reduction in amortizable basis to account for depreciation sustained with respect to property used in the reforestation process (which otherwise qualifies as section 38 property) shall be applied before the $10,000 limitation on eligible costs under section 194(b)(1). For example, if in a taxable year a taxpayer incurs qualifying reforestation costs resulting in $12,000 of amortizable basis with respect to property for which an election is in effect, and $2,000 of these costs are attributable to depreciation of the taxpayer's equipment, such $12,000 would first be reduced by the $2,000 of depreciation, and the $10,000 limitation under section 194(b)(1) would be applied following such reduction.

(2) If a taxpayer makes an election to amortize reforestation expenditures under section 194, and allocates the $10,000 limitation among more than one property under § 1.194–2(b)(2), then such allocation shall apply for purposes of determining the amortizable basis that qualifies as section 38 property under paragraph (p)(1) of this section. If no election is made under section 194, the taxpayer may select the manner in which the $10,000 limitation is to be allocated among the qualified timber properties.

(Authority: Sec. 38(b), 76 Stat. 963; 26 U.S.C. 38; secs. 194 (94 Stat. 1989; 26 U.S.C. 194) and 7805 (68A Stat. 917, 26 U.S.C. 7805) of the Internal Revenue Code of 1954)

**Credits**

[T.D. 6731, 29 FR 6073, May 8, 1964, as amended by T.D. 6838, 30 FR 9060, July 20, 1965; T.D. 6958, 33 FR 9171, June 21, 1968; T.D. 6971, 33 FR 12899, Sept. 12, 1968; T.D. 7203, 37 FR 17129, Aug. 25, 1972; T.D. 7229, 37 FR 28142, Dec. 21, 1972; T.D. 7927, 48 FR 55849, Dec. 16, 1983; T.D. 8031, 50 FR 26697, June 28, 1985; T.D. 8233, 53 FR 39592, Oct. 11, 1988; T.D. 8474, 58 FR 25557, April 27, 1993; 59 FR 1476, Jan. 11, 1994]

SOURCE: T.D. 9757, 81 FR 11432; T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

Notes of Decisions (387)

Current through March 24, 2016; 81 FR 16051.

---

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Computation of Taxable Income
              Tax Exemption Requirements for State and Local Bonds

26 C.F.R. § 1.148–5, Treas. Reg. § 1.148–5

§ 1.148–5 Yield and valuation of investments.

Currentness

**(a) In general.** This section provides rules for computing the yield and value of investments allocated to an issue for various purposes under section 148.

**(b) Yield on an investment—(1) In general.** Except as otherwise provided, the yield on an investment allocated to an issue is computed under the economic accrual method, using the same compounding interval and financial conventions used to compute the yield on the issue. The yield on an investment allocated to an issue is the discount rate that, when used in computing the present value as of the date the investment is first allocated to the issue of all unconditionally payable receipts from the investment, produces an amount equal to the present value of all unconditionally payable payments for the investment. For this purpose, payments means amounts to be actually or constructively paid to acquire the investment, and receipts means amounts to be actually or constructively received from the investment, such as earnings and return of principal. The yield on a variable rate investment is determined in a manner comparable to the determination of the yield on a variable rate issue. For an issue of qualified mortgage bonds, qualified veterans' mortgage bonds, or qualified student loan bonds on which interest is paid semiannually, all regular monthly loan payments to be received during a semiannual debt service period may be treated as received at the end of that period. In addition, for any conduit financing issue, payments made by the conduit borrower are not treated as paid until the conduit borrower ceases to receive the benefit of earnings on those amounts.

**(2) Yield on a separate class of investments—(i) In general.** For purposes of the yield restriction rules of section 148(a) and § 1.148–2, yield is computed separately for each class of investments. For this purpose, in determining the yield on a separate class of investments, the yield on each individual investment within the class is blended with the yield on other individual investments within the class, whether or not held concurrently, by treating those investments as a single investment. The yields on investments that are not within the same class are not blended.

**(ii) Separate classes of investments.** Each of the following is a separate class of investments—

(A) Each category of yield restricted purpose investment and program investment that is subject to a different definition of materially higher under § 1.148–2(d)(2);

(B) Yield-restricted nonpurpose investments; and

(C) All other nonpurpose investments;

**(iii) Permissive application of single investment rules to certain yield restricted investments for all purposes of section 148.** For all purposes of section 148, if an issuer reasonably expects as of the issue date to establish and maintain a sinking fund solely to reduce the yield on the investments in a refunding escrow, then the issuer may treat all of the yield restricted nonpurpose investments in the refunding escrow and that sinking fund as a single investment having a single yield, determined under this paragraph (b)(2). Thus, an issuer may not treat the nonpurpose investments in a reasonably required reserve fund and a refunding escrow as a single investment having a single yield under this paragraph (b)(2)(iii).

**(iv) Mandatory application of single investment rules for refunding escrows for all purposes of section 148.** For all purposes of section 148, in computing the yield on yield restricted investments allocable to proceeds (i.e., sale proceeds, investment proceeds, and transferred proceeds) of a refunding issue that are held in one or more refunding escrows, the individual investments are treated as a single investment having a single yield, whether or not held concurrently. For example, this single investment includes both the individual investments allocable to sale and investment proceeds of a refunding issue that are held in one refunding escrow for a prior issue and the investments allocable to transferred proceeds of that refunding issue that are held in another refunding escrow.

**(3) Investments to be held beyond issue's maturity or beyond temporary period.** In computing the yield on investments allocable to an issue that are to be held beyond the reasonably expected redemption date of the issue, those investments are treated as sold for an amount equal to their value on that date. In computing the yield on investments that are held beyond an applicable temporary period under § 1.148–2, for purposes of § 1.148–2 those investments may be treated as purchased for an amount equal to their fair market value as of the end of the temporary period.

**(4) Consistent redemption assumptions on purpose investments.** The yield on purpose investments allocable to an issue is computed using the same redemption assumptions used to compute the yield on the issue. Yield on purpose investments allocable to an issue of qualified mortgage bonds and qualified veterans' mortgage bonds must be determined in a manner that is consistent with, and using the assumptions required by, section 143(g)(2)(B).

**(5) Student loan special allowance payments included in yield.** Except as provided in § 1.148–11(e), the yield on qualified student loans is computed by including as receipts any special allowance payments made by the Secretary of Education pursuant to section 438 of the Higher Education Act of 1965.

**(c) Yield reduction payments to the United States—(1) In general.** In determining the yield on an investment to which this paragraph (c) applies, any amount paid to the United States in accordance with this paragraph (c), including a rebate amount, is treated as a payment for that investment that reduces the yield on that investment.

**(2) Manner of payment—(i) In general.** Except as otherwise provided in paragraph (c)(2)(ii) of this section, an amount is paid under this paragraph (c) if it is paid to the United States at the same time and in the same manner as rebate amounts are required to be paid or at such other time or in such manner as the Commissioner may prescribe. For example, yield reduction payments must be made on or before the date of required rebate installment payments as described in §§ 1.148–3(f), (g), and (h). The provisions of § 1.148–3(i) apply to payments made under this paragraph (c).

**(ii) Special rule for purpose investments.** For purpose investments allocable to an issue—

(A) No amounts are required to be paid to satisfy this paragraph (c) until the earlier of the end of the tenth bond year after the issue date of the issue or 60 days after the date on which the issue is no longer outstanding; and

(B) For payments made prior to the date on which the issue is retired, the issuer need not pay more than 75 percent of the amount otherwise required to be paid as of the date to which the payment relates.

**(3) Applicability of special yield reduction rule—(i) Covered investments.** This paragraph (c) applies to—

(A) Nonpurpose investments allocable to proceeds of an issue that qualified for one of the temporary periods available for capital projects, restricted working capital expenditures, pooled financings, or investment proceeds under § 1.148–2(e)(2), (e)(3), (e)(4), or (e)(6), respectively;

(B) Investments allocable to a variable yield issue during any computation period in which at least 5 percent of the value of the issue is represented by variable yield bonds, unless the issue is an issue of hedge bonds (as defined in section 149(g)(3)(A));

(C) Nonpurpose investments allocable to transferred proceeds of—

(1) A current refunding issue to the extent necessary to reduce the yield on those investments to satisfy yield restrictions under section 148(a); or

(2) An advance refunding issue to the extent that investment of the refunding escrows allocable to the proceeds, other than transferred proceeds, of the refunding issue in zero-yielding nonpurpose investments is insufficient to satisfy yield restrictions under section 148(a);

(D) Purpose investments allocable to qualified student loans under a program described in section 144(b)(1)(A);

(E) Nonpurpose investments allocable to gross proceeds of an issue in a reasonably required reserve or replacement fund or in a fund that, except for its failure to satisfy the size limitation in § 1.148–2(f)(2)(ii), would qualify as a reasonably required reserve or replacement fund, but only to the extent that—

(1) The value of the nonpurpose investments in the fund is not greater than 15 percent of the stated principal amount of the issue, as computed under § 1.148–2(f)(2)(ii), or

(2) The amounts in the fund (other than investment earnings) are not reasonably expected to be used to pay debt service on the issue other than in connection with reductions in the amount required to be in that fund (e.g., a reserve fund for a revolving fund loan program);

(F) Nonpurpose investments allocated to replacement proceeds of a refunded issue as a result of the application of the universal cap to amounts in a refunding escrow (see § 1.148–11(c)(1)(ii)); and

(G) Investments described in § 1.148–11(f).

**(ii) Exception to yield reduction payments rule for advance refunding issues.** Paragraph (c)(1) of this section does not apply to investments allocable to gross proceeds of an advance refunding issue, other than—

(A) Transferred proceeds to which paragraph (c)(3)(i)(C) of this section applies;

(B) Replacement proceeds to which paragraph (c)(3)(i)(F) of this section applies; and

(C) Transferred proceeds to which paragraph (c)(3)(i)(E) of this section applies, but only to the extent necessary to satisfy yield restriction under section 148(a) on those proceeds treating all investments allocable to those proceeds as a separate class.

**(d) Value of investments—(1) In general.** Except as otherwise provided, the value of an investment (including a payment or receipt on the investment) on a date must be determined using one of the following valuation methods consistently for all purposes of section 148 to that investment on that date:

**(i) Plain par investment—outstanding principal amount.** A plain par investment may be valued at its outstanding stated principal amount, plus any accrued unpaid interest on that date.

**(ii) Fixed rate investment—present value.** A fixed rate investment may be valued at its present value on that date.

**(iii) Any investment—fair market value.** An investment may be valued at its fair market value on that date.

**(2) Mandatory valuation of yield restricted investments at present value.** Any yield restricted investment must be valued at present value. For example, a purpose investment or an investment allocable to gross proceeds in a refunding escrow after the expiration of the initial temporary period must be valued at present value. See, however, paragraph (b) (3) of this section.

**(3) Mandatory valuation of certain investments at fair market value—(i) In general.** Except as provided in paragraphs (d)(2), (d)(3)(ii), and (d)(4) of this section, an investment must be valued at fair market value on the date that it is first allocated to an issue or first ceases to be allocated to an issue as a consequence of a deemed acquisition or deemed disposition. For example, if an issuer deposits existing investments into a sinking fund for an issue, those investments must be valued at fair market value as of the date first deposited into the fund.

**(ii) Exception to fair market value requirement for transferred proceeds allocations, universal cap allocations, and commingled funds.** Paragraph (d)(3)(i) of this section does not apply if the investment is allocated from one issue to

another issue as a result of the transferred proceeds allocation rule under § 1.148–9(b) or the universal cap rule under § 1.148–6(b)(2), provided that both issues consist exclusively of tax-exempt bonds. In addition, paragraph (d)(3)(i) of this section does not apply to investments in a commingled fund (other than a bona fide debt service fund) unless it is an investment being initially deposited in or withdrawn from a commingled fund described in § 1.148–6(e)(5)(iii).

**(4) Special transition rule for transferred proceeds.** The value of a nonpurpose investment that is allocated to transferred proceeds of a refunding issue on a transfer date may not exceed the value of that investment on the transfer date used for purposes of applying the arbitrage restrictions to the refunded issue.

**(5) Definition of present value of an investment.** Except as otherwise provided, present value of an investment is computed under the economic accrual method, using the same compounding interval and financial conventions used to compute the yield on the issue. The present value of an investment on a date is equal to the present value of all unconditionally payable receipts to be received from and payments to be paid for the investment after that date, using the yield on the investment as the discount rate.

**(6) Definition of fair market value—(i) In general.** The fair market value of an investment is the price at which a willing buyer would purchase the investment from a willing seller in a bona fide, arm's-length transaction. Fair market value generally is determined on the date on which a contract to purchase or sell the nonpurpose investment becomes binding (i.e., the trade date rather than the settlement date). Except as otherwise provided in this paragraph (d)(6), an investment that is not of a type traded on an established securities market, within the meaning of section 1273, is rebuttably presumed to be acquired or disposed of for a price that is not equal to its fair market value. The fair market value of a United States Treasury obligation that is purchased directly from the United States Treasury is its purchase price.

**(ii) Safe harbor for establishing fair market value for certificates of deposit.** This paragraph (d)(6)(ii) applies to a certificate of deposit that has a fixed interest rate, a fixed payment schedule, and a substantial penalty for early withdrawal. The purchase price of such a certificate of deposit is treated as its fair market value on the purchase date if the yield on the certificate of deposit is not less than—

(A) The yield on reasonably comparable direct obligations of the United States; and

(B) The highest yield that is published or posted by the provider to be currently available from the provider on reasonably comparable certificates of deposit offered to the public.

**(iii) Safe harbor for establishing fair market value for guaranteed investment contracts and investments purchased for a yield restricted defeasance escrow.** The purchase price of a guaranteed investment contract and the purchase price of an investment purchased for a yield restricted defeasance escrow will be treated as the fair market value of the investment on the purchase date if all of the following requirements are satisfied:

(A) The issuer makes a bona fide solicitation for the purchase of the investment. A bona fide solicitation is a solicitation that satisfies all of the following requirements:

(1) The bid specifications are in writing and are timely forwarded to potential providers.

(2) The bid specifications include all material terms of the bid. A term is material if it may directly or indirectly affect the yield or the cost of the investment.

(3) The bid specifications include a statement notifying potential providers that submission of a bid is a representation that the potential provider did not consult with any other potential provider about its bid, that the bid was determined without regard to any other formal or informal agreement that the potential provider has with the issuer or any other person (whether or not in connection with the bond issue), and that the bid is not being submitted solely as a courtesy to the issuer or any other person for purposes of satisfying the requirements of paragraph (d)(6)(iii)(B)(1) or (2) of this section.

(4) The terms of the bid specifications are commercially reasonable. A term is commercially reasonable if there is a legitimate business purpose for the term other than to increase the purchase price or reduce the yield of the investment. For example, for solicitations of investments for a yield restricted defeasance escrow, the hold firm period must be no longer than the issuer reasonably requires.

(5) For purchases of guaranteed investment contracts only, the terms of the solicitation take into account the issuer's reasonably expected deposit and drawdown schedule for the amounts to be invested.

(6) All potential providers have an equal opportunity to bid. For example, no potential provider is given the opportunity to review other bids (i.e., a last look) before providing a bid.

(7) At least three reasonably competitive providers are solicited for bids. A reasonably competitive provider is a provider that has an established industry reputation as a competitive provider of the type of investments being purchased.

(B) The bids received by the issuer meet all of the following requirements:

(1) The issuer receives at least three bids from providers that the issuer solicited under a bona fide solicitation meeting the requirements of paragraph (d)(6)(iii)(A) of this section and that do not have a material financial interest in the issue. A lead underwriter in a negotiated underwriting transaction is deemed to have a material financial interest in the issue until 15 days after the issue date of the issue. In addition, any entity acting as a financial advisor with respect to the purchase of the investment at the time the bid specifications are forwarded to potential providers has a material financial interest in the issue. A provider that is a related party to a provider that has a material financial interest in the issue is deemed to have a material financial interest in the issue.

(2) At least one of the three bids described in paragraph (d)(6)(iii)(B)(1) of this section is from a reasonably competitive provider, within the meaning of paragraph (d)(6)(iii)(A)(7) of this section.

(3) If the issuer uses an agent to conduct the bidding process, the agent did not bid to provide the investment.

(C) The winning bid meets the following requirements:

(1) Guaranteed investment contracts. If the investment is a guaranteed investment contract, the winning bid is the highest yielding bona fide bid (determined net of any broker's fees).

(2) Other investments. If the investment is not a guaranteed investment contract, the following requirements are met:

(i) The winning bid is the lowest cost bona fide bid (including any broker's fees). The lowest cost bid is either the lowest cost bid for the portfolio or, if the issuer compares the bids on an investment-by-investment basis, the aggregate cost of a portfolio comprised of the lowest cost bid for each investment. Any payment received by the issuer from a provider at the time a guaranteed investment contract is purchased (e.g., an escrow float contract) for a yield restricted defeasance escrow under a bidding procedure meeting the requirements of this paragraph (d)(6)(iii) is taken into account in determining the lowest cost bid.

(ii) The lowest cost bona fide bid (including any broker's fees) is not greater than the cost of the most efficient portfolio comprised exclusively of State and Local Government Series Securities from the United States Department of the Treasury, Bureau of Public Debt. The cost of the most efficient portfolio of State and Local Government Series Securities is to be determined at the time that bids are required to be submitted pursuant to the terms of the bid specifications.

(iii) If State and Local Government Series Securities from the United States Department of the Treasury, Bureau of Public Debt are not available for purchase on the day that bids are required to be submitted pursuant to terms of the bid specifications because sales of those securities have been suspended, the cost comparison of paragraph (d)(6)(iii)(C)(2)(ii) of this section is not required.

(D) The provider of the investments or the obligor on the guaranteed investment contract certifies the administrative costs that it pays (or expects to pay, if any) to third parties in connection with supplying the investment.

(E) The issuer retains the following records with the bond documents until three years after the last outstanding bond is redeemed:

(1) For purchases of guaranteed investment contracts, a copy of the contract, and for purchases of investments other than guaranteed investment contracts, the purchase agreement or confirmation.

(2) The receipt or other record of the amount actually paid by the issuer for the investments, including a record of any administrative costs paid by the issuer, and the certification under paragraph (d)(6)(iii)(D) of this section.

(3) For each bid that is submitted, the name of the person and entity submitting the bid, the time and date of the bid, and the bid results.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

(4) The bid solicitation form and, if the terms of the purchase agreement or the guaranteed investment contract deviated from the bid solicitation form or a submitted bid is modified, a brief statement explaining the deviation and stating the purpose for the deviation. For example, if the issuer purchases a portfolio of investments for a yield restricted defeasance escrow and, in order to satisfy the yield restriction requirements of section 148, an investment in the winning bid is replaced with an investment with a lower yield, the issuer must retain a record of the substitution and how the price of the substitute investment was determined. If the issuer replaces an investment in the winning bid portfolio with another investment, the purchase price of the new investment is not covered by the safe harbor unless the investment is bid under a bidding procedure meeting the requirements of this paragraph (d)(6)(iii).

(5) For purchases of investments other than guaranteed investment contracts, the cost of the most efficient portfolio of State and Local Government Series Securities, determined at the time that the bids were required to be submitted pursuant to the terms of the bid specifications.

**(e) Administrative costs of investments—(1) In general.** Except as otherwise provided in this paragraph (e), an allocation of gross proceeds of an issue to a payment or a receipt on an investment is not adjusted to take into account any costs or expenses paid, directly or indirectly, to purchase, carry, sell, or retire the investment (administrative costs). Thus, these administrative costs generally do not increase the payments for, or reduce the receipts from, investments.

**(2) Qualified administrative costs on nonpurpose investments—(i) In general.** In determining payments and receipts on nonpurpose investments, qualified administrative costs are taken into account. Thus, qualified administrative costs increase the payments for, or decrease the receipts from, the investments. Qualified administrative costs are reasonable, direct administrative costs, other than carrying costs, such as separately stated brokerage or selling commissions, but not legal and accounting fees, recordkeeping, custody, and similar costs. General overhead costs and similar indirect costs of the issuer such as employee salaries and office expenses and costs associated with computing the rebate amount under section 148(f) are not qualified administrative costs. In general, administrative costs are not reasonable unless they are comparable to administrative costs that would be charged for the same investment or a reasonably comparable investment if acquired with a source of funds other than gross proceeds of tax-exempt bonds.

**(ii) Special rule for administrative costs of nonpurpose investments in certain regulated investment companies and commingled funds.** Qualified administrative costs include all reasonable administrative costs, without regard to the limitation on indirect costs under paragraph (e)(2)(i) of this section, incurred by:

(A) Regulated investment companies. A publicly offered regulated investment company (as defined in section 67(c)(2)(B)); and

(B) External commingled funds. A widely held commingled fund in which no investor in the fund owns more than 10 percent of the beneficial interest in the fund. For purposes of this paragraph (e)(2)(ii)(B), a fund is treated as widely held only if, during the immediately preceding fixed, semiannual period chosen by the fund (e.g., semiannual periods ending June 30 and December 31), the fund had a daily average of more than 15 investors that were not related parties, and the daily average amount each investor had invested in the fund was not less than the lesser of $500,000 and 1 percent of the daily average of the total amount invested in the fund. For purposes of this paragraph (e)(2)(ii)(B), an investor will be treated as owning not more than 10 percent of the beneficial interest in the fund if, on the date of each deposit by the investor into the fund, the total amount the investor and any related parties have on deposit in the

fund is not more than 10 percent of the total amount that all investors have on deposit in the fund. For purposes of the preceding sentence, the total amount that all investors have on deposit in the fund is equal to the sum of all deposits made by the investor and any related parties on the date of those deposits and the closing balance in the fund on the day before those deposits. If any investor in the fund owns more than 10 percent of the beneficial interest in the fund, the fund does not qualify under this paragraph (e)(2)(ii)(B) until that investor makes sufficient withdrawals from the fund to reduce its beneficial interest in the fund to 10 percent or less.

**(iii) Special rule for guaranteed investment contracts and investments purchased for a yield restricted defeasance escrow**—(A) In general. An amount paid for a broker's commission or similar fee with respect to a guaranteed investment contract or investments purchased for a yield restricted defeasance escrow is a qualified administrative cost if the fee is reasonable within the meaning of paragraph (e)(2)(i) of this section.

(B) Safe harbor—(1) In general. A broker's commission or similar fee with respect to the acquisition of a guaranteed investment contract or investments purchased for a yield restricted defeasance escrow is reasonable within the meaning of paragraph (e)(2)(i) of this section to the extent that—

(i) The amount of the fee that the issuer treats as a qualified administrative cost does not exceed the lesser of:

(A) $30,000 and

(B) 0.2% of the computational base or, if more, $3,000; and

(ii) For any issue, the issuer does not treat as qualified administrative costs more than $85,000 in brokers' commissions or similar fees with respect to all guaranteed investment contracts and investments for yield restricted defeasance escrows purchased with gross proceeds of the issue.

(2) Computational base. For purposes of paragraph (e)(2)(iii)(B)(1) of this section, computational base shall mean—

(i) For a guaranteed investment contract, the amount of gross proceeds the issuer reasonably expects, as of the date the contract is acquired, to be deposited in the guaranteed investment contract over the term of the contract, and

(ii) For investments (other than guaranteed investment contracts) to be deposited in a yield restricted defeasance escrow, the amount of gross proceeds initially invested in those investments.

(3) Cost-of-living adjustment. In the case of a calendar year after 2004, each of the dollar amounts in paragraph (e)(2)(iii)(B)(1) of this section shall be increased by an amount equal to—

(i) Such dollar amount; multiplied by

(ii) The cost-of-living adjustment determined under section 1(f)(3) for such calendar year by using the language "calendar year 2003" instead of "calendar year 1992" in section 1(f)(3)(B).

(4) Rounding. If any increase determined under paragraph (e)(2)(iii)(B)(3) of this section is not a multiple of $1,000, such increase shall be rounded to the nearest multiple thereof.

(5) Applicable year for cost-of-living adjustment. The cost-of-living adjustments under paragraph (e)(2)(iii)(B)(3) of this section shall apply to the safe harbor amounts under paragraph (e)(2)(iii)(B)(1) of this section based on the year the guaranteed investment contract or the investments for the yield restricted defeasance escrow, as applicable, are acquired.

(6) Cost-of-living adjustment to determine remaining amount of per-issue safe harbor—(i) In general. This paragraph (e)(2)(iii)(B)(6) applies to determine the portion of the safe harbor amount under paragraph (e)(2)(iii)(B)(1)(ii) of this section, as modified by paragraph (e)(2)(iii)(B)(3) of this section (the per-issue safe harbor), that is available (the remaining amount) for any year (the determination year) if the per-issue safe harbor was partially used in one or more prior years.

(ii) Remaining amount of per-issue safe harbor. The remaining amount of the per-issue safe harbor for any determination year is equal to the per-issue safe harbor for that year, reduced by the portion of the per-issue safe harbor used in one or more prior years.

(iii) Portion of per-issue safe harbor used in prior years. The portion of the per-issue safe harbor used in any prior year (the prior year) is equal to the total amount of broker's commissions or similar fees paid in connection with guaranteed investment contracts or investments for a yield restricted defeasance escrow acquired in the prior year that the issuer treated as qualified administrative costs for the issue, multiplied by a fraction the numerator of which is the per-issue safe harbor for the determination year and the denominator of which is the per-issue safe harbor for the prior year. See paragraph (e)(2)(iii)(C) Example 2 of this section.

(C) Examples. The following examples illustrate the application of the safe harbor in paragraph (e)(2)(iii)(B) of this section:

**Example 1.** Multipurpose issue. In 2003, the issuer of a multipurpose issue uses brokers to acquire the following investments with gross proceeds of the issue: a guaranteed investment contract for amounts to be deposited in a construction fund (construction GIC), Treasury securities to be deposited in a yield restricted defeasance escrow (Treasury investments) and a guaranteed investment contract that will be used to earn a return on what otherwise would be idle cash balances from maturing investments in the yield restricted defeasance escrow (the float GIC). The issuer deposits $22,000,000 into the construction GIC and reasonably expects that no further deposits will be made over its term. The issuer uses $8,040,000 of the proceeds to purchase the Treasury investments. The issuer reasonably expects that it will make aggregate deposits of $600,000 to the float GIC over its term. The brokers' fees are $30,000 for the construction GIC, $16,080 for the Treasury investments and $3,000 for the float GIC. The issuer has not previously treated any brokers' commissions or similar fees as qualified administrative costs. The issuer may claim all $49,080 in brokers' fees for these investments as qualified administrative costs because the fees do not exceed the safe harbors in paragraph (e)(2)(iii)(B) of this section. Specifically, each of the brokers' fees equals the lesser of $30,000 and 0.2% of the computational base (or, if more, $3,000) (*i.e.*, lesser of $30,000 and 0.2% x $22,000,000 for the construction GIC; lesser of $30,000 and 0.2% x $8,040,000 for the Treasury investments; and lesser of $30,000 and $3,000 for

the float GIC). In addition, the total amount of brokers' fees claimed by the issuer as qualified administrative costs ($49,080) does not exceed the per-issue safe harbor of $85,000.

**Example 2.** Cost-of-living adjustment. In 2003, an issuer issues bonds and uses gross proceeds of the issue to acquire two guaranteed investment contracts. The issuer pays a total of $50,000 in brokers' fees for the two guaranteed investment contracts and treats these fees as qualified administrative costs. In a year subsequent to 2003 (Year Y), the issuer uses gross proceeds of the issue to acquire two additional guaranteed investment contracts, paying a total of $20,000 in broker's fees for the two guaranteed investment contracts, and treats those fees as qualified administrative costs. For Year Y, applying the cost-of-living adjustment under paragraph (e)(2)(iii)(B)(3) of this section, the safe harbor dollar limits under paragraph (e)(2)(iii)(B)(1) of this section are $3,000, $32,000 and $90,000. The remaining amount of the per-issue safe harbor for Year Y is $37,059 ($90,000-[$50,000 x $90,000/$85,000] ). The broker's fees in Year Y do not exceed the per-issue safe harbor under paragraph (e)(2)(iii)(B)(1)(ii) (as modified by paragraph (e)(2)(iii)(B)(3)) of this section because the broker's fees do not exceed the remaining amount of the per-issue safe harbor determined under paragraph (e)(2)(iii)(B)(6) of this section for Year Y. In a year subsequent to Year Y (Year Z), the issuer uses gross proceeds of the issue to acquire an additional guaranteed investment contract, pays a broker's fee of $15,000 for the guaranteed investment contract, and treats the broker's fee as a qualified administrative cost. For Year Z, applying the cost-of-living adjustment under paragraph (e)(2)(iii)(B)(3) of this section, the safe harbor dollar limits under paragraph (e)(2)(iii)(B)(1) of this section are $3,000, $33,000 and $93,000. The remaining amount of the per-issue safe harbor for Year Z is $17,627 ($93,000-[ ($50,000 x $93,000/$85,000) + ($20,000 x $93,000/$90,000) ] ). The broker's fee incurred in Year Z does not exceed the per-issue safe harbor under paragraph (e)(2)(iii)(B)(1)(ii) (as modified by paragraph (e)(2)(iii) (B)(3)) of this section because the broker's fee does not exceed the remaining amount of the per-issue safe harbor determined under paragraph (e)(2)(iii)(B)(6) of this section for Year Z. See paragraph (e)(2)(iii)(B)(6) of this section.

**(3) Qualified administrative costs on purpose investments—(i) In general.** In determining payments and receipts on purpose investments, qualified administrative costs described in this paragraph (e)(3) paid by the conduit borrower are taken into account. Thus, these costs increase the payments for, or decrease the receipts from, the purpose investments. This rule applies even if those payments merely reimburse the issuer. Although the actual payments by the conduit borrower may be made at any time, for this purpose, a pro rata portion of each payment made by a conduit borrower is treated as a reimbursement of reasonable administrative costs, if the present value of those payments does not exceed the present value of the reasonable administrative costs paid by the issuer, using the yield on the issue as the discount rate.

**(ii) Definition of qualified administrative costs of purpose investments—**(A) In general. Except as otherwise provided in this paragraph (e)(3)(ii), qualified administrative costs of a purpose investment means—

(1) Costs or expenses paid, directly or indirectly, to purchase, carry, sell, or retire the investment; and

(2) Costs of issuing, carrying, or repaying the issue, and any underwriters' discount.

(B) Limitation on program investments. For a program investment, qualified administrative costs include only those costs described in paragraph (e)(3)(ii)(A)(2) of this section.

**Credits**

[T.D. 8418, 57 FR 21011, May 18, 1992; T.D. 8418, 57 FR 44990, Sept. 30, 1992; T.D. 8476, 58 FR 33529, June 18, 1993; 58 FR 44452, Aug. 23, 1993; T.D. 8538, 59 FR 24044, May 10, 1994; T.D. 8718, 62 FR 25511, May 9, 1997; T.D. 8801, 63 FR 71751, Dec. 30, 1998; T.D. 9097, 68 FR 69022, Dec. 11, 2003]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

AUTHORITY: Sections 1.909–1 through 1.906–6 also issued under 26 U.S.C. 909(e).

Notes of Decisions (3)

Current through March 24, 2016; 81 FR 16051.

**End of Document**                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

by amortizing the basis of the intangible asset (as determined under section 167(c) and without regard to salvage value) ratably over the useful life beginning on the first day of the month in which the intangible asset is placed in service by the taxpayer. The intangible asset is not eligible for amortization in the month of disposition.

(4) *Effective date.* This paragraph (b) applies to intangible assets created on or after December 31, 2003.

[T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, as amended by T.D. 8867, 65 FR 3825, Jan. 25, 2000; T.D. 9107, 69 FR 444, Jan. 5, 2004]

### § 1.167(a)–4 Leased property.

(a) *In general.* Capital expenditures made by either a lessee or lessor for the erection of a building or for other permanent improvements on leased property are recovered by the lessee or lessor under the provisions of the Internal Revenue Code (Code) applicable to the cost recovery of the building or improvements, if subject to depreciation or amortization, without regard to the period of the lease. For example, if the building or improvement is property to which section 168 applies, the lessee or lessor determines the depreciation deduction for the building or improvement under section 168. See section 168(i)(8)(A). If the improvement is property to which section 167 or section 197 applies, the lessee or lessor determines the depreciation or amortization deduction for the improvement under section 167 or section 197, as applicable.

(b) *Effective/applicability date*—(1) *In general.* Except as provided in paragraph (b)(2) or (b)(3) of this section, this section applies to taxable years beginning on or after January 1, 2014.

(2) *Application of this section to leasehold improvements placed in service after December 31, 1986, in taxable years beginning before January 1, 2014.* For leasehold improvements placed in service after December 31, 1986, in taxable years beginning before January 1, 2014, a taxpayer may—

(i) Apply the provisions of this section; or

(ii) Depreciate any leasehold improvement to which section 168 applies under the provisions of section 168 and depreciate or amortize any leasehold improvement to which section 168 does not apply under the provisions of the Code that are applicable to the cost recovery of that leasehold improvement, without regard to the period of the lease.

(3) *Application of this section to leasehold improvements placed in service before January 1, 1987.* Section 1.167(a)–4 as contained in 26 CFR part 1 edition revised as of April 1, 2011, applies to leasehold improvements placed in service before January 1, 1987.

(4) *Change in method of accounting.* Except as provided in §1.446–1(e)(2)(ii)(*d*)(*3*)(*i*), a change to comply with this section for depreciable assets placed in service in a taxable year ending on or after December 30, 2003, is a change in method of accounting to which the provisions of section 446(e) and the regulations under section 446(e) apply. Except as provided in §1.446–1(e)(2)(ii)(*d*)(*3*)(*i*), a taxpayer also may treat a change to comply with this section for depreciable assets placed in service in a taxable year ending before December 30, 2003, as a change in method of accounting to which the provisions of section 446(e) and the regulations under section 446(e) apply.

[T.D. 9636, 78 FR 57706, Sept. 19, 2013]

### § 1.167(a)–5 Apportionment of basis.

In the case of the acquisition on or after March 1, 1913, of a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. In the case of property which is subject to both the allowance for depreciation and amortization, depreciation is allowable only with respect to the portion of the depreciable property which is not subject to the allowance for amortization and may be taken concurrently with the allowance for amortization. After the close of the amortization period or after amortization deductions have been discontinued with respect to any such property, the unrecovered cost or other basis of the depreciable portion of such property

0153

§ 1.167(a)–5T                                      26 CFR Ch. I (4–1–15 Edition)

will be subject to depreciation. For adjustments to basis, see section 1016 and other applicable provisions of law. For the adjustment to the basis of a structure in the case of a donation of a qualified conservation contribution under section 170(h), see § 1.170A–14(h)(3)(iii).

[T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, as amended by T.D. 8069, 51 FR 1498, Jan. 14, 1986]

§ 1.167(a)–5T  Application  of  section 1060 to section 167 (temporary).

In the case of an acquisition of a combination of depreciable and non-depreciable property for a lump sum in an applicable asset acquisition to which section 1060 applies, the basis for depreciation of the depreciable property cannot exceed the amount of consideration allocated to that property under section 1060 and § 1.1060–1T.

[T.D. 8215, 53 FR 27043, July 18, 1988]

§ 1.167(a)–6  Depreciation  in  special cases.

(a) *Depreciation of patents or copyrights.* The cost or other basis of a patent or copyright shall be depreciated over its remaining useful life. Its cost to the patentee includes the various Government fees, cost of drawings, models, attorneys' fees, and similar expenditures. For rules applicable to research and experimental expenditures, see sections 174 and 1016 and the regulations thereunder. If a patent or copyright becomes valueless in any year before its expiration the unrecovered cost or other basis may be deducted in that year. See § 1.167(a)–14(c)(4) for depreciation of a separately acquired interest in a patent or copyright described in section 167(f)(2) acquired after January 25, 2000. See § 1.197–2 for amortization of interests in patents and copyrights that constitute amortizable section 197 intangibles.

(b) *Depreciation in case of farmers.* A reasonable allowance for depreciation may be claimed on farm buildings (except a dwelling occupied by the owner), farm machinery, and other physical property but not including land. Livestock acquired for work, breeding, or dairy purposes may be depreciated unless included in an inventory used to determine profits in accordance with section 61 and the regulations thereunder. Such depreciation should be determined with reference to the cost or other basis, salvage value, and the estimated useful life of the livestock. See also section 162 and the regulations thereunder relating to trade or business expenses, section 165 and the regulations thereunder relating to losses of farmers, and section 175 and the regulations thereunder relating to soil or water conservation expenditures.

[T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, as amended by T.D. 8867, 65 FR 3825, Jan. 25, 2000]

§ 1.167(a)–7  Accounting for depreciable property.

(a) Depreciable property may be accounted for by treating each individual item as an account, or by combining two or more assets in a single account. Assets may be grouped in an account in a variety of ways. For example, assets similar in kind with approximately the same useful lives may be grouped together. Such an account is commonly known as a group account. Another appropriate grouping might consist of assets segregated according to use without regard to useful life, for example, machinery and equipment, furniture and fixtures, or transportation equipment. Such an account is commonly known as a classified account. A broader grouping, where assets are included in the same account regardless of their character or useful lives, is commonly referred to as a composite account. For example, all the assets used in a business may be included in a single account. Group, classified, or composite accounts may be further broken down on the basis of location, dates of acquisition, cost, character, use, etc.

(b) When group, classified, or composite accounts are used with average useful lives and a normal retirement occurs, the full cost or other basis of the asset retired, unadjusted for depreciation or salvage, shall be removed from the asset account and shall be charged to the depreciation reserve. Amounts representing salvage ordinarily are credited to the depreciation reserve. Where an asset is disposed of for reasons other than normal retirement, the full cost or other basis of the asset shall be removed from the asset

380

0154

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Computation of Taxable Income
              Itemized Deductions for Individuals and Corporations

26 C.F.R. § 1.170A–1, Treas. Reg. § 1.170A–1

§ 1.170A–1 Charitable, etc., contributions and gifts; allowance of deduction.

Effective: April 9, 2008
Currentness

**(a) Allowance of deduction.** Any charitable contribution, as defined in section 170(c), actually paid during the taxable year is allowable as a deduction in computing taxable income irrespective of the method of accounting employed or of the date on which the contribution is pledged. However, charitable contributions by corporations may under certain circumstances be deductible even though not paid during the taxable year as provided in section 170(a)(2) and § 1.170A–11. For rules relating to recordkeeping and return requirements in support of deductions for charitable contributions (whether by an itemizing or nonitemizing taxpayer) see § 1.170A–13. The deduction is subject to the limitations of section 170(b) and § 1.170A–8 or § 1.170A–11. Subject to the provisions of section 170(d) and §§ 1.170A–10 and 1.170A–11, certain excess charitable contributions made by individuals and corporations shall be treated as paid in certain succeeding taxable years. For provisions relating to direct charitable deductions under section 63 by nonitemizers, see section 63(b)(1)(C) and (i) and section 170(i). For rules relating to the determination of, and the deduction for, amounts paid to maintain certain students as members of the taxpayer's household and treated under section 170(g) as paid for the use of an organization described in section 170(c)(2), (3), or (4), see § 1.170A–2. For the reduction of any charitable contributions for interest on certain indebtedness, see section 170(f)(5) and § 1.170A–3. For a special rule relating to the computation of the amount of the deduction with respect to a charitable contribution of certain ordinary income or capital gain property, see section 170(e) and §§ 1.170A–4 and 1.170A–4A. For rules for postponing the time for deduction of a charitable contribution of a future interest in tangible personal property, see section 170(a)(3) and § 1.170A–5. For rules with respect to transfers in trust and of partial interests in property, see section 170(e), section 170(f)(2) and (3), §§ 1.170A–4, 1.170A–6, and 1.170A–7. For definition of the term section 170(b)(1)(A) organization, see § 1.170A–9. For valuation of a remainder interest in real property, see section 170(f)(4) and the regulations thereunder. The deduction for charitable contributions is subject to verification by the district director.

**(b) Time of making contribution.** Ordinarily, a contribution is made at the time delivery is effected. The unconditional delivery or mailing of a check which subsequently clears in due course will constitute an effective contribution on the date of delivery or mailing. If a taxpayer unconditionally delivers or mails a properly endorsed stock certificate to a charitable donee or the donee's agent, the gift is completed on the date of delivery or, if such certificate is received in the ordinary course of the mails, on the date of mailing. If the donor delivers the stock certificate to his bank or broker as the donor's agent, or to the issuing corporation or its agent, for transfer into the name of the donee, the gift is completed on the date the stock is transferred on the books of the corporation. For rules relating to the date of payment of a contribution consisting of a future interest in tangible personal property, see section 170(a)(3) and § 1.170A–5.

**(c) Value of a contribution in property. (1)** If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution reduced as provided in section 170(e)(1) and paragraph (a) of § 1.170A–4, or section 170(e)(3) and paragraph (c) of § 1.170A–4A.

**(2)** The fair market value is ==the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.== If the contribution is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the usual market in which he customarily sells, at the time and place of the contribution and, in the case of a contribution of goods in quantity, in the quantity contributed. The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, but if he sells only at retail the usual market consists of his retail customers.

**(3)** If a donor makes a charitable contribution of property, such as stock in trade, at a time when he could not reasonably have been expected to realize its usual selling price, the value of the gift is not the usual selling price but is the amount for which the quantity of property contributed would have been sold by the donor at the time of the contribution.

**(4)** Any costs and expenses pertaining to the contributed property which were incurred in taxable years preceding the year of contribution and are properly reflected in the opening inventory for the year of contribution must be removed from inventory and are not a part of the cost of goods sold for purposes of determining gross income for the year of contribution. Any costs and expenses pertaining to the contributed property which are incurred in the year of contribution and would, under the method of accounting used, be properly reflected in the cost of goods sold for such year are to be treated as part of the costs of goods sold for such year. If costs and expenses incurred in producing or acquiring the contributed property are, under the method of accounting used, properly deducted under section 162 or other section of the Code, such costs and expenses will be allowed as deductions for the taxable year in which they are paid or incurred whether or not such year is the year of the contribution. Any such costs and expenses which are treated as part of the cost of goods sold for the year of contribution, and any such costs and expenses which are properly deducted under section 162 or other section of the Code, are not to be treated under any section of the Code as resulting in any basis for the contributed property. Thus, for example, the contributed property has no basis for purposes of determining under section 170(e)(1)(A) and paragraph (a) of § 1.170A–4 the amount of gain which would have been recognized if such property had been sold by the donor at its fair market value at the time of its contribution. The amount of any charitable contribution for the taxable year is not to be reduced by the amount of any costs or expenses pertaining to the contributed property which was properly deducted under section 162 or other section of the Code for any taxable year preceding the year of the contribution. This subparagraph applies only to property which was held by the taxpayer for sale in the course of a trade or business. The application of this subparagraph may be illustrated by the following examples:

**Example 1.** In 1970, A, an individual using the calendar year as the taxable year and the accrual method of accounting, contributed to a church property from inventory having a fair market value of $600. The closing inventory at the end of 1969 properly included $400 of costs attributable to the acquisition of such property, and in 1969 A properly deducted under section 162 $50 of administrative and other expenses attributable to such property. Under section 170(e)(1)(A) and paragraph (a) of § 1.170A–4, the amount of the charitable contribution allowed for 1970 is $400 ($600–[$600–$400]). Pursuant to this subparagraph, the cost of goods sold to be used in determining gross income for 1970 may not include the $400 which was included in opening inventory for that year.

**Example 2.** The facts are the same as in Example 1 except that the contributed property was acquired in 1970 at a cost of $400. The $400 cost of the property is included in determining the cost of goods sold for 1970, and $50 is allowed as a deduction for

that year under section 162. A is not allowed any deduction under section 170 for the contributed property, since under section 170(e)(1)(A) and paragraph (a) of § 1.170A–4 the amount of the charitable contribution is reduced to zero ($600 - [$600 - $0] ).

**Example 3.** In 1970, B, an individual using the calendar year as the taxable year and the accrual method of accounting, contributed to a church property from inventory having a fair market value of $600. Under § 1.471–3(c), the closing inventory at the end of 1969 properly included $450 costs attributable to the production of such property, including $50 of administrative and other indirect expenses which, under his method of accounting, was properly added to inventory rather than deducted as a business expense. Under section 170(e)(1)(A) and paragraph (a) of § 1.170A–4, the amount of the charitable contribution allowed for 1970 is $450 ($600 - [$600 - $450] ). Pursuant to this subparagraph, the cost of goods sold to be used in determining gross income for 1970 may not include the $450 which was included in opening inventory for that year.

**Example 4.** The facts are the same as in Example 3 except that the contributed property was produced in 1970 at a cost of $450, including $50 of administrative and other indirect expenses. The $450 cost of the property is included in determining the cost of goods sold for 1970. B is not allowed any deduction under section 170 for the contributed property, since under section 170(e) (1)(A) and paragraph (a) of § 1.170A–4 the amount of the charitable contribution is reduced to zero ($600 - [$600 - $0] ).

**Example 5.** In 1970, C, a farmer using the cash method of accounting and the calendar year as the taxable year, contributed to a church a quantity of grain which he had raised having a fair market value of $600. In 1969, C paid expenses of $450 in raising the property which he properly deducted for such year under section 162. Under section 170(e)(1)(A) and paragraph (a) of § 1.170A–4, the amount of the charitable contribution in 1970 is reduced to zero ($600 - [$600 - $0] ). Accordingly, C is not allowed any deduction under section 170 for the contributed property.

**Example 6.** The facts are the same as in Example 5 except that the $450 expenses incurred in raising the contributed property were paid in 1970. The result is the same as in Example 5, except the amount of $450 is deductible under section 162 for 1970.

**(5)** Transfers of property to an organization described in section 170(c) which bear a direct relationship to the taxpayer's trade or business and which are made with a reasonable expectation of financial return commensurate with the amount of the transfer may constitute allowable deductions as trade or business expenses rather than as charitable contributions. See section 162 and the regulations thereunder.

**(d) Purchase of an annuity. (1)** In the case of an annuity or portion thereof purchased from an organization described in section 170(c), there shall be allowed as a deduction the excess of the amount paid over the value at the time of purchase of the annuity or portion purchased.

**(2)** The value of the annuity or portion is the value of the annuity determined in accordance with paragraph (e)(1)(iii)(b) (2) of § 1.101–2.

**(3)** For determining gain on any such transaction constituting a bargain sale, see section 1011(b) and § 1.1011–2.

**(e) Transfers subject to a condition or power.** If as of the date of a gift a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible. If an interest in property passes to, or is vested in, charity on the date of the gift and the interest would be defeated by the subsequent performance of some act or the happening of some event, the possibility of occurrence of which appears on the date of the gift to be so remote as to be negligible, the deduction is allowable. For example, A transfers land to a city government for as long as the land is used by the city for a public park. If on the date of the gift the city does plan to use the land for a park and the

possibility that the city will not use the land for a public park is so remote as to be negligible, A is entitled to a deduction under section 170 for his charitable contribution.

**(f) Special rules applicable to certain contributions. (1)** See section 14 of the Wild and Scenic Rivers Act (Pub.L. 90–542, 82 Stat. 918) for provisions relating to the claim and allowance of the value of certain easements as a charitable contribution under section 170.

**(2)** For treatment of gifts accepted by the Secretary of State or the Secretary of Commerce, for the purpose of organizing and holding an international conference to negotiate a Patent Corporation Treaty, as gifts to or for the use of the United States, see section 3 of joint resolution of December 24, 1969 (Pub.L. 91–160, 83 Stat. 443).

**(3)** For treatment of gifts accepted by the Secretary of the Department of Housing and Urban Development, for the purpose of aiding or facilitating the work of the Department, as gifts to or for the use of the United States, see section 7(k) of the Department of Housing and Urban Development Act (42 U.S.C. 3535), as added by section 905 of Pub.L. 91–609 (84 Stat. 1809).

**(g) Contributions of services.** No deduction is allowable under section 170 for a contribution of services. However, unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution. For example, the cost of a uniform without general utility which is required to be worn in performing donated services is deductible. Similarly, out-of-pocket transportation expenses necessarily incurred in performing donated services are deductible. Reasonable expenditures for meals and lodging necessarily incurred while away from home in the course of performing donated services also are deductible. For the purposes of this paragraph, the phrase while away from home has the same meaning as that phrase is used for purposes of section 162 and the regulations thereunder.

**(h) Payment in exchange for consideration—(1) Burden on taxpayer to show that all or part of payment is a charitable contribution or gift.** No part of a payment that a taxpayer makes to or for the use of an organization described in section 170(c) that is in consideration for (as defined in § 1.170A–13(f)(6)) goods or services (as defined in § 1.170A–13(f)(5)) is a contribution or gift within the meaning of section 170(c) unless the taxpayer—

**(i)** Intends to make a payment in an amount that exceeds the fair market value of the goods or services; and

**(ii)** Makes a payment in an amount that exceeds the fair market value of the goods or services.

**(2) Limitation on amount deductible—(i) In general.** The charitable contribution deduction under section 170(a) for a payment a taxpayer makes partly in consideration for goods or services may not exceed the excess of—

(A) The amount of any cash paid and the fair market value of any property (other than cash) transferred by the taxpayer to an organization described in section 170(c); over

(B) The fair market value of the goods or services the organization provides in return.

**(ii) Special rules.** For special limits on the deduction for charitable contributions of ordinary income and capital gain property, see section 170(e) and §§ 1.170A–4 and 1.170A–4A.

**(3) Certain goods or services disregarded.** For purposes of section 170(a) and paragraphs (h)(1) and (h)(2) of this section, goods or services described in § 1.170A–13(f)(8)(i) or § 1.170A–13(f)(9)(i) are disregarded.

**(4) Donee estimates of the value of goods or services may be treated as fair market value—(i) In general.** For purposes of section 170(a), a taxpayer may rely on either a contemporaneous written acknowledgment provided under section 170(f)(8) and § 1.170A–13(f) or a written disclosure statement provided under section 6115 for the fair market value of any goods or services provided to the taxpayer by the donee organization.

**(ii) Exception.** A taxpayer may not treat an estimate of the value of goods or services as their fair market value if the taxpayer knows, or has reason to know, that such treatment is unreasonable. For example, if a taxpayer knows, or has reason to know, that there is an error in an estimate provided by an organization described in section 170(c) pertaining to goods or services that have a readily ascertainable value, it is unreasonable for the taxpayer to treat the estimate as the fair market value of the goods or services. Similarly, if a taxpayer is a dealer in the type of goods or services provided in consideration for the taxpayer's payment and knows, or has reason to know, that the estimate is in error, it is unreasonable for the taxpayer to treat the estimate as the fair market value of the goods or services.

**(5) Examples.** The following examples illustrate the rules of this paragraph (h).

**Example 1.** Certain goods or services disregarded. Taxpayer makes a $50 payment to Charity B, an organization described in section 170(c), in exchange for a family membership. The family membership entitles Taxpayer and members of Taxpayer's family to certain benefits. These benefits include free admission to weekly poetry readings, discounts on merchandise sold by B in its gift shop or by mail order, and invitations to special events for members only, such as lectures or informal receptions. When B first offers its membership package for the year, B reasonably projects that each special event for members will have a cost to B, excluding any allocable overhead, of $5 or less per person attending the event. Because the family membership benefits are disregarded pursuant to § 1.170A–13(f)(8)(i), Taxpayer may treat the $50 payment as a contribution or gift within the meaning of section 170(c), regardless of Taxpayer's intent and whether or not the payment exceeds the fair market value of the goods or services. Furthermore, any charitable contribution deduction available to Taxpayer may be calculated without regard to the membership benefits.

**Example 2.** Treatment of good faith estimate at auction as the fair market value. Taxpayer attends an auction held by Charity C, an organization described in section 170(c). Prior to the auction, C publishes a catalog that meets the requirements for a written disclosure statement under section 6115(a) (including C's good faith estimate of the value of items that will be available for bidding). A representative of C gives a copy of the catalog to each individual (including Taxpayer) who attends the auction. Taxpayer notes that in the catalog C's estimate of the value of a vase is $100. Taxpayer has no reason to doubt the accuracy of this estimate. Taxpayer successfully bids and pays $500 for the vase. Because Taxpayer knew, prior to making her payment, that the estimate in the catalog was less than the amount of her payment, Taxpayer satisfies the requirement of paragraph (h)(1)(i) of this section. Because Taxpayer makes a payment in an amount that exceeds that estimate, Taxpayer satisfies the requirements of paragraph (h)(1)(ii) of this section. Taxpayer may treat C's estimate of the value of the vase as its fair market value in determining the amount of her charitable contribution deduction.

**Example 3.** Good faith estimate not in error. Taxpayer makes a $200 payment to Charity D, an organization described in section 170(c). In return for Taxpayer's payment, D gives Taxpayer a book that Taxpayer could buy at retail prices typically ranging from $18 to $25. D provides Taxpayer with a good faith estimate, in a written disclosure statement under section 6115(a), of $20

for the value of the book. Because the estimate is within the range of typical retail prices for the book, the estimate contained in the written disclosure statement is not in error. Although Taxpayer knows that the book is sold for as much as $25, Taxpayer may treat the estimate of $20 as the fair market value of the book in determining the amount of his charitable contribution deduction.

**(i)** [Reserved]

**(j) Exceptions and other rules. (1)** The provisions of section 170 do not apply to contributions by an estate; nor do they apply to a trust unless the trust is a private foundation which, pursuant to section 642(c)(6) and § 1.642(c)–4, is allowed a deduction under section 170 subject to the provisions applicable to individuals.

**(2)** No deduction shall be allowed under section 170 for a charitable contribution to or for the use of an organization or trust described in section 508(d) or 4948(c)(4), subject to the conditions specified in such sections and the regulations thereunder.

**(3)** For disallowance of deductions for contributions to or for the use of communist controlled organizations, see section 11(a) of the Internal Security Act of 1950, as amended (50 U.S.C. 790).

**(4)** For denial of deductions for charitable contributions as trade or business expenses and rules with respect to treatment of payments to organizations other than those described in section 170(c), see section 162 and the regulations thereunder.

**(5)** No deduction shall be allowed under section 170 for amounts paid to an organization:

**(i)** Which is disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation, or

**(ii)** Which participates in, or intervenes in (including the publishing or distribution of statements), any political campaign on behalf of or in opposition to any candidate for public office.

For purposes of determining whether an organization is attempting to influence legislation or is engaging in political activities, see sections 501(c)(3), 501(h), 4911 and the regulations thereunder.

**(6)** No deduction shall be allowed under section 170 for expenditures for lobbying purposes, the promotion or defeat of legislation, etc. See also the regulations under sections 162 and 4945.

**(7)** No deduction for charitable contributions is allowed in computing the taxable income of a common trust fund or of a partnership. See sections 584(d)(3) and 703(a)(2)(D). However, a partner's distributive share of charitable contributions actually paid by a partnership during its taxable year may be allowed as a deduction in the partner's separate return for his taxable year with or within which the taxable year of the partnership ends, to the extent that the aggregate of his share of the partnership contributions and his own contributions does not exceed the limitations in section 170(b).

**(8)** For charitable contributions paid by a nonresident alien individual or a foreign corporation, see § 1.170A–4(b)(5) and sections 873, 876, 877, and 882(c), and the regulations thereunder.

**(9)** Charitable contributions paid by bona fide residents of a section 931 possession as defined in § 1.931–1(c)(1) or Puerto Rico are deductible only to the extent allocable to income that is not excluded under section 931 or 933. For the rules for allocating deductions for charitable contributions, see the regulations under section 861.

**(10)** For carryover of excess charitable contributions in certain corporate acquisitions, see section 381(c)(19) and the regulations thereunder.

**(11)** No deduction shall be allowed under section 170 for out-of-pocket expenditures on behalf of an eligible organization (within the meaning of § 1.501(h)–2(b)(1)) if the expenditure is made in connection with influencing legislation (within the meaning of section 501(c)(3) or § 56.4911–2), or in connection with the payment of the organization's tax liability under section 4911. For the treatment of similar expenditures on behalf of other organizations see paragraph (h)(6) of this section.

**(k) Effective/applicability date.** In general this section applies to contributions made in taxable years beginning after December 31, 1969. Paragraph (j)(11) of this section, however, applies only to out-of-pocket expenditures made in taxable years beginning after December 31, 1976. In addition, paragraph (h) of this section applies only to payments made on or after December 16, 1996. However, taxpayers may rely on the rules of paragraph (h) of this section for payments made on or after January 1, 1994. Paragraph (j)(9) of this section is applicable for taxable years ending after April 9, 2008.

(Authority: 68A Stat. 58, 26 U.S.C. 170(a)(1); 68A Stat. 917, 26 U.S.C. 7805)

**Credits**

[T.D. 7207, 37 FR 20771, Oct. 4, 1972, as amended by T.D. 7340, 40 FR 1238, Jan. 7, 1975; T.D. 7807, 47 FR 4510, Feb. 1, 1982; T.D. 8002, 49 FR 50666, Dec. 31, 1984; T.D. 8308, 55 FR 35587, Aug. 31, 1990; T.D. 8690, 61 FR 65951, Dec. 16, 1996; T.D. 9194, 70 FR 18928, April 11, 2005; T.D. 9391, 73 FR 19358, April 9, 2008]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

AUTHORITY: Sections 1.909–1 through 1.906–6 also issued under 26 U.S.C. 909(e).

Notes of Decisions (610)

Current through March 24, 2016; 81 FR 16051.

---

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Computation of Taxable Income
              Itemized Deductions for Individuals and Corporations

26 C.F.R. § 1.197–2, Treas. Reg. § 1.197–2

§ 1.197–2 Amortization of goodwill and certain other intangibles.

Effective: September 6, 2013
Currentness

**(a) Overview—(1) In general.** Section 197 allows an amortization deduction for the capitalized costs of an amortizable section 197 intangible and prohibits any other depreciation or amortization with respect to that property. Paragraphs (b), (c), and (e) of this section provide rules and definitions for determining whether property is a section 197 intangible, and paragraphs (d) and (e) of this section provide rules and definitions for determining whether a section 197 intangible is an amortizable section 197 intangible. The amortization deduction under section 197 is determined by amortizing basis ratably over a 15–year period under the rules of paragraph (f) of this section. Section 197 also includes various special rules pertaining to the disposition of amortizable section 197 intangibles, nonrecognition transactions, anti-churning rules, and anti-abuse rules. Rules relating to these provisions are contained in paragraphs (g), (h), and (j) of this section. Examples demonstrating the application of these provisions are contained in paragraph (k) of this section. The effective date of the rules in this section is contained in paragraph (l) of this section.

**(2) Section 167(f) property.** Section 167(f) prescribes rules for computing the depreciation deduction for certain property to which section 197 does not apply. See § 1.167(a)–14 for rules under section 167(f) and paragraphs (c)(4), (6), (7), (11), and (13) of this section for a description of the property subject to section 167(f).

**(3) Amounts otherwise deductible.** Section 197 does not apply to amounts that are not chargeable to capital account under paragraph (f)(3) (relating to basis determinations for covenants not to compete and certain contracts for the use of section 197 intangibles) of this section and are otherwise currently deductible. For this purpose, an amount described in § 1.162–11 is not currently deductible if, without regard to § 1.162–11, such amount is properly chargeable to capital account.

**(b) Section 197 intangibles; in general.** Except as otherwise provided in paragraph (c) of this section, the term section 197 intangible means any property described in section 197(d)(1). The following rules and definitions provide guidance concerning property that is a section 197 intangible unless an exception applies:

**(1) Goodwill.** Section 197 intangibles include goodwill. Goodwill is the value of a trade or business attributable to the expectancy of continued customer patronage. This expectancy may be due to the name or reputation of a trade or business or any other factor.

**(2) Going concern value.** Section 197 intangibles include going concern value. Going concern value is the additional value that attaches to property by reason of its existence as an integral part of an ongoing business activity. Going concern value includes the value attributable to the ability of a trade or business (or a part of a trade or business) to continue functioning or generating income without interruption notwithstanding a change in ownership, but does not include any of the intangibles described in any other provision of this paragraph (b). It also includes the value that is attributable to the immediate use or availability of an acquired trade or business, such as, for example, the use of the revenues or net earnings that otherwise would not be received during any period if the acquired trade or business were not available or operational.

**(3) Workforce in place.** Section 197 intangibles include workforce in place. Workforce in place (sometimes referred to as agency force or assembled workforce) includes the composition of a workforce (for example, the experience, education, or training of a workforce), the terms and conditions of employment whether contractual or otherwise, and any other value placed on employees or any of their attributes. Thus, the amount paid or incurred for workforce in place includes, for example, any portion of the purchase price of an acquired trade or business attributable to the existence of a highly-skilled workforce, an existing employment contract (or contracts), or a relationship with employees or consultants (including, but not limited to, any key employee contract or relationship). Workforce in place does not include any covenant not to compete or other similar arrangement described in paragraph (b)(9) of this section.

**(4) Information base.** Section 197 intangibles include any information base, including a customer-related information base. For this purpose, an information base includes business books and records, operating systems, and any other information base (regardless of the method of recording the information) and a customer-related information base is any information base that includes lists or other information with respect to current or prospective customers. Thus, the amount paid or incurred for information base includes, for example, any portion of the purchase price of an acquired trade or business attributable to the intangible value of technical manuals, training manuals or programs, data files, and accounting or inventory control systems. Other examples include the cost of acquiring customer lists, subscription lists, insurance expirations, patient or client files, or lists of newspaper, magazine, radio, or television advertisers.

**(5) Know–how, etc.** Section 197 intangibles include any patent, copyright, formula, process, design, pattern, know-how, format, package design, computer software (as defined in paragraph (c)(4)(iv) of this section), or interest in a film, sound recording, video tape, book, or other similar property. (See, however, the exceptions in paragraph (c) of this section.)

**(6) Customer–based intangibles.** Section 197 intangibles include any customer-based intangible. A customer-based intangible is any composition of market, market share, or other value resulting from the future provision of goods or services pursuant to contractual or other relationships in the ordinary course of business with customers. Thus, the amount paid or incurred for customer-based intangibles includes, for example, any portion of the purchase price of an acquired trade or business attributable to the existence of a customer base, a circulation base, an undeveloped market or market growth, insurance in force, the existence of a qualification to supply goods or services to a particular customer, a mortgage servicing contract (as defined in paragraph (c)(11) of this section), an investment management contract, or other relationship with customers involving the future provision of goods or services. (See, however, the exceptions in paragraph (c) of this section.) In addition, customer-based intangibles include the deposit base and any similar asset of a financial institution. Thus, the amount paid or incurred for customer-based intangibles also includes any portion of the purchase price of an acquired financial institution attributable to the value represented by existing checking accounts, savings accounts, escrow

accounts, and other similar items of the financial institution. However, any portion of the purchase price of an acquired trade or business attributable to accounts receivable or other similar rights to income for goods or services provided to customers prior to the acquisition of a trade or business is not an amount paid or incurred for a customer-based intangible.

**(7) Supplier-based intangibles—(i) In general.** Section 197 intangibles include any supplier-based intangible. A supplier-based intangible is the value resulting from the future acquisition, pursuant to contractual or other relationships with suppliers in the ordinary course of business, of goods or services that will be sold or used by the taxpayer. Thus, the amount paid or incurred for supplier-based intangibles includes, for example, any portion of the purchase price of an acquired trade or business attributable to the existence of a favorable relationship with persons providing distribution services (such as favorable shelf or display space at a retail outlet), or the existence of favorable supply contracts. The amount paid or incurred for supplier-based intangibles does not include any amount required to be paid for the goods or services themselves pursuant to the terms of the agreement or other relationship. In addition, see the exceptions in paragraph 2(c) of this section, including the exception in paragraph 2(c)(6) of this section for certain rights to receive tangible property or services from another person.

**(ii) Applicability date.** This section applies to supplier-based intangibles acquired after July 6, 2011.

**(8) Licenses, permits, and other rights granted by governmental units.** Section 197 intangibles include any license, permit, or other right granted by a governmental unit (including, for purposes of section 197, an agency or instrumentality thereof) even if the right is granted for an indefinite period or is reasonably expected to be renewed for an indefinite period. These rights include, for example, a liquor license, a taxi-cab medallion (or license), an airport landing or takeoff right (sometimes referred to as a slot), a regulated airline route, or a television or radio broadcasting license. The issuance or renewal of a license, permit, or other right granted by a governmental unit is considered an acquisition of the license, permit, or other right. (See, however, the exceptions in paragraph (c) of this section, including the exceptions in paragraph (c)(3) of this section for an interest in land, paragraph (c)(6) of this section for certain rights to receive tangible property or services, paragraph (c)(8) of this section for an interest under a lease of tangible property, and paragraph (c)(13) of this section for certain rights granted by a governmental unit. See paragraph (b)(10) of this section for the treatment of franchises.)

**(9) Covenants not to compete and other similar arrangements.** Section 197 intangibles include any covenant not to compete, or agreement having substantially the same effect, entered into in connection with the direct or indirect acquisition of an interest in a trade or business or a substantial portion thereof. For purposes of this paragraph (b)(9), an acquisition may be made in the form of an asset acquisition (including a qualified stock purchase that is treated as a purchase of assets under section 338), a stock acquisition or redemption, and the acquisition or redemption of a partnership interest. An agreement requiring the performance of services for the acquiring taxpayer or the provision of property or its use to the acquiring taxpayer does not have substantially the same effect as a covenant not to compete to the extent that the amount paid under the agreement represents reasonable compensation for the services actually rendered or for the property or use of the property actually provided.

**(10) Franchises, trademarks, and trade names. (i)** Section 197 intangibles include any franchise, trademark, or trade name. The term franchise has the meaning given in section 1253(b)(1) and includes any agreement that provides one of the parties to the agreement with the right to distribute, sell, or provide goods, services, or facilities, within a specified area. The term trademark includes any word, name, symbol, or device, or any combination thereof, adopted and used to identify goods or services and distinguish them from those provided by others. The term trade name includes any name used to identify or designate a particular trade or business or the name or title used by a person or organization engaged in a trade or business. A license, permit, or other right granted by a governmental unit is a franchise if it otherwise meets the definition of a franchise. A trademark or trade name includes any trademark or trade name arising under statute or

applicable common law, and any similar right granted by contract. The renewal of a franchise, trademark, or trade name is treated as an acquisition of the franchise, trademark, or trade name.

**(ii)** Notwithstanding the definitions provided in paragraph (b)(10)(i) of this section, any amount that is paid or incurred on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name and that is subject to section 1253(d)(1) is not included in the basis of a section 197 intangible. (See paragraph (g)(6) of this section.)

**(11) Contracts for the use of, and term interests in, section 197 intangibles.** Section 197 intangibles include any right under a license, contract, or other arrangement providing for the use of property that would be a section 197 intangible under any provision of this paragraph (b) (including this paragraph (b)(11)) after giving effect to all of the exceptions provided in paragraph (c) of this section. Section 197 intangibles also include any term interest (whether outright or in trust) in such property.

**(12) Other similar items.** Section 197 intangibles include any other intangible property that is similar in all material respects to the property specifically described in section 197(d)(1)(C)(i) through (v) and paragraphs (b)(3) through (7) of this section. (See paragraph (g)(5) of this section for special rules regarding certain reinsurance transactions.)

**(c) Section 197 intangibles; exceptions.** The term section 197 intangible does not include property described in section 197(e). The following rules and definitions provide guidance concerning property to which the exceptions apply:

**(1) Interests in a corporation, partnership, trust, or estate.** Section 197 intangibles do not include an interest in a corporation, partnership, trust, or estate. Thus, for example, amortization under section 197 is not available for the cost of acquiring stock, partnership interests, or interests in a trust or estate, whether or not the interests are regularly traded on an established market. (See paragraph (g)(3) of this section for special rules applicable to property of a partnership when a section 754 election is in effect for the partnership.)

**(2) Interests under certain financial contracts.** Section 197 intangibles do not include an interest under an existing futures contract, foreign currency contract, notional principal contract, interest rate swap, or other similar financial contract, whether or not the interest is regularly traded on an established market. However, this exception does not apply to an interest under a mortgage servicing contract, credit card servicing contract, or other contract to service another person's indebtedness, or an interest under an assumption reinsurance contract. (See paragraph (g)(5) of this section for the treatment of assumption reinsurance contracts. See paragraph (c)(11) of this section and § 1.167(a)–14(d) for the treatment of mortgage servicing rights.)

**(3) Interests in land.** Section 197 intangibles do not include any interest in land. For this purpose, an interest in land includes a fee interest, life estate, remainder, easement, mineral right, timber right, grazing right, riparian right, air right, zoning variance, and any other similar right, such as a farm allotment, quota for farm commodities, or crop acreage base. An interest in land does not include an airport landing or takeoff right, a regulated airline route, or a franchise to provide cable television service. The cost of acquiring a license, permit, or other land improvement right, such as a building construction or use permit, is taken into account in the same manner as the underlying improvement.

**(4) Certain computer software—(i) Publicly available.** Section 197 intangibles do not include any interest in computer software that is (or has been) readily available to the general public on similar terms, is subject to a nonexclusive license,

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 170 of 651

and has not been substantially modified. Computer software will be treated as readily available to the general public if the software may be obtained on substantially the same terms by a significant number of persons that would reasonably be expected to use the software. This requirement can be met even though the software is not available through a system of retail distribution. Computer software will not be considered to have been substantially modified if the cost of all modifications to the version of the software that is readily available to the general public does not exceed the greater of 25 percent of the price at which the unmodified version of the software is readily available to the general public or $2,000. For the purpose of determining whether computer software has been substantially modified—

(A) Integrated programs acquired in a package from a single source are treated as a single computer program; and

(B) Any cost incurred to install the computer software on a system is not treated as a cost of the software. However, the costs for customization, such as tailoring to a user's specifications (other than embedded programming options) are costs of modifying the software.

**(ii) Not acquired as part of trade or business.** Section 197 intangibles do not include an interest in computer software that is not acquired as part of a purchase of a trade or business.

**(iii) Other exceptions.** For other exceptions applicable to computer software, see paragraph (a)(3) of this section (relating to otherwise deductible amounts) and paragraph (g)(7) of this section (relating to amounts properly taken into account in determining the cost of property that is not a section 197 intangible).

**(iv) Computer software defined.** For purposes of this section, computer software is any program or routine (that is, any sequence of machine-readable code) that is designed to cause a computer to perform a desired function or set of functions, and the documentation required to describe and maintain that program or routine. It includes all forms and media in which the software is contained, whether written, magnetic, or otherwise. Computer programs of all classes, for example, operating systems, executive systems, monitors, compilers and translators, assembly routines, and utility programs as well as application programs, are included. Computer software also includes any incidental and ancillary rights that are necessary to effect the acquisition of the title to, the ownership of, or the right to use the computer software, and that are used only in connection with that specific computer software. Such incidental and ancillary rights are not included in the definition of trademark or trade name under paragraph (b)(10)(i) of this section. For example, a trademark or trade name that is ancillary to the ownership or use of a specific computer software program in the taxpayer's trade or business and is not acquired for the purpose of marketing the computer software is included in the definition of computer software and is not included in the definition of trademark or trade name. Computer software does not include any data or information base described in paragraph (b)(4) of this section unless the data base or item is in the public domain and is incidental to a computer program. For this purpose, a copyrighted or proprietary data or information base is treated as in the public domain if its availability through the computer program does not contribute significantly to the cost of the program. For example, if a word-processing program includes a dictionary feature used to spell-check a document or any portion thereof, the entire program (including the dictionary feature) is computer software regardless of the form in which the feature is maintained or stored.

**(5) Certain interests in films, sound recordings, video tapes, books, or other similar property.** Section 197 intangibles do not include any interest (including an interest as a licensee) in a film, sound recording, video tape, book, or other similar property (such as the right to broadcast or transmit a live event) if the interest is not acquired as part of a purchase of a trade or business. A film, sound recording, video tape, book, or other similar property includes any incidental and ancillary rights (such as a trademark or trade name) that are necessary to effect the acquisition of title to, the ownership of, or the right to

use the property and are used only in connection with that property. Such incidental and ancillary rights are not included in the definition of trademark or trade name under paragraph (b)(10)(i) of this section. For purposes of this paragraph (c)(5), computer software (as defined in paragraph (c)(4)(iv) of this section) is not treated as other property similar to a film, sound recording, video tape, or book. (See section 167 for amortization of excluded intangible property or interests.)

**(6) Certain rights to receive tangible property or services.** Section 197 intangibles do not include any right to receive tangible property or services under a contract or from a governmental unit if the right is not acquired as part of a purchase of a trade or business. Any right that is described in the preceding sentence is not treated as a section 197 intangible even though the right is also described in section 197(d)(1)(D) and paragraph (b)(8) of this section (relating to certain governmental licenses, permits, and other rights) and even though the right fails to meet one or more of the requirements of paragraph (c)(13) of this section (relating to certain rights of fixed duration or amount). (See § 1.167(a)–14(c)(1) and (3) for applicable rules.)

**(7) Certain interests in patents or copyrights.** Section 197 intangibles do not include any interest (including an interest as a licensee) in a patent, patent application, or copyright that is not acquired as part of a purchase of a trade or business. A patent or copyright includes any incidental and ancillary rights (such as a trademark or trade name) that are necessary to effect the acquisition of title to, the ownership of, or the right to use the property and are used only in connection with that property. Such incidental and ancillary rights are not included in the definition of trademark or trade name under paragraph (b)(10)(i) of this section. (See § 1.167(a)–14(c)(4) for applicable rules.)

**(8) Interests under leases of tangible property—(i) Interest as a lessor.** Section 197 intangibles do not include any interest as a lessor under an existing lease or sublease of tangible real or personal property. In addition, the cost of acquiring an interest as a lessor in connection with the acquisition of tangible property is taken into account as part of the cost of the tangible property. For example, if a taxpayer acquires a shopping center that is leased to tenants operating retail stores, any portion of the purchase price attributable to favorable lease terms is taken into account as part of the basis of the shopping center and in determining the depreciation deduction allowed with respect to the shopping center. (See section 167(c)(2).)

**(ii) Interest as a lessee.** Section 197 intangibles do not include any interest as a lessee under an existing lease of tangible real or personal property. For this purpose, an airline lease of an airport passenger or cargo gate is a lease of tangible property. The cost of acquiring such an interest is taken into account under section 178 and § 1.162–11(a). If an interest as a lessee under a lease of tangible property is acquired in a transaction with any other intangible property, a portion of the total purchase price may be allocable to the interest as a lessee based on all of the relevant facts and circumstances.

**(9) Interests under indebtedness—(i) In general.** Section 197 intangibles do not include any interest (whether as a creditor or debtor) under an indebtedness in existence when the interest was acquired. Thus, for example, the value attributable to the assumption of an indebtedness with a below-market interest rate is not amortizable under section 197. In addition, the premium paid for acquiring a debt instrument with an above-market interest rate is not amortizable under section 197. See section 171 for rules concerning the treatment of amortizable bond premium.

**(ii) Exceptions.** For purposes of this paragraph (c)(9), an interest under an existing indebtedness does not include the deposit base (and other similar items) of a financial institution. An interest under an existing indebtedness includes mortgage servicing rights, however, to the extent the rights are stripped coupons under section 1286.

**(10) Professional sports franchises.** Section 197 intangibles do not include any franchise to engage in professional baseball, basketball, football, or any other professional sport, and any item (even though otherwise qualifying as a section 197 intangible) acquired in connection with such a franchise.

**(11) Mortgage servicing rights.** Section 197 intangibles do not include any right described in section 197(e)(7) (concerning rights to service indebtedness secured by residential real property that are not acquired as part of a purchase of a trade or business). (See § 1.167(a)–14(d) for applicable rules.)

**(12) Certain transaction costs.** Section 197 intangibles do not include any fees for professional services and any transaction costs incurred by parties to a transaction in which all or any portion of the gain or loss is not recognized under part III of subchapter C of the Internal Revenue Code.

**(13) Rights of fixed duration or amount. (i)** Section 197 intangibles do not include any right under a contract or any license, permit, or other right granted by a governmental unit if the right—

(A) Is acquired in the ordinary course of a trade or business (or an activity described in section 212) and not as part of a purchase of a trade or business;

(B) Is not described in section 197(d)(1)(A), (B), (E), or (F);

(C) Is not a customer-based intangible, a customer-related information base, or any other similar item; and

(D) Either—

(1) Has a fixed duration of less than 15 years; or

(2) Is fixed as to amount and the adjusted basis thereof is properly recoverable (without regard to this section) under a method similar to the unit-of-production method.

**(ii)** See § 1.167(a)–14(c)(2) and (3) for applicable rules.

**(d) Amortizable section 197 intangibles—(1) Definition.** Except as otherwise provided in this paragraph (d), the term amortizable section 197 intangible means any section 197 intangible acquired after August 10, 1993 (or after July 25, 1991, if a valid retroactive election under § 1.197–1T has been made), and held in connection with the conduct of a trade or business or an activity described in section 212.

**(2) Exception for self-created intangibles—(i) In general.** Except as provided in paragraph (d)(2)(iii) of this section, amortizable section 197 intangibles do not include any section 197 intangible created by the taxpayer (a self-created intangible).

**(ii) Created by the taxpayer—(A) Defined.** A section 197 intangible is created by the taxpayer to the extent the taxpayer makes payments or otherwise incurs costs for its creation, production, development, or improvement, whether the actual work is performed by the taxpayer or by another person under a contract with the taxpayer entered into before the contracted creation, production, development, or improvement occurs. For example, a technological process developed specifically for a taxpayer under an arrangement with another person pursuant to which the taxpayer retains all rights to the process is created by the taxpayer.

(B) Contracts for the use of intangibles. A section 197 intangible is not a self-created intangible to the extent that it results from the entry into (or renewal of) a contract for the use of an existing section 197 intangible. Thus, for example, the exception for self-created intangibles does not apply to capitalized costs, such as legal and other professional fees, incurred by a licensee in connection with the entry into (or renewal of) a contract for the use of know-how or similar property.

(C) Improvements and modifications. If an existing section 197 intangible is improved or otherwise modified by the taxpayer or by another person under a contract with the taxpayer, the existing intangible and the capitalized costs (if any) of the improvements or other modifications are each treated as a separate section 197 intangible for purposes of this paragraph (d).

**(iii) Exceptions.** (A) The exception for self-created intangibles does not apply to any section 197 intangible described in section 197(d)(1)(D) (relating to licenses, permits or other rights granted by a governmental unit), 197(d)(1)(E) (relating to covenants not to compete), or 197(d)(1)(F) (relating to franchises, trademarks, and trade names). Thus, for example, capitalized costs incurred in the development, registration, or defense of a trademark or trade name do not qualify for the exception and are amortized over 15 years under section 197.

(B) The exception for self-created intangibles does not apply to any section 197 intangible created in connection with the purchase of a trade or business (as defined in paragraph (e) of this section).

(C) If a taxpayer disposes of a self-created intangible and subsequently reacquires the intangible in an acquisition described in paragraph (h)(5)(ii) of this section, the exception for self-created intangibles does not apply to the reacquired intangible.

**(3) Exception for property subject to anti-churning rules.** Amortizable section 197 intangibles do not include any property to which the anti-churning rules of section 197(f)(9) and paragraph (h) of this section apply.

**(e) Purchase of a trade or business.** Several of the exceptions in section 197 apply only to property that is not acquired in (or created in connection with) a transaction or series of related transactions involving the acquisition of assets constituting a trade or business or a substantial portion thereof. Property acquired in (or created in connection with) such a transaction or series of related transactions is referred to in this section as property acquired as part of (or created in connection with) a purchase of a trade or business. For purposes of section 197 and this section, the applicability of the limitation is determined under the following rules:

**(1) Goodwill or going concern value.** An asset or group of assets constitutes a trade or business or a substantial portion thereof if their use would constitute a trade or business under section 1060 (that is, if goodwill or going concern value

could under any circumstances attach to the assets). See § 1.1060–1(b)(2). For this purpose, all the facts and circumstances, including any employee relationships that continue (or covenants not to compete that are entered into) as part of the transfer of the assets, are taken into account in determining whether goodwill or going concern value could attach to the assets.

**(2) Franchise, trademark, or trade name—(i) In general.** The acquisition of a franchise, trademark, or trade name constitutes the acquisition of a trade or business or a substantial portion thereof.

**(ii) Exceptions.** For purposes of this paragraph (e)(2)—

(A) A trademark or trade name is disregarded if it is included in computer software under paragraph (c)(4) of this section or in an interest in a film, sound recording, video tape, book, or other similar property under paragraph (c)(5) of this section;

(B) A franchise, trademark, or trade name is disregarded if its value is nominal or the taxpayer irrevocably disposes of it immediately after its acquisition; and

(C) The acquisition of a right or interest in a trademark or trade name is disregarded if the grant of the right or interest is not, under the principles of section 1253, a transfer of all substantial rights to such property or of an undivided interest in all substantial rights to such property.

**(3) Acquisitions to be included.** The assets acquired in a transaction (or series of related transactions) include only assets (including a beneficial or other indirect interest in assets where the interest is of a type described in paragraph (c)(1) of this section) acquired by the taxpayer and persons related to the taxpayer from another person and persons related to that other person. For purposes of this paragraph (e)(3), persons are related only if their relationship is described in section 267(b) or 707(b) or they are engaged in trades or businesses under common control within the meaning of section 41(f)(1).

**(4) Substantial portion.** The determination of whether acquired assets constitute a substantial portion of a trade or business is to be based on all of the facts and circumstances, including the nature and the amount of the assets acquired as well as the nature and amount of the assets retained by the transferor. The value of the assets acquired relative to the value of the assets retained by the transferor is not determinative of whether the acquired assets constitute a substantial portion of a trade or business.

**(5) Deemed asset purchases under section 338.** A qualified stock purchase that is treated as a purchase of assets under section 338 is treated as a transaction involving the acquisition of assets constituting a trade or business only if the direct acquisition of the assets of the corporation would have been treated as the acquisition of assets constituting a trade or business or a substantial portion thereof.

**(6) Mortgage servicing rights.** Mortgage servicing rights acquired in a transaction or series of related transactions are disregarded in determining for purposes of paragraph (c)(11) of this section whether the assets acquired in the transaction or transactions constitute a trade or business or substantial portion thereof.

**(7) Computer software acquired for internal use.** Computer software acquired in a transaction or series of related transactions solely for internal use in an existing trade or business is disregarded in determining for purposes of paragraph (c)(4) of this section whether the assets acquired in the transaction or series of related transactions constitute a trade or business or substantial portion thereof.

**(f) Computation of amortization deduction—(1) In general.** Except as provided in paragraph (f)(2) of this section, the amortization deduction allowable under section 197(a) is computed as follows:

**(i)** The basis of an amortizable section 197 intangible is amortized ratably over the 15–year period beginning on the later of—

(A) The first day of the month in which the property is acquired; or

(B) In the case of property held in connection with the conduct of a trade or business or in an activity described in section 212, the first day of the month in which the conduct of the trade or business or the activity begins.

**(ii)** Except as otherwise provided in this section, basis is determined under section 1011 and salvage value is disregarded.

**(iii)** Property is not eligible for amortization in the month of disposition.

**(iv)** The amortization deduction for a short taxable year is based on the number of months in the short taxable year.

**(2) Treatment of contingent amounts—(i) Amounts added to basis during 15–year period.** Any amount that is properly included in the basis of an amortizable section 197 intangible after the first month of the 15–year period described in paragraph (f)(1)(i) of this section and before the expiration of that period is amortized ratably over the remainder of the 15–year period. For this purpose, the remainder of the 15–year period begins on the first day of the month in which the basis increase occurs.

**(ii) Amounts becoming fixed after expiration of 15–year period.** Any amount that is not properly included in the basis of an amortizable section 197 intangible until after the expiration of the 15–year period described in paragraph (f)(1)(i) of this section is amortized in full immediately upon the inclusion of the amount in the basis of the intangible.

**(iii) Rules for including amounts in basis.** See §§ 1.1275–4(c)(4) and 1.483–4(a) for rules governing the extent to which contingent amounts payable under a debt instrument given in consideration for the sale or exchange of an amortizable section 197 intangible are treated as payments of principal and the time at which the amount treated as principal is included in basis. See § 1.461–1(a)(1) and (2) for rules governing the time at which other contingent amounts are taken into account in determining the basis of an amortizable section 197 intangible.

**(3) Basis determinations for certain assets—(i) Covenants not to compete.** In the case of a covenant not to compete or other similar arrangement described in paragraph (b)(9) of this section (a covenant), the amount chargeable to capital account includes, except as provided in this paragraph (f)(3), all amounts that are required to be paid pursuant to the

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 176 of 651

covenant, whether or not any such amount would be deductible under section 162 if the covenant were not a section 197 intangible.

**(ii) Contracts for the use of section 197 intangibles; acquired as part of a trade or business**—(A) In general. Except as provided in this paragraph (f)(3), any amount paid or incurred by the transferee on account of the transfer of a right or term interest described in paragraph (b)(11) of this section (relating to contracts for the use of, and term interests in, section 197 intangibles) by the owner of the property to which such right or interest relates and as part of a purchase of a trade or business is chargeable to capital account, whether or not such amount would be deductible under section 162 if the property were not a section 197 intangible.

(B) Know–how and certain information base. The amount chargeable to capital account with respect to a right or term interest described in paragraph (b)(11) of this section is determined without regard to the rule in paragraph (f)(3)(ii)(A) of this section if the right or interest relates to property (other than a customer-related information base) described in paragraph (b)(4) or (5) of this section and the acquiring taxpayer establishes that—

(1) The transfer of the right or interest is not, under the principles of section 1235, a transfer of all substantial rights to such property or of an undivided interest in all substantial rights to such property; and

(2) The right or interest was transferred for an arm's-length consideration.

**(iii) Contracts for the use of section 197 intangibles; not acquired as part of a trade or business.** The transfer of a right or term interest described in paragraph (b)(11) of this section by the owner of the property to which such right or interest relates but not as part of a purchase of a trade or business will be closely scrutinized under the principles of section 1235 for purposes of determining whether the transfer is a sale or exchange and, accordingly, whether amounts paid on account of the transfer are chargeable to capital account. If under the principles of section 1235 the transaction is not a sale or exchange, amounts paid on account of the transfer are not chargeable to capital account under this paragraph (f)(3).

**(iv) Applicable rules**—(A) Franchises, trademarks, and trade names. For purposes of this paragraph (f)(3), section 197 intangibles described in paragraph (b)(11) of this section do not include any property that is also described in paragraph (b)(10) of this section (relating to franchises, trademarks, and trade names).

(B) Certain amounts treated as payable under a debt instrument—(1) In general. For purposes of applying any provision of the Internal Revenue Code to a person making payments of amounts that are otherwise chargeable to capital account under this paragraph (f)(3) and are payable after the acquisition of the section 197 intangible to which they relate, such amounts are treated as payable under a debt instrument given in consideration for the sale or exchange of the section 197 intangible.

(2) Rights granted by governmental units. For purposes of applying any provision of the Internal Revenue Code to any amounts that are otherwise chargeable to capital account with respect to a license, permit, or other right described in paragraph (b)(8) of this section (relating to rights granted by a governmental unit or agency or instrumentality thereof) and are payable after the acquisition of the section 197 intangible to which they relate, such amounts are treated, except as provided in paragraph (f)(4)(i) of this section (relating to renewal

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 177 of 651

transactions), as payable under a debt instrument given in consideration for the sale or exchange of the section 197 intangible.

(3) Treatment of other parties to transaction. No person shall be treated as having sold, exchanged, or otherwise disposed of property in a transaction for purposes of any provision of the Internal Revenue Code solely by reason of the application of this paragraph (f)(3) to any other party to the transaction.

**(4) Basis determinations in certain transactions—(i) Certain renewal transactions.** The costs paid or incurred for the renewal of a franchise, trademark, or trade name or any license, permit, or other right granted by a governmental unit or an agency or instrumentality thereof are amortized over the 15–year period that begins with the month of renewal. Any costs paid or incurred for the issuance, or earlier renewal, continue to be taken into account over the remaining portion of the amortization period that began at the time of the issuance, or earlier renewal. Any amount paid or incurred for the protection, expansion, or defense of a trademark or trade name and chargeable to capital account is treated as an amount paid or incurred for a renewal.

**(ii) Transactions subject to section 338 or 1060.** In the case of a section 197 intangible deemed to have been acquired as the result of a qualified stock purchase within the meaning of section 338(d)(3), the basis shall be determined pursuant to section 338(b)(5) and the regulations thereunder. In the case of a section 197 intangible acquired in an applicable asset acquisition within the meaning of section 1060(c), the basis shall be determined pursuant to section 1060(a) and the regulations thereunder.

**(iii) Certain reinsurance transactions.** See paragraph (g)(5)(ii) of this section for special rules regarding the adjusted basis of an insurance contract acquired through an assumption reinsurance transaction.

**(g) Special rules—(1) Treatment of certain dispositions—(i) Loss disallowance rules—**(A) In general. No loss is recognized on the disposition of an amortizable section 197 intangible if the taxpayer has any retained intangibles. The retained intangibles with respect to the disposition of any amortizable section 197 intangible (the transferred intangible) are all amortizable section 197 intangibles, or rights to use or interests (including beneficial or other indirect interests) in amortizable section 197 intangibles (including the transferred intangible) that were acquired in the same transaction or series of related transactions as the transferred intangible and are retained after its disposition. Except as otherwise provided in paragraph (g)(1)(iv)(B) of this section, the adjusted basis of each of the retained intangibles is increased by the product of—

(1) The loss that is not recognized solely by reason of this rule; and

(2) A fraction, the numerator of which is the adjusted basis of the retained intangible on the date of the disposition and the denominator of which is the total adjusted bases of all the retained intangibles on that date.

(B) Abandonment or worthlessness. The abandonment of an amortizable section 197 intangible, or any other event rendering an amortizable section 197 intangible worthless, is treated as a disposition of the intangible for purposes of this paragraph (g)(1), and the abandoned or worthless intangible is disregarded (that is, it is not treated as a retained intangible) for purposes of applying this paragraph (g)(1) to the subsequent disposition of any other amortizable section 197 intangible.

(C) Certain nonrecognition transfers. The loss disallowance rule in paragraph (g)(1)(i)(A) of this section also applies when a taxpayer transfers an amortizable section 197 intangible from an acquired trade or business in a transaction in which the intangible is transferred basis property and, after the transfer, retains other amortizable section 197 intangibles from the trade or business. Thus, for example, the transfer of an amortizable section 197 intangible to a corporation in exchange for stock in the corporation in a transaction described in section 351, or to a partnership in exchange for an interest in the partnership in a transaction described in section 721, when other amortizable section 197 intangibles acquired in the same transaction are retained, followed by a sale of the stock or partnership interest received, will not avoid the application of the loss disallowance provision to the extent the adjusted basis of the transferred intangible at the time of the sale exceeds its fair market value at that time.

**(ii) Separately acquired property.** Paragraph (g)(1)(i) of this section does not apply to an amortizable section 197 intangible that is not acquired in a transaction or series of related transactions in which the taxpayer acquires other amortizable section 197 intangibles (a separately acquired intangible). Consequently, a loss may be recognized upon the disposition of a separately acquired amortizable section 197 intangible. However, the termination or worthlessness of only a portion of an amortizable section 197 intangible is not the disposition of a separately acquired intangible. For example, neither the loss of several customers from an acquired customer list nor the worthlessness of only some information from an acquired data base constitutes the disposition of a separately acquired intangible.

**(iii) Disposition of a covenant not to compete.** If a covenant not to compete or any other arrangement having substantially the same effect is entered into in connection with the direct or indirect acquisition of an interest in one or more trades or businesses, the disposition or worthlessness of the covenant or other arrangement will not be considered to occur until the disposition or worthlessness of all interests in those trades or businesses. For example, a covenant not to compete entered into in connection with the purchase of stock continues to be amortized ratably over the 15–year recovery period (even after the covenant expires or becomes worthless) unless all the trades or businesses in which an interest was acquired through the stock purchase (or all the purchaser's interests in those trades or businesses) also are disposed of or become worthless.

**(iv) Taxpayers under common control**—(A) In general. Except as provided in paragraph (g)(1)(iv)(B) of this section, all persons that would be treated as a single taxpayer under section 41(f)(1) are treated as a single taxpayer under this paragraph (g)(1). Thus, for example, a loss is not recognized on the disposition of an amortizable section 197 intangible by a member of a controlled group of corporations (as defined in section 41(f)(5)) if, after the disposition, another member retains other amortizable section 197 intangibles acquired in the same transaction as the amortizable section 197 intangible that has been disposed of.

(B) Treatment of disallowed loss. If retained intangibles are held by a person other than the person incurring the disallowed loss, only the adjusted basis of intangibles retained by the person incurring the disallowed loss is increased, and only the adjusted basis of those intangibles is included in the denominator of the fraction described in paragraph (g)(1)(i)(A) of this section. If none of the retained intangibles are held by the person incurring the disallowed loss, the loss is allowed ratably, as a deduction under section 197, over the remainder of the period during which the intangible giving rise to the loss would have been amortizable, except that any remaining disallowed loss is allowed in full on the first date on which all other retained intangibles have been disposed of or become worthless.

**(2) Treatment of certain nonrecognition and exchange transactions—(i) Relationship to anti-churning rules.** This paragraph (g)(2) provides rules relating to the treatment of section 197 intangibles acquired in certain transactions. If these rules apply to a section 197(f)(9) intangible (within the meaning of paragraph (h)(1)(i) of this section), the intangible is,

notwithstanding its treatment under this paragraph (g)(2), treated as an amortizable section 197 intangible only to the extent permitted under paragraph (h) of this section.

**(ii) Treatment of nonrecognition and exchange transactions generally**—(A) Transfer disregarded. If a section 197 intangible is transferred in a transaction described in paragraph (g)(2)(ii)(C) of this section, the transfer is disregarded in determining—

(1) Whether, with respect to so much of the intangible's basis in the hands of the transferee as does not exceed its basis in the hands of the transferor, the intangible is an amortizable section 197 intangible; and

(2) The amount of the deduction under section 197 with respect to such basis.

(B) Application of general rule. If the intangible described in paragraph (g)(2)(ii)(A) of this section was an amortizable section 197 intangible in the hands of the transferor, the transferee will continue to amortize its adjusted basis, to the extent it does not exceed the transferor's adjusted basis, ratably over the remainder of the transferor's 15–year amortization period. If the intangible was not an amortizable section 197 intangible in the hands of the transferor, the transferee's adjusted basis, to the extent it does not exceed the transferor's adjusted basis, cannot be amortized under section 197. In either event, the intangible is treated, with respect to so much of its adjusted basis in the hands of the transferee as exceeds its adjusted basis in the hands of the transferor, in the same manner for purposes of section 197 as an intangible acquired from the transferor in a transaction that is not described in paragraph (g)(2)(ii)(C) of this section. The rules of this paragraph (g)(2)(ii) also apply to any subsequent transfers of the intangible in a transaction described in paragraph (g)(2)(ii)(C) of this section.

(C) Transactions covered. The transactions described in this paragraph (g)(2)(ii)(C) are—

(1) Any transaction described in section 332, 351, 361, 721, or 731; and

(2) Any transaction between corporations that are members of the same consolidated group immediately after the transaction.

**(iii) Certain exchanged-basis property.** This paragraph (g)(2)(iii) applies to property that is acquired in a transaction subject to section 1031 or 1033 and is permitted to be acquired without recognition of gain (replacement property). Replacement property is treated as if it were the property by reference to which its basis is determined (the predecessor property) in determining whether, with respect to so much of its basis as does not exceed the basis of the predecessor property, the replacement property is an amortizable section 197 intangible and the amortization period under section 197 with respect to such basis. Thus, if the predecessor property was an amortizable section 197 intangible, the taxpayer will amortize the adjusted basis of the replacement property, to the extent it does not exceed the adjusted basis of the predecessor property, ratably over the remainder of the 15–year amortization period for the predecessor property. If the predecessor property was not an amortizable section 197 intangible, the adjusted basis of the replacement property, to the extent it does not exceed the adjusted basis of the predecessor property, may not be amortized under section 197. In either event, the replacement property is treated, with respect to so much of its adjusted basis as exceeds the adjusted basis of the predecessor property, in the same manner for purposes of section 197 as property acquired from the transferor in a transaction that is not subject to section 1031 or 1033.

**(iv) Transfers under section 708(b)(1)—(A) In general.** Paragraph (g)(2)(ii) of this section applies to transfers of section 197 intangibles that occur or are deemed to occur by reason of the termination of a partnership under section 708(b)(1).

(B) Termination by sale or exchange of interest. In applying paragraph (g)(2)(ii) of this section to a partnership that is terminated pursuant to section 708(b)(1)(B) (relating to deemed terminations from the sale or exchange of an interest), the terminated partnership is treated as the transferor and the new partnership is treated as the transferee with respect to any section 197 intangible held by the terminated partnership immediately preceding the termination. (See paragraph (g)(3) of this section for the treatment of increases in the bases of property of the terminated partnership under section 743(b).)

(C) Other terminations. In applying paragraph (g)(2)(ii) of this section to a partnership that is terminated pursuant to section 708(b)(1)(A) (relating to cessation of activities by a partnership), the terminated partnership is treated as the transferor and the distributee partner is treated as the transferee with respect to any section 197 intangible held by the terminated partnership immediately preceding the termination.

**(3) Increase in the basis of partnership property under section 732(b), 734(b), 743(b), or 732(d).** Any increase in the adjusted basis of a section 197 intangible under sections 732(b) or 732(d) (relating to a partner's basis in property distributed by a partnership), section 734(b) (relating to the optional adjustment to the basis of undistributed partnership property after a distribution of property to a partner), or section 743(b) (relating to the optional adjustment to the basis of partnership property after transfer of a partnership interest) is treated as a separate section 197 intangible. For purposes of determining the amortization period under section 197 with respect to the basis increase, the intangible is treated as having been acquired at the time of the transaction that causes the basis increase, except as provided in § 1.743–1(j)(4)(i)(B)(2). The provisions of paragraph (f)(2) of this section apply to the extent that the amount of the basis increase is determined by reference to contingent payments. For purposes of the effective date and anti-churning provisions (paragraphs (l)(1) and (h) of this section) for a basis increase under section 732(d), the intangible is treated as having been acquired by the transferee partner at the time of the transfer of the partnership interest described in section 732(d).

**(4) Section 704(c) allocations—(i) Allocations where the intangible is amortizable by the contributor.** To the extent that the intangible was an amortizable section 197 intangible in the hands of the contributing partner, a partnership may make allocations of amortization deductions with respect to the intangible to all of its partners under any of the permissible methods described in the regulations under section 704(c). See § 1.704–3.

**(ii) Allocations where the intangible is not amortizable by the contributor.** To the extent that the intangible was not an amortizable section 197 intangible in the hands of the contributing partner, the intangible is not amortizable under section 197 by the partnership. However, if a partner contributes a section 197 intangible to a partnership and the partnership adopts the remedial allocation method for making section 704(c) allocations of amortization deductions, the partnership generally may make remedial allocations of amortization deductions with respect to the contributed section 197 intangible in accordance with § 1.704–3(d). See paragraph (h)(12) of this section to determine the application of the anti-churning rules in the context of remedial allocations.

**(5) Treatment of certain insurance contracts acquired in an assumption reinsurance transaction—(i) In general.** Section 197 generally applies to insurance and annuity contracts acquired from another person through an assumption reinsurance transaction. See § 1.809–5(a)(7)(ii) for the definition of assumption reinsurance. The transfer of insurance

or annuity contracts and the assumption of related liabilities deemed to occur by reason of a section 338 election for a target insurance company is treated as an assumption reinsurance transaction. The transfer of a reinsurance contract by a reinsurer (transferor) to another reinsurer (acquirer) is treated as an assumption reinsurance transaction if the transferor's obligations are extinguished as a result of the transaction.

**(ii) Determination of adjusted basis of amortizable section 197 intangible resulting from an assumption reinsurance transaction—**(A) In general. Section 197(f)(5) determines the basis of an amortizable section 197 intangible for insurance or annuity contracts acquired in an assumption reinsurance transaction. The basis of such intangible is the excess, if any, of—

(1) The amount paid or incurred by the acquirer (reinsurer) under the assumption reinsurance transaction; over

(2) The amount, if any, required to be capitalized under section 848 in connection with such transaction.

(B) Amount paid or incurred by acquirer (reinsurer) under the assumption reinsurance transaction. The amount paid or incurred by the acquirer (reinsurer) under the assumption reinsurance transaction is—

(1) In a deemed asset sale resulting from an election under section 338, the amount of the adjusted grossed-up basis (AGUB) allocable thereto (see §§ 1.338–6 and 1.338–11(b)(2));

(2) In an applicable asset acquisition within the meaning of section 1060, the amount of the consideration allocable thereto (see §§ 1.338–6, 1.338–11(b)(2), and 1.1060–1(c)(5)); and

(3) In any other transaction, the excess of the increase in the reinsurer's tax reserves resulting from the transaction (computed in accordance with sections 807, 832(b)(4)(B), and 846) over the value of the net assets received from the ceding company in the transaction.

(C) Amount required to be capitalized under section 848 in connection with the transaction—(1) In general. The amount required to be capitalized under section 848 for specified insurance contracts (as defined in section 848(e)) acquired in an assumption reinsurance transaction is the lesser of—

(i) The reinsurer's required capitalization amount for the assumption reinsurance transaction; or

(ii) The reinsurer's general deductions (as defined in section 848(c)(2)) allocable to the transaction.

(2) Required capitalization amount. The reinsurer determines the required capitalization amount for an assumption reinsurance transaction by multiplying the net positive or net negative consideration for the transaction by the applicable percentage set forth in section 848(c)(1) for the category of specified insurance contracts acquired in the transaction. See § 1.848–2(g)(5). If more than one category of specified insurance contracts is acquired in an assumption reinsurance transaction, the required capitalization amount for each

category is determined as if the transfer of the contracts in that category were made under a separate assumption reinsurance transaction. See § 1.848–2(f)(7).

(3) General deductions allocable to the assumption reinsurance transaction. The reinsurer determines the general deductions allocable to the assumption reinsurance transaction in accordance with the procedure set forth in § 1.848–2(g)(6). Accordingly, the reinsurer must allocate its general deductions to the amount required under section 848(c)(1) on specified insurance contracts that the reinsurer has issued directly before determining the general deductions allocable to the assumption reinsurance transaction. For purposes of allocating its general deductions under § 1.848–2(g)(6), the reinsurer includes premiums received on the acquired specified insurance contracts after the assumption reinsurance transaction in determining the amount required under section 848(c)(1) on specified insurance contracts that the reinsurer has issued directly. If the reinsurer has entered into multiple reinsurance agreements during the taxable year, the reinsurer determines the general deductions allocable to each reinsurance agreement (including the assumption reinsurance transaction) by allocating the general deductions allocable to reinsurance agreements under § 1.848–2(g)(6) to each reinsurance agreement with a positive required capitalization amount.

(4) Treatment of a capitalization shortfall allocable to the reinsurance agreement—(i) In general. The reinsurer determines any capitalization shortfall allocable to the assumption reinsurance transaction in the manner provided in §§ 1.848–2(g)(4) and 1.848–2(g)(7). If the reinsurer has a capitalization shortfall allocable to the assumption reinsurance transaction, the ceding company must reduce the net negative consideration (as determined under § 1.848–2(f)(2)) for the transaction by the amount described in § 1.848–2(g)(3) unless the parties make the election provided in § 1.848–2(g)(8) to determine the amounts capitalized under section 848 in connection with the transaction without regard to the general deductions limitation of section 848(c)(2).

(ii) Treatment of additional capitalized amounts as the result of an election under § 1.848–2(g)(8). The additional amounts capitalized by the reinsurer as the result of the election under § 1.848–2(g)(8) reduce the adjusted basis of any amortizable section 197 intangible with respect to specified insurance contracts acquired in the assumption reinsurance transaction. If the additional capitalized amounts exceed the adjusted basis of the amortizable section 197 intangible, the reinsurer must reduce its deductions under section 805 or section 832 by the amount of such excess. The additional capitalized amounts are treated as specified policy acquisition expenses attributable to the premiums and other consideration on the assumption reinsurance transaction and are deducted ratably over a 120–month period as provided under section 848(a)(2).

(5) Cross references and special rules. In general, for rules applicable to the determination of specified policy acquisition expenses, net premiums, and net consideration, see section 848(c) and (d), and § 1.848–2(a) and (f). However, the following special rules apply for purposes of this paragraph (g)(5)(ii)(C)—

(i) The amount required to be capitalized under section 848 in connection with the assumption reinsurance transaction cannot be less than zero;

(ii) For purposes of determining the company's general deductions under section 848(c)(2) for the taxable year of the assumption reinsurance transaction, the reinsurer takes into account a tentative amortization deduction under section 197(a) as if the entire amount paid or incurred by the reinsurer for the specified insurance contracts were allocated to an amortizable section 197 intangible with respect to insurance contracts acquired in an assumption reinsurance transaction; and

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 183 of 651

(iii) Any reduction of specified policy acquisition expenses pursuant to an election under § 1.848–2(i)(4) (relating to an assumption reinsurance transaction with an insolvent insurance company) is disregarded.

(D) Examples. The following examples illustrate the principles of this paragraph (g)(5)(ii):

**Example 1.** (i) Facts. On January 15, 2006, P acquires all of the stock of T, an insurance company, in a qualified stock purchase and makes a section 338 election for T. T issues individual life insurance contracts which are specified insurance contracts as defined in section 848(e)(1). P and new T are calendar year taxpayers. Under §§ 1.338–6 and 1.338–11(b)(2), the amount of AGUB allocated to old T's individual life insurance contracts is $300,000. On the acquisition date, the tax reserves for old T's individual life insurance contracts are $2,000,000. After the acquisition date, new T receives $1,000,000 of net premiums with respect to new and renewal individual life insurance contracts and incurs $100,000 of general deductions under section 848(c)(2) through December 31, 2006. New T engages in no other reinsurance transactions other than the assumption reinsurance transaction treated as occurring by reason of the section 338 election.

(ii) Analysis. The transfer of insurance contracts and the assumption of related liabilities deemed to occur by reason of the election under section 338 is treated as an assumption reinsurance transaction. New T determines the adjusted basis under section 197(f)(5) for the life insurance contracts acquired in the assumption reinsurance transaction as follows. The amount paid or incurred for the individual life insurance contracts is $300,000. To determine the amount required to be capitalized under section 848 in connection with the assumption reinsurance transaction, new T compares the required capitalization amount for the assumption reinsurance transaction with the general deductions allocable to the transaction. The required capitalization amount for the assumption reinsurance transaction is $130,900, which is determined by multiplying the $1,700,000 net positive consideration for the transaction ($2,000,000 reinsurance premium less $300,000 ceding commission) by the applicable percentage under section 848(c)(1) for the acquired individual life insurance contracts (7.7 percent). To determine its general deductions, new T takes into account a tentative amortization deduction under section 197(a) as if the entire amount paid or incurred for old T's individual life insurance contracts ($300,000) were allocable to an amortizable section 197 intangible with respect to insurance contracts acquired in the assumption reinsurance transaction. Accordingly, for the year of the assumption reinsurance transaction, new T is treated as having general deductions under section 848(c)(2) of $120,000 ($100,000 + $300,000/15). Under § 1.848–2(g)(6), these general deductions are first allocated to the $77,000 capitalization requirement for new T's directly written business ($1,000,000 x .077). Thus, $43,000 ($120,000 - $77,000) of the general deductions are allocable to the assumption reinsurance transaction. Because the general deductions allocable to the assumption reinsurance transaction ($43,000) are less than the required capitalization amount for the transaction ($130,900), new T has a capitalization shortfall of $87,900 ($130,900 - $43,000) with regard to the transaction. Under § 1.848–2(g), this capitalization shortfall would cause old T to reduce the net negative consideration taken into account with respect to the assumption reinsurance transaction by $1,141,558 ($87,900 ÷ .077) unless the parties make the election under § 1.848–2(g)(8) to capitalize specified policy acquisition expenses in connection with the assumption reinsurance transaction without regard to the general deductions limitation. If the parties make the election, the amount capitalized by new T under section 848 in connection with the assumption reinsurance transaction would be $130,900. The $130,900 capitalized by new T under section 848 would reduce new T's adjusted basis of the amortizable section 197 intangible with respect to the specified insurance contracts acquired in the assumption reinsurance transaction. Accordingly, new T would have an adjusted basis under section 197(f)(5) with respect to the individual life insurance contracts acquired from old T of $169,100 ($300,000 - $130,900). New T's actual amortization deduction under section 197(a) with respect to the amortizable section 197 intangible for insurance contracts acquired in the assumption reinsurance transaction would be $11,273 ($169,100 ÷ 15).

**Example 2.** (i) Facts. The facts are the same as Example 1, except that T only issues accident and health insurance contracts that are qualified long-term care contracts under section 7702B. Under section 7702B(a)(5), T's qualified long-term care insurance contracts are treated as guaranteed renewable accident and health insurance contracts, and, therefore, are considered specified insurance contracts under section 848(e)(1). Under §§ 1.338–6 and 1.338–11(b)(2), the amount of AGUB allocable to T's

qualified long-term care insurance contracts is $250,000. The amount of T's tax reserves for the qualified long-term care contracts on the acquisition date is $7,750,000. Following the acquisition, new T receives net premiums of $500,000 with respect to qualified long-term care contracts and incurs general deductions of $75,000 through December 31, 2006.

(ii) Analysis. The transfer of insurance contracts and the assumption of related liabilities deemed to occur by reason of the election under section 338 is treated as an assumption reinsurance transaction. New T determines the adjusted basis under section 197(f)(5) for the insurance contracts acquired in the assumption reinsurance transaction as follows. The amount paid or incurred for the insurance contracts is $250,000. To determine the amount required to be capitalized under section 848 in connection with the assumption reinsurance transaction, new T compares the required capitalization amount for the assumption reinsurance transaction with the general deductions allocable to the transaction. The required capitalization amount for the assumption reinsurance transaction is $577,500, which is determined by multiplying the $7,500,000 net positive consideration for the transaction ($7,750,000 reinsurance premium less $250,000 ceding commission) by the applicable percentage under section 848(c)(1) for the acquired insurance contracts (7.7 percent). To determine its general deductions, new T takes into account a tentative amortization deduction under section 197(a) as if the entire amount paid or incurred for old T's insurance contracts ($250,000) were allocable to an amortizable section 197 intangible with respect to insurance contracts acquired in the assumption reinsurance transaction. Accordingly, for the year of the assumption reinsurance transaction, new T is treated as having general deductions under section 848(c)(2) of $91,667 ($75,000 + $250,000/15). Under § 1.848–2(g)(6), these general deductions are first allocated to the $38,500 capitalization requirement for new T's directly written business ($500,000 x .077). Thus, $53,167 ($91,667 - $38,500) of general deductions are allocable to the assumption reinsurance transaction. Because the general deductions allocable to the assumption reinsurance transaction ($53,167) are less than the required capitalization amount for the transaction ($577,500), new T has a capitalization shortfall of $524,333 ($577,500 - $53,167) with regard to the transaction. Under § 1.848–2(g), this capitalization shortfall would cause old T to reduce the net negative consideration taken into account with respect to the assumption reinsurance transaction by $6,809,519 ($524,333 ÷ .077) unless the parties make the election under § 1.848–2(g)(8) to capitalize specified policy acquisition expenses in connection with the assumption reinsurance transaction without regard to the general deductions limitation. If the parties make the election, the amount capitalized by new T under section 848 in connection with the assumption reinsurance transaction would increase from $53,167 to $577,500. Pursuant to paragraph (g)(5)(ii)(C)(4) of this section, the additional $524,333 ($577,500 - $53,167) capitalized by new T under section 848 would reduce new T's adjusted basis of the amortizable section 197 intangible with respect to the insurance contracts acquired in the assumption reinsurance transaction. Accordingly, new T's adjusted basis of the section 197 intangible with regard to the insurance contracts is reduced from $196,833 ($250,000 - $53,167) to $0. Because the additional $524,333 capitalized pursuant to the § 1.848–2(g)(8) election exceeds the $196,833 adjusted basis of the section 197 intangible before the reduction, new T is required to reduce its deductions under section 805 by the $327,500 ($524,333 - $196,833).

(E) Effective/applicability date. This section applies to acquisitions and dispositions of insurance contracts on or after April 10, 2006.

**(iii) Application of loss disallowance rule upon a disposition of an insurance contract acquired in an assumption reinsurance transaction.** The following rules apply for purposes of applying the loss disallowance rules of section 197(f)(1)(A) to the disposition of a section 197(f)(5) intangible. For this purpose, a section 197(f)(5) intangible is an amortizable section 197 intangible the basis of which is determined under section 197(f)(5).

(A) Disposition—(1) In general. A disposition of a section 197 intangible is any event as a result of which, absent section 197, recovery of basis is otherwise allowed for Federal income tax purposes.

(2) Treatment of indemnity reinsurance transactions. The transfer through indemnity reinsurance of the right to the future income from the insurance contracts to which a section 197(f)(5) intangible relates does not preclude

the recovery of basis by the ceding company, provided that sufficient economic rights relating to the reinsured contracts are transferred to the reinsurer. However, the ceding company is not permitted to recover basis in an indemnity reinsurance transaction if it has a right to experience refunds reflecting a significant portion of the future profits on the reinsured contracts, or if it retains an option to reacquire a significant portion of the future profits on the reinsured contracts through the exercise of a recapture provision. In addition, the ceding company is not permitted to recover basis in an indemnity reinsurance transaction if the reinsurer assumes only a limited portion of the ceding company's risk relating to the reinsured contracts (excess loss reinsurance).

(B) Loss. The loss, if any, recognized by a taxpayer on the disposition of a section 197(f)(5) intangible equals the amount by which the taxpayer's adjusted basis in the section 197(f)(5) intangible immediately before the disposition exceeds the amount, if any, that the taxpayer receives from another person for the future income right from the insurance contracts to which the section 197(f)(5) intangible relates. In determining the amount of the taxpayer's loss on the disposition of a section 197(f)(5) intangible through a reinsurance transaction, any effect of the transaction on the amounts capitalized by the taxpayer as specified policy acquisition expenses under section 848 is disregarded.

(C) Examples. The following examples illustrate the principles of this paragraph (g)(5)(iii):

**Example 1.** (i) Facts. In a prior taxable year, as a result of a section 338 election with respect to T, new T was treated as purchasing all of old T's insurance contracts that were in force on the acquisition date in an assumption reinsurance transaction. Under §§ 1.338–6 and 1.338–11(b)(2), the amount of AGUB allocable to the future income right from the purchased insurance contracts was $15, net of the amounts required to be capitalized under section 848 as a result of the assumption reinsurance transaction. At the beginning of the current taxable year, as a result of amortization deductions allowed by section 197(a), new T's adjusted basis in the section 197(f)(5) intangible resulting from the assumption reinsurance transaction is $12. During the current taxable year, new T enters into an indemnity reinsurance agreement with R, another insurance company, in which R assumes 100 percent of the risk relating to the insurance contracts to which the section 197(f)(5) intangible relates. In the indemnity reinsurance transaction, R agrees to pay new T a ceding commission of $10 in exchange for the future profits on the underlying reinsured policies. Under the indemnity reinsurance agreement, new T continues to administer the reinsured policies, but transfers investment assets equal to the required reserves for the reinsured policies together with all future premiums to R. The indemnity reinsurance agreement does not contain an experience refund provision or a provision allowing new T to terminate the reinsurance agreement at its sole option. New T retains the insurance licenses and other amortizable section 197 intangibles acquired in the deemed asset sale and continues to underwrite and issue new insurance contracts.

(ii) Analysis. The indemnity reinsurance agreement constitutes a disposition of the section 197(f)(5) intangible because it involves the transfer of sufficient economic rights attributable to the insurance contracts to which the section 197(f)(5) intangible relates such that recovery of basis is allowed. For purposes of applying the loss disallowance rules of section 197(f)(1) and paragraph (g) of this section, new T's loss is $2 (new T's adjusted basis in the section 197(f)(5) intangible immediately before the disposition ($12) less the ceding commission ($10)). Therefore, new T applies $10 of the adjusted basis in the section 197(f)(5) intangible against the amount received from R for the future income right on the reinsured policies and increases its basis in the amortizable section 197 intangibles that it acquired and retained from the deemed asset sale by $2, the amount of the disallowed loss. The amount of new T's disallowed loss under section 197(f)(1)(A) is determined without regard to the effect of the indemnity reinsurance transaction on the amounts capitalized by new T as specified policy acquisition expenses under section 848.

**Example 2.** (i) Facts. Assume the same facts as in Example 1, except that under the indemnity reinsurance agreement R agrees to pay new T a ceding commission of $5 with respect to the underlying reinsured contracts. In addition, under the indemnity reinsurance agreement, new T is entitled to an experience refund equal to any future profits on the reinsured contracts in excess of the ceding commission plus an annual risk charge. New T also has a right to recapture the business at any time after R has recovered an amount equal to the ceding commission.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.     **0181**

(ii) Analysis. The indemnity reinsurance agreement between new T and R does not represent a disposition because it does not involve the transfer of sufficient economic rights with respect to the future income on the reinsured contracts. Therefore, new T may not recover its basis in the section 197(f)(5) intangible to which the contracts relate and must continue to amortize ratably the adjusted basis of the section 197(f)(5) intangible over the remainder of the 15–year recovery period and cannot apply any portion of this adjusted basis to offset the ceding commission received from R in the indemnity reinsurance transaction.

(iv) **Effective dates**—(A) In general—This paragraph (g)(5) applies to acquisitions and dispositions on or after April 10, 2006. For rules applicable to acquisitions and dispositions before that date, see § 1.197–2 in effect before that date (see 26 CFR part 1, revised April 1, 2001).

(B) Application to pre-effective date acquisitions and dispositions. A taxpayer may choose, on a transaction-by-transaction basis, to apply the provisions of this paragraph (g)(5) to property acquired and disposed of before April 10, 2006.

(C) Change in method of accounting—(1) In general—A change in a taxpayer's treatment of all property acquired and disposed under paragraph (g)(5) is a change in method of accounting to which the provisions of sections 446 and 481 and the regulations thereunder apply.

(2) Acquisitions and dispositions on or after effective date. A Taxpayer is granted the consent of the Commissioner under section 446(e) to change its method of accounting to comply with this paragraph (g)(5) for acquisitions and dispositions on or after April 10, 2006. The change must be made on a cut-off basis with no section 481(a) adjustment. Notwithstanding § 1.446–1(e)(3), a taxpayer should not file a Form 3115, "Application for Change in Accounting Method," to obtain the consent of the Commissioner to change its method of accounting under this paragraph (g)(5)(iv)(C)(2). Instead, a taxpayer must make the change by using the new method on its federal income tax returns.

(3) Acquisitions and dispositions before the effective date. For the first taxable year ending after April 10, 2006, a taxpayer is granted consent of the Commissioner to change its method of accounting for all property acquired in transactions described in paragraph (g)(5)(iv)(B) to comply with this paragraph (g)(5) unless the proper treatment of any such property is an issue under consideration in an examination, before an Appeals office, or before a Federal Court. (For the definition of when an issue is under consideration, see, Rev. Proc. 97–27 (1997–1 C.B. 680); and, § 601.601(d)(2) of this chapter). A taxpayer changing its method of accounting in accordance with this paragraph (g)(5)(iv)(C)(3) must follow the applicable administrative procedures for obtaining the Commissioner's automatic consent to a change in method of accounting (for further guidance, see, for example, Rev. Proc. 2002–9 (2002–1 C.B. 327) as modified and clarified by Announcement 2002–17 (2002–1 C.B. 561), modified and amplified by Rev. Proc. 2002–19 (2002–1 C.B. 696), and amplified, clarified and modified by Rev. Proc. 2002–54 (2002–2 C.B. 432); and, § 601.601(d)(2) of this chapter), except, for purposes of this paragraph (g)(5)(iv)(C)(3), any limitations in such administrative procedures for obtaining the automatic consent of the Commissioner shall not apply. However, if the taxpayer is under examination, before an appeals office, or before a Federal court, the taxpayer must provide a copy of the application to the examining agent(s), appeals officer, or counsel for the government, as appropriate, at the same time that it files the copy of the application with the National Office. The application must contain the name(s) and telephone number(s) of the examining agent(s), appeals officer, or counsel for the government, as appropriate. For purposes of From 3115, "Application for Change in Accounting Method," the designated number for the automatic accounting method

change authorized by this paragraph (g)(5)(iv)(C)(3) is "98." A change in method of accounting in accordance with this paragraph (g)(5)(iv)(C)(3) requires an adjustment under section 481(a).

**(6) Amounts paid or incurred for a franchise, trademark, or trade name.** If an amount to which section 1253(d) (relating to the transfer, sale, or other disposition of a franchise, trademark, or trade name) applies is described in section 1253(d)(1)(B) (relating to contingent serial payments deductible under section 162), the amount is not included in the adjusted basis of the intangible for purposes of section 197. Any other amount, whether fixed or contingent, to which section 1253(d) applies is chargeable to capital account under section 1253(d)(2) and is amortizable only under section 197.

**(7) Amounts properly taken into account in determining the cost of property that is not a section 197 intangible.** Section 197 does not apply to an amount that is properly taken into account in determining the cost of property that is not a section 197 intangible. The entire cost of acquiring the other property is included in its basis and recovered under other applicable Internal Revenue Code provisions. Thus, for example, section 197 does not apply to the cost of an interest in computer software to the extent such cost is included, without being separately stated, in the cost of the hardware or other tangible property and is consistently treated as part of the cost of the hardware or other tangible property.

**(8) Treatment of amortizable section 197 intangibles as depreciable property.** An amortizable section 197 intangible is treated as property of a character subject to the allowance for depreciation under section 167. Thus, for example, an amortizable section 197 intangible is not a capital asset for purposes of section 1221, but if used in a trade or business and held for more than one year, gain or loss on its disposition generally qualifies as section 1231 gain or loss. Also, an amortizable section 197 intangible is section 1245 property and section 1239 applies to any gain recognized upon its sale or exchange between related persons (as defined in section 1239(b)).

**(h) Anti-churning rules—(1) Scope and purpose—(i) Scope.** This paragraph (h) applies to section 197(f)(9) intangibles. For this purpose, section 197(f)(9) intangibles are goodwill and going concern value that was held or used at any time during the transition period and any other section 197 intangible that was held or used at any time during the transition period and was not depreciable or amortizable under prior law.

**(ii) Purpose.** To qualify as an amortizable section 197 intangible, a section 197 intangible must be acquired after the applicable date (July 25, 1991, if the acquiring taxpayer has made a valid retroactive election pursuant to § 1.197–1T; August 10, 1993, in all other cases). The purpose of the anti-churning rules of section 197(f)(9) and this paragraph (h) is to prevent the amortization of section 197(f)(9) intangibles unless they are transferred after the applicable effective date in a transaction giving rise to a significant change in ownership or use. (Special rules apply for purposes of determining whether transactions involving partnerships give rise to a significant change in ownership or use. See paragraph (h)(12) of this section.) The anti-churning rules are to be applied in a manner that carries out their purpose.

**(2) Treatment of section 197(f)(9) intangibles.** Except as otherwise provided in this paragraph (h), a section 197(f)(9) intangible acquired by a taxpayer after the applicable effective date does not qualify for amortization under section 197 if—

**(i)** The taxpayer or a related person held or used the intangible or an interest therein at any time during the transition period;

**(ii)** The taxpayer acquired the intangible from a person that held the intangible at any time during the transition period and, as part of the transaction, the user of the intangible does not change; or

**(iii)** The taxpayer grants the right to use the intangible to a person that held or used the intangible at any time during the transition period (or to a person related to that person), but only if the transaction in which the taxpayer grants the right and the transaction in which the taxpayer acquired the intangible are part of a series of related transactions.

**(3) Amounts deductible under section 1253(d) or § 1.162–11.** For purposes of this paragraph (h), deductions allowable under section 1253(d)(2) or pursuant to an election under section 1253(d)(3) (in either case as in effect prior to the enactment of section 197) and deductions allowable under § 1.162–11 are treated as deductions allowable for amortization under prior law.

**(4) Transition period.** For purposes of this paragraph (h), the transition period is July 25, 1991, if the acquiring taxpayer has made a valid retroactive election pursuant to § 1.197–1T and the period beginning on July 25, 1991, and ending on August 10, 1993, in all other cases.

**(5) Exceptions.** The anti-churning rules of this paragraph (h) do not apply to—

**(i)** The acquisition of a section 197(f)(9) intangible if the acquiring taxpayer's basis in the intangible is determined under section 1014(a); or

**(ii)** The acquisition of a section 197(f)(9) intangible that was an amortizable section 197 intangible in the hands of the seller (or transferor), but only if the acquisition transaction and the transaction in which the seller (or transferor) acquired the intangible or interest therein are not part of a series of related transactions.

**(6) Related person—(i) In general.** Except as otherwise provided in paragraph (h)(6)(ii) of this section, a person is related to another person for purposes of this paragraph (h) if—

(A) The person bears a relationship to that person that would be specified in section 267(b) (determined without regard to section 267(e)) and, by substitution, section 267(f)(1), if those sections were amended by substituting 20 percent for 50 percent; or

(B) The person bears a relationship to that person that would be specified in section 707(b)(1) if that section were amended by substituting 20 percent for 50 percent; or

(C) The persons are engaged in trades or businesses under common control (within the meaning of section 41(f)(1)(A) and (B)).

**(ii) Time for testing relationships.** Except as provided in paragraph (h)(6)(iii) of this section, a person is treated as related to another person for purposes of this paragraph (h) if the relationship exists—

(A) In the case of a single transaction, immediately before or immediately after the transaction in which the intangible is acquired; and

(B) In the case of a series of related transactions (or a series of transactions that together comprise a qualified stock purchase within the meaning of section 338(d)(3)), immediately before the earliest such transaction or immediately after the last such transaction.

**(iii) Certain relationships disregarded.** In applying the rules in paragraph (h)(7) of this section, if a person acquires an intangible in a series of related transactions in which the person acquires stock (meeting the requirements of section 1504(a)(2)) of a corporation in a fully taxable transaction followed by a liquidation of the acquired corporation under section 331, any relationship created as part of such series of transactions is disregarded in determining whether any person is related to such acquired corporation immediately after the last transaction.

**(iv) De minimis rule—**(A) In general. Two corporations are not treated as related persons for purposes of this paragraph (h) if—

(1) The corporations would (but for the application of this paragraph (h)(6)(iv)) be treated as related persons solely by reason of substituting "more than 20 percent" for "more than 50 percent" in section 267(f)(1)(A); and

(2) The beneficial ownership interest of each corporation in the stock of the other corporation represents less than 10 percent of the total combined voting power of all classes of stock entitled to vote and less than 10 percent of the total value of the shares of all classes of stock outstanding.

(B) Determination of beneficial ownership interest. For purposes of this paragraph (h)(6)(iv), the beneficial ownership interest of one corporation in the stock of another corporation is determined under the principles of section 318(a), except that—

(1) In applying section 318(a)(2)(C), the 50–percent limitation contained therein is not applied; and

(2) Section 318(a)(3)(C) is applied by substituting "20 percent" for "50 percent".

**(7) Special rules for entities that owned or used property at any time during the transition period and that are no longer in existence.** A corporation, partnership, or trust that owned or used a section 197 intangible at any time during the transition period and that is no longer in existence is deemed, for purposes of determining whether a taxpayer acquiring the intangible is related to such entity, to be in existence at the time of the acquisition.

**(8) Special rules for section 338 deemed acquisitions.** In the case of a qualified stock purchase that is treated as a deemed sale and purchase of assets pursuant to section 338, the corporation treated as purchasing assets as a result of an election thereunder (new target) is not considered the person that held or used the assets during any period in which the assets were held or used by the corporation treated as selling the assets (old target). Thus, for example, if a corporation (the purchasing corporation) makes a qualified stock purchase of the stock of another corporation after the transition period, new target will not be treated as the owner during the transition period of assets owned by old target during that period even if old target and new target are treated as the same corporation for certain other purposes of the Internal Revenue Code or old target and new target are the same corporation under the laws of the State or other jurisdiction of its organization. However, the

anti-churning rules of this paragraph (h) may nevertheless apply to a deemed asset purchase resulting from a section 338 election if new target is related (within the meaning of paragraph (h)(6) of this section) to old target.

**(9) Gain-recognition exception—(i) Applicability.** A section 197(f)(9) intangible qualifies for the gain-recognition exception if—

(A) The taxpayer acquires the intangible from a person that would not be related to the taxpayer but for the substitution of 20 percent for 50 percent under paragraph (h)(6)(i)(A) of this section; and

(B) That person (whether or not otherwise subject to Federal income tax) elects to recognize gain on the disposition of the intangible and agrees, notwithstanding any other provision of law or treaty, to pay for the taxable year in which the disposition occurs an amount of tax on the gain that, when added to any other Federal income tax on such gain, equals the gain on the disposition multiplied by the highest marginal rate of tax for that taxable year.

**(ii) Effect of exception.** The anti-churning rules of this paragraph (h) apply to a section 197(f)(9) intangible that qualifies for the gain-recognition exception only to the extent the acquiring taxpayer's basis in the intangible exceeds the gain recognized by the transferor.

**(iii) Time and manner of election.** The election described in this paragraph (h)(9) must be made by the due date (including extensions of time) of the electing taxpayer's Federal income tax return for the taxable year in which the disposition occurs. The election is made by attaching an election statement satisfying the requirements of paragraph (h)(9)(viii) of this section to the electing taxpayer's original or amended income tax return for that taxable year (or by filing the statement as a return for the taxable year under paragraph (h)(9)(xi) of this section). In addition, the taxpayer must satisfy the notification requirements of paragraph (h)(9)(vi) of this section. The election is binding on the taxpayer and all parties whose Federal tax liability is affected by the election.

**(iv) Special rules for certain entities.** In the case of a partnership, S corporation, estate or trust, the election under this paragraph (h)(9) is made by the entity rather than by its owners or beneficiaries. If a partnership or S corporation makes an election under this paragraph (h)(9) with respect to the disposition of a section 197(f)(9) intangible, each of its partners or shareholders is required to pay a tax determined in the manner described in paragraph (h)(9)(i)(B) of this section on the amount of gain that is properly allocable to such partner or shareholder with respect to the disposition.

**(v) Effect of nonconforming elections.** An attempted election that does not substantially comply with each of the requirements of this paragraph (h)(9) is disregarded in determining whether a section 197(f)(9) intangible qualifies for the gain-recognition exception.

**(vi) Notification requirements.** A taxpayer making an election under this paragraph (h)(9) with respect to the disposition of a section 197(f)(9) intangible must provide written notification of the election on or before the due date of the return on which the election is made to the person acquiring the section 197 intangible. In addition, a partnership or S corporation making an election under this paragraph (h)(9) must attach to the Schedule K–1 furnished to each partner or shareholder a written statement containing all information necessary to determine the recipient's additional tax liability under this paragraph (h)(9).

**(vii) Revocation.** An election under this paragraph (h)(9) may be revoked only with the consent of the Commissioner.

**(viii) Election Statement.** An election statement satisfies the requirements of this paragraph (h)(9)(viii) if it is in writing and contains the information listed below. The required information should be arranged and identified in accordance with the following order and numbering system:

(A) The name and address of the electing taxpayer.

(B) Except in the case of a taxpayer that is not otherwise subject to Federal income tax, the taxpayer identification number (TIN) of the electing taxpayer.

(C) A statement that the taxpayer is making the election under section 197(f)(9)(B).

(D) Identification of the transaction and each person that is a party to the transaction or whose tax return is affected by the election (including, except in the case of persons not otherwise subject to Federal income tax, the TIN of each such person).

(E) The calculation of the gain realized, the applicable rate of tax, and the amount of the taxpayer's additional tax liability under this paragraph (h)(9).

(F) The signature of the taxpayer or an individual authorized to sign the taxpayer's Federal income tax return.

**(ix) Determination of highest marginal rate of tax and amount of other Federal income tax on gain**—(A) Marginal rate. The following rules apply for purposes of determining the highest marginal rate of tax applicable to an electing taxpayer:

(1) Noncorporate taxpayers. In the case of an individual, estate, or trust, the highest marginal rate of tax is the highest marginal rate of tax in effect under section 1, determined without regard to section 1(h).

(2) Corporations and tax-exempt entities. In the case of a corporation or an entity that is exempt from tax under section 501(a), the highest marginal rate of tax is the highest marginal rate of tax in effect under section 11, determined without regard to any rate that is added to the otherwise applicable rate in order to offset the effect of the graduated rate schedule.

(B) Other Federal income tax on gain. The amount of Federal income tax (other than the tax determined under this paragraph (h)(9)) imposed on any gain is the lesser of—

(1) The amount by which the taxpayer's Federal income tax liability (determined without regard to this paragraph (h)(9)) would be reduced if the amount of such gain were not taken into account; or

(2) The amount of the gain multiplied by the highest marginal rate of tax for the taxable year.

**(x) Coordination with other provisions**—(A) In general. The amount of gain subject to the tax determined under this paragraph (h)(9) is not reduced by any net operating loss deduction under section 172(a), any capital loss under section 1212, or any other similar loss or deduction. In addition, the amount of tax determined under this paragraph (h)(9) is not reduced by any credit of the taxpayer. In computing the amount of any net operating loss, capital loss, or other similar loss or deduction, or any credit that may be carried to any taxable year, any gain subject to the tax determined under this paragraph (h)(9) and any tax paid under this paragraph (h)(9) is not taken into account.

(B) Section 1374. No provision of paragraph (h)(9)(iv) of this section precludes the application of section 1374 (relating to a tax on certain built-in gains of S corporations) to any gain with respect to which an election under this paragraph (h)(9) is made. In addition, neither paragraph (h)(9)(iv) nor paragraph (h)(9)(x)(A) of this section precludes a taxpayer from applying the provisions of section 1366(f)(2) (relating to treatment of the tax imposed by section 1374 as a loss sustained by the S corporation) in determining the amount of tax payable under paragraph (h)(9) of this section.

(C) Procedural and administrative provisions. For purposes of subtitle F, the amount determined under this paragraph (h)(9) is treated as a tax imposed by section 1 or 11, as appropriate.

(D) Installment method. The gain subject to the tax determined under paragraph (h)(9)(i) of this section may not be reported under the method described in section 453(a). Any such gain that would, but for the application of this paragraph (h)(9)(x)(D), be taken into account under section 453(a) shall be taken into account in the same manner as if an election under section 453(d) (relating to the election not to apply section 453(a)) had been made.

**(xi) Special rules for persons not otherwise subject to Federal income tax.** If the person making the election under this paragraph (h)(9) with respect to a disposition is not otherwise subject to Federal income tax, the election statement satisfying the requirements of paragraph (h)(9)(viii) of this section must be filed with the Philadelphia Service Center. For purposes of this paragraph (h)(9) and subtitle F, the statement is treated as an income tax return for the calendar year in which the disposition occurs and as a return due on or before March 15 of the following year.

**(10) Transactions subject to both anti-churning and nonrecognition rules.** If a person acquires a section 197(f)(9) intangible in a transaction described in paragraph (g)(2) of this section from a person in whose hands the intangible was an amortizable section 197 intangible, and immediately after the transaction (or series of transactions described in paragraph (h)(6)(ii)(B) of this section) in which such intangible is acquired, the person acquiring the section 197(f)(9) intangible is related to any person described in paragraph (h)(2) of this section, the intangible is, notwithstanding its treatment under paragraph (g)(2) of this section, treated as an amortizable section 197 intangible only to the extent permitted under this paragraph (h). (See, for example, paragraph (h)(5)(ii) of this section.)

**(11) Avoidance purpose.** A section 197(f)(9) intangible acquired by a taxpayer after the applicable effective date does not qualify for amortization under section 197 if one of the principal purposes of the transaction in which it is acquired is to avoid the operation of the anti-churning rules of section 197(f)(9) and this paragraph (h). A transaction will be presumed to have a principal purpose of avoidance if it does not effect a significant change in the ownership or use of the intangible. Thus, for example, if section 197(f)(9) intangibles are acquired in a transaction (or series of related transactions) in which

an option to acquire stock is issued to a party to the transaction, but the option is not treated as having been exercised for purposes of paragraph (h)(6) of this section, this paragraph (h)(11) may apply to the transaction.

**(12) Additional partnership anti-churning rules—(i) In general.** In determining whether the anti-churning rules of this paragraph (h) apply to any increase in the basis of a section 197(f)(9) intangible under section 732(b), 732(d), 734(b), or 743(b), the determinations are made at the partner level and each partner is treated as having owned and used the partner's proportionate share of partnership property. In determining whether the anti-churning rules of this paragraph (h) apply to any transaction under another section of the Internal Revenue Code, the determinations are made at the partnership level, unless under § 1.701–2(e) the Commissioner determines that the partner level is more appropriate.

**(ii) Section 732(b) adjustments**—(A) In general. The anti-churning rules of this paragraph (h) apply to any increase in the adjusted basis of a section 197(f)(9) intangible under section 732(b) to the extent that the basis increase exceeds the total unrealized appreciation from the intangible allocable to—

(1) Partners other than the distributee partner or persons related to the distributee partner;

(2) The distributee partner and persons related to the distributee partner if the distributed intangible is a section 197(f)(9) intangible acquired by the partnership on or before August 10, 1993, to the extent that—

(i) The distributee partner and related persons acquired an interest or interests in the partnership after August 10, 1993;

(ii) Such interest or interests were held after August 10, 1993, by a person or persons other than either the distributee partner or persons who were related to the distributee partner; and

(iii) The acquisition of such interest or interests by such person or persons was not part of a transaction or series of related transactions in which the distributee partner (or persons related to the distributee partner) subsequently acquired such interest or interests; and

(3) The distributee partner and persons related to the distributee partner if the distributed intangible is a section 197(f)(9) intangible acquired by the partnership after August 10, 1993, that is not amortizable with respect to the partnership, to the extent that—

(i) The distributee partner and persons related to the distributee partner acquired an interest or interests in the partnership after the partnership acquired the distributed intangible;

(ii) Such interest or interests were held after the partnership acquired the distributed intangible, by a person or persons other than either the distributee partner or persons who were related to the distributee partner; and

(iii) The acquisition of such interest or interests by such person or persons was not part of a transaction or series of related transactions in which the distributee partner (or persons related to the distributee partner) subsequently acquired such interest or interests.

(B) Effect of retroactive elections. For purposes of paragraph (h)(12)(ii)(A) of this section, references to August 10, 1993, are treated as references to July 25, 1991, if the relevant party made a valid retroactive election under § 1.197–1T.

(C) Intangible still subject to anti-churning rules. Notwithstanding paragraph (h)(12)(ii) of this section, in applying the provisions of this paragraph (h) with respect to subsequent transfers, the distributed intangible remains subject to the provisions of this paragraph (h) in proportion to a fraction (determined at the time of the distribution), as follows—

(1) The numerator of which is equal to the sum of—

(i) The amount of the distributed intangible's basis that is nonamortizable under paragraph (g)(2)(ii)(B) of this section; and

(ii) The total unrealized appreciation inherent in the intangible reduced by the amount of the increase in the adjusted basis of the distributed intangible under section 732(b) to which the anti-churning rules do not apply; and

(2) The denominator of which is the fair market value of such intangible.

(D) Partner's allocable share of unrealized appreciation from the intangible. The amount of unrealized appreciation from an intangible that is allocable to a partner is the amount of taxable gain that would have been allocated to that partner if the partnership had sold the intangible immediately before the distribution for its fair market value in a fully taxable transaction.

(E) Acquisition of partnership interest by contribution. Solely for purposes of paragraphs (h)(12)(ii)(A)(2) and (3) of this section, a partner who acquires an interest in a partnership in exchange for a contribution of property to the partnership is deemed to acquire a pro rata portion of that interest in the partnership from each person who is a partner in the partnership at the time of the contribution based on each partner's respective proportionate interest in the partnership.

(iii) Section 732(d) adjustments. The anti-churning rules of this paragraph (h) do not apply to an increase in the basis of a section 197(f)(9) intangible under section 732(d) if, had an election been in effect under section 754 at the time of the transfer of the partnership interest, the distributee partner would have been able to amortize the basis adjustment made pursuant to section 743(b).

(iv) Section 734(b) adjustments—(A) In general. The anti-churning rules of this paragraph (h) do not apply to a continuing partner's share of an increase in the basis of a section 197(f)(9) intangible held by a partnership under section 734(b) to the extent that the continuing partner is an eligible partner.

(B) Eligible partner. For purposes of this paragraph (h)(12)(iv), eligible partner means—

(1) A continuing partner that is not the distributee partner or a person related to the distributee partner;

(2) A continuing partner that is the distributee partner or a person related to the distributee partner, with respect to any section 197(f)(9) intangible acquired by the partnership on or before August 10, 1993, to the extent that—

(i) The distributee partner's interest in the partnership was acquired after August 10, 1993;

(ii) Such interest was held after August 10, 1993 by a person or persons who were not related to the distributee partner; and

(iii) The acquisition of such interest by such person or persons was not part of a transaction or series of related transactions in which the distributee partner or persons related to the distributee partner subsequently acquired such interest; or

(3) A continuing partner that is the distributee partner or a person related to the distributee partner, with respect to any section 197(f)(9) intangible acquired by the partnership after August 10, 1993, that is not amortizable with respect to the partnership, to the extent that—

(i) The distributee partner's interest in the partnership was acquired after the partnership acquired the relevant intangible;

(ii) Such interest was held after the partnership acquired the relevant intangible by a person or persons who were not related to the distributee partner; and

(iii) The acquisition of such interest by such person or persons was not part of a transaction or series of related transactions in which the distributee partner or persons related to the distributee partner subsequently acquired such interest.

(C) Effect of retroactive elections. For purposes of paragraph (h)(12)(iv)(A) of this section, references to August 10, 1993, are treated as references to July 25, 1991, if the distributee partner made a valid retroactive election under § 1.197–1T.

(D) Partner's share of basis increase—(1) In general. Except as provided in paragraph (h)(12)(iv)(D)(2) of this section, for purposes of this paragraph (h)(12)(iv), a continuing partner's share of a basis increase under section 734(b) is equal to—

(i) The total basis increase allocable to the intangible; multiplied by

(ii) A fraction the numerator of which is the amount of the continuing partner's post-distribution capital account (determined immediately after the distribution in accordance with the capital accounting rules of § 1.704–1(b)(2)(iv)), and the denominator of which is the total amount of the post-distribution capital accounts (determined immediately after the distribution in accordance with the capital accounting rules of § 1.704–1(b)(2)(iv)) of all continuing partners.

(2) Exception where partnership does not maintain capital accounts. If a partnership does not maintain capital accounts in accordance with § 1.704–1(b)(2)(iv), then for purposes of this paragraph (h)(12)(iv), a continuing partner's share of a basis increase is equal to—

(i) The total basis increase allocable to the intangible; multiplied by

(ii) The partner's overall interest in the partnership as determined under § 1.704–1(b)(3) immediately after the distribution.

(E) Interests acquired by contribution—(1) Application of paragraphs (h)(12)(iv)(B)(2) and (3) of this section. Solely for purposes of paragraphs (h)(12)(iv)(B)(2) and (3) of this section, a partner who acquires an interest in a partnership in exchange for a contribution of property to the partnership is deemed to acquire a pro rata portion of that interest in the partnership from each person who is a partner in the partnership at the time of the contribution based on each such partner's proportionate interest in the partnership.

(2) Special rule with respect to paragraph (h)(12)(iv)(B)(1) of this section. Solely for purposes of paragraph (h)(12)(iv)(B)(1) of this section, if a distribution that gives rise to an increase in the basis under section 734(b) of a section 197(f)(9) intangible held by the partnership is undertaken as part of a series of related transactions that include a contribution of the intangible to the partnership by a continuing partner, the continuing partner is treated as related to the distributee partner in analyzing the basis adjustment with respect to the contributed section 197(f)(9) intangible.

(F) Effect of section 734(b) adjustments on partners' capital accounts. If one or more partners are subject to the anti-churning rules under this paragraph (h) with respect to a section 734(b) adjustment allocable to an intangible asset, taxpayers may use any reasonable method to determine amortization of the asset for book purposes, provided that the method used does not contravene the purposes of the anti-churning rules under section 197 and this paragraph (h). A method will be considered to contravene the purposes of the anti-churning rules if the effect of the book adjustments resulting from the method is such that any portion of the tax deduction for amortization attributable to the section 734 adjustment is allocated, directly or indirectly, to a partner who is subject to the anti-churning rules with respect to such adjustment.

(v) Section 743(b) adjustments—(A) General rule. The anti-churning rules of this paragraph (h) do not apply to an increase in the basis of a section 197 intangible under section 743(b) if the person acquiring the partnership interest is not related to the person transferring the partnership interest. In addition, the anti-churning rules of this paragraph (h) do not apply to an increase in the basis of a section 197 intangible under section 743(b) to the extent that—

(1) The partnership interest being transferred was acquired after August 10, 1993, provided—

(i) The section 197(f)(9) intangible was acquired by the partnership on or before August 10, 1993;

(ii) The partnership interest being transferred was held after August 10, 1993, by a person or persons (the post–1993 person or persons) other than the person transferring the partnership interest or persons who were related to the person transferring the partnership interest; and

(iii) The acquisition of such interest by the post–1993 person or persons was not part of a transaction or series of related transactions in which the person transferring the partnership interest or persons related to the person transferring the partnership interest acquired such interest; or

(2) The partnership interest being transferred was acquired after the partnership acquired the section 197(f)(9) intangible, provided—

(i) The section 197(f)(9) intangible was acquired by the partnership after August 10, 1993, and is not amortizable with respect to the partnership;

(ii) The partnership interest being transferred was held after the partnership acquired the section 197(f)(9) intangible by a person or persons (the post-contribution person or persons) other than the person transferring the partnership interest or persons who were related to the person transferring the partnership interest; and

(iii) The acquisition of such interest by the post-contribution person or persons was not part of a transaction or series of related transactions in which the person transferring the partnership interest or persons related to the person transferring the partnership interest acquired such interest.

(B) Acquisition of partnership interest by contribution. Solely for purposes of paragraph (h)(12)(v)(A)(1) and (2) of this section, a partner who acquires an interest in a partnership in exchange for a contribution of property to the partnership is deemed to acquire a pro rata portion of that interest in the partnership from each person who is a partner in the partnership at the time of the contribution based on each such partner's proportionate interest in the partnership.

(C) Effect of retroactive elections. For purposes of paragraph (h)(12)(v)(A) of this section, references to August 10, 1993, are treated as references to July 25, 1991, if the transferee partner made a valid retroactive election under § 1.197–1T.

**(vi) Partner is or becomes a user of partnership intangible**—(A) General rule. If, as part of a series of related transactions that includes a transaction described in paragraph (h)(12)(ii), (iii), (iv), or (v) of this section, an anti-churning partner or related person (other than the partnership) becomes (or remains) a direct user of an intangible that is treated as transferred in the transaction (as a result of the partners being treated as having owned their proportionate share of partnership assets), the anti-churning rules of this paragraph (h) apply to the proportionate share of such intangible that is treated as transferred by such anti-churning partner, notwithstanding the application of paragraph (h)(12)(ii), (iii), (iv), or (v) of this section.

(B) Anti-churning partner. For purposes of this paragraph (h)(12)(vi), anti-churning partner means—

(1) With respect to all intangibles held by a partnership on or before August 10, 1993, any partner, but only to the extent that

(i) The partner's interest in the partnership was acquired on or before August 10, 1993, or

(ii) The interest was acquired from a person related to the partner on or after August 10, 1993, and such interest was not held by any person other than persons related to such partner at any time after August 10, 1993 (disregarding, for this purpose, a person's holding of an interest if the acquisition of such interest was part of a transaction or series of related transactions in which the partner or persons related to the partner subsequently acquired such interest),

(2) With respect to any section 197(f)(9) intangible acquired by a partnership after August 10, 1993, that is not amortizable with respect to the partnership, any partner, but only to the extent that

(i) The partner's interest in the partnership was acquired on or before the date the partnership acquired the section 197(f)(9) intangible, or

(ii) The interest was acquired from a person related to the partner on or after the date the partnership acquired the section 197(f)(9) intangible, and such interest was not held by any person other than persons related to such partner at any time after the date the partnership acquired the section 197(f)(9) intangible (disregarding, for this purpose, a person's holding of an interest if the acquisition of such interest was part of a transaction or series of related transactions in which the partner or persons related to the partner subsequently acquired such interest).

(C) Effect of retroactive elections. For purposes of paragraph (h)(12)(vi)(B) of this section, references to August 10, 1993, are treated as references to July 25, 1991, if the relevant party made a valid retroactive election under § 1.197–1T.

(vii) Section 704(c) allocations—(A) Allocations where the intangible is amortizable by the contributor. The anti-churning rules of this paragraph (h) do not apply to the curative or remedial allocations of amortization with respect to a section 197(f)(9) intangible if the intangible was an amortizable section 197 intangible in the hands of the contributing partner (unless paragraph (h)(10) of this section applies so as to cause the intangible to cease to be an amortizable section 197 intangible in the hands of the partnership).

(B) Allocations where the intangible is not amortizable by the contributor. If a section 197(f)(9) intangible was not an amortizable section 197 intangible in the hands of the contributing partner, a non-contributing partner generally may receive remedial allocations of amortization under section 704(c) that are deductible for Federal income tax purposes. However, such a partner may not receive remedial allocations of amortization under section 704(c) if that partner is related to the partner that contributed the intangible or if, as part of a series of related transactions that includes the contribution of the section 197(f)(9) intangible to the partnership, the contributing partner or related person (other than

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 199 of 651

the partnership) becomes (or remains) a direct user of the contributed intangible. Taxpayers may use any reasonable method to determine amortization of the asset for book purposes, provided that the method used does not contravene the purposes of the anti-churning rules under section 197 and this paragraph (h). A method will be considered to contravene the purposes of the anti-churning rules if the effect of the book adjustments resulting from the method is such that any portion of the tax deduction for amortization attributable to section 704(c) is allocated, directly or indirectly, to a partner who is subject to the anti-churning rules with respect to such adjustment.

**(viii) Operating rule for transfers upon death.** For purposes of this paragraph (h)(12), if the basis of a partner's interest in a partnership is determined under section 1014(a), such partner is treated as acquiring such interest from a person who is not related to such partner, and such interest is treated as having previously been held by a person who is not related to such partner.

**(i)** [Reserved]

**(j) General anti-abuse rule.** The Commissioner will interpret and apply the rules in this section as necessary and appropriate to prevent avoidance of the purposes of section 197. If one of the principal purposes of a transaction is to achieve a tax result that is inconsistent with the purposes of section 197, the Commissioner will recast the transaction for Federal tax purposes as appropriate to achieve tax results that are consistent with the purposes of section 197, in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances.

**(k) Examples.** The following examples illustrate the application of this section:

**Example 1.** Advertising costs. (i) Q manufactures and sells consumer products through a series of wholesalers and distributors. In order to increase sales of its products by encouraging consumer loyalty to its products and to enhance the value of the goodwill, trademarks, and trade names of the business, Q advertises its products to the consuming public. It regularly incurs costs to develop radio, television, and print advertisements. These costs generally consist of employee costs and amounts paid to independent advertising agencies. Q also incurs costs to run these advertisements in the various media for which they were developed.

(ii) The advertising costs are not chargeable to capital account under paragraph (f)(3) of this section (relating to costs incurred for covenants not to compete, rights granted by governmental units, and contracts for the use of section 197 intangibles) and are currently deductible as ordinary and necessary expenses under section 162. Accordingly, under paragraph (a)(3) of this section, section 197 does not apply to these costs.

**Example 2.** Computer software. (i) X purchases all of the assets of an existing trade or business from Y. One of the assets acquired is all of Y's rights in certain computer software previously used by Y under the terms of a nonexclusive license from the software developer. The software was developed for use by manufacturers to maintain a comprehensive accounting system, including general and subsidiary ledgers, payroll, accounts receivable and payable, cash receipts and disbursements, fixed asset accounting, and inventory cost accounting and controls. The developer modified the software for use by Y at a cost of $1,000 and Y made additional modifications at a cost of $500. The developer does not maintain wholesale or retail outlets but markets the software directly to ultimate users. Y's license of the software is limited to an entity that is actively engaged in business as a manufacturer.

(ii) Notwithstanding these limitations, the software is considered to be readily available to the general public for purposes of paragraph (c)(4)(i) of this section. In addition, the software is not substantially modified because the cost of the modifications

by the developer and Y to the version of the software that is readily available to the general public does not exceed $2,000. Accordingly, the software is not a section 197 intangible.

**Example 3.** Acquisition of software for internal use. (i) B, the owner and operator of a worldwide package-delivery service, purchases from S all rights to software developed by S. The software will be used by B for the sole purpose of improving its package-tracking operations. B does not purchase any other assets in the transaction or any related transaction.

(ii) Because B acquired the software solely for internal use, it is disregarded in determining for purposes of paragraph (c)(4) (ii) of this section whether the assets acquired in the transaction or series of related transactions constitute a trade or business or substantial portion thereof. Since no other assets were acquired, the software is not acquired as part of a purchase of a trade or business and under paragraph (c)(4)(ii) of this section is not a section 197 intangible.

**Example 4.** Governmental rights of fixed duration. (i) City M operates a municipal water system. In order to induce X to locate a new manufacturing business in the city, M grants X the right to purchase water for 16 years at a specified price.

(ii) The right granted by M is a right to receive tangible property or services described in section 197(e)(4)(B) and paragraph (c)(6) of this section and, thus, is not a section 197 intangible. This exclusion applies even though the right does not qualify for exclusion as a right of fixed duration or amount under section 197(e)(4)(D) and paragraph (c)(13) of this section because the duration exceeds 15 years and the right is not fixed as to amount. It is also immaterial that the right would not qualify for exclusion as a self-created intangible under section 197(c)(2) and paragraph (d)(2) of this section because it is granted by a governmental unit.

**Example 5.** Separate acquisition of franchise. (i) S is a franchiser of retail outlets for specialty coffees. G enters into a franchise agreement (within the meaning of section 1253(b)(1)) with S pursuant to which G is permitted to acquire and operate a store using the S trademark and trade name at the location specified in the agreement. G agrees to pay S $100,000 upon execution of the agreement and also agrees to pay, throughout the term of the franchise, additional amounts that are deductible under section 1253(d)(1). The agreement contains detailed specifications for the construction and operation of the business, but G is not required to purchase from S any of the materials necessary to construct the improvements at the location specified in the franchise agreement.

(ii) The franchise is a section 197 intangible within the meaning of paragraph (b)(10) of this section. The franchise does not qualify for the exclusion relating to self-created intangibles described in section 197(c)(2) and paragraph (d)(2) of this section because the franchise is described in section 197(d)(1)(F). In addition, because the acquisition of the franchise constitutes the acquisition of an interest in a trade or business or a substantial portion thereof, the franchise may not be excluded under section 197(e)(4). Thus, the franchise is an amortizable section 197 intangible, the basis of which must be recovered over a 15–year period. However, the amounts that are deductible under section 1253(d)(1) are not subject to the provisions of section 197 by reason of section 197(f)(4)(C) and paragraph (b)(10)(ii) of this section.

**Example 6.** Acquisition and amortization of covenant not to compete. (i) As part of the acquisition of a trade or business from C, B and C enter into an agreement containing a covenant not to compete. Under this agreement, C agrees that it will not compete with the business acquired by B within a prescribed geographical territory for a period of three years after the date on which the business is sold to B. In exchange for this agreement, B agrees to pay C $90,000 per year for each year in the term of the agreement. The agreement further provides that, in the event of a breach by C of his obligations under the agreement, B may terminate the agreement, cease making any of the payments due thereafter, and pursue any other legal or equitable remedies available under applicable law. The amounts payable to C under the agreement are not contingent payments for purposes of § 1.1275–4. The present fair market value of B's rights under the agreement is $225,000. The aggregate consideration paid excluding any amount treated as interest or original issue discount under applicable provisions of the Internal Revenue Code, for all assets acquired in the transaction (including the covenant not to compete) exceeds the sum of the amount of Class I assets

and the aggregate fair market value of all Class II, Class III, Class IV, Class V, and Class VI assets by $50,000. See § 1.338–6(b) for rules for determining the assets in each class.

(ii) Because the covenant is acquired in an applicable asset acquisition (within the meaning of section 1060(c)), paragraph (f)(4)(ii) of this section applies and the basis of B in the covenant is determined pursuant to section 1060(a) and the regulations thereunder. Under §§ 1.1060–1(c)(2) and 1.338–6(c)(1), B's basis in the covenant cannot exceed its fair market value. Thus, B's basis in the covenant immediately after the acquisition is $225,000. This basis is amortized ratably over the 15–year period beginning on the first day of the month in which the agreement is entered into. All of the remaining consideration after allocation to the covenant and other Class VI assets ($50,000) is allocated to Class VII assets (goodwill and going concern value). See §§ 1.1060–1(c)(2) and 1.338–6(b).

**Example 7.** Stand-alone license of technology. (i) X is a manufacturer of consumer goods that does business throughout the world through subsidiary corporations organized under the laws of each country in which business is conducted. X licenses to Y, its subsidiary organized and conducting business in Country K, all of the patents, formulas, designs, and know-how necessary for Y to manufacture the same products that X manufactures in the United States. Assume that the license is not considered a sale or exchange under the principles of section 1235. The license is for a term of 18 years, and there are no facts to indicate that the license does not have a fixed duration. Y agrees to pay X a royalty equal to a specified, fixed percentage of the revenues obtained from selling products manufactured using the licensed technology. Assume that the royalty is reasonable and is not subject to adjustment under section 482. The license is not entered into in connection with any other transaction. Y incurs capitalized costs in connection with entering into the license.

(ii) The license is a contract for the use of a section 197 intangible within the meaning of paragraph (b)(11) of this section. It does not qualify for the exception in section 197(e)(4)(D) and paragraph (c)(13) of this section (relating to rights of fixed duration or amount) because it does not have a term of less than 15 years, and the other exceptions in section 197(e) and paragraph (c) of this section are also inapplicable. Accordingly, the license is a section 197 intangible.

(iii) The license is not acquired as part of a purchase of a trade or business. Thus, under paragraph (f)(3)(iii) of this section, the license will be closely scrutinized under the principles of section 1235 for purposes of determining whether the transfer is a sale or exchange and, accordingly, whether the payments under the license are chargeable to capital account. Because the license is not a sale or exchange under the principles of section 1235, the royalty payments are not chargeable to capital account for purposes section 197. The capitalized costs of entering into the license are not within the exception under paragraph (d)(2) of this section for self-created intangibles, and thus are amortized under section 197.

**Example 8.** License of technology and trademarks. (i) The facts are the same as in Example 7, except that the license also includes the use of the trademarks and trade names that X uses to manufacture and distribute its products in the United States. Assume that under the principles of section 1253 the transfer is not a sale or exchange of the trademarks and trade names or an undivided interest therein and that the royalty payments are described in section 1253(d)(1)(B).

(ii) As in Example 7, the license is a section 197 intangible. Although the license conveys an interest in X's trademarks and trade names to Y, the transfer of the interest is disregarded for purposes of paragraph (e)(2) of this section unless the transfer is considered a sale or exchange of the trademarks and trade names or an undivided interest therein. Accordingly, the licensing of the technology and the trademarks and trade names is not treated as part of a purchase of a trade or business under paragraph (e)(2) of this section.

(iii) Because the technology license is not part of the purchase of a trade or business, it is treated in the manner described in Example 7. The royalty payments for the use of the trademarks and trade names are deductible under section 1253(d)(1) and, under section 197(f)(4)(C) and paragraph (b)(10)(ii) of this section, are not chargeable to capital account for purposes of section 197. The capitalized costs of entering into the license are treated in the same manner as in example 7.

**Example 9.** Disguised sale. (i) The facts are the same as in Example 7, except that Y agrees to pay X, in addition to the contingent royalty, a fixed minimum royalty immediately upon entering into the agreement and there are sufficient facts present to characterize the transaction, for federal tax purposes, as a transfer of ownership of the intellectual property from X to Y.

(ii) The purported license of technology is, in fact, an acquisition of an intangible described in section 197(d)(1)(C)(iii) and paragraph (b)(5) of this section (relating to know-how, etc.). As in Example 7, the exceptions in section 197(e) and paragraph (c) of this section do not apply to the transfer. Accordingly, the transferred property is a section 197 intangible. Y's basis in the transferred intangible includes the capitalized costs of entering into the agreement and the fixed minimum royalty payment payable at the time of the transfer. In addition, except to the extent that a portion of any payment will be treated as interest or original issue discount under applicable provisions of the Internal Revenue Code, all of the contingent payments under the purported license are properly chargeable to capital account for purposes of section 197 and this section. The extent to which such payments are treated as payments of principal and the time at which any amount treated as a payment of principal is taken into account in determining basis are determined under the rules of § 1.1275–4(c)(4) or 1.483–4(a), whichever is applicable. Any contingent amount that is included in basis after the month in which the acquisition occurs is amortized under the rules of paragraph (f)(2)(i) or (ii) of this section.

**Example 10.** License of technology and customer list as part of sale of a trade or business. (i) X is a computer manufacturer that produces, in separate operating divisions, personal computers, servers, and peripheral equipment. In a transaction that is the purchase of a trade or business for purposes of section 197, Y (who is unrelated to X) purchases from X all assets of the operating division producing personal computers, except for certain patents that are also used in the division manufacturing servers and customer lists that are also used in the division manufacturing peripheral equipment. As part of the transaction, X transfers to Y the right to use the retained patents and customer lists solely in connection with the manufacture and sale of personal computers. The transfer agreement requires annual royalty payments contingent on the use of the patents and also requires a payment for each use of the customer list. In addition, Y incurs capitalized costs in connection with entering into the licenses.

(ii) The rights to use the retained patents and customer lists are contracts for the use of section 197 intangibles within the meaning of paragraph (b)(11) of this section. The rights do not qualify for the exception in 197(e)(4)(D) and paragraph (c)(13) of this section (relating to rights of fixed duration or amount) because they are transferred as part of a purchase of a trade or business and the other exceptions in section 197(e) and paragraph (c) of this section are also inapplicable. Accordingly, the licenses are section 197 intangibles.

(iii) Because the right to use the retained patents is described in paragraph (b)(11) of this section and the right is transferred as part of a purchase of a trade or business, the treatment of the royalty payments is determined under paragraph (f)(3)(ii) of this section. In addition, however, the retained patents are described in paragraph (b)(5) of this section. Thus, the annual royalty payments are chargeable to capital account under the general rule of paragraph (f)(3)(ii)(A) of this section unless Y establishes that the license is not a sale or exchange under the principles of section 1235 and the royalty payments are an arm's length consideration for the rights transferred. If these facts are established, the exception in paragraph (f)(3)(ii)(B) of this section applies and the royalty payments are not chargeable to capital account for purposes of section 197. The capitalized costs of entering into the license are treated in the same manner as in Example 7.

(iv) The right to use the retained customer list is also described in paragraph (b)(11) of this section and is transferred as part of a purchase of a trade or business. Thus, the treatment of the payments for use of the customer list is also determined under paragraph (f)(3)(ii) of this section. The customer list, although described in paragraph (b)(6) of this section, is a customer-related information base. Thus, the exception in paragraph (f)(3)(ii)(B) of this section does not apply. Accordingly, payments for use of the list are chargeable to capital account under the general rule of paragraph (f)(3)(ii)(A) of this section and are amortized under section 197. In addition, the capitalized costs of entering into the contract for use of the customer list are treated in the same manner as in Example 7.

**Example 11.** Loss disallowance rules involving related persons. (i) Assume that X and Y are treated as a single taxpayer for purposes of paragraph (g)(1) of this section. In a single transaction, X and Y acquired from Z all of the assets used by Z in a trade or business. Z had operated this business at two locations, and X and Y each acquired the assets used by Z at one of the locations. Three years after the acquisition, X sold all of the assets it acquired, including amortizable section 197 intangibles, to an unrelated purchaser. The amortizable section intangibles are sold at a loss of $120,000.

(ii) Because X and Y are treated as a single taxpayer for purposes of the loss disallowance rules of section 197(f)(1) and paragraph (g)(1) of this section, X's loss on the sale of the amortizable section 197 intangibles is not recognized. Under paragraph (g)(1)(iv)(B) of this section, X's disallowed loss is allowed ratably, as a deduction under section 197, over the remainder of the 15–year period during which the intangibles would have been amortized, and Y may not increase the basis of the amortizable section 197 intangibles that it acquired from Z by the amount of X's disallowed loss.

**Example 12.** Disposition of retained intangibles by related person. (i) The facts are the same as in Example 11, except that 10 years after the acquisition of the assets by X and Y and 7 years after the sale of the assets by X, Y sells all of the assets acquired from Z, including amortizable section 197 intangibles, to an unrelated purchaser.

(ii) Under paragraph (g)(1)(iv)(B) of this section, X may recognize, on the date of the sale by Y, any loss that has not been allowed as a deduction under section 197. Accordingly, X recognizes a loss of $50,000, the amount obtained by reducing the loss on the sale of the assets at the end of the third year ($120,000) by the amount allowed as a deduction under paragraph (g) (1)(iv)(B) of this section during the 7 years following the sale by X ($70,000).

**Example 13.** Acquisition of an interest in partnership with no section 754 election. (i) A, B, and C each contribute $1,500 for equal shares in general partnership P. On January 1, 1998, P acquires as its sole asset an amortizable section 197 intangible for $4,500. P still holds the intangible on January 1, 2003, at which time the intangible has an adjusted basis to P of $3,000, and A, B, and C each have an adjusted basis of $1,000 in their partnership interests. D (who is not related to A) acquires A's interest in P for $1,600. No section 754 election is in effect for 2003.

(ii) Because there is no change in the basis of the intangible under section 743(b), D merely steps into the shoes of A with respect to the intangible. D's proportionate share of P's adjusted basis in the intangible is $1,000, which continues to be amortized over the 10 years remaining in the original 15–year amortization period for the intangible.

**Example 14.** Acquisition of an interest in partnership with a section 754 election. (i) The facts are the same as in Example 13, except that a section 754 election is in effect for 2003.

(ii) Pursuant to paragraph (g)(3) of this section, for purposes of section 197, D is treated as if P owns two assets. D's proportionate share of P's adjusted basis in one asset is $1,000, which continues to be amortized over the 10 years remaining in the original 15–year amortization period. For the other asset, D's proportionate share of P's adjusted basis is $600 (the amount of the basis increase under section 743 as a result of the section 754 election), which is amortized over a new 15–year period beginning January 2003. With respect to B and C, P's remaining $2,000 adjusted basis in the intangible continues to be amortized over the 10 years remaining in the original 15–year amortization period.

**Example 15.** Payment to a retiring partner by partnership with a section 754 election. (i) The facts are the same as in Example 13, except that a section 754 election is in effect for 2003 and, instead of D acquiring A's interest in P, A retires from P. A, B, and C are not related to each other within the meaning of paragraph (h)(6) of this section. P borrows $1,600, and A receives a payment under section 736 from P of such amount, all of which is in exchange for A's interest in the intangible asset owned by P. (Assume, for purposes of this example, that the borrowing by P and payment of such funds to A does not give rise to a disguised sale of A's partnership interest under section 707(a)(2)(B).) P makes a positive basis adjustment of $600 with respect to the section 197 intangible under section 734(b).

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   **0199** 38

(ii) Pursuant to paragraph (g)(3) of this section, because of the section 734 adjustment, P is treated as having two amortizable section 197 intangibles, one with a basis of $3,000 and a remaining amortization period of 10 years and the other with a basis of $600 and a new amortization period of 15 years.

**Example 16.** Termination of partnership under section 708(b)(1)(B). (i) A and B are partners with equal shares in the capital and profits of general partnership P. P's only asset is an amortizable section 197 intangible, which P had acquired on January 1, 1995. On January 1, 2000, the asset had a fair market value of $100 and a basis to P of $50. On that date, A sells his entire partnership interest in P to C, who is unrelated to A, for $50. At the time of the sale, the basis of each of A and B in their respective partnership interests is $25.

(ii) The sale causes a termination of P under section 708(b)(1)(B). Under section 708, the transaction is treated as if P transfers its sole asset to a new partnership in exchange for the assumption of its liabilities and the receipt of all of the interests in the new partnership. Immediately thereafter, P is treated as if it is liquidated, with B and C each receiving their proportionate share of the interests in the new partnership. The contribution by P of its asset to the new partnership is governed by section 721, and the liquidating distributions by P of the interests in the new partnership are governed by section 731. C does not realize a basis adjustment under section 743 with respect to the amortizable section 197 intangible unless P had a section 754 election in effect for its taxable year in which the transfer of the partnership interest to C occurred or the taxable year in which the deemed liquidation of P occurred.

(iii) Under section 197, if P had a section 754 election in effect, C is treated as if the new partnership had acquired two assets from P immediately preceding its termination. Even though the adjusted basis of the new partnership in the two assets is determined solely under section 723, because the transfer of assets is a transaction described in section 721, the application of sections 743(b) and 754 to P immediately before its termination causes P to be treated as if it held two assets for purposes of section 197. See paragraph (g)(3) of this section. B's and C's proportionate share of the new partnership's adjusted basis is $25 each in one asset, which continues to be amortized over the 10 years remaining in the original 15–year amortization period. For the other asset, C's proportionate share of the new partnership's adjusted basis is $25 (the amount of the basis increase resulting from the application of section 743 to the sale or exchange by A of the interest in P), which is amortized over a new 15–year period beginning in January 2000.

(iv) If P did not have a section 754 election in effect for its taxable year in which the sale of the partnership interest by A to C occurred or the taxable year in which the deemed liquidation of P occurred, the adjusted basis of the new partnership in the amortizable section 197 intangible is determined solely under section 723, because the transfer is a transaction described in section 721, and P does not have a basis increase in the intangible. Under section 197(f)(2) and paragraph (g)(2)(ii) of this section, the new partnership continues to amortize the intangible over the 10 years remaining in the original 15–year amortization period. No additional amortization is allowable with respect to this asset.

**Example 17.** Disguised sale to partnership. (i) E and F are individuals who are unrelated to each other within the meaning of paragraph (h)(6) of this section. E has been engaged in the active conduct of a trade or business as a sole proprietor since 1990. E and F form EF Partnership. E transfers all of the assets of the business, having a fair market value of $100, to EF, and F transfers $40 of cash to EF. E receives a 60 percent interest in EF and the $40 of cash contributed by F, and F receives a 40 percent interest in EF, under circumstances in which the transfer by E is partially treated as a sale of property to EF under § 1.707–3(b).

(ii) Under § 1.707–3(a)(1), the transaction is treated as if E had sold to EF a 40 percent interest in each asset for $40 and contributed the remaining 60 percent interest in each asset to EF in exchange solely for an interest in EF. Because E and EF are related persons within the meaning of paragraph (h)(6) of this section, no portion of any transferred section 197(f)(9) intangible that E held during the transition period (as defined in paragraph (h)(4) of this section) is an amortizable section 197 intangible pursuant to paragraph (h)(2) of this section. Section 197(f)(9)(F) and paragraph (g)(3) of this section do not apply to any portion of the section 197 intangible in the hands of EF because the basis of EF in these assets was not increased under any of sections 732, 734, or 743.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**Example 18.** Acquisition by related person in nonrecognition transaction. (i) A owns a nonamortizable intangible that A acquired in 1990. In 2000, A sells a one-half interest in the intangible to B for cash. Immediately after the sale, A and B, who are unrelated to each other, form partnership P as equal partners. A and B each contribute their one-half interest in the intangible to P.

(ii) P has a transferred basis in the intangible from A and B under section 723. The nonrecognition transfer rule under paragraph (g)(2)(ii) of this section applies to A's transfer of its one-half interest in the intangible to P, and consequently P steps into A's shoes with respect to A's nonamortizable transferred basis. The anti-churning rules of paragraph (h) of this section apply to B's transfer of its one-half interest in the intangible to P, because A, who is related to P under paragraph (h)(6) of this section immediately after the series of transactions in which the intangible was acquired by P, held B's one-half interest in the intangible during the transition period. Pursuant to paragraph (h)(10) of this section, these rules apply to B's transfer of its one-half interest to P even though the nonrecognition transfer rule under paragraph (g)(2)(ii) of this section would have permitted P to step into B's shoes with respect to B's otherwise amortizable basis. Therefore, P's entire basis in the intangible is nonamortizable. However, if A (not B) elects to recognize gain under paragraph (h)(9) of this section on the transfer of each of the one-half interests in the intangible to B and P, then the intangible would be amortizable by P to the extent provided in section 197(f) (9)(B) and paragraph (h)(9) of this section.

**Example 19.** Acquisition of partnership interest following formation of partnership. (i) The facts are the same as in Example 18 except that, in 2000, A formed P with an affiliate, S, and contributed the intangible to the partnership and except that in a subsequent year, in a transaction that is properly characterized as a sale of a partnership interest for Federal tax purposes, B purchases a 50 percent interest in P from A. P has a section 754 election in effect and holds no assets other than the intangible and cash.

(ii) For the reasons set forth in Example 16 (iii), B is treated as if P owns two assets. B's proportionate share of P's adjusted basis in one asset is the same as A's proportionate share of P's adjusted basis in that asset, which is not amortizable under section 197. For the other asset, B's proportionate share of the remaining adjusted basis of P is amortized over a new 15–year period.

**Example 20.** Acquisition by related corporation in nonrecognition transaction. (i) The facts are the same as Example 18, except that A and B form corporation P as equal owners.

(ii) P has a transferred basis in the intangible from A and B under section 362. Pursuant to paragraph (h)(10) of this section, the application of the nonrecognition transfer rule under paragraph (g)(2)(ii) of this section and the anti-churning rules of paragraph (h) of this section to the facts of this Example 18 is the same as in Example 16. Thus, P's entire basis in the intangible is nonamortizable.

**Example 21.** Acquisition from corporation related to purchaser through remote indirect interest. (i) X, Y, and Z are each corporations that have only one class of issued and outstanding stock. X owns 25 percent of the stock of Y and Y owns 25 percent of the outstanding stock of Z. No other shareholder of any of these corporations is related to any other shareholder or to any of the corporations. On June 30, 2000, X purchases from Z section 197(f)(9) intangibles that Z owned during the transition period (as defined in paragraph (h)(4) of this section).

(ii) Pursuant to paragraph (h)(6)(iv)(B) of this section, the beneficial ownership interest of X in Z is 6.25 percent, determined by treating X as if it owned a proportionate (25 percent) interest in the stock of Z that is actually owned by Y. Thus, even though X is related to Y and Y is related to Z, X and Z are not considered to be related for purposes of the anti-churning rules of section 197.

**Example 22.** Gain recognition election. (i) B owns 25 percent of the stock of S, a corporation that uses the calendar year as its taxable year. No other shareholder of B or S is related to each other. S is not a member of a controlled group of corporations within the meaning of section 1563(a). S has section 197(f)(9) intangibles that it owned during the transition period. S has a basis of $25,000 in the intangibles. In 2001, S sells these intangibles to B for $75,000. S recognizes a gain of $50,000 on the

sale and has no other items of income, deduction, gain, or loss for the year, except that S also has a net operating loss of $20,000 from prior years that it would otherwise be entitled to use in 2001 pursuant to section 172(b). S makes a valid gain recognition election pursuant to section 197(f)(9)(B) and paragraph (h)(9) of this section. In 2001, the highest marginal tax rate applicable to S is 35 percent. But for the election, all of S's taxable income would be taxed at a rate of 15 percent.

(ii) If the gain recognition election had not been made, S would have taxable income of $30,000 for 2001 and a tax liability of $4,500. If the gain were not taken into account, S would have no tax liability for the taxable year. Thus, the amount of tax (other than the tax imposed under paragraph (h)(9) of this section) imposed on the gain is also $4,500. The gain on the disposition multiplied by the highest marginal tax rate is $17,500 ($50,000 x .35). Accordingly, S's tax liability for the year is $4,500 plus an additional tax under paragraph (h)(9) of this section of $13,000 ($17,500 - $4,500).

(iii) Pursuant to paragraph (h)(9)(x)(A) of this section, S determines the amount of its net operating loss deduction in subsequent years without regard to the gain recognized on the sale of the section 197 intangible to B. Accordingly, the entire $20,000 net operating loss deduction that would have been available in 2001 but for the gain recognition election may be used in 2002, subject to the limitations of section 172.

(iv) B has a basis of $75,000 in the section 197(f)(9) intangibles acquired from S. As the result of the gain recognition election by S, B may amortize $50,000 of its basis under section 197. Under paragraph (h)(9)(ii) of this section, the remaining basis does not qualify for the gain-recognition exception and may not be amortized by B.

**Example 23.** Section 338 election. (i) Corporation P makes a qualified stock purchase of the stock of T corporation from two shareholders in July 2000, and a section 338 election is made by P. No shareholder of either T or P owns stock in both of these corporations, and no other shareholder is related to any other shareholder of either corporation.

(ii) Pursuant to paragraph (h)(8) of this section, in the case of a qualified stock purchase that is treated as a deemed sale and purchase of assets pursuant to section 338, the corporation treated as purchasing assets as a result of an election thereunder (new target) is not considered the person that held or used the assets during any period in which the assets were held or used by the corporation treated as selling the assets (old target). Because there are no relationships described in paragraph (h)(6) of this section among the parties to the transaction, any nonamortizable section 197(f)(9) intangible held by old target is an amortizable section 197 intangible in the hands of new target.

(iii) Assume the same facts as set forth in paragraph (i) of this Example 23, except that one of the selling shareholders is an individual who owns 25 percent of the total value of the stock of each of the T and P corporation.

(iv) Old target and new target (as these terms are defined in § 1.338–2(c)(17)) are members of a controlled group of corporations under section 267(b)(3), as modified by section 197(f)(9)(C)(i), and any nonamortizable section 197(f)(9) intangible held by old target is not an amortizable section 197 intangible in the hands of new target. However, a gain recognition election under paragraph (h)(9) of this section may be made with respect to this transaction.

**Example 24.** Relationship created as part of public offering. (i) On January 1, 2001, Corporation X engages in a series of related transactions to discontinue its involvement in one line of business. X forms a new corporation, Y, with a nominal amount of cash. Shortly thereafter, X transfers all the stock of its subsidiary conducting the unwanted business (Target) to Y in exchange for 100 shares of Y common stock and a Y promissory note. Target owns a nonamortizable section 197(f)(9) intangible. Prior to January 1, 2001, X and an underwriter (U) had entered into a binding agreement pursuant to which U would purchase 85 shares of Y common stock from X and then sell those shares in a public offering. On January 6, 2001, the public offering closes. X and Y make a section 338(h)(10) election for Target.

(ii) Pursuant to paragraph (h)(8) of this section, in the case of a qualified stock purchase that is treated as a deemed sale and purchase of assets pursuant to section 338, the corporation treated as purchasing assets as a result of an election thereunder

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 207 of 651

(new target) is not considered the person that held or used the assets during any period in which the assets were held or used by the corporation treated as selling the assets (old target). Further, for purposes of determining whether the nonamortizable section 197(f)(9) intangible is acquired by new target from a related person, because the transactions are a series of related transactions, the relationship between old target and new target must be tested immediately before the first transaction in the series (the formation of Y) and immediately after the last transaction in the series (the sale to U and the public offering). See paragraph (h)(6)(ii)(B) of this section. Because there was no relationship between old target and new target immediately before the formation of Y (because the section 338 election had not been made) and only a 15% relationship between old target and new target immediately after, old target is not related to new target for purposes of applying the anti-churning rules of paragraph (h) of this section. Accordingly, Target may amortize the section 197 intangible.

**Example 25.** Other transfers to controlled corporations. (i) In 2001, Corporation A transfers a section 197(f)(9) intangible that it held during the transition period to X, a newly formed corporation, in exchange for 15% of X's stock. As part of the same transaction, B transfers property to X in exchange for the remaining 85% of X stock.

(ii) Because the acquisition of the intangible by X is part of a qualifying section 351 exchange, under section 197(f)(2) and paragraph (g)(2)(ii) of this section, X is treated in the same manner as the transferor of the asset. Accordingly, X may not amortize the intangible. If, however, at the time of the exchange, B has a binding commitment to sell 25 percent of the X stock to C, an unrelated third party, the exchange, including A's transfer of the section 197(f)(9) intangible, would fail to qualify as a section 351 exchange. Because the formation of X, the transfers of property to X, and the sale of X stock by B are part of a series of related transactions, the relationship between A and X must be tested immediately before the first transaction in the series (the transfer of property to X) and immediately after the last transaction in the series (the sale of X stock to C). See paragraph (h)(6)(ii)(B) of this section. Because there was no relationship between A and X immediately before and only a 15% relationship immediately after, A is not related to X for purposes of applying the anti-churning rules of paragraph (h) of this section. Accordingly, X may amortize the section 197 intangible.

**Example 26.** Relationship created as part of stock acquisition followed by liquidation. (i) In 2001, Partnership P purchases 100 percent of the stock of Corporation X. P and X were not related prior to the acquisition. Immediately after acquiring the X stock, and as part of a series of related transactions, P liquidates X under section 331. In the liquidating distribution, P receives a section 197(f)(9) intangible that was held by X during the transition period.

(ii) Because the relationship between P and X was created pursuant to a series of related transactions where P acquires stock (meeting the requirements of section 1504(a)(2)) in a fully taxable transaction followed by a liquidation under section 331, the relationship immediately after the last transaction in the series (the liquidation) is disregarded. See paragraph (h)(6)(iii) of this section. Accordingly, P is entitled to amortize the section 197(f)(9) intangible.

**Example 27.** Section 743(b) adjustment with no change in user. (i) On January 1, 2001, A forms a partnership (PRS) with B in which A owns a 40–percent, and B owns a 60–percent, interest in profits and capital. A contributes a nonamortizable section 197(f)(9) intangible with a value of $80 and an adjusted basis of $0 to PRS in exchange for its PRS interest and B contributes $120 cash. At the time of the contribution, PRS licenses the section 197(f)(9) intangible to A. On February 1, 2001, A sells its entire interest in PRS to C, an unrelated person, for $80. PRS has a section 754 election in effect.

(ii) The section 197(f)(9) intangible contributed to PRS by A is not amortizable in the hands of PRS. Pursuant to section (g)(2)(ii) of this section, PRS steps into the shoes of A with respect to A's nonamortizable transferred basis in the intangible.

(iii) When A sells the PRS interest to C, C will have a basis adjustment in the PRS assets under section 743(b) equal to $80. The entire basis adjustment will be allocated to the intangible because the only other asset held by PRS is cash. Ordinarily, under paragraph (h)(12)(v) of this section, the anti-churning rules will not apply to an increase in the basis of partnership property under section 743(b) if the person acquiring the partnership interest is not related to the person transferring the partnership interest. However, A is an anti-churning partner under paragraph (h)(12)(vi)(B)(2)(i) of this section. As a result of the license

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 208 of 651

agreement, A remains a direct user of the section 197(f)(9) intangible after the transfer to C. Accordingly, paragraph (h)(12)(vi)(A) of this section will cause the anti-churning rules to apply to the entire basis adjustment under section 743(b).

**Example 28.** Distribution of section 197(f)(9) intangible to partner who acquired partnership interest prior to the effective date. (i) In 1990, A, B, and C each contribute $150 cash to form general partnership ABC for the purpose of engaging in a consulting business and a software manufacturing business. The partners agree to share partnership profits and losses equally. In 2000, the partnership distributes the consulting business to A in liquidation of A's entire interest in ABC. The only asset of the consulting business is a nonamortizable intangible, which has a fair market value of $180 and a basis of $0. At the time of the distribution, the adjusted basis of A's interest in ABC is $150. A is not related to B or C. ABC does not have a section 754 election in effect.

(ii) Under section 732(b), A's adjusted basis in the intangible distributed by ABC is $150, a $150 increase over the basis of the intangible in ABC's hands. In determining whether the anti-churning rules apply to any portion of the basis increase, A is treated as having owned and used A's proportionate share of partnership property. Thus, A is treated as holding an interest in the intangible during the transition period. Because the intangible was not amortizable prior to the enactment of section 197, the section 732(b) increase in the basis of the intangible may be subject to the anti-churning provisions. Paragraph (h)(12)(ii) of this section provides that the anti-churning provisions apply to the extent that the section 732(b) adjustment exceeds the total unrealized appreciation from the intangible allocable to partners other than A or persons related to A, as well as certain other partners whose purchase of their interests meet certain criteria. Because B and C are not related to A, and A's acquisition of its partnership interest does not satisfy the necessary criteria, the section 732(b) basis increase is subject to the anti-churning provisions to the extent that it exceeds B and C's proportionate share of the unrealized appreciation from the intangible. B and C's proportionate share of the unrealized appreciation from the intangible is $120 (2/3 of $180). This is the amount of gain that would be allocated to B and C if the partnership sold the intangible immediately before the distribution for its fair market value of $180. Therefore, $120 of the section 732(b) basis increase is not subject to the anti-churning rules. The remaining $30 of the section 732(b) basis increase is subject to the anti-churning rules. Accordingly, A is treated as having two intangibles, an amortizable section 197 intangible with an adjusted basis of $120 and a new amortization period of 15 years and a nonamortizable intangible with an adjusted basis of $30.

(iii) In applying the anti-churning rules to future transfers of the distributed intangible, under paragraph (h)(12)(ii)(C) of this section, one-third of the intangible will continue to be subject to the anti-churning rules, determined as follows: The sum of the amount of the distributed intangible's basis that is nonamortizable under paragraph (g)(2)(ii)(B) of this section ($0) and the total unrealized appreciation inherent in the intangible reduced by the amount of the increase in the adjusted basis of the distributed intangible under section 732(b) to which the anti-churning rules do not apply ($180 - $120 = $60), over the fair market value of the distributed intangible ($180).

**Example 29.** Distribution of section 197(f)(9) intangible to partner who acquired partnership interest after the effective date. (i) The facts are the same as in Example 28, except that B and C form ABC in 1990. A does not acquire an interest in ABC until 1995. In 1995, A contributes $150 to ABC in exchange for a one-third interest in ABC. At the time of the distribution, the adjusted basis of A's interest in ABC is $150.

(ii) As in Example 28, the anti-churning rules do not apply to the increase in the basis of the intangible distributed to A under section 732(b) to the extent that it does not exceed the unrealized appreciation from the intangible allocable to B and C. Under paragraph (h)(12)(ii) of this section, the anti-churning provisions also do not apply to the section 732(b) basis increase to the extent of A's allocable share of the unrealized appreciation from the intangible because A acquired the ABC interest from an unrelated person after August 10, 1993, and the intangible was acquired by the partnership before A acquired the ABC interest. Under paragraph (h)(12)(ii)(E) of this section, A is deemed to acquire the ABC partnership interest from an unrelated person because A acquired the ABC partnership interest in exchange for a contribution to the partnership of property other than the distributed intangible and, at the time of the contribution, no partner in the partnership was related to A. Consequently, the increase in the basis of the intangible under section 732(b) is not subject to the anti-churning rules to the extent of the total unrealized appreciation from the intangible allocable to A, B, and C. The total unrealized appreciation from the intangible

allocable to A, B, and C is $180 (the gain the partnership would have recognized if it had sold the intangible for its fair market value immediately before the distribution). Because this amount exceeds the section 732(b) basis increase of $150, the entire section 732(b) basis increase is amortizable.

(iii) In applying the anti-churning rules to future transfers of the distributed intangible, under paragraph (h)(12)(ii)(C) of this section, one-sixth of the intangible will continue to be subject to the anti-churning rules, determined as follows: The sum of the amount of the distributed intangible's basis that is nonamortizable under paragraph (g)(2)(ii)(B) of this section ($0) and the total unrealized appreciation inherent in the intangible reduced by the amount of the increase in the adjusted basis of the distributed intangible under section 732(b) to which the anti-churning rules do not apply ($180 - $150 = $30), over the fair market value of the distributed intangible ($180).

**Example 30.** Distribution of section 197(f)(9) intangible contributed to the partnership by a partner.

(i) The facts are the same as in Example 29, except that C purchased the intangible used in the consulting business in 1988 for $60 and contributed the intangible to ABC in 1990. At that time, the intangible had a fair market value of $150 and an adjusted tax basis of $60. When ABC distributes the intangible to A in 2000, the intangible has a fair market value of $180 and a basis of $60.

(ii) As in Examples 28 and 29, the adjusted basis of the intangible in A's hands is $150 under section 732(b). However, the increase in the adjusted basis of the intangible under section 732(b) is only $90 ($150 adjusted basis after the distribution compared to $60 basis before the distribution). Pursuant to paragraph (g)(2)(ii)(B) of this section, A steps into the shoes of ABC with respect to the $60 of A's adjusted basis in the intangible that corresponds to ABC's basis in the intangible and this portion of the basis is nonamortizable. B and C are not related to A, A acquired the ABC interest from an unrelated person after August 10, 1993, and the intangible was acquired by ABC before A acquired the ABC interest. Therefore, under paragraph (h)(12)(ii) of this section, the section 732(b) basis increase is amortizable to the extent of A, B, and C's allocable share of the unrealized appreciation from the intangible. The total unrealized appreciation from the intangible that is allocable to A, B, and C is $120. If ABC had sold the intangible immediately before the distribution to A for its fair market value of $180, it would have recognized gain of $120, which would have been allocated $10 to A, $10 to B, and $100 to C under section 704(c). Because A, B, and C's allocable share of the unrealized appreciation from the intangible exceeds the section 732(b) basis increase in the intangible, the entire $90 of basis increase is amortizable by A. Accordingly, after the distribution, A will be treated as having two intangibles, an amortizable section 197 intangible with an adjusted basis of $90 and a new amortization period of 15 years and a nonamortizable intangible with an adjusted basis of $60.

(iii) In applying the anti-churning rules to future transfers of the distributed intangible, under paragraph (h)(12)(ii)(C) of this section, one-half of the intangible will continue to be subject to the anti-churning rules, determined as follows: The sum of the amount of the distributed intangible's basis that is nonamortizable under paragraph (g)(2)(ii)(B) of this section ($60) and the total unrealized appreciation inherent in the intangible reduced by the amount of the increase in the adjusted basis of the distributed intangible under section 732(b) to which the anti-churning rules do not apply ($120 - $90 = $30), over the fair market value of the distributed intangible ($180).

**Example 31.** Partnership distribution causing section 734(b) basis adjustment to section 197(f)(9) intangible.

(i) On January 1, 2001, A, B, and C form a partnership (ABC) in which each partner shares equally in capital and income, gain, loss, and deductions. On that date, A contributes a section 197(f)(9) intangible with a zero basis and a value of $150, and B and C each contribute $150 cash. A and B are related, but neither A nor B is related to C. ABC does not adopt the remedial allocation method for making section 704(c) allocations of amortization expenses with respect to the intangible. On December 1, 2004, when the value of the intangible has increased to $600, ABC distributes $300 to B in complete redemption of B's interest in the partnership. ABC has an election under section 754 in effect for the taxable year that includes December 1, 2004.

(Assume that, at the time of the distribution, the basis of A's partnership interest remains zero, and the basis of each of B's and C's partnership interest remains $150.)

(ii) Immediately prior to the distribution, the assets of the partnership are revalued pursuant to § 1.704–1(b)(2)(iv)(f), so that the section 197(f)(9) intangible is reflected on the books of the partnership at a value of $600. B recognizes $150 of gain under section 731(a)(1) upon the distribution of $300 in redemption of B's partnership interest. As a result, the adjusted basis of the intangible held by ABC increases by $150 under section 734(b). A does not satisfy any of the tests set forth under paragraph (h)(12)(iv)(B) and thus is not an eligible partner. C is not related to B and thus is an eligible partner under paragraph (h)(12)(iv)(B)(1) of this section. The capital accounts of A and C are equal immediately after the distribution, so, pursuant to paragraph (h)(12)(iv)(D)(1) of this section, each partner's share of the basis increase is equal to $75. Because A is not an eligible partner, the anti-churning rules apply to A's share of the basis increase. The anti-churning rules do not apply to C's share of the basis increase.

(iii) For book purposes, ABC determines the amortization of the asset as follows: First, the intangible that is subject to adjustment under section 734(b) will be divided into three assets: the first, with a basis and value of $75 will be amortizable for both book and tax purposes; the second, with a basis and value of $75 will be amortizable for book, but not tax purposes; and a third asset with a basis of zero and a value of $450 will not be amortizable for book or tax purposes. Any subsequent revaluation of the intangible pursuant to § 1.704–1(b)(2)(iv)(f) will be made solely with respect to the third asset (which is not amortizable for book purposes). The book and tax attributes from the first asset (i.e., book and tax amortization) will be specially allocated to C. The book and tax attributes from the second asset (i.e., book amortization and non-amortizable tax basis) will be specially allocated to A. Upon disposition of the intangible, each partner's share of gain or loss will be determined first by allocating among the partners an amount realized equal to the book value of the intangible attributable to such partner, with any remaining amount realized being allocated in accordance with the partnership agreement. Each partner then will compare its share of the amount realized with its remaining basis in the intangible to arrive at the gain or loss to be allocated to such partner. This is a reasonable method for amortizing the intangible for book purposes, and the results in allocating the income, gain, loss, and deductions attributable to the intangible do not contravene the purposes of the anti-churning rules under section 197 or paragraph (h) of this section.

**(l) Effective dates—(1) In general.** This section applies to property acquired after January 25, 2000, except that paragraph (c)(13) of this section (exception from section 197 for separately acquired rights of fixed duration or amount) applies to property acquired after August 10, 1993 (or July 25, 1991, if a valid retroactive election has been made under § 1.197–1T), and paragraphs (h)(12)(ii), (iii), (iv), (v), (vi)(A), and (vii)(B) of this section (anti-churning rules applicable to partnerships) apply to partnership transactions occurring on or after November 20, 2000.

> **(2) Application to pre-effective date acquisitions.** A taxpayer may choose, on a transaction-by-transaction basis, to apply the provisions of this section and § 1.167(a)–14 to property acquired (or partnership transactions occurring) after August 10, 1993 (or July 25, 1991, if a valid retroactive election has been made under § 1.197–1T) and—

> **(i)** On or before January 25, 2000; or

> **(ii)** With respect to paragraphs (h)(12)(ii), (iii), (iv), (v), (vi)(A), and (vii)(B) of this section, before November 20, 2000.

> **(3) Application of regulation project REG–209709–94 to pre-effective date acquisitions.** A taxpayer may rely on the provisions of regulation project REG–209709–94 (1997–1 C.B. 731) for property acquired after August 10, 1993 (or July 25, 1991, if a valid retroactive election has been made under § 1.197–1T) and on or before January 25, 2000.

**(4) Change in method of accounting—(i) In general.** For the first taxable year ending after January 25, 2000, a taxpayer that has acquired property to which the exception in § 1.197–2(c)(13) applies is granted consent of the Commissioner to change its method of accounting for such property to comply with the provisions of this section and § 1.167(a)–14 unless the proper treatment of such property is an issue under consideration (within the meaning of Rev. Proc. 97–27 (1997–21 IRB 10)(see § 601.601(d)(2) of this chapter)) in an examination, before an Appeals office, or before a Federal court.

**(ii) Application to pre-effective date acquisitions.** For the first taxable year ending after January 25, 2000, a taxpayer is granted consent of the Commissioner to change its method of accounting for all property acquired in transactions described in paragraph (l)(2) of this section to comply with the provisions of this section and § 1.167(a)–14 unless the proper treatment of any such property is an issue under consideration (within the meaning of Rev. Proc. 97–27 (1997–21 IRB 10) (see § 601.601(d)(2) of this chapter)) in an examination, before an Appeals office, or before a Federal court.

**(iii) Automatic change procedures.** A taxpayer changing its method of accounting in accordance with this paragraph (l) (4) must follow the automatic change in accounting method provisions of Rev. Proc. 99–49 (1999–52 IRB 725) (see § 601.601(d)(2) of this chapter) except, for purposes of this paragraph (l)(4), the scope limitations in section 4.02 of Rev. Proc. 99–49 (1999–52 IRB 725) are not applicable. However, if the taxpayer is under examination, before an appeals office, or before a Federal court, the taxpayer must provide a copy of the application to the examining agent(s), appeals officer, or counsel for the government, as appropriate, at the same time that it files the copy of the application with the National Office. The application must contain the name(s) and telephone number(s) of the examining agent(s), appeals officer, or counsel for the government, as appropriate.

**Credits**

[T.D. 8865, 65 FR 3827, Jan. 25, 2000; 65 FR 16318, March 28, 2000; 65 FR 60585, Oct. 12, 2000; T.D. 8907, 65 FR 69671, Nov. 20, 2000; T.D. 8940, 66 FR 9929, Feb. 13, 2001; 66 FR 17363, March 30, 2001; 66 FR 22286, May 3, 2001; T.D. 9256, 71 FR 17996, April 10, 2006; T.D. 9377, 73 FR 3869, Jan. 23, 2008; T.D. 9533, 76 FR 39280, July 6, 2011; T.D. 9637, 78 FR 54759, Sept. 6, 2013]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

AUTHORITY: Sections 1.909–1 through 1.906–6 also issued under 26 U.S.C. 909(e).

Notes of Decisions (9)

Current through March 24, 2016; 81 FR 16051.

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.  **0207** 46

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Corporate Distributions and Adjustments
              Corporate Liquidations
                Effects on Corporation

26 C.F.R. § 1.338–6, Treas. Reg. § 1.338–6

§ 1.338–6 Allocation of ADSP and AGUB among target assets.

Effective: September 11, 2007
Currentness

**(a) Scope—(1) In general.** This section prescribes rules for allocating ADSP and AGUB among the acquisition date assets of a target for which a section 338 election is made.

**(2) Fair market value—(i) In general.** Generally, the fair market value of an asset is its gross fair market value (i.e., fair market value determined without regard to mortgages, liens, pledges, or other liabilities). However, for purposes of determining the amount of old target's deemed sale tax consequences, the fair market value of any property subject to a nonrecourse indebtedness will be treated as being not less than the amount of such indebtedness. (For purposes of the preceding sentence, a liability that was incurred because of the acquisition of the property is disregarded to the extent that such liability was not taken into account in determining old target's basis in such property.)

**(ii) Transaction costs.** Transaction costs are not taken into account in allocating ADSP or AGUB to assets in the deemed sale (except indirectly through their effect on the total ADSP or AGUB to be allocated).

**(iii) Internal Revenue Service authority.** In connection with the examination of a return, the Internal Revenue Service may challenge the taxpayer's determination of the fair market value of any asset by any appropriate method and take into account all factors, including any lack of adverse tax interests between the parties.

**(b) General rule for allocating ADSP and AGUB—(1) Reduction in the amount of consideration for Class I assets.** Both ADSP and AGUB, in the respective allocation of each, are first reduced by the amount of Class I assets. Class I assets are cash and general deposit accounts (including savings and checking accounts) other than certificates of deposit held in banks, savings and loan associations, and other depository institutions. If the amount of Class I assets exceeds AGUB, new target will immediately realize ordinary income in an amount equal to such excess. The amount of ADSP or AGUB remaining after the reduction is to be allocated to the remaining acquisition date assets.

**(2) Other assets—(i) In general.** Subject to the limitations and other rules of paragraph (c) of this section, ADSP and AGUB (as reduced by the amount of Class I assets) are allocated among Class II acquisition date assets of target in proportion to the fair market values of such Class II assets at such time, then among Class III assets so held in such

proportion, then among Class IV assets so held in such proportion, then among Class V assets so held in such proportion, then among Class VI assets so held in such proportion, and finally to Class VII assets. If an asset is described below as includible in more than one class, then it is included in such class with the lower or lowest class number (for instance, Class III has a lower class number than Class IV).

**(ii) Class II assets.** Class II assets are actively traded personal property within the meaning of section 1092(d)(1) and § 1.1092(d)–1 (determined without regard to section 1092(d)(3)). In addition, Class II assets include certificates of deposit and foreign currency even if they are not actively traded personal property. Class II assets do not include stock of target affiliates, whether or not of a class that is actively traded, other than actively traded stock described in section 1504(a)(4). Examples of Class II assets include U.S. government securities and publicly traded stock.

**(iii) Class III assets.** Class III assets are assets that the taxpayer marks to market at least annually for Federal income tax purposes and debt instruments (including accounts receivable). However, Class III assets do not include—

(A) Debt instruments issued by persons related at the beginning of the day following the acquisition date to the target under section 267(b) or 707;

(B) Contingent debt instruments subject to § 1.1275–4, § 1.483–4, or section 988, unless the instrument is subject to the non-contingent bond method of § 1.1275–4(b) or is described in § 1.988–2(b)(2)(i)(B)(2); and

(C) Debt instruments convertible into the stock of the issuer or other property.

**(iv) Class IV assets.** Class IV assets are stock in trade of the taxpayer or other property of a kind that would properly be included in the inventory of taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business.

**(v) Class V assets.** Class V assets are all assets other than Class I, II, III, IV, VI, and VII assets.

**(vi) Class VI assets.** Class VI assets are all section 197 intangibles, as defined in section 197, except goodwill and going concern value.

**(vii) Class VII assets.** Class VII assets are goodwill and going concern value (whether or not the goodwill or going concern value qualifies as a section 197 intangible).

**(3) Other items designated by the Internal Revenue Service.** Similar items may be added to any class described in this paragraph (b) by designation in the Internal Revenue Bulletin by the Internal Revenue Service (see § 601.601(d)(2) of this chapter).

**(c) Certain limitations and other rules for allocation to an asset—(1) Allocation not to exceed fair market value.** The amount of ADSP or AGUB allocated to an asset (other than Class VII assets) cannot exceed the fair market value of that asset at the beginning of the day after the acquisition date.

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 214 of 651

**(2) Allocation subject to other rules.** The amount of ADSP or AGUB allocated to an asset is subject to other provisions of the Internal Revenue Code or general principles of tax law in the same manner as if such asset were transferred to or acquired from an unrelated person in a sale or exchange. For example, if the deemed asset sale is a transaction described in section 1056(a) (relating to basis limitation for player contracts transferred in connection with the sale of a franchise), the amount of AGUB allocated to a contract for the services of an athlete cannot exceed the limitation imposed by that section. As another example, section 197(f)(5) applies in determining the amount of AGUB allocated to an amortizable section 197 intangible resulting from an assumption-reinsurance transaction.

**(3) Special rule for allocating AGUB when purchasing corporation has nonrecently purchased stock—(i) Scope.** This paragraph (c)(3) applies if at the beginning of the day after the acquisition date—

(A) The purchasing corporation holds nonrecently purchased stock for which a gain recognition election under section 338(b)(3) and § 1.338–5(d) is not made; and

(B) The hypothetical purchase price determined under paragraph (c)(3)(ii) of this section exceeds the AGUB determined under § 1.338–5(b).

**(ii) Determination of hypothetical purchase price.** Hypothetical purchase price is the AGUB that would result if a gain recognition election were made.

**(iii) Allocation of AGUB.** Subject to the limitations in paragraphs (c)(1) and (2) of this section, the portion of AGUB (after reduction by the amount of Class I assets) to be allocated to each Class II, III, IV, V, VI, and VII asset of target held at the beginning of the day after the acquisition date is determined by multiplying—

(A) The amount that would be allocated to such asset under the general rules of this section were AGUB equal to the hypothetical purchase price; by

(B) A fraction, the numerator of which is actual AGUB (after reduction by the amount of Class I assets) and the denominator of which is the hypothetical purchase price (after reduction by the amount of Class I assets).

**(4) Liabilities taken into account in determining amount realized on subsequent disposition.** In determining the amount realized on a subsequent sale or other disposition of property deemed purchased by new target, § 1.1001–2(a)(3) shall not apply to any liability that was taken into account in AGUB.

**(5) Allocation to certain nuclear decommissioning funds—(i) General rule.** For purposes of allocating ADSP or AGUB among the acquisition date assets of a target (and for no other purpose), a taxpayer may elect to treat a nonqualified nuclear decommissioning fund (as defined in paragraph (c)(5)(ii) of this section) of the target as if—

(A) Such fund were an entity classified as a corporation;

(B) The stock of the corporation were among the acquisition date assets of the target and a Class V asset;

(C) The corporation owned the assets of the fund;

(D) The corporation bore the responsibility for decommissioning one or more nuclear power plants to the extent assets of the fund are expected to be used for that purpose; and

(E) A section 338(h)(10) election were made for the corporation (regardless of whether the requirements for a section 338(h)(10) election are otherwise satisfied).

**(ii) Definition of nonqualified nuclear decommissioning fund.** A **nonqualified nuclear decommissioning fund** means a trust, escrow account, Government fund or other type of agreement—

(A) That is established in writing by the owner or licensee of a nuclear generating unit for the exclusive purpose of funding the decommissioning of one or more nuclear power plants;

(B) That is described to the Nuclear Regulatory Commission in a report described in 10 CFR 50.75(b) as providing assurance that funds will be available for decommissioning;

(C) That is not a Nuclear Decommissioning Reserve Fund, as described in section 468A;

(D) That is maintained at all times in the United States; and

(E) The assets of which are to be used only as permitted by 10 CFR 50.82(a)(8).

**(iii) Availability of election.** P may make the election described in this paragraph (c)(5) regardless of whether the selling consolidated group (or the selling affiliate or the S corporation shareholders) also makes the election. In addition, the selling consolidated group (or the selling affiliate or the S corporation shareholders) may make the election regardless of whether P also makes the election. If T is an S corporation, all of the S corporation shareholders, including those that do not sell their stock, must consent to the election for the election to be effective as to any S corporation shareholder.

**(iv) Time and manner of making election.** The election described in this paragraph (c)(5) is made by taking a position on an original or amended tax return for the taxable year of the qualified stock purchase that is consistent with having made the election. Such tax return must be filed no later than the later of 30 days after the date on which the section 338 election is due or the day the original tax return for the taxable year of the qualified stock purchase is due (with extensions).

**(v) Irrevocability of election.** An election made pursuant to this paragraph (c)(5) is irrevocable.

**(vi) Effective/applicability date.** This paragraph (c)(5) applies to qualified stock purchases occurring on or after September 11, 2007. For qualified stock purchases occurring before September 11, 2007 and on or after September 15, 2004, see § 1.338–6T as contained in 26 CFR part 1 in effect on April 1, 2007. For qualified stock purchases occurring before September 15, 2004, see § 1.338–6 as contained in 26 CFR part 1 in effect on April 1, 2004.

**(d) Examples.** The following examples illustrate §§ 1.338–4, 1.338–5, and this section:

**Example 1.** (i) T owns 90 percent of the outstanding T1 stock. P purchases 100 percent of the outstanding T stock for $2,000. There are no acquisition costs. P makes a section 338 election for T and, as a result, T1 is considered acquired in a qualified stock purchase. A section 338 election is made for T1. The grossed-up basis of the T stock is $2,000 (i.e., $2,000 + 1/1).

(ii) The liabilities of T as of the beginning of the day after the acquisition date (including the tax liability for the deemed sale tax consequences) that would, under general principles of tax law, properly be taken into account at that time, are as follows:

| | |
|---|---|
| Liabilities (nonrecourse mortgage plus unsecured liabilities)............................................................. | $700 |
| Taxes Payable................................................................................................................................... | 300 |
| Total.................................................................................................................................................. | 1,000 |

(iii) The AGUB of T is determined as follows:

| | |
|---|---|
| Grossed-up basis............................................................................................................................... | $2,000 |
| Total liabilities.................................................................................................................................. | 1,000 |
| AGUB................................................................................................................................................. | 3,000 |

(iv) Assume that ADSP is also $3,000.

(v) Assume that, at the beginning of the day after the acquisition date, T's cash and the fair market values of T's Class II, III, IV, and V assets are as follows:

| Asset class | Asset | Fair market value |
|---|---|---|
| I.....................................| Cash.................................................................................................................... | *$200 |
| II....................................| Portfolio of actively traded securities................................................................. | 300 |
| III..................................| Accounts receivable............................................................................................. | 600 |
| IV..................................| Inventory.............................................................................................................. | 300 |
| V....................................| Building................................................................................................................ | 800 |
| V....................................| Land...................................................................................................................... | 200 |
| V....................................| Investment in T1.................................................................................................. | 450 |

| | |
|---|---|
| ................................ | |
| Total................................................................................................................... | 2,850 |

\*

Amount.

(vi) Under paragraph (b)(1) of this section, the amount of ADSP and AGUB allocable to T's Class II, III, IV, and V assets is reduced by the amount of cash to $2,800, i.e., $3,000 - $200. $300 of ADSP and of AGUB is then allocated to actively traded securities. $600 of ADSP and of AGUB is then allocated to accounts receivable. $300 of ADSP and of AGUB is then allocated to the inventory. Since the remaining amount of ADSP and of AGUB is $1,600 (i.e., $3,000 - ($200 + $300 + $600 + $300)), an amount which exceeds the sum of the fair market values of T's Class V assets, the amount of ADSP and of AGUB allocated to each Class V asset is its fair market value:

| | |
|---|---|
| Building.......................................................................................................... | $800 |
| Land................................................................................................................. | 200 |
| Investment in T1............................................................................................ | 450 |
| Total................................................................................................................. | 1,450 |

(vii) T has no Class VI assets. The amount of ADSP and of AGUB allocated to T's Class VII assets (goodwill and going concern value) is $150, i.e., $1,600 - $1,450.

(viii) The grossed-up basis of the T1 stock is $500, i.e., $450 x 1/.9.

(ix) The liabilities of T1 as of the beginning of the day after the acquisition date (including the tax liability for the deemed sale tax consequences) that would, under general principles of tax law, properly be taken into account at that time, are as follows:

| | |
|---|---|
| General Liabilities........................................................................................... | $100 |
| Taxes Payable.................................................................................................. | 20 |
| Total................................................................................................................. | 120 |

(x) The AGUB of T1 is determined as follows:

| | |
|---|---|
| Grossed-up basis of T1 Stock......................................................................... | $500 |
| Liabilities......................................................................................................... | 120 |
| AGUB................................................................................................................ | 620 |

(xi) Assume that ADSP is also $620.

(xii) Assume that at the beginning of the day after the acquisition date, T1's cash and the fair market values of its Class IV and VI assets are as follows:

| Asset class | Asset | Fair market value |
|---|---|---|
| I......................................Cash...................................................................................................................... | | *$50 |
| IV................................. Inventory.................................................................................................................. | | 200 |
| VI................................ Patent....................................................................................................................... | | 350 |
| Total................................................................................................... | | 600 |

* Amount.

(xiii) The amount of ADSP and of AGUB allocable to T1's Class IV and VI assets is first reduced by the $50 of cash.

(xiv) Because the remaining amount of ADSP and of AGUB ($570) is an amount which exceeds the fair market value of T1's only Class IV asset, the inventory, the amount allocated to the inventory is its fair market value ($200). After that, the remaining amount of ADSP and of AGUB ($370) exceeds the fair market value of T1's only Class VI asset, the patent. Thus, the amount of ADSP and of AGUB allocated to the patent is its fair market value ($350).

(xv) The amount of ADSP and of AGUB allocated to T1's Class VII assets (goodwill and going concern value) is $20, i.e., $570 - $550.

**Example 2.** (i) Assume that the facts are the same as in Example 1 except that P has, for five years, owned 20 percent of T's stock, which has a basis in P's hands at the beginning of the day after the acquisition date of $100, and P purchases the remaining 80 percent of T's stock for $1,600. P does not make a gain recognition election under section 338(b)(3).

(ii) Under § 1.338–5(c), the grossed-up basis of recently purchased T stock is $1,600, i.e., $1,600 x (1-.2)/.8.

(iii) The AGUB of T is determined as follows:

| | |
|---|---|
| Grossed-up basis of recently purchased stock as determined under § 1.338-5(c) ($1,600 x (1-.2)/.8)............ | $1,600 |
| Basis of nonrecently purchased stock................................................................................................ | 100 |
| Liabilities.......................................................................................................................................... | 1,000 |
| AGUB............................................................................................................................................... | 2,700 |

(iv) Since P holds nonrecently purchased stock, the hypothetical purchase price of the T stock must be computed and is determined as follows:

| | |
|---|---|
| Grossed-up basis of recently purchased stock as determined under § 1.338-5(c) ($1,600 x (1-.2)/.8)............ | $1,600 |
| Basis of nonrecently purchased stock as if the gain recognition election under § 1.338-5(d)(2) had been made ($1,600 x .2/(1-.2))..................................................................................................................... | 400 |
| Liabilities.......................................................................................................................................... | 1,000 |
| Total................................................................................................................................................... | 3,000 |

(v) Since the hypothetical purchase price ($3,000) exceeds the AGUB ($2,700) and no gain recognition election is made under section 338(b)(3), AGUB is allocated under paragraph (c)(3) of this section.

(vi) First, an AGUB amount equal to the hypothetical purchase price ($3,000) is allocated among the assets under the general rules of this section. The allocation is set forth in the column below entitled Original Allocation. Next, the allocation to each asset in Class II through Class VII is multiplied by a fraction having a numerator equal to the actual AGUB reduced by the amount of Class I assets ($2,700 - $200 = $2,500) and a denominator equal to the hypothetical purchase price reduced by the amount of Class I assets ($3,000 - $200 = $2,800), or 2,500/2,800. This produces the Final Allocation:

| Class | Asset | Original allocation | Final allocation |
|---|---|---|---|
| I............................................Cash................................................................................ | | $200 | $200 |
| II........................................ Portfolio of actively traded securities............................. | | 300 | *268 |
| III....................................... Accounts receivable........................................................ | | 600 | 536 |
| IV.......................................Inventory............................................................................ | | 300 | 268 |
| V......................................... Building............................................................................. | | 800 | 714 |
| V......................................... Land.................................................................................. | | 200 | 178 |
| V......................................... Investment in T1............................................................. | | 450 | 402 |
| VII.....................................Goodwill and going concern value................................. | | 150 | 134 |
| | Total.................................................................................. | 3,000 | 2,700 |

  * All numbers rounded for convenience.

**Credits**
[T.D. 8940, 66 FR 9943, Feb. 13, 2001; 66 FR 17363, March 30, 2001; T.D. 9158, 69 FR 55742, Sept. 16, 2004; T.D. 9358, 72 FR 51706, Sept. 11, 2007]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

Notes of Decisions (1)

Current through March 24, 2016; 81 FR 16051.

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 26. Internal Revenue
      Chapter I. Internal Revenue Service, Department of the Treasury
         Subchapter A. Income Tax
            Part 1. Income Taxes (Refs & Annos)
               Normal Taxes and Surtaxes
                  Deferred Compensation, Etc.
                     Methods of Accounting
                        Taxable Year for Which Deductions Taken

26 C.F.R. § 1.467–1, Treas. Reg. § 1.467–1

§ 1.467–1 Treatment of lessors and lessees generally.

Currentness

**(a) Overview—(1) In general.** When applicable, section 467 requires a lessor and lessee of tangible property to treat rents consistently and to use the accrual method of accounting (and time value of money principles) regardless of their overall method of accounting. In addition, in certain cases involving tax avoidance, the lessor and lessee must take rent and stated or imputed interest into account under a constant rental accrual method, pursuant to which the rent is treated as accruing ratably over the entire lease term.

**(2) Cases in which rules are inapplicable.** Section 467 applies only to leases (or other similar arrangements) that constitute section 467 rental agreements as defined in paragraph (c) of this section. For example, a rental agreement is not a section 467 rental agreement, and, therefore, is not subject to the provisions of this section and §§ 1.467–2 through 1.467–9 (the section 467 regulations), if it specifies equal amounts of rent for each month throughout the lease term and all payments of rent are due in the calendar year to which the rent relates (or in the preceding or succeeding calendar year). In addition, the section 467 regulations do not apply to a rental agreement that requires total rents of $250,000 or less. For purposes of determining whether the agreement has total rents of $250,000 or less, certain specified contingent rent is disregarded.

**(3) Summary of rules—(i) Basic rules.** Paragraph (c) of this section provides rules for determining whether a rental agreement is a section 467 rental agreement. Paragraphs (d) and (e) of this section provide rules for determining the amount of rent and interest, respectively, required to be taken into account by a lessor and lessee under a section 467 rental agreement. Paragraphs (f) through (h) and (j) of this section provide various definitions and special rules relating to the application of the section 467 regulations. Paragraph (i) of this section is reserved.

**(ii) Special rules.** Section 1.467–2 provides rules for section 467 rental agreements that have deferred or prepaid rents without providing for adequate interest. Section 1.467–3 provides rules for application of the constant rental accrual method, including criteria for determining whether an agreement is subject to this method. Section 1.467–4 provides rules for establishing and adjusting a section 467 loan (the amount that a lessor is deemed to have loaned to the lessee, or vice versa, pursuant to the application of the section 467 regulations). Section 1.467–5 provides rules for applying the section 467 regulations where a rental agreement requires payments of interest at a variable rate. Section 1.467–6, relating to the treatment of certain section 467 rental agreements with contingent payments, is reserved. Section 1.467–7 provides rules for the treatment of dispositions by a lessor of property subject to a section 467 rental agreement and the treatment of assignments by lessees and certain lessee-financed renewals of a section 467 rental agreement. Section 1.467–7 also provides rules for the treatment of modified rental agreements. Section 1.467–8 provides special transitional rules relating

to the method of accounting for certain rental agreements entered into on or before May 18, 1999. Finally, § 1.467–9 provides the effective date rules for the section 467 regulations.

**(4) Scope of rules.** No inference should be drawn from any provision of this section or §§ 1.467–2 through 1.467–9 concerning whether—

**(i)** For Federal tax purposes, an arrangement constitutes a lease; or

**(ii)** For Federal tax purposes, any obligation of the lessee under a rental agreement is treated as rent.

**(5) Application of other authorities.** Notwithstanding section 467 and the regulations thereunder, other authorities such as section 446(b) clear-reflection-of-income principles, section 482, and the substance-over-form doctrine, may be applied by the Commissioner to determine the income and expense from a rental agreement (including the proper allocation of fixed rent under a rental agreement).

**(b) Method of accounting for section 467 rental agreements.** If a rental agreement is a section 467 rental agreement, as described in paragraph (c) of this section, the lessor and lessee must each take into account for any taxable year the sum of—

**(1)** The section 467 rent for the taxable year (as defined in paragraph (d) of this section); and

**(2)** The section 467 interest for the taxable year (as defined in paragraph (e) of this section).

**(c) Section 467 rental agreements—(1) In general.** Except as otherwise provided in paragraph (c)(4) of this section, the term section 467 rental agreement means a rental agreement, as defined in paragraph (h)(12) of this section, that has increasing or decreasing rents (as described in paragraph (c)(2) of this section), or deferred or prepaid rents (as described in paragraph (c)(3) of this section).

**(2) Increasing or decreasing rent—(i) Fixed rent—(A) In general.** A rental agreement has increasing or decreasing rent if the annualized fixed rent, as described in paragraph (j)(3) of this section, allocated to any rental period exceeds the annualized fixed rent allocated to any other rental period in the lease term.

(B) Certain rent holidays disregarded. Notwithstanding the provisions of paragraph (c)(2)(i)(A) of this section, a rental agreement does not have increasing or decreasing rent if the increasing or decreasing rent is solely attributable to a rent holiday provision allowing reduced rent (or no rent) for a period of three months or less at the beginning of the lease term.

**(ii) Fixed rent allocated to a rental period—(A) Specific allocation—(1) In general.** If a rental agreement provides a specific allocation of fixed rent, as described in paragraph (c)(2)(ii)(A)(2) of this section, the amount of fixed rent allocated to each rental period during the lease term is the amount of fixed rent allocated to that period by the rental agreement.

(2) Rental agreements specifically allocating fixed rent. A rental agreement specifically allocates fixed rent if the rental agreement unambiguously specifies, for periods no longer than a year, a fixed amount of rent for which the lessee becomes liable on account of the use of the property during that period, and the total amount of fixed rent specified is equal to the total amount of fixed rent payable under the lease. For example, a rental agreement providing that rent is $100,000 per calendar year, and providing for total payments of fixed rent equal to the total amount specified, specifically allocates rent. A rental agreement stating only when rent is payable does not specifically allocate rent.

(B) No specific allocation. If a rental agreement does not provide a specific allocation of fixed rent (for example, because the total amount of fixed rent specified is not equal to the total amount of fixed rent payable under the lease), the amount of fixed rent allocated to a rental period is the amount of fixed rent payable during that rental period. If an amount of fixed rent is payable before the beginning of the lease term, it is allocated to the first rental period in the lease term. If an amount of fixed rent is payable after the end of the lease term, it is allocated to the last rental period in the lease term.

**(iii) Contingent rent**—(A) In general. A rental agreement has increasing or decreasing rent if it requires (or may require) the payment of contingent rent (as defined in paragraph (h)(2) of this section), other than contingent rent described in paragraph (c)(2)(iii)(B) of this section.

(B) Certain contingent rent disregarded. For purposes of this paragraph (c)(2)(iii), rent is disregarded to the extent it is contingent as the result of one or more of the following provisions—

(1) A qualified percentage rents provision, as defined in paragraph (h)(8) of this section;

(2) An adjustment based on a reasonable price index, as defined in paragraph (h)(10) of this section;

(3) A provision requiring the lessee to pay third-party costs, as defined in paragraph (h)(15) of this section;

(4) A provision requiring the payment of late payment charges, as defined in paragraph (h)(4) of this section;

(5) A loss payment provision, as defined in paragraph (h)(7) of this section;

(6) A qualified TRAC provision, as defined in paragraph (h)(9) of this section;

(7) A residual condition provision, as defined in paragraph (h)(13) of this section;

(8) A tax indemnity provision, as defined in paragraph (h)(14) of this section;

(9) A variable interest rate provision, as defined in paragraph (h)(16) of this section; or

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 223 of 651

(10) Any other provision provided in regulations or other published guidance issued by the Commissioner, but only if the provision is designated as contingent rent to be disregarded for purposes of this paragraph (c)(2)(iii).

**(3) Deferred or prepaid rent—(i) Deferred rent.** A rental agreement has deferred rent under this paragraph (c)(3) if the cumulative amount of rent allocated as of the close of a calendar year (determined under paragraph (c)(3)(iii) of this section) exceeds the cumulative amount of rent payable as of the close of the succeeding calendar year.

**(ii) Prepaid rent.** A rental agreement has prepaid rent under this paragraph (c)(3) if the cumulative amount of rent payable as of the close of a calendar year exceeds the cumulative amount of rent allocated as of the close of the succeeding calendar year (determined under paragraph (c)(3)(iii) of this section).

**(iii) Rent allocated to a calendar year.** For purposes of this paragraph (c)(3), the rent allocated to a calendar year is the sum of—

(A) The fixed rent allocated to any rental period (determined under paragraph (c)(2)(ii) of this section) that begins and ends in the calendar year;

(B) A ratable portion of the fixed rent allocated to any other rental period that begins or ends in the calendar year; and (C) Any contingent rent that accrues during the calendar year.

**(iv) Examples.** The following examples illustrate the application of this paragraph (c)(3):

**Example 1.** (i) A and B enter into a rental agreement that provides for the lease of property to begin on January 1, 2000, and end on December 31, 2003. The rental agreement provides that rent of $100,000 accrues during each year of the lease term. Under the rental agreement, no rent is payable during calendar year 2000, a payment of $100,000 is to be made on December 31, 2001, and December 31, 2002, and a payment of $200,000 is to be made on December 31, 2003. A and B both select the calendar year as their rental period. Thus, the amount of rent allocated to each rental period under paragraph (c)(2)(ii) of this section is $100,000. Therefore, the rental agreement does not have increasing or decreasing rent as described in paragraph (c)(2)(i) of this section.

(ii) Under paragraph (c)(3)(i) of this section, a rental agreement has deferred rent if, at the close of a calendar year, the cumulative amount of rent allocated under paragraph (c)(3)(iii) of this section exceeds the cumulative amount of rent payable as of the close of the succeeding year. In this example, there is no deferred rent: the rent allocated to 2000 ($100,000) does not exceed the cumulative rent payable as of December 31, 2001 ($100,000); the rent allocated to 2001 and preceding years ($200,000) does not exceed the cumulative rent payable as of December 31, 2002 ($200,000); the rent allocated to 2002 and preceding years ($300,000) does not exceed the cumulative rent payable as of December 31, 2003 ($400,000); and the rent allocated to 2003 and preceding years ($400,000) does not exceed the cumulative rent payable as of December 31, 2004 ($400,000). Therefore, because the rental agreement does not have increasing or decreasing rent and does not have deferred or prepaid rent, the rental agreement is not a section 467 rental agreement.

**Example 2.** (i) A and B enter into a rental agreement that provides for a 10–year lease of personal property, beginning on January 1, 2000, and ending on December 31, 2009. The rental agreement provides for accruals of rent of $10,000 during each month of the lease term. Under paragraph (c)(3)(iii) of this section, $120,000 is allocated to each calendar year. The rental agreement provides for a $1,200,000 payment on December 31, 2000.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

(ii) The rental agreement does not have increasing or decreasing rent as described in paragraph (c)(2)(i) of this section. The rental agreement, however, provides prepaid rent under paragraph (c)(3)(ii) of this section because the cumulative amount of rent payable as of the close of a calendar year exceeds the cumulative amount of rent allocated as of the close of the succeeding calendar year. For example, the cumulative amount of rent payable as of the close of 2000 ($1,200,000 is payable on December 31, 2000) exceeds the cumulative amount of rent allocated as of the close of 2001, the succeeding calendar year ($240,000). Accordingly, the rental agreement is a section 467 rental agreement.

**(4) Rental agreements involving total payments of $250,000 or less—(i) In general.** A rental agreement is not a section 467 rental agreement if, as of the agreement date (as defined in paragraph (h)(1) of this section), it is not reasonably expected that the sum of the aggregate amount of rental payments under the rental agreement and the aggregate value of all other consideration to be received for the use of property (taking into account any payments of contingent rent, and any other contingent consideration) will exceed $250,000.

**(ii) Special rules in computing amount described in paragraph (c)(4)(i) of this section of this section.** The following rules apply in determining the amount described in paragraph (c)(4)(i) of this section:

(A) Stated interest on deferred rent is not taken into account. However, the Commissioner may recharacterize a portion of stated interest as additional rent if a rental agreement provides for interest on deferred rent at a rate that, in light of all of the facts and circumstances, is clearly greater than the arm's-length rate of interest that would have been charged in a lending transaction between the lessor and lessee.

(B) Consideration that does not involve a cash payment is taken into account at its fair market value. A liability that is either assumed or secured by property acquired subject to the liability is taken into account at the sum of its remaining principal amount and accrued interest (if any) thereon or, in the case of an obligation originally issued at a discount, at the sum of its adjusted issue price and accrued qualified stated interest (if any), within the meaning of § 1.1273–1(c)(1).

(C) All rental agreements that are part of the same transaction or a series of related transactions involving the same lessee (or any related person) and the same lessor (or any related person) are treated as a single rental agreement. Whether two or more rental agreements are part of the same transaction or a series of related transactions depends on all the facts and circumstances.

(D) If an agreement includes a provision increasing or decreasing rent payable solely as a result of an adjustment based on a reasonable price index, the amount described in paragraph (c)(4)(i) of this section must be determined as if the applicable price index did not change during the lease term.

(E) If an agreement includes a variable interest rate provision (as defined in paragraph (h)(16) of this section), the amount described in paragraph (c)(4)(i) of this section must be determined by using fixed rate substitutes (determined in the same manner as under § 1.1275–5(e), treating the agreement date as the issue date) for the variable rates of interest applicable to the lessor's indebtedness.

(F) Contingent rent described in paragraphs (c)(2)(iii)(B)(3) through (8) of this section is not taken into account.

**(d)** **Section 467 rent—(1) In general.** The section 467 rent for a taxable year is the sum of—

**(i)** The fixed rent for any rental period (determined under paragraph (d)(2) of this section) that begins and ends in the taxable year;

**(ii)** A ratable portion of the fixed rent for any other rental period beginning or ending in the taxable year; and

**(iii)** In the case of a section 467 rental agreement that provides for contingent rent, the contingent rent that accrues during the taxable year.

**(2) Fixed rent for a rental period—(i) Constant rental accrual.** In the case of a section 467 rental agreement that is a disqualified leaseback or long-term agreement (as described in § 1.467–3(b)), the fixed rent for a rental period is the constant rental amount (as determined under § 1.467–3(d)).

**(ii) Proportional rental accrual.** In the case of a section 467 rental agreement that is not described in paragraph (d)(2)(i) of this section, and does not provide adequate interest on fixed rent (as determined under § 1.467–2(b)), the fixed rent for a rental period is the proportional rental amount (as determined under § 1.467–2(c)).

**(iii) Section 467 rental agreement accrual.** In the case of a section 467 rental agreement that is not described in either paragraph (d)(2)(i) or (ii) of this section, the fixed rent for a rental period is the amount of fixed rent allocated to the rental period under the rental agreement, as determined under paragraph (c)(2)(ii) of this section.

**(e)** **Section 467 interest—(1) In general.** The section 467 interest for a taxable year is the sum of—

**(i)** The interest on fixed rent for any rental period that begins and ends in the taxable year;

**(ii)** A ratable portion of the interest on fixed rent for any other rental period beginning or ending in the taxable year; and

**(iii)** In the case of a section 467 rental agreement that provides for contingent rent, any interest that accrues on the contingent rent during the taxable year.

**(2) Interest on fixed rent for a rental period—(i) In general.** Except as provided in paragraph (e)(2)(ii) of this section and § 1.467–5(b)(1)(ii), the interest on fixed rent for a rental period is equal to the product of—

**(A)** The principal balance of the section 467 loan (as described in § 1.467–4(b)) at the beginning of the rental period; and

**(B)** The yield of the section 467 loan (as described in § 1.467–4(c)).

**(ii)** **Section 467 rental agreements with adequate interest.** Except in the case of a section 467 rental agreement that is a disqualified leaseback or long-term agreement, if a section 467 rental agreement provides adequate interest under § 1.467–2(b)(1)(i) (agreements with no deferred or prepaid rent) or § 1.467–2(b)(1)(ii) (agreements with adequate interest stated at a single fixed rate), the interest on fixed rent for a rental period is the amount of interest provided in the rental agreement for the period.

**(3) Treatment of interest.** If the section 467 interest for a rental period is a positive amount, the lessor has interest income and the lessee has an interest expense. If the section 467 interest for a rental period is a negative amount, the lessee has interest income and the lessor has an interest expense. Section 467 interest is treated as interest for all purposes of the Internal Revenue Code.

**(f) Substantial modification of a rental agreement—(1) Treatment as new agreement—(i) In general.** If a substantial modification of a rental agreement occurs after June 3, 1996, the post-modification agreement is treated as a new agreement and the date on which the modification occurs is treated as the agreement date in applying section 467 and the regulations thereunder to the post-modification agreement. Thus, for example, the post-modification agreement is treated as a new agreement entered into on the date the modification occurs for purposes of determining whether it is a section 467 rental agreement under this section, whether it is a disqualified leaseback or long-term agreement under § 1.467–3, and whether it is entered into after the applicable effective date in § 1.467–9.

**(ii) Limitation.** In the case of a substantial modification of a rental agreement occurring on or before May 18, 1999, this paragraph (f) applies only if—

(A) The rental agreement was a disqualified leaseback or long-term agreement before the modification and the agreement date, determined without regard to the modification, is after June 3, 1996; or

(B) The post-modification agreement would, after application of the rules in this paragraph (f) (other than the special rule for disqualified agreements in paragraph (f)(4)(iii) of this section), be a disqualified leaseback or long-term agreement.

**(2) Post-modification agreement; in general.** For purposes of determining whether a post-modification agreement is a section 467 rental agreement or a disqualified leaseback or long-term agreement under paragraph (f)(1) of this section, the terms of the post-modification agreement are, except as provided in paragraph (f)(4) of this section, only those terms that provide for rights and obligations relating to post-modification items (within the meaning of paragraph (f)(5)(iv) of this section).

**(3) Other effects of a modification.** For rules relating to amounts that must be taken into account following certain modifications, see § 1.467–7(g).

**(4) Special rules—(i) Carryover of character; leasebacks.** If an agreement is a leaseback prior to its modification and the lessee prior to the modification (or a related person) is the lessee after the modification, the post-modification agreement is a leaseback even if the post-modification lessee did not have an interest in the property at any time during the two-year period ending on the date on which the modification occurs.

**(ii) Carryover of character; long-term agreements.** If an agreement is a long-term agreement prior to its modification and the entire agreement (as modified) would be a long-term agreement, the post-modification agreement is a long-term agreement.

**(iii) Carryover of character; disqualified agreements.** If an agreement (as in effect before its modification) is a disqualified leaseback or long-term agreement as the result of a determination (whether occurring before or after the modification) under § 1.467–3(b)(1)(ii) and the post-modification agreement is a section 467 rental agreement (or the entire agreement (as modified) would be a section 467 rental agreement), the post-modification agreement will, notwithstanding its treatment as a new agreement under paragraph (f)(1)(i) of this section, be subject to constant rental accrual unless the Commissioner determines that, because of the absence of tax avoidance potential, the post-modification agreement should not be treated as a disqualified leaseback or long-term agreement.

**(iv) Allocation of rent.** If the entire agreement (as modified) provides a specific allocation of fixed rent, as described in paragraph (c)(2)(ii)(A)(2) of this section, the post-modification agreement is treated as an agreement that provides a specific allocation of fixed rent. If the entire agreement (as modified) does not provide a specific allocation of fixed rent, the fixed rent allocated to rental periods during the lease term of the post-modification agreement is determined by applying the rules of paragraph (c)(2)(ii)(B) of this section to the entire agreement (as modified).

**(v) Difference between aggregate rent and interest and aggregate payments—**(A) In general. Except as provided in paragraph (f)(4)(v)(B) of this section, a post-modification agreement described in paragraph (f)(4)(v)(C) of this section is treated as a section 467 rental agreement subject to proportional rental accrual (determined under § 1.467–2(c)).

(B) Constant rental accrual prior to the modification. A post-modification agreement described in paragraph (f)(4)(v)(C) of this section is treated as a section 467 rental agreement subject to constant rental accrual if—

(1) Constant rental accrual is required under paragraph (f)(4)(iii) of this section; or

(2) The post-modification agreement involves total payments of more than $250,000 (as described in paragraph (c)(4) of this section), and the Commissioner determines that the post-modification agreement is a disqualified leaseback or long-term agreement.

(C) Agreements described in this paragraph (f)(4)(v)(C). A post-modification agreement is described in this paragraph (f)(4)(v)(C) if the aggregate amount of fixed rent and stated interest treated as post-modification items does not equal the aggregate amount of payments treated as post-modification items.

**(vi) Principal purpose of tax avoidance.** If a principal purpose of a substantial modification is to avoid the purpose or intent of section 467 or the regulations thereunder, the Commissioner may treat the entire agreement (as modified) as a single agreement for purposes of section 467 and the regulations thereunder.

**(5) Definitions.** The following definitions apply for purposes of this paragraph (f) and § 1.467–7(g):

**(i)** A **modification** of a rental agreement is any alteration, including any deletion or addition, in whole or in part, of a legal right or obligation of the lessor or lessee thereunder, whether the alteration is evidenced by an express agreement (oral or written), conduct of the parties, or otherwise.

**(ii)** A modification is **substantial** only if, based on all of the facts and circumstances, the legal rights or obligations that are altered and the degree to which they are altered are economically substantial. A modification of a rental agreement will not be treated as substantial solely because it is not described in paragraph (f)(6) of this section.

**(iii)** A modification **occurs** on the earlier of the first date on which there is a binding contract that substantially sets forth the terms of the modification or the date on which agreement to such terms is otherwise evidenced.

**(iv) Post-modification items** with respect to any modification of a rental agreement are all items (other than pre-modification items) provided under the terms of the entire agreement (as modified).

**(v) Pre-modification items** with respect to any modification of a rental agreement are pre-modification rent, interest thereon, and payments allocable thereto (whether payable before or after the modification.) For this purpose—

(A) Pre-modification rent is rent allocable to periods before the effective date of the modification, but only to the extent such rent is payable under the entire agreement (as modified) at the time such rent was due under the agreement in effect before the modification; and

(B) Pre-modification items are identified by applying payments, in the order payable under the entire agreement (as modified) unless the agreement specifies otherwise, to rent and interest thereon in the order in which amounts accrue.

**(vi)** The **entire agreement (as modified)** with respect to any modification is the agreement consisting of pre-modification terms providing for rights and obligations that are not affected by the modification and post-modification terms providing for rights and obligations that differ from the rights and obligations under the agreement in effect before the modification. For example, if a 10–year rental agreement that provides for rent of $25,000 per year is modified at the end of the 5th year to provide for rent of $30,000 per year in subsequent years, the entire agreement (as modified) provides for a 10–year lease term and provides for rent of $25,000 per year in years 1 through 5 and rent of $30,000 per year in years 6 through 10. The result would be the same if the modification provided for both the increase in rent and the substitution of a new lessee.

**(6) Safe harbors.** Notwithstanding the provisions of paragraph (f)(5) of this section, a modification of a rental agreement is not a substantial modification if the modification occurs solely as the result of one or more of the following—

**(i)** The refinancing of any indebtedness incurred by the lessor to acquire the property subject to the rental agreement and secured by such property (or any refinancing thereof) but only if all of the following conditions are met—

(A) Neither the amount, nor the time for payment, of the principal amount of the new indebtedness differs from the amount and time for payment of the remaining principal amount of the refinanced indebtedness, except for de minimis changes;

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 229 of 651

(B) For each of the remaining rental periods, the rent allocation schedule, the payments of rent and interest, and the amount accrued under section 467 are changed only to the extent necessary to take into account the change in financing costs, and such changes are made pursuant to the terms of the rental agreement in effect before the modification;

(C) The lessor and the lessee are not related persons to each other or to any lender to the lessor with respect to the property (whether under the refinanced indebtedness or the new indebtedness); and

(D) With respect to the indebtedness being refinanced, the lessor was granted a unilateral option (within the meaning of § 1.1001–3(c)(3)) by the creditor to repay the refinanced indebtedness, exercisable with or without the lessee's consent;

**(ii)** A change in the obligation of the lessee to make any of the contingent payments described in paragraphs (c)(2)(iii) (B)(3) through (8) of this section; or

**(iii)** A change in the amount of fixed rent allocated to a rental period that, when combined with all previous changes in the amount of fixed rent allocated to the rental period, does not exceed one percent of the fixed rent allocated to that rental period prior to the modification.

**(7) Special rules for certain transfers—(i) In general.** For purposes of this paragraph (f), a substitution of a new lessee or a sale, exchange, or other disposition by a lessor of property subject to a rental agreement will not, by itself, be treated as a substantial modification unless a principal purpose of the transaction giving rise to the modification is the avoidance of Federal income tax. In determining whether a principal purpose of the transaction giving rise to the modification is the avoidance of Federal income tax—

(A) The safe harbors and other principles of § 1.467–3(c) are taken into account; and

(B) The Commissioner may treat the post-modification agreement as a new agreement or treat the entire agreement (as modified) as a single agreement.

**(ii) Exception.** Notwithstanding the provisions of paragraph (f)(7)(i) of this section, the continuing lessor and the new lessee (in the case of a substitution of a new lessee) or the new lessor and the continuing lessee (in the case of a sale, exchange, or other disposition by a lessor of property subject to a rental agreement) may, in appropriate cases, request the Commissioner to treat the transaction as if it were a substantial modification in order to have the provisions of paragraph (f)(4)(iii) of this section and § 1.467–7(g)(1) apply to the transaction.

**(g) Treatment of amounts payable by lessor to lessee—(1) Interest.** For purposes of determining present value, any amounts payable by the lessor to the lessee as interest on prepaid rent are treated as negative amounts.

**(2) Other amounts.** [Reserved]

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 230 of 651

**(h) Meaning of terms.** The following meanings apply for purposes of this section and §§ 1.467–2 through 1.467–9:

**(1) Agreement date** means the earlier of the lease date or the first date on which there is a binding written contract that substantially sets forth the terms under which the property will be leased.

**(2) Contingent rent** means any rent that is not fixed rent, including any amount reflecting an adjustment based on a reasonable price index (as defined in paragraph (h)(10) of this section) or a variable interest rate provision (as defined in paragraph (h)(16) of this section).

**(3) Fixed rent** means any rent to the extent its amount and the time at which it is required to be paid are fixed and determinable under the terms of the rental agreement as of the lease date. The following rules apply for the purpose of determining the extent to which rent is fixed rent:

**(i)** The possibility of a breach, default, or other early termination of the rental agreement and any adjustments based on a reasonable price index or a variable interest rate provision are disregarded.

**(ii)** Rent will not fail to be treated as fixed rent merely because of the possibility of impairment by insolvency, bankruptcy, or other similar circumstances.

**(iii)** If the lease term (as defined in paragraph (h)(6) of this section) includes one or more periods as to which either the lessor or the lessee has an option to renew or extend the term of the agreement, rent will not fail to be treated as fixed rent merely because the option has not been exercised.

**(iv)** If the lease term includes one or more periods during which a substitute lessee or lessor may have use of the property, rent will not fail to be treated as fixed rent merely because the contingencies relating to the obligation of the lessee (or a related person) to make payments in the nature of rent have not occurred.

**(v)** If either the lessor or the lessee has an unconditional option or options, exercisable on one or more dates during the lease term, that, if exercised, require payments of rent to be made under an alternative payment schedule or schedules, the amount of fixed rent and the dates on which such rent is required to be paid are determined on the basis of the payment schedule that, as of the agreement date, is most likely to occur. If payments of rent are made under an alternative payment schedule that differs from the payment schedule assumed in applying the preceding sentence, then, for purposes of paragraph (f) of this section, the rental agreement is treated as having been modified at the time the option to make payments on such alternative schedule is exercised.

**(4) Late payment charge** means any amount required to be paid by the lessee to the lessor as additional compensation for the lessee's failure to make any payment of rent under a rental agreement when due.

**(5) Lease date** means the date on which the lessee first has the right to use of the property that is the subject of the rental agreement.

**(6) Lease term** means the period during which the lessee has use of the property subject to the rental agreement, including any option of the lessor to renew or extend the term of the agreement. An option of the lessee to renew or extend the term of the agreement is included in the lease term only if it is expected, as of the agreement date, that the option will be exercised. For this purpose, a lessee is generally expected to exercise an option if, for example, as of the agreement date the rent for the option period is less than the expected fair market value rental for such period. The lessor's or lessee's determination that an option period is either included in or excluded from the lease term is not binding on the Commissioner. If the lessee (or a related person) agrees that one or both of them will or could be obligated to make payments in the nature of rent (within the meaning of § 1.168(i)–2(b)(2)) for a period when another lessee (the substitute lessee) or the lessor will have use of the property subject to the rental agreement, the Commissioner may, in appropriate cases, treat the period when the substitute lessee or lessor will have use of the property as part of the lease term. See § 1.467–7(f) for special rules applicable to the lessee, substitute lessee, and lessor. This paragraph (h)(6) applies to section 467 rental agreements entered into after March 6, 2001. However, taxpayers may choose to apply this paragraph (h)(6) to any rental agreement that is described in § 1.467–9(a) and is entered into on or before March 6, 2001.

**(7)** A **loss payment provision** means a provision that requires the lessee to pay the lessor a sum of money (which may be either a stipulated amount or an amount determined by reference to a formula or other objective measure) if the property subject to the rental agreement is lost, stolen, damaged or destroyed, or otherwise rendered unsuitable for any use (other than for scrap purposes).

**(8)** A **qualified percentage rents provision** means a provision pursuant to which the rent is equal to a fixed percentage of the lessee's receipts or sales (whether or not receipts or sales are adjusted for returned merchandise or Federal, state, or local sales taxes), but only if the percentage does not vary throughout the lease term. A provision will not fail to be treated as a qualified percentage rents provision solely by reason of one or more of the following additional terms:

**(i)** Differing percentages of receipts or sales apply to different departments or separate floors of a retail store, but only if the percentage applicable to a particular department or floor does not vary throughout the lease term.

**(ii)** The percentage is applied to receipts or sales in excess of determinable dollar amounts, but only if the determinable dollar amounts are fixed and do not vary throughout the lease term.

**(9)** A **qualified TRAC provision** means a terminal rental adjustment clause (as defined in section 7701(h)(3)) contained in a qualified motor vehicle operating agreement (as defined in section 7701(h)(2)), but only if the adjustment to the rental price is based on a reasonable estimate, determined as of any date between the agreement date and the lease date (or, in the event the agreement date is the same as or later than the lease date, determined as of the agreement date), of the fair market value of the motor vehicle (including any trailer) at the end of the lease term.

**(10)** An adjustment is **based on a reasonable price index** if the adjustment reflects inflation or deflation occurring over a period during the lease term and is determined consistently under a generally recognized index for measuring inflation or deflation (for example, the non-seasonally adjusted U.S. City Average All Items Consumer Price Index for All Urban Consumers (CPI–U), which is published by the Bureau of Labor Statistics of the Department of Labor). An adjustment will not fail to be treated as one that is based on a reasonable price index merely because the adjustment may be limited to a fixed percentage, but only if the parties reasonably expect, as of any date between the agreement date and the lease date (or, in the event the agreement date is the same as the lease date, as of such date), that the fixed percentage will actually limit the amount of the rent payable during less than 50 percent of the lease term.

**(11)** For purposes of determining whether a section 467 rental agreement is a leaseback within the meaning of § 1.467–3(b)(2), two persons are **related persons** if they are related persons within the meaning of section 465(b)(3)(C). In all other cases, two persons are related persons if they either have a relationship to each other that is specified in section 267(b) or section 707(b)(1) or are related entities within the meaning of sections 168(h)(4)(A), (B), or (C).

**(12) Rental agreement** includes any agreement, whether written or oral, that provides for the use of tangible property and is treated as a lease for Federal income tax purposes.

**(13)** A **residual condition provision** means a provision in a rental agreement that requires a payment to be made by either the lessor or the lessee to the other party based on the difference between the actual condition of the property subject to the agreement, determined as of the expiration of the lease term, and the expected condition of the property at the expiration of the lease term, as set forth in the rental agreement. The amount of any such payment may be determined by reference to any objective measure relating to the use or condition of the property, such as miles, hours or other duration of use, units of production, or similar measure. A provision will be treated as a residual condition provision only if the payment represents compensation for the use of, or wear and tear on, the property in excess of, or below, a standard set forth in the rental agreement, and the standard is reasonably expected, as of any date between the agreement date and the lease date (or, in the event the agreement date is the same as or later than the lease date, as of the agreement date), to be met at the expiration of the lease term.

**(14)** A **tax indemnity provision** means a provision in a rental agreement that may require the lessee to make one or more payments to the lessor in the event that the Federal, foreign, state, or local income tax consequences actually realized by a lessor from owning the property subject to the rental agreement and leasing it to the lessee differ from the consequences reasonably expected by the lessor, but only if the differences in such consequences result from a misrepresentation, act, or failure to act on the part of the lessee, or any other factor not within the control of the lessor or any related person.

**(15) Third-party costs** include any real estate taxes, insurance premiums, maintenance costs, and any other costs (excluding a debt service cost) that relate to the leased property and are not within the control of the lessor or lessee or any person related to the lessor or lessee.

**(16)** A **variable interest rate provision** means a provision in a rental agreement that requires the rent payable by the lessee to the lessor to be adjusted by the dollar amount of changes in the amount of interest payable by the lessor on any indebtedness that was incurred to acquire the property subject to the rental agreement (or any refinancing thereof), but—

**(i)** Only to the extent the changes are attributable to changes in the interest rate; and

**(ii)** Only if the indebtedness provides for interest at one or more qualified floating rates (within the meaning of § 1.1275–5(b)), or the changes are attributable to a refinancing at a fixed rate or one or more qualified floating rates.

**(i)** [Reserved]

**(j) Computational rules.** For purposes of this section and §§ 1.467–2 through 1.467–9, the following rules apply—

**(1) Counting conventions.** Any reasonable counting convention may be used (for example, 30 days per month/360 days per year) to determine the length of a rental period or to perform any computation. Rental periods of the same descriptive length, for example annual, semiannual, quarterly, or monthly, may be treated as being of equal length.

**(2) Conventions regarding timing of rent and payments—(i) In general.** For purposes of determining present values and yield only, except as otherwise provided in this section and §§ 1.467–2 through 1.467–8—

(A) The rent allocated to a rental period is taken into account on the last day of the rental period;

(B) Any amount payable during the first half of the first rental period is treated as payable on the first day of that rental period;

(C) Any amount payable during the first half of any other rental period is treated as payable on the last day of the preceding rental period;

(D) Any amount payable during the second half of a rental period is treated as payable on the last day of the rental period; and

(E) Any amount payable at the midpoint of a rental period is treated, in applying this paragraph (j)(2), as an amount payable during the first half of the rental period.

**(ii) Time amount is payable.** For purposes of this section and §§ 1.467–2 through 1.467–9, an amount is payable on the last day for timely payment (that is, the last day such amount may be paid without incurring interest, computed at an arm's-length rate, a substantial penalty, or other substantial detriment (such as giving the lessor the right to terminate the agreement, bring an action to enforce payment, or exercise other similar remedies under the terms of the agreement or applicable law)). This paragraph (j)(2)(ii) applies to section 467 rental agreements entered into after March 6, 2001. However, taxpayers may choose to apply this paragraph (j)(2)(ii) to any rental agreement that is described in § 1.467–9(a) and is entered into on or before March 6, 2001.

**(3) Annualized fixed rent.** Annualized fixed rent is determined by multiplying the fixed rent allocated to the rental period under paragraph (c)(2)(ii) of this section by the number of periods of the rental period's length in a calendar year. Thus, if the fixed rent allocated to a rental period is $10,000 and the rental period is one month, the annualized fixed rent for that rental period is $120,000 ($10,000 times 12).

**(4) Allocation of fixed rent within a period.** A rental agreement that allocates fixed rent to any period is treated as allocating fixed rent ratably within that period. Thus, if a rental agreement provides that $120,000 is allocated to each calendar year in the lease term, $10,000 of rent is allocated to each calendar month.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 234 of 651

**(5) Rental period length.** Except as provided in § 1.467–3(d)(1) (relating to agreements for which constant rental accrual is required), rental periods may be of any length, may vary in length, and may be different as between the lessor and the lessee as long as—

**(i)** The rental periods are one year or less, cover the entire lease term, and do not overlap;

**(ii)** Each scheduled payment under the rental agreement (other than a payment scheduled to occur before or after the lease term) occurs within 30 days of the beginning or end of a rental period; and

**(iii)** In the case of a rental agreement that does not provide a specific allocation of fixed rent, the rental periods selected do not cause the agreement to be treated as a section 467 rental agreement unless all alternative rental period schedules would result in such treatment.

**Credits**
[T.D. 8820, 64 FR 26853, May 18, 1999; T.D. 8917, 66 FR 1039, Jan. 5, 2001]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

AUTHORITY: Sections 1.909–1 through 1.906–6 also issued under 26 U.S.C. 909(e).

Notes of Decisions (6)

Current through March 24, 2016; 81 FR 16051.

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Deferred Compensation, Etc.
              Methods of Accounting
                Taxable Year for Which Deductions Taken

26 C.F.R. § 1.467–3, Treas. Reg. § 1.467–3

§ 1.467–3 Disqualified leasebacks and long-term agreements.

Currentness

**(a) General rule.** Under § 1.467–1(d)(2)(i), constant rental accrual (as described under paragraph (d) of this section) must be used to determine the fixed rent for each rental period in the lease term if the section 467 rental agreement is a disqualified leaseback or long-term agreement within the meaning of paragraph (b) of this section. Constant rental accrual may not be used in the absence of a determination by the Commissioner, pursuant to paragraph (b)(1)(ii) of this section, that the rental agreement is disqualified. Such determination may be made either on a case-by-case basis or in regulations or other guidance published by the Commissioner (see § 601.601(d)(2) of this chapter) providing that a certain type or class of leaseback or long-term agreement will be treated as disqualified and subject to constant rental accrual.

**(b) Disqualified leaseback or long-term agreement—(1) In general.** A leaseback (as defined in paragraph (b)(2) of this section) or a long-term agreement (as defined in paragraph (b)(3) of this section) is disqualified only if—

**(i)** A principal purpose for providing increasing or decreasing rent is the avoidance of Federal income tax (as described in paragraph (c) of this section);

**(ii)** The Commissioner determines that, because of the tax avoidance purpose, the agreement should be treated as a disqualified leaseback or long-term agreement; and

**(iii)** For section 467 rental agreements entered into before July 19, 1999, the amount determined with respect to the rental agreement under § 1.467–1(c)(4) (relating to the exception for rental agreements involving total payments of $250,000 or less) exceeds $2,000,000.

**(2) Leaseback.** A section 467 rental agreement is a leaseback if the lessee (or a related person) had any interest (other than a de minimis interest) in the property at any time during the two-year period ending on the agreement date. For this purpose, interests in property include options and agreements to purchase the property (whether or not the lessee or related person was considered the owner of the property for Federal income tax purposes) and, in the case of subleased property, any interest as a sublessor.

**(3) Long-term agreement—(i) In general.** A section 467 rental agreement is a long-term agreement if the lease term exceeds 75 percent of the property's statutory recovery period.

**(ii) Statutory recovery period—**(A) In general. The term statutory recovery period means—

(1) In the case of property depreciable under section 168, the applicable period determined under section 467(e)(3)(A);

(2) In the case of land, 19 years; and

(3) In the case of any other tangible property, the period that would apply under section 467(e)(3)(A) if the property were property to which section 168 applied.

(B) Special rule for rental agreements relating to properties having different statutory recovery periods. In the case of a rental agreement relating to two or more related properties that have different statutory recovery periods, the statutory recovery period for purposes of paragraph (b)(3)(ii)(A) of this section is the weighted average, based on the fair market values of the properties on the agreement date, of the statutory recovery periods of each of the properties.

**(c) Tax avoidance as principal purpose for increasing or decreasing rent—(1) In general.** In determining whether a principal purpose for providing increasing or decreasing rent is the avoidance of Federal income tax, all relevant facts and circumstances are taken into account. However, an agreement will not be treated as a disqualified leaseback or long-term agreement if either of the safe harbors set forth in paragraph (c)(3) of this section is met. The mere failure of a leaseback or long-term agreement to meet one of these safe harbors will not, by itself, cause the agreement to be treated as one in which tax avoidance was a principal purpose for providing increasing or decreasing rent.

**(2) Tax avoidance—(i) In general.** If, as of the agreement date, a significant difference between the marginal tax rates of the lessor and lessee can reasonably be expected at some time during the lease term, the agreement will be closely scrutinized and clear and convincing evidence will be required to establish that tax avoidance is not a principal purpose for providing increasing or decreasing rent. The term "marginal tax rate" means the percentage determined by dividing one dollar into the amount of the increase or decrease in the Federal income tax liability of the taxpayer that would result from an additional dollar of rental income or deduction.

**(ii) Significant difference in tax rates.** A significant difference between the marginal tax rates of the lessor and lessee is reasonably expected if—

(A) The rental agreement has increasing rents and the lessor's marginal tax rate is reasonably expected to exceed the lessee's marginal tax rate by more than 10 percentage points during any rental period to which the rental agreement allocates annualized fixed rent that is less than the average rent allocated to all calendar years (determined by taking into account the rules set forth in paragraph (c)(4)(iii) of this section); or

(B) The rental agreement has decreasing rents and the lessee's marginal tax rate is reasonably expected to exceed the lessor's marginal tax rate by more than 10 percentage points during any rental period to which the rental agreement allocates annualized fixed rent that is greater than the average rent allocated to all calendar years (determined by taking into account the rules set forth in paragraph (c)(4)(iii) of this section).

**(iii) Special circumstances.** In determining the expected marginal tax rates of the lessor and lessee, net operating loss and credit carryovers and any other attributes or special circumstances reasonably expected to affect the Federal income tax liability of the taxpayer (including the alternative minimum tax) are taken into account. For example, in the case of a partnership or S corporation, the amount of rental income or deduction that would be allocable to the partners or shareholders, respectively, is taken into account.

**(3) Safe harbors.** Tax avoidance will not be considered a principal purpose for providing increasing or decreasing rent if—

**(i)** The uneven rent test (as defined in paragraph (c)(4) of this section) is met; or

**(ii)** The increase or decrease in rent is wholly attributable to one or more of the following provisions—

(A) A contingent rent provision set forth in § 1.467–1(c)(2)(iii)(B); or

(B) A single rent holiday provision allowing reduced rent (or no rent) for one consecutive period during the lease term, but only if—

(1) The rent holiday is for a period of three months or less at the beginning of the lease term and for no other period; or

(2) The duration of the rent holiday is reasonable, determined by reference to commercial practice (as of the agreement date) in the locality where the use of the property occurs, and does not exceed the lesser of 24 months or 10 percent of the lease term.

**(4) Uneven rent test—(i) In general.** The uneven rent test is met if the rent allocated to each calendar year does not vary from the average rent allocated to all calendar years (determined in accordance with the rules set forth in paragraph (c)(4)(iii) of this section) by more than 10 percent.

**(ii) Special rule for real estate.** Paragraph (c)(4)(i) of this section is applied by substituting "15 percent" for "10 percent" if the rental agreement is a long-term agreement and at least 90 percent of the property subject to the agreement (determined on the basis of fair market value as of the agreement date) consists of real property (as defined in § 1.856–3(d)).

**(iii) Operating rules.** In determining whether the uneven rent test has been met, the following rules apply:

(A) Any contingent rent attributable to a provision set forth in § 1.467–1(c)(2)(iii)(B)(3) through (9) is disregarded.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 238 of 651

(B) If the lease term includes one or more partial calendar years (a period less than a complete calendar year), the average rent allocated to each calendar year is the total rent allocated under the rental agreement, divided by the actual length (in years) of the lease term. The rent allocated to a partial calendar year is annualized by multiplying the allocated rent by the number of periods of the partial calendar year's length in a full calendar year and the annualized rent is treated as the amount of rent allocated to that year in determining whether the uneven rent test is met.

(C) In the case of a rental agreement not described in paragraph (c)(4)(ii) of this section, an initial rent holiday period and any rent allocated to such period are disregarded for purposes of this paragraph (c)(4) if taking such period and rent into account would cause the agreement to fail to meet the uneven rent test. For purposes of this paragraph (c)(4), an initial rent holiday period is any period of three months or less at the beginning of the lease term during which annualized fixed rent (determined by treating such period as a rental period for purposes of § 1.467–1(j)(3)) is less than the average rent allocated to all calendar years (determined before the application of this paragraph (c)(4)(iii)(C)).

(D) In the case of a rental agreement described in paragraph (c)(4)(ii) of this section, one qualified rent holiday period and any rent allocated to such period are disregarded for purposes of this paragraph (c)(4) if taking such period and rent into account would cause the agreement to fail the uneven rent test. For this purpose, a qualified rent holiday period is a consecutive period that is an initial rent holiday period or that meets the following conditions:

(1) The period does not exceed the lesser of 24 months or 10 percent of the lease term (determined before the application of this paragraph (c)(4)(iii)(D)).

(2) Annualized fixed rent during the period (determined by treating the period as a rental period for purposes of § 1.467–1(j)(3)) is less than the average rent allocated to all calendar years (determined before the application of this paragraph (c)(4)(iii)(D)).

(3) Providing less than average rent for the period is reasonable, determined by reference to commercial practice (as of the agreement date) in the locality where the use of the property occurs.

(E) If the rental agreement contains a variable interest rate provision, the uneven rent test is applied by treating the rent as having been fixed under the terms of the rental agreement for the entire lease term using fixed rate substitutes (determined in the same manner as § 1.1275–5(e), treating the agreement date as the issue date) for the variable rates of interest provided under the terms of the lessor's indebtedness.

**(d) Calculating constant rental amount—(1) In general.** Except as provided in paragraph (d)(2) of this section, the constant rental amount is the amount that, if paid at the end of each rental period, would result in a present value equal to the present value of all amounts payable under the disqualified leaseback or long-term agreement as rent and interest. In computing the constant rental amount, the rules for determining present value are the same as those provided in § 1.467–2(d) for computing the proportional rental amount. If constant rental accrual is required, all rental periods (other than an initial or final short period of not more than one month) must be equal in length and satisfy the requirements of § 1.467–1(j)(5).

**(2) Initial or final short periods.** If a disqualified leaseback or long-term agreement has an initial or final short rental period, the constant rental amount for the initial or final short period may be determined under any reasonable method.

However, the sum of the present values of all the constant rental amounts must equal the present values of all amounts payable under the disqualified leaseback or long-term agreement as rent and interest. Any adjustment necessary to eliminate the section 467 loan balance because of the method used to determine the constant rental amount for short periods must be taken into account as section 467 rent for the final rental period.

**(3) Method to determine constant rental amount; no short periods—(i) Step 1.** Determine the present value of amounts payable under the disqualified leaseback or long-term agreement as rent or interest.

**(ii) Step 2.** Determine the present value of $1 to be received at the end of each rental period during the lease term as of the first day of the first rental period during the lease term (or, if earlier, the first day a rent payment is required under the rental agreement).

**(iii) Step 3.** Divide the amount determined in paragraph (d)(3)(i) of this section (Step 1) by the number of dollars determined in paragraph (d)(3)(ii) of this section (Step 2).

**(e) Examples.** The following examples illustrate the application of this section:

**Example 1.** (i) K, lessor, and L, lessee, enter into a long-term agreement for a 10–year lease of personal property beginning on January 1, 2000. K and L are C corporations that use the calendar year as their taxable year. K does not have any unused losses or credits from taxable years preceding 2000. In addition, as of the agreement date, K expects that it will be subject to the maximum rate of tax imposed by section 11 in 2000 and that it will not be limited in its ability to use any losses or credits. As of the agreement date, L expects that it will be subject to the alternative minimum tax imposed by section 55 in 2000. The rental agreement provides for rent allocations in each year of the lease term, as follows:

| Year | Amount |
|------|--------|
| 2000 | $427,500 |
| 2001 | 442,500 |
| 2002 | 457,500 |
| 2003 | 472,500 |
| 2004 | 487,500 |
| 2005 | 502,500 |
| 2006 | 517,500 |
| 2007 | 532,500 |
| 2008 | 547,500 |
| 2009 | 562,500 |

(ii) As described in paragraph (c)(2) of this section, as of the agreement date, a significant difference between the marginal tax rates of the lessor and lessee can reasonably be expected at some time during the lease term. First, the rental agreement has increasing rents. Second, the lessor's marginal tax rate exceeds the lessee's marginal tax rate by more than 10 percentage

points during a rental period to which the rental agreement allocates less than a ratable portion of the aggregate amount of rent payable under the agreement. For example, for the year 2000, the lessor's expected marginal tax rate is 35 percent, the percentage determined by dividing the increase in the Federal income tax liability of K that would result from an additional dollar of rental income ($.35) by $1. Because the lessee is subject to the alternative minimum tax, the lessee's expected marginal tax rate for 2000 is 20 percent, the percentage determined by dividing the decrease in the Federal income tax liability (taking into account both the decrease in the lessee's regular tax and the increase in the lessee's alternative minimum tax) that would result from an additional dollar of rental deduction ($.20) by $1. Further, for the year 2000, the rent allocated in accordance with the rental agreement is $427,500, which is less than a ratable portion of the aggregate amount of rental payments, $495,000, determined by dividing the total rents payable under the agreement ($4,950,000) by the number of years in the lease term (10). Thus, because a significant difference between the marginal tax rates of the lessor and lessee can reasonably be expected during the lease term, the agreement will be closely scrutinized and clear and convincing evidence will be required to establish that tax avoidance is not a principal purpose for providing increasing rent.

**Example 2.** (i) A and B enter into a long-term agreement for a 5–year lease of personal property beginning on July 1, 2000, and ending on June 30, 2005. The rental agreement provides that the rent is allocated to the calendar years in the lease term in accordance with the following schedule and is paid at successive six-month intervals (on December 31 and June 30) during the lease term:

| Year | Amount |
|------|--------|
| 2000 | $450,000 |
| 2001 | 900,000 |
| 2002 | 900,000 |
| 2003 | 1,100,000 |
| 2004 | 1,100,000 |
| 2005 | 550,000 |

(ii) In determining whether the uneven rent test described in paragraph (c)(4)(i) of this section is met, the total amount of rent allocated under the rental agreement is $5,000,000, and the lease term is five years. The average rent for each year is $1,000,000 (see paragraph (c)(4)(iii)(B) of this section), and the uneven rent test is met if the rent for each year is not less than $900,000 and not more than $1,100,000. The test is met for 2000 because the annualized rent for that year is $900,000. The test is met for 2005 because the annualized rent for that year is $1,100,000. The test is met for each of the years 2001 through 2004 because the rent for each of these years is not less than $900,000 and not more than $1,100,000. Accordingly, because the uneven rent test of paragraph (c)(4)(i) of this section is met, the long-term agreement will not be treated as disqualified.

**Example 3.** (i) C and D enter into a long-term agreement for a lease of personal property beginning on October 1, 1999, and ending on December 31, 2005. The rental agreement provides that the rent is allocated to the calendar years in the lease term in accordance with the following schedule and is paid at successive six-month intervals (on December 31 and June 30) during the lease term:

| Year | Amount |
|------|--------|
| 1999 | $0 |
| 2000 | 900,000 |

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 241 of 651

| | |
|---|---|
| 2001.......................................................................................................................................... | 900,000 |
| 2002.......................................................................................................................................... | 900,000 |
| 2003.......................................................................................................................................... | 1,100,000 |
| 2004.......................................................................................................................................... | 1,100,000 |
| 2005.......................................................................................................................................... | 1,100,000 |

(ii) The three-month rent holiday period at the beginning of the lease term is an initial rent holiday within the meaning of paragraph (c)(4)(iii)(C) of this section. Moreover, the agreement would fail the uneven rent test if the rent holiday period and the rent allocated to the period were taken into account. Thus, under paragraph (c)(4)(iii)(C) of this section, the period and the rent allocated to the period are disregarded for purposes of applying the uneven rent test. In that case, the lease term is six years, and the uneven rent test is met because the average rent for each year in the lease term is $1,000,000 and the rent for each calendar year in the lease term is not less than $900,000 nor more than $1,100,000. Accordingly, the long-term agreement will not be treated as disqualified.

**Example 4.** (i) E and F enter into a long-term agreement for a 6–year lease of personal property beginning on January 1, 2000, and ending on December 31, 2005. The rental agreement provides that the rent allocated to the calendar years in the lease term and paid at successive six-month intervals (on June 30 and December 31) during the lease term is the sum of the interest on the lessor's indebtedness, in the amount of $4,637,577, and an amount determined in accordance with the following schedule:

| Year | Amount |
|---|---|
| 2000.......................................................................................................................................... | $539,574 |
| 2001.......................................................................................................................................... | 583,603 |
| 2002.......................................................................................................................................... | 631,225 |
| 2003.......................................................................................................................................... | 886,733 |
| 2004.......................................................................................................................................... | 959,090 |
| 2005.......................................................................................................................................... | 1,037,352 |

(ii) Assume further that the lessor's indebtedness bears interest at the rate of 2 percent in excess of the 6–month London Interbank Offered Rate (LIBOR) in effect on the first day of the 6–month period for each rental period and that, on the agreement date, the interest rate under this formula would be 8 percent. If the interest rate remained fixed during the entire lease term, the formula for determining the rent payable by the lessee would result in payments of rent in the amount of $450,000 for each six-month period in 2000, 2001, and 2002, and $550,000 for each six-month period in 2003, 2004, and 2005.

(iii) Under paragraph (c)(4)(iii)(E) of this section, the fixed rate substitute for the variable interest rate provision produces a schedule of fixed rents that meets the uneven rent test of paragraph (c)(4)(i) of this section. Thus, even if the actual rents payable under the rental agreement do not meet the uneven rent test because of fluctuations in the 6–month LIBOR, the uneven rent test will be treated as having been met, and the long-term agreement will not be treated as disqualified.

**Example 5.** (i) G and H enter into a long-term agreement for a 5–year lease of personal property beginning on January 1, 2000, and ending on December 31, 2004. The rental agreement provides that the rent is payable to G at the rate of $40,000 per month in arrears, subject to an adjustment based on changes in prevailing interest rates during the lease term. Under this adjustment, the lessor is entitled to receive an amount equal to the sum of a specified dollar amount, which increases each

month as payments of rent are made, and interest on a notional principal amount (as defined in § 1.446–3(c)(3)) at a qualified floating rate (as defined in § 1.1275–5(b)). The notional principal amount is initially established at 80 percent of the cost of the property. As each payment of rent is made, the notional principal amount is reduced (but not below zero) to an amount that would represent the outstanding principal balance of a loan the payments on which are equal to the monthly payments of rent. As of the agreement date, the value of the qualified floating rate is 9 percent. Although G did not incur indebtedness specifically for the purpose of acquiring the property, the parties agreed to the adjustment provisions in order to compensate G for its general costs of borrowing.

(ii) The adjustment provision produces a schedule of rent payments that is virtually identical to the schedule that would have resulted if G had actually borrowed money in an amount and on terms identical to the terms used in determining interest on the notional principal amount and the adjustment were based on that indebtedness. An adjustment based on actual indebtedness of the lessor would have been a variable interest rate provision eligible for a safe harbor under paragraph (c)(3)(ii)(A) of this section. Accordingly, based on all the facts and circumstances, the adjustment provision did not have as one of its principal purposes the avoidance of Federal income tax, and thus the long-term agreement will not be treated as disqualified.

**Example 6.** (i) X and Y enter into a leaseback for a 5–year lease of personal property beginning on January 1, 1998, and ending on December 31, 2002. The rental agreement provides that $0 of rent is allocated to years 1998, 1999, and 2000, and that rent of $17,500,000 is allocated to years 2001 and 2002. The rental agreement provides that the rent allocated to each year is payable on December 31 of that year. Assume all rental periods are the calendar year. Assume also that 110 percent of the applicable Federal rate based on annual compounding is 12 percent.

(ii)(A) If the Commissioner determines that the leaseback is disqualified, the constant rental amount is computed as follows:

(B) Step 1 in calculating the constant rental amount is to determine the present value of the two payments due under the rental agreement as follows:

$$\$21{,}051{,}536 = \frac{\$17{,}500{,}000}{(1.12)^4} + \frac{\$17{,}500{,}000}{(1.12)^5}$$

(iii) Because no amounts of rent are payable before the lease term, Step 2 in calculating the constant rental amount is to determine the present value as of the first day of the lease term of $1 to be received at the end of each rental period during the lease term. This results in a present value of $3.6047762. In Step 3 the amount determined in Step 1 is divided by the number of dollars determined in Step 2. Thus, the constant rental amount is $5,839,901 for each calendar year during the lease term computed as follows:

$$\$5{,}839{,}901 = \frac{\$21{,}051{,}536}{3.6047762}$$

**Credits**
[T.D. 8820, 64 FR 26860, May 18, 1999; T.D. 8917, 66 FR 1040, Jan. 5, 2001]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

AUTHORITY: Sections 1.909–1 through 1.906–6 also issued under 26 U.S.C. 909(e).

Notes of Decisions (3)

Current through March 24, 2016; 81 FR 16051.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 244 of 651

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Partners and Partnerships
              Determination of Tax Liability

26 C.F.R. § 1.704–4, Treas. Reg. § 1.704–4

§ 1.704–4 Distribution of contributed property.

Effective: May 26, 2005
Currentness

**(a) Determination of gain and loss—(1) In general.** A partner that contributes section 704(c) property to a partnership must recognize gain or loss under section 704(c)(1)(B) and this section on the distribution of such property to another partner within five years of its contribution to the partnership in an amount equal to the gain or loss that would have been allocated to such partner under section 704(c)(1)(A) and § 1.704–3 if the distributed property had been sold by the partnership to the distributee partner for its fair market value at the time of the distribution. See § 1.704–3(a)(3)(i) for a definition of section 704(c) property.

**(2) Transactions to which section 704(c)(1)(B) applies.** Section 704(c)(1)(B) and this section apply only to the extent that a distribution by a partnership is a distribution to a partner acting in the capacity of a partner within the meaning of section 731.

**(3) Fair market value of property.** The fair market value of the distributed section 704(c) property is the price at which the property would change hands between a willing buyer and a willing seller at the time of the distribution, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. The fair market value that a partnership assigns to distributed section 704(c) property will be regarded as correct, provided that the value is reasonably agreed to among the partners in an arm's-length negotiation and the partners have sufficiently adverse interests.

**(4) Determination of five-year period—(i) General rule.** The five-year period specified in paragraph (a)(1) of this section begins on and includes the date of contribution.

**(ii) Section 708(b)(1)(B) terminations.** A termination of the partnership under section 708(b)(1)(B) does not begin a new five-year period for each partner with respect to the built-in gain and built-in loss property that the terminated partnership is deemed to contribute to the new partnership under § 1.708–1(b)(1)(iv). See § 1.704–3(a)(3)(ii) for the definitions of built-in gain and built-in loss on section 704(c) property. This paragraph (a)(4)(ii) applies to terminations of partnerships under section 708(b)(1)(B) occurring on or after May 9, 1997; however, this paragraph (a)(4)(ii) may be applied to terminations occurring on or after May 9, 1996, provided that the partnership and its partners apply this paragraph (a)(4)(ii) to the termination in a consistent manner.

**(5) Examples.** The following examples illustrate the rules of this paragraph (a). Unless otherwise specified, partnership income equals partnership expenses (other than depreciation deductions for contributed property) for each year of the partnership, the fair market value of partnership property does not change, all distributions by the partnership are subject to section 704(c)(1)(B), and all partners are unrelated.

**Example 1.** Recognition of gain. (i) On January 1, 1995, A, B, and C form partnership ABC as equal partners. A contributes $10,000 cash and Property A, nondepreciable real property with a fair market value of $10,000 and an adjusted tax basis of $4,000. Thus, there is a built-in gain of $6,000 on Property A at the time of contribution. B contributes $10,000 cash and Property B, nondepreciable real property with a fair market value and adjusted tax basis of $10,000. C contributes $20,000 cash.

(ii) On December 31, 1998, Property A and Property B are distributed to C in complete liquidation of C's interest in the partnership.

(iii) A would have recognized $6,000 of gain under section 704(c)(1)(A) and § 1.704–3 on the sale of Property A at the time of the distribution ($10,000 fair market value less $4,000 adjusted tax basis). As a result, A must recognize $6,000 of gain on the distribution of Property A to C. B would not have recognized any gain or loss under section 704(c)(1)(A) and § 1.704–3 on the sale of Property B at the time of distribution because Property B was not section 704(c) property. As a result, B does not recognize any gain or loss on the distribution of Property B.

**Example 2.** Effect of post-contribution depreciation deductions. (i) On January 1, 1995, A, B, and C form partnership ABC as equal partners. A contributes Property A, depreciable property with a fair market value of $30,000 and an adjusted tax basis of $20,000. Therefore, there is a built-in gain of $10,000 on Property A. B and C each contribute $30,000 cash. ABC uses the traditional method of making section 704(c) allocations described in § 1.704–3(b) with respect to Property A.

(ii) Property A is depreciated using the straight-line method over its remaining 10–year recovery period. The partnership has book depreciation of $3,000 per year (10 percent of the $30,000 book basis), and each partner is allocated $1,000 of book depreciation per year (one-third of the total annual book depreciation of $3,000). The partnership has a tax depreciation deduction of $2,000 per year (10 percent of the $20,000 tax basis in Property A). This $2,000 tax depreciation deduction is allocated equally between B and C, the noncontributing partners with respect to Property A.

(iii) At the end of the third year, the book value of Property A is $21,000 ($30,000 initial book value less $9,000 aggregate book depreciation) and the adjusted tax basis is $14,000 ($20,000 initial tax basis less $6,000 aggregate tax depreciation). A's remaining section 704(c)(1)(A) built-in gain with respect to Property A is $7,000 ($21,000 book value less $14,000 adjusted tax basis).

(iv) On December 31, 1997, Property A is distributed to B in complete liquidation of B's interest in the partnership. If Property A had been sold for its fair market value at the time of the distribution, A would have recognized $7,000 of gain under section 704(c)(1)(A) and § 1.704–3(b). Therefore, A recognizes $7,000 of gain on the distribution of Property A to B.

**Example 3.** Effect of remedial method. (i) On January 1, 1995, A, B, and C form partnership ABC as equal partners. A contributes Property A1, nondepreciable real property with a fair market value of $10,000 and an adjusted tax basis of $5,000, and Property A2, nondepreciable real property with a fair market value and adjusted tax basis of $10,000. B and C each contribute $20,000 cash. ABC uses the remedial method of making section 704(c) allocations described in § 1.704–3(d) with respect to Property A1.

(ii) On December 31, 1998, when the fair market value of Property A1 has decreased to $7,000, Property A1 is distributed to C in a current distribution. If Property A1 had been sold by the partnership at the time of the distribution, ABC would have recognized the $2,000 of remaining built-in gain under section 704(c)(1)(A) on the sale (fair market value of $7,000 less $5,000 adjusted tax basis). All of this gain would have been allocated to A. ABC would also have recognized a book loss of $3,000

($10,000 original book value less $7,000 current fair market value of the property). Book loss in the amount of $2,000 would have been allocated equally between B and C. Under the remedial method, $2,000 of tax loss would also have been allocated equally to B and C to match their share of the book loss. As a result, $2,000 of gain would also have been allocated to A as an offsetting remedial allocation. A would have recognized $4,000 of total gain under section 704(c)(1)(A) on the sale of Property A1 ($2,000 of section 704(c) recognized gain plus $2,000 remedial gain). Therefore, A recognizes $4,000 of gain on the distribution of Property A1 to C under this section.

**(b) Character of gain or loss—(1) General rule.** Gain or loss recognized by the contributing partner under section 704(c)(1)(B) and this section has the same character as the gain or loss that would have resulted if the distributed property had been sold by the partnership to the distributee partner at the time of the distribution.

**(2) Example.** The following example illustrates the rule of this paragraph (b). Unless otherwise specified, partnership income equals partnership expenses (other than depreciation deductions for contributed property) for each year of the partnership, the fair market value of partnership property does not change, all distributions by the partnership are subject to section 704(c)(1)(B), and all partners are unrelated.

Example. Character of gain. (i) On January 1, 1995, A and B form partnership AB. A contributes $10,000 and Property A, nondepreciable real property with a fair market value of $10,000 and an adjusted tax basis of $4,000, in exchange for a 25 percent interest in partnership capital and profits. B contributes $60,000 cash for a 75 percent interest in partnership capital and profits.

(ii) On December 31, 1998, Property A is distributed to B in a current distribution. Property A is used in a trade or business of B.

(iii) A would have recognized $6,000 of gain under section 704(c)(1)(A) on a sale of Property A at the time of the distribution (the difference between the fair market value ($10,000) and the adjusted tax basis ($4,000) of the property at that time). Because Property A is not a capital asset in the hands of Partner B and B holds more than 50 percent of partnership capital and profits, the character of the gain on a sale of Property A to B would have been ordinary income under section 707(b)(2). Therefore, the character of the gain to A on the distribution of Property A to B is ordinary income.

**(c) Exceptions—(1) Property contributed on or before October 3, 1989.** Section 704(c)(1)(B) and this section do not apply to property contributed to the partnership on or before October 3, 1989.

**(2) Certain liquidations.** Section 704(c)(1)(B) and this section do not apply to a distribution of an interest in section 704(c) property to a partner other than the contributing partner in a liquidation of the partnership if—

**(i)** The contributing partner receives an interest in the section 704(c) property contributed by that partner (and no other property); and

**(ii)** The built-in gain or loss in the interest distributed to the contributing partner, determined immediately after the distribution, is equal to or greater than the built-in gain or loss on the property that would have been allocated to the contributing partner under section 704(c)(1)(A) and § 1.704–3 on a sale of the contributed property to an unrelated party immediately before the distribution.

**(3) Section 708(b)(1)(B) terminations.** Section 704(c)(1)(B) and this section do not apply to the deemed distribution of interests in a new partnership caused by the termination of a partnership under section 708(b)(1)(B). A subsequent

distribution of section 704(c) property by the new partnership to a partner of the new partnership is subject to section 704(c)(1)(B) to the same extent that a distribution by the terminated partnership would have been subject to section 704(c)(1)(B). See also § 1.737–2(a) for a similar rule in the context of section 737. This paragraph (c)(3) applies to terminations of partnerships under section 708(b)(1)(B) occurring on or after May 9, 1997; however, this paragraph (c)(3) may be applied to terminations occurring on or after May 9, 1996, provided that the partnership and its partners apply this paragraph (c)(3) to the termination in a consistent manner.

**(4) Complete transfer to another partnership.** Section 704(c)(1)(B) and this section do not apply to a transfer by a partnership (transferor partnership) of all of its assets and liabilities to a second partnership (transferee partnership) in an exchange described in section 721, followed by a distribution of the interest in the transferee partnership in liquidation of the transferor partnership as part of the same plan or arrangement. A subsequent distribution of section 704(c) property by the transferee partnership to a partner of the transferee partnership is subject to section 704(c)(1)(B) to the same extent that a distribution by the transferor partnership would have been subject to section 704(c)(1)(B). See § 1.737–2(b) for a similar rule in the context of section 737.

**(5) Incorporation of a partnership.** Section 704(c)(1)(B) and this section do not apply to an incorporation of a partnership by any method of incorporation (other than a method involving an actual distribution of partnership property to the partners followed by a contribution of that property to a corporation), provided that the partnership is liquidated as part of the incorporation transaction. See § 1.737–2(c) for a similar rule in the context of section 737.

**(6) Undivided interests.** Section 704(c)(1)(B) and this section do not apply to a distribution of an undivided interest in property to the extent that the undivided interest does not exceed the undivided interest, if any, contributed by the distributee partner in the same property. See § 1.737–2(d)(4) for the application of section 737 in a similar context. The portion of the undivided interest in property retained by the partnership after the distribution, if any, that is treated as contributed by the distributee partner, is reduced to the extent of the undivided interest distributed to the distributee partner.

**(7) Example.** The following example illustrates the rule of paragraph (c)(2) of this section. Unless otherwise specified, partnership income equals partnership expenses (other than depreciation deductions for contributed property) for each year of the partnership, the fair market value of partnership property does not change, all distributions by the partnership are subject to section 704(c)(1)(B), and all partners are unrelated.

**Example.** (i) On January 1, 1995, A and B form partnership AB, as equal partners. A contributes Property A, nondepreciable real property with a fair market value and adjusted tax basis of $20,000. B contributes Property B, nondepreciable real property with a fair market value of $20,000 and an adjusted tax basis of $10,000. Property B therefore has a built-in gain of $10,000 at the time of contribution.

(ii) On December 31, 1998, the partnership liquidates when the fair market value of Property A has not changed, but the fair market value of Property B has increased to $40,000.

(iii) In the liquidation, A receives Property A and a 25 percent interest in Property B. This interest in Property B has a fair market value of $10,000 to A, reflecting the fact that A was entitled to 50 percent of the $20,000 post-contribution appreciation in Property B. The partnership distributes to B a 75 percent interest in Property B with a fair market value of $30,000. B's basis in this portion of Property B is $10,000 under section 732(b). As a result, B has a built-in gain of $20,000 in this portion of Property B immediately after the distribution ($30,000 fair market value less $10,000 adjusted tax basis). This built-in gain is greater than the $10,000 of built-in gain in Property B at the time of contribution to the partnership. B therefore does not recognize any gain on the distribution of a portion of Property B to A under this section.

**(d) Special rules—(1) Nonrecognition transactions, installment obligations, contributed contracts, and capitalized costs—(i) Nonrecognition transactions.** Property received by the partnership in exchange for section 704(c) property in a nonrecognition transaction is treated as the section 704(c) property for purposes of section 704(c)(1)(B) and this section to the extent that the property received is treated as section 704(c) property under § 1.704–3(a)(8). See § 1.737–2(d)(3) for a similar rule in the context of section 737.

**(ii), (iii)** [Reserved]

**(iv) Capitalized costs.** Property to which the cost of section 704(c) property is properly capitalized is treated as section 704(c) property for purposes of section 704(c)(1)(B) and this section to the extent that such property is treated as section 704(c) property under § 1.704–3(a)(8)(iv). See § 1.737–2(d)(3) for a similar rule in the context of section 737.

**(2) Transfers of a partnership interest.** The transferee of all or a portion of the partnership interest of a contributing partner is treated as the contributing partner for purposes of section 704(c)(1)(B) and this section to the extent of the share of built-in gain or loss allocated to the transferee partner. See § 1.704–3(a)(7).

**(3) Distributions of like-kind property.** If section 704(c) property is distributed to a partner other than the contributing partner and like-kind property (within the meaning of section 1031) is distributed to the contributing partner no later than the earlier of (i) 180 days following the date of the distribution to the non-contributing partner, or (ii) the due date (determined with regard to extensions) of the contributing partner's income tax return for the taxable year of the distribution to the noncontributing partner, the amount of gain or loss, if any, that the contributing partner would otherwise have recognized under section 704(c)(1)(B) and this section is reduced by the amount of built-in gain or loss in the distributed like-kind property in the hands of the contributing partner immediately after the distribution. The contributing partner's basis in the distributed like-kind property is determined as if the like-kind property were distributed in an unrelated distribution prior to the distribution of any other property distributed as part of the same distribution and is determined without regard to the increase in the contributing partner's adjusted tax basis in the partnership interest under section 704(c)(1)(B) and this section. See § 1.707–3 for provisions treating the distribution of the like-kind property to the contributing partner as a disguised sale in certain situations.

**(4) Example.** The following example illustrates the rules of this paragraph (d). Unless otherwise specified, partnership income equals partnership expenses (other than depreciation deductions for contributed property) for each year of the partnership, the fair market value of partnership property does not change, all distributions by the partnership are subject to section 704(c)(1)(B), and all partners are unrelated.

**Example.** Distribution of like-kind property. (i) On January 1, 1995, A, B, and C form partnership ABC as equal partners. A contributes Property A, nondepreciable real property with a fair market value of $20,000 and an adjusted tax basis of $10,000. B and C each contribute $20,000 cash. The partnership subsequently buys Property X, nondepreciable real property of a like-kind to Property A with a fair market value and adjusted tax basis of $8,000. The fair market value of Property X subsequently increases to $10,000.

(ii) On December 31, 1998, Property A is distributed to B in a current distribution. At the same time, Property X is distributed to A in a current distribution. The distribution of Property X does not result in the contribution of Property A being properly characterized as a disguised sale to the partnership under § 1.707–3. A's basis in Property X is $8,000 under section 732(a)(1). A therefore has $2,000 of built-in gain in Property X ($10,000 fair market value less $8,000 adjusted tax basis).

(iii) A would generally recognize $10,000 of gain under section 704(c)(1)(B) on the distribution of Property A, the difference between the fair market value ($20,000) of the property and its adjusted tax basis ($10,000). This gain is reduced, however, by the amount of the built-in gain of Property X in the hands of A. As a result, A recognizes only $8,000 of gain on the distribution of Property A to B under section 704(c)(1)(B) and this section.

**(e) Basis adjustments—(1) Contributing partner's basis in the partnership interest.** The basis of the contributing partner's interest in the partnership is increased by the amount of the gain, or decreased by the amount of the loss, recognized by the partner under section 704(c)(1)(B) and this section. This increase or decrease is taken into account in determining (i) the contributing partner's adjusted tax basis under section 732 for any property distributed to the partner in a distribution that is part of the same distribution as the distribution of the contributed property, other than like-kind property described in paragraph (d)(3) of this section (pertaining to the special rule for distributions of like-kind property), and (ii) the amount of the gain recognized by the contributing partner under section 731 or section 737, if any, on a distribution of money or property to the contributing partner that is part of the same distribution as the distribution of the contributed property. For a determination of basis in a distribution subject to section 737, see § 1.737–3(a).

(2) **Partnership's basis in partnership property.** The partnership's adjusted tax basis in the distributed section 704(c) property is increased or decreased immediately before the distribution by the amount of gain or loss recognized by the contributing partner under section 704(c)(1)(B) and this section. Any increase or decrease in basis is therefore taken into account in determining the distributee partner's adjusted tax basis in the distributed property under section 732. For a determination of basis in a distribution subject to section 737, see § 1.737–3(b).

(3) **Section 754 adjustments.** The basis adjustments to partnership property made pursuant to paragraph (e)(2) of this section are not elective and must be made regardless of whether the partnership has an election in effect under section 754. Any adjustments to the bases of partnership property (including the distributed section 704(c) property) under section 734(b) pursuant to a section 754 election must be made after (and must take into account) the adjustments to basis made under paragraph (e)(2) of this section. See § 1.737–3(c)(4) for a similar rule in the context of section 737.

(4) **Example.** The following example illustrates the rules of this paragraph (e). Unless otherwise specified, partnership income equals partnership expenses (other than depreciation deductions for contributed property) for each year of the partnership, the fair market value of partnership property does not change, all distributions by the partnership are subject to section 704(c)(1)(B), and all partners are unrelated.

**Example.** Basis adjustment. (i) On January 1, 1995, A, B, and C form partnership ABC as equal partners. A contributes $10,000 cash and Property A, nondepreciable real property with a fair market value of $10,000 and an adjusted tax basis of $4,000. B and C each contribute $20,000 cash.

(ii) On December 31, 1998, Property A is distributed to B in a current distribution.

(iii) Under paragraph (a) of this section, A recognizes $6,000 of gain on the distribution of Property A because that is the amount of gain that would have been allocated to A under section 704(c)(1)(A) and § 1.704–3 on a sale of Property A for its fair market value at the time of the distribution (fair market value of Property A ($10,000) less its adjusted tax basis at the time of distribution ($4,000)). The adjusted tax basis of A's partnership interest is increased from $14,000 to $20,000 to reflect this gain. The partnership's adjusted tax basis in Property A is increased from $4,000 to $10,000 immediately prior to its distribution to B. B's adjusted tax basis in Property A is therefore $10,000 under section 732(a)(1).

**(f) Anti-abuse rule—(1) In general.** The rules of section 704(c)(1)(B) and this section must be applied in a manner consistent with the purpose of section 704(c)(1)(B). Accordingly, if a principal purpose of a transaction is to achieve a tax result that is inconsistent with the purpose of section 704(c)(1)(B), the Commissioner can recast the transaction for federal tax purposes as appropriate to achieve tax results that are consistent with the purpose of section 704(c)(1)(B) and this section. Whether a tax result is inconsistent with the purpose of section 704(c)(1)(B) and this section must be determined based on all the facts and circumstances. See § 1.737–4 for an anti-abuse rule and examples in the context of section 737.

    **(2) Examples.** The following examples illustrate the anti-abuse rule of this paragraph (f). The examples set forth below do not delineate the boundaries of either permissible or impermissible types of transactions. Further, the addition of any facts or circumstances that are not specifically set forth in an example (or the deletion of any facts or circumstances) may alter the outcome of the transaction described in the example. Unless otherwise specified, partnership income equals partnership expenses (other than depreciation deductions for contributed property) for each year of the partnership, the fair market value of partnership property does not change, all distributions by the partnership are subject to section 704(c)(1)(B), and all partners are unrelated.

**Example 1.** Distribution in substance made within five-year period; results inconsistent with the purpose of section 704(c)(1)(B). (i) On January 1, 1995, A, B, and C form partnership ABC as equal partners. A contributes Property A, nondepreciable real property with a fair market value of $10,000 and an adjusted tax basis of $1,000. B and C each contributes $10,000 cash.

(ii) On December 31, 1998, the partners desire to distribute Property A to B in complete liquidation of B's interest in the partnership. If Property A were distributed at that time, however, A would recognize $9,000 of gain under section 704(c)(1)(B), the difference between the $10,000 fair market value and the $1,000 adjusted tax basis of Property A, because Property A was contributed to the partnership less than five years before December 31, 1998. On becoming aware of this potential gain recognition, and with a principal purpose of avoiding such gain, the partners amend the partnership agreement on December 31, 1998, and take any other steps necessary to provide that substantially all of the economic risks and benefits of Property A are borne by B as of December 31, 1998, and that substantially all of the economic risks and benefits of all other partnership property are borne by A and C. The partnership holds Property A until January 5, 2000, at which time it is distributed to B in complete liquidation of B's interest in the partnership.

(iii) The actual distribution of Property A occurred more than five years after the contribution of the property to the partnership. The steps taken by the partnership on December 31, 1998, however, are the functional equivalent of an actual distribution of Property A to B in complete liquidation of B's interest in the partnership as of that date. Section 704(c)(1)(B) requires recognition of gain when contributed section 704(c) property is in substance distributed to another partner within five years of its contribution to the partnership. Allowing a contributing partner to avoid section 704(c)(1)(B) through arrangements such as those in this Example 1 that have the effect of a distribution of property within five years of the date of its contribution to the partnership would effectively undermine the purpose of section 704(c)(1)(B) and this section. As a result, the steps taken by the partnership on December 31, 1998, are treated as causing a distribution of Property A to B for purposes of section 704(c)(1)(B) on that date, and A recognizes gain of $9,000 under section 704(c)(1)(B) and this section at that time.

(iv) Alternatively, if on becoming aware of the potential gain recognition to A on a distribution of Property A on December 31, 1998, the partners had instead agreed that B would continue as a partner with no changes to the partnership agreement or to B's economic interest in partnership operations, the distribution of Property A to B on January 5, 2000, would not have been inconsistent with the purpose of section 704(c)(1)(B) and this section. In that situation, Property A would not have been distributed until after the expiration of the five-year period specified in section 704(c)(1)(B) and this section. Deferring the distribution of Property A until the end of the five-year period for a principal purpose of avoiding the recognition of gain under section 704(c)(1)(B) and this section is not inconsistent with the purpose of section 704(c)(1)(B). Therefore, A would not have recognized gain on the distribution of Property A in that case.

**Example 2.** Suspension of five-year period in manner consistent with the purpose of section 704(c)(1)(B). (i) A, B, and C form partnership ABC on January 1, 1995, to conduct bona fide business activities. A contributes Property A, nondepreciable real property with a fair market value of $10,000 and an adjusted tax basis of $1,000, in exchange for a 49.5 percent interest in partnership capital and profits. B contributes $10,000 in cash for a 49.5 percent interest in partnership capital and profits. C contributes cash for a 1 percent interest in partnership capital and profits. A and B are wholly owned subsidiaries of the same affiliated group and continue to control the management of Property A by virtue of their controlling interests in the partnership. The partnership is formed pursuant to a plan a principal purpose of which is to minimize the period of time that A would have to remain a partner with a potential acquiror of Property A.

(ii) On December 31, 1997, D is admitted as a partner to the partnership in exchange for $10,000 cash.

(iii) On January 5, 2000, Property A is distributed to D in complete liquidation of D's interest in the partnership.

(iv) The distribution of Property A to D occurred more than five years after the contribution of the property to the partnership. On these facts, however, a principal purpose of the transaction was to minimize the period of time that A would have to remain partners with a potential acquiror of Property A, and treating the five-year period of section 704(c)(1)(B) as running during a time when Property A was still effectively owned through the partnership by members of the contributing affiliated group of which A is a member is inconsistent with the purpose of section 704(c)(1)(B). Prior to the admission of D as a partner, the pooling of assets between A and B, on the one hand, and C, on the other hand, although sufficient to constitute ABC as a valid partnership for federal income tax purposes, is not a sufficient pooling of assets for purposes of running the five-year period with respect to the distribution of Property A to D. Allowing a contributing partner to avoid section 704(c)(1)(B) through arrangements such as those in this Example 2 would have the effect of substantially nullifying the five-year requirement of section 704(c)(1)(B) and this section and elevating the form of the transaction over its substance. As a result, with respect to the distribution of Property A to D, the five-year period of section 704(c)(1)(B) is tolled until the admission of D as a partner on December 31, 1997. Therefore, the distribution of Property A occurred before the end of the five-year period of section 704(c)(1)(B), and A recognizes gain of $9,000 under section 704(c)(1)(B) on the distribution.

**(g) Effective dates.** This section applies to distributions by a partnership to a partner on or after January 9, 1995, except that paragraph (d)(1)(iv) applies to distributions by a partnership to a partner on or after June 24, 2003.

**Credits**

[T.D. 8642, 60 FR 66730, Dec. 26, 1995; T.D. 8717, 62 FR 25500, May 9, 1997; T.D. 9193, 70 FR 14395, March 22, 2005; T.D. 9207, 70 FR 30342, May 26, 2005]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

AUTHORITY: Sections 1.909–1 through 1.906–6 also issued under 26 U.S.C. 909(e).

Notes of Decisions (92)

Current through March 24, 2016; 81 FR 16051.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
            Tax Based on Income from Sources Within or Without the United States
              Nonresident Aliens and Foreign Corporations
                Miscellaneous Provisions

26 C.F.R. § 1.897–1, Treas. Reg. § 1.897–1

§ 1.897–1 Taxation of foreign investment in United States real property interests, definition of terms.

Currentness

**(a) In general—(1) Purpose and scope of regulations.** These regulations provide guidance with respect to the taxation of foreign investments in U.S. real property interests and related matters. This section defines various terms for purposes of sections 897, 1445, and 6039C and the regulations thereunder. Section 1.897–2 provides rules regarding the definition of, and consequences of, U.S. real property holding corporation status. Section 1.897–3 sets forth rules pursuant to which certain foreign corporations may elect under section 897(i) to be treated as domestic corporations for purposes of sections 897 and 6039C. Finally, § 1.987–4 provides rules concerning the similar election under section 897(k) for certain foreign corporations in the process of liquidation.

**(2) Effective date.** The regulations set forth in §§ 1.897–1 through 1.897–4 are effective for transactions occurring after June 18, 1980. However, with respect to all transactions occurring after June 18, 1980 and before January 30, 1985, taxpayers may at their option choose to apply the Temporary Regulations under section 897 (in their entirety). The Temporary Regulations are located at 26 CFR 6a.897–1 through 6a.897–4 (Revised as of April 1, 1983), and were originally published in the Federal Register for September 21, 1982 (47 FR 41532) and amended by T.D. 7890, published in the Federal Register on April 28, 1983 (48 FR 19163).

**(b) Real property—(1) In general.** The term "real property" includes the following three categories of property: Land and unserved natural products of the land, improvements, and personal property associated with the use of real property. The three categories of real property are defined in subparagraphs (2), (3), and (4) of this paragraph (b). Local law definitions will not be controlling for purposes of determining the meaning of the term "real property" as it is used in sections 897, 1445, and 6039C and the regulations thereunder.

**(2) Land and unserved natural products of the land.** The term "real property" includes land, growing crops and timber, and mines, wells, and other natural deposits. Crops and timber cease to be real property at the time that they are served from the land. Ores, minerals, and other natural deposits cease to be real property when they are extracted from the ground. The storage of severed or extracted crops, timber, or minerals in or upon real property will not cause such property to be recharacterized as real property.

**(3) Improvements—(i) In general.** The term "real property" includes improvements on land. An improvement is a building, any other inherently permanent structure, or the structural components of either, as defined in subdivisions (ii) through (iv) of this paragraph (b)(3).

**(ii) Building.** The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Any structure that is classified as a building for purposes of section 48(a)(1)(B) and § 1.48–1 shall be treated as such for purposes of this section.

**(iii) Inherently permanent structure—**(A) In general. The term "inherently permanent structure" means any property not otherwise described in this paragraph (b)(3) that is affixed to real property and that will ordinarily remain affixed for an indefinite period of time. Property that is not classified as a building for purposes of section 48(a)(1)(B) and § 1.48–1 may nevertheless constitute an inherently permanent structure. For purposes of this section, affixation to real property may be accomplished by weight alone.

(B) Use of precedents under section 48. Any property not otherwise described in this paragraph (b)(3) that constitutes "other tangible property" under the principles of section 48(a)(1)(B) and § 1.48–1(c) and (d) shall be treated for purposes of this section as an inherently permanent structure. Thus, for example, the term includes swimming pools, paved parking areas and other pavements, special foundations for heavy equipment, wharves and docks, bridges, fences, inherently permanent advertising displays, inherently permanent outdoor lighting facilities, railroad tracks and signals, telephone poles, permanently installed telephone and television cables, broadcasting towers, oil derricks, oil and gas pipelines, oil and gas storage tanks, grain storage bins, and silos. However, property that is determined to be either property in the nature of machinery under § 1.48–1(c) or property which is essentially an item of machinery or equipment under § 1.48–1(e)(1)(i) shall not be treated as an inherently permanent structure.

(C) Absence of precedents under section 48. Where precedents developed under the principles of section 48 fail to provide adequate guidance with respect to the classification of particular property, the determination of whether such property constitutes an inherently permanent structure shall be made in view of all the facts and circumstances. In particular, the following factors must be taken into account:

(1) The manner in which the property is affixed to real property;

(2) Whether the property was designed to be easily removable or to remain in place indefinitely;

(3) Whether the property has been moved since its initial installation;

(4) Any circumstances that suggest the expected period of affixation (e.g., a lease that requires removal of the property upon its expiration);

(5) The amount of damage that removal of the property would cause to the property itself or to the real property to which it is affixed; and

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

(6) The extent of the effort that would be required to remove the property, in terms of time and expense.

**(iv) Structural components of buildings and other inherently permanent structures.** Structural components of buildings and other inherently permanent structures, as defined in § 1.48–1(e)(2), themselves constitute improvements. Structural components include walls, partitions, floors, ceilings, windows, doors, wiring, plumbing, central heating and central air conditioning systems, lighting fixtures, pipes, ducts, elevators, escalators, sprinkler systems, fire escapes and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees or serves to an insubstantial degree areas where such temperature or humidity requirements are not essential.

**(4) Personal property associated with the use of the real property—(i) In general.** The term "real property" includes movable walls, furnishings, and other personal property associated with the use of the real property. Personal property is associated with the use of real property only if it is described in one of the categories set forth in subdivisions (A) through (D) of this paragraph (b)(4)(i). "Personal property" for purposes of this section means any property that constitutes "tangible personal property" under the principles of § 1.48–1(c), without regard to whether such property qualifies as section 38 property. Such property will be associated with the use of the real property only where both the personal property and the United States real property interest with which it is associated are held by the same person or by related persons within the meaning of § 1.897–1(i). For purposes of this paragraph (b)(4)(i), property is used "predominantly" in a named activity if it is devoted to that activity during at least half of the time in which it is in use during a calendar year.

(A) Property used in mining, farming, and forestry. Personal property is associated with the use of real property if it is predominantly used to exploit unsevered natural products in or upon the land. Such property includes mining equipment used to extract ores, minerals, and other natural deposits from the ground. It also includes any property used to cultivate the soil and harvest its products, such as farm machinery, draft animals, and equipment used in the growing and cutting of timber. However, personal property used to process or transport minerals, crops, or timber after they are severed from the land is not associated personal property.

(B) Property used in the improvement of real property. Personal property is associated with the use of real property if it is predominantly used to construct or otherwise carry out improvements to real property. Such property includes equipment used to alter the natural contours of the land, equipment used to clear and prepare raw land for construction, and equipment used to carry out the construction of improvements.

(C) Property used in the operation of a lodging facility. Personal property is associated with the use of real property if it is predominantly used in connection with the operation of a lodging facility. Property that is used in connection with the operation of a lodging facility includes property used in the living quarters of such facility, such as beds and other furniture, refrigerators, ranges and other equipment, as well as property used in the common areas of such facility, such as lobby furniture and laundry equipment. Such property constitutes personal property associated with the use of real property in the hands of the owner or operator of the facility, not of the tenant or guest. A lodging facility is an apartment house or apartment, hotel, motel, dormitory, residence, or any other facility (or part of a facility) predominantly used to provide, at a charge, living and/or sleeping accommodations, whether on daily, weekly, monthly, annual, or other basis. The term "lodging facility" does not include a personal residence occupied solely

by its owner, or a facility used primarily as a means of transportation (such as an aircraft, vessel, or a railroad car) or used primarily to provide medical or convalescent services, even though sleeping accommodations are provided. Nor does the term include temporary living quarters provided by an employer due to the unavailability of lodgings within a reasonable distance of a work-site (such as a mine or construction project). The term "lodging facility" does not include any portion of a facility that constitutes a nonlodging commercial facility and that is available to persons not using the lodging facility on the same basis that it is available to tenants of the lodging facility. Examples of nonlodging commercial facilities include restaurants, drug stores, and grocery stores located in a lodging facility.

(D) Property used in the rental of furnished office and other work space. Personal property is associated with the use of real property if it is predominantly used by a lessor to provide furnished office or other work space to lessees. Property that is so used includes office furniture and equipment included in the rental of furnished space. Such property constitutes personal property associated with the use of real property in the hands of the lessor, not of the lessee.

**(ii) Dispositions of associated personal property**—(A) In general. Personal property that has become associated with the use of a real property interest shall itself be treated as a real property interest upon its disposition, unless either:

(1) The personal property is disposed of more than one year before the disposition of any present right to use or occupy the real property with which it was associated (and subject to the provisions of subdivision (B) of this paragraph (b)(4)(ii));

(2) The personal property is disposed of more than one year after the disposition of all present rights to use or occupy the real property with which it was associated (and subject to the provisions of subdivision (C) of this paragraph (b)(4)(ii)); or

(3) The personal property and the real property with which it was associated are separately sold to persons that are related neither to the transferor nor to one another (and subject to the provisions of subdivision (D) of this paragraph (b)(4)(ii)).

(B) Personalty property disposed of one year before realty. A transferor of personal property associated with the use of real property need not treat such property as a real property interest upon disposition if on the date of disposition the transferor does not expect or intend to dispose of the real property until more than one year later.

However, if the real property is in fact disposed of within the following year, the transferor must treat the personal property as having been a real property interest as of the date on which the personalty was disposed of. If the transferor had not previously filed an income tax return, a return must be filed and tax paid, together with any interest due thereon, by the later of the date on which a tax return or payment is actually due (with extensions), or the 60th day following the date of disposition. If the transferor had previously filed an income tax return, an amended return must be filed and tax paid, together with any interest due thereon, by the later of the dates specified above. Such a transferor may be liable to penalties for failure to file, for late payment of tax, or for understatement of liability, but only if the transferor knew or had reason to anticipate that the real property would be disposed of within one year of the disposition of the associated personal property.

(C) Personalty disposed of one year after realty. A disposition of real property shall be disregarded for purposes of subdivision (A)(2) of this paragraph (b)(4)(ii) if any right to use or occupy the real property is reacquired within the

one-year period referred to in that subdivision. However, the disposition shall not be disregarded if such reacquisition is made in foreclosure of a mortgage or other security interest, in the exercise of a contractual remedy, or in the enforcement of a judgment. If, however, the reacquisition of the property is made pursuant to a plan the principal purpose of which is the avoidance of the provisions of section 897, 1445, or 6039C and the regulations thereunder, then the initial disposition shall be disregarded for purposes of subdivision (A)(2) of this paragraph (b)(4)(ii).

(D) Separate dispositions of personalty and realty. A transferor of personal property associated with the use of real property need not treat such property as a real property interest upon disposition if within 90 days before or after such disposition the transferor separately disposes of the real property interest to persons that are related neither to the transferor nor to the purchaser of the personal property. A transferor may rely upon this rule unless the transferor knows or has reason to know that the purchasers of the real property and the personal property—

(1) Are related persons; or

(2) Intend to reassociate the personal property with the use of the real property within one year of the date of disposition of the personal property.

(E) Status of property in hands of transferee. Personal property that has been associated with the use of real property and that is sold to an unrelated party will be treated as real property in the hands of the transferee only if the personal property becomes associated with the use of real property held or acquired by the transferee, in the manner described in paragraph (b)(4)(i) of this section.

**(iii) Determination dates.** The determination of whether personal property is personal property associated with the use of real property as defined in this paragraph (b)(4) is to be made on the date the personal property is disposed of and on each applicable determination date. See § 1.897–2(c).

**(c) United States real property interest—(1) In general.** The term "United States real property interest" means any interest, other than an interest solely as a creditor, in either:

**(i)** Real property located in the United States or the Virgin Islands, or

**(ii)** A domestic corporation unless it is established that the corporation was not a U.S. real property holding corporation within the period described in section 897(c)(1)(A)(ii).

In addition, for the limited purpose of determining whether any corporation is a U.S. real property holding corporation, the term "United States real property interest" means an interest, other than an interest solely as a creditor, in a foreign corporation unless it is established that the foreign corporation is not a U.S. real property holding corporation within the period prescribed in section 897(c)(1)(A)(ii). See § 1.897–2 for rules regarding the manner of establishing that a corporation is not a United States real property holding corporation.

**(2) Exceptions and special rules—(i) Domestically-controlled REIT.** An interest in a domestically-controlled real estate investment trust (REIT) is not a U.S. real property interest. A domestically-controlled REIT is one in which less than 50 percent of the fair market value of the outstanding stock was directly or indirectly held by foreign persons during the five-

year period ending on the applicable determination date (or the period since June 18, 1980, if shorter). For purposes of this determination the actual owners of stock, as determined under § 1.857–8, must be taken into account.

**(ii) Corporation that has disposed of all U.S. real property interests.** The term "United States real property interest" does not include an interest in a corporation which has disposed of all its U.S. real property interests in transactions in which the full amount of gain, if any, was recognized, as provided by section 897(c)(1)(B). See § 1.897–2(f) for rules regarding the requirements of section 897(c)(1)(B).

**(iii) Publicly-traded corporations.** If, at any time during the calendar year, any class of stock of a domestic corporation is regularly traded on an established securities market, an interest in such corporation shall be treated as a U.S. real property interest only in the case of:

(A) A regularly traded interest owned by a person who beneficially owned more than 5 percent of the total fair market value of that class of interests at any time during the five-year period ending either on the date of disposition of such interest or other applicable determination date (or the period since June 18, 1980, if shorter), or

(B) [Reserved]

Separate non-regularly traded interests that were acquired in transactions more than three years apart shall not be cumulated pursuant to this rule. In determining whether a shareholder holds 5 percent of a class of stock in a corporation (or any other interest of an equivalent fair market value), section 318(a) shall apply (except that sections 318(a)(2)(C) and (3)(C) are applied by substituting the phrase "5 percent" for "50 percent").

**(iv) Publicly traded partnerships and trusts.** If any class of interests in a partnership or trust is, within the meaning of § 1.897–1(m) and (n), regularly traded on an established securities market, then for purposes of sections 897(g) and 1445 and § 1.897–2(d) and (e) an interest in the entity shall not be treated as an interest in a partnership or trust. Instead, such an interest shall be subject to the rules applicable to interests in publicly traded corporations pursuant to paragraph (c)(2) (iii) of this section. Such interests can be real property interests in the hands of a person that holds a greater than 5 percent interest. Therefore, solely for purposes of determining whether greater than 5 percent interests in such an entity constitute U.S. real property interests the disposition of which is subject to tax, the entity is required to determine pursuant to the provisions of § 1.897–2 whether the assets it holds would cause it to be classified as a U.S. real property holding corporation if it were a corporation. The treatment of dispositions of U.S. real property interests by publicly traded partnerships and trusts is not affected by the rules of this paragraph (c)(2)(iv); by reason of the operation of section 897(a), foreign partners or beneficiaries are subject to tax upon their distributive share of any gain recognized upon such dispositions by the partnership or trust. The rules of this paragraph (c)(2)(iv) are illustrated by the following example.

**Example.** PTP is a partnership one class of interests in which is regularly traded on an established securities market. A is a nonresident alien individual who owns 1 percent of a class of limited partnership interests in PTP. B is a nonresident alien individual who owns 10 percent of the same class of limited partnership interests in PTP. On July 1, 1986, A and B sell their interests in PTP. Pursuant to the rules of this paragraph (c)(2)(iv), neither disposition is treated as the disposition of a partnership interest subject to the provisions of section 897(g). Instead, A and B are treated as having disposed of interests in a publicly traded corporation. Therefore, pursuant to the rule of paragraph (c)(2)(iii) of this section, A's disposition of a 1 percent interest has no consequences under section 897. However, B's disposition of a 10 percent interest will constitute the disposition of a U.S. real property interest subject to tax by reason of the operation of section 897 unless it is established pursuant to the rules of § 1.897–2 that the interest is not a U.S. real property interest.

**(d) Interest other than an interest solely as a creditor—(1) In general.** This paragraph defines an interest other than an interest solely as a creditor, with respect to real property, and with respect to corporations, partnerships, trusts, and estates. An interest solely as a creditor either in real property or in a domestic corporation does not constitute a United States real property interest. Similarly, where one corporation holds an interest solely as a creditor in a second corporation or in a partnership, trust, or estate, that interest will be disregarded for purposes of determining whether the first corporation is a U.S. real property holding corporation (except to the extent that such interest constitutes an asset used or held for use in a trade or business, in accordance with rules of § 1.897–1(f)). In addition, the disposition of an interest solely as a creditor in a partnership, trust, or estate is not subject to sections 897, 1445, and 6039C. Whether an interest is considered debt under any provisions of the Code is not determinative of whether it constitutes an interest solely as a creditor for purpose of sections 897, 1445, and 6039C and the regulations thereunder.

**(2) Interests in real property other than solely as creditor—(i) In general.** An interest in real property other than an interest solely as a creditor includes a fee ownership, co-ownership, or leasehold interest in real property, a time sharing interest in real property, and a life estate, remainder, or reversionary interest in such property. The term also includes any direct or indirect right to share in the appreciation in the value, or in the gross or net proceeds or profits generated by, the real property.

A loan to an individual or entity under the terms of which a holder of the indebtedness has any direct or indirect right to share in the appreciation in value of, or the gross or net proceeds or profits generated by, an interest in real property of the debtor or of a related person is, in its entirety, an interest in real property other than solely as a creditor. An interest in production payments described in section 636 does not generally constitute an interest in real property other than solely as a creditor. However, a right to production payments shall constitute an interest in real property other than solely as a creditor if it conveys a right to share in the appreciation in value of the mineral property. A production payment that is limited to a quantum of mineral (including a percentage of recoverable reserves produced) or a period of time will be considered to convey a right to share in the appreciation in value of the mineral property. The rules of this paragraph (d)(2)(i) are illustrated by the following example.

**Example.** A, a U.S. citizen, purchases a condominium unit located in the United States for $500,000. A makes a $100,000 down payment and borrows $400,000 from B, a foreign person, to pay the balance of the purchase price. Under the terms of the loan, A is to pay B 13 percent annual interest each year for 10 years and 35 percent of the appreciation in the fair market value of the condominium at the end of the 10–year period. Because B has a right to share in the appreciation in value of the condominium, B has an interest other than solely as a creditor in the condominium. B's entire interest in the obligation from A, therefore, is a United States real property interest.

**(ii) Special rule**—(A) Installment obligations. A right to installment or other deferred payments from the disposition of an interest in real property will constitute an interest solely as a creditor if the transferor elects not to have the installment method of section 453(a) apply, any gain or loss is recognized in the year of disposition, and all tax due is timely paid. See section 1445 and regulations thereunder for further guidance concerning the availability of installment sale treatment under section 453. If an agreement for the payment of tax with respect to an installment sale is entered into with the Internal Revenue Service pursuant to section 1445, that agreement may specify whether or not the installment obligation will constitute an interest solely as a creditor. If an installment obligation constitutes an interest other than solely as a creditor then the receipt of each payment shall be treated as the disposition of an interest in real property that is subject to section 897(a) to the extent of any gain required to be taken into account pursuant to section 453.

If the original holder of an installment obligation that constitutes an interest other than solely as a creditor subsequently disposes of the obligation to an unrelated party and recognizes gain or loss pursuant to section 453B, the obligation will constitute an interest in real property solely as a creditor in the hands of the subsequent holder. However, if the obligation

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 259 of 651

is disposed of to a related person and the full amount of gain realized upon the disposition of the real property has not been recognized upon such disposition of the installment obligation, then the obligation shall continue to be an interest in real property other than solely as a creditor in the hands of the subsequent holder subject to the rules of this paragraph (d)(2)(ii)(A).

In addition, if the obligation is disposed of to any person for a principal purpose of avoiding the provisions of sections 897, 1445, or 6039C, then the obligation shall continue to be an interest in real property other than solely as a creditor in the hands of the subsequent holder subject to the rules of this paragraph (d)(2)(ii)(A). However, rights to payments arising from dispositions that took place before June 19, 1980, shall in no event constitute interests in real property other than solely as a creditor, even if such payments are received after June 18, 1980. In addition, rights to payments arising from dispositions to unrelated parties that took place before January 1, 1985, and that were not subject to U.S. tax pursuant to the provisions of a U.S. income tax treaty, shall not constitute interests in real property other than solely as a creditor, even if such payments are received after December 31, 1984.

(B) Options. An option, a contract or a right of first refusal to acquire any interest in real property (other than an interest solely as a creditor) will itself constitute an interest in real property other than solely as a creditor.

(C) Security interests. A right to repossess or foreclose on real property under a mortgage, security agreement, financing statement, or other collateral instrument securing a debt will not be considered a reversionary interest in, or a right to share in the appreciation in value of or gross or net proceeds or profits generated by, an interest in real property. Thus, no such right of repossession or foreclosure will of itself cause an interest in real property which is otherwise an interest solely as a creditor to become an interest other than solely as a creditor. In addition, a person acting as mortgagee in possession shall not be considered to hold an interest in real property other than solely as a creditor, if the mortgagee's interest in the property otherwise constitutes an interest solely as a creditor.

(D) Indexed interest rates. An interest will not constitute a right to share in the appreciation in the value of, or gross or net proceeds or profits generated by, real property solely because it bears a rate of interest that is tied to an index of any kind that is intended to reflect general inflation or deflation of prices and interest rates (e.g., the Consumer Price Index). However, where an interest in real property bears a rate of interest that is tied to an index the principal purpose of which is to reflect changes in real property values, the real property interest will be considered an indirect right to share in the appreciation in value of, or gross or net proceeds or profits generated by, real property. Such an indirect right constitutes an interest in real property other than solely as a creditor.

(E) Commissions. A right to payment of a commission, brokerage fee, or similar charge for professional services rendered in connection with the arrangement or financing of a purchase, sale, or lease of real property does not constitute a right to share in the appreciation in value of, or gross or net proceeds or profits of, real property solely because it is based upon a percentage of the purchase price or rent. Thus, a right to a commission earned by a real estate agent based on a percentage of the sales price does not constitute an interest in real property other than solely as a creditor.

However, a right to a commission, brokerage fee, or similar charge will constitute an interest other than solely as a creditor if the total amount of the payment is contingent upon appreciation, proceeds, or profits of the real property occurring or arising after the date of the transaction with respect to which the professional services were rendered. For example, a commission earned in connection with the purchase of a real property interest that is contingent upon the amount of gain ultimately realized by the purchaser will constitute an interest in real property other than solely as a creditor.

(F) Trustees' fees, etc. A right to payment of reasonable compensation for services rendered as a trustee, as an administrator of an estate, or in a similar capacity does not constitute a right to share in the appreciation in the value of, or gross or net proceeds or profits of, real property solely because the assets of the trust or estate include U.S. real property interests.

**(3) Interest in an entity other than solely as a creditor—(i) In general.** For purposes of sections 897, 1445, and 6039C, an interest in an entity other than an interest solely as a creditor is—

(A) Stock of a corporation;

(B) An interest in a partnership as a partner within the meaning of section 761(b) and the regulations thereunder;

(C) An interest in a trust or estate as a beneficiary within the meaning of section 643(c) and the regulations thereunder or an ownership interest in any portion of a trust as provided in sections 671 through 679 and the regulations thereunder;

(D) An interest which is, in whole or in part, a direct or indirect right to share in the appreciation in value of an interest in an entity described in subdivision (A), (B), or (C) of this paragraph (d)(3)(i) or a direct or indirect right to share in the appreciation in value of assets of, or gross or net proceeds or profits derived by, the entity; or

(E) A right (whether or not presently exercisable) directly or indirectly to acquire, by purchase, conversion, exchange, or in any other manner, an interest described in subdivision (A), (B), (C), or (D) of this paragraph (d)(3)(i).

**(ii) Special rules—**(A) Installment obligations. A right to installment or other deferred payments from the disposition of an interest in an entity will constitute an interest solely as a creditor if the transferor elects not to have the installment method of section 453(a) apply, any gain or loss is recognized in the year of disposition, and tax due is timely paid. See section 1445 and regulations thereunder for further guidance concerning the availability of installment sale treatment under section 453. If an agreement for the payment of tax with respect to an installment sale is entered into with the Internal Revenue Service pursuant to section 1445, that agreement may specify whether or not the installment obligation will constitute an interest solely as a creditor. If an installment obligation constitutes an interest other than solely as a creditor then the receipt of each payment shall be treated as the disposition of such an interest and shall be subject to section 897(a) to the extent that:

(1) It constitutes the disposition of a U.S. real property interest and

(2) Gain or loss is required to be taken into account pursuant to section 453. Such treatment shall apply to payments arising from dispositions of interests in a corporation any class of the stock of which is regularly traded on an established securities market, but only in the case of a disposition of any portion of an interest described in paragraph (c)(2)(iii)(A) or (B) of this section. If the original holder of an installment obligation that constitutes an interest other than solely as a creditor subsequently disposes of the obligation to an unrelated party and recognizes gain or loss pursuant to section 453B, the obligation will constitute an interest in the entity solely as a creditor in the hands of the subsequent holder. However, if the obligation is disposed of to a related person

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 261 of 651

and the full amount of gain realized upon the disposition of the interest in the entity has not been recognized upon such disposition of the installment obligation, then the obligation shall continue to be an interest in the entity other than solely as a creditor in the hands of the subsequent holder subject to the rules of this paragraph (d)(3)(ii)(A). In addition, if the obligation is disposed of to any person for a principal purpose of avoiding the provisions of section 897, 1445, or 6039C, then the obligation shall continue to be an interest in the entity other than solely as a creditor in the hands of the subsequent holder subject to the rules of this paragraph (d)(3)(ii)(A). However, rights to payments arising from dispositions that took place before June 19, 1980, shall in no event constitute interests in an entity other than solely as a creditor, even if such payments are received after June 18, 1980. In addition, such treatment shall not apply to payments arising from dispositions to unrelated parties that took place before January 1, 1985, and that were not subject to U.S. tax pursuant to the provisions of a U.S. income tax treaty, regardless of when such payments are received.

(B) Contingent interests. The interests described in subdivision (D) of paragraph (d)(3)(i) of this section include any right to a payment from an entity the amount of which is contingent on the appreciation in value of an interest described in subdivision (A), (B), or (C) of paragraph (d)(3)(i) of this section or which is contingent on the appreciation in value of assets of, or the general gross or net proceeds or profits derived by, such entity. The right to such a payment is itself an interest in the entity other than solely as a creditor, regardless of whether the holder of such right actually holds an interest in the entity described in subdivision (A), (B), or (C) of paragraph (d)(3)(i) of this section. For example, a stock appreciation right constitutes an interest in a corporation other than solely as a creditor even if the holder of such right actually holds no stock in the corporation. However, the interests described in subdivision (D) of paragraph (d)(3)(i) of this section do not include any right to a payment that is (1) exclusively contingent upon and exclusively paid out of revenues from sales of personal property (whether tangible or intangible) or from services, or (2) exclusively contingent upon the resolution of a claim asserted against the entity by a person related neither to the entity nor to the holder of the interest.

(C) Security interests. A right to repossess or foreclose on an interest in an entity under a mortgage, security agreement, financing statement, or other collateral instrument securing a debt will not of itself cause an interest in an entity which is otherwise an interest solely as a creditor to become an interest other than solely as a creditor.

(D) Royalties. The interests described in subdivision (D) of paragraph (d)(3)(i) of this section do not include rights to payments representing royalties, license fees, or similar charges for the use of patents, inventions, formulas, copyrights, literary, musical or artistic compositions, trademarks, trade names, franchises, licenses, or similar intangible property.

(E) Commissions. The interests described in subdivision (D) of paragraph (d)(3)(i) of this section do not include a right to a commission, brokerage fee or similar charge for professional services rendered in connection with the purchase or sale of an interest in an entity. However, a right to such a payment will constitute an interest other than solely as a creditor if the total amount of the payment is contingent upon appreciation in value of assets of, or proceeds or profits derived by, the entity after the date of the transaction with respect to which the payment was earned.

(F) Trustee's fees. The interests described in subdivision (D) of paragraph (d)(3)(i) of this section do not include a right to payment representing reasonable compensation for services rendered as a trustee, as an administrator of an estate, or in a similar capacity.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**(4) Aggregation of interests.** If a person holds both interests solely as a creditor and interests other than solely as a creditor in real property or in an entity, those interests will generally be treated as separate and distinct interests. However, such interests shall be aggregated and treated as interests other than solely as a creditor in their entirety if the interest solely as a creditor has been separated from, or acquired separately from, the interest other than solely as a creditor, for a principal purpose of avoiding the provisions of section 897, 1445, or 6039C by causing one or more of such interests to be an interest solely as a creditor. The existence of such a purpose will be determined with reference to all the facts and circumstances. Where an interest solely as a creditor has arm's-length interest and repayment terms it shall in no event be aggregated with and treated as an interest other than solely as a creditor. For purposes of this paragraph (d)(4), an interest rate that does not exceed 120 percent of the applicable Federal rate (as defined in section 1274(d)) shall be presumed to be an arm's-length interest rate. For purposes of applying the rules of this paragraph (d)(4), a person shall be treated as holding any interests held by a related person within the meaning of § 1.897–1(i).

**(5) "Interest" means "interest other than solely as a creditor."** Unless otherwise stated, the term "interest" as used with regard to real property or with regard to an entity hereafter in the regulations under sections 897, 1445, and 6039C, means an interest in such real property or entity other than an interest solely as a creditor.

**(e) Proportionate share of assets held by an entity—(1) In general.** A person that holds an interest in an entity is for certain purposes treated as holding a proportionate or pro rata share of the assets held by the entity. Such proportionate share must be calculated, in accordance with the rules of this paragraph, for the following purposes.

**(i)** In determining whether a corporation is a U.S. real property holding corporation—

(A) A person holding an interest in a partnership, trust, or estate is treated as holding a proportionate share of the assets held by the partnership, trust, or estate (see section 897–2(e)(2)), and

(B) A corporation that holds a controlling interest in a second corporation is treated as holding a proportionate share of the assets held by the second corporation (see § 1.897–2(e)(3)).

**(ii)** In determining reporting obligations that may be imposed under section 6039C, the holder of an interest in a partnership, trust, or estate is treated as owning a proportionate share of the U.S. real property interests held by the partnership, trust, or estate.

**(2) Proportionate share of assets held by a corporation or partnership—(i) In general.** A person's proportionate or pro rata share of assets held by a corporation or partnership is determined by multiplying—

(A) The person's percentage ownership interest in the entity, by

(B) The fair market value of the assets held by the entity (or the book value of such assets, in the case of a determination pursuant to § 1.897–2(b)(2)).

**0258** 11

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 263 of 651

**(ii) Percentage ownership interest.** A person's percentage ownership interest in a corporation or partnership is the percentage equal to the ratio of (A) the sum of the liquidation values of all interests in the entity held by the person to (B) the sum of the liquidation values of all outstanding interest in the entity. The liquidation value of an interest in an entity is the amount of cash and the fair market value of any property that would be distributed with respect to such interest upon the liquidation of the entity after satisfaction of liabilities to persons having interests in the entity solely as creditors. With respect to an entity that has interests outstanding that grant a presently-exercisable option to acquire or right to convert into or otherwise acquire an interest in the entity other than solely as a creditor, the liquidation value of all interests in such entity shall be calculated as though such option or right had been exercised, giving effect both to the payment of any consideration required to exercise the option or right and to the issuance of the additional interest.

The fair market value of the assets of the entity, the amount of cash held by the entity, and the amount of liabilities to persons having interests solely as creditors if determined for this purpose on the date with respect to which the percentage ownership interest is determined.

**(iii) Examples.** The rules of this paragraph (e)(2) are illustrated by the following examples.

**Example 1.** Corporation K's only assets are stock and securities with a fair market value as of the applicable determination date of $20,000,000 K's assets are subject to liabilities of $10,000,000. Among K's liabilities are a $1,000,000 loan from L, under the terms of which L is entitled, upon payment of the loan principal, to a profit share equal to 10 percent of the excess of the fair market value of K's assets over $18,000,000, but only if all other corporate liabilities have been paid. K has two classes of stock, common and preferred. PS1 and PS2 each own 100 of the 200 outstanding shares of preferred stock. CS1 and CS2 each own 500 of the 1,000 outstanding shares of common stock. Each preferred shareholder is entitled to $10,000 per share of preferred stock upon liquidation, subject to payment of all corporate liabilities and to any amount owed to L, but before any common shareholder is paid. The liquidation value of L's interest in K, which constitutes an interest other than an interest solely as a creditor, is $1,200 ($1,000,000 principal of the loan to K plus $200,000 (10 percent of the excess of $20,000,000 over $18,000,000). The liquidation value of each of PS1's and PS2's blocks of preferred stock is $1,000,000 ($10,000 times 100 shares each). The liquidation value of each of CS1's and CS2's blocks of common stock is $3,900,000 [$20,000,000 (the total fair market value of K's assets)—$9,000,000 (liabilities to creditors other than L)—$1,200,000 (L's liquidation value)—$2,000,000 (PS1's and PS2's liquidation value) times 50 percent (the percentage of common stock owned by each)]. The sum of the liquidation values of all of the outstanding interests in K (i.e., interests other than solely as a creditor) is $11,000,000 [$1,200,000 (L's liquidation value) + $2,000,000 (PS1's and PS2's liquidation values) + $7,800,000 (CS1's and CS2's liquidation values)]. Each of CS1's and CS2's percentage ownership interests in K is 35.5 percent ($3,900,000 divided by $11,000,000). Each of PS1's and PS2's percentage ownership interests in K is 9 percent ($1,000,000 divided by $11,000,000). L's percentage ownership interest in K is 11 percent ($1,200,000 divided by $11,000,000).

**Example 2.** A, a U.S. person, and B, a foreign person are partners in a partnership the only asset of which is a parcel of undeveloped land located in the United States that was purchased by the partnership in 1980 for $300,000. The partnership has no liabilities, and its capital is $300,000. A's and B's interests in the capital of the partnership are 25 percent and 75 percent, respectively, and A and B each has a 50 percent profit interest in the partnership. The partnership agreement provides that upon liquidation any unrealized gain will be distributed in accordance with the partners' profit interest. In 1984 the partnership has no items of income or deduction, and the fair market value of its parcel of undeveloped land is $500,000. In 1984 the percentage ownership interest of A in the partnership is 35 percent [the ratio of $100,000 (the liquidation value of A's profit interest in 1984) plus $75,000 (the liquidation value of A's 25 percent interest in the partnership's $300,000 capital) to $500,000 (the sum of the liquidation values of all outstanding interests in the partnership)]. The percentage ownership interest of B in the partnership in 1984 is 65 percent [the ratio of $325,000 (B's $100,000 profit interest plus his $225,000 capital interest) to $500,000].

**(3) Proportionate share of assets held by trusts and estates—(i) In general.** A person's proportionate or pro rata share of assets held by a trust or estate is determined by multiplying—

(A) The person's percentage ownership interest in the trust or estate, by

(B) The fair market value of the assets held by the trust or estate (or the book value of such assets, in the case of a determination pursuant to § 1.897–2(b)(2)).

**(ii) Percentage ownership interest—**(A) General rule. A person's percentage ownership interest in a trust or an estate— is the percentage equal to the ratio of:

(1) The sum of the actuarial values of such person's interests in the cash and other assets held by the trust or estate after satisfaction of the liabilities of the trust or estate to persons holding interests in the trust or estate solely as creditors, to (2) the entire amount of such cash and other assets after satisfaction of liabilities to persons holding interests in the trust or estate solely as creditors. For purposes of calculating this ratio, the fair market value of the trust's or estate's assets, the amount of cash held by the trust or estate, and the amount of the liabilities to persons having interests solely as creditors is determined on the date with respect to which the percentage ownership interest is determined. With respect to a trust or estate that has interests outstanding that grant a presently-exercisable option to acquire or right to convert into or otherwise acquire an interest in the trust or estate other than solely as a creditor, the liquidation value of all interests in such entity shall be calculated as though such option or right had been exercised, giving effect both to the payment of any consideration required to exercise the option or right and to the issuance of the additional interest. With respect to a trust or estate that has interests outstanding that entitle any person to a distribution of U.S. real property interests upon liquidation that is disproportionate to such person's interest in the total assets of the trust or estate, such disproportionate right shall be disregarded in the calculation of the interest-holders' proportionate share of the U.S. real property interests held by the entity. For purposes of determining his own percentage ownership interest in a trust, a grantor or other person will be treated as owning any portion of the trust's cash and other assets which such person is treated as owning under sections 671 through 679.

(B) Discretionary trusts and estates. In determining percentage ownership interest in a trust or an estate, the sum of the definitely ascertainable actuarial values of interests in the cash and the other assets of the trust or estate held by persons in existence on the date with respect to which such determination is made must equal the amount in paragraph (e)(3)(ii)(A)(2) of this section. If the amount in paragraph (e)(3)(ii)(A)(2) of this section exceeds the sum of the definitely ascertainable actuarial values of the interests held by persons in existence on the determination date, the excess will be considered to be owned in total by each beneficiary who is in existence on such date, whose interest in the excess is not definitely ascertainable and who is potentially entitled to such excess. However, such excess shall not be considered to be owned in total by each beneficiary if the discretionary terms of the trust or estate were included for a principal purpose of avoiding the provisions of section 897, 1445, or 6039C by causing assets other than U.S. real property interests to be attributed in total to each beneficiary. The rules of this paragraph (e)(3) are illustrated by the following example.

**Example.** A, a U.S. person, established a trust on December 31, 1984, and contributed real property with a fair market value of $10,000 to the trust. The terms of that trust provided that the trustee, a bank that is unrelated to A, at its discretion may retain trust income or may distribute it to X, a foreign person, or to the head of state of any country other than the United States. The remainder upon the death of X is to go in equal shares to such of Y and Z, both foreign persons, as survive X. On December 31,

1984, the total value of the trust's assets is $10,000. On the same date, the actuarial values of the remainder interests of Y and Z in the corpus of the trust are definitely ascertainable. They are $1,000 and $500, respectively. Neither the income interest of X nor of the head of state of any country other than the United States has a definitely ascertainable actuarial value on December 31, 1984. The interests of Y and Z in the income portion of the trust similarly have no definitely ascertainable actuarial values on such date since the income may be distributed rather than retained by the trust. Since the sum of the actuarial values of definitely ascertainable interests of persons in existence ($1,500) is less than $10,000, the difference ($8,500) is treated as owned by each beneficiary who is in existence on December 31, 1984, and who is potentially entitled to such excess. Therefore, X, Y, Z, and the head of state of any country other than the United States are each considered as owning the entire $8,500 income interest in the trust. On December 31, 1984, the total actuarial value of X's interest is $8,500, and his percentage ownership interest is 85 percent. The total actuarial value of Y's interest in the trust is $9,500 ($1,000 plus $8,500), and his percentage ownership interest is 95 percent. The total actuarial value of Z's interest is $9,000 ($500 plus $8,500), and his percentage ownership interest is 90 percent. The actuarial value of the interest of the head of state of each country other than the United States is $8,500, and his percentage ownership interest is 85 percent.

**(4) Dates with respect to which percentage ownership interests are determined.** The dates with respect to which percentage ownership interests are determined are the applicable determination dates outlined in § 1.897–2 or in regulations under section 6039C.

**(f) Asset used or held for use in a trade or business—(1) In general.** The term "asset used or held for use in a trade or business" means—

**(i)** Property, other than a U.S. real property interest, that is—

(A) Stock in trade of an entity or other property of a kind which would properly be included in the inventory of the entity if on hand at the close of the taxable year, or property held by the entity primarily for sale to customers in the ordinary course of its trade or business, or

(B) Depreciable property used or held for use in the trade or business, as described in section 1231(b)(1) but without regard to the holding period limitations of section 1231(b), or

(C) Livestock, including poultry, used or held for use in a trade or business for draft, breeding, dairy, or sporting purposes, and

**(ii)** Goodwill and going concern value, patents, inventions, formulas copyrights, literary, musical, or artistic compositions, trademarks, trade names, franchises, licenses, customer lists, and similar intangible property, but only to the extent that such property is used or held for use in the entity's trade or business and subject to the valuation rules of § 1.897–1(o)(4), and

**(iii)** Cash, stock, securities, receivables of all kinds, options or contracts to acquire any of the foregoing, and options or contracts to acquire commodities, but only to the extent that such assets are used or held for use in the corporation's trade or business and do not constitute U.S. real property interests.

**(2) Used or held for use in a trade or business.** An asset is used or held for use in an entity's trade or business if it is, under the principles of § 1.864–4(c)(2)—

**(i)** Held for the principal purpose of promoting the present conduct of the trade or business,

**(ii)** Acquired and held in the ordinary course of the trade or business, as, for example, in the case of an account or note receivable arising from that trade or business (including the performance of services), or

**(iii)** Otherwise held in a direct relationship to the trade or business.

In determining whether an asset is held in a direct relationship to the trade or business, consideration shall be given to whether the asset is needed in that trade or business. An asset shall be considered to be needed in a trade or business only if the asset is held to meet the present needs of that trade or business and not its anticipated future needs. An asset shall be considered as needed in the trade or business if, for example, the asset is held to meet the operating expenses of that trade or business. Conversely, an asset shall be considered as not needed in the trade or business if, for example, the asset is held for the purpose of providing for future diversification into a new trade or business, future expansion of trade or business activities, future plant replacement, or future business contingencies. An asset that is held to meet reserve or capitalization requirements imposed by applicable law shall be presumed to be held in a direct relationship to the trade or business.

**(3) Special rules concerning liquid assets—(i) Safe harbor amount.** Assets described in paragraph (f)(1)(iii) of this section shall be presumed to be used or held for use in a trade or business, in an amount up to 5 percent of the fair market value of other assets used or held for use in the trade or business. However, the rule of this paragraph (f)(3)(i) shall not apply with respect to any assets described in paragraph (f)(1)(iii) of this section that are held or acquired for the principal purpose of avoiding the provisions of section 897 or 1445.

**(ii) Investment companies.** Assets described in paragraph (f)(1)(iii) of this section shall be presumed to be used or held for use in an entity's trade or business if the principal business of the entity is trading or investing in such assets for its own account. An entity's principal business shall be presumed to be trading or investing in assets described in paragraph (f)(1)(iii) of this section if the fair market value of such assets held by the entity equals or exceeds 90 percent of the sum of the fair market values of the entity's U.S. real property interests, interests in real property located outside the United States, assets otherwise used or held for use in trade or business, and assets described in paragraph (f)(1)(iii) of this section.

**(4) Examples.** The application of this paragraph (f) may be illustrated by the following examples:

**Example 1.** M, a domestic corporation engaged in industrial manufacturing, is required to hold a large current cash balance for the purposes of purchasing materials and meeting its payroll. The amount of the cash balance so required varies because of the fluctuating seasonal nature of the corporation's business. In months when large cash balances are not required, the corporation invests the surplus amount in U.S. Treasury bills. Since both the cash and the Treasury bills are held to meet the present needs of the business, they are held in a direct relationship to that business, and, therefore, constitute assets used or held for use in the trade or business.

**Example 2.** R, a domestic corporation engaged in the manufacture of goods, engages a stock brokerage firm to manage securities which were purchased with funds from R's general surplus reserves. The funds invested in these securities are intended to provide for the future expansion of R into a new trade or business. Thus, the funds are not necessary for the present needs of the business; they are accordingly not held in a direct relationship to the business and do not constitute assets used or held for use in the trade or business.

**Example 3.** B, a federally chartered and regulated bank, is required by law to hold substantial reserves of cash, stock, and securities. Pursuant to the rule of paragraph (f)(2) of this section, such assets are presumed to be held in a direct relationship to B's business, and thus constitute assets used or held for use in the trade or business. In addition, B holds substantial loan receivables which are acquired and held in the ordinary course of its banking business. Pursuant to the rule of paragraph (f)(1)(iii) of this section, such receivables constitute assets used or held for use in the trade or business.

**(g) Disposition.** For purposes of sections 897, 1445, and 6039C, the term "disposition" means any transfer that would constitute a disposition by the transferor for any purpose of the Internal Revenue Code and regulations thereunder. The severance of crops or timber and the extraction of minerals do not alone constitute the disposition of a U.S. real property interest.

**(h) Gain or loss.** The amount of gain or loss arising from the disposition of the U.S. real property interest shall be determined as provided in section 1001(a) and (b). Such gain or loss shall be subject to the provisions of section 897(a) and (b), unless a nonrecognition provision is applicable pursuant to section 897(d) or (e) and regulations thereunder. Amounts otherwise treated for Federal income tax purposes as principal and interest payments on debt obligations of all kinds (including obligations that are interests other than solely as a creditor) do not give rise to gain or loss that is subject to section 897(a). However, principal payments on installment obligations described in §§ 1.897–1(d)(2)(ii)(A) and 1.897–1(d)(3)(ii)(A) do give rise to gain or loss that is subject to section 897(a), to the extent such gain or loss is required to be recognized pursuant to section 453. The rules of paragraphs (g) and (h) are illustrated by the following examples.

**Example 1**. Foreign individual C has an undivided fee interest in a parcel of real property located in the United States. The fair market value of C's interest is $70,000, and C's basis in such interest is $50,000. The only liability to which the real property is subject is the liability of $65,000 secured by a mortgage in the same amount. C transfers his fee interest in the property subject to the mortgage by gift to D. C realizes $15,000 of gain upon such transfer. As a transfer by gift constitutes a disposition for purposes of the Code, and as gain is realized upon that transfer, the gift is a disposition for purposes of sections 897, 1445, and 6039C and is subject to section 897(a) to the extent of the gain realized. However, section 897(a) would not be applicable to the transfer if the mortgage on the U.S. real property were equal to or less than C's $50,000 basis, since the transfer then would not give rise to the realization of gain or loss under the Internal Revenue Code.

**Example 2.** Foreign corporation Y makes a loan of $1 million to domestic individual Z, secured by a mortgage on residential real property purchased with the loan proceeds. The loan agreement provides that Y is entitled to receive fixed monthly payments from Z, constituting repayment of principal plus interest at a fixed rate. In addition, the agreement provides that Y is entitled to receive a percentage of the appreciation value of the real property as of the time that the loan is retired. The obligation in its entirety is considered debt for Federal income tax purposes. However, because of Y's right to share in the appreciation in value of the real property, the debt obligation gives Y an interest in the real property other than solely as a creditor. Nevertheless, as principal and interest payments do not constitute gain under section 1001 and paragraph (h) of this section, and both the monthly and final payments received by Y are considered to consist solely of principal and interest for Federal income tax purposes, section 897(a) shall not apply to Y's receipt of such payments. However, Y's sale of the debt obligation to foreign corporation A would give rise to gain that is subject to section 897(a).

**(i) Related person.** For purposes of sections 897, 1445, and 6039C, persons are considered to be related if they are partners or partnerships described in section 707(b)(1) of the Code or if they are related within the meaning of section 267(b) and (c) of the Code (except that section 267(f) shall apply without regard to section 1563(b)(2)).

**(j) Domestic corporation.** The term "domestic corporation" has the same meaning as set forth in section 7701(a)(3) and (4) and § 301.7701–5. For purposes of sections 897 and 6039C, it also includes a foreign corporation with respect to which an election under section 897(i) and § 1.897–3 or section 897(k) and § 1.897–4 to be treated as domestic corporation is in effect.

**(k)** [Reserved]

**(l) Foreign corporation.** The term "foreign corporation" has the meaning ascribed to such term in section 7701(a)(3) and (5) and § 301.7701–5. For purposes of sections 897 and 6039C, however, the term does not include a foreign corporation with respect to which there is in effect an election under section 897(i) and § 1.897–3 or section 897(k) and § 1.897–4 to be treated as a domestic corporation.

**(m) Established securities market.** For purposes of sections 897, 1445, and 6039C, the term "established securities market" means—

**(1)** A national securities exchange which is registered under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f),

**(2)** A foreign national securities exchange which is officially recognized, sanctioned, or supervised by governmental authority, and

**(3)** Any over-the-counter market. An over-the-counter market is any market reflected by the existence of an interdealer quotation system. An interdealer quotation system is any system of general circulation to brokers and dealers which regularly disseminates quotations of stocks and securities by identified brokers or dealers, other than by quotation sheets which are prepared and distributed by a broker or dealer in the regular course of business and which contain only quotations of such broker or dealer.

**(n)** [Reserved]

**(o) Fair market value—(1) In general.** For purposes of sections 897, 1445, and 6039C only, the term "fair market value" means the value of the property determined in accordance with the rules, contained in this paragraph (o). The definition of fair market value provided herein is not to be used in the calculation of gain or loss from the disposition of a U.S. real property interest pursuant to section 1001. An independent professional appraisal of the value of property must be submitted only if such an appraisal is specifically requested in connection with the negotiation of a security agreement pursuant to section 1445.

**(2) Method of calculating fair market value—(i) In general.** The fair market value of property is its gross value (as defined in paragraph (o)(2)(ii) of this section) reduced by the outstanding balance of any debts secured by the property which are described in paragraph (o)(2)(iii) of this section. See § 1.897–2(b) for the alternative use of book values in certain limited circumstances.

**(ii) Gross value.** Gross value is the price at which the property would change hands between an unrelated willing buyer and willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all relevant facts. Generally, with respect to trade or business assets, going concern value should be used as it will provide the most accurate reflection of such a price. However, taxpayers may use other methods of valuation if they can establish that such method will provide a more accurate determination of gross value and if they consistently apply such method

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

to all assets to be valued. See subdivisions (3) and (4) of this paragraph (o) for special rules with respect to the valuation of leases and of intangible assets.

**(iii) Debts secured by the property.** The gross value of property shall be reduced by the outstanding balance of debts that are:

(A) Secured by a mortgage or other security interest in the property that is valid and enforceable under the law of the jurisdiction in which the property is located, and

(B) Either (1) Incurred to acquire the property (including long-term financing obtained in replacement of construction loans or other short-term debt within one year of the acquisition or completion of the property), or (2) otherwise incurred in direct connection with the property, such as property tax liens upon real property or debts incurred to maintain or improve property.

In addition, if any debt described in this paragraph (o)(2)(iii) is refinanced for a valid business purpose (such as obtaining a more favorable rate of interest), the principal amount of the replacement debt does not exceed the outstanding balance of the original debt, and the replacement debt is secured by the property, then the gross value of the property shall be reduced by the replacement debt. Obligations to related persons shall not be taken into account for purposes of this paragraph (o)(2)(iii) unless such obligations constitute interests solely as a creditor pursuant to the provisions of paragraph (d)(4) of this section and unless the related person has made similar loans to unrelated persons on similar terms and conditions.

**(iv) Anti-abuse rule.** The gross value of real property located outside the United States and of assets used or held for use in a trade or business shall be reduced by the outstanding balance of any debt that was entered into for the principal purpose of avoiding the provisions of section 897, 1445, or 6039C by enabling the corporation to acquire such assets. The existence of such a purpose shall be determined with reference to all the facts and circumstances. Debts that a particular corporation routinely enters into in the ordinary course of its acquisition of assets used or held for use in its trade or business will not be considered to be entered into for the principal purpose of avoiding the provisions of section 897, 1445, or 6039C.

**(3) Fair market value of leases and options.** For purposes of sections 897, 1445, and 6039C, the fair market value of a leasehold interest in real property is the price at which the lease could be assigned or the property sublet, neither party to such transaction being under any compulsion to enter into the transaction and both having reasonable knowledge of all relevant facts. Thus, the value of a leasehold interest will generally consist of the present value, over the period of the lease remaining, of the difference between the rental provided for in the lease and the current rental value of the real property. A leasehold interest bearing restrictions on its assignment or sublease has a fair market value of zero, but only if those restrictions in practical effect preclude (rather than merely condition) the lessee's ability to transfer, at a gain, the benefits of a favorable lease. The normal commercial practice of lessors may be used to determine whether restrictions in a lease have the practical effect of precluding transfer at a gain. The fair market value of an option to purchase any property is, similarly, the price at which the option could be sold, consisting generally of the difference between the option price and the fair market value of the property, taking proper account of any restrictions upon the transfer of the option.

**(4) Fair market value of intangible assets.** For purposes of determining whether a corporation is a U.S. real property holding corporation, the fair market value of intangible assets described in § 1.897–1(f)(1)(ii) may be determined in accordance with the following rules.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 270 of 651

**(i) Purchase price.** Intangible assets described in § 1.897–1(f)(1)(ii) that were acquired by purchase from a person not related to the purchaser within the meaning of § 1.897–1(i) may be valued at their purchase price. However, such purchase price must be adjusted to reflect any amortization required by generally accepted accounting principles applied in the United States. Intangible assets acquired by purchase shall include any amounts allocated to goodwill or going concern valued pursuant to section 338(b)(3) and regulations thereunder. Intangible assets acquired by purchase shall not include assets that were acquired indirectly through an acquisition of stock to which section 338 does not apply. Such assets must be valued pursuant to a method described in subdivision (ii) or (iii) of this paragraph (o)(4).

**(ii) Book value.** Intangible assets described in § 1.897–1(f)(1)(ii) (other than good will and going concern value) may be valued at the amount at which such assets are carried on the financial accounting records of the holder of such assets, provided that such amount is determined in accordance with generally accepted accounting principles applied in the United States. However, this method may not be used with respect to assets acquired by purchase from a related person within the meaning of § 1.897–1(i).

**(iii) Other methods.** Intangible assets described in § 1.897–1(f)(1)(ii) may be valued pursuant to any other reasonable method at an amount reflecting the price at which the asset would change hands between an unrelated willing buyer and willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all relevant facts. However, a corporation that uses a method of valuation other than the purchase price or book value methods may be required to comply with the special notification requirements of § 1.897–2(h)(1)(iii)(A).

**(p) Identifying number.** The "identifying number" of an individual is the individual's United States social security number or the identification number assigned by the Internal Revenue Service (see § 301.6109–1 of this chapter). The "identifying number" of any other person is its United States employer identification number.

(Approved by the Office of Management and Budget under control number l545–0123)

(Authority: Sec. 897 (94 Stat. 2683; 26 U.S.C. 897), sec. 6011 (68A Stat. 732; 26 U.S.C. 6011) and sec. 7805 (68A Stat. 917; 26 U.S.C. 7805) of the Internal Revenue Code of 1954)

**Credits**
[T.D. 7999, 49 FR 50693, Dec. 31, 1984; 50 FR 12530, March 29, 1985; T.D. 8113, 51 FR 46626, Dec. 24, 1986; T.D. 8198, 53 FR 16217, May 5, 1988; T.D. 8657, 61 FR 9343, March 8, 1996; 61 FR 14248, April 1, 1996; T.D. 9082, 68 FR 46082, Aug. 5, 2003]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

Current through March 24, 2016; 81 FR 16051.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

JCS- 2-11 NO 6 (I.R.S.), 2011 WL 940372

JOINT COMMITTEE PRINTS

Prepared by the Staff
of the
JOINT COMMITTEE ON TAXATION

GENERAL EXPLANATION OF TAX LEGISLATION ENACTED IN THE 111TH CONGRESS

PART TWO: REVENUE PROVISIONS OF THE AMERICAN RECOVERY
AND REINVESTMENT ACT OF 2009 (PUBLIC LAW 111-5) [37]

TITLE I--TAX PROVISIONS

March 2011

D. ENERGY INCENTIVES

**\*1** 1. Extension of the renewable electricity production credit (sec. 1101 of the Act and sec. 45 of the Code)

2. Election of investment credit in lieu of production tax credits (sec. 1102 of the Act and secs. 45 and 48 of the Code)

3. Modification of energy credit (sec. 1103 of the Act and sec. 48 of the Code)

4. Grants for specified energy property in lieu of tax credits (secs. 1104 and 1603 of the Act and secs. 45 and 48 of the Code)

5. Expand new clean renewable energy bonds (sec. 1111 of the Act and sec. 54C of the Code)

6. Expand qualified energy conservation bonds (sec. 1112 of the Act and sec. 54D of the Code)

7. Modification to high-speed intercity rail facility bonds (sec. 1504 of the Act and sec. 142(i) of the Code)

8. Extension and modification of credit for nonbusiness energy property (sec. 1121 of the Act and sec. 25C of the Code)

9. Credit for residential energy efficient property (sec. 1122 of the Act and sec. 25D of the Code)

10. Temporary increase in credit for alternative fuel vehicle refueling property (sec. 1123 of the Act and sec. 30C of the Code)

11. Modification of credit for carbon dioxide sequestration (sec. 1131 of the Act and sec. 45Q of the Code)

12. Modification of the plug-in electric drive motor vehicle credit (secs. 1141-1144 of the Act and secs. 30, 30B, and 30D of the Code)

13. Parity for qualified transportation fringe benefits (sec. 1151 of the Act and sec. 132 of the Code)

14. Credit for investment in advanced energy property (sec. 1302 of the Act and new sec. 48C of the Code)

**1. Extension of the renewable electricity production credit (sec. 1101 of the Act and sec. 45 of the Code)**

*Present Law*

### In general

An income tax credit is allowed for the production of electricity from qualified energy resources at qualified facilities (the "renewable electricity production credit").[216] Qualified energy resources comprise wind, closed-loop biomass, open-loop biomass, geothermal energy, solar energy, small irrigation power, municipal solid waste, qualified hydropower production, and marine and hydrokinetic renewable energy. Qualified facilities are, generally, facilities that generate electricity using qualified energy resources. To be eligible for the credit, electricity produced from qualified energy resources at qualified facilities must be sold by the taxpayer to an unrelated person.

### Credit amounts and credit period

*In general*

 **\*2**  The base amount of the electricity production credit is 1.5 cents per kilowatt-hour (indexed annually for inflation) of electricity produced. The amount of the credit was 2.1 cents per kilowatt-hour for 2008. A taxpayer may generally claim a credit during the 10-year period commencing with the date the qualified facility is placed in service. The credit is reduced for grants, tax-exempt bonds, subsidized energy financing, and other credits.

*Credit phaseout*

The amount of credit a taxpayer may claim is phased out as the market price of electricity exceeds certain threshold levels. The electricity production credit is reduced over a 3-cent phaseout range to the extent the annual average contract price per kilowatt-hour of electricity sold in the prior year from the same qualified energy resource exceeds 8 cents (adjusted for inflation; 11.8 cents for 2008).

*Reduced credit periods and credit amounts*

Generally, in the case of open-loop biomass facilities (including agricultural livestock waste nutrient facilities), geothermal energy facilities, solar energy facilities, small irrigation power facilities, landfill gas facilities, and trash combustion facilities placed in service before August 8, 2005, the 10-year credit period is reduced to five years, commencing on the date the facility was originally placed in service. However, for qualified open-loop biomass facilities (other than a facility described in section 45(d)(3)(A)(i) that uses agricultural livestock waste nutrients) placed in service before October 22, 2004, the five-year period commences on January 1, 2005. In the case of a closed-loop biomass facility modified to co-fire with coal, to co-fire with other biomass, or to co-fire with coal and other biomass, the credit period begins no earlier than October 22, 2004.

In the case of open-loop biomass facilities (including agricultural livestock waste nutrient facilities), small irrigation power facilities, landfill gas facilities, trash combustion facilities, and qualified hydropower facilities the otherwise allowable credit amount is 0.75 cent per kilowatt-hour, indexed for inflation measured after 1992 (1 cent per kilowatt-hour for 2008).

*Other limitations on credit claimants and credit amounts*

In general, in order to claim the credit, a taxpayer must own the qualified facility and sell the electricity produced by the facility to an unrelated party. A lessee or operator may claim the credit in lieu of the owner of the qualifying facility in the case of qualifying open-loop biomass facilities and in the case of closed-loop biomass facilities modified to co-fire with coal, to co-fire with other biomass, or to co-fire with coal and other biomass. In the case of a poultry waste facility, the taxpayer may claim the credit as a lessee or operator of a facility owned by a governmental unit.

For all qualifying facilities, other than closed-loop biomass facilities modified to co-fire with coal, to co-fire with other biomass, or to co-fire with coal and other biomass, the amount of credit a taxpayer may claim is reduced by reason of grants, tax-exempt bonds, subsidized energy financing, and other credits, but the reduction cannot exceed 50 percent of the otherwise allowable credit. In the case of closed-loop biomass facilities modified to co-fire with coal, to co-fire with other biomass, or to co-fire with coal and other biomass, there is no reduction in credit by reason of grants, tax-exempt bonds, subsidized energy financing, and other credits.

**\*3** The credit for electricity produced from renewable resources is a component of the general business credit.[217] Generally, the general business credit for any taxable year may not exceed the amount by which the taxpayer's net income tax exceeds the greater of the tentative minimum tax or 25 percent of so much of the net regular tax liability as exceeds $25,000. However, this limitation does not apply to section 45 credits for electricity or refined coal produced from a facility (placed in service after October 22, 2004) during the first four years of production beginning on the date the facility is placed in service.[218] Excess credits may be carried back one year and forward up to 20 years.

### Qualified facilities

#### Wind energy facility

A wind energy facility is a facility that uses wind to produce electricity. To be a qualified facility, a wind energy facility must be placed in service after December 31, 1993, and before January 1, 2010.

#### Closed-loop biomass facility

A closed-loop biomass facility is a facility that uses any organic material from a plant which is planted exclusively for the purpose of being used at a qualifying facility to produce electricity. In addition, a facility can be a closed-loop biomass facility if it is a facility that is modified to use closed-loop biomass to co-fire with coal, with other biomass, or with both coal and other biomass, but only if the modification is approved under the Biomass Power for Rural Development Programs or is part of a pilot project of the Commodity Credit Corporation.

To be a qualified facility, a closed-loop biomass facility must be placed in service after December 31, 1992, and before January 1, 2011. In the case of a facility using closed-loop biomass but also cofiring the closed-loop biomass with coal, other biomass, or coal and other biomass, a qualified facility must be originally placed in service and modified to co-fire the closed-loop biomass at any time before January 1, 2011.

A qualified facility includes a new power generation unit placed in service after October 3, 2008, at an existing closed-loop biomass facility, but only to the extent of the increased amount of electricity produced at the existing facility by reason of such new unit.

#### Open-loop biomass (including agricultural livestock waste nutrients) facility

An open-loop biomass facility is a facility that uses open-loop biomass to produce electricity. For purposes of the credit, open-loop biomass is defined as (1) any agricultural livestock waste nutrients or (2) any solid, nonhazardous, cellulosic waste material or any lignin material that is segregated from other waste materials and which is derived from:
• forest-related resources, including mill and harvesting residues, precommercial thinnings, slash, and brush;

• solid wood waste materials, including waste pallets, crates, dunnage, manufacturing and construction wood wastes, and landscape or right-of-way tree trimmings; or

**\*4** • agricultural sources, including orchard tree crops, vineyard, grain, legumes, sugar, and other crop by-products or residues.

Agricultural livestock waste nutrients are defined as agricultural livestock manure and litter, including bedding material for the disposition of manure. Wood waste materials do not qualify as open-loop biomass to the extent they are pressure treated, chemically treated, or painted. In addition, municipal solid waste, gas derived from the biodegradation of solid waste, and paper which is commonly recycled do not qualify as open-loop biomass. Open-loop biomass does not include closed-loop biomass or any biomass burned in conjunction with fossil fuel (co-firing) beyond such fossil fuel required for start up and flame stabilization.

In the case of an open-loop biomass facility that uses agricultural livestock waste nutrients, a qualified facility is one that was originally placed in service after October 22, 2004, and before January 1, 2009, and has a nameplate capacity rating which is not less than 150 kilowatts. In the case of any other open-loop biomass facility, a qualified facility is one that was originally placed in service before January 1, 2011. A qualified facility includes a new power generation unit placed in service after October 3, 2008, at an existing open-loop biomass facility, but only to the extent of the increased amount of electricity produced at the existing facility by reason of such new unit.

*Geothermal facility*

A geothermal facility is a facility that uses geothermal energy to produce electricity. Geothermal energy is energy derived from a geothermal deposit that is a geothermal reservoir consisting of natural heat that is stored in rocks or in an aqueous liquid or vapor (whether or not under pressure). To be a qualified facility, a geothermal facility must be placed in service after October 22, 2004, and before January 1, 2011.

*Solar facility*

A solar facility is a facility that uses solar energy to produce electricity. To be a qualified facility, a solar facility must be placed in service after October 22, 2004, and before January 1, 2006.

*Small irrigation facility*

A small irrigation power facility is a facility that generates electric power through an irrigation system canal or ditch without any dam or impoundment of water. The installed capacity of a qualified facility must be at least 150 kilowatts but less than five megawatts. To be a qualified facility, a small irrigation facility must be originally placed in service after October 22, 2004, and before October 3, 2008. Marine and hydrokinetic renewable energy facilities, described below, subsume small irrigation power facilities after October 2, 2008.

*Landfill gas facility*

A landfill gas facility is a facility that uses landfill gas to produce electricity. Landfill gas is defined as methane gas derived from the biodegradation of municipal solid waste. To be a qualified facility, a landfill gas facility must be placed in service after October 22, 2004, and before January 1, 2011.

*Trash combustion facility*

 *5  Trash combustion facilities are facilities that use municipal solid waste (garbage) to produce steam to drive a turbine for the production of electricity. To be a qualified facility, a trash combustion facility must be placed in service after October 22, 2004, and before January 1, 2011. A qualified trash combustion facility includes a new unit, placed in service after October 22, 2004, that increases electricity production capacity at an existing trash combustion facility. A new unit generally would include a new burner/boiler and turbine. The new unit may share certain common equipment, such as trash handling equipment, with

other pre-existing units at the same facility. Electricity produced at a new unit of an existing facility qualifies for the production credit only to the extent of the increased amount of electricity produced at the entire facility.

*Hydropower facility*

A qualifying hydropower facility is (1) a facility that produced hydroelectric power (a hydroelectric dam) prior to August 8, 2005, at which efficiency improvements or additions to capacity have been made after such date and before January 1, 2011, that enable the taxpayer to produce incremental hydropower or (2) a facility placed in service before August 8, 2005, that did not produce hydroelectric power (a nonhydroelectric dam) on such date, and to which turbines or other electricity generating equipment have been added after such date and before January 1, 2011.

At an existing hydroelectric facility, the taxpayer may claim credit only for the production of incremental hydroelectric power. Incremental hydroelectric power for any taxable year is equal to the percentage of average annual hydroelectric power produced at the facility attributable to the efficiency improvement or additions of capacity determined by using the same water flow information used to determine an historic average annual hydroelectric power production baseline for that facility. The Federal Energy Regulatory Commission will certify the baseline power production of the facility and the percentage increase due to the efficiency and capacity improvements.

Nonhydroelectric dams converted to produce electricity must be licensed by the Federal Energy Regulatory Commission and meet all other applicable environmental, licensing, and regulatory requirements.

For a nonhydroelectric dam converted to produce electric power before January 1, 2009, there must not be any enlargement of the diversion structure, construction or enlargement of a bypass channel, or the impoundment or any withholding of additional water from the natural stream channel.

For a nonhydroelectric dam converted to produce electric power after December 31, 2008, the nonhydroelectric dam must (1) have been placed in service before October 3, 2008, (2) have been operated for flood control, navigation, or water supply purposes and (3) not have produced hydroelectric power on October 3, 2008. In addition, the hydroelectric project must be operated so that the water surface elevation at any given location and time that would have occurred in the absence of the hydroelectric project is maintained, subject to any license requirements imposed under applicable law that change the water surface elevation for the purpose of improving environmental quality of the affected waterway. The Secretary, in consultation with the Federal Energy Regulatory Commission, shall certify if a hydroelectric project licensed at a nonhydroelectric dam meets these criteria.

*Marine and hydrokinetic renewable energy facility*

**\*6**  A qualified marine and hydrokinetic renewable energy facility is any facility that produces electric power from marine and hydrokinetic renewable energy, has a nameplate capacity rating of at least 150 kilowatts, and is placed in service after October 2, 2008, and before January 1, 2012. Marine and hydrokinetic renewable energy is defined as energy derived from (1) waves, tides, and currents in oceans, estuaries, and tidal areas; (2) free flowing water in rivers, lakes, and streams; (3) free flowing water in an irrigation system, canal, or other man-made channel, including projects that utilize nonmechanical structures to accelerate the flow of water for electric power production purposes; or (4) differentials in ocean temperature (ocean thermal energy conversion). The term does not include energy derived from any source that uses a dam, diversionary structure (except for irrigation systems, canals, and other man-made channels), or impoundment for electric power production.

**TABLE 1.--SUMMARY OF SECTION 45 CREDIT FOR ELECTRICITY
PRODUCED FROM CERTAIN RENEWABLE RESOURCES**

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

| Eligible electricity production activity | Credit amount for 2008 (cents per kilowatt-hour) | Credit period for facilities placed in service on or before August 8, 2005 (years from placed-in-service date) | Credit period for facilities placed in service after August 8, 2005 (years from placed-in-service date) |
|---|---|---|---|
| Wind........................................ | 2.1 | 10 | 10 |
| Closed-loop biomass................ | 2.1 | 10 [1] | 10 |
| Open-loop biomass (including agricultural livestock waste nutrient facilities)..................... | 1.0 | 5 [2] | 10 |
| Geothermal............................... | 2.1 | 5 | 10 |
| Solar (pre-2006 facilities only) | 2.1 | 5 | 10 |
| Small irrigation power............. | 1.0 | 5 | 10 |
| Municipal solid waste (including landfill gas facilities and trash combustion facilities) | 1.0 | 5 | 10 |
| Qualified hydropower.............. | 1.0 | N/A | 10 |
| Marine and hydrokinetic.......... | 1.0 | N/A | 10 |

[1]    In the case of certain co-firing closed-loop facilities, the credit period begins no earlier than October 22, 2004.

[2]    For certain facilities placed in service before October 22, 2004, the five-year credit period commences on January 1, 2005.

*Taxation of cooperatives and their patrons*

For Federal income tax purposes, a cooperative generally computes its income as if it were a taxable corporation, with one exception: the cooperative may exclude from its taxable income distributions of patronage dividends. Generally, a cooperative that is subject to the cooperative tax rules of subchapter T of the Code [219] is permitted a deduction for patronage dividends paid only to the extent of net income that is derived from transactions with patrons who are members of the cooperative. [220] The availability of such deductions from taxable income has the effect of allowing the cooperative to be treated like a conduit with respect to profits derived from transactions with patrons who are members of the cooperative.

 *7  Eligible cooperatives may elect to pass any portion of the credit through to their patrons. An eligible cooperative is defined as a cooperative organization that is owned more than 50 percent by agricultural producers or entities owned by agricultural producers. The credit may be apportioned among patrons eligible to share in patronage dividends on the basis of the quantity or value of business done with or for such patrons for the taxable year. The election must be made on a timely filed return for the taxable year and, once made, is irrevocable for such taxable year.

*Reasons for Change*

The Congress believes that additional incentives for the production of electricity from renewable resources will help limit the environmental consequences of continued reliance on power generated using fossil fuels. The Congress also believes that a multi-year extension of the present-law electricity production credit will encourage the development of renewable energy projects that will create new jobs for workers.

### *Explanation of Provision*

The provision extends for three years (generally, through 2013; through 2012 for wind facilities) the period during which qualified facilities producing electricity from wind, closed-loop biomass, open-loop biomass, geothermal energy, municipal solid waste, and qualified hydropower may be placed in service for purposes of the electricity production credit. The provision extends for two years (through 2013) the placed-in-service period for marine and hydrokinetic renewable energy resources.

The provision also makes a technical amendment to the definition of small irrigation power facility to clarify its integration into the definition of marine and hydrokinetic renewable energy facility.

### *Effective Date*

The extension of the electricity production credit is effective for property placed in service after the date of enactment (February 17, 2009). The technical amendment is effective as if included in section 102 of the Energy Improvement and Extension Act of 2008.

### **2. Election of investment credit in lieu of production tax credits (sec. 1102 of the Act and secs. 45 and 48 of the Code)**

### *Present Law*

#### *Renewable electricity credit*

An income tax credit is allowed for the production of electricity from qualified energy resources at qualified facilities. [221] Qualified energy resources comprise wind, closed-loop biomass, open-loop biomass, geothermal energy, solar energy, small irrigation power, municipal solid waste, qualified hydropower production, and marine and hydrokinetic renewable energy. Qualified facilities are, generally, facilities that generate electricity using qualified energy resources. To be eligible for the credit, electricity produced from qualified energy resources at qualified facilities must be sold by the taxpayer to an unrelated person. The credit amounts, credit periods, definitions of qualified facilities, and other rules governing this credit are described more fully in section D.1 of this document.

#### *Energy credit*

 **\*8**  An income tax credit is also allowed for certain energy property placed in service. Qualifying property includes certain fuel cell property, solar property, geothermal power production property, small wind energy property, combined heat and power system property, and geothermal heat pump property. [222]  The amounts of credit, definitions of qualifying property, and other rules governing this credit are described more fully in section D.3 of this document.

### *Reasons for Change*

The Congress believes that current economic circumstances are constraining investments in facilities that ordinarily would utilize the production tax credit, and wishes to give maximum flexibility to taxpayers to choose the tax incentive that will deliver the greatest benefit to them.

### *Explanation of Provision*

The Act allows the taxpayer to make an irrevocable election to have certain qualified facilities be treated as energy property eligible for a 30 percent investment credit under section 48. For this purpose, qualified facilities are facilities otherwise eligible for the section 45 production tax credit (other than refined coal, Indian coal, and solar facilities) with respect to which no credit under section 45 has been allowed. A taxpayer electing to treat a facility as energy property may not claim the production credit under section 45. Under the Act, facilities are eligible if placed in service during the extension period of section 45 as provided (generally, through 2013; through 2012 for wind facilities),

Property eligible for the credit is tangible personal or other tangible property (not including a building or its structural components), and with respect to which depreciation or amortization is allowable, but only if such property is used as an integral part of the qualified facility. For example, in the case of a wind facility, the conferees intend that only property eligible for five-year depreciation under section 168(e)(3)(b)(vi) is treated as credit-eligible energy property under the election.

*Effective Date*

The provision applies to facilities placed in service after December 31, 2008.

### 3. Modification of energy credit FN;B223[FN223]FN;F223 (sec. 1103 of the Act and sec. 48 of the Code)

*Present Law*

*In general*

A nonrefundable, 10-percent business energy credit [224] is allowed for the cost of new property that is equipment that either (1) uses solar energy to generate electricity, to heat or cool a structure, or to provide solar process heat, or (2) is used to produce, distribute, or use energy derived from a geothermal deposit, but only, in the case of electricity generated by geothermal power, up to the electric transmission stage. Property used to generate energy for the purposes of heating a swimming pool is not eligible solar energy property.

 **\*9**  The energy credit is a component of the general business credit. [225] An unused general business credit generally may be carried back one year and carried forward 20 years. [226] The taxpayer's basis in the property is reduced by one-half of the amount of the credit claimed. For projects whose construction time is expected to equal or exceed two years, the credit may be claimed as progress expenditures are made on the project, rather than during the year the property is placed in service. The credit is allowed against the alternative minimum tax for credits determined in taxable years beginning after October 3, 2008.

Property financed by subsidized energy financing or with proceeds from private activity bonds is subject to a reduction in basis for purposes of claiming the credit. The basis reduction is proportional to the share of the basis of the property that is financed by the subsidized financing or proceeds. The term "subsidized energy financing" means financing provided under a Federal, State, or local program a principal purpose of which is to provide subsidized financing for projects designed to conserve or produce energy.

*Special rules for solar energy property*

The credit for solar energy property is increased to 30 percent in the case of periods prior to January 1, 2017. Additionally, equipment that uses fiber-optic distributed sunlight to illuminate the inside of a structure is solar energy property eligible for the 30-percent credit.

*Fuel cells and microturbines*

The energy credit applies to qualified fuel cell power plants, but only for periods prior to January 1, 2017. The credit rate is 30 percent.

A qualified fuel cell power plant is an integrated system composed of a fuel cell stack assembly and associated balance of plant components that (1) converts a fuel into electricity using electrochemical means, and (2) has an electricity-only generation efficiency of greater than 30 percent and a capacity of at least one-half kilowatt. The credit may not exceed $1,500 for each 0.5 kilowatt of capacity.

The energy credit applies to qualifying stationary microturbine power plants for periods prior to January 1, 2017. The credit is limited to the lesser of 10 percent of the basis of the property or $200 for each kilowatt of capacity.

A qualified stationary microturbine power plant is an integrated system comprised of a gas turbine engine, a combustor, a recuperator or regenerator, a generator or alternator, and associated balance of plant components that converts a fuel into electricity and thermal energy. Such system also includes all secondary components located between the existing infrastructure for fuel delivery and the existing infrastructure for power distribution, including equipment and controls for meeting relevant power standards, such as voltage, frequency and power factors. Such system must have an electricity-only generation efficiency of not less than 26 percent at International Standard Organization conditions and a capacity of less than 2,000 kilowatts.

### Geothermal heat pump property

 *10  The energy credit applies to qualified geothermal heat pump property placed in service prior to January 1, 2017. The credit rate is 10 percent. Qualified geothermal heat pump property is equipment that uses the ground or ground water as a thermal energy source to heat a structure or as a thermal energy sink to cool a structure.

### Small wind property

The energy credit applies to qualified small wind energy property placed in service prior to January 1, 2017. The credit rate is 30 percent. The credit is limited to $4,000 per year with respect to all wind energy property of any taxpayer. Qualified small wind energy property is property that uses a qualified wind turbine to generate electricity. A qualifying wind turbine means a wind turbine of 100 kilowatts of rated capacity or less.

### Combined heat and power property

The energy credit applies to combined heat and power ("CHP") property placed in service prior to January 1, 2017. The credit rate is 10 percent.

CHP property is property: (1) that uses the same energy source for the simultaneous or sequential generation of electrical power, mechanical shaft power, or both, in combination with the generation of steam or other forms of useful thermal energy (including heating and cooling applications); (2) that has an electrical capacity of not more than 50 megawatts or a mechanical energy capacity of no more than 67,000 horsepower or an equivalent combination of electrical and mechanical energy capacities; (3) that produces at least 20 percent of its total useful energy in the form of thermal energy that is not used to produce electrical or mechanical power, and produces at least 20 percent of its total useful energy in the form of electrical or mechanical power (or a combination thereof); and (4) the energy efficiency percentage of which exceeds 60 percent. CHP property does not include property used to transport the energy source to the generating facility or to distribute energy produced by the facility.

The otherwise allowable credit with respect to CHP property is reduced to the extent the property has an electrical capacity or mechanical capacity in excess of any applicable limits. Property in excess of the applicable limit (15 megawatts or a mechanical energy capacity of more than 20,000 horsepower or an equivalent combination of electrical and mechanical energy capacities)

is permitted to claim a fraction of the otherwise allowable credit. The fraction is equal to the applicable limit divided by the capacity of the property. For example, a 45 megawatt property would be eligible to claim 15/45ths, or one third, of the otherwise allowable credit. Again, no credit is allowed if the property exceeds the 50 megawatt or 67,000 horsepower limitations described above.

Additionally, systems whose fuel source is at least 90 percent open-loop biomass and that would qualify for the credit but for the failure to meet the efficiency standard are eligible for a credit that is reduced in proportion to the degree to which the system fails to meet the efficiency standard. For example, a system that would otherwise be required to meet the 60-percent efficiency standard, but which only achieves 30-percent efficiency, is permitted a credit equal to one-half of the otherwise allowable credit (i.e., a 5-percent credit).

### *Reasons for Change*

**\*11** The Congress believes the cap on the availability of the investment credit with respect to wind energy property is inconsistent with the objective of stimulating greater investment in such property. Therefore, the Congress believes it is appropriate to remove the cap on the amount of credit that may be claimed for wind energy property.

In order to protect the efficacy of both the energy credit and subsidized financing as means of stimulating investment in renewable technologies, the Congress believes taxpayers utilizing subsidized energy financing should not be required to reduce their otherwise allowable credit.

### *Explanation of Provision*

The Act eliminates the credit cap applicable to qualified small wind energy property. The Act also removes the rule that reduces the basis of the property for purposes of claiming the credit if the property is financed in whole or in part by subsidized energy financing or with proceeds from private activity bonds.

### *Effective Date*

The provision applies to periods after December 31, 2008, under rules similar to the rules of section 48(m) of the Code (as in effect on the day before the enactment of the Revenue Reconciliation Act of 1990).

### 4. Grants for specified energy property in lieu of tax credits (secs. 1104 and 1603 of the Act and secs. 45 and 48 of the Code)

### *Present Law*

#### *Renewable electricity production credit*

An income tax credit is allowed for the production of electricity from qualified energy resources at qualified facilities (the "renewable electricity production credit").[227] Qualified energy resources comprise wind, closed-loop biomass, open-loop biomass, geothermal energy, solar energy, small irrigation power, municipal solid waste, qualified hydropower production, and marine and hydrokinetic renewable energy. Qualified facilities are, generally, facilities that generate electricity using qualified energy resources. To be eligible for the credit, electricity produced from qualified energy resources at qualified facilities must be sold by the taxpayer to an unrelated person. The credit amounts, credit periods, definitions of qualified facilities, and other rules governing this credit are described more fully in section D.1 of this document.

#### *Energy credit*

An income tax credit is also allowed for certain energy property placed in service. Qualifying property includes certain fuel cell property, solar property, geothermal power production property, small wind energy property, combined heat and power system property, and geothermal heat pump property. [228] The amounts of credit, definitions of qualifying property, and other rules governing this credit are described more fully in section D.3 of this document.

### *Reasons for Change*

The Congress believes that incentives for the production of electricity from renewable resources will help limit the environmental consequences of continued reliance on power generated using fossil fuels. The Congress understands that some investors in renewable energy projects have suffered economic losses that prevent them from benefitting from the renewable electricity production credit and the energy credit. The Congress further believes that this situation, combined with current economic conditions, has the potential to jeopardize investment in renewable energy facilities. The Congress therefore believes that, in the short term, allowing renewable energy developers to elect to receive direct grants in lieu of the renewable electricity production credit and the energy credit is necessary for continued growth in this important industry.

### *Explanation of Provision* [229]

**\*12**  The provision authorizes the Secretary of the Treasury to provide a grant to each person who places in service energy property that is either (1) part of an electricity production facility otherwise eligible for the renewable electricity production credit or (2) qualifying property otherwise eligible for the energy credit. In general, the grant amount is 30 percent of the basis of the property that would (1) be eligible for credit under section 48 or (2) be part of a section 45 credit-eligible facility. For qualified microturbine, combined heat and power system, and geothermal heat pump property, the amount is 10 percent of the basis of the property.

Qualifying property must be depreciable or amortizable to be eligible for a grant. In addition, the property must be originally placed in service in 2009 or 2010 or construction of the property must begin in 2009 or 2010 and be completed prior to 2013 (in the case of wind facility property), 2014 (in the case of other renewable power facility property eligible for credit under section 45), or 2017 (in the case of any specified energy property described in section 48).

It is intended that the grant provision mimic the operation of the credit under section 48. For example, the amount of the grant is not includable in gross income. However, the basis of the property is reduced by fifty percent of the amount of the grant. In addition, some or all of each grant is subject to recapture if the grant eligible property is disposed of by the grant recipient within five years of being placed in service.

Nonbusiness property and property that would not otherwise be eligible for credit under section 48 or part of a facility that would be eligible for credit under section 45 is not eligible for a grant under the provision. The grant may be paid to whichever party would have been entitled to a credit under section 48 or section 45, as the case may be.

Under the provision, if a grant is paid, no renewable electricity credit or energy credit may be claimed with respect to the grant eligible property. In addition, no grant may be awarded to any Federal, State, or local government (or any political subdivision, agency, or instrumentality thereof) or any section 501(c) tax-exempt entity.

The provision appropriates to the Secretary of Energy the funds necessary to make the grants. No grant may be made unless the application for the grant has been received before October 1, 2011.

### *Effective Date*

The provision is effective on the date of enactment (February 17, 2009).

## 5. Expand new clean renewable energy bonds (sec. 1111 of the Act and sec. 54C of the Code)

*Present Law*

*New Clean Renewable Energy Bonds*

New clean renewable energy bonds ("New CREBs") may be issued by qualified issuers to finance qualified renewable energy facilities. [230]  Qualified renewable energy facilities are facilities that: (1) qualify for the tax credit under section 45 (other than Indian coal and refined coal production facilities), without regard to the placed-in-service date requirements of that section; and (2) are owned by a public power provider, governmental body, or cooperative electric company.

 **\*13**  The term "qualified issuers" includes: (1) public power providers; (2) a governmental body; (3) cooperative electric companies; (4) a not-for-profit electric utility that has received a loan or guarantee under the Rural Electrification Act; and (5) clean renewable energy bond lenders. The term "public power provider" means a State utility with a service obligation, as such terms are defined in section 217 of the Federal Power Act (as in effect on the date of the enactment of this paragraph). A "governmental body" means any State or Indian tribal government, or any political subdivision thereof. The term "cooperative electric company" means a mutual or cooperative electric company (described in section 501(c)(12) or section 1381(a)(2)(C)). A clean renewable energy bond lender means a cooperative that is owned by, or has outstanding loans to, 100 or more cooperative electric companies and is in existence on February 1, 2002 (including any affiliated entity which is controlled by such lender).

There is a national limitation for New CREBs of $800 million. No more than one third of the national limit may be allocated to projects of public power providers, governmental bodies, or cooperative electric companies. Allocations to governmental bodies and cooperative electric companies may be made in the manner the Secretary determines appropriate. Allocations to projects of public power providers shall be made, to the extent practicable, in such manner that the amount allocated to each such project bears the same ratio to the cost of such project as the maximum allocation limitation to projects of public power providers bears to the cost of all such projects.

New CREBs are a type of qualified tax credit bond for purposes of section 54A of the Code. As such, 100 percent of the available project proceeds of New CREBs must be used within the three-year period that begins on the date of issuance. Available project proceeds are proceeds from the sale of the bond issue less issuance costs (not to exceed two percent) and any investment earnings on such sale proceeds. To the extent less than 100 percent of the available project proceeds are used to finance qualified projects during the three-year spending period, bonds will continue to qualify as New CREBs if unspent proceeds are used within 90 days from the end of such three-year period to redeem bonds. The three-year spending period may be extended by the Secretary upon the qualified issuer's request demonstrating that the failure to satisfy the three-year requirement is due to reasonable cause and the projects will continue to proceed with due diligence.

New CREBs generally are subject to the arbitrage requirements of section 148. However, available project proceeds invested during the three-year spending period are not subject to the arbitrage restrictions (i.e., yield restriction and rebate requirements). In addition, amounts invested in a reserve fund are not subject to the arbitrage restrictions to the extent: (1) such fund is funded at a rate not more rapid than equal annual installments; (2) such fund is funded in a manner reasonably expected to result in an amount not greater than an amount necessary to repay the issue; and (3) the yield on such fund is not greater than the average annual interest rate of tax-exempt obligations having a term of 10 years or more that are issued during the month the New CREBs are issued.

 **\*14**  As with other tax credit bonds, a taxpayer holding New CREBs on a credit allowance date is entitled to a tax credit. However, the credit rate on New CREBs is set by the Secretary at a rate that is 70 percent of the rate that would permit issuance of such bonds without discount and interest cost to the issuer. [231]  The Secretary determines credit rates for tax credit bonds

based on general assumptions about credit quality of the class of potential eligible issuers and such other factors as the Secretary deems appropriate. The Secretary may determine credit rates based on general credit market yield indexes and credit ratings. [232]

The amount of the tax credit is determined by multiplying the bond's credit rate by the face amount of the holder's bond. The credit accrues quarterly, is includible in gross income (as if it were an interest payment on the bond), and can be claimed against regular income tax liability and alternative minimum tax liability. Unused credits may be carried forward to succeeding taxable years. In addition, credits may be separated from the ownership of the underlying bond similar to how interest coupons can be stripped for interest-bearing bonds.

An issuer of New CREBs is treated as meeting the "prohibition on financial conflicts of interest" requirement in section 54A(d) (6) if it certifies that it satisfies (i) applicable State and local law requirements governing conflicts of interest and (ii) any additional conflict of interest rules prescribed by the Secretary with respect to any Federal, State, or local government official directly involved with the issuance of New CREBs.

### *Reasons for Change*

The Congress believes that the New CREBs program provides an efficient mechanism to finance qualified renewable energy facilities. Therefore, the Congress wishes to expand the New CREBs program by increasing the amount of the national bond volume limitation.

### *Explanation of Provision* [233]

#### *In general*

The provision expands the New CREBs program. The provision authorizes issuance of up to an additional $1.6 billion of New CREBs.

### *Effective Date*

The provision applies to obligations issued after the date of enactment (February 17, 2009).

### 6. Expand qualified energy conservation bonds (sec. 1112 of the Act and sec. 54D of the Code)

### *Present Law*

Qualified energy conservation bonds may be used to finance qualified conservation purposes.

The term "qualified conservation purpose" means:
1. Capital expenditures incurred for purposes of reducing energy consumption in publicly owned buildings by at least 20 percent; implementing green community programs; rural development involving the production of electricity from renewable energy resources; or any facility eligible for the production tax credit under section 45 (other than Indian coal and refined coal production facilities);

 **\*15**  2. Expenditures with respect to facilities or grants that support research in: (a) development of cellulosic ethanol or other nonfossil fuels; (b) technologies for the capture and sequestration of carbon dioxide produced through the use of fossil fuels; (c) increasing the efficiency of existing technologies for producing nonfossil fuels; (d) automobile battery technologies and other technologies to reduce fossil fuel consumption in transportation; and (E) technologies to reduce energy use in buildings;

3. Mass commuting facilities and related facilities that reduce the consumption of energy, including expenditures to reduce pollution from vehicles used for mass commuting;

4. Demonstration projects designed to promote the commercialization of: (a) green building technology; (b) conversion of agricultural waste for use in the production of fuel or otherwise; (c) advanced battery manufacturing technologies; (D) technologies to reduce peak-use of electricity; and (d) technologies for the capture and sequestration of carbon dioxide emitted from combusting fossil fuels in order to produce electricity; and

5. Public education campaigns to promote energy efficiency (other than movies, concerts, and other events held primarily for entertainment purposes).

There is a national limitation on qualified energy conservation bonds of $800 million. Allocations of qualified energy conservation bonds are made to the States with sub-allocations to large local governments. Allocations are made to the States according to their respective populations, reduced by any sub-allocations to large local governments (defined below) within the States. Sub-allocations to large local governments shall be an amount of the national qualified energy conservation bond limitation that bears the same ratio to the amount of such limitation that otherwise would be allocated to the State in which such large local government is located as the population of such large local government bears to the population of such State. The term "large local government" means: any municipality or county if such municipality or county has a population of 100,000 or more. Indian tribal governments also are treated as large local governments for these purposes (without regard to population).

Each State or large local government receiving an allocation of qualified energy conservation bonds may further allocate issuance authority to issuers within such State or large local government. However, any allocations to issuers within the State or large local government shall be made in a manner that results in not less than 70 percent of the allocation of qualified energy conservation bonds to such State or large local government being used to designate bonds that are not private activity bonds (i.e., the bond cannot meet the private business tests or the private loan test of section 141).

Qualified energy conservations bonds are a type of qualified tax credit bond for purposes of section 54A of the Code. As a result, 100 percent of the available project proceeds of qualified energy conservation bonds must be used for qualified conservation purposes. In the case of qualified conservation bonds issued as private activity bonds, 100 percent of the available project proceeds must be used for capital expenditures. In addition, qualified energy conservation bonds only may be issued by Indian tribal governments to the extent such bonds are issued for purposes that satisfy the present law requirements for tax-exempt bonds issued by Indian tribal governments (i.e., essential governmental functions and certain manufacturing purposes).

 *16  Under present law, 100 percent of the available project proceeds of qualified energy conservation bonds to be used within the three-year period that begins on the date of issuance. Available project proceeds are proceeds from the sale of the issue less issuance costs (not to exceed two percent) and any investment earnings on such sale proceeds. To the extent less than 100 percent of the available project proceeds are used to finance qualified conservation purposes during the three-year spending period, bonds will continue to qualify as qualified energy conservation bonds if unspent proceeds are used within 90 days from the end of such three-year period to redeem bonds. The three-year spending period may be extended by the Secretary upon the issuer's request demonstrating that the failure to satisfy the three-year requirement is due to reasonable cause and the projects will continue to proceed with due diligence.

Qualified energy conservation bonds generally are subject to the arbitrage requirements of section 148. However, available project proceeds invested during the three-year spending period are not subject to the arbitrage restrictions (i.e., yield restriction and rebate requirements). In addition, amounts invested in a reserve fund are not subject to the arbitrage restrictions to the extent: (1) such fund is funded at a rate not more rapid than equal annual installments; (2) such fund is funded in a manner reasonably expected to result in an amount not greater than an amount necessary to repay the issue; and (3) the yield on such

fund is not greater than the average annual interest rate of tax-exempt obligations having a term of 10 years or more that are issued during the month the qualified energy conservation bonds are issued.

The maturity of qualified energy conservation bonds is the term that the Secretary estimates will result in the present value of the obligation to repay the principal on such bonds being equal to 50 percent of the face amount of such bonds, using as a discount rate the average annual interest rate of tax-exempt obligations having a term of 10 years or more that are issued during the month the qualified energy conservation bonds are issued.

As with other tax credit bonds, the taxpayer holding qualified energy conservation bonds on a credit allowance date is entitled to a tax credit. The credit rate on the bonds is set by the Secretary at a rate that is 70 percent of the rate that would permit issuance of such bonds without discount and interest cost to the issuer. [234] The Secretary determines credit rates for tax credit bonds based on general assumptions about credit quality of the class of potential eligible issuers and such other factors as the Secretary deems appropriate. The Secretary may determine credit rates based on general credit market yield indexes and credit ratings. [235] The amount of the tax credit is determined by multiplying the bond's credit rate by the face amount on the holder's bond. The credit accrues quarterly, is includible in gross income (as if it were an interest payment on the bond), and can be claimed against regular income tax liability and alternative minimum tax liability. Unused credits may be carried forward to succeeding taxable years. In addition, credits may be separated from the ownership of the underlying bond similar to how interest coupons can be stripped for interest-bearing bonds.

 **\*17**  Issuers of qualified energy conservation bonds are required to certify that the financial disclosure requirements that applicable State and local law requirements governing conflicts of interest are satisfied with respect to such issue, as well as any other additional conflict of interest rules prescribed by the Secretary with respect to any Federal, State, or local government official directly involved with the issuance of qualified energy conservation bonds.

### *Reasons for Change*

The Congress believes that an increase in the volume limitation for qualified energy conservation bonds is needed to help move the nation toward more energy-efficient policies. The Congress is aware that a number of communities have initiated low-interest loan and grant programs to encourage the adoption of energy conserving products as part of their green community programs. The Congress believes that incentives for the purchase and installation of energy-efficient property and energy-efficient improvements to residences are desirable to help reduce energy consumption in the household sector. Therefore, the Congress believes it is appropriate to allow the proceeds of qualified energy conservation bonds to be used for loans and grants to implement green community programs.

### *Explanation of Provision* [236]

The provision expands the present-law qualified energy conservation bond program. The provision authorizes issuance of an additional $2.4 billion of qualified energy conservation bonds. Also, the provision clarifies that capital expenditures to implement green community programs include grants, loans and other repayment mechanisms to implement such programs. For example, this expansion will enable States to issue these tax credit bonds to finance retrofits of existing private buildings through loans and/or grants to individual homeowners or businesses, or through other repayment mechanisms. Other repayment mechanisms can include periodic fees assessed on a government bill or utility bill that approximates the energy savings of energy efficiency or conservation retrofits. Retrofits can include heating, cooling, lighting, water-saving, storm water-reducing, or other efficiency measures.

Finally, the provision clarifies that any bond used for the purpose of providing grants, loans or other repayment mechanisms for capital expenditures to implement green community programs is not treated as a private activity bond for purposes of determining whether the requirement that not less than 70 percent of allocations within a State or large local government be used to designate bonds that are not private activity bonds (sec. 54D(e)(3)) has been satisfied.

*Effective Date*

The provision is effective for bonds issued after the date of enactment (February 17, 2009).

**7. Modification to high-speed intercity rail facility bonds (sec. 1504 of the Act and sec. 142(i) of the Code)**

*Present Law*

*In general*

**\*18** Under present law, gross income does not include interest on State or local bonds. State and local bonds are classified generally as either governmental bonds or private activity bonds. Governmental bonds are bonds the proceeds of which are primarily used to finance governmental functions or which are repaid with governmental funds. Private activity bonds are bonds in which the State or local government serves as a conduit providing financing to nongovernmental persons (e.g., private businesses or individuals). The exclusion from income for State and local bonds does not apply to private activity bonds unless the bonds are issued for certain permitted purposes ("qualified private activity bonds") and other Code requirements are met.

*High-speed rail*

An exempt facility bond is a type of qualified private activity bond. Exempt facility bonds can be issued for high-speed intercity rail facilities. A facility qualifies as a high-speed intercity rail facility if it is a facility (other than rolling stock) for fixed guideway rail transportation of passengers and their baggage between metropolitan statistical areas. The facilities must use vehicles that are reasonably expected to operate at speeds in excess of 150 miles per hour between scheduled stops and the facilities must be made available to members of the general public as passengers. If the bonds are to be issued for a nongovernmental owner of the facility, such owner must irrevocably elect not to claim depreciation or credits with respect to the property financed by the net proceeds of the issue.

The Code imposes a special redemption requirement for these types of bonds. Any proceeds not used within three years of the date of issuance of the bonds must be used within the following six months to redeem such bonds.

Seventy-five percent of the principal amount of the bonds issued for high-speed rail facilities is exempt from the volume limit. If all the property to be financed by the net proceeds of the issue is to be owned by a governmental unit, then such bonds are completely exempt from the volume limit.

*Explanation of Provision*

*In general*

The provision modifies the requirement that high-speed intercity rail transportation facilities use vehicles that are reasonably expected to operate at speeds in excess of 150 miles per hour. Instead, under the provision such facilities must use vehicles capable of attaining a maximum speed in excess of 150 miles per hour.

*Effective Date*

The provision is effective for obligations issued after the date of enactment (February 17, 2009).

**8. Extension and modification of credit for nonbusiness energy property (sec. 1121 of the Act and sec. 25C of the Code)**

*Present Law*

Section 25C provides a 10-percent credit for the purchase of qualified energy efficiency improvements to existing homes. A qualified energy efficiency improvement is any energy efficiency building envelope component (1) that meets or exceeds the prescriptive criteria for such a component established by the 2000 International Energy Conservation Code as supplemented and as in effect on August 8, 2005 (or, in the case of metal roofs with appropriate pigmented coatings, meets the Energy Star program requirements); (2) that is installed in or on a dwelling located in the United States and owned and used by the taxpayer as the taxpayer's principal residence; (3) the original use of which commences with the taxpayer; and (4) that reasonably can be expected to remain in use for at least five years. The credit is nonrefundable.

**\*19**  Building envelope components are: (1) insulation materials or systems which are specifically and primarily designed to reduce the heat loss or gain for a dwelling; (2) exterior windows (including skylights) and doors; and (3) metal or asphalt roofs with appropriate pigmented coatings or cooling granules that are specifically and primarily designed to reduce the heat gain for a dwelling.

Additionally, section 25C provides specified credits for the purchase of specific energy efficient property. The allowable credit for the purchase of certain property is (1) $50 for each advanced main air circulating fan, (2) $150 for each qualified natural gas, propane, or oil furnace or hot water boiler, and (3) $300 for each item of energy-efficient building property.

An advanced main air circulating fan is a fan used in a natural gas, propane, or oil furnace originally placed in service by the taxpayer during the taxable year, and which has an annual electricity use of no more than two percent of the total annual energy use of the furnace (as determined in the standard Department of Energy test procedures).

A qualified natural gas, propane, or oil furnace or hot water boiler is a natural gas, propane, or oil furnace or hot water boiler with an annual fuel utilization efficiency rate of at least 95.

Energy-efficient building property is: (1) an electric heat pump water heater which yields an energy factor of at least 2.0 in the standard Department of Energy test procedure, (2) an electric heat pump which has a heating seasonal performance factor (HSPF) of at least 9, a seasonal energy efficiency ratio (SEER) of at least 15, and an energy efficiency ratio (EER) of at least 13, (3) a central air conditioner with energy efficiency of at least the highest efficiency tier established by the Consortium for Energy Efficiency as in effect on Jan. 1, 2006,[237] (4) a natural gas, propane, or oil water heater which has an energy factor of at least 0.80 or thermal efficiency of at least 90 percent, and (5) biomass fuel property.

Biomass fuel property is a stove that burns biomass fuel to heat a dwelling unit located in the United States and used as a principal residence by the taxpayer, or to heat water for such dwelling unit, and that has a thermal efficiency rating of at least 75 percent. Biomass fuel is any plant-derived fuel available on a renewable or recurring basis, including agricultural crops and trees, wood and wood waste and residues (including wood pellets), plants (including aquatic plants), grasses, residues, and fibers.

Under section 25C, the maximum credit for a taxpayer with respect to the same dwelling for all taxable years is $500, and no more than $200 of such credit may be attributable to expenditures on windows.

The taxpayer's basis in the property is reduced by the amount of the credit. Special proration rules apply in the case of jointly owned property, condominiums, and tenant-stockholders in cooperative housing corporations. If less than 80 percent of the property is used for nonbusiness purposes, only that portion of expenditures that is used for nonbusiness purposes is taken into account.

**\*20**  For purposes of determining the amount of expenditures made by any individual with respect to any dwelling unit, expenditures which are made from subsidized energy financing are not taken into account. The term "subsidized energy

financing" means financing provided under a Federal, State, or local program a principal purpose of which is to provide subsidized financing for projects designed to conserve or produce energy.

The credit applies to expenditures made after December 31, 2008, for property placed in service after December 31, 2008, and prior to January 1, 2010.

### *Reasons for Change*

The Congress believes that an immediate increase in the credit rate and the amount of the maximum credit that may be claimed is warranted to encourage additional investments that will help reduce reliance on fossil fuels.

### *Explanation of Provision* [238]

The Act raises the 10 percent credit rate to 30 percent. Additionally, all energy property otherwise eligible for the $50, $100, or $150 credit is instead eligible for a 30 percent credit on expenditures for such property.

The credit is extended for one year, through December 31, 2010. The $500 lifetime cap (and the $200 lifetime cap with respect to windows) is eliminated and replaced with an aggregate cap of $1,500 in the case of property placed in service after December 31, 2008 and prior to January 1, 2011. The present law rule related to subsidized energy financing is eliminated.

The Act modifies the efficiency standards for qualifying property as follows.

Building insulation must follow the prescriptive criteria of the 2009 International Energy Conservation Code. Additionally, qualifying exterior windows, doors, and skylights must have a U-factor at or below 0.30 and a seasonal heat gain coefficient ("SHGC") at or below 0.30.

Electric heat pumps must achieve the highest efficiency tier of Consortium for Energy Efficiency, as in effect on January 1, 2009. These standards are a SEER greater than or equal to 15, EER greater than or equal to 12.5, and HSPF greater than or equal to 8.5 for split heat pumps, and SEER greater than or equal to 14, EER greater than or equal to 12, and HSPF greater than or equal to 8.0 for packaged heat pumps.

Central air conditioners must achieve the highest efficiency tier of Consortium for Energy Efficiency, as in effect on January 1, 2009. These standards are a SEER greater than or equal to 16 and EER greater than or equal to 13 for split systems, and SEER greater than or equal to 14 and EER greater than or equal to 12 for packaged systems.

Natural gas, propane, or oil water heaters must have an energy factor greater than or equal to 0.82 or a thermal efficiency of greater than or equal to 90 percent. Natural gas, propane, or oil water boilers must achieve an annual fuel utilization efficiency rate of at least 90. Qualified oil furnaces must achieve an annual fuel utilization efficiency rate of at least 90.

**\*21**  Lastly, the requirement that biomass fuel property have a thermal efficiency rating of at least 75 percent is modified to be a thermal efficiency rating of at least 75 percent as measured using a lower heating value.

### *Effective Date*

The provision is generally effective for taxable years beginning after December 31, 2008. The provisions that alter the efficiency standards of qualifying property, other than biomass fuel property, apply to property placed in service after the date of enactment, February 17, 2009. The modification with respect to biomass fuel property is effective for taxable years beginning after December 31, 2008.

### 9. Credit for residential energy efficient property (sec. 1122 of the Act and sec. 25D of the Code)

*Present Law*

Section 25D provides a personal tax credit for the purchase of qualified solar electric property and qualified solar water heating property that is used exclusively for purposes other than heating swimming pools and hot tubs. The credit is equal to 30 percent of qualifying expenditures, with a maximum credit of $2,000 with respect to qualified solar water heating property. There is no cap with respect to qualified solar electric property.

Section 25D also provides a 30 percent credit for the purchase of qualified geothermal heat pump property, qualified small wind energy property, and qualified fuel cell power plants. The credit for geothermal heat pump property is capped at $2,000, the credit for qualified small wind energy property is limited to $500 with respect to each half kilowatt of capacity, not to exceed $4,000, and the credit for any fuel cell may not exceed $500 for each 0.5 kilowatt of capacity.

The credit with respect to all qualifying property may be claimed against the alternative minimum tax.

Qualified solar electric property is property that uses solar energy to generate electricity for use in a dwelling unit. Qualifying solar water heating property is property used to heat water for use in a dwelling unit located in the United States and used as a residence if at least half of the energy used by such property for such purpose is derived from the sun.

A qualified fuel cell power plant is an integrated system comprised of a fuel cell stack assembly and associated balance of plant components that (1) converts a fuel into electricity using electrochemical means, (2) has an electricity-only generation efficiency of greater than 30 percent and has a nameplate capacity of at least 0.5 kilowatt. The qualified fuel cell power plant must be installed on or in connection with a dwelling unit located in the United States and used by the taxpayer as a principal residence.

Qualified small wind energy property is property that uses a wind turbine to generate electricity for use in a dwelling unit located in the U.S. and used as a residence by the taxpayer.

Qualified geothermal heat pump property means any equipment which (1) uses the ground or ground water as a thermal energy source to heat the dwelling unit or as a thermal energy sink to cool such dwelling unit, (2) meets the requirements of the Energy Star program which are in effect at the time that the expenditure for such equipment is made, and (3) is installed on or in connection with a dwelling unit located in the United States and used as a residence by the taxpayer.

 **\*22**  The credit is nonrefundable, and the depreciable basis of the property is reduced by the amount of the credit. Expenditures for labor costs allocable to onsite preparation, assembly, or original installation of property eligible for the credit are eligible expenditures.

Special proration rules apply in the case of jointly owned property, condominiums, and tenant-stockholders in cooperative housing corporations. If less than 80 percent of the property is used for nonbusiness purposes, only that portion of expenditures that is used for nonbusiness purposes is taken into account.

For purposes of determining the amount of expenditures made by any individual with respect to any dwelling unit, there shall not be taken into account expenditures which are made from subsidized energy financing. The term "subsidized energy financing" means financing provided under a Federal, State, or local program a principal purpose of which is to provide subsidized financing for projects designed to conserve or produce energy.

The credit applies to property placed in service prior to January 1, 2017.

*Reasons for Change*

The Congress believes that an increase in the maximum credit that may be claimed for solar hot water, geothermal, and wind property is warranted to encourage additional investments that will help reduce reliance on fossil fuels. For the same reasons, the Congress believes it is appropriate to eliminate the rules that reduce available credits for property using subsidized energy financing.

### *Explanation of Provision*

The Act eliminates the credit caps for solar hot water, geothermal, and wind property and eliminates the reduction in credits for property using subsidized energy financing.

### *Effective Date*

The provision applies to taxable years beginning after December 31, 2008.

### 10. Temporary increase in credit for alternative fuel vehicle refueling property (sec. 1123 of the Act and sec. 30C of the Code)

### *Present Law*

Taxpayers may claim a 30-percent credit for the cost of installing qualified clean-fuel vehicle refueling property to be used in a trade or business of the taxpayer or installed at the principal residence of the taxpayer.[239]  The credit may not exceed $30,000 per taxable year per location, in the case of qualified refueling property used in a trade or business and $1,000 per taxable year per location, in the case of qualified refueling property installed on property which is used as a principal residence.

Qualified refueling property is property (not including a building or its structural components) for the storage or dispensing of a clean-burning fuel or electricity into the fuel tank or battery of a motor vehicle propelled by such fuel or electricity, but only if the storage or dispensing of the fuel or electricity is at the point of delivery into the fuel tank or battery of the motor vehicle. The use of such property must begin with the taxpayer.

 **\*23**  Clean-burning fuels are any fuel at least 85 percent of the volume of which consists of ethanol, natural gas, compressed natural gas, liquefied natural gas, liquefied petroleum gas, or hydrogen. In addition, any mixture of biodiesel and diesel fuel, determined without regard to any use of kerosene and containing at least 20 percent biodiesel, qualifies as a clean fuel.

Credits for qualified refueling property used in a trade or business are part of the general business credit and may be carried back for one year and forward for 20 years. Credits for residential qualified refueling property cannot exceed for any taxable year the difference between the taxpayer's regular tax (reduced by certain other credits) and the taxpayer's tentative minimum tax. Generally, in the case of qualified refueling property sold to a tax-exempt entity, the taxpayer selling the property may claim the credit.

A taxpayer's basis in qualified refueling property is reduced by the amount of the credit. In addition, no credit is available for property used outside the United States or for which an election to expense has been made under section 179.

The credit is available for property placed in service after December 31, 2005, and (except in the case of hydrogen refueling property) before January 1, 2011. In the case of hydrogen refueling property, the property must be placed in service before January 1, 2015.

### *Reasons for Change*

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

The Congress believes that widespread adoption of advanced technology and alternative-fuel vehicles is necessary to transform automotive transportation in the United States to be cleaner, more fuel efficient, and less reliant on petroleum fuels. The Congress further believes that one important method to encourage this trend is to provide additional tax incentives for the development and installation of the infrastructure necessary to deliver clean fuels to drivers of clean-fuel vehicles.

### *Explanation of Provision* [240]

For property placed in service in 2009 or 2010, the provision increases the maximum credit available for business property to $200,000 for qualified hydrogen refueling property and to $50,000 for other qualified refueling property. For nonbusiness property, the maximum credit is increased to $2,000. In addition, the credit rate is increased from 30 percent to 50 percent, except in the case of hydrogen refueling property.

### *Effective Date*

The provision is effective for taxable years beginning after December 31, 2008.

### 11. Modification of credit for carbon dioxide sequestration (sec. 1131 of the Act and sec. 45Q of the Code)

### *Present Law*

A credit of $20 per metric ton is available for qualified carbon dioxide captured by a taxpayer at a qualified facility and disposed of by such taxpayer in secure geological storage (including storage at deep saline formations and unminable coal seams under such conditions as the Secretary may determine). [241] In addition, a credit of $10 per metric ton is available for qualified carbon dioxide that is captured by the taxpayer at a qualified facility and used by such taxpayer as a tertiary injectant (including carbon dioxide augmented waterflooding and immiscible carbon dioxide displacement) in a qualified enhanced oil or natural gas recovery project. Both credit amounts are adjusted for inflation after 2009.

**\*24** Qualified carbon dioxide is defined as carbon dioxide captured from an industrial source that (1) would otherwise be released into the atmosphere as an industrial emission of greenhouse gas, and (2) is measured at the source of capture and verified at the point or points of injection. Qualified carbon dioxide includes the initial deposit of captured carbon dioxide used as a tertiary injectant but does not include carbon dioxide that is recaptured, recycled, and reinjected as part of an enhanced oil or natural gas recovery project process. A qualified enhanced oil or natural gas recovery project is a project that would otherwise meet the definition of an enhanced oil recovery project under section 43, if natural gas projects were included within that definition.

A qualified facility means any industrial facility (1) which is owned by the taxpayer, (2) at which carbon capture equipment is placed in service, and (3) which captures not less than 500,000 metric tons of carbon dioxide during the taxable year. The credit applies only with respect to qualified carbon dioxide captured and sequestered or injected in the United States [242] or one of its possessions. [243]

Except as provided in regulations, credits are attributable to the person that captures and physically or contractually ensures the disposal, or use as a tertiary injectant, of the qualified carbon dioxide. Credits are subject to recapture, as provided by regulation, with respect to any qualified carbon dioxide that ceases to be recaptured, disposed of, or used as a tertiary injectant in a manner consistent with the rules of the provision.

The credit is part of the general business credit. The credit sunsets at the end of the calendar year in which the Secretary, in consultation with the Administrator of the Environmental Protection Agency, certifies that 75 million metric tons of qualified carbon dioxide have been captured and disposed of or used as a tertiary injectant.

*Explanation of Provision*

The provision requires that carbon dioxide used as a tertiary injectant and otherwise eligible for a $10 per metric ton credit must be sequestered by the taxpayer in permanent geological storage in order to qualify for such credit. The provision also clarifies that the term permanent geological storage includes oil and gas reservoirs in addition to unminable coal seams and deep saline formations. In addition, the provision requires that the Secretary of the Treasury consult with the Secretary of Energy and the Secretary of the Interior, in addition to the Administrator of the Environmental Protection Agency, in promulgating regulations relating to the permanent geological storage of carbon dioxide.

*Effective Date*

The provision is effective for carbon dioxide captured after the date of enactment (February 17, 2009).

## 12. Modification of the plug-in electric drive motor vehicle credit (secs. 1141-1144 of the Act and secs. 30, 30B, and 30D of the Code)

*Present Law*

### *Alternative motor vehicle credit*

**\*25**  A credit is available for each new qualified fuel cell vehicle, hybrid vehicle, advanced lean burn technology vehicle, and alternative fuel vehicle placed in service by the taxpayer during the taxable year.[244] In general, the credit amount varies depending upon the type of technology used, the weight class of the vehicle, the amount by which the vehicle exceeds certain fuel economy standards, and, for some vehicles, the estimated lifetime fuel savings. The credit generally is available for vehicles purchased after 2005. The credit terminates after 2009, 2010, or 2014, depending on the type of vehicle. The alternative motor vehicle credit is not allowed against the alternative minimum tax.

### *Plug-in electric drive motor vehicle credit*

A credit is available for each qualified plug-in electric drive motor vehicle placed in service. A qualified plug-in electric drive motor vehicle is a motor vehicle that has at least four wheels, is manufactured for use on public roads, meets certain emissions standards (except for certain heavy vehicles), draws propulsion using a traction battery with at least four kilowatt-hours of capacity, and is capable of being recharged from an external source of electricity.

The base amount of the plug-in electric drive motor vehicle credit is $2,500, plus another $417 for each kilowatt-hour of battery capacity in excess of four kilowatt-hours. The maximum credit for qualified vehicles weighing 10,000 pounds or less is $7,500. This maximum amount increases to $10,000 for vehicles weighing more than 10,000 pounds but not more than 14,000 pounds, to $12,500 for vehicles weighing more than 14,000 pounds but not more than 26,000 pounds, and to $15,000 for vehicle weighing more than 26,000 pounds.

In general, the credit is available to the vehicle owner, including the lessor of a vehicle subject to lease. If the qualified vehicle is used by certain tax-exempt organizations, governments, or foreign persons and is not subject to a lease, the seller of the vehicle may claim the credit so long as the seller clearly discloses to the user in a document the amount that is allowable as a credit. A vehicle must be used predominantly in the United States to qualify for the credit.

Once a total of 250,000 credit-eligible vehicles have been sold for use in the United States, the credit phases out over four calendar quarters. The phaseout period begins in the second calendar quarter following the quarter during which the vehicle cap has been reached. Taxpayers may claim one-half of the otherwise allowable credit during the first two calendar quarters of

the phaseout period and twenty-five percent of the otherwise allowable credit during the next two quarters. After this, no credit is available. Regardless of the phase-out limitation, no credit is available for vehicles purchased after 2014.

The basis of any qualified vehicle is reduced by the amount of the credit. To the extent a vehicle is eligible for credit as a qualified plug-in electric drive motor vehicle, it is not eligible for credit as a qualified hybrid vehicle under section 30B. The portion of the credit attributable to vehicles of a character subject to an allowance for depreciation is treated as part of the general business credit; the nonbusiness portion of the credit is allowable to the extent of the excess of the regular tax over the alternative minimum tax (reduced by certain other credits) for the taxable year.

### *Explanation of Provision*

### *Credit for electric drive low-speed vehicles, motorcycles, and three-wheeled vehicles*

 **\*26**  The provision creates a new 10-percent credit for low-speed vehicles, motorcycles, and three-wheeled vehicles that would otherwise meet the criteria of a qualified plug-in electric drive motor vehicle but for the fact that they are low-speed vehicles or do not have at least four wheels. The maximum credit for such vehicles is $2,500. Basis reduction and other rules similar to those found in section 30 apply under the provision. In the case of vehicles of a character subject to an allowance for depreciation, the new credit is part of the general business credit. The new credit is not available for vehicles sold after December 31, 2011.

### *Credit for converting a vehicle into a plug-in electric drive motor vehicle*

The provision also creates a new 10-percent credit, up to $4,000, for the cost of converting any motor vehicle into a qualified plug-in electric drive motor vehicle. To be eligible for the credit, a qualified plug-in traction battery module must have a capacity of at least four kilowatt-hours. The credit is not available for conversions made after December 31, 2011.

### *Modification of the plug-in electric drive motor vehicle credit*

The provision modifies the plug-in electric drive motor vehicle credit by limiting the maximum credit to $7,500 regardless of vehicle weight. The provision also eliminates the credit for low speed plug-in vehicles and for plug-in vehicles weighing 14,000 pounds or more.

The provision replaces the 250,000 total plug-in vehicle limitation with a 200,000 plug-in vehicles per manufacturer limitation. The credit phases out over four calendar quarters beginning in the second calendar quarter following the quarter in which the manufacturer limit is reached.

### *Treatment of alternative motor vehicle credit as a personal credit allowed against the alternative minimum tax*

The provision provides that the alternative motor vehicle credit for nondepreciable property is a personal credit allowed against the alternative minimum tax.

### *Effective Date*

The new 10-percent credit for low-speed vehicles, motorcycles, and three-wheeled vehicles is effective for vehicles acquired after February 17, 2009. The credit for converting a vehicle into a plug-in electric drive motor vehicle is effective for property placed in service after February 17, 2009. The modification of the plug-in electric drive motor vehicle credit is effective for vehicles acquired after December 31, 2009. The allowance of the treatment of the alternative motor vehicle credit against the alternative minimum tax is effective for taxable years beginning after December 31, 2008.

### 13. Parity for qualified transportation fringe benefits (sec. 1151 of the Act and sec. 132 of the Code)

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

*Present Law*

Qualified transportation fringe benefits provided by an employer are excluded from an employee's gross income for income tax purposes and from an employee's wages for payroll tax purposes. [245] Qualified transportation fringe benefits include parking, transit passes, vanpool benefits, and qualified bicycle commuting reimbursements. Up to $230 (for 2009) per month of employer-provided parking is excludable from income. Up to $120 (for 2009) per month of employer-provided transit and vanpool benefits are excludable from gross income. These amounts are indexed annually for inflation, rounded to the nearest multiple of $5. No amount is includible in the income of an employee merely because the employer offers the employee a choice between cash and qualified transportation fringe benefits. Qualified transportation fringe benefits also include a cash reimbursement by an employer to an employee. However, in the case of transit passes, a cash reimbursement is considered a qualified transportation fringe benefit only if a voucher or similar item which may be exchanged only for a transit pass is not readily available for direct distribution by the employer to the employee.

*Explanation of Provision* [246]

**\*27**  The provision increases the monthly exclusion for employer-provided transit and vanpool benefits to the same level as the exclusion for employer-provided parking.

*Effective Date*

The provision is effective for months beginning on or after date of enactment (February 17, 2009). The provision does not apply to tax years beginning after December 31, 2010.

**14. Credit for investment in advanced energy property (sec. 1302 of the Act and new sec. 48C of the Code)**

*Present Law*

An income tax credit is allowed for the production of electricity from qualified energy resources at qualified facilities. [247] Qualified energy resources comprise wind, closed-loop biomass, open-loop biomass, geothermal energy, solar energy, small irrigation power, municipal solid waste, qualified hydropower production, and marine and hydrokinetic renewable energy. Qualified facilities are, generally, facilities that generate electricity using qualified energy resources.

An income tax credit is also allowed for certain energy property placed in service. Qualifying property includes certain fuel cell property, solar property, geothermal power production property, small wind energy property, combined heat and power system property, and geothermal heat pump property. [248]

In addition to these, numerous other credits are available to taxpayers to encourage renewable energy production and energy conservation, including, among others, credits for certain biofuels, plug-in electric vehicles, and energy efficient appliances, and for improvements to heating, air conditioning, and insulation.

No credit is specifically designed under present law to encourage the development of a domestic manufacturing base to support the industries described above.

*Explanation of Provision*

The provision establishes a 30-percent allocated credit for investment in qualified property used in a qualified advanced energy manufacturing project. The provision authorizes the Secretary of the Treasury to allocate up to $2.3 billion of credits.

A qualified advanced energy project is a project that re-equips, expands, or establishes a manufacturing facility for the production of: (1) property designed to be used to produce energy from the sun, wind, or geothermal deposits (within the meaning of section 613(e)(2)), or other renewable resources; (2) fuel cells, microturbines, or an energy storage system for use with electric or hybrid-electric motor vehicles; (3) electric grids to support the transmission of intermittent sources of renewable energy, including storage of such energy; (4) property designed to capture and sequester carbon dioxide; (5) property designed to refine or blend renewable fuels (but not fossil fuels) or to produce energy conservation technologies (including energy-conserving lighting technologies and smart grid technologies); (6) property designed to manufacture any new qualified plug-in electric drive motor vehicle (as defined by section 30D(c)), any qualified plug-in electric vehicle (as defined by section 30(d)), or any component which is designed specifically for use with such vehicles, including any electric motor, generator, or power control unit; or (7) other advanced energy property designed to reduce greenhouse gas emissions as may be determined by the Secretary.

 **\*28**  Qualified property must be depreciable (or amortizable) property used in a qualified advanced energy project and must consist of tangible personal property or other tangible property (not including building or its structural components). Qualified property does not include property designed to manufacture equipment for use in the refining or blending of any transportation fuel other than renewable fuels. The basis of qualified property must be reduced by the amount of credit received.

Credits are available only for projects certified by the Secretary of the Treasury, in consultation with the Secretary of Energy. The Secretary of the Treasury must establish a certification program no later than 180 days after date of enactment, and may allocate up to $2.3 billion in credits.

In selecting projects, the Secretary may consider only those projects where there is a reasonable expectation of commercial viability. In addition, the Secretary must consider other selection criteria, including which projects (1) will provide the greatest domestic job creation; (2) will provide the greatest net impact in avoiding or reducing air pollutants or anthropogenic emissions of greenhouse gases; (3) have the greatest potential for technological innovation or commercial deployment; (4) have the lowest levelized cost of generated or stored energy, or of measured reduction in energy consumption or greenhouse gas emission; and (5) have the shortest project time from certification to completion.

Each project application must be submitted during the two-year period beginning on the date such certification program is established. An applicant for certification has one year from the date the Secretary accepts the application to provide the Secretary with evidence that the requirements for certification have been met. Upon certification, the applicant has three years from the date of issuance of the certification to place the project in service. Not later than four years after the date of enactment of the credit, the Secretary is required to review the credit allocations and redistribute any credits that were not used either because of a revoked certification or because of an insufficient quantity of credit applications.

### *Effective Date*

The provision is effective on the date of enactment (February 17, 2009).

37    H.R. 1. The House Committee on Ways and Means reported H.R. 598 on January 27, 2009 (H.R. Rep. No. 111-8). The text of H.R. 598 was added to H.R. 1 at Division B, Title I. H.R. 1 passed the House on January 28, 2009. The Senate Committee on Finance reported S. 350 without a written report on January 29, 2009. The Senate passed H.R. 1 with an amendment incorporating the text of S. 350, as amended, at Division B, Title I on February 10, 2009. The conference report was filed on February 12, 2009 (H.R. Rep. No. 111-16) and was passed by the House on February 13, 2009, and the Senate on February 13, 2009. The President signed the bill on February 17, 2009.

216    Sec. 45. In addition to the renewable electricity production credit, section 45 also provides income tax credits for the production of Indian coal and refined coal at qualified facilities.

Sec. 38(b)(8).

Sec. 38(c)(4)(B)(iii).

Secs. 1381-1383.

Sec. 1382.

Sec. 45. In addition to the electricity production credit, section 45 also provides income tax credits for the production of Indian coal and refined coal at qualified facilities.

Sec. 48.

Additional provisions that (1) allow section 45 facilities to elect to be treated as section 48 energy property, and (2) allow section 45 and 48 facilities to elect to receive a grant from the Department of the Treasury rather than the section 45 production credit or the section 48 energy credit, are described by sections D.2 and D.4 of Part Two of this document.

Sec. 48.

Sec. 38(b)(1).

Sec. 39.

Sec. 45. In addition to the renewable electricity production credit, section 45 also provides income tax credits for the production of Indian coal and refined coal at qualified facilities.

Sec. 48.

The provision was subsequently amended by section 707 of the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. No. 111-312, described in Part Sixteen of this document.

Sec. 54C.

Given the differences in credit quality and other characteristics of individual issuers, the Secretary cannot set credit rates in a manner that will allow each issuer to issue tax credit bonds at par.

See Notice 2009-15, 2009-6 I.R.B. 449 (January 22, 2009).

Section 301 of the Hiring Incentives to Restore Employment Act, Pub. L. No. 111-147, added a provision to section 6431, allowing the issuer of the bonds to elect to receive a direct payment from the Treasury in lieu of providing a tax credit to the holders of the bonds. For further discussion, see Part Seven of this document.

Given the differences in credit quality and other characteristics of individual issuers, the Secretary cannot set credit rates in a manner that will allow each issuer to issue tax credit bonds at par.

See Notice 2009-15, 2009-6 I.R.B. 449 (January 22, 2009).

Section 301 of the Hiring Incentives to Restore Employment Act, Pub. L. No. 111-147, added a provision to section 6431, allowing the issuer of the bonds to elect to receive a direct payment from the Treasury in lieu of providing a tax credit to the holders of the bonds. For further discussion, see Part Seven of this document.

The highest tier in effect at this time was tier 2, requiring SEER of at least 15 and EER of at least 12.5 for split central air conditioning systems and SEER of at least 14 and EER of at least 12 for packaged central air conditioning systems.

The provision was subsequently amended by section 710 of the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. No. 111-312, described in Part Sixteen of this document.

Sec. 30C.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 297 of 651

The provision was subsequently amended by section 711 of the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. No. 111-312, described in Part Sixteen of this document.

Sec. 45Q.

Sec. 638(1).

Sec. 638(2).

Sec. 30B.

Secs. 132(f), 3121(b)(2), 3306(b)(16), and 3401(a)(19).

The provision was subsequently amended by section 727 of the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. No. 111-312, described in Part Sixteen of this document.

Sec. 45. In addition to the electricity production credit, section 45 also provides income tax credits for the production of Indian coal and refined coal at qualified facilities.

Sec. 48.

JCS- 2-11 NO 6 (I.R.S.), 2011 WL 940372

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.



 
## EXECUTIVE ORDER S-14-08

**WHEREAS**, the State of California is a world leader in efforts to reduce global warming and greenhouse gas emissions, increase renewable energy production, promote energy efficiency, energy conservation, clean air and emission controls, expand the use of low carbon, alternative fuels and promote and commercialize new technologies and industries; and

**WHEREAS**, California has previously led the nation with an aggressive Renewable Portfolio Standard (RPS), requiring California's retail sellers of electricity to serve 20 percent of their load with renewable energy by 2010; and

**WHEREAS**, in 2003, the Governor called for an acceleration of the RPS, urging that 20 percent of California's electricity come from renewable sources by 2010 rather than 2017, seven years earlier than previously required, and this accelerated standard became law in September 2006, when the Governor signed SB 107; and

**WHEREAS**, California's high standards and ambitious goals have resulted in California leading the nation in renewable energy innovation, receiving more investment funding in clean technology than anywhere else in the United States, and accounting for 44 percent of all U.S. patents in solar technologies and 37 percent of all U.S. patents in wind technologies; and

**WHEREAS**, producing electricity from renewable resources provides multiple and significant benefits to California's environment and economy, including improving local air quality and reducing global warming pollution, diversifying energy supply, improving energy security, enhancing economic development, and creating jobs; and

**WHEREAS**, California has some of the best renewable energy resource areas in the world, providing immense potential for clean, valuable electricity generation in the state, and the development of these resources must be accelerated; and

**WHEREAS**, substantially increased development of renewable electricity sources, energy efficiency and demand response is needed to meet the greenhouse gas reduction goal of 1990 levels by 2020 and 80 percent below 1990 emissions levels by 2050, making the success and expansion of renewables a key priority for California's economic and environmental future; and

**WHEREAS**, fostering greater and more timely renewable energy development means California's energy agencies must establish a more cohesive and integrated statewide strategy, including greater coordination and streamlining of the siting, permitting, and procurement processes for renewable generation, improving the manner in which the state develops its transmission infrastructure, and encouraging technically and economically feasible distributed renewable energy opportunities; and

**WHEREAS**, the California Public Utilities Commission (CPUC) has approved more than 6,300 MW of renewable generation contracts for investor-owned utilities, and has identified various challenges that impede their timely realization, relating to transmission, financing, siting, permitting, integration, environmental and military objectives, technology development and commercialization and equipment procurement; and

**WHEREAS**, the California Energy Commission (CEC) in its 2007 Integrated Energy Policy Report (IEPR) indicated that there are substantial barriers to generation siting, permitting and transmission that must be addressed in order to achieve the 2010 and 2020 RPS goals; and

**WHEREAS**, the Renewable Energy Transmission Initiative (RETI) is a statewide initiative to help identify the transmission projects needed to accommodate these renewable energy goals and facilitate transmission corridor designation and transmission and generation siting and permitting; and

**WHEREAS,** RETI will (1) assess competitive renewable energy zones in California and surrounding regions that can provide significant electricity to California consumers by 2020; (2) identify those zones that can be developed in the most timely and cost effective way, with least environmental impact; and (3) prepare detailed transmission plans for those zones identified for development; and

**WHEREAS**, deployment of new renewable energy technologies across the state will require utilizing new areas of biologically sensitive land; and

**WHEREAS**, California is committed to conserving natural communities at the ecosystem scale through the use of California's unique Natural Community Conservation Planning (NCCP) tool, coordinated by the Department of Fish and Game (DFG) and CEC, which identifies and provides for the region-wide protection of plants, animals, and their habitats while allowing for compatible economic activities such as renewable energy generation; and

**WHEREAS**, the Western Governor's Association has initiated the Western Renewable Energy Zone (WREZ) initiative to identify and expedite cost-effective, environmentally sensitive transmission development to areas with high-grade, renewable energy resources in order to bring about the development of 30,000 megawatts of clean and diversified energy across the West by 2015.

### Latest News



**Governor Brown, Other Leaders to Discuss Landmark Minimum Wage Deal in Sacramento Today** 03-28-2016



**Governor Brown Grants Pardons** 03-25-2016



**Governor Brown Announces Appointments** 03-24-2016



**Governor Brown Announces Appointments** 03-23-2016



**Governor Brown Issues Statement on World Water Day and White House Water Summit** 03-22-2016



**Governor Brown Issues Statement on Brussels Attacks** 03-22-2016



**Governor Brown to Attend Memorial Service for CHP Officer Tomorrow** 03-21-2016



**Governor Brown Announces Appointments** 03-21-2016



**Governor and First Lady Honor Staff Sgt. Louis F. Cardin** 03-21-2016



**Governor Brown Issues Proclamation Declaring Tsunami Preparedness Week** 03-21-2016

**0294**

**NOW, THEREFORE, I, ARNOLD SCHWARZENEGGER**, Governor of the State of California, by virtue of the power vested in me by the Constitution and statutes of the State of California, do hereby order effective immediately:

1.    That the following Renewable Portfolio Standard target is hereby established for California:  All retail sellers of electricity shall serve 33 percent of their load with renewable energy by 2020.  State government agencies are hereby directed to take all appropriate actions to implement this target in all regulatory proceedings, including siting, permitting, and procurement for renewable energy power plants and transmission lines.

2.    The Resources Agency shall lead the joint collaboration between the CEC and the DFG to expedite the development of RPS eligible renewable energy resources through the actions outlined in this order.

3.    The Department of Fish and Game shall immediately create a new internal division, the primary purpose being comprehensive planning and streamlined compliance services; including for renewable energy projects.  The division shall ensure the timely completion of NCCPs, which embody the balancing of project assurances with ecosystem protection.

4.    Pursuant to this Order and the MOU signed on November 17, 2008 by the CEC and DFG formalizing the Renewable Energy Action Team (REAT), the REAT shall lead completion of items 5 through 12.

5.    Pursuant to the MOU, DFG and CEC shall immediately create a "one-stop" process for permitting renewable energy generation power plants.  Instead of filing multiple sequential applications, the DFG and CEC shall create a concurrent application review process, which shall be filed directly at the state level.  To facilitate this process, a special joint streamlining unit shall be created and shall reduce permit processing times by at least 50% for projects in renewable energy development areas, as such areas are defined by the REAT beginning on February 1, 2009.

6.    Pursuant to the MOU signed on November 17, 2008 by the CEC, the DFG, the United States Bureau of Land Management and the U.S. Fish and Wildlife Service, the REAT shall endeavor to include all appropriate federal partners in the expedited permitting process described in number 5 above.

7.    By December 1, 2008, the REAT shall initiate the Desert Renewable Energy Conservation Plan (DRECP) process for the Mojave and Colorado Desert regions.

8.    By March 1, 2009, the REAT shall identify and publish top priority areas in California where other NCCPs or similar plans should be developed based upon their renewable energy development potential.

9.    By December 31, 2009, the REAT shall develop and publish a Best Management Practices manual to assist RPS project applicants in designing projects to emphasize siting considerations and minimize environmental impacts for RPS desert projects.

10.  By December 31, 2009, the REAT, in conjunction with our federal partners and stakeholder groups, shall develop a conservation strategy that clearly identifies and maps areas for RPS project development and areas intended for long-term natural resource conservation as a foundation for the DRECP.

11.  By December 31, 2010, the REAT, in conjunction with our federal partners and stakeholder groups, shall complete the draft DRECP and initiate the environmental review process.

12.  By June 1, 2012, the final DRECP shall provide binding, long-term endangered species permit assurances, facilitate the RPS desert project approval process, and provide a process for state and federal conservation funding to implement the DRECP.

13.  By January 1, 2010, the CEC shall provide an estimate of total retail electricity sales in California in 2020 by utility and shall update this number every two years through the IEPR.

14.  Direct the CEC, and request the CPUC and California Independent System Operator (ISO), to work with other RETI stakeholders to complete the following by March 31, 2009: (a) develop a product that identifies top priority renewable energy zones that can be developed reliably, cost-effectively and with least environmental impact; and (b) issue a Renewable Transmission Development Report that identifies potential routes and interconnection points for new lines.  I direct DFG to participate in the RETI process and the REAT to provide increased technical support to the RETI stakeholder group.  I also request that the CPUC and the ISO support the RETI stakeholder group as appropriate in order to meet this deadline.

15.  Direct the CEC, and request the CPUC, to participate in the WREZ initiative in order to increase availability to all potential renewable energy resources, coordinate research, planning, and investments with our regional partners, and to complement RETI.  Specifically, I request that the CPUC, in conjunction with the CEC, ensure that there is information exchange and coordination between the WREZ initiative and RETI and to facilitate the feasible integration of the resulting plans from each initiative.

16.  In order to facilitate the timely permitting of renewable energy projects, all state regulatory agencies shall give priority to renewable energy projects as set forth in this Executive Order.

17.  In conjunction with its work with DFG to develop the DRECP pursuant to number 7 above and any work it performs to facilitate the siting and permitting of renewable generation and transmission projects, the CEC shall coordinate with BLM, CPUC, the California ISO, and other interested federal, state, and local agencies, work closely with interested stakeholders, and utilize input from RETI.

This Order is not intended to create, and does not create, any right or benefit, whether substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, entities, officers, employees, agents or any other person.

**0295**

**I FURTHER DIRECT** that as soon as hereafter possible, this Order be filed with the Office of the Secretary of State and that widespread publicity and notice be given to this Order.

Copyright © 2010 State of California

**0296**

300          453 FEDERAL REPORTER, 2d SERIES

**CHOCK FULL O' NUTS CORPORATION,
Plaintiff-Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellee.**

No. 156, Docket 71-1536.

United States Court of Appeals,
Second Circuit.

Argued Oct. 20, 1971.

Decided Dec. 21, 1971.

Taxpayer appealed from judgment of the United States District Court for the Southern District of New York, Richard H. Levet, J., 322 F.Supp. 772, denying claim for refund of federal income taxes based on amounts attributable to the conversion feature of convertible debentures issued by taxpayer, which it sought to deduct as amortizable bond discount. The Court of Appeals, Mansfield, Circuit Judge, held that the portion of the initial offering price of the debentures allocable to the conversion feature did not constitute "original issue discount," and thus taxpayer was not entitled to deduction with respect to the same.

Affirmed.

**1. Internal Revenue ⊕154**

Subject to certain limitations, the Commissioner of Internal Revenue is empowered to prescribe the extent, if any, to which his regulations shall be given retroactive effect, and retroactivity of such regulations is presumptively permissible, but the Commissioner's authority in such area is subject to review for abuse of discretion. 26 U.S.C.A. (I.R.C.1954) § 7805(b).

**2. Internal Revenue ⊕130**

Tax statutes which have been given retroactive effect by Congress, though not necessarily unconstitutional because of their retroactivity, may be denied such effect where harsh, arbitrary, or unfair.

**3. Internal Revenue ⊕173**

To the extent that a treasury regulation interprets or elucidates the meaning of a statute, it is merely explanatory or confirmatory rather than retroactive. 26 U.S.C.A. (I.R.C.1954) § 7805(b).

**4. Constitutional Law ⊕46(1)
Internal Revenue ⊕154**

Taxpayer, when acting in an area of unsettled law, has no vested interest in a hypothetical decision in his favor prior to the advent of regulations, but the Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulations. 26 U.S.C.A. (I.R.C.1954) § 7805(b).

**5. Internal Revenue ⊕607**

Where corporate taxpayer issued callable convertible debentures at par, that part of the initial offering price allocable to the conversion feature did not constitute "original issue discount," and thus taxpayer was not entitled to deduct the same as amortizable bond discount; "issue price" included the conversion feature, and in any event such feature did not represent a cost of borrowing money that must without qualification be paid since, unlike issuer of bond-warrant investment units, taxpayer would in no event be required both to honor the conversion privilege and to redeem the debenture. 26 U.S.C.A. (I.R.C.1954) §§ 163, 249, 1232(b) (1, 2).

See publication Words and Phrases for other judicial constructions and definitions.

**6. Internal Revenue ⊕607**

Denial by the Commissioner of Internal Revenue of discount deductions with respect to that part of the issue price of convertible debentures allocable to the conversion feature was not inconsistent with regulations requiring the subtraction of any conversion feature from issue price of a bond in determining whether the bond was issued at a

**0297**

premium since, in neither situation, is amortization of the conversion feature allowed.

———◆———

Harry Geist, New York City, for plaintiff-appellant.

Michael I. Saltzman, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., Michael D. Hess and Alan B. Morrison, Asst. U. S. Attys., New York City, on the brief), for defendant-appellee.

Stuart S. Opotowsky, Alan D. Berlin, New York City, for amicus curiae Hunt Foods & Industries, Inc.; Walter J. Rockler, Julius M. Greisman, Richard L. Hubbard, Washington, D. C., for amicus curiae J. P. Stevens & Co., Inc., Alex M. Gruder, Stamford, Conn., for amicus curiae Olin Corp.; Arnold & Porter, Washington, D. C., of counsel, on the brief for amici curiae.

Before MEDINA, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal raises the question, apparently one of first impression, whether a corporation which has issued callable convertible bonds at par is entitled under the Internal Revenue Code of 1954 and the Treasury Regulations promulgated thereunder by the Commissioner of Internal Revenue to deduct as "original issue discount" that part of the issue price allocable to the conversion feature.

The factual background is undisputed. Appellant Chock Full O' Nuts Corporation ("the taxpayer"), a New York corporation engaged in the importing and sale of coffee and other food products and in the restaurant business, issued on or about August 1, 1961, its $100 par value convertible subordinated debentures, at 4½% interest, due in 20 years, in the total principal amount of $6,938,900. The holder of each $100 de-

benture had the option of converting it into shares of the taxpayer's common stock at a stated conversion price per share ($28.50) unless the debenture should be called for redemption by the taxpayer before the holder exercised his option.[1] The parties have stipulated that as of the date of the sale of the debentures, the same debentures *without the conversion feature* would have sold at $89.625 for each $100 par value. In its corporate income tax return for the fiscal year ending July 31, 1962, the taxpayer claimed a deduction of $35,995.58 as that year's amortization of the bond discount, a figure arrived at by multiplying the number of debentures sold, 69,389, by $10.375, the claimed discount, and by dividing the result ($719,911) by the 20-year life of the bonds.

The Commissioner denied the deduction and assessed the sum of $18,717.70 plus $2,023.96 in interest. Taxpayer paid this amount under protest and began suit in the district court for a refund. In an opinion reprinted at 322 F.Supp. 772 (S.D.N.Y.1971), Judge Levet, to whom the case was submitted by the parties for decision upon stipulated facts without taking of testimony, awarded judgment to the United States. We affirm.[2]

No provision of the Internal Revenue Code explicitly allows issuers of bonds to deduct original issue discount. However, every federal income tax act since 1864 has included a provision for the deduction of interest paid.[3] Section 163 of the Internal Revenue Code of 1954, for instance, which was in effect at all relevant times, permits deduction of "interest paid or accrued within the taxable years on indebtedness." It has long been accepted that "original issue discount serves the same function as stated interest." United States v. Midland-Ross Corp., 381 U.S. 54, 57, 85 S.Ct. 1308, 1310, 14 L.Ed.2d 214 (1965). Like

1. Stipulation of August 15, 1969, ¶ 4.

2. Appearing as *amici curiae* urging reversal were Hunt Foods & Industries, Inc., J. P. Stevens & Co., Inc., and Olin Corporation, each of which issued convertible

debentures and claimed an original issue discount deduction.

3. See, *e. g.*, Rev.Act of 1864, § 117, 13 Stat. 282; Rev.Act of 1913, § II(G) (b) (third), 38 Stat. 173.

interest, discount represents a cost of borrowing money. Both are also alternative means of determining the price which a bond will command in the market.[4] Ever since Article 150 of Treas. Reg. 33 was promulgated under the Internal Revenue Code of 1916 the Commissioner has recognized that this economic congruence required equal tax treatment. The current regulation is § 1.163–3(a) (1), which provides in pertinent part:

> "Deduction for bond discount.—(a) *Discount upon issuance.* (1) If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds."

At the time of the taxpayer's issuance of its convertible bonds in 1961, the applicable regulation was § 1.61–12(c) (3), whose language is identical to that of § 1.163–3(a) (1).[5]

To determine whether that part of the issue price paid by the holder for the conversion privilege of a convertible bond constitutes original issue discount, as appellant here contends, we look to the Code and regulations defining that term. At the time of the issuance of the taxpayer's bonds in 1961, § 1232(b) (1) defined "original issue discount" to be "the difference between the issue price and the stated redemption price at maturity." "Issue price" was defined by § 1232(b) (2) to be "the initial offering price to the public at which price a substantial amount of such bonds or other evidences of indebtedness were sold."

The Government has argued that our problem is greatly simplified by the Commissioner's promulgation in 1968 of

Treas.Reg. § 1.1232–3(b) (2) (i), which was made retroactive to obligations issued after December 31, 1954. It defines "issue price" in the case of an obligation convertible into stock or into another obligation to include "any amount paid in respect of the conversion privilege." Since original issue discount is defined as the difference between the issue price and the stated redemption price at maturity, taxpayer's debentures would not have been issued at a discount if Treas.Reg. § 1.1232–3(b) (2) (i) were to be applied. In reply, the taxpayer contends that that Regulation should not be given retroactive effect, arguing that it represented an effort to change the policy of existing regulations in order to support the Government's position in its pending litigation with the taxpayer.

[1, 2] We recognize that subject to certain limitations the Commissioner is empowered to prescribe the extent, if any, to which his regulations shall be given retroactive effect. Int.Rev.Code § 7805(b). See Helvering v. Griffiths, 318 U.S. 371, 397–399 n. 49, 63 S.Ct. 636, 87 L.Ed. 843 (1943). Indeed, it is the Commissioner's position that every Revenue Ruling is to be accorded retroactive treatment unless some specific statement of nonretroactivity is included. Rev.Proc. 68–37, 1968–2 Cum.Bull. p. 926. The Commissioner's authority in this area, however, is subject to review for abuse of discretion. "The Internal Revenue Service does not have *carte blanche*. Its choice must be a rational one, supported by relevant considerations." International Business Machines Corp. v. United States, 343 F.2d 914, 920, 170 Ct.Cl. 357, 367 (1965), cert. denied, 382 U.S. 1028, 86 S.Ct. 647, 15 L. Ed.2d 540 (1966).[6] While retroactivity

---

4. Of course, there are often additional determinants, *e. g.*, maturity date, prevailing market rates of interest, the issuer's credit standing, degree of subordination, and other particular terms of the debenture.

5. The history of this regulation is traced in Montana Power Co. v. United States,

232 F.2d 541, 546–548 (3d Cir.), cert. denied, 352 U.S. 843, 77 S.Ct. 51, 1 L.Ed. 2d 59 (1956).

6. Thus, courts have declined to give retroactive effect to regulations or rulings of the Commissioner when retroactivity would work a change in settled law relied on by the taxpayer and implicitly ap-

0299

in tax regulations is therefore presumptively permissible, it is in each case for the court to determine whether under all the circumstances retroactive application would be warranted.[7] See May Seed & Nursery Co. v. Commissioner, 242 F.2d 151, 155 (8th Cir.), cert. denied, 355 U.S. 839, 78 S.Ct. 62, 2 L.Ed.2d 51 (1957); Kay v. Commissioner, 178 F.2d 772, 773 (3d Cir. 1950).

[3,4] To the extent that a regulation interprets or elucidates the meaning of a statute, it is merely explanatory or confirmatory rather than retroactive.[8] A taxpayer, when acting in an area of unsettled law, has no "vested interest in a hypothetical decision in his favor prior to the advent of the regulations." Helvering v. Reynolds, 313 U.S. 428, 433, 61 S.Ct. 971, 974, 85 L.Ed. 1438 (1941).[9] On the other hand, the Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulations. Here, for instance, while the taxpayer issued

its bonds in August, 1961, took its discount deduction in 1962, filed its claim for a refund in January, 1966, and began suit in January, 1968, Treas.Reg. § 1.1232–3(b) (2) (i) was not promulgated until December, 1968. 33 Fed.Reg. 19176.

[5] Thus it is questionable whether Treas.Reg. § 1.1232–3(b) (2) represents a valid exercise of the Commissioner's power to promulgate retroactive regulations. We find it unnecessary to resolve that issue, however, for the reason that, even under the regulations that had been promulgated at the time of issuance of the debentures, the portion of the original issue price allocable to the conversion feature did not constitute "original issue discount," which turns on the definition of "issue price" in Internal Revenue Code § 1232(b) (2) as "the initial offering price to the public." To accept the taxpayer's contention would be to depart from that definition. Here the initial offering price of the bonds to the public was $100 per bond. The taxpayer asks that a component of that offering price—the part attributable to the con-

---

proved by Congress, Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 116, 59 S.Ct. 423, 83 L.Ed. 536 (1939), when it would lead to inequality of treatment between taxpayers, International Business Machines Corp. v. United States, *supra*, when litigation involving the area clarified by the regulation had already been begun, Commissioner of Internal Revenue v. Goodwyn Crockery Co., 315 F.2d 110, 113 (6th Cir. 1963), or when, in general, the result of retroactivity in a particular case would be unduly harsh, Lesavoy Foundation v. Commissioner, 238 F.2d 589, 594 (3d Cir. 1956); cf. Woodward v. United States, 322 F.Supp. 332, 335 (W.D.Va.1971).

7. Even tax *statutes* which have been given retroactive effect by Congress, although not necessarily unconstitutional because of their retroactivity, Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938), may be denied such effect where "harsh, arbitrary, or unfair." See *e. g.,* Shanahan v. United States, 447 F.2d 1082, 1084 (10th Cir. 1971).

8. See K. C. Davis, Administrative Law Treatise § 5.09, p. 347 (1958):

"If an interpretive rule is merely an interpretation of a statute, and if the meaning of the statute has been there from the time of its original enactment, then no problem of a retroactive interpretive rule can arise, for either the interpretive rule expresses the true meaning of the statute or it does not; if it does, then that is what the statute has always meant and the rule has not changed the law retroactively; if it does not, then it does not matter whether the rule can be made retroactive, for the rule is invalid in that it is inconsistent with the statute."
In the tax area at least, such a view has been labelled a "fiction" by Professor (now Solicitor General) Griswold. See Griswold, A Summary of the Regulations Problem, 54 Harv.L.Rev. 398, 415 (1941).

9. We note in passing that the Commissioner approved the amortization and deduction of bond "discount" by *amicus* J. P. Stevens & Co., Inc. for the years 1965 to 1968, not changing its position until after the adoption of Treas.Reg. § 1.1232–3(b) (2) in December, 1968.

**0300**

**304**          **453 FEDERAL REPORTER, 2d SERIES**

version feature—be excluded and that the balance be treated as the offering price for the purpose of finding whether there was an "original issue discount" within the meaning of § 1232(b) (1). However, we find no evidence that the term "offering price" was intended to apply solely to the investment element of a convertible bond as distinguished from its conversion element. Moreover, if we were to exclude the value of the conversion feature in determining the issue price, we could by the same logic deduct that figure when arriving at the redemption price, in recognition of the fact that the bond contains two distinct and separate components. We do not believe that the statutory language contemplates such a division.[10]

Furthermore, if we look to the substance of the transaction and overlook the failure of taxpayer's debentures to satisfy the express requirements of Treas.Reg. § 1.1232–3(b) (1) for computation of an original issue discount, the taxpayer has failed to satisfy its burden of showing that the amount of the issue price allocable to the conversion feature represents a cost of borrowing money that must without qualification be paid. Its inability to meet this condition arises from the fact that the debentures provide for two mutually exclusive modes of satisfaction. Under one the holder may exercise his right to convert the debenture into common stock, in which event he will surrender his debenture and it will not be redeemed or paid at maturity. To permit deduction of the amount attributable to the conversion feature in the face of such a possibility would be to disregard established conditions precedent to the allowance of discount as a cost of borrowing money which must be repaid. "Amortized bond discount," wrote Mr. Justice (later Chief Justice) Stone for

the Supreme Court in 1934, "is deductible from the taxpayer's gross income *only* by way of anticipation of payment of the bonds at maturity." Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 292, 55 S.Ct. 158, 160, 79 L.Ed. 367 (1934) (emphasis added). The alternative to conversion is that the taxpayer will redeem the debenture or pay it at maturity, in which event the conversion privilege will be terminated and it will pay out no more than it received at the time of issuance, thus precluding the existence of any original issue discount.

In no event will the taxpayer be required both to honor the conversion privilege *and* to redeem the debenture. By the terms of the debenture, no conversion may take place until the bond is surrendered, and the option to convert expires as the bond becomes due. "The holder of an obligation convertible into stock has the privilege of electing between two alternative modes of satisfaction, but he cannot resort to both."[11] Therefore we feel that the taxpayer is not entitled to a deduction for original issue discount based upon two inconsistent assumptions, first that the debentures will be redeemed and second that they will be converted into common stock.

A further contention of the taxpayer which merits consideration is its attempt to analogize convertible bonds to bond-warrant investment units, which consist of (1) a bond obligation *and* (2) an option or warrant for the purchase of stock. The statutory definition of "issue price" contained in § 1232(b) (2) and Treas.Reg. § 1.163–3(a) (2) makes clear that in the case of a bond issued as part of an investment unit the total price received for the investment unit is to be allocated between the bond and the warrant according to their fair market

---

10. See Fleischer & Cary, The Taxation of Convertible Bonds and Stock, 74 Harv.L. Rev. 473, 516 (1961); Note, The Tax Consequences of Redemption of Convertible Bonds, 49 B.U.L.Rev. 96, 102–03 (1969).

11. Hills, Convertible Securities—Legal Aspects and Draftsmanship, 19 Calif.L. Rev. 1, 13 (1930); Fleischer & Cary, *supra*, at 515.

CHOCK FULL O' NUTS CORPORATION v. UNITED STATES    305

Cite as 453 F.2d 300 (1971)

values, with the market value of the bond being accepted as its issue price. Taxpayer urges that consistency requires the same treatment of a convertible debenture. While this argument has a surface appeal, it ignores the essential economic differences between a bond-warrant investment unit and a convertible debenture.

The convertible debenture is an indivisible unit; the issuer has but one obligation to meet, either redemption *or* conversion. It can never be required to do both. With the bond-warrant investment unit, however, the holder receives and the issuer incurs two separate and independent obligations, and both may have to be fulfilled. Indeed, while the warrant and debt obligations are often issued as a package, since they are far more attractive to investors in unison than they would be separately, they are totally independent and separable obligations, and the warrant, unlike the conversion privilege, should be independently valued.[12] Further evidence of this independence is the fact that the conversion feature of a bond is not assignable apart from the bond itself, 6A W. Fletcher, Private Corporations § 2693, p. 87 (1968 perm.ed.), whereas warrants "are customarily traded both on the [stock] exchanges and in the over-the-counter market." I L. Loss, Securities Regulation ch. 3A, p. 467 (2d ed. 1961). Finally, the accounting profession has recently underscored these distinctions between conversion features and warrants by adopting rules which recommend differing treatment on the issuer's financial statements.[13]

[6] The taxpayer next urges that to deny it the right to deduct the value of the conversion privilege in determining the presence of discount is a "flat contradiction" of Treas.Regs. §§ 1.61–12(c) (5) and 1.171–2(c) (1), which require the subtraction of the value of any conversion feature from the issue price of the bond in determining whether the bond was issued at a premium. We disagree. It is true that the issuer of a bond at premium is not required to include in income that portion of the premium which represents the conversion privilege, nor is the holder entitled to deduct that amount as interest. But, as the district court properly noted, 322 F. Supp. at 776, in neither the premium nor the discount cases is the amount attributable to the conversion feature allowed to be amortized. Thus, there is no substantive inconsistency in the treatment accorded by the Regulations to the value of the conversion feature. The issuer may not gain a tax deduction on the basis of the conversion privilege in either the discount or the premium situation, nor may the holder deduct it as interest.[14]

The Government's position is buttressed by the further fact that amounts paid for conversion privileges are usually attributable to equity transactions rather than to the cost of borrowing money.[15] The Accounting Principles Board, for instance, has noted that the issuer, "in planning its long-range financing, may view convertible debt as essentially a means of raising equity capital,"[16] and that when investors assess the attractiveness of a convertible bond offering, "the conversion feature may be of primary importance, with the debt feature regarded more as a hedge than as the principal investment

---

12. Symposium, Convertible Debentures and Strange Securities, 28 N.Y.U.Inst. of Fed. Tax. 331, 347 (1970).

13. Accounting Principles Board Opinion No. 14 (March, 1969). The APB is of the opinion that "no portion of the proceeds from the issuance of . . . convertible debt securities . . . should be accounted for as attributable to the conversion feature," (¶ 12), but that

"the proceeds from the sale of debt with stock purchase warrants should be allocated to the two elements for accounting purposes." (¶ 15).

14. *Cf.* De Kosmian, Original Issue Discount, 22 Tax Lawyer 339, 360 (1968).

15. Note, 49 B.U.L.Rev. 96, 112 (1969).

16. Accounting Principles Board Opinion No. 14, ¶ 4.

0302

objective."[17] Indeed, a 1955 survey reported that a large majority of corporations issuing convertible bonds did so to raise additional equity capital rather than to improve the salability of their debentures.[18] Thus, denial of a deduction under these circumstances would be in line with the policy of the Internal Revenue Code disallowing deductions for amounts paid in capital transactions. See, *e. g.*, Int.Rev.Code § 249.[19]

Having in mind that the interest deduction, like all other deductions, is to be narrowly construed, New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934), we fail to see how, in view of the possibility of conversion, the $10.375 which the taxpayer seeks to deduct over the life of each debenture is the economic equivalent, under these circumstances, of a fixed interest charge that must without qualification be paid each year. Gilbert v. Commissioner, 248 F.2d 399, 402 (2d Cir. 1957) (Medina, J.). Possibly the taxpayer has incurred some costs in connection with the conversion feature, such as having to keep authorized but unissued stock on hand, having to convert at the holders' request, having to risk possible harm to the corporation's borrowing position, possibly having to offer more than the stated call price in order to prevent a conversion, or having to disclose possible dilution of shareholders' equity on the balance sheet. Whatever costs the taxpayer here may have

incurred in the granting of this conversion feature, however, they are highly speculative [20] and they differ from the type of economic costs which § 163 was designed to mitigate.

For the foregoing reasons we are convinced that the taxpayer is not entitled to the interest deduction which it claimed on its fiscal year 1962 return. The judgment of the district court is affirmed.



UNITED STATES of America,
Appellee,

v.

Leo KAUFMAN, Defendant-Appellant.

No. 111, Docket 71-1423.

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1971.

Decided Dec. 3, 1971.

Defendant was convicted before the United States District Court for the Southern District of New York, Dudley B. Bonsal, J., of 90 counts of making false "non-military" affidavits for purpose of obtaining default judgments in violation of the Soldiers' and Sailors'

---

17. *Id.* at ¶ 8.

18. Note, 49 B.U.L.Rev. 96, 112 and n. 57 (1969).

19. Section 249, added in 1969, provides that, in the repurchase by the issuer of its convertible obligation, premium attributable to the conversion privilege rather than the cost of borrowing is nondeductible. 26 U.S.C. § 249. Congress reasoned that such excess is "not analogous to an interest expense or deductible business expense, but rather is similar to an amount paid in a capital transaction. In effect, the corporation is repurchasing the right to convert the bonds into its common stock, much as it might purchase its stock." H.R.Rep.No.91-413, 91st

Cong., 1st Sess. 111 (1969), 1969 U.S. Code Cong. & Admin.News pp. 1645, 1759-1760. Section 249 was made necessary by the decision in Roberts & Porter, Inc. v. Commissioner, 307 F.2d 745 (7th Cir. 1962), which allowed the entire premium to be deducted, and the Commissioner's nonacquiescence in that decision, Rev.Rul. 67-409, 1967-2 Cum.Bull. p. 62.

20. For an argument that the corporate issuer often incurs no expense in granting a conversion feature, see A. Dewing, I The Financial Policy of Corporations 269-70 n. cc (1953). Professor Dewing also challenges the idea that the corporation's existing stockholders are hurt because of a dilution of equity.

**0303**

**646**    **675 FEDERAL REPORTER, 3d SERIES**

U.S. Attorneys' offices in this circuit to work with defendants seeking fast-track consideration and to willingly stipulate to sentencing judges that defendants are eligible if that appears to be the case.

To wrap up, we conclude that the fast-track arguments made by all three of these defendants were illusory and could be passed over in silence. Accordingly, we AFFIRM each of their sentences; Ramirez's sentence, however, is MODIFIED to clarify that his participation in the Inmate Financial Responsibility Program is voluntary.



**Tariq MALIK, Mahdiur Rahman, and Janice Quinn, Personal Representative of the Estate of Joe Lee Lott, Plaintiffs–Appellants,**

**v.**

**FALCON HOLDINGS, LLC, and Aslam Khan, Defendants–Appellees.**

**No. 11–2815.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 2012.

Decided March 14, 2012.

**Background:** Managers for limited liability company (LLC) that owned and operated fast-food restaurants sued LLC and its sole equity owner for fraud and breach of contract, based upon owner's alleged

promise to give managers equity interest in LLC once he acquired full ownership. The United States District Court for the Northern District of Illinois, Ronald A. Guzmán, J., 2011 WL 2790168, granted summary judgment for LLC and owner. Managers appealed.

**Holding:** The Court of Appeals, Easterbrook, Chief Judge, held that factual issues precluded summary judgment for LLC and owner.

Vacated and remanded.

**1. Damages ⚖️153**

Court cannot dismiss action on ground that plaintiffs, by underestimating their damages, are asking for less than their due.

**2. Federal Civil Procedure ⚖️2481**

Issues of fact, including value of equity interest held in limited liability company (LLC) by its sole equity owner and manner in which equity interests in LLC were to be conveyed its top managers, precluded summary judgment for LLC and owner in action for fraud and breach of contract brought by managers, based upon owner's alleged promise to give them 50 percent of LLC's equity once he acquired full ownership.

**3. Federal Civil Procedure ⚖️1278**

Plaintiffs' alleged failure to set out details quantifying their damages for alleged fraud and breach of contract prior to close of discovery did not provide basis for granting summary judgment for defendants; if they believed that plaintiffs had failed to perform their obligations under discovery rules, defendants should have

grid V. Eagly, *Prosecuting Immigration,* 104 Nw. U.L.REV. 1281, 1322 n. 251 & 254 (2010) (citing interviews with Federal Defender in District of New Mexico and ''Panel Representative'' in the Southern District of California); James F. Smith, *United States Immigration*

*Law as We Know It: El Clandestino, the American* Gulag, Rounding Up the Usual Suspects, 38 U.C. DAVIS L.REV. 747, 785 n. 167 (2005) (citing interview with Federal Defender in the Northern District of California).

requested sanction before discovery closed, rather than waiting until their motion for summary judgment. Fed.Rules Civ.Proc. Rule 37(c)(1), 28 U.S.C.A.

**4. Federal Civil Procedure ⏦1278**

Rule addressing discovery sanctions gives the judge discretion to match a remedy to the wrong. Fed.Rules Civ.Proc. Rule 37(c)(1), 28 U.S.C.A.

––––––––––

Mary Massaron Ross (argued), Attorney, Plunkett & Cooney, Detroit, MI, for Plaintiffs–Appellants.

Samuel G. Harrod, IV (argued), Attorney, Meltzer, Purtill & Stelle LLC, Schaumburg, IL, for Defendants–Appellees.

Before EASTERBROOK, Chief Judge, BAUER, Circuit Judge, and SHADID, District Judge.*

EASTERBROOK, Chief Judge.

Falcon Holdings was organized in 1999 to own and operate 100 fast-food restaurants. Aslam Khan owned 40% of Falcon's common units. (Falcon is a limited liability company rather than a corporation; ownership is represented by units rather than shares.) The remainder of the common units, and all of the preferred units, were owned by Sentinel Capital Partners II and Omega Partners (collectively "Sentinel"). According to the plaintiffs, Khan told Falcon's managers that he would acquire full ownership one day, and that, when he did, he would reward the top managers with 50% of Falcon's equity. Plaintiffs say that they accepted lower salaries because they anticipated receiving a stake if Falcon proved to be a success, and

that they worked hard to make it prosper (which it did).

Sentinel was bought out in 2005, and Khan became Falcon's sole equity owner. He did not distribute common units to any of the top managers and has denied ever promising that he would. Five of the managers filed this suit. The district court assumed that the evidence in the summary-judgment record would permit a jury to conclude that Khan had promised the plaintiffs an equity stake in Falcon. (Contracts for the sale of stock are not subject to the statute of frauds in Illinois, see 810 ILCS 5/8–113, so the absence of a writing signed by Khan is not dispositive.) Two of the original plaintiffs nonetheless lost on the basis of releases; they have not appealed. The others lost because, the district judge held, they had not adequately estimated the damages they sustained. 2011 WL 2790168, 2011 U.S. Dist. LEXIS 77983 (N.D.Ill. July 15, 2011). These three have appealed. (One has died; his estate's representative has been substituted.)

Plaintiffs offer a simple estimate of damages. They calculate that the price paid for Sentinel's ownership interest (100% of the preferred units and 60% of the common units) implies that Falcon as a whole was worth approximately $48 million in 2005. Half of $48 million is $24 million. In 2005, twenty managers qualified for units under the terms of Khan's offer. Thus each plaintiff lost about $1.2 million when Khan did not keep his promise.

The district court stated that plaintiffs' approach has two flaws, each fatal: first, because Sentinel did not own 100% of Falcon, it is impossible to derive the value of the whole firm from the amount paid for its holdings; second, the amount that Sentinel was paid depended on how much

* Of the Central District of Illinois, sitting by     designation.

**648**    **675 FEDERAL REPORTER, 3d SERIES**

Khan and Falcon could borrow rather than Falcon's true value. Neither of these propositions is sound; indeed, each supposes that there is some measure of "true" value that differs from what a willing buyer will pay a willing seller in an arms'-length transaction. Yet that is the gold standard of valuation; other measures are approximations. The value of a thing *is* what people will pay. The judiciary should not reject actual transactions prices when they are available.

[1] Let us simplify the transaction by assuming that Sentinel owned 60% of Falcon and accepted $6 million for its units. Falcon as a whole then must be worth at least $10 million. If it is worth less than that, Khan has overpaid. Khan does not contend in this litigation that he paid Sentinel too much. Falcon might be worth *more* than $10 million in this example; Sentinel would accept "only" $6 million if it thought that Khan, as the controlling manager, would prevent Sentinel from receiving payments equivalent to 60% of the firm's full value. But if the price Sentinel accepted represents less than 60% of Falcon's value, then plaintiffs have underestimated their damages. A court can't dismiss a suit because the plaintiffs are asking for less than their due.

The same thing is true about the district court's belief that the ability of Khan and Falcon to borrow money set a cap on what Sentinel received. If this means that Sentinel accepted less for its units than their proportional share in Falcon represented, then again plaintiffs have underestimated their damages. That's not a good reason why they should go home empty-handed.

There's another problem with this aspect of the district court's analysis. The amount that Khan and Falcon could borrow depended on Falcon's value. Although the record surprisingly does not contain the details of the transaction, it appears to be a leveraged buyout (LBO). In an LBO, a business borrows money against its own value, promising to repay from its anticipated net earnings. Outside investors are cashed out; insiders own the equity in a highly leveraged venture. The amount a firm can borrow to conduct an LBO depends on the lender's estimate of its future earnings, which is a good indicator of value. So to say that Falcon could not pay Sentinel more than Falcon could borrow is not to say that the price was an arbitrary number. If the amount offered *were* a poor estimate of Falcon's value, Sentinel would have said no. Instead it took the offer. To repeat, we have a willing buyer and willing seller dealing at arms' length; the price they agree on *is* the value of the asset.

[2] The real problem with plaintiffs' damages estimate is not inability to value Falcon Holdings as an entity. It is that what Khan promised was half of the equity interest in Falcon. Khan emerged from the LBO owning 100% of the equity—but *not* 100% of Falcon. Suppose Falcon borrowed $38 million from a bank (or syndicate of banks) to pay off Sentinel. Then, if Falcon was worth $48 million as a whole in 2005, the lenders' debt interest was $38 million and Khan's equity interest was worth $10 million. Half of that, split 20 ways, would come to $250,000 for each plaintiff, not the $1.2 million apiece they have demanded. Because the record does not contain the details of the transaction, we have no idea whether this example is even approximately accurate. But it is unsound to assume, as plaintiffs do, that Khan's equity interest in Falcon is worth 100% of the firm's value. It might take an expert financial economist to derive an equity valuation, and plaintiffs did not disclose an expert in discovery. For their part, however, defendants have not asked

us to affirm on the ground that the record is silent about the value of Khan's equity interest in Falcon.

In addition to assuming that the value of Falcon as a whole is the same as the value of Khan's equity interest, plaintiffs make a second questionable assumption: that Khan would hand over to each of the 20 managers 2.5% of Falcon's equity units without any terms or conditions. That would be a disaster not only for the ownership structure of a closely held firm but also from a tax perspective. The units' value would be taxed as ordinary income, just like a cash bonus. To pay the tax, many of the managers might have had to sell some or all of their units—yet there is no market for units in a limited liability company. To avoid problems such as these, firms usually distribute options rather than shares (or units). The exercise price of the options will be set at the value of the shares (or units) on the date the options are awarded, so there is no taxable income until the options are exercised—and then the tax is at the capital–gains rate rather than the higher ordinary-income rate. Options not only have tax benefits but also offer managers a share in any appreciation without the risk of capital loss. (Rewards for past success can be distributed as bonuses, also without exposing managers to loss from future operations.) Many managers hold under-diversified portfolios and are risk averse as a consequence. Exposing them to a risk of capital loss could injure the firm by inducing them to be timid when making decisions.

Perhaps Khan indeed offered Falcon's managers illiquid units that would require them to pay immediate taxes without a means to raise the money to do so, and without any terms such as buy-sell agreements (which would provide a means for valuing the units and preventing distribu-

tion to outsiders). But such a transaction would be sufficiently unusual that plaintiffs cannot simply assume that a promise to give them an equity interest in the firm was to be accomplished by handing out units rather than options. If ownership would have entailed options, then it becomes necessary to know the exercise price, the duration of the options, and at what rate they would vest. (Deferred vesting is common in order to give managers an incentive to remain with the firm.) So many vital terms are missing that any promise may well be too indefinite to enforce, see *Brines v. XTRA Corp.*, 304 F.3d 699 (7th Cir.2002); *ATA Airlines, Inc. v. Federal Express Corp.*, 665 F.3d 882 (7th Cir.2011)—but once again defendants have not asked us to affirm on this ground.

[3, 4] Defendants do try to defend their judgment by arguing that plaintiffs waited too long to quantify their damages. According to defendants, details should have been set out before the close of discovery, perhaps as early as the initial disclosures under Fed.R.Civ.P. 26(a)(1)(A), and plaintiffs' delay entitles them to prevail outright. This is absurd. Litigants are entitled to use discovery to learn facts (such as how much Sentinel received in the buyout) that will affect the remedy; a party can wait until the facts are in hand before adding specifics to the claim adumbrated in the complaint. Anyway, if defendants thought that plaintiffs had failed to perform their obligations under the rules, they should have asked the district judge for a sanction before discovery closed rather that waiting (as they did) until their motion for summary judgment. Fed.R.Civ.P. 37(c)(1) gives the judge discretion to match a remedy to the wrong. Defendants have not explained how the plaintiffs' delay injured them, so a remedy (if any rule was transgressed) would have been mild. (We have explained in *Ball v.*

**650**    **675 FEDERAL REPORTER, 3d SERIES**

*Chicago,* 2 F.3d 752 (7th Cir.1993), and many other cases, that the remedy for procedural missteps in litigation must be proportionate to the injury.)  As defendants did not ask for any arguably appropriate sanction, however, they are in no position to complain that the district judge did not award one.

The judgment is vacated, and the case is remanded for proceedings consistent with this opinion.



**Estate of Nicholas D. RICE, deceased, by: Rick D. RICE and Diane J. Waldrop, co-personal representatives, Plaintiff–Appellant,**

**v.**

**CORRECTIONAL MEDICAL SERVICES, a Missouri corporation, et al., Defendants–Appellees.**

**Nos. 09–2804, 10–2389.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 2010.

Decided March 20, 2012.

**Background:** Following pretrial detainee's death while incarcerated, his parents, representing his estate filed suit pursuant to § 1983, alleging among other things that jail officials and medical personnel had deprived pretrial detainee of due process by exhibiting deliberate indifference to his declining mental and physical condition. The United States District Court for the Northern District of Indiana, Robert L. Miller, Jr., J., 2009 WL 1748059, entered summary judgment against the es-

tate. Estate filed a second suit reasserting the state wrongful death claims that the judge in the first suit had dismissed without prejudice after disposing of the federal claims. The District Court, Rudy Lozano, J., dismissed that case on the basis of collateral estoppel, and estate appealed both judgments.

**Holdings:** The Court of Appeals, Rovner, Circuit Judge, held that:

(1) genuine issues of material fact existed as to whether jail officials were deliberately indifferent to pretrial detainee's conditions of confinement, and whether his conditions of confinement were sufficiently serious to support his Fourteenth Amendment due process claim;

(2) jail officials did not employ excessive force;

(3) evidence was insufficient to show that jail officials or psychiatric facilities maintained a policy or custom evincing deliberate indifference to the needs of mentally ill prisoners; and

(4) neither treating physician nor psychiatrist consciously disregarded the circumstances that led to detainee's death.

Affirmed in part, reversed in part, and remanded.

**1. Prisons ⚷120**

Incarcerated persons are entitled to confinement under humane conditions which provide for their basic human needs.

**2. Constitutional Law ⚷4545(1)**
   **Sentencing and Punishment ⚷1532**

Courts look to Eighth Amendment case law in addressing conditions of confinement claims of pretrial detainees, given that the protections of the Fourteenth Amendment's due process clause are at least as broad as those that the Eighth

Miami Val. Broadcasting Corp. v. U.S., 204 Ct.Cl. 582 (1974)

499 F.2d 677, 30 Rad. Reg. 2d (P & F) 907, 34 A.F.T.R.2d 74-5253, 74-2 USTC P 9525

KeyCite Yellow Flag - Negative Treatment

**Disagreement Recognized by** Kraft, Inc. v. U.S., Fed.Cl., January 28, 1994

499 F.2d 677
United States Court of Claims.

MIAMI VALLEY BROADCASTING CORPORATION
and Carolina Broadcasting Company
v.
The UNITED STATES.

No. 236-68.
|
June 19, 1974.

Suit for refund of alleged overpayments of federal income tax and assessed interest for taxable years 1959-1962. The Court of Claims, Davis, J., held that in allocating corporate taxpayer's adjusted basis in subsidiary's stock among assets received on date of liquidation, total reproduction cost of subsidiary's tangible assets should not have been reduced by time in which plant and facilities had been in operation and by minor wear and tear occurring during that period, where appraiser's assessment had already taken account of depreciation, insofar as it had occurred, and the United States had not sought any reduction from reproduction cost figures for individual items; and that amortization deductions should have been allowed on allocable cost of subsidiary's intangible asset in form of a television network affiliation contract, where contract had a reasonably predictable life of ten years as of date of liquidation.

Judgment for taxpayer.

West Headnotes (6)

**[1]      Internal Revenue**
      Cost or Value of Property in General

**Internal Revenue**
      Basis of Property Received by Corporate Transferee

**Internal Revenue**
      Allocation of Basis

In allocating corporate taxpayer's adjusted basis in subsidiary's stock among assets received on

date of liquidation, total reproduction cost of subsidiary's tangible assets should not have been reduced by time in which plant and facilities had been in operation and by minor wear and tear occurring during that period, where appraiser's assessment had already taken account of depreciation, insofar as it had occurred, and the United States had not sought any reduction from reproduction cost figures for individual items. 26 U.S.C.A. (I.R.C.1954) §§ 332, 334(b)(2).

1 Cases that cite this headnote

**[2]      Internal Revenue**
      Goodwill

In allocating corporate taxpayer's adjusted basis in subsidiary's stock among assets received on date of liquidation, financial benefit to be derived from immediate and continuing use of subsidiary's broadcast facility during period after liquidation which would have been required to construct an equivalent plant, if thought to represent pure good will, was not depreciable or amortizable. 26 U.S.C.A. (I.R.C.1954) §§ 332, 334(b)(2).

1 Cases that cite this headnote

**[3]      Internal Revenue**
      Property Used in Trade or Business

In allocating corporate taxpayer's adjusted basis in subsidiary's stock among assets received on date of liquidation, "going concern value" of subsidiary's broadcast facility, in sense of special value inherent in a functioning established plant continuing to operate, to do business, and to earn money with its staff and personnel, could not be considered as an enhancement in market value of depreciable assets for purpose of depreciation. 26 U.S.C.A. (I.R.C.1954) §§ 332, 334(b)(2).

1 Cases that cite this headnote

**[4]      Internal Revenue**
      Evidence

In allocating corporate taxpayer's adjusted basis in subsidiary's stock among assets received on

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 314 of 651

Miami Val. Broadcasting Corp. v. U.S., 204 Ct.Cl. 582 (1974)
499 F.2d 677, 30 Rad. Reg. 2d (P & F) 907, 34 A.F.T.R.2d 74-5253, 74-2 USTC P 9525

date of liquidation, immediate use value of subsidiary's broadcast facility, i. e., ability to have and use facility on date of liquidation, rather than to have to wait some two years for its equivalent to be reproduced, was not proven by taxpayer, even if it could have enhanced fair market value of a tangible depreciable asset. 26 U.S.C.A. (I.R.C.1954) §§ 332, 334(b)(2).

1 Cases that cite this headnote

[5]     **Internal Revenue**
        Evidence

Record failed to establish that, in allocating corporate taxpayer's adjusted basis in subsidiary's stock among assets received on date of liquidation, that a "willing buyer, willing seller" negotiation for subsidiary's broadcast facility would have added an appreciable sum over total reproduction cost, including "turnkey" increment, for immediate use, or that, even if such increment would have been added, it would have been measured by anticipated profits from facility during period required to construct an equivalent plant. 26 U.S.C.A. (I.R.C.1954) §§ 332, 334(b)(2).

3 Cases that cite this headnote

[6]     **Internal Revenue**
        Property Used in Trade or Business

In allocating corporate taxpayer's adjusted basis in subsidiary's stock among assets received on date of liquidation, amortization deductions should have been allowed on allocable cost of subsidiary's intangible asset in form of a television network affiliation contract, where contract had a reasonably predictable life of ten years as of date of liquidation, but amortization deductions were properly disallowed in respect to affiliation contract which had a wholly unpredictable life. 26 U.S.C.A. (I.R.C.1954) §§ 332, 334(b)(2).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*678   \*585** Bernard J. Long, Jr., Washington, D.C., for plaintiff; Richard L. Braunstein, Washington, D.C., attorney of record. Dow, Lohnes & Albertson, Washington, D.C., of counsel.

Joseph Kovner, Washington, D.C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Gilbert E. Andrews, Washington, D.C., of counsel.

Before COWEN, Chief Judge, and DAVIS, and KUNZIG, Judges.

OPINION

DAVIS, Judge. [*]

Plaintiffs seek judgment for $866,166.97, with interest, for refund of alleged overpayments of federal income tax and assessed interest for taxable years 1959, 1960, 1961 and 1962. They paid the amounts of tax as computed on their returns **\*586** for such years, and also the deficiencies and interest, as assessed or determined by the Internal Revenue Service; timely filed claims for refund for those years, which were denied; and thereafter timely filed their petition, seeking relief on the same grounds asserted in their claims.

Plaintiff Carolina Broadcasting Company (Carolina) is and was a wholly owned subsidiary of plaintiff Miami Valley Broadcasting Corporation (Miami Valley), respectively corporations of Delaware and Ohio. They filed consolidated income tax returns for the years 1959-1961, and Carolina filed its separate return for 1962. The tax liabilities in issue arise out of the business affairs of Carolina, and Miami Valley is a plaintiff only because of the filing of the consolidated returns.

On May 14, 1959, after obtaining approval of the Federal Communications Commission (FCC), Carolina purchased all of the outstanding stock of WSOC Broadcasting Company (WSOC company) for an agreed price of $5,600,000. WSOC company was a corporation which owned and operated radio and television stations WSOC-AM, FM, and TV, broadcasting at Charlotte, North Carolina. The stockholders of WSOC company were the sellers of the entire business of that company.

**\*\*679** Effective June 1, 1959, WSOC company was liquidated in accordance with the provisions of 26 U.S.C. §§ 332 and 334(b)(2), and all of its assets were distributed to and all of its liabilities assumed by Carolina. Those assets and liabilities related to the operation of the radio and television stations and that business continued without interruption under direct control of Carolina upon liquidation of WSOC company.

On June 1, 1959, Carolina's total adjusted cost basis of the WSOC company stock, to be allocated to the assets acquired from WSOC company, was $6,719,696, which included the $5,600,000 paid for the stock and $1,199,696 in liabilities assumed in the liquidation.

Section 1.334-1(c)(4)(viii) of the Treasury Regulations provides that, upon complete liquidation of a subsidiary under 26 U.S.C. § 334(b)(2), the parent corporation's adjusted basis in its subsidiary's stock is to be allocated among the various assets received (except for cash and its equivalent), **\*587** both tangible and intangible (whether or not depreciable or amortizable), in proportion to the net fair market value of such assets on the date received.

The parties are in agreement that, after deduction of $193,122 in cash and $231,348 in accounts receivable distributed to Carolina in the liquidation, Carolina's adjusted cost basis to be allocated to all other assets, tangible and intangible, was $6,295,226. The parties further agree that the amounts allocable to two items of intangible assets, i.e., the transmitter site lease and the film contracts, were respectively $84,076 and $209,917, leaving a balance of $6,001,233.

This balance of $6,001,233 remains for allocation to all other assets, i.e., the tangible assets and the following intangibles: NBC television network affiliation contract, ABC television network affiliation contract, the NBC radio network affiliation contract, and the FCC radio and television licenses. (The radio network affiliation contract and the radio licenses had only minimal values in relation to the other intangibles, because of lack of past and prospective profitability of the radio operations.) Essentially this case involves the allocation of this $6,001,233 among these assets for tax depreciation and amortization purposes.

I

The tangible assets are the land, improvements, technical installations, equipment and supplies, and other physical items, all of which constituted the well-designed, completed, tested and fully operational plant and facilities existing in the operations of WSOC-AM, FM and TV, as of June 1, 1959. The first question before us concerns the basis for depreciation of these tangible assets during the taxable years; the Internal Revenue Service disallowed depreciation deductions calculated by taxpayers on a higher basis than the Service thought proper.

A. The reproduction cost of each of the separate tangible assets is not in dispute, being in the amounts set forth in finding 6, totaling $2,178,072 for all the assets. Defendant argues that that sum is the amount to be allocated to the tangible assets. The reproduction costs of those assets included catalogue prices, labor, freight, sales tax and supervision, **\*588** but did not contain any element of increase in value because such assets were parts of an assembled and operating plant. The Government argues that, at least in this instance where the physical assets were practically new, already assembled, and in good working order, nothing should be added for so-called 'turnkey value'- the value of an equivalent plant with guaranteed equal performance.

The answer lies, we think, in Section 1.334-1(c)(4)(viii) of the Regulations, supra, which refers us, for this basis allocation, to the net fair market value of the tangible assets-not to the seller's cost or even for the matter the buyer's actual cost. Reproduction cost can be an **\*\*680** adequate measure of fair market value, especially where as here there is no real market, [1] since that is what the buyer would have to pay if he did not purchase the particular item from the seller but had it replaced by fabrication or construction (1 J. Bonbright, Valuation of Property 156-57 (1937)).

By the same token, we agree with plaintiffs that fair market value would take into account the fact that this buyer received (and was entitled under its contract to receive) a put-together plant in good all-round working shape, not a congeries of uncoordinated physical assets liable as not to fail to work as a unit. The 'turnkey' product was worth more than the sum of the untested and uncoordinated parts, even though they were all constructed and installed in place. Normally a buyer would pay an increment for such an assurance that the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination.

In this case the total of the itemized reproduction costs for the individual items did not include any charge related **\*589** to (or market value based upon) this 'turnkey' guarantee that a fully tested and operational plant was and would be available to be handed over. The overhead, contingencies and profit included in those individual sums appear to cover only the costs of the contractor's and subcontractor's work on the individual items. The charges of a 'turnkey contractor', with responsibility for overall supervision and coordination of the complex project, are not reflected in the tabulation. If Carolina had to obtain an equivalent plant with guaranteed equal performance, the cost of that plant would in all probability have included the total of the reproduction costs of the individual assets ($2,178,072), plus increments covering construction interest, and the contractor's contingencies, overhead and profit for the 'turnkey' aspect.

It makes no difference on this point that the plant was virtually new, or that the seller (the WSOC company) may not have paid such 'turnkey' costs to someone else, or that 'turnkey' contracts may not be a general industry practice, or that the Cox chain (of which plaintiffs formed a part) never used such contracts. We are determining the fair market value of this plant and these tangible assets which plaintiffs actually received in the spring of 1959, in the state in which they were acquired-not what the seller had paid out or what plaintiffs and the broadcasting industry may do in other circumstances. If the seller of this property did not pay out 'turnkey' costs to another, it assumed or bore them itself in this instance, and would undoubtedly seek to charge its buyers for them if it could. The fact that the plant was new would be irrelevant if, as we think clear, the cost and worth of a new 'turnkey' plant exceeds that of a new plant which has not been tested and coordinated, and is not guaranteed to be in good working shape. There is no sound reason to believe that plaintiffs or any other purchaser of these assets in the Charlotte market would not have paid such an increment in 1959 in order to obtain the plant in its then operating condition.

Plaintiff's appraiser, Horace W. Gross, arrived at a total reproduction **\*\*681** cost of the tangible assets of $2,696,964-$518,892 above the total reproduction costs of the individual assets-which he termed 'turnkey value.' He used the agreed **\*590** reproduction costs of the individual assets and added costs which would have been incurred in their assembly into a fully operational plant under a turnkey contract with guaranteed performance. [2] No element of profitability was included in such computation, except,

of course, the profit to be realized by the contractor on the construction project.

[1] Mr. Gross' assessment of the total reproduction cost was accepted by the trial judge as reasonable and sufficiently accurate. We have no ground for rejecting the trial judge's general appraisal of this evidence. He did reduce the total to $2,600,000 because the WSOC plant and facilities had been in operation for about 2 years and some minor wear and tear would have occurred, but plaintiff correctly observes that the appraiser's assessment already took account of depreciation (insofar as it had occurred) and that at the trial stage defendant did not seek any reduction from the total of the reproduction cost figures for the individual items. In those circumstances the reduction was not warranted. We therefore find the total reproduction cost (including the 'turnkey' factor) to be $2,696,964.

B. To his total reproduction cost of $2,696,964, Mr. Gross added almost $1 million to arrive at his total fair market value of all tangible assets in the sum of $3,636,783, which he termed the 'immediate use value' as of June 1, 1959. He based this increment on the financial benefit to be derived by Carolina from the immediate and continuing use of the broadcast facility during the period after June 1, 1959, which would have been required to construct an equivalent plant. Such a construction period would have been 2 years, absent lengthy delays. The television industry was affluent in 1959, there was considerable demand for broadcasting equipment, and some delays were reasonably to be expected.

In the appraiser's view, the financial benefit to be derived from immediate and continuing broadcast operations over the 2-year construction period was primarily that Carolina would realize net earnings and cash flow which would otherwise be lost during such period, and also that Carolina could increase its rate of earnings during such period to a point **\*591** above that which could be expected at the commencement of operations delayed to the end of the construction period, and that Carolina would effect savings in unproductive overhead, such as salaries and taxes, which would be incurred in such period.

The trial judge considered the increment sought by taxpayers to be too high but he accepted an additional sum of $600,000 (over and above the total reproduction cost, including the 'turnkey' increment) as part of depreciable fair market value of the tangible assets. We cannot agree that in this case any

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 317 of 651

Miami Val. Broadcasting Corp. v. U.S., 204 Ct.Cl. 582 (1974)
499 F.2d 677, 30 Rad. Reg. 2d (P & F) 907, 34 A.F.T.R.2d 74-5253, 74-2 USTC P 9525

extra sum is allowable (over total reproduction cost) for the purposes of depreciation.

 **[2]**    Insofar as this additional amount is intended to reflect the increased value of the individual tangible assets because they were assembled, installed, integrated, tested, coordinated, and in operating order, that type of increment is already reflected, as shown supra, in our figure for total reproduction cost. To the extent that the extra $600,000 (or more) is thought to represent pure goodwill, it is of course not depreciable or amortizable. Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 683 n. 8 (5th Cir. 1971); cf. Meredith Broadcasting Co. v. United States, 186 Ct.Cl. 1, 18-21, 405 F.2d 1214, 1224-1225 (1968).

 **[3]**    If the supplement stands for a separate 'going concern value'-in the **\*\*682** sense of the special value inherent in a functioning established plant continuing to operate, to do business, and to earn money, with its staff and personnel-then that element, too, is not to be considered as an enhancement in the market value of depreciable assets for the purposes of depreciation. United States v. Cornish, 348 F.2d 175, 185-186 (9th Cir. 1965); Winn-Dixie Montgomery, Inc. v. United States, supra, 444 F.2d at 685; Northern Natural Gas Co. v. United States, 470 F.2d 1107, 1109-1110 (8th Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). As the Eighth Circuit said in Northern Natural Gas Co.:
This allowance for depreciation is intended to provide a nontaxable fund to restore income-producing assets at the end of their useful life and their capacity to produce income has ceased or, to allow a taxpayer to recoup his investment in wasting assets free of income tax. (citation omitted) With this in mind, we conclude that the basis **\*592** for depreciation of a purchaser of a going concern should not include the 'enhanced' portion of the acquired assets' value. Though the assets of a going concern may have a greater actual value when acquired in their combined form and therefore cost more to acquire, at the end of these assets' useful life they will not be separately replaced with new tanks and cylinders (the assets in that case) with like enhanced value, but only by tanks and cylinders at the ordinary prices of suppliers. The going concern value or enhancement in the assets' value remains and is independent of the exhaustion of the individual assets. See Cornish, supra (348 F.2d) at 185.

We do not view our holding as being in conflict with (Int.Rev.Code) § 1012 which dictates that the basis for depreciation shall be the cost of the acquired property. This was not a transaction involving the purchase of assets with a fair market value of X dollars which, following the end of their useful life, will be replaced by like assets of similar cost. Here, the acquired assets carried additional value due to their being combined in a particular manner in a going concern and this additional value will not depreciate but will continue to exist possibly for the life of the business which acquired the assets.

For this reason a 'going concern' component cannot be used, for depreciation purposes, as part of the basis of the depreciable tangible assets. [3]

 **[4]**    Taxpayers argue that the increment here does not represent such 'going concern value' but rather the element of immediate availability or immediate use value, i.e. the ability to have and to use the plant on June 1, 1959, rather than to have to wait some two years for its equivalent to be reproduced. It is said that, unlike the present case, in Northern Natural Gas Co. and Cornish (the leading cases on the non-depreciability **\*593** of an increment for 'going concern value') there was no contention or showing that replacement of the assets would take time or be delayed. Here the construction of an **\*\*683** equivalent plant would consume at least two years.

The difficulty is that, assuming that such an 'immediate use value' can sometimes enhance the fair market value of a tangible depreciable asset (see 1 J. Bonbright, Valuation of Property 157-58 (1937)), plaintiffs have not proved this to be such a case. Professor Bonbright warns that 'the practical difficulties of estimating in monetary terms those losses which would result from the delay are likely to be so serious that an appraiser or a court will not attempt it', and he pointed out that the common law tends to limit the appraisal to replacement cost 'through its vaguely defined restrictions against allowances for consequential speculative damages, speculative values, or lost opportunities to make a profit.' Ibid. This view cautions that, to be allowable at all, 'immediate use value' must be shown persuasively and clearly, and by a proper measure.

 **[5]**    The overall criterion is, as we emphasize again, fair market value, and we are not persuaded either (a) that in 1959 a 'willing buyer-willing seller' negotiation for this plant would have added an appreciable sum over total reproduction cost (including the 'turnkey' increment) for 'immediate use', or (b) that even if such an increment would have been added it would be measured by the anticipated profits from the

plant during the next two years. This is not, so far as we know, an instance in which buyers would be desperate or exceedingly anxious to obtain this plant at once; though plaintiffs wanted to enter the Charlotte market, there is no adequate showing that they were so intent on entering only that market, and entering it in the spring of 1959, that they (or any other purchaser) would have paid a significant sum above total reproduction cost for this particular plant at that particular time. [4] Combined with this great factor of doubt is the unlikelihood that, if any increment were added at all, plaintiffs would agree to have it gauged by the 'lost' profits **\*594** of an equivalent plant for the next two years; there is no reason to believe that if the taxpayers had had to wait for two years for a plant they would not have used their capital to good advantage in some other or substitute endeavor to make up at least a good part of these so-called 'lost' profits. [5] Fair market value of the tangible property would not be enhanced, if at all, by the full amount of the so-called 'lost profits.' Indeed, the use of full profitability as the measure smacks of 'going concern value' rather than an 'immediate use' increment-and there is much in the evidence and the trial judge's discussion to suggest that a proper separation between the two concepts was not maintained in the presentation and consideration below. [6]

We are led by these grave doubts to hold that in this case plaintiffs have failed to prove the existence of any excess value in the tangible assets attributable to freedom from delay and, if any did exist, a correct standard of measurement. [7] The fair market value **\*\*684** of the tangible assets must stand at $2,696,964.

## II

The next set of issues involves the duration for amortization purposes of the ABC and NBC television affiliation contracts. [8]

Since the expiration of the DuMont television network in 1955, there have been only three national commercial television networks, CBS, NBC and ABC. They have been the **\*595** major source of high-level competitive programming for local stations. During the 1960's, CBS accounted for about 40 percent of all television network revenues. As between NBC and ABC, NBC has been stronger in overall program popularity and network service. [9]

Generally, in any market where the number of television stations is the same or greater than the number of networks, and where there are at least three competitive stations, each of the three networks enters into an exclusive affiliation contract with one television station in that market. This is a standard primary affiliation contract for which the station does not pay the network. Such contract provides inter alia that: (1) the network, at its own expense, will provide programming to the station; (2) the network promises the station to offer it first call for all programs broadcast in that community; and (3) the network agrees to pay the station a specified percentage of the station's network time rate paid to the network by the national advertiser sponsoring the network program.

Commercial television is dependent upon revenues from advertisers. Advertisers seek large audiences, and the popularity of television programs is of paramount importance to them, whether on a national, regional or local basis. Network programs generally have substantially exceeded local programming in popularity, and network affiliated stations have in general attracted much larger audiences than independent stations in the same market. Only in the very large markets, such as New York City, Chicago, San Francisco-Oakland, and Washington, D.C., have independent stations been able to attract audiences comparable to those of affiliated stations, and thus to attain comparable revenues. For the various reasons detailed in the findings of fact herein, the economics of the television industry is such that generally and affiliated station has substantially greater advertising revenues and profits than an independent station in the same market. One very important factor is that an affiliated station not only receives its share of the revenues from **\*596** the sale of network time to national advertisers, whose announcements are interspersed throughout a network program, but also revenues from sale by such station (without network involvement) to national and local advertisers of the highly lucrative adjacencies to network programs, the intervals of time reserved to the affiliated station between network programs or between segments of long network programs. The use by national advertisers of adjacencies is called 'national spot' advertising, sold by an advertising agency or agencies of the local affiliated station, subject only to a sales commission.

Network affiliation is such a powerful factor in the concentration of profitability in the television industry that the relationship **\*\*685** between each television network and one local station in a given market, as extended throughout the nation, has been termed an oligopoly. However, the

national network systems stem in substantial part from the circumstance that only a few of the 12 very high frequency (VHF) channels are available for television broadcasting in a given market, and despite the availability of 70 ultra high frequency (UHF) channels in recent years, television networks have continued to favor VHF stations, because UHF commercial stations have generally failed to become competitive for technical and other reasons.

On the date of liquidation of WSOC company, June 1, 1959, there were only two commercial television stations operating in the Charlotte, North Carolina, market. These were both VHF stations, one being subject station, WSOC-TV (Channel 9), and the other WBTV (Channel 3). No other VHF station has ever operated in that market. In 1961, the FCC refused to allocate another VHF channel there.

The strongest of the two stations was WBTV, which commenced operations in July 1949. Until 1957, when subject station commenced operations, WBTV maintained network affiliations with all three television networks, but thereafter was exclusively affiliated with CBS.

Subject station, WSOC-TV, began broadcasting in April 1957, and immediately obtained primary affiliation contracts with both NBC and ABC, maintaining such dual affiliation until September 30, 1967, when it terminated the ABC contract, **\*597** and thereafter has had exclusive affiliation with NBC.

In November 1964, UHF commercial station WCCB-TV (Channel 18) commenced operations in the Charlotte market, and has remained in continuous operation since that time. When WSOC-TV terminated its ABC contract in 1967, WCCB-TV became and has remained affiliated with that network.

The only other commercial television station ever broadcasting in the Charlotte market was another UHF station, WCTU-TV (Channel 36), which began broadcasting in July 1967, and has continued to the present time, being an independent station, unaffiliated with any network.

Since the advent of television, the FCC has sought to provide multiple competitive television broadcasting in the larger cities, and in particular has attempted in each of the top 50 markets, which on June 1, 1959, included Charlotte, North Carolina, as the 25th market in audience size, to provide at least three competitive television stations. ABC, having

a lesser number of affiliated stations than CBS and NBC, has consistently exerted pressure toward that end, obviously supported nationwide by its affiliated stations.

In 1952, the FCC allocated 70 UHF channels to television, and expressed the hope that the UHF band would be fully utilized, and that UHF television stations would compete on a favorable basis with VHF as an integral part of a single, nationwide television service. It was even contemplated that commercial television might be transferred from the VHF to the UHF band.

In the late 1950's, it had become apparent that UHF television had not become competitive with VHF, and the FCC proposed allocation of a third VHF station in a number of markets, including Charlotte, North Carolina, although such proposal was rejected in 1961.

In 1959, the FCC recommended the enactment by Congress of the All-Channel Receiver legislation, prohibiting shipment in interstate commerce of new television sets not equipped to receive both VHF and UHF signals. UHF television broadcasting had been seriously handicapped by the paucity of home sets equipped to receive its signals. Such legislation was, of course, enacted in time by Congress.

**\*598** Considering the circumstances existing in the Charlotte, North Carolina, market, and in the light of the actions and announced policies of the FCC, it **\*\*686** was reasonably predictable as of June 1, 1959, that within 10 years, a third commercial television station would become established and competitive in such market, that there would then be a restructuring of such market in the normal pattern of each television network being exclusively affiliated with one television station, that CBS would remain exclusively affiliated with the strongest station WBTV, that WSOC-TV (by Carolina) would move to make a choice between NBC and ABC for an exclusive affiliation, that both NBC and WSOC-TV would prefer and accomplish exclusive affiliation between them, and that ABC would be left to affiliate with the new competitive station in the market. These expectations actually came to pass.

[6]   From all of the evidence in this case, it is found that the ABC television network affiliation contract with WSOC-TV had a reasonably predictable life of 10 years as of June 1, 1959, with amortization of the cost basis of that asset to be computed accordingly during the taxable years in suit. The

Miami Val. Broadcasting Corp. v. U.S., 204 Ct.Cl. 582 (1974)
499 F.2d 677, 30 Rad. Reg. 2d (P & F) 907, 34 A.F.T.R.2d 74-5253, 74-2 USTC P 9525

Internal Revenue Service disallowed claimed amortization deductions for the ABC network contract.

With respect to WSOC-TV's television network affiliation contract with NBC, however, it is concluded that plaintiffs are not entitled to amortization deductions on Carolina's allocable cost of that asset during any of the taxably years in issue, because the testimony and evidence fail to establish that such affiliation contract had a reasonably ascertainable future life. Commissioner of Internal Revenue v. Indiana Broadcasting Corp., 350 F.2d 580 (7th Cr. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 645, 15 L.Ed.2d 539 (1966); Westinghouse Broadcasting Co. v. Commissioner of Internal Revenue, 309 F.2d 279 (3d Cir. 1962), cert. denied, 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963); Roy H. Park Broadcasting, Inc., 56 T.C. 784 (1971); Gulf Television Corp., 52 T.C. 1038 (1969).

Plaintiffs' position, controverted by defendant, is that the NBC television network affiliation contract had a useful life of not more than 30 years from June 1, 1959, seeking to have this court adopt the theory of plaintiff's expert witnesses, opposed by defendant's expert witnesses, that whether or not WSOC-TV's affiliation with NBC terminates by 1990, the **\*599** economic characteristics of such affiliation contract will be so different that it must be considered an entirely different asset than the contract acquired by Carolina in 1959, and that the value which Carolina paid for such contract in 1959 will have been exhausted by 1990. The factual basis for plaintiffs' predictions in this respect is set forth in the extensive findings of fact. Basically plaintiffs' argument is that in the light of the pronouncements and actions of the FCC to foster competition and attain diversity of programming in television broadcasting, the growth of competitive television outlets, both commercial and otherwise, and natural forces inherent in commercial television must inevitably eliminate the network-affiliate oligopoly. Plaintiffs state that they expect the television networks and their affiliates to continue to operate profitably, but that the value of a television station's affiliation with a network will be exhausted in the time indicated.

The competitive forces upon which plaintiffs rely are in the main the pronouncements of the FCC against the control of supply of television programming by the three networks, FCC actions toward providing greater competition and additional outlets within a given market, the availability of the UHF band for licensing and operation of additional stations, and the nature, state of development and competitive potential

of noncommercial public or educational television (PTV), subscription television (STV), and cable or community antenna television (CATV).

Upon careful consideration of the opposing opinions of the expert witnesses, and upon consideration of all of the evidence **\*\*687** in this case, it is concluded that the record as a whole persuasively indicates that, as of 1959-1962, the NBC television network affiliation contract might be expected to remain in force for a wholly unpredictable period of time, and that the value of such contract would not be exhausted by any reasonably ascertainable time. The findings detail the facts as to the status of PTV. STV, and CATV, and the other circumstances which plaintiffs invoke. Suffice it here to say that we are not at all convinced by the plaintiffs' predictions that, as of 1959-1962, the demise of network **\*600** power was foreseeable by 1990 (or any other date). The preponderance of the evidence is to the contrary.

### III

There remain the questions of the allocation of cost basis to the television network affiliation contracts and to the FCC television license.[10]

Plaintiffs would have the court allocate $3,600,000 to the tangible assets (but see Part I, supra), thus leaving about $2,400,000 for allocation to the radio and television network affiliation contracts and the FCC radio and television licenses. Plaintiffs seek to have 90 percent of the residual sum (or about $2,200,000) allocated to the television network affiliation contracts with 55 percent of the latter sum to the NBC contract and 45 percent to the ABC contract. Thus, plaintiffs would have only about $200,000 allocated to the FCC television license and to the NBC radio network affiliation contract and radio licenses. Disregarding the radio network affiliation contract and the radio licenses, defendant seeks to have 80 percent of the residue (over the allocation to the tangible assets and other agreed values) allocated to the FCC television license, 14 percent of the residue to the NBC television contract and 6 percent to the ABC contract.

The NBC radio network affiliation contract and the FCC radio licenses had minimal values. Neither of such intangibles is shown to have an ascertainable future life, which is also the case with respect to the FCC television license and the NBC television network affiliation contract. Consequently the radio contract and the radio licenses are lumped respectively

Miami Val. Broadcasting Corp. v. U.S., 204 Ct.Cl. 582 (1974)

499 F.2d 677, 30 Rad. Reg. 2d (P & F) 907, 34 A.F.T.R.2d 74-5253, 74-2 USTC P 9525

with the NBC television network contract and the television license in allocating basis to the three remaining intangibles, i.e., the two network television contracts and the FCC television license.

The adjudicated cases cited by the parties furnish little in the way of guidelines for the allocation of basis to the intangibles in this case, but rather indicate that the determination **\*601** must be made largely on the facts and circumstances peculiar to each case. Mathematical precision is impossible, and the broadest kind of estimates must be made. Meredith Broadcasting Co. v. United States, 405 F.2d 1214, 1227, 186 Ct.Cl. 1, 24 (1968). See Roy H. Park Broadcasting, Inc., supra; Indiana Broadcasting Corp., 41 T.C. 793 (1964), rev'd on other grounds, Commissioner v. Indiana Broadcasting Corp., supra.

Within the framework of the evidence adduced in this case, it is concluded that plaintiffs and defendant both seek unreasonable allocations in furtherance of their purposes, and that the percentages of the residue fairly and reasonably allocable to the three intangibles as of June 1, 1959, and during the taxable years in suit, are as follows: NBC television network affiliation contract, 39%; ABC television network affiliation contract, 26%; and the FCC television license, 35%.

**\*\*688** In Meredith Broadcasting Co. v. United States, supra, this court stated in the light of the facts and circumstances of that case that an FCC television license is, from a practical standpoint, a more permanent arrangement than network affiliation contracts, rejecting as unpersuasive the taxpayer's argument that the license had no value, that it was merely a license to lose money, and that profitability of operations should not be ascribed to the license, but rather to the network affiliation contracts. Nevertheless, the court recognized that the network affiliations had substantial value, even though there was considerable chance that they would continue to exist for only a relatively short period of time, as proved to be the case. The court allocated remaining basis 50 percent to the television network affiliation contracts, 35 percent to going concern value (including the licenses), and 15 percent to television advertising contracts.

An FCC television license has value in relation to its use in profitable, or potentially profitable operations. It can be transferred from one holder to another only with the approval of the FCC which administers a stringent policy against trafficking in broadcast licenses. In the circumstances existing in the Charlotte market, the WSOC television license had substantial value, because the WSOC operations **\*602** had been and were reasonably expected to be profitable. However, such license did not have overwhelming value merely because the WSOC television operations would not have existed without the license.

It is clearly established in this case that the profitability of the WSOC-TV operations, established as of June 1, 1959, by experience over the preceding 2 years, and reasonably expected to improve thereafter, was due to its television network affiliations. WSOC-TV's most valuable intangible assets were its NBC and ABC television network affiliation contracts. Unlike the gamble involved in the Meredith case, WSOC-TV reasonably could expect, as we have found, to retain the ABC affiliation for 10 years and the NBC affiliation indefinitely and much longer.

Of course, with WBTV exclusively affiliated with CBS, and with no other competitive station in the Charlotte market, WSOC-TV was assured of affiliations with NBC and ABC for the asking and without cost in 1959. Obviously the sellers of WSOC-TV would not have operated their television broadcast business without obtaining such readily available affiliations, and they must have regarded such affiliations as valuable assets of their business. The actual existence of such affiliations, as well as their ready availability and prospective long lives, figured prominently in the decision of the buyer to purchase, and the buyer and sellers must have given full consideration to these circumstances in fixing of the agreed purchase price. It cannot be found that such affiliations had little or no value, because they could have been readily obtained by the buyer without cost, assuming unrealistically that they did not exist at the time of the sale agreement in 1959.

The detailed facts which establish the prospective profitability of the WSOC-TV operations are set forth in the extensive findings of fact made in this case, repetition of which would unduly prolong this opinion.

Mention must be made, however, of the circumstance that in the appraisal report prepared by Horace W. Gross for plaintiff in 1959, the fair market values of the NBC and **\*603** ABC television network affiliation contracts were determined respectively to be only in the sums of $665,990 and $471,476. These low values stemmed from mistaken assumptions that such contracts would terminate in 1963.

Case 1:13-cv-00402-RTH Document 111-1 Filed 03/31/16 Page 322 of 651

Miami Val. Broadcasting Corp. v. U.S., 204 Ct.Cl. 582 (1974)
499 F.2d 677, 30 Rad. Reg. 2d (P & F) 907, 34 A.F.T.R.2d 74-5253, 74-2 USTC P 9525

In his testimony before this court in 1971, Mr. Gross stated that if he had assumed in 1959 that the ABC contract **689 had a life of 8 years (and it was in fact terminated in 1967) and that the NBC contract then had a 30-year (as plaintiff now argues), or even an indefinite life, he would have valued such contracts respectively over 8- and 10-year periods. The use of the 10-year period for the NBC contract, he explained, was because a buyer would seek to recover his investment in the television station within that period of time, as was said to be usual in the industry.

Based on 8 years for the ABC contract and 10 years for the NBC contract, he calculated that such contracts had a total value of $2,194,000 in 1959. In doing so, he took the 1958 television network revenues of WSOC-TV ($307,379 from NBC and $198,521 from ABC), the basis of his appraisal in 1959, and by increasing the 1958 network revenues from each network at the rate of 6.7 percent per year, he arrived at the amount of the expected ABC revenues for the next 8 years, and at the amount of the expected NBC revenues for the next 10 years. He then discounted such future earnings, as to each network, on an annuity basis to arrive at separate values for the network contracts, and then added these two discount values to reach his total appraised amount for both contracts as of 1959.

In allocating the total appraised amount to the two network contracts, he considered such factors as WSOC-TV's opportunity to exert leverage on each of the two networks for better station rates on the basis of competition for the station's time, increased revenues to be derived from having both networks, improved station programming because of choice between competing programs of the two networks on the basis of relative popularity, and the avoidance of local program expense by maximum use of the network programs of both networks to fill the station time.

*604 Taking these factors into consideration, Mr. Gross concluded that the NBC contract, with the programs of that network being the more popular, was worth more in 1959 to WSOC-TV than the ABC contract. He allocated 55 percent of the total value of the television network affiliation contracts to the NBC contract and 45 percent to ABC.

No weight is given to the fair market values of the television network affiliations contracts reached by Mr. Gross in his 1959 appraisal, because of his mistaken assumption as to the lives of such contracts, but careful consideration is given to his 1971 appraisal, in the light of all of the evidence relating to profitability of operations of WSOC-TV.

IV

In summary, it is concluded that the total cost basis of Carolina in the sum of $6,719,696 for all assets acquired by Carolina upon liquidation of WSOC company as of June 1, 1959, was allocable as of that date to the various assets involved, as follows:

| | |
|---|---:|
| Cash.................................................................... | $ 193,122.00 |
| Accounts receivable.............................................. | 231,348.00 |
| All other tangible assets........................................ | 2,696,964.00 |
| Transmitter site lease........................................... | 84,076.00 |
| Film contracts..................................................... | 209,917.00 |
| NBC television network affiliation......................... | |
| contract.............................................................. | 1,288,663.91 |
| ABC television network affiliation.......................... | |
| contract.............................................................. | 859,109.94 |
| FCC television license.......................................... | 1,156,495.15 |
| Total cost basis.................................................... | $6,719,696 |

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 323 of 651

Miami Val. Broadcasting Corp. v. U.S., 204 Ct.Cl. 582 (1974)
499 F.2d 677, 30 Rad. Reg. 2d (P & F) 907, 34 A.F.T.R.2d 74-5253, 74-2 USTC P 9525

Since plaintiffs are entitled to additional depreciation and amortization deductions over and above those allowed by the Internal Revenue Service for the taxable years in issue, it is concluded that plaintiffs are entitled to recover, with the amounts of recovery to be determined in further proceedings under Rule 131(c).

Upon the findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 131(c).

**All Citations**

204 Ct.Cl. 582, 499 F.2d 677, 30 Rad. Reg. 2d (P & F) 907, 34 A.F.T.R.2d 74-5253, 74-2 USTC P 9525

CONCLUSION OF LAW

Footnotes

[*] Parts II and III of this opinion incorporate, with minor additions and with modifications needed to adjust to our conclusions in Part I, the relevant segments of the opinion of Trial Judge Hogenson. In Part I, A, we agree with the trial judge's conclusion with a modification; in Part I, B, we come to a different result. We adopt, with changes reflecting our conclusions in this opinion, the trial judge's numbered findings of fact, but we think it unnecessary to print them for general distribution.

[1] Contemporary sales of comparable property have been recognized as normally the reliable and preferable test of fair market value. But that approach seems inapplicable to the market value of a broadcast business, or to its tangible or intangible assets, because the nature of the broadcast industry is that incomparability is the hallmark of individual radio and television stations, not only from market to market throughout the country, but even within any given market or area. Reproduction cost, basically used by the appraisers in this case to assess the fair market value of the tangible assets and accepted by both sides, is a relevant factor when reasonably applied, but it must be recognized that in certain circumstances fair market value may be more or less than the strict reproduction cost of the property appraised. Jack Daniel Distillery v. United States, 379 F.2d 569, 578, 180 Ct.Cl. 308, 323 (1967).

[2] Defendant challenges Mr. Gross' 'turnkey' increments but on this record we consider them reasonable. The witness explained the items and there was no contradictory testimony or evidence.

[3] Aside from two unclear Tax Court memorandum decisions which may have been referring primarily to 'turnkey' value (Philadelphia Steel & Iron Corp. v. Commissioner, 23 T.C.M. 558, 564 (1964); WEG Dial Telephone, Inc, v. Commissioner, 25 T.C.M. 233, 242 (1966)), there are no contrary rulings. Los Angeles Gas Co. v. R.R. Commission, 289 U.S. 287, 307, 313, 53 S.Ct. 637, 77 L.Ed. 1180 (1933), did not deal with tax depreciation but with the value of a utility for rate-making purposes. Similarly, Perrault v. Commissioner, 25 T.C. 439, 451 (1955), aff'd per curiam, 244 F.2d 408 (10th Cir. 1957), cert. denied sub. nom. Gunn v. Commissioner of Internal Revenue, 355 U.S. 830, 78 S.Ct. 41, 2 L.Ed.2d 42 (1957), did not involve the addition of 'going-concern value' to the depreciable basis of physical assets but enhancement of the value of a machine by a necessary patent. In Commissioner of Internal Revenue v. Seaboard Finance Co., 367 F.2d 646, 650-652 (9th Cir. 1966), there was no issue as to the amortizability or depreciability of 'going concern value' which the Tax Court had held not depreciable.

[4] Plaintiffs would add an increment of almost 40%. The trial judge's increment would be about 26%; he lowered plaintiff's figure only because he thought a portion of the added value, attributable to the expected profitability during the 2-year period, should be assigned to the intangible assets.

[5] The WSOC company seems to have operated its television station out of temporary or makeshift quarters until its television studio building was completed and equipped in January 1959.

[6] Defendant's two experts each added an increment to the reproduction cost of the individual items. It is quite unclear how much and whether these increments represented 'going concern value' (which we have held supra to be unallowable for depreciation purposes as a matter of law, even if proved as fact) rather than 'immediate use value.' It is also unclear how much of the increment, if any, the witnesses deemed depreciable. In any event, the court is not bound by such opinion testimony. Sternberger v. United States, 401 F.2d 1012, 1016, 185 Ct.Cl. 528, 535-536 (1968).

[7] In their last briefs to the court, taxpayers refer, alternatively, to the 'two year time saving' as a separate intangible asset amortizable over the two years. Without deciding that this issue is properly before us, we note that for the reasons given above plaintiffs have failed to prove the existence or worth of any such intangible.

[8] This Part incorporates, with our conclusion, the portion of Trial Judge Hogenson's opinion relating to these issues. The court agrees with and adopts this part of his opinion.

**Miami Val. Broadcasting Corp. v. U.S., 204 Ct.Cl. 582 (1974)**

499 F.2d 677, 30 Rad. Reg. 2d (P & F) 907, 34 A.F.T.R.2d 74-5253, 74-2 USTC P 9525

9 An excellent summary of the basic elements of television broadcasting and the contractual relationships between the television networks and local stations is set forth in this court's opinion in Meredith Broadcasting Co. v. United States, 405 F.2d 1214, 1216-1220, 186 Ct.Cl. 1, 4-11 (1968).

10 This Part incorporates the portion of the trial judge's opinion dealing with these matters, with the computation modifications made necessary by our conclusions in Part I, supra. Except for these changes in computation, the court sees no adequate reason to depart from the trial judge's considered allocation and therefore adopts his discussion of these matters.

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.    **0320** 12

🟨  KeyCite Yellow Flag - Negative Treatment

**Disagreed With by**   Zuanich v. Commissioner of Internal Revenue,
U.S.Tax Ct.,   August 20, 1981

544 F.2d 478
United States Court of Claims.

PACIFIC FAR EAST LINE, INC.

v.

The UNITED STATES.

No. 214—70.
|
Oct. 20, 1976.

Taxpayer brought action for refund for taxes paid pursuant to notice of deficiency based on reduction of investment tax credit. The Court of Claims, 513 F.2d 1355, 206 Ct.Cl. 378, granted taxpayer's motion for partial summary judgment. On cross motions for summary judgment with respect to questions reserved by the first opinion, the Court of Claims, Kashiwa, J., held that in determining basis for investment credit, taxpayer was not required to deduct from cost of ships funds representing down payments drawn from reserve funds maintained pursuant to operating-differential subsidy agreements with the Federal Maritime Board and the Maritime Administration and was not required to deduct subsequent mortgage payments drawn from the reserve funds and allocated to tax-deferred earnings.

Government's motion denied and taxpayer's motion granted.

Cowen, C.J., and Skelton, J., filed dissenting opinions.

West Headnotes (24)

**[1]**    **Statutes**
          🔑 Purpose and intent

Where the purpose of an act is specially treated, departure from the purpose defeats the legislative intent.

Cases that cite this headnote

**[2]**    **Internal Revenue**
          🔑 Investment Credit

Investment tax credit provisions of the Internal Revenue Code will be liberally construed, keeping in mind the purposes of the investment tax credit. 26 U.S.C.A. (I.R.C.1954) §§ 38, 46–48, 46(a)(1), (c)(1, 2), 48(a)(1), (b).

2 Cases that cite this headnote

**[3]**    **Internal Revenue**
          🔑 Investment Credit

The investment credit was not intended to be affected by the extent of taxation or the deferral of taxation on income that has produced funds used to make the investment that creates the credit. 26 U.S.C.A. (I.R.C.1954) §§ 38, 46–48, 46(a)(1), (c)(1, 2), 48(a)(1), (b).

Cases that cite this headnote

**[4]**    **Internal Revenue**
          🔑 Amount and computation

Treasury regulations providing that only the proportionate part of property with respect to which a deduction for depreciation is allowable qualifies for purpose of determining the amount of investment credit allowable had no application in determining whether taxpayer in computing basis for investment credit was required to deduct from cost of ships funds representing tax-deferred income from reserve funds. 26 U.S.C.A. (I.R.C.1954) §§ 38, 46–48, 46(a)(1), (c)(1, 2), 48(a)(1), (b).

5 Cases that cite this headnote

**[5]**    **Internal Revenue**
          🔑 Amount and computation

Fact that portion of cost of ships was not depreciable because that cost had already been recovered through prior tax deferrals did not remove that portion from the investment tax credit provisions. 26 U.S.C.A. (I.R.C.1954) §§ 38, 46–48, 46(a)(1), (c)(1, 2), 48(a)(1), (b).

Cases that cite this headnote

**[6]**    **Internal Revenue**
          🔑 Property for which credit may be taken

Taxpayer's 1947 agreement to accept reduction in basis of ships for depreciation, gain and loss purposes did not constitute a waiver of benefits conferred by the subsequent investment tax credit, and for purposes of the tax credit enactment, the basis provisions of the 1947 agreement were inoperative and basis or qualified investment for the calculation of the credit was to be determined under the investment tax provisions without reference to those provisions of the agreement. Merchant Marine Act, 1936, § 607 as amended 46 U.S.C.A. § 1177; 26 U.S.C.A. (I.R.C.1954) §§ 38, 46–48, 46(a)(1), (c)(1, 2), 48(a)(1), (b).

Cases that cite this headnote

**[7]   Statutes**
        Statutory scheme in general

A new enactment on a subject is to be taken as intended to fit into the existing scheme and to be given a conforming effect unless a different purpose is plainly shown.

Cases that cite this headnote

**[8]   Internal Revenue**
        Property for which credit may be taken

Inasmuch as the Maritime Act and the investment tax credit both deal with subsidized vessels, the investment tax credit was intended to fit into the existing system which necessarily included the special depreciation arrangement. Merchant Marine Act, 1936, § 607 as amended 46 U.S.C.A. § 1177; 26 U.S.C.A. (I.R.C.1954) §§ 38, 46–48, 46(a)(1), (c)(1, 2), 48(a)(1), (b).

Cases that cite this headnote

**[9]   Internal Revenue**
        Property for which credit may be taken

New closing agreement executed by taxpayer and Federal Maritime Board and Maritime Administration in 1964 would not be construed differently than 1947 agreement which was executed prior to enactment of investment tax credit provisions where the new agreement contained identical terms and conditions

concerning the nonrecognition of tax-deferred funds in the determination of cost basis and did not extend the scope of the 1947 agreement. Merchant Marine Act, 1936, § 607 as amended 46 U.S.C.A. § 1177; 26 U.S.C.A. (I.R.C.1954) §§ 38, 46–48, 46(a)(1), (c)(1, 2), 48(a)(1), (b).

1 Cases that cite this headnote

**[10]   Internal Revenue**
         Revenue rulings and letter rulings

Revenue ruling is not binding on courts.

2 Cases that cite this headnote

**[11]   Internal Revenue**
         Amount and computation

In determining basis for investment credit, taxpayer was not required to deduct from cost of ships those funds representing down payments drawn from reserve funds maintained pursuant to operating-differential subsidy agreements with the Federal Maritime Board and the Maritime Administration and was not required to deduct subsequent mortgage payments drawn from the reserve funds and allocated to tax-deferred earnings. Merchant Marine Act, 1936, § 607 as amended 46 U.S.C.A. § 1177; 26 U.S.C.A. (I.R.C.1954) §§ 38, 46–48, 46(a)(1), (c)(1, 2), 48(a)(1), (b).

3 Cases that cite this headnote

**[12]   Internal Revenue**
         Construction and Operation of Revenue Laws in General
         **Internal Revenue**
         Construction and Operation

The tax statutes and regulations must be applied as written and without any equitable consideration of the desirability of offsetting prior tax benefits.

Cases that cite this headnote

**[13]   Internal Revenue**
         Investment Credit

The legislative purpose in providing for a credit for investment in certain depreciable property, in the case of both regulated and non-regulated industries, was to encourage modernization and expansion of the Nation's productive facilities and to improve its economic potential by reducing the net cost of acquiring new equipment, thereby increasing the earnings of the new facilities over their productive lives.

2 Cases that cite this headnote

**[14]    Internal Revenue**
　　　　 Persons entitled

Where the purpose of an act is specially treated, departure from the purpose defeats the legislative intent. Thus, where it was the legislative intent that a credit for investment in certain depreciable property applies to both regulated and non-regulated industries, the special reference in H.R. Report No. 2508, 87th Cong., 2d Sess., 14, to regulated industries should not be considered lightly.

Cases that cite this headnote

**[15]    Internal Revenue**
　　　　 Investment Credit

In applying various sections of the investment credit statute, the Revenue Act should be interpreted liberally in keeping with its purpose.

1 Cases that cite this headnote

**[16]    Internal Revenue**
　　　　 Amount and computation

In determining whether plaintiff's investment in its ships qualifies for investment tax credit, Secs. 38 and 46-48 of the Code, as well as the legislative history and implementing Treasury regulations, do not state that "qualified investment" should exclude investment funds derived from untaxed, tax-exempt or tax-deferred income, and absent such restriction, there is no warrant for creating one. The cost of property to the taxpayer is the amount of money that he paid to acquire the property, whatever the source of the money.

4 Cases that cite this headnote

**[17]    Internal Revenue**
　　　　 Investment Credit

Where invested funds are derived from income on which the taxpayer's taxes have been reduced by an investment credit on other property, as demonstrated by S. Rep. No. 1881 at 11-12 Congress explicitly contemplated that a further credit should be allowed on the reinvestment.

Cases that cite this headnote

**[18]    Internal Revenue**
　　　　 Persons entitled

The legislative history relating to the investment tax credit indicates that transportation industries, regulated and nonregulated, were to receive such credit.

Cases that cite this headnote

**[19]    Internal Revenue**
　　　　  Property for which credit may be taken

Treas. Reg. s 1.48-1(b)(2)(1964) is inapplicable to property such as the subject ships purchased by plaintiff under operating-differential subsidy agreements and used 100% in its trade or business.

Cases that cite this headnote

**[20]    Internal Revenue**
　　　　 Amount and computation

Since the 1947 and 1954 tax closing agreements were entered into many years prior to enactment of the investment tax credit, the parties did not anticipate the tax credit, and thus the agreements to accept reduction in basis for depreciation, gain and loss purposes did not constitute a waiver of benefits conferred by the subsequent investment tax credit. Therefore, for purpose of the investment tax credit enactment, the basis provisions of the closing agreements are inoperative, and basis or qualified investment for calculation of the credit is to be determined under

the investment tax provisions without reference to those provisions of the agreements.

1 Cases that cite this headnote

**[21]   Internal Revenue**
     Investment Credit

A new enactment on a subject is to be taken as intended to fit into the existing system and to be given a conforming effect unless a different purpose is plainly shown. Thus, when Congress included in the Revenue Act of 1962 the special provision relating to documented vessels purchased under operating and construction subsidy agreements, it was the intent that the investment tax credit fit into the existing system which necessarily included the Merchant Marine Act of 1936 and the special depreciation arrangement as provided in the closing agreements.

1 Cases that cite this headnote

**[22]   Internal Revenue**
     Amount and computation

Since the court has determined that the tax-deferred source of the funds used to originally acquire the subject ships does not affect their bases for the investment tax credit, it must follow where such funds are used to reduce the mortgages thereon. Once the bases of the ships are determined and the investment credit calculated, the tax-deferred nature of the funds used to subsequently pay off the mortgages is irrelevant.

1 Cases that cite this headnote

**[23]   Internal Revenue**
     Revenue rulings and letter rulings

A Revenue Ruling may be helpful in interpreting a statute, but it is not binding on the Secretary or the courts. It does not have the effect of a regulation or a Treasury decision.

4 Cases that cite this headnote

**[24]   Internal Revenue**

     Amount and computation

A method for computing investment tax credit wherein only such of the investment is qualified investment as does not have its source in tax-deferred income on deposit in the reserve funds required by 46 U.S.C.A. § 1177 (1964) would be inconsistent with the legislative purpose to increase the profitability of the investment.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*479   \*74**  Mark P. Schlefer, Washington, D.C., attorney of record, for plaintiff. T.S.L. Perlman, Leonard Egan, Stephen T. Owen, Kominers, Fort, Schlefer & Boyer, Washington, D.C., of counsel.

Fenton P. Wilkinson, Washington, D.C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D.C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D.C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

**\*71**  ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge:

This tax refund action concerning the investment tax credit provisions of the Internal Revenue Code of 1954, ss 38, **\*75**  46—48,[1]  has previously been before this court. On March 19, 1975, this court granted plaintiff's motion for partial summary judgment, **\*\*480**  holding that plaintiff's credit should have been computed upon its entire bases in the ships, rather than upon only a ratable portion attributable to construction work done in 1962 as defendant contended. Pacific Far East Line, Inc. v. United States, 513 F.2d 1355, 206 Ct.Cl. 378 (1975).[2]  We shall hereinafter refer to said March 19, 1975, opinion as the first opinion.

The case is again on cross motions for summary judgment and raises the following two questions reserved by the first opinion:

1. Whether from plaintiff's cost of the ships should be deducted that portion derived from tax deferred earnings deposited in plaintiff's reserve funds to arrive at plaintiff's qualified investment for the investment credit?

2. Whether from plaintiff's qualified investment should be deducted the amount of subsequent mortgage payments made by plaintiff from tax deferred earnings?

Affidavits have been filed by plaintiff in support of its motion for summary judgment. The pleadings and the affidavits filed show that there is no genuine issue of material fact. For the reasons stated below, we grant plaintiff's motion for summary judgment and deny defendant's cross motion.

Plaintiff has been, continuously since 1953, a contractor under operating-differential subsidy agreements with the federal Maritime Board and the Maritime Administration (hereinafter either will be referred to as Maritime).[3] 'To insure * * * the replacement of the contractor's subsidized vessels as may be required,' s 607 of the Merchant Marine **76** Act of 1936 (MMA) required contractors, including plaintiff, to create and maintain a 'capital reserve fund.' 46 U.S.C. s 1177 (1964). In this fund plaintiff was required to deposit amounts equal to (1) the annual depreciation charges on its subsidized ships, (2) insurance proceeds from losses of subsidized ships, (3) the proceeds of sales of such ships, and (4) certain portions of its net profits, viz. (a) half of all profits in excess of 10 per cent per annum, (b) such further portion as Maritime might deem necessary to build up a vessel replacement fund and (c) such further portion as the contractor might elect with Maritime's approval. From the 'capital reserve fund' the statute permitted the contractor to 'make disbursements for the purchase of replacement vessels' and to 'pay the principal, when due, on all notes secured by mortgage on the subsidized vessels.' 46 U.S.C. s 1177(b) (1964).

Also, 'to insure the continued maintenance and successful operation of the subsidized vessels' the contractor must create a 'special reserve fund' into which he shall deposit certain excess profits. 46 U.S.C. s 1177(c)(1964). The statute went on to provide (46 U.S.C. ss 1177(f), (h) (1964)) that upon the termination of the subsidy contract 'the reserve funds * * * shall be the property of the contractor * * *.' and that '(t)he

earnings * * * deposited in the contractor's reserve funds as provided in this section * * * shall be exempt from all Federal taxes.' (Hereinafter, capital reserve fund and special reserve fund will be referred to collectively as reserve funds.)

In 1947, several years before plaintiff became subsidized, shipowners then subsidized entered into tax closing agreements with the Commissioner of Internal Revenue (Commissioner). Those closing agreements provided that all earnings after 1946 deposited in the lines' reserve funds should be **481** 'tax-deferred income.'[4] The closing agreements defined tax deferred as meaning the income is not taxed but is not recognized in 'cost basis' or 'invested capital.' This provision contained the following proviso: 'provided, however, that the *77 taxpayer shall not be bound by this commitment beginning with the calendar year in which a decision of any court, sustaining the contention that Section 607(h) of the Act (MMA) gives a tax exemption, instead of a Tax-defendant as herein provided, shall become final.' The closing agreements contained other provisions concerning the time of accrual of deposits, investment income of the reserve funds, the useful life of vessels for depreciation, and the allocation of funds between income and capital items.

In 1952, after plaintiff had applied for a subsidy, Maritime offered it a subsidy contract providing in part that 'No subsidy accrued hereunder shall be paid * * * unless the Operator is * * * a party to * * * a Closing Agreement similar in scope and effect, so far as applicable, to the Closing Agreements with the then subsidized Operators approved July 21, 1947 * * *.' Although it had no dispute with the Internal Revenue Service (IRS), plaintiff had no choice but to apply for and execute a closing agreement, in order to obtain the subsidy accruing to it. The Commissioner approved the agreement on April 13, 1954.

Like its predecessors, plaintiff's closing agreement provided that all earnings deposited in the reserve funds would be 'tax-deferred income' but that plaintiff would be relieved of the commitment when a court decided that s 607(h) of the MMA exempted the income from taxes. Pertinent provisions of plaintiff's closing agreement read as follows:

'Tax-deferred' or 'Tax-deferment' referring to ordinary income and capital gains deposited in Reserve Funds means that such items are not to be recognized as taxable income, except as provided in paragraph VI(c) hereof, and likewise are not to be recognized in the determination of cost basis or invested capital.

All earnings including capital gains, (not tax exempt under the Internal Revenue Code), which are deposited in the taxpayer's Reserve Funds, shall be taxdeferred income; provided, however, that the taxpayer shall not be bound by this commitment beginning with the calendar year in which a decision of any court, sustaining the contention that Section 607(h) of the Act (MMA) gives a tax exemption, instead of a Tax-deferment as herein provided, shall become final.

**\*78** Plaintiff's agreement also tracked the 1947 agreements in its provisions for useful life, accrual of deposits, investment income, and allocation of the reserves. In 1964 plaintiff entered into a new closing agreement merely changing the useful life of ships from 20 years to 25 years. We shall hereafter refer to plaintiff's closing agreements as the 1947 agreement because in substance they are the identical agreements that the other shipowners entered into in 1947.

From the beginning of its subsidized operations, in accordance with s 607 of the MMA, plaintiff made periodic deposits in its reserve funds. These included amounts equal to its depreciation expense on the subsidized ships and portions of its earnings.

In 1959, pursuant to the replacement provisions of its subsidy contract, plaintiff and Maritime contracted with Bethlehem Steel Company for the construction of the ships Philippine Bear and China Bear. While they were under construction the Revenue Act of 1962 providing for the investment credit was enacted. Bethlehem delivered the ships in 1962 and they then entered the plaintiff's subsidized service. Plaintiff used **\*\*482** them in its business of carrying cargo for hire between United States ports on the West Coast and the Far East.

Plaintiff paid $14,558,925 for the ships.[5] It financed these payments with $10,274,557 borrowed on the security of mortgages on the ships and $4,284,368 cash down payment from its own funds. The down payment included $1,406,416 of reserve funds moneys attributed to plaintiff's deposits of earnings treated as 'tax-deferred' and $2,877,952 of plaintiff's general moneys and reserve funds moneys attributed to deposits of funded depreciation or other forms of capital.

Since delivery of the ships plaintiff has made periodic payments of principal and interest on the mortgages. These payments were in part drawn from the reserve funds. The source of the reserve funds moneys included $1,912,332

allocated to plaintiff's earlier deposits of tax deferred earnings.

**\*79** In filing its federal income tax returns for 1962, 1963, and 1964,[6] plaintiff claimed an investment credit of $999,479, seven per cent of $14,278,270, which it then computed investment tax credit.[7] On audit the IRS reduced the credit to $146,410, then 'recaptured' $20,795 of that sum. The reduction reflected (i) the elimination of the portion (84.7 per cent) of plaintiff's cost that the IRS attributed to construction work before January 1, 1962, and (ii) the elimination of a further part of the cost on account of the $1,406,416 that had been part of plaintiff's down payment for the ships, that was drawn from the reserve funds, and that in accounting for those funds was allocated to tax deferred earnings. The 'recapture' reflected (iii) the elimination of a still further part of the cost on account of $1,912,332 of plaintiff's mortgage payments in 1962, 1963, and 1964 that had been drawn from its reserve funds and had been allocated to tax deferred earnings. The IRS issued a deficiency notice accordingly. Having paid the deficiency and having filed a claim for refund in the amount of $791,927.60, which was denied, plaintiff brought this action.[8] This court in its first opinion held that plaintiff's cost attributable to pre-1962 construction could properly be considered for the investment credit computation. The amounts which are presently at issue are payments by the plaintiff of tax deferred income from its reserve funds for the two ships it placed in service in 1962.

The issues are:

1. Whether the basis for the investment credit is plaintiff's cost or whether from that cost must be deducted **\*80** $1,406,416 representing down payments drawn from the reserve funds and allocated to tax deferred earnings, and

2. Whether from the cost should be further deducted $1,912,332 representing subsequent mortgage payments drawn from the reserve funds and allocated to tax deferred earnings.

In order to answer these questions we must first examine the relevant investment **\*\*483** tax credit provisions. The investment tax credit sections of the Internal Revenue Code of 1954 are s 38 and ss 46—48. Section 38 authorizes the allowance of a tax credit in an amount determined under ss 46—48. Section 46(a)(1) provides:

Pacific Far East Line, Inc. v. U. S., 211 Ct.Cl. 71 (1976)
544 F.2d 478, 38 A.F.T.R.2d 76-5958, 76-2 USTC P 9718

> The amount of the credit * * * shall be equal to 7 percent of the qualified investment (as defined in subsection (c)).

Subsection (c) (s 46(c)(1)) provides:
* * * the term 'qualified investment' means * * *

(A) the applicable percentage of the basis of each new section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year * * *. [9]

Section 48(a)(1) defines 'section 38' property' as follows:
* * * the term 'section 38' property' means—

(A) tangible personal property * * *

Such term includes only property with respect to which depreciation * * * is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.

(2) Property used outside the United States.—
(A) In general.—Except as provided in subparagraph (B), the term 'section 38' property' does not include property which is used predominantly outside the United States.
(B) Exceptions.—Subparagraph (A) shall not apply to—

**\*81** (iii) any vessel documented under the laws of the United States which is operated in the foreign or domestic commerce of the United States;

The investment tax credit reflects the legislature's decision to use the taxing system for economic ends. The credit was proposed by President Kennedy's tax message of 1961 to Congress, suggesting amendments to the tax laws to 'increase the modernization, productivity, and competitive status of American industry—to stimulate the expansion and growth of our economy' (H.R.Doc.No. 140, 87th Cong., 1st Sess. 1 (1961)). In his economic report of 1962 the President said (as quoted at H.R.Rep.No.1447, 87th Cong., 2d Sess. 7 (1962)):

> The centerpiece of these proposals is the * * * credit against tax

for gross investment in depreciable machinery and equipment. * * * The tax credit increases the profitably of productive investment by reducing the net cost of acquiring new equipment. It will stimulate investment in capacity expansion and modernization, contribute to growth of our productivity, and output, and increase the competitiveness of American exports in world markets.

See, also, H.R.Rep.No.1447, supra at 8; S.Rep.No.1881, 87th Cong., 2d Sess. 11 (1962).
 **[1]**   The conferees who reconciled the Senate and House reports adopted the following statement (H.R.Rep.No.2508, 87th Cong., 2d Sess. 14 (1962)):

> It is the understanding of the conferees on the part of both the House and the Senate that the purpose of the credit for investment in certain depreciable property, in the case of both regulated and non-regulated industries, is to encourage modernization and expansion of the Nation's productive facilities and to improve its economic potential by reducing the net cost of acquiring new equipment, thereby increasing the earnings of the new facilities over their productive lives.

It is significant that both the House and the Senate in the above statement made special **\*\*484** reference to regulated industries and that the major purpose was to reduce the cost of acquiring new equipment. It is common knowledge that regulated industries require expensive equipment costing millions **\*82** of dollars. Special reference to regulated industries, therefore, should not be considered lightly. Since the conferees on the part of both the Senate and the House held the same view, we deem the special reference very material in the discussion to follow. Where the purpose of an act is specially treated, departure from the purpose defeats the legislative intent. In Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 55 S.Ct. 50, 79 L.Ed. 211 (1934), the Court stated at 93—94, 55 S.Ct. at 54:

> * * * The intention of the lawmaker controls in the constructions of taxing acts as it does in the construction of

544 F.2d 478, 38 A.F.T.R.2d 76-5958, 76-2 USTC P 9718

other statutes, and that intention is to be ascertained, not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will. Compare Rein v. Lane, L.R. 2 Q.B. Cases 144, 151. The intention being thus disclosed, it is enough that the word or clause is reasonably susceptible of a meaning consonant therewith, whatever might be its meaning in another and different connection. * * *

[2]    Before we enter into a discussion of issues, we note that this court has held that s 38 and ss 46—48 should be liberally construed and, furthermore, that the purpose of the Revenue Act must be considered in construing these sections.

> * * * In applying various sections of the investment credit statute, this court and other courts have noted that the (Revenue) Act should be interpreted liberally in keeping with its purposes, * * * and this case is no exception. (Lykes Bros. Steamship Co. v. United States, 513 F.2d 1342, 1353, 206 Ct.Cl. 354, 375 (1975).)

Alabama Displays, Inc. v. United States, 507 F.2d 844, 848, 205 Ct.Cl. 716, 724 (1974); Weirick v. Commissioner, 62 T.C. 446, 453 (1974); Minot Federal Savings & Loan Ass'n v. United States, 435 F.2d 1368, 1372 (8th Cir. 1970). We shall again follow the rule of liberal construction in the discussion to follow, keeping in mind the purposes of the investment tax credit as above described. In this court's first opinion it incorporated the reasoning in Lykes Bros. and this court's opinions in both cases were unanimous. We should not discard *83 the rule of liberal construction midstream. The same statutes and facts are involved herein as in the first opinion.

Plaintiff first argues that plaintiff's investment in its ships qualifies for the investment tax credit irrespective of the source of the funds invested. Defendant responsively contends that only so much of the investment is qualified investment for the investment tax credit as did not have its source in tax deferred income on deposit in the reserve funds. We have weighed the arguments made by both parties. We find plaintiff's arguments more convincing.

We observed that s 46(c)(1), quoted above, defines qualified investment as 'the applicable percentage of the basis of each new section 38 property * * *.' Both the House Ways and Means Committee and the Senate Finance Committee reported, 'The basis of 'new section 38 property' is to be determined under the general rules for determining the basis of property. Thus, the basis of property purchased or constructed would generally be its cost.' S.Rep.No.1881, supra, at 143; H.R.Rep.No.1447, supra, at A7.

The Treasury's regulations implementing the investment credit provide (Treas.Reg. s 1.46—3(c) (1964)):

> (c) Basis or cost. (1) The basis of any new section 38 property shall be determined in accordance with the general rules for determining the basis of property. Thus, the basis of property would generally be its cost (see section 1012), unreduced by the adjustment to basis provided by section 48(g)(1) * * *and **485 any other adjustment to basis, such as that for depreciation, and would include all items properly included by the taxpayer in the depreciable basis of the property, such as installation and freight costs. * * *[10]

Section 1012, cited by the regulation, provides, 'The basis of property shall be the cost of such property, except as otherwise provided in this subchapter * * *.' and the Treasury's regulation interpreting s 1012 states, 'The cost is the amount paid for such property in cash or other property.' *84 Treas.Reg. s 1.1012—1 (1957). None of this contains the slightest indication that 'qualified investment' should exclude investment funds derived from untaxed, tax-exempt, or tax deferred income. It states that the qualified investment in a 'section 38 property' is the basis of that property, that the basis is its cost, and, except for instances not here applicable, that 'adjustments' to basis are to be disregarded. We believe that it is fair to say that the 'general rules for determining the basis of property,' referred to by the House and Senate Committees and the Treasury's regulation, have no reference to whether the funds spent as part of the 'cost' of the property

had their source in untaxed income. The cost of property to the taxpayer is the amount of money that he paid to acquire the property, whatever the source of the money.

As is true in this case, property is often acquired in whole or part with borrowed money; it is elementary that borrowed money is not taxed when received by the taxpayer from the lender, yet the Government could not—and does not here—contend that the taxpayer's qualified investment in the property is reduced by the amount of borrowed funds invested. The same would be true of an investment consisting in whole or in part of money received as a gift exempt from tax (s 102), of interest earned by the taxpayer on tax-exempt municipal bonds (s 103), of income earned abroad on which plaintiff pays no federal income tax because of the 'foreign tax credit' (s 33), or of retirement income subject to a 'retirement income credit' (s 37). Indeed, where the invested funds are derived from income on which the taxpayer's taxes have been reduced by an investment credit on other property, Congress explicitly contemplated that a further credit should be allowed on the reinvestment, for the legislative committees stated, 'It is your committee's intent that the financial assistance represented by the credit should itself be used for new investment, thereby further advancing the economy.' (S.Rep.No.1881, supra, at 11—12; cf. H.R.Rep.No.1447, supra, at 8.)

 [3]   In view of the vast array of credits, exemptions, deferrals, deductions, and different rates of tax on income laid down by Congress in intricate detail in the Internal Revenue Code  *85  it is unthinkable that the amount of the conceptually simple investment credit was intended—without a word of textual support—to be affected by the extent of taxation or the deferral of taxation on income that had produced funds used to make the investment that creates the credit. Such a result would cause the credit to vary in an unpredictable and arbitrary amount depending on all the countless array of prior events that affected taxpayers' effective rates of taxation on income earned years before. The operation of the credit would be infinitely capricious, and the accounting difficulties in tracing funds to their source and ascertaining the extent to which they had been taxed would be staggering. As the Fifth Circuit has said, 'We think that the tax statutes and regulations must be applied as written and without any equitable consideration of the desirability of offsetting prior tax benefits.'  **486  (Footnote omitted.) Greer v. Commissioner, 230 F.2d 490, 493—94 (5th Cir. 1956).

Such a method, as defendant propounds, of computing the credit would be inconsistent with the reiterated purpose of its sponsors, to increase the profitability of investment. Any restriction of the credit diminishes its effect in improving the profitability of the investment; that is as true of restrictions resting on the tax deferred character of the funds invested as of any other reduction. In the absence of any provision in the statute for such a restriction, we believe that there is no warrant for creating one.

We see that where Congress has intended to reduce the basis for the credit because of the source of the moneys invested, it has made express provision. An example is s 46(c)(4), added by the Senate, which provides that where property is destroyed or damaged by casualty, or stolen, and is insured, reinvestment of the insurance proceeds in replacement property is not eligible for the investment credit. The purpose was to prevent a windfall by an investment credit on insurance proceeds where the taxpayer has neither put up new funds nor expanded its business. Outside the sections dealing with the credit, nevertheless, incorporated into the investment credit provisions by s 1012 via s 46(c)(1) and regulations thereunder, s 362(c)(2) provides that if money is contributed to a corporation by a non-stockholder, any  *86  basis of property acquired within one year with such money shall be reduced by the amount of the contribution. In the absence of such expressed provision, Congress must have intended that the basis be the full amount of the moneys invested, undiminished by reason of events involved in the taxpayer's acquisition of the moneys.

We see that subsidized vessel owners are not different from other taxpayers in this respect. Although it was initially suggested that the investment tax credit not be made available to them, no such limitation was extended by Congress. On the contrary, s 48(a)(2) expressly covers 'any vessel documented under the laws of the United States.' The legislative history indicates that transportation industries, regulated and unregulated, were to receive the credit. This court so held in States Steamship Co. v. United States, supra note 3. As was there pointed out (428 F.2d at 837, 192 Ct.Cl. at 803):

> * * * it was the understanding of the conferees on the part of both the House and the Senate that the purpose of the credit was to encourage modernization and expansion of productive facilities in 'both regulated and nonregulated industries.' Moreover, it would be

anomalous indeed to deprive a subsidized industry of the benefit of the credit, since that would work at cross-purposes to the subsidy, which is provided to allow the carrier to compete economically. (Emphasis in original.)

[4]  Defendant, in taking its position that only so much of the investment is qualified investment as did not have its source in tax deferred income on deposit in the reserve funds, relies to a great extent on Treas.Reg. s 1.48—1(b)(2) (1964), which reads as follows:

> (2) If, for the taxable year in which property is placed in service, a deduction for depreciation is allowable to the taxpayer only with respect to a part of such property, then only the proportionate part of the property with respect to which such deduction is allowable qualifies as section 38 property for the purpose of determining the amount of credit allowable under section 38. Thus, for example, if property is used 80 percent of the time in a trade or business and is used 20 percent of the time for personal purposes, only 80 percent of the basis (or cost) of such property qualifies as section 38 property. Further, property does not qualify to the extent that a deduction **\*87** for depreciation thereon is disallowed under section 274 (relating to disallowance of certain entertainment, etc., expenses). (Emphasis supplied.)

In the text of its argument in its brief, defendant recited only the first sentence of the above-quoted subparagraph (2) and left **\*\*487** out entirely the portion we have emphasized. The first sentence would appear to apply to the situation at hand but we believe the portion emphasized by this court and significantly omitted by defendant places limitations on the first sentence. We do not think that the first sentence was meant to apply to the unique situation before us, particularly in light of the remainder of the regulation and for the other reasons as stated in this opinion. The emphasized portion clearly brings out the purpose of the regulation. It is a paraphrase of a statement that appears in both the House and Senate committee reports on the Revenue Act of 1962 which

stipulated that investment credit should be proportionately reduced to the extent property is used for personal or entertainment purposes. If, for example, an automobile is used 80 per cent for business purposes and 20 per cent for pleasure purposes, the rule allows only the 80 per cent to qualify as section 38 property. The difficulty is that in the present case the ships purchased by plaintiff were to be and are used 100 per cent in its trade or business. The regulation has absolutely no application in a case like the present. Further, s 274, relating to disallowance of certain entertainment expenses, also has no application herein. It is significant that defendant does not point to nor can the court suppose another situation in which the first sentence could apply.

We, therefore, hold that the above-recited s 1.48—1(b)(2) has no application herein.

However, defendant argues that since the investment tax credit is computed on depreciable property, plaintiff does not get the credit based on cost basis because under the 1947 agreement a lesser basis is used to determine depreciation and it is on this cost less contributions from the reserve funds basis that the credit should be measured. This brings us to an examination of the closing agreement and the reason why the basis for determining depreciation is not cost but a lesser amount.

**\*88**  Defendant's primary position is that to the extent the vessels were acquired with tax-free reserve funds, they were not 'section 38 property' because no depreciation was allowable thereon under the 1947 agreement. Defendant points to paragraph II of the agreement which states that money deposited in the reserve funds shall be 'tax-deferred income' and to paragraph I(d) which provides that the 'tax-deferred' funds are not to be recognized in the determination of cost basis. Since depreciation is allowed with respect to basis, and no depreciation may be claimed on the portion of the ships acquired with tax deferred funds, concomitantly, defendant contends that the investment credit does not extend to that portion of the vessel acquired with tax deferred funds. As a corollary, defendant argues that the term 'cost basis,' as used in the 1947 agreement, must have been meant to refer to 'basis' as defined in s 1012.

Any consideration of the primary position presented by defendant necessarily requires this court to analyze the practical effect of the standard 1947 agreement, which

other shipowners requesting subsidy entered into and which plaintiff entered into when it applied for subsidy.

 **[5]**    It is our opinion that the fact that a portion of the cost of the ships is not depreciable because that cost has already been recovered through prior tax deferrals does not remove that portion from the investment tax credit provisions. When the parties entered the 1947 agreement, they did not anticipate the investment tax credit which came years later. They were providing a method for the recovery of a part of the cost of a vessel prior to its being purchased. In order to avoid a double deduction after the vessel had been purchased, depreciation was not allowed on that part of the cost already recovered. However, in reality, the cost to the plaintiff is what is paid for the vessels. The fact that the plaintiff was allowed to recover a portion of that cost prior to purchase by untaxed earnings and the remainder of the cost after purchase by depreciation is no different than if plaintiff were allowed accelerated depreciation in the early years of the vessel resulting in a deferral of taxes on part of  **\*\*488**  its earnings to later years when its depreciation deduction would be lesser and, consequently, its income and its tax thereon would be greater.

 **\*89**  The fact that accelerated depreciation was to be taken on a property would not affect its basis for the investment credit. We believe that plaintiff gets the equivalent of accelerated depreciation deductions in the years earnings escape taxation by being deposited in its reserve funds. The untaxed earnings are subtracted from basis; the 1947 agreement thereby adjusts basis to insure that depreciation deductions shall not be taken on elements of cost recovered through other means, viz., the non-taxation of those elements when earned. Adjustments made to ensure that elements of cost are deducted only once are irrelevant to the purpose of the investment credit, viz., to reduce the initial cost. We conclude that the agreement provides for an arrangement which we shall hereafter refer to as the 'special depreciation arrangement.'[11]

 **[6]**    It is significant to this court that defendant does not in any portion of its briefs give its analysis of the special depreciation arrangement as plaintiff has done. We agree with plaintiff  **\*90**  that since the 1947 agreement was entered into many years prior to the enactment of the investment tax credit, the parties did not anticipate the tax credit. In this respect we refer to States Steamship Co. v. United States, supra. In States Steamship Co., this court held that Maritime could not adopt regulations reducing the benefit of the investment tax credit to subsidized operators and that the plaintiff's agreement to accept Maritime's method of computing the subsidy did not constitute a waiver of benefits conferred by the subsequent

investment credit. The court said (428 F.2d at 837, 192 Ct.Cl. at 804):

> \* \* \* It could not have been within the contemplation of either of the parties to bind themselves to any future changes in the tax laws, no matter how far-reaching or important. This is especially true where a whole new provision was inserted into the tax law in 1962 \* \* \*. (Emphasis in original.)

Likewise, in the instant case plaintiff's agreement to accept the reduction in basis for depreciation, gain, and loss purposes did not constitute a waiver of benefits conferred by the subsequent investment tax credit. Plaintiff's 1947 agreement affects  **\*\*489**  the basis of its ships only for the purposes of depreciation, gain, and loss involved in the tax deferral plan. The investment credit added a new use to the uses of the concept of basis. The basis provision in the 1947 agreement could not determine the basis of the ships for the investment tax credit because the enactment of the credit modified the assumptions of the parties as to the purposes for which basis was then relevant. Such a modification brings into play the saving clause in the 1947 agreement whereby the agreement is subject to changes in the law. The 'WITNESSETH' clause of plaintiff's agreement provides:

> \* \* \* any subsequent change or modification of applicable statutory law will render this agreement ineffective to the extent that it is dependent upon such law.

For purposes of the investment tax credit enactment, therefore, the basis provisions of the 1947 agreement are inoperative and basis or qualified investment for the calculation of the credit is to be determined under the investment tax provisions  **\*91**  without reference to those provisions of the agreement.

As defendant proposes, it is conceivable that the plaintiff could have purchased its vessels entirely with tax-free funds, in which case no portion of the cost would be recoverable through a method of depreciation. Applying defendant's premise, the plaintiff would not be entitled to the investment credit since the vessels would not be depreciable at all. This contention is tantamount to denying the investment credit

Pacific Far East Line, Inc. v. U. S., 211 Ct.Cl. 71 (1976)

544 F.2d 478, 38 A.F.T.R.2d 76-5958, 76-2 USTC P 9718

to all subsidized shipowners which use only reserve funds to purchase vessels. It is unlikely that Congress intended such a result. As demonstrated hereinabove, the investment credit was a novel concept designed to stimulate the economy by reducing the cost of capital assets. Furthermore, the legislative record shows a clear and consistent Congressional intent that subsidized operators should obtain the full benefit of the investment credit. The 1947 agreement was shown to be unrelated in purpose to the investment credit. It established a special depreciation arrangement whereby deposits of taxpayer's earnings in its statutory reserve funds resulted in a change in the method by which plaintiff takes depreciation deductions on its vessels. We deem that Congress understood the effect of the investment tax credit on the 1947 agreement, that Congress foresaw the possibility that a shipowner could have purchased a vessel entirely out of its reserve funds, and that Congress intended that such a shipowner should still be entitled to the tax credit.

 [7]    [8]    However, the defendant contends that there is no reference in the record to the subsidy agreement itself and, therefore, Congress had no notice of the special depreciation arrangement. It argues that these details were not shown in the record. We differ with the defendant because the 1947 agreement follows from the Maritime Act and that Act and the investment tax credit both deal with subsidized vessels. A new enactment on a subject is to be taken as intended to fit into the existing system and to be given a conforming effect unless a different purpose is plainly shown. United States v. Arizona, 295 U.S. 174, 191, 55 S.Ct. 666, 79 L.Ed. 1371 (1935); United States v. Jefferson Electric Manufacturing Co., 291 U.S. 386, 396, 54 S.Ct. 443, 78 L.Ed. 859 (1934); Maul v. United States, 274 U.S. 501, 508, 47 S.Ct. 735, 71 L.Ed. 1171 (1927). Anyone dealing **\*92** with the Maritime Act, which entails operating and construction subsidies, should have had some general knowledge of how the Maritime Act operates with the reserve funds requirements. Ship replacement without these reserve funds was impossible. The special depreciation arrangement which we have discussed above was a necessary portion of the entire reserve funds structure. From the legislative record we deem that when the special provision with relation to documented vessels was put in the Revenue Act of 1962, Congress knew from the very mention of the word 'subsidized' that subsidized ships were involved. This necessarily meant that the investment tax credit was intended to fit into the existing system which necessarily included the special depreciation arrangement. **\*\*490** We deem it also relevant to note that when the investment tax credit was originally introduced, it did not include vessels used outside of the United States but that in

the course of drafting the credit, Congress had before it, and rejected, the Treasury's view that the investment tax credit should not be made available to owners of vessels operating under an operating-differential agreement with Maritime. In fact, the decision to allow the credit on such vessels was explicitly criticized by the dissenting Congressional minority. As a result, we find that defendant's argument of no notice is unavailable.

 [9]    Defendant alternatively contends that even if plaintiff could benefit by this court's decision that the 1947 agreement was not applicable to the investment tax credit, the plaintiff could only benefit from such a decision for 1962 and 1963. The rationale for defendant's contention is that modification of the 1947 agreement was accomplished by execution of a new agreement in 1964; and, as a result, the years beginning with 1964 would be controlled by the new agreement, which could not be construed in the same manner the 1947 agreement was construed, viz., that the parties did not anticipate the investment tax credit. In answer to the defendant's argument, we deem it important again to note that the new agreement, as compared with the 1947 agreement, contained identical terms and conditions concerning the nonrecognition of tax deferred funds in the determination of cost basis, despite the fact that the new agreement was executed two years **\*93** after the enactment of the investment credit provisions. The 1964 agreement did not extend the scope of the 1947 agreement. Therefore, we find that the parties themselves have evidenced an understanding that the new closing agreement was not modified by the investment credit. In other words, the concept of cost basis as defined by the 1947 agreement carried over to the 1964 agreement and was unaffected by the investment credit provisions. In support of this holding, we deem it relevant to note that the IRS had not made its present position concerning the investment credit known to the plaintiff prior to the re-execution of the 1947 agreement in 1964. The first year in which the IRS made its position openly known was 1967; its position had not been announced in 1964 when the 1947 agreement was changed in the manner hereinabove described.

The first publication of the IRS position on the point is Rev. Rul. 67—395, 1967—2 Cum. Bull. 11. In that Ruling, the IRS addressed itself to the same situation as is presented here; however, no mention is made of the existence or terms of a closing agreement.

 [10]    We recognize that the above-cited Revenue Ruling is the IRS general position on this matter; nevertheless, this court has stated that a ruling 'may be helpful in interpreting

a statute, but it is not binding on the Secretary or the courts. It does not have the effect of a regulation or a Treasury Decision.' Stubbs, Overbeck s Associates, Inc. v. United States, 445 F.2d 1142, 1147 (5th Cir. 1971); Allstate Insurance Co. v. United States, 530 F.2d 378, 384, 209 Ct.Cl. 1, 11 (1976). The Court stated a similar proposition in Biddle v. Commissioner, 302 U.S. 573, 582, 58 S.Ct. 379, 82 L.Ed. 431 (1938): '* * * departmental rulings not promulgated by the Secretary are of little aid in interpreting a tax statute, Helvering v. New York Trust Co., 292 U.S. 455, 467—468, 54 S.Ct. 806, 810, 78 L.Ed. 1361, * * *.'

 [11]   Also at issue is the effect on the investment tax credit of subsequent mortgage payments drawn from the reserve funds and allocated to tax deferred earnings. Since the tax deferred source of the funds used to originally acquire the ships here does not affect their bases for the investment credit, the identical result must follow where the funds are used to reduce the mortgages. Once the bases of the vessels are determined  *94  and the investment credit calculated, we hold that the tax deferred nature of the funds used to subsequently pay off the mortgages on the vessels is irrelevant. We recognize the IRS litigating position as stated in  **491  Rev. Rul. 68—468, 1968—2 Cum. Bull. 26; however, again we refer to Allstate Insurance Co. v. United States, supra, and Biddle v. Commissioner, supra.

One other point should be mentioned. It is not necessary to decide whether the reserve funds are tax-exempt or tax deferred since plaintiff prevails in that the closing agreement does not affect plaintiff's basis for the investment credit.

CONCLUSION

For the reasons above, defendant's motion for summary judgment is denied, plaintiff's motion for summary judgment is granted, and the amount of recovery is to be determined pursuant to Rule 131(c).

COWEN, Chief Judge (dissenting).

The provisions of the Merchant Marine Act, 46 U.S.C. s 1101, et seq. (hereafter MMA or 'The Act'), as interpreted by the Maritime Administration, required shipowners to make deposits into the reserve funds to account for depreciation, not only for ships in existence but also for the future depreciation of ships yet to be built. The result was practically unique in that (1) depreciation was permitted and earnings

were exempted from tax for ships which had not yet been purchased; and (2) depreciation deposits generally exceeded the depreciation allowed for tax purposes. In the absence of the closing agreements, the shipowners might well have claimed additional depreciation beyond that required by the Act, by deducting depreciation on newly purchased ships bought with tax-deferred funds. In effect, this would have permitted them to depreciate the cost of the ships once before purchase and once after.

The Closing Agreements of 1947 and 1954 sought to prevent this 'double dip' by excluding the tax-deferred funds from the computation of the tax basis of the ships. This was not a 'special depreciation agreement' as the majority maintains.  *95  Rather, it was a broad attempt to limit excessive depreciation deductions for any tax purpose. The Closing Agreement of 1954, provided as follows:

I. Definitions:

(d) 'Tax-deferred' or 'Tax-deferment' referring to ordinary income and capital gains deposited in Reserve Funds means that such items are not to be recognized as taxable income, except as provided in paragraph VI(c) hereof, and likewise are not to be recognized in the determination of cost basis or invested capital.

II. Tax treatment of deposits in reserve funds:

All earnings including capital gains, (not tax exempt under the Internal Revenue Code), which are deposited in the taxpayer's Reserve Funds, shall be Tax-deferred income; provided, however, that the taxpayer shall not be bound by this commitment beginning with the calendar year in which a decision of any court, sustaining the contention that Section 607(h) of the Act gives a tax exemption, instead of a Tax-deferment as herein provided, shall become final.

Article V of the same Agreement, entitled 'Depreciation on Subsidized Vessels,' provided in part as follows:

> * * * Where, as the result of a portion of the price paid for vessels having been paid from funds not recognized as a part of basis for tax purposes, the amount of depreciation deposits required by the Maritime Administration exceeds the amount of depreciation so computed for tax purposes, such excess deposits

shall be treated as required deposits of earnings, tax-deferred in character. * * *

These provisions, taken together, show that the parties intended that the entire amount of tax-deferred deposits would reduce the basis of the ships for all 'tax purposes.' There is no attempt to limit the nature or scope of the basis reduction, or to characterize the situation in any way as a 'special depreciation arrangement' for a specific purpose.

**492 The investment tax credit, as enacted in 1962 and reenacted in 1973, allows a tax credit of 7 percent of the taxpayer's basis on the article purchased. Int.Rev.Code s 46(c)(1)(A). *96 For newly acquired articles, the taxpayer's basis is generally the cost, as specified by Treasury Regulations s 1.46—3(c)(1). However, it is apparent that neither the Treasury Regulations nor the drafters of section 46 considered a situation by which a taxpayer's basis in property could be reduced even before the article was purchased, as occurred with the uniquely situated subsidized shipowners.

The reduction of the shipowners' basis before their purchase of the ships, while unusual, is nevertheless in keeping with principles evinced throughout the Internal Revenue Code. For example, section 167 requires reduction of basis to the extent of depreciation already taken, because the depreciation deduction reduces the tax cost of the article purchased.

Since the provisions of the MMA permitted the taxpayer to make deposits in a tax-deferred fund to account for future depreciation, it was reasonable that the parties would, in the Closing Agreements, agree to reduce their basis in the ships in accord with the tax deferment already received. What is not reasonable is that the majority would now restore the reduced basis of the ships to the level that existed before any depreciation had been taken. This result allows the taxpayer to compute the tax credit upon an artificially increased amount.

If it is permissible to restore a taxable basis previously reduced by agreement to the pre-existing level for purposes of computing the investment tax credit, it is logically permissible to restore that taxable basis for other purposes. For example, if the taxpayer derived capital gains from subsequent sales of its ships, it could argue that its cost basis in the ships should not be reduced by the allocable amount of reserve fund payments, but rather that the cost basis of the ships should be restored to the full amount of the cash purchase price.

The majority seeks to avoid such an untenable result by premising its holding in part upon 'special reference' by Congress to subsidized industries in passing the investment tax credit. Yet the majority can find no special reference to subsidized shipowners in the legislative history and is forced to draw inferences from general statements regarding the *97 broad objectives of the tax credit. In contrast to the majority's inferences, it is my opinion that the legislative history indicates that Congress passed the credit without considering any possible effects upon the subsidized shipping industry. Statements appearing in the Senate Finance Committee Report on the Tax Reform Act of 1976 reinforce this conclusion. I recognize the general principle that subsequent Congressional reports on what Congress intended in enacting prior legislation, are to be accorded little weight, but I feel that the remarks of the Senate Finance Committee are too pertinent to escape note here. In its Report, the Committee states that:

> * * * since the tax provisions relating to the capital construction fund are in the Merchant Marine Act of 1936 rather than in the Internal Revenue Code, this question (of the effect of the shipowners' reduced basis upon the investment credit) was not reviewed when the investment credit was subsequently generally restored. S.Rep.No. 94—938, 94th Cong., 2d Sess., 196—97 (1976).

The only reasonable conclusion to be drawn from this statement is that the framers of the tax credit were completely unaware of the situation of the subsidized shipowners when provision was made for a tax credit to be computed upon a taxpayer's basis in acquired property. It may well be that if the question now before us had been presented to and considered by Congress when the investment credit was authorized, special provision would have been made to give the subsidized shipowners the credit claimed in this action. However, I find nothing in the applicable law or its legislative history which is sufficient to warrant judicial restoration of a taxable basis in property which has been reduced in accordance **493 with the provisions of the MMA and the Closing Agreements of 1947 and 1954.

In summary, I would grant defendant's motion for partial summary judgment in so far as plaintiff's claim for investment credit includes a taxable basis which had previously been reduced by use of tax-deferred funds in purchasing the

property, including both original payments and subsequent mortgage installments.

**\*98** SKELTON, Judge (dissenting):

I cannot agree with the majority opinion because it allows the taxpayer a double deduction from its income tax of the money in the reserve fund used to buy the ships and to pay off mortgages on them.

The first deduction occurred when the money was deposited in the reserve fund. This was proper and in accordance with 46 U.S.C. s 1177(h) (1964) which provides that earnings deposited in the reserve funds 'shall be exempt from all Federal taxes.' This deduction was also in accordance with the tax closing agreements of 1947 and 1964, which provided that earnings deposited in the reserve funds would be 'tax-deferred income,' which was defined as meaning that such earnings were not taxed.

The second tax deduction occurred when the taxpayer included the payments from the tax exempt reserve funds in its cost basis in figuring its invested capital in the ships. This deduction was a direct and express violation and breach of the tax closing agreement of 1947 the taxpayer signed with the Internal Revenue Service. The majority holds that the Revenue Act of 1962 providing for the investment tax credit nullified the 1947 agreement. I do not agree. A new closing agreement was executed by the taxpayer and the IRS which, for all practical purposes, was the same as the 1947 agreement. These closing agreements provided that money deposited in the reserve funds 'are not to be recognized in the

determination of cost basis or invested capital.' The taxpayer ignored this provision and included the previously deducted reserve fund money in its cost basis of the ships, thereby increasing its invested capital, resulting in an increased investment tax credit and a double tax deduction of the reserve funds.

Furthermore, the inclusion of the reserve funds in taxpayer's cost basis was in violation of Sections 38, 46 and 48 of the Internal Revenue Code of 1954 and Treasury Regulation s 1.48—1(b)(2) (1964), which allow an investment tax credit only on section 38 property, which is defined as 'property with respect to which depreciation * * * is allowable.' The above regulation provides that if a deduction for depreciation is allowable only on a part of taxpayer's property, then only that part qualifies as section 38 property for the purpose of **\*99** determining the investment tax credit. Here, that part of the ships paid for with reserve funds (down payment and mortgage payments) is not depreciable property because the amount thereof has already been deducted from taxpayer's income tax the same as if it was the value of fully depreciated property, and it cannot qualify as section 38 property for the purpose of determining the amount of investment tax credit.

I would allow defendant's motion for summary judgment, and deny that of the plaintiff and dismiss plaintiff's petition.

**All Citations**

211 Ct.Cl. 71, 544 F.2d 478, 38 A.F.T.R.2d 76-5958, 76-2 USTC P 9718

Footnotes

1   All section references are to the Internal Revenue Code of 1954 unless otherwise noted. All statutory references in this opinion regarding the Internal Revenue Code refer to applicable provisions in force for the years in question, 1962, 1963, and 1964.

2   In its companion case, Lykes Bros. S.S. Co. v. United States, 206 Ct.Cl. 354, 513 F.2d 1342 (1975), judgment was also entered in favor of the plaintiff taxpayer.

3   For a description and the purpose of the operating-differential subsidy program, see, e.g., Moore-McCormack Lines, Inc. v. United States, 413 F.2d 568, 188 Ct.Cl. 644 (1969); American Export Isbrandtsen Lines, Inc. v. United States, 499 F.2d 552, 204 Ct.Cl. 424 (1974); Farrell Lines Inc. v. United States, 499 F.2d 587, 204 Ct.Cl. 482 (1974); Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 184 Ct.Cl. 169 (1968). As the program relates to the investment credit, see States S.S. Co. v. United States, 428 F.2d 832, 192 Ct.Cl. 795 (1970).

4   Deposits of pre-1943 income and capital gains were agreed to be exempt; deposits of 1943—1945 ordinary income were agreed to be taxable but the lines were given an election not to be taxed on deposited capital gains of those years, in which event the gains were to be included in cost basis but not in invested capital.

5   The total cost of the two vessels was $27,931,945, of which $13,373,020 was paid to Bethlehem by Maritime as construction-differential subsidy and as payment for national defense features built into the vessels at the instance of the Navy.

6   The credit was spread over three years by operation of carry-forward provisions of the Code.

7    This sum included $3,564 investment in property not in issue here, leaving $14,274,706 as its investment in the ships. Later outlays brought the final cost to $14,558,925. Plaintiff's refund claim is predicated on 7 percent of $14,278,270. (Rounded numbers are used in the paragraph in the text and in this footnote.)

8    A balance of $81,937 unused credit was carried forward by plaintiff to 1965. The total of the $125,614 (The $1 difference is due to rounding.) ($146,410 less $20,795) allowed by the IRS, the refund claim of $791,928, and the carry forward of $81,937 is $999,479, seven percent of the plaintiff's investment. Before the IRS issued the deficiency notice the parties settled by agreement a number of issues affecting plaintiff's taxes for the years in question. The deficiency notice reflected the investment tax credit issues involved here and certain other issues. Plaintiff's refund claim was confined to the investment credit issues and the sums affected by it. (Rounded numbers are used.)

9    The 'applicable percentage' depends merely upon the useful life; in case of a useful life of 8 years or more, the applicable percentage is 100 (s 46(c) (2)). Section 48(b) defines 'new section 38 property' as property built or acquired after 1961 and was construed by this court in its first opinion and in a companion case. Lykes Bros. S.S. Co. v. United States, 513 F.2d 1342, 206 Ct.Cl. 354 (1975).

10   The 'adjustment to basis provided by section 48(g)(1),' mentioned in the regulation, was a provision that the amount of the credit was to be deducted from the basis of the property in respect of which the credit was allowed, so that a $100 property on which a $7 credit was allowed would receive a basis of $93 for depreciation, gain, and loss. This reduction was repealed in 1964, and the repeal was given a substantially retroactive effect. Act of Feb. 26, 1964, Pub.L.No. 88—272, s 203, 78 Stat. 33.

11   Plaintiff well illustrates the practical effect of the 1947 agreement by referring to the special depreciation arrangement as follows:

'* * * Thus (considering the income tax (effect) first) income and gains deposited in the reserves would not 'be recognized as taxable income' when earned; later, however, as the operating-differential subsidy agreement required, the reserves would be invested in new ships, and when so invested the portion allocated to tax deferred earnings would not 'be recognized in the determination of cost basis.'

'Since basis controls the computation of depreciation, future annual deductions for depreciation expense would thus be reduced by operation of the agreement. New ships would earn a larger taxable income than in the absence of the agreement, and over the life of the ships the government would recover the taxes that had been deferred when the deposited income was earned.[FN26] To illustrate, $100 of earnings deposited in the reserve funds would be untaxed when earned. But when invested in a new ship costing $1000 the untaxed $100 would reduce the basis for depreciation ('cost basis') of the new ship to $900. Over the 20-year life of the new ship the annual deduction for depreciation would be $45 rather than $50, the $5 difference would be taxable income, and in 20 years the government would have recovered the deferred taxes on $100.[FN27]

'Similarly, as basis controls gain or loss, on any sale of the future ship the agreement would, by reducing the basis, augment the taxable gains (or reduce losses) to the extent of the tax deferred income invested in the ship.

26 'If over the 20 years the rates of taxation should rise, as in fact occurred, the government would tax the future income at higher rates, offsetting its deferral of the use of the tax money.

27 'Accelerated depreciation produces a similar deferral of taxes. See, e.g., Jones Bros. Bakery, Inc. v. United States, 411 F.2d 1282, 188 Ct.Cl. 226, 246—52 (1969). Large depreciation charges reduce taxable income in the early years of an asset's useful life; in the later years accelerated depreciation accounting produces smaller depreciation charges and higher income than straight line depreciation would have produced. The additional taxable income enables the government to recover the taxes deferred in the earlier years.'

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Boutwell and the Midgett. AR 1855. In its "Best Value Analysis," the Coast Guard concluded that Wepfer, having also been assigned a past performance rating of "Excellent+," "represents the overall best value to the Government" compared to a third bidder with the highest past performance rating, but which also had the highest price. AR 1856. The Coast Guard added as part of its justification that Wepfer had "recently completed a similar scope of work to the Coast Guard's approval." *Id.*

The court finds that the Coast Guard's references to the dollar value of Wepfer's past contracts and its observation that Wepfer's most recent work was similar in scope to that required under the Patoka solicitation evince a rational analysis and sufficient consideration of the relevant factors. The Coast Guard sufficiently documented a reasonable explanation for its contract award.

Accordingly, again especially in view of the deference owed to the agency in this type of procurement, the court sees no basis for finding that the Coast Guard's decision-making process was arbitrary or capricious or in violation of regulation or procedure.

### IV. Conclusion

Defendant's motion to dismiss is GRANTED with respect to the Sapelo and Knight Island solicitations. Defendant's motion for judgment on the administrative record is GRANTED with respect to the Staten Island and Patoka contracts. Plaintiff's motion for judgment on the administrative record is DENIED.

The Clerk of Court is hereby directed to enter judgment for Defendant.



**ARRA ENERGY COMPANY I, Arra Energy Company II, and Arra Energy Company III, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 10–84 C.**

United States Court of Federal Claims.

Jan. 18, 2011.

**Background:** Contractors, which placed mobile solar-powered generating systems into service, filed complaint, seeking more than $2.3 million in damages incurred as a result of the government's denial of their applications for reimbursement grants pursuant to the American Recovery and Reinvestment Tax Act. Government filed motion to dismiss.

**Holdings:** The Court of Federal Claims, Bush, J., held that:

(1) provision of American Recovery and Reinvestment Tax Act compelling the government to provide a grant to any person who places specified energy property into service, subject only to the express requirements set forth in the statute was money mandating source of law within meaning of Tucker Act, and

(2) provision was not an offer by the government to enter into a unilateral contract.

Motion granted in part and denied in part.

**1. Federal Courts** ⚷1072

Tucker Act does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages. 28 U.S.C.A. § 1491(a)(1).

**2. Federal Courts** ⚷1073.1

Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act; claimant

must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the federal government for the damages sustained.   28 U.S.C.A. § 1491(a)(1).

**3. Federal Courts ⟐1072**

In general, a statute will be deemed to be a money-mandating source of law within meaning of Tucker Act if it compels the government to make a payment to an identified party or group; whether a statute is money mandating under the Tucker Act generally turns on whether the government has discretion to refuse to make payments under that statute.   28 U.S.C.A. § 1491(a)(1).

**4. Federal Courts ⟐1073.1**

Provision of American Recovery and Reinvestment Tax Act compelling the government to provide a grant to any person who places specified energy property into service, subject only to the express requirements set forth in the statute, was money mandating source of law within meaning of Tucker Act, and therefore Court of Federal Claims had subject matter jurisdiction over claim for reimbursement under the statute; provision compelled the payment of money by the government and did not provide the government with any discretion to refuse such payments when the specific requirements of the statute were met.   28 U.S.C.A. § 1491; American Recovery And Reinvestment Act of 2009 § 1603, 42 U.S.C.A. § 17953.

**5. Federal Courts ⟐1072**

When the government does not possess complete discretion over whether to make a payment under a statute, the statute may still be considered a money mandating source of law within meaning of Tucker Act if (1) it provides "clear standards for paying" money to recipients; (2) states the "precise amounts" that must be paid; or (3) as interpreted, compels payment on satisfaction of certain conditions.   28 U.S.C.A. § 1491.

**6. Federal Courts ⟐1073.1**

Contractors' claims for reimbursement grants pursuant to the American Recovery and Reinvestment Tax Act for placing mobile solar-powered generating systems into service did not seek the payment of money under a statute that subsidized future activities, and thus were not barred by *Bowen*, which concerned jurisdiction of the district courts under the Administrative Procedure Act (APA).   5 U.S.C.A. § 702; Pub.L. No. 111–5, Div. B, tit.   I, § 1603, 123 Stat. 115, 364.

**7. United States ⟐60(1), 69(1)**

Elements of an implied-in-fact contract with government are the same as those required for an express contract: (1) mutuality of intent; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) actual authority to bind the government.

**8. Statutes ⟐233**

There is a general presumption that statutes are not intended to create any vested contractual rights.

**9. United States ⟐66**

Provision of American Recovery and Reinvestment Tax Act compelling the government to provide a grant to any person who places specified energy property into service, subject only to the express requirements set forth in the statute, was not an offer by the government to enter into a unilateral contract; statute did not evidence government's intent to enter into contracts with all persons and entities that filed applications for reimbursement grants.   Pub.L. No. 111–5, Div. B, tit.   I, § 1603, 123 Stat. 115, 364.

————————

John C. Hayes, Jr., Washington, DC, for plaintiffs.   Grayson Yeargin and Colin W. O'Sullivan, Washington, DC, of counsel.

Jane C. Dempsey, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Kenneth M. Dintzer, Assistant Director, Washington, DC, for defendant.

**OPINION**

BUSH, Judge.

Now pending before the court is defendant's motion to dismiss, which has been fully briefed and is ripe for a decision by the court. Because the court concludes that it has

**14**                    **97 FEDERAL CLAIMS REPORTER**

subject matter jurisdiction over both counts of plaintiffs' complaint, defendant's motion to dismiss those counts pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) is denied. However, the court also holds that Count II of the complaint fails to state a claim upon which relief can be granted and must be dismissed under RCFC 12(b)(6). For those reasons, defendant's motion to dismiss is granted in part and denied in part.

### BACKGROUND[1]

In this case, plaintiffs seek more than $2.3 million in damages incurred as a result of the government's denial of plaintiffs' applications for reimbursement grants pursuant to section 1603 of the American Recovery and Reinvestment Tax Act of 2009, Pub.L. No. 111–5, Div. B, tit. I, § 1603, 123 Stat. 115, 364 (Recovery Act).[2] Plaintiffs' applications requested reimbursement grants to cover a portion of the cost of placing twenty-five mobile solar power generating systems into service in 2009. In the first count of their complaint, plaintiffs assert that the government violated its mandatory obligation to award reimbursement grants to plaintiffs under section 1603. In the second count of their complaint, plaintiffs argue in the alternative that section 1603 constitutes an offer by the government to enter into a unilateral contract, which was accepted by plaintiffs when they filed their applications for reimbursement grants. In both counts, plaintiffs seek to recover the amount to which they claim they were entitled under section 1603, as well as consequential damages stemming from the denial of plaintiffs' grant applications. Defendant argues that the entire complaint should be dismissed under RCFC 12(b)(1) because the court is without jurisdiction over both of plaintiffs' claims. In addition, defendant further argues that Count II of the complaint should be dismissed pursu-

ant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

### I.  Factual History

#### A.   The Recovery Act

The President signed the Recovery Act into law on February 17, 2009. Compl. ¶ 9. The Recovery Act was designed to provide a fiscal stimulus to the nation's ailing economy in the form of various spending and tax measures and was intended to achieve several related purposes:

(1) To preserve and create jobs and promote economic recovery.

(2) To assist those most impacted by the recession.

(3) To provide investments needed to increase economic efficiency by spurring technological advances in science and health.

(4) To invest in transportation, environmental protection, and other infrastructure that will provide long-term economic benefits.

(5) To stabilize State and local government budgets, in order to minimize and avoid reductions in essential services and counterproductive state and local tax increases.

123 Stat. 116.

One provision of the Recovery Act established a program under which the Department of the Treasury (Treasury) awards reimbursement grants in lieu of tax credits to persons and entities that invest in specified types of renewable energy property. Section 1603(a) provides that

[u]pon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person

---

1.  The facts recounted here are taken from plaintiffs' complaint.

2.  The "American Recovery and Reinvestment Act of 2009" encompasses the entire statute contained in Public Law Number 111–5. *See* 123 Stat. 115. Division B, Title I of the statute is referred to as the "American Recovery and Reinvestment Tax Act of 2009." *See* 123 Stat. 306.

The money-mandating source asserted by plaintiffs in this case is section 1603 of the American Recovery and Reinvestment Tax Act of 2009. Except where otherwise noted, the court will use the term "Recovery Act" to refer to the entire statute, while all references to section 1603 will be to that section of Division B, Title I of the statute.

for a portion of the expense of such property as provided in subsection (b).

123 Stat. 364. Under that provision, a person or entity may be reimbursed for a portion of the cost of placing "specified energy property" into service in 2009 or 2010, or later than 2010 in limited circumstances. In addition, section 1603(c) provides that Treasury "shall make payment of any grant" required under section 1603 within the sixty-day period beginning on the later of the date of the grant application or the date on which the specified energy property is actually placed in service. *Id.*

Section 1603(b) further provides that the amount of a reimbursement grant "shall be the applicable percentage of the basis of such property." 123 Stat. 364. The applicable percentage depends upon the type of energy property that is placed into service. Section 1603(d) states that the term "specified energy property" includes, *inter alia,* "solar property" as that term is defined in clause (i) or (ii) of section 48(c)(1) of the Internal Revenue Code of 1986(IRC), 26 U.S.C. § 48(c)(1) (2006). 123 Stat. 365. Under section 1603(b)(2)(A), the applicable reimbursement rate for solar property is thirty percent. 123 Stat. 364. In short, section 1603 requires the government to award grants in the amount of thirty percent of the basis of solar property placed into service during 2009 or 2010, provided that all of the requirements set forth in that section have been satisfied.

### B. Plaintiffs and the Power Systems

ARRA Energy Company I (AEC I), ARRA Energy Company II (AEC II), and ARRA Energy Company III (AEC III) (collectively, plaintiffs or the AECs) are limited liability companies formed under the laws of the State of California. Compl. ¶¶ 4–6. In 2009, plaintiffs purchased twenty-five mobile solar-powered generating systems (the power systems) from the manufacturer and placed those power systems into service by making them available to end-users pursuant to leasing arrangements. *Id.* ¶¶ 27, 30. The power

systems use solar energy to generate off-grid electricity that is used by end-users in the entertainment, construction, equipment rental, agricultural, and emergency disaster relief industries. *Id.* ¶¶ 24, 30. Plaintiffs spent a total of $7,777,715 for the power systems.[3] *Id.* ¶¶ 27, 31.

On or before August 21, 2009, plaintiffs filed twenty-five separate applications for reimbursement grants under section 1603—one application for each power system. Compl. ¶ 31. The applications requested a total of $2,333,314.50 in grants, which represented thirty percent of the systems' claimed cost basis.[4] *Id.* When originally filed with Treasury, the applications included valuation reports for the power systems. *Id.* ¶ 33. The initial valuation reports, which had been prepared by the manufacturer, set forth plaintiffs' asserted cost basis for each of the power systems and supported the amounts requested in the grant applications. *Id.*

In response to questions from the government, plaintiffs commissioned the preparation of an independent fair market valuation report to support the asserted cost basis of the power systems and submitted that report to the government on October 6, 2009. *Id.* ¶¶ 34–35. The government later confirmed the receipt of the independent valuation report provided by plaintiffs. *Id.* ¶ 36. On November 23, 2009, the government informed plaintiffs that it was in possession of all information needed to review the grant applications and declined plaintiffs' offer to provide additional information. *Id.* ¶ 37.

On December 4, 2009, the government notified plaintiffs that their applications had been denied. *Id.* ¶ 39. In its decision, the government stated that the claimed cost basis for the power systems was not supported by sufficient documentation:

Eligible Basis—basis of property is determined in accordance with the general rules for determining the basis of property for federal income tax purposes. Thus, the basis of property generally is its cost and

---

**3.** AEC I spent $2,222,132 on twelve power systems, AEC II spent $2,825,265 on seven power systems, and AEC III spent $2,730,318 on six power systems. *See* Compl. ¶ 27.

**4.** AEC I sought $666,639.60 in reimbursement grants, AEC II sought $847,579.50 in grants, and AEC III sought $819,095.40 in grants. *See* Compl. ¶¶ 31, 38.

**16**                    **97 FEDERAL CLAIMS REPORTER**

includes all items properly included by the taxpayer in the depreciable basis of the property. Applicants must submit with their application for a Section 1603 payment documentation to support the cost basis claimed for the property. Although you submitted documentation regarding your cost basis, we found the documentation insufficient to support your claimed basis.

*Id.* The next week, the government confirmed that its decision on plaintiffs' applications was final, and that "[a]ny further action would need to be pursued through the judicial process." *Id.* ¶ 40.

## II. Procedural History

On February 12, 2010, plaintiffs filed a two-count complaint in this court. In their complaint, plaintiffs seek damages to cover economic losses incurred as a result of defendant's denial of plaintiffs' applications for reimbursement grants. Plaintiffs argue in Count I of the complaint that the government violated section 1603, which plaintiffs assert is a money-mandating source of law. In Count II of the complaint, plaintiffs argue that Treasury's denial of their grant applications breached an express or implied-in-fact contract between plaintiffs and the government. According to plaintiffs, section 1603 was an offer by the government to enter into a unilateral contract, which plaintiffs accepted by filing timely applications for reimbursement grants. Plaintiffs request $2,333,314.50 in damages to cover the amount they would have received if their grant applications had been approved, as well as additional consequential damages incurred as a result of the denial of those applications.

Defendant filed its answer to the complaint on May 27, 2010, and filed a motion to dismiss the complaint in its entirety on July 7, 2010. In that motion, defendant argues that this court does not possess subject matter jurisdiction over Count I of the complaint because section 1603 is not a money-mandating source of law. Defendant contends that section 1603 is intended to subsidize future expenditures instead of compensating plaintiffs for their past injuries or labors. For that reason, defendant asserts that Count I of the complaint is barred under the United

States Supreme Court's decision in *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), and therefore must be dismissed under RCFC 12(b)(1) for lack of subject matter jurisdiction. Next, defendant argues that the court may not exercise subject matter jurisdiction over Count II of the complaint because the basis of that claim is section 1603 rather than an express contractual provision providing for damages. Because the asserted contract does not contain an express damages remedy and is not based on a money-mandating source, defendant argues that plaintiffs' contractual claim is barred under the United States Court of Appeals for the Federal Circuit's decision in *Rick's Mushroom Serv., Inc. v. United States,* 521 F.3d 1338, 1343 (Fed.Cir.2008) (*Rick's Mushroom* ). Furthermore, defendant argues that the alleged contract is not within the scope of the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613 (2006), because it does not involve the procurement of goods or services. Finally, defendant argues that Count II of the complaint should be dismissed for failure to state a claim upon which relief can be granted. In that regard, defendant asserts that plaintiffs have failed to allege facts sufficient to demonstrate the necessary elements of an implied-in-fact contract.

In plaintiffs' response to defendant's motion to dismiss, plaintiffs first argue that the court may properly exercise jurisdiction over Count I of the complaint because section 1603 is a money-mandating source of law. Plaintiffs note that section 1603 contains mandatory language that leaves the government with no discretion over whether to award reimbursement grants when the requirements of the statute have been met. Next, plaintiffs assert that defendant misreads *Bowen,* and argues that several decisions of the Federal Circuit interpreting *Bowen* have limited the reach of that case to a narrow set of factual circumstances not present here. In response to defendant's assertion that this court lacks jurisdiction over Count II of the complaint, plaintiffs contend that their contractual claim is based upon an express or implied-in-fact contract and is therefore within the jurisdiction of this

court under the Tucker Act. Plaintiffs assert that the Federal Circuit's holding in *Rick's Mushroom* is inapposite because that case involved an unusual cost-sharing agreement that did not contain an express damages remedy. Finally, plaintiffs assert that Count II of the complaint should not be dismissed for failure to state a claim because it is based upon well-pleaded factual allegations that the government entered into an express or implied-in-fact contract with plaintiffs and breached that contract.

In its reply to plaintiffs' response, defendant reiterates its argument that Count I of plaintiffs' complaint is barred under *Bowen.* Defendant asserts that a statute must contain an express or implied damages remedy in order to be a money-mandating source under the Tucker Act. Defendant argues that when a source of law, like section 1603, mandates the payment of money in the form of a grant or a subsidy, that source is not money-mandating because such payments do not constitute "money damages." On the contrary, according to defendant, the claims raised by plaintiffs are equitable in nature and would require prospective injunctive relief as a remedy.

Next, defendant argues that section 1603 is not money mandating for the additional reason that the government possesses the discretion to deny grant applications when an applicant does not meet the requirements of the statute. Defendant also attempts to distinguish the cases cited by plaintiffs as limiting the reach of *Bowen,* noting that each of those cases was based on a contractual relationship, rather than a statute requiring the payment of a grant or subsidy. In contrast to plaintiffs' limited reading of *Rick's Mushroom,* defendant argues that the holding in that case established a general rule that limits this court's jurisdiction over contractual claims to those based on contracts with an express damages clause. While noting the general presumption that damages are an available remedy for breach of contract, defendant argues that the presumption does not apply here because section 1603 is not money mandating and does not contain an express damages remedy for its violation. Finally, defendant challenges plaintiffs' as-

sertion that their factual allegations are sufficient to survive a motion to dismiss for failure to state a claim. Defendant argues that plaintiffs have failed to allege facts sufficient to meet any of the requirements of an implied-in-fact contract with the government.

## DISCUSSION

### I. Standards of Review

#### A. Standard of Review under RCFC 12(b)(1)

In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and must construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 814–15, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988). The relevant issue in a motion to dismiss under RCFC 12(b)(1) " 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Patton v. United States,* 64 Fed.Cl. 768, 773 (2005) (quoting *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683). The plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)), and must do so by a preponderance of the evidence, *Reynolds,* 846 F.2d at 748 (citations omitted). The court may look at evidence outside of the pleadings in order to determine its jurisdiction over a case. *Martinez v. United States,* 48 Fed.Cl. 851, 857 (2001) (citing *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461–62 (Fed.Cir.1998); *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991)), *aff'd in relevant part,* 281 F.3d 1376 (Fed. Cir.2002). "Indeed, the court may, and often must, find facts on its own." *Id.* If jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3).

**18**                    **97 FEDERAL CLAIMS REPORTER**

**B. Standard of Review under RCFC 12(b)(6)**

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed.Cir.2002). When considering a motion to dismiss under this rule, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief," dismissal is warranted under RCFC 12(b)(6). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To survive a motion to dismiss for failure to state a claim, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. 1955. While a complaint is not required to contain detailed factual allegations, it must provide "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. In order to meet the requirement of facial plausibility, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

**II. Analysis of Plaintiffs' Claims**

Plaintiffs assert an entitlement to damages under two alternative theories of liability. First, plaintiffs argue that the government was obligated to make payments to them under section 1603 and violated that obligation when it denied plaintiffs' applications for reimbursement grants. In addition, plaintiffs also contend that the enactment of section 1603 constituted an offer by the government to enter into a unilateral contract, which plaintiffs accepted by filing their applications for reimbursement grants. Plaintiffs assert that the government breached its contract with plaintiffs when it denied the grant applications. In its motion to dismiss, defendant first argues that both counts of the complaint are beyond the jurisdiction of this court. Defendant further argues that Count II of the complaint fails to state a claim upon which relief can be granted. For the reasons discussed below, the court concludes that it possesses jurisdiction over both counts of the complaint. In addition, the court also holds that the contentions of fact in Count II of the complaint fail to state a claim upon which relief can be granted. For those reasons, defendant's motion to dismiss is granted in part and denied in part.

**A. Motion to Dismiss the Complaint in Its Entirety for Lack of Subject Matter Jurisdiction**

**1. This Court Has Jurisdiction over Count I of the Complaint**

Defendant argues that Count I of the complaint must be dismissed under RCFC 12(b)(1) because section 1603 is not a money-mandating source of law. In support of that argument, defendant asserts that the first count of plaintiffs' complaint is barred in this court under the Supreme Court's decision in *Bowen*. Defendant argues that this court's jurisdiction is limited to claims for "damages," and that plaintiffs have not requested money damages but instead seek to enforce the terms of section 1603 itself. In addition to its argument that Count I is barred under *Bowen*, defendant further argues that section 1603 is not money mandating because the government has discretion to deny payments when it determines that the requirements of that section have not been satisfied.

**a. Section 1603 Is a Money–Mandating Source of Law**

In order to establish subject matter jurisdiction in this court, plaintiffs must demonstrate that the government has consented to suit and that there is a substantive legal basis for their claims. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (*White Mountain Apache*) ("Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver.") (citations omitted).

[1] Plaintiffs assert that this court has jurisdiction over both of their claims under the Tucker Act, which provides in relevant part that the

United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2006). The Federal Circuit has explained that the Tucker Act "does two things: (1) it confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and (2) it waives the Government's sovereign immunity for those actions." *Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005) (*en banc* in relevant part). However, the statute "does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Id.*

[2] "Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act." *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). On the contrary, "the claimant must demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.' " *Id.* at 216–17, 103 S.Ct. 2961 (quoting *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)) (footnote and quotations omitted). If the asserted legal basis of a claim does not mandate the payment of money by the government, the court must dismiss the action because "the absence of a money-mandating source [is] fatal to the court's jurisdiction under the Tucker Act." *Fisher,* 402 F.3d at 1173.

[3] In general, a statute will be deemed to be a money-mandating source of law if it compels the government to make a payment to an identified party or group. *See Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1009 (Ct.Cl.1967) ("Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can be fairly interpreted as mandating compensation by the Federal Government for the damage sustained."). Under the "fair interpretation" standard, the asserted money-mandating source of law must be "reasonably amenable to the reading that it mandates a right of recovery in damages." *White Mountain Apache,* 537 U.S. at 473, 123 S.Ct. 1126.

Whether a statute is money mandating under the Tucker Act generally turns on whether the government has discretion to refuse to make payments under that statute. In that regard, the Federal Circuit has held that a source of law is not money mandating when the government enjoys complete discretion in determining to whom it will make payments. *See Doe v. United States,* 463 F.3d 1314, 1324 (Fed.Cir.2006) ("A statute is not money-mandating when it gives the government complete discretion over the decision whether or not to pay an individual or group.") (citing *Doe v. United States,* 100 F.3d 1576, 1582 (Fed.Cir.1996)). In addition, the Federal Circuit has held that a statute is money mandating when the government has an absolute duty to make payments to any person who meets the specific requirements set forth in the statute. *See Grav v. United States,* 886 F.2d 1305, 1307 (Fed.Cir.1989) (*Grav II* ) (holding that a statute was money mandating because it required the government to enter into a contract to pay money to any recipient who met the express requirements of the statute).

[4] Plaintiffs assert that section 1603 is money mandating because Treasury does not possess any discretion in determining whether to award a grant under that section. Defendant, in contrast, contends that the language of that section is not money mandating because it does not include an express damages remedy for its violation. The court concludes that section 1603 compels the payment of money by the government and does not provide the government with any discre-

tion to refuse such payments when the specific requirements of the statute are met.

First, section 1603(a) provides that

[u]pon application, the Secretary of the Treasury *shall*, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b).

123 Stat. 364 (emphasis added). The quoted language compels the government to provide a grant to any person who places specified energy property into service, subject only to the express requirements set forth in the statute. *See Greenlee County, Ariz. v. United States,* 487 F.3d 871, 877 (Fed.Cir.2007) (noting that "use of the word 'shall' generally makes a statute money-mandating"); *Agwiak v. United States,* 347 F.3d 1375, 1380 (Fed. Cir.2003) ("We have repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating."). Defendant asserts that, because the government is required to determine whether an applicant has satisfied the requirements of section 1603, it necessarily has the discretion to deny applications for grants under that section. While defendant asserts that the requirements of section 1603 are contingent upon its interpretation of the IRC, *see* Def.'s Reply at 4, it completely fails to point to any specific language in the statute that might be interpreted to confer such discretion upon the government. Although the government must determine whether the requirements of the statute have been met, the court concludes that those determinations are ministerial in nature.

For example, the government must determine whether an applicant for a reimbursement grant has placed specified energy property into service during the relevant time period. That determination involves two separate inquiries. First, the government must determine whether the subject of the application meets the definition of "specified energy property." In addition, the govern-

ment must determine whether that property was placed into service in either 2009 or 2010.[5] As discussed below, neither of those determinations involves the exercise of discretion by the government.

The statute states that specified energy property includes "solar property," and incorporates by reference the definition of energy property as set forth in section 48(a)(3)(A) of the IRC. That section of the IRC, in turn, provides that such property includes, *inter alia*, equipment that uses solar energy to generate electricity. *See* 26 U.S.C. § 48(a)(3)(A)(i). In reviewing plaintiffs' applications for reimbursement grants, the government was required to determine whether their power systems use solar energy to generate electricity. There does not appear to be any dispute as to whether the power systems meet the definition of specified energy property under section 1603. In any event, the determination of whether the power systems meet that definition cannot be viewed as involving "discretion" to approve or deny those applications.

Likewise, the factual determination of whether the power systems were placed in service in 2009 or 2010 does not involve the exercise of any discretion by the government. In their complaint, plaintiffs allege that the power systems were placed into service in 2009, and defendant does not appear to dispute that allegation. Plaintiffs further note that, under applicable regulations, energy property is deemed to be placed in service in the taxable year in which the "property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." Compl. ¶ 20 (quoting 26 C.F.R. § 1.46–3(d)(1)(ii) (2010)). Defendant does not assert that the standard set forth in that regulation confers any discretion to deny an application for reimbursement grants, and the court does not discern the existence of any such discretion in that regulatory language. Nor do the

---

**5.** As noted above, reimbursement grants are also available for energy property placed in service later than 2010 when certain conditions are met. Because there appears to be no dispute that

plaintiffs placed the power systems into service in 2009, the additional conditions applicable to property placed in service after 2010 are inapplicable here.

other necessary determinations cited by defendant require the exercise of discretion by the government. *See* Def.'s Mot. at 4 (noting that the government must determine whether the energy property is installed on other property or used predominantly outside of the United States, and whether its use began with the applicant).

**[5]** The court thus holds that section 1603 does not provide the government with discretion to deny an application for reimbursement grants when the express requirements of that section are met. However, even if the court were to hold that Treasury enjoyed some degree of discretion in deciding whether to award a grant to an applicant that met all of the requirements set forth in the statute, section 1603 would nonetheless meet the test for a discretionary money-mandating source of law as set forth in *Samish Indian Nation v. United States,* 419 F.3d 1355, 1364–65 (Fed.Cir.2005) (*Samish II* ). When the government does not possess complete discretion over whether to make a payment under a statute, the appropriate standard for determining whether that statute is money mandating is the standard articulated by the Federal Circuit in *Samish II*:

> The court has found Congress provided [for] damage remedies where the statutory text leaves the government no discretion over payment of claimed funds. But Tucker Act jurisdiction is not limited to such narrow statutory entitlements. Certain discretionary schemes also support claims within the Court of Federal Claims jurisdiction. These include statutes: (1) that provide "clear standards for paying" money to recipients; (2) that state the "precise amounts" that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions.

*Samish II,* 419 F.3d at 1364 (citation omitted). In short, if the court determines that a discretionary source of law meets one of the three requirements set forth above, that source will be deemed to meet the fair interpretation standard and is therefore money mandating for purposes of this court's jurisdiction under the Tucker Act.

Section 1603 meets the test set forth in *Samish II* because it provides a clear stan-dard for the payment of money and states a precise amount of money to be paid. The statute provides that the amount of the grant "*shall be* the applicable percentage of the basis of such property," 123 Stat. 364 (emphasis added), and further states that the applicable percentage for solar property is thirty percent. While section 1603 does not define the basis of the property, it notes that the "[t]erms used in this section which are also used in section 45 or 48 of the [IRC] shall have the same meaning for purposes of this section as when used in such section 45 or 48." 123 Stat. 366. Under the IRC, the term "basis" is generally used to refer to the cost of the property to the taxpayer. *See* 26 U.S.C. § 1012 (2006) ("The basis of property shall be the cost of such property. . . ."); Compl. ¶ 39 (quoting the decision denying plaintiffs' grant applications, which noted that "the basis of property generally is its cost and includes all items properly included by the taxpayer in the depreciable basis of the property"). While the government may decide, as it has in this case, that an applicant has miscalculated or misrepresented the basis of its property, it has no discretion to reimburse an applicant for less than, or more than, thirty percent of the correct basis of the property.

Defendant notes that "Congress did not pass the statute to permit those seeking grants to take advantage of the Government." Def.'s Reply at 5. Because the government must be allowed to deny fraudulent applications, defendant argues section 1603 cannot be viewed as money mandating:

> If an applicant inflates the basis, Treasury has the discretion of denying the grant and protecting the statute's objectives. Congress has not legislated itself into being a patsy. It is precisely this type of discretion—and judgment—that exists in Section 1603 and prevents the statute from being deemed money-mandating.

*Id.* There is no question that the government has the authority to deny fraudulent claims and applications that do not meet the requirements set forth in the statute. However, that ability does not affect the money-mandating status of the statute.

**22**                    **97 FEDERAL CLAIMS REPORTER**

As noted above, section 1603 is money mandating because it compels the payment of money by the government *when the requirements of the statute are met.* Many statutes require the government to make an initial eligibility determination before making payments under those statutes, but the need for such ministerial determinations does not negate the money-mandating status of those statutes. *See, e.g., Greenlee County,* 487 F.3d at 874 (finding that a statute was money mandating, despite its requirement that the government determine whether a county or municipality was a "unit of local government" and thus eligible for payments under the program); *Doe,* 463 F.3d at 1325 (noting that a statute requiring the payment of administratively uncontrollable overtime pay for employees holding certain positions was money mandating, even though it required the government to determine whether any particular position met the requirements of the statute); *Fisher,* 402 F.3d at 1174–75 (holding that the military disability statute is money mandating because it requires the payment of money to disabled military personnel when the government determines that the requirements of the statute have been met). In addition, even if the preliminary determinations made by the government under section 1603 involve the exercise of some level of discretion, the statute would nonetheless be money mandating under *Samish II* because it "compel[s] payment on satisfaction of certain conditions." 419 F.3d at 1364.

Finally, the court notes that nothing in the legislative history of section 1603 suggests that Congress intended to endow Treasury with the discretion to refuse payments to any applicant that met the requirements set forth in the statute.[6] Indeed, defendant does not assert that there is any evidence in the legislative history supporting its interpretation of

section 1603. On the contrary, defendant merely argues that nothing in the legislative history of section 1603 clearly supports plaintiffs' contrary interpretation of the statute. The court concludes that section 1603 can be fairly interpreted as mandating the payment of money by the government when the specific requirements of the statute have been satisfied. The statute is therefore money mandating.

**b. Count I Is Not Barred under *Bowen***

**[6]** Defendant relies on *Bowen* for the broad proposition that this court may not exercise jurisdiction over any claim for the payment of money under a statute that is designed to subsidize future expenditures by awarding grants to recipients. Under defendant's reading of *Bowen,* a statute will be deemed money mandating only when it contains an express damages remedy to compensate recipients for past injuries or labors incurred as a result of the government's violation of the statute. As discussed below, defendant's argument misreads *Bowen* and ignores the Federal Circuit's subsequent application of the jurisdictional analysis set forth in that case.

In *Bowen,* the Commonwealth of Massachusetts (the State) challenged a disallowance decision by the United States Department of Health and Human Services (HHS) under the Medicaid program. The State filed suit in district court under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (2006), seeking declaratory, injunctive and monetary relief. HHS argued that the district court did not have subject matter jurisdiction over the suit under the APA because it sought monetary damages. For that reason, according to HHS, jurisdiction was proper only in the United States

---

**6.** Plaintiffs' characterization of section 1603 as a money-mandating source is further supported by a proposed amendment of that section. In March 2010, Senator Charles E. Schumer introduced the American Renewable Energy Jobs Act, S. 3069, 111th Cong. (2010), which seeks, *inter alia,* to endow Treasury with precisely the discretion that defendant claims the agency already possesses under the current statute. Specifically, the proposed amendment provides the following:

(a) Discretion To Provide Grants—Subsection (a) of section 1603 of division B of the Amer-

ican Recovery and Reinvestment Act of 2009 is amended by striking 'Upon application, the Secretary of the Treasury shall' and inserting 'Upon application, the Secretary of the Treasury may'.

*Id.* § 2(a). While this proposed amendment is entitled to less weight than the legislative history of section 1603 itself, it nonetheless provides some support for plaintiffs' interpretation of that section.

Claims Court. The Supreme Court rejected the government's argument and held that the State's suit was within the jurisdictional scope of the APA.

The Supreme Court first noted that the waiver of sovereign immunity contained in the APA is subject to three important limitations. First, the APA waives immunity only for those claims "seeking relief other than money damages." 5 U.S.C. § 702. Second, suits under the APA are permitted only when "there is no other adequate remedy in a[nother] court...." 5 U.S.C. § 704. Finally, a claim under the APA is proscribed when "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Because of these jurisdictional limitations, the Court engaged in a three-part analysis to determine: (1) whether the State sought "money damages" in its suit; (2) whether there was an adequate remedy available in another forum; or (3) whether the suit was barred in district court under any other jurisdictional statute. The Court answered each of those questions in the negative.

First, the Court held that while judgment in favor of the State would result in the payment of money by the government, the monetary relief sought could not be characterized as "damages." On the contrary, the Court explained that the

> State's suit to enforce § 1396b(a) of the Medicaid Act, which provides that the Secretary "shall pay" certain amounts for appropriate Medicaid services, is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money.

487 U.S. at 900, 108 S.Ct. 2722 (footnote omitted). In addition, the monetary relief requested by the State was not simply the payment of a certain sum of money. Instead, the reversal of the disallowance decision represented "an adjustment—and, indeed, usually a relatively minor one—in the size of the federal grant to the State that is payable in huge quarterly installments." *Id.* at 893, 108 S.Ct. 2722. Such adjustments on

an open government account cannot, according to the Court, be described as "damages," as that term is used in section 702 of the APA.

Second, the Court held that the suit was not barred under section 704 of the APA because there was not an adequate remedy in another court. In that regard, the Court rejected the government's contention that there was an adequate remedy available in the Claims Court:

> As the facts of these cases illustrate, the interaction between the State's administration of its responsibilities under an approved Medicaid plan and the Secretary's interpretation of his regulations may make it appropriate for judicial review to culminate in the entry of declaratory or injunctive relief that requires the Secretary to modify future practices. We are not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties.

487 U.S. at 905, 108 S.Ct. 2722 (footnote omitted). The Court noted that a money judgment would have been an incomplete and inadequate remedy in that case because the Claims Court did not possess the general equitable powers needed to manage the "relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets...." *Id.* at 904 n. 39, 108 S.Ct. 2722.

Finally, the Court held that jurisdiction under the APA was not foreclosed by any other jurisdictional statute. In that regard, the Court first noted that jurisdiction in the Claims Court under the Tucker Act was "doubtful." *See id.* at 905–06, 108 S.Ct. 2722. Because the "quarterly payments of federal money are actually advances against expenses that have not yet been incurred by the State, it is arguable that a dispute concerning the status of the open account is not one in which the State can claim an entitlement to a specific sum of money that the Federal Government owes to it." *Id.* at 907, 108 S.Ct. 2722 (footnote omitted). In addition, the Court noted that the types of stat-

**24**                     **97 FEDERAL CLAIMS REPORTER**

utes that have generally been interpreted as money mandating for purposes of jurisdiction under the Tucker Act are those "attempt[ing] to compensate a particular class of persons for past injuries or labors." *Id.* at 905 n. 42, 108 S.Ct. 2722. The Medicaid statute, in contrast, "directs the Secretary to pay money to the State, not as compensation for a past wrong, but to subsidize future state expenditures." *Id.* The Court further explained that it was reasonable to assume that Congress intended to lodge jurisdiction over challenges to Medicaid disallowance decisions in the district courts because "the nature of the controversies that give rise to [such] decisions typically involve state governmental activities that a district court would be in a better position to understand and evaluate than a single tribunal headquartered in Washington." *Id.* at 907–08, 108 S.Ct. 2722.

In its motion to dismiss the complaint, defendant seeks to reduce the complex jurisdictional analysis articulated in *Bowen* into a stark bright-line rule that precludes jurisdiction in this court over any claim that seeks the payment of money under a statute that subsidizes future activities. The court first notes that even under defendant's proposed interpretation of *Bowen,* plaintiffs' suit would not be barred under the holding in that case. As defendant appears to recognize, the grants awarded under section 1603 are designed not to subsidize future behavior, but to reimburse applicants for costs that were already incurred. *See* Def.'s Mot. at 8 (noting that the grants denied to plaintiffs "would have been based upon the money that the plaintiffs had previously invested in solar technology"). Perhaps more importantly, however, defendant's proposed reading of *Bowen* is not supported by the holding in that case or by the Federal Circuit's subsequent application of that holding in later cases.

First, the court notes that the principal issue addressed in *Bowen* was not the limits of this court's jurisdiction under the Tucker Act; rather, the dispute in that case was related to the jurisdiction of the district courts under the APA. Because this court's jurisdiction is not defined by the APA, this court's jurisdictional analysis is not fully addressed by the three-part analysis of APA jurisdiction set forth in *Bowen.* Instead, the relevant question is whether the asserted money-mandating source can be fairly interpreted as mandating the payment of compensation by the government. *See Mitchell,* 463 U.S. at 216–17, 103 S.Ct. 2961.

In this case, the court has held that section 1603 can be fairly interpreted as mandating the payment of money by the government when all of the requirements of the statute have been met. In addition, neither party contests or challenges the premise that a money judgment in favor of plaintiffs in this court would provide them with a complete and adequate remedy for the relief currently sought. *See Telecare Corp. v. Leavitt,* 409 F.3d 1345, 1349 (Fed.Cir.2005) (noting that "[t]he availability of an action for money damages under the Tucker Act . . . is presumptively an 'adequate remedy' for § 704 purposes.") (citations omitted); *see also Suburban Mortg. Assocs., Inc. v. United States,* 480 F.3d 1116, 1126 (Fed.Cir.2007) (noting that the three-part *Bowen* analysis should begin with the issue of whether there is an adequate remedy in another court, because if that question is answered in the affirmative, then the district courts lack jurisdiction under section 704 of the APA, and there is no further need to determine whether the requested relief constitutes damages for purposes of section 702 of the APA). For those reasons, contrary to defendant's assertion, it is clear that a district court would not have jurisdiction over plaintiffs' claims under the APA, and this court is the proper forum for plaintiffs' suit.[7]

---

**7.** Similarly*, Katz v. Cisneros,* 16 F.3d 1204 (Fed. Cir.1994)*,* and *Nat'l Ctr. for Mfg. Scis. v. United States,* 114 F.3d 196 (Fed.Cir.1997) (*NCMS* )*,* both of which defendant relies upon*,* have no clear application to this case. In *Katz,* the plaintiff challenged the calculation of contract rents under a federal housing program by the Department of Housing and Urban Development

(HUD). The Federal Circuit held that the district court could exercise jurisdiction over the suit under the APA because there was no adequate remedy in this court. *See Katz,* 16 F.3d at 1209 ("[Plaintiff] unmistakably asks for prospective relief. An adjudication of the lawfulness of HUD's regulatory interpretation will have future impact on the ongoing relationship between the parties.

Finally, defendant asserts that this court may never exercise jurisdiction over suits based on a statute that requires the payment of money as a grant or subsidy. In addition, defendant argues that this court has jurisdiction only over those claims that are based on a statute containing an express damages remedy for its violation by the government. Both of those assertions are contradicted by multiple decisions of the Federal Circuit. *See, e.g., Greenlee County,* 487 F.3d at 877 (holding that a statute providing for payments to local governments to cover the loss in tax revenues attributable to the tax-exempt status of federal lands was money mandating); *Kanemoto v. Reno,* 41 F.3d 641 (Fed.Cir.1994) (holding that a statute requiring the payment of money to individuals of Japanese descent who were placed in internment camps during World War II was money mandating). The statutes at issue in *Greenlee County* and *Kanemoto,* which were held to be money mandating in those cases, did not contain an express provision allowing for the recovery of damages in the event that the government breached its obligations under those statutes. On the contrary, those two statutes—like section 1603—simply commanded the payment of money to recipients upon the satisfaction of certain conditions. For all of the foregoing reasons, the court concludes that Count I of plaintiffs' complaint is not barred under *Bowen.*

### 2. The Court Has Jurisdiction over Count II of the Complaint

In Count II of the complaint, plaintiffs argue that section 1603 constituted an offer by the government to enter into a unilateral contract, and that plaintiffs accepted that offer when they filed their applications for reimbursement grants. Defendant responds that plaintiffs' contract claim is barred under the decision of the Federal Circuit in *Rick's Mushroom Serv., Inc. v. United States,* 521 F.3d 1338 (Fed.Cir.2008) (*Rick's Mushroom* ). For the reasons discussed below,

the court holds that it possesses subject matter jurisdiction over Count II of the complaint.

Under the Tucker Act, this court possesses subject matter jurisdiction over claims based "upon any express or implied contract with the United States...." 28 U.S.C. § 1491(a)(1). The Tucker Act merely "waiv[es] sovereign immunity and provid[es] the forum for adjudication[,]" and plaintiffs must also point to a substantive source of law that compels the payment of money in order to establish jurisdiction in this court. However, the Federal Circuit has noted that a well-pleaded allegation of an express or implied-in-fact contract is sufficient to survive a motion to dismiss under RCFC 12(b)(1). *See Bank of Guam v. United States,* 578 F.3d 1318, 1325 (Fed.Cir.2009) ("A well pleaded allegation of a breach of either an express or implied-in-fact contract is sufficient to overcome challenges to jurisdiction.") (citing *Trauma Serv. Grp. v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997)). Because Count II of the complaint alleges the existence of a contract between plaintiffs and the government, defendant's motion to dismiss that count under RCFC 12(b)(1) must be denied.

However, defendant argues that the asserted contract in this case does not provide a sufficient basis for jurisdiction under the Tucker Act because it is not based upon a money-mandating statute. In support of that argument, defendant relies upon the decision of the Federal Circuit in *Rick's Mushroom,* which held that this court did not possess subject matter jurisdiction over a contract claim based upon a cost-share agreement between the plaintiff and the government. Under that agreement, the government provided detailed design specifications for the construction of a spent mushroom substrate facility and agreed to cover a portion of the cost of constructing that fa-

---

The Court of Federal Claims cannot provide this relief.''). In *NCMS,* the Federal Circuit held that a suit seeking the release of certain funds appropriated to the United States Air Force by Congress pursuant to a cooperative agreement between the plaintiff and the Air Force was within the jurisdiction of the district court under the APA because those funds were not ''damages''

and the Court of Federal Claims could not provide an adequate remedy in light of the probable need for declaratory or injunctive relief. *See NCMS,* 114 F.3d at 202. Both of these cases are distinguishable from the present case inasmuch as this court can provide a complete and adequate remedy.

cility. When the plaintiff in that case sought to recover damages from the government under the cost-share agreement, this court concluded that it did not have jurisdiction over the claim because the agreement was not a contract for the procurement of goods or services and was thus beyond the scope of the CDA. On appeal, the plaintiff argued that this court had erred in dismissing its contract claim because that claim was based in part on an implied-in-fact contract with the government, which the plaintiff claimed was squarely within the subject matter jurisdiction of this court under the Tucker Act.

The Federal Circuit affirmed this court's dismissal of the contract claim. First, the court noted that the cost-share agreement did not provide an express substantive right to recover money damages for its breach, and that any claim based on that agreement was not covered by the CDA because it did not govern the procurement of goods or services. *Rick's Mushroom,* 521 F.3d at 1343–44. Next, the Federal Circuit noted that the plaintiff had asserted that its contract claim was based upon the existence of an implied-in-fact contract, but further observed that the complaint failed to identify a money-mandating statute that would have allowed the court to infer the existence of an implied contract. *See id.* at 1344. Finally, the Federal Circuit held that the implied contract claim was precluded by the existence of an express contract between the government and the plaintiff for the same subject matter. *See id.* Thus, the Federal Circuit concluded that because "[the plaintiff] and the federal government [had] entered into an express contract," *id.,* the court could not reasonably infer an implied contract.

Defendant argues that the identification of an express damages clause or some other money-mandating source is a jurisdictional prerequisite to any contract claim under the Tucker Act. Regardless of whether that assertion is supported by a fair reading of *Rick's Mushroom,* the court holds that it has jurisdiction over Count II of plaintiffs' complaint even under the standard proposed by defendant.[8] First, defendant's reliance on *Rick's Mushroom* is predicated on its incorrect assertion that section 1603 is not money mandating. *See* Def.'s Mot. at 6 ("Because plaintiffs rest their breach-of-contract claim solely upon Section 1603, a non money-mandating source, this Court lacks jurisdiction over this claim."); Def.'s Reply at 14 ("Although [there is] a general presumption that money damages are an available remedy upon breaches of . . . express and implied-in-fact contracts, this presumption is not applicable here because Section 1603 is not money-mandating and does not support a claim for money damages upon breach."). However, this court has already held that section 1603 is a money-mandating source of law.

In addition, unlike in *Rick's Mushroom,* here there is no express contract that, from the outset, would preclude the inference of an implied-in-fact contract. Because Count II of the complaint contains a non-frivolous allegation that the government entered into a contract with plaintiffs, defendant's motion to dismiss that count under RCFC 12(b)(1) must be denied. *See Hanlin v. United States,* 214 F.3d 1319, 1321 (Fed.Cir.2000) ("[The] complaint presents a non-frivolous allegation of the existence of an implied-in-fact contract; this is sufficient to confer jurisdiction in the Court of Federal Claims under 28 U.S.C. § 1491(a)(1).") (citing *Gould*

---

**8.** The court need not address whether there is an inconsistency between the decision in *Rick's Mushroom* and the long line of Federal Circuit precedent holding that this court has subject matter jurisdiction over contract claims under the Tucker Act, regardless of whether the asserted contract contains an express damages clause or is based upon a money-mandating statute. *See, e.g., Trauma Service Group,* 104 F.3d at 1325; *Lewis v. United States,* 70 F.3d 597, 603 (Fed.Cir.1995). However, to the extent that *Rick's Mushroom* is inconsistent with the Federal Circuit's earlier pronouncements on that issue,

those earlier cases are controlling. *See Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed. Cir.1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc.* Where there is direct conflict, the precedential decision is the first.") (citation omitted). For the reasons discussed *infra,* the court further notes that Count II of plaintiffs' complaint must be dismissed regardless of whether that count is within this court's jurisdiction.

*v. United States,* 67 F.3d 925, 929 (Fed.Cir. 1995)).

### B. Motion to Dismiss Count II for Failure to State a Claim

Defendant argues that plaintiffs' contract claim must be dismissed for failure to state a claim because that count of the complaint does not allege facts sufficient to meet the requirements of an implied-in-fact contract. Because the court concludes that plaintiffs have failed to demonstrate the existence of such a contract, defendant's motion to dismiss Count II under RCFC 12(b)(6) is granted.

**[7]** The Supreme Court has explained that "[a]n agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Hercules, Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). The elements of an implied-in-fact contract are the same as those required for an express contract: (1) mutuality of intent; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) actual authority to bind the government. *See Hanlin v. United States,* 316 F.3d 1325, 1328 (Fed.Cir.2003) (*Hanlin II* ). Plaintiffs carry the burden of demonstrating the existence of an implied contract. *Id.*

Plaintiffs argue that section 1603 is promissory in nature because it requires the government to award grants to any applicant who meets the requirements of the statute. Defendant, in contrast, counters that "[b]inding precedent establishes that statutes cannot form the basis of a legally operative promise or offer on the part of the government." Def.'s Mot. at 10 (citing *Hanlin II,* 316 F.3d at 1329–30). However, *Hanlin II* did not hold that a statute can never constitute an offer to enter into a contract. Rather, the Federal Circuit held that the particular statute at issue in that case could not be interpreted in that manner. *See Hanlin II,* 316 F.3d at 1330 ("We discern no language in the statute or regulation that indicates an intent to enter into a contract with an attorney who has reached and submitted a proper fee agreement with a veteran."). Although the court rejects the categorical rule urged by defendant, it nonetheless holds that section 1603 cannot be interpreted as an unambiguous offer indicating the government's intent to enter into a contract.

**[8, 9]** There is a general presumption that statutes are not intended to create any vested contractual rights. *See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) ("For many decades, this Court has maintained that absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'") (quoting *Dodge v. Bd. of Educ.,* 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937)); *Pa. Dep't of Pub. Welfare v. United States,* 48 Fed.Cl. 785, 791 (2001) (noting that a law will not be interpreted to create any contractual rights "absent some clear indication that the legislature intends to bind itself contractually"). In order to overcome this presumption, plaintiffs must point to specific language in section 1603 or to conduct on the part of the government that allows a reasonable inference that the government intended to enter into a contract. Plaintiffs assert that the government's intent to enter a contract can be inferred from the conduct of Congress and the President in enacting and signing the Recovery Act.

In support of their argument that section 1603 should be construed by this court as an offer by the government to enter into a unilateral contract, plaintiffs cite *Radium Mines, Inc. v. United States,* 153 F.Supp. 403, 405–06 (Ct.Cl.1957), and *Grav v. United States,* 14 Cl.Ct. 390 (1988) (*Grav I* ), *aff'd,* 886 F.2d 1305 (Fed.Cir.1989) (*Grav II* ), two cases that are distinguishable from the facts in this case. While those cases held that a statute or regulation can constitute an offer to enter into a unilateral contract, the statu-

tory and regulatory provisions discussed in those cases clearly expressed the government's intent to enter into contractual arrangements with program participants and thus had overcome the general presumption that a statutory entitlement does not create contractual rights.

In *Radium Mines,* the Court of Claims held that a regulation stating that the government would purchase uranium from mining companies at specified prices was an offer to enter into unilateral contracts. Unlike section 1603, the regulation at issue in that case stated that the government would enter into a contract with any producer who offered to sell uranium to the government, provided that the uranium met the requirements set forth in the regulation. For example, the regulation in *Radium Mines* stated that upon the receipt of a written offer and an acceptable sample of uranium from a program applicant, the government would "forward to the person making the offer a form of contract containing applicable terms and conditions ready for his acceptance." *Radium Mines,* 153 F.Supp. at 405. There is no indication in section 1603 that the government intended to enter into a contractual relationship with any reimbursement grant recipient. On the contrary, that section simply provides that the government will make an outright payment to any applicant who meets certain specified conditions.

Similarly, the statute at issue in *Grav I* established a program that required the government to enter into a contract with any milk producer that agreed to reduce its production during a specified fifteen-month period. In that case, the Claims Court noted that the statute at issue provided that the "Secretary shall . . . provide for a Milk Diversion Program under which the Secretary shall offer to enter into a contract . . . with any producer of milk in the United States for the purpose of [reducing milk production]." *Grav I,* 14 Cl.Ct. at 392. The court further concluded that the government had no discretion to refuse to enter into a contract with any qualified producer. *See id.* at 393 ("It is

the court's conclusion that Congress intended the Secretary to be the offeror under this particular program. Therefore, it follows from this conclusion that Congress mandated that the Secretary enter into contracts, for the payment of money, to *any* producer who qualified for the milk diversion program.").[9] Like the regulation asserted in *Radium Mines,* and unlike section 1603, the statute at issue in *Grav I* expressly required the government to enter into written contracts with program participants.

The court does not discern and plaintiffs have not pointed to any language in section 1603 or its legislative history that would allow a reasonable inference that the government intended to enter into contracts with all persons and entities that filed applications for reimbursement grants. Even if the government had a statutory obligation to approve plaintiffs' grant applications and to award such grants to plaintiffs, that fact does not automatically lead to the conclusion that the government intended to form a binding contract with plaintiffs. *See Hanlin II,* 316 F.3d at 1331 (noting that the government "may indeed be obligated to follow a statute or regulation regardless of whether it also has a contractual duty to perform"). Unlike the regulatory or statutory provisions at issue in *Radium Mines* and *Grav I,* there is no express language in section 1603 to support plaintiffs' assertion of an implied-in-fact contract. Because plaintiffs have not demonstrated an unambiguous offer or the parties' mutual intent to enter a contract, the court must dismiss plaintiffs' contract claim.

In accordance with the foregoing, the court concludes that it has subject matter jurisdiction over both counts of the complaint. For that reason, defendant's motion to dismiss the complaint under RCFC 12(b)(1) is denied. Because the court concludes that Count II of the complaint fails to state a claim upon which relief can be granted, however, that count must be dismissed with prejudice under RCFC 12(b)(6). Thus, defen-

---

**9.** Although it affirmed the trial court's decision, the Federal Circuit did not adopt the contractual theory upon which that decision was based. Rather, the Federal Circuit held that the statute

was a money-mandating source of law for purposes of this court's jurisdiction under the Tucker Act. *See Grav II,* 886 F.2d at 1307.

dant's motion to dismiss plaintiffs' contract claim is granted.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

(1) Defendant's Motion to Dismiss, filed July 7, 2010, is hereby **DENIED in part,** as to Count I of the complaint, and **GRANTED in part,** as to Count II of the complaint;

(2) The Clerk's Office is directed to **DISMISS** Count II of the complaint with prejudice;

(3) The parties are directed to **CONFER** to determine how they wish to proceed with respect to Count I of the complaint and whether this case may be settled by the parties; and

(4) The parties shall **FILE** a **Joint Status Report** by **February 18, 2011** proposing the next steps in this litigation.



**WESTERN MANAGEMENT, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 97–340T.**

United States Court of Federal Claims.

Jan. 19, 2011.

**Background:** Taxpayer legal services corporation sued United States, seeking refund of employment taxes paid to Internal Revenue Service (IRS) for tax attorney who was corporation's sole shareholder. Government counterclaimed for unpaid employment taxes and penalties. The Court of Federal Claims, Firestone, J., 45 Fed.Cl. 543, granted government partial summary judgment on issue of liability, determining that attorney was statutory employee rather than independent contractor. Parties cross-moved for summary judgment on issue of tax and penalty amounts.

**Holdings:** The Court of Federal Claims, Firestone, J., held that:

(1) attorney's status as statutory employee did not warrant reconsideration;

(2) corporation's reported payments to attorney were wages;

(3) IRS's method of determining quarterly wages was appropriate;

(4) failure-to-deposit penalty was warranted;

(5) negligence penalty was warranted; and

(6) amounts calculated for wages and penalties were accurate.

Defendant's motion granted.

**1. Federal Courts** ⊂⟩**1120**

In considering a motion for summary judgment, the role of the Court of Federal Claims is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. RCFC, Rule 56(c)(1), 28 U.S.C.A.

**2. Federal Courts** ⊂⟩**1120**

On a motion for summary judgment in the Court of Federal Claims, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. RCFC, Rule 56(c)(1), 28 U.S.C.A.

**3. Federal Courts** ⊂⟩**1120**

Cross-motions for summary judgment do not constitute admissions that no genuine issues of material fact remain; rather, each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts. RCFC, Rule 56(c)(1), 28 U.S.C.A.

**4. Internal Revenue** ⊂⟩**5076, 5087**

In a refund suit, a taxpayer has the burden of proving by a preponderance of the evidence that the assessment or determination is incorrect and the correct amount, if any, of tax.

🏴 KeyCite Yellow Flag - Negative Treatment

**Called into Doubt by** Kraft, Inc. v. U.S., Fed.Cl., January 28, 1994

14 Cl.Ct. 398
United States Claims Court.

HERMES CONSOLIDATED, INC. and
Consolidated Subsidiaries, Plaintiffs,
v.
The UNITED STATES, Defendant.

No. 570-83T.
|
March 4, 1988.

Corporate taxpayer sued for refund, based on IRS's alleged erroneous disallowance of carry-over losses claimed on return. The United States Claims Court, Smith, Chief Judge, held that: (1) acquiring corporation which had power to veto any fundamental corporate changes in taxpayer, but which could elect only one third of taxpayer's board of directors, did not acquire 50% of taxpayer's voting power, for purpose of net operating loss carry-over provisions of Internal Revenue Code; (2) arms-length, open-market transactions between acquiring and target corporation provided most persuasive evidence of value of stock acquired, for purpose of such carry-over provisions; and (3) addition of new line to corporate taxpayer's business in years immediately following block sale of stock did not constitute "substantial change" in taxpayer's trade or business, such as would prevent it from carrying over net operating losses incurred in prior tax years.

Judgment for taxpayer.

West Headnotes (11)

**[1]**    **Internal Revenue**
  ➳ Acquisitions to Evade or Avoid Taxes

    In determining whether acquiring corporation has obtained 50% of target corporation's voting power, so as not to be entitled to claim target corporation's carry-over deductions, critical factor is generally percentage of voting stock acquired. 26 U.S.C.A. § 269(a).

    1 Cases that cite this headnote

**[2]**    **Internal Revenue**
  ➳ Acquisitions to Evade or Avoid Taxes

    Record ownership is not sole criteria in determining whether acquiring corporation has obtained at least 50% of corporate taxpayer's voting power, for purpose of net operating loss carry-over provisions of Internal Revenue Code. 26 U.S.C.A. § 269(a).

    1 Cases that cite this headnote

**[3]**    **Internal Revenue**
  ➳ Acquisitions to Evade or Avoid Taxes

    Ultimate expression of voting power, for purpose of statute disallowing any carry-over of corporate taxpayer's losses to extent voting power is acquired by other corporation, is ability to approve or disapprove of fundamental changes in corporate structure, and ability to elect corporation's board of directors. 26 U.S.C.A. § 269(a).

    3 Cases that cite this headnote

**[4]**    **Internal Revenue**
  ➳ Acquisitions to Evade or Avoid Taxes

    Acquiring company which had power to veto any fundamental corporate changes in taxpayer, but which could elect only one third of taxpayer's board of directors, did not acquire 50% of taxpayer's voting power, for purpose of net operating loss carry-over provisions of Internal Revenue Code. 26 U.S.C.A. § 269(a).

    2 Cases that cite this headnote

**[5]**    **Internal Revenue**
  ➳ Evidence

    Corporate taxpayer which seeks to carry over net operating losses incurred prior to its acquisition by other corporation has burden of showing that acquiring corporation did not obtain 50% of value of taxpayer's stock. 26 U.S.C.A. § 269(a).

    Cases that cite this headnote

**[6]**    **Internal Revenue**

Acquisitions to Evade or Avoid Taxes

Acquiring corporation obtains 50% of "value" of corporate taxpayer's stock, so as not to be entitled to claim taxpayer's carry-over deductions, where corporation obtains 50% of fair-market value of stock. 26 U.S.C.A. § 269(a).

2 Cases that cite this headnote

**[7]    Internal Revenue**

Acquisitions to Evade or Avoid Taxes

Arms-length, open-market transactions between acquiring and target corporation provided most persuasive evidence of value of stock acquired, for purpose of statute disallowing any carry-over of target corporation's losses to extent acquiring corporation, with intent to avoid taxes, obtains 50% of "value" of stock. 29 U.S.C.A. § 269(a).

Cases that cite this headnote

**[8]    Internal Revenue**

Carryover of Losses or Other Deductions

Increase in value of target corporation's stock attributable solely to general market conditions, and not to acquiring corporation's purchase of or target corporation's redemption of stock, was not type of increase that would prevent acquiring corporation from carrying over net operating losses incurred by target corporation in prior tax years. 26 U.S.C.(1982 Ed.) § 382(a)(1)(A).

Cases that cite this headnote

**[9]    Internal Revenue**

Carryover of Losses or Other Deductions

Addition of new line to corporate taxpayer's business in years immediately following block sale of stock did not qualify as "substantial change" in taxpayer's trade or business, such as would prevent it from carrying over net operating losses incurred in prior tax years. 26 U.S.C.(1982 Ed.) § 382(a)(1)(C).

Cases that cite this headnote

**[10]    Internal Revenue**

Carryover of Losses or Other Deductions

Not all changes in corporate taxpayer's business in years immediately following block sale of stock are significant enough to be considered "substantial," for purpose of net operating loss carry-over provisions of Internal Revenue Code. 26 U.S.C.(1982 Ed.) § 382(a)(1)(C).

Cases that cite this headnote

**[11]    Internal Revenue**

Carryover of Losses or Other Deductions

Change in corporate taxpayer's employees in years immediately following block sale of stock was not significant enough to be considered "substantial," under net loss carry-over provisions of Internal Revenue Code. 26 U.S.C.(1982 Ed.) § 382(a)(1)(C).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*400**  Buford P. Berry, Dallas, Tex., for plaintiffs. Thornton Hardie III, and Mary J. Clariday, Dallas, Tex., of counsel.

Ellen C. Specker, with whom was Asst. Atty. Gen. Roger M. Olsen, Mildred L. Seidman, Gerald Leedom, and Douglas A. Richards, Washington, D.C., for defendant.

OPINION

SMITH, Chief Judge.

This is a tax refund case for income taxes of $727,830 in principal, $311,730.59 in assessed interest, and an uncalculated amount of accrued statutory interest thereon. These amounts represent net operating loss carry-overs deducted in 1978 by plaintiff under I.R.C. § 172 (1978), but denied by the Internal Revenue Service (the Service) on the basis of I.R.C. §§ 269 and 382 (1978).

The Service disallowed plaintiff's deductions on the basis of sections 269 and 382 because the Service believed that Hermes had undergone a substantial change in its line of business and at least a 50% change of control as a result of the combined acquisitions of stock and operating rights in

61 A.F.T.R.2d 88-823, 88-1 USTC P 9220

Hermes during 1977. This opinion will, accordingly, focus on a review of the terms of these acquisitions during 1977 and on the business history of the Hermes corporation before and after this period. On the basis of the evidence submitted and witnesses heard at trial, as well as the stipulations of the parties, the court finds that the Service's disallowance of plaintiff's net operating loss carry-overs was incorrect and that plaintiff's claim for refund should, therefore, be granted.

### Undisputed Facts

*1. Background of Hermes Business Operations as a Wholly-Owned Subsidiary of Hermes Precisa International*

Hermes Consolidated, Inc. (Hermes) was a wholly-owned subsidiary of Hermes Precisa International, S.A. (H.P.I.) until 1977. During much of its existence, Hermes operated as a manufacturer and seller of office products such as typewriters, calculators, and adding machines. Hermes was also involved in the business of selling camera and movie equipment.

In the late 1960's and early 1970's, Hermes began to simplify its business activities. By 1969, Hermes terminated its involvement in camera and movie manufacturing and devoted itself solely to distribution. The sale of such equipment was later transferred to a newly-created and wholly-owned subsidiary called Paillard. Paillard continued to distribute these goods for a few years but subsequently ended its business activities in 1975. As a result, the only part of Hermes' business which remained operational was its distribution of office products.

During this period, the profitability of Hermes' line of office products began to rapidly decline. Hermes faced strong competition from I.B.M.'s new line of Selectric typewriters (known in the trade as "golf ball typewriters" since they used a golf ball sized element for printing rather than the standard key arrangement then in use). This product revolutionized the market and rendered the older models obsolete. Hermes' business suffered further adverse effects as a result of the overall decline in the economy due to the Arab oil embargo and the subsequent large increase in oil prices.

In order to survive, Hermes continued to distribute its calculators and adding machines but limited the distribution of its typewriters to lighter models. The lighter typing machines were able to serve different business needs than IBM's golf ball typewriters and thus still remained a profitable **\*401** sales item. H.P.I., Hermes parent, also began research and development on its own golf ball machine in 1971, but H.P.I. restricted the sale of that machine to the Swiss market in order to effectively respond to any initial problems which might normally accompany the production of any new design. Nevertheless, despite these efforts of Hermes and H.P.I., Hermes carry-over losses had accumulated to a total of $7,268,174 by the end of 1976.

*2. Hamilton's Stock Option Purchase in Hermes*

As a result of these losses, H.P.I. began considering the sale of part or all of Hermes. After several unsuccessful negotiations with various buyers, H.P.I. began negotiating the sale of Hermes stock with another corporation named Hamilton Brothers Oil Company (Hamilton).

These negotiations resulted in Hamilton's acquisition of a purchase option for shares of stock in Hermes. Under this option, Hamilton could require that Hermes' equity be recapitalized from 20,000 shares of common stock into a capital structure of 100,000 shares of common stock and 104,000 shares of preferred stock.

*3. Hamilton's Purchase of a Refinery Located in Newcastle, Wyoming*

While Hamilton was negotiating for the purchase of an option in Hermes' stock, it was also negotiating with Tesoro Petroleum Corporation (Tesoro) for the purchase of a refinery located in Newcastle, Wyoming. This Newcastle, Wyoming refinery had lost $236,000 during the 1976 fiscal year and over $1.3 million during the first half of fiscal 1977. Hamilton entered into a sales contract with Tesoro for the refinery on April 21, 1977; and the contract price for the refinery equalled $5 million in cash, plus the fair market value of available inventories related to the refinery at its closing, and finally, up to $2 million in earn-out payments if the refinery's gross profits reached certain levels.

In order to ensure the future profitability of the refinery as much as possible, Hamilton applied to the Federal Energy Administration (FEA) to have the refinery placed into the FEA's Entitlements Program. This program, designed and available only for small refiners, provided a myriad of federal regulatory benefits. The benefit most sought by Hamilton was the ability to obtain certain preferences on the sale of its gasoline under then existing price control limits. Specifically, the program would enable Hamilton to sell its product at the maximum current market price, under what was called the

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

"new item rule," instead of a lower rate which was normally used under "the legal entity rule."

On August 29, 1977, Hamilton's application for entry into the Entitlements Program was accepted in all respects except that the refinery was not given the right to utilize "new item rule" pricing. Instead of receiving "new item rule" pricing, Hamilton was given alternative relief from gasoline price controls through an allocation from the FEA's cost bank. This allocation allowed Hamilton to sell its product above the price control limits until the allocation was exhausted. This allocation was projected by Hamilton to be a rough equivalent to the "new item rule" pricing originally sought.

### 4. Hamilton's Exercise of its Stock Option in Hermes and Purchase Agreement with H.P.I.

On July 20, 1977, after Hamilton's purchase of the Newcastle, Wyoming refinery but before the refinery's acceptance into the FEA's Entitlements Program, Hamilton exercised its stock option in Hermes recapitalizing Hermes stock into 100,000 common shares and 104,000 preferred shares. Hamilton simultaneously entered into a purchase agreement with H.P.I. in which Hamilton purchased all of Hermes' common stock for $100,000. The preferred stock was not part of the purchase agreement and therefore remained under H.P.I.'s control.

Besides requiring the recapitalization of Hermes, the exercised stock option required the restatement of Hermes Certificate **402** of Incorporation (the restated Certificate). Under the restated Certificate, all shares, whether common or preferred, were only entitled to one vote, but special voting majorities were required in certain circumstances. A majority vote of each stock group voting as a separate class was required for any change in Hermes' capital stock, for any declaration of bankruptcy, for any general assignment for the benefit of creditors, and for any further amendment of the restated Certificate. A two-thirds majority of each stock group voting as a separate class was required for the effectuation of any dissolution, merger, consolidation, or reorganization.

The restated Certificate provided Hermes with three directors and special voting rules for their election. Of these three directors, one was to be elected by the common shareholders, i.e., Hamilton; one was to be elected by the preferred shareholders, i.e., H.P.I.; and the last was to be elected from both groups of shareholders voting as a single class.

The restated Certificate created par values for the recapitalized stock in Hermes. The recapitalized common stock was given a par value of $1.00 per share, and the newly created preferred stock was given a par value of $2.20 per share.

The preferred stock had some additional differences with the common stock besides the higher par value. First, the preferred shares were entitled to a dividend of 6% per annum which was to become cumulative after January 1, 1982. Second, the preferred stock could be converted into common stock after January 1, 1986.

The most important difference between the preferred and common stock was that the preferred stock was redeemable by Hermes. The restated certificate provided that up to 5,000 shares of preferred stock could be redeemed on or after January 1, 1980, and that the remainder of the preferred stock could be redeemed on or after July 1, 1982.

In order for Hermes to declare the redemption of either the 5,000 shares or the remaining 99,000 shares of preferred stock, the restated Certificate required a majority vote among Hermes' three directors. The purchase agreement further provided that the "preferred stock's" director had to vote in favor of redemption when the "common stock's" director did the same. Thus, the combined effect of both the restated Certificate and the purchase agreement was to give Hamilton the power to unilaterally redeem the preferred stock since Hamilton had control over two out of the three vote majority necessary to effectuate a favorable vote for redemption.

The restated Certificate did require, however, that Hermes pay a certain cost for the redemption of each preferred share. Specifically, each preferred share could be redeemed at a cost of, as follows:

1. $2.20 per share, plus

2. 25% of the first $3,840,000 of pretax income earned after July 1, 1977, [1] reduced by 50% for all of the taxes payable by Hermes, and with the difference divided by 104,000, plus

3. Accrued but unpaid dividends earned on the redeemed preferred shares after July 1, 1982, plus

   4. A 10% redemption premium on any share redeemed after June 30, 1983. The premium was to be increased to 20% with respect to any shares redeemed after June 30, 1985.

*5. Hamilton's Exercise of its Operating Agreement with H.P.I.*

On August 1, 1977, approximately one month after Hamilton's stock option and stock agreement were exercised, Hamilton entered into an operating agreement [2] with H.P.I. The agreement provided that the recapitalized Hermes corporation was to be operated under two separate divisions: the Products Division which consisted of the office products business previously owned by Hermes prior to the recapitalization; **\*403** and the Refining Division which was designed to operate Hamilton's recently purchased Newcastle, Wyoming refinery.

Each division was to operate independently of the other during most day-to-day operations; each was to maintain their own books, and each was to maintain their own separate accounts for cash and securities. Each division also operated under a separate name; the Product Division continued to market itself as Hermes, but the Refining Division referred to itself as the Wyoming Refining Company instead. Lastly, the Products Division was not to rely entirely upon its own corporate structure for funds. Under the stock purchase agreement, H.P.I. was required to forgive $350,000 of loans due from Hermes and had agreed to contribute capital of $350,000 to reduce Hermes' bank debts. Furthermore, under the operating agreement, H.P.I. agreed to infuse working capital when needed, and H.P.I. was to promptly provide funds on demand when the net worth of the Products Division fell below $100,000. [3] The Refining Division, on the other hand, was not provided by Hamilton with any similar funding benefits.

There was one circumstance under the operating agreement in which each division could not act with total independence from the other. Specifically, the agreement prevented the Products Division from undertaking any payment or receipt in excess of $250,000 under a contract or under any other form of commitment without approval from the majority of the board. The restriction on the refining division was more limited; it could not undertake any such commitment in excess of $250,000 outside the normal course of the refining business as determined by Hermes' President or Vice President.

The operating agreement, like the purchase agreement, provided for the separation of H.P.I.'s control from Hermes in later years. The operating agreement included a repurchasing option in which H.P.I. could repurchase the entire assets of its Products Division. This option could be exercised between January 1, 1980 and January 1, 1981. The operating agreement also provided for a put option as well. Under the put option, Hamilton could require the repurchase of the Products Division by H.P.I. starting from February 1, 1980 until January 1, 1981.

The repurchase price of the Products Division to H.P.I. was to be $350,000, plus the assumption of the Products Division's liabilities. This price was to be reduced by 35% of such losses if the division produced net cumulative losses for the period from July 1, 1977 to the date of redemption, but in no instance was the price to fall below $215,000. If the Products Division produced net cumulative gains during the same period, the price was to be increased by 10% of the amount of such gains.

*6. Hermes' Business Activities After its Recapitalization and Reorganization*

The newly comprised board of directors consisted of: one director who was elected by the common stockholder, which was Hamilton; one director who was elected by the preferred stockholder, which was H.P.I.; and a third director who was elected by the majority of both classes of Hermes' stock. Soon after their election, this board of directors agreed to accept an assignment of Hamilton's contract with Tesoro for the purchase of the Newcastle Refinery. Thereafter, in October of 1977, the board purchased the refinery with a $5,000,000 loan borrowed from the Crocker National Bank. The board of directors borrowed an additional $3,000,000 from the Crocker National Bank, of which $1,936,961 was used for the purchase of the refinery's closing inventory.

Both divisions remained operational within Hermes for the next several years. The redemption option and the put option under the operating agreement were not exercised during the allowed periods in 1980 and 1981. Instead, on January 1, 1982, the Products Division, including all of its assets and liabilities, was removed from Hermes by transferring it to Paillard, **\*404** which, as stated earlier, was the wholly-owned subsidiary of Hermes that was left with no assets after the termination of its camera distribution business. [4]

Then, on August 15, 1982, in accordance with the restated Certificate and Hamilton's stock agreement with H.P.I., all of the preferred stock held by H.P.I. was redeemed by Hermes [5]. However, in lieu of the $2.20 portion of the redemption price per share, H.P.I. received all of Hermes' shares in Paillard. [6] Thus, the net effect of Hermes' shift of assets to Paillard

Hermes Consol., Inc. v. U.S., 14 Cl.Ct. 398 (1988)

61 A.F.T.R.2d 88-823, 88-1 USTC P 9220

and exchange of Paillard stock for H.P.I.'s preferred stock in Hermes was the complete severance of H.P.I.'s interest in Hermes.

*7. Hermes' Net Operating Tax Loss Deductions Taken in 1978*

As a result of the large amount of losses Hermes incurred because of a general decline in the economy during the oil crisis and because of Hermes' poor competition with I.B.M.'s golf ball typewriters, Hermes accumulated a large number of net operating loss carry-over deductions (carry-over deductions). *See generally* I.R.C. § 172. These carry-overs deductions had accumulated to $9,909,699 by the time of Hermes' recapitalization. In 1978, the year following the recapitalization, Hermes used these carry-over deductions in order to offset its income taxes by $727,830.

The Internal Revenue Service disallowed plaintiff's carry-over deductions, and it issued a notice of deficiency for the $727,830 amount. Plaintiff paid the alleged deficiency and filed an administrative claim for refund which was subsequently disallowed. Plaintiff then filed suit in this court in order to obtain relief.

Discussion

Central to this dispute is the effect Hamilton's and H.P.I.'s three agreements had on the ownership of Hermes. It is defendant's contention that the stock option, stock purchase, and operating agreements between Hamilton and H.P.I. so changed the ownership and operation of Hermes that Hermes' carry-over deductions should be disallowed under Sections 269 and 382 of the Code.

Under I.R.C. § 269(a) (1978), a corporation's carry-over deductions will be disallowed where: (1) control over the corporation possessing the carry-over deductions was acquired by another corporation, and where (2) the acquiring corporation obtained that control for the principal purpose of avoiding tax. According to defendant, this is precisely what occurred in this case because control of Hermes, the corporation possessing the carry-over deductions, was acquired by Hamilton, and Hamilton acquired Hermes for the principal purpose of avoiding tax.

In most disputes involving I.R.C. § 269, the central issue revolves around whether or not the acquisition was

principally motivated for the purpose of avoiding tax. In this case, however, plaintiff failed to raise this issue in its administrative refund claim. *See generally* I.R.C. § 6511 (1978). As a result of this failure, plaintiff can no longer assert that Hamilton's acquisition was not principally motivated for the avoidance of tax because of the doctrine of variance, which prevents the taxpayers from raising any assertion when seeking a refund in court when the taxpayer failed to make that assertion at the administrative refund level. *See Gindes v. United States,* 228 Ct.Cl. 632, 645, 661 F.2d 194, 202 (1981); *aff'd on other grounds,* 740 F.2d 947 (Fed.Cir.1984), *cert. denied,* 469 U.S. 1074, 105 S.Ct. 569, 83 L.Ed.2d 509 (1984). *See generally* F. Burnett & G. Kafka, Litigation of Federal Tax Controversies § 15.02 (1986).

Plaintiff concedes that the defect in its administrative refund claim had this preclusive effect. Yet, plaintiff contends that I.R.C. § 269(a) still does not apply because Hamilton never obtained the requisite control of Hermes as is required by that Section. **\*405** This dispute over whether or not control was acquired, unlike the issue of whether or not the acquisition was principally done for the avoidance of tax, was raised at the administrative level and therefore must be resolved by the court.

Section 269 of the Code recognizes two ways in which control can be established. First, control is considered established if the acquiring corporation has "at least 50 percent of the total combined voting power of all classes of stock entitled to vote." I.R.C. § 269(a). Second, control is to be established if the acquiring corporation has "at least 50 percent of the total value of shares of all classes of stock of the corporation." *Id.*

*Voting Control*

 [1]    In determining whether the acquiring corporation has obtained 50% of the target corporation's voting power, the percentage of voting stock owned by the acquiring corporation is generally the critical factor. *See Jupiter Corp. v. United States,* 2 Cl.Ct. 58, 65 (1983). In this case, Hamilton never obtained 50% of the record ownership in Hermes' voting stock. After the recapitalization, Hamilton owned 100,000 voting common shares and H.P.I. owned 104,000 voting preferred shares. Since both classes of stock were entitled to one vote per share, Hamilton only owned 100,000 votes out of the 204,000 total. In other words, Hamilton only owned 49.02% of Hermes voting power; 0.98% short of the 50% amount required to qualify under I.R.C. § 269(a).

[2]    [3]    Nevertheless, record ownership is not the sole criteria for determining voting power where there is other evidence to the contrary. *See id.* at 64-65; *see also Ach v. Commissioner,* 358 F.2d 342, 346 (6th Cir.) *cert. denied,* 385 U.S. 899, 87 S.Ct. 207, 17 L.Ed.2d 131 (1966) (decision holding that beneficial voting power is the essential thrust for control, and not literal record ownership, where taxpayer did not own the voting stock but in effect ran all the operations and made all the decisions of the corporation). *But cf.* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders § 3.08, at 3-34 (3rd ed. 1979) (Under I.R.C. 368(c), "it is usually assumed that the computation of 'total combined voting power' is not to take account of shareholders' voting agreements or similar arrangements even though they may alter the balance of power; but the question is not foreclosed by case law or rulings.") Voting power is not merely the holding of voting stock shares. Rather, the ultimate expression of voting power is the ability to approve or disapprove of fundamental changes in the corporate structure, and the ability to elect the corporation's board of directors. L. Solomon, R. Stevenson, Jr. & D. Schwartz, Corporations Law and Policy ch. 3, at 26 (1982).

[4]    Upon review of all of the evidence, the court finds that while Hamilton came close to controlling the 50% amount of Hermes' voting power required to effectuate I.R.C. § 269, Hamilton never quite reached that key percentage. Hamilton did have 50% of Hermes' voting power when approving or disapproving fundamental corporate changes. In that regard, Hamilton had exactly the same ability as H.P.I. to effectuate or prevent such a change since each corporation could not act without the consent of the other. In order to amend the certificate of incorporation, change Hermes' capital stock, file for bankruptcy, or make a general assignment for the benefit of creditors, a majority of H.P.I.'s preferred shares and a majority of the Hamilton's common shares had to approve. In order to dissolve, merge, consolidate, or reorganize; two-thirds of the H.P.I.'s preferred shares and two-thirds of Hamilton's common shares had to approve.

The quantum of voting power in which Hamilton fell short of the 50% control required was in its power to elect Hermes' board of directors. Hermes had three members on its board. The majority of Hamilton's shares were entitled to elect one member. The majority of H.P.I.'s shares were entitled to elect another. The third member of the board was elected from the majority of all the shares voting as a single class. Since H.P.I. had 104,000 shares and Hamilton only had 100,000

shares, H.P.I. had the power to independently **\*406** elect the third member of the board. In measuring Hamilton's power to elect Hermes' board of directors then, Hamilton held a 33 #% interest since it controlled only enough votes to elect one out of the three members. It is this failure to control 50% of the power in electing Hermes' board of directors which prevents the court from finding that Hamilton obtained the necessary 50% of voting power required under I.R.C. § 269(a).

Hamilton's failure to obtain 50% of the voting power in electing Hermes' board of directors is critical in the 50% voting power determination under I.R.C. § 269(a) for two reasons. First, Hamilton barely held 50% of the power to prevent fundamental changes in Hermes, and therefore Hamilton's lack of power in electing the directors of the board was sufficient to throw Hamilton's overall power in Hermes under the 50% mark. Secondly, the power to elect a corporation's board of directors is more indicative of voting power than the power to participate in fundamental corporate changes because the power to participate fundamental corporate changes is generally attendant with all stock ownership under local state law. *See* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders § 3.08, at 3-34 (the critical factor in determining whether stock is entitled to vote under I.R.C. § 368(c) is the stock's ability to vote in the election of the board); Rev.Rul. 69-126, 1969-1 C.B. 218 (preferred stock qualified as voting stock under I.R.C. § 1504(a) since it could vote in elections for the board).

The defendant contends that Hamilton's inability to elect a third member should not persuade the court from finding that Hamilton held 50% of the voting power in electing the board of directors because H.P.I. exercised its power by voting for a director who was independent [7] of both Hamilton and H.P.I. Therefore, according to defendant, since both Hamilton and H.P.I. equally controlled one member of the board and the third board member was controlled by neither, Hamilton, in fact, shared equal power over the board with H.P.I. Thus, defendant argues that this equal share should be considered as equivalent to the 50% voting power required under I.R.C. § 269(a).

The court finds the fact that H.P.I. voted for an independent director to be an unpersuasive equivalent to 50% voting control. There was no evidence presented to the court that H.P.I. was bound to vote for an independent director nor was there any evidence that H.P.I.'s unfettered power to vote for a third director was illegitimate. Even if oral

evidence were produced that H.P.I.'s written voting power was a sham, the issue of sham is an issue which must be resolved against the government. *See Maxwell Hardware Co. v. Commissioner,* 343 F.2d 713, 720 (9th Cir.1965). At this point, it should be remembered that legally binding agreements affecting voting control are "too valuable ... for the effectuation of innumerable commercial transactions to be ... lightly impugned...." *Id.* at 721 (case involving a voting trust agreement).

Assuming arguendo that H.P.I.'s use of its voting power to elect an independent board member could be considered as a nullification of that power, defendant still fails to prove that Hamilton controlled 50% of the voting power in electing Hermes' board members. The third member was independent of both H.P.I. and Hamilton. "Independent" does not mean being equally subject to control by all, but rather "independent" means being subject to control by none. *See* Webster's New Collegiate Dictionary 584 (5th ed. 1977); *see also* Black's Law Dictionary 693 (5th ed. 1979) (independent is defined as "not subject to control ... from a given outside source.") Therefore, Hamilton would still only be considered to have control over one out of the three members on the board; an interest in the board equalling merely thirty-three and a third percent.

In sum, it cannot be said that Hamilton obtained 50% of the voting power in Hermes. Hamilton only owned 49.02% of the record ownership in Hermes' voting **\*407** stock. Upon review of other evidence indicating voting control, Hamilton again came close but again fell short of the prohibited 50% limit. Hamilton did own 50% of the voting power to prevent corporate changes yet fell critically short of holding 50% of the voting power necessary to elect the board. It should be remembered that the ability to prevent fundamental corporate changes may also reside with small shareholder minorities in certain situations.

*Stock Value*

 **[5]**    As discussed previously, there are two types of control which must be avoided in order for plaintiff to prove that Hamilton's acquisition did not fall within the confines of I.R.C. § 269(a). Besides proving that the acquiring corporation did not obtain 50% of the target corporation's voting power, the taxpayer must prove that the acquiring corporation did not obtain 50% of the value of the target corporation's stock. This question of valuation is one of fact, *e.g., Hamm v. Commissioner,* 325 F.2d 934, 938 (8th Cir.1963) *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12

L.Ed.2d 1046 (1964); 14 Mertens Law of Federal Income Taxation (Callaghan) § 59.01, at 5 [hereinafter Mertens], and the burden of proving this fact lies with the taxpayer. *E.g., Carpenter v. United States,* 7 Cl.Ct. 732, 736 (1985), *aff'd without opinion,* 790 F.2d 91 (Fed.Cir.1986); *Rosenberg v. United States,* 3 Cl.Ct. 432, 435 (1983).

 **[6]**    The value of stock referred to under I.R.C. § 269(a) is its fair market value. *See Maxwell Hardware Co. v. Commissioner,* 343 F.2d at 720. Fair market value is not defined under I.R.C. § 269(a) nor under its attendant regulations, but its meaning has been widely established throughout the code. Specifically, fair market value is "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under a compulsion to buy nor sell and both being reasonably informed as to all the relevant facts." 14 Mertens § 59.01, at 4; *accord e.g., Guggenheim v. Rasquin,* 312 U.S. 254, 257 n. 4, 61 S.Ct. 507, 508 n. 4, 85 L.Ed. 813 (1941); *Central Trust Co. v. United States,* 158 Ct.Cl. 504, 520, 305 F.2d 393, 402 (1962) (per curiam); *True v. United States,* 547 F.Supp. 201, 202 (D.Wyo.1982).

 **[7]**    There is "little evidence [which] could be more probative [of fair market value] than the direct sale [or cost] of the property in question." *Estate of Kaplin v. Commissioner,* 748 F.2d 1109, 1111 (6th Cir.1984); *accord e.g., Goldstein v. Commissioner,* 298 F.2d 562, 567 (9th Cir.1962) ( "cost is often considered persuasive (and frequently the best) evidence of fair market value."); *Estate of Fitts v. United States,* 237 F.2d 729, 731 (8th Cir.1956) (actual sales are the best criterion for fair market value). In this case, Hamilton purchased the stock in question at a cost of $100,000. This purchase becomes all the more persuasive as evidence of value in light of the fact that the date of the purchase is the same as the date of valuation. [8] *See e.g., Estate of Fitts v. Commissioner,* 237 F.2d at 731 (actual sales are determinative when they are within a reasonable time before or after the valuation date).

As for the value of the other stock not owned by Hamilton, i.e., H.P.I.'s preferred stock, its value can be measured by the cost which Hermes agreed to pay for its **\*408** redemption. [9] The calculation of cost in this situation, however, is not an easy one since the calculation is divided into four separate steps, and all of these steps are based on different computations.

Hermes Consol., Inc. v. U.S., 14 Cl.Ct. 398 (1988)
61 A.F.T.R.2d 88-823, 88-1 USTC P 9220

The first part of the formula requires Hermes to redeem the preferred stock at a cost of $2.20 per share or at a cost of $228,800 in total. [10] Under the second step of the formula, Hermes was required to pay up to 25% for its first $3,800,000 of pre-tax income. This amount, an amount which could reach up to $960,000, was then to be reduced by 50% for all the taxes payable on the first $3,800,000. In other words, the cost calculation under this second step depended very much upon the taxability of this first $3,800,000 of income, which, in turn, hinged very much upon the deductibility of Hermes' carry-over deductions taken prior to the recapitalization. The deductibility of these carry-overs, of course, is the subject of this dispute, and therefore, possible costs imposed by this second step will be ignored. If the court were to do otherwise, it would be forced into the awkward situation of assessing in hindsight the possible outcome of this litigation. The third step of the cost calculation required Hermes to pay all accrued but unpaid dividends. These dividends began accruing after

January 1, 1982 at a 6% per annum interest, which was to be compounded quarterly. In light of the tax avoidance purpose of this transaction, it was safe to predict in 1977 that the redemption would have occurred at the earliest possible date which was on July 1, 1982. [11] The sum of these accruals at the 6% per annum rate by July 1, 1982, amounts to $6,864. [12] Lastly, under the fourth step, additional premiums were to be paid if the redemptions occurred after June 30, 1983. The court will ignore these possible premiums though because they, like much of the accrued dividends, were to be paid only if the stock was redeemed after the earliest possible redemption date.

Based on the above computations, the total expected cost in 1977 to redeem H.P.I.'s preferred stock in 1982 would be, as follows:

| | | | | |
|---|---|---|---|---|
| (step 1-$2.20 per share) | = | $ | 228,800 | + |
| (step 2-based on the possible tax on the first 25% $3,800,000 of Hermes income) | = | $ | 0 | + |
| (step 3-accrued dividends after July 1, 1982) | = | $ | 6,864 | + |
| (step 4-premiums if the stock is held after June 30, 1983) | = | $ | 0 | + |
| Total Cost of | = | $ | 235,664 | + |

There is one problem with this figure however. The redemption cost of the stock is for the year 1982 and not for the date of valuation on July 20, 1977. [13] Thus, the difference in timing must be considered since the value of money held in 1982 was greater than the sum of the same amount of money held in 1977. *See generally* Halperin, **\*409** *Interest in Disguise: Taxing the Time Value of Money,* 95 Yale L.J. 506 (1986); Cunningham, *A Theoretical Analysis of the Tax Treatment of Future Costs,* 40 Tax L.Rev. 577 (1985). Defendant's computations do take the time value of money into account and have assigned a discount rate of 12%. Applying this factor to the $235,664 amount, the discounted value of H.P.I.'s preferred stock could thus be said to be $133,723. Although this discount rate seems to be slightly high, this amount will be assumed for the sake of simplicity. [14]

Having reviewed both the cost of Hamilton's stock in Hermes and the value of Hermes stock owned by H.P.I., the court

fails to find that Hamilton owned 50% or more of the value in Hermes' stock as is required by I.R.C. § 269(a). The purchase price of Hamilton's stock was $100,000 as compared to the present discounted redemption cost of $133,723. This amounted to a holding by Hamilton of only 42.8%; 7.2% short of the 50% required.

Defendant concedes that Hamilton cannot be considered a 50% owner in the value of Hermes' stock if the $100,000 cost of the common stock is compared with the $133,723 redemption cost of the preferred stock. Rather, it is defendant's contention that the $100,000 purchase price for Hermes' common stock was not truly representative of the common stock's fair market value because, according to defendant, the sale should not be considered as an arms length transaction. Although the weight of evidence is that this sale of Hermes' common stock was an arms length transaction, [15] there are grounds for questioning the truly representative nature of the common stock's sale price in this instance. Hamilton purchased more than just 100,000 shares

of stock in Hermes. Hamilton also purchased a variety of voting, management, and redemption rights, and Hamilton then assigned its Tesoro refinery purchase contract to Hermes' operations.

The problem with these separate agreements is that their construct may have been an elaborate way of lowering the value of Hamilton's stock in Hermes in order to avoid I.R.C. § 269(a). If these other agreements had such an effect, it is clear that the cost of the common stock cannot be considered the sole criteria for determining value. *Cf. Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1934) (mere devises in the form of a reorganization cannot be used to conceal the distribution of a dividend). Under the judicially created step transaction doctrine, a series of transactions must be "amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching ... [an] ultimate result." *King Enterprises, Inc. v. United States,* 189 Ct.Cl. 466, 475, 418 F.2d 511, 516 (1969) **\*410** (per curiam) (quoting Herwitz, Business Planning 804 (1966)). *See generally* Mertens §§ 43.91-92; Fed.Tax Coordinator 2d (Res.Inst.Am.) 22,397-22,400.

Hamilton's various agreements with H.P.I. and Tesoro were clearly a series of component transactions intended to effectuate a single result. As Hamilton is forced to concede because of the defect in its administrative claim for refund, Hamilton's acquisition of Hermes' stock was for the purpose of tax avoidance. Thus, it seems evident, in light of Hamilton's tax avoidance purpose and in light of the construct of its various agreements with Hermes, that Hamilton wanted to place the Tesoro refinery inside of Hermes' corporate shell for the sole reason of utilizing Hermes' carry-over deductions.

Yet, in order for Hamilton to successfully utilize these deductions, Hamilton could not simply acquire a majority interest in Hermes since it would trigger disallowance of the carry-over deductions under I.R.C. § 269. On the other hand, Hamilton needed a majority interest in Hermes if Hamilton wanted to retain a controlling interest in the operations and profits of the refinery. [16] Hamilton's response to these problems was to arrange its agreements in such a way as to avoid the pitfalls of both positions. While there is nothing improper in this action, it is the court's duty to scrutinize the transaction to insure it is not afoul of the limits set out in I.R.C. § 269.

Hamilton, accordingly, purchased less than 50% of the voting stock in Hermes in order to avoid I.R.C. § 269. At the same time, Hamilton sought to secure extra control over the refinery's operations through the use of special corporate structural mechanisms, as follows: by obtaining management direction over day-to-day operations in the refinery by requiring greater than normal voting majorities, by requiring special director election rules, and by creating put and redemption options for the Products Division.

As for the Tesoro refinery, it makes no difference how Hamilton affected its transfer because the value of the refinery was completely offset with debt. Had Hamilton made the purchase and then transferred the refinery with the debt assumed for its purchase, the value of Hamilton's stock in Hermes under I.R.C. § 269(a) would not have increased. The value of the refinery contributed to Hermes would be completely eliminated with the correspondent debt attached. Hamilton only entered into the contract for the Tesoro refinery but never actually made the purchase. Instead, Hamilton simply transferred the refinery contract to Hermes. [17] Hermes then purchased the refinery directly without any financial investment from Hamilton. The value of this direct purchase to Hermes was again eliminated by the assumption of debt.

It is obvious that the $100,000 purchase price of the stock cannot be viewed in isolation when valuing Hamilton's stock acquisition. The valuation must additionally include the possible effects of the other agreements. Special emphasis must further be made when considering the value of the refinery. The acquisition of the refinery should not be considered the usual proportional acquisition by all the shareholders but rather, because of the effect of the other agreements, the acquisition of the refinery should be solely attributed to the value of Hamilton's stock in Hermes.

**\*411** Therefore, it is quite possible that the construct of these transactions had the effect of concealing part of the value which Hamilton held in Hermes. On the other hand, it should be noted that it is also quite possible that the $100,000 purchase price was reflective of the fair market value in the stock held by Hamilton. This purchase price may have included more than just the purchase of stock; the purchase price may have reflected the value of these other agreements as well as the anticipated acquisition of the Tesoro refinery. After all, Hamilton surely would not have paid $100,000 for a minority interest in a failing corporation. [18] Hence, the court finds that the purchase price is not as cogent a

value of evidence as it is considered to be in most situations. Nonetheless, the purchase price is relevant and competent evidence; evidence which the court deems as sufficient to overcome the Commissioner's presumption of correctness and sufficient to shift the burden of proving the deficiency onto the government. *See e.g., Keogh v. Commissioner,* 713 F.2d 496, 501 (9th Cir.1983); *Demkowicz v. Commissioner,* 551 F.2d 929, 931 (3rd Cir.1977).

It should be noted that plaintiff did not rely solely upon the purchase price to support its position that the common stock had a fair market value of $100,000. Plaintiff also presented an appraisal and testimony by Mr. Bryan Lawrence; a witness who was recognized by the court as an expert in valuating stock assets, and one who showed himself to have particular expertise in the field of oil and gas.

According to Mr. Lawrence's appraisal, which was a book value [19] balance sheet determination of Hermes' assets at the time of the sale, Hermes had assets of $1,263,000 and liabilities of $926,000 which when added together gave Hermes a net worth of $337,000. The values of the common and preferred were then allocated according to par value. The common stock had a par value of $1.00 per share or $100,000 in total, and the preferred stock had a par value of $2.20 per share or $228,800 in total. [20] Mr. Lawrence then testified that the $100,000 par value of the common stock as compared with the $228,800 par value of the preferred was reflective of the relative fair market worth in both classes of stock. Mr. Lawrence believed that such a comparison was reflective because the par value was established at arms length and because of the preferred stock's voting majority, conversion rights, liquidation preferences, cumulative dividend rights, and available redemption options.

Mr. Lawrence's testimony considered the impact on the value of the common stock which may have resulted from Hermes' later acquisition of the Tesoro oil refinery and its related assets. Since the purchase was accomplished entirely with debt, Hermes' additional refinery assets were completely offset by a corresponding increase in Hermes' liabilities. The end result being that no increase, under any proper book method of valuation, could have existed with respect to Hamilton's shares of Hermes' common stock for there was no increase in Hermes' net worth.

Although the court does not dispute the expertise of Mr. Lawrence, it does have a problem with Mr. Lawrence's reliance on book value. Book value calculations may be

the correct method for determining a corporation's value according to principles of financial accounting, but it should be remembered that correct methods of valuation under financial accounting and correct methods of valuation under tax accounting are not necessarily the same. *See generally* **\*412** Dubroff, *Tax Accounting: The Relationship of Clear Reflection of Income to Generally Accepted Accounting Principles,* 47 Alb.L.Rev. 354 (1983) (financial accounting and tax accounting often have different computations). When making a fair market valuation for the purposes of the tax code, book value is only one of three factors to be reviewed; a corporation's dividend yield and earnings must also be considered. *See Righter v. United States,* 194 Ct.Cl. 400, 412, 439 F.2d 1204, 1210 (1971) (citing *Central Trust Co. v. United States,* 194 Ct.Cl. at 533-34, 305 F.2d at 410-11). Moreover, upon review of these three factors, book value has consistently been held to have the least weight. *See Id.*

The second problem with relying upon the book method of valuation is that this method's probative weight is greatest when the valuated business is in liquidation. *See Fehrs v. United States,* 223 Ct.Cl. 488, 509, 620 F.2d 255, 266 (1980) (per curiam) (citing *Righter v. United States,* 194 Ct.Cl. at 412, 439 F.2d at 1210). In this case, Hermes' Products Division and oil refinery had not liquidated operations but remained as going concerns. The Products Division may have been operating at a loss for quite some time but continued to service its warranty claims and continued to sell its calculators and light office typewriters. The oil refinery also operated at a loss, but it too continued operations. Furthermore, both businesses had an opportunity for revival. The Products Division was expecting increased business as a result of the anticipated advent in June and July of 1977 of H.P.I.'s new line of 808 Hermes golf ball typewriters. As for the oil refinery, it had become more competitive as a result of its acceptance into the FEA's Entitlements Program.

Lastly, the fact that plaintiff's calculations are virtually the same as those for par value is not strong support for its position. "The par value of ... stock is [merely] an arbitrary dollar amount stated in the [corporation's] articles of incorporat[ion].... It bears no relationship to the stock's [fair market] value." *Id.* 77 n. 8. *See generally* 14 Mertens § 59.26, at 80. Problems with the use of par value are evident in this case. The common stock/preferred stock 1:2.20 par ratio's probative value is relatively weak despite the expert testimony of Mr. Lawrence. The preferred stock may have had several preferences over the common, yet many of these preferences were illusory. This is because the preferences

held by the preferred were only effective on or after July 1, 1982; and July 1, 1982, it should be remembered, was the first date on which the preferred stock could be redeemed. [21] Other of these so-called preferences, such as the redemption and put options for the Products Division and the preferred stock, were created more for the benefit of the common stock than for the benefit of the preferred. [22] Finally, the 1:2.20 par ratio of the common stock to the preferred was not reflective of the relative voting power of both classes after the recapitalization. As discussed earlier, Hamilton was not merely a minority shareholder; rather, Hamilton was a minority shareholder which had the benefit of a variety of voting mechanisms designed to give it veto power over most corporate actions.

However, upon a review of all of the evidence, the court still finds the $100,000 purchase price to be the most persuasive evidence of the common stock's fair market value. While this evidence is not overwhelming, it is certainly sufficient to shift the burden of proof to the defendant.

Where the purchase price or cost may not necessarily be determinative of the fair market value of property, the next strongest evidence is the property's projected earnings. *See* 14 Mertens § 59.23, at 72. *See also Fehrs v. United States,* 223 Ct.Cl. at 509, 620 F.2d at 266 (market value of a going concern derived from those ingredients **\*413** bearing upon the business' future earnings capacity). This was the type of evidence which defendant produced at trial in order to prove that Hamilton's stock in Hermes was worth more than the $100,000 purchase price.

Defendant first presented a set of earnings projections which Hamilton used in its application to the FEA Entitlements Program. These figures, according to defendant, showed that Hamilton's indirect control over the refinery obtained through its purchase of Hermes' common stock was alone worth more than the common stock's $100,000 purchase price. The problem with applying these projections to this case, however, is that they were not designed for the purpose of measuring the refinery's fair market value. These projections were instead designed to compare the difference between the refinery's future earnings if assisted by the FEA Entitlements Program with the refinery's future earnings if it had to continue without that assistance. As a result, these projections had to assume that certain crucial variables would remain constant: general gasoline prices, the refinery's sales volume, and the level of the FEA's entitlements. Moreover, other variables, such as the possible termination

of the FEA Entitlements Program and the possible cost of capital improvements to meet future E.P.A. standards, had to be ignored. In light of these assumptions, this valuation for the FEA must be considered as meaningless, for these assumptions, in effect, totally disregarded the refinery's associated risks.

In addition to the earnings projections used by Hamilton for the FEA, defendant also presented a second set of earnings projections which were prepared by its own expert, Dr. Spencer Martin. Dr. Martin's valuation of Hamilton's controlled common stock in Hermes was calculated by capitalizing Hermes' projected earnings under the following three part formula:

Part (1)

All of Hermes' assets [times] Hermes' expected rate of return in its assets = Hermes' projected yearly net income.

and part (2)

Hermes' projected yearly net income under step (1) [times] Hermes' price earnings ratio = the total fair market value of Hermes' stock.

and part (3)

The total fair market value of Hermes' stock [minus] the fair market value of Hermes' preferred stock = the fair market value of the common stock in Hermes controlled by Hamilton.

Under part one of the formula, Dr. Martin appraised the assets of the refinery at $7,000,000. [23] Next, he obtained an expected reported rate of return on these assets from a study done by *Bonner and Moore,* an association which was formed to assist petroleum and chemical processing plants. The *Bonner and Moore* study reported a rate of return at .076 for a refinery of the size owned by Hermes. [24] When the .076 reported rate of return was multiplied by the refinery's $7,000,000 worth of assets as was required under part one of the formula, Hermes' net income was calculated to be $532,000 per year.

Not fully satisfied with these calculations though, Dr. Martin modified the numbers to some extent in order to take into account some specific aspects of Hermes' particular corporation. He did this by averaging the $532,000 amount with the $407,473 income projection estimated by Hamilton

in its application to the FEA. The resultant determination for income was therefore expected to be $469,737.

It should be remembered that Hermes also was the owner of the Products Division. Dr. Martin did not rely upon a study for his figures as he had done with the refinery but made a rough approximation instead. Although Dr. Martin expected Hermes to continue losing money as it had in the past, he found it significant that Hermes could demand H.P.I. to cover all of its losses over $100,000. Based on this **\*414** fact, Dr. Martin estimated that Hermes would probably suffer a loss of $50,000 per year. Thus, Hermes' net income was adjusted downwards by $50,000, which gave Hermes a projected net income total of $419,737 for the combined divisions.

As required by part two of the formula, which converts Hermes' net income projections into a purchase price for the total value of its stock, the $419,737 amount had to be multiplied by Hermes' price earnings ratio. This ratio converts the future value money into a present value; a calculation which reflects the time value of money and which reflects the risk of the investment. In this case, Dr. Martin expected the amount of risk in Hermes' refinery[25] to be somewhat high because oil and gas extraction is a volatile field, but he also expected this risk to be cushioned to some extent by the government's entitlements. Therefore, since a safe investment, like treasury bonds, yielded a 7% return in 1977, Dr. Martin estimated the refinery's projected yield at 15%. This number converted into a multiplier of 6.7 on a 100 point scale.[26] Returning to the calculations under part two of the formula, the 6.7 price earnings ratio multiplied by the $419,737 net income amount equalled a total value in Hermes' stock of $2,812,238.

Finally, in order to differentiate between the value of Hermes' common stock from Hermes' total stock as required by part three of the formula, Dr. Martin subtracted the preferred stock from the $2,812,238 amount. Dr. Martin did not expect the preferred stock to share in the corporation's proceeds beyond what was required by the redemption agreement and therefore considered the preferred to have the value of its cost at redemption. As discussed earlier, the preferred stock's cost was discounted to a present value of $133,723. Accordingly, the $133,723 value of the preferred stock was subtracted from the $2,812,238 total which left the common stock with a value of $2,678,515. Dr. Martin then subtracted 10% of the value of the common stock in order to cover the costs of transfer. The value of the common stock which remained was 2,410,663; a value approximately eighteen times greater than the preferred.

Although Dr. Martin's calculations are logical, the court has problems with the accuracy of their results. Dr. Martin may have been an expert in making general corporate and financial stock valuations, but he failed to show any special expertise in the business of oil and gas. While the court believes that such special expertise is not generally required in valuating oil and gas corporate stock, special expertise in the field of oil and gas is essential in this situation where the stock is closely tied to the unique benefits and obstacles of the particular business itself. Also, this time period was a critical and unique one in the oil and gas industry.

Dr. Martin's lack of specific expertise was apparent in his calculations. Most of his calculations were simply based on industry averages rather than based on an analysis of the refinery itself.[27] As a result of this, Dr. Martin overlooked many of the risks that the refinery had to overcome. First, Dr. Martin failed to recognize that the refinery was faced with stiff competition from seven local refineries. Second, he failed to consider the condition of the refinery, which was in a state of disrepair. Lastly, he failed to consider the possible future costs of impending environmental **\*415** regulations.[28]

There were other problems with Dr. Martin's calculations besides those stemming from his lack of expertise in the field of oil and gas. The most significant of these other problems was Dr. Martin's overvaluation of the FEA Entitlements Program. He overestimated the program by first assuming that it was free from risk of termination or of alteration. Such assumptions were not properly made, however, since the regulations in the field of oil and gas were subject to great change during this period. As a matter of fact, the FEA Entitlements Program was terminated in the early 1980's as a result of the policy of deregulation. His second overestimation of the program was his failure to consider the possibility that other local refineries would be receiving benefits from the same program. For several months after its recapitalization, Hermes did, indeed, suffer further losses from this kind of competition.

The other significant problem that the court had with Dr. Martin's calculations was their total disregard of the refinery's prior losses. The refinery's prior losses may not have been entirely reflective of future earnings over the long term where the business enterprise changed its management, was infused with capital, and given governmental assistance, *see Central Trust Co. v. United States,* 158 Ct.Cl. at 521, 305 F.2d at

61 A.F.T.R.2d 88-823, 88-1 USTC P 9220

403 ("[p]ast earnings are significant only insofar as they reasonably forecast future earnings"), but such losses were still indicative of future earnings during the short period of transition. After all, it takes time for management, even with the assistance of new capital and governmental benefits, to turn a failing enterprise around. Hermes' expected income should, therefore, have been reduced during the early period after its recapitalization in order to take this transitional period into account.

Having reviewed both parties' arguments made at trial, the court finds the arms length open market transactions between Hamilton and H.P.I. more persuasive than the mechanical textbook valuations computed by both parties' experts. This leaves Hamilton with a value of $100,000 in Hermes' stock out of a $233,723 total. [29] Thus, since Hamilton failed to acquire 50% of the value in Hermes' stock, and since, as discussed earlier, it failed to obtain 50% of the voting power in Hermes, the I.R.C. § 269(a) disallowance of Hermes' carry-over deductions cannot be found to apply.

*Application of I.R.C. § 382.*
Defendant argues in the alternative, that even if I.R.C. § 269(a) is not applicable to this situation, that Hermes' 1978 carry-over deductions should be disallowed on the basis of I.R.C. § 382. *See Princeton Aviation Corp. v. Commissioner,* 47 T.C.M. (CCH) 575, 585 (1983) (citing Treas.Reg. § 1.269-6 (1982)), *nonacq.,* 1965-2 C.B. 7. I.R.C. § 382, like I.R.C. § 269(a), also denies the use of carry-over losses once a certain type of acquisition of stock has taken place. In order for a transaction to fall under I.R.C. § 382, the transaction must have fulfilled two basic requirements.

The first requirement of I.R.C. § 382 is that Hamilton, the purchasing corporation, must have experienced a 50% point increase in the fair market value of Hermes', i.e., the target corporation's, stock. I.R.C. § 382(a)(1)(A) (1978). This 50% point increase must have occurred within a two-year period beginning one year prior to the **\*416** year in which the carry-over deductions were claimed. *Id.* The increase must also have been attributable to the purchase of Hermes' stock or attributable to a decrease in its total stock outstanding. I.R.C. § 382(a)(1)(B) (1978). The second requirement of I.R.C. § 382 is that Hermes, the target corporation, must not have continued to carry on substantially the same trade or business after the 50% point increase as it did prior to that increase. I.R.C. § 382(a)(1)(C) (1978).

[8]    Because Hamilton held no stock in Hermes before the transaction in issue, the analysis of the 50% point increase requirement is essentially the same in this case as the 50% value control requirement of I.R.C. § 269. The only difference that exists between the application of both sections is the valuation date. Under I.R.C. § 269, the court reviewed Hamilton's percentage of control based on the value of Hermes' stock as of July 29, 1977, the date when Hamilton acquired Hermes' common stock. Under I.R.C. § 382 however, the valuation date is the year in which the carry-over losses were deducted and the prior year before that. Therefore, because the carry-over losses in dispute were deducted in 1978, the valuation date under I.R.C. § 382 ends on December 31, 1978 and begins on January 1, 1977.

Both parties agree that Hamilton had no ownership in Hermes' stock prior to the recapitalization on July 29, 1977. As the court has already determined above, Hamilton also did not obtain a 50% point interest in the value of Hermes' stock as a result of the recapitalization. The question then becomes whether Hamilton obtained any additional increases after July 29, 1977, which could be attributable to the purchase or reduction of Hermes' stock.

No evidence of any such purchase or reduction was shown or even alleged in this case. The only possible increase which Hamilton could have had in Hermes' common stock was due to a general appreciation of the common stock itself. This type of increase, however, was not the type of increase which was envisioned by I.R.C. § 382(a). *See* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Stockholders, 16.22, at 16-57 ("The language of I.R.C. § 382(a)(1)(B) suggests that the statutory increase must be attributable to the purchase or redemption transactions, rather than to general 'market rises,' but the regulations are silent on this point.") Rather, I.R.C. § 382(a) was only meant to include those increases which were the direct result of a taxable (recognizable) event or exchange, Rev.Rul. 77-81; 1977-1 C.B. 97; Rev.Rul. 75-249; 1975-1 C.B. 125, and a general market rise is clearly not considered a taxable event or exchange. *See* I.R.C. § 1001(a-c) (1978). There was, accordingly, no 50% point increase in this case because Hamilton only acquired 49.02% of the value in Hermes when it purchased Hermes' common stock and because there was no increase attributable to a purchase or redemption of the stock after that date.

[9]    Even assuming arguendo that a 50% point increase did occur, the second requirement of I.R.C. § 382(a) was not

met since no substantial change occurred in Hermes' trade or business. The fact that Hermes purchased an oil refinery does not change this result. This is so because the addition of a business does not, in and of itself, make the change in a corporation's trade or business substantial even if that new line of business is radically different from the other existing businesses. *Accord* Treas.Reg. § 1.382(h)(8) (1978); *Commissioner v. Goodwyn Crockery Co.,* 315 F.2d 110, 112 (6th Cir.1963) (the additional line of dry goods added to plaintiff's houseware line was not a substantial change); *American M.A.R.C., Inc. v. United States,* 67-1 U.S. Tax Cas. (CCH) ¶ 9277 at 83, 654 (C.D.Cal.1967) (the addition of a petroleum exploration and development business to the business of manufacturing engines was not a substantial change); *Power-Line Sales Inc. v. Commissioner,* 36 T.C.M. (CCH) 190, 196 (1977) (the addition of the business of nailers to the oil electronic detection business was not a substantial change). Moreover, a substantial change will not be deemed to occur even where all of the accrued carry-over losses from the **\*417** prior business are applied to the new business. *See* S.Rep. No. 94-938, 9th Cong., 2d Sess. 446 (1976), U.S.Code Cong. & Admin.News 1976, p. 2897.

**[10]** Defendant argues, however, that other changes were made to Hermes' operations besides the addition of the refinery. These other changes asserted by defendant only relate to Hermes' prior office products operations and, therefore, could be considered substantial within the meaning of I.R.C. § 382(a). Yet, it should be remembered that not all changes are significant enough to be considered substantial. The statute does not require absolute rigidity nor does it require a corporation to pursue exactly the same ends after the acquisition as it did before. *Glen Raven Mills, Inc. v. Commissioner,* 59 T.C. 1, 12 (1972) (citing *Goodwyn Crockery Co. v. Commissioner,* 37 T.C. 355 (1961)), *aff'd,* 315 F.2d 110, *acq. in result,* 1973-2 C.B. 2; *e.g., see H.F. Ramsey Co. v. Commissioner,* 43 T.C. 500, 514 (1965) (citing *Goodwyn Crockery Co. v. Commissioner,* 37 T.C. at 355, *aff'd,* 315 F.2d 110); *Princeton Aviation Corp. v. Commissioner,* 47 T.C.M. (CCH) at 586. After all, if such rigidity was required, "good management would be helpless to change past practices to revive a failing corporation." *Coast Quality Construction Corp. & Sub. v. United States,* 325 F.Supp. 500, 505 (1971), *aff'd,* 463 F.2d 503 (5th Cir.1972).

The most significant change asserted by defendant was the change in the type of product which Hermes sold. Specifically, Hermes' office products operations no longer generated most of their sales from light office typewriters but instead from the newer heavier Hermes model 808. This was a change which could hardly be considered significant, let alone substantial, for the basic product remained the same, "only the brand and model sold were changed." *Princeton Aviation Corp. v. Commissioner,* 47 T.C.M. (CCH) at 586. *See Commissioner v. Goodwyn Crockery Co.,* 315 F.2d at 112 (the conversion of part of a wholesale houseware business to retail was not substantial); *Glen Raven Mills, Inc. v. Commissioner,* 59 T.C. at 12-13 (the conversion of equipment from producing full-fashioned hosiery to making full flat fabric was not substantial).

**[11]** Defendant also asserted that Hermes' prior office products operations had been substantially modified after Hamilton's acquisition because the Products Division had increased its sales volume and had changed some of its employees. The court, however, is hard pressed to find a substantial change merely because the prior line of business had increased its volume of sales. Such a finding is counterintuitive, in fact, where the purpose of the statute was to prevent the purchase of a new business simply so that it could be discarded rather than continued or revived. *See* H.R.Rep. No. 1337, 83d Cong., 2nd Sess. pt. 1, at 41-42 (1954), U.S.Code Cong. & Admin.News 1954, p. 4025. Defendant's other assertion, that a substantial alteration occurred because the Products Division changed its employees, is stronger, but it, too, cannot stand in light of the facts of this case. [30] *See generally* Treas.Reg. § 1.382(a)-1(h)(5) (1978) (facts and circumstances test-some of the factors, among others, to be reviewed are the changes in the corporate employees, plant, equipment, product, location, and customers). A change of employees by itself is generally not enough of a change to be considered substantial within the meaning of I.R.C. § 382(a). *See Clarksdale Rubber Co. v. Commissioner,* 45 T.C. 234, 247 (1965). Furthermore, the change of employees in this case is even of less significant because H.P.I., the prior owner of Hermes, retained control over the day to day management of the Products Division's affairs. [31]

**\*418** There is one other way in which a substantial change can be found to exist under I.R.C. § 382(a). This occurs when the prior line of business has become inactive by the time of the acquisition and is only revived afterwards. Treas.Reg. § 1.382(a)-1(h)(6) (1978); *see also Princeton Aviation Corp. v. Commissioner,* 47 T.C.M. at 586-87. According to the evidence presented, Hermes suffered a serious slowdown of its operations by the time of Hamilton's acquisition. Its distribution of office products had been reduced to one type

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 374 of 651

of light office typewriter and to several models of calculators. Hermes only had twelve employees left and the bulk of their work was devoted toward servicing the warranties on old contracts. The company even terminated its pension and investment plan for employees.

Yet, while it can be said that Hermes was down, it can, by no means, be said that Hermes was out. Its sales may have been reduced to a third and its employees reduced to a fraction, but the company never terminated, *see* Treas.Reg. § 1.382(a)-1(h)(6) (example 1 & 2) (1978); *Glover Packing of Texas v. United States,* 164 Ct.Cl. 572, 581, 328 F.2d 342, 348 (1964); *see also United States v. Fenix & Scisson, Inc.,* 360 F.2d 260, 266 (10th Cir.1966), *cert. denied,* 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 599 (1967) (the corporation was inactive where its company had voted to liquidate, its business abandoned and only turned to the rental of property leaving a few employees), nor even suspended its operations. Treas.Reg. § 1.382(a)-1(h)(6) (example 2); *The Wallace Corp. v. Commissioner,* 23 T.C.M. (CCH) 89, 51 (1964). In fact, Hermes continued to produce a gross income of $100,000, an amount which can hardly be considered negligible in this case. Thus, Hermes' operations cannot be said to have become so inactive as to fall within the meaning of a substantial change under I.R.C. § 382(a).

## Conclusion

Upon review of all the evidence and arguments presented, the court finds that Hermes' 1978 carry-over deductions should not be disallowed on the basis of I.R.C. § 269 or I.R.C. § 382. I.R.C. § 269 cannot be applied here because there was no 50% acquisition in Hermes' stock value or in Hermes' voting power. I.R.C. § 382 is inapplicable as well because there was no 50% point acquisition of Hermes' stock; and even if a 50% point acquisition did occur, Hermes did not undergo a substantial change of its trade or business.

The clerk is therefore directed to enter judgment in favor of plaintiff in the amount of $727,830 in principal, $311,730.59 in assessed interest, and for all of the accrued statutory interest thereon.

IT IS SO ORDERED.

**All Citations**

14 Cl.Ct. 398, 61 A.F.T.R.2d 88-823, 88-1 USTC P 9220

## Footnotes

1    In other words, this was an amount which could total up to $960,000.

2    This operating agreement was amended three times. For purposes of simplicity, the term "operating agreement" will be considered as including these amendments.

3    Hermes also could demand extra working capital from H.P.I. when Hermes' working capital fell below $75,000 for two consecutive fiscal quarters.

4    Hermes' name was subsequently changed to Hermes Consolidated, Inc., and Paillard's name was subsequently changed to Hermes Products, Inc.

5    Known at this point in time as Hermes Consolidated, Inc.

6    Known at this point in time as Hermes Products, Inc.

7    Having reviewed the testimony and the evidence at trial, this court finds that the third director was, indeed, independent. Defendant has conceded as much in its post trial brief.

8    Throughout this case, both parties have treated the valuation date and the acquisition date as occurring at the same time on July 20, 1977. This court will note that defendant need not have argued its position in this manner for Hamilton's acquisition of partial control in Hermes was performed by three agreements rather than through any single one. Hamilton may have purchased the 100,000 shares of stock on July 20, 1977, but it also signed a stock option and an operating agreement during a different time of that same year.

Yet, the stock option, signed on March 25, 1977, and the operating agreement, signed on August 1, 1977, were signed at approximately the same time as date of purchase. There were also no significant intervening events which occurred between these dates. Therefore, the fair market value on July 20, 1977, the date the stock was acquired, would still be reflective of fair market value even if the other dates were used instead. *See Estate of Kaplin v. Commissioner,* 748 F.2d at 1111 (a two-year difference in sale and valuation date was of no consequence where there is no intervening evidence of any event changing the value of the property between the two dates).

Plaintiff has consistently claimed that the preferred stock was worth $228,800, which was an amount equal to its par value. Par value, though, is merely an arbitrary number, 14 Mertens § 59.26 at 80, and could scarcely be considered as a better estimate of a property's fair market value than the property's cost.

It is interesting to note that defendant could have asserted that the $2.20 portion of the cost formula established as part of the redemption price in the 1977 purchasing agreement was not truly reflective of cost because it was later substituted with the assets of the Products Division in a 1982 novation of that agreement. If defendant attempted to substitute the $2.20 portion of the formula with these office product assets, however, defendant would have had to prove that the $2.20 price per share was a sham to artificially increase the price of the preferred shares for the purposes of I.R.C. § 269(a). In the absence of any such argument or evidence though, the court finds the $2.20 per share a realistic figure.

Actually, 5,000 out of the 104,000 preferred shares could have been redeemed before July 1, 1982. Yet, for the sake of simplicity, and because it makes no difference to the outcome of this case, the earliest possible redemption date for all the shares has been assumed by both parties to fall upon July 1, 1982.

The sum of these accruals is based on the calculations of Dr. Spencer J. Martin, who is defendant's expert.

It should be remembered that 5,000 of these shares could have been redeemed before July 1, 1982, but were ignored for the sake of simplicity.

In the absence of alternative calculations, this court relies upon those calculations provided by defendant.

In its brief, defendant asserted that the transaction was not at arms length under the terms of Revenue Ruling 59-60, § 4.02(g) 1959-1 C.B. 241-42, as follows:

> Sales of a closely held corporation should be carefully investigated to determine whether they represent transactions at arms length. Forced or distress sales do not ordinarily reflect fair market value nor do isolated sales in small amounts necessarily control as a measure of value.

Although this court need not decide this issue, there are several problems with this argument. First and foremost, Revenue Ruling 59-60 was issued by the service for the purpose of making fair market valuations in the gift and estate tax area, and not for the purpose of making fair market valuations in the area of income taxes. Rev.Rul. 59-60, § 1, 1959.1 C.B. 237. Moreover, even if Revenue Ruling 59-60 were issued for the purpose of fair market valuations in the income tax area, it still would not invalidate the $100,000 purchase price of the common stock in this instance.

The fact that the sale was of closed corporate stock should not be determinative for the sale was made to a member of the general public. Revenue Ruling 59-60 was not intended to prevent these types of sales, but only those sales in a restricted market, such as: a sale to a family member, or to an employee. See Central Trust Co. v. United States, 504 Ct.Cl. at 519-20, 305 F.2d at 402.

Defendant also asserted that the sale was a forced sale since it was done in a state of liquidation. Yet, forced sales were only meant to include those situations similar to those resulting from a court order. See Mertens 27. Even if a liquidation sale were to be considered a forced sale, the facts do not indicate that Hermes ever reached the stage of liquidation.

Control over the earnings and profits of specific assets cannot be achieved by simply owning a proportionate interest in corporate stock. Stock ownership gives a shareholder a proportional interest in all of a corporation's property rather than a total interest in a particular asset. See Wood v. Commissioner, 75 F.2d 364, 366 (1st Cir.1935) (new shares of corporate stock do not generally represent full ownership in new assets but only a proportional interest in the corporate assets as a whole). Thus, a purchase of a mere percentage of stock without the use of other agreements would not have provided Hamilton with its desired level of control over the refinery division's assets.

No assertion or evidence was presented to the court which attempted to treat the value of the contract itself as an additional part of the common stock's purchase price. There is no reason to believe otherwise since Hamilton's assignment simply provided Hermes with a contract on the same terms as was originally provided to Hamilton.

The $100,000 value also cannot be considered related to the carry-over deductions which plaintiff claims it is entitled to in this case because their value was to be recovered under the purchase agreement when H.P.I. redeemed its stock.

Plaintiff originally argued that Mr. Lawrence's appraisal was based on the value of Hermes' net assets. In its post trial reply brief, however, it argued that the appraisal was also equivalent to a book value determination since the assets were appraised near the sale date.

It should be noted that plaintiff's book value calculations do not entirely add up. Mr. Lawrence valued the company at $337,000, but the total stock in the corporation was valued only at $328,800 ($100,000 for the common and $228,800 for the preferred).

Moreover, it should be remembered that 5,000 of these shares could be redeemed even before there was an opportunity for them to accrue at all.

61 A.F.T.R.2d 88-823, 88-1 USTC P 9220

It is clear that these options were constructed so Hamilton could sever its relations with H.P.I. after it successfully used Hermes' carry-over losses.

The actual value of the refinery and its inventory on hand at closing was $6,936,961.

Hermes' refinery fell in the category of a refinery which was expected to produce 10,000-30,000 barrels a day.

The Products Division was ignored in this price earnings ratio. Dr. Martin perhaps ignored this division in the ratio because it was only expected to lose money.

The 6.7 multiplier amount fell 0.3 points below the Bonner and Moore average of a refinery expected to produce 10,000-30,000 barrels a day. Dr. Martin's reason for this lower figure seemed to be that the refinery had the benefit of the FEA Entitlements Program.

The only way Dr. Martin tried to incorporate the specifics of the refinery was by averaging his projections with those used by Hamilton in its calculations made to the FEA Entitlements Program. This average clearly cannot be considered a sufficient analysis of the specifics of the corporation. This is especially so where Hamilton's calculations themselves were of little utility in making an overall fair market valuation of Hermes' common stock.

It should be noted that the court is not requesting that Dr. Martin consider an event which occurred after the date of valuation. *See generally Central Trust Co. v. United States,* 158 Ct.Cl. at 520, 305 F.2d at 403 ((" 'The valuation of the stock must be made as of the relevant dates without regard to events occurring subsequent to the crucial dates.' ") (quoting *Bader v. United States,* 172 F.Supp. 833, 840 (S.D.Ill.1959)). The only fact which Dr. Martin should have considered in his appraisal was the possibility that such an event would have occurred.

This court accepts plaintiff's valuation of Hermes' common stock at $100,000. With respect to the preferred stock, this court finds defendant's figure to be more realistic than plaintiff's valuation at $228,800 since it takes the time value of money into consideration. The court has also chosen defendant's valuation of the preferred because it provides the weakest case for plaintiff under I.R.C. § 269(a), and plaintiff still prevails. Therefore, there is no need to put undue importance as to which valuation of the preferred ought to be accepted.

The change of employees is not as dramatic as defendant suggests. Only one key employee was changed and most of the other employees with Hermes before the recapitalization remained with the company afterwards. The biggest change of employees came by way of increase as a result of increased sales; and as just stated above, no substantial change can be deemed to have occurred simply because the company increased its business.

H.P.I.'s control over the day-to-day affairs of the Products Division was a condition of the operating agreement between Hamilton and H.P.I.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

**268**            **714 FEDERAL SUPPLEMENT**

of record in this action, and having entered its findings of fact, conclusions of law and memorandum opinion, and being fully advised in the premises,

IT IS ORDERED that defendant, Anna Goldey, her employees, agents and all those acting in concert with her, are hereby enjoined as follows:

1. From operating or doing business under any name or in any manner that might tend to give the general public the impression that her license with KFC is still in force, or that she is in any way connected with KFC or authorized to use KFC's trademarks.

2. From making, using, or availing herself of any of the trade secrets, trademarks of, or confidential information imparted by KFC, or disclosing or revealing any such other information or any portion thereof to others.

3. From occupying, constructing, equipping, ordering, or assisting any person or persons in the occupation, construction, or equipping of any premises incorporating the distinctive features or equipment layout which KFC has originated and developed and which are identifying characteristics of premises operated by franchisees of KFC.

4. To return to KFC all Confidential Operating Manuals, together with all other material containing trade secrets, confidential materials, operating instructions, or business practices.

5. To discontinue the use of service marks, trademarks and trade names of KFC and the use of any and all signs, menu board inserts, point-of-sale materials, or printed goods bearing such marks or names or any reference thereto.

6. To renovate or refurbish the outlet sufficiently to eliminate any possibility of confusion in the mind of the public that the outlet is in any manner connected with KFC or any of its licensed Kentucky Fried Chicken outlets. Such renovation may require changing the building interior and exterior color scheme, removing glass, removing light fixtures, and other items.

This order is conditioned upon plaintiff giving security by filing a bond in an appropriate form, which bond need be executed only by the surety in the amount of $5,000 for the payment of such costs and damages as may be suffered or incurred by defendant or any other party who has found to have been wrongfully enjoined or otherwise restrained.



James C. MacKENZIE and Jill W. MacKenzie, Individuals, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 87–CV–72534–DT.

United States District Court, E.D. Michigan, S.D.

April 28, 1989.

In action challenging Internal Revenue Service's disallowance of certain deductions, the District Court, Hackett, J., held that: (1) taxpayer was required to use straight line method of depreciation for film, rather than proposed deduction schedule of 60% of value of claimed film in first year, 15% in second year and 5% in each year thereafter, and (2) taxpayer was entitled to depreciate amount by which stated purchase price of film exceeded film's fair market value.

Ordered accordingly.

**1. Internal Revenue** ⬦3270

Taxpayer is allowed deduction from income only if he falls squarely within statutory provision allowing a deduction.

**2. Internal Revenue** ⬦3480

Taxpayer was required to use straight line method of depreciation for television film, rather than proposed deduction sched-

**0373**

**MacKENZIE v. U.S.**                              **269**
Cite as 714 F.Supp. 268 (E.D.Mich. 1989)

ule of 60% of value of claimed film in first year, 15% in second year and 5% in each year thereafter, where contract did not create substantial likelihood that taxpayer would receive bulk of his total anticipated revenue during first year of film's useful life, rather, income projections showed that no proceeds were anticipated during first year and that amount of anticipated proceeds would steadily increase each year. 26 U.S.C.A. § 167(a).

**3. Internal Revenue ⊚⟿3480**

Taxpayer was entitled to depreciate amount by which stated purchase price of television film exceeded film's fair market value, where taxpayer purchased films with predominant purpose of earning a profit and parties intended that promissory notes used to purchase films would actually be paid. 26 U.S.C.A. §§ 167(g), 1011, 1012.

---

Joseph Falcone, Southfield, Mich., for plaintiffs.

Thomas Clark, Justice Dept., Tax Div., Washington, D.C., for defendant.

### ORDER

HACKETT, District Judge.

The Internal Revenue Service (IRS) disallowed certain deductions claimed by plaintiff James C. MacKenzie[1] on the ground that plaintiff was not actually engaged in the film distribution business for profit. The IRS also contested the method of depreciation used by plaintiff with regard to that business. The case was tried before a jury and, at the conclusion of the trial, the jury determined that plaintiff purchased the two television films in question with the predominant purpose of making a profit, and that no part of the plaintiff's underpayment of tax was due to negligence. The jury also found that plaintiff had actually paid $150,000 for each film, by finding that the $115,000 notes that plaintiff had

given to Saturn Productions Company were bona fide notes.[2] However, the jury determined that the fair market values for the films were only $60,000 (Inca Gold) and $75,000 (The Sharkhunters), respectively.

At trial, the parties agreed to reserve two questions for decision by the court: 1) the proper method for depreciating the films and 2) the tax treatment, if any, of that amount by which the stated purchase price of the films exceeded the films' fair market value.

With respect to the first issue, it is plaintiff's position that he is entitled to use the method of depreciation which he claimed on his return, i.e., the method approved in *Kiro, Inc. v. Commissioner*, 51 T.C. 155 (1968) (allowing 60% of cost of film to be deducted in first year, 10% in second year, 5% each year thereafter.) It is defendant's position that the method of depreciation claimed by plaintiff is unacceptable and that plaintiff must use the straight line method of depreciation.

With respect to the second issue, plaintiff claims that the cost basis of the films should be $150,000 each ($115,000 note plus $35,000 cash) and that, with regard to the excess paid for the films over their fair market value, plaintiff is entitled to write off that excess in the year incurred, or to amortize that amount over the useful life of the films by the same method used for the films. It is defendant's position, however, that the amount by which the stated purchase price of the films exceeds the films' fair market value cannot be depreciated by the plaintiff. Defendant maintains further that no provision in the Internal Revenue Code (IRC) allows for any favorable tax treatment with respect to this amount during the years in suit and that, no tax benefits should flow to plaintiff with respect to this amount.

For the reasons set forth below, the court finds that: 1) the depreciation method used by plaintiff was not reasonable

---

1. Although there are two plaintiffs in this case, the evidence at trial showed that only James C. MacKenzie took part in the transactions in question. Therefore, throughout this opinion the court will use "plaintiff" in the singular, referring only to James C. MacKenzie.

2. There is no issue that plaintiff paid an additional $35,000 cash for each film.

under the facts of this case and that plaintiff must use the straight line method of depreciation; and, 2) plaintiff's depreciable basis in each film is $150,000.

[1] It is a well-settled principle of tax law that a taxpayer is allowed a deduction from income only if he falls squarely within a statutory provision allowing a deduction. *See, e.g., New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790–91, 78 L.Ed. 1348 (1934); *Walter Constr. Co. v. Commissioner*, 634 F.2d 1029, 1039 (6th Cir.1980). With respect to property placed in service prior to January 1, 1981, section 167 of the Internal Revenue Code (IRC), 26 U.S.C. § 167, was the sole statutory provision which permitted deductions for depreciation. Section 167 allows as a depreciation deduction a "reasonable allowance" for the exhaustion, wear and tear of property used in a trade or business or of property held for the production of income. Section 167(b) contains a non-exclusive list of methods of depreciation which will be deemed "reasonable". In the event that the method of depreciation initially claimed by a taxpayer is found to be unacceptable or unreasonable, the taxpayer is required to use the straight line method of depreciation. *See* Treas.Reg. § 1.167(b)–1(a).

The depreciation deduction is designed to permit the taxpayer to recover, during the useful (or income-producing) life of an asset, the cost of the asset so that the asset may be restored at the end of its useful life. 5 Mertens, Law of Federal Income Taxation, § 23A.01. The law recognizes that over the life of an asset, its value will decrease through exhaustion, wear and tear, or obsolescence. The essence of the depreciation deduction is to permit the taxpayer to spread his loss over the years when a gradual loss is in fact occurring. *Id.*

### APPROPRIATE METHOD OF DEPRECIATION

Section 167(a) permits a "reasonable allowance" for depreciation. Plaintiff claimed, with respect to each film, a depreciation deduction in the amount of 60 percent of the claimed value of the films in the first year, 15 percent in the second year, and 5 percent in each year thereafter. As authority for this method, plaintiff relied on *Kiro, Inc. v. Commissioner*, 51 T.C. 155 (1968).

In *Kiro*, the taxpayer owned a television station which had acquired by license, from Paramount, the programming rights of 700 various television films and programs. Under its license agreement with Paramount, Kiro was permitted to broadcast each of the 700 films a maximum of 7 times over a 10–year period. The contract also provided that, upon certain conditions, Paramount had the right to withdraw any film. In the event of such a withdrawal, the contract between Kiro and Paramount specified the adjustments that would be made in the contract price. The contract provided that upon the withdrawal of a film, the amount to be refunded to Kiro would be equal to a percentage of the original film license fee, which percentage would be inversely related to the number of times the film had been broadcast, as follows:

| Number of times Kiro had broadcast withdrawn film | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 40% | 25% | 20% | 15% | 10% | 5% | 0 |

In light of the foregoing, Kiro claimed depreciation deductions on the following schedule over the seven-year life of the contract: 60%, 15%, 5%, 5%, 5%, 5%, and 5%.

The *Kiro* court determined that, under the circumstances of the case, "the first run of a film is the most important run and that each successive run diminishes rapidly in value." *Id.* at 170. Accordingly, the court reasoned, "it seems only reasonable that if a contract provides for more than one showing, the exhaustion should be allocated among the several showings on a graduated or sliding-scale basis so as to allocate the large portions to the earlier showings." *Id.* at 171. Thus, the *Kiro* court determined that a deduction of 60% in the first year of the license was a "reasonable allowance" for the exhaustion, wear and tear of the films, and that such a method of depreciation was consistent with

the income expectations of the parties as set forth in their contract. *Id.* at 171.

[2] Unlike the situation in *Kiro,* the instant plaintiff was not a party to a contract which created a substantial likelihood that plaintiff would receive the bulk of his total anticipated revenue during the first year of the films' respective useful lives. To the contrary, plaintiff's distributor testified that he had not entered into any license agreements with television stations. Further, plaintiff's trial exhibit 18, at page 84, contains a chart wherein the promoter sets forth the income projections for the plaintiff's films. This chart shows that no proceeds were anticipated during the first year and that the amount of the anticipated proceeds would steadily increase each year until it peaked at $180,000 in the seventh year. Therefore, application of the method of depreciation approved in *Kiro* is not appropriate under the facts of this case because the instant plaintiff was not a party to the type of licensing contract present in *Kiro,* nor is the claimed method of depreciation consistent with the income expectations of plaintiff as described by plaintiff's promotor. Accordingly, the court finds that the method of depreciation claimed by plaintiff is not a "reasonable allowance" for depreciation under section 167(a) and, therefore, plaintiff is required to use the straight line method of depreciation. *See* Treas.Reg. § 1.167(b)–1(a).

### TAX TREATMENT OF EXCESS OF PURCHASE PRICE OVER FAIR MARKET VALUE

The total amount of depreciation deductions which a taxpayer may claim with respect to property is limited to the taxpayer's basis in the property. As a general rule, the basis of property for tax purposes is the cost of the property. *See* I.R.C. §§ 167(g), 1011 & 1012. Cost includes valid liabilities incurred in acquiring the property. *Waddell v. Commissioner,* 86 T.C.

848, 898 (1986), *aff'd,* 841 F.2d 264 (9th Cir.1988).

The jury determined that the two $115,-000 notes that plaintiff used to purchase the T.V. films were valid, genuine liabilities. In addition to these notes, plaintiff paid $35,000 cash for each film. Plaintiff therefore claims that the depreciable basis of each film should be $150,000—his cost per film.

Defendant points out, however, that the jury found that the fair market values for the films were $60,000 (Inca Gold) and $75,-000 (The Sharkhunters). Defendant then argues that, despite the amounts actually paid by plaintiff, plaintiff's depreciable basis is limited to the fair market value of the property.[3]

[3] Defendant cites a number of cases to support its argument that plaintiff's basis is limited to the films' respective fair market values. Generally, however, in those cases in which courts limited the basis of an asset to its fair market value, the courts found that the taxpayers were not dealing at arms-length, that there was not a real indebtedness, or that there was not a bona fide business purpose. *See, e.g., Bryant v. Commissioner,* 790 F.2d 1463 (9th Cir.1986) (where notes payable in beavers, court found that as to portion of notes payable in beavers, there existed no bona fide indebtedness); *Waddell* (court found payment on nonrecourse note unlikely); *Lemmen v. Commissioner,* 77 T.C. 1326 (1981) (basis does not include portion of stated purchase price of asset that exceeds value of asset, if peculiar circumstances induce taxpayer to pay more for asset than its value). Unlike the cases relied upon by defendant, in the instant case the jury determined that plaintiff purchased the films with the predominant purpose of earning a profit, and that plaintiff and Saturn Productions intended that the promissory notes in question would actual-

---

3. The defendant also advances the argument that because plaintiff's notes are to be paid some time in the future, the notes should be discounted to present value. The jury found, however, that the notes in question represented genuine liabilities. In such a situation, the

court will not "attach any significance to the fact that the obligation was not due until a point several years in the future." *Taube v. Commissioner,* 88 T.C. 464, 457 (1987) (citing *Melvin v. Commissioner,* 88 T.C. 63 (1987)).

272        714 FEDERAL SUPPLEMENT

ly be paid. There was no allegation or finding of bad faith on the part of plaintiff. The court finds in this fact situation that the taxpayer should not be limited to a fair market value basis but, rather, is entitled to a depreciable basis reflective of cost. *See* I.R.C. §§ 167(g), 1011 & 1012.

The court's conclusion is supported by the Ninth Circuit's statement in *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir.1976):

> Our focus on the relationship of the fair market value of the property to the unpaid purchase price should not be read as premised upon the belief that a sale is not a sale if the purchaser pays too much. Bad bargains from the buyer's point of view—as well as sensible bargains from the buyer's, but exceptionally good from the seller's point of view—do not thereby cease to be sales.

*Id.* at 1049 (citations omitted.)

Accordingly, the court finds that plaintiff's depreciable basis is $150,000 per film and that plaintiff is required to utilize the straight line method of depreciation with regard to that amount. IT IS SO ORDERED.



**Tim BOETTGER and Becky Boettger, Individually; and as Next Friend for their Minor Daughter, Amanda Boettger, Plaintiffs,**

v.

**Otis R. BOWEN, Secretary, U.S. Dept. of Health and Human Services, and C. Patrick Babcock, Director, Michigan Dept. of Social Services, Defendants.**

No. 87–CV–10319–BC.

United States District Court,
E.D. Michigan, N.D.

May 15, 1989.

Father in family receiving aid to families with dependent children-unemployed parent benefits obtained job on his own initiative and then voluntarily terminated job, and Michigan Department of Social Services then notified family that AFDC-U benefits would be terminated for three months based on the father's having quit his employment without good cause. Parents brought action alleging that state policies contradicted federal statute authorizing imposition of sanctions on AFDC and AFDC-U benefit recipients, that state policies violated state legislation, and that federal regulation contravened federal statutes. On cross motions for summary judgment, the District Court, Churchill, Chief Judge, held that: (1) the federal regulation did contravene federal statute as regulation's terms "terminated employment" and "reduced earnings," were inconsistent with statutory phrase of refusal to accept employment, and (2) Michigan's policies permitted imposition of sanctions for conduct beyond pale of participation under work incentive program as that phrase was defined by federal statute, through providing for sanctions for voluntarily quitting job or reducing hours of employment, and Michigan's policies accordingly contravened federal statute.

Judgment for parents on two counts; dismissed in part.

**1. Social Security and Public Welfare** ⬤➡**194.5**

Federal regulation imposing sanctions when mandatory registrant for work incentive program is found to have terminated employment or to have reduced earnings without good cause was inconsistent with federal work incentive statute which provides for sanctioning aid to families with dependent children and aid to families with dependent children-unemployed parent benefit recipients for refusal without good cause to participate under work incentive program and refusal without good cause to accept employment, and sanctions could not be imposed for termination of employment or reduction of earnings on theory such

employer's good faith implementation of an effective antidiscrimination policy." *Costa v. Desert Palace, Inc.,* 299 F.3d 838, 864 (9th Cir.2002) (citations omitted), *aff'd on other grounds, Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). It is premature to grant summary judgment on the issue of entitlement to punitive damages. As described above, factual disputes exist with respect to Mr. Soden's status as a supervisor or senior manager and with respect to Applied Finishing timely implementation or distribution of its employee handbook which contained its antidiscrimination policies. Accordingly, the court denies Applied Finishing's motion with respect to punitive damages under Title VII.

### IV.  CONCLUSION

As described above, the court GRANTS in part and DENIES in part Applied Finishing's motion for summary judgment (Dkt. # 21) and Mr. Soden's motion for summary judgment (Dkt. # 22).



**WASHINGTON MUTUAL, INC. as the Successor in Interest to H.F. Ahmanson & Co. and Subsidiaries, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Case No. CV06–1550 BJR.**

United States District Court,
W.D. Washington,
at Seattle.

Feb. 10, 2014.

**Background:** Taxpayer filed action against United States seeking tax refund based on amortization and loss deduction. The United States District Court for the Western District of Washington, John C.

Coughenour, J., 2008 WL 8422136, granted partial summary judgment in favor of the United States. Taxpayer appealed. The Court of Appeals, 636 F.3d 1207, reversed and remanded.

**Holdings:** After bench trial on remand, the District Court, Barbara Jacobs Rothstein, J., held that:

(1) taxpayer did not establish reliable cost basis for its right to operate branch in Missouri and

(2) taxpayer did not establish that it had permanently abandoned its right to operate branches in Missouri.

Tax refund claims dismissed.

**1.  Internal Revenue** &#x1F511;**4993, 5076**

A taxpayer may sue the government in district court to recover taxes erroneously collected or withheld; in so doing, the taxpayer must prove that he is entitled to a refund, and must also establish the exact amount of refund owed. 28 U.S.C.A. § 1346(a)(1).

**2.  Internal Revenue** &#x1F511;**5076**

In an action to recover taxes erroneously collected or withheld, a taxpayer must demonstrate more than the assessment of the tax for which refund is sought was erroneous in some respects; rather, in order to prevail, Plaintiff must establish the exact amount which it is entitled to recover. 28 U.S.C.A. § 1346(a)(1).

**3.  Internal Revenue** &#x1F511;**3478, 3505**

Washington thrift taxpayer did not establish reliable cost basis for its right to operate branch in Missouri, as required for income tax refund based on amortization, where assumption made by taxpayer's expert regarding Missouri deposit market growth was unreliable, assumption that hypothetical buyer would capture 7% of Missouri deposit market was unrealistic, assumption that hypothetical buyer would

originate high volume of new loans was unrealistic, assumption that hypothetical buyer would make net interest spread of 2.5% was unrealistic, and market analysis by government's expert otherwise significantly undercut trustworthiness of model proposed by taxpayer's expert. 26 U.S.C.A. § 1012; 26 C.F.R. § 20.2031–1(b).

**4. Internal Revenue ☞4536**

Where there is no doubt that the taxpayer incurred some deductible expense, but the taxpayer failed to present evidence sufficient to allow the court to make an accurate finding on the amount of the deduction, a court will not estimate the amount of a claimed deduction.

**5. Internal Revenue ☞3200, 3478**

On a claim for a income tax refund in a transaction where one lump-sum purchase price is paid for a conglomeration of assets, the cost of each asset must be determined by apportioning the purchase price among the assets according to each asset's relative fair market value at the time of the acquisition.

**6. Internal Revenue ☞4533**

For federal tax purposes, defining fair market value with reference to hypothetical willing buyers and willing sellers provides an objective standard by which to measure value. 26 C.F.R. § 20.2031–1(b).

**7. Internal Revenue ☞4533**

When calculating fair market value for federal tax purposes, value must be determined on the date of the transaction; any subsequent event or future value is of no consequence in determining cost basis.

**8. Internal Revenue ☞3195, 3478**

Washington thrift taxpayer did not establish that it had permanently abandoned its right to operate branches in Missouri, as required for income tax refund based on abandonment loss deduction, where taxpayer took actions to safeguard, rather than permanently disavow, its right to op-

erate branches in Missouri; although thrift may have closed its Missouri branches and did not plan to purchase additional branches, it recognized value in leaving Missouri branching right intact. 26 U.S.C.A. § 165.

**9. Internal Revenue ☞3428**

An abandonment loss is deductible if evidenced by a closed and completed transaction that is fixed by an identifiable event occurring in the year of the claimed loss, but only if the taxpayer shows both an intention to abandon the asset in question and an affirmative act of abandonment. 26 U.S.C.A. § 165.

**10. Internal Revenue ☞3428**

On a tax refund claim, neither the non-use of an asset nor the mere intention to abandon is sufficient by itself to accomplish abandonment; a taxpayer must show through the surrounding facts and circumstances that it intended to abandon the asset and that it performed an overt act of abandonment. 26 U.S.C.A. § 165.

––––––––

David J. Burman, Jeffrey M. Hanson, Perkins Coie, Seattle, WA, Maria O'Toole Jones, Steven R. Dixon, Miller & Chevalier, Thomas D. Johnston, Richard J. Gagnon, Jr., Sherman & Sterling, Washington, DC, for Plaintiff.

Henry C. Darmstadter, James Edward Weaver, Quinn Patrick Harrington, U.S. Department of Justice, David N. Geier, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

BARBARA JACOBS ROTHSTEIN, District Judge.

### I. INTRODUCTION

Plaintiff Washington Mutual, Inc. ("Plaintiff"), as successor in interest to

Home Savings of America, FSB ("Home"), brought this tax refund suit to recover taxes assessed by the Internal Revenue Service ("IRS") with respect to the 1990, 1992, and 1993 tax years. This case represents a chapter in a continuing saga that has its genesis in the savings and loan crisis of the late 1970's and early 1980's. Since that time, numerous lawsuits involving Home and other similarly situated litigants have wound their way through multiple courts, including the United States Supreme Court, the Federal Circuit, and the Ninth Circuit.

In the case before this Court, Plaintiff claims that it is entitled to refunds due to tax deductions and losses for certain intangible assets referred to by the parties as the "Branching Right" and the "RAP Right." [1]  Plaintiff filed amended tax returns seeking the refunds on behalf of Home, and after the IRS denied the refund claims, Plaintiff filed suit against Defendant, the United States of America, on behalf of Home in the district court for the Western District of Washington.  This case was originally assigned to the Honorable John C. Coughenour.  Shortly thereafter, both parties moved for partial summary judgment on the issue of whether Home could establish a cost basis for the Branching and RAP Rights (a taxpayer must be able to establish a cost basis in an asset before the taxpayer is entitled to a tax refund).  Judge Coughenour granted Defendant's motion for partial summary judgment, ruling that Home did not have a cost basis in the Rights, and therefore, was not entitled to a tax refund.  Plaintiff appealed and the Ninth Circuit reversed. The Ninth Circuit determined that Home has a cost basis in the Branching and RAP Rights based on what it cost Home to acquire the Rights, and remanded the mat-

ter with instructions to the court to proceed with determining the cost basis.

Thereafter, the case was reassigned to this District Court Judge and a bench trial was held on December 12 through December 19, 2012.  Having heard the testimony of the witnesses, reviewed the evidence in the record together with the briefs filed by the parties, this Court finds that Plaintiff has not proved, to a reasonable degree of certainty, Home's cost basis in the Branching and RAP Rights.  Accordingly, the Court will GRANT judgment in favor of Defendant.  The reasoning for this Court's determination follows.

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  The Savings and Loan Crisis

As stated previously, this case arises out of the savings and loan crisis of the late 1970's and the early 1980's.  *Wash. Mut., Inc. v. United States,* 2008 WL 8422136, at *1 (W.D.Wash. Aug. 12, 2008) (hereinafter referred to as "*Washington Mut. I*").  By way of background, in the late 1970's and early 1980's, out of concern for rising inflation rates, the Federal Reserve saw fit to allow interest rates to rise to unprecedented levels.  The effect of this phenomenon on savings and loan associations (also known as "thrifts") was disastrous.  This is because thrifts derived their profitability from a spread between the interest they paid to depositors and the interest they charged on loans (which were almost exclusively long-term, fixed-rate mortgages).  *Id.; see also United States v. Winstar Corp.,* 518 U.S. 839, 845, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).  In normal times, the spread was positive for the thrifts, that is, a thrift could pay a lower interest rate

---

**1.**  Exactly what the Branching and RAP Rights are will be discussed in detail later in this

Order.

to its depositors, while the interest rate it charged borrowers was sufficiently higher to ensure profitability. *Wash. Mut., Inc. v. United States,* 636 F.3d 1207, 1210 (9th Cir.2011) (hereinafter referred to as "*Washington Mut. II*"). When interest rates soared in the late 1970's and early 1980's, the world turned upside down for thrifts. *Id.* Given the higher interest rates that were available in the market, in order to attract more depositors, thrifts had to pay higher interest rates on their deposits. *Id.* Meanwhile, the thrifts' outstanding mortgage loans were locked in at long-term, fixed-rates that were significantly lower than the prevailing rates. *Id.* To make matters worse, given the high interest rates being charged for mortgage loans, housing purchases came to a near standstill, so there was little or no opportunity to lend out new mortgage money. *Id.* The entire thrift industry was insolvent to the tune of billions of dollars. This situation is commonly described as the savings and loan crisis. *Winstar,* 518 U.S. at 845, 116 S.Ct. 2432.

The Federal Savings and Loan Insurance Corporation (hereinafter "FSLIC"), in its capacity as thrift regulator and insurer of thrift deposits, was obligated to take over and liquidate any thrift that had liabilities that exceeded its assets. Dkt. No. 154 at p. 6 (Admitted Fact 5). "Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the [Federal Home Loan Bank Board (hereinafter "Bank Board") ][2] chose to avoid the insurance liability by encouraging healthy thrifts . . . to take over ailing [thrifts]" in transactions known as "supervisory mergers." *Winstar,* 518 U.S. at 847, 116 S.Ct. 2432. Supervisory mergers-in which healthy thrifts assumed all of the obligations of failing thrifts-were not intrinsi-

cally attractive to healthy thrifts; nor did FSLIC have sufficient cash to promote the supervisory mergers through direct subsidies alone. *Id.* at 848, 116 S.Ct. 2432. Instead, FSLIC had to devise other non-cash incentives to attract healthy thrifts to these transactions. *Id.* Two such incentives are central to this dispute.

Before the savings and loan crisis, regulations prohibited thrifts from opening branch offices outside states in which their home offices were located. *Washington Mut. II,* 636 F.3d at 1213. Healthy thrifts wanted to expand nationally into growing markets. FSLIC recognized this and issued regulations in September 1981 that allowed a thrift to operate branches in a state other than its home state, but only if the first branch in the non-home state was acquired in a supervisory merger. The parties refer to this as the "Branching Right."

In addition, thrifts were subject to regulations that required them to maintain a certain amount of capital, known as the "minimum regulatory capital requirement." *See Home Sav. of Am. v. United States,* 57 Fed.Cl. 694, 697 (Fed.Cl.2003). During the height of the savings and loan crisis, a thrift was required to maintain minimum regulatory capital that equaled at least three percent of the thrift's liabilities. 47 Fed.Reg. 3543 (Jan. 14, 1982). FSLIC recognized that this requirement would be an impediment to supervisory mergers given that a healthy thrift would have to acquire the liabilities of a failing thrift, liabilities that exceeded the failing thrift's assets. Therefore, regulators allowed health thrifts to apply the "purchase method" of accounting to supervisory mergers. *Washington Mut. II,* 636 F.3d at 1210.

---

**2.** Congress vested the Bank Board with the authority to charter and regulate federal

thrifts. *Wash. Mut.,* 636 F.3d at 1210.

The purchase method of accounting permitted the acquiring thrift to designate the excess of the acquired thrift's liabilities over the acquired thrift's assets as an intangible asset known as "supervisory goodwill." *Id.* The supervisory goodwill could then be counted towards the acquiring thrift's minimum regulatory capital requirement. *Id.* (citing *Winstar,* 518 U.S. at 850–51, 116 S.Ct. 2432). Regulators also permitted the acquiring thrift to amortize the supervisory goodwill over a significant period of time, up to forty years in accordance with regulatory accounting principles. *Id.* The right to designate the excess liabilities of an acquired thrift as supervisory goodwill and to amortize the supervisory goodwill over a 40–year period became known as the "RAP Right."[3] *Id.*

### B. Home Acquires Three Failing Thrifts through a Supervisory Merger

In 1981, Home was considered a "healthy" thrift, and in November of that same year, it agreed to a supervisory merger with three failing thrifts: Security Federal Savings and Loan Association ("Security") and Hamiltonian Federal Savings and Loan Association ("Hamiltonian"), both thrifts located in Missouri, and Southern Federal Savings and Loan Association ("Southern"), a thrift located in Florida (hereinafter the "Missouri–Florida Transaction"). *Washington Mutual I,* 2008 WL 8422136 at *2. Under the terms of the Missouri–Florida Transaction, Home assumed all of the liabilities of the three failing thrifts in return for a "generous incentive package" from the government. *Washington Mut. II,* 636 F.3d at 1219. As part of this incentive package, Home received FSLIC assistance in the form of cash contributions (to the extent the book value of the failing thrifts' liabilities exceeded the book value of their respective

assets), indemnities related to covered assets, and "other payments and/or credits to be accounted for through use of a 'special reserve account.'" *Washington Mut. I,* 2008 WL 8422136 at *2. Home also received Branching Rights in Missouri and Florida, which meant that California-based Home would be permitted to open branches in Missouri and Florida. *Id.* In addition, Home was given the RAP Right (*i.e.,* Home was permitted to count the excess of the failing thrifts' liabilities over their assets as "supervisory goodwill" and apply it to Home's minimum regulatory capital requirement). *Id.* Finally, Home was able to structure the transaction as a tax free "G" reorganization, which allowed Home to "carry over" the tax basis associated with the acquired assets and thereby realize substantial built-in losses by selling the loans of the acquired thrifts. *Id.*

### C. *Winstar* and Related Litigation

In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183. *Washington Mut. II,* 636 F.3d at 1211. Among other changes, FIRREA no longer allowed thrifts to count supervisory goodwill toward their minimum regulatory capital requirement. *Winstar,* 518 U.S. at 857, 116 S.Ct. 2432. This change had a significant impact on thrifts that had acquired failing thrifts through supervisory mergers, as the acquiring thrifts had relied on the supervisory goodwill granted to them at acquisition. *Id.* Three thrifts sued the United States for damages on both contractual and constitutional theories, arguing that the government had promised the thrifts that the supervisory goodwill could be counted toward their regulatory capital requirements and FIRREA was a breach of the government's promise. *Id.* at 858,

---

**3.** RAP is an acronym for Regulatory Accounting Principles.

116 S.Ct. 2432. The Supreme Court agreed, holding that the government breached its contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, the federal regulatory agencies limited the use of supervisory goodwill and capital credits as acceptable regulatory capital. *Id.* at 870, 116 S.Ct. 2432.

#### D. Current Litigation

In 1992 and 1993, Home sold its Missouri branch offices and in 1998 Plaintiff acquired Home. *Id.* at 1214, 116 S.Ct. 2432. In 2005, Plaintiff filed amended income tax returns on behalf of Home, claiming refunds for tax years 1990, 1992, and 1993. Plaintiff asserted that the IRS had not credited Home for its RAP Right amortization deduction during those years. *Id.* Plaintiff also claimed a loss deduction during for 1993, alleging that Home had abandoned its Missouri Branching Right. *Id.* The IRS denied the refund requests and Plaintiff, on Home's behalf, brought this suit.

In order to establish that Home is entitled to a tax refund, Plaintiff must first establish that Home has a tax basis in the Branching and/or RAP Rights.[4] When this matter first came to district court, the United States argued that Plaintiff's refund claims failed as a matter of law because Home did not have a tax basis in the Rights. As discussed previously in this Order, both parties moved for partial summary judgment on this issue. In its summary judgment motion, Plaintiff raised two alternative theories for establishing a tax basis for the Branching and RAP Rights. First, Plaintiff argued that it can establish a tax basis based on what it cost Home to acquire the Rights (this was Plaintiff's "cost basis theory"). *Id.* at 1215, 116 S.Ct.

2432. Under the cost basis theory, Plaintiff asserted that FSLIC effectively sold the Rights to Home in exchange for Home's assumption of the FSLIC's liability with respect to the three failing thrifts. *Id.* at 1217, 116 S.Ct. 2432. On this theory, Plaintiff claimed a tax basis for the Rights since "[t]he assumption of liability in connection with the acquisition of property is part of the property's cost for Federal income tax purposes," and under the Internal Revenue Code, "the basis of property shall be the cost of such property . . . ." *Washington Mut. I,* 2008 WL 8422136 at *3. Plaintiff argued that Home's cost to acquire the Rights was "the amount by which the acquired thrifts' liabilities exceeded the value of their assets." *Id.* Plaintiff therefore concluded that Home took a tax basis in the Rights equal to that excess liability.

In the alternative, Plaintiff argued that it could establish a tax basis for the Rights based on their fair market value (this was Plaintiff's "fair market value theory"). *Id.* Under the fair market value theory, Plaintiff argued that the Branching and RAP Rights were provided by FSLIC to induce Home to enter into the supervisory merger, and as such, are considered income for tax purposes. Dkt. No. 49, Pl.'s Mot. for Summ. J. at 10. According to Plaintiff, "a taxpayer that receives property as income takes a fair-market-value basis in that property." *Id.* Therefore, Plaintiff argued, Home has a fair market value basis in the Branching and RAP Rights. *Id.*

The United States disputed both of Plaintiff's theories for establishing a tax basis. With respect to the cost basis theory, the Government argued that Plaintiff was "double-counting" Home's assumption of the failing thrifts' liabilities. In the

---

**4.** The term ''basis'' refers to a taxpayer's capital stake in property. *In re Lilly,* 76 F.3d 568, 572 (4th Cir.1996). Ordinarily, and where no other exceptions apply, the basis of an asset is equal to its cost, also known as its ''cost basis.'' 26 U.S.C. § 1012.

**0383**

Government's view, the primary benefit of the supervisory merger to Home was that the merger was structured as a "tax-free merger commonly referred to as a 'G' reorganization." Dkt. No. 51, Def.'s Mot. for Summ. J. at 2. According to the Government, Home was willing to incur the failing thrifts' liabilities in return for the tax-free merger because the G reorganization allowed Home to realize sizable tax benefits by carrying over the failing thrifts' assets with "built-in tax losses." *Id.* However, the Government argued, 27 years after the transaction occurred, Plaintiff is now attempting to reap a second or "double" recovery for assuming the failed thrifts' liabilities by arguing that Home had assumed the liabilities as consideration for the Branching and RAP Rights. *Id.* at 3.

As for Plaintiff's fair market value theory, the Government argued that neither the Branching Right nor the RAP Right could qualify as income, and as such, Plaintiff cannot claim a fair-market-value basis in the Rights. *Id.*

Judge Coughenour rejected Plaintiff's two alternative theories for establishing a tax basis for the Branching and RAP Rights and granted partial summary judgment in favor of the United States. *Id.* at 1216. With respect to Plaintiff's cost basis theory, the district court: (1) rejected Plaintiff's argument that Home had assumed FSLIC's liabilities, stating that "while [the United States] had an undeniable interest in Home's acquisition of the failing thrifts, it was in no way relieved of its insurance obligations as a result of the transaction. Rather, those obligations were simply less likely to come to fruition," [5] and (2) determined that Plaintiff

had not bargained for the right to assign a separate tax basis to the Branching and/or RAP Rights. *Washington Mut. I,* 2008 WL 8422136 at *6. As to Plaintiff's fair market value theory, the district court held that the Rights did not qualify as income.

Plaintiff appealed the decision to the Ninth Circuit, which reversed and remanded. In reaching its decision, the Ninth Circuit "return[ed] to the very basics of tax law" to note that the term "basis" is a "fundamental concept and refers to a taxpayer's capital stake in an asset for tax purposes." *Id.* at 1217 (citing *In re Lilly,* 76 F.3d 568, 572 (4th Cir.1996)). The Court further noted that "[g]enerally, a taxpayer's basis in an asset is equal to the cost to the taxpayer of acquiring the asset." *Id.* (citing 26 U.S.C. § 1012). With these principles in mind, the Ninth Circuit turned to the supervisory merger at issue here. It determined that the "documentary evidence, as well as the economic realities of the transaction, compel the conclusion" that the merger "comprised one, all-encompassing transaction" whereby the FSLIC benefited because three failing thrifts were assimilated into one healthy thrift, "thereby considerably reducing the FSLIC's own insurance liability exposure" and Home received "a generous incentive package," which included, among other items, the Branching and RAP Rights. *Id.* at 1218–19. Having determined that the Branching and RAP Rights were part of the consideration Home received in the supervised merger, the Ninth Circuit "appl[ied] basic tax principles regarding basis" and concluded that the cost to

---

**5.** In making this determination, the district court "agree[d]" that Plaintiff was "double-counting," but not in the terms that the Government had argued (*i.e.* that Plaintiff was attempting to use its assumption of the failed thrifts' liabilities both as consideration for being able to designate the merger as a G reor-

ganization and as consideration for the Rights). *Washington Mut. I,* 2008 WL 8422136, at *6. Rather, the Court held that Plaintiff was "double-counting" by asserting that Home assumed the liabilities of the failing thrifts *and* the FSLIC's insurance liability. *Id.*

Home for acquiring this incentive package "was the excess of the three failing thrifts' liabilities over the value of their assets." *Id.* at 1219. Therefore, the Court concluded, Home's cost basis in the Branching and RAP Rights is "equal to *some part* of the total amount of that excess liability." *Id.* (emphasis in original).[6]

Accordingly, the Ninth Circuit reversed Judge Coughenour's holding that Plaintiff did not have a cost basis in the Branching and RAP Rights, and remanded with instructions to grant Plaintiff's motion for partial summary motions (*i.e.,* grant Plaintiff's motion that Home has a cost basis in the Rights) and proceed to determining what that cost basis is (*i.e.,* Plaintiff must still establish what the cost basis is for the Branching and RAP Rights). Stated differently, although the Ninth Circuit accepted Plaintiff's argument that, in theory, a taxpayer in Home's position has a cost basis in the Branching and RAP Rights, Plaintiff still had to meet its burden of establishing what that cost basis is.

### III.  DISCUSSION

### A.  Plaintiff Bears the Burden of Proof

**[1]**  Following the Ninth Circuit's lead, this Court returns to basic tax law principles. It is undisputed that a taxpayer may sue the government in district court to recover taxes erroneously collected or withheld. *Oppel v. United States,* 164 F.3d 631, 632 (9th Cir.1998) (citing 28 U.S.C. § 1346(a)(1)). "In so doing, the taxpayer must prove that he is entitled to a refund, and must also establish the exact amount of refund owed." *Id.* (citing *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976)); *Fed–Mart Corp. v. United States,* 572 F.2d 235, 238 (9th Cir.1978) ("The taxpayer's burden

in a refund suit in district court is to prove not only that the Commissioner erred in his determination of tax liability but also to establish the correct amount of the refund due."); *Moore v. Comm'r,* 425 F.2d 713, 715 (9th Cir.1970) ("[T]he taxpayer bears the burden of establishing the cost basis of property"); *United States v. Youngquist,* 2013 WL 5268924, at *7 (D.Or. Apr. 17, 2013) (noting that if a taxpayer fails to establish the value of property (where that value is critical to the taxpayer's claim in a refund suit), the taxpayer loses).

**[2, 3]**  It is not sufficient for a taxpayer to "demonstrate that the assessment of the tax for which refund is sought was erroneous in some respects." *Trigon Ins. Co. v. United States,* 234 F.Supp.2d 581, 586 (E.D.Va.2002) (quoting *Janis,* 428 U.S. at 440, 96 S.Ct. 3021). Rather, in order to prevail, Plaintiff "must establish the exact amount which [it] is entitled to recover." *Compton v. United States,* 334 F.2d 212, 216 (4th Cir.1964); *Trigon,* 234 F.Supp.2d at 587 (a plaintiff cannot satisfy its burden "by showing merely that some refund is owed without proving the amount owed"). In the case before the Court, this requires Plaintiff to prove, to a reasonable degree of certainty, Home's cost basis in the Branching and RAP Rights. *See Better Beverages, Inc. v. United States,* 619 F.2d 424, 428 (5th Cir.1980).

The fact that the cost basis may be difficult to establish does not relieve Plaintiff of its burden. *Coloman v. Comm'r,* 540 F.2d 427, 430 (9th Cir.1976) (citing *O'Neill v. Comm'r,* 271 F.2d 44 (9th Cir. 1959)); *see also Estate of Marsack v. Comm'r,* 288 F.2d 533, 535 (7th Cir.1961) (noting that whether valuation is difficult or not, it must be established, and complex forms of property must be, and are, valued

---

**6.**  Because Plaintiff prevailed on its cost basis theory, the Ninth Circuit did not address Plaintiff's alternative, fair market value theo-

ry. *Washington Mut. II,* 636 F.3d at 1221 n. 9.

for tax purposes); *Better Beverages,* 619 F.2d at 428 n. 4 ("Where the taxpayer fails to carry [its] burden to prove a cost basis in the item in question, the basis utilized by IRS, which enjoys a presumption of correctness, must be accepted even where, as here, the IRS has accorded the item a zero basis."); *Compton,* 334 F.2d at 216 (same). Lastly, this Court is not required to, and indeed cannot, derive the cost basis from unreliable evidence. *See Norgaard v. Comm'r,* 939 F.2d 874, 879 (9th Cir. 1991) (stating that any estimation of a deduction without that "assurance from the record ... would be unguided largesse' ")

**[4]** Plaintiff, relying on *Cohan v. Comm'r,* 39 F.2d 540, 544 (2d Cir.1930), argues that under *Cohan* and its progeny, a taxpayer claiming a deduction may overcome the presumptive correctness of the IRS' denial, even where the taxpayer has failed to show the exact amount of the deduction, so long as the evidence shows that the taxpayer is entitled to the deduction, and there is sufficient evidence in the record from which the court may estimate the exact amount. Plaintiff is correct that courts have relied on *Cohan* to estimate the amount of a claimed deduction in cases where the taxpayer is unable to produce evidence substantiating the exact amount of a claimed deduction. *Trigon,* 234 F.Supp.2d at 589. However, courts are reluctant to accept invitations to follow *Cohan* where a taxpayer fails to provide evidence that would permit an *informed* estimate of the amount of deduction. *Id.* Indeed, the Ninth Circuit has cautioned that a liberal application of the *Cohan* rule "would be in essence to condone the use of that doctrine as a substitute for burden of proof." *Coloman,* 540 F.2d at 431–32. For this reason, courts decline to apply *Cohan* in cases where there is no doubt that the taxpayer incurred some deductible expense, but the taxpayer failed to present evidence sufficient to allow the court to make an accurate finding on the amount of the deduction. *See, e.g., Norgaard,* 939 F.2d at 879 (Ninth Circuit rejected taxpayer's argument that finder of fact was compelled to estimate a value based on the evidence provided); *Coloman,* 540 F.2d at 432. As the *Trigon* court aptly stated:

> [Plaintiff] has cited, and the Court has found, no decision applying the rule of *Cohan* to complex valuation cases such as this one. And, where, as here, the basic evidentiary predicate for valuation has been found wanting in so many ways, to do so would offend fundamental precepts respecting the nature and importance of the burden of proof.

*Trigon,* 234 F.Supp.2d at 591.

Relying on a case from the Third Circuit, *Capital Blue Cross v. Comm'r,* 431 F.3d 117 (3rd Cir.2005), Plaintiff also argues that where "the Government refuses to submit expert valuation testimony regarding particular adjustments to a proffered valuation, a court will 'essentially be forced to start from the taxpayer's valuation.' " Pl.'s Post Trial Br. at 15 (quoting *Capital Blue Cross,* 431 F.3d at 130). If the holding in *Capital Blue Cross* were as Plaintiff suggests, it would be inconsistent with the Ninth Circuit's clear precedent that it is the taxpayer's burden to establish the amount of the refund with reasonable precision. However, *Capital Blue Cross* does not stand for the proposition that a court must accept a taxpayer's valuation if a counter valuation is not offered by the Government. Rather, the *Capital Blue Cross* court determined that it had been unreasonable for the Tax Court to reject the plaintiff's valuation simply because the Government "identified minor flaws in [plaintiff's] valuation" and the Government failed to "explain[ ] or quantify[ ] how [the flaws] impacted the bottom-line calculation, and [did not] offer[ ] any alternatives." *Capital Blue Cross,* 431 F.3d at

**0386**

**1104**   996 FEDERAL SUPPLEMENT, 2d SERIES

120, 130. In fact, in its holding, the *Capital Blue Cross* court adhered to the principle that the taxpayer bears the "heavy burden" to prove that his intangible asset may be valued with "reasonable precision," and this burden "will often prove too great to bear." *Id.* at 129–130 (quoting *Newark Morning Ledger v. United States,* 507 U.S. 546, 566, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993)).

**B.  The Cost Basis for the Branching and RAP Rights is Equal to Some Portion of the Excess of the Failing Thrifts' Liabilities over Their Assets**

The Ninth Circuit held that the Branching and RAP Rights have a cost basis that, upon proper proof, could qualify Home for a tax refund. *Washington Mut. II,* 636 F.3d at 1219. As discussed above, Plaintiff's burden is to establish, to a reasonable certainty, what that cost basis is for each Right. The Ninth Circuit provided a road map for answering this question. It determined that the Branching and RAP Rights were part of the incentive package Home received from FSLIC, and the cost to Home for acquiring that incentive package was "the excess of the three failing thrifts' liabilities over the value of their assets." *Id.* Therefore, the Ninth Circuit concluded, the cost to Home for acquiring the Branching and RAP Rights is "equal to *some part* of the total amount of that excess liability." *Id.* (emphasis in original). Thus, in order to determine the cost basis for the Branching and RAP Rights, Home must first establish the "excess of the three failed thrift's liabilities over the value of their assets" (the parties refer to this as the "Purchase Price"), and then establish what portion of the Purchase Price was allocated to the Branching and RAP Rights.

**1.  The Purchase Price**

In order to determine how much Home paid for the incentive package it received from FSLIC as part of the supervisory merger, Plaintiff must establish: (1) the total value of the three failing thrifts' liabilities, and (2) the total value of their assets. The difference between these two asset values represents the "excess liability" or the "Purchase Price" that Home paid for the incentive package. *Washington Mut. II,* 636 F.3d at 1219. While one may expect that this calculation would be straight-forward (at least relatively speaking), the parties dispute each variable in the calculation.

**2.  The Allocation of the Purchase Price**

**[5]** In transactions where one lump-sum purchase price is paid for a conglomeration of assets—as is the case here—the cost of each asset must be determined by apportioning the purchase price among the assets according to each asset's relative fair market value at the time of the acquisition. *See, e.g., Bixby v. Comm'r,* 58 T.C. 757, 785, 1972 WL 2458 (1972) (holding that "when a taxpayer buys a mixed group of assets for a lump sum, the purchase price will be allocated among the assets in accordance with the relative value that each item bears to the total value of the group of the assets purchased"); *Victor Meat Co. v. Comm'r,* 52 T.C. 929, 931, 1969 WL 1734 (1969) (holding that "when a taxpayer buys a mixed aggregate of assets for a lump sum, an allocation of the purchase price will be made to the separate items upon the relative value of each item to the value of the whole"); *C.D. Johnson Lumber Corp.,* 12 T.C. 348, 363, 1949 WL 166 (1949) (same).

Plaintiff asserts that, here, the Purchase Price does not represent the total fair market value of the incentive package Home acquired in the supervisory merger.

**0387**

Pl.'s Post Trial Br. at 54. Indeed, Plaintiff concedes that the total fair market value of the incentive package is *more* than the Purchase Price Home paid for the package. *Id.* In other words, the combined fair market value of each asset in the incentive package is greater than what Home actually paid for the package. This is significant because it means that Plaintiff cannot simply determine the fair market value of one of the assets in the package and then allocate a corresponding percentage of the Purchase Price to that asset. Instead, Plaintiff must establish the fair market value of each asset in the incentive package to arrive at a total fair market value for the package, and from that, determine each asset's pro rata share of the total fair market value. Only when Plaintiff has arrived at a total fair market value for the incentive package can Plaintiff establish the pro rata share of each asset in the total fair market value. The pro rata share allotted to each asset can then be applied to the Purchase Price to establish the cost basis of each asset.

An illustration is helpful. Assume that a thrift paid $300 for an incentive package it received in a supervisory merger. Assume, as well, that the incentive package is comprised of three assets: A, B, and C. Now assume that the fair market value of A is $175, the fair market value of B is $125, and the fair market value of C is $100. Therefore, the total fair market value of the combined assets constituting the incentive package is $400. This information is not sufficient to allow for the correct allocation of the purchase price among A, B, and C. For instance, one cannot simply allot $175 of the purchase price to A because that would result in too much of the purchase price being allotted to A. In other words, A would be allotted one-hundred percent of its fair market value, while B and C would be left with some percentage less than one-hundred percent because only $125 of the purchase price would re-main to allocate to B and C, whose fair market value is $125 and $100, respectively, for a total of $225.

Therefore, because the purchase price is less than the total fair market value of A, B, and C, it is necessary to determine each of the asset's pro rata share of the total fair market value. Once this is determined, the pro rata share of each asset can then be applied to the purchase price to determine each asset's pro rate share of the purchase price. In this example, A's pro rata share of the total fair market value is 44%, B's is 31%, and C's is 25%. Therefore, A's pro rata share of the purchase is $132, B's is $93, and C's is $75.

However, this formula only works if Plaintiff is able to establish the fair market value for *each* asset in the incentive package. If Plaintiff is not able to establish the fair market value for any one of the assets in the incentive package, it is impossible to ascertain the total fair market value of the incentive package, and thereby, impossible to ascertain the pro rata share of each asset. This is because the total fair market value of the incentive package is the sum of the fair market value of each asset in the package. If any one of these variables is unknown, it is impossible to determine the total fair market value. And, without a total fair market value, it is likewise impossible to determine the pro rata share of purchase price for each individual asset.

In the illustration above, one is able to determine the total fair market value of the incentive package simply by adding together the individual fair market values of the three assets that comprise the package: A's fair market value is $175, B's is $125, and $C's is 100. Therefore, the total fair market value for the incentive package is $400. If, however, the fair market value for A, B, or C is unknown, it is impossible to determine the total fair market of the

incentive package (*i.e.*, A($175) + B($125) + C(?) = ?). And, if the total fair market value of A, B and C is unknown, it is impossible to determine each asset's pro rata share of the total fair market value. Likewise, if each asset's pro rata share of the total fair market value is unknown, it is impossible to allocate the $300 purchase price among the assets according to their pro rata share.

In short, in order for this Court to determine what portion of the Purchase Price for the Missouri–Florida Transaction was allocated to each of the Branching Rights (*i.e.*, the Missouri Branching Right and the Florida Branching Right) and the RAP Right, Plaintiff must first establish the fair market value for each asset contained in the incentive package.[7] Failure to establish the fair market value for any one of the Rights is fatal to Plaintiff's tax refund claims.[8]

### C. Plaintiff Failed to Establish the Fair Market Value for the Missouri Branching Right to a Reasonable Degree of Certainty

As discussed above, the first step in this process is to determine what Home paid for the FSLIC incentive package (in other words, what the Purchase Price is). The parties contest this issue, disagreeing on the extent of the failing thrifts' liabilities, assets, and the values for each. However, it is not necessary for this Court to resolve this dispute because, for the reasons discussed below, the Court finds that Plaintiff

failed to establish, to a reasonable certainty, the fair market value for the Missouri Branching Right.[9] Given that Plaintiff failed to establish the fair market value for the Missouri Branching Right, the Court is unable to ascertain the cost basis for either the Branching Rights or the RAP Right, or, for that matter, to the incentive package. Accordingly, Plaintiff has not met its burden of proof, and thus, failed to establish its entitlement to a tax refund. Plaintiff's claims must be dismissed as a matter of law.

### 1. The Grabowski Model: An Income Approach to Determining the Fair Market Value of the Missouri Branching Right on the Date of the Missouri–Florida Transaction

[6, 7] Plaintiff's valuation expert, Roger Grabowski, valued the Missouri Branching Right under the tax law standard for "fair market value." For Federal tax purposes, "fair market value" is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); *Morrissey v. Comm'r*, 243 F.3d 1145, 1147–48 (9th Cir.2001) (citing Treas. Reg. § 20.2031–1(b)). Under this standard, the willing buyer and willing seller are hypothetical: "[d]efining fair market value with reference to hypothetical willing-buyers and

---

7. The parties dispute what assets, exactly, are included in the incentive package for the Missouri–Florida Transaction. For the reasons discussed below, the Court does not reach this issue.

8. If Plaintiff were able to establish the Purchase Price and what portion of the Purchase Price was allocated to the Branching and RAP Rights, then the Court must turn to the remaining issues in this litigation, namely whether Plaintiff is entitled to a tax refund

based on Home's alleged abandonment of the Missouri Branching Right and whether the RAP Right is amortizable and, if so, over what period of time.

9. Plaintiff acquired Branching Rights in both Missouri and Florida through the Missouri–Florida Transaction. However, the parties focus their discussion of the fair market value for the Branching Rights to Missouri. For the sake of simplicity, this Court will do the same.

willing-sellers provides an objective standard by which to measure value." *Propstra v. United States,* 680 F.2d 1248, 1252 (9th Cir.1982). In addition, value must be determined on the date of the transaction (here, December 17, 1981), and any subsequent event or future value is of no consequence in determining cost basis. *See Moore v. Comm'r,* 425 F.2d 713, 714 (9th Cir.1970).

Mr. Grabowski used an income approach to determine the fair market value of the Missouri Branching Right to a hypothetical buyer. Day 3 AM 8:16. More specifically, Mr. Grabowski used a discounted cash flow model known as the "excess earnings" approach. Excess earnings represent the cash flows that the hypothetical buyer would have expected the Branching Right to generate beginning in December 1981, net of charges for the use of contributory assets, and discounted to present value. In order to determine the excess earnings (*i.e.* the cash flow) attributable to the Missouri Branching Right under the excess earnings approach, Mr. Grabowski employed a five-step analysis. First, he projected the net operating income generated by the Branching Right based on: (a) the projected rate of overall statewide thrift deposit market growth in Missouri; (b) the projected market share that the hypothetical buyer could be expected to capture in Missouri; (c) the projected spread on loans funded by the new deposits; and (d) the projected operating expenses for the hypothetical buyer. *Id.* at 10: 1–9; 15:21–25. Second, he deducted income taxes from the net operating income to arrive at the projected net income. Third, Mr. Grabowski projected charges for the use of contributory assets (commonly referred to as "capital charges") and deducted those charges from the net income to arrive at the projected cash flow attributable to the Missouri Branching Right. Fourth, Mr. Grabowski used a 22% discount rate to determine the present val-

ue of the projected cash flow. Lastly, Mr. Grabowski deducted estimated transition costs and assemblage value from the present value of the cash flow. This resulted in Mr. Grabowski finding a fair market value of $28.8 million for the Missouri Branching Right.

### a. First Step: Determine the Projected Net Operating Income Attributable to the Missouri Branching Right

As discussed above, the first step in Mr. Grabowski's analysis was to determine the projected net operating income attributable to the Missouri Branching Right. In order to do this, Mr. Grabowski first had to project the net revenue of the Missouri Branching Right. The Grabowski Model did this by projecting growth in Missouri's new deposit market based on aggregate deposits statistics from 1968 through 1981 for the state of Missouri. Day 3 A.M. at 10:1–9. Based on this information, the Grabowski Model projected that Missouri's new deposit market would increase as follows: 47% in 1982; 39% in 1983; 32.3% in 1984; 26.5% in 1985; and 21.85% in 1986. *See* Ex. 283. Mr. Grabowski attributed the growth increase to inflation and indicated that in real dollar terms, Missouri's deposit market did not actually grow. *Id.* at 15:1–10.

Next, Mr. Grabowski had to calculate the expected share of those new deposits that a hypothetical buyer could expect to capture. *Id.* at 15:13. Here, Mr. Grabowski stated that he assumed that the hypothetical buyer was a "well-capitalized thrift" that would capture part of the Missouri deposit market through offering new products, an image of "safety," and advertising. *Id.* at 15:14–20; 22:18–20. However, because up to this point, thrifts were prohibited from operating branches outside their home market, Mr. Grabowski could not turn to an already-established interstate thrift operation as a guide to

predict how much of the Missouri deposit market the hypothetical buyer could capture. *Id.* at 16:1–7. Instead, Mr. Grabowski used Home's entry into the Northern California market as a model to determine what the hypothetical buyer could expect to achieve. *Id.* at 16:8–25. He felt that this approach was reasonable because Home had originally been limited to opening branches within 100 miles of its headquarters in Southern California, thereby making Northern California a new market in the same way that Missouri would be a new market, and because, according to Mr. Grabowski, the competition in Missouri was similar to the competition in Northern California. *Id.* Thus, the Grabowski Model assumed a hypothetical buyer would capture a market share equal to Home's market share in Northern California after 10 years, which was 7% of the market. *See* Ex. 281. Mr. Grabowski referred to this as "the mid-case market share scenario." [10] *Id.* From this, Mr. Grabowski subtracted the acquired thrifts' existing deposits that were merely acquired through the merger in order to determine the total new deposits available to the hypothetical buyer to reinvest by originating new loan mortgages.

Mr. Grabowski then assumed that all of the new deposits the hypothetical buyer captured would be used to originate new adjustable rate loan mortgages ("ARMS"). "The ARMS, which were the new tool that was granted to thrifts ... would allow [the hypothetical buyer] to price differently and price better," putting the hypothetical buyer "first" in line as the lender. *Id.* at 24:1–5. In predicting the hypothetical buyer's ability to make mortgage loans, Mr. Grabowski stated that he assumed that interest rates would remain flat. *Id.* at 25:10–15. However, he did not think this would

impact the hypothetical buyer's ability to make loans because the ARMS would be an attractive product to purchasers. *Id.* at 25:18–23. However, he conceded that the flat interest rate would "impact[ ]" the "deposit market" and "would really tone[ ] down the amount that was available for new loans." *Id.*

Next, Mr. Grabowski had to project the "spread" the hypothetical buyer would make on the new mortgage loans. The spread is the difference between the interest charged on a mortgage loan and the cost to the thrift for obtaining and maintaining the deposits. *Id.* at 26:5–6. In making this calculation, Mr. Grabowski assumed that the hypothetical buyer would only issue ARMs. *Id.* at 26:11–13. He also assumed that the hypothetical buyer would be getting the deposits in Missouri (which was less expensive than getting the deposits in California) and making ARMs in California, thereby "making a little bit more than the contract spread." *Id.* at 28:15–20; 30:21–24. Based on the cost of funds in San Francisco and Des Moines in 1981, Mr. Grabowski assumed a spread on the loans that ranged between 2.25 and 2.75%. 32:13–25. From this, he assumed the mid-range spread of 2.5% and came up with net revenues of $2,784,000. 38:10–18.

Mr. Grabowski next projected that the operating expenses of a hypothetical buyer would start at 1.8% for 1982, decline to 1.6% in 1983, and continue decline down to 1%. He subtracted the operating expenses from the net revenues to arrive at the projected net operating income. 41:1–6.

### b. Second Step: Determine the Projected Net Income

In order to determine the projected net income of the Missouri Branching Right, Mr. Grabowski "subtracted the income tax

---

**10.** Mr. Grabowski used a scenario analysis, which allowed him to run his model with a variety of assumptions that were probability

weighted. Pl.'s Post Trial Br. at 56. Ultimately, Mr. Grabowski adopted the "mid-case scenario" for his final analysis.

rate that would be applicable to the incremental income that would be earned at the statutory tax rates." 41:8–11. He determined that 36% would be the average tax rate and subtracted that from the operating income to arrive at the projected net income. 41:12–15.

### c. Third Step: Determine the Cash Flow Attributable to the Missouri Branching Right

In order to isolate the cash flow attributable to the Missouri Branching Right, Mr. Grabowski had to separate out income streams attributable to assets that came from the acquired thrifts. Mr. Grabowski accomplished this by taking capital charges for contributory assets against the projected net income. In this case, Mr. Grabowski determined that the contributory assets included fixed assets (*i.e.*, furniture, fixtures, and equipment), working capital (*e.g.* prepaid expenses, interest income receivables, and other receivables minus operating liabilities), trade name (of the hypothetical buyer), technology, workforce (both assembled and new), and the regulatory minimum capital requirement. Pl.'s Ex. 297. By subtracting capital charges from the projected net income, Mr. Grabowski claimed to calculate the cash flows that are attributable solely to the Missouri Branching Right. *Id.*

### d. Fourth Step: Determine the Value of the Branching Rights (before Adjustments)

Mr. Grabowski acknowledged that "making projections" is a "risky business," and as such, employed a 22% discount rate to determine the present value of the cash flow attributable to the Missouri Branching Right. 49:2–9. Mr. Grabowski then calculated the residual period cash flow and converted it to its present value. Day 3 A.M. at 53:14–17. Mr. Grabowski concluded that the present value of the cash flow, including the residual value, is $37 million (before adjustments). 53:19–22.

He notes that this is actually more conservative than his mid-case scenario. 56:1–2.

### e. Fifth Step: Determine the Fair Market Value of the Missouri Branching Right

Next, Mr. Grabowski recognized two other "upfront investments" that had to be made by the hypothetical buyer in order to capitalize on the Missouri Branching Right: transaction costs and assemblage value. 56:4–8. Mr. Grabowski determined that the hypothetical buyer would have to invest $1.2 million in transaction costs in order to take over existing and acquire new branches in Missouri (*e.g.*, change signage, advertisement and promotional expenses, and transitioning the workforce). 57:12–21. He also recognized that the hypothetical buyer would have a "head start because [it would be] able to buy the existing branches" of the acquired thrifts (*i.e.*, without this "head start" the hypothetical buyer would need to find branch locations and assemble or build the infrastructure required to get the business operating). 58:3–5. He referred to this as "assemblage value" and set its value at $5 million. 57:19–20. The final step in his analysis was to subtract the transaction cost and assemblage value from the value for the Missouri Branching Right that he had reached in Step Four above. 58:21–24. Based on the foregoing analysis, he concluded that the fair market value for the Missouri Branching Right is $28,800,000. 58:23–24.

### 2. The Government's Challenges to the Grabowski Model: The Model is too Flawed to Form a Reliable Basis for Valuing the Missouri Branching Right

The Government contends that Mr. Grabowski's discounted cash flow model is simply too flawed to form a reliable basis for valuing the Missouri Branching Right. The Government raises multiple objections to the valuation model; however, its main

**1110**   996 FEDERAL SUPPLEMENT, 2d SERIES

criticism is that Mr. Grabowski's analysis is based on an unrealistic view of the grim economic circumstances in 1981. The Government charges that there is a "complete disconnect" between the economic reality on December 17, 1981 (*i.e.,* the date of the Missouri–Florida Transaction) and Mr. Grabowski's "rosy projections" with respect to the inputs he used in his Model.

The Grabowski Model, in the Government's view, rests on four "value drivers"—key assumptions that go into predicting the cash flow. Day 5 A.M. 76:17–25. The four value drivers are: (1) growth in the Missouri deposit market, (2) the hypothetical buyer's ability to capture a share of Missouri's deposit market, (3) the hypothetical buyer's ability to originate a high volume of new loans; and (4) the spread between the interest on the new loans and the cost of deposits. 76:22–77:1. The Government charges that the Grabowski Model is overly optimistic with respect to each of these value drivers, which has the net effect of inflating the value of the Missouri Branching Right.[11] The Court addresses each of the Government's challenges to the Grabowski Model below.

### a. The Grabowski Model's Assumption Regarding the Missouri Deposit Market Growth Is Unreliable

As discussed earlier in this order, the first step in the Grabowski Model's discounted cash flow analysis is to determine the projected net operating income for the Missouri Branching Right. To do this, Mr. Grabowski projected the Missouri deposit market growth rate and calculated the hypothetical buyer's expected share of that market. As discussed above, the Gra-

bowski Model anticipated that the Missouri deposit market would grow as follows: 47% in 1982; 39% in 1983; 32.3% in 1984; 26.5% in 1985; and 21.85% in 1986. *See* Ex. 283, row 3. In addition, the Grabowski Model projected that the hypothetical buyer would eventually capture 7% of the Missouri deposit market, based on Home's expansion in the Northern California market.

The Government argues that these are unrealistic projections in light of the grim economic circumstances surrounding the thrift industry in 1981. As a preliminary matter, the Government points out that deposits were swiftly flowing out of the thrift industry in 1981. According to the Government, this outflow, known as disintermediation, was a function of the juxtaposition of high interest rates and restrictive regulations. The Government's expert, Dr. Steven Mann, testified that historically regulators placed ceilings on the rates of interest that thrifts could pay depositors. Day 5 A.M. 56:3–57. According to Dr. Mann, in the early 1970's, the interest rate ceilings had the positive effect of keeping costs down for the thrift industry and allowed thrifts to earn generous positive net interest margins on loans. However, with the onset of high inflation, depositors demanded higher returns to keep pace with the eroding value of their money. *Id.* As competing products not subject to the interest rate ceilings imposed on the thrifts began to enter the market, deposits began to flow out of thrifts and into these newer products.[12] The Government argues that the effects of disintermediation

---

**11.** The Government also contends that the Grabowski Model inflates the value of the Florida Branching Right, for the same reasons it overvalues the Missouri Branching Right. However, because this Court finds that the Grabowski Model is unreliable as to the Missouri Branching Right, it is unnecessary for this Court to also address the Govern-

ment's arguments concerning the Florida Branching Right.

**12.** Eventually Congress began to loosen restrictions on deposit products within the thrift industry. In 1980, Congress passed the Depository Institutions Deregulation and Monetary Control Act of 1980, but under this Act,

are reflected in industry statistics that show a sharp downward trend in levels of new net deposits received by FSLIC-insured thrifts from 1976 through 1981. *See* Ex. 605. Indeed, the Government points out, Home lost approximately $720 million in deposits in 1981. *See* Ex. 17, p. KS–009372.

The Government argues that the fundamental reality of disintermediation did not change for the thrift industry until Congress, with the passage of the Garn–St. Germain Act in late 1982, authorized thrifts to offer a product that could directly compete with other deposit products. Indeed, in the *final two weeks* of December 1982, after Home began offering the new "Money Market Deposit Account" authorized by the Act, Home attracted over $1.2 billion in new deposits. *See* Ex. 18, p. KS–009476.

The Court is persuaded by the Government's argument. As the Government points out, the Grabowski Model does not address disintermediation. Instead, the Model projects a high rate of deposit growth in Missouri, ranging between 21% and 47% between 1981 through 1986, until it is eventually reduced over time. Although Mr. Grabowski claimed at trial that the introduction of the "All Savers Certificate" justified his robust deposit projections, in reality the product was quickly labeled a "dud." Day 3 A.M. 13:23–14:12; Day 6 P.M. 26:23–29:24. Nor is this Court persuaded by Plaintiff's contention that the Grabowski Model actually shows nominal deposit growth if it is adjusted for inflation. As will be discussed later in this

section, Plaintiff's contention is only true for the Model's statewide deposit projections. Once those projections are multiplied by the hypothetical buyer's share of the deposit market as projected by the Model, the Model more than compensates for inflation. *See* Ex. 283. Plaintiff's contention that the hypothetical buyer would be able to lure deposits from other existing thrifts on account of its perceived "safety" is also unpersuasive. The Court finds it a much more likely scenario that if a depositor was indeed willing to move funds, the funds would have been moved to a bank with an equivalent "safe" reputation, but one that offered a deposit product with a higher rate of return (*i.e.,* a product that the hypothetical buyer—a thrift—could not offer until late 1982 after Congress passed the Garn–St. Germain Act).

What is more, the Grabowski Model projects Missouri's deposit growth by relying on the State's aggregate deposit statistics. *See* Ex. 277. However, as Mr. Grabowski conceded during his trial testimony, the deposit statistics included "interest credited" balances (*i.e.,* interest posted to accounts of existing customers that is not a source of "new" deposit funds that can be loaned out). Day 3 P.M. 27:8–30:16. Thus, the statistics artificially skewed the numbers towards a higher rate of new deposit growth.[13]

**b. The Grabowski Model's Assumption that the Hypothetical Buyer Will Capture 7% of the Missouri Deposit Market Is Unrealistic**

The Government also contends that the Grabowski Model's assumption that the

---

the restrictions were to be phased out over a period of five to six years. Day 5 A.M. 56:3–57:25. Therefore, as of the date of the transaction (December 17, 1981), thrifts still operated at a competitive disadvantage to other competing deposit products.

**13.** Plaintiff argues that the "interest credited" issue is a non-starter because as long as the

depositor does not "withdraw the credited interest amounts from her account, the thrifts would have that new cash available to make loans." Pl.'s Post Trial Br. at 63–64. The Court disagrees. While interest credited, if not withdrawn, may be available for loans, it still is not "new" deposit growth.

**1112**          **996 FEDERAL SUPPLEMENT, 2d SERIES**

hypothetical buyer will achieve a 7% share of Missouri's deposit market is unreliable. As discussed previously, Mr. Grabowski reached this assumption based on his analysis of Home's expansion into the Northern California market. But, as the Government points, Home's expansion into Northern California largely predated disintermediation, and thereby, escaped its adverse effects. This Court agrees that Home's expansion into Northern California is not a reliable indicator of the hypothetical buyer's ability to capture a share of the Missouri deposit market. Home's expansion into the Northern California market took place in the 1970's. During the 70's, the thrift industry was in an entirely different economic landscape than existed at the time of the Missouri–Florida Transaction; indeed, unlike the 70's, in 1981, the entire industry was economically insolvent to the tune of billions of dollars. *See* Ex. 769 (Richard T. Pratt, the chairman of the FHLBB in 1981 stating "In 1982, the Bank Board saw no [surviving thrifts] in the event that the then present financial conditions continued or worsened."). Based on this alone, Home's experience in Northern California is a wholly unreliable indicator of the hypothetical buyer's ability to capture a share of the Missouri deposit market.

That Home's expansion into Northern California is an unreliable indicator is further substantiated by the fact that Home paid for a significant portion of its growth into Northern California by acquiring existing thrift institutions. Day 5 P.M. 8:15–23. The Grabowski Model, in contrast, bases the hypothetical buyer's ability to capture market share solely on organic expansion (*i.e.,* the hypothetical buyer would open new branches as opposed to acquiring branches that already were up and running). *See* Pl.'s Post Trial Br. at 60. Plaintiff attempted to overcome this fundamental difference between Home's Northern California expansion and the

Grabowski Model by claiming that "Mr. Grabowski concluded that a buyer could have achieved the same market share after ten years by opening branches or buying branches, and simply used the ten-year market share as a benchmark." *Id.* (citing Day 7 A.M. 21:22–22:1). In other words, in Mr. Grabowski's view, whether the buyer captured its market share by opening new branches or by acquired existing branches, the buyer would have had the same market share at the ten year mark. Plaintiff further claims that the Model properly reflected the cost of opening new branches in capital charges, and through the S-curve that reflected smooth growth rather than erratic growth through acquisitions. *Id.* To the contrary, the Court finds that the Grabowski Model did not properly account for the expense of such rapid growth. *See* Day 6 A.M. 32:13–39:24 (Dr. Mann noting that the Model does not account for any such growth); 34:19–25 ("Well, there must—for the model to make any sense or have any reliability, there must be some payment for all of this growth" but "I couldn't really find anything.").

In addition, the Grabowski Model stands in marked contrast to contemporaneous business projections prepared by Home for the Securities and Exchange Commission ("SEC") three days before the Missouri–Florida Transaction closed. *See* Ex. 132. In a December 14, 1981 letter from M.J. Antoci, who at the time was Home's chief financial officer, to the SEC, Mr. Antoci projected a "most probable case" scenario that Home would be able to acquire $638 million in new Missouri deposit funds by the end of 1986—compared to the over $1 billion in new funds that the Grabowski Model projects the hypothetical buyer will have by the end of 1986. *Id.* at KS–050398. This contrast is made more remarkable because Mr. Antoci assumed falling interest rates in his analysis, where-

as the Grabowski Model assumes that interest rates will remain flat.  Day 1 P.M. 25:4–17.  Lowering the Grabowski Model's market share rate in Missouri to a level that aligns with Mr. Antoci's projections for 1986 reduces the Model's computation of the Missouri Branching Right fair market value by almost fifty percent.  Day 5 P.M. 10:14–25.

**c.   The Grabowski Model's Assumption that the Hypothetical Buyer Will Originate a High Volume of New Loans Is Unrealistic In Light of the Evidence Presented at Trial**

As discussed previously in this order, the Grabowski Model assumes that all new Missouri deposits captured by the hypothetical buyer would be used to originate new adjustable rate mortgages ("ARMs"), particularly in California where, Mr. Grabowski testified, demand for loans remained high.  *Id.* at 25:18–23.  This is an important assumption because a high influx of new deposits without an ability to generate new loans would significantly impact a thrift's earnings.  This is because the thrift would have to carry the cost of the interest on the deposits, without receiving mortgage payments to offset those costs.  The Government argues that this assumption is fundamentally flawed because the evidence presented at trial shows that during 1981, the thrift industry was unable to originate mortgage loans at any appreciable volume.  Indeed, the Government points to Home's own statistics which reveal that Home originated a mere $342.6 million in new mortgages in 1981, compared to the $2.3 billion in new mortgages it originated in 1976.  *See* Ex. 17, at pp. KS–009443, KS–009439.  This precipitous drop in loan volume was the direct result of the "sky-high" interest rates and the inability of home buyers to finance their purchases.  As Mr. Antoci testified, "Nobody could afford the rate."  Day 1 P.M. 20:6–12.  Nevertheless, as the Government points out, despite this stark reality, the Grabowski Model assumes that the hypothetical buyer would be able to originate loans at an "astonishing[ly] high rate."

Plaintiff responds that it was reasonable for the Grabowski Model to make this assumption because Home and other thrifts "historically had been able to use all of their deposits to make mortgages." Pl.'s Post Trial Br. at 62 (citing Day 3 A.M. 24:17–19).  The Court finds this argument unpersuasive for at least two reasons.  First, as previously discussed, relying on Home's prior ability to originate loans ignores that fact that interest rates had sky-rocketed at the time of the Missouri–Florida Transaction.  Home's prior ability to originate loans is simply not a reliable indicator in the grim economic realities of 1981.  Second, as Mr. Antoci testified, the thrift industry was a loan driven industry, which meant that if loan demand was high, a thrift sought to attract new deposits.  If the loan demand was weak, a high influx of deposits would drag down earnings.  Day 1 P.M. 40:10–13.  Given this model, it is not surprising that Home managed to originate loans from all of its deposits in the past—this simply meant that Home was good at judging its need for deposits.  The Grabowski Model, on the other hand, is deposit-driven, meaning that the hypothetical buyer was expected to capture as many new deposits as possible and *then* attempt to originate mortgages from those funds.  Under the Grabowski Model, the hypothetical buyer could well generate more deposits funds than it could turn into loans.

Plaintiff also contends that it is a reasonable assumption that the hypothetical buyer would able to use all new deposits to originate mortgages because the hypothetical buyer would be offering ARMs. Plaintiff argues that ARMs were "most attractive in a high interest rate environment

**0396**

**1114**        **996 FEDERAL SUPPLEMENT, 2d SERIES**

because they could be priced at one or two percent below the fixed rate mortgages being offered by other lenders." Pl.'s Post Trial Br. at 62. According to Grabowski, "ARMS, which were the new tool that was granted to thrifts . . . would allow [the hypothetical buyer] to price differently and price better," putting the hypothetical buyer "first" in line as the lender, thereby allowing it to originate a significant volume of loans. *Id.* at 24:1–5.

Plaintiff's argument cannot be reconciled with the evidence presented at trial. Mr. Antoci testified that it was inconsistent to project high loan volume during 1981's sky-rocketing interest rates. Day 1 P.M. 25:4–11 (stating that Home could not assume high loan volume while the interest rates remained high. "In fact, we couldn't have assumed even survival if [the interest rates] stayed at the level at the end of 1981."). What is more, even when Home first offered ARMs in California in November of 1981, Home's loan origination volume continued to stagnate because "potential buyers [were] unable to qualify for [the] loans." 20:6–12; Ex. 17 p. KS–009392. Indeed, as of December 1981, Home's management was unsure of whether Home's ARMs "would be accepted in volume" by its residential loan customers. Ex. 17 p. KS–009369. Mr. Antoci testified that "interest rates were too high to make that determination because very few loans were being made." Day 1 P.M. 33:15–21; 25:4–13 (testifying that Home had no ex-

pectation of making a large volume of ARMs, unless interest rates fell).[14]

In light of the evidence presented at trial, the Court finds wholly unreliable the Grabowski Model's assumption that a hypothetical buyer would be able to originate a volume of new loans sufficient to absorb the amount of new deposits that the Model assumes the buyer would capture.

**d.  The Grabowski Model's Assumption that the Hypothetical Buyer Will Make a Net Interest Spread of 2.5% Is Unrealistic In Light of the Evidence Presented at Trial**

The Grabowski Model assumes a hypothetical buyer (in the mid-case scenario) can make ARMs at a spread over deposits costs of 2.5%. *See* Ex. 302, row 2. The Government presumes that Mr. Grabowski based this assumption on Mr. Antoci's testimony that Home expected to price ARMs to yield 2.25% or 2.5% more than the Eleventh District Cost of Funds Index.[15] The Government argues that this is a faulty assumption because the Eleventh District Cost of Funds Index measured the average costs on all existing deposits, not just the new, higher-rate deposit products. For instance, from December 1981 to January 1982, the average cost of funds, as measured in the Eleventh District, was in the range of 11.95–12.18%. *See* Ex. 613. In contrast, the Government points out, the going rate for a new market rate six-month CD during that same timeframe

14. The Government's expert, Dr. Mann, repeatedly faulted the Grabowski Model because it was based on the assumption that interest rates would drop. The Court does not agree with Dr. Mann on this point. The Grabowski Model was based on an underlying assumption that interest rates would remain flat far into the future. *See* Day 3 A.M. 5:2–17.

15. The Eleventh District Cost of Funds Index is one of many indices used by mortgage lenders to adjust the interest rate on adjustable rate mortgages. It is computed from the actual interest expenses reported for a given month by Arizona, California, and Nevada savings institution members of the Federal Home Loan Bank of San Francisco that satisfy the bank's criteria for inclusion in the Index. *See* http://www.fhlbsf.com/resource-center/cofi/ (last accessed February 10, 2014).

was 13.07–14.25%. *Id.* According to the Government, since the Grabowski Model is based on new loans with *new* deposits, the hypothetical buyer would have to pay the going rate for a *new* market rate CD—in other words .75% to 1% more than the *average* cost reflected in the Eleventh District Index, thereby narrowing the achievable net interest spread from 2.5% as the Grabowski Model projects to a more modest 1.5 to 1.75%. Day 5 P.M. 18:24–24:6. Reducing the net interest spread to this more modest margin reduces the Model's computation for the Missouri Branching Right's fair market value by almost 60%. *Id.* at 22:11–24:6.

Plaintiff counters that the Government's assumption that the hypothetical buyer would have to pay competitive interest rates in order to attract new deposits is incorrect. In Plaintiff's view, the hypothetical buyer would have been able to attract new deposits simply by using "marketing and [its] secure reputation[ ] . . . , just as Home did in Northern California in the 1970s." Pl.'s Post Trial Br. at 65. However, as this Court has already determined, relying on Home's experience in Northern California in the 1970's is not a reliable indicator of what the hypothetical buyer would have been able to accomplish in the 1980's.

### e. Assemblage

Turning away from the four value drivers in the Grabowski Model, the Government next challenges the Model's attempt to isolate a license value for the Missouri Branching Right by comparing a "without" or start-up scenario to a baseline "with" scenario. Day 5 P.M. 38:8–10. The parties agree that the Branching Right was a license—the hypothetical buyer was granted a license to operate in Missouri. The Grabowski Model tries to isolate value of the license by comparing a "without" scenario to a baseline or "with" scenario. In other words, in the "without" scenario, the Model assumes that the hypothetical buyer enters the Missouri market without any existing network to work with (*i.e.,* no branches, work force, teller machines, *etc.,* what the parties refer to as "assemblage"). In the "with" scenario, the hypothetical buyer enters the market with "a running start" (*i.e.,* existing branches that are already up and running). By calculating what the hypothetical buyer would have do in order to reach the same point in the "without" scenario, as where the hypothetical buyer would be in the "with" scenario, the Model projects the value of the license. The Model's mid-case scenario projected that the "without" scenario would catch up to the "with" scenario within four years. 30:6–10. To do this, however, the Model projected that the hypothetical buyer would achieve new deposit growth in the "without" scenario of between 90% to 165% over those four year period. 41:9–14. The Government argues that this growth rate for the "without" scenario "simply def[ies] explanation." This Court agrees. Assuming such extravagant growth during a time when depositors were fleeing the savings and loan market defies credibility.

What is more, the Grabowski Model does not take into account the possibility that the licensing value might decline over time. Mr. Antoci testified that at the time of the Missouri–Florida Transaction, several other thrifts had acquired interstate branching rights. As such, the Model should have addressed the possibility that more thrifts would be given the right to enter the Missouri market, thereby diluting the value of the Missouri Branching Right. Day 5 P.M. 46:8–19. However, instead of accounting for this possibility, the Model projects that the licensing value will increase into perpetuity.

### D. Dr. Mann's Market Analysis

The Government challenged the reliability of the Grabowski Model, not only by

challenging the inputs and assumptions that Mr. Grabowski made in completing his analysis, but also by performing a market analysis on approximately two hundred in-state thrift mergers that occurred near the date of the Missouri–Florida Transaction. Day 5 P.M. 71:14–15. The Government points out that Plaintiff attributes Home's willingness to pay a premium to acquire the failing thrifts (*i.e.,* Home was willing to pay a purchase price above and beyond the failing thrifts' assets) because Home wanted the Branching Rights. In the Government's view, if Plaintiff's assumption is correct, then a similar premium should not be found in the in-state mergers because these transactions necessarily did not include branching rights. 75:6–12. However, Dr. Mann's market analysis of the in-state mergers revealed that the acquiring thrifts in these transactions still paid a premium similar to that of the Missouri–Florida Transaction. *Id.* Based on this, Dr. Mann concluded, the purchase premium must be for some other intangible asset. *Id.* Thus, in the Government's view, the Grabowski Model errs by attributing a significant percentage of the premium in the Missouri–Florida Transaction to the Missouri Branching Right.

Plaintiff counters that Dr. Mann's market analysis is "worthless" because it compares instate mergers that did not involve FLSIC assistance with the Missouri–Florida Transaction that did involve FLSIC assistance. Pl.'s Post Trial Br. at 77. As Plaintiff points out, the FLSIC used interstate branching rights only in mergers involving the least desirable thrifts. Day 2 A.M. 70:2–14. "Thus, the very fact that the [Missouri–Florida] Transaction involved the acquisition of failed thrifts in a FLSIC-assisted interstate supervisory merger involving Branching Rights reveals that [the failed thrifts] were qualitatively different than the thrifts involved in the unassisted in-state mergers Dr. Mann examined." Pl.'s Post Trial Br. at 78.

Therefore, Plaintiff argues, it is "clear that Dr. Mann's in-state mergers were generally not comparable to the [Missouri–Florida] Transaction and cannot be used in a market analysis to determine the fair market value of the Branching Rights." *Id.* at 78–79.

Nevertheless, Mr. Grabowski examined 55 in-state mergers in Dr. Mann's market analysis to determine "why the acquiring thrifts in those cases might have been willing to pay a [premium]." *Id.* at 79. Mr. Grabowski concluded that the acquirer in those mergers benefited "from marketing and operational efficiencies" (what he referred to as "synergy"), as well as "some trade name value and market positioning." *Id.* In order to determine the potential value of this "synergy" in the in-state mergers, Mr. Grabowski analyzed the median transaction from Dr. Mann's market analysis—the Penn Federal Savings acquisition of Sayreville, both of which were thrifts in New Jersey. Day 7 P.M. 28:23–29:8. "He discovered that Penn Federal Savings was a "medium" thrift (based on data from the 1982 Functional Cost Analysis ("FCA") and Sayreville was a small thrift)." After the merger, the combined assets of the two thrifts placed them in the FCA "large" thrift category, which Mr. Grabowski concluded would likely achieve synergies as a result of the reduced operating expenses. 36:3–20. Based on the average operating costs of thrifts in the FCA's various sized grouping (*i.e.* small, medium, and large), Mr. Grabowski concluded that 80% of the $10 million premium associated with the Penn–Sayreville merger was attributable to synergy value. 37:5–38:4. This, he concluded, was on par with the fair market value the Grabowski Model attributed to the Missouri Branching Right.

The Government contends that Mr. Grabowski's concluding premise—that the pre-

mium paid in the in-state transactions can be explained by "synergy"—is incorrect because Dr. Mann's analysis reveals that similar premiums were paid by both large and small in-state acquiring thrifts. 31:19–33:8 (Dr. Mann testifying that "synergies" cannot explain the premiums paid because the larger thrifts would not gain as much synergy value from acquiring smaller thrifts). Because large thrifts would not benefit from a significant "synergy" boost by entering into these transactions, "synergy" cannot explain why the large thrifts were still willing to pay a premium on par with the premium in the Missouri–Florida Transaction.[16]

The Court finds that Plaintiff has not adequately explained why the premium paid by acquiring thrifts for both in-state mergers (without branching rights) and interstate mergers (with branching rights) were of similar proportion. Mr. Grabowski's contention that in-state thrifts were willing to pay such a high premium to acquire "synergies" is contradicted by Dr. Mann's testimony that large thrifts (who would not benefit to a great extent from synergy) paid similar premiums. Accordingly, the Court finds that Dr. Mann's market analysis significantly undercuts the trustworthiness of the Grabowski Model.

### E. Plaintiff Did Not Abandon the Missouri Branching Right

[8–10] In order to succeed on its tax refund claim for the Missouri Branching Right, not only does Plaintiff have the burden of establishing the cost basis for the Right, but Plaintiff must also establish that Home abandoned the Right. Section 165 of the Internal Revenue Code allows a taxpayer to deduct "any loss sustained during the taxable year," so long as the loss is not compensated by insurance or otherwise. 26 U.S.C. § 165(a). "An abandonment loss is deductible if evidenced by a closed and completed transaction that is fixed by an identifiable event occurring in the year of the claimed loss, but only if the taxpayer shows both an intention to abandon the asset in question and an affirmative act of abandonment." *Lapin v. Comm'r*, 956 F.2d 1167 (9th Cir.1992) (citing *A.J. Indus., Inc. v. United States*, 503 F.2d 660, 670–71 (9th Cir.1974)). Thus, Plaintiff must show through the surrounding facts and circumstances (1) that Home intended to abandon the Missouri Branching Right and (2) that Home performed an overt act of abandonment. Neither the non-use of an asset nor the mere intention to abandon is sufficient by itself to accomplish abandonment. *A.J. Indus.*, 503 F.2d at 670 (quoting *Beus v. Comm'r*, 261 F.2d 176, 180 (9th Cir.1958)).

The parties presented the following evidence at trial. Sometime in the early 1990s, Home made a business decision to close deposit-taking branches in certain states because those branches were not operating efficiently. Rinehart's Dep. 8:22–14:11. Missouri branches were especially inefficient, and Home decided to sell them. *Id.* at 14:12–17. The decision to close branches in certain states was made by Home's executives, including CEO Rinehart. However, Home entrusted upper-level managers, more particularly, Senior Vice President Verne Kline, with the task of implementing the geographic strategy of selling inefficient deposit-taking branches. Kline's Dep. at 22:16–23:18.

---

**16.** The Government also argues that Mr. Grabowski artificially inflated the operating costs of the in-state thrifts in order to find greater synergy in the in-state mergers by looking to the operating costs of thrifts that had 40% of their assets in auto installment loans. Day 8 A.M. 28:17–23. Auto loans, by nature, are more expensive to service than mortgages. Therefore, the Government argues, looking to these thrifts artificially inflated the operating costs for the in-state thrifts. 30:10–12.

**0400**

In 1992 and 1993, Verne Kline negotiated and signed three agreements to sell or exchange Home's Missouri branches. *See generally id.;* Def.'s Exs. 420–22. These agreements each contained a covenant not-to-compete, which prohibited Home from soliciting deposits for a set time period (either two or three years depending on the agreement) in a designated noncompete area. *Id.* However, depending on the covenant, Home retained certain flexibilities.

For instance, the May 28, 1993 agreement stated that Home could not "establish, open, operate, purchase, or acquire a deposit-taking office of branch of a thrift institution or commercial bank within the Springfield, Missouri Metropolitan Statistical Area," *i.e.* the Non–Compete Area. Def.'s Ex. 422 at 19–20. Yet the covenant carved out exceptions: it explicitly allowed Home to purchase, acquire and operate a branch within the Non–Compete Area in the event that Home merged or purchased a thrift institution that already operated thrifts in the Non–Compete Area, or in the event that another thrift institution that operated thrifts in the Non–Compete Area purchased Home. *Id.*

The May 21, 1993 agreement forbade Home from opening any offices for deposit gathering activities or otherwise soliciting deposits in the State of Missouri, but the agreement allowed Home to maintain any branches already in existence. Def.'s Ex. 421 at 19–20. Similarly, the July 31, 1992 agreement contained a covenant not-to-compete that allowed Home to continue its operations of existing branches, and it also allowed Home to open new loan offices (as opposed to deposit-taking branches) in the designated non-compete area. Def.'s Ex. 420 at 29.

Plaintiff argues that this evidence demonstrates that Home both had the intent to abandon the Missouri Branching Right in 1993 and acted affirmatively to do so. According to Plaintiff, Home abandoned the Missouri Branching Right by closing its Missouri deposit-taking branches. Def.'s Post Trial Br. at 99. Plaintiff states that Home notified the Office of Thrift Supervision of its intention to permanently leave the Missouri market and discussed its decision with stock analysts and shareholders. *Id.* at 101 & 107. Plaintiff concludes that "Home [ ] abandon[ed] the [Missouri Branching] Right by abandoning the economically inefficient business in which it used the Right (*i.e.,* Missouri deposit taking), disposing of the assets it used in that business (*i.e.,* the Missouri branches), and ceasing to use the Right in that business." *Id.* at 104. Thus, Plaintiff argues, it is entitled to a deduction for Home's cost basis in the Right for the 1993 tax year.[17] *Id.* at 96–97.

The Government counters that Plaintiff failed to show that Home "affirmatively gave up its legal right to operate branches in Missouri in 1993." Def.'s Post Trial. Br. at 89. According to the Government, Home did not achieve abandonment of the Missouri Branching Right simply by disposing of the Missouri branches because the branches and the Branching Right constitute two separate assets. *Id.* at 89. Instead, the Government maintains, "all available evidence leads to the conclusion that Home retained its Missouri [B]ranching [R]ight after 1993 in the event that it subsequently decided to return to Missouri at some point in the future." *Id.* at 91. More specifically, the Government observes that as part of Home's sale of its Missouri deposit-taking branches Home

---

**17.** This argument assumes, of course, that Plaintiff had been able to establish Home's

cost basis in the Missouri Branching Right.

WASHINGTON MUT., INC. v. U.S. **1119**
Cite as 996 F.Supp.2d 1095 (W.D.Wash. 2014)

signed covenants not-to-compete, which restricted Home from reestablishing deposit-taking branches in Missouri for two to three years but did not preclude Home from opening Missouri branches after that time. *Id.* The Government argues that the testimony of Verne Kline, Home's employee who negotiated the sale contracts of the Missouri branches, further supports that Home intended to leave open the ability to reenter the Missouri market in case a favorable opportunity should present itself. *Id.* at 93. Moreover, the Government asserts, Home did not publically or privately express any intention to abandon its Missouri Branching Right in 1993, instead waiting until 1996 to make a public proclamation that it had abandoned the Right. *Id.* at 98. Lastly, the Government argues that Home had no incentive to abandon the Right, as there was no cost associated with retaining the Right while it might have presented some future value. *Id.* at 100.

The Court finds that Plaintiff failed to establish that Home intended to abandon the Missouri Branching Right. Each of the three agreements to transfer Home's Missouri branches contained covenants not-to-compete that contemplated that Home may not only re-enter the Missouri market after a designated time period, but may also continue to operate branches that were already in existence. In the Court's view, these terms counter Plaintiff's assertion that the covenants not-to-compete were just routinely included in these types of transfer agreements. The terms of the covenants not-to-compete undermine Plaintiff's position that Home's sale and transfer of the Missouri branches constitutes an affirmative act indicating abandonment.

Mr. Kline's testimony further brings into doubt Home's intention to permanently abandon its ability to purchase and operate branches in Missouri. According to Mr. Kline, the covenant not-to-compete

clauses were meant to provide Home with flexibility "should an opportunity arise or if there [was] a change of a decision." Kline Dep. at 83:14–16. In negotiating the sale and transfer of Home's Missouri branches, Kline understood he should aim to retain "the most flexibility that [Home] could get." *Id.* at 85:4–6. Kline explained that Home did not want the non-compete clauses to present obstacles "if [Home] were to go out and acquire another national firm that perhaps had branches in these [non-compete] areas." *Id.* at 85:8–12. Further, both Messrs. Kline and Rinehart explained that, other than the covenants not-to-compete, there was nothing prohibiting Home from opening branches in Missouri. Kline's Dep. at 99: 11–18. Such testimony cuts against Plaintiff's argument that Home's closure of the Missouri branches demonstrates either the intent to abandon or an overt act of abandonment.

Moreover, this Court is not persuaded that Home performed an affirmative act in furtherance of its abandonment of the Missouri Branching Right when it notified stock analysts, shareholders, and the Office of Thrift Supervision that it was closing its Missouri branches. The Court finds that Home indeed made such notifications and that the notifications signaled that Home intended to close its Missouri branches. However, these notifications did not demonstrate that Home was permanently surrendering its right to purchase and operate a deposit-taking thrift branch in Missouri—the asset at issue here.

Instead, the evidence (*i.e.* the covenants not-to-compete and Mr. Kline's deposition) supports that while Home may have closed its Missouri branches and did not plan to purchase additional branches, Home recognized the value in leaving the Missouri Branching Right intact. The ability to re-enter the Missouri deposit-taking market

in the future may have benefitted Home in ways other than the purchasing and operating of branches. For instance, Home may have been more attractive to buyers or to other thrifts seeking to merge. Indeed, retaining the Missouri Branching Right for such a purpose would have made sense in light of Mr. Rinehart's testimony that "at the time we were seeing a lot of consolidation in the industry, so competitors were getting larger, more concentrated in their ability to compete." Mr. Rinehart's Dept. 10:16–19. For these reasons, the Court rejects Plaintiff's argument that Home "end[ed] the usefulness of the [Missouri] Branching Right," once it "disposed of the [Missouri] branches." Def.'s Post Tr. Br. at 103.

The Court also disagrees with Plaintiff's argument that Home abandoned "the business" in which the Missouri Branching Right was used when it decided to exit the Missouri market. Plaintiff conveniently defines Home's business narrowly, as the "branch banking business in Missouri," whereas the Court finds that Home's business was the savings and loans business throughout the United States. By defining Home's business more broadly, it becomes clear that Home's exit of the Missouri market did not necessarily result in "ending the usefulness of the [Missouri] Branching Right," since, as described above, the Missouri Branching Right may have played a role in Home's future growth and/or interest.

In sum, the Court finds that Home took actions to safeguard, rather than permanently disavow, its Missouri Branching Right. Such actions made sense considering that the Missouri Branching Right retained value for Home. Accordingly, the Court concludes that Home did not abandon its Missouri Branching Right so as to qualify for a deduction pursuant to 26 U.S.C. § 165(a).

## IV.  CONCLUSION

After hearing testimony at a trial before this Court, reviewing the exhibits, testimony, and pleadings submitted by the parties, and considering all of the evidence presented, the Court rules as follows:

1.  Plaintiff failed to carry its burden in that it has not established a reliable cost basis for the Missouri Branching Right. Without such a basis, Plaintiff is unable to support its right to a tax refund for the 1990, 1991, and 1993 tax years; and

2.  Plaintiff has failed to persuade the Court that Home permanently abandoned its right to operate branches in Missouri. Thus, Plaintiff is not entitled to a refund for abandonment loss for the 1993 tax year.

For these reasons, Plaintiff's tax refund claims are HEREBY DISMISSED.



**PATRIOT MANUFACTURING LLC, Plaintiff,**

**v.**

**HARTWIG, INC., Defendant.**

**Case No. 10–1206–EFM–KGG.**

United States District Court,
D. Kansas.

Feb. 6, 2014.

**Background:** Lathe buyer's sole owner, who was undergoing bankruptcy proceedings, brought breach of contract action against lathe seller, and seller counterclaimed for breach of contract. Buyer was substituted for owner as real party in interest. Seller moved for summary judgment on basis of judicial estoppel due to

T.C. Memo. 1999-7
United States Tax Court.

CORBIN WEST LIMITED PARTNERSHIP, CDC Equity Corporation, Tax Matters Partner, Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent

No. 2203–97.
|
Jan. 15, 1999.

**Attorneys and Law Firms**

Robert J. Percy, for petitioner.

Andrew R. Ceccherini, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, J.

**\*1** Respondent issued notices of final partnership administrative adjustment (FPAA's) to Corbin West Limited Partnership (Corbin West) for 1990, 1991, 1992, and 1993.[1]

The issues for our decision are: (1) Whether a note executed by Corbin West should be included in the basis of certain acquired property for purposes of computing depreciation deductions and low-income housing credits, (2) whether Corbin West is entitled to interest deductions for the accrued interest on that note, (3) whether Corbin West is entitled to include an "acquisition fee", a "developer's fee", or a "tax credit guarantee fee" in the basis of certain acquired property or, alternatively, whether Corbin West may currently deduct any of those fees, and (4) whether Corbin West is entitled to amortization expense for a "no negative cash flow guarantee fee" paid.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Corbin West is a TEFRA partnership. At the time of the filing of the petition, its principal place of business was located in Farmington, Connecticut. Corbin West consists of one general partner, CDC Equity Corp. (CDC), and 29 limited partners. CDC is the wholly owned subsidiary of CDC Financial Corp. (Financial).

CDC is the tax matters partner of Corbin West. Pursuant to Rule 240(c), CDC filed a petition requesting a redetermination of respondent's adjustments to partnership items.

I. *Acquisition of the Property*

Corbin West was formed to purchase, manage, and syndicate the Corbin West Apartments (the property). From approximately March 17, 1970, until December 23, 1988, Norman Associates (Norman) owned the property.

On December 8, 1987, Corbin West entered into an option agreement (the first option) with Norman to purchase the property for $1,760,000. On or about December 9, 1987, CDC, acting on behalf of Corbin West, applied for a reservation of a Federal low-income housing tax credit relating to the property with the Connecticut Housing Finance Authority (CHFA application). The CHFA application reflected a total acquisition cost of $1,760,000 plus estimated development and/or rehabilitation costs of $1,698,315. Corbin West was unable to obtain the financing required for rehabilitation of the property and allowed the first option to lapse on April 1, 1988.

Corbin West remained interested in obtaining the property. With the help of its attorneys, Corbin West devised a new plan to acquire the property. Under the plan, Norman would sell the property to a charitable organization for a price below an alleged fair market value and take a charitable contribution deduction for the difference between the sale price and the alleged fair market value. The charitable organization in turn would sell the property to Corbin West. Corbin West would reimburse the charitable organization for the cash paid to Norman to acquire the property and execute a promissory note for the difference between the alleged fair market value and the cash paid (the same amount as Norman's charitable contribution deduction). The so-called bargain sale would be advantageous to Norman because it would provide Norman with a large charitable contribution deduction. The bargain sale would also provide Corbin West a high basis in the property.

**\*2** On or about November 30, 1988, Financial approached the New Britain Housing Authority (NBHA) and asked if the NBHA would participate in Corbin West's bargain sale plan. The NBHA officials believed this was a strange request but nonetheless agreed to participate. At the NBHA's request, Financial indemnified the NBHA against any and all loss, cost, claim, demand, or damage arising out of or in connection with the NBHA's purchase of the property (hold harmless agreement).

On or about December 23, 1988, the NBHA entered into a purchase and sale agreement with Norman whereby the NBHA was granted the right to acquire the property for $1,808,500. Norman took a charitable contribution deduction for the difference between the alleged fair market value of $3,150,000 and the sale price of $1,808,500 (i.e., $1,341,500). Respondent denied Norman's charitable contribution deduction, and Norman never challenged respondent's determination in court.

On or about December 23, 1988, the NBHA entered into an option agreement (the second option) with Corbin West under which Corbin West acquired the right of the NBHA to purchase the property. Corbin West exercised the second option and purchased the property from Norman pursuant to the option with the NBHA for $1,808,500. Corbin West paid the $1,808,500 by assuming the existing first mortgage of $873,000, obtaining a second mortgage of $920,000, and paying the balance from the limited partners' contributions. Corbin West also gave the NBHA a promissory note (the note) for $1,341,500 (the difference between the alleged fair market value of $3,150,000 and the amount already paid of $1,808,500).

The note was recourse against Corbin West but not against the general partner or any of the limited partners. The note was not secured by the property. Interest and principal on the note were not payable until the earlier of the sale of the property or January 1, 2011. The note was subordinated to repayment of the first and second mortgages, repayment of loans from the general partner plus interest, and repayment of the limited partners' capital contributions and loans plus 8 percent interest. The NBHA did not record the note as an asset on its financial statements.

On its Federal income tax returns for 1990, 1991, 1992, and 1993, Corbin West included the note in the property's basis for purposes of determining its depreciation deductions and low-income housing credits. On these returns, Corbin West

also claimed accrued interest deductions related to the note of $135,000, $147,492, $160,719, and $175,323, respectively.

## II. *Fees Paid*

Corbin West paid CDC substantial fees related to the property. These fees included the following: (1) An "acquisition fee" of $157,500, (2) a "developer's fee" of $87,213, (3) a "tax credit guarantee fee" of $90,000, and (4) a "no negative cash flow guarantee fee" of $53,000.

Corbin West paid CDC the "tax credit guarantee fee" for CDC's guaranty that the property would be operated in a manner which would comply with the requirements of section 42 and ensure the availability of a low-income housing tax credit. CDC guaranteed that if the property failed to qualify for the low-income housing tax credit, then CDC would advance Corbin West an amount equal to any loss of credit. To date, CDC has not made any payments under this provision.

**\*3** Corbin West paid CDC the "no negative cash flow guarantee fee" for CDC's promise to make loans up to $250,000 to Corbin West to fund any operating deficits that might arise through December 31, 1995.

On its Federal income tax returns for 1990, 1991, 1992, and 1993, Corbin West included the "acquisition fee", the "developers fee", and the "tax credit guarantee fee" in the property's basis. On these returns, Corbin West capitalized the "no negative cash flow guarantee fee" and claimed amortization deductions related to that fee of $7,571, $7,571, $7,571, and $7,574, respectively.

## OPINION

### I. *Inclusion of the Note in the Property's Basis*

It is well established that the economic substance of a transaction, rather than its form, controls for Federal tax purposes. *Gregory v. Helvering,* 293 U.S. 465 (1935). Respondent argues that the note lacks economic substance; therefore, Corbin West cannot include the note in the property's basis for purposes of computing depreciation deductions or low-income housing credits.

Generally, the basis for computing depreciation and the low-income housing credit is the cost of the underlying property. See secs. 42, 167(c), 1011, 1012. "Cost" is the amount paid

for the property in cash or other property. Sec. 1.1012–1(a), Income Tax Regs. A promissory note is generally included in that cost. *Crane v. Commissioner,* 331 U.S. 1 (1947); see *Commissioner v. Tufts,* 461 U.S. 300 (1983); *Estate of Franklin v. Commissioner,* 544 F.2d 1045 (9th Cir.1976), affg. 64 T.C. 752 (1975). To be included in the cost of the property, the promissory note must reflect a genuine debt. See *Estate of Franklin v. Commissioner, supra* at 1049; *Odend'hal v. Commissioner,* 80 T.C. 588, 604–605 (1983), affd. on this issue and remanded 748 F.2d 908 (4th Cir.1984).

Recourse notes are normally included in basis because the taxpayer has a fixed, unconditional obligation to pay, with interest, a specified sum of money. See *Waddell v. Commissioner,* 86 T.C. 848, 898 (1986), affd. per curiam 841 F.2d 264 (9th Cir.1988). In deciding whether a recourse note is included in basis, the mere fact that the note is recourse on its face, however, is not determinative. See *Roe v. Commissioner,* T.C. Memo.1986–510, affd. per order (8th Cir., Apr. 1, 1988), affd. without published opinion sub nom. *Sincleair v. Commissioner,* 841 F.2d 394 (5th Cir.1988). When taking economic realities into account, if a recourse debt has no reasonable likelihood of being paid, then the recourse note lacks economic substance and should not be included in basis. See *Rose v. Commissioner,* 88 T.C. 386, 421–422 (1987), affd. 868 F.2d 851 (6th Cir.1989); *Waddell v. Commissioner, supra; Bridges v. Commissioner,* 39 T.C. 1064, 1077 (1963), affd. 325 F.2d 180 (4th Cir.1963). In determining whether there is a likelihood of repayment, we look at the facts and circumstances of each case. See *Waddell v. Commissioner, supra* at 903.

 **\*4** Where the purchase price greatly exceeds the fair market value of the property, courts often find the transaction lacks economic substance. See *Rose v. Commissioner, supra* at 419–420, 422. Corbin West reported the purchase price of the property as $3,150,000. Respondent argues that the fair market value of the property at the time of Corbin West's acquisition was only $1,808,500; therefore, the purchase price greatly exceeds the fair market value.

In this case, the most significant indicator of the fair market value of the property is the first option entered into by Corbin West and Norman 1 year before the acquisition of the property through the bargain sale. The first option allowed Corbin West to purchase the property for $1,760,000. The evidence suggests that this price was negotiated at arm's length. It, therefore, appears that the purchase price greatly exceeded the fair market value of the property at the time of Corbin West's

acquisition, and the note was unlikely to be repaid from its inception.

Furthermore, the repayment of the note was subordinate to repayment of the following: (1) The existing first mortgage of approximately $873,000, (2) the second mortgage of $920,000, (3) the limited partners' loans of $705,600 plus 8 percent interest, (4) the limited partners' capital contributions of $258,900, and (5) the general partners' loans of $500,000 plus interest. These amounts total $3,257,500.

The preexisting debt on the property and the obligations to the partners already exceeded by a large amount the fair market value of the property at the time of Corbin West's purchase, and, as noted above, the repayment of the note was subordinate to repayment of that debt and those partner obligations. Therefore, there was no reasonable likelihood that the note would be repaid. See *Estate of Franklin v. Commissioner, supra; Waddell v. Commissioner, supra.*

Additionally, it appears from the record that the property was the sole asset held by Corbin West; therefore, even if Corbin West decided to pay off the note, it is unlikely that Corbin West would have the financial ability to pay off the note and the interest thereon when due. [2]

In determining the likelihood of repayment of the note, we also focus on the nature of the dealings between the parties. See *Rose v. Commissioner, supra* at 415–416, 423. The NBHA was chosen by Corbin West to execute its bargain sale plan. The NBHA was not a negotiating party in the transaction. There is no evidence that the NBHA made any independent analysis concerning the fair market value of the property or the likelihood of repayment of the note by Corbin West. The NBHA had nothing at risk in the transaction because Financial gave the NBHA a hold harmless agreement. The NBHA received the note for allowing itself to be used by Corbin West and Norman in their attempt to ensure advantageous tax positions.

Although the subjective intent of the parties to create a genuine debt is not controlling, we note that the NBHA did not treat the note as genuine debt. See *Graf v. Commissioner,* 80 T.C. 944, 952 (1983); *Bridges v. Commissioner, supra* at 1077; *Roe v. Commissioner, supra.* There is no evidence that the NBHA considered the credit rating of Corbin West before agreeing to accept the note. See *Capek v. Commissioner,* 86 T.C. 14, 48–49 (1986); *Burns v. Commissioner,* 78 T.C. 185, 212 (1982); *Estate of Helliwell v. Commissioner,* 77 T.C.

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 411 of 651

Corbin West Ltd. Partnership v. C.I.R., T.C. Memo. 1999-7 (1999)
77 T.C.M. (CCH) 1202, T.C.M. (RIA) 99,007, 1999 RIA TC Memo 99,007

964, 976–977, 987–988 (1981). The NBHA never recorded the note as an asset on its financial statements. At the time of trial, the NBHA could not locate the note. See *Patin v. Commissioner,* 88 T.C. 1086 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir.1989), affd. without published opinion sub nom. *Hatheway v. Commissioner,* 856 F.2d 186 (4th Cir.1988), affd. sub nom. *Gomberg v. Commissioner,* 868 F.2d 865 (6th Cir.1989), affd. sub nom. *Skeen v. Commissioner,* 864 F.2d 93 (9th Cir.1989). The note was subordinate to repayment of the preexisting debt and the obligations to the partners, which greatly exceeded the property's fair market value at the note's inception. The facts in toto indicate that the NBHA did not expect the note to be repaid and never treated the note as genuine debt.

 **\*5** On the basis of our review of the entire record, we hold that there was no reasonable likelihood that Corbin West would pay off the note; therefore, the note lacks economic substance and is not includable in the property's basis. Accordingly, Corbin West is not entitled to depreciation deductions or low-income housing credits related to the note.

II. *Deductibility of Accrued Interest on the Note*
In general, section 163(a) allows a deduction for interest paid or accrued. For the interest to be deductible, however, the underlying debt must be genuine. *Elliott v. Commissioner,* 84 T.C. 227, 244–246 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir.1986). When a debt lacks economic reality and is incurred solely to create an income tax deduction, it does not support an interest deduction. *Goldstein v. Commissioner,* 364 F.2d 734, 740 (2d Cir.1966), affg. 44 T.C. 284 (1965).

We have already found that the note lacks economic substance and is not genuine indebtedness. We therefore conclude that Corbin West is not entitled to interest deductions associated with the note. [3]

III. *The Fees Capitalized Into the Property's Basis*
Corbin West paid CDC substantial fees related to the property. These fees included the following: (1) An "acquisition fee" of $157,500, (2) a "developer's fee" of $87,213, and (3) a "tax credit guarantee fee" of $90,000. Corbin West capitalized these fees into the basis of the property for purposes of computing depreciation deductions and low-income housing credits. In the FPAA's, respondent disallowed the inclusion of these various fees in the property's basis. Petitioner argues that (1) these fees are properly

includable in the property's basis or, in the alternative, (2) these fees are deductible expenses. Neither party disputes that these fees were actually paid by Corbin West to CDC.

Under section 1.263(a)–2, Income Tax Regs., acquisition costs of property must be capitalized. Included as acquisition costs are expenditures that result in the taxpayer's acquisition of a capital asset, such as survey fees, attorney's fees for drafting documents, and real estate commissions. *Godfrey v. Commissioner,* 335 F.2d 82 (6th Cir.1964), affg. T.C. Memo.1963–1; *Burman v. Commissioner,* 23 B.T.A. 639 (1931).

A. *"Acquisition Fee" and "Developer's Fee"*
Corbin West capitalized $157,500 as an "acquisition fee" and $87,213 as a "developer's fee" into the property's basis. Petitioner presented two exhibits at trial detailing the services performed or to be performed by it for both of these fees. The services included, among other things, the following: (1) Arranging for an option to acquire the property, (2) evaluating zoning requirements and ensuring compliance, (3) arranging and evaluating an environmental report relating to the property, and (4) establishing guidelines for compliance with the low-income housing tax credits requirements.

 **\*6** We conclude that the "acquisition fee" and "developer's fee" were incident to Corbin West's acquisition of the property, and they must be considered part of the property's acquisition cost. We therefore conclude that Corbin West is entitled to capitalize both the "acquisition fee" and "developer's fee" into its basis in the property.

B. *"Tax Credit Guarantee Fee"*
Corbin West also capitalized a "tax credit guarantee fee" of $90,000 into the basis of the property. This fee was for CDC's guaranty that the property would be operated in a manner that would ensure Corbin West's entitlement to a low-income housing tax credit for the property. If Corbin West failed to obtain such a credit in any year, CDC guaranteed that it would advance Corbin West an amount equal to the amount of any loss of credit.

Petitioner has failed to demonstrate that this cost is associated with Corbin West's acquisition of the property. Sec. 1.263(a)–2, Income Tax Regs. We therefore conclude that Corbin West is not entitled to capitalize the "tax credit guarantee fee" into its basis in the property.

**Corbin West Ltd. Partnership v. C.I.R., T.C. Memo. 1999-7 (1999)**

77 T.C.M. (CCH) 1202, T.C.M. (RIA) 99,007, 1999 RIA TC Memo 99,007

Petitioner alternatively argues that this fee is a deductible expense. Deductions are a matter of legislative grace, and petitioner has the burden of showing that Corbin West is entitled to any deduction claimed. Rule 142(a); *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440 (1934). Petitioner has failed to cite a Code section or other authority that would permit a deduction for this cost; therefore, petitioner has failed to establish that Corbin West is entitled to such a deduction.

IV. *"No Negative Cash Flow Guarantee Fee"*

Corbin West paid CDC a fee that it labeled a "no negative cash flow guarantee fee" in the amount of $53,000. In exchange for this fee, CDC agreed to make loans to Corbin West in any amount up to $250,000 to fund any operating deficits through December 31, 1995. Corbin West capitalized this fee and deducted amortization expense related to this fee during the years in issue. In the FPAA's, respondent disallowed the amortization expense deduction related to this fee.

Petitioner provides no explanation for its treatment of this item and fails to cite any Code section or other authority that would allow its capitalization and amortization of this fee. Rule 142(a); *New Colonial Ice Co. v. Helvering, supra.* We therefore conclude that Corbin West is not entitled to any deductions associated with this fee.

To reflect the foregoing,

   *Decision will be entered under Rule 155.*

**All Citations**

T.C. Memo. 1999-7, 1999 WL 13704, 77 T.C.M. (CCH) 1202, T.C.M. (RIA) 99,007, 1999 RIA TC Memo 99,007

Footnotes

1    All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

2    Petitioner provided expert testimony that the note could be paid off at the end of its term (22 years) because it anticipated 6–percent annual appreciation on the property. Barry J. Cunningham, petitioner's expert, testified that at the end of the note's term the property would be worth approximately $11 million. He also testified that at that time the first and second mortgages and the note could be paid off with approximately $9 million.

     Mr. Cunningham, however, did not consider the loans from the general partner or the loans and capital contributions from the limited partners. Petitioner has not shown that the amount remaining after satisfaction of the first and second mortgages and the obligations to the partners would be sufficient to pay off the note.

3    The interest deductions claimed by Corbin West were for accrued interest on the note; no interest was ever paid on the note during the years in issue.

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   **0408**   5

73 T.C. 743
United States Tax Court

LOUIS C. FIELAND and RUTH
F. FIELAND, PETITIONERS
v.
COMMISSIONER of INTERNAL
REVENUE, RESPONDENT

Docket No. 2001-75.
|
Filed January 30, 1980.

Held, component depreciation not available in the circumstances of this case in respect of existing improvements to used real property acquired for a lump sum. Such improvements to the building made by the taxpayer's predecessor must be depreciated by the taxpayer-purchaser together with the building itself over the remaining useful life of the building. Held, further, allocations of taxpayer's purchase price between land and building made in the deficiency notice sustained. Held, further, useful life of building determined. Held, further, so-called premium or excess rent paid by lessee over the initial term of the lease to reimburse the original lessor for cost of improvements could not be separately amortized by the taxpayer-purchaser of the property over the initial term of the lease. Midler Court Realty, Inc. v. Commissioner, 61 T.C. 590 (1974), affd. 521 F.2d 767 (1975), followed. Held, further, such excess rent not excludable from gross income. Held, further, documentary support for a claimed interest deduction presented for the first time after the trial will not be considered.

**Attorneys and Law Firms**

*743 Louis C. Fieland, pro se.

Jani Maurer and Larry Kars, for the respondent.

**Opinion**

RAUM, Judge:

The Commissioner determined deficiencies in income tax against petitioners for the years 1969-71, as follows:

| *Year* | *Deficiency* |
| --- | --- |
| 1969......................................... | $37,546.60 |
| 1970......................................... | 37,260.93 |
| 1971......................................... | 37,290.70 |

*744 The principal issue relates to the amount of depreciation allowable in respect of a building owned by Mr. Fieland.

FINDINGS OF FACT

Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference.

Petitioners, husband and wife, filed joint returns for the years in issue. The husband, Mr. Fieland, will sometimes hereinafter be referred to as petitioner. At the time the petition was filed in this case, he resided in Florida; his wife resided in New York.

As more fully hereinafter set forth, petitioner in December 1968 purchased certain property (the property) in Nassau County, N.Y., consisting of a building of some 50,000 square feet and underlying land of approximately 4.75 acres, zoned for light industrial use. The property is on the west side of Route 107, Broadway-Hicksville Road, a major north-south artery. Opposite the property on Route 107 is a large area known as the Grumman Aerospace Complex, which contains the corporate headquarters of Grumman Aerospace Corp. (Grumman), an airport, and various buildings used by Grumman [1] in its business as a producer of military aircraft and related systems, military and commercial seacraft, and spacecraft. Also, in the immediate vicinity of the property are a number of commercial and light industrial facilities. The surrounding community is primarily residential. The property is about 31;2 miles from the center of Hicksville.

The building on the property is constructed of masonry and steel, and was erected between 1951 and 1953. It contains approximately 50,000 square feet. Prior to 1967,

the property was owned and occupied by the Corydon M. Johnson Co., a publisher of technical manuals for Grumman and other concerns. Grumman also leased space in the building in the early sixties *745 for use by its purchasing department. In 1966, Country Capital Corp. (Country Capital), a federally licensed small business investment company, acquired complete ownership of the property in foreclosure proceedings. Petitioner acted as trial counsel for Country Capital in those proceedings.

At the time of foreclosure, the building was a one-story factory and warehouse with a two-story section at the front of the building. Approximately 30,000 square feet of the building was an unfinished factory and warehouse area with concrete floors, exposed block walls, unfinished ceilings, suspended space heaters, and exposed fluorescent lighting. Another approximately 10,000 square feet had been used as office space and had tiled floors, but there were still exposed block walls, unfinished ceilings, suspended space heaters, and exposed fluorescent lighting. The remaining area of approximately 10,000 square feet was office space with tiled floors, finished walls, finished ceilings, and recessed lighting, and was located in the building's two-story section. The building had plumbing facilities to accommodate approximately 165 employees. The parking area adjacent to the building met the then-minimum building code requirements, with space available for approximately 110 cars.

On October 19, 1967, Country Capital leased the property to Grumman for 6 years, but, pursuant to paragraph 54 of the lease, the 6-year term was stated to commence 10 days after the completion of 15 "items" which were to be performed by the lessor as specified in paragraph 53. Rent was stated to be $125,000 per year, and the lessee agreed to pay all real estate taxes as additional rent. At its insistence, Grumman was given an option not only to renew the lease for a term of an additional 5 years at an annual rental of $72,500, but to purchase the property for $750,000 during the fifth and sixth years of the term of the lease. [2] Grumman leased the premises in order to provide office space for engineers working on the lunar module (LEM) used in the Apollo Space Program.

Prior to the completion of the work involved in the 15 items specified in paragraph 53 of the lease, Grumman, in February of 1968, requested that the building be modified to accommodate *746 an increased personnel force of up to 750 people. Specifically, Grumman requested (i) that changes be made to the interior of the building so as to accommodate up to 750 people, and (ii) that additional parking space on the outside of the building be added to accommodate parking by the increased number of personnel. Accordingly, the lease was subsequently amended on March 18, 1968, by a rider, [3] which modified a number of the provisions of the original lease.

Among other things, paragraph 53 was expanded by the rider to provide for extensive additional work. Items 1 through 15 of that paragraph remained unchanged, but new items 16 through 35 were added. Grumman took possession on April 21, 1968. [4]

Some of the items involved merely ordinary or deferred maintenance, such as cleaning up the premises, painting, repair of the parking area, repairs to roof, repairs to chain link fence and gate, etc. On the other hand, much of the work involved items that were capital in nature, such as the installation of a sprinkler system, battery operated exit lights, air conditioning facilities, expanded toilet and sewage removal facilities, new lighting fixtures, a 3,000-gallon fuel oil tank, metal office partitions, acoustical ceilings, roof exhaust fan, additional paved parking area, plaster-finished lobby wall, doors and frames, drinking fountains, and other items.

The rider also made some important changes in the financial arrangements between the parties. Thus, the annual rent during the initial 6-year term was increased to $163,500, but no change was made in the $72,500 rent payable during the 5-year renewal term. Further, paragraph 59 of the original lease, which established a schedule of payments required of the lessee in the event of the lessee's cancellation of the lease prior to termination of the 6-year term, was revised to include not only all rent *747 to the end of the year within which notice of cancellation was given, but also additional payments as follows:

| | |
|---|---|
| Within first year............................................................ | $505,000 |
| Within second year....................................................... | 404,000 |
| Within third year........................................................... | 303,000 |

| | |
|---|---|
| Within fourth year........................................................................ | 202,000 |
| Within fifth year........................................................................... | 101,000 |
| Within sixth year........................................................................... | None |

Further, although the basic $750,000 price payable by the lessee upon exercising the option to purchase during the fifth and sixth years remained the same, there was an increase in the additions thereto referred to in note 2 supra. [5]

The amounts by which the rental during the 6-year term exceeded the rents provided in the renewal period, as well as the additional amounts required to be paid upon premature cancellation of the lease or the exercise of the option to purchase prior to the end of the 6-year period, were all directly related to the estimated expenditures by the lessor in carrying out the work called for by paragraph 53.

On December 20, 1968, petitioner purchased the property from Country Capital subject to the Grumman lease as amended by the rider. On the preceding day, December 19, 1968, apparently in anticipation of the sale to petitioner, Country Capital had mortgaged the property to a bank to secure an indebtedness of $750,000. Petitioner acquired the property subject to the first mortgage obligation. In addition, he paid $261,000 in cash and gave a purchase money note in the amount of $340,000. This original purchase price was thus $1,351,000. The December 20, 1968, purchase agreement gave petitioner an option to require Country Capital to repurchase the property between April 15, 1974, and May 15, 1974, inclusive, "at a consideration of $295,000.00 above the then existing balance of the first mortgage." Such remaining balance at the termination of the 6-year lease period would be $506,792.

In connection with petitioner's purchase of the property, Country Capital represented that the lease and rider were in full **\*748** force and effect, without defense or offset, that Grumman had accepted the premises, and that all rents were on a current basis. However, shortly after purchasing the property, petitioner became aware that Grumman was asserting that the work required by the lease and rider had not been fully performed. Grumman threatened to, and in the early spring of 1969 in fact did, withhold payment of rent. Thereupon, petitioner and Country Capital settled the resulting dispute by having Country Capital lease back the property and assume all rights and obligations to Grumman. The leaseback to Country Capital was on a "net-net" basis, except that petitioner continued to be responsible for the

payment of the $97,428 annual charges for interest and amortization of the mortgage indebtedness. The annual rental under this leaseback was fixed at $121,428, and, after subtracting the foregoing $97,428 charges for interest and amortization, there remained an annual return of $24,000 to petitioner on this "net-net" lease. As a further part of the settlement with Country Capital, the latter agreed to "satisfy the ($340,000) note * * * given as a part of the consideration for the original conveyance of the premises" to petitioner, thus reducing his purchase price for the property. Petitioner's cost of the property, as thus revised, was $1,020,440. [6]

As of December 1968, there was a strong likelihood that Grumman would exercise either its option to renew the lease or its option to purchase, and it was more probable that of the two courses of action, it would exercise the option to purchase. The likelihood that it would exercise the option to purchase was enhanced in 1971 when the building ceased being a satellite to the lunar module program and became part of Grumman's training facility; during that year, Grumman added certain further improvements to the building at a cost to it of approximately $300,000.

Within the time specified in the lease, Grumman exercised its **\*749** option to purchase the property for $750,000. However, as a consequence of a corporate reorganization of Grumman and the emergence of a new corporate entity, a controversy arose as to whether the particular Grumman entity exercising the option had the right to do so under the lease. Resulting litigation was resolved by Grumman purchasing the property in September 1974 for $850,000.

More than an acre and a half of the property was "excess" land, or land in excess, of what would normally be needed for the operation of the building as a warehouse or for light industrial purposes. Such excess land added a further increment to the overall value of the property if the property were to be used as a warehouse or light industrial facility. There was still excess land when Grumman began to use the property as an office building and training center. In fact, Grumman leased such excess land for employee parking to its next door neighbor, Unity Buying Service, a catalog sales organization that conducts some sort of discount sales operation in conjunction with a warehouse on its premises. In

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 416 of 651

the late 1970's, Grumman ultimately sold the entire property to Unity Buying Service.

| | |
|---|---|
| Land | $300,000 |
| Building | 325,472 |
| Leasehold improvements | 394,968 |

The "leasehold improvements" related to the work performed by Country Capital as required by paragraph 53 of its lease to Grumman. In their returns for 1969, 1970, and 1971, petitioners took depreciation deductions on a straight-line basis (a) in respect of the building based on an estimated life of 40 years; and (b) in respect of the "leasehold improvements" based on an estimated useful life of 571;2 months, which represented the claimed remaining period of the Grumman 6-year lease.

In the statutory notice of deficiency, the Commissioner appeared to accept a division of the purchase price among land, building, and leasehold improvements, but he revised the allocations to land and building so that his allocations were as follows:

Petitioner allocated his $1,020,440 purchase price as follows:

| | |
|---|---|
| Land | $350,000 |
| Building | 275,472 |
| Leasehold improvements | 394,968 |

 **\*750**  However, he refused to permit the leasehold improvements to be depreciated over the remaining life of the Grumman lease [7] and required that they be depreciated over the 40-year life of the building.

In an amendment to answer, respondent alleged that the correct basis for the building was $435,000, and the correct basis for the leasehold improvements was $270,440. Thereafter, in an amended petition, petitioners alleged a useful life of no greater than 20 years for the building, and contended further, in the alternative, that (a) they are entitled to exclude from income as a return of capital the portion of the rental that constituted a reimbursement of the cost of the leasehold improvements, or (b) that they are entitled to an amortization deduction of $74,452.72 in respect of the consideration paid, over and above the fair market value of the building and land, for the right to receive a premium rental from the lessee over the initial term of the lease.

initial term of the Grumman lease at the time petitioner purchased the property. The parties appear to be in agreement that the purchase price for the entire property was $1,020,440. Moreover, the Commissioner's determination of deficiency did not disturb petitioner's allocation of $394,968 of that purchase price to the improvements to the property made by petitioner's predecessor in accordance with the requirements of the Grumman lease. However, the Commissioner did not accept petitioner's allocation of the remaining portion of the purchase price between land and building; he increased the cost of the land by $50,000 and decreased the cost of the building by the same amount. The Commissioner accepted the 40-year life for the building which was used in the returns, and he required that the improvements  **\*751**  as well as the building be depreciated over that period. The burden of proof is, of course, upon the petitioners to overcome that determination. Zimmerman v. Commissioner, 67 T.C. 94, 104 (1976). To be sure, the Commissioner filed an amended answer in which he increased substantially the amount which he had previously allocated to the building and decreased substantially the amount previously allocated to the improvements. However, the Government's brief indicates that the position thus taken in the amended answer is in substance merely an alternative position which it maintains in the event that it should be unsuccessful in its principal contention. Moreover, the burden of proof, in respect of the new position, is upon the Government, and, as will appear

OPINION

The central matter in dispute is whether petitioner is entitled to depreciate the so-called leasehold improvements made by his predecessor, separate and apart from the building itself, and upon the basis of a useful life measured by the remaining

hereinafter, we have concluded that it did not carry that burden. At the same time, we have also concluded that petitioners have not carried their burden of proving that they are entitled to the depreciation deductions taken in their returns or to still further relief claimed by them in an amended petition that alleges not only a remaining useful life of 20 years for the building but also a somewhat more favorable allocation of the purchase price.

We turn at once to the question whether depreciation deductions may be approved on this record in respect of the so-called leasehold improvements separate and apart from the building itself. Plainly, petitioner did not purchase these improvements separately, and there is no indication that any separate value was assigned to such improvements in the purchase agreement, either individually or in the aggregate. Petitioner purchased a single asset, namely, the building as already modified by the improvements. What petitioners are here seeking is sometimes referred to as component depreciation.

Buyers of used real property ordinarily purchase a unified structure, not individual assets, and there cannot be a precise determination of the cost to the purchaser of the individual components of used depreciable property. See Lesser v. Commissioner, 42 T.C. 688, 704 (1964), affd. 352 F.2d 789, 790 (9th Cir., 1965), cert. denied 384 U.S. 927 (1966). The situation is to be sharply distinguished from one where the original owner of the property has a building constructed or where he adds improvements to an existing building. In either of such cases, the cost of the individual components is susceptible of precise ascertainment, **\*752** and depreciation deductions based upon the useful lives of such components have been approved. Shainberg v. Commissioner, 33 T.C. 241, 254 (1959); see Merchants Nat'l Bank v. Commissioner, 554 F.2d 412, 413 (10th Cir. 1977), affg. a Memorandum Opinion of this Court; Hastings v. United States, 279 F. Supp. 13, 19-21 (N.D. Cal. 1967); University City, Inc. v. Commissioner, 38 T.C.M. 827, 833 & n. 3, 48 P-H Memo T.C. par. 79,198 at 795-796 & n. 3 (1979). See generally 4 J. Mertens, Law of Federal Income Taxation, sec. 23.46 (1973 rev.). The distinction between new and used property in this respect was the basis for the former administrative practice of the IRS in refusing to allow separate depreciation in respect of existing components of used buildings purchased by the taxpayer. Rev. Rul. 66-111, 1966-1 C.B. 46, 47. To be sure, there has been some relaxation of that position, as reflected in Rev. Rul. 73-410, 1973-2 C.B. 53. But such relaxation was strictly limited. The IRS there recognized

"that the component method of accounting for depreciation on used real property improvements may be used if the cost of acquisition is properly allocated to the various components based on their value and useful lives are assigned to the component accounts based on the condition of such components at the time of acquisition." Such standards appear to have been observed in the relatively few instances where component depreciation has been sought in respect of existing improvements to buildings acquired by a taxpayer. Willits v. Commissioner, 38 T.C.M. 1152, 1153, 48 P-H Memo T.C. par. 79,294 at 1107 (1979); Maloney v. Commissioner, 34 T.C.M. 1237, 1241, 44 P-H Memo T.C. par. 75,286 at 1214 (1975), affd. 566 F.2d 1054 (6th Cir. 1977); Harsh Investment Corp. v. United States, an unreported case (D. Ore. 1970) 27 AFTR 2d 71-706, 71-707, 71-1 USTC par. 85,798, 1970 WL 423. Graves v. Commissioner, 48 T.C. 7, 14-15 (1967), affd. per curiam 400 F.2d 528 (9th Cir. 1968).

So far as this record discloses, petitioner did not make any allocation of his cost of the improvements among their various components—-e.g., the sprinkler system, exit lights, air conditioning, masonry partitions, plumbing facilities, etc. He simply lumped all the improvements together, treating as his cost thereof the aggregate unamortized cost of the improvements in the hands of his predecessor, and then proceeded to depreciate such aggregate amount as his own cost over the alleged remaining life of the Grumman initial 6-year lease. This hardly **\*753** satisfied the standards required to be observed in such circumstances.

Certainly, petitioner was not justified in limiting the useful life of the improvements to the remaining period of the 6-year lease, which he fixed at 571;2 months, wholly apart from the fact that the 571;2-month figure itself was highly questionable (see n. 7 supra ). A lessor normally is required to depreciate property over its useful life, without regard to the fact that the property is subject to a lease. [8] The length of the lease may be used as the measure of the useful life of the property only if the lessor can establish that there was a "practical certainty" that the property cannot be used in his business after termination of the lease. Airport Building Development Corp. v. Commissioner, 58 T.C. 538, 539-540 (1972), quoting from Lassen Lumber & Box Co. v. Commissioner, 6 B.T.A. 241, 248 (1927), affd. sub nom. Lassen Lumber & Box Co. v. Blair, 27 F.2d 17 (9th Cir. 1928). To establish such a certainty, petitioner must show that the lease would not be renewed by Grumman, and that in this event, no other tenant would be willing to pay for the use of the improvements. See Airport Building Development Corp. v. Commissioner,

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

58 T.C. at 541-543; New England Tank Industries, Inc. v. Commissioner, 50 T.C. 771, 780-782 (1968), affd. per curiam 413 F.2d 1038 (1st Cir. 1969); Ames v. Commissioner, 36 T.C.M. 1010, 1013-1014, 46 P-H Memo T.C. par. 77,249 at 1013-1014 (1977); Potter v. Commissioner, 28 T.C.M. 1190, 1192, 38 P-H Memo T.C. par. 69,227 at 1292 (1969). Most of the improvements appear to us to have a useful life substantially in excess of the initial period of the lease, and we reject the position that they were useful only during Grumman's occupancy. To be sure, there was evidence in support of that position, but we did not find it convincing. Indeed, we had considerable difficulty with the testimony and report not only of petitioner's expert but also of respondent's expert. In our judgment, it was not a foregone conclusion as of the time petitioner purchased the property that Grumman would exercise its option to purchase the property upon termination of the initial term of the lease, even though **\*754** such course did appear to be likely. Moreover, even if it were a certainty that Grumman would exercise its option to purchase, this factor alone would not justify depreciating the improvements over so short a period any more than it would warrant depreciating the building itself over such period—-a truly bizarre result, to say the least. Petitioner would still be obliged to prove that the improvements would be valueless at the end of the lease, a showing which has not been convincingly made.

The issue as to the remaining useful life of the building itself gave us considerable trouble. The evidence seemed quite clear that the building had a useful life of 40 years when first constructed in 1953, and some 15 years had passed when petitioner purchased it in 1968. However, we are satisfied that the improvements did much to renovate the building, and there was indeed credible evidence that some of the improvements even increased the life of the structure. We are fully satisfied that petitioners have not carried their burden of proof in respect of the allegation in their amended petition that the useful life of the building was 20 years. The matter is not susceptible of any mathematically precise determination and calls for a practical solution on the basis of the record before us. Using our best judgment, on the entire record, we have concluded, and hereby find as a fact, that the remaining useful life of the building at the time of acquisition by petitioner was 30 years. Moreover, as to the allocation of petitioner's purchase price between land and building, we find unconvincing the conclusions of the experts for both parties, and it is our judgment not only that petitioners have failed to carry their burden of proving that the Commissioner's determination in the deficiency notice was incorrect, but also that the Government has failed to carry its burden of establishing the correctness of a still more favorable allocation alleged by it in the amended answer which in turn was based on the conclusions of its expert.

Petitioners make two new alternative contentions in their amended petition. First, they argue that included in the rent paid by Grumman to petitioner was an amount equal to the cost of the improvements made to the property that should not be treated as rent at all, and should not be included in petitioner's income. We disagree.

Rent is specifically included in the definition of gross income by section 61(a)(5), I.R.C. 1954, and represents payment "for the **\*755** occupancy of real estate or the use of personal property." Sec. 1.61-8(a), Income Tax Regs. Payments by the lessee of expenses of the lessor are rental income. Sec. 1.61-8(c), Income Tax Regs. Moreover, advance rentals "must be included in income for the year of receipt." Sec. 1.61-8(b), Income Tax Regs. In this case, both the lease with Grumman and petitioner's lease with Country Capital provided for the payment of "rent." Although there is evidence in the record that the rent for the initial term of the Grumman lease was calculated to return to the lessor the entire cost of the improvements required by Grumman, there is no basis for treating these payments as anything other than compensation for the use of property, or rent.

The improvements in this case were made by the original lessor, Country Capital, and not the lessee, Grumman; hence, the cases cited by petitioners determining that the value of lessee-constructed improvements did not constitute rental income to the lessor are not relevant.[9] Petitioners also rely upon Beecham, Inc. v. United States, an unreported case (E.D. Tenn. 1973, 32 AFTR 2d 73-5916, 73-5918, 73-2 USTC par. 82,317, 82,319), which we find to be factually distinguishable. There, the lessee undertook to pay for the cost of special purpose improvements in one year, and in the circumstances of that case, it was found that such payments did not in fact constitute rent even though they had been labeled as such. Notwithstanding that the payments herein appear to reflect the cost of the improvements made by petitioner's predecessor, they are in fact rent or advance rentals, includable in income in the year received. See sec. 1.61-8(b), Income Tax Regs.; Satterfield v. Commissioner, 34 T.C.M. 872, 874-875, 44 P-H Memo T.C. par. 75,203 at 859 (1975). Cf. Midler Court Realty, Inc. v. Commissioner, 61 T.C. 590 (1974), affd. 521 F.2d 767 (3d Cir. 1975).

The second alternate contention is that part of petitioner's purchase price should be allocated to the cost of acquiring a "premium lease," and that he should be entitled to depreciate this amount over the initial term of the lease. That position is contrary to thoroughly considered opinions in at least several cases which hold that a right to receive rents under a lease is not **\*756** a depreciable asset separable from ownership of real property. Midler Court Realty, Inc. v. Commissioner, 61 T.C. at 595 (1974), affd. 521 F.2d 767 (3d Cir. 1975); Schubert v. Commissioner, 33 T.C. 1048, 1052-1054 (1960), affd. 286 F.2d 573 (4th Cir.), cert. denied 366 U.S. 960 (1961); Friend v. Commissioner, 40 B.T.A. 768, 771-772 (1939), affd. 119 F.2d 959, 960 (7th Cir.), cert. denied 314 U.S. 673 (1941). Petitioners have ignored these cases on brief. Moreover, even conceding that the costs of acquiring a premium lease are amortizable over the life of the lease, petitioners have not demonstrated that such a lease is involved in this case. If there is any premium value to the lease, it must surely arise from an excess of the rent receivable for the term of the lease over the fair rental value of the property. See Midler Court Realty, Inc. v. Commissioner, 521 F.2d at 769-770. Petitioners have not shown any such excess, for, even if the payments to amortize the cost of the improvements over the initial term of the lease did represent a premium, petitioners have not shown that these elements were not offset by the value of the renewal option under the lease, since the rental provided in that option, as well as the purchase option price, may have been below market values. See Midler Court Realty, Inc. v. Commissioner, supra. Cf. also Schubert v. Commissioner, 286 F.2d 581-583. The two cases cited by petitioners in support of their position on this point (Commissioner v. Moore, 207 F.2d 265 (9th Cir. 1953), cert. denied 347 U.S. 942 (1954); World Publishing Co. v. Commissioner, 299 F.2d 614 (8th Cir. 1962)) were distinguished in Midler Court Realty, Inc. v. Commissioner, 61 T.C. at 595-596, and have no greater weight here.

A minor and wholly unrelated issue in this case involves the Commissioner's disallowance of a deduction for interest in 1969 to the extent of $2,000. Although petitioners assigned error in their petition as to this adjustment, no evidence was presented in respect thereof at the trial. During the opening statements at the trial, the following colloquy occurred:
THE COURT: May I interrupt you at this point to ask Mr. Fieland whether or not the $2,000 item is in issue here.

MR. FIELAND: I really don't recall—-

THE COURT: Do you expect to present any evidence in that connection?

 **\*757** MR. FIELAND: I really didn't realize that there was such an issue. I'll have to look at it, Your Honor.

THE COURT: Well, I'm asking you now, whether you intend to present any evidence in respect to that.

MR. FIELAND: I don't even know what the item relates to, Your Honor, as of this moment. I will look at the Petition and then inform the Court.

Nothing further was presented at the trial as to this matter, and, in petitioners' opening brief (p. 3) it was stated: "Petitioners concede that no evidence with respect to such interest expense was introduced at the trial, and the Petitioners thus did not sustain their burden of proof on this issue." Thereafter, Mr. Fieland sent to the Court a copy of a letter addressed by him to Government counsel, with enclosures, in which he undertook to show the propriety of the deductions of the full amount of interest claimed in the 1969 return. And petitioners' reply brief makes the contention that the Commissioner's $2,000 adjustment was improper. The argument purports to be supported by an attached photocopy of an alleged bank statement. Wholly apart from possible problems relating to the admissibility of the document into evidence without a proper foundation, the matter is presented entirely too late. Moreover, we can find no justification for any such tardy effort to reopen the record in this manner. The issue relating to this $2,000 item must be decided against petitioners for failure of proof. [10]

A final issue relating to deductions in all 3 years for medical expenses is merely a matter of computation based upon the amounts of adjusted gross income to be determined herein in connection with the

Decision to be entered under Rule 155.

[1]	There appear to have been at least several apparently related corporations identified with the Grumman name, and they will be referred to herein either in the aggregate or individually simply as "Grumman." Nothing of consequence, in respect of the tax liabilities for the years in controversy, appears to turn upon which Grumman entity is involved.

However, par. 60 provided that the purchase price was to be "increased by the unamortized cost of improvement, in accordance with" a specified formula to the effect that if the option were exercised during the first month of the fifth year, $120,000 was to be added to the purchase price, and thereafter $120,000 "less the aggregate of the number of the succeeding months times $5,000."

Pars. 36 through 60, inclusive, of the original lease as executed Oct. 19, 1967, were contained in an "attachment" to that document, which was designated at that time as a "Rider." The Mar. 18, 1968, document embodying the changes was also designated "rider," and, to avoid confusion, the word "rider" as used herein, unless indicated otherwise, will refer only to the foregoing amendatory provisions of Mar. 18, 1968.

The lease as amended by the rider continued to provide that the 6-year term was to commence 10 days after completion of the items specified in par. 53. However, the record does not disclose when that 10-day period elapsed, and it is assumed, in the absence of any evidence to the contrary, that the 6-year term began on Apr. 21, 1968, when Grumman took possession.

The new formula provided for an additional amount of $202,000 if the option were exercised during the first month of the fifth year, and if the option were exercised during any succeeding month of the fifth and sixth years, such additional amount was to be reduced by the number of succeeding months times $8,400.

If $340,000 is subtracted from the original purchase price of $1,351,000, there remains $1,011,000 as the apparent revised purchase price. However, in their requested findings of fact (petitioner's No. 14 and respondent's No. 44), both parties treated petitioner's purchase price as $1,020,440, and there was no objection to either of those requested findings. Moreover, the $1,020,440 figure is supported by computations made on the basis of figures in pars. 16 and 17 of the stipulation of facts. In the circumstances, the finding is here made that the revised purchase price was $1,020,440. The $9,440 discrepancy between the two possible figures for the purchase price is unexplained; it may possibly be due to payments made by petitioner on the $340,000 note prior to his being relieved of liability thereon, but there is nothing in the record to support such conjecture.

Since petitioner acquired the property on Dec. 20, 1968, and the Grumman lease expired Apr. 21, 1974, the remaining life of the Grumman lease would seem to be 5 years and 4 months, or a total of 64 months. However, the Commissioner apparently found it unnecessary to consider this matter in his deficiency notice, since he required the improvements to be depreciated together with the building over the reasonable life of the building without taking into account the extent of the remaining life of the lease.

Sec. 1.167(a)-4, Income Tax Regs., provides as follows:

> "Capital expenditures made by a lessor for the erection of buildings or other improvements shall, if subject to depreciation allowances, be recovered by him over the estimated life of the improvements without regard to the period of the lease."

In this connection, petitioners have cited M. E. Blatt Co. v. United States, 305 U.S. 267, 277-278 (1938), and Cunningham v. Commissioner, 28 T.C. 670, 680-682 (1957), affd. 258 F.2d 231, 232-233 (9th Cir. 1958). In any event, the extent of the authoritativeness of Blatt must be considered in the light of the Supreme Court's later decision in Helvering v. Bruun, 309 U.S. 461 (1940).

Our disposition of this issue does not preclude the Government from conceding the point if it is satisfied on the basis of materials presented to it that petitioners are entitled to the claimed deduction, and such concession could be reflected in the Rule 155 computation. However, we take no position as to whether the Government should follow such course of action. To the extent that the matter is before us for adjudication, petitioners have failed to carry their burden of proof.

## All Citations

73 T.C. 743

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

[the state court] judgment"); *In re Pixley,* 456 B.R. at 787–89 (allegations in state court complaint that injury to plaintiff was "willful" within the meaning of § 523(a)(6) were not "necessary to" or "essential to support" judgment for statutory conversion under Michigan law). And since Michigan law does not require circumstances of fraud for statutory conversion under Michigan Compiled Laws § 600.2919a(a), the state court judgment cannot have issue preclusive effect as to the third element of nondischargeability for embezzlement under § 523(a)(4). Therefore, the bankruptcy court erred when it granted summary judgment for Plaintiffs based on the issue preclusive effect of the prior state court judgment.

### V.  CONCLUSION

The Panel concludes that the bankruptcy court erred when it held that the issue of fraud was "necessarily determined" by the state court. Accordingly, the state court judgment cannot have issue preclusive effect as to this element for nondischargeability under the embezzlement portion of § 523(a)(4). The bankruptcy court's order granting summary judgment to Plaintiffs is reversed, and the matter is remanded to the bankruptcy court for further proceedings consistent with this opinion.



**In re CREEKSIDE SENIOR APARTMENTS, LP, et al., Debtors.**

**BAP No. 11–8072.**

United States Bankruptcy Appellate Panel of the Sixth Circuit.

Argued: April 23, 2012.

Decided: June 29, 2012.

**Background:** Debtor-limited partnerships in jointly administered Chapter 11 cases, each of which was single-asset real estate debtor, and debtors' general partners moved to determine value of bank's secured claims for plan purposes. The United States Bankruptcy Court for the Eastern District of Kentucky ruled that determination of fair market value of debtors' apartment complexes included consideration of remaining federal low-income housing tax credits, and also denied motion in limine seeking exclusion of portions of expert reports, affidavit, and testimony of bank's expert witness. Debtors and their general partners appealed.

**Holdings:** The Bankruptcy Appellate Panel, Arthur I. Harris, J., held that:

(1) valuation of bank's secured interest in debtors' interest in their low-income housing properties had to include consideration of value of remaining tax credits;

(2) finding that bank's appraisal more accurately reflected properties' true value was not abuse of bankruptcy court's discretion or clearly erroneous; and

(3) declining to exclude those portions of bank's appraisals that included valuation of remaining tax credits was not abuse of discretion.

Affirmed.

**IN RE CREEKSIDE SR. APARTMENTS, LP**                    **41**
Cite as 477 B.R. 40 (6th Cir.BAP 2012)

**1. Bankruptcy ⬤⟿3767**

For purposes of appeal, a "final" order ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.

> See publication Words and Phrases for other judicial constructions and definitions.

**2. Bankruptcy ⬤⟿3767**

Order determining the value of property pursuant to statute governing determination of claim's secured status is a "final" order for purposes of appeal if the valuation was made for purposes of plan confirmation.  11 U.S.C.A. § 506(a).

**3. Bankruptcy ⬤⟿3767**

Order in which bankruptcy court made valuation of jointly administered Chapter 11 debtors' properties for use in connection with plan, disclosure statement, and confirmation process was "final," appealable order.  11 U.S.C.A. § 506(a).

**4. Bankruptcy ⬤⟿2929**

Determination of value pursuant to statute governing determination of claim's secured status presents a mixed question of law and fact.  11 U.S.C.A. § 506(a).

**5. Bankruptcy ⬤⟿3786**

Bankruptcy court's findings of fact are reviewed under the clearly erroneous standard.

**6. Bankruptcy ⬤⟿3786**

Finding of fact is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

> See publication Words and Phrases for other judicial constructions and definitions.

**7. Bankruptcy ⬤⟿3782**

Bankruptcy court's legal conclusions are reviewed "de novo," meaning that the appellate court determines the law independently of the bankruptcy court's determination.

> See publication Words and Phrases for other judicial constructions and definitions.

**8. Bankruptcy ⬤⟿3784**

Rulings of bankruptcy court, as trier of fact, on evidentiary matters will only be reversed on a clear showing of abuse of discretion; this standard applies to denials of motions in limine, as well as to determinations regarding the weight that particular evidence should be given.

**9. Bankruptcy ⬤⟿2852**

In valuing property under statute governing determination of claim's secured status, court must engage in a two-step process under which court must first compare creditor's claim to value of property serving as collateral, a determination that necessarily requires court to ascertain "creditor's interest in the estate's interest in" property.  11 U.S.C.A. § 506(a).

**10. Bankruptcy ⬤⟿2852**

Second step of two-step process for valuing property under statute governing determination of claim's secured status requires court to determine how to value collateral.  11 U.S.C.A. § 506(a).

**11. Bankruptcy ⬤⟿2852**

When debtor proposes to retain property serving as creditor's collateral and to continue to use property in debtor's trade or business, proper methodology to use in establishing amount of creditor's secured claim is price that willing buyer in debtor's trade, business, or situation would pay to obtain like property from willing seller. 11 U.S.C.A. § 506(a).

**12. Internal Revenue ⚎3527**

Federal low-income housing tax credits are attached to the low-income housing property and belong to the owner of such property. 26 U.S.C.A. § 42(b)(1), (d)(7)(A)(ii).

**13. Internal Revenue ⚎3527**

Even when an entity allocates the rights to use federal low-income housing tax credits to investors, it does not lose ownership of the tax credits, which remain with the property and with the owner of the property. 26 U.S.C.A. § 42(b)(1)(B), (d)(7)(A)(ii).

**14. Bankruptcy ⚎2852**
**Internal Revenue ⚎3527**

Chapter 11 debtor-limited partnerships owned federal low-income housing tax credits, which were covenants running with debtors' apartment complexes, even though debtors allocated tax credits to their investor limited partners, and therefore valuation of bank's secured interest in debtors' interest in their low-income housing properties had to include consideration of value of remaining tax credits. 11 U.S.C.A. § 506(a); 26 U.S.C.A. § 42(b)(1)(B), (d)(7)(A)(ii).

**15. Bankruptcy ⚎2163**

Courts have broad discretion in admitting expert witnesses and weighing testimony.

**16. Bankruptcy ⚎3786**

Judging the credibility and mental capacity of witnesses and resolving conflicts in the evidence are within the unique capacity of the factfinder, and a court's determinations on such issues will not be disturbed on appeal unless clearly erroneous.

**17. Bankruptcy ⚎2852**

Valuation of property under statute governing determination of claim's secured status is an inexact science and whatever method is used will only be an approximation, and variance of opinion by two individuals does not establish a mistake in either. 11 U.S.C.A. § 506(a).

**18. Bankruptcy ⚎2852**

Bankruptcy court is not bound to accept the values contained in the parties' appraisals in valuing property under statute governing determination of claim's secured status; rather, it may form its own opinion of the value of the property after considering the appraisals and expert testimony. 11 U.S.C.A. § 506(a).

**19. Bankruptcy ⚎3538, 3566.1**

Finding that, for purposes of valuing Chapter 11 debtor-limited partnerships' low-income housing properties for plan purposes, bank's appraisal more accurately reflected properties' true value was not abuse of bankruptcy court's discretion or clearly erroneous, notwithstanding debtors' contention that their appraiser's approach was more nuanced and better reasoned; debtors ignored unwarranted instruction given to their appraiser not to factor in properties' remaining federal low-income housing tax credits, bankruptcy court had copies of all appraisals and opportunity to assess appraisers' credibility, and court analyzed market conditions as set forth by both appraisers and determined that figures of bank's appraiser were more accurate. 11 U.S.C.A. § 506(a).

**20. Bankruptcy ⚎3538, 3566.1**

Bankruptcy court did not clearly err or abuse its discretion in finding that, in valuing federal low-income housing tax credits as part of his determination of fair market value of Chapter 11 debtor-limited partnerships' apartment complexes for plan purposes, bank's appraiser properly set forth extraordinary assumptions and limiting conditions in compliance with re-

quirements of Uniform Standards of Professional Appraisal Practice (USPAP) and reached credible result as to value of remaining tax credits; bankruptcy court engaged in thorough analysis of appraisals and appraisers' qualifications, set forth detailed analysis of why it gave more weight to bank's figures as compared to those of debtors, and set forth detailed explanation of why it deviated from bank's appraisals regarding tax expense calculation. 11 U.S.C.A. § 506(a); 26 U.S.C.A. § 42.

**21. Bankruptcy ☜2163**

In making determination under rule governing testimony by expert witnesses, a court must determine (1) if the witness is qualified by knowledge, skill, experience, training, or education, (2) if the witness's opinion or testimony will assist the trier of fact, and (3) if the testimony is reliable. Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**22. Bankruptcy ☜2163**

Court does not assess the credibility and accuracy of expert opinion when determining the reliability of the expert opinion, but must only ensure that the opinion is made upon a reliable factual foundation and is not unsupported speculation. Fed. Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**23. Bankruptcy ☜2163**

Court has broad discretion in determining the admissibility of expert testimony, and the gatekeeping inquiry must be tied to the facts of a particular case. Fed. Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**24. Bankruptcy ☜2163**

Requirement that proffered expert testimony, to be admissible, must assist the trier of fact requires the testimony to be relevant. Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**25. Bankruptcy ☜2163**

Expert testimony which does not relate to any issue in the case is not "relevant," contrary to requirements of rule governing its admissibility, and, ergo, is non-helpful. Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

See publication Words and Phrases for other judicial constructions and definitions.

**26. Bankruptcy ☜2163**

Requirement of rule governing admissibility of expert testimony dictating that testimony assist trier of fact mandates that expert testimony be sufficiently tied to the facts of the case that it will aid factfinder in resolving a factual dispute. Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**27. Bankruptcy ☜2163**

As long as expert's testimony relates to issue that factfinder must determine, it is "relevant" under rule governing admissibility of expert testimony. Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**28. Bankruptcy ☜2163**

Requirement that scientific testimony or evidence admitted be not only relevant but also reliable entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid, and of whether that reasoning or methodology properly can be applied to the facts in issue. Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**29. Bankruptcy ☜2163**

Inquiry under rule governing admissibility of expert testimony is a flexible one, and focus must be solely on principles and methodology, not on the conclusions that they generate. Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**44**                    **477 BANKRUPTCY REPORTER**

**30. Bankruptcy** ⟜**2163**

Rule governing admissibility of expert testimony should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact. Fed. Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**31. Bankruptcy** ⟜**2163**

Party seeking to introduce expert testimony bears the burden of demonstrating its admissibility by a preponderance of the evidence. Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**32. Bankruptcy** ⟜**2163**

Issue of whether appraiser's report complied with industry standards goes to the weight that report should be given, instead of whether it should be admitted; nature and extent of deviations from industry standards concern only report's credibility, even if appraiser makes extraordinary assumptions in coming to his ultimate conclusion. Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**33. Bankruptcy** ⟜**2163**

When a party agrees that an expert witness used an accepted methodology, but contends that the data used in applying that methodology was flawed, such an allegation does not require a court to exclude the testimony or report; instead, such an attack goes to the weight of the evidence, rather than to its admissibility. Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

**34. Bankruptcy** ⟜**3784**

Because a trial court has broad discretion in admitting and excluding expert testimony, such a determination will be upheld on appeal unless there was an abuse of discretion or unless the decision was manifestly erroneous.

**35. Bankruptcy** ⟜**2163**

Determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion, and, instead, court, acting as factfinder, must determine whether an expert witness's opinion is accurate in deciding what weight to give to that opinion at trial.

**36. Bankruptcy** ⟜**3538**

Declining to exclude from valuation determination those portions of bank's appraisals that included valuation of remaining tax credits for Chapter 11 debtor-limited partnerships' low-income housing apartment complexes was not abuse of bankruptcy court's discretion; although bank's appraiser developed extraordinary assumption in valuing remaining tax credits, debtors' appraiser testified that methodology used by bank's appraiser was accepted one in the industry. 11 U.S.C.A. § 506(a); 26 U.S.C.A. § 42; Fed.Rules Evid.Rule 702, 28 U.S.C.App.(2006 Ed.)

———————

**ARGUED:** Robert D. Gordon, Clark Hill PLC, Birmingham, Michigan, for Appellants. Daniel E. Hitchcock, Wyatt, Tarrant, & Combs, LLP, Lexington, KY, for Appellee. **ON BRIEF:** Robert D. Gordon, John R. Stevenson, Clark Hill PLC, Birmingham, MI, Ellen Arvin Kennedy, Dinsmore & Shohl LLP, Lexington, KY, for Appellants. Daniel E. Hitchcock, Wyatt, Tarrant, & Combs, LLP, Lexington, KY, for Appellee.

Before: HARRIS, PRESTON, and SHEA–STONUM, Bankruptcy Appellate Panel Judges.

## OPINION

ARTHUR I. HARRIS, Bankruptcy Judge.

This appeal arises from a bankruptcy court order in which the bankruptcy court

concluded that, for purposes of determining the value of the secured portion of the claims of Bank of America, N.A. ("Bank") pursuant to 11 U.S.C. § 506(a), a determination of the fair market value of various apartment complexes included consideration of the remaining federal low-income housing tax credits. In determining the value of the real property, the bankruptcy court also concluded that various rates and/or figures used by the Bank's appraiser were more accurate.

The five Kentucky limited partnership debtors in the five jointly-administered Chapter 11 cases (collectively "Debtors") and their general partners (collectively "General Partners") challenge the bankruptcy court's valuation of the real property. In connection therewith, they also take issue with the bankruptcy court's order overruling (1) the Debtors' objection to the valuation of low-income housing tax credits in the Bank's appraisals ("Valuation Objection") and (2) the Debtors' motion *in limine* to exclude certain portions of expert reports, affidavit, and testimony of the Bank's expert witness ("Motion *In Limine*").

For the reasons that follow, we affirm the bankruptcy court's orders setting the market value of the Debtors' low-income housing tax credit properties ("LIHTC properties") and overruling the Debtors' and the General Partners' Valuation Objection and Motion *In Limine.*

### I. ISSUES ON APPEAL

The main issue presented by this appeal is whether the bankruptcy court erred in including the purported value of the remaining low-income housing tax credits when valuing the Bank's secured interest in the Debtors' real properties under § 506(a) of the Bankruptcy Code. The Debtors and their General Partners have also alleged that the bankruptcy court made several errors in weighing the evidence at the valuation hearing and in denying their Motion *In Limine* to exclude certain portions of the Bank's appraisals.

### II. JURISDICTION AND STANDARD OF REVIEW

[1] The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Eastern District of Kentucky has authorized appeals to the Panel, and no party has timely elected to have this appeal heard by the district court. 28 U.S.C. § 158(b)(6), (c)(1). A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). For purposes of appeal, a final order "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States,* 489 U.S. 794, 798, 109 S.Ct. 1494, 1497, 103 L.Ed.2d 879 (1989) (citations omitted).

[2, 3] An order determining the value of property pursuant to 11 U.S.C. § 506(a) is a final order for purposes of appeal if the valuation was made for purposes of plan confirmation. *Chase Manhattan Mortg. Corp. v. Rodriguez (In re Rodriguez),* 272 B.R. 54, 56 (D.Conn. 2002); *see also Gen. Electric Credit Equities, Inc. v. Brice Rd. Devs., L.L.C. (In re Brice Rd. Devs., L.L.C.),* 392 B.R. 274, 282 n. 4 (6th Cir. BAP 2008). Because the bankruptcy court made its valuation "for use in connection with the plan, disclosure statement, and confirmation process," the valuation order is a final order. (Order Setting Market Value of Debtors' Low–Income Housing Tax Credit Properties at 1, Bankr.Case No. 10–53019, ECF No. 252.)

[4–7] A determination of value pursuant to 11 U.S.C. § 506(a) presents a mixed question of law and fact. *Fin. Sec. Assur-*

**46**                    **477 BANKRUPTCY REPORTER**

*ance, Inc. v. T–H New Orleans Ltd. P'ship (In re Matter of T–H New Orleans Ltd. P'ship),* 116 F.3d 790, 799 (5th Cir.1997). The bankruptcy court's findings of fact are reviewed under the clearly erroneous standard. *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.),* 486 F.3d 940, 944 (6th Cir.2007). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). The bankruptcy court's legal conclusions are reviewed *de novo. Solis v. Laurelbrook Sanitarium and School, Inc.,* 642 F.3d 518, 522 (6th Cir.2011). "De novo means that the appellate court determines the law independently of the trial court's determination." *Treinish v. Norwest Bank Minn., N.A. (In re Periandri),* 266 B.R. 651, 653 (6th Cir. BAP 2001) (citations omitted).

[8] As the trier of fact, a bankruptcy "'court's rulings on evidentiary matters will only be reversed on a clear showing of abuse of discretion.'" *Phillips Petroleum Co. v. Stokes Oil Co., Inc.,* 863 F.2d 1250, 1257 (6th Cir.1988) (citing *Apponi v. Sunshine Biscuits, Inc.,* 809 F.2d 1210, 1218 (6th Cir.1987)). This standard applies to denials of motions *in limine, United States v. Poulsen,* 655 F.3d 492, 508 (6th Cir. 2011), as well as to determinations regarding the weight particular evidence should be given. *United States v. McKneely,* 6 F.3d 1447, 1453 (10th Cir.1993).

### III. FACTS

This appeal arises from an order dated September 12, 2011, setting the market value of Debtors' low-income housing tax credit properties ("Valuation Order"), entered in five jointly-administered Chapter 11 cases in the Eastern District of Kentucky:

| | |
|---|---|
| 10–53019 | In re Creekside Senior Apartments, Limited Partnership |
| 10–53298 | In re Nicholasville Greens, Limited Partnership |
| 10–53300 | In re Franklin Place Senior Apartments, Limited Partnership |
| 10–53301 | In re Pennyrile Senior Apartments, Limited Partnership |
| 10–53346 | In re Park Row Senior Apartments, Limited Partnership |

#### A. *Background of the Debtors*

The Debtors are five single-asset real estate debtors as defined in 11 U.S.C. § 101(51B). Each of the Debtors is a Kentucky limited partnership with a corresponding general partner, an administrative limited partner, and an investor limited partner. By virtue of the partnership agreements, the General Partners hold .01% of the corresponding limited partnership's equity interests, the administrative limited partners hold .01% of the corresponding limited partnership's equity interests, and the investor limited partners hold the remaining 99.98% of the corresponding limited partnership's equity interests. Each of the Debtors owns a parcel of real property on which it operates a low-incoming housing apartment complex.

To finance the acquisition and construction/rehabilitation of each property, the Debtors obtained construction loan financing from the Bank. Each construction loan automatically converted into permanent financing upon various terms and conditions. Pursuant to the agreements, the Bank loaned the Debtors the following total amounts of money:

| | |
|---|---|
| Creekside Senior Apartments, LP: | $1,390,000.00 |
| Nicholasville Greens, LP: | $ 760,234.35 |
| Franklin Place, LP: | $ 793,345.29 |

Pennyrile Senior Apartments,
LP:      $ 534,242.63
Park Row Senior Apartments,
LP:      $1,034,222.00

As security for these loans, the Bank took a first mortgage lien upon the Debtors' real properties. All five notes matured prior to the filing of the Debtors' bankruptcy cases.

Each of the Debtors' real property complexes was developed in conjunction with the federal Low–Income Housing Tax Credit Program enacted by Congress in 1986 to encourage private market investment in low-income housing. *See* 26 U.S.C. § 42. In exchange for agreeing to rent restrictions, the owners or investors in the property get a dollar-for-dollar credit against their federal income tax obligations over a period of 10 years, provided that the property remains in compliance with the low-income housing tax credit program requirements. The Treasury Department administers the program while state agencies distribute the credits on a competitive basis.

B. *The Land Use Restriction Agreements*

In 2008, each of the Debtors entered into a land use restriction agreement ("LURA") with the Kentucky Housing Corporation ("KHC"), the agency tasked with administering the federal low-income housing tax credit program for the Commonwealth of Kentucky. The Debtors, and not their General Partners, administrative limited partners, or investor limited partners, entered into these LURAs as the owners of the properties. The LURAs entered into between the Debtors and the KHC in these cases provide that the restrictions set forth therein are covenants running with the land:

> Owner intends, declares and covenants, on behalf of itself and all future owners and operators of the Project during the

term of this Agreement, that this Agreement and the covenants and restrictions set forth in this Agreement regulating and restricting the use, occupancy and transfer of the Project (i) shall be and are covenants running with the Project, encumbering the Project for the term of this Agreement, binding upon Owner's successors in title and all subsequent owners and operators of the Project; (ii) are not merely personal covenants of Owner; . . . .

(LURA § 2(b), Bankr.Case No. 10–53019, ECF Nos. 204–4, 204–8, 204–12, 204–16, and 204–20.) The LURAs further provide:

> (j) Subject to the requirements of Section 42 of the [Internal Revenue] Code and this Agreement, Owner may sell, transfer or exchange the entire Project at any time, but Owner shall notify in writing and obtain the agreement of any buyer or successor or other person acquiring the Project or any interest therein that such acquisition is subject to the requirements of this Agreement and the requirements of Section 42 of the Code and applicable regulations and the KHC Occupancy Restrictions. This provision shall not act to waive any other restriction on sale, transfer or exchange of the Project or any low-income portion of the Project. KHC may void any sale, transfer or exchange of the Project if the buyer or successor or other person fails to assume in writing the requirements of this Agreement and the requirements of Section 42 of the Code.

> (k) Owner will notify KHC in writing of any sale, transfer or exchange of the entire Project or any low-income portion of the Project.

(*Id.* at § 3(j) and (k).)

Subject to limited exceptions not applicable here, the term of each LURA was for an initial compliance period of 15 years

and then an additional 15 year extended period. (*Id.* at §§ 5(a) and 6(a).) As the lender for the construction and/or acquisition of the properties, the Bank was a party to each LURA. The sole purpose of making the Bank a party to the LURA was to subordinate the Bank's debt to the restrictions contained within the LURA. All of the properties in this case were put into service in 2004 or 2005, and the tax credits have been used through 2010. As a result, there are 4 to 5 years of remaining tax credits and 24 to 25 years remaining on the rent restrictions.

In accordance with 26 U.S.C. § 42(h)(6), the LURAs entered into between the Debtors and the KHC in this case provide as follows:

> THIS DECLARATION OF LAND USE RESTRICTIVE COVENANTS AND SUBORDINATION AGREEMENT, . . . [is] given by [each Debtor], a Kentucky limited partnership and its successors and assigns ("Owner") . . . as a condition precedent to the allocation of Low Income Housing Tax Credits by KENTUCKY HOUSING CORPORATION. . . .

(LURAs at 1, Bankr.Case No. 10–53019, ECF Nos. 204–4, 204–8, 204–12, 204–16 and 204–20.) Each LURA was recorded in the appropriate county recorder's office.

C.  *The Tax Credit Allocations and Partnership Agreements*

Once the KHC awarded and reserved the tax credits to each of the Debtors' properties, the corresponding investor limited partner "syndicated the investment and tax credits opportunity to a pool of investors. Through the Investor LP, those investors then funded the 'Investor Limited Partner Contribution' in accordance with paragraph 3.4 of each Debtor's Amended and Restated Agreement of Limited Partnership." (Appellant Br. at

4.) All of the investments were made by the investor limited partners in exchange for 99.98% of the equity ownership in the corresponding Limited Partnership.

With respect to the tax credits, the partnership agreements provide as follows:

> [T]he Partners intend that Housing Tax Credits *shall be allocated* 99.98% to the Investor Limited Partner, 0.01% to the Administrative Limited [Partner] and 0.01% to the General Partner.

(Amended and Restated Partnership Agreements at § 9.1(G)(v)(a), Bankr.Case No. 10–53019, ECF Nos. 214–1 through 214–15) (emphasis added.) In the event of a recapture of certain tax credits, then "Housing Tax Credits shall be recaptured by the Partners who originally claimed said Housing Tax Credits, in proportion to the ratio in which such recaptured Housing Tax Credits were claimed." (*Id.* at § 9.1(G)(v)(b).) Section 6.6 of the Partnership Agreements also provides "[e]xcept for the Apartment Complex, the Housing Tax Credits, and the contractual rights referred to herein, the [Limited] Partnership [aka the Debtor] owns no other property, tangible or intangible, real or personal." (*Id.* at § 6.6(A).)

In the "Low Income Housing Tax Credit Certificate of Carryover Allocation" letters from KHC to the Debtors, KHC identifies the name of the "Taxpayer Receiving Allocations" as "Creekside Senior Apartments, Limited Partnership," "Nicholasville Greens, Limited Partnership," "Franklin Place Senior Apartments, Limited Partnership," "Pennyrile Senior Apartments, Limited Partnership," and "Park Row Senior Apartments, Limited Partnership." (Tax Credit Letters, Bankr.Case No. 10–53019, ECF No. 204–29.)

D.  *The Bankruptcy Cases*

The Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code in

September and October 2010.  On January 10, 2011, the Bank filed proofs of claim as to each Debtor for the following amounts:

| | |
|---|---|
| 10–53019, Creekside: | $1,272,589.36 |
| 10–53298, Nicholasville Greens: | $ 714,857.43 |
| 10–53300, Franklin Place: | $ 863,467.53 |
| 10–53301, Pennyrile: | $ 466,294.67 |
| 10–53346, Park Row: | $1,037,461.15 |

In each proof of claim, the Bank asserted that its claim was fully secured.

On March 4, 2011, the Debtors and the General Partners filed a motion for a hearing to determine the value of the Bank's secured claims pursuant to 11 U.S.C. § 506(a).  The Debtors and the General Partners disputed the Bank's assertion that each claim was fully secured and instead alleged that the claims were substantially undersecured.  The Debtors and the General Partners further asserted that a valuation hearing was vital because "[t]he treatment of the secured and unsecured portions of the [Bank's] Claims will be a critical component of the Debtors' and the General Partners' prospective plan." (Mot. for Valuation Hr'g at 5, Bankr.Case No. 10–53019, ECF No. 164.)

The Debtors filed their disclosure statement and plan on March 17, 2011.  In Article IV, paragraph 4. 1, the plan states that the Bank will have an allowed secured claim "equal to the fair market value of [the Bank's] interest in the Estate's interest in such Debtor's Property as determined by the Court at the Valuation Hearing." (Joint Plan of Reorganization at ¶ 4. 1, Bankr.Case No. 10–53019, ECF No. 170.)  Class 3 of the Debtors' plan is comprised solely of the Bank's allowed unsecured deficiency balance.  The Debtors proposed to pay the Bank the "full principal amount of each of its Allowed Unsecured Claims" unless the Bank timely elected to be treated in accordance with the "Alternative Unsecured Claim Treatment." (*Id.* at ¶ 4.3.)  The Debtors and the

General Partners filed their First Amended Plan on August 11, 2011, which provided for the same treatment of the Bank's claims as the original plan.

On March 28, 2011, the bankruptcy court granted the Debtors' request to schedule a valuation hearing.  The bankruptcy court also set forth various deadlines for identifying expert witnesses, submission of written reports and/or appraisals, filing a list of witnesses, submission of testimony by affidavit, and other various pretrial issues.

### E. *The Valuation Objection and Motion In Limine*

On July 25, 2011, the Debtors and its General Partners filed their Valuation Objection and Motion *In Limine* seeking to exclude portions of expert reports, the affidavit, and related testimony of the Bank's appraiser, David A. Donan.  In their Valuation Objection, the Debtors argued that the valuation of the remaining tax credits in the Bank's appraisals was critically flawed for three reasons.  First, the Debtors alleged that the tax credits do not constitute property in which a security interest can be taken and, therefore, the credits are not part of the Bank's collateral or its secured claims.  Second, the Debtors asserted that the tax credits were held by the Debtors' limited partners and not by the Debtors so the credits are not property of the Debtors' estates.  Last, the Debtors argued that the Bank's loan and security documents failed to create a security interest in the tax credits "and, in fact, explicitly carve the Tax Credits out of the Bank's collateral." (Valuation Obj. at 1, Bankr.Case No. 10–53019, ECF No. 214.)

In its brief on appeal, the Bank states, Bank of America has never stated that it does not hold a security interest in the Remaining Tax Credits.  Bank of America has continuously maintained that

whether it has a security interest in the Remaining Tax Credits themselves is irrelevant, as it holds a perfected security interest in the LIHTC real properties which cannot be separated from the Remaining Tax Credits for purposes of § 506 valuation.

(Appellee Br. at 21, n. 5.) A review of the pleadings filed in the bankruptcy court supports the Bank's assertion. Additionally, the mortgage documents provide that the Bank's security interest includes:

(j) To the extent not expressly prohibited by law or not inconsistent with the terms of the Partnership Agreement, all federal, state, and local tax credits, and other tax benefits related to the Property . . . .

(Construction Phase Mortgage at 3, ¶ 1.1(j), Bankr.Case No. 10–53019, ECF Nos. 214–16, 214–18, 214–20, 214–22, and 214–24.)

In their Motion *In Limine*, the Debtors argued that the bankruptcy court should exclude those portions of David Donan's reports, affidavit, and related testimony which purport to include the value of the remaining low-income housing tax credits in the value of the Bank's collateral. The Debtors alleged that those portions of Donan's evidence "are not based on sufficient facts and data, are not based on and do not conform to accepted principles and methodologies in the industry, and are therefore not reliable." (Mem. in Support of Mot. *In Limine* at 5, Bankr.Case No. 10–53019, ECF No. 215–1.) The Debtors also alleged that the testimony relating to the value of the remaining tax credits was irrelevant.

In response, the Bank argued that the value of the remaining tax credits was relevant to the valuation of its interest in the Debtors' real properties for several reasons. First, the Bank alleged that 28 U.S.C. § 47(d)(7)(A)(ii) clearly provides that federal low-income housing tax credits cannot be separated from ownership of the LIHTC properties, and that once the property is sold the purchaser obtains the right to claim the remaining tax credits. As a result, the Bank argued the value of the remaining tax credits significantly impacts the price a willing buyer would pay to obtain the LIHTC properties at issue in this case. The Bank also alleged that excluding consideration of the value of the remaining low-income housing tax credits while including consideration of the impact the low-income rent restrictions on the value of the properties would lead to an "absurd result." (Resp. to Obj. and Mot. *In Limine* at 1–2, Bankr.Case No. 10–53019, ECF No. 228.) Finally, the Bank asserted that the Debtors' arguments "incorrectly attempt[ ] to divert the Court's attention to whether security interests in the Remaining Tax Credits themselves are obtainable, as opposed to the real issue of § 506 valuation of [the Bank's] security interest in the Debtors' LIHTC real property and the impact the Remaining Tax Credits that go with the property have on value." (Mem. of Law in Support of Bank's Resp. to Obj. at 5–6, Bankr.Case No. 10–53019, ECF No. 229.)

On August 15, 2011, the bankruptcy court overruled the Debtors' Valuation Objection and Motion *In Limine* and held that evidence of the remaining tax credits was relevant to the issue of valuation ("*In Limine* Order"). The bankruptcy court also held that the Debtors' arguments really went "to the weight of the evidence, not to its reliability." The bankruptcy court observed that, as the trier of fact, it could determine the proper weight to give the evidence of the value of the remaining tax credits at the valuation hearing. (*Id.*)

In overruling the Debtors' Valuation Objection and Motion *In Limine*, the bankruptcy court stated:

It is uncontroverted that the Bank holds a first mortgage on each Debtor's LIHTC Property. It is further uncontroverted that each of those parcels of real estate is subject to a Land Use Restriction Agreement ("LURA") entered into between the Debtor entity as "Owner" (not the individual limited partners) and the Kentucky Housing Corporation ("KHC"). It is through the LURA that the Debtor entities became entitled to the Tax Credits and each Debtor's LIHTC Property became subject to the rent restrictions. The limited partners may have become entitled to the allocation of the Tax Credits through the respective partnership agreements, but they did not become the owners of the Tax Credits through those agreements. Both the rent restrictions and the Tax Credits run with the land. Therefore, if the LIHTC Property is sold prior to the end of the compliance period and there are remaining tax credits, then

> [T]he credit allowable ... to the taxpayer for any period after such acquisition shall be equal to the amount of credit which would have been allowable ... for such period to the prior *owner* ... had such owner not disposed of the building.

26 U.S.C. § 42(d)(7)(A)(ii) (emphasis added). This provision makes it clear that the limited partners do not own the Remaining Tax Credits. Those credits would be transferred to the purchaser of the Debtors' LIHTC Properties. As such, the Remaining Tax Credits as well as the rent restrictions would affect the price any purchaser was willing to pay for the Debtors' LIHTC Properties; and thus, their respective values.

(*In Limine* Order at 4–5 and 8, Bankr. Case No. 10–53019, ECF No. 235.)

### F. *The Valuation Hearing and Bankruptcy Court Determination*

The bankruptcy court conducted the valuation hearing on August 18, 2011. The Debtors' appraiser and the Bank's appraiser both appeared at the hearing.

The Bank's appraisals included a valuation of the respective properties and a separate valuation of the remaining tax credits prepared by its expert witness and appraiser, David A. Donan of Allgeier Company. The values placed on the Debtors' properties by the Bank's appraiser were as follows:

| LIHTC Property | Bank's Real Estate Value | Bank's Tax Credit Value | Bank's Total Value |
|---|---|---|---|
| Creekside Senior Apartments | $890,000 | $350,000 | $1,240,000.00 |
| Nicholasville Greens Townhomes | $495,000 | $160,000 | $ 655,000.00 |
| Franklin Place Senior Apartments | $535,000 | $445,000 | $ 980,000.00 |
| Pennyrile Senior Apartments | $575,000 | $755,000 | $1,330,000.00 |
| Park Row Senior Apartments | $825,000 | $865,000 | $1,690,000.00 |

(Valuation Order at 14, Bankr.Case No. 10–53019, ECF No. 252.)

Debtors' appraisals, prepared by its expert witness and appraiser, Brad Weinberg of Novogradac & Company, LLC, were as follows:

| LIHTC Property | Debtors' Total Value |
|---|---|
| Creekside Senior Apartments | $593,000.00 |
| Nicholasville Greens Townhomes | $425,000.00 |
| Franklin Place Senior Apartments | $274,000.00 |
| Pennyrile Senior Apartments | $398,000.00 |

**52**                    **477 BANKRUPTCY REPORTER**

Park Row Senior
  Apartments                       $750,000.00

(Valuation Order at 14, Bankr.Case No. 10–53019, ECF No. 252.) Like the Bank's appraiser, the Debtors' appraiser considered the impact the restricted rents have on the properties' values. (*See* Market Valuations at 3, Bankr.Case No. 10–53019, ECF Nos. 207–1, 207–3, 207–6, 207–8, 207–10.) Despite this similarity, the Debtors' appraisals specifically excluded the valuation of the remaining tax credits because the Debtors "believed, and continue to believe, that the remaining Tax Credits are irrelevant to the valuation of the Bank's secured claims, since the Tax Credits are not part of the Bank's collateral." (Appellant Br. at 7.)

Both appraisers testified that the availability of remaining low-income housing tax credits can affect the value of a piece of property. The Bank's appraiser included the value of the remaining tax credits as a component in his determination of the value of the properties; however, the Debtors' appraiser stated that he did not include any consideration of the remaining tax credits in his appraisal because "under the scope of work my appraisal was of the real property only, that was the collateral for the basis of the bankruptcy and that was defined for me, and I—I completed the appraisal on that basis." (Aug. 18, 2011 Tr. of H'rg at 72, Bankr.Case No. 10–53019, ECF No. 258.) When asked by counsel for the Debtors whether he thought there was a market for the sale of mid-stream tax credits associated with small properties in small, non-money center banking markets, the Debtors' appraiser testified that his opinion was "no." (*Id.* at 141–143.) The Bank's appraiser disput-ed this conclusion and instead stated that the market for tax credits is "extremely busy" at the present time. (*Id.* at 174.)

The bankruptcy court issued a Valuation Order on September 12, 2011. In that order, the bankruptcy court weighed the two appraisals and arrived at values for the Debtors' properties. In so doing, the bankruptcy court concluded that the Bank's appraisals more accurately reflected the true value of the Debtors' properties. The bankruptcy court recognized that "[b]oth appraisers stated substantially the same formula for calculating market value under the income capitalization method" although they disagreed on how each component of that formula was derived. (Valuation Order at 13, Bankr.Case No. 10–53019, ECF No. 252.)

As to the vacancy and collection loss rate ("VCLR"), the Debtors' appraiser stated that a minimum of 5% is the industry standard. (Aug. 18, 2011 Tr. of H'rg at 17, Bankr.Case No. 10–53019, ECF No. 258.) The Debtors' appraiser also pointed out that "while historical performance is important, lenders and buyers recognize that conditions can change over the life of the loan and simply will not factor in a vacancy and loss rate of less than 5%, in order to be conservative." (Appellant Br. at 35.) The Bank's appraiser, on the other hand, based his VCLRs on the historically low vacancy rates for most of Debtors' LIHTC properties. With the exception of Nicholasville Greens, all of the Debtors' properties had waiting lists at the time of the Bank's appraisals.

The bankruptcy court analyzed the VCLR for each property and concluded as follows:

| LIHTC Property | Debtors' VCLR | Bank's VCLR | Bankruptcy Court's conclusion |
|---|---|---|---|
| Creekside | 5% | 3% | 3%; based on historical vacancy rate, existing waiting list, and vacancy rates of comparable LIHTC properties |

| Franklin Place | 6% | 3% | 3%; (same as Creekside) |
|---|---|---|---|
| Nicholasville Greens | 9% | 11% | 11%; composed of 9% vacancy loss and 2 % collection loss |
| Pennyrile | 5% | 3% | 3%; (same as Creekside) |
| Park Row—residential | 4% | 2.5% | 2.5%; based on average historical vacancy rate of 2.45% for 2008–2010 |
| Park Row—commercial | 10% | 15% | 15%; one of two commercial units would have to be built-out for light and heat prior to being rented |

(Valuation Order at 15–17.)

The parties disagreed on two other figures used in determining the proper value of the Debtors' properties. First, although the parties agreed that a management fee based on 5% of effective gross income was the proper measure for 4 of the 5 properties, they did not agree on that percentage for Nicholasville Greens. Instead, the Debtors' appraiser calculated a management fee of 4% of effective gross income, while the Bank's appraiser used a management fee of 5%. Because the management fee for Nicholasville Greens averaged 4.875% over the last four years, the bankruptcy court used the Bank's figure of 5%. (*Id.* at 17.)

Second, the parties disagreed as to the proper real estate tax expense to use in valuing the Debtors' properties. Although both appraisers stated "that the Debtors' real estate taxes were significantly higher than they should be as reflected by comparable LIHTC Properties," the bankruptcy court concluded that only "[t]he Bank's Appraiser reduced the real estate tax expense to an amount that would be consistent with his opinion of the market value of the Debtors' real estate for each particular LIHTC Property before any adjustments for the Remaining Tax Credit Value." (*Id.* at 18–19.) The Debtors' appraiser only reduced the expense for three of the five properties. The bankruptcy court found the Bank's appraiser's testimony "that a fair market purchaser will consider the effect of the purchase price on future prop-

erty taxes in his decision regarding the value of (and thus price to pay for) the property" to be more credible. (*Id.* at 19.) However, because the Bank's appraiser failed to complete all of the necessary "calculation[s] once the effect of the Remaining Tax Credits was included in his opinion of fair market value, . . . the Court adjusted the real estate tax component . . . to arrive at the annual real estate tax that is consistent with the Court's findings regarding the fair market value of each property." (*Id.*) The bankruptcy court used the assessment rates set forth in the Bank's appraisals in order to do these calculations since the Bank's appraisals contained the most current information. (*Id.* at 19, n. 14.)

Turning to the issue of the remaining tax credits, the bankruptcy court stated:

The Remaining Tax Credits are not being valued as if they are being sold. As previously held, the Remaining Tax Credits cannot be separated from the Debtors' LIHTC Properties and sold separately. . . . "Although market participants often talk casually about 'selling' the tax credits, they are actually referring to selling a partial ownership interest in the *entity that owns the real estate.* The tax credits themselves cannot be severed from the ownership of the real estate." Appraising Low–Income Housing Tax Credit Real Estate, 10/1/10 APPRAISAL J. 350 (emphasis added).

. . . .

. . . Debtors chose to ignore the fact [that] the Remaining Tax Credits impact the value of the property, are owned by the Debtors and that any rights/benefit/burdens of the Remaining Tax Credits which inure to the limited partners do so only as a result of their ownership/partnership interests in the Debtors. If the LIHTC Properties are sold, all proceeds of a sale belong to the respective Debtor with any benefits of the Remaining Tax Credits flowing through the new entity to the owners of that new entity.

(*Id.* at 20–22.) Because the Bank "provided the only detailed, substantiated evidence of the impact of the Remaining Tax Credits on the market value of the Debtors' LIHTC Properties," the bankruptcy court included the value of the remaining tax credits in its § 506(a) valuation of the Debtors' property. (*Id.*)

After considering all the evidence, the bankruptcy court set the following values for the Debtors' real properties:

| LIHTC Property | Value of Real Estate | Value of Tax Credits | Total Value |
|---|---|---|---|
| Creekside Senior Apartments | $708,718.67 | $350,000 | $1,058,718.67 |
| Nicholasville Greens Townhomes | $307,475.86 | $160,000 | $ 467,475.86 |
| Franklin Place Senior Apartments | $371,244.42 | $445,000 | $ 816,244.42 |
| Pennyrile Senior Apartments | $446,188.44 | $755,000 | $1,201,188.44 |
| Park Row Senior Apartments | $727,427,01 | $865,000 | $1,592,427.01 |

(*Id.* at 23–28.)

After the valuation hearing, but prior to entry of the Valuation Order, the Debtors and their General Partners had filed a notice of appeal and a motion for leave to appeal the bankruptcy court's *In Limine* Order as it related to the Debtors' Valuation Objection. On September 26, 2011, the Debtors and General Partners filed an amended notice of appeal to include an appeal of the bankruptcy court's Valuation Order. This appeal was timely.

## IV.  DISCUSSION

A.  *11 U.S.C. § 506(a)(1) & 26 U.S.C. § 42*

**[9–11]**  Section 506(a)(1) of the Bankruptcy Code provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1). In valuing property under this section, a court must engage in a two-step process. First, "a court must compare the creditor's claim to the value of 'such property,' *i.e.*, the collateral." *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 961, 117 S.Ct. 1879, 1884–85, 138 L.Ed.2d 148 (1997). This determination necessarily requires the court to ascertain the "creditor's interest in the estate's interest in" the property. 11 U.S.C. § 506(a)(1). The second step in the valuation process requires the court to determine how to value the collateral. *Rash*, 520 U.S. at 961–62, 117 S.Ct. 1879. When a debtor proposes to retain property and

continue to use the property in the debtor's trade or business, the proper methodology to use in establishing "the amount of the secured claim under § 506(a) . . . is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960., 117 S.Ct. 1879 Although *Rash* was decided in the context of Chapter 13, its holding applies equally to valuation of secured claims in Chapter 11. *In re Heritage Highgate, Inc.,* 679 F.3d 132 (3d Cir.2012). The Debtors and General Partners allege that the Debtors do not have any ownership interest in the tax credits and that the tax credits are not part of the Bank's collateral. Therefore, the Debtors assert the value of the remaining tax credits are not properly included in determination of the secured portion of the Bank's claim.

The Bank asserts Debtors' arguments are flawed because the right to claim the low-income housing tax credits goes to the owner of the LIHTC property and this right cannot be separated from the land. The bankruptcy court agreed with the Bank. (*See In Limine* Order at 4–5 Bankr. Case No. 10–53019, ECF Nos. 235 and 252) (referenced in Valuation Order at 20, Bankr.Case No. 10–53019, ECF No. 252.) Additionally, the bankruptcy court concluded that:

> Debtors chose to ignore the fact the Remaining Tax Credits impact the value of the property, are owned by the Debtors and that any rights/benefit/burdens of the Remaining Tax Credits which inure to the limited partners do so only as a result of their ownership/partnership interests in the Debtors. If the LIHTC Properties are sold, all proceeds of a sale belong to the respective Debtor with any benefits of the Remaining Tax Credits flowing through the new entity to the owners of that new entity.

(Valuation Order at 22, Bankr.Case No. 10–53019, ECF No. 252.)

The Low–Income Housing Tax Credit program is provided for in § 42 of the Internal Revenue Code. 26 U.S.C. § 42. The program provides an incentive to develop low-income housing properties in exchange for a 10–year stream of tax credits. 26 U.S.C. § 42(b)(1)(B). The availability of the tax credits is dependent on the property maintaining compliance with the Low–Income Housing Tax Credit program's rent and occupancy restrictions. *See* 26 U.S.C. § 42.

**[12]** Section 42(b)(1) provides that, for purposes of calculating the amount of the low-income housing credit,

> the term "applicable percentage" means, with respect to any building, the appropriate percentage prescribed by the Secretary for the earlier of—
>
> (i) the month in which such building is placed in service, or
>
> (ii) at the election of the taxpayer—
>
>> (I) the month in which the taxpayer and the housing credit agency enter into an agreement with respect to such building (which is binding on such agency, the taxpayer, and all successors in interest) *as to the housing credit dollar amount to be allocated to such building . . . .*

26 U.S.C. § 42(b)(1) (emphasis added). Additionally, as recognized by the bankruptcy court, if a low-income housing property is sold prior to the conclusion of the compliance period,

> the credit allowable . . . to the taxpayer for any period after such acquisition shall be equal to the amount of credit which would have been allowable . . . for such period to the prior *owner* . . . had such *owner* not disposed of the building.

26 U.S.C. § 42(d)(7)(A)(ii) (emphasis added). These sections make clear that the

low-income housing tax credits are attached to the low-income housing property and belong to the owner of such property. "The tax credits are better characterized as 'rights and privileges' belonging to the land under the definition of 'real property' . . . as they do not exist separate from an ownership right in the low-income housing." *Brandon Bay, Ltd. P'ship v. Payette Cnty.,* 142 Idaho 681, 132 P.3d 438, 441 (2006). "Because the tax credits are rights and privileges that directly relate to the real estate, they are properly considered in assessing the value of low-income housing." *Id.*

The various exhibits in this case bolster this conclusion. Section 2(b) of the LURAs states that the covenants and the restrictions set forth therein are "covenants running with the Project." (LURA Section 2(b), Bankr.Case No. 10–53019, ECF Nos. 204–4 at 25, 204–8 at 5, 204–12 at 16, 204–16 at 11 and 204–20 at 14.) Section 6.6 of the Partnership Agreements states "[e]xcept for the Apartment Complex, the Housing Tax Credits, and the contractual rights referred to herein, the [Limited] Partnership [aka the Debtor] owns no other property, tangible or intangible, real or personal." (Amended and Restated Partnership Agreements, section 6.6(A), Bankr.Case No. 10–53019, ECF No. 214–1 through 214–15.) This section demonstrates that the Debtors own the low-income housing tax credits. The "Low Income Housing Tax Credit Certificate of Carryover Allocation" letters from KHC identify the "Taxpayer Receiving Allocations" as the Debtors. (Tax Credit Letters, Bankr.Case No. 10–53019, ECF No. 204–29 at 1–6.) Additionally, section 9.1G(v) of the Partnership Agreements state that tax credits shall be *allocated* among the partners, just as profits and losses are allocated among the partners. (Amended and Restated Partnership Agreements, section 9.1G(v), Bankr.Case

No. 10–53019, ECF No. 214–1 through 214–15.) Nowhere in the partnership agreements is there an indication that the tax credits are sold or otherwise conveyed to the partners.

In a case factually analogous to the one before the Panel, a limited partnership, Pine Pointe, entered into a land-use restriction agreement with the state housing authority in exchange for the allocation of low-income housing tax credits. *Pine Pointe Hous., L.P. v. Lowndes Cnty. Bd. of Tax Assessors,* 254 Ga.App. 197, 561 S.E.2d 860 (2002). The limited partnership agreement allocated 99% of the tax credits to Pine Pointe's limited investor partners. Following an ad valorem tax assessment on the property, Pine Pointe appealed the assessment. The issue on appeal was how to determine the fair market value of the property "given the rental restrictions and the federal tax benefits applicable to the project." *Id.* at 862. Although the ultimate issue in the *Pine Pointe* case was different, two of the holdings are applicable to the case currently before the Panel.

In its appeal, Pine Pointe asserted that the tax credits had been effectively sold to its limited investor partners by virtue of the limited partnership agreement and thus had no value to Pine Pointe. Pine Pointe therefore alleged that inclusion of the value of the remaining tax credits was in error. The Georgia Court of Appeals rejected this argument based on the provisions of 26 U.S.C. § 42(d)(7) which state that, when the property is sold, the subsequent owner is entitled to claim the remaining tax credits. *Id.* at 863. The court held that because the tax credits run with the land, they cannot be severed from the property and sold to an investor.

The *Pine Pointe* court also concluded that "[b]ecause Section 42 tax credits are

generated by a designated property, a third party would pay for the value as part of that property's sale price in a bona fide, arm's length transaction." 561 S.E.2d at 863. "Furthermore, the tax credits go hand in hand with restrictive covenants that require the property to charge below-market rent" and, therefore, the tax credits run with the land. *Id.*

In another case factually identically to the one before the Panel, *Spring Hill, L.P. v. Tenn. State Bd. of Equalization,* No. M2001–02683–COA–R3–CV, 2003 WL 23099679 (Tenn.Ct.App. Dec. 31, 2003), the taxpayers appealed from property tax assessments that included the present value of the remaining low-income housing tax credits authorized by § 42 of the Internal Revenue Code. The taxpayers were three limited partnerships who owned low-income housing tax credit properties. After the low-income housing tax credits were awarded by the Tennessee state agency tasked with administering the low-income housing tax credit program, the taxpayers allocated the right to claim the annual tax credits to limited partner investors. *Id.* at *2.

Like the Debtors in this case, the owners contracted with the state agency to receive the tax credits in exchange for surrendering a portion of their property rights, *i.e.,* the right to charge higher rents and to use the property without restraint. "[B]ecause the tax credits may be transferred to purchasers" and because the "tax credits made ownership of the properties more desirable to" the owners of the properties, the trial court determined that the low-income housing tax credits "enhance[d] the value of the properties in the marketplace." *Id.* at *4. The court of appeals affirmed and stated "the real economic benefit caused by [the tax credits] has a significant impact on the value of the property and must, therefore, be analyzed when determining the fair value of the property." *Id.* at *11.

> [A]lthough the owner of the property had, by the limited partnerships, internally allocated the right to receive the Tax Credits to limited partners in exchange for a discounted lump sum payment by investors, the assignment of this right is the equivalent of any number of other financing tools available.

*Id.* (summarizing prior decision of Tax Board which found syndication of tax credits did not serve to exclude the consideration of tax credits in determining a property's value).

In determining that the value of the tax credits was properly included in the value of the property at issue in the case, the *Spring Hill* court recognized that

> [w]hile some [other states] have found that the Tax Credits should not constitute a factor in assessing the value of the real property, the majority take the position that, absent legislation to the contrary, the Tax Credits should be used as a factor in determining the fair market value of the real property upon which they were awarded.
>
> . . . .
>
> In these cases, the courts determined that only consideration of both the value-decreasing factor of restricted rents along with the value-increasing factor of the Tax Credits provides a full and accurate picture of the property's worth.

*Id.* at *12–13 (citations omitted). The *Spring Hill* court agreed. Because the "issue is 'whether the price that a willing buyer and seller would agree upon would take into account the tax credits,'" the value of "[i]ntangible factors should be considered when they affect the value, either upward or downward." *Id.* at *14.

Kentucky has not excluded the consideration of tax credits in assessing property

values either by statute or case law. Although the Debtors and General Partners argue that Kentucky partnership law and federal tax law "recognize[ ] the ability of limited partnerships to syndicate partnership interests—and, of paramount importance, the attendant tax credits—to limited partners," they cite no authority for their argument. (Appellant Reply Br. at 3–4.) And, although this may be true, the fact that allocation of tax credits is allowed does not mean that such allocation has the effect of transferring ownership of the low-income housing tax credits away from the property owner.

In this appeal, the Debtors and the General Partners argue that the cases cited by the Bank are inapposite because the underlying policy considerations in those cases are tax policies, not the policies of § 506(a) of the Bankruptcy Code. Nevertheless, these cases are relevant in demonstrating that, just as the property tax rate can affect the value of real property, so too can the availability of tax credits. Indeed, in using an income analysis to value real property, it would be incongruous to consider the limitations imposed by land use restrictions but not consider the associated benefits of tax credits made available to the property's owners. For example, real property may be owned subject to certain restrictions in furtherance of historic preservation that limit its value, while at the same time providing the owner with a reduced property tax rate or even complete tax abatement. In such a situation, it would be inconsistent to consider the limitations imposed by the historic preservation restrictions without also considering the effect that a reduced or zero tax rate would have on the net income generated by the property. Ultimately, both the benefits and the burdens associated with property ownership are relevant in valuing the real property.

The Debtors cite the case of *Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), in support of their position that the tax credits are not collateral in which the Bank could take a security interest and, therefore, cannot be included within the Bank's secured claim; however, the Supreme Court's decision in *Randall* is readily distinguished and is not inconsistent with the bankruptcy court's valuation analysis in the case currently before the Panel. In *Randall,* the Supreme Court considered whether an award of damages in a prospectus securities fraud case must be offset by the tax benefits received by defrauded investors. The Supreme Court held, under the plain meaning of the statute, that the "offset for 'income received' on the security does not encompass the tax benefits received by defrauded investors by virtue of their ownership of the security, because such benefits cannot, under any reasonable definition, be termed 'income.'" *Id.* at 656, 106 S.Ct. 3143.

The Supreme Court then added:

[The tax credits] have no value in themselves; the economic benefit to the investor—the true "tax benefit" arises because the investor may offset tax deductions *against* income received from other sources or use tax credits to reduce the taxes otherwise payable on account of such income. Unlike payments in cash or property received by virtue of ownership of a security . . . "receipt" of tax deductions or credits is not itself a taxable event, for the investor has received no money or other "income" within the meaning of the Internal Revenue Code.

*Id.* at 657, 106 S.Ct. 3143 (citing 26 U.S.C. § 61).

The Debtors and General Partners assert that *Randall* stands for the proposition that tax credits have no value in and

of themselves and are not property in which an enforceable lien can be taken. Their reliance on *Randall* is misplaced; *Randall* addressed the measure of damages under the remedy of rescission in a securities fraud case. The key issue in the present case is different—namely, whether the tax credits associated with the ownership of real property can be considered in determining the value of that real property. In short, nothing in *Randall* suggests that a court cannot consider the effect that tax credits associated with the ownership of real property have when valuing that real property.

The Debtors also rely on the case of *City of Chicago v. Michigan Beach Housing Cooperative,* 242 Ill.App.3d 636, 182 Ill.Dec. 343, 609 N.E.2d 877 (1993). In *Michigan Beach,* the City of Chicago argued that, because its security interest extended to proceeds of its collateral, its security interest extended to the syndication funds that investors paid to purchase interests in a limited partnership that owned a low-income housing complex and held the right to claim certain income tax credits. The trial court held that the language of the city's security agreement did not cover the income tax credits, and the Illinois Court of Appeals affirmed. *Id.* at 884–85. The Illinois Court of Appeals also found the city's argument unavailing "because income tax credits cannot be intangible personal property subject to a security interest under Article 9." *Id.* at 885. In following *Randall,* the Illinois Court of Appeals explained:

> Applying the Supreme Court's analysis in *Randall* to the case at bar, we are led ineluctably to the conclusion that the tax credits at issue cannot serve as collateral because they are not general intangible personal property. Tax credits, as *Randall* instructs us, have no independent value in and of themselves; instead, they are an incidental benefit that

investors receive when they purchase a security evidencing their interest in a limited partnership. The investors cannot transfer or sell the tax credits separate from the security itself. The limited partnership did not "sell" the tax credits to the investors; the tax credits remain exactly where they resided before the sale of the securities, in the limited partnership. Accordingly, it is clear that the NTC defendants in this case did not purchase and do not own tax credits; instead, they bought and now possess securities which gave them an interest in the Michigan Beach Limited Partnership. The tax credits they received along with their interest in the partnership were incidental benefits of that investment—not separate intangible personal property which could collateralize the city's loan—and whatever benefit they conferred on the investor renders no comfort to the city.

*Id.* at 886.

**[13]**  Although the Debtors and General Partners quoted at length from this paragraph of the opinion in support of their argument that the value of the Bank's secured claim does not include the value of the remaining tax credits, they omitted and replaced with ellipses a key sentence:

> The limited partnership did not "sell" the tax credits to the investors; *the tax credits remain exactly where they resided before the sale of the securities, in the limited partnership.*

*Id.* (emphasis added). Even when an entity allocates the rights to use the low-income housing tax credits to investors, it does not lose ownership of the tax credits. The tax credits remain with the property and with the owner of the property. As the bankruptcy court recognized in this case, "[t]he [investor] limited partners may have become entitled to the allocation of

**60**                    **477 BANKRUPTCY REPORTER**

the Tax Credits through the respective partnership agreements, but they did not become the owners of the Tax Credits through those agreements." (*In Limine* Order at 4, Bankr.Case No. 10–53019, ECF No. 235.) In short, the *Michigan Beach* case is consistent with the bankruptcy court's analysis that the right to the tax credits remains in the limited partnership that owns the real property, and not with the investors who purchased an ownership interest in the limited partnership.

[14] The Debtors in this case still own the tax credits, and the tax credits are covenants running with the real properties. This is true even though the Debtors allocated the credits to the investor limited partners. *See Spring Hill,* 2003 WL 23099679. As a result, determination of the Bank's interest in the Debtors' interest in the LIHTC properties must include consideration of the value of those credits. Because "[a] willing buyer would most certainly consider the availability of section 42 tax credits when determining the fair cash value of the property," the bankruptcy court in this case was correct in concluding that the value of the remaining tax credits is properly included in determining the value of the Bank's secured claim. *Rainbow Apartments v. Ill. Prop. Tax Appeal Bd.,* 326 Ill.App.3d 1105, 260 Ill.Dec. 875, 762 N.E.2d 534, 537 (2001).

The Debtors and General Partners seemingly fail to understand a key issue in this case. The question before the bankruptcy court was not whether the Bank has an independent security interest in the tax credits. The issue was whether the fair market value of the various apartment complexes secured by the Bank's mortgages should reflect the value of the remaining tax credits. The Bank did not argue, nor did the bankruptcy court determine, that the Bank was entitled to claim the tax credits on its tax returns. Nor did the

Bank argue that it owned or had a separate security interest in the tax credits or in the money paid by the investors in exchange for allocation of the tax credits. The only aspect of the tax credits at issue in this case is whether the value of the remaining credits affects the value of the Bank's collateral and, thus, the amount of the Bank's secured claim.

The ability to claim the low-income housing tax credits pursuant to 26 U.S.C. § 42 flows from the property owner's agreement to comply with the rent and occupancy restrictions of the Low–Income Housing Program. If the owners fail to comply with those restrictions, the owners, or whomever they allocate the right to claim the tax credits to, lose the benefits of the tax credits. Simply stated, without the burden, there is no benefit.

Because the restrictions limit the amount of income an owner can realize from low-income housing properties, the restrictions affect the price a willing seller would agree to pay for such properties. The Debtors and the General Partners do not dispute this, and their appraisals state that the estimated market value was calculated in light of the rent and occupancy restrictions. If the burden impacts the value, the benefits must as well. In short, the bankruptcy court did not err when it concluded, consistent with the Internal Revenue Code, relevant case law, and the record before it, that the value of the remaining tax credits is properly included in determining the amount of the Bank's secured claim.

B.   *Weighing of Evidence in Determining Value Under § 506(a)*

The Debtors and General Partners also allege that the bankruptcy court erred in accepting the Bank's appraisal figures in setting the value of the real properties and

in determining the value of the remaining tax credits.

**[15, 16]** "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr.P. 8013. Courts have broad discretion in admitting expert witnesses and weighing testimony. *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.,* 258 F.3d 180, 191 (3rd Cir.2001) (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 153, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). "Judging the credibility and mental capacity of witnesses and resolving conflicts in the evidence are within the unique capacity of the factfinder" and a court's determinations on such issues will not be disturbed on appeal unless clearly erroneous. *United States v. Baker,* 807 F.2d 1315, 1320 (6th Cir.1986).

**[17, 18]** "The valuation of property is an inexact science and whatever method is used will only be an approximation and variance of opinion by two individuals does not establish a mistake in either." *Boyle v. Wells (In re Gustav Schaefer Co.),* 103 F.2d 237, 242 (6th Cir.1939). "Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses." *In re Smith,* 267 B.R. 568, 572 (Bankr.S.D.Ohio 2001).

> In examining the valuations given to the debtors' property, the court notes that valuation is ultimately the opinion of a particular appraiser and, as such, the weight to be accorded the opinion rests upon a number of factors frequently used by courts in evaluating appraisal testimony. A nonexclusive listing of these factors includes: the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented.

*Buckland v. Household Realty Corp. (In re Buckland),* 123 B.R. 573, 578 (Bankr. S.D.Ohio 1991). "A bankruptcy court is not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion of the value of the subject property after considering the appraisals and expert testimony." *Smith,* 267 B.R. at 572–73.

When faced with setting a value for a low-income housing tax credit property, a court's job is difficult.

> [S]ales of LIHTC properties are very rare. When sales do occur, they are difficult to compare because the land use restrictions may be quite different from one LIHTC property to another. The extreme scarcity of comparable sales and the difficulties in evaluating the differences between the comparable properties' LURAs present formidable obstacles to performing a credible sales comparison approach for an LIHTC property.

Kenneth N. Alford & David C. Wellsandt, *Appraising Low–Income Housing Tax Credit Real Estate,* 10/1/10 APPRAISAL J. 350 (Oct. 1, 2010).

In the case currently on appeal, the bankruptcy court found both appraisers to be qualified as experts. (Valuation Order at 10, Bankr.Case No. 10–53019, ECF No. 252.) The bankruptcy court also found that both appraisers, as certified appraisers, had extensive experience in appraising low-income housing tax credit properties and that both appraisers used an accepted

method of valuing the property. Although both appraisers agreed that the income capitalization approach was the most reliable one to use for income-producing properties, the appraisers disagreed how to calculate the vacancy and collection loss rate, or VCLR, and the proper management fee. They also disagreed about which real estate tax expenses to use.

With respect to the tax credits, the Debtors and General Partners argue that the bankruptcy court erred in accepting the Bank's appraiser's value of the credits because the Bank's appraiser did not consider the impact of the tax credits. Instead, he merely valued the remaining tax credits. The bankruptcy court rejected this argument and determined that the Bank's appraisal of the tax credits was valid.

> The Court finds Mr. Donan's testimony on the issue of the impact of the Remaining Tax Credits to be credible and further finds that the Debtors' evidence presented on rebuttal is too little, too late. The Debtors' Rebuttal Exhibit lacks the details, analysis and substantiation contained in the Bank's Appraisals. Debtors chose to ignore the fact [that] the Remaining Tax Credits impact the value of the property, are owned by the Debtors and that any rights/benefit/burdens of the Remaining Tax Credits which inure to the limited partners do so only as a result of their ownership/partnership interests in the Debtors. . . . When backed into a corner, Debtors finally chose to compute a value for the Remaining Tax Credits by challenging the methodology used by the Bank's Appraiser with unsupported assertions of components missing from Mr. Donan's calculations.

(Valuation Order at 20–22, Bankr.Case No. 10–53019, ECF No. 252.)

**[19]** After thoroughly reviewing the record and the briefs in this matter, it does not appear that the bankruptcy court abused its discretion in finding the Bank's appraisal more accurately reflected the true value of the properties under § 506(a), nor was that finding clearly erroneous. Although the Debtors argue that their appraiser's approach was "far more nuanced and better reasoned," they offer no true support for their assertion, which ignores the instruction given their appraiser not to factor the tax credits in his analysis. (Appellant Br. at 35.) As pointed out above, there is no exact science for determining the value of low-income housing tax credit properties. The bankruptcy court had copies of all the appraisals as well as the opportunity to assess the credibility of each appraiser in the courtroom. The bankruptcy court analyzed the market conditions as set forth by both appraisers and determined that the Bank's figures were more accurate. Quite simply, the bankruptcy court did what it was tasked with doing: determining which report more accurately reflected the market conditions for these properties.

With respect to the tax credits, the bankruptcy court was correct in determining their value was included when assessing the value of the Bank's secured claim. Because the Debtors held fast to their contention that the value of the tax credits was not properly included in the claim, they failed to timely introduce any evidence of the credits. When pressed at the hearing, their appraiser finally agreed that the Bank's appraiser used an accepted methodology, but contended that he had used some incorrect figures in calculating the value. The Debtors, however, failed to convince the bankruptcy court that the figures used by the Bank's appraiser were invalid.

**[20]** The Debtors further argue that the Bank's appraisal of the tax credits was flawed because the appraiser failed to analyze the partnership agreements and the Debtors' current debt structure. The Debtors allege that this failure is in violation of the Uniform Standards of Professional Appraisal Practice ("USPAP"); however, the bankruptcy court considered this argument and found that the Bank's appraiser properly set forth the extraordinary assumptions and limiting conditions in compliance with the requirements of the USPAP and that he reached a credible result as to the value of the remaining tax credits. This was not an abuse of the bankruptcy court's discretion.

In this case, the bankruptcy court engaged in a thorough analysis of the appraisals and the appraisers' qualifications. The bankruptcy court set forth a detailed analysis of why it gave more weight to the Bank's figures as compared to those of the Debtors. Additionally, the bankruptcy court also set forth a detailed explanation of why it deviated from those of the Bank's appraisals regarding the tax expense calculation. The bankruptcy court's reliance on the Bank's appraisals and its calculation of the final values was well-reasoned. There was neither clear error nor an abuse of discretion in the bankruptcy court's analysis.

C. *Order Overruling Debtors' Valuation Objection and Motion In Limine*

The Debtors assert that the bankruptcy court erred in overruling their Valuation Objection and Motion *in Limine* on August 15, 2011, because those portions of the appraisals and related testimony about the remaining tax credits were "not based on sufficient facts and data" and did "not conform to accepted principles and methodologies in the industry . . . ." (Mem. in Support of Mot. *in Limine* at 1, Bankr.

Case No. 10–53019, ECF No. 215–1.) Specifically, the Debtors and General Partners asserted that the Bank's appraiser's reports did not comply with the USPAP. The Debtors and General Partners also argued that the value of the remaining tax credits was irrelevant to the valuation issue because the tax credits were not part of the Bank's collateral.

**[21–23]** In their brief, the Debtors and General Partners allege that their Valuation Objection and Motion *In Limine* should have been granted in light of Federal Rule of Evidence 702 which governs testimony by expert witnesses and provided as of the valuation hearing:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702 (version in effect prior to general restyling of the Federal Rules of Evidence effective December 1, 2011). There are essentially three components in making a Rule 702 determination. A court must determine (1) if the witness is qualified by "knowledge, skill, experience, training, or education;" (2) if the witness' opinion or testimony will "assist the trier of fact;" and (3) if the testimony is reliable "which is shown by the satisfaction of the three numbered elements in Rule 702." *Kaylor v. Holsinger (In re Holsinger),* 437 B.R. 260, 270 (Bankr.S.D.Ohio 2010) (citing *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, at 528–29 (6th Cir.2008)).

Importantly, the court does not assess the credibility and accuracy of expert opinion when determining the reliability of the expert opinion, but must only ensure that the opinion is made upon a reliable factual foundation and is not unsupported speculation. [*Scrap Metal Antitrust Litig.,* 527 F.3d] at 529–30. Ultimately, the court has broad discretion in determining the admissibility of expert testimony and "the gatekeeping inquiry must be [tied to the facts of a particular case.]" *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, [150], 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

*Holsinger,* 437 B.R. at 270.

**[24–28]**  Rule 702's requirement that the proffered testimony "assist the trier of fact" requires the testimony be relevant. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (citation omitted) (internal quotation marks omitted). Essentially, this requirement mandates that the expert testimony "is sufficiently tied to the facts of the case that it will aid the [factfinder] in resolving a factual dispute." *Id.* (citation omitted) (internal quotation marks omitted). "T[he] relevance requirement ensures that there is a 'fit' between the testimony and the issue to be resolved at trial." *Buck v. Ford Motor Co.,* 810 F.Supp.2d 815, 822 (N.D.Ohio 2011). As long as the testimony relates to an issue the factfinder must determine, it is relevant. *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.,* 358 Fed.Appx. 643, 652 (6th Cir.2009). Additionally,

[t]he Court's "requirement that 'any and all scientific testimony or evidence admitted [be] not only relevant, but reliable,' 'entails a preliminary assessment of whether the reasoning or

methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' " *Sigler v. Am. Honda Motor Co.,* 532 F.3d 469, 478 (6th Cir.2008) (citations omitted).

**[29–31]**  "The inquiry [under Rule 702] is … a flexible one…. The focus … must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.,* 151 F.3d 500, 516 (6th Cir.1998) (internal citations omitted).

In *Daubert,* the Supreme Court "established a general gatekeeping [or screening] obligation for trial courts" to exclude from trial expert testimony that is unreliable and irrelevant. *Hardyman v. Norfolk & W. Ry. Co.,* 243 F.3d 255, 260 (6th Cir.2001) (citation and internal quotation marks omitted). The district court must determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Id.* (citation omitted). In assessing relevance and reliability, the district court must examine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Jahn v. Equine Servs., PSC,* 233 F.3d 382, 388 (6th Cir.2000) (citations omitted). This involves a preliminary inquiry as to whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* (citation and internal quotation marks omitted). Some of the factors that may be used in such an inquiry include: (1) whether the theory or technique has

been tested and subjected to peer review and publication, (2) whether the potential rate of error is known, and (3) its general acceptance. *Hardyman,* 243 F.3d at 260.

*Conwood Co., L.P. v. U.S. Tobacco Co.,* 290 F.3d 768, 792 (6th Cir.2002). "[R]ejection of expert testimony is the exception rather than the rule." Fed.R.Evid. 702 advisory committee's note. The party seeking to introduce the expert testimony bears the burden of demonstrating its admissibility by a preponderance of the evidence. *Nelson v. Tenn. Gas Pipeline Co.,* 243 F.3d 244, 251 (6th Cir.2001).

[32] With respect to a claim that a method used in an appraiser's report does not comply with the USPAP, there is no authority "for the proposition that an appraiser's compliance with USPAP is the sole determining factor as to whether an appraiser's valuation report is reliable." *Whitehouse Hotel Ltd. P'ship v. Comm'r,* 615 F.3d 321, 332 (5th Cir.2010). This is especially true when the trial court is the "factfinder as well as the expert-testimony gatekeeper . . . ." *Id.* The issue of whether an appraiser's report complied with US-PAP standards goes to "the *weight* [the] report should be given, instead of whether it should be admitted." *Id.* "[T]he nature and extent of the deviations [from USPAP] concern only the report's *credibility . . . .*" *Id.; see also Wal–Mart Stores, Inc. v. Qore, Inc.,* No. 1:06CV326, 2009 WL 224908, at *3 (N.D.Miss. Jan. 28, 2009). This is true even if an appraiser, like the Bank's appraiser in this case, makes "extraordinary assumptions in coming to his ultimate conclusion." *Id.*

[33] When a party agrees that an expert witness used an accepted methodology, but that the data used in applying that methodology was flawed, such an allegation does not require a court to exclude the testimony or report. *Quiet Tech. DC–8,*

*Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1345–46 (11th Cir.2003). Instead, "such an attack goes to the weight of the evidence, rather than to its admissibility." *Scrap Metal Antitrust Litig.,* 527 F.3d at 530 (citing *Quiet Tech. DC–8,* 326 F.3d at 1345) (" 'Thus, the alleged flaws in [the appellee's] analysis are of a character that impugn the *accuracy* of his results, not the general scientific *validity* of his methods.' "). "The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech. DC–8,* 326 F.3d at 1345; *see also Daubert,* 509 U.S. at 596, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

[34, 35] Because a "trial court has broad discretion in admitting and excluding expert testimony," such a determination will be upheld on appeal unless there was an abuse of discretion or unless the decision was "manifestly erroneous." *Gen. Electric Co. v. Joiner,* 522 U.S. 136, 141–42, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997); *Mayhew v. Bell S.S. Co.,* 917 F.2d 961, 962 (6th Cir.1990). However, "a determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion." *Scrap Metal Antitrust Litig.,* 527 F.3d at 529. Instead, a court must determine whether an expert witness's opinion is accurate in deciding what weight to give to that opinion at trial. *Id.* at 531.

[36] In the case currently before the Panel, the Debtors and General Partners allege that the Bank's appraisal of the value of the remaining tax credits "materially fail[s] to comply with the USPAP standards" because the "valuation of the remaining Tax Credits is based upon 'ex-

traordinary assumptions.'" (Appellant Br. at 29.)   According to the Debtors and General Partners, the "extraordinary assumptions" used by the Bank's appraiser "reflect 'assignment conditions' that restrain appropriate due diligence 'to such a degree that the assignment results are not *credible,*' per the USPAP."   (Appellant Br. at 30–31) (emphasis added.)

Despite these allegations, the Debtors' own appraiser testified that the Bank's appraiser used an accepted methodology in calculating the value of the remaining tax credits.   When asked by Bank's counsel if he agreed with Donan's methodology, the Debtors' appraiser stated:

> There are certain issues I have with— with application of the methodology. The general methodology, no, but there are certain things that are missing, key components that are missing as part of applying the methodology that he applied.

(August 18, 2011 Tr. of H'rg at 144.)

In analyzing Debtors' arguments, the bankruptcy court noted that, by using an extraordinary assumption, the Bank's appraiser concluded that he could still reach a credible result.   The bankruptcy court also held that the use of the extraordinary assumption was allowed by the USPAP. (*See In Limine* Order at 6–8, Bankr.Case No. 10–53019, ECF No. 235.)   Based on these holdings, the bankruptcy court concluded that "the Debtors' arguments go to the weight of the evidence, not to its reliability."   (*Id.* at 8.)

Whether the Bank's appraiser complied with USPAP is not a determining factor as to whether an appraisal is reliable.   It may impact whether or not the report is credible, but does not determine the admissibility of the report.   Additionally, as long as an appraiser uses a methodology that is accepted in the industry, his report is admissible.   If, in applying the methodology, the appraiser uses incorrect data or the appraiser's use of the methodology is somehow flawed, a court is not required to exclude the testimony or report.   Instead, the error may affect the weight the testimony or report is given.

In the case presently before the Panel, the bank's appraiser developed an "extraordinary assumption" as provided for in USPAP in valuing the remaining tax credits.   Although the Debtors assert that the assumption was wrong, their own appraiser testified that the methodology the Bank's appraiser used in valuing the remaining tax credits was an accepted one in the industry.   As a result, the bankruptcy court did not abuse its broad discretion in declining to exclude those portions of the Bank's appraisals which included valuation of the remaining tax credits.

As for the Debtors' argument that the value of the remaining tax credits was irrelevant to the valuation issue, such argument must fail.   The ultimate issue the bankruptcy court had to determine was the value of the secured portion of the Bank's claim.   A major component of this determination was whether the value of the remaining tax credits would influence the price offered by a hypothetical willing purchaser of the property that serves as collateral for the Bank's claims.   As a result, the issue of whether the tax credits had any value was relevant to the issue before the bankruptcy court, and the bankruptcy court properly denied the Debtors' Motion *In Limine.*

## V.   CONCLUSION

For the foregoing reasons, we affirm the bankruptcy court's orders setting the market value of the Debtors' low-income housing tax credit properties and overruling the Debtors' and the General Partners'

Valuation Objection and Motion *In Limine.*



**In re John Robert IWANSKI, and, Kay Ellen Collins, Debtors.**

**John Robert Iwanski, Appellant,**

**v.**

**Federal Home Loan Mortgage Corp., Cody Brown, Kristin Solovy, and Kelsea Solovy, Appellees.**

**Nos. 10–74033, 11–12379.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 2, 2012.

**Background:** Order was entered by the Bankruptcy Court, compelling debtor to return the full amount of security deposits paid by tenants, and debtor appealed.

**Holdings:** The District Court, Victoria A. Roberts, J., held that:

(1) under Michigan law, mortgagor is entitled to possession of mortgaged property, and to all the benefits of possession, including rents, until expiration of time to redeem property;

(2) under Michigan law, landlord may apply tenant's security deposit to any rent in arrearage; and

(3) adversary proceeding brought by debtor's tenants to compel return of their security deposits had to be remanded to bankruptcy court for determination as to whether, as of date of expiration of debtor ability to redeem property, any rental arrears existed on part of tenants, to which debtor was entitled to apply security deposits.

Reversed and remanded.

**1. Bankruptcy ⟫3782, 3786**

District court reviews bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

**2. Bankruptcy ⟫3785.1, 3790**

If bankruptcy court's factual findings are silent or ambiguous as to outcome determinative factual question, district court may not engage in its own factfinding but, instead, must remand case to bankruptcy court for the necessary factual determination.

**3. Mortgages ⟫372(4)**

Under Michigan law, mortgagor is entitled to possession of mortgaged property, and to all the benefits of possession, until expiration of time to redeem property following foreclosure sale.

**4. Mortgages ⟫372(4)**

Under Michigan law, benefits of possession, to which mortgagor is entitled following foreclosure sale and prior to expiration of redemption period, include right to collect rent.

**5. Mortgages ⟫372(4)**

Under Michigan law, after automatic stay was lifted and mortgagee foreclosed on investment property owned by debtor-mortgagor, debtor retained right to rents from this property up until expiration of state law redemption period.

**6. Landlord and Tenant ⟫184(2)**

Under Michigan law, landlord may apply tenant's security deposit to any rent in arrearage. M.C.L.A. § 554.607.

forward with this bankruptcy case only adds an additional and unnecessary layer of litigation and expenses to the dispute between the Debtor and [DF Servicing], and delays [DF Servicing] from realizing on its collateral after the Debtor has been in default under the loan documents since 2008 and after [DF Servicing] and the Debtor have already been involved in litigation for over two years;" (iii) the state court forum is available to decide the issues and protect the interests of the Debtor and DF Servicing in particular the summary judgment for the foreclosure of the real estate property; (iv) this case was filed to prevent a judicial sale of the property in the state foreclosure case; (v) DF Servicing will be prejudiced if Debtor's case is not dismissed because it will delay the execution of its contractual and legal rights to sell the property to satisfy its debts; (vi) the Debtor will not be prejudiced if the case is dismissed because the Debtor's sole asset is subject to DF Servicing's mortgage lien; and (vii) Debtor's unsecured creditors will not be prejudiced if the case is dismissed because they will receive nothing whether the petition is dismissed or not; (viii) the Debtor is using its Chapter 11 petition to delay the inevitable foreclosure sale of the property (Docket No. 48).

This court finds that DF Servicing's arguments are premised on unsupported allegations which fail to evince how dismissal will benefit both the Debtor and its creditors. DF Servicing has only demonstrated how dismissal would serve its own interests as a mortgage holder that seeks foreclosure of the Debtor's property in state court. *See* Alan N. Resnick & Henry J. Sommer, 2 *Collier on Bankruptcy* ¶ 305.02[2][d] (16th ed. 2012). This court finds that DF Servicing's request for dismissal pursuant to Section 305(a) should not be used as an alternative remedy for a motion to dismiss under Section 1112(b).

Thus, this court concludes that DF Servicing has failed to satisfy its burden of proof on this particular issue.

*Conclusion*

In view of the foregoing, the court: (1) denies DF Servicing's motion to dismiss pursuant to 11 U.S.C. § 1112(b)(4)(A) and for bad faith (lack of good faith); (2) denies DF Servicing's request for the appointment of a Chapter 11 trustee or examiner under 11 U.S.C. § 1104(a); and (3) denies DF Servicing's alternative remedy requesting dismissal under 11 U.S.C. § 305(a).

SO ORDERED.



In re LEWIS AND CLARK APARTMENTS, LP,
Debtor.

U.S. Bank National Association,
Creditor–Appellant

v.

Lewis and Clark Apartments,
LP, Debtor–Appellee.

BAP No. 12–6023.

United States Bankruptcy Appellate Panel for the Eighth Circuit.

Submitted: Sept. 12, 2012.

Decided: Oct. 11, 2012.

**Background:** Debtor, which owned an apartment complex that qualified as Low Income Housing Tax Credit (LIHTC) property, filed motion to value allowed secured claim of creditor holding first priority deed of trust on the apartment complex and to determine the value of the property

**48**                                   **479 BANKRUPTCY REPORTER**

to be $3,500,000. The United States Bankruptcy Court for the Eastern District of Missouri, Kathy A. Surratt-States, J., entered order granting the motion, and creditor appealed.

**Holdings:** The Bankruptcy Appellate Panel (BAP), Federman, J., held that:

(1) the bankruptcy court's valuation order was not a final order, for purposes of appeal;

(2) leave to appeal the interlocutory order would be granted; and

(3) in valuing creditor's collateral, the bankruptcy court erred in failing to attribute any value to the low income tax credits that the owner of the property was eligible to claim, as well as to the obligations they imposed.

Reversed and remanded.

**1. Bankruptcy** ⬤⟿**3763, 3767, 3768, 3772**

Bankruptcy Appellate Panel (BAP) has jurisdiction to hear appeals from final orders and from interlocutory orders with leave of the court.    28    U.S.C.A. § 158(a)(1), (a)(3), (b).

**2. Bankruptcy** ⬤⟿**3767**

Bankruptcy court order granting debtor's motion to value creditor's allowed secured claim and determining the value of the real property that secured that claim was not a "final" order, for purposes of appeal; although, when debtor filed its motion for valuation, there were two pending matters which were dependent on the value of the property, namely, a motion for stay relief and/or adequate protection and debtor's second amended plan of reorganization, motion to value was not being appealed as part of an appeal of one of those other pending matters, as determination of value was not needed for the stay relief motion and the bankruptcy court had not yet ruled on confirmation, and purpose of the valuation was not stated in either the

motion itself or the record.    11 U.S.C.A. § 506(a); 28 U.S.C.A. § 158.

See publication Words and Phrases for other judicial constructions and definitions.

**3. Bankruptcy** ⬤⟿**3768, 3772**

In deciding whether to grant a motion for leave to appeal an interlocutory order, the Eighth Circuit generally applies the standards found in the statute defining the jurisdiction of the Courts of Appeals to review interlocutory orders.    28 U.S.C.A. § 1292.

**4. Bankruptcy** ⬤⟿**3768**

Statute defining the jurisdiction of the Courts of Appeals to review interlocutory orders requires the following: (1) that the question involved be one of law, (2) that the question be controlling, (3) that there exists a substantial ground for difference of opinion respecting the correctness of the bankruptcy court's decision, and (4) a finding that an immediate appeal would materially advance the ultimate determination of the litigation.    28 U.S.C.A. § 1292(b).

**5. Bankruptcy** ⬤⟿**3768, 3772**

Leave to grant review of interlocutory appeals should be sparingly granted, and then only in exceptional cases.    28 U.S.C.A. § 1292.

**6. Bankruptcy** ⬤⟿**3768, 3772**

In light of the unusual circumstances presented, the Bankruptcy Appellate Panel (BAP) would grant creditor leave to appeal bankruptcy court's interlocutory order granting debtor's motion for valuation of creditor's collateral; determination of the value of the collateral was critical to the manner in which creditor's claim would be treated in debtor's plan, appeal presented a novel issue of law in the circuit whose resolution would control creditor's rights in any plan that might be confirmed, and there was a substantial ground for differ-

**IN RE LEWIS AND CLARK APARTMENTS, LP**                    **49**
Cite as 479 B.R. 47 (8th Cir.BAP 2012)

ence of opinion with respect to the bankruptcy court's legal determination.  11 U.S.C.A. § 506(a); 28 U.S.C.A. § 1292.

**7. Bankruptcy ⚖2852**

Valuation under section of the Bankruptcy Code governing determination of claim's secured status first requires court to compare creditor's claim to the value of such property, that is, the collateral, which requires court to ascertain creditor's interest in the estate's interest in the property; second step requires court to determine how to value the collateral.  11 U.S.C.A. § 506(a).

**8. Bankruptcy ⚖2852**

When debtor proposes to retain property and continue to use it in debtor's trade or business, proper methodology to use in establishing amount of creditor's secured claim under section of the Bankruptcy Code governing determination of claim's secured status is the price a willing buyer in debtor's trade, business, or situation would pay to obtain like property from a willing seller.  11 U.S.C.A. § 506(a).

**9. Bankruptcy ⚖2852**

In valuing the collateral of creditor holding a first priority deed of trust on debtor's apartment complex, which qualified as a Low Income Housing Tax Credit (LIHTC) property, the bankruptcy court erred in failing to attribute any value to the low income tax credits that the owner of the property was eligible to claim, as well as to the cap on rents and other use restrictions to which the property was subject; the tax credits and accompanying restrictions had an effect on the amount that a willing buyer would pay to purchase the real estate, that is, its value.  11 U.S.C.A. § 506(a).

Mark V. Bossi, St. Louis, MO, Allison E. Graves, St. Louis, MO, on brief, for Appellant.

Nicholas A. Franke, St. Louis, MO, for Appellee.

Matthew S. Layfield, St. Louis, MO, Sherry K. Dreisewered, St. Louis, MO, on brief, for BankLiberty.

Before KRESSEL, Chief Judge, FEDERMAN and NAIL, Bankruptcy Judges.

FEDERMAN, Bankruptcy Judge.

U.S. Bank National Association ("U.S. Bank") appeals from an Order granting the motion of Debtor Lewis and Clark Apartments, LP to value U.S. Bank's allowed secured claim pursuant to § 506(a) of the Bankruptcy Code, and valuing the claim at $3,500,000.  There are two issues before us.  The first is whether the valuation Order by itself can be the subject of this appeal.  We hold that the Order is not final but that U.S. Bank's alternative request[1] to grant leave to appeal it as an interlocutory order should be granted.  The second issue is whether the Bankruptcy Court erred in its valuation by not attributing any value to the low income tax credits that the owner of the property is eligible to claim.  For the reasons that follow, we conclude that such credits, as well as the obligations they impose, do affect the value of the property and should have been considered as part of the property's value.  Therefore, we REVERSE AND REMAND.

**FACTUAL BACKGROUND**

The Debtor owns an apartment complex.  It is structured as a limited partnership

---

**1.**  *Notice of Appeal* at n. 1.

**50**                    **479 BANKRUPTCY REPORTER**

consisting of (i) a General Partner—Lewis and Clark Partners, LLC—that owns a 0.01% interest, (ii) a Special Class B Limited Partner—Lewis and Clark State LIHTC Fund, LLC ("State LIHTC Fund")—that owns a 0.01 % interest, (iii) an Investor Limited Partner—Centerline LP—that owns a 99.97% interest, and (iv) a Special Limited Partner—Centerline LLC—that owns a 0.01% interest.

The apartment complex is a Low Income Housing Tax Credit (LIHTC) property. LIHTC programs provide parties with an incentive to invest in affordable housing for low-income families by awarding state and federal tax credits to owners of property, provided those owners agree to certain rent and occupancy restrictions on their multi-family properties. The tax credits are available to the owners for a ten-year period, but the rent and occupancy restrictions remain with the land for a longer period of time. In this case, the restrictions are evidenced by a Low Income Tax Credit Land Use Restriction Agreement, dated June 11, 2009 and recorded June 17, 2009. The parties agreed at oral argument that, with certain conditions including the compliance with the rent and occupancy restrictions, the tax credits are available to a subsequent owner of the property, regardless of whether the new owner acquires through a foreclosure or a sale. The amount of the state tax credits that may be claimed by the owner of the Debtor's apartment complex each year through 2018 is approximately $277,649, and the amount of the federal tax credits that may be claimed by the owner in those years is likewise approximately $277,649. The Debtor's partnership agreement specifies how these tax credits

are to be allocated among the partners. Since eligibility for the tax credits runs with the land, those partners are only eligible to claim those tax credits so long as they retain an ownership interest in the entity that owns the property.

U.S. Bank filed a proof of claim in Debtor's bankruptcy case asserting a secured claim against Debtor in the total amount of $6,297,215.39. There is no dispute that that claim is secured by a first priority Deed of Trust on the apartment complex. U.S. Bank also claims a security interest in other collateral including, but not limited to, the tax credits. BankLiberty claims a security interest in the portion of the tax credits allocated by the partnership agreement to State LIHTC Fund, the Special Class B Limited Partner, as security for a loan made by that bank's predecessor to someone other than the Debtor.

### STANDARD OF REVIEW

A determination of value pursuant to § 506(a) of the Bankruptcy Code presents a mixed question of fact and law.[2] The bankruptcy court's findings of facts are reviewed under the clearly erroneous standard, while its legal conclusions are reviewed *de novo.*[3]

### LEGAL ANALYSIS

#### 1. Is the Order Appealable?

[1, 2] We have jurisdiction to hear appeals from final orders and from interlocutory orders with leave of the court.[4] As stated, this appeal is from an Order granting the Debtor's motion to value U.S. Bank's claim and determining the value of the property. Generally speaking, an or-

---

**2.** *In re Creekside Senior Apartments, LP,* 477 B.R. 40, 45 (6th Cir. BAP 2012).

**3.** *Addison v. Seaver (In re Addison),* 540 F.3d 805, 809 (8th Cir.2008).

**4.** *In re Coleman Enters., Inc.,* 275 B.R. 533, 537 (8th Cir. BAP 2002); 28 U.S.C. §§ 158(a)(1), (a)(3), (b).

der valuing collateral, standing alone, is not a final order inasmuch as it does not give either party the right to do anything as against the other.[5]   At the time the Debtor filed its motion for valuation, however, there were two pending matters which were dependent on the value of the property.   One was a motion for relief from the stay or, in the alternative for adequate protection, which was filed by U.S. Bank. The other was the Debtor's Second Amended Plan of Reorganization.

On March 6, 2012, the Court held a hearing on the motion for relief from stay and on valuation.   At that hearing, the Debtor offered no evidence on valuation, but did offer evidence on the elements necessary to confirm a plan, recognizing that the confirmation hearing was to be held two weeks later.   Debtor's counsel represented that the Debtor valued the property—without consideration of any value attributable to the tax credits—at $3.4 to $3.5 million.   U.S. Bank appraised it at $3.27 million, with an additional $2,040,000 for the tax credits, for a total of $5,310,000. On March 12, 2012, the Court entered its Order denying the motion for relief from the stay and, as applicable here, valuing the property.   This appeal does not involve the portion of the Order dealing with the automatic stay.

Subsequently, on March 20, 2012, the Bankruptcy Court held the confirmation hearing.   As of now, the Bankruptcy Court has not entered an order on confirmation of the Second Amended Plan.

If the motion to value were being appealed as part of an appeal of one of those other pending matters, it might be consid-

ered final for purposes of appeal.[6]   However, the motion itself was silent as to its purpose, and there is nothing in the record stating what the purpose of valuation was. The Debtor asserts that it filed the motion for valuation in connection with the motion for stay relief, since one element of proof under § 362(d) is that there is no equity in the property.   However, the Debtor conceded, and the Bank's appraisal evidence showed, that there was no equity in the property even if the tax credits were included in the value.   Therefore, contrary to the Debtor's assertion, no further valuation was necessary for purposes of stay relief.   U.S. Bank contends that valuation was necessary in order for the Debtor to confirm its plan, which requires the Debtor to prove that the plan pays secured creditors the present value of their collateral.[7] As stated, the Bankruptcy Court has not ruled on confirmation.

As a result, since the determination of value was not needed for the stay relief motion, and since the Court has not ruled on confirmation, the determination as to value is not a final order.

[3–6]   In deciding whether to grant a motion for leave to appeal an interlocutory order, the Eighth Circuit typically applies the standards found in 28 U.S.C. 1292, which define the jurisdiction of courts of appeal to review interlocutory orders. Section 1292(b) requires that:  (1) the question involved be one of law;  (2) the question be controlling;  (3) there exists a substantial ground for difference of opinion respecting the correctness of the bankruptcy court's decision;  and (4) a finding that an immediate appeal would materially

---

5.  *Gaines v. Nelson (In re Gaines),* 932 F.2d 729, 731 (8th Cir.1991) (finality requires, *inter alia,* that the Order leave nothing for the bankruptcy court to do but execute on it).

6.  *See, e.g., Zahn v. Fink (In re Zahn),* 526 F.3d 1140, 1143 (8th Cir.2008) (holding that earlier rulings can be reviewed as part of appeal from confirmation order).

7.  11 U.S.C. § 1129(b)(2).

advance the ultimate determination of the litigation.[8] Leave to grant review of interlocutory appeals should be sparingly granted, and then only in exceptional cases.[9] We hold that, in the unusual circumstances presented to us here, such leave should be granted. That is so because regardless of whether the pending plan is confirmed, or a modified one is proposed, a determination of the value of U.S. Bank's collateral is critical to the manner in which its claim will be treated in any such plan. This appeal presents a novel issue of law in this Circuit, namely whether the tax credits and attendant use restrictions attributable to the Bank's collateral should be considered in valuing such collateral. Determination of that issue will control U.S. Bank's rights in any plan which may be confirmed. Unlike a typical appeal involving valuation, where the issue involves a finding of fact as to which party's evidence is more credible, the issue here is whether the Court applied the correct legal standard in determining that the availability of tax credits should not be considered.

In addition, as will be seen, there is a substantial ground for difference of opinion with the Bankruptcy Court's legal determination; indeed, we hold that its ruling as to value was based on an erroneous legal conclusion. Since any plan confirmation will be dependent on valuation, resolution of the question presented would materially advance a final determination on confirmation. For these reasons, we grant U.S. Bank's alternative request for leave to appeal the interlocutory order.

---

**8.** *In re Machinery, Inc.* 275 B.R. 303, 306 (8th Cir. BAP 2002)

**9.** *Id.* (citation omitted).

**10.** 11 U.S.C. § 506(a)(1).

**11.** *Assocs. Commercial Corp. v. Rash,* 520 U.S. 953, 961, 117 S.Ct. 1879, 1884–85, 138

## 2. *Did the Court Err by Failing to Consider the Tax Credits and Restrictions in Valuing U.S. Bank's Collateral?*

[7, 8] Section 506(a)(1) of the Bankruptcy Code provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.[10]

Valuation under § 506(a)(1) first requires the court to "compare the creditor's claim to the value of such property, *i.e.,* the collateral." [11] This determination requires the court to ascertain the "creditor's interest in the estate's interest in" the property.[12] The second step requires the court to determine how to value the collateral.[13] When, as here, the debtor proposes to retain property and continue to use it in the debtor's trade or business, "the proper methodology to use in establishing 'the amount of the secured claim under § 506(a) . . . is the price a willing buyer in the debtor's trade, business, or situation

---

L.Ed.2d 148 (1997) (internal quotation marks omitted).

**12.** 11 U.S.C. § 506(a)(1). *See also In re Creekside Senior Apartments,* 477 B.R. at 54.

**13.** *Creekside,* 477 B.R. at 54 (citing *Rash,* 520 U.S. at 961–62, 117 S.Ct. 1879).

**0450**

would pay to obtain like property from a willing seller.' " [14]

**[9]**   As noted, U.S. Bank claims a direct security interest in the tax credits themselves, which is disputed by the Debtor. In addition, BankLiberty claims a security interest in the portion of the credits which, under the partnership agreement, have been allocated to State LIHTC Fund, for a separate loan as to which the Debtor is not obligated.   These claims presume that the tax credits are an asset which can be owned separate and apart from ownership of the apartment complex itself.   Instead, those tax credits—like a low property tax rate or good schools—are a benefit which accrues only to those who have an ownership interest in the apartment complex itself.[15]   For that reason, we hold that those credits and the accompanying restrictions have an effect on the amount that a willing buyer would pay to purchase the real estate: *i.e.*, its value.

In *Creekside Apartments*, the Bankruptcy Appellate Panel for the Sixth Circuit recently considered the precise issue presented here: whether, as a matter of law, valuation of LIHTC property must include the value of remaining tax benefits available to the owners of such property.   As here, the debtors in *Creekside Apartments* argued that the right to the tax credits was a separate asset held by the partnership that owned the debtor, and should therefore not be included in the property's value for plan confirmation purposes.   But, as the Court there pointed out, "[t]he [investor] limited partners may have become entitled to the allocation of the Tax Credits

through the respective partnership agreements, but they did not become the owners of the Tax Credits through those agreements." [16]   Instead, the Court held, those tax credits were owned by the debtors, and were covenants that ran with the real property.   Therefore, such credits would become available to subsequent owners of the property, whether due to sale or foreclosure, assuming the subsequent owners remained in compliance with applicable requirements.   In any event, upon transfer of ownership, the existing partnership and its members would no longer be entitled to claim the credits.

While the tax credits are only available to those who own the property, either directly or via an interest in an entity which itself owns the property, the Bankruptcy Court concluded that the availability of those credits should not be considered in determining what a willing buyer would pay for such property.   The problem with that conclusion is that a valuation of income-producing property typically relies at least in part on the income capitalization approach, as did U.S. Bank's appraisal here.   Of course, the income capitalization approach produces a result which is directly related to the rents charged on the property.   LIHTC property, by its very nature, is property as to which the owners agree to a cap on the rents to be charged tenants.   Therefore, to the extent that that cap is below the market rate that could otherwise be charged, the value produced by the income capitalization approach would be expected to be artificially reduced. The reason that the owners agree to those caps is that in exchange they, by

**14.**   *Id.* (*quoting Rash,* 520 U.S. at 960, 117 S.Ct. 1879).

**15.**   *See* 26 U.S.C. § 42(b)(1) and (d)(7)(A)(ii); *In re Creekside,* 477 B.R. at 59 (''Even when an entity allocates the rights to use the low-income housing tax credits to investors, it does not lose ownership of the tax credits.

The tax credits remain with the property and with the owner of the property.'').

**16.**   *In re Creekside,* 477 B.R. at 51 (brackets in original, quoting the bankruptcy court's order).

**54**                                **479 BANKRUPTCY REPORTER**

virtue of their status as owners, become entitled to the tax credits, which in turn reduce the taxes the owners owe on other income. In the same way that the caps and other restrictions on use of the property may affect its value negatively, the tax credits available to the owners as a result affect its value positively. For that reason, valuation without consideration of the tax credits does not accurately reflect what a willing buyer would pay to purchase the property from the Debtor. While the partners of the Debtor have decided in their partnership agreement how to allocate use of the tax credits among themselves, they cannot choose to transfer the right to those credits to someone who does not have a direct or indirect ownership interest in the apartment complex.

The Debtor relies heavily on footnote 6 in *In re Rash*,[17] which concerned valuation of a vehicle. The Supreme Court held that where a debtor chooses to retain a vehicle, the secured claim should be the cost that the debtor would incur to obtain a like asset for the same proposed use. In footnote 6, the Court stated in part that "[a] creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning."[18] Thus, if the debtor went to a car lot to buy that vehicle, it might as part of the price get a short-term warranty which it does not get if it simply retains its own vehicle, so the value of the warranty should not be included. But here, the owners of the Debtor will, by retaining the property, continue to get the benefits of the tax credits which are available to them only because of their status as owners.

Debtor also relies on the last sentence of the footnote, which states that "Nor should the creditor gain from modifications to the property—*e.g.*, the addition of accessories to a vehicle—to which a creditor's lien would not extend under state law."[19] Thus, if a bank has a lien on the vehicle and the debtor installs a stereo system to which the lien does not attach, the secured claim does not include the amount by which that system enhances the vehicle's value. Again, this argument tries to make an artificial distinction between ownership of the real property and ownership of the tax credits. Regardless whether U.S. Bank has or even could claim a lien on the tax credits themselves, the value of U.S. Bank's Deed of Trust on the apartment complex is affected both by the existence of the restrictions on rents and the value of the tax credits available to whomever owns such complex.

The Bankruptcy Court held first that the tax credits should not be considered in valuing the property on which U.S. Bank holds a lien. For the reasons stated, we hold that that conclusion was erroneous as a matter of law.

In the alternative, the Bankruptcy Court rejected in its entirety the testimony of U.S. Bank's expert as to the value of those tax credits. While we find no clear error in the Bankruptcy Court's decision to do so, that testimony was the only evidence offered to establish the effect of the tax credits on the value of the apartment complex. Consequently, the Bankruptcy Court was left with no basis for determining the amount a willing buyer, giving due consideration to the availability of the tax credits, would pay for the apartment complex.

---

**17.** 520 U.S. at 965 n. 6, 117 S.Ct. at 1886 n. 6.

**18.** *Id.*

**19.** *Id.*

In order to confirm a plan, the Debtor must offer evidence as to all elements needed for confirmation, including that it proposes to pay U.S. Bank the present value of its secured claim.[20]  To the extent the Debtor's motion for valuation was intended to establish a value for those purposes, the Debtor failed to offer sufficient evidence to allow the Bankruptcy Court to establish that value.  On remand, the Bankruptcy Court should afford the parties the opportunity to offer additional valuation evidence before ruling on confirmation of the Debtor's plan.

The decision of the Bankruptcy Court granting the Debtor's motion for valuation and valuing U.S. Bank's secured claim at $3.5 million is REVERSED AND REMANDED.



**In re Christopher and Rachel MOUTON, Debtors.**

**Christopher S. Mouton, Plaintiff**

**v.**

**Toyota Motor Credit Corp., First Security Bank, Defendants.**

**Bankruptcy No. 4:11–BK–16479.
Adversary No. 4:11–AP–1275.**

United States Bankruptcy Court,
E.D. Arkansas,
Western Division.

Sept. 7, 2012.

**Background:** Chapter 13 debtor-husband brought adversary proceeding for determination as to validity and extent of compet-

ing liens in his motor vehicle, as well as for avoidance of liens and/or a declaratory judgment regarding them.

**Holdings:** The Bankruptcy Court, James G. Mixon, J., held that:

(1) automatic stay which arose upon debtors' Chapter 13 filing, three weeks after debtor-husband granted bank a security interest in his allegedly unencumbered motor vehicle, did not prevent bank from perfecting its security interest by having its interest noted upon certificate of title, so that no basis existed for granting bank that failed to act an equitable lien;

(2) creditor's security interest in motor vehicle sold to Chapter 13 debtor was unperfected on date bankruptcy petition was filed;

(3) debtor did not have standing, even in aid of his exemption rights, to exercise trustee's strong-arm powers to avoid unperfected consensual lien that he had granted prepetition;

(4) fact that creditor that released its purchase-money lien on debtor-husband's motor vehicle, in mistaken belief that motor vehicle loan had been paid off, succeeded in persuading debtor to return certificate of title after petition was filed did not result in reinstatement of lien; and

(5) court would not use its equitable powers to reinstate motor vehicle lien that creditor had released prepetition.

So ordered.

**1. Bankruptcy ⟐2397(1.5), 2579**

Automatic stay which arose upon debtors' Chapter 13 filing, three weeks after debtor-husband granted bank a security interest in his allegedly unencumbered motor vehicle, did not prevent bank from

---

**20.**   11 U.S.C. § 1129.

Case 1:13-cv-00402-RTH Document 111-1 Filed 03/31/16 Page 458 of 651

IT&S of Iowa, Inc. v. C. I. R., 97 T.C. No. 34 (1991)
97 T.C. 496, Tax Ct. Rep. (CCH) 47,735, Tax Ct. Rep. Dec. (P-H) 97.34

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Field Service Advisory, IRS FSA, February 25, 2000

97 T.C. 496
United States Tax Court

IT&S OF IOWA, INC., AND IOWA TRUST AND SAVINGS BANK, Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10741-88.
|
Filed November 12, 1991.

P, a State bank, acquired the assets and liabilities of another State bank, W. P allocated a portion of the purchase price to a core deposit intangible asset, based on its calculation of the cost savings realized by using the core deposits, rather than an alternative funding source, to fund P's assets. After allocation of the purchase price among specific assets, including the core deposit intangible, P allocated the residual amount of the purchase price to goodwill. P claimed amortization deductions on account of the core deposit intangible asset based on the present value of the cost savings arising in each year of the core's life, calculated as of the time of the acquisition.

HELD, the core deposit intangible asset arising from the purchase of W is separate and distinct from goodwill and has a limited useful life, the duration of which can be ascertained with reasonable accuracy. P therefore may depreciate such intangible asset under sec. 167(a), I.R.C. 1954, and sec. 1.167(a)-3, Income Tax Regs. Citizens & Southern Corp. v. Commissioner, 91 T.C. 463 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990), followed.

HELD FURTHER, P erroneously calculated the value of the core deposit intangible asset by including interest sensitive deposits, by failing to reduce the core for reserve requirements and float on deposits, by using an inappropriate alternative funding source, and by using an incorrect discount rate.

HELD FURTHER, P may depreciate the value of its core deposit intangible on an accelerated basis.

**Attorneys and Law Firms**

**\*496** Philip C. Cook, Terence J. Greene, and Timothy J. Peaden, for the petitioners.

Anne Hintermeister and William H. Stoddard III, for the respondent.

**Opinion**

**\*497** WELLS, JUDGE:

Respondent determined deficiencies in petitioners' Federal income tax as follows:

| Year | Deficiency |
|------|-----------|
| 1972 | $6,703 |
| 1974 | 75,008 |
| 1979 | 1,241 |
| 1984 | 77,252 |

After stipulations by the parties, the issues remaining in the instant case relate to petitioners' entitlement to depreciate, under section 167,[1] the value of a core deposit intangible asset acquired in the purchase of another bank. The issues we address are: (1) Whether petitioners have established that the core deposit intangible of the acquired bank has an ascertainable value separate and distinct from goodwill; (2) whether petitioners have proved that the core deposit intangible has a limited useful life; (3) whether the values and amortization schedules utilized by petitioners in calculating their depreciation deductions with respect to the core deposit intangible are reasonable; and (4) whether petitioners may amortize the core deposit intangible on an accelerated basis.

FINDINGS OF FACT

Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The stipulated facts are incorporated in this Opinion irrespective of any restatement below. Petitioners are Iowa corporations, and their principal business is commercial banking. At the time the petition in the instant case was filed, petitioners' principal place of business was located in Oskaloosa, Iowa.

In April or May of 1981, petitioner [2] learned that the First State Bank of What Cheer (What Cheer bank) was for sale because its controlling stockholder and manager, Mrs. Dorothy Baylor, wished to retire. The What Cheer bank is located in the small town of that name some 20 miles from *498 petitioner's main office in Oskaloosa. At such time, What Cheer, Iowa [3] was a small rural community with a population of approximately 800 residents, who generally worked outside of the town, primarily in agricultural occupations. The What Cheer bank was the only bank in What Cheer. Fourteen other banks and banking offices were located within a 25-mile radius of What Cheer. At such time, petitioner's assets exceeded $40 million, while the assets of the What Cheer bank totaled about $7.5 million.

Petitioner considered the What Cheer bank an attractive acquisition prospect. It had above average earnings, a good reputation in the community, stable and loyal customers who were local residents, good management, and a good location, and was experiencing growth in deposits. Approximately 25 percent of the bank's assets consisted of loans, while the remainder was made up of high quality securities. The bank had no bad loans. Furthermore, under Iowa bank regulatory policy, the only way that petitioner could have established an office in What Cheer was to acquire the What Cheer bank.

The prospect of marketing banking services to the customers of the What Cheer bank was another attractive feature of the acquisition. Petitioner desired to expand the number of banking services available to customers of the What Cheer bank by offering additional trust services, expanded access to loans, individual retirement accounts, and Keogh plans. Petitioner desired to have its customers use as many of its services as possible.

Upon learning of the availability of the What Cheer bank, petitioner's president contacted a banking consultant to assist in arriving at a price for the bank and obtaining regulatory approval for the acquisition. After an initial offer by petitioner was rejected, Mrs. Baylor, in June 1981, informed petitioner of the price she considered acceptable.

To decide whether to pay the asking price, petitioner's president met with the banking consultant and a representative of an outside accounting firm. They considered the earning potential of the What Cheer bank by comparing its *499 cost of funds against projections of historical earnings, as well as its core deposits. Petitioner also considered that none of the target bank's deposits consisted of "hot money," defined as deposits highly sensitive to interest rate changes, which enhanced the value of the What Cheer bank to petitioner.

The group also discussed the concept of the core deposit intangible asset and whether the value of the What Cheer bank's core deposits could be booked as part of its regulatory capital in order to meet the capital adequacy requirements set by Iowa banking regulators, as well as whether the core deposit intangible could be amortized for tax purposes. A rough estimate of the value of the core deposit intangible was used in assessing whether to purchase the bank at the asking price, but no attempt was made to study the interest rate sensitivity of the core deposits or to perform a study to value the core deposit intangible at such time. The outside accountant advised petitioner that a study valuing the core deposit intangible would be needed to sustain a tax deduction based on amortization of the core deposit intangible. Based on all of such factors, petitioner and its advisers concluded that the transaction would be profitable at the price asked by Mrs. Baylor and decided to accept her offer.

Mrs. Baylor, however, did not want to wait until petitioner completed the lengthy process of obtaining regulatory approval for the acquisition before selling her bank. Consequently, petitioner's president, one of its directors, and the banking consultant were authorized by petitioner's board to purchase the stock of the What Cheer bank. Petitioner agreed to purchase the bank stock from them at the price they had paid for it, plus any interest costs incurred in carrying such stock, contingent upon receipt of approval for the acquisition from the Iowa Department of Banking and the Federal Deposit Insurance Corporation (FDIC). No adjustment of such amount on account of changes in the value of the What Cheer bank's stock while it was held by the three individuals could be made under the agreement. If the requisite approvals had not been obtained, the three

individuals would have continued to own the What Cheer bank.

**\*500**  Pursuant to such plan, on July 16, 1981, the three individuals agreed to purchase the stock of the What Cheer bank from Mrs. Baylor and the other stockholders for a sum equal to two times the book value of the capital, surplus, and undivided profits of such bank at the time such sale was settled. The book value of the What Cheer bank stock was $961,500 as of the date of the purchase. The three individuals financed the purchase of the What Cheer bank with a loan from a bank in Des Moines at the prime rate.

On May 12, 1982, petitioner and the three individuals entered into a sale agreement calling for the stock of the What Cheer bank to be sold to petitioner under the terms of their prior arrangement. The agreement provided for allocation of the purchase price among various assets, including goodwill; however, no amount of the price was allocated to a separate core deposit intangible asset. Subsequently, petitioner undertook the task of obtaining regulatory approval for the acquisition of the What Cheer bank, filing the required applications with the Iowa Department of Banking on April 12, 1982, and the FDIC on May 29, 1982.

Petitioner sought approval from the FDIC and the Iowa Department of Banking for recording the core deposit intangible asset to be obtained in the acquisition of the What Cheer bank. At such time, the FDIC had stated, in BL-5-82, issued March 5, 1982, that it would allow, on a case-by-case basis, the recording of an acquired core deposit intangible as an asset. The FDIC permitted such booking because it viewed the core deposit intangible as an asset and considered that its amortization was necessary to avoid distorting a bank's income. The core deposit intangible is also treated as an asset under generally accepted accounting principles (GAAP).

Petitioner's outside accounting firm conducted a preliminary study valuing the core deposit intangible at $1,080,611. The FDIC rejected such figure on the ground that it included certificates of deposit in the deposit core, contrary to FDIC guidelines. The FDIC only considered demand and savings accounts to be core deposits. The FDIC would not accept the inclusion of such deposits in the core even though petitioner could show that such deposits were  **\*501**  stable. Petitioner's outside accountants subsequently figured the value of the core deposit intangible without including certificates of deposit at $613,120.

The FDIC, however, would not approve petitioner's request to book the core deposit intangible unless Iowa bank regulators also allowed it to be booked. At a hearing on its application, petitioner attempted to persuade the State regulators to allow booking of the core deposit intangible and to have it considered as part of its regulatory capital. Including the core deposit intangible in regulatory capital would have enabled petitioner to meet the capital adequacy requirements of the State banking department without raising additional capital, but its exclusion would have left petitioner $600,000 short of the level of capital required to obtain approval of the proposed acquisition.

Ultimately, the Iowa Department of Banking was not willing to recognize the core deposit intangible as a separate asset, and, in approving the acquisition, ruled that petitioner had to meet the capital adequacy requirement without counting a core deposit intangible. Iowa bank regulators required petitioner to subtract the premium paid for the What Cheer bank from undivided profits and write it off immediately. When the Iowa banking department issued its ruling, petitioner dropped its effort to have the core deposit intangible approved by the FDIC. In order to raise the additional capital, petitioner subsequently issued $800,000 of preferred stock, paying dividends at the prime rate, to its banking consultant, who financed the purchase with a loan at the prime rate from a Des Moines bank. The stock was redeemed in 1984.

On April 18, 1983, the FDIC approved petitioner's application to acquire the What Cheer bank, but required that the entire amount of the premium paid be subtracted from undivided profits and written off immediately. On May 20, 1983, petitioner purchased all of the stock of the What Cheer bank, paying the three individuals $1,931,075 in cash and assuming liabilities of $7,870,300. All of the What Cheer bank's assets were acquired and all of its liabilities were assumed by petitioner. Petitioner filed a valid election under section 338(g) to treat the acquisition of the stock as a deemed purchase of the assets of the What Cheer bank.  **\*502**  Immediately after purchasing the shares, petitioner liquidated the What Cheer bank pursuant to section 332. After such liquidation, petitioner operated such bank as a branch, offering an expanded array of banking services to its customers.

Petitioner's outside accounting firm conducted a study to determine the value of the core deposit intangible on the date that petitioner acquired the What Cheer bank. The accountants concluded that the deposit core was an asset

separate and distinct from goodwill because it could be valued and it had a determinable life.

The accountants valued the core by means of the cost savings method, under which the value of the core is determined as the amount of savings achieved by funding assets with the core instead of an alternative funding source. The study valued only the cost savings afforded by the deposit core and did not include the value of the What Cheer bank's other customer relationships. The accountants used only information available as of the date of the acquisition to determine the value of the deposit core.

The first step in the methodology was to define the deposit core. Petitioner's accountants considered core deposits to be

funds which were stable and cost less than the alternative funding source identified by the accountants. Under such standard, all deposits of the What Cheer bank, excepting only government funds, internal accounts, and certificates of deposit over $100,000, i.e., "hot money," were considered core deposits. No deposits were excluded from the core on the basis of interest rate sensitivity. The deposit core was not reduced by reserves or for the float on uncollected balances, neither of which are available for use by a bank. The accountants calculated the amount of core deposits in the What Cheer bank on the acquisition date to be approximately $7,229,086. The accountants included the following deposits in the core:

### Table A

| Account type | Amount | Percentage of total |
|---|---|---|
| Demand | $749,341 | 10.4% |
| NOW [4] | 189,868 | 2.6 |
| Super NOW | 693,516 | 9.6 |
| Regular savings | 369,916 | 5.1 |
| Certificates of deposit | 4,159,595 | 57.5 |
| Money market | 1,066,849 | 14.8 |
| Total | [5] 7,229,086 | 100.0 |

[4] The acronym "NOW" stands for "negotiable order of withdrawal."

[5] Sum of figures for account types may not equal total due to rounding.

 *503  The deposits of the What Cheer bank, however, were not entirely insensitive to interest rate changes. The call reports which the What Cheer bank filed with the FDIC between 1978 and 1983 showed its deposits were migrating from low yielding demand and savings accounts to higher yielding certificates of deposit.

The accountants then determined the cost of the core deposits, calculating the amount of interest and maintenance costs incurred by the What Cheer bank. The core's maintenance

costs, which are the expenses incurred by a bank in providing services to its customers, were determined by having the What Cheer bank's management allocate such expenses between the deposit and other functions of the bank. The cost of Federal deposit insurance was included in figuring the core's maintenance cost. Based on the expense allocation, over half of all of the What Cheer bank's overhead expenses were allocated to the deposit base. Maintenance costs vary by account type, with demand accounts having the highest costs, even after service fees are considered.

Petitioner calculated the deposit core maintenance cost as follows: Petitioner took its 1982 operating expenses and allocated them between the core and other functions of the bank. Petitioner concluded that, after netting out service fee income, the total expense allocable to the deposit core was

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 462 of 651

IT&S of Iowa, Inc. v. C. I. R., 97 T.C. No. 34 (1991)
97 T.C. 496, Tax Ct. Rep. (CCH) 47,735, Tax Ct. Rep. Dec. (P-H) 97.34

$89,969. Petitioner calculated that such figure equaled 1.284 percent of the $7,009,611 average balance of deposits of the type included in the core outstanding on December 30, 1982. Of such deposit total, $1,353,599 was attributable to demand and NOW accounts, and $838,683 was attributable to regular savings accounts. Maintenance costs were assumed to remain constant over the life of the core, even as the core shrank.

The accountants calculated the interest cost of the core using the rates actually paid by the What Cheer bank on its **\*504** accounts at the date of the acquisition. Interest rates paid on each type of deposit at the time of the acquisition were as follows:

### Table B

| Account type | Average rate |
|---|---|
| Demand | 0.00% |
| NOW | 5.25 |
| Super NOW | 8.50 |
| Regular savings | 5.25 |
| Certificates of deposit | 10.39 |
| Money market deposit accounts | 8.50 |

The weighted average interest rate of the deposit core, which petitioner's accountants calculated based on the relative percentage of each type of deposit within the core, was 8.454 percent.

In order to take into account the effect of banking deregulation on interest costs the accountants projected that interest rates paid on the core would rise in equal stages between 1983 and 1986,[6] approaching the rate they projected would be paid on U.S. Treasury bills as of such time, on the basis of the yield curve for U.S. Treasury debt issues as of the date of the acquisition, and thereafter would remain at one percentage point below such rate over the life of the deposit base. Petitioner's accounting firm projected that the interest cost of the deposit core would be 9.523 percent during 1986 and beyond.

Bank deposits may be withdrawn at the will of the depositor. Inasmuch as core deposits do not remain with a bank indefinitely, but eventually leave for a variety of reasons,

the accountants measured the life of the What Cheer bank's deposit core. They calculated such life by reference to the rate at which accounts within the core were closed; such rate was then applied to the amount of deposits projected to remain with the bank in each succeeding year, thus determining the runoff of the core. The accountants did not stratify the accounts by age or size because the number of closed accounts was too small to produce meaningful results.

 **\*505** Different periods were used to determine the runoff rates for the various account types. For the demand/NOW account and money market categories, attrition rates were established by sampling accounts closed during a 1-year period ending April 30, 1983. Account closings between 1979 and 1982 were studied in order to determine attrition rates for regular savings accounts and time certificates.[7] The rate used in the study for each category of deposits was an average of the attrition rates calculated with respect to such category for each year studied. The accountants developed the following attrition rates for each type of deposit:

### Table C

| Deposit type | Attrition rate | Amount of deposits |
|---|---|---|
| Demand/NOW | 3.74% | [8] $1,632,726 |

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 463 of 651

IT&S of Iowa, Inc. v. C. I. R., 97 T.C. No. 34 (1991)
97 T.C. 496, Tax Ct. Rep. (CCH) 47,735, Tax Ct. Rep. Dec. (P-H) 97.34

| Regular savings | 7.61 | 369,916 |
|---|---|---|
| Time certificates | 6.20 | [9] 2,654,021 |
| Money market | 13.40 | 2,572,423 |

The accountants predicted that, based on the runoff rates calculated in the study, the deposit core had a useful life of 26.75 years. The end of the deposit core's useful life was fixed at the point where 98 percent of its value had been realized.

The accountants then sought to measure the savings afforded by the core deposits by comparing the core's cost against that of an alternative funding source. The alternative selected was an issue of petitioner's unsecured debt equal to the amount of core deposits on the date of the acquisition and having a maturity and runoff equal to the life of the deposit base. In selecting such alternative, the accountants did not consider the alternative sources of funds actually used by petitioner. At the time of the acquisition, petitioner used deposits to fund its assets. The  **\*506**  accountants did not compare the What Cheer bank's cost of funds to that of its peer group, not believing it relevant to the valuation of the deposit core.

An investment bank in Chicago informed petitioner that such a debt issue would bear an interest rate of 13 percent, but that the availability of a market for such an issue could not be guaranteed. The alternative funding source did not have Federal deposit insurance, while the core deposits did.

The accountants figured the cost savings of the deposit core as the difference between the interest and maintenance costs of the deposit core and the interest cost of the hypothetical debt issue in each year of the deposit core's useful life. The accountants reduced the amount of such stream by 48.7 percent, representing the combined effect of Federal, State, and local income taxes, in order to determine the net amount of savings produced by the core.

The accountants then calculated the present value of such stream of savings as of the date of the acquisition by applying a discount factor to each year's projected savings. The discount factor was determined as a weighted average of petitioner's cost of debt and equity capital. To figure the cost of debt capital, the accountants multiplied 6.669 percent, which was the after-tax interest cost of the 13-percent rate quoted on the hypothetical debt issue, by 92.5 percent, the portion of petitioner's assets funded by debt, i.e., deposits. To figure the cost of equity capital, the accountants multiplied

7.5 percent, the portion of petitioner's assets funded by equity, by a 20-percent "desired after-tax return." The discount rate resulting from summing the two figures was 7.667 percent, which was applied to the stream of cost savings to calculate its present value.

In discounting the stream of cost savings by such rate to calculate the present value in 1983 of each future year's cost savings attributable to the deposit core, the accountants also figured in the tax savings to be realized from amortizing the deposit core in each year of its life, thus arriving at the final value for the core. Without considering tax savings, the value calculated for the core was $581,490. When the tax savings were included, the value of the What Cheer bank's deposit core increased to $906,470. The accountants added the cost of the study, $32,079, to such  **\*507**  value in order to arrive at the total amount subject to amortization, which equaled $938,549.

The present value of each future year's cost savings, determined as of 1983, together with a portion of the cost of the study, would be deducted from such year's income to amortize the core. Due to the effect of discounting, the deposit core's value wastes on an accelerated basis, so the amortization schedule is accelerated.

Petitioner used the residual method to allocate the purchase price of the What Cheer bank among the assets purchased in the acquisition. After making allocations among the identified assets of its target, including the core deposit intangible, petitioner allocated the residue of the price, $229,512, to goodwill.

OPINION

The questions presented in the instant case arise out of our opinion in Citizens & Southern Corp. Inc. v. Commissioner, 91 T.C. 463 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990). The cases relied upon by the Court in deciding the core deposit amortization issue are set forth in detail in Citizens & Southern and do not bear repeating

in the instant case. [10] We therefore will turn directly to the arguments presented by the parties in the instant case.

To qualify for a depreciation deduction, petitioners must show that the deposit core acquired from the What Cheer bank (1) had an ascertainable cost basis separate and distinct from the goodwill [11] and going-concern value [12] of such bank, and (2) had a limited useful life, the duration of which could be ascertained with reasonable accuracy. Donrey Inc. v. United States, 809 F.2d 534, 537 (8th Cir. 1987); Houston Chronicle Publishing Co. v. United States, *508 481 F.2d 1240, 1250 (5th Cir. 1973); Citizens and Southern Corp. v. Commissioner, 91 T.C. at 479. Whether such requirements have been met is essentially a question of fact. Donrey Inc. v. United States, 809 F.2d at 536; Citizens and Southern Corp. v. Commissioner, 91 T.C. at 479.

As the instant case presents issues of a technical nature, both parties have relied heavily on expert opinions and testimony in presenting their respective positions concerning the existence and value of the core deposit intangible. We evaluate each expert's opinion in the light of such expert's demonstrated qualifications and all other evidence. Parker v. Commissioner, 86 T.C. 547, 561 (1986); Johnson v. Commissioner, 85 T.C. 469, 477 (1985). We are not bound, however, by the opinion of any expert witness where such opinion is contrary to our judgment. Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court. While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Mfg. Co v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion. Parker v. Commissioner, 86 T.C. at 562. Consequently, we will consider expert opinion testimony to the extent that it assists us in resolving the issues presented by the instant case.

1. WHETHER PETITIONER HAS ESTABLISHED THAT THE CORE DEPOSITS HAVE A N ASCERTAINABLE VALUE SEPARATE AND DISTINCT FROM GOODWILL

Our inquiry is primarily factual. We must decide whether the record provides sufficient evidence to permit amortization of the core deposit intangible under our opinion in Citizens & Southern. Respondent makes several arguments that the core deposit intangible is not separate and distinct from the goodwill of the What Cheer bank. On that issue, many of the same arguments respondent advances in the instant case were made in the Citizens & Southern case and were rejected.

Nevertheless, before we turn to the other issues, we will briefly touch upon respondent's arguments in the instant case regarding the separateness of the core deposit intangible from goodwill.

*509 Respondent argues that the value of the core deposits represents nothing more than the value flowing from the expectation that the What Cheer bank's customers will continue to do business with petitioner by supplying it with low cost funds. Respondent contends that the "inertia" of a bank's depositors, which causes them to leave funds on deposit for an ascertainable length of time and which we found in Citizens & Southern Corp. v. Commissioner, 91 T.C. at 499- 500, to contribute to the value of the core deposit intangible is nothing more than the continuation of established customer relationships, which are the essence of goodwill. Because deposit relationships are terminable at will, respondent views the value attributable to such inertia as nothing more than the expected value of future patronage or renewal of previous business, or simply, goodwill. Respondent argues that petitioner is attempting to depreciate a part of the What Cheer bank's customer structure, which is an inseparable component of goodwill.

Respondent's arguments in the instant case, however, do not persuade us to reconsider our holding in Citizens & Southern. As we said in Citizens & Southern Corp. v. Commissioner,

> The fact that a deposit account has no fixed termination date and is terminable at will does not as a matter of law prevent petitioner from factually showing that deposit base has an ascertainable cost basis separate and distinct from goodwill. * * *

91 T.C. at 486. Furthermore, mere inertia, which lasts for only a limited time, should not be equated with the continued patronage of a business over an indefinite period. As in Citizens & Southern, petitioner is not attempting to depreciate the value of the What Cheer bank's customer structure or the expected value of the continued patronage of the What Cheer bank's established clientele, 91 T.C. at 499; rather, it seeks to amortize only one separate component of the value petitioner acquired when it purchased the What Cheer bank, namely, the core deposits. While the What Cheer bank's customer structure may have had many more elements of value, which petitioner hoped to exploit, petitioner did not attempt to take those elements into account in calculating

the amortization value of the deposit core. For instance, the prospect of selling as many banking services as possible to **\*510** the customers of the acquired bank was a significant consideration in petitioner's decision to acquire the What Cheer bank, but the potential value of such opportunity did not figure in the calculations with respect to the deposit core.

Respondent also suggests that petitioner's failure to separately value the core deposits in the initial phase of the acquisition, when it decided whether to pay the price Mrs. Baylor asked for the What Cheer bank in 1981, casts doubt on petitioner's effort to value and amortize the core after the acquisition was finalized in 1983. The record, however, shows that petitioner and its advisers considered the value of the What Cheer bank's core deposits in deciding to accept Mrs. Baylor's offer, and that acquiring the What Cheer bank's core deposits was one of the principal reasons that petitioner wished to purchase the What Cheer bank. Moreover, in Citizens & Southern, we concluded that, where the record showed that core deposits were considered in making the decision to go forward with an acquisition, the separate valuation of the core deposits prior to the transaction was not necessary in order for the taxpayer to be eligible for a subsequent amortization deduction. 91 T.C. at 494-495.

Respondent also points to petitioner's failure to obtain approval for its core deposit valuation from the Iowa Department of Banking and the FDIC as further evidence of the core's inseparability from goodwill. The bank regulators, however, rejected petitioner's attempt to include the core in its regulatory capital. As we stated in Citizens & Southern, adequacy of bank capital is defined in terms of assets which can be easily sold and which provide a suitable liquidity cushion. 91 T.C. at 497-498. Mr. Robert Storch, an official of the FDIC, testified that capital adequacy is not an income accounting concept, but a bank supervisory one. Accordingly, as the bank capital rules serve a special, limited purpose, whether a core deposit intangible is excluded from regulatory capital is irrelevant in determining whether the core deposit intangible is an amortizable asset for purposes of income accounting. Citizens & Southern Corp. v. Commissioner, 91 T.C. at 497-498.

**\*511** We also note that Mr. Storch stated that the FDIC considered the core deposit intangible to be among the assets of a bank, and that its amortization was necessary in order to avoid distorting a bank's income. He testified that, in issuing BL-5-82, under which petitioner sought approval of its core deposit valuation, the FDIC sought to inform banks that they would be allowed to book a core deposit intangible as an asset with the consent of the FDIC. He stated that it was the position of the FDIC that a core deposit intangible could be booked as an asset if such asset was recordable under generally accepted accounting principles.

Respondent also suggests that, since petitioner did not report the core deposit intangible on its financial statements or regulatory reports, the core deposit intangible should be treated as goodwill. Petitioner, however, is a small bank which maintains its books under regulatory accounting principles, and does not maintain a separate set of books using generally accepted accounting principles, under which petitioner would have been able to recognize the core deposit asset. Accordingly, we hold that such circumstance is not an impediment to petitioner's amortization of the core deposits.

Respondent makes a number of other arguments that we considered and rejected in Citizens & Southern and, as we stated above, we see no reason for restating our conclusion with respect to such arguments in the instant case. We therefore hold that in the instant case the core deposit intangible is an asset separate and distinct from goodwill which petitioner may amortize if it shows that it has a limited life and ascertainable value. We will now turn to those issues.

## 2. WHETHER PETITIONERS HAVE PROVED THAT THE CORE DEPOSIT INTANGIBLE HAS A LIMITED USEFUL LIFE

Petitioner calculated the life of the deposit core on the basis of the rate at which accounts in the core closed. Respondent criticizes petitioner's method of calculating the useful life of the deposit core, pointing out that the value of the core lay in the amount of funds held in the core, not in the number of accounts. Respondent contends that the rate **\*512** at which accounts close is not necessarily the same as the rate at which funds leave the deposit core, and that petitioner must show that the rate at which accounts close accurately measures the rate at which deposit dollars actually leave the core in order to establish the validity of such an indirect method of determining the life of the deposit base. Respondent points to the fact that the call reports of the What Cheer bank in the years prior to the acquisition show a marked movement of funds from low or no interest accounts to accounts paying higher rates, while the account closing data assembled by petitioner does not indicate that a fundamental shift in the deposit structure of the bank was occurring. Respondent's criticism echoes that which he made of the taxpayer's use of account closings to measure deposit runoff in Citizens &

97 T.C. 496, Tax Ct. Rep. (CCH) 47,735, Tax Ct. Rep. Dec. (P-H) 97.34

Southern. In Citizens & Southern, however, the taxpayer was able to show the validity of its method by followup studies which showed that the rate of account closings accurately predicted the runoff of deposits. 91 T.C. at 500-503.

In the instant case petitioner made no independent effort to confirm the validity of using account closures to measure the shrinkage of the deposit base. At trial, however, Mr. Robert McMahon, petitioners' expert and the accountant in charge of preparing petitioner's study, testified that the historical rate of account closures furnishes the most accurate and reasonable estimate of the life of the deposit core. We agree with Mr. McMahon's conclusion in the instant case and hold that account closings accurately reflected the expected life of the core.

Respondent also contends that petitioner's methodology is deficient because it used only a sample of closed accounts to determine attrition rates when it could have considered every account closure during the period examined. Respondent points out that, in Citizens & Southern, the taxpayer developed its attrition rates by taking into account every account closed during its test period, 91 T.C. at 470, 500, and that, because the What Cheer bank was so small, petitioner could easily have counted all of the closed accounts, rather than relying upon a sample. Respondent further argues that petitioner did not use statistically valid sampling techniques in arriving at its figures. Petitioners *513 contend that the sample results were accurate for three reasons: First, in developing its initial valuation, petitioner's outside accountants surveyed all account closures during the test period used in such study to develop attrition rates, and the results of the final study, based on a sample, were in line with the rates in the earlier study. Secondly, the rates determined in the final study were found by the What Cheer bank's management to be consistent with its experience. Finally, the sampling techniques of the final study were the same as those the accountants who prepared the study used for auditing purposes. We agree with petitioner that sufficient grounds exist in the instant case to uphold the accuracy of petitioner's methodology regarding account closings. [13]

Respondent also contends that petitioner's lifting analysis is not valid because closed accounts were not stratified by age and size to take account of differences in attrition rates on the basis of such variables. Respondent notes that the valuation methodology approved by this Court in Citizens & Southern involved stratification of accounts on such basis. 91 T.C. at 471. Petitioners point out that the number of closed accounts in the test period was not large enough to permit calculation of meaningful results using stratification and therefore the lack of account stratification did not prevent petitioners' expert from making accurate predictions. We agree with petitioners that the failure to stratify the closed accounts did not prevent petitioners' expert from calculating a reasonably valid attrition rate.

Accordingly, we conclude that petitioners have shown that the core deposit intangible has a limited useful life, the length of which has been calculated with reasonable accuracy, and turn to the valuation issue.

*514 3. WHETHER THE VALUES AND AMORTIZATION SCHEDULES UTILIZED IN CALCULATING THE DEPRECATION DEDUCTIONS WERE REASONABLE

Petitioner used the cost savings method to value the core deposit intangible, under which the value of the core is determined by reference to the reduction in cost realizable by using the core as a funding source rather than the next most costly such source. Citizens & Southern Corp. v. Commissioner, 91 T.C. at 498, 506. We previously have considered the use of the cost savings method in dealing with the valuation of the core deposit intangible, although cost savings was used as a secondary valuation tool. In our earlier cases, taxpayers have primarily relied upon the income method to value the core, which supported the deposit core's value according to the additional increment of income realizable from using the core to fund loans and investments. See Colorado National Bankshares, Inc. v. Commissioner, T.C. Memo. 1990-495, 60 T.C.M. 771, 792; P-H Memo T.C. par. 90,495, at 2399-2400. The cost savings method is somewhat simpler to apply than the income method, as it does not require a determination of the rate of return that will be earned on the bank's assets in order to arrive at a value for the core deposit intangible.

Valuation of the core deposit intangible under the cost savings method is accomplished in the following manner: Deposits within the core are identified, based on their stability and insensitivity to fluctuations in market rates of interest. The cost of such deposits is then ascertained, taking into account both explicit interest paid plus the cost of providing services to such accounts, net of service fee income. The life of the deposit base is then calculated, based upon the rate of attrition of deposits within the base. The cost advantage of the deposit base is then found by comparing its cost to the cost of the alternative funding source, which is selected on

the basis of its comparability to the deposit base on the basis of characteristics such as risk and expected life. The net cost savings equals the avoided cost achieved by using the deposit base, instead of the alternative, as a funding source over the life of the deposit base, decreased by the income taxes payable upon the savings. The after-tax present value of such cost savings is **515** found by applying a discount factor, based upon the taxpayer's cost of capital, to the net cost savings projected in each year of the deposit core's life. The total stream of such cost savings, together with the tax savings obtained by amortizing the core, equals the value of the deposit core.

Respondent contends that the manner in which petitioner has executed each part of the methodology described above is defective. We will consider respondent's contentions regarding petitioner's implementation of each step of the method. While we hold that petitioner may calculate the value of the core deposit intangible under its cost savings methodology, we also hold that certain of the steps must be modified in order to arrive at a reasonable value for the core deposit intangible. See Anselmo v. Commissioner, 80 T.C. 872, 884-885 (1983), affd. 757 F.2d 1208 (11th Cir. 1985).

a. DEFINITION OF THE DEPOSIT CORE

In defining the deposit core of the What Cheer bank petitioner included all deposits except for certificates of deposit over $100,000, internal accounts, and governmental funds. Such definition resulted in the inclusion of demand accounts, savings accounts, NOW accounts, super NOW accounts, money market deposit accounts, and certificates of deposit under $100,000, which comprised nearly all of the deposits in the What Cheer bank. Respondent contends that such a definition of the deposit core is overinclusive, and that it improperly takes into account deposits which are sensitive to interest rate changes and therefore do not offer an identifiable funding cost advantage over the true market alternative. Petitioners contend that such a definition is proper because the core deposit as so defined was stable and did not constitute "hot money," i.e., those deposits that are extremely sensitive to interest rate fluctuations and enter and leave a bank rapidly in response to rate shifts. Petitioners' position is that core deposits can include deposits that do not have regulated interest rate ceilings. [14]  **516** We agree with respondent that petitioners' definition of core deposits is overly broad.

In Citizens & Southern, we defined core deposits as "a relatively low-cost source of funds, reasonably stable over

time, and relatively insensitive to interest rate changes." Citizens & Southern Corp. v. Commissioner, 91 T.C. at 465. See also AmSouth Bancorporation and Subsidiaries v. United States, 681 F. Supp. 698, 706 (N.D. Ala. 1988). The taxpayer in Citizens & Southern defined its core deposits as amounts in demand, NOW, and regular savings accounts, and excluded deposits not subject to regulated interest rate ceilings. 91 T.C. at 465, 472. [15]  In Citizens and Southern, we did not consider the breadth of the core deposit definition because it was not contested by respondent.

The importance of interest rate insensitivity as a distinguishing feature of core deposits becomes apparent as we consider the manner in which the banking business operates. One of respondent's experts, Dr. Victor L. Andrews, the Mills Lane Professor of Banking and Finance at Georgia State University, testified that banks generally view deposits as their usual source of funds. The record in the instant case bears out Dr. Andrews' characterization of the banking industry's practice, as neither the What Cheer bank nor petitioner regarded anything other than deposits as their normal source of funds. Banks therefore will differentiate between types of deposits based on their cost. If deposits bear a market rate of interest and are sensitive to interest rate fluctuations, they offer no potential for extra-normal profitability and there is no potential for cost savings associated with them. If, however, deposits are insensitive to interest rate changes, they do offer the possibility of providing above-normal profits, and, accordingly, will command a premium in a sale transaction. Petitioners would have us expand the definition of core deposits beyond that utilized by the taxpayer in Citizens & Southern. We, however, decline petitioners' invitation in the instant case.

 **517** Petitioners contend that stability should be the principal criterion in the definition of core deposits, and have ignored altogether the requirement of interest rate insensitivity. Petitioners contend that as long as deposits are not "hot money," which is hypersensitive to interest rate shifts, they are includable in the core. Petitioners also contend that the What Cheer bank's deposits cost less than the alternative funding source proposed by petitioner, and therefore should be considered core deposits on such account. For reasons which will be discussed infra, however, we disagree.

Adjustable rate deposit accounts, such as certificates of deposit, money market deposit accounts, and super NOW accounts, were expressly created in order to allow banks

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 468 of 651

IT&S of Iowa, Inc. v. C. I. R., 97 T.C. No. 34 (1991)
97 T.C. 496, Tax Ct. Rep. (CCH) 47,735, Tax Ct. Rep. Dec. (P-H) 97.34

to compete successfully for deposits against other financial intermediaries not bound by the interest rate ceilings applicable to banks. Money market and super NOW accounts were authorized pursuant to section 327 of the Garn-St. Germain Depository Institutions Act of 1982, Pub. L. 97-320, 96 Stat. 1501, which stated that such accounts were to be "directly equivalent to and competitive with money market mutual funds." Competitive pressures similarly led to the creation of certificates of deposit, which were designed to allow banks to retain funds which otherwise would be attracted to alternate instruments. E. Altman, Handbook of Financial Markets and Institutions 13-19 (6th ed. 1987). Dr. Andrews stated that such accounts are susceptible of rate competition among banks, as indicated by their frequent repricing. Inasmuch as such accounts were designed to be the interest rate sensitive and rate competitive products of banking, it is illogical to include them automatically in core deposits, a term defined to mean deposits which are not sensitive to interest rate changes.

Our holding in the instant case does not exclude the possibility that a taxpayer may show deposits in such accounts are in fact insensitive to interest rate changes. Nonetheless, the record in the instant case shows that the funds held in the What Cheer bank's Super NOW, money market deposit, and certificate of deposit accounts actually were sensitive to interest rate changes. Mrs. Baylor testified that her customers were aware of and concerned with interest rates, and that she paid competitive rates on **\*518** deposits in order to retain their business. Inasmuch as there were 14 other banks within 25 miles of What Cheer, consistent with Mrs. Baylor's testimony, we conclude that competitive pressures would have influenced the rates paid on the What Cheer bank's deposits.

Dr. Andrews also constructed a chart from What Cheer's call reports which showed that deposits migrated over time from low or no interest accounts to higher yielding accounts. [16] For instance, individual, partnership, and corporate (IPC) demand deposits made up 26.74 percent of all deposits at the bank in 1978, but the percentage of deposits contained in them dropped as interest bearing transaction accounts became available around 1980. By 1982, only 14.50 percent of the banks' deposits were in IPC demand accounts. At the time of the acquisition in May 1983, nongovernmental demand deposits comprised only $749,341 of the $7,229,086 on deposit in nongovernmental accounts, slightly over 10 percent of the total. [17] Furthermore, although super NOW accounts first were made available in January 1983, 47 Fed.

Reg. 56321 (Dec. 16, 1982), $693,516 was deposited in such accounts by the date of the acquisition of the What Cheer bank.

Regular savings deposits similarly exhibited a marked decline as compared to other types of deposits offering more attractive interest rates. In 1978, IPC savings deposits comprised 22.48 percent of all deposits, but by 1981, their share had fallen to 15.16 percent. [18] Balances in savings deposits, as a percentage of nongovernmental deposits, continued to decline, totaling only $369,916 of the $7,229,086 on deposit in May 1983, approximately 5 percent of such deposits.

**\*519** Interest rate sensitive products, on the other hand, increased their share of the bank's deposits during such time. In 1978, IPC time deposits, which included certificates of deposit, made up 48.86 percent of the bank's deposits, but by 1982, they had grown to 69.63 percent of deposits. On the date of the acquisition of the What Cheer bank, nongovernmental time deposits totaled $5,226,444, approximately 72 percent of the total of such deposits with the bank. We find particularly noteworthy that $1,066,849 of the deposits included by petitioner in the deposit core were held in money market accounts on that date, even though such accounts had only been authorized in December 1982, 5 months prior to the acquisition. 47 Fed. Reg. 53716 (Nov. 29, 1982). The migration of deposits from low to high yielding accounts indicates that such deposits were sensitive to interest rates, and, consequently, they do not fit the definition of core deposits.

Petitioner's valuation study attempted to show that What Cheer's deposits were not rate sensitive by comparing the rate of account runoff against market rates of interest. The comparison, however, did not show any marked correlation between the two, and the study merely concluded that the deposit base was insensitive to rate changes. [19] Dr. Andrews criticized the test and stated that the statistical method used was insufficient to prove insensitivity. Petitioner's method did not appear to take into account the possibility that the What Cheer bank kept its rate of attrition stable by paying market rates of interest to its depositors or that depositors did not close their old accounts when shifting funds to higher yielding alternatives. Given the clear evidence furnished by the call reports that total deposits were increasing during the years preceding the acquisition, but that funds were being drawn from low to high interest accounts, we hold that petitioners

have not proved that the deposits without interest rate ceilings included in the deposit core were interest rate insensitive.

**\*520** To the contrary, it appears that the What Cheer bank was paying market interest rates on such deposits. Consequently, such deposits did not offer any cost advantage over other deposits which would justify payment of a premium by petitioners. At the time of the acquisition in May 1983, the What Cheer bank's money market and super NOW accounts paid interest at a rate of 8.5 percent, and its certificates of deposit under $100,000 paid an average interest rate of 10.39 percent. Readily available data published by the Federal Reserve show that, at such time, commercial banks were paying an average rate of 7.13 percent on super NOW accounts and 8.06 percent on money market accounts. Federal Reserve Statistical Release H6, Special Supplementary Table (July 15, 1983). Federal Reserve reports also show that rates paid by such banks on certificates of deposit ranged from 8.76 percent to 9.58 percent, depending upon the time to maturity of the certificate. Federal Reserve Statistical Release H6, Special Supplementary Table (July 15, 1983). The fact that the rates paid on such deposits by the What Cheer bank were higher than the industry figures published by the Federal Reserve suggests that the funds held in such accounts were not insensitive to interest rates and were not a source of funds obtainable at below market rates. [20] Furthermore, both of respondent's experts, based on their own analyses, concluded that the deposits of the What Cheer bank did not bear interest rates below those of alternate deposits. Consequently, we hold that even though such deposits were stable and did not constitute "hot money," they were not properly includable in the deposit core in the instant case.

Furthermore, the amount of the deposit base must be reduced for funds required to be held in reserve and the float on uncollected balances, which was not done in petitioner's original study. Such funds are not available to replace higher cost sources of funds, and so furnish no cost savings to the bank. See Citizens & Southern Corp. v. Commissioner, 91 T.C. at 471. At trial, petitioners' expert, **\*521** Mr. McMahon, agreed that the deposit core should have been reduced to reflect such factors. [21]

### b. COST OF DEPOSIT CORE

Once the deposit core has been defined, its cost to the bank, both in terms of explicit interest and the cost of services provided to depositors, called "implicit" interest, must be ascertained. At the time of the acquisition, the FDIC's

regulations forbade payment of explicit interest on demand deposits, 12 C.F.R. sec. 329.2(a) (1983), so the What Cheer bank paid no explicit interest on such deposits. Rates on savings deposits and NOW accounts were subject to a ceiling of 5.25 percent. 12 C.F.R. sec. 1204.108(a) (1983) (NOW accounts); 12 C.F.R. sec. 329.6(c) (1983) (savings accounts). Consequently, the explicit interest costs incurred by the What Cheer bank on its deposit base must be determined with reference to such limitations.

Petitioner calculated the cost of implicit interest furnished depositors by allocating a portion of each category of expense incurred by the What Cheer bank to the deposit function. The maintenance costs of the deposit base were calculated based on allocations furnished by the What Cheer bank's management. The cost of deposit insurance was included in determining the maintenance cost of the deposit core. The allocation used by petitioner resulted in over half of the bank's operating expenses being allocated to deposits.

Respondent's expert, Dr. Edward J. Kane, the Everett D. Reese Professor of Banking and Monetary Economics at Ohio State University, objected to petitioner's allocation of expenses, concluding that, due to the jointness of production of a bank's services, accurate calculation of the amount of expense incurred in producing the services provided to any particular class of customers was very difficult, if not impossible. Dr. Kane noted that the banking industry had not been able to develop a satisfactory method of cost allocation, and that, therefore, manipulation of allocations in **\*522** order to artificially inflate or depress costs allocable to a particular bank function was not difficult. Dr. Kane concluded that the allocations made in the study appeared arbitrary, and that a survey based on the actual expenses incurred in servicing the deposit base would have provided better information as to the maintenance cost of the deposit core. We hold, however, that the allocation was made using the best information available at the time the study was done, and that the persons most likely to have had an accurate idea of the amount of expenses properly allocable to deposits were consulted in developing the allocation. A taxpayer is not required to use the most theoretically correct method in order to establish the amount of depreciation to which he is entitled; rather, his method must be reasonable. Citizens & Southern Corp. v. Commissioner, 91 T.C. at 514. Based on the record in the instant case, we hold that petitioner's cost allocation method is reasonable.

IT&S of Iowa, Inc. v. C. I. R., 97 T.C. No. 34 (1991)

97 T.C. 496, Tax Ct. Rep. (CCH) 47,735, Tax Ct. Rep. Dec. (P-H) 97.34

Petitioner's study, however, lumped together all costs attributable to the deposit function and did not break out the costs allocable to each type of account within the core. Because we have held supra that the types of deposits properly includable in the core must be limited, we will require petitioner to adjust its maintenance cost calculation to reflect the inclusion of only such maintenance costs as are attributable to the deposits remaining in the core and to eliminate costs allocable to noncore deposits.

The record shows, however, that the 1.284-percent maintenance rate originally calculated for the deposit core would not be an accurate representation of the level of expense incurred in servicing the redefined deposit base. Professor Kane, respondent's own expert, noted that maintenance costs on transaction accounts, such as checking accounts, generally were higher than on time deposits, such as certificates of deposit, and that, with respect to demand deposits, where payment of explicit interest is prohibited by law, competition among banks is based on the services provided to such accounts. Furthermore, petitioner's expert, Mr. McMahon, also testified that maintenance costs on transaction accounts, such as demand and NOW accounts, generally were higher than the costs incurred with respect to time deposits.

 *523 Accordingly, we hold that maintenance costs for the redefined deposit core should be a higher percentage of deposits than originally calculated. Petitioner originally allocated $89,969 of its 1982 operating expenses to the deposit core, and figured the rate of such costs as a percentage of the average balance of core deposits outstanding on December 30, 1982. The average balance on such date of demand, NOW, and regular savings deposits, which we have held properly includable in the core on such date, was $2,192,282. [22] Using our best judgment, we allow half of the expenses originally allocated to the core, or $44,985 ($89,969/2), to be allocated to the redefined core and find that maintenance costs as a percentage of such core equals 2.05 percent. [23] See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).

c. EFFECT OF BANKING DEREGULATION

In order to take account of the effect of banking deregulation on the deposit core, petitioner assumed that the cost of the What Cheer bank's deposits would increase according to the Treasury debt yield curve as it stood on May 20, 1983. Petitioner assumed that most of the cost advantage of the

deposit core would be eliminated between 1983 and 1986, and that the deposit core thereafter would pay a rate one percentage point below the rate it projected would be paid on short-term Treasury debt. Such assumption was the only effect of deregulation incorporated into petitioner's valuation study. Petitioner did not project an increase in the cost of maintaining the deposit base and assumed that maintenance costs would remain a constant percentage of core deposits over the life of the base. Furthermore, petitioner did not project any change in attrition rates over the life of the deposit base.

Respondent contends that petitioner's method of projecting the effect of deregulation is not appropriate because petitioner does not demonstrate a relationship between changes in the yields on Treasury debt and the cost of bank deposits. Drs. Kane and Andrews noted that the relationship *524 between rates paid on certificates of deposit and U.S. Treasury debt of similar maturity were unstable. Therefore, they explained it was difficult to make predictions about the changes in bank interest rates based on the behavior of interest rates on Treasury debt. Dr. Andrews also stated that it was unreasonable to assume, as petitioner did, that interest rates would remain at the historically high levels of the early 1960's for the next 26 years.

Based on the redefined deposit core, which excludes deposits not having interest rate ceilings, however, at least a portion of petitioner's speculation concerning the future interest cost of the deposit core has been rendered moot. In 1983, the types of accounts properly includable in the deposit core were subject to interest rate ceilings, thus limiting the bank's interest rate costs. In the year of the acquisition, however, some increase in rates on core deposits was foreseeable, and so such increase properly could be taken into account in valuing the core deposit intangible. Southern Bancorporation, Inc. v. Commissioner, 847 F.2d 131, 137-138 (4th Cir. 1988), affg. a Memorandum Opinion of this Court.

Under section 326 of the Garn-St. Germain Depository Institutions Act of 1982, Pub. L. 97-320, 96 Stat. 1500, which took effect October 15, 1982, Congress directed that commercial banks be allowed to raise the interest rates payable on savings accounts to 5- 1/2 percent by January 1, 1984. See 48 Fed. Reg. 50067-50068 (Oct. 31 1983). Furthermore, under the section 202 of the Depository Institutions Deregulation Act of 1980, Pub. L. 96-221, 94 Stat. 142, Congress ordered the removal of interest rate ceilings on all types of savings deposits by March 31, 1986.

Consequently, the removal of savings deposit interest rate ceilings at such time was foreseeable in 1983. During the 1980's, however, Congress did not move to permit payment of interest on demand deposits. Therefore no basis exists for assuming that interest payments would be made on such deposits in valuing the deposit core.

It is difficult to say whether petitioner reasonably could have foreseen in 1983 whether interest rates on savings and NOW accounts would increase after the removal of interest rate ceilings on March 31, 1986. Petitioner's original assumption *525 that interest rates paid on the deposit core would increase was made on the basis of a deposit core containing interest rate sensitive deposits. Because we have decided that such deposits are not properly includable in the core, and have defined the core as being comprised of deposits not sensitive to interest rate changes, it appears that the grounds for petitioner's assumption as to future interest costs no longer exist. Consequently, we hold that petitioners have not established that the interest cost of the deposit base would rise to the levels predicted in the valuation study after removal of interest rate ceilings in 1986. [24]

d. ALTERNATIVE FUNDING RATE

The cost savings afforded by core deposits are ascertained by comparing their cost against that of the next most expensive source of funds available to the bank. Such alternative funding source is selected on the basis of its similarity to core deposits in terms of average balance size, remaining life, and insurability. Citizens & Southern Corp. v. Commissioner, 91 T.C. at 507. In prior cases in this Court involving core deposit issues, taxpayers have used the cost of rate sensitive deposits, such as money market certificates of deposit, in order to measure the cost savings afforded by the deposit base. Citizens & Southern Corp. v. Commissioner, 91 T.C. at 506-507; [25] Colorado National Bankshares, Inc. v. Commissioner, T.C. Memo. 1990-495, 60 T.C.M. at 786; P-H Memo T.C. par. 90,495, at 2393.

In the instant case, however, petitioner used the cost of unsecured debt with a maturity equal to the life of the deposit base, as calculated in its study. Petitioner solicited a quote from an investment bank in order to establish the rate of interest payable on such debt. The investment bank informed petitioner that such a debt issue would carry a 13-percent rate of interest, but also stated that the existence of a market for such an issue could not be guaranteed.

Respondent contends that petitioner's method of establishing an alternative funding rate is not valid because it *526 does not represent the cost of a bank's actual alternative sources of funds. Respondent's experts advanced several reasons why an unsecured debt issue would not be an appropriate funding alternative to core deposits. Dr. Andrews testified that banks do not regard unsecured debt issues as a replacement for or alternative to insured deposits as a funding source for loans and investments. Such debt issues generally are used only to build a bank's capital to serve as a base for attracting deposits. The facts in the instant case bear out Dr. Andrews' conclusion. Mrs. Baylor testified that, during the time she ran the What Cheer bank, she would not have issued unsecured debt to make loans or purchase investments.

Moreover, petitioner itself never obtained funds to lend or invest through issuance of debt, using debt only to augment its capital. Petitioner's president testified at trial that, at the time of the acquisition, deposits constituted its source of funds for acquiring assets. Petitioner's position with respect to debt issuance was made quite clear in the acquisition of What Cheer bank. In the acquisition, petitioner attempted to avoid incurring debt. It sought to have the core deposit intangible booked as part of its regulatory capital so as to meet the minimum capital requirements set by the Iowa Department of Banking, and only took on debt indirectly through the issuance of preferred stock when such action was absolutely necessary to meet such requirement. Consequently, we fail to see how unsecured debt could have been an alternative to deposits as a source of funds for petitioner. We do not think it sufficient that such a debt issue constituted a theoretically possible alternative source, especially when it was not actually the next most expensive alternative to the core deposits.

Dr. Kane found an additional ground on which to question the validity of petitioner's alternative funding comparison. He pointed out that the rate paid on insured deposits is not comparable to the rate of interest payable on a commercial debt issue because Federal deposit insurance, and the regulatory requirements imposed on banks to qualify for it, essentially eliminate the risk of the deposit, which causes the rate of interest demanded by depositors to fall below what would be required on a comparable *527 uninsured investment. Dr. Andrews made the same point in his report. Even petitioners' expert witness, Mr. McMahon, conceded at trial that guaranteed debt is materially different from nonguaranteed debt, and that insured deposits pay a lower interest rate than uninsured ones. Respondent's expert,

Dr. Kane, stated that at least a portion of the difference in rate paid on an uninsured debt instrument issued by a bank and an insured deposit taken by a bank is attributable to the credit enhancement of deposit insurance, which is neither a wasting asset, nor an attribute unique to core deposits. Dr. Kane concluded that comparison of the cost of unsecured debt to the cost of Federally insured deposits was unreasonable.

Petitioners contend that including the cost of Federal deposit insurance in the maintenance cost of the deposit base adequately accounts for the reduction in funding cost afforded by such deposit insurance. Petitioners, however, assume that the reduction in interest rate demanded by depositors on account of deposit insurance is exactly equal to the premium paid for such insurance. Petitioners have offered no evidence in support of such a proposition. To the contrary, Dr. Kane notes that the value of deposit insurance to a bank will vary with the "riskiness" of a bank. The ability of a "very risky" bank to offer deposit insurance will appreciably reduce the rate the bank would otherwise have to pay to attract depositors. On the other hand, if the bank is not risky, the funding cost reduction afforded by deposit insurance will not be as great. Consequently, even though the banks in the instant case were well run, petitioner cannot adequately control for the funding cost advantage provided by deposit insurance merely by taking its maintenance cost into account in figuring the cost of the deposit core.

We think that to properly measure the cost advantage of core deposits over rate sensitive alternative funding sources, an alternative funding source which has the same risk characteristics as the core deposits should be used. Although the alternative funding source selected by petitioner had the same life as the deposit core, such alternative did not have the same risk characteristics. We therefore will not allow it to be used to measure the cost savings furnished by **\*528** the deposit core. To eliminate any value attributable to Federal deposit insurance from the deposit core, we will allow petitioners to use only an alternative funding source with the same risk characteristics as the core deposits.

Dr. Kane suggests that use of insured noncore deposits as an alternative funding source would strip out the value of deposit insurance and thus produce a more accurate value for the cost savings afforded by the core. Therefore, we believe that interest rate sensitive deposits, such as certificates of deposit, to the extent otherwise comparable to the core, are the best alternative funding source to use in calculating the value of the deposit core. Based on petitioner's own practices

and the normal practices of the banking industry, as outlined by Dr. Andrews, we believe that petitioner would view such deposits as the most natural alternative to the low- cost core deposits. Because the value of the What Cheer bank's deposit core for purposes of the instant case is equal to the cost savings petitioner would realize by utilizing such core as a funding source, as opposed to the alternate source, the cost to petitioner of such alternative deposits would be the best basis for developing the value of the core.

Petitioners argue that insured certificates of deposit were not comparable to the deposit core because they did not have 26-year maturities, i.e., the life petitioner calculated for the deposit core. We hold, however, that the term to maturity of a financial instrument is not decisive of comparability. The premise of the core deposit valuation is that funds will be left on deposit for ascertainable periods even though they may be withdrawn at will by depositors. The core deposit intangible derives its value from the inertia of depositors, rather than a bank's legal ability to retain deposits against the will of depositors.

Consequently, in deciding comparability, the actual life of a group of deposits, not its term to maturity, is the key characteristic. In deciding comparability, we therefore focus on the time over which the bank can be expected to have the use of the funds based on attrition data, rather than on the time when the instruments mature. If funds are likely to be left on deposit after the maturity of an instrument, such maturity has no practical effect on the ability of the **\*529** bank to use such funds, and therefore such maturity is not relevant to calculating the life of a group of deposits. Accordingly, where, based on attrition rates, funds in certificates of deposit can be expected to remain with a bank for a period similar to that of core deposits, the funds should not be disqualified as an alternative funding source simply because the individual certificates do not have the same time to maturity as the life of the core deposit intangible.

Having decided that interest sensitive deposits are the best alternative source of funds, we must look to the rate paid on such funds for purposes of comparison. The record, however, contains no evidence of the rates petitioner paid on interest rate sensitive deposits as of the time of the acquisition. Nevertheless, inasmuch as we are satisfied that such an alternative was available to petitioner, we may make a reasonable estimate of the cost of such alternative source based on such evidence as in the record. Cf. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).

In his report, respondent's expert Dr. Kane concluded that, if the unsecured debt instrument used as petitioner's alternative funding source possessed the same risk characteristics as an insured deposit, the source would bear an interest rate of 11.2 percent. Respondent, in his post trial brief, requests that we hold that the alternative funding rate is no more than 11.2 percent. We agree, and, accordingly, we hold that the alternative funding cost should be 11.2 percent. Such evidence as is in the record suggests that 11.2 percent is a reasonable approximation of the cost of insured noncore deposits to petitioner at the time of the acquisition. Petitioner's study of the deposits of the What Cheer bank shows that insured certificates of deposit paid an average rate of 10.39 percent at the time of the acquisition. That provides a useful indication of what petitioner's cost would likely have been, as both petitioner and the What Cheer bank operated in the same general market and were in a similar competitive environment. Operating statistics of insured commercial banks in Iowa compiled by the FDIC for 1982 show that the cost factor for deposits, other than certificates of deposit over $100,000, for banks similar in size to petitioner was 10.33 percent. **\*530** When maintenance costs and the Federal deposit insurance premium are included, the actual overall cost would probably be quite close to 11.2 percent.

### e. COST SAVINGS REDUCED BY TAXES

Petitioner reduced the total cost savings afforded by the core deposits by the Federal, State, and local income taxes that would be levied upon them, yielding the net savings for each year over the life of the deposit base. Petitioner used a 48.7-percent tax rate to calculate the after-tax cost savings of the deposit base. Respondent does not object to such reduction, for, as Dr. Kane's report stated, "the bite that taxing authorities take must be discharged before income begins to accrue to a corporation's stockholders."

### f. DISCOUNT RATE

A discount rate is applied to the net cost savings yielded by the deposit core over its life in order to determine its present value. The present value of each year's cost savings, determined at the time the deposit core is valued, affords the basis for calculating the amount of amortization to be deducted in each year of the deposit core's life. Citizens & Southern Corp. v. Commissioner, 91 T.C. at 513-514.

In the instant case petitioner used a weighted average cost of capital equal to 7.667 percent as the discount rate. Such

figure was calculated as the sum of the after-tax cost of long-term debt capital and after-tax desired rate of return on equity, weighted according to the relative percentages of debt, in the form of deposit liabilities, and equity funding petitioner's assets on the acquisition. [26] The debt cost used was the 13 percent rate quoted by the investment bank on the hypothetical debt issue. [27] The after-tax rate of return on equity was set at 20 percent, but the record does not show how such figure was derived, and petitioner's study describes it as a "desired" rate of return.

Respondent objects to petitioner's discount rate, claiming that it is too low and therefore overstates the present value of the savings yielded by the deposit core. Respondent **\*531** argues that use of the interest rate on the hypothetical debt issue in figuring the discount rate is inappropriate. Respondent's expert, Dr. Kane, concluded that, because the purpose of the valuation was to calculate the payment made by petitioner's stockholders for the stream of cost savings generated by the What Cheer bank deposit base and because the cost savings of the core deposits accrue to petitioner's equity holders, the rate of interest payable to a hypothetical class of debtholders was conceptually irrelevant. Furthermore, long-term debt like the hypothetical alternative funding source did not form part of petitioner's capital at the time of the acquisition, and so the interest rate payable on such debt did not affect petitioner's cost of capital at such time.

Dr. Kane elaborated that, under corporate finance theory, the appropriate discount rate to use would be the marginal capitalization rate, which equals the weighted average of the returns paid on the mix of debt and equity actually used to finance the acquisition of the What Cheer bank. In the instant case, the cash used to acquire the What Cheer bank came from petitioner's equity capital. No debt was issued to finance the acquisition, although petitioner subsequently issued preferred stock after the acquisition in order to satisfy the minimum capital requirements of Iowa banking regulators.

Accordingly, we find that the appropriate discount rate is petitioner's after-tax return on equity as of the time of the acquisition. We previously have approved of the use of an after-tax rate of return on equity as an appropriate discount rate. Colorado National Bankshares, Inc. v. Commissioner, T.C. Memo. 1990-495, 60 T.C.M. at 785, 793; P-H Memo T.C. par. 90,495, at 2389, 2400-2401. At trial, however, petitioner's expert, Mr. McMahon, testified that it was very difficult to determine the after-tax rate of return on equity demanded by petitioner's shareholders, and that the 20-

percent figure used in the study was a conservative estimate of such rate. Dr. Kane also testified that it was very difficult for small banks, such as petitioner, to determine an appropriate capitalization rate. Consequently, we hold, under the facts of the instant case, that the 20-percent after-tax rate of return on equity used in **\*532** petitioner's study is the best available information regarding the discount rate to use in valuing the deposit core and therefore uphold petitioner's use of that rate.

g. TAX SAVINGS INCLUDED AS PART OF VALUE OF DEPOSIT BASE

Under petitioner's valuation methodology, the present value of the cost savings yielded by the core deposits acquired from the What Cheer bank equaled $581,490 on the valuation date. In figuring the final value of the core deposits, however, petitioner included the value of the tax deductions attributable to the amortization of the deposit core, which increased the value of the core to the final figure of $906,470.

Respondent contends that inclusion of such tax deduction is an unwarranted inflation of the value of the deposit core. Petitioners contend that the purpose of including the tax deduction is to calculate the after-tax value of the deposit core, the consideration of which was approved in Citizens & Southern. Applying our precedent, [28] we find that the petitioner may include in its valuation the tax savings generated by the core.

Petitioners, however, must establish that the tax savings are susceptible of reasonable calculation. Petitioner's calculation of the savings in the instant case varies from that used by the taxpayer in Citizens & Southern. In that case, the after-tax value of the deposit core was figured by applying a 20-percent effective tax rate to its projected income stream. 91 T.C. at 506-507. In the instant case, petitioner adopted a two-step approach to calculating the effect of taxes on the deposit core. In the first step, the cost savings generated by the deposit core was reduced by a marginal tax rate of 48.7 percent in each year of its life. In the second step, the tax savings produced by the deposit core depreciation deductions were added to the value of the cost savings generated by the core to yield the overall value for the core. Petitioner's method takes account of the tax effect of depreciation in reducing the effective rate of tax **\*533** below the marginal rate by adding back some of the tax taken out in the first part of the calculation. Petitioner's calculations therefore accomplish the same end as the application of an effective tax rate to the deposit core cost savings approved in Citizens & Southern. Accordingly, we hold that petitioner's method is a proper calculation of the tax savings in the instant case.

4. WHETHER PETITIONER MAY AMORTIZE THE DEPOSIT CORE INTANGIBLE ON A N ACCELERATED BASIS

The final issue for our decision is whether petitioner may depreciate the deposit core on an accelerated basis. Petitioners contend that, in each year of the life of the deposit core, the present value of the cost savings attributable to the core in such year may be deducted. Petitioners contend that present value is properly calculated as of the valuation date of the core in 1983. Such a calculation results in accelerated amortization of the core because the cost savings in earlier years are greater than the savings in later years due to the effect of discounting. Respondent contends petitioner's amortization schedule is not proper. Respondent contends that depreciation deductions should be keyed to the attrition of the core, which would result in straight-line depreciation because such attrition is assumed to be constant under petitioner's valuation methodology.

Although the straight line method generally is used to depreciate intangibles, petitioner may use an accelerated method if it can show that such method results in a more reasonable depreciation allowance. Citizens & Southern Corp. v. Commissioner, 91 T.C. at 512. A method other than straight line is appropriate when, considering the facts of the case, it "results in a fair allocation of the basis of the asset to periods in which income is realized." Citizens & Southern Corp. v. Commissioner, 91 T.C. at 512, quoting Schneider v. Commissioner, 65 T.C. 18, 32 (1975). In Citizens & Southern, we found the present value approach to calculating each year's amortization produced a reasonable allowance for depreciation. 91 T.C. at 512-514. Accordingly, we hold that petitioner may base its depreciation **\*534** allowance on the present value, on the acquisition date, of the cost savings yielded by the deposit core.

To reflect the foregoing,

Decision will be entered under Rule 155.

[1] Except as otherwise noted, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The term "petitioner," as used herein, refers to Iowa Trust and Savings Bank (Iowa Trust). IT&S of Iowa, Inc.

97 T.C. 496, Tax Ct. Rep. (CCH) 47,735, Tax Ct. Rep. Dec. (P-H) 97.34

(IT&S) is a party to the instant case because it filed a consolidated return with Iowa Trust for the taxable year 1984. IT&S was incorporated on July 26, 1983, after the transaction in issue in the instant case, and became the parent of Iowa Trust by acquiring 88.4 percent of Iowa Trust's stock.

As far as we can tell, the name "What Cheer" was taken from the greeting given to Roger Williams by Narragansett Indians when he arrived from Massachusetts to found the settlement of Providence, Rhode Island, and the town was so named by a former resident of Providence who moved to Iowa in the mid-19th century.

1986 was the year in which, under the Depository Institutions Deregulation Act of 1980, Pub. L. 96-221, 94 Stat. 143, interest rate ceilings on all nondemand accounts were to be removed.

The longer study period was used in order to investigate the relationship between the rate of account closings and changes in market interest rates. Based on a comparison of account closing rates and interest rates in the years studied, the accountants concluded that there was no relationship between the two.

Figure is the sum of demand, NOW, and super NOW account balances shown in Table A.

For purposes of determining deposit core attrition, money market certificates equalling $1,505,574 were reclassified from the certificate of deposit category to the money market category, accounting for the difference between the total shown for the certificate of deposit category on the instant table and the amount shown on Table A.

See also Colorado National Bankshares, Inc. v. Commissioner, T.C. Memo. 1990-495.

Goodwill is the "expectancy of continued patronage, for whatever reason." Boe v. Commissioner, 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961). It is a "preexisting business relationship, based on a continuous course of dealing, which may be expected to continue indefinitely." Computing & Software, Inc. v. Commissioner, 64 T.C. 223, 233 (1975).

Going-concern value has been defined as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern, VGS Corp. v. Commissioner, 68 T.C. 563, 591 (1977); Conestoga Transportation Co. v. Commissioner, 17 T.C. 506, 514 (1951), and it is manifested in the business' ability to operate without interruption and to continue

generating sales after an acquisition. Computing & Software, Inc. v. Commissioner, 64 T.C. at 235.

We note that, in calculating the attrition rate for demand and NOW accounts, petitioner included in such category super NOW accounts, which we have found, for reasons discussed infra, are not includable in the core. We have examined the work papers of petitioner's study, however, and are satisfied that closures of super NOW accounts did not affect the calculation of the attrition rate for demand and NOW accounts.

In the instant case, petitioner's only cost-related criterion for including deposits in the core was that they bear a rate below the alternative funding source used in the study. As discussed infra, because we do not find that petitioner used an appropriate alternative funding source in its study, we do not consider the relevance of whether deposits carry a rate of interest above or below the rate payable on such alternative in determining whether a deposit should be included in the core.

See also Colorado National Bankshares, Inc. v. Commissioner, T.C. Memo. 1990-495.

The FDIC has defined core deposits as "demand and savings accounts," and the FDIC rejected petitioner's attempt to include certificates of deposit in the deposit core figure petitioner submitted for approval, requiring its recalculation without them, even though petitioner could show that the deposits were stable.

The experience of the What Cheer bank regarding deposit shifts was by no means unique, and it appears that, during the time studied by Dr. Andrews, banks were experiencing a shift in deposits from low to high yielding accounts. For instance, a study by the Federal Reserve found that most of the deposits in money market deposit and super NOW accounts came from lower yielding bank accounts, rather than from other sources. Furlong, "New Deposit Instruments," 69 Fed. Res. Bull. 319, 322-323 (1983).

The figures for deposits at the time of the acquisition are net of government deposits and are taken from petitioner's valuation study.

We note that the figures in the call reports reflecting savings deposits for 1982 possibly are inaccurate, as they fail to separately report balances in savings accounts and NOW accounts, instead lumping them together. Such deficiency in the data, however, does not appear to detract from Dr. Andrews' conclusion.

Petitioner's study examined account closings in regular savings accounts and certificates of deposit for 4 years before the acquisition, but only examined closures of demand deposits and NOW accounts in the year preceding the acquisition. It is curious that petitioner's accountants did not study the accounts which would appear to be the most susceptible to erosion attributable to rate changes, as such accounts paid little or no interest.

Petitioners claim that the cost of the deposit base was low compared to a hypothetical alternative funds cost; however, as discussed below, we find that the alternative rate selected by petitioners is not the proper standard to use in determining whether the cost of the What Cheer deposits paid more or less than the market rate of interest.

Mr. McMahon stated that taking into account reserve requirements for demand and other types of deposits would have reduced the core by 3 percent, and that taking float on uncollected balances into account would have further reduced the core by another 6 percent. Such adjustments must be taken into account in recalculating the value of the deposit core in the Rule 155 proceeding we order below.

Such figure does not include any balances in super NOW accounts, as such accounts were not available until January 1983, after the time as of which the expense rate was calculated.

Such percentage is the same percentage as $44,985 is of $2,192,282, the average outstanding balances of the accounts properly includable in the core on December 30, 1982.

Furthermore, there is no evidence in the record to suggest that rates on savings accounts actually did rise after the interest rate ceiling were removed.

The taxpayer's expert in Citizens & Southern figured the cost savings of the deposit base using certificates of deposit because "insured certificates of deposit are the most realistic alternative to core deposits." 91 T.C. at 507.

On the acquisition date, 92.5 percent of petitioner's assets were funded by debt, i.e., deposits, while 7.5 percent were funded by equity.

On an after tax basis, such rate equaled 6.669 percent.

The Supreme Court also has recognized that the tax savings generated by an asset can be an identifiable component of its value, and that sophisticated taxpayers may consider such savings in assigning a value to property. "We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction." Frank Lyon Co. v. United States, 435 U.S. 561, 580 (1978).

Respondent has not challenged petitioner's amortization of the cost of its valuation study over the useful life of the deposit core. Accordingly, petitioner may take such cost into account in computing its depreciation allowance.

## All Citations

97 T.C. No. 34, 97 T.C. 496, Tax Ct. Rep. (CCH) 47,735, Tax Ct. Rep. Dec. (P-H) 97.34

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Williston Basin Interstate Pipeline Company,
F.E.R.C., October 8, 1992

97 T.C. 253
United States Tax Court

ITHACA INDUSTRIES, INC. Petitioner

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent

Docket No. 7076-89.
|
Filed August 12, 1991

P purchased the stock of a corporation which it then liquidated. P allocated the price of the stock among the assets it acquired, including an asset it designated as an "assembled work force" and an asset it designated as "raw material contracts." HELD, the assembled work force is not a wasting asset separate and distinct from goodwill and going-concern value and therefore may not be amortized. HELD FURTHER, the raw material contracts have a limited useful life of 14 months and an ascertainable value separate and distinct from goodwill and going-concern value, which value may be amortized over the useful life of the contracts pursuant to sec. 167.

**Attorneys and Law Firms**

**\*253** David M. Ivey, Patrick G. Jones, Alison M. Drummond, William A. Turner, Phillip A. Bradley, and Kendall L. Houghton, for the petitioner.

Gary F. Walker, David R. Reid, and Albert L. Sandlin. Jr., for the respondent.

**Opinion**

SCOTT, JUDGE:

Respondent determined deficiencies in petitioner's corporate income tax for its fiscal years ending **\*254** February 3, 1984, and February 1, 1985, in the amounts of $404,290 and $572,775, respectively. The issues for decision are: (1) Whether an assembled work force is an intangible asset distinct from goodwill or going- concern value with an ascertainable useful life over which the value of the asset may

be amortizable; (2) whether raw material supply contracts are assets distinct from goodwill or going-concern value with an ascertainable useful life over which the value of the asset may be amortizable; and (3) if either the work force in place or the raw material contracts has a value apart from goodwill or going- concern value and an ascertainable useful life, what is the useful life and proper value allocable to each such asset? [1]

**\*255** FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

On the date of filing its petition, petitioner was a Delaware corporation with its principal place of business in Wilkesboro, North Carolina. It timely filed United States Corporation Income Tax Returns for its fiscal years ending February 3, 1984, and February 1, 1985, with the Internal Revenue Service Center at Memphis, Tennessee. Petitioner keeps its books and files its Federal income tax returns on an accrual basis.

Ithaca Industries, Inc. (Old Ithaca), was formed in 1948 by George Abbott (Mr. Abbott), as a manufacturer of women's intimate apparel. In 1982 Mr. Abbott was the majority stockholder, owning approximately 70 percent of the stock. The other stockholders at that time were Gregory B. Abbott, G. Christopher Abbott, and Nicholas Wehrmann. By 1982 Old Ithaca had become the largest private label manufacturer of women's sheer hosiery and underwear in the United States. It was also a major producer of men's and boys' private label underwear.

Sometime around 1983, Mr. Abbott decided to retire from active involvement in the corporation. At that time, Old Ithaca was a client of Merrill Lynch Capital Markets (Merrill Lynch CM). Representatives of Merrill Lynch CM suggested to Mr. Abbott a public offering of Old Ithaca stock in order to provide liquidity to the shareholders, in particular to Mr. Abbott. Because of the length of time required to complete a public offering, the shareholders of Old Ithaca considered other options, including a sale of their entire interest in the corporation.

The Abbott family then discussed with representatives of Merrill Lynch Capital Partners, Inc. (Merrill Lynch CP), the possibility of a leveraged buyout. The representatives of Merrill Lynch CP considered Old Ithaca a very attractive

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 478 of 651

Ithaca Industries, Inc. v. C. I. R., 97 T.C. No. 16 (1991)
97 T.C. 253, Tax Ct. Rep. (CCH) 47,536, Tax Ct. Rep. Dec. (P-H) 97.16

investment due to its stability, management, position in the marketplace, and good relations with customers. The primary purpose of a leveraged buyout would be to provide **\*256** liquidity to Mr. Abbott with respect to his interest in Old Ithaca.

Petitioner was incorporated by Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) on September 22, 1983, as New Ithaca Corporation (New Ithaca) for the purpose of acquiring the assets and business of Old Ithaca. New Ithaca offered the shareholders of Old Ithaca $110,000,000, consisting of $5,432,432.43 of junior subordinated notes and the balance in cash, in exchange for all common stock of Old Ithaca. The offering price was determined by Merrill Lynch from industry comparables, preliminary discussions regarding the public offering, imputed values from financial projections, and the need to balance the sales price against the ability to finance the sale. The Abbott family considered the price and concluded that it was attractive to them. The purchase price reflected the fair market value of Old Ithaca.

On October 28, 1983 (day of the merger or merger date), New Ithaca purchased the stock of Old Ithaca and then liquidated Old Ithaca. Following the liquidation, New Ithaca changed its name to Ithaca Industries, Inc. (Ithaca). As of November 11, 1983, after the liquidation of Old Ithaca, the stock of new Ithaca was held by Merrill Lynch Interfunding, Inc., Venture Lending Associates, L.P., General Electric Pension Trust, Gregory B. Abbott, G. Christopher Abbott, and Nicholas Wehrmann.

On or before October 28, 1983, petitioner did not engage in negotiations with the persons selling Old Ithaca's stock with respect to a specific price for the items purchased and Old Ithaca and petitioner did not allocate a specific price to the items purchased. When purchasing a business, Merrill Lynch generally intends to hold the business as a going concern for a number of years, then sell the business as a going concern.

On the day of the merger, Old Ithaca had 17 manufacturing plants and warehouse facilities in North Carolina, South Carolina, and Georgia, a distribution facility in Arizona, an executive office and sales office in New York City, and sales representatives located in various areas of the United States. It employed a work force of approximately 5,153 hourly production employees and had an assembled staff of other than production employees of 212 individuals, consisting **\*257** of 17 executives, 153 other salaried employees, and 42 hourly office employees.

The business operations of Old Ithaca and Ithaca were identical and there was no interruption of business activity as a result of the sale and liquidation. After the sale and liquidation, the officers and management personnel of Ithaca were the same as those of Old Ithaca, with the exception of Mr. Abbott. The members of the Board of Directors of Ithaca were different from the members of the Board of Directors of Old Ithaca.

At the time of the merger, the economy was in a deep recession nationally. Unemployment in North Carolina in February 1983 reached a high of 11.4 percent. As a result of the unemployment trends in North Carolina, there were labor surpluses. Workers in the apparel industry are paid low wages and their educational requirements are minimal. Large numbers of the workers in the apparel industry are high school dropouts. Most of the workers, particularly the women, move in and out of the labor force with great frequency.

The hiring process for production workers starts with an application being submitted at one of Ithaca's plants. The application is screened by a designated person within that plant. If the applicant has the necessary qualifications, the applicant is called in for an interview. At the interview, the interviewer goes through the application with the applicant to make sure everything is correct and to see if anything needs to be added. A supervisor or department head then shows the applicant the operation for which he or she is applying. After viewing the operation, the applicant is brought back to the office and a job either will or will not be offered at that time.

The hiring process for a salaried employee also begins with an application being submitted, although the actual interview process is usually longer because generally more than one applicant will be interviewed. The applicant will talk to the supervisor of the position applied for and generally those persons offered employment will have followup interviews scheduled, at which time an offer generally will be made. The hiring process for executives often involves the services of an executive recruiter, travel **\*258** expenses, and the interviewing of a number of applicants for one position.

During 1983, training was generally necessary for a production worker. Initially, the trainee would be familiarized with break times and lunch times and then taken to the

area in which the trainee was going to work. Sometimes the supervisor did all of the training, but more often the training was done by a training operator or a training instructor. The trainer would show the trainee an experienced operator who did the work to be performed in a manner that was consistent with the method Ithaca wished to teach and the rapid pace Ithaca expected. The trainee would watch the experienced operator for some period of time and then would be introduced to his or her particular job.

The next step would be to give the trainee material scraps on which to sew until the trainee felt comfortable operating the sewing machine. The trainee then would be given garments to sew, generally in the beginning an easy size and an easy style. When the trainee began producing garments, the quality control operator would review and grade the garments and the supervisor would also review the work. As the trainee progressed, less and less time would be spent with the supervisor, training instructor, and quality control operator.

A production worker was considered trained when the worker met and maintained Ithaca's standard productivity for at least 2 or 3 weeks consecutively. Standard productivity levels are established by calculating how many garments each operator must produce in a given period of time for the company to operate at a profit after covering overhead costs. In making this determination the cost system for the product and the maximum production capability of an operator are considered. The costs incurred by petitioner in the hiring and training of its work force were deducted as business expenses.

Ithaca entered into contracts with hosiery and other retailers to supply them with a stated quantity of garments over a stated period. In anticipation of meeting these contract requirements, Ithaca entered into long-term contracts to purchase raw materials used in manufacturing the **\*259** garments. In general, each raw material supply contract is evidenced by a written purchase order and a sales contract. The purchase order is prepared by Ithaca's director of purchasing at or about the time the director reaches a verbal agreement with a supplier regarding the terms of a supply contract. The sales contract is a document containing identical terms to the purchase order. It is generally prepared by the supplier and signed by both parties. Either party might suggest a change in one or more terms of a supply contract, and the supply contract would be altered if both parties agreed to such alteration. The delivery dates were chosen by Ithaca and were occasionally modified.

The process of negotiating prices of yarn for yarn supply contracts includes obtaining price quotations over the telephone from a variety of suppliers and checking with suppliers who made acceptable quotations as to the availability of the volume of yarn desired by Ithaca. Some of the factors affecting the pricing of both 100-percent cotton and cotton/polyester-blend yarns include the following: price movement on the cotton commodity futures market, the delivery dates desired (relative to the available supply of cotton and yarn), the volume to be purchased, supply and demand, and the type and quality of yarn to be purchased. The cotton market is very volatile and the price is influenced by fluctuations in the cotton commodity futures market. The price of synthetic cotton-blend yarn fluctuates with the price of both cotton and polyester. Supplier's yarn prices are competitive. Large yarn customers such as Ithaca, with volume business, have more leverage and can negotiate more favorable prices than smaller customers.

If Ithaca needs an additional supply of the type of yarn covered by a supply contract that has been completed, Ithaca's director of purchasing will enter into a new series of price negotiations with a variety of suppliers. Old Ithaca and Ithaca generally requested and negotiated "far out" delivery dates of one year or longer.

Mr. Ed Mohn was director of purchasing of both Old Ithaca and Ithaca. The director of purchasing purchases cotton and cotton/polyester-blend yarns and oversees the timely delivery of the yarns against raw material supply contracts which have been entered into. As a matter of **\*260** business routine, Mr. Mohn also kept copies of all purchase orders and sales contracts, receiving records, and correspondence relating to such documents.

Inside Textiles is a textiles market newsletter published every 2 weeks. Among other things, the newsletter presents market price ranges for a number of fibers and cotton and cotton/polyester-blend yarns. These ranges are derived from quotations which the editor solicits from a variety of sources in the industry, including sellers and purchasers of yarn. Inside Textiles contains market price ranges for several types of yarns which are covered by Ithaca's raw material supply contracts. The published yarn prices are yarn prices from the preceding 2 weeks.

As of the merger date, petitioner had entered into supply contracts with various suppliers or agents that were in various stages of completion and had delivery dates extending past

the merger date. The contracts terminated by their terms on various dates, the latest of which was approximately 14 months after October 28, 1983. None of the raw material contracts, by their express terms, could be assigned without the consent of the supplier. Deliveries of the yarn covered by contract numbers 3743, 7965, 7992, 6591, 6592, 4511, 033176, C889, C1228, 11488-7, 442, 2172 (Jaman yarns), 2172 (Rowann Mills), 9040, 2748, 8495, 8495, and 8496 were not completed on the merger date. These contracts all show a cost per pound for yarn to be delivered over the remaining term of the contract.

Mr. Ed Mohn for petitioner kept in its record some notations of market prices for yarn. The next week's prices shown in Inside Textiles were substantially the same as the notations of market prices kept by Mr. Ed Mohn. Petitioner purchased yarn in such large quantities that it generally obtained its yarn at a lower price than either the market prices shown in Inside Textiles or the market prices shown in its own records kept by Mr. Ed Mohn. On one contract with respect to cotton yarn

18.1, the price obtained by Ithaca was 6 cents per pound less than the mid-range of the contemporaneous listings quoted by Inside Textiles.

Separate receiving records are maintained by petitioner's personnel with respect to shipments made under each supply contract. These records show the date of each **\*261** delivery and the supply contract balance left to be delivered after subtracting the amount received by Ithaca as of that date. From the receiving records for most of the supply contracts, it is possible to ascertain the remaining balance of a supply contract as of the merger date.

Several months prior to the merger date, the American Appraisal Company (AAC) appraised the assets of Old Ithaca. The appraisal was used by petitioner to provide a valuation for bank lenders and to determine an allocation of basis for tax purposes. The allocation of basis was as follows:

| *Allocation* | *Amount* |
|---|---|
| Cash........................................................................ | $1,722,000 |
| Accounts receivable................................................ | 22,138,000 |
| Inventory.................................................................. | 39,108,000 |
| Prepaid Expense..................................................... | 765,000 |
| Fixed Assets............................................................ | 62,722,000 |
| Patents..................................................................... | 11,860,000 |
| Raw material contracts............................................ | 1,760,000 |
| New York office lease.............................................. | 165,000 |
| Work force in place.................................................. | 7,700,000 |
| Deferred debt expense............................................ | 2,750,000 |
| Goodwill................................................................... | 3,845,000 |
| Other........................................................................ | 508,000 |
| Investment in subsidiary......................................... | 5,092,000 |
| Basis in assets acquired......................................... | 160,135,000 |

The amount allocated by petitioner to goodwill was determined under the residual method. Under the residual method, goodwill is equal to the excess of the basis over the

aggregate fair market value of the identifiable tangible and intangible assets.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 481 of 651

Ithaca Industries, Inc. v. C. I. R., 97 T.C. No. 16 (1991)
97 T.C. 253, Tax Ct. Rep. (CCH) 47,536, Tax Ct. Rep. Dec. (P-H) 97.16

On the basis of AAC's allocation of $7,700,000 to the work force in place, petitioner assigned an average per capita amount to each of its hourly and production work force and staff employees and amortized that amount when that person's employment relationship terminated. Accordingly, petitioner claimed deductions for amortization of assembled staff and work force in the amounts of $674,104 and $1,884,422 for the fiscal years ending February 3, 1984, and February 1, 1985, respectively.

On its returns petitioner allocated a basis to 26 raw material supply contracts in the total amount of $1,760,000, with the value of each contract allocated over the term of the contract. Petitioner amortized the value of each raw **\*262** material supply contract over its remaining term. Petitioner claimed amortization deductions with respect to the raw material contracts in the amounts of $495,440 and $1,264,560 for the fiscal years ending February 3, 1984, and February 1, 1985, respectively.

In his notice of deficiency, respondent disallowed the deductions claimed for amortization of the work force in place in the amounts of $674,104 and $1,884,422 for the fiscal years ending February 3, 1984, and February 1, 1985, respectively, with the explanation that the amount of purchase price allocated to the work force in place is part of going-concern value and not properly amortizable. Respondent also disallowed the deductions claimed for amortization of raw material contracts in the amounts of $495,440 and $1,264,560 for the fiscal years ending February 3, 1984, and February 1, 1985, respectively, with the explanation that the amount of the purchase price allocated by petitioner to the raw material contracts is part of goodwill or going-concern value and not properly amortizable.

OPINION

ASSEMBLED WORK FORCE

Section 167(a) allows as a deduction for depreciation a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business or of property held for the production of income. The term "property" includes intangibles. Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 479 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990). Section 1.167(a)-3, Income Tax Regs., provides that an intangible asset may be amortized if the --

intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy * * *.

No deduction for depreciation is allowable with respect to goodwill or going-concern value since neither has an ascertainable useful life. Sec. 1.167(a)-3, Income Tax Regs.; United States v. Cornish, 348 F.2d 175 (9th Cir. 1965).

**\*263** To depreciate an intangible asset, a taxpayer must demonstrate that the asset has a limited useful life, the duration of which can be estimated with reasonable accuracy, and an ascertainable value separate and distinct from goodwill or going-concern value. Southern Bancorporation, Inc. v. Commissioner, 847 F.2d 131, 136-137 (4th Cir. 1988), affirming a Memorandum Opinion of this Court; Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240, 1250 (5th Cir. 1973); Citizens & Southern Corp. v. Commissioner, supra at 479.

Petitioner contends that the assembled work force is an asset separate and distinct from goodwill or going-concern value and that this asset has an ascertainable limited useful life. Petitioner concludes that the replacement cost method can be used to value the assembled work force and that when valued on this basis no part of the value of this assembled work force is an integral part of going- concern value. Respondent contends that an assembled work force represents the value inherent in having a trained staff of employees in place, enabling the business to continue without interruption, and is going-concern value. Respondent argues that, because going-concern value is not a depreciable asset, petitioner is not entitled to a deduction for amortization of the assembled work force.

Respondent contends that, as a matter of law, the value of an assembled work force represents going-concern value. Petitioner argues that the determination of whether the assembled work force is an intangible asset with an ascertainable useful life and value and, therefore, subject to amortization, is a question of fact. Although it has been consistently held that no deduction for amortization is allowable for goodwill and going-concern value, sec. 1.167(a)-3, Income Tax Regs.; United States v. Cornish, supra, it also has been consistently held that the determination

of whether an intangible asset is part of goodwill or going-concern value is a question of fact. Houston Chronicle Publishing Co. v. United States, supra at 1245-1251; Citizens & Southern Corp. v. Commissioner, supra at 479. Accordingly, whether the assembled work force is an intangible asset with an ascertainable value and a limited **\*264** useful life separate from goodwill or going-concern value is a question of fact.

Going-concern value is "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." VGS Corp. v. Commissioner, 68 T.C. 563, 591 (1977). It is characterized by the ability of an acquired business to continue to operate and generate income without interruption during and after acquisition. UFE, Inc. v. Commissioner, 92 T.C. 1314, 1323 (1989); Solitron Devices, Inc. v. Commissioner, 80 T.C. 1, 19-20 (1983), affd. without published opinion 744 F.2d 95 (11th Cir. 1984); VGS Corp. v. Commissioner, supra at 592; Computing & Software, Inc. v. Commissioner, 64 T.C. 223, 235 (1975). While goodwill and going- concern value are often referred to conjunctively, technically going-concern value is the ability of a business to generate income without interruption, even though there has been a change in ownership; and goodwill is a "preexisting" business relationship, based on a continuous course of dealing, which may be expected to continue indefinitely. Computing & Software, Inc. v. Commissioner, supra at 232. See also Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 685 (5th Cir. 1971).

Prior case law supports a conclusion that, because an assembled work force is necessary to allow the business to operate and generate income without interruption during and after acquisition, such assembled work force generally is not an asset that is separate and distinct from going-concern value.

In First Pennsylvania Banking & Trust Co. v. Commissioner, 56 T.C. 677, 690 (1971), when discussing the amount of the amortization deduction to which the taxpayer was entitled with respect to a mortgage servicing business it had purchased, we stated:

> We note that the agreement did not (and obviously could not) state that Clarke's employees were bound over to Penn, but this does not detract from the PROBABILITY that the employees would join petitioner's operation and that

this factor formed a part of the going-concern value which was purchased. * * *

Under the facts in First Pennsylvania Banking & Trust Co. v. Commissioner, supra, when the directors and stockholders **\*265** of W. A. Clarke Mortgage Co. (Clarke), which serviced mortgage loans for various institutions, decided to liquidate and dissolve the corporation, First Pennsylvania Banking & Trust Co. (Penn), became interested in acquiring from Clarke the right to service a major portion of the mortgage loans Clarke was servicing. Penn had no mortgage service department of its own, but it anticipated starting up such a department by employing a large portion of Clarke's staff and acquiring Clarke's furniture and fixtures. In its negotiations with the lending institutions, Penn represented that it expected to employ Clarke's personnel to do the servicing. Subsequently Clarke entered into an agreement of sale with Penn.

The issue before this Court was the amount of the purchase price of Clarke with respect to which Penn was entitled to amortization deductions. Respondent argued that, although Penn was entitled to amortization deductions for the right to receive servicing fees, Penn had also purchased intangible assets from its predecessor such as the right to service future loans and Clarke's goodwill and going-concern value.

Before the transaction, Clarke originated loans for various lenders and also serviced loans which in many cases it had originated. Penn hired most of Clarke's employees, serviced loans formerly serviced by Clarke, serviced future loans of some of Clarke's customers, had full use of the escrow funds associated with all loans, and was in possession of Clarke's records and information on servicing loans. From the outset, Penn knew that it would employ Clarke's personnel and take over the files and equipment, thus benefitting from Clarke's experience and know-how. The personnel were expected to and did continue to perform the same duties and services as they had for Clarke. We found in First Pennsylvania Banking & Trust Co. v. Commissioner, supra at 690, that a portion of what was paid for the right to service the existing loans and the right to use the escrow amounts associated therewith were amortizable and the remaining portion of the purchase price paid was allocable to goodwill or going-concern value, nonamortizable intangible assets.

97 T.C. 253, Tax Ct. Rep. (CCH) 47,536, Tax Ct. Rep. Dec. (P-H) 97.16

**\*266** In Computing & Software, Inc. v. Commissioner, Computing & Software, Inc., acquired substantially all the properties, assets, and liabilities of Consumer Credit Clearance and the assets, including the credit information files, goodwill, and trade names, of Retail Merchants Credit Association and of Credit Bureau of Compton and Lynwood. Consumer Credit Clearance, Retail Merchants Credit Association and Credit Bureau of Compton and Lynwood operated credit information services.

One of the issues before this Court was whether the credit information files were subject to depreciation. We found that the taxpayer had satisfied its burden of proof and established that the credit files purchased were separate and distinct from the goodwill of the companies purchased because the credit information had value for only a limited period. However, we found that in addition to credit information files, goodwill and going-concern value had been purchased. In concluding that going-concern had been purchased, we listed factors which demonstrated that the taxpayer could continue to provide services to customers of the acquired business without interruption because of a takeover. These factors included:

> -- an organization that was doing business and earning money; a network of customers and the expectation that their patronage would continue; a staff of employees trained in working with the credit files and dealing with the organization's customers; an established routine for supplying available credit information and obtaining and recording new data from various sources; and an established routine for recording the fees charged for credit-reporting services and billing the customers.

Computing & Software, Inc. v. Commissioner, supra at 235. The portion of the price attributed to the above-listed factors was found to be nondepreciable.

Petitioner's contention with respect to its work force is conceptually similar to that in the cases discussed above. The existence of a trained and operational staff allowed Ithaca to step into the shoes of Old Ithaca. Ithaca acquired an organization that was doing business and earning money, had a staff of employees trained in operating sewing machines, working with fabrics, etc., and had an established routine for preparing garments. While the employees of Old Ithaca were not bound over to Ithaca, this fact does not **\*267** detract from the probability that the employees would join Ithaca's operation. Therefore, the assembled work force represents going-concern value, which has been regarded as not having an ascertainable useful life.

Generally an asset has been regarded as an asset distinct from goodwill and going-concern value where the evidence shows such asset to be a wasting asset with a reasonably ascertainable useful life and value. An asset is subject to amortization only if it is a wasting asset. Richard S. Miller & Sons, Inc. v. United States, 210 Ct. Cl. 431, 537 F.2d 446, 452 (1976). Depreciation is intended to reflect the loss in value of an asset used to produce income and to make a meaningful allocation of the cost to the tax period benefited by the use of the asset. Massey Motors, Inc. v. United States, 364 U.S. 92 (1960). The Eighth Circuit Court of Appeals, in discussing the theory of depreciation, stated --

> This allowance for depreciation is intended to provide a nontaxable fund to restore income-producing assets at the end of their useful life and their capacity to produce income has ceased or, to allow a taxpayer to recoup his investment in wasting assets free of income tax.

Northern Natural Gas Co. v. United States, 470 F.2d 1107, 1109 (8th Cir. 1973).

In this case, it is "the assembled work force" that petitioner claims is a wasting asset, not each individual worker. Although the assembled work force is used to produce income, this record fails to show that its value diminishes as a result of the passing of time or through use. As an employee terminated his or her employment, another would be hired and trained to take his or her place. While the assembled work force might be subject to temporary attrition as well as expansion through departure of some employees and the hiring of others, it would not be depleted due to the passage of time or as a result of use. The turnover rate of employees represents merely the ebb and flow of a continuing work force. An employee's leaving does not interrupt or destroy the continued existence of the whole. To the extent the leaving of any employee reduces the value of the assembled work force as a whole this value would be restored by the hiring of a new employee. The whole of the assembled work force is equal to the sum of its employees, but each employee enjoys

no separate capital standing independent of the whole. See generally Golden **\*268** State Towel & Linen Service, Ltd. v. United States, 179 Ct. Cl. 300 (1967); Thrifticheck Service Corp. v. Commissioner, 33 T.C. 1038, 1047 (1960), affd. 287 F.2d 1 (2d Cir. 1961). Because the assembled work force does not diminish in value as a result of the passage of time or through use, there is no loss in value that must be allocated to the tax period benefitted by the use of the assembled work force.

The cases relied on by petitioner, such as Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 479 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990), Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240 (5th Cir. 1973), and First Pennsylvania Banking & Trust Co. v. Commissioner, 56 T.C. 677 (1971), where the addition of new deposit accounts or customers or service contracts obtained by the taxpayer were held not to replace the ones purchased by the taxpayer which were lost through the years, are factually distinguishable from the present case. The assets involved in those cases are very different from an assembled work force. In the situations involved in those cases the taxpayer would attempt to obtain as many new customers, contracts, or deposit accounts as possible since those accounts would mean growth of the business. If new accounts had to be used in replacing an account taken over from another concern that had been lost, this growth might not occur, but the obtaining of new accounts, customers, or contracts was in no way limited to replacing ones taken over from a predecessor which were lost. Here, absent a growth in the petitioner's business or change in that business which was not shown to have occurred, petitioner's work force was stationary and replacements were made only when there was a person who resigned, retired, or was fired. Therefore, the replacement did replace the person lost rather than being an addition or increase. Except when losing a worker, petitioner would not hire a new worker. Therefore the work force as such did not diminish as did a group of deposit accounts, service contracts, or subscriber lists. The work force continued with only necessary replacements. The necessary replacements did not form a separate asset of petitioner as did the subscribers, service contracts, or bank deposit accounts obtained by a taxpayer through its own **\*269** efforts. The obtaining of new subscribers, customers, contracts, or deposit accounts might well represent growth of the taxpayer's business rather than replacing a diminishing asset. We conclude from the facts here present that petitioner's assembled work force was not a wasting asset.

If the asset is not a wasting asset, the taxpayer must wait until he sells the business to recover any gain or loss inhering in that asset. Misegades v. Commissioner, 53 T.C. 477 (1969). In Misegades the taxpayer purchased a patent law practice. We held that it was customary for retiring patent attorneys and the estate of a deceased patent attorney to sell the patent law practice. In finding that the taxpayer had purchased an intangible asset in the nature of goodwill which had no ascertainable useful life, we stated that --

> at whatever time petitioner retired, or should he continue in practice until his death, at the time of his death the intangible asset composed of the patent law practice which he purchased might have a value equal to or in excess of the amount petitioner paid for the asset. Therefore, there is nothing in this record to indicate that an amortization or depreciation deduction should be allowed with respect to the $45,000 over petitioner's life expectancy. * * *

Misegades v. Commissioner, supra at 486.

The assembled work force, just as the patent law practice involved in Misegades is not a wasting asset. The assembled work force would be included in any sale of the entire business by petitioner as it was in petitioner's purchase of the assets of Old Ithaca and at the time of such a sale petitioner would realize any gain or loss with respect to the assembled work force.

Petitioner argues that it has shown that there is a limited useful life of the assembled work force separate and distinct from going-concern value and, therefore, has shown that it is an asset separate from goodwill or going-concern value. A taxpayer may establish the useful life of an asset for purposes of depreciation based on his own experience with similar property or, if his own experience is inadequate, based on the general experience of the industry. Sec. 1.167(a)-1(b), Income Tax Regs. Mathematical or absolute accuracy is not required when estimating the life of a depreciable asset. A rough estimate or reasonable approximation is sufficient. Burnet v. Niagara Falls Brewing Co., **\*270** 282 U.S. 648, 654- 655 (1931), Super Food Services. Inc. v. United States, 416 F.2d 1236, 1238 (7th Cir. 1969); Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 500 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990).

Case 1:13-cv-00402-RTH Document 111-1 Filed 03/31/16 Page 485 of 651

Ithaca Industries, Inc. v. C. I. R., 97 T.C. No. 16 (1991)
97 T.C. 253, Tax Ct. Rep. (CCH) 47,536, Tax Ct. Rep. Dec. (P-H) 97.16

The useful life must be based on facts existing as of the close of the taxable year in issue. Southern Bancorporation. Inc. v. Commissioner, 847 F.2d 131, 137 (4th Cir. 1988), affirming a Memorandum Opinion of this Court; Citizens & Southern Corp. v. Commissioner, supra at 500. Evidence of a taxpayer's subsequent experience is acceptable to corroborate its projections based on prior experience. Citizens & Southern Corp. v. Commissioner, supra at 500.

Petitioner argues, first, that the life of the work force is limited because employees will terminate their employment with petitioner. The termination will be either voluntary, involuntary, or as a result of death. Petitioner argues that the fact that the employment relationship will terminate at the latest upon the death of the employee establishes a limited useful life for the assembled work force under the holding of Newark Morning Ledger Co. v. United States, 734 F. Supp. 176 (D.N.J. 1990).

In Newark Morning Ledger Co. v. United States, supra, a predecessor to Newark Morning Ledger Company, Herald Company, purchased all the outstanding stock of Booth Newspapers. Booth Newspapers published a number of paid-circulation newspapers. A paid- circulation newspaper is one where the newspaper is sold to the readers. Herald Company claimed depreciation deductions for the paid-circulation subscribers of the newspapers that it acquired. The issue before the court was whether the acquisition of existing paying subscribers was an amortizable intangible asset separate and apart from goodwill.

The facts in Newark Morning Ledger Co. v. United States, at 176, are distinguishable from the facts in the present case since it is the work force in place that petitioner contends is the separate asset in the instant case. This fact distinguishes this case from Newark Morning Ledger Co. v. United States, supra, as it does from the other cases relied on by petitioner in valuing customers or subscribers. In the case of accounts, customers, or subscriptions, the new account, customer, or subscriber obtained is **\*271** not necessarily related to the discontinuing of the old and the taxpayer would prefer to keep both. In the instant case only when an employee leaves is he or she replaced so that there is no change nor is there intended to be a change in the assembled work force. The training of the new employee to keep the assembled work force unchanged is a deductible expense.

Petitioner contends that our holding in Citizens & Southern Corp. v. Commissioner, supra, supports its argument that the assembled work force has a limited useful life. The taxpayer in Citizens & Southern Corp. v. Commissioner, supra, acquired nine banks and allocated a portion of the purchase price to an identified deposit base as a separately defined intangible asset. The deposit base had a value equal to the present value of the future stream of income to be derived from employing the purchased core deposits of a bank. The taxpayer proved that the deposit base had an ascertainable cost basis separate and distinct from the goodwill and going-concern value of the acquired banks and that it had a limited useful life, the duration of which could be ascertained with reasonable accuracy. We held that the taxpayer was entitled to allocate to the deposit base an amount equal to the present value of the difference in cost between the acquired core deposits and the market alternative.

The facts in this case are distinguishable from Citizens & Southern Corp. v. Commissioner, supra. In Citizens & Southern this Court made a factual determination that the core deposits at issue did not possess any characteristics of goodwill. On the facts in this case, we conclude that the assembled work force is not an asset that is separate and distinct from going-concern value since it is not a wasting asset.

Petitioner relies on the analysis of a Dr. Doerfler, whom it engaged to conduct a lifing analysis of the assembled work force in place on the date of the merger to support its argument that the assembled work force has a limited useful life which can be measured with reasonable accuracy. Specifically, Dr. Doerfler was engaged to determine the rate at which workers employed by Ithaca on the date of the merger could be expected to terminate employment following **\*272** the acquisition. Dr. Doerfler determined that the average useful life of the aggregate assembled work force was approximately 6.8 years and summarized how 5,149 employees would be expected to terminate over the subsequent years. Respondent objects to the statistical method used by Dr. Doerfler. However, we need not decide whether this statistical method is appropriate since we do not agree that such statistical method is an accurate measure of the useful life of the assembled work force. Dr. Doerfler has attempted to determine the useful life of the individuals who make up the work force on the day of the merger, not the length of time the work force as an assembled entity will exist in the hands of the corporation. As noted above, each employee is not a separate asset independent of the whole as would be the situation under petitioner's theory. The rate at which the individual employees who make up the work force

Case 1:13-cv-00402-RTH  Document 111-1  Filed 03/31/16  Page 486 of 651

Ithaca Industries, Inc. v. C. I. R., 97 T.C. No. 16 (1991)
97 T.C. 253, Tax Ct. Rep. (CCH) 47,536, Tax Ct. Rep. Dec. (P-H) 97.16

on a specific day will leave their jobs is not a determination of the length of time an assembled work force as an entity will be an intangible asset of the business. This is evidenced by the fact that, while individual employees that make up the assembled work force on a specific date may leave the work force at a predictable rate, the work force as an assembled entity does not diminish by reason of the employees leaving. If the useful life of the employees employed on the date of the merger were the same as the useful life of the assembled work force, at the end of 6.8 years petitioner would no longer have an assembled work force. Clearly, this is not the case.

Accordingly, we hold that the assembled work force is not separate and distinct from going-concern value and, because it is not a depreciable asset, that amortization deductions claimed by petitioner are not allowable.

RAW MATERIAL CONTACTS

Under section 167(a) and section 1.167(a)-3, Income Tax Regs., a contract which has a limited life and is utilized in the business of a taxpayer may be amortized ratably over its useful life. Triangle Publications. Inc. v. Commissioner, 54 T.C. 138, 147 (1970). In order to show that a contract is amortizable, a taxpayer must establish that the contract has a limited useful life, the duration of which can be **\*273** estimated with reasonable accuracy, and an ascertainable value separate and distinct from goodwill and going-concern value. Southern Bancorporation. Inc. v. Commissioner, 847 F.2d 131, 136-137 (4th Cir. 1988), affirming a Memorandum Opinion of this Court; Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240, 1250 (5th Cir. 1973); Citizens & Southern Corp. v. Commissioner, 91 T.C. at 479.

Petitioner argues that the contracts are separate and distinct from going-concern value. Respondent argues that the favorableness of the contracts does not constitute an asset that is separate and distinct from going-concern value because a supply of yarn is essential for the business operations of Ithaca to continue without interruption. Respondent contends that the contracts represent favorable business factors and as such are part of going-concern value.

Respondent states that VGS Corp. v. Commissioner, 68 T.C. 563 (1977), supports his contention. In VGS Corp. a predecessor of VGS Corporation acquired all of the stock of another corporation and certain assets of a partnership. No allocation of the purchase price was made to supply contracts held by one of the acquired companies. No allocation was made to the contracts because no competitive advantage was gained from them, not because they were considered to be part of going-concern value. We conclude that our holding in VGS Corp. v. Commissioner, does not support respondent's contention.

We do not agree with respondent that the fact that a supply of yarn is essential for petitioner's business operations requires the characterization of the yarn contracts asset as goodwill or going- concern value. Certain equipment may be essential for business operations, but the equipment may also be a depreciable asset, separate and distinct from going-concern value. While raw material is necessary to enable Ithaca to continue its business, contracts for acquisition of the raw material at a specified price are assets that are separate and distinct from going-concern value. See Triangle Publications. Inc. v. Commissioner, 54 T.C. 138 (1970); Hoffman v. Commissioner, 48 T.C. 176 (1967).

Petitioner argues that the contracts had a useful life of 14 months. Respondent argues that the contracts did not have **\*274** a limited useful life. While the useful life of an asset must be based on the facts as they exist at the close of the taxable year in issue, Southern Bancorporation. Inc. v. Commissioner, supra; Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 500 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990), a taxpayer may establish the useful life of an asset based on its own experience with similar property. Sec. 1.167(a)-1(b), Income Tax Regs.

Respondent argues that the life of the contracts is indefinite because any value inhering in the contracts exists only so long as the favorable price spread is predicted to exist. Respondent argues that because yarn prices fluctuate, it is impossible to predict with any accuracy the length of time the spread would exist. We find this argument unpersuasive. The favorable spread of the contracts is not the asset being amortized. The asset is the contracts themselves. The favorable spread is used only to determine the value of the contracts.

Respondent argues that the contracts are indefinite in length because the existing contracts would be replaced with new contracts with the same suppliers and therefore were regenerative. Where a contract is renewable indefinitely as a matter of course it generally will be considered as having an indefinite life and therefore not subject to amortization under section 167. Triangle Publications, Inc. v. Commissioner, 54 T.C. 138, 147 (1970). The probability of future renewals is a question of fact. Toledo TV Cable Co. v. Commissioner,

55 T.C. 1107, 1117 (1971), affd. 483 F.2d 1398 (9th Cir. 1973); Westinghouse Broadcasting Co. v. Commissioner, 36 T.C. 912, 921 (1961), affd. 309 F.2d 279 (3d Cir. 1962). The contracts here in issue were not renewable as a matter of course. The cotton and polyester markets were very volatile. While new contracts might or might not be negotiated by petitioner with the same supplier, neither the purchaser nor the supplier would be willing to enter into a contract that was automatically renewable or consider any contract as automatically renewable with prices as volatile as those of the yarn market. The record here supports petitioner's contention that the yarn contracts were not automatically renewed. Petitioner presented **\*275** convincing evidence that all contracts were entered into only after negotiations. Each contract would contain its own quantity to be delivered, delivery schedule, type and quality of yarn, and price. The price that could be obtained would depend on the amount Ithaca intended to order, the supply and demand of the market in general, the time of year Ithaca was placing its order, the time between placing the order and delivery, and sometimes the price of polyester. Each contract here involved is separate and distinct from a predecessor contract even when the parties are the same. The fact that old contracts which are not by their terms renewable may be replaced with new contracts does not make the life of the old contracts indefinite or regenerative. See Commissioner v. Seaboard Finance Co., 367 F.2d 646 (9th Cir. 1966), affg. a Memorandum Opinion of this Court.

Respondent next argues that the contracts are indefinite in length because the stated delivery or termination dates were occasionally changed. Because of the volume of yarn that Ithaca purchased and the length of time from order to delivery, the parties contemplated a reasonable measure of flexibility in the delivery schedule of the yarn. This is evidenced by the fact that it was common for the delivery dates to be altered. However, since alteration was by mutual agreement of the parties, the provisions of the contracts were honored by both parties. The fact that the delivery schedule was altered to meet the needs of Ithaca and that final delivery was not always completed before the termination date stated on the contract does not cause the contracts to have an indefinite life. Petitioner need only establish a reasonable approximation of the useful life of an asset for purposes of depreciation. Burnet v. Niagra Falls Brewing Co., 282 U.S. 648, 655 (1931). We find that a 14-month useful life for the yarn contracts as a whole is a reasonable approximation. Accordingly, we hold that the yarn contracts are an intangible asset properly amortizable over a 14-month period.

Respondent argues that the nonassignment clause in each contract destroys any favorableness because the seller would consent to an assignment only if the contracts were favorable to the supplier on the acquisition date. Generally **\*276** in a merger the surviving corporation succeeds to the rights of the old corporation by operation of law, not by assignment. Therefore, the nonassignability clause in the contract would not have prevented petitioner from enforcing its rights under the supply contracts following the merger. See Econo-Travel Motor Hotel Corp. v. Taylor, 301 N.C. 200, 271 S.E.2d 54 (1980). The nonassignment clause in the contracts would of course have an effect on petitioner's ability to sell them, which would mean that the value of these contracts could not be reasonably determined on a sale basis. However, the nonassignment clause does not keep the contracts from having a value to petitioner. The contracts enable petitioner to obtain yarn at a price less than current market price. The nonassignment clause without the seller's consent affects the value of the contracts, but does not cause them to have no reasonably ascertainable value.

Petitioner measured the savings yielded by each supply contract by computing the difference between the price in the supply contract and the claimed market price for the same yarn as of the merger date. The savings were then computed for the remaining term of each supply contract by multiplying the favorable price differential by the pounds to be delivered in each month. The present value of the total savings per month was determined using an 11.99-percent discount rate. Those savings were then tax-effected at a rate of 48 percent and the amortization benefit factored in.

Respondent, through his expert witness Mr. Kim, computed the value of the contracts (as an alternative to claiming that no value could reasonably be computed) by using a lesser market price and a 15-percent discount rate and eliminating contracts which showed no deliveries after the merger date or that had been completed prior to the merger date. Petitioner in appendix III to its brief followed respondent's system except that petitioner used the same market price for yarn that had been used in its prior compilations. On the basis of this compilation, which petitioner stated was the "value of raw material contracts using Mr. Kim's formula," petitioner arrived at a fair market value of the contracts of $951,353. After reviewing all of the evidence in this case and considering the opinions **\*277** as to the value of the yarn contracts as of the date of the merger given by both petitioner's and respondent's expert witnesses, we conclude that the most reasonable method of valuing these contracts is the method

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Ithaca Industries, Inc. v. C. I. R., 97 T.C. No. 16 (1991)

97 T.C. 253, Tax Ct. Rep. (CCH) 47,536, Tax Ct. Rep. Dec. (P-H) 97.16

as used in appendix III to petitioner's brief with the exception that the market price used by petitioner in the compilation is too high. Petitioner's compilation makes no adjustment for the fact that petitioner as a quantity purchaser was able to obtain a better price than the going market price used in the compilation. Neither the price from petitioner's own records nor the market prices from Inside Textiles adjusts for quantity purchases.

The testimony of respondent's witness shows with respect to at least one contract that the price obtained on the date of the merger or substantially close to that date by petitioner in a purchase of yarn was 6 cents per pound lower than the mean quoted market price of Inside Textiles and petitioner's own recorded market price. We conclude that some discount must be taken on the market price used by petitioner in making the compilation in order to determine the true value of the yarn contracts considering prices petitioner would have paid without the contracts. The current market prices used by petitioner for the various yarns ranged from a low of $1.73 to a high of $3.17. From the record in this case, we cannot determine a precise average price either on all cotton yarns or yarns with some polyester. However, we conclude based on the record as a whole that a reasonable discount on all the prices for the quantities in which petitioner purchased is 2.5 percent on the market price at the date of merger as used in appendix III attached to petitioner's brief. If in any instance this results in a market price below the contract price, that particular contract should be eliminated since from the testimony as a whole it appears to be unlikely that there were prices at the merger date in October 1983 that were lower than the contract prices for the same yarn. We, therefore, decide that a proper computation of the market value is the value as computed in appendix III to petitioner's brief after adjusting market prices as used in that compilation by reducing such prices by 2.5 percent but eliminating any contracts where no savings result. The **\*278** parties can make the computation of the value of the yarn contracts determined on this basis in connection with their recomputation under Rule 155.

Decision will be entered under Rule 155.

1    Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue.

Petitioner in its brief states that "petitioner acquired old Ithaca in a statutory merger that was treated by petitioner as a purchase of old Ithaca stock and a liquidation under Internal Revenue Code (Code) section 334(b)(2) as then in effect."

Sec. 334 as generally applicable for the years 1983, 1984, and 1985 provides:

Sec. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(a) GENERAL RULE. -- If property is received in a distribution in complete liquidation (other than a distribution to which section 333 applies), and if gain or loss is recognized on receipt of such property, then the basis of the property in the hands of the distributee shall be the fair market value of such property at the time of the distribution.

(b) LIQUIDATION OF SUBSIDIARY.--

(1) DISTRIBUTION IN COMPLETE LIQUIDATION. -- If property is received by a corporation in a distribution in a complete liquidation to which section 332(a) applies, the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor.

(2) TRANSFERS TO WHICH SECTION 332(c) APPLIES. -- If property is received by a corporation in a transfer to which section 332(c) applies, the basis of the property in the hands of the transferee shall be the same as it would be in the hands of the transferor.

(3) DISTRIBUTEE DEFINED. -- For purposes of this subsection, the term "distributee" means only the corporation which meets the 80-percent stock ownership requirements specified in section 332(b).

(c) PROPERTY RECEIVED IN LIQUIDATION UNDER SECTION 333 -- If --

(1) property was acquired by a shareholder in the liquidation of a corporation in cancellation or redemption of stock, and

(2) with respect to such acquisition --

(A) gain was realized, but

(B) as the result of an election made by the shareholder under section 333, the extent to which gain was recognized was determined under section 333,

then the basis shall be the same as the basis of such stock cancelled or redeemed in the liquidation, decreased in the amount of any money received by the shareholder, and increased in the amount of gain recognized to him.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

97 T.C. 253, Tax Ct. Rep. (CCH) 47,536, Tax Ct. Rep. Dec. (P-H) 97.16

The effective date of sec. 334 as set forth above is generally August 31, 1982. However, there are numerous exceptions to the effective date of August 31, 1982, for dissolutions planned prior to August 31, 1982, and for situations where a ruling had been obtained prior to that date.

In any event, respondent has not questioned the fact that petitioner is entitled to allocate the amount paid for the stock of Old Ithaca among the assets of Old Ithaca which it received. The only determination made in the notice of deficiency issued to petitioner in this case is that an assembled work force and certain supply contracts are not assets separate from goodwill or going-concern value to which an amount of the purchase price of the stock may be properly allocated. The facts surrounding the merger are not shown in this record in complete enough form to determine which section of the Code is applicable.

### All Citations

97 T.C. No. 16, 97 T.C. 253, Tax Ct. Rep. (CCH) 47,536, Tax Ct. Rep. Dec. (P-H) 97.16

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

71 T.C.M. (CCH) 3168, T.C.M. (RIA) 96,270, 1996 RIA TC Memo 96,270

T.C. Memo. 1996-270
United States Tax Court.

Richard A. and Carol B. LITTLE, Petitioners

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent.

No. 27374–93.
|
June 12, 1996.

**Attorneys and Law Firms**

John D. Copeland, for petitioners.

Steven Walker and Barbara Leonard, for respondent.

**\*1** P owned stock in Dondi Financial (DF). DF held 97 percent of the stock of Vernon (V). V was a savings and loan. The FHLBB seized V, terminated its operations, and appointed the FSLIC as its receiver in March 1987. DF filed for bankruptcy in May 1987.

P owned stock in Texana (T). T held 98 percent of the stock of Texana Savings & Loan (TSL). The FHLBB put TSL in receivership and appointed the FSLIC to liquidate TSL in August 1988. P deducted losses for worthless stock from DF in 1987 and T in 1988. R disallowed part of the DF loss and all of the T loss. R amended the answer, contending that P owed an additional deficiency because the DF stock became worthless in 1985.

R called two FBI agents as witnesses and offered into evidence 264 pages of interview notes. In response to P's hearsay objection, R argued that the agents' oral testimony and notes were records or reports of a public agency admissible under Fed.R.Evid. 803(8) or (24).

*Held:* R's contention in the amended answer is new matter upon which R bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.

*Held, further,* oral testimony of the two FBI agents is not a record or report of a public agency of Fed.R.Evid. 803(8).

*Held, further,* oral testimony of the two FBI agents is not admissible under Fed.R.Evid. 803(24) because respondent did not satisfy the notice requirement of the rule.

*Held, further,* the interview notes are not admissible because they were not exchanged before trial contrary to the Court's standing pretrial order.

*Held, further,* P may deduct $727,600 for DF stock in 1987.

*Held, further,* P may deduct $199,600 for T stock in 1988.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:

Respondent determined that petitioners had deficiencies in Federal income tax of $162,761 for 1987 and $57,199 for 1988. Respondent filed an amended answer asserting an additional deficiency of $31,170 for 1987.

The issues for decision are:

1. Whether respondent's contention that petitioners' worthless stock deduction for Dondi Financial Corp. (Dondi Financial) stock in 1987 was taken in the wrong year is new matter on which respondent bears the burden of proof. We hold that it is.

2. Whether testimony in the trial of this case by Federal Bureau of Investigation (FBI) special agents is a record or report of a public agency, admissible under rule 803(8) or (24) of the Federal Rules of Evidence. We hold that it is not.

3. Whether 264 pages of interview notes made by FBI special agents which were not exchanged before trial are admissible. We hold that they are not.

4. Whether petitioners may deduct $727,600 for a loss from Dondi Financial stock in 1987. We hold that they may.

5. Whether petitioners may deduct $199,600 for a loss from Texana Capital Corp. stock in 1988. We hold that they may.

Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise stated.

FINDINGS OF FACT

71 T.C.M. (CCH) 3168, T.C.M. (RIA) 96,270, 1996 RIA TC Memo 96,270

Some of the facts have been stipulated and are so found.

A. *Petitioners*

Petitioners are married and lived in Scottsdale, Arizona, when they filed their petition.

Richard A. Little (petitioner) graduated from the University of Michigan in 1957 with a bachelor's degree in economics. Petitioner was an officer in the U.S. Air Force. He was stationed in France from 1959 to 1961. He returned to the United States in 1961 and worked for 6 months as a registered stockbroker in Santa Barbara, California. He then worked for a home builder in Ventura, California, for about a year and a half. From 1961 to 1970, he operated his own building company and joint ventured with another person for 3 years.

After succeeding in the home building business in California, petitioner moved to New York City to work for Levitt & Sons, one of the nation's largest single-family-home builders. After about 3 years, he took a position in Columbus, Ohio, with a company that built apartment buildings. Petitioner then worked in Jacksonville, Florida, for a company that built apartment and condominium buildings.

In 1970, petitioner moved to the San Francisco area to work for Builders Resources (Builders). Builders' primary business was providing venture capital to small builders throughout the United States. Petitioner worked for Builders for about 2 years. During that time he met Donald R. Dixon (Dixon). Dixon was then the third largest single-family-home builder in Dallas, Texas. Builders financed Dixon's Dallas home-building activities.

From 1970 to 1978, petitioner worked on several real estate developments and syndications and became the chief financial officer of a residential real estate firm. In 1978, petitioner moved to France. In 1980, he moved to London and helped to establish the U.S. Property Trust, which invested money from English and Scottish pension funds.

 **\*2** Petitioner was financially successful. In 1974, he bought 50 acres of land in Sonoma County, California. He started a vineyard which produced about $50,000 per year net of expenses and taxes starting in 1979. Petitioner sold the vineyard in 1988.

B. *Dondi Financial Corp.*

1. *Petitioner's Association With Dondi Group, Inc., From January to September 1981*

Dixon contacted petitioner in 1980. Dixon wanted petitioner to work for him. At Dixon's request, petitioner went to Dallas in January 1981 to see Dixon's home building business. Petitioner decided to work for Dixon. Petitioner joined Dixon's organization, Dondi Group, Inc., and ran a subsidiary financing company called Dondi Equities. Petitioner commuted between London and Dallas from February to May and moved to Dallas in June 1981. While working at Dondi Equities, petitioner met Woody Lemons (Lemons). Lemons was president of Vernon Savings & Loan (Vernon) at the time.

Petitioner stopped working for Dondi Equities in September 1981. He moved to Houston, Texas, and started building single-family homes and an apartment project with a friend.

2. *Dixon's Purchase of Vernon*

During the summer of 1981, Dixon decided that he wanted to buy a savings and loan. Dixon researched various financial institutions and chose Vernon. Dixon proposed that he buy 70 percent of Vernon's stock, and that petitioner, Lemons, and Rick Ramsey (not otherwise identified in the record) each buy 10 percent.

Dixon bought 97 percent of Vernon in January 1982 for an amount not stated in the record. Dixon paid 20 percent of the purchase price in cash and financed 80 percent.

Dixon transferred Vernon's stock to Dondi Financial in June 1982. Dondi Financial was a holding company formed to hold Vernon stock. Dondi Financial had no other assets. Dondi Financial assumed Dixon's obligation to pay the rest of the purchase price. Dondi Financial paid significant amounts on this obligation while it owned Vernon.

3. *Petitioner's Reassociation With Dondi Group, Inc.*

Dixon contacted petitioner in June 1983. Petitioner needed additional capital for his apartment project. Dixon convinced petitioner to work for him again by agreeing to provide capital for the project. Petitioner moved to Dallas and started working for Dixon at Dondi Financial in June 1983.

Petitioner became president of Dondi Financial shortly after he returned. Lemons was Vernon's chairman when petitioner returned to Dondi Financial.

C. *Texana Savings & Loan*

1. *Lemons' Purchase of Tomanet Stock*

In mid–1983, Lemons approached petitioner about buying another savings and loan. Lemons suggested that he, petitioner, and several other Dondi Financial and Vernon executives buy the stock of a holding company named Tomanet. Tomanet owned about 98 percent of the stock of Texana Savings & Loan (Texana).

Lemons negotiated an option to buy Tomanet stock. Lemons bought Tomanet stock with purchase money mortgages from Tomanet stockholders and financial institutions such as First City Savings. Petitioner and the other investors were to give Lemons a downpayment and execute a note payable to him for the balance of the purchase price if they wanted to buy the Tomanet stock.

2. *Petitioner's Purchase of Tomanet Stock From Lemons*

  **\*3**  Petitioner bought 34,900 shares of Tomanet stock for $199,600 on December 12, 1983. Petitioner paid $77,200 as a downpayment. Petitioner borrowed the downpayment from State Savings & Loan (not further identified in the record) through an unsecured loan. Petitioner executed notes, payable to Lemons, for $106,795 and $15,605 on December 12, 1983.

Lemons gave petitioner quarterly reminders of the amounts due under the notes. Petitioner paid Lemons about $31,795 on the $106,795 note. Petitioner had no agreement with Lemons to not make payments on the $106,795 note. Petitioner paid about $4,100 on the $15,605 note.

On December 13, 1983, Tomanet issued stock certificates to petitioner for 14,535 shares and 20,365 shares. Petitioner pledged 20,365 shares to Lemons as security for his note.

On August 2, 1984, Tomanet changed its name to Texana Capital Corp. (Texana Capital). Petitioner was not involved in any of Texana's activities and did not receive Texana's financial statements.

D. *Petitioner's Transfer to Vernon's California Subsidiary and Dixon's Offer To Sell Dondi Financial Stock to Dondi Group, Inc., Employees*

Petitioner left Dallas in August 1984 to become president of Vernon Asset Management Corp., a Vernon subsidiary in southern California. While in California, petitioner did not control Vernon's day-to-day operations or know about every loan Vernon made.

On August 16, 1984, Vernon entered into a supervisory agreement (not otherwise described in the record) with the Federal Savings and Loan Insurance Corporation (FSLIC).

Dixon offered to sell Dondi Financial stock to Dondi Group, Inc. employees in December 1984. Dixon required any employee who wanted to buy the stock to pay 15 percent down and execute a purchase money mortgage for 85 percent. The purchase money mortgage was a 5–year note. Employees were to pay only interest during the 5 years and make a balloon payment of the principal after 5 years. Dixon held at least 51 percent of Dondi Financial stock at all relevant times.

Petitioner bought 6,800 shares of Dondi Financial stock on January 1, 1985. Petitioner paid $727,600 for the stock. Petitioner paid $109,140 in cash and executed a note for $618,460. The cash consisted of $6,975 from deferred compensation, $3,083 from interest on the deferred compensation, $30,600 from accrued dividends, and $68,482 from a loan from Vernon. The loan from Vernon was evidenced by a 5–year note for $68,482 and secured by petitioner's savings account. Petitioner paid the $68,482 note in 1986.

The $618,460 note was payable to Dondi Financial. The note required petitioner to make quarterly payments and had an interest rate of 11.25 percent. The note was fully recourse. Petitioner pledged his Dondi Financial stock as security for the note. From February 28, 1985, to July 14, 1986, petitioner paid $107,160.92 on the note.

Petitioner agreed to give Dixon, Dondi Financial, and the other Dondi Financial shareholders an option to buy petitioner's Dondi Financial stock if he stopped working for Dondi Financial. Dixon had the first right to buy the shares. If Dixon did not buy the stock within 30 days, Dondi Financial could exercise its option. If Dondi Financial did not do so, the shareholders could buy the stock pro rata. If neither Dixon, Dondi Financial, nor the other shareholders exercised their option, Dondi Financial had to buy the stock.

E. *Initial Actions by Bank Regulators*

1. *The Cease and Desist Order*

**\*4** On June 16, 1986, the Federal Home Loan Bank Board (FHLBB) issued a cease and desist order (FHLBB order) to Vernon because of its improper lending practices. The FHLBB order required Vernon to correct its loan approval process, to evaluate its portfolio, and to bring its operations into compliance with regulatory standards. The FHLBB order required Vernon to prepare a plan detailing its projected business strategies and operations through June 30, 1989.

### 2. *Petitioner's Resignation From Dondi Financial*

Petitioner resigned from Dondi Financial on August 15, 1986. Petitioner wanted to sell his Dondi Financial stock for about $1.3 million as provided by the shareholder agreement. In December 1986, Dondi Financial offered to buy petitioner's stock for an amount not disclosed in the record. Petitioner rejected this offer. Petitioner and Dondi Financial could not agree on a selling price, and petitioner did not sell the stock.

### 3. *Vernon's Financial Troubles*

In September 1986, the State of Texas appointed Earl Hall (Hall), a State regulatory agent, to run Vernon. Hall and the remaining directors tried to continue Vernon's operations.

On December 11, 1986, respondent issued a refund check to Dondi Financial for $6,054,581. On January 15, 1987, Dondi Financial endorsed the check to Vernon.

### F. *The Attempted Sale of Texana Capital*

In late 1986, petitioner and other Texana Capital shareholders tried to sell Texana Capital's Texana stock. The shareholders held about 93 percent of Texana Capital's shares and Texana Capital held about 98 percent of Texana's shares. Texana Capital had no assets other than Texana stock.

In November or December of 1986, Lemons negotiated the sale of Texana Capital's Texana stock. In February of 1987, Lemons and petitioner signed agreements to sell the stock. However, the parties did not make a final agreement, and petitioner never sold his stock. Petitioner would have made a profit of about $44,000 if the agreement had been completed.

### G. *Termination of Vernon's Operations and Bankruptcy of Dondi Financial*

### 1. *The Seizure of Vernon*

The FHLBB seized Vernon, terminated its operations, and appointed the FSLIC as receiver on March 20, 1987. Vernon disavowed all of its obligations to pay its creditors. Vernon was reconstituted as Vernon Federal Savings Association (VFSA). VFSA did not issue stock to Dondi Financial to replace Dondi Financial's holdings in Vernon.

On April 27, 1987, the FSLIC sued seven Vernon officers, including petitioner, for $350 million.

### 2. *The Bankruptcy of Dondi Financial*

Dondi Financial filed for bankruptcy on May 9, 1987. Petitioner filed a claim against Dondi Financial for $577,626. This amount was the difference between the repurchase price of his stock and the balance on the note. The bankruptcy trustee (trustee) sued petitioner for $659,118 plus interest on petitioner's note. These suits were settled on June 22, 1990. Petitioner paid the bankruptcy estate $2,500 and withdrew his suit. The trustee also withdrew his suit.

**\*5** Philip Palmer (Palmer) was the attorney for Dondi Financial's bankruptcy trustee. Palmer examined Dondi Financial's books and records during his investigation of Dondi Financial. Palmer saw Vernon's financial statements, including those which had been certified by audit and others that had been prepared by Government regulatory authorities for each year before the bankruptcy, monthly reports from 1984 to 1986, and regulatory reports. Palmer used these documents to estimate Vernon's fair market value from about 1982 to 1986. Palmer took into account the fair market value of Vernon and about three of its small subsidiaries in estimating when Dondi Financial became insolvent. Palmer focused on Vernon's commercial and residential loans because Vernon's and Dondi Financial's insolvency resulted from the improper granting and reporting of these loans.

### 3. *The FSLIC's Seizure of Petitioner's Assets*

On June 29, 1987, the FSLIC obtained a preliminary injunction against seven Vernon directors, including petitioner. The injunction sequestered the directors' assets. The injunction allowed petitioner to spend $2,000 each month. That amount was increased a few days later to $3,500. Because of the injunction, petitioner could no longer make payments on the $106,795 note to Lemons. The injunction made petitioner insolvent. The injunction was still in effect at the time of the trial of this case.

### 4. *The Closing of Texana*

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 494 of 651

Little v. Commissioner of Internal Revenue, T.C. Memo. 1996-270 (1996)

71 T.C.M. (CCH) 3168, T.C. Memo. (RIA) 96,270, 1996 RIA TC Memo 96,270

On August 19, 1988, the FHLBB put Texana in receivership and appointed the FSLIC as receiver to liquidate Texana.

### H. *Criminal Prosecution and Conviction of Some Vernon Officers and Directors*

Some Vernon officers and directors (not including petitioner) were convicted of crimes relating to their activities at Vernon or its subsidiaries. On September 8, 1988, Roy Dickey, a former Vernon president, was convicted of falsifying a delinquent loan list submitted to the FSLIC. On August 29, 1989, James R. Veteto, the former president of Vernon Service Corp., was convicted of falsifying Vernon loans. On October 5, 1989, Pat L. Malone, a Vernon executive vice president, was convicted of misapplying Vernon funds, using false documents to conceal the misapplication of funds, and using the misapplied funds to make illegal political campaign contributions. On November 8, 1989, Patrick King, a former vice chairman of Vernon's board of directors, was convicted of making false entries in Vernon books, reports, and statements, and of using Vernon funds to make illegal campaign contributions. On April 10, 1990, Lemons was convicted of misapplying Vernon funds and accepting a bribe. Petitioner was not indicted for or convicted of any crimes relating to Vernon.

### OPINION

### A. *Burden of Proof*

We first decide whether respondent's contention that petitioners' worthless stock deduction for Dondi Financial stock in 1987 was taken in the wrong year is new matter on which respondent bears the burden of proof.

### 1. *Burden of Proof If Respondent Raises New Matter or An Increased Deficiency in An Amended Answer*

**\*6** The taxpayer generally bears the burden of proof. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111, 115 (1933). However, if the Commissioner pleads new matter or an increased deficiency in the answer, the Commissioner has the burden of proof as to the new matter or increased deficiency. Rule 142(a). A new position taken by the Commissioner is not new matter if it clarifies and is consistent with the original determination and does not increase the deficiency. *Estate of Jayne v. Commissioner,* 61 T.C. 744, 748–749 (1974); *McSpadden v. Commissioner,* 50 T.C. 478, 492–493 (1968). However, if the new position requires the taxpayer to present different evidence, it is new matter, and the Commissioner bears the burden of proof. *Achiro v. Commissioner,* 77 T.C. 881, 890 (1981); *Estate of Falese v. Commissioner,* 58 T.C. 895, 899–900 (1972).

### 2. *Notice of Deficiency*

Petitioners deducted $727,600 for worthless Dondi Financial stock in 1987 and $199,600 for worthless Texana Capital stock in 1988. In the notice of deficiency, respondent disallowed $618,460 of petitioners' deduction for 1987 and all of their deduction for 1988. Respondent determined that petitioners "did not establish that the amount shown, i.e. $618,460 and $199,600 was (a) a loss, and (b) sustained by you". The notice of deficiency also included the following calculation:

**1987**

| | |
|---|---|
| Purchase cost | $727,600 |
| Less cash paid | 109,140 |
| Adjustment | 618,460 |

**1988**

| | |
|---|---|
| Purchase cost | $199,600 |
| Payments verified | 0 |
| Adjustment | 199,600 |

### 3. *Amendment to Answer*

In the petition, petitioners contended that respondent erred in disallowing the worthless stock deductions. In the answer, respondent denied that respondent's determination was in error. About 11 months later and 14 days before trial, respondent moved to amend the answer and lodged an amended answer. We granted respondent's motion.

In the amended answer, respondent asserted that petitioners were liable for an increased deficiency of $31,170 for 1987 because they were not entitled to deduct the $109,140

*Little v. Commissioner of Internal Revenue*, T.C. Memo. 1996-270 (1996)

71 T.C.M. (CCH) 3168, T.C.M. (RIA) 96,270, 1996 RIA TC Memo 96,270

respondent had previously allowed for the Dondi Financial stock. In the amended answer, respondent asserted for the first time that, because Dondi Financial "became insolvent in a year earlier than 1987, * * * the stock in Dondi Financial Corp. became worthless no later than August 1, 1985".

4. *Increased Deficiency and New Matter Under Rule 142*
Respondent contends that the amended answer did not raise new matter for purposes of Rule 142 and that the notice of deficiency required petitioners to prove that the Dondi Financial stock became worthless in 1987. Respondent argues that respondent discovered that the notice of deficiency mistakenly failed to disallow all of the deduction, and that respondent's error was computational. Respondent also contends that the notice of deficiency was broadly worded and that the amended answer is consistent with that broad language.

Respondent bears the burden of proof if respondent asserts an increased deficiency. Rule 142(a). Thus, respondent bears the burden of proving that petitioner is liable for the additional deficiency of $31,170.

 **\*7** We also conclude that respondent raised new matter in the amended answer. Respondent allowed petitioners' deduction in 1987 for part of the Dondi Financial stock loss ($109,140). Petitioner would not be entitled to any worthless stock deductions for Dondi Financial in 1987 unless it became worthless in 1987. We can only conclude that respondent was not challenging petitioners' claim that the Dondi Financial stock became worthless in 1987. In the amended answer, respondent contends that the Dondi Financial stock became worthless no later than August 1, 1985. Petitioners would be required to present different evidence to contest this allegation than they would have been required to present to contest the notice of deficiency. Thus, respondent's contention in the answer is new matter upon which respondent bears the burden of proof.

Respondent contends that the amended answer corrected a mathematical computation in the notice of deficiency. We disagree. Respondent has not identified a mathematical error in the notice of deficiency.

Respondent contends that petitioners bear the burden of proof because they are not prejudiced if they are required to prove the year their Dondi Financial stock became worthless. Respondent contends that petitioners are not prejudiced because they amended their petition after respondent amended the answer to claim that, if their Dondi Financial stock did not become worthless in 1987, then it became worthless in 1985 or 1986. We disagree. First, Rule 142(a) provides that the burden of proof on new matter is on the Commissioner; Rule 142(a) does not limit this to cases where the taxpayer would be prejudiced by bearing the burden of proof. Rule 142(a). Second, petitioners would be prejudiced by being first told 14 days before trial that they have the burden of proving when their Dondi Financial stock became worthless.

5. *Conclusion*
Petitioners bear the burden of proving that their basis in Dondi Financial stock was as claimed on their 1987 tax return. Respondent bears the burden of proving that the Dondi Financial stock became worthless before 1987.

B. *Evidentiary Matters*
We next decide whether certain evidence is admissible.

1. *Testimony by FBI Special Agents*
In the pretrial memorandum, respondent listed two FBI special agents as witnesses, Curt L. Hodges (Hodges) and Dale V. Hogue (Hogue). Respondent's memo said only that both agents would testify about their "investigation of the facts surrounding this case and to the truthfulness or untruthfulness of the petitioner's witnesses".

In 1987, Hodges and Hogue were assigned to a task force created to investigate suspected criminal activity in the Texas savings and loan industry. Hogue was the agent in charge of the Vernon investigation from 1987 to 1991. Hodges investigated Vernon from 1987 to 1992.

Respondent called Hodges and Hogue to testify about their investigation. Petitioner objected that the testimony was hearsay.

2. *Whether Hodges' and Hogue's Testimony Is a Record of a Public Agency for Purposes of Rule 803(8) of the Federal Rules of Evidence, the Public Records Exception to the Hearsay Rule*
 **\*8** The Federal Rules of Evidence generally apply to proceedings of this Court. Sec. 7453; Rule 143(a); *Conti v. Commissioner, 99 T.C. 370, 373 (1992)*, affd. 39 F.3d 658 (6th Cir.1994); *Estate of Shafer v. Commissioner, 80*

T.C. 1145, 1151 (1983), affd. 749 F.2d 1216 (6th Cir.1984). Respondent concedes that Hodges' and Hogue's testimony is hearsay but contends that it is admissible under rule 803(8)(C) of the Federal Rules of Evidence, as a report or statement of a public agency.

Records, reports, statements, or data compilations of a public agency setting forth factual findings resulting from an investigation made pursuant to authority granted by law are admissible as an exception to the hearsay rule unless the sources of information or other circumstances indicate lack of trustworthiness. [1] Fed.R.Evid. 803(8)(C).

Respondent contends that the trial testimony of Hodges and Hogue is a statement of a public agency for purposes of rule 803(8)(C) of the Federal Rules of Evidence. We recognize that the word "statement", viewed in isolation, could refer to an oral communication. If rule 803 of the Federal Rules of Evidence referred to statements by "an employee of" a public agency, we might agree with respondent that oral testimony could be a "statement" for purposes of that rule. However, the phrase "an employee of" does not appear in rule 803(8) of the Federal Rules of Evidence. Thus, we think the phrase a "statement * * * by a public agency" does not include an oral statement by an individual agency employee; instead, we think it refers to a more formal, written document which was reviewed, approved, or subject to a clearance process of some sort that transforms it from a statement by an employee of an agency to a statement "by" the agency.

Respondent does not cite and we have not found a case where trial testimony was admissible as a record or report of a public agency under rule 803(8) of the Federal Rules of Evidence. The cases respondent cites all involve written documents. See *Yaich v. United States,* 283 F.2d 613, 616 (9th Cir.1960) (selective service file); *Olender v. United States,* 210 F.2d 795, 801–802 (9th Cir.1954) (file containing affidavits, investigator reports, and bank reports); *Wong Wing Foo v. McGrath,* 196 F.2d 120, 123 (9th Cir.1952) (transcript of an administrative hearing); *Vanadium Corp. of Am. v. Fidelity & Deposit Co.,* 159 F.2d 105, 108–109 (2d Cir.1947) (written interdepartmental communications). Contrary to respondent's position, Professor Wigmore concludes that a statement should be in writing to be admitted under the common law public records exception. Wigmore on Evidence, sec. 1633(5), at 623 (1974).

We conclude that Hodges' and Hogue's oral testimony is not admissible under rule 803(8)(C) of the Federal Rules of Evidence.

3. *Whether Hodges' and Hogue's Oral Testimony Is Admissible Under Rule 803(24) of the Federal Rules of Evidence, the Residual Exception to the Hearsay Rule*

a. *Background*

**\*9**    Respondent contends that Hodges' and Hogue's testimony is admissible under rule 803(24) of the Federal Rules of Evidence,[2] the residual exception to the hearsay rule. To admit a statement under rule 803(24) of the Federal Rules of Evidence, the proponent must show that it: (1) Has circumstantial guarantees of trustworthiness equivalent to those required to qualify for other hearsay exceptions; (2) is offered as evidence of a material fact; (3) is more probative on the point for which it is offered than any other evidence which the proponent could obtain through reasonable efforts; (4) serves the general purposes of the Federal Rules of Evidence and the interests of justice if admitted; and (5) was provided with particulars of the testimony to the other party sufficiently in advance of trial so that the other party has a fair opportunity to prepare to meet it. Fed.R.Evid. 803(24). Rule 803(24) of the Federal Rules of Evidence is narrowly construed and applies only in exceptional circumstances. *SEC v. First City Fin. Corp.,* 890 F.2d 1215 (D.C.Cir.1989); *United States v. Kim,* 595 F.2d 755 (D.C.Cir.1979); *Powers v. Commissioner,* 100 T.C. 457, 485 (1993); *Goldsmith v. Commissioner,* 86 T.C. 1134, 1140 (1986).

b. *Notice Requirement*

Rule 803(24) of the Federal Rules of Evidence requires the offering party to notify the opposing party of the particulars of the testimony sufficiently in advance of trial to prepare to meet it.

Respondent contends that petitioner had adequate notice of Hodges' and Hogue's testimony. We disagree. Respondent's only notice to petitioner was a statement in the pretrial memorandum that the two agents would testify about the truthfulness or untruthfulness of petitioners' witnesses and the facts surrounding this case (i.e., this civil tax case), a case which Hodges said at trial was not the subject of the task force's investigation. Respondent did not give notice to

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 497 of 651

Little v. Commissioner of Internal Revenue, T.C. Memo. 1996-270 (1996)
71 T.C.M. (CCH) 3168, T.C.M. (RIA) 96,270, 1996 RIA TC Memo 96,270

petitioners of any of the particulars of the direct examination, which covered 106 transcript pages.

Respondent cites *United States v. Brown,* 770 F.2d 768, 771 (9th Cir.1985), and *Piva v. Xerox Corp.,* 654 F.2d 591, 596 (9th Cir.1981), in which the U.S. Court of Appeals for the Ninth Circuit interpreted the notice requirement of rule 803(8) (C) of the Federal Rules of Evidence.

In *Brown,* the Court of Appeals held that the trial court properly admitted the defendants' passports where the Government did not tell the defendants before trial that it intended to offer the passports into evidence. *United States v. Brown, supra.* The Government's failure to meet the notice requirement did not prevent admission of the passports because the defendants had a fair opportunity to attack the trustworthiness of their own passports. *Id.*

In *Piva,* work sheets and information about job applicants were held to be admissible even though the notice requirement was not met. The trial lasted more than a year after the evidence was admitted, during which the other party could have moved to strike it or could have rebutted it with additional evidence. Also, the opposing party had ample opportunity to attack the trustworthiness of the evidence through extensive cross-examination, and the trial court found that the evidence was reliable. *Piva v. Xerox Corp., supra* at 595–596.

 **\*10** This case is very different from *Brown* and *Piva.* Respondent elicited very detailed testimony from Hodges and Hogue. Petitioner had no notice of the testimony except for a general reference in respondent's pretrial memorandum. Respondent contends that petitioner had a fair opportunity to cross-examine Hodges and Hogue. We disagree. Although petitioners' counsel had cross-examined Hodges and Hogue, respondent's pretrial memorandum did not help petitioners to prepare for it. Petitioners' counsel telephoned both Hodges and Hogue about a week before trial to ask about their testimony. However, neither agent responded to his inquiry. We hold that respondent did not give petitioners notice as required by rule 803(24) of the Federal Rules of Evidence.

c. *Circumstantial Guarantees of Trustworthiness*

Respondent must also show that Hodges' and Hogue's testimony has circumstantial guarantees of trustworthiness equivalent to those required to qualify for other hearsay

exceptions. Fed.R.Evid. 803(24). Respondent contends that the testimony meets this requirement because the FBI agents had an adequate basis for their factual findings, the results of the FBI's investigation support the truthfulness of the FBI agents' factual findings, petitioner extensively cross-examined the FBI agents, and statements made by public officials based on their factual findings from an investigation made pursuant to authority granted by law are generally believed to be trustworthy. We disagree that these points establish circumstantial guarantees of trustworthiness equivalent to those required to qualify for other hearsay exceptions.

Respondent's only reference to another hearsay exception is to rule 803(8) of the Federal Rules of Evidence. We held above that rule 803(8) of the Federal Rules of Evidence does not apply here. See par. B–2, p. 18. The rules of evidence do not provide a blanket hearsay exception for testimony by public officials. Respondent has not shown that the FBI agents' testimony has circumstantial guarantees of trustworthiness that are equivalent to other hearsay exceptions.

We hold that the testimony of Hodges and Hogue is not admissible under rule 803(24) of the Federal Rules of Evidence.

4. *Whether Statements Made by Witnesses to FBI Agents Are Admissible*

a. *FD–302 Reports*

Hodges and Hogue testified that the FBI agents assigned to the task force prepared memoranda of interviews with 300 to 400 people during their investigation of Vernon. These documents are FD–302 reports (302 reports).

Respondent offered into evidence 302 reports for 25 witnesses, covering 264 pages. Respondent first gave the 302 reports to petitioner at 2 p.m. on the second (and last) day of trial. Respondent also asked that the 302 reports be sealed. Respondent asked that the 302 reports be used only for the instant case and that the copy petitioner was to receive be returned by petitioners' counsel with a statement, under penalty of perjury, that it had not been copied or released and that no additional copies of which he was aware were made.

**\*11** Petitioner objected to admitting the 302 reports on the grounds that they were not exchanged before trial as required by the standing pretrial order and that they are hearsay.

#### b. *Standing Pretrial Order*

About 5 months before this case was calendared for trial, we sent a copy of the Court's standing pretrial order to the parties. It stated in part: "Any documents or materials which a party expects to utilize in the event of trial (except for impeachment), but which are not stipulated, shall be identified in writing and exchanged by the parties at least 15 days before the first day of the trial session."

Materials not provided in compliance with our pretrial orders may be excluded from evidence. *Moretti v. Commissioner, 77 F.3d 637 (2d Cir.1996).* Exclusion of documents under the standing pretrial order is particularly justified if they are complex and voluminous, as here. See *Kodak v. Commissioner,* T.C.Memo. 1991–485, affd. without published opinion 14 F.3d 47 (3d Cir.1993). The 302 reports are not admissible because they were not exchanged at least 15 days before the first day of the trial session as required by our standing pretrial order.

In light of our ruling that the 302 reports are not admissible because they were not exchanged before trial, we need not consider petitioner's hearsay objection.

#### C. *Dondi Financial Stock*

As stated above, petitioners bear the burden of proving that their basis in the Dondi Financial stock was as they claimed on their 1987 tax return, and respondent has the burden of proving that the Dondi Financial stock became worthless before 1987. See par. A–5, p. 17.

#### 1. *Basis*

Petitioner paid $109,140 in cash and executed a $618,460 note for 6,800 shares of Dondi Financial stock. Respondent concedes and we find that petitioners' basis in the Dondi Financial stock was $727,600.

#### 2. *Worthlessness*

##### a. *Background*

Respondent contends that the Dondi Financial stock became worthless in 1985 or earlier. We disagree, and we conclude that the Dondi Financial stock became worthless in 1987. We reach this conclusion regardless of which party has the burden of proof.

Stock is worthless if it has neither liquidating value nor potential value. *Austin Co. v. Commissioner, 71 T.C. 955, 970 (1979).* A corporation's stock has liquidating value if its assets exceed its liabilities. *Id.* A corporation's stock has potential value if there is a reasonable expectation that it will become valuable in the future. *Morton v. Commissioner, 38 B.T.A. 1270, 1278 (1938),* affd. 112 F.2d 320 (7th Cir.1940). A corporation's stock may be worthless if the corporation declares bankruptcy, ceases to operate, liquidates, or has a receiver appointed, because these events can destroy the stock's potential value. *Id.*

Whether stock becomes worthless in a particular year is a question of fact. *Boehm v. Commissioner, 326 U.S. 287, 293 (1945); Finney v. Commissioner, 253 F.2d 639, 642 (9th Cir.1958),* affg. in part and revg. in part T.C.Memo. 1956–247; *Austin Co. v. Commissioner, supra* at 969. The standard for deciding when stock becomes worthless varies according to the circumstances of each case. *Boehm v. Commissioner, supra; Lucas v. American Code Co., 280 U.S. 445, 449 (1930).* The taxpayer's attitude and conduct are considered, but are not dispositive. *Boehm v. Commissioner, supra* at 293; *Aagaard v. Commissioner, 56 T.C. 191, 209 (1971).*

##### b. *Collapse of Vernon and Dondi Financial*

**\*12** Respondent contends that Dondi Financial became insolvent by 1985 because the real estate market crashed in 1984, Vernon paid millions of dollars of compensation to Vernon officers and directors from 1983 to 1986, and Vernon paid other flamboyant expenses. We disagree. We think other, more significant facts show that Dondi Financial stock did not become worthless in 1985. The FHLBB order required Vernon to change its financial practices to meet Federal regulatory standards. The FHLBB order required Vernon to prepare a comprehensive plan detailing business strategies and operations through June 30, 1989. These actions show that an effort was made by the FHLBB and Vernon to keep Vernon operating. It is reasonable to conclude that Dondi Financial stock had value as long as Vernon operated. We conclude that Vernon had value until the FHLBB appointed

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

a receiver and ordered its liquidation and Dondi Financial declared bankruptcy in May 1987.

#### c. *Palmer's Testimony*

Respondent contends that Dondi Financial stock had no liquidating value after 1984 because Palmer, the bankruptcy trustee's attorney during Dondi Financial's bankruptcy proceedings, testified that Dondi Financial was insolvent by 1984. Respondent asserts that Palmer's opinion is convincing because he was independent and his findings are supported by a reasonable foundation (the real estate downturn from 1982 to 1984, and crash by early 1984; Vernon's liability for the loans owned by Dondi Residential Properties, Inc., for its property; and Vernon's extensive lending of money on commercial real estate projects). We disagree.

Palmer believed that the FSLIC appraisers underappraised property, yet he relied on the FSLIC appraisals and did not use an independent appraiser. Palmer did not consider Vernon's non-Texas assets. Palmer was reviewing whether Dondi Financial had made any fraudulent conveyances within the last 4 years before its insolvency. Under the then-applicable Texas fraudulent conveyances law, a transfer was void if a debtor (Dondi Financial) did not have enough assets in Texas to pay all of its debts. Tex.Bus. & Com.Code Ann. sec. 24.03(a) (West 1986).[3] Thus, Palmer's valuation of Vernon and Dondi included only Texas assets. See *In re Dondi Financial Corp.,* 119 Bankr. 106, 108 (N.D.Tex.1990). About 46 percent of the amount of Vernon loans was non-Texas loans; i.e., out-of-State loans made in Florida, California, Louisiana, and Oklahoma.

Palmer recognized that Vernon failed gradually. He said:

> Vernon Savings & Loan died by degrees. The first was the notice in '81, as I recall, to see if the Vernon Savings & Loan people could correct their own problems.

> The second * * * was [in 1986] when the federal government went in there and put their people in, to see if the supervision would help.

> The third was * * * [also in 1986] when the federal government actually took over the running of it, to see whether or not it could be sold.

**\*13**  * * * The final take over, [in 1987] is after you've determined that none of those others will work. The patient is dead and it's time for a funeral. * * *

On March 20, 1987, the FHLBB seized Vernon, appointed the FSLIC as receiver, and reconstituted Vernon as VFSA. Dondi Financial filed its bankruptcy petition on May 9, 1987. We hold that this was when Dondi Financial stock became worthless.

#### d. *Petitioner's Testimony About Dondi Financial Assets and Liabilities*

Dondi Financial received a $6 million tax refund check in December 1986. Petitioner testified that as of January 1987, Dondi Financial had liabilities of about $1.5 to $2 million. Respondent did not introduce evidence to rebut petitioner's testimony. Petitioner was knowledgeable about Vernon's and Dondi Financial's finances and was Dondi Financial's president from 1983 to 1984 and president of Vernon's California operations from 1984 to 1986. Petitioner estimated that Vernon had between $30 and $80 million in assets when Dixon bought it in 1981 and that those assets had grown to more than $200 million when petitioner returned to Dondi Financial in 1983. Petitioner also testified that a monthly report submitted to the FHLBB showed that Vernon had a positive net worth as of September 1986. While petitioner's testimony is less reliable than Vernon's or Dondi Financial's financial statements, we disagree with respondent's view that we should disregard it.

#### e. *Respondent's Other Contentions*

Respondent points out that petitioner did not provide documents or expert testimony to establish the amount of Vernon's or Dondi Financial's liabilities for any year.

Petitioner testified to these points, but respondent urges us to disregard his testimony as self-serving. We may not arbitrarily disregard testimony that is competent, relevant, credible, and uncontradicted. *Conti v. Commissioner,* 39 F.3d at 664; *Ansley v. Commissioner,* 217 F.2d 252, 257 (3d Cir.1954); *Loesch & Green Constr. Co. v. Commissioner,* 211 F.2d 210, 212 (6th Cir.1954). We found petitioner's testimony to be credible and uncontradicted. Respondent contends that we should infer that any documentary evidence

or testimony from prospective witnesses would have been unfavorable to petitioner. Respondent points out that where a party fails to introduce evidence in his or her possession, which, if true, would be favorable, there is a presumption that the evidence, if produced, would favor the opposing party. *Wichita Terminal Elevator Co. v. Commissioner,* 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir.1947). We do not apply that presumption here for several reasons. First, petitioner offered Vernon's monthly reports for March, June, and August 1986 and an unaudited statement of Vernon's financial condition for July and August 1986. These exhibits were admitted to show their effect on petitioner and not for their truth. However, since petitioners offered the documents, the rationale behind the negative inference under *Wichita Terminal* does not apply. Second, petitioners introduced evidence that the Dondi Financial stock became worthless in 1987. *Wichita Terminal* does not apply to situations where a party provides evidence sufficient to meet the burden of proof. See *Ianniello v. Commissioner,* T.C.Memo. 1991–415; *Cohen v. Commissioner,* T.C.Memo. 1991–413. Third, respondent, not petitioner, had the burden of proving that the Dondi Financial stock became worthless no later than August 1, 1985. The *Wichita Terminal* presumption generally applies where the party failing to produce the evidence has the burden of proof. *Wichita Terminal Elevator Co. v. Commissioner, supra* at 1165. Fourth, respondent's contention that we infer that testimony by prospective witnesses not called at trial would be unfavorable to petitioner seems hypothetical at best since respondent did not identify any available witnesses who petitioners should have called.

#### f. *Testimony of Hodges and Hogue*

 **\*14** Respondent contends that testimony by Hodges and Hogue shows that Dondi Financial stock lost its value before 1984. As stated above, Hodges' and Hogue's testimony is inadmissible. See par. B, p. 17. However, even if we considered their testimony, our conclusion would remain the same.

Hodges and Hogue testified about criminal activities by Vernon officers. Hodges said that the FBI agents did not consider the financial impact those activities had on Vernon or Dondi Financial. Their testimony about Vernon's financial status consisted of examples of bad loans and accounting misrepresentations of delinquent loans to the Federal regulatory authorities and was based on the 302 reports, some of which were prepared by other agents. The

testimony, although marginally relevant to the liquidating value analysis, is not helpful in deciding whether Dondi Financial stock had potential value.

As stated above, we conclude that petitioners' Dondi Financial stock became worthless in 1987.

#### 3. *Conclusion*

We hold that petitioners may deduct $727,600 in 1987 for worthless Dondi Financial stock. [4]

#### D. *Texana Capital Stock*

#### 1. *Notice of Deficiency*

In the notice of deficiency, respondent calculated the amount of petitioners' Texana Capital stock loss by subtracting what respondent determined petitioners' basis to be (zero) from the amount petitioners deducted ($199,600). Respondent gives no reason for making this calculation if respondent was intending to challenge the timing of petitioners' deduction. Respondent also determined that petitioners did not establish that the amount deducted "was (a) a loss, and (b) sustained by you." Respondent describes the determination as "broadly worded". While the language in the previous sentence is broad, the notice of deficiency also included the computation described earlier in this paragraph. As we concluded above regarding the Dondi Financial stock, we conclude that the notice of deficiency challenged petitioners' basis in their Texana Capital stock, but not that it became worthless in 1988. See par. A–4, p. 15. Thus, we need not address respondent's argument on brief that petitioners did not prove that their Texana Capital stock became worthless in 1988.

If we had to decide whether 1988 was the year in which petitioners' Texana Capital stock became worthless, however, we would find that 1988 was the appropriate year. In February 1987, petitioner agreed to sell his Texana Capital stock. Although a final agreement was never executed, petitioners would have made a $44,000 profit on the sale. This suggests that the Texana Capital stock had value in 1987. There is no indication in the record that the stock became worthless until August 19, 1988, when the FHLBB placed Texana into receivership and appointed the FSLIC to liquidate Texana. Thus, if the year of worthlessness were in issue, every indication from the record, although sparse, is that the Texana Capital stock became worthless in 1988.

71 T.C.M. (CCH) 3168, T.C.M. (RIA) 96,270, 1996 RIA TC Memo 96,270

2. *Basis*

**\*15** Petitioners' basis in the Texana Capital stock is the amount petitioner paid for it. Sec. 1012. The amount he paid includes cash and other property given in exchange for the property and any liabilities petitioner assumed or to which the property is subject. *Commissioner v. Tufts,* 461 U.S. 300, 307 (1983); *Crane v. Commissioner,* 331 U.S. 1, 11 (1947).

Petitioner bought 34,900 shares of Texana Capital stock for $199,600 on December 12, 1983. Petitioner borrowed $77,200 for the downpayment and executed notes for $106,795 and $15,605 to buy the stock.

Respondent contends that petitioners have not proven that they had basis in the Texana Capital stock because they did not provide a copy of the $15,605 promissory note or other documentary evidence showing how much petitioner paid and that petitioner's only evidence of payment is his testimony. We may not arbitrarily disregard testimony that is competent, relevant, credible, and uncontradicted. *Conti v. Commissioner,* 39 F.3d at 664. We found petitioner's testimony to be generally credible.

Respondent also contends that petitioner did not provide documentary evidence that he paid interest or principal on the $106,795 promissory note. Respondent finally contends that petitioner did not prove that the $77,200 he says that he paid

in cash to buy Texana Capital stock went to Lemons to buy the stock.

Petitioner testified that he paid Lemons $31,795 on the $106,795 note and about $4,100 on the $15,605 note, and that he stopped paying Lemons when the FSLIC's injunction made him insolvent. Despite respondent's skepticism, we found petitioner to be credible. We believe that petitioner made payments on the $106,795 and $15,605 notes and that he used those notes and the $77,200 he borrowed to buy Texana Capital stock.

3. *Conclusion*

We hold that petitioners' basis in the Texana Capital stock was $199,600 and conclude that petitioners are entitled to a $199,600 worthless stock deduction for Texana Capital stock in 1988. [5]

To reflect the foregoing and concessions,

*Decision will be entered under Rule 155.*

**All Citations**

T.C. Memo. 1996-270, 1996 WL 315771, 71 T.C.M. (CCH) 3168, T.C.M. (RIA) 96,270, 1996 RIA TC Memo 96,270

Footnotes

1    Fed.R.Evid. 803(8) provides an exception to the hearsay rule for:
    Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

2    Fed.R.Evid. 803(24) provides an exception to the hearsay rule for:
    A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

3    This statute was amended in 1987. See Tex.Bus. & Com.Code Ann. sec. 24.003, Historical Note (West 1987).

4    Respondent does not contend, and we therefore need not consider, whether petitioners had any debt-forgiveness income in respect of the Dondi Financial stock in 1987 or 1988.

5    Respondent does not contend that, and we need not consider whether, petitioners had any debt-forgiveness income in respect of the Texana Capital stock in 1987 or 1988.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**Little v. Commissioner of Internal Revenue, T.C. Memo. 1996-270 (1996)**

71 T.C.M. (CCH) 3168, T.C.M. (RIA) 96,270, 1996 RIA TC Memo 96,270

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

4 T.C. 1236
Tax Court of the United States.

MARTHA R. PETERS, PETITIONER,
v.
COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 4330.
|
Promulgated April 30, 1945.

1. In November 1939 petitioner acquired through the partial liquidation of a Massachusetts voluntary association, taxable as a corporation, an undivided interest in certain real property then under lease to the Woolworth Co. Held, the right to receive rental under the lease was acquired as an incident to the real property and the difference between the total rentals payable under the unexpired term of the lease and the estimated fair rental value for a like term was not acquired as a separate exhaustible asset (as claimed by petitioner), amortizable over the remaining term of the lease.

2. Held, prepaid insurance should be treated by a taxpayer on the cash receipts and disbursement basis as an asset to be exhausted ratably over the term of the insurance and not as an ordinary and necessary business expense of the year in which the premiums are paid.

**Attorneys and Law Firms**

 **\*1236**  Harold L. Clark, Esq., for the petitioner.

C. A. Stutsman, Jr., Esq., for the respondent.

OPINION.

ARNOLD, Judge:

In this proceeding the Commissioner has determined an income tax deficiency for 1941 in the amount of $451.11. Two issues are presented: (1) Whether petitioner is entitled to an amortization deduction for exhaustion of the cost of 'excess rentals' paid under a lease on real property, the fee of which was acquired November 14, 1939; and (2) whether petitioner is entitled to deduct prepaid insurance on various policies covering a period of three years from the date written

in 1941 by a taxpayer on the cash receipts and disbursements basis, or only an

The Commissioner increased petitioner's income from rents by $1,247.76 in determining the deficiency herein, but made no adjustment with respect to exhausting petitioner's cost of 'excess rentals,' as the right to this deduction was merely noted in schedule J of petitioner's return without any amount being deducted for amortization of the alleged cost to her of 'excess rentals.'

The term 'excess rentals' referred to is the difference between the rentals payable under the existing lease and the rental value as claimed by petitioner under conditions existing at or about the time she acquired her undivided interest in the real property.

The facts were stipulated and are adopted as stipulated.

The petitioner's principal residence is Boston, Massachusetts. Her income tax return for 1941 was filed with the collector for the district of Massachusetts.

 **\*1237**  On or about June 22, 1910, petitioner acquired certain shares in the Phillips Estates Trust, hereinafter referred to as the trust, which is a Massachusetts voluntary association, created June 22, 1910, and subject to the provisions of the law of Massachusetts now contained in chapter 182, Massachusetts General Laws (Ter. Ed.). The trust is taxed as a corporation. The original corpus of the trust consisted of the real property mentioned below as distributed in partial liquidation, and other properties transferred to the trust by the recipients of shares of stock therefrom. On November 14, 1939, the trust made a partial liquidation of one of its principal assets, a parcel of real estate known as the 'Phillips Building,' located in Boston, Massachusetts.

The partial liquidation was effected by the execution, delivery, and recording on November 14, 1939, of a deed dated November 13, 1939, from the ten trustees of the trust to Henry C. Brookings, to the use of the Several holders of shares or certificates of beneficial interest in the trust pro rata according to the number of shares held by each and in an exchange for the surrender to the said trustees for cancellation of one-half of the number of such shares then held by each of said beneficiaries.

The total number of shares of the trust outstanding immediately prior to the partial liquidation was 32,000, of which petitioner held 3,100 shares. Of the 16,000 shares surrendered in partial liquidation, this petitioner surrendered

1,550 shares for cancellation in exchange for the interests conveyed to her by the deed of November 13, 1939. For these shares the petitioner by said deed acquired a 155/1600 undivided interest in the property conveyed and transferred by the deed.

The property conveyed and transferred by the deed consisted of a parcel of about 16,407 square feet of land in the downtown retail shopping district of Boston. On November 13, 1939, this land had erected thereon a six-story brick and stone store and office building called the Phillips Building and numbered 120 Tremont Street.

The 'said land and building was conveyed by said deed dated November 13, 1939, subject to a preexisting lease thereof made and executed by a predecessor sole trustee of (the trust) to F. W. Woolworth Company, a Pennsylvania Corporation, as lessor for a term of 30 years beginning September 1, 1923, and terminating August 31, 1953, and having an unexpired term, on November 14, 1939, of about 13 years, 9 months, 16 days; The lessor's interest in which lease was expressly assigned by said deed, together with the Lessor's interest under an Agreement of Guaranty duly executed by F. W. Woolworth Company, a New York Corporation, dated August 25, 1922, and annexed to said lease. This taxpayer received by said conveyance a **\*1238**  155/1600 interest in said land, buildings, lease and guaranty agreement.'

Under the lease the tenant was obligated to pay for the unexpired balance of the term thereof a net rental of $130,000 per annum, payable in equal monthly installments plus the amount of municipal taxes assessed and to be assessed thereon during the term, and also the cost of insurance; plus an additional cash amount of $10,000 per annum during the last five years of the term, payable monthly.

The total cash rental to be paid over the balance of the unexpired term of the lease from and after November 14, 1939, was $1,843,277, in addition to which the lessee was obligated to pay as rent the amount of taxes and insurance payable on the demised premises.

In her 1941 income tax return petitioner claimed depreciation on the building acquired by the partial liquidation in the amount of $640.15. This amount was computed on a basis of petitioner's share of a 1939 value of $165,000 for the building and a remaining life in 1939 of 25 years. The Commissioner allowed depreciation on the building in the sum of $601.48, computed on petitioner's share of a value of $103,480.52 for the building and a remaining life in 1941 of 16 2/3 years,

depreciated at a rate of 6 percent. The amount of depreciation allowed for the building is not in dispute.

In her 1939 return the petitioner, in reporting the partial liquidation, used a figure of $1,600,000 as representing a total value of the property distributed upon the liquidation. The same figure of $1,600,000 was used by the trust upon its information return, Form 996, filed pursuant to the liquidation. The Commissioner did not question the use of said valuation in petitioner's 1939 return.

On or before February 29, 1940, the property in question was appraised by two appraisers, who fixed a value for the land and buildings at $1,390,000. They valued the property without the existing lease at $500,000 and attributed the remainder of their appraised value to the earning power of the lease. The appraisal shows the assessed valuation of the property to be $1,293,000, allocated $1,184,500 to the land and $108,500 to the building. In determining the liquidating value of the land and building the Commissioner fixed the values at $1,496,519.48 and $103,480.52, respectively, based on an allowed value for liquidation purposes of $1,600,000.

The property in question was sold by the distributees during 1942 for a gross price of $1,275,000.

During the taxable year the petitioner (with the other tenants in common owning undivided interests in the Phillips Building) purchased policies of insurance upon or with respect to their interests in the Phillips Building at a cost to the petitioner of $1,601.15. The policies were each written for a term of three years. The petitioner's **\*1239**  tax returns are made and her books of record were kept on the cash receipts and disbursements basis. On a pro rata basis petitioner used or 'exhausted' during the taxable year $353.39 of the cost of her insurance, which left at the end of the taxable year unexpired insurance that cost $1,247.76. The Commissioner disallowed the cost of this unexpired insurance as a deduction for 1941.

The expense of purchasing and carrying insurance of the kinds represented by the policies purchased by or for account of the taxpayer and others, as aforesaid, was to this taxpayer an ordinary and necessary business expense of a kind properly deductible under section 23 of the Internal Revenue Code. The purchase of such insurance on policies for three-year terms was customary and usual and less expensive than if the same coverage were purchased on policies bought on a yearly basis. Each policy unexpired at the end of the taxable year had a substantial time to run and a substantial surrender value.

The asset acquired by petitioner in November 1939 was an undivided interest in real property then under lease. As an incident thereto petitioner acquired the right to receive her pro rata portion of the lease rentals. Such right was not separately valued by the parties, nor was the right to receive excess rentals separately acquired as an exhaustible assets.

The first issue is whether petitioner is entitled to a deduction for exhaustion of the cost of 'excess rentals.' Petitioner contends that she purchased the right to receive her pro rata share of the rentals over the unexpired term of the lease by surrendering one-half of her shares in the trust; that the right to receive a pro rata share of the rentals was a property right in the nature of a wasting asset which she acquired at the same time she acquired her undivided interests in the land and building; and that section 23(l) of the code authorizes the deduction for exhaustion, since it provides that in computing net income 'there shall be allowed as deductions * * * (l) * * * a reasonable allowance for the exhaustion, wear, and tear * * * ' (1) of property used in the trade or business, or (2) of property held for the production of income. She points out that it is manifest under the stipulated facts that her interest in the lease constituted 'property' within the meaning of section 23(l) and that this property is a wasting asset. This being true, she would apportion the cost basis of $1,600,000 for the entire property at November 14, 1939, between building, land, and lease or excess rentals as follows: Building, $165,000; land, $544,049.34; and lease or excess rentals, $890,950.66. She supports the lease or excess rental apportionment by a written appraisal made by two appraisers, which respondent accepted as a fair and accurate summary of the facts and opinions to which the appraisers would testify if called as witnesses.

**\*1240** Petitioner's argument is not convincing. After the sole trustee of the trust leased the Phillips property to Woolworth in 1923 the fee owner had the reversion and Woolworth the leasehold estate. The fee owner had no capital investment in the lease; the trust simply carved an estate for years out of its fee for the considerations stated in the lease. So long as the fee owner continued to hold the reversion and made no assignment of the rents, the owner's right to least rentals could not be questioned, nor would it be entitled to any deduction for exhaustion thereof. In 1939, when the reversion was conveyed to the petitioner and the other beneficiaries, not only did the owner of the reversion make no reservation of the lease rentals, but it assigned by the deed its interest as lessor in the lease and the agreement of guaranty. In Massachusetts, and generally, the rule seems to be well established that in a conveyance of real property by deed, which property is

under a lease for years, the grantee takes such estate as his grantor had, namely, a reversion. 'But the rent is incident to the reversion and passes with it, and the grantee or mortgagee, by force of the conveyance, has a right to receive all rent accruing upon the estate; it is a part of the realty and passes by the deed.' Burden v. Thayer, 3 Met.(Mass.) 76, 78; 44 Mass.Reports 76; see also note to Glidden v. Second Avenue Investment Co., 125 Minn. 471; 147 N.W. 658, in 'L.R.A. 1915C,' p. 190, 32 American Jurisprudence 104; 35 C.J. 1214.

In our opinion, when this petitioner acquired her undivided interest in the reversion she acquired as an incident thereof the right to receive her pro rata share of the rent from the tenant. She did not acquire as a separate and distinct item of property the right to receive rental income; she acquired this right as a part of the bundle of rights incident to ownership of the fee. This right of ownership and all other rights of a fee owner were subject to the outstanding leasehold estate and were acquired by the beneficiaries at a value not here in dispute. The subject matter of the conveyance was all the rights, i.e., the entire interest of the grantor, and no attempt was made to separately value each of the various rights and incidents of ownership possessed by the holder of the fee either before or after the conveyance. But petitioner now seeks to have us determine, and hold, that the right to receive lease rentals was not an incident of the ownership of the fee, but was a separate property right which was transferred by the conveyance and had a value for tax purposes in excess of $890,000, based upon the appraisal aforementioned. Since we are convinced that the right to receive income from the tenant is a part of the realty and passed by the deed of conveyance, it is immaterial whether the lease was advantageous or detrimental to the fee owner. If advantageous, as the evidence here indicates, the value of the property as a whole would be increased; if detrimental, the value would be depressed.

**\*1241** In any event we do not think that the play of economic forces, or the results of fortuitous or unfortunate circumstances, constitutes legal justification for separately valuing one of the rights and incidents of ownership possessed by the holder of the fee, especially in view of the fact that the record is wholly devoid of any evidence that lessor's interest in the lease, including the right to receive rentals, was purchased as a separate item of property, that it cost petitioner over $890,000, or that any value separate and apart from the fee was placed thereon at the time of the conveyance. And even if we were convinced that a value should be separately ascribed to this one right and incident of ownership of property, which we are not, we could not agree

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00402-RTH Document 111-1 Filed 03/31/16 Page 506 of 651

with petitioner that all value over and above the value of the land and buildings should be allocated to this right to receive income. There are other rights and incidents of ownership that have value which can not be overlooked. The tenant's covenants to insure, to pay taxes, and to do or perform other covenants for the benefit of the fee owner were important considerations in the total valuation and should be separately valued if any allocation of the value of the whole is to be made to the various parts. No attempt was made by petitioner to value these property rights, and without them the right to receive rental income would be less valuable.

We have found no case precisely in point, nor have counsel referred us to any. The case of Friend v. Commissioner (C.C.A., 7th Cir.), 119 Fed.(2d) 959, affirming 40 B.T.A. 768, more nearly approximates the present facts than any other published report. There, the decedent leased properties prior to his death. Upon his death the petitioners (trustees of a testamentary trust) contended that they acquired two separate estates in the properties—the leaseholds and the reversionary estate— and that the leases had a value in excess of the naked fee simple which was exhaustible. The petitioners there conceded that the decedent had no exhaustible right, but argued that by reason of his death they acquired the right to receive the rents under the leases as items of substantial value, which were taxed for estate tax purposes, thereby fixing a cost to them which they should be permitted to amortize. The court held the petitioners' theory untenable.

Petitioner here derives comfort from the Friend decision because the Seventh Circuit, in the course of its opinion, stated that depreciation allowances, when permitted, are deductible by the entity that acquired the asset at some 'cost,' meaning capital expenditure, or other valuable consideration. But there, as petitioner recognizes in her brief, the court did not have before it the value of the lessor's interest in the leases as separate items of property. Nor do we have before us here the lessor's interest as a separate item of property. We have merely an effort to prove that the capitalized value of the

excess rentals over **\*1242** the unexpired term of the lease was in excess of $890,000. Based thereon, we are asked to allocate this sum to the lessor's interest as though this separate amount was paid therefor. This we are unwilling to do, and on this issue we sustain the respondent.

The second issue must also be decided against the petitioner. In Higginbotham-Bailey-Logan Co., 8 B.T.A. 566, 577, we stated:

The payment in advance of premiums for insurance results in the creation of an asset, since the policy has a surrender value. The asset value is exhausted ratably over the term for which the premium is paid. In the balance sheet such items are often carried as assets under such terms as prepaid insurance or prepaid expense.

The Board continued to follow this treatment of prepaid insurance despite the decision in Welch v. DeBlois (C.C.A., 1st Cir.), 94 Fed.(2d) 842, which held such expenditures to be deductible as an ordinary and necessary business expense of the year in which paid by a taxpayer on the cash receipts and disbursement basis. George S. Jephson, 37 B.T.A. 1117. In its more recent decision, Commissioner v. Boylston Market Association (C.C.A., 1st Cir.), 131 Fed.(2d) 966, affirming B.T.A. memorandum opinion, the Circuit Court held prepaid insurance should be amortized over the life of the insurance and not deducted as an expense of the year in which the premiums were paid. We see no point in trying to reconcile the two cases, as petitioner would have us do, in view of the court's statement in the Boylston case as follows: 'We are, therefore, of the opinion that Welch v. DeBlois, supra, is incorrect and should be overruled.'

Decision will be entered for the respondent.

**All Citations**

4 T.C. 1236

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

33 T.C. 1048
Tax Court of the United States.

ROSALIE M. SCHUBERT, PETITIONER,

v.

COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 70793.
|
Filed March 23, 1960.

**Attorneys and Law Firms**

**\*1048**  Leroy B. Cohen, Esq., and John F. Kelly, Esq., for the petitioner.

Charles B. Norris, Esq., for the respondent.

Petitioner is a life beneficiary of a testamentary trust which includes in the corpus certain land which decedent had leased on a long-term lease. The tenant constructed one building on this and adjacent parcels of land. The estimated useful life of the building extended beyond the term of the lease. Held, petitioner is not entitled to a deduction for depreciation of the building; held, further, petitioner is not entitled to amortize the purported premium portion of the lease; and, held, further, section 275(b), I.R.C. 1939, is not applicable under the facts of this case to the year 1953.

**Opinion**

MULRONEY, Judge

The respondent determined deficiencies in petitioner's income tax for the years 1953, 1954, and 1955 in the amounts of $672.63, $2,938.13, and $2,782.92, respectively.

Petitioner is the beneficiary of a testamentary trust and thus required to report trust income distributed or distributable to her, including rents from land decedent had leased on a long-term lease, and on which the lessee had built a building. The questions are:

(1) Whether, in reporting such rents, petitioner is entitled to a deduction for depreciation during the years before the Court;

(2) Whether petitioner is entitled to amortize any premium value of the lease, and

(3) Whether any deficiency for the year 1953 is barred by section 275(b), I.R.C. 1939.

FINDINGS OF FACT.

Some of the facts have been stipulated and they are found accordingly.

Petitioner's mother, Gazelle K. Millhiser, owned certain real estate in the business section of Richmond, Virginia. On October 2, 1941, she leased this property, described as 409 East Broad Street, to G. C. Murphy Company. This property was located about 61.36 feet from the intersection of Broad and Fourth Streets and it consisted of a frontage on Broad Street of 19.04 feet with a depth of 138 feet to an alley in the rear. At about the time of the execution of the above lease, G. C. Murphy Company entered into two other leases with the owners of adjacent property extending to the corner of Fourth and Broad Streets and to the rear fronting on Fourth Street. The three leases were all for a term ending in each case on January 31, 1973, and they permitted G. C. Murphy Company to demolish the buildings on the three properties, use or sell the salvage materials, and put up one building on the three parcels in accordance with certain plans and specifications.

**\*1049**  The leasehold period of the Millhiser lease began November 1, 1944, FN1 and it provided for monthly rental thereafter of $1,000 per month through January 1948, $1,145.83 1/3 per month thereafter through January 1958 and $1,208.33 1/3 per month thereafter through January 1973. Some of the other provisions of the lease may be summarized as follows:

1      The three properties had existing leases on them in 1941, the longest of which expired in 1944.

(a) The tenant was obligated to reimburse the lessor for all real estate taxes and charges against the property during the term in excess of $2,445.91 annually, that being the amount of such taxes for the year 1940.

(b) The tenant was obligated to reimburse the lessor each year for the cost of fire insurance on the building and improvements during the term in excess of. $184.09 annually, that being the amount of such premiums for the year 1940.

(c) The tenant agreed in case of a new building being erected on the property by the tenant it would deliver up the same at the end of the term in as good order, repair, and condition as

the same was in at the time of completion, ordinary wear and tear, and accidents by fire or other casualty excepted.

(d) The tenant agreed at the end of the term to erect individual walls along the boundary lines of the property, to restore separate water, sewer, and powerlines and other facilities so as to make the building upon the demised premises a separate rentable unit.

(e) The tenant agreed that any building constructed by the tenant should be unencumbered by any act of the tenant and should be and become the property of the lessor upon the termination of the lease.

(f) The tenant agreed to make all exterior and interior repairs during the term.

On or about May 1, 1947, demolition of the existing improvements was begun by the G. C. Murphy Company and was immediately followed by construction of one department store building on all of the several demised properties. This building, consisting of a basement and five stories, was completed on or about July 1, 1948, at a total cost of $1,442,969. The estimated useful life of the building is 50 years from July 1, 1948.

The estimated cost of the building insofar as it was constructed on Gazelle K. Millhiser's property was from $150,000 to $180,000 and it was borne by the tenant, except to the extent of any salvage value recovered by the tenant from the demolished building thereon.

The cost to Gazelle K. Millhiser of the improvements upon the demised property at the time of their demolition on May 1, 1947, after depreciation was $6,200. She claimed for income tax purposes on account of depreciation of the demolished improvements a deduction **1050** at the rate of $240.77 annually from May 1,1947, until her death.

Gazelle K. Millhiser died on August 31, 1953, while a resident of the city and State of New York, and her will was duly admitted to probate in the Surrogate's Court of the County of New York on September 14, 1953. The will nominated decedent's son, E. Ross Millhiser, as executor and directed that the residue of the estate, after gifts of tangible personal property, be divided into two parts, one of which was $275,000 greater than the other. The larger of the two parts was devised and bequeathed to E. Ross Millhiser as trustee, for the benefit of petitioner for life (the net annual income to be paid to her in quarterly or more frequent installments) and remainder to her children, with authority in the trustee, 'in his uncontrolled discretion' to pay principal for the benefit of the life beneficiary or her children. In dividing the estate the executor was authorized to allocate assets in kind at the value of such assets as of the date of testator's death.

E. Ross Millhiser qualified as executor and trustee under said will and it is stipulated here that pursuant to the authority conferred upon him by the will the executor allotted the real property known as 409 East Broad Street, richmond, Virginia, to that part of the residuary estate devised and bequeathed in trust for petitioner. In the Federal estate tax return the above property was described and appraised as follows:

No. 409 East Broad Street, Richmond, Virginia, approximately 19.2 feet by 142.5 feet upon which other property not owned by deceased a department store has been built. Current annual gross rental $13,750. Owner's share of annual real estate taxes $2,445.19. Of annual insurance premiums.$184.09. Value based on appraisal $200,000.

The Federal estate tax was paid upon the above appraised value of $200,000. E. Ross Millhiser, as trustee, paid petitioner, who resides at the Hotel Surrey in New York, the annual income as computed by him since August 31, 1953. E. Ross Millhiser also, as petitioner's attorney in fact, filed income tax returns for petitioner for the years in question with the district director of internal revenue for the district of Virginia at Richmond. These returns report as income the net rents from 409 East Broad Street, which were computed by E. Ross Millhiser as trustee, as follows:

|  | 1953 | 1954 | 1955 |
|---|---|---|---|
| Gross rents......................................... | $4,583.32 | $17,422.61 | $17,422.31 |
| Less: |  |  |  |
| Real estate taxes............................... |  | 6,118.56 | 6,118.22 |
| Insurance.......................................... | 7.54 | 12.32 | 93.59 |
| Commissions..................................... | 275.00 | 825.00 | 825.00 |

| | | | |
|---|---|---|---|
| Depreciation....................................... | 1,666.67 | 5,000.00 | 5,000.00 |
| Net rents............................................. | 2,634.11 | 5,466.73 | 5,385.50 |

**\*1051**  Respondent disallowed the deductions for depreciation in the above computations of net income for the years in question thereby increasing the net income distributable to petitioner from the trust estate by $1,666.67 for the year 1953, $5,000 for the year 1954, and $5,000 for the year 1955. The above adjustment gives rise to the entire deficiency determined in respondent's notice of deficiency.

OPINION.

In Albert L. Rowan, 22 T.C. 865, the taxpayer inherited a one-third interest in property on which a building had been constructed by the lessee under a 66-year lease. We held the taxpayer was not entitled to a depreciation allowance on the building and our opinion reviews earlier opinions of this Court, Mary Young Moore, 15 T.C. 906; Charles Pearson, Jr., 13 T.C. 851; and Charles Bertram Currier, 7 T.C. 980, where upon similar facts we had reached an opposite result. Our opinions in the Moore and Pearson cases had been reversed by the Ninth and Fifth Circuits (Commissioner v. Moore, 207 F.2d 265, and Commissioner v. Pearson, 188 F.2d 72) and in our Rowan opinion we stated that we were reexamining our position and we concluded that the cited opinions of the Fifth and Ninth Circuits in the Pearson and Moore cases 'lay down the correct rule of law' and we specifically overruled our prior opinions in the Moore, Pearson, and Currier cases. The rule which we drew from the said Circuit Court decisions was stated in our Rowan opinion in the following language:

The effect of those decisions, as we understand them, especially the decision of the Ninth Circuit in reversing us in Mary Young Moore, supra, is to hold that in situations such as we have here where the term of the lease extended beyond the useful life of the building and where the taxpayer would not sustain any economic loss as the building wore out and could not sell her interest in the building apart from the land or the rentals, the value of her interest in the building was zero and she could not take depreciation on the building.

We applied the rule in the Rowan case, stating:

What Ellen Rowan was receiving at the time of her death was ground rental of $16,500. She was receiving no rental from the building; she had no investment in the building.

Ground rental was all that the heirs of Ellen Rowan, including petitioner, received from the property. During the taxable years they were not receiving any rental income from the building itself. The rental income from the building was being received by the lessee who had erected the building on the leased land at his own expense. The lessee was the one to whom annual depreciation deductions on the cost of the building were properly granted. * * *

Petitioner argues the instant case is not within the rule of the Rowan case; that the case only holds no depreciation will be allowed when the term of the lease extended beyond the useful life of the  **\*1052**  building. Here the term of the lease will not be expected to extend beyond the useful life of the building.

Any deduction for depreciation must be under section 23(l), I.R.C. 1939, and section 167, I.R.C. 1954. The statutes allow as a depreciation deduction, a 'reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)— (1) of property used in the trade or business, or (2) of property held for the production of income.'

As stated in Commissioner v. Moore, supra:

The statutory allowance is available to him whose interest in the wasting asset is such that he would suffer an economic loss resulting from the deterioration and physical exhaustion as it takes place. * * *

Petitioner in the instant case had no interest in the building gained by her inheritance of the interest in the land plus the right of reversion at the end of the lease that would suffer an economic loss by reason of the physical wasting of the building during the 3 years in question.

In Goelet v. United States, (S.D.N.Y. 1958) 161 F.Supp. 305, it fairly appears that the useful life of the lessee constructed building would extend beyond the end of the lease. In denying the claim of the devisees of the lessor, for depreciation, the Court stated:

Plaintiffs inherited the fee subject to the lease, the right to receive the ground rentals reserved by the lease, and a reversionary interest in the building itself. Their interest in the building is restricted to a right to occupy it some 32 years

after the crucial date in 1941. It is plain that such right suffers no diminution in value as a result of the passage of time; on the contrary, the value of the right must increase as the time for its actual enjoyment advances. This reversion is the only interest which plaintiffs have in the building as such; and as pointed out above, it is not depreciable.

Upon appeal to the United States Court of Appeals, Second Circuit, the above case was affirmed (266 F.2d 881), the opinion rejecting the very contention here made that the case is distinguishable from such cases as Commissioner v. Moore, supra, and Commissioner v. Pearson, supra. The court then goes on to say:

Appellants fail to show how a depreciable interest in the building was supplied to them in the taxable years by the circumstance that prior to 1946, when the lease term was extended for an additional ten years, the estimated useful life of the building extended eight years beyond the original term of the lease. * * *

We hold respondent was right in disallowing the claimed deductions for depreciation.

Petitioner's alternative argument is that she should be allowed a deduction in the tax years representing the amortization of the capitalized value of what is to be considered a favorable lease. This argument is based upon the proposition that the lease is a separable property interest which is to be valued separately at the date of **\*1053** lessor's death and the difference between the high rentals being paid under the lease and those which could then be obtained in the market, sometimes called premium value, should be amortized over the remaining term of the lease.

We rejected the same argument here made in cases with similar facts in Milton H. Friend et al., Trustees, 40 B.T.A. 768, affd. 119 F.2d 959 (C.A. 7, 1941), certiorari denied 314 U.S. 673, and Mary Young Moore, 15 T.C. 906, reversed on this point 207 F.2d 265 (C.A. 9, 1953), certiorari denied 347 U.S. 942. In both cases we held that the difference between the total rentals payable under the unexpired term of the lease and the estimated fair rental value for the term was not amortizable over the remaining life of the lease. Cf. Martha R. Peters, 4 T.C. 1236. In our opinion in the Moore case, we cited our earlier opinion in Milton H. Friend et al., Trustees, supra, and the affirming opinion of the Seventh Circuit in that case, and stated:

What petitioner inherited from her mother was an undivided half interest in the land under the Barker Bros. Building and a

reversionary interest in the building. Petitioner has attempted to separate the right to receive rent from the bundle of rights possessed by the holder of the fee. The right to receive rent under the lease to which the land was subject at the time of her mother's death was merely incident to the ownership of the fee. The lease grew out of the land, is reflected in the value of the land, and it neither constitutes a separate capital asset, nor increases the value of the building.

In the opinion of the Ninth Circuit in Commissioner v. Moore, supra, reversing our opinion in Mary Young Moore, supra, on this point, the Court noted its disagreement with the opinion of the Seventh Circuit in Friend v. Commissioner, supra.

It is conceded decedent could not amortize any favorable features of the lease during her lifetime. We see no justification for the separability of the favorable lease value from the many elements that determine the entire value of realty. It was apparently held in Commissioner v. Moore, supra, that there is no difference between a transfer by death or purchase; that the devisee of the land is to be considered a purchaser of the lease paying 'a bonus or premium for the acquisition of the 'favorable' features of the lease,' which he should be allowed to recover as his 'investment' in the property by depreciating a portion of the rents he will receive over the remaining period of the lease.

If the purchaser would be entitled to isolate the lease from the fee and take deductions for the favorable portion of the lease, it means some of the rents reserved in the lease would escape ordinary income taxation altogether. This is so because the seller of favorably leased property is entitled to treat the sale as a single transaction or the sale of a single asset with the lease merged in the fee subject to capital **\*1054** gains treatment. If it is logical to say an amount of rent due under the lease, which is considered in excess of normal rent, can be deducted by the purchaser of the favorably leased realty, then it would be equally logical to say the seller should be forced to isolate this amount of rent due under the lease and take it into his ordinary income.

We think the sound solution is to treat the lease interest as merged into the fee. We have not detailed the testimony of the expert who first gave his opinion as to the value of the land, then his opinion as to the normal rental for the property on August 31, 1953. From these figures he arrived at a conclusion that the premium value of the lease on the date of decedent's death was $38,685. We hold that the fact, if it be a fact, that the property was advantageously rented at the date of decedent's death, does not give rise to any claim for deduction

for amortization or depreciation of the capitalized value of excess rentals over what might be considered market rentals, on the date of decedent's death. In so holding we follow our opinion in Milton H. Friend, supra, and its affirmance by the Seventh Circuit in Friend v. Commissioner, supra.

Petitioner argues any deficiency for 1953 is barred by section 275(b), I.R.C. 1939, which provides, as follows:

SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

Except as provided in section 276—

(b) REQUEST FOR PROMPT ASSESSMENT.— In the case of income received during the lifetime of a decedent, or by his estate during the period of administration, or by a corporation, the tax shall be assessed, and any proceeding in court without assessment for the collection of such tax shall be begun, within eighteen months after written request therefor (filed after the return is made) by the executor, administrator, or other fiduciary representing the estate of such decedent, or by the corporation, but not after the expiration of three years after the return was filed. This subsection shall not apply in the case of a corporation unless—

(1) Such written request notifies the Commissioner that the corporation contemplates dissolution at or before the expiration of such 18 months' period; and

(2) The dissolution is in good faith begun before the expiration of such 18 months' period; and

(3) The dissolution is completed.

The executor made and filed with the Commissioner the written request for prompt assessment of income tax. The record does not show the date of the request. The executor was asked if any 'assessment for the year 1953 (was) made within 18 months following that requested assessment or adjustment or any phase of it,' and he answered 'No.' We do not know whether he meant an assessment against the estate or petitioner for 1953 income. At any rate, it is **\*1055** clear the statute merely limits time for an assessment of income tax for income received by a decedent in his lifetime or by his estate during the period of administration. It does not limit the time of assessment of a deficiency in the individual return of a taxpayer.

Reviewed by the Court.

Decision will be entered for the respondent.

OPPER, J., dissenting

### I.

As I read the present opinion, the real problem involved is not discussed. It arises as a question of recovery of basis and the nearest approach to suggesting that there is any such difficulty, is the decision here in issue—not before us— as to what depreciation may be deducted by an imaginary purchaser of improved real property who paid more for it than he would for vacant land even though he did not thereby acquire title to the improvement.

It is presumably being held, gratuitously it seems to me, that when the improvement finally becomes worthless, or the valuable lease covering it comes to an end, and the real property reverts to the unimproved value it would have had without the improvement and lease in the first place, the consequent loss must either be taken all in 1 year, or possibly, since the opinion is obscure as to this, that it may never be taken at all. No cases are cited for this treatment and the authorities seem to me to be to the contrary.

### II.

A somewhat similar situation was presented in Millinery Center Building Corp., 21 T.C. 817. There, the purchaser of the fee happened to be the tenant who had constructed the building but whose cost thereof had been fully depreciated. In order, as it insisted, to rid itself of a burdensome lease, it purchased the fee with whatever rights its landlord might have in the building. In denying to it any deduction for depreciation or amortization, we said, as the present opinion says: 'We think that the bundle of rights which petitioner acquired by its contract of purchase * * * was so inextricably entwined in the acquiring of the land as not to be separable therefrom.' Six judges dissented. On appeal, the case was reversed (C.A. 2) 221 F.2d 322. The Court of Appeals said, among other things:

Petitioner's main argument throughout this litigation has been that the difference between the purchase price of $2,100,000 and the unimproved value of the land, $660,000, namely the sum of $1,440,000, should be deductible * * * . (I)t suggested amortization of this amount over the unexpired term of the lease, **\*1056** or its depreciation as an additional cost of acquiring the already fully depreciated building.

The Appellate Court refused to allow the deduction as an ordinary and necessary expense and pointed out that there, the lease having merged with the fee, there could be no amortization of it. But it said (p. 324):

But the dissent seems more in accord with the realities of this situation. The taxpayer in acquiring this fee bought not only a reversionary interest in the land itself, but also a reversionary interest in the building which under the lease it would have had to surrender to the landlord when its term expired. A third-party purchaser of such a fee would be entitled to allocate part of its cost to the building and to depreciate it as such. (Emphasis added.)

The case went to the United States Supreme Court (350 U.S. 456) which affirmed the reversal by the Court of Appeals, saying (p. 460), 461):

Petitioner's claim that it 'owned' the building is based on a loose and misleading use of 'owned.' * * * It could make use of the building for the remainder of its economic life, but only on payment of the stated rent. * * * A complementary feature of the purchase of the lessor's interests in the land and building was the elimination of the obligation to pay rent on the improved land. The purchase price presumably reflected this situation. * * *

* * * Petitioner has acquired two assets— land and building— whose use it will have for the remainder of their useful lives, and petitioner therefore cannot amortize the cost allocable to the acquisition of the wasting asset over the term of the extinguished lease.

Accordingly, we affirm the judgment * * * leaving to the Tax Court the allocation still to be made. (Emphasis added.)

It would seem to follow that if a third person rather than Millinery Center had purchased the fee, two other consequences would ensue. Its purpose for the purchase would not be like Millinery Center to eliminate a burdensome lease but to acquire the benefit of the collection of a favorable rental; and it could not be said, as it was in Millinery Center, that the lease having merged with the fee, no deduction for amortization of the lease would be permissible. Some method of compensating the purchaser for the excess payment, corresponding in the Millinery Center case to $1,440,000, would have to be found to reconcile the decision there with that in the Millinery Center case.

Another example is the case of Bueltermann v. United States, (C.A. 8) 155 F.2d 597, upon which we relied in Charles Bertram Currier, 7 T.C. 980. There, land upon which the building did not then belong to the owner of the fee was inherited, and as the Court there notes (p. 600):

(F)or the purpose of the Federal estate tax the estate's interest in the land, and in the building on the land, the property in which taxpayer acquired a share by devise, was valued at $100,000. * * *

 *1057  (A)n expert witness familiar with the land before the erection of the building testified that its value as vacant property at the time of the execution of the lease was $50,000. (Emphasis added.)

See also Frieda Bernstein, 22 T.C. 1146, affirmed per curiam (C.A. 2) 230 F.2d 603.

## III.

When real property is acquired by devise it assumes a new basis in the hands of the devisee, consisting of fair market value at decedent's death and established primarily for estate tax purposes. Of course, this will ordinarily be different from decedent's basis, and what he could or could not recover would be quite different. But it is similar to the basis of cost established by an acquisition by purchase, and gain or loss on final disposition by the devisee, just as by the purchaser, will be measured by his own basis. This, as I read it, is what the Court of Appeals had in mind in Commissioner v. Moore, (C.A. 9) 207 F.2d 265, reversing 15 T.C. 906, certiorari denied 347 U.S. 942.

Now it would be miraculous if, for estate tax purposes, respondent should value unimproved, unproductive land by the same formula as property producing a substantial net long-term income. FN1 We know from petitioner's evidence that here, in fact, the values were different. FN2

1   In Albert L. Rowan, 22 T.C. 865, 873, we said: 'It seems plain that in the instant case the Commissioner in valuing the interest of Ellen Rowan in the Gulf States Building property at $412,500 did so solely by capitalizing the ground rental of $16,500 at 4 per cent for the remaining term of the lease.' This, of course, would have been an impossible procedure as to vacant and unproductive land.

2   Of course, the question is purely theoretical in a specific case since it would be impossible to find an instance of two exactly identical pieces of real property, one

improved and the other vacant. All that can be done is what was attempted here— a comparative valuation by an opinion witness.

The situation is brilliantly illustrated by the case of Albert L. Rowan, 22 T.C. 865, 870. There the Tax Court's findings were:

The fair market value of the * * * property * * * without taking into consideration the outstanding lease on the property was as follows:

Land . . . $300,000

The fair market value of Ellen Rowan's (decedent's) entire interest in the * * * property on June 20, 1940 (the date of death), that is to say including her interest in the land, building, and the lease, was $412,500. The Commissioner in arriving at this valuation for estate tax purposes * * * did so without ascribing any valuation to (decedent's) reversionary interest in the land and building at the end of the term of the lease. His valuation was based upon capitalizing the annual rental * * * (Emphasis added.)

**\*1058**  There was thus a difference between the bare land value FN3 and decedent's interest, which of course the taxpayer in the Rowan case partly inherited, of $112,500.

3     It is true that in Commissioner v. Pearson (C.A. 5) 188 F.2d 72, reversing 13 T.C. 851, certiorari denied 342 U.S. 861, which happened to involve the same property as Rowan, the Court assumed that the estate tax valuation was for the land only and that this is accepted in Commissioner v. Moore (C.A. 9) 207 F.2d 265, where, referring to the Pearson case, the statement is made (p. 270):

It is true that under the facts of that case it appeared from the record that the sum of $412,500, fixed as the value of the ancestor's interest in the property for estate tax purposes, had been based upon the value of the land alone. That fact made the case an easy one to decide. But on the more amplified record in the Rowan case as detailed above these factual statements were— although understandably— in error. And in the Pearson case, had the valuation been based upon the value of the land alone, it would have been $300,000 and not $412,500.

This difference in value, which will disappear with the improvement and the lease when the real property reverts to its unimproved valuation, should be recovered over the life of one or the other. Otherwise what is really a return of basis will appear to be taxable income. The Rowan case was, however,

probably decided correctly, since the present issue and the one raised in the Moore case was for some reason not there presented.

IV.

We tried to meet this overall problem in Charles Bertram Currier, supra, where, for want of a better approach, a part of the devisee's basis was assumed to be in the building, even though he did not own it. In this we were mistaken, as witness the Courts of Appeals of the Fifth and Ninth Circuit, although in Commissioner v. Pearson, 188 F.2d 72, reversing 13 T.C. 851, certiorari denied 342 U.S. 861, the Court of Appeals for the Fifth Circuit specifically refrained from repudiating the doctrine of the Currier case. But what is of real significance here is that the only other reversal, Moore, sought to solve the obvious problem by the very means which the present opinion rejects, namely, to incorporate in the total value some element for the lease itself which will eventually terminate and for which depreciation should accordingly be available. The problem has not been illuminated by the failure of the Supreme Court to grant certiorari in Moore, which appears to present an irreconcilable conflict with Friend v. Commissioner, (C.A. 7) 119 F.2d 959, affirming 40 B.T.A. 768, certiorari denied 314 U.S. 673.

It seems to me to be of little consequence whether the asset being permitted to justify depreciation, or, if you prefer, amortization, is stated to be the interest in the building, the lease, or some other intangible which is either different or a combination of the two. The inescapable economic fact is that the estate tax was paid on a higher value because the property was improved and leased; that this differential **\*1059** will eventually disappear; and that some consideration must necessarily be given it.

There is a suggestion in Pearson that what has been said about a basis for gain or loss would not apply to this situation because we are concerned here with basis for depreciation. See Bueltermann v. United States, supra. This proposition, which also appears in Friend v. Commissioner, supra, is, we think, set at rest by the statement in Commissioner v. Moore, supra at 275:

What we have said discloses that we do not agree with the quoted statement. We think that the court there failed to note that Sec. 114(a) provides that the basis for depreciation is the same basis provided in Sec. 113.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 514 of 651

For the reason that in my opinion some consideration must be given to the excess value incorporated in the estate tax appraisal and that some depreciation thereon should be computed, I respectfully note my dissent.

DRENNEN, J., agrees with this dissent.

**All Citations**

33 T.C. 1048

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Tax Ct. Rep. (CCH) 39,801

80 T.C. 1
United States Tax Court

SOLITRON DEVICES, INC., PETITIONER

v.

COMMISSIONER of INTERNAL
REVENUE, RESPONDENT

Docket No. 8313-78.
|
Filed January 10, 1983.

Petitioner was engaged in the business of designing, manufacturing, and marketing electronic components. In 1968, it decided to enter the microwave industry. After several unsuccessful attempts to acquire large microwave manufacturing companies, petitioner began to acquire a number of smaller companies which collectively could offer the broad product mix of the larger competitors. Pursuant to this strategy, petitioner purchased GRFF, a manufacturer primarily engaged in the custom connector business. After abbreviated negotiations, petitioner purchased all of the stock of GRFF on Aug. 29, 1968, for $3.9 million cash, of which $600,000 was attributable to realty and $958,551 to tangible assets.

On Jan. 13, 1969, GRFF was liquidated and its assets transferred to a wholly owned subsidiary of petitioner. After the purchase of GRFF, petitioner began to alter the operations of that corporation. Accordingly, New GRFF, the wholly owned subsidiary into which GRFF's assets were transferred, began to undergo a change in product mix and a restructuring of product line, thereby transforming its products from specialty products to a standard line of products. This transformation took 11;2 to 2 years. Sometime in early 1971, New GRFF was liquidated by petitioner.

On its tax return for the year ended Feb. 28, 1971, petitioner claimed an abandonment loss deduction of $2,341,449 on the ground that it abandoned an intangible asset derived from GRFF's reputable image as a custom connector manufacturer. *Held*: GRFF possessed goodwill and going-concern value equal to the amount paid by petitioner to purchase that corporation in excess of the value attributable to GRFF's realty and tangible assets. Petitioner did not spontaneously create goodwill by such acquisition. *Held, further*, such intangible assets were transferred into petitioner's wholly owned subsidiary along with the underlying tangible assets of GRFF. *Held, further*: Petitioner has not proven that the assets of New GRFF were distributed to it in liquidation at any time prior to the end of its taxable year ended Feb. 28, 1971. Accordingly, petitioner is not entitled to the abandonment loss deduction for such year and we need not decide whether such abandonment actually took place during that period.

**Attorneys and Law Firms**

**\*2** *John Y. Taggart* and *M. Jack Duksin*, for the petitioner.

*David M. Kirsch*, for the respondent.

**Opinion**

STERRETT , *Judge*:

By notice of deficiency dated April 20, 1978, respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended February 28, 1970, in the amount of $981,762. The issues for decision are (1) whether petitioner purchased certain intangible assets previously held by General RF Fittings, Inc. (hereinafter GRFF), upon its acquisition of the stock of GRFF or whether petitioner created such intangible assets in itself by such acquisition; (2) whether, upon liquidation of GRFF, petitioner received such intangible assets to which it must allocate the attributable portion of its basis in the GRFF stock; (3) whether petitioner transferred all assets received upon the liquidation of GRFF, including the intangible assets, to a preexisting subsidiary, Integronics, Inc. (hereinafter New GRFF); (4) assuming that the intangible assets are found to have belonged to New GRFF, whether the assets of New GRFF were transferred to petitioner at any time prior to March 1, 1971; and (5) if it is found that petitioner owned the intangible assets during the fiscal year ended February 28, 1971, whether petitioner abandoned such assets during the fiscal year ended February 28, 1971.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

**\*3** Petitioner Solitron Devices, Inc., was at all times material herein a New York corporation having its principal place of business in Tappan, N.Y. Petitioner's principal place of business at the time of filing the petition herein was

Riviera Beach, Fla. The returns for the taxable years ended February 28, 1970, and February 28, 1971, were filed timely with the Internal Revenue Service Center, Andover, Mass. Petitioner did not file consolidated income tax returns with its subsidiaries at any time prior to its taxable year beginning March 1, 1970. Petitioner filed a consolidated income tax return for its taxable year ended February 28, 1971.

At all times material herein, petitioner was engaged in the business of designing, manufacturing, and marketing electronic components, including semiconductor devices. Petitioner was very successful in this business, having experienced a growth of sales from $8.5 million in 1966 to more than $18 million in 1968. It had the image of an innovative and dynamic electronics company in the forefront of the development and marketing of semiconductors.

Early in 1968, petitioner decided to enter the microwave field, an area in which it previously had not been engaged, and to attempt to gain an immediate reputation as a microwave company. This decision was kindled by petitioner's perception that there would be significant growth in the microwave communications business in the ensuing years. [1]

Petitioner believed that there would be rapid movement by other companies into the microwave field. Thus, it appeared necessary for it to gain an immediate presence or reputation as a microwave component manufacturing company in order *4 to compete successfully. Petitioner understood that it would be unable to gain an immediate reputation or presence if it relied solely upon internal growth, for it would take anywhere from 18 months to 2 years to produce and market a newly conceived microwave connector [2] and from 3 to 5 years to establish a reputation in the industry as a reliable source for the product. Therefore, it chose to enter the microwave business through the purchase of companies already engaged in that business.

Petitioner first made an unsuccessful stock tender offer for Ampherol Corp., a major electronics company which was a significant microwave component manufacturer. Petitioner realized an unexpected profit of more than $29 million as a result of this unsuccessful offer. Thus, petitioner had adequate funds to engage in a cash acquisition program. Petitioner also sought unsuccessfully to acquire Microwave Associates, one of the largest independent microwave companies, and a company with a record of $20 million in sales.

Petitioner then began to eye a number of smaller companies with the objective of entering the microwave industry by acquiring companies that collectively could offer a broad product line. This would allow petitioner to compete with such companies as Microwave Associates, a company which at that time offered the type of product mix that petitioner sought. Petitioner would have attempted to purchase any company in the microwave field that provided a product that fit within the spectrum that petitioner coveted. Conversely, petitioner would not have attempted to purchase two companies that made the identical product; the acquisition of only one would have satisfied petitioner's needs.

After deciding to acquire a number of smaller microwave companies, petitioner became interested in General RF Fittings, Inc., a company that manufactured microwave connectors. [3] GRFF's business consisted of the manufacture of electronic *5 connectors in limited quantities for microwave applications in missiles, satellites, avionics, and undersea use, where size, weight, and premium operating performance were required. It was considered a high-quality, job-order specialty house.

GRFF was highly regarded in the connector industry, having had substantial before-tax profits generated from sales exceeding $1 million for the previous 5 years. It had a good reputation with its customers and was known for producing quality products. It was known as a dependable supplier that delivered on time, and, because it was a pioneer in the development of the product it manufactured, occupied a somewhat unique position in the industry. Its image as a reputable microwave connector company made it attractive to petitioner.

GRFF was engaged primarily in the custom connector business. The type of connector in which it specialized represented a very small fraction of the connector market. GRFF developed its connector business in the TNC and stainless steel areas. A TNC connector is not a specific type of connector, but encompasses a broad range of types and sizes. It is a threaded, medium-sized, medium-power connector with only a limited market. GRFF had continued as a manufacturer of custom connectors and, in this respect, had deviated from the trend of the industry as a whole, which was to concentrate on the miniature and subminiature types of connectors and on the types of standardized connectors that would be covered by military specification. [4]

Tax Ct. Rep. (CCH) 39,801

**\*6** GRFF was a high-grade machine shop. It had no secret formulas or patented drawings of value. The equipment in GRFF's plant was ordinary machinery for working metal and plating, with little specialized equipment. GRFF filled specific customer orders in small quantities with connectors made to order. It did not produce connectors in volume or by using mass production techniques. GRFF did not sell in large quantities. It did not maintain a distributor network, but sold only through its own four sales representatives.

GRFF was attractive to petitioner because its acquisition would provide an addition to the broad line of products that petitioner was attempting to assemble and would provide an immediate competitive advantage in that area. The fact that GRFF's product was somewhat outmoded did not detract from its desirability.

Petitioner commenced negotiations for the acquisition of GRFF in July of 1968 with the shareholders of that corporation. These shareholders were members of the Potsdam family. William Kearns, then executive vice president of petitioner, contacted Jay Potsdam, who was president of GRFF, and informed him of petitioner's interest in acquiring GRFF. Mr. Potsdam told Mr. Kearns that his family was not interested in selling the company. Subsequently, Jay and Harold A. Potsdam met with Mr. Kearns, who was again told that GRFF was not for sale. Mr. Kearns continued to press the matter until he finally was given a figure of $3 million, all payable in cash, and not subject to negotiation.

On July 23, 1968, there was a meeting between the two Potsdams and various representatives of petitioner. After a brief discussion, petitioner offered $3.5 million for GRFF, to be paid in 3 years. The Potsdams declined to accept less than $3.9 million, all cash. This amount was readily agreed to by petitioner. The purchase price was to consist of $3.3 million for the stock of GRFF and $600,000 for the real property on which the plant was located.

The acquisition of the stock and real property of GRFF **\*7** closed on August 29, 1968, pursuant to letter agreements and a memorandum of sale between the parties. Solitron did not seek or obtain an appraisal of GRFF before it purchased the company.

At approximately the same time petitioner purchased GRFF, it made a number of additional acquisitions in the microwave field. The other companies purchased were Filmohm Corp.,

ESCA (Electronic Standard Corp. of America), Microwave Chemical Laboratories, Plaxial, and Royal Microwave. The GRFF plant at Port Salerno, Fla., was expanded in size by 30 percent (10,000 square feet) as a result of these acquisitions. Petitioner also attempted other acquisitions, among them Microlab/FXR.

On August 28, 1968, petitioner's board of directors directed that GRFF should be liquidated and its liabilities discharged as soon as possible. Accordingly, GRFF was liquidated on January 13, 1969, and its assets and liabilities were then transferred to petitioner. [5]

On January 13, 1969, petitioner transferred the assets received from GRFF to Integronics, Inc. (hereinafter Integronics), a wholly owned subsidiary of petitioner. On February 18, 1969, Integronics changed its name to General RF Fittings, Inc. (hereinafter New GRFF). Upon transfer to Integronics, **\*8** petitioner did not retain any of the assets received from GRFF upon the liquidation of that company. [6]

Upon liquidation of GRFF into petitioner, petitioner allocated $958,551 of the $3.3 million stock purchase price to the tangible assets received. In making this allocation, GRFF's machinery was written up to its original cost to reflect the value of such assets. Petitioner allocated the balance of the purchase price, $2,341,449, to an intangible asset that it described on its general ledger and general journal for its fiscal year ended February 28, 1969, as "Goodwill re: General RF Fittings" and in its annual reports as "Excess of Purchase Price over Book Value of Assets Acquired."

The assets that had been received by petitioner upon liquidation of GRFF, and subsequently were transferred to Integronics, carried over their basis from petitioner to Inte__gronics. However, the $2,341,449 attributable to the intangible asset was not recorded on New GRFF's books, but was retained on petitioner's books when the assets received by petitioner from GRFF were transferred to Integronics. The latter was renamed New GRFF shortly thereafter.

No effort was made by petitioner to secure the services of the personnel of GRFF by long-term contracts, or otherwise. From the outset, petitioner planned to operate GRFF using petitioner's key employees from its nearby Riviera Beach **\*9** plant. GRFF's president, sales manager, chief engineer, and production manager left GRFF shortly after the acquisition of GRFF by petitioner.

After purchasing GRFF, petitioner began to change the operations of that corporation. It was concluded by the sales and marketing arm of petitioner that the optimal means of enhancing its image in the microwave industry would be by implementing a "divisional" approach, rather than by maintaining a disconnected series of small companies. Thus, petitioner began to create a divisional image by developing its own logo and by phasing out the product identification that came from the individual companies acquired. However, the GRFF name was retained for corporate identification purposes. After some time, though, it was phased out and New GRFF's products were marketed under petitioner's name using the terminology "Solitron/Microwave."

In accordance with this plan, the ESCA corporation was moved into the GRFF building, as eventually was the Microwave Semiconductor Division. An extension also was added to the building to house the Plaxial operation.

Petitioner had little interest in the number and quality of GRFF's customers. The number of users of microwave companies was limited, and petitioner could readily have identified them. In the electronics industry, new contracts are based upon price, quality, and in some cases, uniqueness of product. At its acquisition, GRFF was a leader in the manufacture of a unique product, that is, TNC connectors. Nevertheless, petitioner began to direct its efforts toward a market entirely different from that in which GRFF had been engaged.

Some 3 to 5 months after the acquisition of GRFF, petitioner began the restructuring of GRFF's product line. From its sales staff, petitioner ascertained that the specialty products manufactured by GRFF would not generate the desired level of business, that the future was in the military specification types of microwave connectors. Accordingly, New GRFF began to undergo a change in product mix and a restructuring of product line, thereby transforming its products from specialty products to a standard line of products. It added new product lines and changed the design of existing product lines. GRFF designs were discarded or updated to meet new design criteria. New GRFF turned to the filling of large orders rather than **\*10** special ones, and it terminated the old GRFF sales representatives and began using distributors to market

Charles Whorl

Joseph Friedman

Richard Trivison

its products. This transformation took a substantial period of time, at least 11;2 to 2 years. By February 28, 1971, the new designs were in wide use. [7]

Sometime in early 1971, New GRFF was liquidated by petitioner. The minute book of New GRFF contains a document entitled "Minutes of Action of the Shareholders of General RF Fittings, Inc. Taken as of March 1, 1971," providing as follows:

WHEREAS , Solitron Devices, Inc. owns all of the issued and outstanding voting stock of this Corporation; and

WHEREAS , Solitron Devices, Inc., as the sole shareholder, has determined it would be desirable to discontinue the operation of the Corporation and to dissolve the Corporation and transfer its assets to Solitron Devices, Inc; and

WHEREAS , it is necessary for this Corporation to hold an annual meeting of shareholders and to elect directors to govern the Corporation until it has been dissolved; and

WHEREAS , Solitron Devices, Inc. desires to waive notice of said meeting and to hold said meeting by written consent:

NOW, THEREFORE, BE IT

RESOLVED , that Solitron Devices, Inc. the sole voting shareholder of the Corporation, hereby waives notice of the annual meeting of shareholders of the Corporation; and be it further

RESOLVED , that the officers or directors of the Corporation are hereby authorized to take whatever steps are necessary to dissolve the Corporation and to transfer its assets to Solitron Devices, Inc., and to execute any documents necessary to achieve such purpose, and any steps heretofore taken with regard thereto are hereby ratified; and be it further

RESOLVED , that the following named persons be and they are hereby elected directors of the Corporation to serve until their successors are elected and qualified:

Solitron Devices, Inc., v. Commissioner of Internal Revenue, 80 T.C. 1 (1983)

Tax Ct. Rep. (CCH) 39,801

(S)                                         Benjamin Friedman

                                            BENJAMIN FRIEDMAN, *President*

                                            Solitron Devices, Inc.

**\*11** Also contained therein is a document entitled "Minute of Action of the Shareholders of General RF Fittings, Inc. taken as of June 8, 1971," which states:

WHEREAS , Solitron Devices, Inc. owns all of the issued and outstanding voting stock of this Corporation; and

WHEREAS , it is necessary for this Corporation to hold an annual meeting of shareholders and to elect directors to govern the corporation for the ensuing year;

WHEREAS , Solitron Devices, Inc. desires to waive notice of said meeting and to hold said meeting by written consent;

> Charles Whorl
>
> Joseph Friedman
>
> Richard Trivison
>
> (S) Benjamin Friedman
>
> BENJAMIN FRIEDMAN, *President*
>
> Solitron Devices, Inc.

NOW, THEREFORE, BE IT

RESOLVED , that Solitron Devices, Inc., the sole voting shareholder of the corporation, hereby waives notice of the annual meeting of shareholders of the Corporation; and, be it further

RESOLVED , that the following named persons be and they are hereby elected directors of the Corporation to serve until their successors are elected and qualified.

Another document entitled "Minute of Action of the Shareholders of General RF Fittings, Inc. taken as of June 8, 1971" provides:

WHEREAS , Solitron Devices, Inc. owns all of the issued and outstanding voting stock of this Corporation; and

WHEREAS , Solitron Devices, Inc., as the sole shareholder, has determined it would be desirable to discontinue the operation of the Corporation and to dissolve the Corporation and transfer its assets to Solitron Devices, Inc.; and

WHEREAS , it is necessary for this Corporation to hold an annual meeting of shareholders and to elect directors to govern the Corporation until it has been dissolved; and

**\*12** WHEREAS , Solitron Devices, Inc. desires to waive notice of said meeting and to hold said meeting by written consent;

> Charles Whorl

NOW, THEREFORE, BE IT

RESOLVED , that Solitron Devices, Inc., the sole voting shareholder of the Corporation, hereby waives notice of the annual meeting of shareholders of the Corporation; and be it further

RESOLVED , that the officers or directors of the Corporation are hereby authorized to take whatever steps are necessary to dissolve the Corporation and to transfer its assets to Solitron Devices, Inc., and to execute any documents necessary to achieve such purpose, and any steps heretofore taken with regard thereto are hereby ratified; and be it further

RESOLVED , that the following named persons be and they are hereby elected directors of the Corporation to serve until their successors are elected and qualified.

Joseph Friedman

Richard Trivison

BENJAMIN FRIEDMAN, *President*

Solitron Devices, Inc.

Also submitted into evidence was a document entitled "Assignment of Assets From General RF Fittings, Inc. To Solitron Devices, Inc.," which provided as follows:
WHEREAS , Solitron Devices, Inc. owns all the issued and outstanding voting stock of this Corporation, and

WHEREAS , Solitron Devices, Inc. in February 1971 elected to liquidate this Corporation and discontinue its operations as General RF Fittings, Inc.

WHEREAS , in 1971 all the assets of General RF Fittings, Inc. were physically transferred to Solitron Devices, Inc., but

no formal documentation of that transfer was made except on the books of the corporations,

NOW THEREFORE , to evidence the foregoing prior transfers this Corporation hereby transfers all its rights, title and interest in all its assets to Solitron Devices, Inc.

IN WITNESS WHEREOF , the parties hereto, acting through their individually authorized officers have caused this assignment to be executed as of this 1st day of March 1971.

Attest:

(S) Joseph Friedman

General RF Fittings, Inc.

By: (S) R.J. Trivison

*President*

Attest:

(S) James S. Trager

Solitron Devices, Inc.

By: (S) Benjamin Friedman

 **\*13**  This was the only executed document transferring title of New GRFF's assets to petitioner. Petitioner failed to produce its books of account for its fiscal year that began March 1, 1971.

During the 1971 fiscal year, an ultrasonic screw machine was transferred from petitioner to New GRFF. This is recorded on petitioner's General Ledger and on New GRFF's "Intercompany Account." No transfer of assets from New GRFF to petitioner was recorded on petitioner's books for its fiscal year ended February 28, 1971. As of February 28, 1971, New GRFF had a debit balance in its "Intercompany Account," indicating the presence of assets in that account. [8]

According to the Official Records of Martin County, Fla., the real property belonging to New GRFF was not transferred to petitioner until October 23, 1973.

Petitioner claimed an abandonment loss for the intangible asset in the amount of $2,341,449 on its tax return for the fiscal year ended February 28, 1971. This was reflected in petitioner's books of account. Petitioner reported a net operating loss on its tax return for its fiscal year ended February 28, 1971, resulting from the $2,341,449 deduction. This was carried back and used to offset income in that amount for petitioner's fiscal year ended February 28, 1970, a year during which it had not filed a consolidated return. Petitioner then applied for, and received, a refund of tax for the carryback year. The refund was paid in due course to petitioner. Petitioner's returns for its fiscal years ended

Tax Ct. Rep. (CCH) 39,801

February 28, 1971, and February 28, 1970, subsequently were audited. [9]

Respondent asserts that the claimed abandonment loss must be denied petitioner because the intangible asset upon which the loss deduction was based did not belong to petitioner, or, *14 alternatively, that such asset was not, in fact, abandoned during petitioner's fiscal year ended February 28, 1971.

OPINION

The first issue we must decide is whether petitioner purchased $2,341,449 in intangible assets along with its acquisition of GRFF's tangible assets or whether such assets were created by petitioner's purchase of that company. If the latter is true, then there is no question but that such assets were petitioner's to abandon during the year in issue.

A brief review of the essential facts should be helpful. In early 1968, petitioner made a decision to enter the microwave industry. In order to establish an immediate presence in this industry, it chose to gain entry by means of acquisition rather than by internal growth. Having been thwarted in its attempts at takeover of two large microwave companies, petitioner began to acquire a number of smaller companies which it hoped collectively would offer the broad product mix that petitioner desired. As part of this strategy, petitioner purchased GRFF, a reputable company which specialized in the manufacture of custom connectors. After a brief period of negotiation, petitioner agreed to pay the $3.9 million asking price of the GRFF shareholders. Of this amount, $3.3 million was paid for the stock of GRFF and $600,000 was paid for the underlying real property. The stated value of GRFF's tangible *15 assets was $958,551. It is the treatment of the stock consideration in excess of this stated amount that is in issue.

Petitioner contends that as a result of its haste to enter the burgeoning microwave industry, it paid a premium for GRFF's stock that far exceeded the fair market value of that stock. By acquiring GRFF, petitioner asserts, it augmented its product mix, thereby creating a previously nonexistent intangible asset with a basis of $2,341,449. This intangible asset was alleged to be petitioner's new image as a producer of high-performance microwave connectors custom-manufactured in limited quantities for sophisticated microwave circuits. It is argued that this asset never belonged to GRFF since it was created solely by the synergistic fit of that company into the larger unity brought together through

petitioner's efforts. In reaching this conclusion, petitioner posits that GRFF possessed no goodwill or going-concern value at the time of its purchase.

Respondent counters by arguing that GRFF possessed intangible assets in the nature of goodwill and going-concern value at the date of acquisition and that the amount paid by petitioner for GRFF's stock in excess of the amount attributable to GRFF's tangible assets is allocable to such intangible assets. Accordingly, when GRFF was liquidated and its assets dropped into a newly created subsidiary, petitioner transferred ownership of the intangible assets previously held by GRFF to that subsidiary.

As is evident, the underlying dispute centers on whether petitioner or New GRFF owned the intangible asset(s) at the time of the purported abandonment. If petitioner is correct in its assertion that it created an intangible asset in its own hands with its purchase of GRFF, then it follows that petitioner retained the asset upon liquidation and reincorporation of the GRFF enterprise. If respondent is correct that the intangible assets followed the tangible assets of GRFF into the newly formed corporate entity, we must still decide whether that entity, New GRFF, was liquidated during petitioner's taxable year ended February 28, 1971, and then whether the intangible assets were abandoned by petitioner during that year.

We begin with the axiom that petitioner bears the burden of *16 proof. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Ordinarily, upon the purchase of the stock of one corporation by another, the acquiring corporation assumes a cost basis in the purchased stock. Sec. 1012, I.R.C. 1954. The cost is the amount paid for the property received. Sec. 1.1012-1(a), Income Tax Regs. Section 334(b)(2) provides that if a subsidiary is purchased by the parent corporation and liquidated shortly thereafter, the parent's basis in the property distributed to it is equal to the adjusted basis of the stock of the subsidiary with respect to which the distribution was made. Thus, in the case of a purchase of all the stock of a subsidiary followed by a liquidation of that subsidiary, the parent would take an aggregate basis in the distributed property equal to its cost basis in the stock. This basis must be allocated to the individual assets, both tangible and intangible, received from the liquidated subsidiary in proportion to their respective fair market values. Sec. 1.334-1(c)(4)(viii), Income Tax Regs. Application of these rules is mandatory, not elective. *Broadview Lumber Co. v. United States*, 561

Tax Ct. Rep. (CCH) 39,801

F.2d 698, 711 (7th Cir. 1977). To complete the analysis, if the parent corporation then drops all of the recently distributed assets into a newly formed subsidiary, its basis in the stock of the subsidiary will be equal to its aggregate basis in those assets (which in turn was equal to its cost basis in the first subsidiary's stock). Sec. 358(a).

Applying these rules to the instant case, respondent asserts that petitioner's basis in the stock of GRFF was, pursuant to section 1012, the amount paid for that stock, that is, $3.3 million. Upon the subsequent liquidation of GRFF, petitioner's basis in the assets was to be determined by allocating the $3.3 million in proportion to the relative fair market values of the assets. The parties apparently are in agreement that the fair market value, and consequently the allocable basis, of the tangible assets acquired upon GRFF's liquidation was $958,551. Respondent departs from petitioner's portrayal by insisting that the remainder of the purchase price, $2,341,449, is allocable to the intangible assets of GRFF purchased by petitioner. All assets received by petitioner from GRFF then were transferred by the general assignment of assets to the newly formed subsidiary, New GRFF.

Petitioner describes a different version. It maintains that *17 GRFF's fair market value was equal to the fair market value of its tangible assets, and that the excess purchase price constituted a "premium" paid by petitioner to secure an immediate image as a reputable manufacturer of custom-made connectors. This image, petitioner alleges, was an intangible asset created by petitioner upon its purchase of GRFF and held continuously by petitioner until its eventual abandonment.

Petitioner proposes a somewhat unique exception to section 1012. According to its spontaneous-creation theory, the normal cost basis rule that property obtained from the seller receives a basis equal to the consideration given by the buyer (sec. 1.1012-(a), Income Tax Regs.) is suspended, or at least extended into a new realm. Here, according to petitioner, the stock acquired from GRFF takes as a basis only a fraction of the amount paid for it, with the remainder of the purchase price forming the cost basis of petitioner's spontaneously created intangible asset.

In order for us to uphold petitioner's position in its entirety, we would be required to find that GRFF had no goodwill and no going-concern value at the time it was purchased. We would then have to find that, once title to the stock passed,

an intangible asset was born, an immaculate conception of sorts, in the hands of the purchaser. Thus, we would have to accept the unusual concept that cost basis can be allocated to property other than the property purchased. This we refuse to do, although we compliment the attorneys for petitioner on their creative reasoning.

We first address the issue of whether GRFF possessed any goodwill at the time of its purchase. If so, petitioner acquired such goodwill with the purchase of GRFF's stock. *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 681 (5th Cir. 1971); *Webster Investors, Inc. v. Commissioner*, 291 F.2d 192, 195 (2d Cir. 1961), affg. a Memorandum Opinion of this Court; [10] *Peerless Investment Co. v. Commissioner*, 58 T.C. 892, 895 (1972). [11] The question of whether goodwill exists is to be *18 resolved based upon the particular facts and circumstances. *Staab v. Commissioner*, 20 T.C. 834, 840 (1953).

Goodwill is an amorphous concept which consists of "the sum total of those imponderable qualities which attract the custom of a business." *Grace Bros., Inc. v. Commissioner*, 173 F.2d 170, 175-176 (9th Cir. 1949). Goodwill has been defined as —-

> the advantage or benefit, which is acquired by an establishment beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill, or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices. [ *Metropolitan Bank v. St. Louis Dispatch Co.*, 149 U.S. 436, 446 (1893).] [12]

Goodwill exists where there is an "expectancy of both continuing excess earning capacity and also of competitive advantage or continued patronage." *Wilmot Fleming Engineering Co. v. Commissioner*, 65 T.C. 847, 861 (1976). More succinctly, it has been described as the probability that "old customers will resort to the old place." *Metallics Recycling Co. v. Commissioner*, 79 T.C. 730 (1982); *Brooks*

Solitron Devices, Inc., v. Commissioner of Internal Revenue, 80 T.C. 1 (1983)

Tax Ct. Rep. (CCH) 39,801

*v. Commissioner*, 36 T.C. 1128, 1133 (1961); see also *Miller v. Commissioner*, 56 T.C. 636, 649 (1971). The indicia of goodwill are numerous and include practically every imaginable trait that has a positive bearing on earnings.

After an exhaustive review of the case law and a thorough examination of the record, we are of the opinion that GRFF possessed substantial goodwill at the time it was purchased by petitioner. GRFF was a successful company which had a reputation within the industry and among its customers for manufacturing unique, high-quality products. It was known for dependability and timely delivery. Petitioner asserts that the intangible it created by acquiring GRFF was the image of a reputable manufacturer of custom-made connectors, an image that gave it an immediate competitive boost it could not otherwise have obtained. Petitioner contends that it created **\*19** this image. We believe that the "image" that petitioner alleges it created was precisely the same image owned by GRFF prior to its sale.

A history of high earnings, reliability, a reputation for quality, and the competitive edge resulting from these traits and from the uniqueness of the product sold all are indicative of goodwill. See *Buddy Schoellkopf Products, Inc. v. Commissioner*, 65 T.C. 640, 647 (1975); *Miller v. Commissioner, supra* at 649; *Schulz v. Commissioner*, 34 T.C. 235, 248 (1960), affd. 294 F.2d 52 (9th Cir. 1961); *Friedlaender v. Commissioner*, 26 T.C. 1005, 1017 (1956); *LeVine v. Commissioner*, 24 T.C. 147, 156 (1955); *Staab v. Commissioner, supra* at 840; *Estate of Trammell v. Commissioner*, 18 T.C. 662, 668 (1952); *Clarence Whitman & Sons, Inc. v. Commissioner*, 10 T.C. 264, 272 (1948).[13] The GRFF name carried with it an "aura" of quality and reliability. Petitioner exploited the characteristics associated with the GRFF name by continuing the company under that name for a period of time subsequent to its purchase of the company. This suggests that petitioner was aware of and attempted to benefit from the goodwill of GRFF. See *Winn-Dixie Montgomery, Inc. v. United States, supra* at 681; *Miller v. United States*, 181 Ct. Cl. 331, 347 (1967); *Cohen v. Kelm*, 119 F. Supp. 376, 379 (D. Minn. 1953).

It is undisputed that GRFF had an excellent reputation for the manufacture of a quality product. It also had an impressive earnings history over the 5 years prior to its acquisition. We find that GRFF possessed substantial goodwill at the time of its purchase, and that the existence of this intangible asset was reflected in the consideration paid by petitioner for its stock.

We next turn to the question of whether GRFF had any going-concern value at the time petitioner acquired it. Going-concern value has been defined as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." *VGS Corp. v. Commissioner*, 68 T.C. 563, 591 (1977); *Conestoga Transportation Co. v. Commissioner*, 17 T.C. 506, 514 (1951). It is **\*20** manifested by the ability of the acquired business to continue generating sales without interruption during and after acquisition. *Concord Control, Inc. v. Commissioner*, 78 T.C. 742, 746 (1982); *Computing & Software, Inc. v. Commissioner*, 64 T.C. 223, 234 (1975). A number of cases have not distinguished between goodwill and going-concern value. See, for example, *Computing & Software, Inc. v. Commissioner, supra* at 234-235; *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 685 (5th Cir. 1971). Others have. See, for example, *VGS Corp. v. Commissioner, supra* at 591.

We believe that GRFF possessed going-concern value at the time of its acquisition. We have found as a fact that, if petitioner had relied upon internal growth to develop a business identical to that of GRFF, it would have taken 18 months to 2 years to produce and market its product and from 3 to 5 years to establish the reputation enjoyed by GRFF. GRFF had before-tax profits generated from sales exceeding $1 million for the 5 years prior to its acquisition and had a good reputation with its customers. Certainly, GRFF possessed that "additional element of value that attaches to property because of its existence as part of an ongoing business." *Concord Control, Inc. v. Commissioner, supra* at 746. This value was not diminished by the change of ownership; there was no interruption of sales inflicted upon GRFF as a result of its acquisition. The fact that petitioner eventually shifted GRFF's business away from the production of custom connectors does not have the effect of reducing the value of GRFF's ongoing business at the time of purchase.

We recognize that there frequently is an overlap between the goodwill and going-concern value of a business. See *Winn-Dixie Montgomery, Inc. v. United States, supra* at 685, and cases cited therein. However, we need not establish a strict boundary between the two concepts since it is not necessary in this instance to allocate values to each of the intangible assets that have been found to have existed during the purchase of GRFF.

The sale of GRFF was a sale between unrelated parties at arm's length. In such circumstances, the sales price is the

Solitron Devices, Inc., v. Commissioner of Internal Revenue, 80 T.C. 1 (1983)

Tax Ct. Rep. (CCH) 39,801

best evidence of fair market value. *Florida Publishing Co. v. Commissioner,* 64 T.C. 269, 280 (1975), affd. by unpublished order (5th Cir., Apr. 25, 1977). Fair market value is the price at **\*21** which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both reasonably informed as to all relevant facts. See *VGS Corp. v. Commissioner, supra* at 588-589. Petitioner in essence contends that it was under a "compulsion" to purchase GRFF in order to carry out its objective of establishing a broad product mix that could successfully compete with the larger microwave companies. Consequently, petitioner asserts, it was compelled to pay a premium above and beyond the fair market value of GRFF in order to pry ownership away from the somewhat stubborn sellers.

It is true that the sellers of GRFF took a firm stance in the abbreviated negotiations between the parties, demanding an up-front cash payment of $3.9 million. Petitioner offered little resistance, appearing quite willing to meet this price. We believe that the resulting price reflected the substantial goodwill and going-concern value that was transferred to petitioner along with GRFF's tangible assets. We do not accept the proposition that GRFF's prior owners were unwilling sellers. On the contrary, they were quite ready to sell the company at the right price, and petitioner was quite willing to pay this price. Petitioner's lofty aspirations with respect to GRFF did not give rise to a "compulsion" to purchase that company, they simply produced the usual motivations prompting a willing buyer. As we stated in *Florida Publishing Co. v. Commissioner, supra* at 280, "Different purchasers see different benefits in making acquisitions and such benefits do not necessarily give rise to calling a portion of the acquisition cost a 'premium.'" Here, we conclude that the price paid by petitioner is the best evidence of fair market value and that such price constituted the fair market value of GRFF at the time of acquisition. The so-called "premium" alleged to have been paid by petitioner was paid for the substantial goodwill and going-concern value of GRFF. See *Winn-Dixie Montgomery, Inc. v. United States, supra* at 686. The "image" enjoyed by petitioner immediately after the acquisition of GRFF was not created by that acquisition, but was purchased along with the tangible assets of GRFF from the owners of that company.

In the case of a business possessing goodwill and going-concern value, where the fair market value of the business as a whole and the fair market value of the tangible assets of the **\*22** business have both been established, the "residual" or

"gap" method of valuation is a proper method for determining the value of the intangible assets owned by the business. Under such method, the value of the intangible assets equals the difference between the total purchase price and the value of the tangible assets. See *R. M. Smith, Inc. v. Commissioner,* 69 T.C. 317, 320 (1977), affd. 591 F.2d 248 (3d Cir. 1979); *Florida Publishing Co. v. Commissioner, supra* at 281; *Massey-Ferguson, Inc. v. Commissioner,* 59 T.C. 220, 231 (1972); *McKinney Manufacturing Co. v. Commissioner,* 10 T.C. 135, 140 (1948); *Jack Daniel Distillery v. United States,* 180 Ct. Cl. 308, 379 F.2d 569, 579 (1967). [14] Here, because the parties have stipulated to the value of the tangible assets of GRFF and because we have determined the value of the company as a whole, we hold that the residual method is the appropriate method of establishing the value of the intangible assets of GRFF.

Due to the vigor with which petitioner propounds its spontaneously created basis theory, we deem it appropriate to examine this contention in greater detail. In general terms, petitioner's theory stands for the proposition that an amount paid for property in excess of that property's fair market value constitutes a premium which is not attributable to the cost basis of the property. Rather, this premium gives birth to a quantity of free-floating basis which attaches to an alleged intangible asset which is none other than the incarnation of the expected surplus benefit that motivated the purchaser to pay the surplus price. [15] This proposition runs counter to the principle that a buyer's cost basis in stock includes the entire consideration paid for the stock despite the fact that he got the worst of the bargain by paying an amount in excess of fair **\*23** market value. See *Commissioner v. Matheson,* 82 F.2d 380, 381 (5th Cir. 1936), affg. 31 B.T.A. 493 (1934). [16]

More importantly, if we were to accept petitioner's theory, we would be guilty of engendering an administrative nightmare. One of the verities of tax law is that the cost basis of property is equal to the amount of cash paid for such property. Petitioner's proposition would demolish this faithful truism, opening the door to a vast new arena of controversy. We refuse to open this door.

The fallacy underlying petitioner's position stems from its confusion in distinguishing between value and basis. We would agree that an art collector's purchase of the 10th and final painting in a series would have a positive effect upon the value of the related property. However, the increment in value does not produce a corresponding increment in the basis of the affected property. The premium paid to

acquire the last painting is part of the cost basis of that final purchase. This result is mandated under section 1012 and section 1.1012-1(a), Income Tax Regs. To hold otherwise would create a chaotic situation permitting the manipulation of basis according to the whims and fancies of each individual taxpayer. If such a proposition were carried to its logical extreme, any indirect benefit derived by a purchaser as a result of the acquisition of property would require some sort of basis allocation. We would prefer to stick with the proper rule: the cost basis of property is the amount of cash paid for that property. [17] Sec. 1012; sec. 1.1012-1(a), Income Tax Regs. Thus, even if petitioner were **\*24** correct in its assertion that it paid a premium for the GRFF stock, such premium would still be allocable to petitioner's cost basis in the GRFF stock rather than to the enhanced value of petitioner's own corporate entity indirectly resulting from the acquisition.

Having found that GRFF owned intangible assets with a value determined by application of the residual method of valuation, it follows that the totality of such assets was transferred to New GRFF by the general assignment of assets. Such assignment transferred all assets received by petitioner from GRFF; therefore, any contention that GRFF's goodwill and going-concern value were retained by petitioner upon formation of New GRFF is inconsistent with the plain language of the assignment. Furthermore, such retention would have been virtually impossible, since, as a general rule, such intangibles are inseparable from the underlying assets. See *Webster Investors, Inc. v. Commissioner*, 291 F.2d 192, 195 (2d Cir. 1961), affg. a Memorandum Opinion of this Court; *Peerless Investment Co. v. Commissioner*, 58 T.C. 892, 895 (1972); *Gumpel v. Commissioner*, 2 B.T.A. 1127, 1129 (1925); *Cohen v. Kelm*, 119 F. Supp. 376, 378 (D. Minn. 1953). [18] We hold that the intangibles previously belonging to GRFF were transferred to New GRFF along with the underlying tangible assets.

Petitioner argues in the alternative that even if we find that New GRFF owned the intangible asset(s) in question, it is still entitled to an abandonment loss deduction for such assets for its taxable year ended February 28, 1971, on the ground that New GRFF was liquidated in February of 1971, prior to the end of petitioner's taxable year. Respondent maintains that New GRFF was not liquidated until the succeeding taxable year, and therefore, petitioner did not come into possession of any intangible property held by New GRFF until that time.

Both parties are guilty of erroneous reasoning. We are not concerned with the precise time of liquidation. Liquidation generally is a process that can extend over a period of months or even years. See *McDaniel v. Commissioner*, 25 T.C. 276, 280-281 (1955); *Estate of Fearon v. Commissioner*, 16 T.C. 385, 394-395 (1951); **\*25** *R. D. Merrill Co. v. Commissioner*, 4 T.C. 955, 969 (1945). In fact, we can assume for argument's sake that some liquidation activities commenced prior to March 1, 1971, and that such activities continued well into petitioner's following taxable year. This does not resolve the issue.

The critical question is one of ownership, or, more specifically, whether New GRFF distributed its assets, including its intangible assets, to petitioner prior to March 1, 1971. In order for petitioner to be entitled to a loss deduction on account of its abandonment of certain assets, it is an obvious prerequisite that petitioner be the owner of such assets. It matters not that New GRFF began its liquidation in February of 1971 if its distribution of assets took place on or after March 1, 1971, the first day of petitioner's new taxable year.

The timing of the distribution of assets is a question of fact, upon which petitioner bears the burden of proof. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

The liquidation of New GRFF did not require or give rise to a *physical* transfer of assets. Since petitioner was the sole shareholder of New GRFF stock, and since the New GRFF facilities continued to operate in conjunction with the unified Solitron complex, the liquidation was essentially a documentary one. The transfer of assets therefore must be, and can only be, established by means of the records and documents of the related corporations. We find that petitioner has failed to establish that the New GRFF tangible assets, and accordingly its intangible assets, were distributed from New GRFF at any time prior to March 1, 1971.

The only documentation of the transfer of New GRFF's assets to petitioner introduced into evidence was the Assignment of Assets from General RF Fittings, Inc., to Solitron Devices, Inc., dated "as of this 1st day of March 1971." Of course, an assignment as of March 1, 1971, is too late to help petitioner. The assignment states that New GRFF's assets were "physically transferred" to petitioner at some prior date, but "that no formal documentation of that transfer was made except on the books of the corporation." As we said before, no physical transfer of the assets was undertaken and since no formal documentation was made, petitioner's only hope could

Solitron Devices, Inc., v. Commissioner of Internal Revenue, 80 T.C. 1 (1983)
Tax Ct. Rep. (CCH) 39,801

be that the books of the corporations establish a transfer prior to March 1, 1971. With respect to the assignment, one **\*26** additional comment is instructive. The document purports to transfer all of New GRFF's "rights, titles and interest in its assets to" petitioner as of March 1, 1971. Thus, even if the transfers were recorded on the books of the two corporations sometime in February, it appears that ownership did not change hands until the date recited in the assignment. [19]

Petitioner asserts that its accountants were instructed to place New GRFF's assets on petitioner's books as of the beginning of the new fiscal year, that is, as of March 1, 1971. Petitioner's books of account indicate that New GRFF still held its assets as of February 28, 1971. Petitioner asserts that the appropriate bookkeeping entries establishing the transfer were made on the books of petitioner as of March 1, 1971. However, petitioner was not able to introduce such books into evidence since they had been lost during the intervening years. We repeat that a transfer of assets to petitioner on March 1, 1971, is too late to permit petitioner to take an abandonment loss deduction for those assets during its taxable year ended February 28, 1971.

Assuming, arguendo, that we had found that petitioner did in fact become the owner of New GRFF's assets at some time during mid- or late February of 1971, and assuming that we had found that the intangible assets in question were abandoned, petitioner would still have an extremely difficult time proving its entitlement to the abandonment loss deduction. Petitioner argues that the abandonment of the intangible assets resulted from its transformation of the business of GRFF from that of the custom connector business into the military specification connector business. This transformation allegedly took almost 2 years to complete. Yet, in order for petitioner to be entitled to the claimed abandonment loss deduction for its taxable year ended February 28, 1971, we would have to find that such abandonment was effectuated *after* petitioner came into possession of the intangible assets but *before* the close of the taxable year. Thus, assuming the transfer of assets was made on February 14, 1971, a date that is wholly unsupported by the facts, we would have to find that abandonment occurred at some time within the next 2 weeks. **\*27** At most, there is minimal, though insufficient, support for the assertion that the assets were transferred on February 28. This means that petitioner would be entitled to the claimed deduction only if abandonment occurred after such transfer but before March 1, a highly unlikely proposition.

No matter. We find that the assets were not transferred prior to March 1, 1971, and, therefore, that petitioner is not entitled to the abandonment loss deduction claimed on its income tax return for the year ended February 28, 1971. [20]

To reflect the foregoing,

*Decision will be entered for the respondent.*

[1] Microwave technology first was developed during World War II in response to military needs. Vast sums were expended on microwave research after the war to accommodate increasingly complex military systems. In the 1950s, as the microwave art developed, new by-products began to find their way into nonmilitary applications such as radar, and, particularly, telecommunications. The concept of microwave telecommunications inspired very large investment in this new industry. However, because the U.S. Government insisted on emphasizing the military role in research and development expenditures and because of problems in using telephone lines for communication, civilian applications of microwave technology were slow to develop. Prior to the late 1960s, common carrier telephone companies primarily were interested in microwave. During the late 1960s, favorable administrative and judicial decisions appeared to permit private microwave communication companies to have access to telephone lines without special interconnection devices, which access the telephone companies had been resisting vehemently. Large growth in the microwave communications business was foreseen.

[2] Between the time of inception to the time of marketing, a product design would have to be developed, plant and machinery would have to be acquired, parts would have to be ordered, and a labor force would have to be recruited.

[3] A connector is a device which is used to fasten two or more electronic components together. In August 1968, there were three categories of microwave connectors: (1) The ordinary commercial shield connectors, that is, inexpensive connectors used in portable radios, television, and other unsophisticated applications; (2) a series of connectors that had been developed and used in radar and transmitter systems during World War II and thereafter formalized (some of these connectors were manufactured in compliance with military specifications); and (3) the class I, high-performance connectors custom manufactured in limited quantities for very sophisticated microwave

circuits. The standard type of connectors, and those covered by military specifications, were used throughout the microwave industry and were manufactured in large volume. The custom connectors normally were manufactured in small volume, sometimes in as few as 5 or 10 pieces.

In the middle 1960s, MIL-C-39012, a military specification standard, was formulated to standardize the design rules of the RF connector industry by establishing uniform specification and performance parameters so that customers could be assured of a certain measure of performance. MIL-C-39012 covers the bulk of the connectors used for medium-performance microwave applications for radar and communications applications. Although the specification came into being around 1965, the individual specification sheets did not appear until 1966 through 1968, after which time they came into general use.

> By contrast, the custom connector area in which GRFF operated had a more demanding set of criteria than the MIL-C-39012 specification area. For the most part, GRFF chose not to pursue the mass-production market, but elected to stay in the custom market. However, to a limited degree, GRFF had started to engage in the MIL-C-39012 segment of the microwave business prior to its acquisition by petitioner, but soon decided not to compete in this area. GRFF never really had an opportunity to qualify or modify its product in accordance with specification sheets because of its acquisition by petitioner.

The general assignment of assets from GRFF to petitioner provided as follows:

> KNOW ALL MEN BY THESE PRESENTS:
> That General RF Fittings, Inc. a Florida corporation by Jack N. Popper, its president, its duly authorized agent, in consideration of all its outstanding capital stock the receipt of which is hereby acknowledged, hereby assigns and transfers to Solitron Devices, Inc. all of the assets of the corporation, including, but not limiting, all real and personal property, both tangible and intangible, all claims, whether matured or unmatured, all choses in actions, and all assets of every kind and nature.
> IN WITNESS WHEREOF, said corporation has caused these presents to be signed in its name, by its President, and sealed with its corporate seal, attested by its Secretary.
> Dated this 13th day of January, 1969.

> General RF Fittings, Inc.
> By: (S) Jack N. Popper

> JACK N. POPPER

ATTEST(S) George Reiland
> GEORGE REILAND, *Secretary*

The general assignment of GRFF assets by petitioner to Integronics, Inc., provided as follows:

> KNOW ALL MEN BY THESE PRESENTS :
> That Solitron Devices, Inc., a New York Corporation, by Benjamin Friedman, its president, its duly authorized agent, hereby assigns and transfers to Integronics, Inc. all of the assets of General RF Fittings, Inc. which it has received in liquidation of said corporation, including, but not limiting, all real and personal property, both tangible and intangible, all claims, whether matured or unmatured, all choses in actions, and all assets of every kind and nature.
> IN WITNESS WHEREOF , said corporation has caused these presents to be signed in its name by its President, and sealed with its corporate seal, attested by its Secretary.
> Dated this 13th day of January, 1969.

> SOLTRON DEVICES, INC.
> By: (S) Benjamin Friedman
> BENJAMIN FRIEDMAN, *President*

ATTEST: (S) Paul Windels, Jr.
PAUL WINDELS, Jr., *Secretary*

New GRFF did not entirely terminate its production of custom-made connectors, because it felt bound to continue to supply such long-time customers of GRFF as NASA and RCA. Because of the unique nature of GRFF's specialty product, these customers would have experienced difficulties in obtaining another source for their needs. Petitioner felt honorbound to fulfill these carryover contractual responsibilities.

Another subsidiary, Soledei Italia, also had a debit balance in its "Intercompany Account" as of Feb. 28, 1971.

On its Federal income tax return for the taxable year ended Jan. 31, 1967, Integronics reported no income and no deductions. It was a dormant corporation that year. On its Federal income tax return for the period ended Jan. 31, 1968, Integronics reported no income, and deductions of $238,427.53 for research and development expenses resulting in a loss in that amount. On its final return for the period July 1, 1968, through Aug. 31, 1968, a period

of 2 months, GRFF reported gross income of $53,124. In its tax return for the fiscal year ended June 30, 1968, GRFF reported gross income of $1,253,166. In its tax return for the period ended June 30, 1967, GRFF reported gross income of $667,876.

On its Federal income tax return for the period ended Feb. 28, 1969, New GRFF reported total income of $820,794; total deductions of $457,127; taxable income before a net operating loss deduction of $363,665; net operating loss deduction of $554,860 (carried over from Integronics); and no taxable income and no tax.

On its tax return for the year ended Feb. 28, 1970, New GRFF reported total income of $1,178,436; total deductions of $718,791; taxable income before net operating loss of $459,645; net operating loss deduction of $209,665 (carried over from Integronics); taxable income of $249,980; and total tax of $125,560. Prior to the transfer of GRFF to New GRFF (formerly Integronics) the latter was an inactive corporate shell that nevertheless possessed substantial net operating loss carryovers. Petitioner sought to, and in fact did, offset earnings of the business acquired from GRFF against these net operating loss carryovers in the total amount of $573,330.

10 T.C. Memo. 1960-74.

11 See also *Fox & Hounds, Inc. v. Commissioner*, T.C. Memo. 1962-229; *Yellow Cab & Baggage Co. v. Commissioner*, a Memorandum Opinion of this Court dated Sept. 15, 1950.

12 See *Pfleghar Hardware Specialty Co. v. Commissioner*, 11 B.T.A. 361, 363-364 (1928); *Seaboard Finance Co. v. Commissioner*, T.C. Memo. 1964-253, affd. 367 F.2d 646 (9th Cir. 1966).

13 See also *Proctor v. Commissioner*, T.C. Memo. 1981-436; *Fedders Corp. v. Commissioner*, T.C. Memo. 1979-350, affd. by unpublished order (3d Cir., May 8, 1981); *H & R Distributing Co. v. Commissioner*, T.C. Memo. 1972-203; *Broyles v. Commissioner*, T.C. Memo. 1962-215.

14 See also *Proctor v. Commissioner*, T.C. Memo. 1981-436; *Black Industries, Inc. v. Commissioner*, T.C. Memo. 1979-61; *R. M. Smith, Inc. v. Commissioner*, T.C. Memo. 1977-23, affd. 591 F.2d 248 (3d Cir. 1979); *Pensacola Greyhound Racing, Inc. v. Commissioner*, T.C. Memo. 1973-225, affd. by unpublished order (5th Cir., Sept. 3, 1974); *H & R Distributing Co.*

*v. Commissioner*, T.C. Memo. 1972-203; *Plantation Patterns, Inc. v. Commissioner*, T.C. Memo. 1970-182, affd. 462 F.2d 712 (5th Cir. 1972); *Philadelphia Steel & Iron Corp. v. Commissioner*, T.C. Memo. 1964-93, affd. 344 F.2d 964 (3d Cir. 1965); *Charlotte Corp. v. Commissioner*, T.C. Memo. 1960-97, affd. sub nom. *Meister v. Commissioner*, 302 F.2d 54 (2d Cir. 1962).

15 Again, we have found as a fact that no such premium was paid in this case.

16 See also *Spitcaufsky v. Commissioner*, a Memorandum Opinion of this Court dated Jan. 20, 1954. Compare *P & R Investors, Inc. v. Commissioner*, T.C. Memo. 1963-284.

17 We are not unmindful of a number of cases wherein the purchaser of property for more than fair market value has been denied that portion of basis attributable to the excess purchase price. However, in these atypical cases, the parties were not adverse and did not deal at arm's length. Accordingly, where the parties are related, and a payment in excess of fair market value is a disguised dividend, gift, contribution to capital, or the like, the cost basis of property might not be equal to the value received by the seller. See *Majestic Securities Corp. v. Commissioner*, 120 F.2d 12 (8th Cir. 1941), affg. 42 B.T.A. 698 (1940); *Mountain Wholesale Co. v. Commissioner*, 17 T.C. 870, 875 (1951); *New Hampshire Fire Insurance Co. v. Commissioner*, 2 T.C. 708, 724 (1943), affd. 146 F.2d 697 (1st Cir. 1945); *Estate of Monroe v. Commissioner*, 45 B.T.A. 1061, 1072 (1941); *McDonald v. Commissioner*, 28 B.T.A. 64, 66 (1933); *Memphis Transit Co. v. United States*, 155 Ct. Cl. 797 (1961), 297 F.2d 542, 545 (1962); *Broadwell Construction Co. v. United States*, an unreported case (E.D. N.C. 1977, 40 AFTR 2d 77-6072, 77-2 USTC par. 9725). This is not the situation in the instant case.

18 See also *Fox & Hounds, Inc. v. Commissioner*, T.C. Memo. 1962-229.

19 We note that ownership of the realty possessed by New GRFF was not transferred until Oct. 23, 1973.

20 Because of this finding, we need not reach the issue of whether the intangible assets in question were, in fact, abandoned during the year in question.

## All Citations

80 T.C. 1, Tax Ct. Rep. (CCH) 39,801

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 529 of 651

Utilicorp United, Inc. & Subsidiaries v. C.I.R., T.C. Memo. 1997-47 (1997)
73 T.C.M. (CCH) 1835, T.C.M. (RIA) 97,047, 1997 RIA TC Memo 97,047

T.C. Memo. 1997-47
United States Tax Court.

UTILICORP UNITED, INC. & SUBSIDIARIES,
f.k.a. Missouri Public Service Co., Petitioner,
v.
COMMISSIONER OF INTERNAL
REVENUE, Respondent.

No. 8563–94.
|
Jan. 27, 1997.

**Attorneys and Law Firms**

James G. Kreissman, Michael H. Simonson, and Naftali Z. Dembitzer, New York City, for petitioner.

Peter J. Graziano, Napanoch, NY, and Pamela L. Cohen, Wayne, NJ for respondent.

**\*1** S, a subsidiary of P, purchased certain of the assets of a reconstructed hydroelectric power facility and immediately leased those assets back to the seller. R determined that S should have allocated a portion of the asset purchase price to goodwill or going concern value. P contends that a reallocation is inappropriate becuase S acquired no going concern value or goodwill.

> *Held:* P has proven that the fair market value of the listed assets acquired by S, which did not include going concern value or goodwill, equaled or exceeded the price paid for them; therefore, S need not allocate any portion of that purchase price to goodwill or going concern value.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:

Petitioner Utilicorp United, Inc. (petitioner) is the common parent corporation of an affiliated group of corporations making a consolidated return of income (the affiliated group). Respondent has determined deficiencies of $2,462,443 and $229,479 in the consolidated Federal taxable income of the affiliated group for the group's 1984 and 1987 taxable (calendar) years, respectively. The only issue remaining for decision is the depreciable basis of certain assets. Respondent has determined that one member of the affiliated group, Utilicorp, Inc. (UtilCo), improperly included in the depreciable basis of certain property the nondepreciable cost of goodwill or going concern value.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

*Introduction*

Some facts have been stipulated and are so found. The stipulations of fact filed by the parties and accompanying exhibits are incorporated herein by this reference.

Petitioner is a Delaware corporation with its principal place of business in Kansas City, Missouri.

On December 17, 1987, UtilCo entered into a sale-leaseback transaction with a Minnesota limited partnership, Topsham Hydro Partners Limited Partnership (THP). THP owned a hydroelectric facility in Topsham and Brunswick, Maine, on the Androscoggin River, at the Pejepscot Mill Dam (the hydroelectric facility). UtilCo purchased an undivided 50–percent interest in certain assets (including real property) constituting the hydroelectric facility (the undivided interest) and immediately thereafter leased the undivided interest back to THP. Chrysler Capital Corp. (Chrysler Capital) simultaneously purchased (and leased back) the remaining undivided interest.

*History of the Facility*

*Androscoggin Water Power Company*
The Pejepscot Mill Dam originally was owned by a Maine corporation, the Androscoggin Water Power Co. (AWP). In 1982, AWP obtained a license from the Federal Energy Regulatory Commission (FERC) to construct a hydroelectric generating facility at the dam. In furtherance of that project, among other actions, AWP entered into contracts for reconstruction of the site (the construction contracts) and negotiated a power purchase agreement with Central Maine Power Co. (CMP).

*Construction Contracts*

The construction contracts included (1) an agreement with Cianbro Corp. (Cianbro) for general construction and the installation of equipment, (2) an agreement with Allis–Chalmers Corp. (Allis–Chalmers) for a turbine/generator and related equipment, and (3) an agreement with Acres International Corp. (Acres) for design and engineering services.

None of the construction contracts entitles AWP to a complete and working hydroelectric generating facility. In particular, Acres was only responsible for (1) preliminary engineering of the facility, (2) determining the total project cost, (3) final design of the facility, including the creation of detailed construction drawings, and (4) management of the construction process. Acres was not obligated to deliver to AWP a functional facility. Acres did not function as a general contractor for the construction of the facility. The only warranties provided by Allis–Chalmers and Cianbro were that the work that those companies performed would conform to the requirements of their respective contracts and would be free from defects in design, workmanship, materials, and/or performance. Cianbro and Allis–Chalmers did not guarantee each other's work. The prices charged by Allis–Chalmers and Cianbro were not fixed and were subject to increases or decreases in the event those contractors were required to make changes in the amount of work that they had to perform.

*Power Purchase Agreement*

**\*2**  AWP and CMP entered into the power purchase agreement on June 25, 1984, and amended it on June 17, 1985 (as so amended, the power purchase agreement). Pursuant to the power purchase agreement, CMP agreed to purchase the electrical output of the hydroelectric facility for 15 years and obtained an option to purchase such output for an additional 5 years. The power purchase agreement expressly provided that it would terminate if CMP did not receive electricity from the hydroelectric facility by September 1, 1988. The rates provided by the power purchase agreement were market rates.

*THP Acquires AWP and Completes the Hydroelectric Facility*

THP was formed in 1985. In June 1985, THP acquired all of the shares of stock of AWP for $10.5 million. At that time, AWP had sold no electricity and had no paid employees. AWP assigned its rights and obligations under the power purchase agreement and the construction contracts to THP. The power purchase agreement was not significant to

THP's decision to purchase AWP, since the power purchase agreement was a market rate contract and there was a risk that it might expire before construction of the hydroelectric facility was completed. AWP's FERC license was transferred to THP. On February 10, 1986, AWP was liquidated and its assets distributed to THP.

In June 1985, THP commenced reconstruction of the hydroelectric facility. Over the next 2½ years, THP made substantial alterations to the properties acquired from AWP. During that period, THP assumed various construction risks, including labor strikes, unforeseen delays and costs, and physical damage. Personnel employed by THP managed the completion of construction. THP paid a total of $48.2 million to acquire the stock in AWP and to complete the reconstruction of the hydroelectric facility. The hydroelectric facility was synchronized with CMP, and THP began furnishing electric power to CMP on October 31, 1987.

*UtilCo Acquisition and Lease*

*Purchase of Undivided Interest*

On December 17, 1987, UtilCo purchased the undivided interest from THP for $32,250,000. UtilCo immediately leased the undivided interest back to THP for a 15–year term pursuant to Project Lease Agreement No. 2, dated December 1, 1987 (the project lease). Under the terms of the project lease, THP has, at the end of that 15–year term, the option of either extending the lease term or repurchasing the undivided interest. UtilCo effected its purchase and lease of the undivided interest through the Meridian Trust Co., which, pursuant to a trust agreement, purchased the undivided interest on behalf of UtilCo. (Hereafter, we shall disregard Meridian's role and consider UtilCo as owning directly the undivided interest.)

*The Bill of Sale*

The document evidencing the purchase of the undivided interest by UtilCo was Warranty Deed and Bill of Sale No. 2, dated December 15, 1987 (the bill of sale). The bill of sale sets forth with particularity the assets that were acquired by UtilCo pursuant to the bill of sale (the bill of sale assets). The bill of sale assets consist of (1) the land upon which the hydroelectric facility was constructed, (2) the flowage rights appurtenant to that land, (3) certain easements appurtenant to that land (excluding the previously referenced flowage rights), (4) the structures located on that land, and (5) the equipment comprising the hydroelectric facility.

*FERC License*

**\*3** The FERC license was not specifically identified in the bill of sale or the schedules attached thereto as an asset to be transferred to UtilCo. FERC requires that owners of hydroelectric facilities become colicensees for such facilities, regardless of whether those owners perform significant services with respect to the ownership or management of the facility. On November 6, 1987, FERC issued an order transferring the license for the hydroelectric facility from THP alone to THP, UtilCo, and Chrysler Capital as colicensees.

*Operating Agreement*

As part of the sale-leaseback, UtilCo entered into an operating agreement with THP.

*Security for Lease Payments*

The bill of sale does not provide for a sale by THP of its interest in the power purchase agreement or the construction contracts. THP assigned its rights under the power purchase agreement and the construction contracts to UtilCo to secure the payment of rents by THP under the project lease.

*Purchase Price Allocation*

In making its purchase price allocation, UtilCo allocated the $32,250,000 purchase price among the bill of sale assets. After consummating its purchase of the undivided interest, UtilCo calculated its investment tax credit, business energy tax credit, and depreciation for the 1987 taxable year, using that purchase price allocation. Because UtilCo could not use all of its general business credit in the 1987 taxable year, a portion of that credit was carried back to the 1984 taxable year. UtilCo did not record any goodwill or going concern value on its books as a result of the acquisition of the undivided interest.

*Expert Testimony*

*Petitioner's Expert*

Petitioner presented the expert testimony of David C. Moody, vice president of Stone & Webster Management Consultants, Inc. Mr. Moody is licensed in the State of Maine as a professional engineer and as a real estate appraiser. Mr. Moody is experienced in the appraisal of all kinds of utility properties, including hydroelectric plants. Mr. Moody has opinions as to the market values of (1) the bill of sale assets and (2) an undivided 50–percent interest therein. He is of the opinion that, as of December 17, 1987, the market values of the bill of sale assets and of an undivided 50–percent interest therein were $65,000,000 and $32,500,000, respectively.

Mr. Moody arrived at his opinions by determining the reproduction cost of the bill of sale assets to be $64,879,102. He also applied an earnings analysis to the income stream that the bill of sale assets (in conjunction with certain other assets of THP) could have been expected to produce. He determined that the present value of such income stream was $73,261,609.

Mr. Moody determined the reproduction cost of the bill of sale assets as follows:

| | |
|---|---|
| Cost of AWP stock | $10,500,000 |
| New construction | 28,566,497 |
| Subtotal | 39,066,497 |
| Turnkey fee (15%) | 5,860,000 |
| Other costs [1] | 9,142,605 |
| Total construction costs | 54,069,102 |
| Developer's profit (20%) | 10,810,000 |

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.  **0527**

Utilicorp United, Inc. & Subsidiaries v. C.I.R., T.C. Memo. 1997-47 (1997)

73 T.C.M. (CCH) 1835, T.C.M. (RIA) 97,047, 1997 RIA TC Memo 97,047

| Total cost indicator | $64,879,102 |
|---|---|

**\*4** Mr. Moody applied his earnings analysis by considering an estimate of annual net operating income, which was adjusted for income tax considerations and then discounted to present value using an after-tax discount rate of 10.55 percent.

Mr. Moody reconciled the difference in result between his two valuation approaches by assigning virtually all of the excess under his earnings analysis to certain business assets, such as the right to receive payments under the power purchase agreement, retained by THP.

*Respondent's Expert*

Respondent presented the expert testimony of Richard H. Knoll, senior consultant, Business Valuation Services, Inc. Mr. Knoll is experienced in the valuation of assets, operating entities, and proprietary technologies in the fields of petroleum refining, chemical processing, food processing, pharmaceuticals, and related fields. Mr. Knoll is licensed as an engineer in the State of Illinois. Mr. Knoll has opinions as to the market values of UtilCo's undivided 50–percent interest in (1) all of the assets that he believed were acquired by UtilCo and Chrysler Capital and (2) only the tangible assets acquired by UtilCo and Chrysler Capital. He is of the opinion that the market values of such interests at December 17, 1987, were $32,250,000 and $20,650,008, respectively.

In part, Mr. Knoll arrived at his opinions by determining the replacement cost of the real and personal property purchased by THP. He determined replacement cost by adding to the actual cost of that property an entrepreneurial profit of 13 percent. A 13–percent allowance for entrepreneurial profit was considered reasonable by Mr. Knoll because it represented the weighted-average cost of capital of UtilCo at the time of the sale-leaseback transaction. Mr. Knoll determined that the "acquisition cost/rehabilitation cost of

a 50% interest to THP was approximately $24,000,000." Mr. Knoll also applied an income approach, which involved determining the present value of UtilCo's after tax cash flows (including residual value), using a discount rate of 13 percent. Taking into account that present value, he determined that the value of UtilCo's undivided 50–percent interest in all of the assets that he believed were acquired by UtilCo and Chrysler Capital was $34,538,942 as of December 17, 1987. In arriving at his opinion that the market value of UtilCo's undivided interest was $32,250,000, Mr. Knoll assumed that UtilCo enjoyed some negotiating advantage over THP.

Mr. Knoll assumed that the difference between the $32,250,000 value of UtilCo's undivided interest and his determination of the tangible asset value using the cost approach ($24,000,000) was due to UtilCo's acquisition of intangible assets. Mr. Knoll concluded:

> The fair market value of the Project largely relates to its proposed power sale under the prenegotiated PPA, [power purchase agreement] the leasing of the Facility under the Participation Agreement, the guarantee of tax savings under the Tax Indemnity Agreement, guaranteed use of the FERC license, guaranteed use of the required easements near the Facility and going concern value, in addition to the tangible value associated with the Facility's personal property and operating assets.

**\*5** In pertinent part, Mr. Knoll's "Total Project Cost Allocation" was as follows:

| Personal property | $12,856,365 |
|---|---|
| Real estate improvements | 28,425,492 |
| Real estate-unimproved | 18,159 |
| Total tangibles | 41,300,016 |
| | |
| Intangibles | |
| Flowage rights | |

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 533 of 651

**Utilicorp United, Inc. & Subsidiaries v. C.I.R., T.C. Memo. 1997-47 (1997)**
73 T.C.M. (CCH) 1835, T.C.M. (RIA) 97,047, 1997 RIA TC Memo 97,047

| | |
|---|---:|
| Easement | |
| Permits/licenses | |
| Collateralization of | |
| power purchase agreement | |
| Participation agreement | |
| Tax indemnity agreement | |
| Project lease | |
| Security deposit agreement | |
| Other intangibles | |
| Total intangibles | 23,199,984 |
| Fair Market Value of Total Assets | 64,500,000 |

Mr. Knoll was unable to ascribe any particular value to any intangible asset. In his opinion, "it is nearly impossible to quantify a single element of intangible value."

## OPINION

### I. *Introduction*

Petitioner has assigned error to respondent's determination that the purchase price paid by UtilCo for its undivided 50–percent interest (the undivided interest) in certain of the assets constituting the hydroelectric facility located at the Pejepscot Mill Dam, on the Androscoggin River, in the State of Maine (the hydroelectric facility), should in part be reallocated to either goodwill or going concern value. At trial, respondent conceded that, if there was any goodwill, it was "very small or nothing". We accept that statement as a concession by respondent that UtilCo did not acquire goodwill. Thus, we shall limit our inquiry to the question of whether UtilCo acquired going concern value. Also at trial, the parties agreed that the Court, as an initial matter, should determine the fair market value of the assets listed in Warranty Deed and Bill of Sale No. 2 (the bill of sale assets). We have found that UtilCo acquired an undivided 50–percent interest in the bill of sale assets. Going concern value is *not* one of the bill of sale assets. Respondent concedes that, if the fair market value of the bill of sale assets was at least $65,000,000, then UtilCo acquired *no* going concern value. [1] As set forth below, we find that the value of the bill of sale assets was $65,000,000. Accordingly,

we find that UtilCo acquired no going concern value, and we sustain petitioner's assignment of error.

### II. *Testimony*

#### A. *Reliance on Expert Testimony*

Both petitioner and respondent rely heavily, if not exclusively, on expert testimony to establish fair market value. As its expert witness as to valuation, petitioner called David C. Moody. As her expert witness as to valuation, respondent called Richard H. Knoll. Messrs. Moody and Knoll each provided a written report, which were both admitted into evidence. Like the parties, we rely heavily on expert testimony in making our finding as to the value of the bill of sale assets. We found Mr. Moody to be convincing, and we agree with his conclusion as to the value of the bill of sale assets. We had difficulty with the testimony of Mr. Knoll, who, in any event, did not have an opinion as to the amount of going concern value allegedly acquired by UtilCo. We were not persuaded by his testimony and do not accept his conclusions as to value. We shall set forth some of our reasons for agreeing with Mr. Moody and disagreeing with Mr. Knoll.

#### B. *David C. Moody*

**\*6** Mr. Moody is licensed in the State of Maine as an engineer and as a real estate appraiser. He is experienced in the appraisal of electric and water utility properties,

including hydroelectric plants. Like Mr. Knoll, Mr. Moody rejected a comparable sales approach as inappropriate to the circumstances in this case and relied on both a cost and earnings approach to determine value. He identified the properties that he was appraising as the bill of sale assets. He determined the reproduction cost of the bill of sale assets to be $64,879,102, but, taking into account the results of his income analysis, concluded that the fair market value of the hydroelectric facility was $65,000,000. We are not troubled by that discrepancy. Mr. Moody did not assign any value to going concern value.

Respondent's criticism of Mr. Moody's opinions focuses on his determination that the reproduction cost of the bill of sale assets was $64,879,102. Respondent quarrels with inclusion of a 15 percent turnkey fee of $5,860,000 and a 20 percent developer's profit of $10,810,000. Apparently, respondent does not disagree that the remaining acquisition and construction costs of the bill of sale assets were $48,209,102. Indeed, respondent's expert, Mr. Knoll, was of the opinion that the "overall construction price" paid by THP was $48,200,000.

In his report, Mr. Moody states that, although THP had contracted for construction of the facility, it was not guaranteed a complete working hydroelectric facility at the completion of construction. He states that the owners bore the risk of nonperformance of the various contractors, as well as the cost of unforeseen difficulties such as bad weather, floods, subsurface geotechnical problems, or start-up problems. Mr. Moody states that those risks could have been alleviated by hiring an overseer of the entire process who would be in charge of delivering a completed, operating facility. He refers to that risk of delivering a completed, operating facility as the "turnkey risk", and he states that contractors who take on a turnkey risk charge a premium, which is typically 15 percent.

If THP bore a turnkey risk in connection with construction of the facility, then the addition of a turnkey premium in determining the value of the bill of sale assets is appropriate. See *Miami Valley Broadcasting Corp. v. Commissioner,* 204 Ct.Cl. 582, 499 F.2d 677, 680 (1974) (turnkey premium appropriate in valuing a fully operational plant received on dissolution of a corporation). We have found that none of the construction contracts entitled AWP (or its successor by assignment, THP) to a complete and working hydroelectric generating facility. AWP and then its assignee, THP, bore the ultimate risk that the facility would not function when completed. Notwithstanding respondent's argument to the

contrary, we are persuaded that THP bore a turnkey risk in connection with the construction of the facility, and we so find. We must determine whether the inclusion of the 15–percent turnkey premium in Mr. Moody's valuation of the bill of sale assets was appropriate.

**\*7** In determining an appropriate turnkey fee, Mr. Moody consulted employees of Stone & Webster Engineering Corp. That corporation enters into turnkey contracts to build hydroelectric power facilities. Based on those conversations, Mr. Moody concluded that contractors that enter into agreements to deliver fully functional hydroelectric power facilities typically charge a turnkey premium equal to 15–percent of the funds expended in constructing the facility in question. Respondent asserts that a 15–percent turnkey fee is excessive. Respondent supports that assertion with Mr. Knoll's testimony. Mr. Knoll's experience with turnkey contracts, however, is limited to three turnkey contracts involving the construction of assets to be used in the petrochemical industry. Mr. Knoll apparently has no experience in determining appropriate turnkey fees applicable to contracts calling for the construction of assets to be used in the hydroelectric power industry. We find that Mr. Moody was a more credible witness than Mr. Knoll. We have no reason to believe that Mr. Moody overstated the turnkey fee, and we accept his determination and calculation of that fee.

Respondent questions the amount of, rather than the necessity of, a developer's profit allowance. Indeed, Mr. Knoll factors into his own analysis a developer's profit of 13 percent. Respondent also argues that Mr. Moody erred by including both a turnkey fee and a developer's profit in computing the reproduction cost of the facility. Respondent cites no authority prohibiting both a turnkey fee and a developer's profit, and petitioner has convinced us that the two address different economic risks. The turnkey risk is the risk inherent in promising a working facility. The developer's profit represents the risk inherent in constructing a facility that cannot be sold for the price asked by the developer. Insofar as the turnkey fee and the developer's profit address different components of reproduction cost, we see no logical reason why they cannot coexist. We are persuaded that, in the instant case, the turnkey fee and the developer's profit figure represent different components of the reproduction cost of the bill of sale assets and that it was appropriate for Mr. Moody to include both of those figures in the reproduction cost of those assets. We now turn to Mr. Moody's computation of the developer's profit.

In calculating a developer's profit, Mr. Moody looked to conditions encountered by persons selling hydroelectric generating assets in the northeastern United States in December 1987. Mr. Moody determined that an appropriate range for a developer's profit was 20 to 25 percent; Mr. Moody applied a developer's profit of 20 percent. We do not believe that Mr. Moody overstated the developer's profit, and we accept his calculation of that profit figure.

C. *Richard K. Knoll*

Mr. Knoll's written report is coauthored by Martin D. Hanan; neither Mr. Knoll nor Mr. Hanan is licensed as an appraiser. Mr. Knoll testified that his recent professional focus has been in the valuation of intangible assets and intellectual property. We conclude that Mr. Knoll has limited experience in valuing hydroelectric generating facilities.

 **\*8**  Mr. Knoll's valuation is not limited to the bill of sale assets, and his written report is inconsistent in describing exactly what his valuation assignment was: e.g., "50% undivided interest * * * in the Topsham Hydroelectric Project", "50% undivided interest in [the sale leaseback transaction]", "50% undivided interest in the assets purchased by UtilCo". Moreover, Mr. Knoll has no opinion as to the value of the bill of sale assets per se. He is of the opinion that the market value of UtilCo's undivided 50 percent interest in the tangible assets acquired by UtilCo and Chrysler Capital was $20,650,008. He has not explained how he squares that figure with the statement in his report that the "acquisition cost/rehabilitation cost of a 50% interest to THP was approximately $24,000,000."

We are troubled that Mr. Knoll's calculation of entrepreneurial profit is idiosyncratic. Mr. Knoll considered a 13–percent allowance for entrepreneurial profit reasonable because it represented the weighted-average cost of capital of UtilCo at the time of the sale-leaseback transaction. He testified that, if UtilCo's weighted-average cost of capital changed, that would change his estimate of the appropriate percentage of entrepreneurial profit. He testified that if there were a different buyer, with a different cost of capital, that might change his entrepreneurial profit allowance. In neither his written report nor his oral testimony did Mr. Knoll state that he performed any market analysis or interviewed any developers to determine the expectations of profit required to undertake a project such as the hydroelectric facility.

Although Mr. Knoll is of the opinion that at least a portion of the difference between UtilCo's purchase price of $32,500,000 and the $24,000,000 "acquisition cost/ rehabilitation cost" is attributable to going concern value, he has no opinion as to what that portion is, except as an inseparable portion of the value of a package of at least nine intangibles, including flowage rights and easements. His opinion that UtilCo acquired going concern value is of no help to us because he is unable to distinguish the going concern value from the value of other intangible assets, such as flowage rights and easements that are specifically set forth as bill of sale assets.

Mr. Knoll testified in rebuttal to Mr. Moody. His rebuttal testimony failed to persuade us that Mr. Moody made any error in arriving at his opinion as to the fair market value of the bill of sale assets.

III. *Conclusion*

We find that the fair market value of the bill of sale assets was $65,000,000. As a result, we conclude that UtilCo acquired no going concern value. We sustain petitioner's assignment of error.

*Decision will be entered under Rule 155.*

**All Citations**

T.C. Memo. 1997-47, 1997 WL 28654, 73 T.C.M. (CCH) 1835, T.C.M. (RIA) 97,047, 1997 RIA TC Memo 97,047

Footnotes

1    Construction interest, financing, and legal costs, administrative and general costs, and contingency costs.

1    Where assets are purchased and the fair market value of assets other than goodwill or going concern value equals or exceeds the purchase price, goodwill or going concern value is not generally attributable to the purchase price. See, e.g., *UFE, Inc. v. Commissioner,* 92 T.C. 1314, 1328 (1989); *Citizens & Southern Corp. v. Commissioner,* 91 T.C. 463, 511– 512 (1988), affd. 919 F.2d 1492 (11th Cir.1990). Sec. 1060 provides special allocation rules for certain asset acquisitions. Under the residual method described in sec. 1.1060–1T(d), Temporary Income Tax Regs., 53 Fed.Reg. 27040 (July 18,

**Utilicorp United, Inc. & Subsidiaries v. C.I.R., T.C. Memo. 1997-47 (1997)**

73 T.C.M. (CCH) 1835, T.C.M. (RIA) 97,047, 1997 RIA TC Memo 97,047

1988), consideration is first allocated among cash and other items, including both tangible and intangible property (but not intangibles in the nature of goodwill and going concern value), before being allocated to goodwill and going concern value.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00402-RTH   Document 111-1   Filed 03/31/16   Page 537 of 651

Van Duzer V. C. I. R., T.C. Memo. 1991-249 (1991)
61 T.C.M. (CCH) 2791, T.C. Memo. P 91,249, 1991 TC Memo 91,249

T.C. Memo. 1991-249
United States Tax Court

VICTOR E. VAN DUZER AND
JANE N. VAN DUZER, Petitioners

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent

Docket No. 25802-88.
|
Filed June 5, 1991.

**Attorneys and Law Firms**

Jonathan Cobb Dickey and David S. Foster, for the petitioners.

Steven J. Sibley, for the respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, JUDGE:

Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows:

**Additions to Tax**

| Year | Deficiency | Sec. 6653 (a)(1)[1] | Sec. 6653(a)(2) | Sec. 6661 |
|---|---|---|---|---|
| 1984.......... | $232,941.00 | $11,674.05 | 50 percent of the interest due on $232,941.00 | $58,235.25 |
| 1985.......... | 350,555.00 | 13,481.00 | 50 percent of the interest due on $269,620.00 | 67,405.00[2] |

Respondent also determined that petitioners are liable for the increased rate of interest under section 6621(c) for each of the taxable years in issue.

Following concessions,[3] the issues for decision are: (1) Whether the purchase prices of two windfarms, purchased by Victor E. Van Duzer in 1984 and 1985, were in excess of their respective fair market values; (2) whether a portion of the purchase price of each windfarm purchased by Victor E. Van Duzer, in 1984 and 1985, should be allocated to warranties made by FloWind Corporation — the seller and manufacturer of said windfarms; (3) whether petitioners are liable for additions to tax for substantial understatement of income tax under section 6661; and (4) whether petitioners are liable for the increased rate of interest under section 6621(c).[4]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners Victor E. Van Duzer and Jane N. Van Duzer, husband and wife, resided in Los Altos Hills, California, when they filed their petition in this case. Petitioners filed joint Federal income tax returns for taxable years 1984 and 1985 with the Internal Revenue Service Center in Fresno, California.

Mr. Van Duzer (petitioner) has a masters degree in electrical engineering from Stanford. He worked for Hewlett-packard for nine years in the development of new products and project management. Petitioner was the founder and president of a microwave component manufacturing company, and has been a member of the board of directors of several companies. Petitioner was retired in 1984.

Since 1971, petitioner has had experience in analyzing investments. In the summer of 1984, he investigated investments in various types of alternative energy sources, including solar and wind energy. In the fall of 1984, petitioner visited several operating windfarms, which were all located in California. A windfarm consists of fully erected operating wind turbines which are connected to a utility or energy user and able to generate electricity.

Petitioner decided to evaluate an investment into wind energy. He obtained private placement memorandums and offering circulars from various windfarm offerings, spoke with windfarm sponsors, and visited several windfarm sites. The windfarms that petitioner investigated were mostly being offered for sale through limited partnerships. Petitioner determined rates of return on various windfarm offerings and concluded that he would receive the best rate of return by purchasing a windfarm from FloWind Corporation (FloWind). In determining the profitability of a windfarm, petitioner considered the tax benefits he expected to receive from purchasing a windfarm.

Petitioner visited a FloWind windfarm, that was located on Cameron Ridge, which is located between the townships of Tehachapi and Mojave in Kern County, California. Cameron Ridge is in Tehachapi Pass which is in a low section in the Sierra Nevada-Tehachapi Mountains ridgeline. The windfarm consisted of 19-meter and 17-meter vertical axis wind turbine generators. The wind turbine generators are made of two aluminum extruded rotor blades designed in the shape of

an airfoil which are vertically attached to a mast. The mast rests upon a base structure which houses a gear box and induction motor generator. As electricity is produced from the rotation of the mast, the electricity generated is transmitted to pad mounted transformers, which in turn transmit the electricity to substations. Electricity was transmitted from the substations to Southern California Edison Company's (Southern California Edison) transmission system, where it is distributed to its customers.

FloWind was organized, in 1981, under the laws of the State of Washington. FloWind's purpose was to develop and construct wind turbines to generate electricity. The wind turbines would be sold to individuals, corporations, and limited partnerships which in turn sell the electricity generated by the wind turbines to utilities. FloWind commenced business operation in March 1982.

During the early 1980s, FloWind sold windfarms to limited partnerships. Either FloWind or its affiliates and subsidiaries acted as the general partners of the limited partnerships, and also performed management, operation, maintenance and repair, and other services for the limited partnerships. FloWind manufactured and installed wind turbines purchased by the limited partnerships. Some of the limited partnerships that acquired wind turbines from FloWind include, FloWind Partners I (issued in fall of 1983), FloWind Partners II (issued in spring of 1984), FloWind Partners III (issued in December 1984), FloWind Partners 1984 (issued in October 1984), and FloWind Partners IV.

According to the FloWind Partners IV private placement memorandum, the first FloWind wind turbine was an initial test 17- meter wind turbine generator installed on May 20, 1982; as of September 30, 1984, 86 17-meter wind turbine generators had been installed; as of December 31, 1984, 254 17-meter wind turbine generators had been installed; during 1984, an affiliate of FloWind had installed two test 19-meter wind turbine generators, and FloWind had added 34 19-meter wind turbine generators to 17-meter windfarms to bring the windfarms up to production levels required by warranties.

In November 1984, petitioner entered into negotiations with FloWind for the purchase of a windfarm. Petitioner believed that he would save promotional fees, and would have more control over his windfarm by directly purchasing a windfarm from FloWind. As a result, petitioner did not purchase his windfarm as an investor in a limited partnership.

Prior to purchasing his windfarm, petitioner received and reviewed copies of FloWind Partners II and FloWind Partners 1984 private placement memorandums. Petitioner also received and reviewed a Report on the Engineering Evaluation of the FloWind Partners 1984 Windpark (Stone & Webster report), which was prepared by Stone & Webster Engineering Corporation and was dated October 1984. The FloWind Partners 1984 windfarm consisted of 17-meter wind turbine generators and was located on Cameron Ridge. [5] According to the Stone & Webster report, the objective of the evaluation was to assess all major aspects of the FloWind Partners 1984 windpark from engineering, construction, operation and maintenance perspectives. The Stone & Webster report also assessed the wind resource and the site suitability of the property, the equipment system performance, and the estimated project output. The Stone & Webster report stated that

> from a technical perspective, FloWind Partners 1984 can achieve its estimated performance, availability, and service life by careful implementation of the expertise, designs, specifications, and prior experience available to the project.

The Stone and Webster report concluded that "Cameron Ridge, with an annual average wind speed of about 24 mph on the BLM property is an excellent site for a wind energy project."

Petitioner also received a wind study on the Cameron Ridge area, which was performed by Dr. Edwin X. Berry of Atmospheric Research & Technology, Inc. [6] Dr. Berry has a Ph.D. in Atmospheric Physics. The report was prepared for FloWind Partners III and was dated November 1982. The report was revised in July 1983 and was reissued in July 1984. Dr. Berry's study was based upon the wind speed measurements taken from 6 anemometer stations which were placed on Cameron Ridge. The anemometer stations were designated CAM1, CAM2, CAM3, CAM4, CAM5, and CAM6. The wind measurements were recorded from CAM1 beginning in June 1981, and from CAM2 through CAM6 in July 1981. [7] Generally, 12 months of wind speed data is needed in order to predict wind speeds with 90 percent accuracy. Due to vandalism, wind measurement data recorded from CAM2 through CAM6 was for less than one year. Dr. Berry grouped the data from the wind speed measurements into "low" and "high" values, and computed that the low

group had an estimated mean wind speed of 20.3 miles per hour, and the high group had an estimated wind speed of 22.8 miles per hour. In addition, Dr. Berry concluded that:

The wind evaluation indicates that energy can be obtained from the wind for over 70 percent of all hours of the year and for all months of the year.

* * *

Cameron Ridge has stronger, more consistent wind power than any other site currently proposed for wind-electric development in the United States. With economic returns on wind-electric power plants directly related to the quality of the wind-energy resource, Cameron Ridge represents the best known wind-electric power project site in the State of California.

Based upon Dr. Berry's report and the Stone & Webster report, petitioner believed that the Cameron Ridge area had the best wind resource of all the other windfarm offerings he had investigated.

Petitioner also received and reviewed a packet entitled FloWind Partners 1984 Due Diligence Documents. Contained in this packet were various documents compiled in connection with the FloWind Partners 1984 limited partnership offering. The documents contained in the packet included a power purchase Contract between FloWind and Southern California Edison, the Stone & Webster report, an insurance contract between FloWind and Zurich Insurance Company, various construction permits and lease agreements, and technical data on the FloWind 17-meter wind turbine generator.

Petitioner also received and reviewed a report prepared by American Appraisal Associates for FloWind Partners III. The report stated:

> Based on our investigation and appraisal, it is our opinion that the stated purchase price of the Windfarm to the partnership does not exceed the fair market value of the Windfarm.

Petitioner also reviewed FloWind projections on the anticipated energy production of the windfarm. FloWind estimated that the "designed projected output" of petitioner's 19-meter windfarm would be 1,650,000 kilowatt hours per

year, or 550,000 kilowatt hours per wind turbine generator per year. The designed projected output of a windfarm is based upon the "power curve" of the wind turbine generators used in the windfarm and the wind characteristics at the windfarm site. The power curve represents the expected power output, at different wind speeds, of a wind turbine generator located at sea level. The wind conditions of a windfarm site are applied to the power curve to arrive at the expected electrical output for a typical wind turbine generator at the windfarm site. Prior to December 1984, no actual production data was available regarding the performance of 19-meter wind turbine generators.

1984 WINDFARM

Petitioner purchased his windfarm by entering into a "Windfarm Construction Agreement" (1984 agreement) with FloWind, which was dated December 20, 1984. Pursuant to the 1984 agreement, FloWind constructed and sold to petitioner a windfarm (1984 windfarm) which consisted of three 19-meter wind turbine generators, cement pads, and electrical transmission lines which ran up to, but not including, the pad-mounted transformer. The windfarm was to be constructed on property leased by petitioner in the Tehachapi Mountains, Kern County, California.

At the time of his purchase, petitioner was the first individual purchaser and owner of 19-meter wind turbine generators. He selected the 19-meter wind turbine generator because it had a higher projected output than the 17-meter wind turbine generator.

The purchase price of the 1984 windfarm was $1,065,000 or $355,000 per wind turbine generator. Petitioner paid $690,000 cash and executed a level payment nonrecourse note in the amount of $375,000. The note was to be repaid in 20 annual installments of $41,674.40, at an interest rate of 9 percent per annum. Petitioner has made all required payments on the nonrecourse note.

Detailed specifications of the 19-meter wind turbine generators were attached to the 1984 agreement. In addition, the 1984 agreement included warranties similar to those FloWind had negotiated with investment bankers in connection with syndicated partnership offerings. FloWind did not sell windfarms without warranties. Through their stipulations, the parties have summarized the warranties that FloWind made in the 1984 agreement, as follows:
c. FIVE YEAR WARRANTY AGAINST DEFECTS, ETC. FloWind warranted that, except for normal wear and

tear, each wind turbine generator (WTG) would be free from defects in material, workmanship, or design or other malfunction or failure to perform for five years. In addition, FloWind warranted that the WTGs (including towers) would be capable of withstanding wind conditions up to 140 miles per hour without damage, that the turbines and towers would be compatible and not subject to damaging harmonic resonance; that all components not manufactured by FloWind were used within their specifications and for their intended purposes; and that all WTGs met or exceeded descriptions and specifications. The remedy for breach was for FloWind to remedy the defect, including, if necessary, repair or replacement at the 1984 Site, without charge and within a reasonable time.

d. FIVE YEAR AVAILABILITY WARRANTY. FloWind warranted that, in the absence of an occurrence not covered by the warranties, each WTG would be available for intended operation at least 90 percent of each year for five years. This 90 percent performance warranty was guaranteed for five years following the WTGs' commissioning and delivery to Mr. Van Duzer. If any WTG needs repair, alternation, (sic) replacement or turbine shut down is necessary, FloWind will reimburse Mr. Van Duzer as follows:

(1) This warranty applies if the WTG is unavailable exceeding an aggregate of 877 hours (36-1/2 days), in any year within the five year period following commissioning.

(2) For each hour of unavailability after 877 hours, FloWind will pay to Mr. Van Duzer an amount based on the affected WTG's projected kilowatt hours. This projection is equal to the Windfarm's applicable wind speeds multiplied by the projected power performance curve (as shown in Exhibit 3-C).

(3) This amount is then multiplied by the contracted price of electricity.

(4) This warranty can provide up to $25,000 per WTG per year.

e. ONE YEAR POWER PERFORMANCE WARRANTY. FloWind warranted that each WTG would be capable of operating at 90 percent of projected power performance, in accordance with a power production curve, for a period of one year. The remedy for breach was modification of the WTGs or the provision of additional WTGs, as follows:

(1) After consulting with Mr. Van Duzer and an outside expert, wind speed measurements of another WTG similar to the warranted turbine will be made by FloWind.

(2) This windspeed data will be collected at FloWind's expense at least once per month.

(3) The windspeed data of the paired WTG will then be compared to 90 percent of the power performance of the warranted wind turbine.

(4) If Mr. Van Duzer determines that at any time during this measurement period, the 90 percent power performance has not been consistently met, FloWind is required to either (i) fix all the WTGs, (ii) provide Mr. Van Duzer additional WTGs to produce an amount equal to 90 percent of the power performance of the total Windfarm, or (iii) or a combination of alternatives (i) and (ii).

(5) This warranty also provides for subsequent one year data collection to insure the Windfarm is operating at the 90 percent power performance curve.

f. FIVE YEAR OUTPUT WARRANTY. FloWind warranted that, in the absence of force majeure, the Windfarm would produce no less than 50 percent of its designed Projected output of 1,650,000 kilowatt hours per year for each of the first five years of operation. The remedy for breach is payment of the additional revenues that would have been earned if 50 percent of the designed projected output had been produced, less any cash amounts paid under other warranties. Revenues will be determined by the average per kilowatt hour price for electricity sold to Southern California Edison during the calendar year at issue. This warranty precludes FloWind from obtaining a refund if electrical generation subsequently exceeds projections. Under this warranty, FloWind agreed to relocate 90 percent of the Windfarm's lowest producing WTGs if the individual WTG does not produce 50 percent of its individual projected output on a cumulative basis as of the end of any of the first five years (or make other arrangements). An Act of God will automatically set the WTG at the 50 percent level.

g. THREE YEAR OUTPUT WARRANTY. FloWind agreed to add additional wind turbines or otherwise modify the Windfarm on or before December 31, 1990, if, in the absence of force majeure, the Windfarm did not produce an average of at least 67 percent of designed projected output during the first three years. An Act of God brings FloWind into compliance

under this warranty. 1985 and 1986 production data can be used to compute the 67 percent designed projection.

h. THREE YEAR INSTALLATION WARRANTY. FloWind warranted for a period of three years that the Windfarm had been installed in a good and workmanlike manner on unfilled ground, that components which together comprise the Windfarm (excluding the WTGs) were free from defects in material, workmanship and design or other malfunction or failure to perform under normal use and service, and that FloWind had obtained all required building permits. The remedy for breach was to remedy the problem, including, if necessary, repair or replacement at the Windfarm, without charge and within a reasonable time.

No portion of the purchase price of the 1984 windfarm was allocated to any of the warranties described above. The warranties referred to above are extended while the wind turbine generators or related components are not functioning properly. FloWind specified in the 1984 agreement that the 19-meter wind turbine generators would produce 550,000 kilowatt hours per year and warranted that each wind turbine generator would produce 275,000 kilowatt hours per year. The warranties FloWind made in connection with the sale of its wind turbine generators were made in response to competitive pressures from other windfarm developers. Petitioner would not have purchased the 1984 windfarm from FloWind without the warranty agreement.

Petitioner entered into various contracts in connection with his purchase of the 1984 windfarm. These contracts are: An Operation, Repair and Management Agreement; a Transmission Facility Agreement, which included an assignment of a Long Term Power Purchase Contract with Southern California Edison Company; an Authorized User Agreement; and a Windfarm Easement Agreement with Wind Energy Company, a subsidiary of FloWind. Prior to executing these contracts, petitioner hired a lawyer to review the contracts. These contracts are summarized below, and unless otherwise indicated, all of these contracts were dated December 20, 1984.

Petitioner and FloWind entered into an Operation, Repair and Management Agreement. The agreement provided for a monthly fee equal to 6 percent of gross revenues derived from the sale of electricity, plus an incentive fee equal to 15 percent of the amount by which gross revenues exceeded projections, during the years 1984 through 1994. This incentive fee was increased to 30 percent in 1995 and the years thereafter. The

agreement had an initial 1-year term, and was automatically renewed for up to 29 additional 1-year terms.

Petitioner and FloWind entered into a Transmission Facility Agreement. Pursuant to the agreement, FloWind granted to petitioner a non-exclusive right and non-exclusive license to use FloWind's transmission facilities for the purpose of transmitting electric power between the 1984 windfarm and Southern California Edison's transmission system. The transmission facilities were constructed by FloWind, and included substations, and related collector lines and interconnections. Under this agreement, FloWind assigned to petitioner its rights under a Power Purchase Contract with Southern California Edison.[8] Petitioner agreed to pay an annual interconnection service charge in the amount of $1,700 per 19-meter wind turbine generator. Beginning on January 1, 1986, the service charge was subject to annual increases based upon the consumer price index.

In September of 1983, the United States Department of the Interior, Bureau of Land Management, entered into a Right-of-Way Grant with Wind Energy Company for the construction, operation and maintenance of wind turbine, electric generators, electric transmission lines, access roads and ancillary facilities. The basic rent payable under the Right-of-Way Grant was 4 percent of gross revenues (with certain minimums). In May of 1984, FloWind acquired 100 percent of the stock of Wind Energy Company. Petitioner, FloWind, and Wind Energy Company entered into an Authorized User Agreement dated December 19, 1984, whereby Wind Energy Company conveyed to petitioner the right to use the windfarm property for the 1984 windfarm, subject to the terms and conditions of the Right-of-Way Grant, through September 22, 2013, or upon sooner termination of a Windfarm Easement Agreement.

Petitioner entered into a Windfarm Easement Agreement with Wind Energy Company. Pursuant to this agreement, Wind Energy Company granted to petitioner the right to use the property at the 1984 windfarm site and also granted a right of access over roads to the 1984 windfarm. Petitioner agreed to pay a fee equal to 5 percent of gross revenues for the first 10 years, and then 10 percent thereafter, with a minimum of $750 per wind turbine generator per year for the first 10 years and $1,000 thereafter. The Windfarm Easement Agreement had an initial 1-year term and was automatically extended for up to 29 additional 1-year terms unless petitioner gave notice of termination.

The 1984 windfarm was placed in service and $766.21 of electrical power was generated and delivered to Southern California Edison in December 1984. Petitioner received monthly reports on the operation of the 1984 windfarm from FloWind. In addition, petitioner arranged with FloWind to access data with respect to the 1984 windfarm via computer and modem. This enabled petitioner to monitor the 1984 windfarm in his home, which he did on a regular basis.

1985 WINDFARM

In 1985, petitioner purchased another windfarm from FloWind. Petitioner's decision to purchase this windfarm was based in part upon his experience with the 1984 windfarm. Prior to purchasing the second windfarm, petitioner reviewed the materials that he had received with respect to his purchase of the 1984 windfarm. Petitioner also reviewed the FloWind Partners IV private placement memorandum, which was a limited partnership offering for a windfarm consisting of 19-meter wind turbine generators. Petitioner observed that the wind projections and power curves for both the 19-meter and 17-meter wind turbine generators had been lowered since his purchase of the 1984 windfarm. The designed projected output of the 17-meter wind turbine generator was 328,000 kilowatt hours per year, but after negotiations between FloWind and petitioner, this projection was later reduced to 262,000 kilowatt hours per year.

On December 30, 1985, petitioner entered into a second Windfarm Construction Agreement (1985 agreement) with FloWind. Under the terms of the 1985 agreement, FloWind constructed and sold to petitioner a windfarm (1985 windfarm), consisting in part of three 17-meter wind turbine generators, control panels, cement pads and electrical transmission lines running from each wind turbine generator up to, but not including, the pad-mounted transformer. The windfarm was to be constructed on property leased by petitioner on Cameron Ridge.

The purchase price of the 1985 windfarm was $546,000 or $182,000 per wind turbine generator. Petitioner paid $363,000 cash and executed a level payment nonrecourse note in the amount of $183,000. The note was to be repaid in 20 annual installments of $22,980.34, at an interest rate of 11 percent per annum.

Detailed specifications of the wind turbine generators were attached to the 1985 agreement. Also attached to the 1985 agreement was a separate Windfarm Warranty Agreement, dated December 30, 1985. The warranty agreement was

executed between petitioner and FloWind and generally provided the same warranties that were made with respect to the 1984 windfarm, except that the 5-year output warranty was only 131,000 kilowatt hours per year per wind turbine generator. FloWind did not sell windfarms without warranties. Moreover, petitioner would not have purchased the 1985 windfarm from FloWind without the warranty agreement.

Petitioner entered into various contracts in connection with his purchase of the 1985 windfarm. These contracts are: A Management Agreement; an Operation, Repair and Maintenance Agreement; a Transmission Facility Agreement and Power Purchase Agreement Assignment; a Windfarm Site Agreement; and a Subordination and Fee Payment Agreement. These contracts are summarized below. Unless otherwise indicated, all of these contracts were dated December 30, 1985.

Pursuant to the Management Agreement, FloWind agreed to manage the 1985 windfarm. FloWind charged a monthly fee equal to 2 percent of "gross revenues." Under this agreement, gross revenues were defined as revenue derived from the sale of electricity and all proceeds derived under performance warranties and insurance proceeds for reimbursement of lost revenue. Petitioner also agreed to reimburse FloWind for all real and personal property taxes, assessments and insurance premiums incurred. The agreement had an initial 10-year term, and was automatically renewable by petitioner for up to four additional 5-year terms.

Under the Operation, Repair and Maintenance Agreement, FloWind agreed to render services for the operation, repair and maintenance of the 1985 windfarm. The fee schedule was composed of two parts. For the first 10 years the fee was equal to 8 percent of monthly gross revenues. Commencing with the 11th year, the fee was equal to the greater of 12-1/2 percent of the monthly gross revenues of the 1985 windfarm or FloWind's actual operating costs and expenses. However, this fee after the 11th year was limited to no more than 20 percent of the gross revenue for the prior month, with excess amounts carried forward. The second part of the operating, repair and maintenance fee was an incentive fee equal in the first 10 years to 15 percent of the amount that the gross revenues exceed projections; 30 percent in subsequent years. The agreement had an initial 10-year term, and was automatically renewed for up to four additional 5-year terms by petitioner.

Pursuant to the Transmission Facility Agreement and Power Purchase Agreement Assignment, FloWind granted petitioner a non- exclusive right and non-exclusive license to use FloWind's transmission facilities for the purpose of transmitting electric power between the 1985 windfarm and Southern California Edison's transmission system. FloWind also assigned its rights under the same Power Purchase Contract that FloWind assigned with respect to the 1984 windfarm. Petitioner agreed to pay an annual interconnection service fee in the amount of $1,000 per wind turbine generator. Beginning on January 1, 1987, the annual service charge was subject to annual increases based upon the consumer price index.

FloWind's subsidiary, Wind Energy Company, had entered into a Lease for Meteorological Research Sites and Construction of Wind Turbine Machines, dated October 10, 1981. Under the Windfarm Site Agreement, Wind Energy Company assigned its rights under the meteorological research sites lease to petitioner. Petitioner agreed to pay to Wind Energy Company an annual fee equal to 6 percent of the gross revenues from the sale of electricity. On January 1, 1995, the fee was increased to 7 percent of gross revenues. The term of the lease and the Windfarm Site Agreement continued until October 10, 2014.

Under the Subordination and Fee Payment Agreement, the fees that petitioner was required to pay to FloWind with respect to the 1985 windfarm were subordinated to the payments on the construction note that petitioner executed in connection with his purchase of the 1985 windfarm. The fee payments that were specifically subordinated were those payments required under the Windfarm Construction Agreement; the Operation, Repair and Maintenance Agreement; the Transmission Facility Agreement and Power Purchase Agreement Assignment; and the Management Agreement.

The 1985 windfarm was placed in service and electrical power was generated and delivered to Southern California Edison Company in 1985.

On Schedule C of their 1984 Federal income tax return, petitioners reported a loss in the amount of $144,133 from their windfarm activity. This loss consisted entirely of a depreciation deduction claimed for the 1984 windfarm. On Form 3468 (Computation of Investment Credit), petitioners reported a total allowed general business credit in the amount of $265,076. The portion of the general business credit

claimed with respect to petitioner's 1984 windfarm consisted of a regular investment credit in the amount of $106,003, and a business energy investment credit in the amount of $159,004. Petitioners claimed on Form 1040 a general business credit in the amount of $158,330, and designated the excess ($106,746) as a "carry" on Form 3468. In the notice of deficiency, respondent disallowed petitioners windfarm activity loss and petitioners' general business credit.

On Schedule C of their 1985 Federal income tax return, petitioners reported a loss in the amount of $278,727 from their windfarm activity. On Form 3468 (Computation of Investment Credit), petitioners' reported a total allowed general business credit in the amount of $135,553. The portion of the general business credit claimed with respect to petitioner's 1985 windfarm, consisted of a regular investment credit in the amount of $54,100, and a business energy investment credit in the amount $81,150. Petitioners claimed on Form 1040 a general business credit in the amount of $97,078, and designated the excess ($38,475) as "carried" on Form 3468. In the notice of deficiency, respondent disallowed $275,727 of petitioners' reported windfarm activity loss.[9] Respondent also disallowed petitioners' general business credit.

OPINION

In the notice of deficiency, respondent stated several alternative reasons for disallowing petitioners' general business credits and losses claimed with respect to the 1984 and 1985 windfarms. After trial, however, respondent conceded most of the reasons raised in his notice of deficiency. The remaining issues as briefed by the parties are whether the purchase prices of the windfarms were in excess of their respective fair market values, whether a portion of the purchase prices should be allocated to warranties made by FloWind, whether petitioners are liable for the additions tax pursuant to section 6661, and whether petitioners are liable for the increased rate of interest pursuant to section 6621(c).[10]

As a preliminary matter, petitioners argue that respondent's method of valuing the 1984 and 1985 windfarms by allocating a portion of the purchase price to warranties constitutes a new matter. Thus, petitioners argue that respondent bears the burden of proof on this issue.

Generally, respondent's determination is presumed correct, and petitioners bear the burden of proving otherwise. Rule 142(a). However, respondent bears the burden of proof with "respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer," and with respect to a new position taken at trial. Rule 142(a); Estate of Falese v. Commissioner, 58 T.C. 895, 898-899 (1972).

A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence. Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989); Colonnade Condominium, Inc. v. Commissioner, 91 T.C. 793, 795 n.3 (1988); Achiro v. Commissioner, 77 T.C. 881, 890-891 (1981). A new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof. Wayne Bolt & Nut Co. v. Commissioner, supra; Achiro v. Commissioner, supra at 890; Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner, 50 T.C. 478, 492-493 (1968).

In the notice of deficiency, respondent placed the depreciable cost basis of the 1984 and 1985 windfarms in issue. Moreover, petitioners allege in their petition that the price petitioners paid for the tangible equipment was not in excess of their fair market value. Respondent's method of valuing the windfarms by allocating a portion of the purchase prices to warranties does not constitute a new matter, but rather clarifies his original determination. Accordingly, the burden of proof remains with petitioners. Rule 142(a).

The first issue for decision is whether the purchase prices of the 1984 and 1985 windfarms were in excess of their respective fair market values. As a general rule, the basis of property for tax purposes will be the cost of such property. Sec. 1012. In a money- for-property transaction, cost is equal to the price paid for the property. Lemmen v. Commissioner, 77 T.C. 1326, 1347-1348 (1981). This general rule that basis is equal to cost, however, does not apply where "peculiar circumstances" surround the transaction which influence the purchaser to agree to a price in excess of the property's fair market value. Bryant v. Commissioner, 790 F.2d 1463, 1466-1467 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Lemmen v. Commissioner, supra; Bixby v. Commissioner, 58 T.C. 757, 776 (1972). In such cases, the basis of property for tax purposes may be limited to its fair market value at the time of purchase. Lemmen v. Commissioner, supra.

Van Duzer V. C. I. R., T.C. Memo. 1991-249 (1991)
61 T.C.M. (CCH) 2791, T.C. Memo. P 91,249, 1991 TC Memo 91,249

In the instant case, respondent argues that the tax benefits petitioner expected to receive from the purchases of the 1984 and 1985 windfarms constitute peculiar circumstances which influenced petitioner to pay more than the fair market value for the windfarms. On brief, respondent argues that petitioner relied solely upon FloWind's projections for the 1984 and 1985 windfarms and failed to make an independent inquiry to verify FloWind's production estimates, or determine whether FloWind's projection estimates were based upon any type of industry standards. Respondent alleges that, at the time of purchase, petitioners realized that there was a "substantial probability their windfarms would not meet projections" and that the acceptance of FloWind's projections was caused by "the lure of tax benefits." Respondent also argues that favorable financing constitutes a peculiar circumstance, and that the purported State and Federal tax benefits petitioner expected to receive from the purchases of the 1984 and 1985 windfarms allowed petitioner to recover his "cash investment" after 3 years of operation.

There are several flaws in respondent's argument. First, respondent has conceded his initial position that petitioner lacked a bona fide profit objective. The evidence presented at trial fully warranted this concession. The existence of a bona fide profit objective for petitioner's purchase of the windfarms is inconsistent with respondent's argument that petitioner was willing to pay an excessive purchase price for tax shelter purposes. Secondly, respondent's own requested findings of fact, predicated on respondent's expert's report, shows that the fair market value of the windfarm which petitioner purchased in 1985 was MORE than his purchase price. On brief, respondent asserts that the fair market value of each 17-meter wind turbine generator was at least $86,237 and that the intangible value attributable to the warranties on each wind turbine generator was $96,733. The windfarm purchased in 1985 had three wind turbine generators, thus respondent's valuation of the 1985 windfarm was $548,910. Petitioner purchased the 1985 windfarm for $546,000. [11]

With respect to the 1984 windfarm, respondent argues, based on the same expert's report, that the fair market value of the windfarm was $717,081 as opposed to the contract price of $1,065,000. Respondent arrives at this figure by valuing each of the three 19- meter wind turbine generators at $115,264 and the warranties attached to each wind turbine generator at $123,763 per turbine. Respondent does not attempt to place a specific value on tax benefits or favorable financing nor did respondent offer any evidence that either of these

alleged components had separate specific values. The fact that respondent and his expert place a value on the 1985 windfarm wind turbine generators and warranties that is greater than petitioner's purchase price, without assigning any value to identical tax benefits and financing arrangements, is inconsistent with his argument that these components had substantial value in 1984.

Through the course of the trial and on brief, petitioners have maintained that the amounts petitioner paid for the 1984 and 1985 windfarms were the result of arm's-length transactions, and that the purchase prices of the two windfarms were not in excess of their respective fair market values. Petitioners point out that windfarms are "congressionally-blessed investments," and thus, the existence of tax benefits should not be considered as a peculiar circumstance so as to decrease their bases in the windfarms.

Taxpayers have the legal right to decrease taxes, or avoid them altogether, by means which the law permits. Maxwell v. Commissioner, 95 T.C. 107, 123 (1990). Federal income tax laws affect and shape every business transaction, and parties to such transactions are entitled to take into account and to maximize favorable tax results so long as the transaction has economic substance and a business purpose. See Frank Lyon Co. v. Commissioner, 435 U.S. 561, 583-584 (1978). In previous cases, we have recognized transactions which are likely to be motivated by tax reasons, but are nevertheless sanctioned under the tax laws. Examples of such transactions are the purchase of tax-exempt securities; purchases of property motivated by the availability of accelerated depreciation, the investment credit, and the deductibility of interest; safe-harbor leasing; renovation of historic structures; location of subsidiaries in Puerto Rico because of tax credits; acquiring interests in low-income housing partnerships; and many others. Some of these transactions are significantly tax motivated. Levy v. Commissioner, 91 T.C. 838, 871- 872 (1988); Friendship Dairies, Inc. v. Commissioner, 90 T.C. 1054, 1064 (1988); Fox v. Commissioner, 82 T.C. 1001, 1021 (1984).

On their 1984 and 1985 Federal income tax returns, petitioners claimed general business credits with respect to their windfarms. See sec. 38(a). During the years in issue, these general business credits consisted of a 10-percent regular investment credit and a 15-percent energy investment credit. Sec. 46(b). The business energy investment credit was enacted as part of the Energy Tax Act of 1978, and was originally equal to 10 percent of the qualified investment.

Sec. 301(a)(1), Pub. L. 95-618, 92 Stat. 3174, 3194-3195. At the time of the enactment of the Energy Tax Act of 1978, Congress was concerned about the United States' dependence upon imported oil. The business energy investment credit was enacted in order to stimulate investment into alternative energy resources, which included solar and wind energy. See H. Rept. 95-496 (Part III), 1978-3 C.B. (Vol. 2) 71, 81- 85, 94; S. Rept. 95-529, 1978-3 C.B. (Vol. 2) 199, 205-211, 262-264. In 1980, Congress recognized that the then current tax law incentives were not broad enough to carry out the objectives of the Energy Tax Act of 1978. As a result, and in an effort to promote increased use of alternative energy resources, Congress increased the business energy investment credit from 10 percent to 15 percent of the amount of the qualified investment, and extended the period for the availability of the credit through December 31, 1985. Crude Oil Windfall Profit Tax Act of 1980, Pub. L. 96-223, sec. 221(a), 94 Stat. 229, 260. See S. Rept. 96-394, 1980-3 C.B. 131, 198-199.

By enacting the business energy investment credit, it is clear that Congress was encouraging investment into alternative energy resources in order to curtail the United States' dependence upon imported oil. Thus, the favorable tax incentives petitioner expected to receive from his purchases of the 1984 and 1985 windfarms should not be considered as a "peculiar circumstance" so as to reduce petitioners' bases in the windfarms, provided that these tax incentives did not cause petitioner to pay more for the windfarms than their respective fair market values. See Bryant v. Commissioner, 790 F.2d at 1466; Lemmen v. Commissioner, 77 T.C. at 1349.

As a general rule the price at which a willing buyer will purchase property from a willing seller, when neither party is acting under compulsion and both parties are fully informed of all the relevant facts and circumstances, establishes fair market value. United States v. Cartwright, 411 U.S. 546, 551 (1973); Marine v. Commissioner, 92 T.C. 958, 982 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McShain v. Commissioner, 71 T.C. 998, 1004 (1979). This definition assumes that the buyer and seller will have adverse economic interests. Brannen v. Commissioner, 722 F.2d 695, 701 (11th Cir. 1984), affg. 78 T.C. 471, 493 (1982); Marine v. Commissioner, supra; Narver v. Commissioner, 75 T.C. 53, 96 (1980), affd. 670 F.2d 855 (9th Cir. 1982). Thus, regardless of how FloWind and petitioner determined the purchase prices of the windfarms, the relevant inquiry is, given the facts and circumstances as they existed on the dates petitioner purchased his windfarms, what would a willing

buyer have paid FloWind for the 1984 and 1985 windfarms. See Taube v. Commissioner, 88 T.C. 464, 488 (1987).

In the instant case, respondent concedes that petitioner,s purchases of the 1984 and 1985 windfarms had economic substance, and that petitioner purchased the windfarms with the objective of making a profit. Thus, petitioner's purchases of the windfarms were motivated by nontax business reasons. It is clear that petitioner was bargaining at arm's length with FloWind at the time he purchased his windfarms. Petitioner is experienced in business matters and in evaluating investments. He was under no "pressure" to purchase a windfarm from FloWind. Petitioner reviewed the contracts that he executed in connection with his purchases of the windfarms, and proposed changes in these contracts, some of which were incorporated into the final drafts. He also hired an attorney who reviewed the contracts. He negotiated a lower purchase price for the 1985 windfarm. We found petitioner to be knowledgeable and forthright as to his transactions with FloWind and believe him to be a credible witness. In deciding whether the purchase prices of petitioner's windfarms were in excess of their respective fair market values, we find significant the fact that petitioner bargained at arm's length with FloWind.

To establish the fair market value of the 1984 and 1985 windfarms, both parties presented the testimony of expert witnesses. We are not bound by the opinions of expert witnesses when those opinions are contrary to our own judgment. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may accept or reject expert testimony as we find appropriate in our best judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. After reviewing the expert reports of both parties, we find that the purchase prices of the 1984 and 1985 windfarms were not in excess of their respective fair market values.

Petitioners' principal expert witness is employed by Marshall and Stevens Incorporated as a Financial Appraiser. His appraisal experience began in 1975 and he has prepared financial appraisals for a wide variety of business entities. He has been extensively involved in the appraisal of alternate energy systems. He is a member of the Institute of Business Appraisers, and is also designated as a Certified Business Appraiser.

Van Duzer V. C. I. R., T.C. Memo. 1991-249 (1991)
61 T.C.M. (CCH) 2791, T.C.M. P 91,249, 1991 TC Memo 91,249

Before valuing the 1984 and 1985 windfarms, petitioners' expert personally inspected both windfarms located on Cameron Ridge and also interviewed personnel involved in the management and operation of petitioner's windfarms. He also reviewed studies performed on the wind resource at Cameron Ridge. These studies included, a California Energy Commission (CEC) staff report "Wind Energy Assessment of California," dated March 31, 1981; CEC staff report, "Relative Cost of Electricity Production," dated December 1983; and several reports, prepared by Stone & Webster, on the engineering evaluation of FloWind wind turbines. Petitioners' expert determined the fair market value of petitioner's windfarms under three different valuation methods. These three valuation methods were the cost approach, the market approach, and the income approach.

Under the cost approach, petitioners' expert valued the windfarms based upon the direct and indirect costs associated with the construction of the windfarms. In determining the cost of constructing the windfarms, petitioners' expert relied upon the cost information that was supplied by FloWind. Petitioners' expert witness estimated "book expenses" which included research and engineering, general and administrative, and sales costs. Petitioners' expert concluded that FloWind's costs of constructing the 1984 and 1985 windfarms were $832,514 and $500,736, respectively. The difference between FloWind's costs and amounts that petitioner paid for the windfarms represented FloWind's gross profit. Petitioners' expert compared FloWind's gross profit margins with General Electric's and Westinghouse's power systems divisions, as reported by Moody's Industrial Manual 1982 and found FloWind's gross profit margins to be substantially lower. Petitioners' expert concluded that the construction costs of the two windfarms to petitioner under the cost approach were not in excess of the fair market values of the two windfarms.

Under the market approach, petitioners' expert used "comparative market data," based upon other windfarm programs, in order to arrive at a fair market value. The cost of the comparable windfarm was divided by its projected annual output which yielded a cost per projected kilowatt hour. Petitioners' expert used 30 market comparables for valuing the 1984 windfarm, and 43 market comparables for valuing the 1985 windfarm. Petitioners' expert calculated the median cost per projected kilowatt hour for the 1984 windfarm market comparables to be $0.74, and the 1985 windfarm market comparables to be $0.70. These respective median figures were then multiplied by the projected output of petitioner's

windfarms. Petitioners' expert concluded, under the market approach, that petitioner's 1984 and 1985 windfarms had a market value of $1,221,000 and $550,200, respectively, at the time of purchase.

Under the income approach, petitioners' expert explained the methodology for valuing petitioner's windfarms as follows:

> The valuation methodology used in this appraisal is an income approach analysis known as a "discounted, debt-free, net cash flow." In this discounted cash flow analysis, a projection is made of the revenues, expenses before interest charges, and the impact of income taxes to arrive at the "debt-free net income" from the investment. To this, is added all noncash expenses and other elements of cash flow accruing to the investor below the net income level. The resulting amount is the "debt-free net cash flow" (DFNCF) from the investment, and it is equal to the total cash return available to be paid to both equity and potential debt investors. Thus, the DFNCF represents the cash return on the total capital structure of the investment.

In determining the debt-free net cash flow (cash flow) from petitioner's windfarms, petitioners' expert used a useful life for the 1984 and 1985 windfarms of not less than 20 years. Petitioners' expert also considered the Federal and State tax benefits petitioners expected to receive from the windfarms as a cash inflow. Petitioners' expert discounted the cash flow to present value. He used an initial discount rate of 14 percent, not including the years that the windfarms were purchased, and subsequently increased the discount rate 2 percent every 5 years. Petitioners' expert concluded that the fair market values of the 1984 and 1985 windfarms were $1,318,000 and $610,000, respectively.

Respondent's expert is employed by the Internal Revenue Service. He has worked on a broad number of issues while employed by the Service, including valuation of wind turbine generators. Respondent's expert also used the same three approaches to valuation (cost, market, income) that petitioners' expert used in valuing the 1984 and 1985 windfarms. However, for reasons discussed below, we place

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

little weight on respondent's expert in deciding whether petitioner paid more than fair market value for the 1984 and 1985 windfarms.

Under the cost approach, respondent's expert added up the "component values" of petitioner's 19-meter and 17-meter wind turbine generators. One of these component values was the manufacturing cost of the wind turbine generator. On cross-examination, respondent's expert testified that the manufacturing cost figure in his expert report represented the manufacturer's cost to construct the individual components of the wind turbine generators. Respondent's expert estimated the manufacturing cost of the 17-meter wind turbine to be $70,000, and the 19-meter to be $87,900. Additional component values that respondent's expert used to value the wind turbines were freight expenses, taxes, and construction costs. with respect to the 1984 windfarm, respondent's expert concluded, under the cost approach to valuation, that the three 19-meter wind turbine generators had a fair market value of $349,200, or $116,400 per wind turbine generator. With respect to the 1985 windfarm, respondent's expert concluded that the three 17-meter wind turbine generators had a fair market value of $285,900, or $95,300 per wind turbine generator. These figures do not include any value attributable to the warranties that FloWind made with respect to the 17-meter and 19-meter wind turbine generators. Respondent's expert placed a separate value on the warranties. Respondent's expert concluded that the availability and power curve warranties had a combined fair market value of $202,800 per windfarm, or $67,600 per wind turbine generator, and that the output warranties had a fair market value of $174,900 per windfarm, or $58,300 per wind turbine generator. Respondent's method of valuing these warranties is fully discussed below. After adding the fair market values of the warranties and the fair market value of the wind turbine generators, respondent's expert determined that petitioner's 1984 windfarm had a fair market value of $726,900, and that the 1985 windfarm had a fair market value of $663,600. We note that the fair market value of the 1985 windfarm, as determined by respondent's expert, is substantially greater than the purchase price of the 1985 windfarm.

The cost approach to valuing the wind turbine generators represented only the manufacturer's cost of producing the tangible assets. In determining the cost of replacing the component parts of the wind turbine generators, respondent's expert examined FloWind's production line manufacturing costs, and cost data obtained through other windfarm investigations. Respondent's expert did not include any costs

attributable to the research, design, and development of the FloWind wind turbine generators. During cross-examination, respondent's expert was unable to identify any manufacturers of wind turbines that sold wind turbine generators to third parties at the manufacturer's cost.

Under the market approach, respondent's expert used the same methodology as did petitioners' expert, by computing the average per projected kilowatt hour cost of selected market comparables. However, respondent's expert used only two market comparables to value both of petitioner's windfarms. The market comparables were taken from a Suffolk County Solar Energy Commission newsletter (dated August 1986) which listed the purchase prices of selected wind turbine generators. [12] Respondent's expert calculated the average cost of the two market comparables to be $0.41 per projected kilowatt hour. This figure was multiplied by the projected output of petitioner's windfarms as estimated by Dr. Wilson. Dr. Wilson was respondent's expert who performed an evaluation of the wind resource at Cameron Ridge. Dr. Wilson had prepared eight reports in connection with audits of several FloWind limited partnerships. Two of these reports were used by respondent in the instant case. These two reports were prepared in 1987 in connection with respondent's audit of FloWind Managers and FloWind Partners IV.

With respect to the 1984 windfarm, Dr. Wilson's output projections that respondent's valuation expert used, were not based upon any of Dr. Wilson's reports that were in evidence. Respondent's expert obtained the output projection from a report that was prepared by Dr. Wilson in connection with another windfarm which was located in Altamont Pass, Alameda County, California. With respect to the 1985 windfarm, respondent's expert was unable to recall where he obtained the output projections for the 17-meter wind turbine generators. With respect to the 1984 windfarm, respondent's expert concluded, under the market approach to valuation, that the three 19- meter wind turbine generators and their respective warranties, had a fair market value of $451,200, or $150,400 per wind turbine generator. With respect to the 1985 windfarm, respondent's expert concluded that the three 17-meter wind turbine generators and their respective warranties, had a fair market value of $389,400, or $129,800 per wind turbine generator. Under the market approach, respondent's expert did not allocate any independent value to the wind turbine generator warranties.

Respondent's expert did not consider the market approach to be a reliable method of determining the fair market value of

petitioner's windfarms. On brief, respondent argues that the market approach to valuation is unreliable.

Under the income approach, respondent's expert determined the gross operating revenues of petitioner's windfarms over a period of 20 years. The operating expenses were deducted from gross operating revenues in order to determine net revenue. Respondent's expert discounted the net revenues to present value in order to determine the fair market values of petitioner's windfarms. He used a discount rate of 20 percent.

Respondent's expert relied upon inappropriate information in determining the gross operating revenues of petitioner's windfarms. Gross operating revenues were estimated by multiplying the projected energy production of petitioner's wind turbine generators by the "avoided cost" of electricity. Respondent's expert did not use the projected output of petitioner's wind turbine generators as estimated by FloWind. Instead, he used the projected output of petitioner's wind turbine generators as estimated by Dr. Wilson. These estimates prepared by Dr. Wilson do not purport to evaluate petitioner's windfarms.

The price per kilowatt hour that respondent's expert used in determining gross operating revenue of the 1984 windfarm was not based upon the power purchase contracts between petitioner and Southern California Edison. Instead, the price per kilowatt hour that respondent's expert used was obtained from the FloWind Partners II private placement memorandum. FloWind Partners II was a 17-meter windfarm located in Altamont Pass. On cross-examination, respondent's expert was unable to recall whether the cost per kilowatt hour as stated in the FloWind Partners II private placement memorandum was the same as the price per kilowatt hour that Southern California Edison was required to pay petitioner under the power purchase contract.

The net cash flow of the 1984 windfarm was determined by subtracting expenses from the estimated gross operating revenue. One of the expenses that respondent's expert subtracted from gross operating revenue was an "initial management fee" in the amount of $10,000, which was taken from the FloWind Partners II private placement memorandum. However, petitioner was never required to pay an initial management fee. Moreover, respondent's expert testified that he did not base any of the expenses that he subtracted from gross operating revenues on the contracts that petitioner executed in connection with his purchase of the 1984 windfarm. The operating and maintenance expense

figure was obtained from Dr. Wilson's report. The other expenses, which included property taxes, a transmission facility fee, insurance, and land rental, were obtained from the FloWind Partners II private placement memorandum. With respect to the 1985 windfarm, all of the expenses that respondent's expert subtracted from gross operating revenues were obtained from the FloWind Partners IV private placement memorandum. FloWind Partners IV was a 19-meter windfarm; petitioner's 1985 windfarm was a 17-meter windfarm.

With respect to the 1984 windfarm, respondent's expert concluded, under the income approach to valuation, that the three 19- meter wind turbine generators had a fair market value of $495,000, or $165,000 per wind turbine generator. With respect to the 1985 windfarm, respondent's expert concluded that the three 17-meter wind turbine generators had a fair market value of $240,900, or $80,300 per wind turbine generator. Respondent's expert concludes, after adding the values of the warranties, that petitioner's 1984 windfarm had a fair market value of $872,700, and the 1985 windfarm had a fair market value of $618,600. We note that the fair market value of the 1985 windfarm, as determined by respondent's expert using the income approach, is substantially greater than the purchase price of the 1985 windfarm.

We find that petitioners have met their burden of proving that petitioner did not pay in excess of fair market value for the 1984 and 1985 windfarms. Accordingly, petitioner's bases in his 1984 and 1985 windfarms are equal to their respective purchase prices.

The second issue for decision is whether a portion of the purchase prices of petitioner's 1984 and 1985 windfarms should be allocated to warranties made by FloWind. On brief, respondent argues that petitioner purchased a "bundle of assets" and, as a result, argues that the purchase prices of the windfarms should be allocated to these assets. These assets, according to respondent, are the wind turbine generators and their respective availability and output warranties.

Section 38(b)(1) provides for a credit for qualified investments in section 38 property in the first year the property is placed in service. Section 38 property is defined as "tangible personal property" or "other tangible property." Sec. 48(a)(1); Sec. 1.48- 1(a), Income Tax Regs. See Texas Instruments, Inc. v. United States, 551 F.2d 599 (5th Cir. 1977); Ronnen v. Commissioner, 90 T.C. 74 (1988). Section 38 property also includes "energy property" which is defined

with reference to recovery property under section 48(1). Generally, recovery property means "tangible property of a character subject to the allowance for depreciation." Sec. 168(c)(1). Both parties agree that, if viewed separately from the wind turbine generators, the availability and output warranties would be considered intangible property.

With respect to the 1984 and 1985 windfarms, FloWind made a 5- year availability warranty, under which FloWind warranted that each wind turbine generator would be available for operation for 90 percent of each year for 5 years. Generally, the availability warranty provided that if a wind turbine generator was unavailable for more than an aggregate of 877 hours per year, then FloWind would reimburse petitioner for each hour of unavailability after 877 hours. The amount that FloWind was required to pay petitioner was determined by multiplying the contracted price of electricity by the number of kilowatt hours that would have been produced during the period of unavailability after the initial 877 hours. Coverage under this warranty was limited to $25,000 per wind turbine generator per year.

FloWind also made a 5-year output warranty, under which FloWind warranted that petitioner's 1984 and 1985

windfarms would produce no less than 50 percent of their respective designed projected output per year for each of the first 5 years of operation. The projected output of petitioner's 1984 windfarm was 1,650,000 kilowatt hours per year, and the projected output of petitioner's 1985 windfarm was 262,000 kilowatt hours per year. Thus, FloWind would become liable under the output warranties if petitioner's 1984 windfarm produced less than 825,000 kilowatt hours per year, and if petitioner's 1985 windfarm produced less than 131,000 kilowatt hours per year. Any amounts that FloWind was required to pay under the output warranties were offset by any payments that FloWind made under the other warranties [13]

Respondent argues that the availability and output warranties are intangible property, and that the amounts allocable to these warranties must be excluded for purposes of computing the available credits under section 38 and available deductions under section 168. [14] On brief, respondent has requested an ultimate finding of fact that the availability and output warranties should be valued, per wind turbine generator, as follows:

|  | 19-Meter Wind Turbine Generator | 17-Meter Wind Turbine Generator [15] |
|---|---|---|
| Availability warranty..................... | $67,500 | $67,590 |
| Output warranty........................... | 56,263 | 29,143 [16] |
|  | _____ | _____ |
| Total............................................ | $123,763 | $96,733 |

When warranties are offered as the standard practice of an industry, such warranties generally add little or nothing to the value of the warranted asset. See Houchins v. Commissioner, 79 T.C. 570, 593-594 (1982); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1239 (1981). See also Autrey v. United States, 889 F.2d 973, 983-984 (11th Cir. 1989). The evidence shows that FloWind's competitors made warranties in connection with the sale of windfarms. During

1984, one of FloWind's competitors sold windfarms with a 70-percent output warranty. The warranties that FloWind made during 1984 were in response to this competition. We note that FloWind apparently made similar availability and output warranties in connection with the sale of windfarms to FloWind Partners 1984, and FloWind Partners IV. FloWind made an availability warranty to FloWind Partners II, but did not make any type of output warranty to FloWind Partners II.

We were not persuaded by respondent's expert's income approach to valuing the availability and output warranties of the windfarms. Respondent's expert determined that the availability warranties would yield a gross income stream in the amount of $25,000 per wind turbine generator per year for 5 years. In order for petitioner to receive the maximum amount payable under the availability warranties, the windfarms would have to be inoperable for the entire warranty period of 5 years.

Respondent argues that there was a "substantial probability" that the availability warranties would be called upon, and thus, it is reasonable to assume that petitioner would receive the maximum amount payable under the availability warranties. We disagree. Petitioner reviewed wind studies on the Cameron Ridge area and reviewed the projected output of his windfarms. He purchased his windfarms with the objective of making a profit, as conceded by respondent. Petitioner made significant cash down payments toward the purchases of his windfarms. Based upon the information available to petitioner at the time he purchased his windfarms, we do not believe that it is reasonable to assume that petitioner's windfarms would be inoperable for 5 years, as respondent's expert has assumed for purposes of valuing the availability warranties.

Respondent's expert also used the income stream approach to valuing the output warranties. On cross-examination, however, it became clear that respondent's expert misunderstood the conditions under which FloWind became liable to petitioner under the output warranties. The gross revenues payable under the output warranties were determined by multiplying a projected output figure for both windfarms by a cost per kilowatt hour. [17] FloWind became liable under the output warranties only if the windfarms failed to produce 50 percent of their projected output. The projected kilowatt hour figures that respondent's expert used in determining the gross revenues payable under the output warranties were not reduced by 50 percent, as would be required. On cross-examination, respondent's expert agreed that, under his method of valuing the output warranties, he overstated the value of these warranties.

The amount that respondent's expert determined would be payable under the output warranties was based upon the assumption that petitioner would receive the maximum amount payable under the output warranties. On brief, respondent argues that it is reasonable to allocate the full

value of the output warranties, as determined by respondent's expert, to the purchase prices of the windfarms. We note that respondent's own witness, who was employed as comptroller of FloWind during 1984 and 1985, testified that FloWind did not anticipate any material exposure under its output warranties. We believe that it is unreasonable to assume that petitioner would receive the maximum amount payable under the output warranties.

Based upon the evidence in the record, we believe that the availability and output warranties did not have a separate identifiable value. Accordingly, we find that petitioners have met their burden of proving that no portion of the purchase prices of petitioner's windfarms should be allocated to their respective availability and output warranties.

Respondent also determined that petitioners are liable for additions to tax under section 6661. Section 6661 imposes an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6661(b)(1)(A). The amount of the understatement is equal to the excess of the amount of tax required to be shown on the return for the tax year less the amount of tax shown on the return. Woods v. Commissioner, 91 T.C. 88, 94 (1988).

Respondent's deficiency determination for petitioners' taxable year 1984 was based entirely upon petitioner's windfarm activity. Our finding that petitioner did not pay in excess of fair market value for his windfarms is thus dispositive of this issue. Accordingly, petitioners are not liable for the addition to tax under section 6661 for taxable year 1984.

With respect to taxable year 1985, respondent also increased petitioners' income to include additional interest income and a "capital gain and loss." petitioners have conceded these adjustments. In the notice of deficiency, respondent determined the section 6661 addition to tax based upon petitioners' underpayment attributable to petitioner's windfarm activity and the capital gain and loss adjustment. Respondent did not determine the addition to tax, under section 6661, with respect to the portion of petitioners' underpayment attributable to interest income. Since we have found that the amount petitioner paid for his windfarms was not in excess of their respective fair market value, no

61 T.C.M. (CCH) 2791, T.C.M. P 91,249, 1991 TC Memo 91,249

underpayment exists with respect to petitioner's windfarm activity in 1985. Thus, the only item of adjustment for taxable year 1985 that is subject to the addition to tax under section 6661 is petitioners' capital gain and loss adjustment. However, the amount of tax attributable to petitioners' capital gain and loss adjustment is less than $5,000. Accordingly, petitioners are not liable for the addition to tax under section 6661 for taxable year 1985.

The final issue for decision is whether petitioners are liable for the increased rate of interest under section 6621(c). Section 6621(c) provides that with respect to interest payable under section 6601, an increased rate of interest is imposed when there is a "substantial underpayment" (exceeds $1,000) "attributable to one or more tax motivated transactions." A "tax motivated transaction" includes "any valuation overstatement" as defined in section 6659(c). Sec. 6621(c)(3). Under section 6659(c), a valuation overstatement is present if the value of any property claimed on a return is 150 percent

or more of the amount determined to be the correct valuation of such property.

According to respondent's brief, the determination that petitioners are liable for the increased rate of interest is based upon the valuation of the 1984 and 1985 windfarms. We have found that petitioners did not pay in excess of the respective fair market value of the 1984 and 1985 windfarms, and that no portion of the purchase prices of the windfarms should be allocated to warranties made by FloWind. Accordingly, we hold for petitioners on this issue.

Due to concessions,

Decision will be entered under Rule 155.

**All Citations**

T.C. Memo. 1991-249, 1991 WL 93170, 61 T.C.M. (CCH) 2791, T.C.M. P 91,249, 1991 TC Memo 91,249

Footnotes

1    Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

2    Based upon respondent's computation of the addition to tax under section 6661 for taxable year 1985, respondent did not determine the addition to tax under section 6661 with respect to the portion of petitioners' underpayment attributable to $161,869 of interest income.

3    Petitioners concede that they owe tax on an additional $161,869 of interest income for taxable year 1985. Petitioners also concede a $556 adjustment for taxable year 1985, which was labeled "capital gain and loss" in the notice of deficiency. Respondent concedes that petitioners are not liable for the additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a)(1) and (2).

4    Petitioners have requested, on brief, that we specify the amount of the 1984 business credit that petitioners may be entitled to carryback, under section 39, to taxable year 1983. Our responsibility is limited to redetermining the deficiencies determined for the years before us. See LTV Corp. v. Commissioner, 64 T.C. 589, 593 (1975). The notice of deficiency and petition relate only to taxable years 1984 and 1985. We have no jurisdiction over taxable year 1983. Sec. 6214(b).

5    The FloWind Partners 1984 private placement memorandum also contained information relevant to the 19-meter wind turbine generator.

6    Dr. Berry was an officer and shareholder of Wind Energy Company. At the time Dr. Berry performed his wind study, Wind Energy Corporation had leased or purchased private land and applied for the use of Bureau of Land Management land on Cameron Ridge for the purpose of installing a large wind-electric power plant. In May of 1984, Wind Energy Company became a subsidiary of FloWind. Dr. Berry exchanged his shares of stock in Wind Energy Company for preferred shares of FloWind which, at the time of trial, were still held by Dr. Berry.

7    CAM1 had originally been established by Atmospheric Research & Technology, Inc., in November 1979 and operated through January 1981. As part of his wind study for FloWind Partners III, Dr. Berry used the wind measurement data that was recorded from CAM1 during this time period.

8    The Long Term Power Purchase Contract between FloWind and Southern California Edison Company was entered into on August 6, 1984, and was amended and restated on April 16, 1985. FloWind entered into the contract "acting in its own behalf and in behalf of other owners, if any, as Project Manager." The contract had a 30-year term, beginning on or about September 1, 1984, and was thereafter terminable on 90 days' notice by either party. The contract had a fixed payment

schedule for 10 years. Thereafter, the price was based on the utility's avoided cost with a minimum. The Power Purchase Agreement was a standard offer #4 contract which at that time was generally available to any small power producer.

9   With respect to 1985, the total of the expenses listed on petitioners' Schedule C was $333,092, whereas the indicated total was $330,092. The IRS Service Center subtracted the $330,092 on line 32 from the $54,365 on line 5 and came up with ($275,727) on line 33, instead of the ($278,727) petitioners had indicated. The Service Center reduced petitioners' refund with respect to the interest income by the tax attributable to the $3,000. Thus, the notice of deficiency added back only $275,727 with respect to the $278,727 "wind energy loss."

10   In the notice of deficiency, respondent also disallowed petitioners' windfarm losses and general business credits because petitioners were not at risk within the meaning of section 465, and because the windfarms did not qualify for the investment and business energy credits. Respondent has failed, however, to address these issues on brief. Respondent has apparently abandoned these arguments, and we will not consider them further. Sundstrand Corporation and Subsidiaries v. Commissioner, 96 T.C. 226 (Slip Op. at 174-175) (1991). See Ideal Basic Industries, Inc. v. Commissioner, 82 T.C. 352, 366 n.4 (1984).

11   As explained hereafter, the report of respondent's principal expert placed an even greater value on the 1985 windfarm.

12   Respondent's expert could not recall when the wind turbine generators that he used as market comparables were installed, but testified that they were installed between 1982 and 1985.

13   FloWind also made a power performance warranty in connection with petitioner's purchases of the 1984 and 1985 windfarms. Under this warranty, FloWind warranted that each wind turbine generator would be capable of operating at 90 percent of its projected power performance, in accordance with a power production curve for a period of one year. The remedy for breach was either the modification of the wind turbine generator or installation of additional wind turbine generators. Respondent's expert appears to have valued the power performance warranties and the availability warranties together. Respondent has not argued that any portion of the purchase prices of the 1984 and 1985 windfarms should be separately allocated to the power performance warranties.

14   On brief petitioners point out that if we find that a portion of the purchase prices of the windfarms should be allocated to warranties, then such warranties would be amortizable over the warranty period.

15   As we have previously noted, respondent's valuation of the 1985 windfarm, including the value of the output and availability warranties and the wind turbine generators, is greater than the actual purchase price of the 1985 windfarm.

16   Respondent's expert's report valued this warranty at $58,286. Respondent's brief gives no explanation for this variance. However, we assume that it is in recognition of the fact that respondent's expert erroneously used an output figure that was double the amount covered by the warranty.

17   As between the two windfarms, respondent's expert used a different kilowatt hour multiplier for determining the gross revenues payable under the output warranties. Respondent's expert was unable to explain his reasons for using two different multipliers.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Von-Lusk v. C.I.R., 104 T.C. No. 8 (1995)

104 T.C. 207, Tax Ct. Rep. (CCH) 50,466, Tax Ct. Rep. Dec. (RIA) 104.8

KeyCite Yellow Flag - Negative Treatment
**Distinguished by**    Reichel v. C.I.R.,    U.S.Tax Ct.,    January 7, 1999

104 T.C. 207
United States Tax Court.

VON–LUSK, a California Limited Partnership, the
Lusk Company, Tax Matters Partner, Petitioner,
v.
COMMISSIONER OF INTERNAL
REVENUE, Respondent.

No. 4271–93.
|
Feb. 2, 1995.

**Attorneys and Law Firms**

**\*208**  Milton E. Bracken (an officer), for petitioner.

Susan C. Hergenhan and Roy Wulf, Laguna Niguel, CA, for
respondent.

**\*207**  P is a partnership organized for the purpose
of managing, holding, and developing property for
investment. P acquired certain raw land (the property)
which it planned to subdivide. It planned to build houses
on the lots of the resulting subdivision. P deducted the
costs of meeting with government officials, obtaining
building permits and zoning variances, negotiating permit
fees, performing engineering and feasibility studies, and
drafting architectural plans as "other deductions." P also
deducted property taxes in respect of the property.

Sec. 263A(a) and (b)(1), I.R.C., precludes the deduction
and provides for capitalization of direct and the allocable
share of indirect costs allocable to property "produced
by the taxpayer". And sec. 263A(g)(1), I.R.C., states that
"The term '*produce* ' includes construct, build, install,
manufacture, *develop,* or improve." (Emphasis added.)

*Held,* the Commissioner is sustained in disallowing
deductions and requiring capitalization of the foregoing
costs as well as property taxes paid by P in respect
of the property, notwithstanding that P did not make
any physical change to the property during the taxable
years. The foregoing costs were the initial steps ancillary
to actual construction of the buildings contemplated to
be built. They may properly be treated as part of the
development costs. Cf. *Louisiana Land & Exploration
Co. v. Commissioner,* 7 T.C. 507 (1946), affd. 161 F.2d
842 (5th Cir.1947). The result is not affected by the fact
that local government regulations may delay or even
ultimately preclude completion of the project.

OPINION

RAUM, Judge:

This case involves the Commissioner's determination that
certain expenses deducted in Von–Lusk's returns for 1988,
1989, and 1990, were not deductible but instead were to be
capitalized under section 263A. [1]

Von–Lusk (also referred to as "the Partnership") is a
California limited partnership. Petitioner, the Lusk Company,
is an S corporation and was the tax matters partner of Von–
Lusk for 1988, 1989, and 1990. On the date the petition was
filed in this case, the principal place of business for both the
Partnership and the Lusk Company was in Irvine, California.

Von–Lusk filed a U.S. Partnership Return of Income (Form
1065) for each of the calendar years 1988, 1989, and 1990.
On December 14, 1992, the Commissioner issued Notices
of Final Partnership Administrative Adjustment (FPAA) to
Von–Lusk for those years in which deductions claimed on the
returns for each of the years were disallowed as follows:

| Partnership Item | 1988 | 1989 | 1990 |
| --- | --- | --- | --- |
| Interest expense | $190,761 | $352,150 | $457,659 |
| Taxes | 206,377 | 229,845 | 211,903 |
| Other deductions | 110,725 | 201,443 | 187,797 |

After the initial pleadings in this Court, the Commissioner
filed an amendment to answer, in which the Commissioner

conceded the foregoing interest expense deductions. The
adjustments in the FPAAs for taxes and other deductions
remain at issue. The explanation of adjustments in the FPAAs

stated that "The deduction for taxes is not allowed because the partnership has not established that the amounts claimed were not capital in nature." It went on to state that "The deduction for other expenses is not allowed because the partnership has not substantiated that the **\*209** amounts claimed were ordinary and necessary expenses paid or incurred by the partnership during the taxable year in carrying on a trade or business or an activity engaged in for profit or that the amounts claimed were not capital in nature."

Von–Lusk was formed in 1966 with the stated purpose of managing, holding, and developing for investment approximately 278 acres of raw land (the Property), which was contributed to the Partnership by its partners in 1966. Prior to the transfer, the general and limited partners (collectively) each owned an undivided one-half interest in the Property. The general partner (The Lusk Company) and the limited partners collectively (various members of the Von der Ahe family) each own a 50–percent interest in the Partnership.

The Lusk Company is a residential and commercial real estate development company. The Lusk Company is the general partner in more than 40 general and limited partnerships in California (the Lusk partnerships). The Lusk partnerships invest in and develop real estate, own and rent apartments, commercial buildings and industrial buildings, and own and operate a livestock ranch and farm.

The Lusk Company, as general partner and managing partner of real estate development partnerships, engages the services of many contractors, lobbyists, various engineers, architects, and others to perform services for these partnerships. These independent contractors, on behalf of the Lusk partnerships, meet with government officials, obtain building permits and zoning variances, negotiate permit fees, perform engineering and feasibility studies, and draft architectural plans. The contractors bill the Lusk partnerships that benefit from their work for the cost of their services. During 1988, 1989, and 1990, Von–Lusk incurred independent contractor costs of $17,912, $62,611, and $88,848, respectively. Von–Lusk claimed these amounts on its returns for such years under the caption "other deductions" as consultants, advertising, insurance, market research, off premise sales, and other costs.

Service Mortgage Company is a California corporation and an affiliate of The Lusk Company. Service Mortgage Company provides management services for The Lusk Company and the Lusk partnerships. Service Mortgage Company employs executives, project managers, secretaries, and accountants. These employees monitor **\*210** the Lusk partnership projects and review and direct the work of the contractors discussed above. Service Mortgage Company bills the cost of their employees to the Lusk partnerships that benefit from the work.

When Service Mortgage Company bills a Lusk partnership other than a partnership engaged in property management or rental activities, the amount is charged to a "work in progress" account for that particular partnership. Service Mortgage Company includes a mark-up for overhead and facilities costs in the wages charged to "work in progress" accounts. The Lusk partnerships that own and operate rental property are charged for time spent by Service Mortgage Company's administrative personnel. These charges are deducted by the Lusk partnerships as period costs.

During 1988, 1989, and 1990, Service Mortgage Company billed Von–Lusk in the amounts of $92,813, $138,822, and $98,949, respectively. These amounts include the wages, payroll taxes, and fringe benefits of Service Mortgage Company's administrative personnel and the overhead mark-up described above. The overhead mark-up represents approximately 40 percent of the total amount billed. The wages, payroll taxes, and fringe benefits of Service Mortgage Company's administrative personnel represent approximately 60 percent of the total amount billed. Accordingly, during 1988, 1989, and 1990, Service Mortgage Company billed Von–Lusk approximately $37,125, $55,529, and $39,580, respectively, for overhead and $55,688, $83,293, and $59,369, respectively, for the wages, payroll taxes, and fringe benefits of Service Mortgage Company's administrative personnel. Von–Lusk deducted the amounts it paid to Service Mortgage Company during the years 1988, 1989, and 1990, on its tax returns for those years under the caption "other deductions—wages and salaries".

The "other deductions" claimed on Von–Lusk's tax returns for the years 1988, 1989, and 1990, consist of the following costs:

| Other Deductions | 1988 | 1989 | 1990 |
|---|---|---|---|
| Consultants | $  13,563 | $  49,750 | $  74,644 |

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

104 T.C. 207, Tax Ct. Rep. (CCH) 50,466, Tax Ct. Rep. Dec. (RIA) 104.8

| | | | |
|---|---|---|---|
| Advertising | 475 | 3,875 | 0 |
| Insurance | 711 | 905 | 916 |
| Wages & salaries | 92,813 | 138,822 | 98,949 |
| Market research | 500 | 1,625 | 6,934 |
| Off premise sales | 2,516 | 3,837 | 5,514 |
| Other costs | 147 | 2,619 | 840 |
| TOTAL | $ 110,725 | $ 201,433 | $ 187,797 |

**\*211** The deductions for "Advertising", "Market Research", and "Off Premise Sales" refer to costs incurred to advise Von–Lusk as to the appropriateness of product mix and pricing for the Property. Von–Lusk did not engage in active sales efforts during 1988, 1989, and 1990. On its returns for the years 1988, 1989, and 1990, Von–Lusk deducted real property taxes incurred and paid in the amounts of $206,377, $229,845, and $211,303, respectively. Von–Lusk also deducted $600 in 1990 for a California franchise tax shown to be due on its California franchise tax return.

The Property is located in San Bernardino County, California, in an area called Chino Hills. Chino Hills was incorporated on December 1, 1991. Prior to this date, development was controlled by the San Bernardino County Planning Commission and Board of Supervisors.

In August 1982, the San Bernardino County Board of Supervisors approved the Chino Hills Specific Plan, which provided for 2,779 dwelling units on the Property. In 1985, Von–Lusk agreed to the inclusion of the Property in Chino Hills Assessment District No. 85–1, which is a special assessment district that was formed to provide for the acquisition and construction of certain public improvements within the district. Without further elaboration or explanation the parties have stipulated that "This special assessment increased Von–Lusk's property taxes by over $200,000 per year."

In 1985, Von–Lusk submitted a preliminary development plan for the Property to the San Bernardino County Board of Supervisors. In January 1986, the San Bernardino County Board of Supervisors approved the preliminary development plan for the Property (also referred to as the Lusk Los Serranos property and/or Fairfield Ranch). The approved Lusk Los Serranos Preliminary Development Plan provided for 1,444 dwelling units on the Property. The Chino Hills Specific Plan (referred to above) had provided for 2,779 dwelling units on the Property.

**\*212** The San Bernardino County Board of Supervisors set a development fee of $31,680,600 for the Property. The County did not reduce the development fee when it approved the Preliminary Development Plan. The Preliminary Development Plan allowed 1335 fewer units than the Chino Hills Specific Plan. On a per unit basis, this increased the development fee from $11,400 per unit to $21,940 per unit. During 1988, 1989, and 1990, Von–Lusk pursued an appeal in an attempt to reduce the development fee.

In January 1986, the San Bernardino County Board of Supervisors informed Von–Lusk that it would not approve a final development plan and tract map for the Property unless certain conditions were met. In 1987, in response to an application filed by Von–Lusk, the Property was removed from the agricultural preserve and zoned for residential development. The rezoning was done in accordance with the Chino Hills Specific Plan and constituted a rezoning of the Property for future use. The Property was used by tenant farmers to raise grass and grains during the years 1988, 1989, and 1990.

On September 22, 1988, Von–Lusk submitted tentative tract maps to the San Bernardino County Board of Supervisors. On May 18, 1989, the County approved the tentative tract maps, subject to certain conditions. Condition No. 70 provides:

> no map shall be recorded for any phase of this tract until all necessary contracts have been approved and executed for the construction of Soquel Canyon Parkway from El Prado Road/Central Avenue to its

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

planned connection with lower Carbon Canyon Road or an alternative highway in Orange County and no building permits shall be issued until 90 days prior to the projected completion of the parkway.

During 1988, 1989, and 1990, no agreement was reached between San Bernardino County and Orange County as to the location of the Soquel Canyon Parkway connection, no funding issues for the highway were approved, and no physical activities were commenced in connection with the construction of the highway.

Condition No. 125 also imposed by the San Bernardino County Board of Supervisors as a condition for approval of the tentative tract map required Von–Lusk to design, construct, and finance a six-lane addition to Soquel Canyon **\*213** Parkway from the Corona Expressway interchange east to Chino Creek, a six-lane bridge at Chino Creek, a six-lane section of Soquel Canyon Parkway from the Chino Creek Bridge east to the El Prado Road/Central Avenue intersection, and a one-half width section of Central Avenue from the Corona Expressway east to the Chino Creek.

Von–Lusk appealed Condition No. 70 and several other conditions. This appeal was pending during the years 1988, 1989, and 1990. During those years Von–Lusk could not obtain building permits for the Property because Condition No. 70 had not been met. During the years 1988, 1989, and 1990, Von–Lusk did not make any physical improvements to the Property and the Property continued to be used by tenant farmers to raise grass and grains.

The parties stipulated that on August 6, 1993, section 1.263A–1 through 1.263A–6, Income Tax Regs., was adopted, and that these regulations apply to costs incurred in taxable years beginning after December 31, 1993. Accordingly, the parties agreed that neither party would argue that the facts contained in the stipulation of facts cause section 1.263A–2(a)(3)(ii), Income Tax Regs., to apply to the Property.

No controversy is before us as to whether Von–Lusk was engaged in an activity for profit, or whether the expenditures at issue were properly made in pursuit of a business profit. Both parties have limited their argument to, and our opinion deals exclusively with, whether the expenditures at issue

should have been capitalized under section 263A or were properly deducted, as claimed by petitioner.

The general rule of section 263A is found in section 263A(a), which states:

(a) Nondeductibility of Certain Direct and Indirect Costs. —

(1) In general.—In the case of any property to which this section applies, any costs described in paragraph (2)—

(A) in the case of property which is inventory in the hands of the taxpayer, shall be included in inventory costs, and

(B) in the case of any other property, shall be capitalized.

(2) Allocable costs.—The costs described in this paragraph with respect to any property are—

(A) the direct costs of such property, and

(B) such property's proper share of those indirect costs (including taxes) part or all of which are allocable to such property.

**\*214** Any cost which (but for this subsection) could not be taken into account in computing taxable income for any taxable year shall not be treated as a cost described in this paragraph.

Subsection (b) describes the property to which section 263A applies. Briefly stated, section 263A applies to (1) property produced by the taxpayer and (2) property acquired for resale. The parties agree that the property at issue was not acquired by Von–Lusk for resale, as contemplated by the statute. Therefore, for section 263A to be applicable, the property must be "produced by the taxpayer."

Section 263A(g)(1) states that "The term 'produce' includes construct, build, install, manufacture, develop, or improve." The term produce is given further explanation in section 1.263A–1T(a)(5)(ii), Temporary Income Tax Regs., 52 Fed.Reg. 10061 (Mar. 30, 1987), which states that "For purposes of this section, the term 'produce' includes construct, build, install, manufacture, develop, improve, create, raise or grow."

If Von-Lusk's activities fall within the description "construct, build, install, manufacture, develop, improve, create, raise or

grow", then Von–Lusk "produced" the property. If Von–Lusk "produced" the property, then section 263A applies. If section 263A applies then the direct and a proper share of the indirect costs of the property are to be capitalized.

Section 263A is a relatively new addition to the Internal Revenue Code, having been added by section 803 of the Tax Reform Act of 1986, Pub.L. 99–514, 100 Stat. 2085, 2350. The statute itself does not provide a comprehensive definition of "produce". Rather, it merely lists a series of examples of activities which are included in the term "produce". Sec. 263A(g)(1). The Commissioner's regulations quoted above follow this path, choosing merely to add to the statutory list of examples rather than setting forth a comprehensive definition.

It falls on us then to determine whether Von–Lusk's activities come within the word "produce" as used by Congress in section 263A. To the extent that the legislative history accompanying section 263A furnishes some guide as to what activities Congress meant to include within the term "produce", it may be found in the reasons behind the development of section 263A. As the Senate Finance Committee stated:

**\*215**  The committee believes that the present-law rules regarding the capitalization of costs incurred in producing property are deficient in two respects. First, the existing rules may allow costs that are in reality costs of *producing,* acquiring, or *carrying* property to be deducted currently, rather than capitalized into the basis of the property and recovered when the property is sold or as it is used by the taxpayer. This produces a mismatching of expenses and the related income and an unwarranted deferral of taxes. Second, different capitalization rules may apply under present law depending on the nature of the property and its intended use. These differences may create distortions in the allocation of economic resources and the manner in which certain economic activity is organized.

The committee believes that, in order to more accurately reflect income and make the income tax system more neutral, a single, comprehensive set of rules should govern the capitalization of costs of producing, acquiring, and holding property, including interest expense, subject to appropriate exceptions where application of the rules might be unduly burdensome. [Emphasis added.]

S.Rept. 99–313 (1986), 1986–3 (Vol. 3) C.B. 140. For virtually identical language, see H.Rept. 99–426 (1985), 1986–3 (Vol. 2) C.B. 625; Staff of the Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986 (J.Comm.Print 1987, 508–509).

Two purposes behind the enactment of section 263A can be gathered from this legislative history. First, Congress expected that a single set of comprehensive rules would be applied to determine whether to capitalize costs. Second, Congress expected those rules to be applied from the acquisition of property, through the time of production, until the time of disposition. To give full effect to this Congressional purpose a broad definition of "produce" is necessary.

We must determine whether the activities engaged in by Von–Lusk properly fit within a broad definition of "produce". Von–Lusk deducted as "other expenses", under the headings consultants, advertising, insurance, market research, off premise sales, and other costs, amounts paid for the services of independent contractors. The functions performed by these independent contractors included meeting with government officials, obtaining building permits and zoning variances, negotiating permit fees, performing engineering and feasibility studies, and drafting architectural plans. Von–Lusk deducted under "other deductions—wages & salaries" amounts paid to Service Mortgage Company. The amounts paid Service Mortgage Company represented compensation for services provided by Service Mortgage Company in reviewing and directing the work of the contractors discussed above.

**\*216**  While the pursuit of building permits and zoning variances, negotiating permit fees and similar activities may not readily spring to mind as examples of production activity, we think that upon reflection they are properly classifiable as such. Such activities are ancillary to actual physical work on the land and are as much a part of a development project as digging a foundation or completing a structure's frame. The project can not move forward if these steps are not taken.

Von–Lusk took purposeful steps to begin the development of the Property. Petitioner attempts to place weight on the fact that Von–Lusk was formed with the stated purpose of managing, holding, and developing the Property for investment. Petitioner claims Von–Lusk's activities never went beyond managing and holding. The stipulated facts indicate otherwise. Meeting with government officials, obtaining building permits and zoning variances, negotiating permit fees, performing engineering and feasibility studies, drafting architectural plans, and appealing development

Von-Lusk v. C.I.R., 104 T.C. No. 8 (1995)
104 T.C. 207, Tax Ct. Rep. (CCH) 50,466, Tax Ct. Rep. Dec. (RIA) 104.8

conditions go beyond managing and holding. *These activities represent the first steps of development.*

Having determined that Von–Lusk's activities represented the first steps in the development of the Property, it then follows that Von–Lusk produced the property, as contemplated by Congress. As such, section 263A applies to the Property, and Von–Lusk must capitalize the direct and a proper share of the indirect costs of the property.

We note that petitioner made no argument as to whether the costs at issue represented direct or indirect costs of the Property. Petitioner contended only that section 263A does not apply to the Property. Although we may treat this issue as conceded, see Rule 142(a), we consider it briefly below.

Section 263A(a)(2) states that the costs described in this paragraph with respect to any property are (A) the direct costs of such property, and (B) such property's proper share of those indirect costs (including taxes) part or all of which are allocable to such property. Section 1.263A–1T(b)(2)(i), Temporary Income Tax Regs., 52 Fed.Reg. 10061–10062, states: "Direct material costs and direct labor costs must be capitalized with respect to a production or resale activity * * * 'Direct labor costs' include the cost of labor that can be identified or associated with a particular activity." The costs deducted under "other deductions" pertained to the cost of **\*217** various professionals. As such they represent the cost of labor which can be identified or associated with a particular activity.

The fact that the services of these professionals were arranged by the Lusk Company or performed by Service Mortgage Company does not take them out from under section 263A. While they may, therefore, become indirect costs, they remain "costs that directly benefit or are incurred by reason of the performance of a production or resale activity". Sec. 1.263A–1T(b)(2)(ii), Temporary Income Tax Regs. They still must be capitalized. While only the "proper share" of the indirect costs are to be capitalized, petitioner offered no proof or argument that any of these costs did not relate to the activities that we have determined to be part of the development of the property.

The property taxes paid by Von–Lusk must also be capitalized. Taxes otherwise allowable as a deduction are specifically listed as an example of indirect costs. Sec. 263A(a)(2)(B); sec. 1.263A–1T(b)(2)(iii)(I), Temporary Income Tax Regs.

Petitioner states in its brief "With respect to the terms used to define 'produce' it would seem to be a logical conclusion that the physical appearance of raw land would be altered to some degree." Petitioner attempts to use the fact that no physical change occurred on the Property to argue that there was no production. However, section 263A contains no requirement that there be a physical change. To read such a requirement into the statute would, in our judgment, subvert the purpose of Congress in enacting a broad set of uniform rules. In our opinion, Congress meant to include in the costs to be capitalized the preliminary, nonphysical steps of development at issue here.

Petitioner's argument is similar to one rejected by this Court in *Louisiana Land & Exploration Co. v. Commissioner, 7 T.C. 507 (1946)*, affd. 161 F.2d 842 (5th Cir.1947). There the taxpayer attempted to deduct amounts expended for a geophysical survey of property under lease to the taxpayer. The Commissioner argued that those amounts should be capitalized under section 24(a)(2) of the Internal Revenue Code of 1939 (the forerunner of section 263). Section 24(a)(2) prohibited the deduction of amounts paid for permanent **\*218** improvements or betterments made to increase the value of any property or estate.

The taxpayer argued "the geophysical survey was not an improvement or betterment of its property, because it added nothing tangible thereto, and that it did not and could not increase the value of the property". *Louisiana Land & Exploration Co. v. Commissioner, supra* at 514. The Court rejected this argument. In language especially pertinent to the present case, the Court stated:

> Under these circumstances it seems abundantly clear that the survey was the first step in the over-all development for oil of these tracts of land and that the benefit derived from the expenditure was to be enjoyed by petitioner in its business during the entire useful life of the asset being developed. * * * It is well settled that development expenses such as the platting, mapping, and subdividing of a tract of land held for sale must be capitalized and treated as an adjustment of the taxpayer's basis for such property. * * *, and we are unable to perceive any significant difference between such expenses and the one

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

involved here. [*Id.* at 516; citations omitted.]

The Court rejected a requirement of physical change for capitalization. The result there reached is even more strongly called for in the present case. In *Louisiana Land & Exploration Co., supra,* the Court dealt with the precursor of section 263, whereas here the controlling provisions are in section 263A. And the legislative history of section 263A discloses that Congress was concerned with broadening, not narrowing, the scope of section 263 so as to avoid a "mismatching of expenses and the related income", and sought to provide for a more accurate reflection of income. See *supra* at 12.

Petitioner next argues that the property could not be "produced" until the "production period" began. The "production period" is defined in section 263A(f)(4)(B) as beginning on the date on which production of the property begins, and ending on the date on which the property is ready to be placed in service or is ready to be held for sale. Petitioner relies upon the following explanation of the term "production period" in I.R.S. Notice 88–99, 1988–2 C.B. 422.

> For purposes of the interest capitalization rules, the production period of real property generally begins when physical activity is first performed upon the property (e.g., the grading or clearing of land, the excavation of foundations or lines for utilities, the performance of mechanical activities such as plumbing or electrical work upon a building that is being rehabilitated **\*219** or improved, or any other work relating to the construction or improvement of real property).

Petitioner argues that since no physical activity was performed on the Property, the production period did not begin for purposes of the interest capitalization rules, and that it therefore did not "produce" the property.

While petitioner's argument does have a superficial appeal, it does not survive close scrutiny. Subsection (f) of section 263A provides special rules for the *allocation of interest* to property produced by the taxpayer. It has no effect on the costs here at issue. Indeed, the narrow scope of subsection

(f) is reflected in the Commissioner's concession as to the deductibility of the interest items for each of the 3 years at issue. To read the requirements of subsection (f) as applying to all costs would change the special rule to a general rule. Put differently, if no costs were to be capitalized until the beginning of the "production period," then section 263A(f)(1)(A) would be superfluous. Such a construction "offends the well-settled rule of statutory construction that all parts of a statute, if at all possible, are to be given effect." *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 633 (1973). See also *Phillips Petroleum Co. v. Commissioner,* 101 T.C. 78, 97 (1993) (all parts of a statute must be read together, and each part should be given its full effect).

Petitioner next argues for a consistency requirement between section 263A and section 312(n)(1). Section 312(n)(1) requires an adjustment to the earnings and profits account for construction period carrying charges. It imposes a capitalization requirement for interest, property taxes, and similar carrying charges incurred during the construction period. The term "construction period" is given the same meaning as the term "production period" under section 263A(f)(4)(B). Sec. 312(n)(1)(C).

Because the costs at issue were not incurred during the section 263A(f)(4)(B) production period, they were not incurred during the "construction period" and are, therefore, not required to be capitalized under section 312(n)(1). Petitioner argues that, in the interest of consistency, we should not require capitalization under section 263A. We disagree.

Section 312(n)(1) applies to costs that are otherwise deductible. Section 312(n)(1)(B) includes construction period **\*220** carrying charges "to the extent such interest, taxes, or charges are attributable to the construction period for such property and would be allowable as a deduction in determining taxable income under this chapter for the taxable year in which paid or incurred." If costs must be capitalized under other provisions of the Internal Revenue Code, then section 312(n)(1) is not applicable. Earnings and profits will be accurately reflected through the taxpayer's decreased deductions and increased income.

The final argument made by petitioner is that some of these costs are specifically excluded from capitalization under section 1.263A–1T(b)(2)(v)(A), Temporary Income Tax Regs., 52 Fed.Reg. 10063. The costs excluded by that regulation are marketing, selling, advertising, and distribution expenses. Petitioner uses this regulation to argue that the

advertising, market research, and off premise sales expenses are not capital expenditures.

Petitioner stipulated that those expenditures "refer to costs incurred to advise Von–Lusk as to the appropriateness of product mix and pricing for the Property. Von–Lusk did not engage in active sales efforts during 1988, 1989 and 1990." As such, these expenses are not of the type contemplated by the above cited regulation. The label applied by petitioner is irrelevant.

We are aware that conditions imposed on Von–Lusk by local government authorities made the delay of this project unavoidable and the continued pursuit of the project so financially unattractive as to possibly preclude going forward with it. That does not change our view that steps were taken to begin the development of the Property. The result of those steps is that Von–Lusk came under the rule of section 263A. [2]

In the light of our conclusion above that the deductions in controversy must be capitalized, it is unnecessary to consider the Commissioner's alternative argument that the "other expenses," if not required to be capitalized by section 263A should be capitalized under section 263.

**\*221** Since respondent has conceded the interest deductions originally at issue,

*Decision will be entered under Rule 155.*

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] We are aware of the opinion in *Hustead v. Commissioner, T.C.Memo. 1994–374,* which contains some dicta as to the scope of the term "produce" in respect of certain expenditures for activities that were less extensive than and were quite unlike the expenditures involved herein. The case also considered whether the property was held by the taxpayer primarily for sale to customers in the ordinary course of trade or business so as to bring sec. 263A(b)(2) into play in the circumstances there before the Court. The Court ultimately by-passed the applicability of sec. 263A, and held the expenditures nondeductible by reason of sec. 263.

**All Citations**

104 T.C. No. 8, 104 T.C. 207, Tax Ct. Rep. (CCH) 50,466, Tax Ct. Rep. Dec. (RIA) 104.8

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

**Payments for Specified Energy Property in Lieu of Tax Credits**

**under the**

**AMERICAN RECOVERY AND REINVESTMENT ACT OF 2009**

 

**U.S. Treasury Department**
**Office of the Fiscal Assistant Secretary**
**July 2009/ Revised March 2010/ Revised April 2011**

1

**Payments for Specified Energy Property in Lieu of Tax Credits
under the
American Recovery and Reinvestment Act of 2009**

**Program Guidance**

Under Section 1603 of the American Recovery and Reinvestment Tax Act of 2009
(Section 1603), the United States Department of the Treasury (Treasury) makes payments
to eligible persons who place in service specified energy property and apply for such
payments.  The purpose of the payment is to reimburse eligible applicants for a portion of
the expense of such property.  Eligible property under this program includes only
property used in a trade or business or held for the production of income.  Nonbusiness
energy property described in section 25C of the Internal Revenue Code (IRC) and
residential energy efficient property described in section 25D of the IRC do not qualify
for payments under this program but may qualify for tax credits under those provisions.

By receiving payments for property under section 1603, applicants are electing to forego
tax credits under sections 48 and 45 of the IRC with respect to such property for the
taxable year in which the payment is made or any subsequent taxable year.  Applicants
must agree to the terms and conditions applicable to the Section 1603 program.

This Guidance establishes the procedures for applying for payments under the Section
1603 program and is intended to clarify the eligibility requirements under the program.
Treasury welcomes questions about the program and the application process at
1603Questions@do.treas.gov.

**I.  Overview**
On February 17, 2009, President Obama signed the American Recovery and
Reinvestment Act of 2009 (Public Law 111-5).  The purpose of the Recovery Act is to
preserve and create jobs and promote economic recovery in the near term and to invest in
infrastructure that will provide long-term economic benefits.

Section 1603 of the Act's tax title, the American Recovery and Reinvestment Tax Act, as
amended by Section 707 of the Tax Relief, Unemployment Insurance Reauthorization,
and Job Creation Act of 2010 (Public Law 111-312), appropriates funds for payments to
persons who place in service specified energy property during 2009, 2010, or 2011 or
after 2011 if construction began on the property during 2009, 2010 or 2011 and the
property is placed in service by a certain date known as the credit termination date
(described more fully below in the Property and Payment Eligibility section).  Treasury
will make Section 1603 payments to qualified applicants in an amount generally equal to
10% or 30% of the basis of the property, depending on the type of property.  Applications
will be reviewed and payments made within 60 days from the later of the date of the

2

complete application or the date the property is placed in service.    Applicants who receive payments for property under Section 1603 are not eligible for the production or investment tax credit under sections 45 and 48 of the IRC with respect to the same property for the taxable year of the payment or subsequent years.  In addition, any credit under section 48 previously allowed with respect to progress expenditures for the property will be recaptured.

It is expected that the Section 1603 program will temporarily fill the gap created by the diminished investor demand for tax credits.  In this way, the near term goal of creating and retaining jobs is achieved, as well as the long-term benefit of expanding the use of clean and renewable energy and decreasing our dependency on non-renewable energy sources.

## II. Application Procedures

Applicants interested in receiving payments under Section 1603 may submit an application on-line by going to www.treasury.gov/recovery.  Applications may only be submitted after the property to which the application relates is placed in service, or is under construction.  A completed application will include the signed and complete application form; supporting documentation; signed Terms and Conditions; and complete payment information.  All applications must be received before the statutory deadline of October 1, 2012.

For property placed in service in 2009, 2010 or 2011, applications must be submitted after the property has been placed in service and before October 1, 2012.  Treasury will review  the applications and make payment to qualified applicants within 60 days from the date the completed application is received by Treasury.

For property not placed in service in 2009, 2010 or 2011 but for which construction began in 2009, 2010 or 2011, applications must be submitted after construction commences but before October 1, 2012.  If the property has been placed in service at the time of the application, Treasury will make payments to qualified applicants within 60 days from the date the completed application is received.  For property not yet placed in service at the time of the application, Treasury will review such applications and notify the applicant if all eligibility requirements that can be determined prior to the property being placed in service have been met.  If so notified, applicants must then submit, within 90 days after the date the property is placed in service, supplemental information sufficient for Treasury to make a final determination.  Treasury will conduct a final review of the application at that time and make payment to qualified applicants within 60 days after the supplemental information is received by Treasury.  Instructions provided on the application will indicate which portions of the application must be completed at the time the application is initially submitted and which portions must be completed at the time the application is supplemented.

If an applicant is applying for Section 1603 payments for multiple units of property that are treated as a single, larger unit of property (see Section IV. D. below), all such units may be included in a single application.

3

The application form requests, among other identifying data elements, the applicant's Data Universal Numbering System (DUNS) number from Dun and Bradstreet.  If the applicant does not already have a DUNS number, it may request one at no cost by calling the dedicated toll-free DUNS Number request line at 1-866-705-5711.

Applicants must also register with the Central Contractor Registration (CCR).  To register, go to www.ccr.gov/startregistration.aspx.   The registration must be completed before a payment can be made.

When Treasury determines that an application is approved, it will send a notice to the applicant.  The notice informs the applicant that the payment will be made and incorporates the information contained in the applicant's completed application form and the Terms and Conditions.  Treasury makes payment to the applicant no later than five days from the date of the notice.  Payment will be made by Electronic Funds Transfer based upon the banking information in the CCR.

In cases where an applicant has not submitted sufficient information upon which a determination can be based, the applicant will be so notified and given 21 days from the date of the notice to submit additional information.  If additional information is not received within the 21 day period, the application will be denied.

When Treasury determines that the application does not qualify for payment, the applicant will be so notified.  Such notification will include the reasons for the determination and will be considered the final agency action on the application.

### III. Applicant Eligibility

Certain persons are not eligible to receive Section 1603 payments. These include:

- any Federal, state or local government, including any political subdivision, agency or instrumentality thereof
- any organization that is described in section 501(c) of the IRC and is exempt from tax under section 501(a) of the IRC
- any entity referred to in paragraph (4) of section 54(j) of the IRC or
- any partnership or other pass-thru entity,  any direct or indirect partner (or other holder of an equity or profits interest) of which is an organization or entity described above unless this person only owns an indirect interest in the applicant through a taxable C corporation.

As long as each direct and indirect partner in the partnership or shareholder or similar interest holder in any other pass-thru entity is eligible to receive Section 1603 payments, the partnership or pass-thru entity is eligible to receive Section 1603 payments.  Having as a direct or indirect partner, shareholder, or similar interest holder a taxable C corporation any of whose shareholders are not eligible to receive Section 1603 payments does not affect the eligibility of the partnership or pass-thru entity.   Neither a Real Estate Investment Trust, nor a cooperative organization described in section 1381(a) of the IRC is a pass-thru entity for this purpose.

4

For an applicant to be eligible to receive a Section 1603 payment it must be the owner or lessee of the property and must have originally placed the property in service.  Lessees are eligible to apply for Section 1603 payments only if the conditions described in Section VI of this Guidance are met.

A foreign person or entity may be eligible for a Section 1603 payment if the person or entity qualifies for the exception in section 168(h)(2)(B) of the IRC.

Applicant eligibility will be determined as of the time the application is received.

**IV. Property and Payment Eligibility**

A.  Placed in Service
Qualified property must be originally placed in service between January 1, 2009, and December 31, 2011, (regardless of when construction begins) or placed in service after 2011 and before the credit termination date (see below) if construction of the property begins between January 1, 2009, and December 31, 2011.  Qualified property includes expansions of an existing property that is qualified property under section 45 or 48 of the IRC.

Placed in service means that the property is ready and available for its specific use.

B.  Credit Termination Date and Applicable Payment Percentage
The following chart lists the Credit Termination Date and the applicable percentage of eligible cost basis used in computing the payment for each specified energy property.

| Specified Energy Property | Credit Termination Date | Applicable Percentage of Eligible Cost Basis |
|---|---|---|
| Large Wind | Jan 1, 2013 | 30% |
| Closed-Loop Biomass Facility | Jan 1, 2014 | 30% |
| Open-loop Biomass Facility | Jan 1, 2014 | 30% |
| Geothermal under IRC sec. 45 | Jan 1, 2014 | 30% |
| Landfill Gas Facility | Jan 1, 2014 | 30% |
| Trash Facility | Jan 1, 2014 | 30% |
| Qualified Hydropower Facility | Jan 1, 2014 | 30% |
| Marine & Hydrokinetic | Jan 1, 2014 | 30% |
| Solar | Jan 1, 2017 | 30% |
| Geothermal under IRC sec. 48 | Jan 1, 2017 | 10%* |
| Fuel Cells | Jan 1, 2017 | 30%** |
| Microturbines | Jan 1, 2017 | 10%*** |
| Combined Heat & Power | Jan 1, 2017 | 10% |
| Small Wind | Jan 1, 2017 | 30% |
| Geothermal Heat Pumps | Jan 1, 2017 | 10% |

5

*Geothermal Property that meets the definitions of qualified property in both § 45 and § 48 is allowed either the 30% credit or the 10% credit but not both.
** For fuel cell property the maximum amount of the payment may not exceed an amount equal to $1,500 for each 0.5 kilowatt of capacity.
 *** For microturbine property the maximum amount of the payment may not exceed an amount equal to $200 for each kilowatt of capacity.

C. Beginning of Construction

Construction begins when physical work of a significant nature begins.  Work performed by the applicant and by other persons under a written binding contract is taken into account in determining whether construction has begun.  An applicant may elect the safe harbor described below to determine when construction begins.

**Physical work of a significant nature.**  Both on-site and off-site work may be taken into account for purposes of demonstrating that physical work of a significant nature has begun.  For example, in the case of a facility for the production of electricity from a wind turbine, on-site physical work of a significant nature begins with the beginning of the excavation for the foundation, the setting of anchor bolts into the ground, or the pouring of the concrete pads of the foundation.  If the facility's wind turbines and tower units are to be assembled on site from components manufactured off site and delivered to the site, physical work of a significant nature begins when the manufacture of the components begins at the off-site location.  If a manufacturer produces components for multiple facilities, reasonable methods must be used to associate individual components with particular facilities.  Physical work of a significant nature does not include preliminary activities such as planning or designing, securing financing, exploring, researching, clearing a site, test drilling of a geothermal deposit, test drilling to determine soil condition, or excavation to change the contour of the land (as distinguished from excavation for footings and foundations).

**Self construction.**  If an applicant manufactures, constructs, or produces property for use by the applicant in the applicant's trade or business (or for the applicant's production of income), the work performed by the applicant is taken into account in determining when physical work of a significant nature begins.

**Construction by contract.**  For property that is manufactured, constructed, or produced for the applicant by another person under a written binding contract (as described below) that is entered into prior to the manufacture, construction, or production of the property for use by the applicant in the applicant's trade or business (or for the applicant's production of income) the work performed under the contract is taken into account in determining when physical work of a significant nature begins.  A contract is binding only if it is enforceable under State law against the applicant or a predecessor, and does not limit damages to a specified amount (for example, by use of a liquidated damages provision).  For this purpose, a contractual provision that limits damages to an amount equal to at least 5 percent of the total contract price will not be treated as limiting damages to a specified amount.  If a contract provides for a full refund of the purchase

6

price in lieu of any damages allowable by law in the event of breach or cancellation, the contract is not considered binding.  A contract is binding even if the contract is subject to a condition, as long as the condition is not within the control of either party or a predecessor.  A contract will continue to be binding if the parties make insubstantial changes in its terms and conditions or any term is yet to be determined by a standard beyond the control of either party.  For example, minor modifications to the design specifications of property to be produced under a contract, such as a cold weather package for wind turbines, do not affect the binding nature of the contract.  A contract that imposes significant obligations on the applicant or a predecessor will be treated as binding notwithstanding the fact that certain terms remain to be negotiated by the parties to the contract.  An option to either acquire or sell property is not a binding contract.  A binding contract does not include a supply, or similar, agreement if the amount and design specifications of the property to be purchased have not been specified.

**Safe Harbor.** An applicant may treat physical work of a significant nature as beginning when more than 5 percent of the total cost of the property has been paid or incurred and may treat physical work of a significant nature as not having begun until more than 5 percent of the total cost of the property has been paid or incurred.  In the case of property constructed by the applicant, costs of the property are treated as paid or incurred when paid or incurred by the applicant.  In the case of property manufactured, constructed, or produced for the applicant by another person under a binding written contract that is entered into prior to the manufacture, construction, or production of the property (i) the cost of the property under the contract is treated as paid or incurred when the property is provided to the applicant, and (ii) for periods before the property is provided to the applicant, costs paid or incurred with respect to the property by such other person are treated as costs of the property that are paid or incurred when paid or incurred by such other person.  If the property includes both self-constructed components and components constructed under a contract, the costs relating to the self-constructed components and the costs relating to the components constructed under a contract are combined in determining if the 5 percent of total costs has been exceeded.  All costs included in the eligible basis (as described in section V) of the specified energy property and only such costs are taken into account in determining if 5 percent of total costs has been exceeded.  If the applicant is a lessee of property for which the lessor has elected to pass-through the payment to the lessee, this safe harbor must be met by the lessor (unless the applicant sold and leased back the property).  An applicant may elect to use this safe harbor by stating in section 2F of the application that the applicant is electing this safe harbor and describing the costs that satisfy the requirements for this election.  See also section 6B of the application regarding supporting documentation.

**Reliance on prior Guidance.**  An applicant may determine when construction begins under the Program Guidance in effect before March 15, 2010.  This Guidance can be found at http://www.treasury.gov/initiatives/recovery/Documents/SUMMARY%20OF%20PROPOSED%20CHANGES%20TO%20SECTION%201603%20PROGRAM%20GUIDANCE.doc

7

D.  Units of Property

For purposes of determining the beginning of construction of property or the date property is placed in service, all the components of a larger property are a single unit of property if the components are functionally interdependent. Components of property that are produced by, or for, the applicant are functionally interdependent if the placing in service of each of the  components is dependent on the placing in service of each of the other component. For example, on a wind farm for the production of electricity from wind energy, the electricity generating wind turbine, its tower, and its supporting pad are the single unit of property.  Each wind turbine on the wind farm can be separately operated and metered and can begin producing electricity individually.  A control system on a wind farm that optimizes the operation of the farm is a unit of property that is separate from the wind turbines.

The owner of multiple units of property that are located at the same site and that will be operated as a larger unit may elect to treat the units (and any property, such as a computer control system, that serves some or all such units) as a single unit of property for purposes of determining the beginning of construction and the date the property is placed in service.  In such a case, the entire cost of such larger unit of property is taken into account in applying the safe harbor.  The owner may not include within this larger unit any property that was placed in service before January 1, 2009.  For example, the owner of a wind farm may treat as a single unit a wind farm that will consist of fifty turbines, their associated towers, their supporting pads, a computer system that monitors and controls the turbines, and associated power condition equipment.  In cases where the applicant treats multiple units of property as a single unit, failure to complete the entire planned unit will not preclude receipt of a Section 1603 payment.  For example, in the example noted above if only 40 of the planned 50 turbines were placed in service by the credit termination date, an otherwise eligible applicant would be eligible for a payment based on the  40 turbines placed in service.

E. Specified Energy Property Installed on Other Property

Only the portion of a facility that is described in section 48 of the IRC is taken into account in computing the Section 1603 payment.  For example, in the case of a building with solar property on its roof, only the cost of the solar property (including the cost of mounting the solar property on the roof) qualifies for a Section 1603 payment; the cost of the building does not qualify.  In the case of a truck on which solar energy property is mounted, the cost of the solar energy property and the cost of mounting the property may be eligible for a Section 1603 payment.  However, the truck on which the property is mounted is not specified energy property.  Likewise, in the case of a forklift powered by a fuel cell power plant, the fuel cell power plant may be eligible for a Section 1603 payment.  However, the forklift in which it is used is not specified energy property.

F.  Location of Property

Property which is used predominantly outside the United States does not qualify for a payment under section 1603. The determination of whether property is used predominantly outside the United States is made by comparing the period of time during which the property is physically located outside the United States with the period of time

8

during which the property is physically located within the United States in a given year. If the property is located outside the United States during more than 50% of the year, such property is considered to be used predominantly outside the United States during that year.  This limitation does not apply to property described in section 168(g)(4) of the IRC.

G.  Original Use
The original use of the property must begin with the applicant. If the cost of the used parts contained within the property is not more than 20 percent of the total cost of the property  (whether acquired or self-constructed), an applicant will not fail to be considered the original user of property because it  contains used parts.

If new property is originally placed in service by a person and is sold to an applicant and leased back to the person by the applicant within three months after the date the property was originally placed in service by the person, unless the lessor and lessee elect otherwise, the applicant-lessor is considered the original user of the property and the property is considered to be placed in service not earlier than when it is used under the lease back.

H.  Required Documentation
Applicants must submit supporting documentation demonstrating that the property is eligible property and that it has been placed in service, and if placed in service after December 31, 2011, that construction began in 2009, 2010 or 2011 (See section V below for documentation required to support costs).  The following documents are required as indicated below:

**Eligible Property** – the following documentation must be provided, as applicable, to demonstrate that the property is eligible (for further details on property eligibility, see sections 45 or 48 of the IRC):
Design plans (required of all applicants).  Final engineering design documents, stamped by a licensed professional engineer.

Documentation demonstrating that the property is designed to have a nameplate capacity that meets required minimums or maximums (see Section 4A of the Application for properties with minimum or maximum nameplate capacity requirements) : [open-loop biomass facility (livestock waste nutrients), marine and hydrokinetic renewable energy facility, fuel cell property, microturbine property, combined heat and power system property, and small wind energy property only].  This documentation can be included within the required design plans or commissioning report, or with the original equipment manufacturer (OEM)/equipment vendor specification sheets.

Documentation demonstrating that the property is designed to meet the electricity-only generation efficiency requirements described in Section 4A of the Application (fuel cell property and microturbine property only).  The system efficiency is typically calculated as a ratio of the electrical energy output from the device to the amount of fuel consumed to produce the electricity divided by the lower heating value (LHV) of the fuel (if

9

alternating current, be sure to include conversion losses). OEM/equipment vendor specification sheets that specify the above values can be used as supporting documentation for nameplate capacity and system efficiency.  This documentation can also be included within the required design plans or commissioning report, as long as it specifies the above values.

For combined heat and power system property only, documentation demonstrating that the system is designed to meet the requirements described in Section 4A of the Application. See IRC section 48(c)(3)(C) for calculation of the system energy efficiency percentage.  This documentation can be included within the required design plans or commissioning report, or with OEM/equipment vendor specification sheets.

For a closed-loop biomass facility modified to use closed-loop biomass to co-fire with coal, other biomass, or both, documentation demonstrating approval under the Biomass Power for Rural Development Program or documentation demonstrating that the facility is part of a pilot project of the Commodity Credit Corporation.

FERC certification (applicable to incremental hydropower production projects only). Certification provided by the Federal Energy Regulatory Commission that certifies the baseline and incremental increase in energy production for incremental hydropower production.

FERC license (applicable to hydropower facility installed on a qualifying nonhydroelectirc dam only).

**Placed in Service** - the following documentation must be provided, as applicable, to demonstrate that the property is placed in service:
Commissioning report (required for all properties placed in service). A report provided by the project engineer, or the equipment vendor, or an independent third party that certifies that the equipment has been installed, tested, and is ready and capable of being used for its intended purpose.

Interconnection agreement (required only for properties placed in service that are interconnected with a utility).  A formal document between the applicant and the local utility that establishes the terms and conditions under which the utility agrees to interconnect with the applicant's system.  Applicants must also submit any subsequent documentation to demonstrate that the interconnection agreement has been placed in effect.

**Under Construction but not yet Placed in Service** - the following documentation must be provided, as applicable, to demonstrate that construction has begun on the property: Paid invoices and/or other financial documents demonstrating that physical work of a significant nature has begun on the property as described in Section IV.C.  If beginning of construction is based on the safe harbor, these documents must demonstrate that more than 5 percent of the total cost of the property) has been incurred or paid by the applicant.

Binding contract (required for property not yet placed in service that is being manufactured, constructed or produced for the applicant by another person).  The binding contract for the manufacture, construction or production of the property as described in section IV.C above.

**Leased Property** - the following documentation must be provided where the applicant is the lessee of the property to demonstrate that the lessor and lessee have entered into the agreement required by section VI of this Guidance.
The written agreement with the lessor described in Section VI of this Guidance.

I.  Types of Property

Property eligible to receive Section 1603 payments is "specified energy property." Specified energy property includes only tangible property (not including a building) that is an integral part of the facility.  The tangible property is tangible personal property and other tangible property as defined in sections 1.48-1(c) and (d) of the Income Tax Regulations.  Specified energy property is property for which depreciation (or amortization in lieu of depreciation) is allowable.

Qualified property must be placed in service in 2009, 2010 or 2011 or, in the case of property placed in service after 2011 for which construction begins in 2009, 2010 or 2011, before the credit termination date.  Property that satisfies this placed-in-service requirement may be qualified property even if it is an addition to or expansion of a qualified facility placed in service before 2009.

Qualified property includes only tangible property that is an integral part of the qualified facility. Qualified property does not include a building but may include structural components of a building.  Property is an integral part of a qualified facility if the property is used directly in the qualified facility and is essential to the completeness of the activity performed in that facility.  Roadways and paved parking areas located at the qualified facility and used for transport of material to be processed at the facility or equipment to be used in maintaining and operating the facility are integral to the activity preformed there, but roadways or paved parking lots that provide solely for employee and visitor vehicle traffic are not an integral part a qualified facility.  Property is considered used as an integral part of a qualified facility if so used either by the owner of the property or by the lessee of the property.

In the case of an open-loop biomass, closed-loop biomass, or municipal solid waste facility, an integral part of the qualified facility may include property used for unloading, transfer, storage, reclaiming from storage, or preparation (shredding, chopping, pulverizing, or screening) of the material to be processed at the plant.  If the facility uses a gas or liquid derived from open-loop biomass, closed-loop biomass, or municipal solid waste to produce electricity, equipment used to produce and process such gas or liquid may also be an integral part of the facility.  However, equipment used to cultivate closed-loop biomass, equipment used to collect open-loop biomass, closed-loop biomass, or municipal solid waste, and  trucks, railroad cars, barges and pipelines that transport open-loop biomass, closed-loop biomass, or municipal solid waste (or a gas or liquid

11

produced from any of the foregoing) to a qualified facility or between noncontiguous parts of a qualified facility are not an integral part of the facility.  Property that is integral to a geothermal facility includes equipment that transports geothermal steam or hot water from a geothermal deposit to the site of ultimate use. This includes components of a heating system, such as pipes and ductwork that distribute within a building the energy derived from the geothermal deposit and, if geothermal energy is used to generate electricity, includes equipment that transports hot water from the geothermal deposit to a power plant.

For qualified property that generates electricity, qualified property includes storage devices, power conditioning equipment, transfer equipment, and parts related to the functioning of those items but does not include any electrical transmission equipment, such as transmission lines and towers, or any equipment beyond the electrical transmission stage, such as transformers and distribution lines.

 Specified energy property, within the meaning of Section 1603, consists of two broad categories of property - certain property that is part of a facility described in IRC section 45 (Qualified Facility Property) and certain other property described in IRC section 48. The following types of property are specified energy property within the meaning of Section 1603[1]:

*Qualified Facility Property:*
Qualified Facility Property is property that is an integral part of a qualified  facility described in IRC section 45(d)(1), (2), (3), (4), (6), (7), (9), or (11).Although this Guidance does not address the placed-in-service requirements of IRC section 45,Qualified Facility Property must be part of a facility that meets those requirements. Qualified Facility Property may, however, be a post-2008 addition to or modification of a facility placed in service before 2009 so long as the facility meets the placed-in-service requirements of section 45.  In the case of a post-2008 addition to or modification of a qualified facility described in section 45(d)(1), (2), (3), (4), (6), (7), (9), or (11) and placed in service before 2009, no credit is allowed with respect to such facility under section 45, or with respect to such property under section 48, in the taxable year a Section 1603 payment is made or in any subsequent year.

> *Wind facility:* A wind facility is a facility using wind to produce electricity (wind turbines 100kW or less may also qualify as qualified small wind energy property, but only one payment is allowed with respect to the property).

> *Closed-loop biomass facility:* A closed-loop biomass facility uses closed-loop biomass to produce electricity.  Closed-loop biomass is any organic material from a plant that is planted exclusively for purposes of being used at a qualified facility to produce electricity. A closed loop biomass facility includes the modifications to

---

[1] The property descriptions included in this Guidance are intended to assist applicants in determining if a property qualifies for funding.  They are not intended to change the meaning of the terms as they are used in sections 45 or 48 of the IRC.

12

a facility that was originally placed in service and modified to use closed-loop biomass to co-fire with coal, with other biomass, or with both, but only if the modification is approved under the Biomass Power for Rural Development Programs or is part of a pilot project of the Commodity Credit Corporation as described in 65 Fed. Reg. 63052.

*Open-loop biomass facilities:* An open-loop biomass facility uses open-loop biomass to produce electricity.  Open-loop biomass is any agriculture livestock waste nutrients or any solid, nonhazardous, cellulosic waste material or any lignin material that is derived from qualified sources.

- Agricultural livestock waste nutrients are agriculturale livestock manure and litter, including wood shavings, straw, rice hulls, and other bedding material for the disposition of manure. Agricultural livestock includes bovine, swine, poultry, and sheep.
- The qualified sources from which solid, nonhazardous, cellulosic waste material or any lignin material must be derived are:
    1. Any of the following forest-related resources: mill and harvesting residues, precommercial thinnings, slash, and brush;
    2. Solid wood waste materials, including waste pallets, crates, dunnage, manufacturing and construction wood wastes (other than pressure-treated, chemically-treated, or painted wood wastes), landscape or right-of-way tree trimmings, but not including municipal solid waste, gas derived from the biodegradation of solid waste, or paper that is commonly recycled; and
    3. Agriculture sources, including orchard tree crops, vineyard, grain, legumes, sugar, and other crop by-products or residues.

An open-loop biomass facility does not include:

- A facility that burns fossil fuel (co-firing) beyond such fossil fuel required for startup and flame stabilization; or
- A facility using agricultural livestock waste nutrients that has a nameplate capacity rating of less than 150 kilowatts.

*Geothermal facility:*  A geothermal facility uses geothermal energy to produce electricity.  Geothermal energy is energy derived from a geothermal deposit. A geothermal deposit is a geothermal reservoir consisting of natural heat that is stored in rocks or in an aqueous liquid or vapor (whether or not under pressure).

*Landfill gas facilities:* A landfill gas facility is a facility producing electricity from gas derived from the biodegradation of municipal solid waste.

*Trash facilities:* A trash facility is a facility, other than a landfill gas facility, that uses municipal solid waste to produce electricity. In the case of a new unit placed in service in connection with a trash facility placed in service before October 23, 2004, only property related to the new unit can qualify as specified energy property that is eligible for a Section 1603 payment.

13

*Qualified hydropower facility:*

*Incremental hydropower:*  A facility that produces incremental hydropower production described in IRC section 45(c)(8)(B).  The percentage of incremental hydropower and baseline <u>must</u> be certified by the Federal Energy Regulatory Commission.  The determination of incremental hydropower production shall not be based on any operational changes at such facility not directly associated with the efficiency improvements or additions of capacity.  Only property related to the efficiency improvements and additions to capacity to which the incremental hydropower production is attributable can qualify as specified energy property that is eligible for a Section 1603 payment.

*Nonhydroelectric dam:*  Qualified hydropower facilities also include any hydropower producing facility described in IRC section 45(c)(8)(C) (relating to hydroelectric projects installed on a nonhydroelectric dams that were placed in service before August 8, 2004, and did not produce hydroelectric power on August 8, 2004).  The hydroelectric project must be licensed by the Federal Energy Regulatory Commission and must meet all other applicable environmental, licensing, and regulatory requirements.  The hydroelectric project must be operated so that the water surface elevation at any given location and time that would have occurred in the absence of the hydroelectric project is maintained, subject to any license requirements imposed under applicable law that change the water surface elevation for the purpose of improving environmental quality of the affected waterway.  The Secretary of the Treasury, in consultation with the Federal Energy Regulatory Commission, shall certify that the hydroelectric project licensed at a nonhydroelectric dam meets these criteria.  Only property related to the turbines or other generating devices added to the facility to produce hydroelectric power can qualify as specified energy property that is eligible for a Section 1603 payment.

*Marine and hydrokinetic renewable energy facilities:* A marine or hydrokinetic renewable energy facility is a facility that produces electricity from marine and hydrokinetic renewable energy and has a nameplate capacity rating of at least 150 kilowatts.  Marine and hydrokinetic renewable energy is energy derived from:
- Waves, tides, and currents in oceans, estuaries, and tidal areas, free flowing water in rivers, lakes, and streams;
- Free flowing water in an irrigation system, canal, or other man-made channel, including projects that utilize nonmechanical structures to accelerate the flow of water for electric power production purposes; or
- Differentials in ocean temperature (ocean thermal energy conversion).

Marine and hydrokinetic renewable energy does not include any energy that is derived from any source that utilizes a dam, diversionary structure (except as provided above for man-made projects), or impoundment for electric power production purposes.

*Energy property described under IRC section 48:*

14

Specified energy property for purposes of Section 1603 includes, in addition to qualified property that is part of a qualified facility, any other energy property described under IRC section 48. Such energy property must meet performance and quality standards that are prescribed either in IRC section 48 or in associated Treasury Regulations and that are in effect at the time of the acquisition of the property.

*Solar property:* Equipment that uses solar energy to generate electricity, to heat or cool (or provide hot water for use in) a structure, or to provide solar process heat, excepting property used to generate energy for the purposes of heating a swimming pool; equipment that uses solar energy to illuminate the inside of a structure using fiber-optic distributed sunlight.

*Geothermal property:* Equipment used to produce, distribute, or use energy derived from a geothermal deposit, but only, in the case of electricity generated by geothermal power, up to (but not including) the electrical transmission stage. A geothermal deposit is a geothermal reservoir consisting of natural heat that is stored in rocks or in an aqueous liquid or vapor (whether or not under pressure).

*Qualified fuel cell property:* Qualified fuel cell property is a fuel cell power plant that has a nameplate capacity of at least 0.5 kilowatt of electricity using an electrochemical process and has an electricity-only generation efficiency greater than 30%. A fuel cell power plant is an integrated system comprised of a fuel cell stack assembly and associated balance of plant components that converts a fuel into electricity using electrochemical means. Payments for qualified fuel cell property cannot exceed an amount equal to $1,500 for each 0.5 kilowatt of capacity of such property.

*Qualified microturbine property:* Qualified microturbine property is a stationary microturbine power plant that has a nameplate capacity of less than 2,000 kilowatts and has an electricity-only generation efficiency of not less than 26% at International Standard Organization conditions. A stationary microturbine power plant is an integrated system comprised of a gas turbine engine, a combustor, a recuperator or regenerator, a generator or alternator, and associated balance of plant components which converts a fuel into electricity and thermal energy. The microturbine power plant also includes all secondary components located between the existing infrastructure for fuel delivery and the existing infrastructure for power distribution, including equipment and controls for meeting relevant power standards, such as voltage, frequency, and power factors. Payments for qualified microturbine property cannot exceed an amount equal to $200 for each kilowatt of capacity of such property.

*Combined heat and power (CHP) system property:* Combined heat and power system property is property comprising a system that meets the following requirements:
- The system uses the same energy source for the simultaneous or sequential generation of electrical power, mechanical shaft power, or both in

15

combination with the generation of steam or other forms of useful thermal energy (including heating and cooling applications).

- The system--
  - o Produces at least 20% of its total useful energy in the form of thermal energy that is not used to produce electrical or mechanical power (or combination thereof); and
  - o Produces at least 20% of its total useful energy in the form of electrical or mechanical power (or combination thereof); and
  - o Has a system energy efficiency percentage in excess of 60%. This requirement does not apply to a facility designed to use biomass [within the meaning of IRC section 45(c)(2) and (3) without regard to the last sentence of paragraph (3)(A)] for at least 90% of the energy source. (See IRC section 48(c)(3)(C) for calculation of the system energy efficiency percentage and IRC section 48(c)(3)(D) for the reduction in payment for biomass systems with an energy efficiency of less than 60%.)
  - o Does not have a capacity in excess of 50 megawatts or a mechanical energy capacity in excess of 67,000 horsepower or an equivalent combination of electrical and mechanical energy capacities.

CHP system property does not include property used to transport the energy source to the facility or to distribute energy produced by the facility.

*Qualified small wind energy property:* Qualified small wind energy property is property that uses a qualifying small wind turbine to generate electricity. A qualifying small wind turbine is a wind turbine that has a nameplate capacity of not more than 100 kilowatts.

*Geothermal Heat Pump Property:* Equipment that uses the ground or ground water as a thermal energy source to heat a structure or as a thermal energy sink to cool a structure.

## V. Eligible Basis

The basis of property is determined in accordance with the general rules for determining the basis of property for federal income tax purposes. Thus, the basis of property generally is its cost (IRC section 1012), unreduced by any other adjustment to basis, such as that for depreciation, and includes all items properly included by the taxpayer in the depreciable basis of the property, such as installation costs and the cost for freight incurred in construction of the specified energy property. If property is acquired in exchange for cash and other property in a transaction described in IRC section 1031, in which no gain or loss is recognized, the basis of the newly acquired property is equal to the adjusted basis of the other property plus the cash paid.

Costs that will be deducted for federal income tax purposes in the year in which they are paid or incurred are not includible in the basis on which the payment is determined. For example, if the applicant will take the IRC section 179 deduction for all or part of the cost

16

**0573**

of the property, then no payment is allowed for the portion of the cost of the property for which the IRC section 179 deduction will be taken. For geothermal property, if intangible drilling and development expenses will be deducted by the applicant, no payment will be allowed on the costs that will be deducted as intangible drilling and development expenses. If the applicant will capitalize intangible drilling and development expenses, only those costs that may be recovered through depreciation are includible in the basis on which the payment is allowed. However, if the applicant will elect under IRC § 59(e) to deduct intangible drilling and development costs over 60 months, the payment is based on the amount for which the election under § 59(e) applies because the effect of § 59(e) is to treat these costs as amortizable.

Only the cost basis of property placed in service after 2008 is eligible for a Section 1603 payment. Thus, if property is placed in service in 2009 at a qualified facility that was placed in service in an earlier year, only the basis of the property placed in service in 2009 is eligible for a Section 1603 payment.

Limitation on eligible basis. The eligible basis of a qualified facility does not include the portion of the cost of the facility that is attributable to a non qualifying activity. For example, for a biomass facility that burns fuel other than open-loop biomass or closed-loop biomass, the eligible cost basis is the percentage of total eligible costs that is equal to the percentage of the electricity produced at the facility that is attributable to the open-loop biomass and closed-loop biomass. In the case of costs that relate to both a nonqualifying activity and a qualifying activity, the costs must be reasonably allocated between the nonqualifying and qualifying activities. For example, if combustion equipment burns both qualifying biomass and other fuel, the equipment's eligible cost basis is limited to the percentage of its otherwise eligible cost corresponding to the percentage of the equipment's electricity production that is attributable to the qualifying biomass. Similarly, the eligible basis of a qualified hydropower facility producing incremental hydropower includes the entire costs of the modification even though only a portion of the power produced from the modification is attributable to the modification.

Applicants must submit with their application for a Section 1603 payment documentation to support the cost basis claimed for the property. Supporting documentation includes a detailed breakdown of all costs included in the basis. Other supporting documentation, such as contracts, copies of invoices, and proof of payment must be retained by the applicant and made available to Treasury upon request. For properties that have a cost basis in excess of $500,000 applicants must submit an independent accountant's certification attesting to the accuracy of all costs claimed as part of the basis of the property.

**VI. Leased Property**
A lessor who is eligible to receive a Section 1603 payment with respect to a property may elect to pass-through the Section 1603 payment to a lessee. The election may only be made with respect to property that would be eligible for the Section 1603 payment if owned by the lessee. Such an election will treat the lessee as having acquired the property for an amount equal to the independently assessed fair market value of the

17

property on the date the property is transferred to the lessee and will generally follow the rules in the IRC and Treasury regulations governing elections to allow lessees to receive energy tax credits.

The lessor and lessee must agree that the lessor waives all right to a Section 1603 payment or a production or investment tax credit with respect to the eligible property, before the lessee may apply for a Section 1603 payment with respect to such property. The lessee must agree to include ratably in gross income over the five year recapture period an amount equal to 50 % of the amount of the Section 1603 payment.

In order to make this election, both the lessor and the lessee must be persons eligible to receive a payment under Section 1603. Additionally, this election may not be made by a lessor that is a mutual savings bank or similar financial organization, a regulated investment company or a real estate investment trust.

The election of a lessor to allow the lessee to receive a Section 1603 payment may be made with respect to each property leased by the lessor to the lessee. The lessee's written consent is required. The lessor's election is made by a written agreement with the lessee that contains the following information:

- A waiver of the lessor's right to receive any payment under Section 1603 with respect to the property, as well as a waiver of the lessor's right to claim a production or investment tax credit under sections 45 and 48 of the IRC with respect to the same property for the taxable year of the payment or subsequent years;
- All information necessary to determine the amount of lessee's Section 1603 payment;
- The name, address, and employer identification number of the lessor and the lessee;
- A description of each property with respect to which the election in being made;
- The date on which possession of the property is transferred to the lessee; and
- The lessee's consent to the election.

A copy of this agreement must be included in the lessee's application for the Section 1603 payment. This election is irrevocable.

Special Rule for Sale-leaseback Transaction

In a sale-leaseback transaction, the lessee, who is not the owner of the property, may claim the Section 1603 payment, if three conditions are satisfied:

- First, the lessee must be the person who originally placed the property in service.
- Second, the property must be sold and leased back by the lessee, or must be leased to the lessee, within three months after the date the property was originally placed in service.
- Third, the lessee and lessor must not make an election to preclude application of the sale-leaseback rules.

**VII. Recapture**

18

If the applicant disposes of the property to a disqualified person or the property ceases to qualify as a specified energy property within five years from the date the property is placed in service (hereinafter "disqualifying event"),  the Section 1603 payment must be repaid to the Treasury as follows: 100% of the  payment must be repaid if the disqualifying event takes place within one year from the date placed in service; 80% of the  payment must be repaid if the disqualifying event takes place after one year but before two years from the date placed in service; 60% of the  payment must be repaid if the disqualifying event takes place after two years but before three years from the date placed in service; 40% of the payment must be repaid if the disqualifying event takes place after three years but before four years from the date placed in service; and 20% of the payment must be repaid if the disqualifying event takes place after four years but before five years from the date placed in service.

Property is considered to have been disposed of to a disqualified person if any interest in the property or in the applicant or in any partnership or pass-thru entity that is a direct or indirect owner of an interest in the applicant is sold to: any Federal, state or local government, including any political subdivision, agency or instrumentality thereof; any organization that is described in section 501(c) of the IRC and is exempt from tax under section 501(a) of the IRC; any entity referred to in paragraph (4) of section 54(j) of the IRC; or any partnership or other pass-thru entity any partner (or other holder of an equity or profits interest) of which is a Federal, state or local government, including any political subdivision, agency or instrumentality thereof; an organization that is described in section 501(c) of the IRC and is exempt from tax under section 501(a) of the IRC; or an entity referred to in paragraph (4) of section 54(j) of the IRC.  A taxable corporation some or all of whose shareholders are disqualified persons is not a disqualified person and such a corporation's ownership of an interest in a partnership or other pass-thru entity will not cause the partnership or other entity to be treated as a disqualified person.

Property ceases to qualify as a specified energy property if the use of the property changes so that it no longer qualifies as specified energy property.  For example, use of property predominantly outside the United States in a year will result in recapture. Temporary cessation of energy production will not result in recapture provided the owner of the property intends to resume production at the time production ceases.  Permanent cessation of production will result in recapture.  Permanent cessation of production due to natural disaster will not result in recapture unless the property is replaced with property for which a Section 1603 payment is allowed.  Replacement would be treated as occurring if the applicant uses IRC section 1033 to avoid gain recognition.

For a hydropower property where incremental hydropower production has been licensed by FERC, recapture will not take place if actual incremental increases in energy production do not occur that year due to environmental and/or regulatory factors. Recapture for a hydropower facility installed on a nonhydroelectric dam will occur if the Federal Energy Regulatory Commission license is surrendered or repealed based on significant changes in water surface elevation caused by operation of the facility.

19

**0576**

If the amount of the Section 1603 payment depends on the percentage of electricity produced from biomass (in the case of closed-loop and open-loop biomass facilities) or the energy efficiency percentage (in the case of combined heat and power system property using biomass) and the percentage is reduced, a proportionate percentage of the property ceases to qualify as specified energy property. The applicable percentages will be determined on an annual basis for the year beginning on the date the property is placed in service and for each succeeding year within the recapture period. No additional grant will be allowed in a subsequent year in which the percentage increases.

Selling or otherwise disposing of the property to an entity other than a disqualified person does not result in recapture provided the property continues to qualify as a specified energy property and provided the purchaser of the property agrees to be jointly liable with the applicant for any recapture. Recapture would occur in the event the property is resold to a disqualified person or ceases to qualify as a specified energy property. The applicant remains jointly liable to the Treasury for the recapture amount even if the applicant no longer has control over the property.

Where a lessor elects to pass through the Section 1603 payment to a lessee, if the lessor sells the property to a disqualified person, the lessee is liable to the Treasury for the recapture amount even if the lessee maintains control over the property. If the lease is terminated and possession of the property is transferred by the lessee to the lessor or any other person, the lessee is liable to the Treasury for the recapture amount if the use of the property changes during the recapture period so that it no longer qualifies as specified energy property.

Applicants are not required to post a bond as a condition of receiving payment under the section 1603 program and receipt of payment does not create a lien on the property in favor of the United States. However, funds that must be repaid to the Treasury under these rules are considered debts owed to the United States and if not paid when due, will be collected by all available means against any assets of the applicant, including enforcement by the United States Department of Justice. Debts arising under these rules are not considered tax liabilities.

### VIII. Miscellaneous Provisions
A. Assignment of Payment
Applicants may submit, along with their request for payment, a Notice of Assignment, assigning the payment to a third party provided the requirements of the Federal Assignment of Claims Act (31 U.S.C. 3727) are met. The Notice of Assignment will include the DUNS number for the third party. The third party will be required to register in CCR.

B. National Environmental Protection Act (NEPA)
A Section 1603 payment with respect to specified energy property does not make the property subject to the requirements of NEPA and similar laws.

C. Davis- Bacon

20

A 1603 payment with respect to specified energy property does not make the property subject to the requirements of the Davis-Bacon Act.

D.  Treatment of Payments as Taxable Income

Except as described in Section IV of this Guidance with respect to leased property, a Section 1603 payment with respect to specified energy property is not includible in the gross income of the applicant.  The basis of the property is reduced by an amount equal to 50% of the payment.

E.  Real Estate Investment Trusts

A Real Estate Investment Trust (REIT) will be eligible to receive Section 1603 payments only to the extent allowed by section 50 of the IRC.  IRC section 50(d)(1) specifies that rules similar to the rules of former IRC section 46(e) will apply.   IRC section 46(e)(1)(B) provides that, in general, in the case of a REIT,  qualified investment is limited to the REIT's ratable share of such qualified investment.  The ratable share is a ratio, the numerator of which is its taxable income and the denominator of which is its taxable income computed without regard to the deduction for dividends paid (provided by IRC section 857(b)(2)(B)).  For this purpose, the REIT's taxable income is determined without regard to any deduction for capital gains dividends and by excluding any net capital gain.

F.  Applicability of Normalization Rules

Payments received under the Section 1603 program must be normalized.  See former IRC Section 46(f).

G.  Reporting

Applicants will be required to provide reports, as required by Treasury, including an annual performance report as set forth in the Terms and Conditions.

21

**0578**

**Payments for Specified Energy Property in Lieu of Tax Credits
Under the American Recovery and Reinvestment Act of 2009**

# FREQUENTLY ASKED QUESTIONS AND ANSWERS

### Application Procedures

1. Question: Must an applicant submit all of the required documentation at the same time the application is submitted?

   Answer: An applicant should submit all of the required documentation at the same time the application is submitted.  Not doing so will delay payment. An application will not be considered complete until all required documentation has been submitted.

2. Question: What documentation must be submitted with an application?

   Answer: All applicants must submit documentation demonstrating that (1) the property is eligible; (2) the property has been placed in service; and (3) the amount requested is accurate.

   To show eligibility, design plans stamped by a licensed professional engineer are required for all properties.

   To establish that a property has been placed in service, a commissioning report is required.  For properties interconnected with a utility, an interconnection agreement must be provided.

   To establish that the amount requested is accurate, a detailed breakdown of all costs included in the cost basis is required.  For properties with a cost basis of more than $500,000 an Independent accountant's certification is required.

   Applicants may also be asked to submit documentation beyond what is listed here to fully demonstrate eligibility.  Examples include, but are not limited to, power purchase agreements, equipment lease agreements, and certain invoices.  If such additional documentation is required applicants will be notified.

   See also, Questions #3 and #4 below.

3. Question:  What additional documentation must be submitted with an application for property that is placed in service after December 31, 2011?

   Answer:  If the property is placed in service after December 31, 2011, the documentation must show that construction began in 2009, 2010 or 2011. Paid invoices and/or other financial documents demonstrating that physical work of a significant nature had begun on the property during 2009, 2010, or 2011 are required.

**0579**

4.  Question:  Is any other documentation required?

Answer:  Additional documentation is required in certain cases as follows:

*Property that has a minimum or maximum nameplate capacity requirement:* (applies to open-loop biomass facility using livestock waste nutrients, marine and hydrokinetic renewable energy facility, fuel cell property, microturbine property, combined heat and power system property, and small wind energy property) documentation demonstrating nameplate capacity is required.

*Other specific types of property*:  please refer to Page 9 of the Program Guidance for information on additional documentation requirements for fuel cell property; microturbine property; combined heat and power; closed-loop biomass facility modified to use closed-loop biomass to co-fire with coal, other biomass or both; incremental hydropower production projects; and hydropower facilities installed on a nonhydroelectric dam.

*Lessees:*  applicants that are lessees of the property must submit a written agreement with the lessor that meets the requirements described on page 17 of the program guidance.

*Applicants who select "Other" in section 1A of the Application:*  must submit documentation explaining the business structure of the applicant

*Applications and Terms and Conditions signed by a person who is not an officer or employee of the applicant:* must include documentation evidencing the person's authority to legally bind the applicant.

5.  Question: Who can sign the Application and Terms and Conditions?

Answer: Applications and Terms and Conditions must be signed by an authorized representative of the applicant entity.  If the person signing both documents is not an officer or employee of the applicant entity, the application must include evidence of the person's authority to bind the applicant entity.

6.  Question: Can a vendor of energy property, for example a company that sells solar energy systems, sign the application on behalf of its customer, the entity applying for payment?

Answer: Only if the vendor submits written evidence of its authority to bind the applicant.  If this authority does not exist, the application must be signed by an officer or employee of the applicant entity.

7.  Question: When should an application be submitted if the property has not yet been placed in service but construction has begun?

Answer: The purpose of submitting an application for a property that is not yet placed in service and will not be placed in service in 2009, 2010 or 2011 is to demonstrate that construction has begun during the required time period of 2009, 2010 or 2011.  If the eligible property will be placed in service before the end of 2011, submitting an application after construction has begun but before the property is placed in service will not accelerate payment and is not

**0580**

recommended.  If the property will not be placed in service by the end of 2011, the applicant should submit the application after construction has begun but no later than September 30, 2012.  See Question #8 for property placed in service on or after October 1, 2012.

8.  Question: When does supplemental information need to be submitted for properties not yet placed in service?

Answer: For properties that are placed in service on or after October 1, 2012, applicants have 90 days after the property is placed in service to provide Treasury with supplemental information necessary to make a determination.

9.  Question: Will an applicant receive a response if the application is submitted prior to the property being placed in service?

Answer: Yes, the applicant will be informed that it has or has not sufficiently demonstrated that construction began.

10. Question:  Can applications for multiple properties be submitted on a single application?  For example, may a company that leases solar panels to hundreds of different properties, consolidate these properties into a single application?

Answer:  No.  Because key information for each property, such as property location and placed in service date is likely to differ and design plans and other documentation are likely to be unique for each property, applications for multiple properties cannot be consolidated.  However, if documentation submitted to support one application applies to other applications submitted by the same applicant, an applicant need not re-submit the documentation with each application.  Instead, the applicant can cross-reference the application that includes the documentation.

11.  Question:  Are payments to successful applicants made by Fedwire®?

Answer:  No.  Payments to successful applicants are made through the Automated Clearing House (ACH).  Applicants must ensure that the bank account into which they direct their payment is able to accept ACH payments.

12. Question:  Can payments be assigned to entities other than financial institutions?

Answer:  Assignments of payments must comply with the Federal Assignment of Claims Act which only permits assignments to banks, trust companies or other financing institutions.   In general this means that assignments may only be made to entities that are in the business of providing financing.

13.  Question:  Are decisions on applications final?  What options are available to an applicant whose application is denied?

Answer: While we will make every effort to work with an applicant during the review process to ensure that the applicant has the opportunity to address any deficiencies in its application, once a determination is made, that determination is final.  No administrative appeal is available.

13a. Question:  What actions may Treasury or other governmental entities take with respect to an application after a Section 1603 payment is issued?

**0581**

Answer:  Consistent with the Terms and Conditions, each applicant has agreed that any information provided to Treasury may be shared with other federal entities, including the Internal Revenue Service, as needed by those entities to conduct official agency business including audits, examinations, and evaluations after issuance of a payment in order to confirm that Section 1603 funds were properly obtained.  Treasury or other relevant federal entities may take appropriate action, including action to seek repayment, if it is determined that an overpayment was made.  This is true even in those cases where the payment may have already been reduced at the payment stage relative to the claimed level.

14. Question:  May an application be withdrawn?  If so, can an application that has been withdrawn be re-submitted?

Answer:  Yes, an application may be withdrawn at any time prior to a final determination.  If an application is withdrawn it can be re-submitted.

15.  Question:  If an applicant does not know its final costs at the time an application is submitted may a supplemental application be submitted once those costs are known?

Answer:  Applicants should not submit an application until all costs are known and final.

16. Question: Is there a cap on funds available to a specific project or applicant?

Answer: No, funding for the program has no overall cap.  The amount payable to any applicant for a qualifying project or projects is not limited.  However, the maximum amount payable for any project is limited to 30% or 10% of the eligible costs depending on the type of project.  The payment may not exceed a specified amount for each kilowatt of capacity for qualified fuel cell property and qualified microturbine property.

**Applicant Eligibility**

17. Question: Are schools, colleges or universities eligible applicants?

Answer: Schools, colleges or universities that are agencies or instrumentalities of a Federal, State or Local government are not eligible for payment.  Additionally, schools, colleges or universities that are organizations described in section 501(c) of the Internal Revenue Code and exempt from taxation under section 501(a) of the Internal Revenue Code are not eligible for payment.

18.  Question: Are manufacturers of specified energy property eligible applicants?

Answer: Payments are only available to entities that place specified energy property into service.  An entity that manufacturers specified energy property but does not own the property at the time it is placed in service is not eligible for payment.  If a manufacturer continues to own the property once it is placed in service (for example, a manufacturer who leases rather than sells its property), it may be eligible.

19. Question: Do builders or contractors who install solar systems on residential properties qualify for payment?

Answer: No, unless they continue to own the solar property.

**0582**

20. Question: Is an applicant who has received a prior USDA or other federal or state-funded grant for the same property eligible?

Answer:  Yes, receipt of other federal or state grants does not impact an applicant's eligibility.  However, receipt of other federal grants, state grants, or rebates may have an impact on the eligible cost basis of the property. If the rebate or grant is includable in taxable income of the applicant, the basis on which the payment is computed is not reduced.  If the rebate or grant is not includable in the income of the applicant, a basis reduction may be required.

21. Question: Is an applicant who owns eligible energy property eligible to receive payment if the energy property is leased to a non-profit or otherwise ineligible entity?

Answer:  Yes.  If the owner of the energy property is the applicant and is otherwise eligible, the fact that the property is being leased to an ineligible entity does not impact the eligibility of the owner/applicant provided that the lease is a true lease and not a disguised sale.

22.  Question:  If the owner of the property is an LLC that is disregarded for federal tax purposes, is the proper applicant the disregarded LLC or its parent?

Answer:  The proper applicant is the owner of the property which would be the disregarded LLC.

23.  Question:  If an applicant is not one of the entities listed in Section 1A of the application is the applicant ineligible?

Answer:  Not necessarily.  If the applicant is an entity that is not listed in Section 1A of the application it may still be eligible as long as it is not an entity that is expressly excluded from eligibility (see Program Guidance page 4).  The applicant should select "Other" and provide an explanation and supporting documentation sufficient to establish that it is not ineligible.

24.  Question:  Can a lessee of eligible property receive payment?

Answer:  Yes, if the lessor/owner of the property waives its right to payment and elects to pass it on to the lessee and the property would be eligible if owned by the lessee.  See Question 4 for documentation that must be submitted if the applicant is the lessee of the property.

25.  Question:  Is a partnership that has a foreign entity as a partner eligible?

Answer:  Having as a partner a foreign entity does not make an entity ineligible, unless the foreign entity is tax-exempt.

26. Question:  Can a taxable corporation that is wholly-owned by an ineligible entity be eligible?

Answer:  A taxable corporation can be an eligible applicant even if wholly owned by an ineligible entity.

**Property Eligibility**

27. Question: Is energy property that is used at a residence eligible?

**0583**

Answer:  Generally no, but energy property used at a residence may be eligible in some circumstances.  Property used in a building that is used for residential purposes may be eligible if it is subject to depreciation or amortization in lieu of depreciation by its owner.  This means that the property must be used in a trade or business or for the production of income.  For example, if the applicant is a business that installed an otherwise eligible solar energy system on the roof of a residence that the business rents out for the production of income, the property would be eligible.  If, however, the applicant is a homeowner who installed a solar energy system on the roof of his/her home and uses the solar energy property for personal purposes, the property would not be subject to depreciation and therefore would not be eligible.

28. Question:  If a business receives a section 1603 payment for energy property used at a residential rental property, and subsequently sells the residential property to the tenant within five years, will the business be required to return all or part of the section 1603 payment?

Answer:  Yes.  The property ceases to be specified energy property when it is sold to a person who cannot depreciate the property because that person will use the property for personal purposes.

29. Question:  What about energy property that is part of a building used for both business and residential purposes?  For example, can a solar energy system installed on a building that is used both as a residence and a place of business be eligible?

Answer:  A solar energy system installed on a building that is used as both a residence and a place of business may be eligible for a section 1603 payment based on the portion of the basis of the solar energy property used for business purposes. The portion that is used for business purposes must be demonstrated by either a separate meter, an allocation based on square footage or other reasonable means.

30. Question:  Can a property that is located in Puerto Rico be eligible?

Answer: Generally, to be eligible, the property must be used predominantly in the United States. An exception to this general rule is property described in the Internal Revenue Code, section 168(g)(4) which includes property owned by a domestic corporation or U.S. citizen that is used predominantly in a U.S. possession. The corporation must not have an election in effect under section 936 of the Internal Revenue Code and the U.S. citizen must not be entitled to the benefits of section 931 or section 933 of the Internal Revenue Code.

31. Question: Can property that contains "used" or "refurbished" parts qualify for the Section 1603 program?

Answer:  For a property to be eligible, the original use of the property must begin with the applicant.  If the cost of any used parts in a facility is less than 20% of the total cost of the facility, the property will not be considered "used" for purposes of determining original use.

**0584**

32. Question:  Can dead and diseased trees resulting from pine beetle infestation qualify as open-loop biomass?

Answer:  Yes, provided the trees have no commercial value other than use in producing energy from biomass.  For this purpose, infested trees from which lumber or pulp could be recovered with appropriate processing may, nevertheless, have no commercial value if they are located in an area without milling or pulping facilities or if they are in excess of the area's milling and pulping capacity.

33. Question:  Can a facility that produces electricity from pyrolysis oil derived from open-loop biomass qualify as an open-loop biomass facility?

Answer:  Yes.  Open-loop biomass facilities include, in addition to facilities that burn open-loop biomass, facilities that burn gases or liquids derived from open-loop biomass.

34. Question:  In the case of a qualified facility that produces electricity by burning gases or liquids derived from a qualified energy resource such as open-loop biomass or municipal solid waste, can the equipment used to convert the qualified energy resource into a gas or liquid qualify for a Section 1603 payment?

Answer:  Yes, but only if the equipment used to produce the gas or liquid (the conversion equipment) is an integral part of the qualified facility.  In general, conversion equipment that is owned by the same person and located at the same site as the qualified facility will be treated as an integral part of the facility.  In addition, the conversion equipment may be treated as an integral part of the qualified facility, even if under different ownership or at a different site, if it is established that the conversion equipment is integrated into the facility.  Factors that may be relevant in determining whether the conversion equipment is integrated into the facility include whether the conversion equipment and the facility are placed in service simultaneously, the extent to which the gas or liquid produced is dedicated to the facility (for example, under an exclusive long-term supply contract), and the dependence of the facility on the gas or liquid produced by the conversion equipment.  Conversion equipment generally will not be treated as an integral part of a qualified facility if less than 75 percent of the gas or liquid produced is dedicated to the facility.  In addition, if conversion equipment is treated as an integral part of a qualified facility but not all the gas or liquid produced is dedicated to that facility, the conversion equipment's eligible cost basis is limited to the percentage of its otherwise eligible cost corresponding to the percentage of its production that is dedicated to the qualified facility.

35. Question:  If components of a facility are owned by different persons, must each owner submit a separate application for a Section 1603 payment?

Answer:  Yes, a separate application must be submitted for each part of the facility with a different ownership structure.  For example, if an open-loop biomass facility consists of conversion equipment owned by corporation X and generation equipment owned by corporation Y, X and Y must submit separate applications to receive Section 1603 payments for their portions of the facility. All owners of the facility (including owners of portions of the facility that are not eligible for a Section 1603 payment) must join in each separate application for the Section 1603 payment and agree to the terms and conditions, including the

**0585**

waiver of the right to claim a credit under section 45 with respect to the facility. In any such case, the application and the terms and conditions will be appropriately modified to reflect the participation of persons other than the claimant.

36. Question:  Can conversion equipment that is an integral part of a qualified facility qualify for a Section 1603 payment if the combustion equipment included in the facility was placed in service before 2009?

    Answer:  Only if, for purposes of determining depreciation with respect to the conversion equipment, it is placed in service in 2009, 2010, or 2011 or (for equipment on which construction begins in 2009, 2010, or 2011) in 2012 or 2013.  Conversion equipment placed in service at a later date than the original facility may, nevertheless, be an integral part of the facility if, for example, the facility was not initially dependent on the conversion equipment because an alternative source of biomass fuel was available when the combustion equipment was placed in service.  In that case, the combustion equipment and the conversion equipment are not treated as a single unit of property for purposes of determining the beginning of construction or the date property is placed in service.

37. Question:  Is the eligible cost basis of the conversion equipment reduced if the qualifying facility of which it is a part burns fuel other than fuel that the conversion facility produces from qualified energy resources?

    Answer:  No, not if all fuel produced by the conversion equipment is used by the qualifying facility in the production of electricity.

## Use of Awarded Funds

38. Question: Do the "Buy American" provisions in the American Recovery and Reinvestment Act of 2009 apply to the Section 1603 program?

    Answer: No.

39. Question: Does the Davis-Bacon Act apply to the Section 1603 program?

    Answer: Receipt of funds under Section 1603 does not trigger the requirements of the Davis-Bacon Act.

## Eligible Basis

40. Question: What costs qualify for a Section 1603 payment?

    Answer:  The amount of the Section 1603 payment is a percentage of the eligible basis of the property.  The basis of property generally is its cost (IRC section 1012), unreduced by any other adjustment to basis, such as that for depreciation, and includes all items properly included by the taxpayer in the depreciable basis of the property, such as installation costs and the cost for freight incurred in construction of the specified energy property.

**0586**

41. Question:  If an applicant has received another federal or state grant or a rebate for the same property, must the basis be reduced?

Answer:  If the rebate or grant is includable in taxable income of the applicant, the basis on which the payment is computed is not reduced.  If the rebate or grant is not includable in the income of the applicant, a basis reduction may be required.

42. Question:  In an earlier communication on its website concerning evaluations of the cost basis for solar photovoltaic properties, Treasury presented price benchmarks that it uses in evaluating applicants' claimed basis.  Has Treasury updated those benchmarks since the release of that communication?

Answer:   No updated benchmarks have been published.  While Treasury continues to compare applicants' claimed basis with typical market pricing during the relevant time period, such comparisons have been used and continue to be used as only one of several factors in assessing whether Treasury requires additional information from the applicant to support the claimed basis prior to Treasury's issuance of  payment.  Just as one property's eligible basis may exceed a national benchmark, another property's eligible basis may fall below that benchmark.  As a result, we have determined that continuing to publish benchmarks is not useful.

43. Question:  Is there a particular level of development fee or profit that Treasury may accept as part of determining the eligible basis?

Answer:  As stated in the Program Guidance, cost basis for purposes of Section 1603 is determined in accordance with the general rules for determining the basis of property for federal income tax purposes.  In those circumstances in which inclusion of a development fee, profit, or other components of markups above a property's direct costs (e.g., for allocated indirect costs) is appropriate, the appropriate level of development fee, profit, or markup is case-specific and depends on many factors.  Therefore, applicants with a claimed basis that implicitly or explicitly reflects markups of any kind above the property's direct cost should be able to support the appropriateness of the specific level of markup with reference to particular facts and circumstances relevant to their property.

44. Question:  How does Treasury evaluate appraisals or other information submitted in support of a property's fair market value?

Answer:  In certain circumstances (such as those generally described in a document titled "Evaluating Cost Basis for Photovoltaic Property," to be found at http://www.treasury.gov/initiatives/recovery/Documents/N%20Evaluating_Cost _Basis_for_Solar_PV_Properties%20final.pdf) applicants must be able to demonstrate that their claimed basis is consistent with their property's fair market value (FMV).  Applicants typically submit an appraisal to make this demonstration.  In evaluating appraisals, Treasury often considers the appraiser's various judgments and analyses for consistency with market data and with any property-specific information that may offer insight about the property's value.

With respect to property-specific information, it is often the case that a developer enters into a transaction with an unrelated investor involving the project in which the Section 1603 eligible property is employed.  Such a transaction is typically structured in a way that the unrelated investor receives (either directly or through a partnership distribution or otherwise) some or all of the project's cash flows in exchange for a cash payment, capital investment or

lease payments.  In these cases, the terms negotiated between the unrelated investor and the developer (assuming such terms are negotiated at arm's length and are not influenced by peculiar circumstances) can offer significant information regarding the value of the entire project. For example, the projected return on investment that a developer agrees to provide an unrelated investor offers information regarding the developer's assessment of the value of the project's expected cash flows. Thus, it should be possible to reconcile an applicant's claimed basis, and any appraised valuation supporting that claimed basis, with what the terms of any such transaction imply about the project's value, taking into account that the value of the Section 1603 eligible *property* may be less than the value of the overall *project* in which it is used if some of the project's value reflects the value of other ineligible assets associated with the project.  Also, to the extent that a project's purchase price depends in part on the project's developer making an investment in the project or making some other financial commitment associated with the project's operation (e.g., agreeing to a lease agreement in a sale-leaseback), applicants should be able to demonstrate that the terms of the project developer's involvement are consistent with terms to which a party not involved in the project's development would reasonably agree.

## **Helpful Links**

Department of Energy: http://www.energy.gov/taxbreaks.htm; http://www.energy.gov/recovery/48C.htm

Energy Star: http://www.energystar.gov/index.cfm?c=tax_credits.tx_index

DSIRE: http://www.dsireusa.org/

U.S. Department of Agriculture: http://www.rurdev.usda.gov/

IRS: http://www.irs.gov/newsroom/article/0,,id=204335,00.html?portlet=6

Department of Housing & Urban Development: www.hud.gov

0588

IRS CCA 201040004, 2010 WL 3937045

Internal Revenue Service (I.R.S.)

IRS CCA
Chief Counsel Advisory

Issue: October 8, 2010
June 24, 2010

Section 197 -- Amortization of Goodwill & Certain Other Intangibles
197.00-00 Amortization of Goodwill & Certain Other Intangibles

**CC:ITA:B07:RNasrallah**

**POSTN-114336-10**
to: Nicholas J. Singer

Attorney, CC:LM:CTM:SF:2

(Large & Mid-Size Business)

from: Branch Chief, Branch 7, CC:ITA:7

(Income Tax & Accounting)

subject: Treatment of American Viticultural Area Designation Under Section 197

This Chief Counsel Advice responds to your request for assistance. This advice may not be used or cited as precedent.

LEGEND

Taxpayer =

Date =

Location A =

Location B =

X =

Y =

ISSUE

When Taxpayer purchased a vineyard that is located in an American viticultural area ("AVA"), is the amount of the purchase price allocated by Taxpayer to the right to use the AVA designation an amortizable § 197 intangible?

CONCLUSION

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

For § 197 purposes, the right to use an AVA designation is a license, permit, or other right granted by a governmental unit and is not an interest in land. Therefore, the right to use an AVA designation is a § 197 intangible and the amount of the vineyard's purchase price allocated by Taxpayer to the right to use the AVA designation is an amortizable § 197 intangible.

FACTS

On Date, Taxpayer purchased a vineyard in the Location A viticultural area and the Location B viticultural area. The Alcohol and Tobacco Tax and Trade Bureau ("TTB") of the United States Department of the Treasury has approved the Location A viticultural area and the Location B viticultural area as AVAs. Taxpayer allocated a portion of the purchase price to the right to use the AVA designation and treats such allocated amount as an amortizable § 197 intangible.

LAW AND ANALYSIS

Section 197(a) of the Internal Revenue Code provides that a taxpayer shall be entitled to an amortization deduction with respect to any amortizable § 197 intangible. Section 197(c)(1) provides that, in general, the term "amortizable section 197 intangible" means any § 197 intangible which is acquired after August 10, 1993, and which is held in connection with the conduct of a trade or business or an activity described in § 212.

Section 197(d)(1)(D) provides that the term "section 197 intangible" means, among other things, any license, permit, or other right granted by a governmental unit or an agency or instrumentality thereof. Section 1.197-2(b)(8) of the Income Tax Regulations provides that § 197 intangibles include any license, permit, or other right granted by a governmental unit (including for purposes of § 197, an agency or instrumentality thereof) even if the right is granted for an indefinite period or is reasonably expected to be renewed for an indefinite period. These rights include, for example, a liquor license, a taxi-cab medallion (or license), an airport landing or takeoff right (sometimes referred to as a slot), a regulated airline route, or a television or radio broadcasting license.

Section 197(e)(2) provides that the term "section 197 intangibles" does not include, among other things, any interest in land. Section 1.197-(2)(c)(3) provides for this purpose, an interest in land includes a fee interest, life estate, remainder, easement, mineral right, timber right, grazing right, riparian right, air right, zoning variance, and any other similar right, such as a farm allotment, quota for farm commodities, or crop acreage base. However, an interest in land does not include an airport landing or takeoff right, a regulated airline route, or a franchise to provide cable television service.

The TTB has promulgated regulations relating to AVAs in 27 CFR Part 9. 27 CFR § 9.3 provides the procedures for submitting a petition (including the information to be included in such petition) to the Administrator to establish an American viticultural area. The Administrator is defined in 27 CFR § 9.11 as the Administrator of the TTB.

Pursuant to 27 CFR § 9.11, a viticultural area is defined as a delimited grape growing region distinguishable by geographical features, the boundaries of which have been delineated in Subpart C of 27 CFR Part 9 (Approved American Viticultural Areas). 27 CFR § 9.21 provides that the viticultural areas listed in Subpart C of 27 CFR Part 9 are approved for use as appellation of origin in accordance with 27 CFR Part 4. Two of these approved American viticultural areas are the Location A viticultural area as described in 27 CFR § X and the Location B viticultural area as described in 27 CFR § Y.

In addition, the TTB has promulgated regulations relating to AVAs in 27 CFR Part 4 with respect to the labeling and advertising of wine. Under 27 CFR § 4.23(a), the names of one or more grape varieties may be used as the type designation of a grape wine only if the wine is also labeled with an appellation of origin as defined in 27 CFR § 4.25(a). 27 CFR § 4.25(a)(1) provides that for American wine, an American appellation of origin is: (i) the United States; (ii) a state; (iii) two or no more than three states which are all contiguous; (iv) a county (which must be identified with the word "county" in the same size of type, and in letters as conspicuous as the name of the county); (v) two or no more than three counties in the same states; or (vi) a viticultural area

as defined in 27 CFR § 4.25(e). 27 CFR § 4.34(b) provides in pertinent part that an appellation of origin disclosing the true place of origin of the wine shall appear in direct conjunction with and in lettering substantially as conspicuous as the class and type designation if a varietal (grape type) designation is used on the label.

For purposes of 27 CFR Part 4, a viticultural area for American wine is defined in 27 CFR § 4.25(e)(1)(i) as a delimited grape growing region distinguishable by geographical features, the boundaries of which have been recognized in 27 CFR Part 9. 27 CFR § 4.25(e)(3)(i), (ii), and (iv) provide that in the case of American wine, a wine may be labeled with a viticultural area appellation only if the appellation has been approved under 27 CFR Part 9, not less than 85 percent of the wine is derived from grapes grown within the boundaries of the viticultural area, and it has been fully finished within the state or one of the states, within which the labeled viticultural area is located. 27 CFR § 4.25(e)(2) provides that petitions for establishment of American viticultural areas may be made to the Administrator by any interested party.

The TTB approves the areas established as AVAs. Any winemaker regardless of whether they have petitioned to establish an AVA may use an AVA designation on its wine bottle label if that winemaker meets the requirements set forth by the TTB. These requirements are that the vitcultural area appellation has been approved by the TTB under 27 CFR Part 9, not less than 85 percent of the wine is derived from grapes grown within the boundaries of the viticultural area, and it has been fully finished within the state or one of the states, within which the labeled viticultural area is located. Accordingly, the right to use an AVA designation is a right granted by a governmental unit and is a § 197 intangible within the meaning of § 197(d)(1)(D).

However, an interest in land is not a § 197 intangible. Section 1.197-2(c)(3) provides a nonexclusive list of examples of interests in land. For this purpose, an interest in land includes a fee interest, life estate, remainder, easement, mineral right, timber right, grazing right, riparian right, air right, zoning variance, and any other similar right, such as a farm allotment, quota for farm commodities, or crop acreage base. Arguably, the AVA designation is an interest in land because the grapes producing the wine are harvested from the vineyard and the vineyard is land. However, the AVA designation applies to one of the uses of a particular crop from any land within the designated viticultural area, which is further processed into a finished product. It is not the right to or a limitation on the uses or product of a particular piece of land within the designated viticultural area. Consequently, the AVA designation is not similar to any of the enumerated examples of interests in land as stated in § 1.197-(2)(c)(3) and, thus, is not an interest in land under § 197(e)(2) and § 1.197-2(c)(3).

CASE DEVELOPMENT, HAZARDS AND OTHER CONSIDERATIONS

We have concerns about how a taxpayer would value the right to use an AVA designation. It is unclear whether the value of the right to use an AVA designation attaches to an acquisition of a particular vineyard within an AVA. The benefit in value from the right to use an AVA designation accrues to all land whose highest and best use is as a vineyard within such designated viticultural area. Consequently, all of the closest comparable vineyards share the same intangible benefit thereby making an appraiser's determination of the increment of value assigned to the intangible benefit and finding comparable vineyards outside of the particular AVA factually difficult.

In addition, § 197(f)(8) provides that § 197 shall not apply to any increment of value if, without regard to § 197, such increment is properly taken into account in determining the cost of property (the land and tangible improvements) that is not a § 197 intangible. Without § 197, the benefit of an AVA designation to a vineyard would be subsumed into the value of the land and improvements. Only if there was a factual showing of some clear premium, such as a recognized and marketable tradename to a taxpayer's vineyard, would an intangible asset be recognized.

This writing may contain privileged information. Any unauthorized disclosure of this writing may undermine our ability to protect the privileged information. If disclosure is determined to be necessary, please contact this office for our views.

Please call (202) 622-4930 if you have any further questions.

George Blaine

Associate Chief Counsel (Income Tax & Accounting)

Kathleen Reed

Branch Chief, Branch 7 (Income Tax & Accounting)

Section 6110(j)(3) of the Internal Revenue CodeThis document may not be used or cited as precedent. .

IRS CCA 201040004, 2010 WL 3937045

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

# Depreciation

## Frequently Asked Questions

[1]  **Can I deduct the cost of the equipment that I buy to use in my business?**

[2]  **Are there any other capital assets besides equipment that can be depreciated?**

[3]  **Can I depreciate the cost of land?**

[4]  **How do I depreciate a capital asset (like a car) that I use for both business and personal?**

[5]  **If I owe money on an asset, can I still depreciate it?**

[6]  **Can I claim depreciation on equipment that I rent or lease for my business?**

[7]  **I have owned a building for several years and made major improvements to it this year.  Can I deduct the cost of those improvements?**

[8]  **What information do I need to compute depreciation on my capital assets?**

[9]  **What is basis?**

[10]  **What is class life?**

[11]  **Why is the term "placed in service" important?**

[12]  **What method of depreciation should I use?**

[13]  **How does the month I place my equipment in service affect my depreciation computation?**

[14]  **Does the month I place my building in service affect my depreciation computation?**

[15]  **Is there any exception to the general rule that costs of property must be depreciated?**

[16]  **Are there any limitations on the amount of depreciation I can claim in one year?**

[17]  **Can I claim depreciation on my business vehicle if I use the standard mileage rate?**

[18]  **How do I claim depreciation on my tax return?**

**0593**

**[1]  Can I deduct the cost of the equipment that I buy to use in my business?**

Equipment is considered a capital asset.  You can deduct the cost of a capital asset, but not all at once.  The general rule is that you depreciate the asset by deducting a portion of the cost on your tax return over several years.  See Question 15 for an exception to this general rule.

Return to top

**[2]  Are there any other capital assets besides equipment that can be depreciated?**

There are several types of capital assets that can be depreciated when you use them in your business.  For example:

- *Real Property-* buildings or anything else built on or attached to land
- *Personal Property* – cars, trucks, equipment, furniture, or almost anything that isn't "real property"

Return to top

**[3]  Can I depreciate the cost of land?**

Land can never be depreciated.  Since land cannot be depreciated, you need to allocate the original purchase price between land and building.  You can use the property tax assessor's values to compute a ratio of the value of the land to the building.

**Example:**

Ryan bought an office building for $100,000.  The property tax statement shows:

| | | |
|---|---|---|
| Improvements | $60,000 | 75% |
| Land | $20,000 | 25% |
| | | |
| Total Value | $80,000 | 100% |

Multiply the purchase price ($100,000) by 25% to get a land value of $25,000.  You can depreciate your $75,000 basis in the building using the mid-month MACRS tables.

Return to top

**[4]  How do I depreciate a capital asset (like a car) that I use for both business and personal?**

Only the business portion of the asset can be depreciated on your tax return.  For example, if you use your car 60% for business use, depreciation can be claimed on 60% of the cost.

Return to top

**[5]  If I owe money on an asset, can I still depreciate it?**

Yes, as long as you are responsible for making payments on the asset, you can take a depreciation deduction.

Return to top

**[6]  Can I claim depreciation on equipment that I rent or lease for my business?**

If you are renting or leasing an asset, you can deduct your monthly rent/lease costs as an expense.  Usually only the owner can depreciate a capital asset.

Return to top

**0594**

**[7]  I have owned a building for several years and made major improvements to it this year.  Can I deduct the cost of those improvements?**

The cost of major improvements is not deductible all in one year.  They must be capitalized and depreciated.  The total improvements you made this year are handled as though you purchased a new building.  You would recover the cost of the improvement using the depreciation methods in effect for the tax year you made them.

Return to top

**[8]  What information do I need to compute depreciation on my capital assets?**

You need the following information to compute depreciation:

- Basis
- Class Life
- Placed in Service
- Method of Depreciation

Return to top

**[9]  What is basis?**

Basis is your original cost in the asset, including sales tax, freight and installation.  The cost of the property includes:

- Cash
- The amount of money borrowed to purchase the asset
- The value of any items you traded for the new asset
- The value of bartered services

Your basis will increase by the amount of major improvements you make to the property and will decrease by the amount of depreciation deductions you take on your tax return.  This adjusted basis is used to measure your gain or loss when you sell the property.

**Example:**

Adam bought a bulldozer from a local contractor for $6,000. He paid $2,000 in cash, borrowed $3,000 from the bank, and agreed to dig the foundation for the seller's lake cabin. Adam's basis is $6,000.  Note: Adam will also include $1,000 in income in the year he digs the foundation.

| | |
|---|---|
| Cash | $2,000 |
| Loan | $3,000 |
| Services | $1,000 |
| Total | $6,000 |

Return to top

**[10]  What is class life?**

Class life is the number of years over which an asset can be depreciated.  The tax law has defined a specific class life for each type of asset.  Real Property is 39 year property, office furniture is 7 year property and autos and trucks are 5 year property.  See Publication 946, How to Depreciate Property.

Return to top

**[11]  Why is the term "placed in service" important?**

**0595**

Property is placed in service when it is ready and available for use in your business even if you have not begun using it.  This date determines when you can begin to depreciate the asset.

Return to top

**[12]  What method of depreciation should I use?**

The method used by most taxpayers is the Modified Accelerated Cost Recovery System (MACRS).  MACRS provides a uniform method for all taxpayers to compute the depreciation.  Using the basis, class life, and the MACRS tables, you can compute the deduction for each asset in the year it is placed in service and each subsequent year of its class life.  See Publication 946, How to Depreciate Property.

**Example:**

Shawn bought and placed in service a used pickup for $15,000 on March 5, 1998.   The pickup has a 5 year class life.  His depreciation deduction for each year is computed in the following table.

| Year | Cost x MACRS % | Depreciation |
|------|----------------|--------------|
| 1998 | $15,000 x 20.00% | $3,000 |
| 1999 | $15,000 x 32.00% | $4,800 |
| 2000 | $15,000 x 19.20% | $2,880 |
| 2001 | $15,000 x 11.52% | $2,880 |
| 2002 | $15,000 x 11.52% | $2,880 |
| 2003 | $15,000 x  5.76% | $  864 |
| Total |  | $15,000 |

### MACRS Percentage Table

| Year | 3 Year | 5 Year | 7 Year |
|------|--------|--------|--------|
| 1 | 33.33% | 20.00% | 14.29% |
| 2 | 44.45% | 32.00% | 24.49% |
| 3 | 14.81% | 19.20% | 17.49% |
| 4 | 7.41% | 11.52% | 12.49% |
| 5 |  | 11.52% | 8.93% |
| 6 |  | 5.76% | 8.92% |
| 7 |  |  | 8.93% |
| 8 |  |  | 4.46% |

Return to top

**[13]  How does the month I place my equipment in service affect my depreciation computation?**

MACRS assumes all *personal property* is purchased and placed in service in the middle of the year.  This is called the half-year convention.  The example in Question 12 and the MACRS percentage table above show how to compute depreciation using the half-year convention.

There is an exception to the half-year convention.  If more than 40% of your newly purchased *personal property* is placed in service during the last 3 months of a year, then you should use the mid-quarter convention.  The mid-quarter convention tables start your depreciation in the quarter that you placed the asset in service.  The mid-quarter convention reduces the amount of the depreciation for the year because you are only using the property for a short period of time.  If you are required to use the mid-quarter convention, those MACRS tables can be found in Publication 946, How to Depreciate Property.

Return to top

**[14]  Does the month I place my building in service affect my depreciation computation?**

Depreciation on *real property,* like an office building, begins in the month the building is placed in service. This is called the mid-month convention. In most cases, when you buy a building, the purchase price includes the cost of both the land and the building. Since land cannot be depreciated, you need to identify the portion of the original purchase price that relates to land. You can use the property tax assessor's values to compute a ratio of the value of the land to the building. The MACRS tables for mid-month convention are in Publication 946, How to Depreciate Property.

**Example:**

Ryan bought an office building for $100,000. The property tax statement shows :

| | | |
|---|---|---|
| Improvements | $60,000 | 75% |
| Land | $20,000 | 25% |
| | | |
| Total Value | $80,000 | 100% |

Multiply the purchase price ($100,000) by 25% to get a land value of $25,000. You can depreciate your $75,000 basis in the building using the mid-month MACRS tables.

Return to top

**[15]  Is there any exception to the general rule that costs of property must be depreciated?**

This exception is called *Section 179 Deduction.* You can choose to take an immediate deduction for some personal property that you would otherwise depreciate over several years. You must make this election in the year that you placed the property in service using Form 4562, Depreciation and Amortization. You cannot take this special deduction on property you've previously used personally and then converted to business use.

This deduction is limited to your wages and net business income. There is also a maximum dollar limit, which changes from year to year. The maximum dollar limitation is printed on Form 4562 every year. If you can't use all of the *Section 179 Deduction* because of the income limit, you can carry the unused deduction over to the next tax year.

**Example:**

Mark purchased a piece of equipment for $30,000 in 1998. On his 1998 tax return he could choose to take an *additional* depreciation deduction up to $17,500. Mark's total business net profit for 1998 was $12,000. His *additional* first year deduction would be limited to $12,000. If he elects the full $17,500, the unused $5,500 ($17,500-$12,000) will be carried over to 1999.

Return to top

**[16]  Are there any limitations on the amount of depreciation I can claim in one year?**

There are not any overall limitations on yearly depreciation. However, if an asset is considered *Listed Property*, your annual deduction is limited. Listed property is a term for business assets that are often used for personal purposes. Under the MACRS rules, depreciation is limited for listed property, such as:

- Vehicles that weigh 6,000 or less
- Other property used for transportation (pick-ups, airplanes, buses, boats, motorcycles, etc.)
- Property used for entertainment, recreation, or amusement (video recorders, stereo equipment, photographic equipment, etc.)
- Computer and related equipment unless used at a regular place of business
- Cellular telephones

Return to top

**[17]  Can I claim depreciation on my business vehicle if I use the standard mileage rate?**

**0597**

The standard mileage rate covers all the expenses of operating your vehicle.  Therefore you do not claim depreciation seperately.  However, if you use the actual expense method (see the Travel and Entertainment FAQ's) to compute your vehicle expenses, you will be allowed to claim depreciation.

**Example:**

Dianne uses her Corvette in her business. She took odometer reading at the beginning and end of the year. The total miles for the year were 12,000. She kept a log to record her business miles. The car cost $64,000.

| | |
|---|---|
| Business Miles | 7,000 |
| Total Miles | 12,000 |
| Business Percentage (7000/12000) | 58% |
| | |
| Original Cost | $64,000 |
| Business Use Percentage | 58% |
| Basis to be Depreciated | $37,334 |
| MACRS percentage | 20% |
| Maximum MACRS Depreciation | $ 7,467 |
| | |
| Maximum Vehicle Depreciation (see Publication 946) | $ 3,160 |
| Business Use Percentage | 58% |
| Limited Vehicle Depreciation | $1,843 |

Dianne compares the maximum MACRS depreciation with the limited vehicle depreciation.  She can deduct the smaller of the two which is $1,843.

Return to top

**[18]  How do I claim depreciation on my tax return?**

You must complete and attach Form 4562 to your tax return if you are claiming any of the following:

- A Section 179 deduction for the current year or a Section 179 carryover deduction from a prior year
- Depreciation for property placed in service during the current year
- Depreciaiton on any vehicle or other listed property, regardless of when it was placed in service

Return to top

1992 WL 1355768 (IRS FSA)

Internal Revenue Service(I.R.S.)

IRS FSA
Field Service Advisory

February 11, 1992

**CC:TL-N-4382-91**

**FS:FI&P:RLHarrigal**
to: District Counsel, \*\*\*

from: Associate Chief Counsel (Field Service) CC:FS

subject: \*\*\*--Field Advisory

You requested our advice on whether the sale of certain contract rights should be taxable as capital gain or ordinary income. You provided Examination with a memorandum (dated April 2, 1991) on this issue setting forth your preliminary analysis. We understand that the case has gone forward on the argument that the gain is ordinary and that the case is currently in appeals.

ISSUE:

Whether the transfer of a contract to sell electricity is capital such that the gain from the transfer of the contract is capital. 1221.00-00

CONCLUSION:

As a threshold and potentially dispositive matter, we note, based upon review of the specific utility laws cited by the taxpayer, that the value of the contract with \*\*\* may be de minimis or even zero (as opposed to the $\*\*\* that \*\*\* allocated to it), in which case the value currently assigned by the seller to the contract may be allocable to goodwill/going concern value. Reallocation is required if the purchaser could have entered into a new contract with \*\*\* at substantially the same terms as the acquired contract. If the \*\*\* contract has a de minimis value, the issue of the character of the contract takes on much less importance.

To the extent that a portion of the purchase price is allocated to the \*\*\* contract, we believe that the contract at issue has elements of property, within the meaning of I.R.C. § 1221, and income. Accordingly, we believe that the Service has an argument that the transfer of the contract should have resulted in ordinary income. Nevertheless, we recognize that the property nature of the contract does create litigating hazards to the ordinary income argument. Accordingly, we would recommend acknowledging, at least in the alternative, that a portion of the value assigned to the contract is property for purposes of section 1221

FACTS:

We understand the facts as follows. \*\*\* [1], a \*\*\* Corporation, [2] was an integrated oil and gas company with interests in coal, geothermal energy and chemicals. \*\*\* operations consisted of 1) exploration and production; 2) refining and marketing; 3) coal; 4) chemicals; and 5) geothermal. In \*\*\*, the chemical business consisted of two major product lines: commodity chemicals and specialty chemicals. The chemical product group had efficient, low cost plants; a well trained, highly professional sales force; a large and efficient distribution system; and a broad customer base. [3]

The price and availability of energy, while important to all of ***' operations, was of particular importance in the manufacture of commodity chemicals. *** operated a cogeneration unit--gasfired turbines to generate steam and electricity at its *** facilities.

In ***, *** signed a *** contract to sell *** megawatts of cogenerated electricity a year to ***. The contract appears to dedicate all of the electrical output of the cogeneration unit to ***, other than output used captively by *** and defined "excess." See Cogeneration Agreement § 3.4. The initial term of the contract was for ***. The price *** paid for the electricity was based on a capacity payment and an energy payment. The capacity payment was required even if *** required no electricity.

In ***, *** announced its plan to sell its coal and chemicals businesses. *** sold its chemicals business to *** for approximately $***. The issued and outstanding shares of *** wholly owned subsidiary, *** were sold to a subsidiary of *** for approximately $*** in cash and the assumption of approximately $*** in debt. Immediately prior to the sale of ***, *** sold its cogeneration facilities to another wholly owned subsidiary of *** for $*** million, which amount was transferred to *** as a dividend on *** shares of ***.

The sale of the cogeneration facilities included assignment of the *** contract. Of the $*** purchase price, $*** was allocated in the sale agreement to the *** contract. *** reported a zero basis in the *** contract and reported the $*** as a long term capital gain. Prior to the sale of the contract, *** reported the income received under the terms of the contract as ordinary income.

The agent argued that the proceeds from the sale of the *** contract should be taxable as ordinary income. The agent reasoned that the contract by itself did not represent a right to future income, but rather, a right to receive income in the future and that the contract did not appreciate in value over time as contemplated under the capital gains provisions.

DISCUSSION:

I. VALUATION OF THE *** CONTRACT

As a threshold and potentially dispositive matter, we would like to note our concern about the amount allocated to the *** contract. The value of the *** contract may be de minimis or even zero (as opposed to the $*** that *** allocated to it). This is because the purchaser may have been able to enter into a new contract with *** at terms substantially identical to those of the acquired contract.

In this case, we are dealing with the Public Utility Regulatory Policies Act of 1978, which requires electric utilities to purchase electricity from """qualifying cogeneration facilities" ("QFs"). An electric utility need not pay more than its "avoided costs" for the electricity. 18 CFR § 292.304. A QF may sell its excess electricity to an electric utility either as the QF determines that the energy is available for purchase, or the QF may provide energy or capacity under contract stating a specified term. 18 CFR § 292.304(d). If energy is provided "as available," the rates for the purchase are based on the utility's avoided costs, calculated at the time the electricity is delivered. Id. If the QF provides energy or capacity under contract, the QF has the option to base the rates on either the (1) avoided costs calculated at the time of delivery or (2) the avoided costs calculated at the time the obligation is incurred. Id.

***. Accordingly, anyone who owns a cogeneration facility could sell electricity to *** and the price *** paid for the electricity was controlled by the State of ***.

We suspect, therefore, that if the purchaser did not buy the *** contract from *** (but only bought the cogeneration facilities), it could have gone to *** and received a long-term contract with terms very similar to the *** contract that *** received. If this is true, then the *** contract has little, if any, value. See Ithaca Industries v. Commissioner, 97 T.C. 253 (1991) (value of supply contracts arises from favorableness of contract).

The value of the cogeneration facility has been enhanced by the Federal and state laws which required *** to purchase energy from the cogeneration facility at a fixed price. Thus, we believe that under these circumstances, the excess purchase price over the value of the cogeneration facility should be allocated to going concern value/goodwill. Goodwill is treated as a capital asset in the hands of the seller. As you are aware, the purchaser is unable to depreciate goodwill. Thus, the parties' allocation of this large value to the contract may have been an accommodation to the buyer.

On the other hand, if at the time of the purchase the purchaser could not have entered into a long-term contract with *** or the terms of the long-term contract would have been less favorable, then value should properly be allocated to the contract.

*** submission does not answer the question whether, at the time the purchaser bought the cogeneration facilities, it could have entered into a similar long-term contract with ***. On page 6 of its submission, *** describes the lower energy payments which QFs without a long-term contract received prior to ***. *** further states that after ***, QFs received no capacity payment for nonfirm energy. However, *** fails to explain the amount of the capacity payment the purchaser would receive had it entered into a new long-term agreement with ***.

Accordingly, we advise you to explore this factual question. If you find that the *** contract has a de minimis value, the issue of the character of the contract takes on much less importance.

The remainder of the memorandum applies to the value you determine is properly allocable to the contract.

II. RELEVANT STATUTES:

I.R.C. § 1221 provides as follows:
For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include--
1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer ...

2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

3) a copyright, a literary, musical or artistic composition ...

4) accounts or notes receivable ...

5) a publication of the United States Government ...

Thus, generally property held by a taxpayer is capital unless it is within one of the enumerated exceptions.

Section 1231 provides for capital gain treatment of property[4] used in a trade or business (provided section 1231 gains exceed section 1231 losses). Property used in the trade or business is defined in section 1231(b) as property used in the trade or business of a character which is subject to the allowance for depreciation under section 167, held for the required period, and which is not 1) property which would properly be includible in inventory at the close of the taxable year, 2) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, 3) certain copyright, literary, musical or artistic composition, or similar property, or 4) a publication of the United States meeting certain requirements.

Consequently, it appears that if property is of use in the taxpayer's trade or business and is of a character which is subject to the allowance for depreciation under section 167, the fact that such property is excluded under section 1221 does not mean gain on the sale is ordinary. Rather, section 1231 may nevertheless require capital gain treatment. Treas. Reg. § 1.221-1(b).

III. RELEVANT CASE LAW:

The Supreme Court relatively recently addressed section 1221 in Arkansas Best Corp. v. Commissioner, 485 U.S. 212 (1988). The Court held that the sale of bank stock by a diversified holding company was subject to capital loss treatment as the stock was within the definition of capital asset under section 1221 and did not fall within any of the enumerated classes of excluded property. The court narrowed its earlier decision, Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955), stating that the corn futures in that case were inventory substitutes and fell within the inventory exception to capital asset treatment. The Court in Arkansas Best indicated that the general rule that property is a capital asset should be read broadly.

The Court, however, stated in footnote 5:
Petitioner mistakenly relies on cases in which the Court, in narrowly applying the general definition of capital asset, has "construed 'capital asset' to exclude property representing income items or accretions to the value of a capital asset themselves properly attributable to income," even though these items are property in the broad sense of the word. ... This line of cases, based on the premise that § 1221 "property" does not include claims of rights to ordinary income, has no application in the present context. Petitioner sold capital stock, not a claim to ordinary income.

485 U.S. at 217.

We believe that the Court was suggesting that the preliminary question of whether the item is "property held by the taxpayer" under section 1221 was not at issue in Arkansas Best. For example, assignment of earned income could not become property, and thereby gain capital treatment under section 1221, through the sale of the earned income.

Much earlier, the Supreme Court decided another relevant case, Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958). In P.G. Lake, the taxpayer received consideration for assignment of an oil payment right. This right was carved out by the taxpayer from a larger mineral interest it held. The Supreme Court held that the consideration for the assignment was ordinary income. The Court reasoned that the consideration was essentially a substitution for what would otherwise be received at a future time as ordinary income and the amount of such payouts were fairly certain. The consideration was not, the Court noted, paid for an increase in the value of the income-producing property.

There are several Fifth Circuit cases which are relevant to our analysis. In United States v. Dresser Industries, Inc., 324 F.2d 56 (5th Cir. 1963)[5] , the Fifth Circuit held that transfer to the patent holder by the holder of the exclusive license to practice the patent for hire was the transfer of property or a capital asset. The court focussed on the distinction between the right to earned income and the right to earn income. Id. at 59. The court reasoned that the license holder had a right, a property, which would produce income.[6]

Dresser seems to be in conflict with another Fifth Circuit decision decided in the same year, Bisbee-Baldwin Corporation v. Commissioner, 320 F.2d 929 (1963).[7] In Bisbee-Baldwin, the taxpayer agreed to terminate mortgage servicing contracts for a percentage of the principal balance outstanding on mortgages. The taxpayer unsuccessfully attempted to distinguish the right to receive future income and the right to earn future income.

The court held that to the extent that the mortgage servicing rights represent the right to earn future income in the form of commissions for services rendered, then the sum received for the transfer is ordinary income.[8] To the extent that the mortgage servicing rights act as a "feeder" for related businesses, they enhance the servicing agent's credit standing and they are in the

nature of property. Further, there is, the court suggested, goodwill which is also a capital asset. See also General Guaranty Mortgage Co. v. Commissioner, 335 F.2d 518 (5th Cir. 1964) (remand in light of Bisbee-Baldwin).

In United States v. Woolsey, 326 F.2d 287 (5th Cir. 1963), the Fifth Circuit held that amounts the taxpayers received in consideration for the sale of their rights in their partnership business (which owned a management contract with a mutual insurance company) were taxable as ordinary income to the extent such amount related to the management contract. To the extent such amount related to the transfer of assets such as operating records, goodwill and the state-wide charter, it was capital.

The court stated that 1) it was fundamental to determine the type and nature of the underlying right or property transferred; and 2) it is relevant to inquire how the proceeds would have been taxed had there been no assignment such that close scrutiny is required if the consideration is actually a substitute for what would have been earned income without the transfer. The court reasoned that here the consideration paid for the management contract was for the right to earn and receive future income, not for an increase in the value of the income producing property.

The Fifth Circuit has referred to the reasoning in a Second Circuit case, Commissioner v. Ferrer, 304 F.2d 125 (1962). See e.g., Dresser, 324 F.2d at 59. In Ferrer, the taxpayer transferred 1) the "lease" from a playwright which permitted the taxpayer to produce the play, 2) the right to prevent disposition of film rights after production, and 3) the right to a percentage of the film proceeds if the taxpayer consented to the transfer. The court held that amounts for the "lease" and the right to prevent disposition were capital, the amount for the right to a percentage of the proceeds was ordinary.

The Second Circuit summarized the cases in this area, stating that if the taxpayer has an "estate" or an "encumbrance" or an option to acquire an interest in property which, if itself held, would be a capital asset, he has property. With respect to the lease, the court analogized the "lease" to the facts in Commissioner v. Golonsky, 200 F.2d 72 (3d Cir. 1952) (lessee's surrender of the lease to the lessor results in capital gain), and Commissioner v. McCue Bros. & Drummond, Inc., 210 F.2d 752 (2d Cir.) (same), cert. denied, 348 U.S. 829 (1954). Ferrer, at 131-32.

With respect to the "negative power" to prevent disposition, the court reasoned that power would be protected in equity [9]. On the other hand, the right to profits, the court reasoned, was like a lessor agreeing to pay the lessee a percentage from leases with lessees who were attracted by the original lessee's operations.

One writer has summarized the line of Fifth Circuit cases in the following manner.
The decisions in the above cases perhaps may be summarized along the following lines: a right to earn future ordinary income by the performance of personal services will not be treated as a capital asset, and consideration received for the transfer of such a right ... will be a substitute for this income and taxed accordingly. Similarly, a bare legal right to receive future ordinary income, even though the taxpayer personally is not required to perform, or has not performed, services to earn such income, probably is not a capital asset, and consideration received for the transfer of such a right will most likely be taxed as ordinary income. An even stronger case for ordinary income treatment is presented if services have already been performed by the taxpayer, and the contract right being transferred is merely a deferred payment right for such services. But the exclusive right to use or possess specific property, either by lease or exclusive license, is ... a capital asset, and the sale ... will produce capital gain.

J. Eustice, Contract Rights, Capital Gain, Assignment of Income--the Ferrer Case, 20 Tax L. Rev. 1, 29 (1964) (footnotes removed).

The Tax Court may have shed a little more light on this area in Foy v. Commissioner, 84 T.C. 50 (1985). In Foy, the taxpayer and his company held an interest in a janitorial and building maintenance franchise network. The taxpayer had helped create the network and held certain duties with respect to the network. The taxpayer transferred his and his company's rights to the network to the franchisor.

The Tax Court stated that the prior cases indicate that the entire economics of the transaction need to be considered as well as an evaluation of the risks and obligations of the taxpayer under the agreement prior to the transfer. The court listed the following items as pertinent to whether the item at issue constituted a capital asset:

1) how the contract rights originated;

2) how the contract rights were acquired;

3) whether the contract rights represented an equitable interest in property which itself constituted a capital asset;

4) whether the transfer of contract rights merely substituted the source from which the taxpayer otherwise would receive ordinary income;

5) whether significant investment risks were associated with the contact rights and, if so, whether they were included in the transfer; and

6) whether the contract rights primarily represented compensation for personal services.

Id. at 70.

IV. ANALYSIS:

In the case at issue, *** transferred a contract which generally dedicated the output of *** cogeneration unit to ***. We believe that this contract has elements of property within the meaning of section 1221 and elements of ordinary income. Accordingly, we must first address whether the contract represents property to which section 1221 applies.

As indicated above, the *** contract contains elements of income, especially the value from the capacity payment (as compared to the energy payment) which is received whether *** requires electricity or not. This is similar to a right to receive income even though the taxpayer is not personally required to perform. See Ferrer, 304 F.2d 125 (right to profits).

Moreover, the contract has some similarities to mortgage servicing rights, see, e.g., Bisbee-Baldwin, 320 F.2d 929, which have been held to be in the nature of ordinary income, at least to the extent the rights relate to income from servicing. Like mortgage servicing rights, the *** contract gives the holder the right to earn ordinary income through its efforts.

Likewise, the contract also resembles the management contract in Woolsey, 326 F.2d 287, which was held to result in ordinary income. But, the *** contract is the right to sell a product to earn income as compared to the right to perform services to earn income which is present in the management contract. See J. Eustice, Contract Rights, Capital Gain, Assignment of Income-- the Ferrer Case, 20 Tax L. Rev. 1, 29 (1964) (suggesting this distinction may be determinative).

Indeed, arguing that the gain on the *** contract is ordinary is, arguably, consistent with the Service's Action on Decision in Dresser, 324 F.2d 56. The contract does not represent an exclusive right to produce income from another's property, such as a license to practice a patent. Rather, it guarantees a customer for its product--a right to earn future ordinary income.

The contract also has some elements of property. The *** contract has some similarities to an exclusive license to practice a patent, Dresser, 324 F.2d 56, or the "lease" to produce the play in Ferrer, 304 F.2d 125, both of which were found to be capital in nature. The contract essentially requires all of the cogeneration unit's output to be used for sale to ***. Thus, if another party owned the unit, it would be prevented from selling its output because of the *** contract. But see, supra note 9.

Also, the \*\*\* contract, like the contract in <u>Dresser</u>, represents the right to earn income in the future, as compared to the right to earned income. The \*\*\* contract provides the license holder with the right, or property, to produce income. But, the \*\*\* contract is not just a right to earn income based on the electrical output, it represents a promise by \*\*\* to purchase the output. Thus, we believe it is more like income than the contracts in <u>Dresser</u> and <u>Ferrer.</u>

Using the list in Foy, 84 T.C. 50, like <u>Foy</u>, \*\*\* created the facility which permitted the creation of the contract. The contract rights, as argued above, represent an equitable interest in the cogeneration facility since it requires the output to be used for \*\*\*. Moreover, as indicated above, while the taxpayer would have received ordinary income had it retained the contract, the contract does not represent compensation for personal services. It is not clear whether \*\*\* has investment risks associated with the contract (e.g., whether it would be difficult for \*\*\* to sell the output from the facility if \*\*\* fails to perform). [10]

Further, unlike P.G. Lake, 356 U.S. 260, \*\*\* was not attempting to carve out an interest, rather \*\*\* transferred its entire interest in the contract. \*\*\*

If it is determined that a portion of the \*\*\* contract is capital and section 1221 applies, the gain will probably be capital in nature. While section 1221 provides an exception from capital treatment for certain depreciable property, [11] section 1231 may require capital treatment if the depreciable property is used in the taxpayer's trade or business. Treas. Reg. § 1.1221-1(b).

<u>CONCLUSION</u>:

Accordingly, if value is properly allocated to the \*\*\* contract, we believe that the Service has a colorable argument that the transfer of the contract should have resulted in ordinary income. Nevertheless, we recognize that the property nature of the contract does create litigating hazards to the ordinary income argument. Accordingly, we would recommend acknowledging, at least in the alternative, that a portion of the value assigned to the contract is capital, especially if some of the contract value can be allocated to goodwill or going concern value (see <u>supra</u> footnote 3).

If you have any questions, please call Rebecca L. Harrigal at FTS 566-3305.

This document may include confidential information subject to the attorney-client and deliberative process privileges, and may also have been prepared in anticipation of litigation. This document should not be disclosed to anyone outside the Service, including the taxpayer(s) involved, and its use within the Service should be limited to those with a need to review the document in relation to the subject matter or case discussed herein. This document also is tax information of the instant taxpayer which is subject to I.R.C. § 6103.

DANIEL J. WILES

By:

RICHARD L. CARLISLE
Chief, FI&P Branch
Field Service Division

Section 6110(j)(3) of Internal Revenue CodeThis document may not be used or cited as precedent. .

Footnotes

1      \*\*\* was formerly \*\*\*.
2      We assume, based on the correspondence, that venue for this case lies in the \*\*\*.
3      These facts suggest that the group (including the cogeneration unit) had going concern value.

4 Property for purposes of section 1231 is the same as property for purposes of section 1221. See Hollywood Baseball Assoc. v. Commissioner, 423 F.2d 494 (9th Cir.), cert. denied, 400 U.S. 848 (1970).

5 The Service in an Action on Decision on Dresser stated that the taxpayer merely relinquished certain contract rights providing the taxpayer with an opportunity to earn ordinary income in the future and as such the transfer was not a sale of a capital asset. Nevertheless, no certiorari was recommended.

6 The court distinguished Wiseman v. Halliburton Oil Well Cementing Co., 301 F.2d 654 (10th Cir. 1962), by stating that in Wiseman, the taxpayer had the right to sublicense the patent to third parties for a fee, which right he gave up for the right to a share of the royalties from third parties.

7 It has been suggested that one can distinguish Dresser from Bisbee-Baldwin on the basis that the latter case involved the element of personal services-- personal services were required to earn the future income. J. Eustice, Contract Rights, Capital Gain, and Assignment of Income--the Ferrer Case, 20 Tax L. Rev. 1, 26 (1964).

8 The court noted that two of its earlier decisions, Nelson Weaver Realty Co. v. Commissioner, 307 F.2d 897 (5th Cir. 1962) (transfer of mortgage servicing contract with life insurer was capital asset) and United States v. Eidson, 310 F.2d 111 (5th Cir. 1962) (transfer of management contract was ordinary) were not reconcilable. The court decided to follow Eidson.

9 It may be that *** would not have an injunction action against *** if *** failed to purchase the output. This factor suggests that the *** contract is less capital in nature than the "negative" power in Ferrer. See Commissioner v. Pittston, 252 F.2d 344 (2d Cir.) (majority used unavailability of injunctive action to deny capital gain treatment), cert. denied, 357 U.S. 919 (1958).

10 We note, however, that *** had a zero basis in the contract.

11 See Ithaca Industries v. Commissioner, 97 T.C. 253 (1991) (holding that the value allocated to the supply contract was amortizable).

1992 WL 1355768 (IRS FSA)

---

**End of Document**                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   **0606**   8



**Internal Revenue Bulletin: 2013-20**

**May 13, 2013**

**Notice 2013-29**

*Beginning of Construction for Purposes of the Renewable Electricity Production Tax Credit and Energy Investment Tax Credit*

**Table of Contents**

- SECTION 1. PURPOSE
- SECTION 2. BACKGROUND
- SECTION 3. METHODS FOR ESTABLISHING BEGINNING OF CONSTRUCTION
- SECTION 4. PHYSICAL WORK
- SECTION 5. SAFE HARBOR
- SECTION 6. DRAFTING INFORMATION

## SECTION 1. PURPOSE

Under the American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, 126 Stat. 2313 (ATRA), a qualified facility (as described in section 45(d) of the Internal Revenue Code) will be eligible to receive the renewable electricity production tax credit (PTC) under section 45, or the energy investment tax credit (ITC) under section 48 in lieu of the PTC, if construction of such facility begins before January 1, 2014. This notice provides guidelines and a safe harbor to determine when construction has begun on such a facility.

## SECTION 2. BACKGROUND

A taxpayer can claim a PTC with respect to electricity produced at a "qualified facility" within the meaning of section 45(d). If the taxpayer makes an election under section 48(a)(5), the taxpayer may instead claim an ITC with respect to that facility. Prior to ATRA, to be a qualified facility, a facility was required to be placed in service before January 1, 2014, except for qualified wind facilities, which had to be placed in service before January 1, 2013. Section 407 of ATRA modified section 45 by extending the PTC for wind facilities through 2013. ATRA also modified the definition of qualified facility by replacing the requirement to place a facility in service before January 1, 2014, with the requirement to begin construction of a facility before January 1, 2014. For purposes of sections 45(d) and 48(a)(5), qualified facilities include wind facilities, closed-loop biomass facilities, open-loop biomass facilities, geothermal facilities, landfill gas facilities, trash facilities, hydropower facilities, and marine and hydrokinetic facilities.

## SECTION 3. METHODS FOR ESTABLISHING BEGINNING OF CONSTRUCTION

This notice provides two methods that a taxpayer may use to establish that construction of a qualified facility has begun. A taxpayer may establish the beginning of construction by starting physical work of a significant nature as described in section 4. Alternatively, a taxpayer may establish the beginning of construction by meeting the safe harbor provided in section 5 (Safe Harbor). Although a taxpayer may satisfy both methods, a taxpayer need only satisfy one method to establish that construction of a facility has begun for the purpose of qualifying for the PTC or ITC.

## SECTION 4. PHYSICAL WORK

.01 *In general*. Construction of a qualified facility begins when physical work of a significant nature begins. Work performed by the taxpayer and work performed for the taxpayer by other persons under a binding written contract that is entered into prior to the manufacture, construction, or production of the property for use by the taxpayer in the taxpayer's trade or business (or for the taxpayer's production of income) is taken into account in determining whether construction has begun. Whether a taxpayer has begun construction of a facility before January 1, 2014, will depend on the relevant facts and circumstances. The Internal Revenue Service will closely scrutinize a facility, and may determine that construction has not begun on a facility before January 1, 2014, if a taxpayer does not maintain a continuous program of construction as determined under section 4.06.

.02 *Physical work of a significant nature*. Both on-site and off-site work (performed either by the taxpayer or by another person under a binding written contract) may be taken into account for purposes of demonstrating that physical work of a significant nature has begun. For example, in the case of a facility for the production of electricity from a wind turbine, on-site physical work of a significant nature begins with the beginning of the excavation for the foundation, the setting of anchor bolts into the ground, or the pouring of the concrete pads of the foundation. If the facility's wind turbines and tower units are to be assembled on-site from components manufactured off-site by a person other than the taxpayer and delivered to the site, physical work of a significant nature begins when the manufacture of the components begins at the off-site location, but only if (i) the manufacturer's work is done pursuant to a binding written contract (as described in section 4.03(1)) and (ii) these components are not held in the manufacturer's inventory (as described in section 4.02(2)). If a manufacturer produces components for multiple facilities, a reasonable method must be used to associate individual components with particular facilities.

(1) *Preliminary activities*. Physical work of a significant nature does not include preliminary activities, even if the cost of those preliminary activities is properly included in the depreciable basis of the facility. Preliminary activities include planning or designing, securing financing, exploring, researching, obtaining permits, licensing, conducting surveys, environmental and engineering studies, clearing a site, test drilling of a geothermal deposit, test drilling to determine soil condition, or excavation to change the contour of the land (as distinguished from excavation for footings and foundations). Removal of existing turbines and towers is preliminary work and, therefore, does not constitute physical work of a significant nature with respect to the facility.

(2) *Inventory*. Physical work of a significant nature does not include work (performed either by the taxpayer or by another person under a binding written contract) to produce property that is either in existing inventory or is normally held in inventory by a vendor.

.03 *Construction by contract*. For property that is manufactured, constructed, or produced for the taxpayer by another person under a binding written contract (as described in section 4.03(1)), the work performed under the contract is taken into account in determining when physical work of a significant nature begins, provided the contract is entered into prior to the work taking place.

(1) *Binding written contract*. A contract is binding only if it is enforceable under local law against the taxpayer or a predecessor and does not limit damages to a specified amount (for example, by use of a liquidated damages provision). For this purpose, a contractual provision that limits damages to an amount equal to at least five percent of the total contract price will not be treated as limiting damages to a specified amount. For additional guidance regarding the definition of a binding contract, see § 1.168(k)-1(b)(4)(ii)(A)-(D).

**0607**

(2) *Master contract*. If a taxpayer enters into a binding written contract for a specific number of components to be manufactured, constructed, or produced for the taxpayer by another person under a binding written contract (a "master contract"), and then through a new binding written contract (a "project contract") the taxpayer assigns its rights to certain components to an affiliated special purpose vehicle that will own the facility for which such property is to be used, work performed with respect to the master contract may be taken into account in determining when physical work of a significant nature begins with respect to the facility.

.04 *Facility* — (1) *In general*. A facility (within the meaning of section 45(d)) generally includes all components of property that are functionally interdependent. Components of property are functionally interdependent if the placing in service of each of the components is dependent upon the placing in service of each of the other components in order to generate electricity. For example, on a wind farm for the production of electricity from wind energy, an electricity-generating wind turbine, its tower, and its supporting pad comprise a single facility. Each such facility can be separately operated and metered and can begin producing electricity separately. *See* Rev. Rul. 94-31, 1994-1 C.B. 16.

(2) *Single project*. Solely for purposes of determining whether construction of a facility has begun for purposes of sections 45 and 48, multiple facilities that are operated as part of a single project (along with any property, such as a computer control system, that serves some or all such facilities) will be treated as a single facility. Whether multiple facilities are operated as part of a single project will depend on the relevant facts and circumstances. Factors indicating that multiple facilities are operated as part of a single project include, but are not limited to:

(a) The facilities are owned by a single legal entity;

(b) The facilities are constructed on contiguous pieces of land;

(c) The facilities are described in a common power purchase agreement or agreements;

(d) The facilities have a common intertie;

(e) The facilities share a common substation;

(f) The facilities are described in one or more common environmental or other regulatory permits;

(g) The facilities were constructed pursuant to a single master construction contract; and

(h) The construction of the facilities was financed pursuant to the same loan agreement.

(3) *Example*. X is developing a wind farm that will consist of 50 turbines, their associated towers, their supporting pads, a computer system that monitors and controls the turbines, and associated power conditioning equipment. The entire wind farm will be connected to the power grid through a single intertie, and power generated by the wind farm will be sold to a local utility through a single power purchase agreement. In 2013, for 10 of the 50 turbines, X excavates the site for the foundations of the wind turbines and pours concrete for the supporting pads. Thereafter, X completes the construction of all 50 turbines and related facilities pursuant to a continuous program of construction (as determined under section 4.06). For purposes of sections 45 and 48, the entire wind farm is a single project that will be treated as a single facility, and X has performed physical work of a significant nature that constitutes the beginning of construction of that facility in 2013.

.05 *Property integral to the facility* — (1) *In general*. Only physical work of a significant nature on tangible personal property and other tangible property used as an integral part of the activity performed by the facility will be considered for purposes of determining whether a taxpayer has begun construction of a facility. This includes property integral to the production of electricity, but does not include property used for electrical transmission. Thus, physical work on a transmission tower located at the site is not physical work of a significant nature because the transmission is not an integral part of the activity performed by the facility. However, physical work on a custom-designed transformer that steps up the voltage of electricity produced at the facility to the voltage needed for transmission is physical work of a significant nature with respect to the facility because power conditioning equipment is an integral part of the activity performed by the facility.

(2) *Roads*. Roads that are integral to the facility are integral to the activity performed by the facility; these include onsite roads that are used for moving materials to be processed (for example, biomass) and roads for equipment to operate and maintain the qualified facility. Starting construction on these roads constitutes physical work of a significant nature with respect to the facility. Roads primarily for access to the site, or roads used primarily for employee or visitor vehicles are not integral to the activity performed by the facility; physical work of a significant nature on these roads is not considered for purposes of determining whether a taxpayer has begun construction of a facility.

(3) *Fencing*. Generally, fencing is not an integral part of the facility because it is not integral to the activity performed by the facility.

(4) *Buildings*. Generally, buildings are not integral parts of the facility because they are not integral to the activity of the facility. However, the following structures are not treated as buildings for this purpose: (1) a structure that is essentially an item of machinery or equipment, or (2) a structure that houses property that is integral to the activity of the facility if the use of the structure is so closely related to the use of the housed property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. *See* Treas. Regs. § 1.48-1(e)(1).

.06 *Continuous construction* — (1) *In general*. A continuous program of construction involves continuing physical work of a significant nature (as described in section 4.02). Whether a taxpayer maintains a continuous program of construction will be determined by the relevant facts and circumstances.

(2) *Construction disruptions*. Certain disruptions in the taxpayer's construction of a facility that are beyond the taxpayer's control will not be considered as indicating that a taxpayer has failed to maintain a continuous program of construction. Examples of such disruptions include, but are not limited to:

(a) severe weather conditions;

(b) natural disasters;

(c) licensing and permitting delays;

(d) delays at the written request of a state or federal agency regarding matters of safety, security, or similar concerns;

(e) labor stoppages;

(f) inability to obtain specialized equipment of limited availability;

(g) the presence of endangered species;

(h) financing delays of less than six months; and

(i) supply shortages.

## SECTION 5. SAFE HARBOR

.01 *In general*. Construction of a facility will be considered as having begun before January 1, 2014, if (1) a taxpayer pays or incurs (within the meaning of Treas. Reg. § 1.461-1(a)(1) and (2)) five percent or more of the total cost of the facility, except as provided in section 5.01(2), before January 1, 2014, and (2) thereafter, the taxpayer makes continuous efforts to advance towards completion of the facility (as determined under section 5.02).

(1) *Total cost of the facility*. All costs properly included in the depreciable basis of the facility are taken into account to determine whether the Safe Harbor has been met. The total cost of the facility does not include the cost of land or any property not integral to the facility, as described in section 4.05(1).

(2) *Look-through for economic performance*. Solely for purposes of this notice, for property that is manufactured, constructed, or produced for the taxpayer by another person under a binding written contract with the taxpayer, costs incurred with respect to the property by the other person before the property is provided to the taxpayer are deemed incurred by the taxpayer when the costs are incurred by the other person under the principles of section 461.

(3) *Example*. In 2013, accrual-method taxpayer W enters into a binding written contract with A pursuant to which W will provide a wind turbine to A in June 2015. In 2013, W pays Y pursuant to a contract for Y to provide parts in May 2014 for use in the wind turbine. W's employees provide W with services necessary to design and plan for the production of the wind turbine in 2013 and with services to manufacture (assemble) the wind turbine in 2015. W incurs the cost to design and plan for the production of the turbine assembly in 2013, incurs the costs for the parts in May 2014 when Y delivers the parts to W (even though the parts were paid for in 2013), and incurs the costs for W's employees to manufacture the

**0608**

wind turbine in 2015. *See* § 1.461-4(d) and § 1.446-1(c)(1)(ii). The costs W incurred in 2013 for its employees' performance of turbine design and planning activities are costs deemed incurred by A before January 1, 2014, for purposes of the Safe Harbor. The other costs in this example were incurred by W in 2014 and 2015 and are costs that A includes in the total cost of the facility, but these other costs were not deemed incurred by A before January 1, 2014.

.02 *Continuous efforts* — (1) *In general*. Whether a taxpayer makes continuous efforts to advance towards completion of the facility will be determined by the relevant facts and circumstances. Facts and circumstances indicating continuous efforts to advance towards completion of the facility may include, but are not limited to:

(a) paying or incurring additional amounts included in the total cost of the facility;

(b) entering into binding written contracts for components or future work on construction of the facility;

(c) obtaining necessary permits; and

(d) performing physical work of a significant nature (as described in section 4.02).

(2) *Disruptions to continuous efforts*. Certain disruptions in the taxpayer's continuous efforts to advance towards completion of the facility that are beyond the taxpayer's control will not be considered as indicating that a taxpayer has failed to make continuous efforts to advance towards completion of the facility. Examples of such disruptions include, but are not limited to:

(a) severe weather conditions;

(b) natural disasters;

(c) licensing and permitting delays;

(d) delays at the written request of a state or federal agency regarding matters of safety, security, or similar concerns;

(e) labor stoppages;

(f) inability to obtain specialized equipment of limited availability;

(g) the presence of endangered species;

(h) financing delays of less than six months; and

(i) supply shortages.

.03 *Cost overruns* — (1) *Single project*. If the total cost of a facility that is a single project comprised of multiple facilities (as described in section 4.04(2)) exceeds its anticipated total cost, so that the amount a taxpayer actually paid or incurred with respect to the facility before January 1, 2014, is less than five percent of the total cost of the facility at the time the facility is placed in service, the Safe Harbor is not fully satisfied. However, the Safe Harbor will be satisfied and the PTC or ITC may be claimed with respect to some, but not all, of the individual facilities (as described in section 4.04(1)) comprising the single project, as long as the total aggregate cost of those individual facilities is not more than twenty times greater than the amount the taxpayer paid or incurred before January 1, 2014 (see Example 1 in section 5.03(3)(a)).

(2) *Single facility*. If the total cost of a single facility that is not a single project comprised of multiple facilities (as described in section 4.04(2)), and cannot be separated into smaller facilities, exceeds its anticipated total cost so that the amount a taxpayer actually paid or incurred with respect to the facility before January 1, 2014, is less than five percent of the total cost of the facility at the time the facility is placed in service, then the taxpayer will not satisfy the Safe Harbor with respect to any portion of the facility.

(3) *Examples* — (a) *Example 1*. A taxpayer incurs $25,000 in costs in 2013 constructing a five-turbine wind farm that will be operated as a single project (as described in section 4.04 (2)), anticipating that each turbine (including its own tower and pad) will cost $100,000 for a total cost for the facility of $500,000. Thereafter, the taxpayer makes continuous efforts to advance towards completion of the facility. At the time the taxpayer places the wind farm in service, the actual total cost of the facility amounts to $600,000, with each turbine costing $120,000. Although the taxpayer did not pay or incur five percent of the actual total cost of the facility before January 1, 2014, the taxpayer will be treated as satisfying the Safe Harbor with respect to four of the turbines, as their actual total cost of $480,000 is not more than twenty times greater than the $25,000 in costs incurred by the taxpayer in 2013. Thus, the taxpayer may claim the PTC on electricity produced from four of the turbines, or the ITC based on $480,000, the cost of four of the turbines. Alternatively, if construction of the facility began (within the meaning of section 4.01) before January 1, 2014, the taxpayer may be able to claim the PTC or the ITC with respect to the entire facility (all five turbines).

(b) *Example 2*. A taxpayer incurs $25,000 in costs in 2013 in constructing an open-loop biomass facility, anticipating that the total cost of the facility, including one boiler and one turbine generator, will be $500,000. The boiler and turbine generator are functionally interdependent. Thereafter, the taxpayer makes continuous efforts to advance towards completion of the facility. At the time the taxpayer places the facility in service, its actual total cost amounts to $600,000. Because the boiler and turbine generator are a single facility that is not a single project comprised of multiple facilities (as described in section 4.04(2)), the taxpayer will not satisfy the Safe Harbor. However, if construction of the facility began (within the meaning of section 4.01) before January 1, 2014, the taxpayer may be able to claim the PTC or the ITC with respect to the entire facility.

## SECTION 6. DRAFTING INFORMATION

The principal author of this notice is Brian J. Americus of the Office of Associate Chief Counsel (Passthroughs & Special Industries). For further information regarding this notice contact Brian J. Americus on (202) 622-3110 (not a toll-free call).

Prev                              Up                              Next
Home

More Internal Revenue Bulletins

**0609**

TAM 200907024 (IRS TAM), 2009 WL 356169

Internal Revenue Service (I.R.S.)

IRS TAM
Technical Advice Memorandum

Issue: February 13, 2009
November 10, 2008

Section 367 -- Foreign Corporations
367.00-00 Foreign Corporations
367.30-00 Transfers of Intangible Property to Foreign Corporations Under Section 367(d)

**TAM-108926-08**

**LEGEND**:

Amount A =

Amount B =

Business A =

Corporation K =

Corporation L =

Corporation M =

Corporation N =

Corporation O =

Corporation P =

Corporation Q =

Corporation R =

Country Y =

Date 1 =

DE =

Partnership =

Region X =

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Taxpayer =

Year 1 =

$C =

$D =

X% =

Y% =

ISSUE(S):

1. Whether the Network, associated with Business A, is a type of intangible property described in section 936(h)(3)(B)?

2. Whether Corporation M's transfer of the Network to Corporation O is exempt from section 367(d) on the grounds that the Network represents foreign goodwill or going concern value, as defined in Treas. Reg. § 1.367(a)-1T(d)(5)(iii)?

CONCLUSION(S):

1. The Network is a type of intangible property described in section 936(h)(3)(B).

2. The Network does not represent foreign goodwill or going concern value, as defined in Treas. Reg. § 1.367(a)-1T(d)(5)(iii). Therefore, Corporation M's transfer of the Network to Corporation O is subject to section 367(d).

**FACTS**

I. The Transaction

At the time of the transaction at issue (the "Transaction"), Taxpayer, a domestic corporation, owned all of the stock of Corporation K and Corporation L. Corporation L owned all of the stock of Corporation M, which owned all of the stock of Corporation N. Corporations K, L, M, and N were members of Taxpayer's consolidated group. Corporation M operated Business A in Region X and had developed, over the course of operating this business, a network of contracts with a large number of foreign agents in numerous countries ("Network").

On Date 1 of Year 1, Taxpayer reorganized its business model and centralized its Business A outside of the United States. Specifically, Corporation M created a wholly-owned subsidiary, Corporation O, located in Country Y. Corporation O set up three controlled foreign corporations ("CFCs") as defined in section 957(a), Corporation P, Corporation Q, and Corporation R, which formed a partnership ("Partnership"). Corporation M then transferred all of the assets of Business A, except for the accounts receivable, to Corporation O. The transferred assets included intercompany services agreements, cash, software, and the Network. Corporation O subsequently transferred these assets to Corporations P, Q, and R, which in turn transferred the assets to Partnership. After the Transaction, DE, an entity disregarded as separate from its owner, Partnership, conducted Business A. Corporation N licensed trademarks to Corporation K, which sublicensed these trademarks to Partnership.

II. Taxpayer's Business and the Network

Business A is a delivery business that allows a customer to have units transferred from one location to another location. The Network comprises contracts with a large number of foreign agents in numerous countries. The contracts are typically for a five-year term, subject to renegotiation and renewal, and obligate the agents to provide delivery services to the public on behalf of Taxpayer. Agents are not typically given exclusive rights within a territory. Agents receive a commission for their services. Agents may recruit and contract with sub-agents to help them provide the Business A service in their areas, subject to Taxpayer's approval. Taxpayer's standard contracts with its agents require that the agents set up call centers that are open twenty-four hours a day for customers to call and inquire about their deliveries. The contracts also require that the agents spend at least X% of their gross revenue from Business A on marketing the Business A service. Taxpayer often voluntarily reimburses up to Y% of these expenses. Taxpayer must approve all marketing campaigns and materials. The agents must purchase computers and equipment as specified by Taxpayer to conduct the deliveries. They must buy forms for the customers to use, the formats of which are specified by Taxpayer. Agents are prohibited from adding charges or providing discounts on the fees established by Taxpayer. The agents also agree to a non-compete provision that prohibits them from offering a competing service during the period of the contract plus one year.

Taxpayer provides the agents with detailed service manuals and requires in the contracts that the agents adhere to the standards outlined in those manuals. Taxpayer provides training for the agents and also provides regional operations centers to support the agents. Taxpayer handles the processing of the delivery requests, provides accounting of all the Business A transactions, and also settles the amounts owed between agents for these transactions.

Before the Transaction, Taxpayer had also established several CFCs that provided support to foreign agents and managed the development of agent relationships by recruiting and training new foreign agents. In the approximately nine years preceding the Transaction, Taxpayer's number of foreign agents grew significantly, from Amount A to Amount B (a more than twenty-fold increase).

III. Taxpayer's Return Position Regarding the Transaction

On its return filed for Year 1, Taxpayer took the position that Corporation M's transfer to Corporation O of the assets associated with Business A qualified as a section 351 exchange. On its Form 926, Taxpayer treated the Network as part of the goodwill associated with, and the going concern value of, Business A. It reported that the value of the foreign goodwill and going concern value transferred to Corporation O was approximately $C, while the value of all other assets transferred to Corporation O was approximately $D. Thus, Taxpayer reported that the value of the foreign goodwill and going concern value was approximately ninety-seven percent of the total value of the Business A assets transferred in the section 351 exchange.

**LAW**

I. Section 367(d), in General

Section 367(d) requires a U.S. person that transfers intangible property to a foreign corporation in an exchange described in section 351 or 361 to take into income annual payments over the useful life of the intangible as though the transferor had sold the intangible for payments contingent upon productivity, use, or disposition of the property. [1] Further, the statute requires that the payments be commensurate with the income attributable to the intangible. Section 367(d)(2)(A). Thus, although sections 351 and 361 normally allow a transferor to exchange property for stock of a corporation without any recognition of gain, section 367(d) requires a U.S. person to recognize income when it exchanges intangible property for stock of a foreign corporation. The transferor must recognize such income regardless of whether the transferee corporation actually makes payments to the transferor.

Section 367(d) refers to section 936(h)(3)(B) for the definition of intangible property. Section 936(h)(3)(B) provides that the term "intangible property" means any:
(i) patent, invention, formula, process, design, pattern, or know-how;

(ii) copyright, literary, musical, or artistic composition;

(iii) trademark, trade name, or brand name;

(iv) franchise, license, or contract;

(v) method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data; or

(vi) any similar item, *** which has substantial value independent of the services of any individual.

Thus, a U.S. person will be required to recognize annual payments under section 367(d) upon the transfer of any of these enumerated intangibles or similar items to a foreign corporation in an exchange described in section 351 or 361. These payments must represent an appropriate arm's length charge for the use of the property, and the charge is determined in accordance with the provisions of section 482 and regulations thereunder. Treas. Reg. § 1.367(d)-1T(c)(1).

Congress enacted section 367(d) because it thought it was inappropriate to allow a foreign corporation to earn deferred income from intangible property that was developed by claiming significant expenses in the United States. See H.R. Rep. No. 98-342 (1984); S. Rep. No. 98-169, at 361 (1984) ("the transferor U.S. companies hope to reduce their U.S. taxable income by deducting substantial research and experimentation expenses associated with the development of the transferred intangible and, by transferring the intangible to a foreign corporation at the point of profitability, to ensure deferral of U.S. tax on the profits generated by the intangible.")

To prevent this mismatch between expenses that offset taxable income in the United States and deferred income in a foreign country, Congress enacted a regime to ensure a U.S. transferor of intangible property continues to be taxed on amounts commensurate with the income attributable to the transferred intangible. See § 1231(e) of Pub. L. No. 99-514 (adding the "commensurate with income" requirement to section 367(d)(2)(A)).

II. Exception for Transfers of Foreign Goodwill or Going Concern Value

Section 367(d) does not contain any statutory exceptions or special rules for transfers of particular types of intangibles. However, Congress stated in the legislative history to the enactment of section 367(d) that the transfer of goodwill or going concern value developed by a foreign branch did not represent the kind of abuse that it wanted to target by enacting this provision. S. Rep. No. 98-169, Vol. 1, p. 362 (1984). Nevertheless, the legislative history does not give any specific direction to exclude these items from section 367(d), and the accompanying Joint Committee report indicates only that such an exception would be provided in regulations "where appropriate." [2] Section 1.367(d)-1T(b), following on this legislative history, provides that section 367(d) and the regulations thereunder do not apply to the transfer of foreign goodwill or going concern value. For this purpose, "foreign goodwill or going concern value" is defined as "the residual value of a business operation conducted outside the United States after all other tangible and intangible assets have been identified and valued." Treas. Reg. § 1.367(a)-1T(d)(5)(iii).

**ANALYSIS**

I. Overview of Taxpayer and IRS Positions

The IRS Exam team ("Exam") and Taxpayer have requested this TAM because of a disagreement over how to characterize the Network. Exam argues that the Network is an intangible asset described in section 936(h)(3)(B). Specifically, Exam argues that the Network is a collection of contracts, a franchise, a system, a method, a program, or a similar asset. See section 936(h)(3)(B)(iv) through (vi). Under this view, Corporation M's transfer of the Network to Corporation O is subject to section 367(d).

Taxpayer argues that the Network satisfies definitions of goodwill or going concern value derived from case law ("traditional definitions") and that these traditional definitions were intended to be used when applying section 367(d). Specifically, Taxpayer argues that the Network meets the definition of going concern value, defined as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern," a vital part of which is "the ability of a business to continue to function and generate income without interruption as a consequence of a change in ownership." VGS Corp. v. Comm'r, 68 T.C. 563, at 592 (1977). Alternatively, Taxpayer argues that the Network meets the definition of goodwill, defined as "the expectancy of continued patronage" or the expectation that "the old customers will resort to the old place." See Boe v. Comm'r, 307 F.2d 339, 343 (9th Cir. 1962); Comm'r v. Killian, 314 F.2d 852, 855 (5th Cir. 1963) (quoting Nelson Weaver Royalty Co. v. Comm'r, 307 F.2d 897 (5th Cir. 1962)).

Part II of this Analysis provides initial discussion of Issue 1 regarding whether the Network is intangible property described in section 936(h)(3)(B). We agree with Exam and conclude that the Network is intangible property described in section 936(h)(3)(B) because it satisfies the definition of several of the items specified under that section.

Part III of this Analysis discusses whether the "enhanced value" of the Network, as described by the Taxpayer,[3] corresponds to the intangibles described in Part II or to a separate asset that may qualify as foreign goodwill or going concern value. We conclude that the enhanced value of the Network is attributable to intangible assets discussed in Part II and does not constitute a separate asset.

Part IV of this Analysis addresses Issue 2, whether the Network represents foreign goodwill or going concern value. We conclude that the Network does not represent foreign goodwill or going concern value under the definition provided by Treas. Reg. § 1.367(a)-1T(d)(5)(iii). In analyzing whether the Network represents foreign goodwill or going concern value, we discuss why the traditional definitions relied upon by Taxpayer do not apply.

In Part V of this Analysis we conclude that Corporation M's transfer of the Network to Corporation O is subject to section 367(d).

II. Whether the Network is Described in Section 936(h)(3)(B)

Section 936(h)(3)(B) lists intangibles that are subject to section 367(d). Although it does not specifically identify every conceivable type of intangible property, the breadth of this list suggests that it was intended to cover, at a minimum, all identifiable intangibles. This is reinforced by the fact that the list includes not only the enumerated intangibles, but also "any similar item." Section 936(h)(3)(B)(vi). Thus, if the Network fits within the definition of one or more of the listed intangibles, or constitutes a similar item, its transfer must be subject to section 367(d) absent the possible application of the exception for foreign goodwill or going concern value.

The Network fits within the definition of several of the intangibles listed in section 936(h)(3)(B). In particular, the Network consists of a collection of contracts with foreign agents. The Network also satisfies the definition of several other listed intangibles, including a collection of "franchises," a "system," a "method," and a "procedure." Because these terms are not defined in sections 936 or 367 or the regulations thereunder, the common and ordinary use of the terms applies. See Amoco Production Co. v. Southern Ute Indian Tribe, 526 U.S. 865, 873-874 (1999).

A. The Network Constitutes a Collection of Contracts

The Network is founded on the contracts between Taxpayer and its agents. Contracts are specifically listed in section 936(h)(3)(B)(iv) and therefore constitute intangible property that is subject to section 367(d). Taxpayer agrees with this position but asserts that each contract separately has little value relative to the value of the Network as a whole. In fact, Taxpayer argues that the aggregate value of the separately valued contracts equals less than three percent of the value of the transferred Business A

assets. Taxpayer then argues that the value of the relationships among the agents represents approximately ninety-seven percent of the value of the transferred Business A assets.

Although the Network comprises individual contracts, it functions as a single, integrated unit and therefore should be considered as a single asset rather than the sum of individual assets. There are many examples of circumstances in which it is more reliable to view a collection of assets in this manner. For instance, a business that purchases a new car does not treat a portion of the cost as goodwill to the extent the price of the car exceeds the sum of the values of the car's parts. Likewise, the business does not depreciate the car's separate parts but rather the car as a whole. Similarly, a group of individual patents that are used in combination to make a product may each have little value separately if the entire group of patents is necessary to make the product. Nevertheless, the group of patents has a value greater than the sum of its parts because it is the collection of patents that enables the holder to make a valuable product. This added value is attributable to the patents themselves and is not goodwill or going concern value. See, e.g., Kraft Foods Co. v. Comm'r, 21 T.C. 513 (1954) (discussed further in Part III below).

The value of the Network resides in the value of the contracts determined on an aggregate basis, as discussed further in Part III below. This value does not represent foreign goodwill or going concern value for purposes of section 367(d), as discussed in Part IV below.

B. The Network Constitutes a Collection of Franchises

The Network may also be described as a group of franchises that constitute a franchise operation. Although sections 936 and 367 and the related regulations do not define "franchise," there is a general definition of the term in section 1253(b)(1). That provision states that a franchise "includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area.[4] This definition is consistent with the ordinary meaning of the term. Webster's Third New International Dictionary, Unabridged (1986) ( "Webster's") defines "franchise" to mean "the right granted to an individual or group to market a company's goods or services in a particular territory." The Tax Court, when considering whether a Federal Communications Commission ("FCC") license was a franchise under section 1253, stated "we read the word 'franchise,' as used in section 1253, broadly to mean 'franchises' as that term is commonly understood, including any agreement which gives one party the right to distribute, sell, or provide goods, services, or facilities within a specified area." Jefferson-Pilot Corp v. Comm'r, 98 T.C. 435, 441 (1992), aff'd, 995 F.2d 530 (4th Cir. 1993). Indeed, this definition has been applied in the context of other Code provisions that do not contain their own definition of "franchise."[5] Because the section 1253 definition reflects the common understanding of the term, because Congress did not indicate that it intended a different meaning, and because policy considerations do not favor a different meaning, that definition applies for purposes of sections 936(h)(3)(B) and 367(d) as well. The arrangements with the agents meet the definition of a franchise because the contracts give the agents the right to offer Taxpayer's Business A service in a defined area.

Taxpayer argues that this definition of "franchise" is too broad and that the ordinary meaning of "franchise" is "an agreement whereby the franchisor grants to the franchisee the right to operate a turnkey business for its own account.[6] Taxpayer cites no authority to support this narrow definition, however, which is at odds with the common meaning of franchise and the meaning provided in section 1253. This definition is also at odds with the case law applying the section 1253 definition broadly to include many arrangements not traditionally considered franchises, such as cable television franchises,[7] FCC broadcast licenses,[8] and the right of licensees to distribute computer programs.[9]

Finally, Taxpayer argues that a broad definition of "franchise" would contravene Congressional intent to exclude foreign goodwill and going concern value from the application of section 367(d).[10] This assumes that Congress intended that foreign goodwill and going concern value be defined broadly in a way that included most franchises; however, this argument is belied by the narrow definition of goodwill discussed below in Part IV. It is also belied by court opinions that view goodwill arising from a franchise operation as being attributable to the value of the franchise itself and not as a separate intangible.[11] In other

words, case law directly contradicts Taxpayer's argument that the intangible commonly understood to be a franchise is, in fact, not a franchise but goodwill instead. The authorities reject such attempts to recharacterize franchise value as goodwill value.

Thus, the Network fits within the definition of "franchise" for purposes of section 936(h)(3)(B)(iv) and therefore is an intangible subject to section 367(d). As discussed further in Parts III and IV below, the value of the Network resides in the franchises as valued on an aggregate basis and does not constitute foreign goodwill or going concern value.

C. The Network Constitutes a Method, Program, and Procedure

The list of intangibles under section 936(h)(3)(B) also includes the items "method," "program," and "procedure." Webster's defines "method" to include "a procedure or process for attaining an object." It defines "program" to include "a schedule or system under which action may be taken toward a desired goal." Lastly, it defines "procedure" to include "a particular way of doing or going about the accomplishment of something." As their definitions indicate, these three terms are similar in that they all suggest a particular way or plan for accomplishing a goal.

The Network fits the definition of a method, program, or procedure. Taxpayer has designed a particular process for carrying out Business A, the foundation of which is the collection of contracts with its agents. The contracts require the agents to use specific software and equipment to conduct Business A transactions. [12] The contracts require agents to establish regional call centers for customer support. In addition to various other requirements, the contracts also specify that the agents will spend at least X% of their transaction fees on advertising for Business A and that all advertising must be approved by Taxpayer.

In short, the contracts embody Taxpayer's design for carrying out Business A. This particular way of doing Business A is thus a method, program, or procedure for purposes of section 936(h)(3)(B)(v) and therefore is an intangible subject to section 367(d).

D. The Network Constitutes a System

Finally, we agree with Exam that the Network comprises a "system" within the meaning of section 936(h)(3)(B)(v). Webster's defines a "system," in part, as "a group of devices or artificial objects forming a network or used for a common purpose ..." and "a set of units combined by nature or art to form an integral, organic, or organized whole." The Network fits this definition because it is an organization of agents forming an integrated delivery network serving the common purpose of engaging in Business A. The agents are integrated because of the interrelationship among the worldwide locations through which Taxpayer conducts Business A. A single agent location could not conduct Business A because there must be at least two locations for a Business A transaction to take place. Furthermore, each additional agent location that is added to the Network confers a benefit to existing locations as well, by adding new customers located in that area, and by enabling customers in other countries to engage in Business A transactions with customers in the new area. Because each agent location is connected to and relies upon the others to conduct Business A, it is apparent that the Network represents an integrated "system" for purposes of section 936(h)(3)(B)(v).

E. Taxpayer's Argument that Network is Neither a System, Method, Program, Nor Procedure is Not Persuasive

Taxpayer makes several arguments that the Network is neither a system, method, program, nor procedure. For example, Taxpayer states "any manuals or procedures assembled by [Taxpayer] for its agents in the ordinary course of business arguably might be considered a system," but goes on to state that the collection of agents cannot be viewed as a system because to define "system" so broadly would capture items that are neither proprietary nor commercially transferable. [13] As we understand Taxpayer's first argument, a system, method, program, or procedure must have a commercially transferable value to be an intangible under section 936(h)(3)(B); that is, they must be something for which someone else would pay consideration. [14] We believe that Taxpayer's intangibles, whether labeled as a method, program, procedure, or system, do have value, but we do not undertake to value them here. Nevertheless, we note that if Taxpayer is correct that these assets have no value and do not generate income, then whether or not they are intangibles under section 936(h)(3)(B) makes no difference because they

will not result in a deemed payment under section 367(d). And if they do have value, then Taxpayer's argument for excluding these assets from section 367(d) fails.

Further, Taxpayer argues that the way in which it conducts Business A is not proprietary and does not share with any of the intangibles listed in section 936(h)(3)(B) the common characteristic of being legally protected or subject to legal protection as a matter of contract. [15] This argument is premised on two apparently incorrect assumptions. First, Taxpayer assumes that the way in which it conducts Business A is not proprietary and, therefore, valueless. However, the course of conduct between Taxpayer and its agents suggests the Network is indeed proprietary. Taxpayer exercises control over who joins the Network and the services they provide and prohibits agents from working for a competitor. That Taxpayer's competitors in Business A also have their own networks does not mean that Taxpayer's network is not proprietary and therefore without value. Second, Taxpayer assumes that legal protection is a necessary characteristic of section 936(h)(3)(B) intangibles. It is well recognized that valuable intangibles may not be legally protected, for example, in the form of a patent. A taxpayer that develops a patentable formula or process may choose not to seek a patent. In so doing, the taxpayer takes the calculated risk that it will be able to successfully protect its formula or process without the legal protection of a patent in exchange for the possibility that the taxpayer will have a monopoly on that formula or process for a longer period than patent protection would provide. Yet still, a taxpayer may very well resort to private contracts if it seeks legal protection. Whether the taxpayer has the legal protection of a patent (or of a contract) does not affect the fact that the taxpayer has valuable know-how and trade secrets that meet the section 936(h)(3)(B) definition of intangible.

Taxpayer also argues that Exam's characterization of the Network is analogous to the government's assertion in Merck & Co. v. United States, 24 Cl. Ct. 73 (1991) that Merck's affiliate structure, pricing mechanism, and group wide planning structure was an intangible. There, the court stated, "Defendant's intangible property argument essentially is no more than a recognition that Merck is the parent of the foreign affiliates and MSDQ." Id. at 88. The court rejected the argument that that relationship constituted a method, program, or procedure or any other asset subject to section 482. However, Exam does not assert, nor do we conclude, that Taxpayer's role as the parent of DE or any other entity is itself an intangible that is subject to section 367(d). Rather, the intangible in this case consists of the methods and programs discussed above, which relate to how the agents actually carry out Business A in a carefully coordinated manner. These are not simply a function of Taxpayer's particular corporate structure. Therefore, Merck & Co. is inapposite.

Finally, Taxpayer makes two statutory construction arguments to support its view that the Network does not constitute a "method," "program," "procedure," or "system" under section 936(h)(3)(B). [16] First, it argues that under the doctrine expressio unius est exclusio alterius (to express one thing is to exclude others), the intangibles enumerated in section 936(h)(3)(B) are the only intangibles covered by the statute and because the Network is not specifically listed there, it is not subject to section 367(d). This argument is flawed on its face because section 936(h)(3)(B) includes not only the listed intangibles but also the category "or other similar item," which clearly would include the Network because it is at least similar to many of the listed items as described above. Second, Taxpayer argues that the term "system" cannot be understood as including the Network because of the doctrine of noscitur a sociis, which requires that terms in a statute be interpreted by reference to the surrounding words. It argues that because the term "system" is accompanied in the statute by "method," program," and "procedure," we must interpret "system" as including "an organized and established procedure" but nothing more. This interpretation would require us to conclude that the other terms found in the same clause, including "campaign, survey, study, forecast, estimate, customer list, or technical data," also must mean only "an organized and established procedure," which cannot be correct. If Congress had wanted to encompass only those qualities that these various terms share in common, it would have provided a clearer and narrower definition rather than a list of apparently unrelated terms. Moreover, both of these statutory construction arguments fail for the reason that they would render other parts of the statute meaningless, which violates the more general rule of statutory construction that all terms in a statute should be given effect. [17]

Therefore, the Network is a system, method, program, or procedure that is a section 936(h)(3)(B) asset and is therefore subject to section 367(d).

III. Whether the Network is Valued as a Single Intangible

Taxpayer argues that although the contracts that comprise the Network are subject to section 367(d), the vast majority of the Network's value is not attributable to the contracts and is instead foreign goodwill or going concern value.[18] Exam argues that the Network's value is attributable to the intangibles that comprise it. We agree with Exam for three reasons. First, the Network should be analyzed and valued as a single intangible asset, as explained in Part II above, because it operates as an integrated whole. Second, the appropriate charge that Taxpayer must include in income under section 367(d) upon its transfer of the Network is determined under section 482 principles. Treas. Reg. § 1.367(d)-1T(c)(1). Those principles militate in favor of valuing the Network as an integrated asset rather than as the sum of individual contracts valued separately outside the context of the Network.[19] Third, case law supports a conclusion that it is appropriate to value interrelated assets in the aggregate and that the synergistic value of a collection of assets is attributable to those assets rather than a conceptually distinguishable goodwill or going concern value element.

A. Applicable Section 482 Principles Require the Network to be Valued on an Aggregate Basis Rather Than on an Item-by-Item Basis

The charge that Taxpayer must include under section 367(d) is determined using section 482 principles. As discussed above, a U.S. person that transfers intangible property to a foreign corporation in a transaction subject to section 367(d) shall, over the useful life of the property, annually include in gross income an amount that represents an appropriate arm's length charge for the use of the property. Treas. Reg. § 1.367(d)-1T(c)(1). The appropriate charge is determined in accordance with the provisions of section 482 and regulations thereunder. Id. Taxpayer must adopt the most reliable method of determining the arm's length consideration for a controlled transaction(s) pursuant to Treas. Reg. § 1.482-1(f)(2)(i), which provides,
The combined effect of two or more separate transactions (whether before, during, or after the taxable year under review) may be considered, if such transactions, taken as a whole, are so interrelated that consideration of multiple transactions is the most reliable means of determining the arm's length consideration for the controlled transactions. Generally, transactions will be aggregated only when they involve related products or services, as defined in Treas. Reg. § 1.6038A-3(c)(7)(vii).

Corporation M's transfer of the foreign agent contracts can be viewed as either a single controlled transaction or as multiple controlled transactions. Because both Corporation M and Corporation O constitute "controlled parties" within the meaning of section 482, the transfer of the contracts could be viewed as part of a single "controlled transaction." Under this view, the appropriate arm's length charge would be determined as though Corporation M had transferred a single asset, that is, the collection of contracts, to Corporation O. This single controlled transaction approach also applies if the transfer is viewed as a transfer of a collection of "franchises," or as a transfer of a single "system, method, program, or procedure." Alternatively, the transfer could be viewed as though Corporation M separately transferred each contract to Corporation O. Under this alternative view, the transfer would be viewed as numerous "controlled transactions" under section 482.[20]

It is more reliable to determine the arm's length consideration for the transfer of the contracts by considering the separate contracts "as a whole" because they are "so interrelated." See Treas. Reg. § 1.482-1(f)(2)(i). First, before the transfer, a single company, Corporation M, used the contracts as an integrated network to conduct Business A. The individual contracts were not used for separate business purposes or by separate legal entities. Instead, they all were used as part of a single business enterprise and by a single legal entity. Moreover, these numerous contracts were transferred together — as a single network — to a single legal entity, Corporation O, so that after the transfer, the contracts would continue to be used in a single business enterprise. As a matter of economic reality and fundamental valuation principles, a taxpayer transferring Network at arm's length would conclude that the contracts should be valued in the aggregate in a manner that properly reflects their synergistic relationship. The numerous contracts are used as a single integrated asset, so it would be inappropriate to value the contracts as separate, stand-alone assets when they have functioned in the past, and will function in the future, as a single asset. Treas. Reg. § 1.482-1(f)(2)(i) recognizes such economic realities by providing that multiple transactions should be considered a single

transaction "if such transactions, taken as a whole, are so interrelated that consideration of multiple transactions is the most reliable means of determining the arm's length consideration.

B. Interrelated Assets Must be Treated as an Aggregate, and Enhanced Value of Similar Assets is Attributable to Those Assets, Not Foreign Goodwill or Going Concern Value

The Tax Court has recognized that multiple, related assets may be most appropriately viewed as an aggregate. In cases addressing the acquisition of a collection of related patents, the court has had to determine whether a taxpayer had a depreciable basis in the patents and over what period that basis could be recovered. See, e.g. Kraft Foods Co. v. Comm'r, 21 T.C. 513 (1954). In Kraft, the Tax Court held that a group of thirty-one related patents must be valued as a group and that the useful life for depreciation should be based on the average of the patents' useful lives. Specifically, the court observed:

> [W]e agree with the parties that it is not possible to determine the cost of each patent separately. It is undoubtedly true, as the respondent suggests, that some of the patents are worth more than others ... In the circumstances here, however, it is not possible to determine within the group, particularly those which are functionally related, where the scope of one patent ends and the other begins. Rather obviously, there is an overlapping and the second or third patent would not have been what it was except for matters covered by those which preceded it.

Id. at 592-93. See also Standard Conveyor Co. v. Comm'r, 25 BTA 281, 283 (1932) ("[I]t is evident that it is impossible to value these seven patents separately. Their value, as in the case of many groups of patents representing improvements on the prior art, appears largely to consist of their combination.").

Thus, because the contracts comprising the Network are interrelated, and the value of the Network arises largely from the value of the connections among the agents, it is more appropriate to value the Network as a single unified intangible than as a collection of discrete intangibles treated artificially as having no economic connection to one another. Taxpayer challenges this aggregate valuation of the Network by arguing that each individual contract has little value. Taxpayer argues that the "enhanced value" of the Network is not attributable to the value of the contracts between Taxpayer and the agents, but rather to the value of the "interlocking relationship" among the agents, which is goodwill and going concern value. [21]

We agree that a substantial portion of the value relating to the Network is due to the number and integration of the numerous separate agent locations. And it is true that a contract corresponding to a single agent location would have little value in itself because there must be at least two locations — a sending point and a receiving point—for a delivery system to exist. But the critical integration of thousands of agents and contracts is a result of Taxpayer's risky but successful efforts to develop a highly valuable network that serves as the backbone of its business. We disagree with Taxpayer's position because it disregards the fact that Taxpayer developed the Network as the central intangible for carrying on its business and generating profits and erroneously assigns the labels goodwill and going concern value to that readily identifiable intangible.

The enhanced value of a collection of similar assets, like the contracts (or franchises) at issue here, is attributable to those collected assets and is not separate goodwill or going concern value. For example, in Computing and Software, Inc. v. Comm'r, 64 T.C. 223, (1975), the taxpayer was in the credit reporting business. It acquired the assets, including credit files of three other credit reporting companies. The credit files consisted of individual index cards that held each credit record. While the individual cards probably had little value in themselves, the value of the file collection as a whole was assigned a value of over $1.8 million by the court. Had the court adopted the petitioner's approach, it would have included the enhanced value as part of the going concern value of the business and therefore would have allocated little or nothing to the credit files themselves. Because the court instead included that enhanced value in the depreciable basis of the credit card files, it is clear that the court considered that enhanced value as part of the value of the card files and not separate goodwill or going concern value.

Likewise, in Massey-Ferguson, Inc. v. Comm'r, 59 T.C. 220 (1972), the taxpayer acquired Mid-Western Industries (MI), a developer of light industrial equipment. Among the assets of MI that the taxpayer acquired was the distribution network through which MI sold most of its products. This distribution network consisted of contracts with eighteen general line distributors. A few years after the acquisition, the taxpayer decided to abandon the distribution network. The last of the contracts with the distributorships was canceled in the taxpayer's 1961 tax year, though some had been terminated in the previous year. The court determined that the taxpayer was entitled to an abandonment loss for the entire network on its 1961 return because that is the year in which the entire asset was abandoned. The court observed: "In the present case, an entire asset, the distributorship system, was abandoned, and the entire intangible value of the system was lost." Massey-Ferguson, 59 T.C. 220, 227. While that case did not involve the issue of enhanced value, it is nevertheless clear that the court treated the distributor network based on multiple contracts as a single asset, rather than as simply a collection of separate contractual arrangements.

Taxpayer's attempt to atomize the Network so that the vast majority of the value of the intangible would escape taxation under section 367(d) is inconsistent with sections 367 and 482, as well as the applicable regulatory framework.[22] Rather, like a pool of interrelated patents, the interrelated agent contracts must be analyzed for transfer pricing purposes in the aggregate. The enhanced value arising from the collection of contracts is attributable to the contracts themselves and is not goodwill or going concern value. Because the value of the Network is attributable to the group of contracts, it is subject to section 367(d).

IV. Whether the Network Represents Foreign Goodwill or Going Concern Value

Taxpayer asserts that the transfer of the Network is not subject to section 367(d) because it qualifies for the exception for transfers of "foreign goodwill or going concern value" under Treas. Reg. § 1.367(d)-1T(b). We disagree with Taxpayer's position for several reasons. The Network cannot satisfy the section 367(d) definition of foreign goodwill or going concern value because the Network, as was explained in Parts II and III, constitutes a single intangible asset or a collection that falls within one or more of the categories listed in section 936(h)(3)(B).

Furthermore, Taxpayer's insistence that traditional definitions of goodwill and going concern value be applied in the section 367(d) context is flawed because the traditional definitions are too broad. Even in the context of depreciation (from which the traditional definitions were derived), the inquiry of whether an asset satisfies the traditional definitions of goodwill and going concern value has proven unworkable and was therefore abandoned. See Newark Morning Ledger v. United States, 507 U.S. 546, 570 (1993).

A. The Network Is Not Foreign Goodwill or Going Concern Value Under the Regulations

As described in Parts II and III, the Network constitutes a single intangible or a collection under section 936(h)(3)(B). Thus, to treat the Network as being part of foreign goodwill or going concern value is inconsistent with the narrow definition of "foreign goodwill or going concern value" under the regulations. Treas. Reg. § 1.367(a)-1T(d)(5)(iii) defines foreign goodwill or going concern value as "the residual value of a business operation conducted outside of the United States after all other tangible and intangible assets have been identified and valued." This definition specifically excludes "all other ... intangible assets ... identified and valued" ("identifiable intangibles"). The Network constitutes such an identifiable intangible because, as explained in Part II, the Network falls within one or more categories of intangible property as described in section 936(h)(3)(B), and as explained in Part III, the Network is most reliably valued as a single asset. The Network, therefore, must be excluded from the regulatory definition of "foreign goodwill or going concern value."

The regulations' definition of foreign goodwill or going concern value does not depend upon the traditional definitions of goodwill or going concern value. The regulations avoided traditional definitions because such definitions ultimately proved unworkable in the depreciation context. When the section 367(d) regulations were promulgated, taxpayers and the IRS were engaged in bitter and costly disputes concerning the concepts of goodwill and going concern value because, at that time, goodwill and going concern value were non-depreciable assets. See generally H.R. Rep. No. 103-111 at 760 (1993) (describing disputes that led Congress to enact section 197, which mitigated these disputes by allowing for the amortization of intangibles such as

goodwill and going concern value). With those well-known disputes in the background, the drafters of the regulations chose to define foreign goodwill or going concern value in a way that did not rely upon such controversial terms. [23]

Despite this well-known history, Taxpayer nevertheless asks us to ignore the regulations' approach and dive back into the abyss of the decades-old disputes about what constitutes goodwill or going concern value under the traditional definitions. Taxpayer argues that when Congress expressed its intent in the legislative history to exclude foreign goodwill or going concern value from the application of section 367(d), it had the traditional definitions in mind. Taxpayer argues that the definition under the regulations was drafted against the same "jurisprudential backdrop" as these cases. [24]

We disagree with Taxpayer's argument. The traditional definitions are fundamentally inconsistent with the regulations' definition of foreign goodwill or going concern value. [25] The traditional definitions encompassed, among other things, customer-based intangibles that are specifically listed under section 936(h)(3)(B), like customer lists and trademarks. [26] As explained above, such identifiable intangibles are clearly excluded from the section 367(d) definition of "foreign goodwill or going concern value."

The Supreme Court's findings in Newark Morning Ledger ("Newark") support the conclusion that the traditional definitions are too broad to be relied upon for purposes of section 367(d). In Newark, the Court concluded that a newspaper subscriber list was depreciable because it was "an intangible asset with an ascertainable value and a limited useful life." [27] Under a section 367(d) analysis, this customer list would constitute an identifiable intangible that would be excluded from the regulations' definition of "foreign goodwill or going concern value." See section 936(h)(3)(B)(v). The Court, however, also found that the customer list depended upon the continued and voluntary patronage of customers, [28] which is a typical formulation of the traditional definition of goodwill and going concern value. Newark shows that the traditional definitions of goodwill and going concern value are too broad for section 367(d) purposes because certain intangible assets, such as a customer list, may be included in the traditional definitions but nevertheless excluded from the section 367(d) definition. [29]

In support of its reliance on the traditional definitions of goodwill and going concern value, the Taxpayer cites to several early depreciation cases. [30] See e.g., Northern Natural Gas Co. v. United States, 470 F.2d 1107 (8th Cir. 1973); Black Industries v. Comm'r, 38 T.C.M. 242 (1979); Phillip Morris v. Comm'r, 96 T.C. 606 (1991). These cases dealt with the question of what assets of an acquired business a purchaser could depreciate. [31] Taxpayer's reliance on these cases is misplaced because these cases do not employ a substantive definition of goodwill and going concern value. Rather, they tend to conclude that all non-depreciable assets were goodwill or going concern value, even if they were intangibles described in section 936(h)(3)(B). [32] By treating all non-depreciable assets as goodwill or going concern value, these cases gave goodwill and going concern value a meaning that is much broader than their meaning under section 367(d). See, e.g., Northern Natural Gas Co. v. United States, 470 F.2d 1107 (8th Cir. 1973) (holding that certain assets were depreciable and that the remaining value of the business was non-depreciable but without specifically labeling it as goodwill or going concern value); VGS Corp. v. Comm'r, 68 T.C. 563 (1977) (holding that tangible assets were depreciable and that all remaining value was non-depreciable and therefore goodwill or going concern value). [33]

The problem of using the terms "goodwill and going concern value" loosely to include all non-depreciable intangibles was highlighted in Newark. Because the Court held that the depreciability of the customer list at issue in that case turned on whether it had a useful life and ascertainable value, it did not look to whether it satisfied the traditional definition of goodwill. [34] Thus, Newark severed the historical nexus between whether an asset represents goodwill and whether the asset is depreciable. This had the effect of rendering irrelevant the early depreciation cases in so far as they used the term "goodwill and going concern value" as shorthand for any intangible that was nondepreciable. Thus, the cases that predate Newark treating a particular intangible as "goodwill" solely to make that intangible non-depreciable are not relevant in determining whether that intangible is "goodwill and going concern value" for other tax purposes, such as section 367(d).

B. Taxpayer's Position Violates the Fundamental Policy of Section 367(d)

Taxpayer's characterization of the Network violates the fundamental policy of section 367(d) because treating ninety-seven percent of the value of the Network as foreign goodwill or going concern value would allow a virtually tax-free transfer of valuable intangible property that was developed by incurring significant expenses that reduced income otherwise taxable in the United States. If Taxpayer's view were the law, Corporation O would be free to exploit the value of the Network while earning deferred income. This is precisely the abuse Congress sought to address by enacting section 367(d). H.R. Rep. No. 98-342 (1984); S. Rep. No. 98-169 (1984), at 361 ("the transferor U.S. companies hope to reduce their U.S. taxable income by deducting substantial research and experimentation expenses associated with the development of the transferred intangible and, by transferring the intangible to a foreign corporation at the point of profitability, to ensure deferral of U.S. tax on the profits generated by the intangible.")

Exam submitted a table demonstrating expenses that Taxpayer incurred over a period of ten years. Taxpayer disputes the amounts in the Table as misleading because they are not limited to expenses of Business A. Nonetheless, because Business A produces a very large portion of Taxpayer's overall income, Business A is also likely responsible for a correspondingly large portion of Taxpayer's overall expenses. Although it is not perfectly precise, Exam's table is persuasive in showing that Taxpayer's development of the Network, and Business A generally, relied upon incurring significant expenses that reduced income otherwise taxable in the United States. Thus, after reaping the benefits of offsetting income taxable in the United States with the expenses incurred to develop the Network, Taxpayer now seeks to claim, contrary to section 367(d) policy, that Corporation O will be free to earn deferred income from its exploitation of the Network.

The exception for foreign goodwill or going concern value was intended only to exclude from tax the goodwill or going concern value developed by a foreign branch, the development of which (at the time section 367(d) was enacted) never gave rise to a U.S. tax benefit. S. Rep. No. 98-169, Vol. 1, p. 362 (1984). Taxpayer's broad construction of this limited exception eviscerates the general rule.

V. Conclusion

The Network meets the definitions of a contract, system, franchise, method and program for purposes of sections 936(h)(3)(B) and 367(d). Taxpayer's contracts with the agents are best viewed as an integrated asset, and the value that arises from the collection of contracts is attributable to the contracts and not to foreign goodwill or going concern value. The exception for transfers of "foreign goodwill or going concern value" does not apply to the transfer of the Network because the Network does not constitute foreign goodwill or going concern value within the meaning of section 367(d). Not only does Taxpayer's characterization of the Network conflict with the regulatory definition of foreign goodwill or going concern value, but Taxpayer's treatment also violates the fundamental policy of section 367(d) because it allows for a virtually tax-free transfer of intangible property that was developed by incurring significant expenses that offset income otherwise taxable in the United States. In sum, Corporation M's transfer of the Network to Corporation O is subject to section 367(d).

CAVEAT(S):

A copy of this technical advice memorandum is to be given to the taxpayer(s). Section 6110(k)(3) of the Code provides that it may not be used or cited as precedent.

Section 6110(j)(3) of the Internal Revenue CodeThis document may not be used or cited as precedent. .

Footnotes

1    Except as otherwise noted, section references are to the Internal Revenue Code of 1986, as amended, and Treas. Reg. § references are to the Treasury Regulations promulgated thereunder.

2    General Explanation of H.R. 4710, 98th Congress (1984), p. 435 ("where appropriate, it is expected that the regulations relating to tainted assets and the special rule for intangibles will provide exceptions for this type of property"). The reference to regulations relating to tainted assets is to the provision in section 367(a)(3)(B)(iv) that excludes intangibles as defined in section 936(h)(3)(B) from the active trade or business exception of section 367(a)(3)(A). The reference to the special rule for intangibles is to section 367(d).

3    Taxpayer's letter dated March 25, 2008 at p. 11.

4    See also Rev. Rul. 87-63, 1987-2 C.B. 210.

5    See Int'l Multifoods Corp. v. Comm'r, 108 T.C. 25, 38 (1997) (applying the section 1253 definition of "franchise" for purposes of section 865: "Since we find no indication that Congress intended "franchise" to carry a different meaning in the context of section 865, we adopt this definition for purposes of this section."); see also Treas. Reg. § 1.197-2(b)(10) (incorporating the section 1253 definition for purposes of section 197).

6    Taxpayer's Letter dated March 25, 2008 at p. 20.

7    Tele-Communications Inc. v. Comm'r, 95 T.C. 495 (1990), aff'd, 12 F.3d 1005 (10th Cir. 1993).

8    Jefferson-Pilot, 98 T.C. 435, 441 (1992), aff'd, 995 F.2d 530 (4th Cir. 1993).

9    Syncsort Inc. v. United States, 31 Fed. Cl. 545 (1994).

10   Taxpayer's letter dated March 25, 2008 at p. 20.

11   Canterbury v. Comm'r, 99 T.C. 223, at 249 (1992) ("we find that petitioners acquired no goodwill that was separate and apart from the goodwill inherent in the McDonald's franchise"); Int'l Multifoods, 108 T.C. at 36-37 (noting that the taxpayer's argument that goodwill was transferred separately from a Mr. Donut franchise, trademarks, and system "mistakes goodwill for the intangible assets which embody it" and that "intangible assets such as trademarks and franchises are 'inextricably related' to goodwill").

12   Taxpayer acknowledges the software is subject to section 367(d).

13   Taxpayer's letter dated March 25, 2008, p. 24.

14   Taxpayer's letter dated March 25, 2008, p. 25.

15   Taxpayer's letter dated March 25, 2008, p. 24.

16   Taxpayer's letter dated March 25, 2008, pp. 21-23.

17   Mason v. United States, 260 U.S. 545, 554 (1923) (noting that a canon of statutory construction "cannot be employed to render general words meaningless, since that would be to disregard the primary rules, that effect should be given to every part of a statute ...").

18   Taxpayer's letter dated March 25, 2008, p. 11.

19   Furthermore, it may also be the case that other identifiable intangibles transferred to Corporation O, such as the software, are so inextricably related to the contracts that it is more reliable to value them with the contracts on an aggregate basis.

20   Alternatively, if the contracts are viewed as "franchises," then the transfer could also be viewed as though Company M transferred each franchise to Company N.

21   Taxpayer's letter dated March 25, 2008 at p. 19.

22   The preceding analysis focused on numerous transfers of individual contracts, but this analysis would also apply to numerous transfers of franchises, systems, methods, processes or procedures.

23   The section 367(d) approach echoes the method that was, at about the same time, mandated under sections 338 and 1060. Under the section 338 and 1060 approach, any excess paid for a trade or business over the fair market value of the identifiable assets must be allocated to goodwill and going concern value. See S. Rep. No. 313, 252-253 (1986); see also T.D. 8215, 1988-2 C.B. 304.

24   Taxpayer's letter dated March 25, 2008 at p. 8-9.

25   For example, under the traditional definition, goodwill was "a useful label with which to identify the total of all the imponderable qualities that attract customers to the business." Newark Morning Ledger v. United States, 507 U.S. 546 at 555-56 (1993). By focusing on the effect of goodwill in enhancing the customer relationship, this definition gave goodwill a substantive meaning. Thus, intangibles such as trademarks could be considered assets "in the nature of goodwill" under this case law. Comm'r v. Killian, 314 F.2d 852 (5th Cir. 1963) (describing information on fire and casualty policies as an asset "in the nature of goodwill"). Cf. Newark at 556 ("This definition ... is of little assistance to a taxpayer trying to evaluate which of its intangible assets is subject to a depreciation allowance. The value of every intangible asset is related, to a greater or lesser degree, to the expectation that customers will continue their patronage."). Indeed, some regulations also adopted a similar formulation. See T.D. 8072 (Temporary Regulations under Section 338(b)(5)), 1986-1 C.B. 111 (establishing the Class IV residual category for "intangible assets in the nature of goodwill and going concern value").

26 Richard S. Miller v. United States, 537 F.2d 446, 450 (Ct. Cl. 1976) ("Goodwill sometimes is used to describe the aggregate of all of the intangibles of a business, including such items as patents, trademarks, leases, contracts, and franchises.").

27 Newark Morning Ledger, 507 U.S. 546, 566.

28 Id. at 557.

29 As a further argument based on the traditional definition, Taxpayer asserts that the value associated with the location and reach of the Network is foreign goodwill. Taxpayer's letter dated March 25, 2008 at p. 14. It cites several cases in which courts observed that the location of a business is an element of goodwill because it contributes to the expectancy that customers will return to the old location. Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 681 (5th Cir. 1971); L.A. Central Animal Hospital v. Comm'r, 68 T.C. 269 (1977); Metro Auto Auction of Kansas City, Inc. v. Comm'r, 48 T.C.M. (CCH) 894 (1984). Again, reliance on the traditional definition of goodwill misses the point, which is whether the Network is foreign goodwill under the section 367(d) regulations. Further, it is not clear that the "geographical footprint" of the Network is the type of "locational" goodwill described in these cases, which dealt with the purchase of established bricks-and-mortar businesses that were landmarks in the community and operated without interruption by the new owners.

30 Taxpayer's letter dated March 25, 2008 at pp. 11-14.

31 It is puzzling that the Taxpayer relies upon these depreciation cases for their definition of "goodwill or going concern value" given that it attempts to downplay the importance of a more relevant case, Newark, on the grounds that it only deals with depreciation. Taxpayer's letter dated March 25, 2008 at p. 16.

32 The cases cited by Taxpayer tend to employ a broad definition of goodwill and going concern value, but the scope of these definitions varies in some cases. Both the breadth of these definitions and their varying scope underscore that the application of the traditional definitions of goodwill and going concern value in the context of section 367(d) is unworkable. "In some cases [goodwill] has been used in a general sense to describe all intangible assets arising in connection with the operation of a business; in other cases, it has been used in a more limited sense to describe a single intangible asset." Massey-Ferguson, Inc. v. Comm'r, 59 T.C. 220 (1972). Thus, the assets defined in some of the depreciation cases were not strictly goodwill or going concern value but rather were considered to be assets "in the nature of" goodwill and going concern value.

33 See also Black Industries v. Comm'r, 38 T.C.M. 242 (1979) (holding that tangible assets were depreciable and that intangibles were not depreciable, without distinguishing between types of intangibles, such as goodwill, going concern value, etc.); Phillip Morris v. Comm'r, 96 T.C. 606 (1991) (court admitted that the term goodwill, in the broad sense, encompasses a number of intangibles).

34 Newark, 507 U.S. at 570 ("the relationship this asset may have to the expectancy of continued patronage is irrelevant, for it satisfies all the necessary conditions to qualify for the depreciation allowance under § 167 of the Code").

TAM 200907024 (IRS TAM), 2009 WL 356169

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00402-RTH    Document 111-1    Filed 03/31/16    Page 629 of 651

TAM 9317001 (IRS TAM), 1993 WL 134598

Internal Revenue Service (I.R.S.)
Technical Advice Memorandum

Issue: April 30, 1993
January 12, 1993

Section 48 -- Definitions; Special Rules
48.00-00 Definitions; Special Rules
Section 167 -- Depreciation
167.00-00 Depreciation

**TR-32-0016-92**
District Director: * * *

Taxpayer's Name: * * *

Taxpayer's Address: * * *

Identification Number: * * *

Years Involved: * * *

Date of Conference: * * *

Legend: * * *

Taxpayer: * * *

Company: * * *

Year 1: * * *

Year 2: * * *

Satellite A: * * *

Satellite B: * * *

Seller/Operator/Lessee: * * *

Amount D: * * *

Amount E: * * *

Amount F: * * *

Amount G: * * *

Amount H: * * *

X: * * *

Y: * * *

ISSUE

Whether amounts paid by the Company for the Year 1 acquisitions of satellite transponders qualifies in their entirety as payments in respect of tangible property (thus eligible for investment credit and accelerated depreciation [1] ), or alternatively, does some portion of the purchase price qualify as intangible assets (identified by the District as "neighborhood effect" and "protected status").

FACTS:

Company, a wholly-owned subsidiary of Taxpayer, in Year 1, invested in two leveraged lease agreements involving the purchase and leaseback of satellite transponders. The first set of agreements provided for the acquisition (and immediate leaseback) of X Ku-band transponders aboard Satellite A. The second set of agreements involved Y Ku-band transponders aboard Satellite B. The purchase price of the X transponders on Satellite A was Amount D; for the Y transponders on Satellite B the purchase price was Amount E. Both satellites were placed in service during Year 1. Company filed a consolidated tax return with Taxpayer for the tax Years 1 and 2, claiming investment credit of Amount F in Year 1. Depreciation (five year ACRS) was claimed on the entire purchase prices, amounting to Amount G in Year 1, and Amount H in Year 2.

For each of the two transponder transactions, a number of agreements were made among the various parties. These included a purchase agreement, trust agreement, participation agreement, lease agreement, service agreement, and guarantee agreement. These agreements provided, in part, for the following pertinent matters:
(1) The Company receives good and marketable title to the subject transponders.

(2) The Company may assign, convey, or otherwise transfer its rights, title, and interest subject to the obligations under the various agreements.

(3) The satellite operator maintains and manages the operating functions of the satellite for a fee.

(4) The satellite operator retains ownership rights to spare components and auxiliary equipment aboard the satellite.

(5) The seller warrants the satellite contains the specified power amplifiers and spare receivers.

(6) Warranties arising pursuant to the Uniform Commercial Code are expressly excluded.

(7) If a receiver serving a transponder fails, the lessee shall switch to an available spare receiver, subject to its prior use.

(8) If a power amplifier serving a transponder fails and a spare amplifier relating to such transponder is operable and not serving any other transponder, the spare shall be utilized to serve such transponder.

(9) The Lessee shall not discriminate among transponders on the basis of ownership.

(10) The corporate parent of the lessee guarantees payments by the lessee.

There is no specific language in either set of agreements addressing the status of the acquired transponders as being protected either by access to pre-emptible transponders or by priority access to spare components. However, expert appraisals for both the Company and Examinations discuss the increased rental value associated with protected transponders, and assume a mix of protected and pre-emptible transponders for purposes of projecting cash flow. Additionally, the appraisals refer to "special market" or "neighborhood effect" value for Satellite B, which provides access to a much larger market, thus generating higher rental rates.

The District has proposed, as separable intangible assets in these transactions, the following:

Neighborhood Effect-The premium value derived from the presence of either, a specific user(s) on the satellite, or a dedicated or targeted market for the transponders. Incorporated into this premium value is the related "Scarcity Factor", representing the limited number of satellite orbital positions and the demand for transponders. The value of this intangible reflects wider access to a larger market and the level of supply vs. demand. This intangible has been identified only for Satellite B.

Transponder Protection-The value associated with two related items: (a) access to pre-emptible transponders, and (b) priority access to spare receivers and power amplifiers on the satellite. Though equipment failures are rare, protected transponders can yield up to twice the rental value of pre-emptible transponders.

The Company and Examinations have agreed with the following points regarding the issues herein:
(1) It is standard industry practice for all commercial satellites to be constructed with spare components and for the owner of a transponder to be provided access to spare components aboard the satellite.

(2) The existence and configuration of spare components is perceived to bear directly on the level of reliability of the transponder.

(3) The contracts pursuant to which the Company acquired its transponders aboard Satellite A and B provide a first-to-fail, first-served arrangement for the use of spare components.

(4) The Company, as the owner of the subject transponders, has no access to any pre-emptible transponders nor priority access to spare amplifiers.

(5) The appraisal references regarding lease rates for protected and pre-emptible transponders were for purposes of evaluating whether the lessees' expected cash flows were consistent with the basic valuation of the transponders.

LAW:

Section 38 of the Internal Revenue Code allowed, for the tax years in question, a credit against federal income tax for qualified investment in section 38 property. Section 38 property, as defined in section 48(a)(1) of the Code, includes (A) tangible personal property, and (B) other tangible property (not including buildings and their structural components) only if used as an integral part of certain activities (including the furnishing of communications services). Section 38 property must be recovery property or depreciable property having a useful life of three years or more.

Section 1.48-1(c) of the Income Tax Regulations provides that the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Section 1.48-1(d)(1) of the regulations provides, in part, that the term "other tangible property" means any tangible property (but not including a building and its structural components) used as an integral part of furnishing communication services by a person engaged in a trade or business of furnishing such service.

Section 1.48-1(d)(4) provides, in part, that property shall be considered used as an integral part of one of the specified activities if so used either by the owner of the property or by the lessee of the property. Section 1.48-1(g)(2)(viii) provides an exception to the exclusion of property used predominately outside the United States from the definition of "section 38" property for any communication satellite, or any interest therein, of a U.S. person.

Section 1.48-1(f) provides that intangible property, such as patents, copyrights, and subscription lists, do not qualify as section 38 property.

Section 167(a) of the Internal Revenue Code provides for a reasonable allowance as a depreciation deduction for the exhaustion, wear and tear, and obsolescence of property used in a trade or business, or held for the production of income. In the case of recovery property, the deduction allowable under section 168 shall constitute the reasonable allowance.

Recovery property is defined in section 168(c)(1) as tangible property of a character subject to the allowance for depreciation used in a trade or business, or held for the production of income.

ANALYSIS:

The "Neighborhood Effect" (also identified as "Special Market Premium") is the added value derived from either a specific user(s) on the satellite, or a dedicated market for the transponders (i.e., broadcast video only). This asset has been identified only with respect to Satellite B. As with an anchor tenant in a shopping mall, the neighborhood effect provides access by others using the satellite to a much larger market, resulting in higher rental rates for the transponders. This value is incorporated in the purchase price of a transponder and reflects the satellite operator's marketing or packaging of the transponder applications to end-users. While the benefit has a measurable value based on comparable market transactions, it does not necessarily follow that such a benefit is a separate asset from the underlying transponder.

First, the neighborhood effect benefit does not represent a contractual relationship between the Company and the Seller/ Operator/Lessee of Satellite B. The added value derived from the higher rental rates this benefit generates assumes continuation of (1) the primary user(anchor tenant)/primary use(limited users), and (2) a premium demand to access this benefit. But the obligation of the subject satellite's primary user/primary use exists only between the specific end-users and the operator. The Price paid by the Company for transponders aboard Satellite B reflects the added value this benefit creates, yet such added value, by itself, does not give rise to a separate and distinct intangible asset.

Second, in American Controlled Industries v. U.S., (S.D. Ohio, 1984), the government successfully argued that the purchaser of a property (a shopping mall), which is leased at higher than market levels, has not, as a matter of law, acquired a separately amortizable asset in the "premium" leases. The court adopted the "bundle of rights" concept and held that a "premium" paid to acquire the favorable leases is not separately amortizable from the from the underlying purchased property. See also, Schubert v. Comm'r, 33 TC 1048 (1960), aff'd 286 F.2d 573 (4th Cir.), cert. denied, 366 U.S. 960 (1961). Thus, while such leases would impact the purchase price, the premium price due to the existence of a desirable anchor tenant is not an asset separate from the underlying tangible asset.

Third, there is no separate and distinct intangible asset attributable to favorable location/position or marketing strategy. In the subject case the Company has engaged in a sale/leaseback of tangible assets (transponders). The neighborhood effect and scarcity factor are part of the assets' favorableness in its market, which is reflected in its value, and cannot be separated from the transponder itself. The Service continues to dispute the analysis of the Tax Court in the core deposit cases that by identifying, valuing and lifing an asset, it is by definition separate and distinct. (i.e., Citizen and Southern Corp. v. Comm'r, 91 TC 463 (1988), aff'd per curiam, (11th Cir., 1990)). See, Newark Morning Ledger Co. v. U.S., 736 F.Supp. 176 (D. N.J. 1990), rev'd 945 F.2d 555 (3rd Cir. 1991) cert. granted 60 U.S.L.W. 3687.

The "Protected Transponder" intangible identified by the District is made up of two components. First, access to pre-emptible transponders, and second, priority access to spare transponder equipment on board the satellite. Regarding the first component, the agreements between the Company and the two different Sellers/Operators/Lessees do not address "protected" or "pre-emptible" status for the transponders at issue. Protected status means the ability to bump a pre-emptible user if the protected transponder should fail. A transponder designated as "protected" can generate as much as 100% more revenue than a pre-emptible or a non-protected transponder. Such ability to bump is important to certain end-users who require assured continuation of service (i.e., a live network broadcast of the World Series or the Super Bowl). This status is apparently contractually determined between the satellite operator and the end-user. There are no rights in the instant case acquired by the Company as to bumping other end-users. Therefore, access to pre-emptible transponders (and thus protected status) does not exist in the instant case and no separate intangible asset exists herein for this component.

It is recognized that the appraisals done for both the Company and the Service make reference to protected and pre-emptible status in estimating the lease rental potential of the transponders on the satellites. These appraisals assume a certain number of protected and pre-emptible transponders on a given satellite in order to make projections of future cash flows. However, this income approach whether the comparable market estimate of market value, as well as the leaseback rates, are reasonable and sustainable.

The second component of the "protected transponder" asset identified by the District is the priority access to the spare equipment on board the satellite. It is agreed between the District and the Company that it is standard practice in the satellite industry for all commercial satellites to be constructed with spare equipment components and that transponder owners be provided access to these spares. The existence and configuration of the spare components is perceived to bear directly on the reliability of the transponders and thus reflected in their market value.

The agreements between the Company and the two Seller/Operators specifically disclaims application of the product warranty provisions of the Uniform Commercial Code, and only warrants the existence and number of spare components on the satellites. There is no separate charge for the spares and title to these spare components remain with the Seller/Operator. The agreements also provide that the operator will provide the spare components on a first-to-fail basis, that the operator will reconfigure the receivers and power amplifiers as necessary to maximize the number of operating transponders, and that the operator will not discriminate between transponders based on identity of ownership. In the event of equipment failure where a spare component is not available, an "event of loss" occurs resulting in contractually specified loss damages to the owner. Thus, there is no stated priority of access to spare components on the satellite, except on a first-to-fail basis.

The existence of the spare components provides the redundancy that determines the level of reliability of the transponders on the satellite. Since servicing is not possible once the satellite is stationed in its orbit, the availability of spares takes the place of a warranty of operation. This warranty substitute represents standard industry practice, is neither separately contracted for nor valued, and the transponders are not offered or purchased without the availability of the spares. It would be difficult to argue that the existence and availability of the spare components in this case represents a separate and distinct asset rather than its value being part of the purchase price of the equipment.

The cases cited below by the District are distinguishable from the instant case. In Wadell v. Comm'r, 86 TC 848 (1986), aff'd Per curiam, 841 F.2d 264 (9th Cir. 1988), the Tax Court allocated a purchase price between medical machinery and a franchise after finding that the fair market value of the machinery was less than the basis claimed by the taxpayer in that case. In Lemmen v. Comm'r, 77 TC 1326 (1981), the court allocated purchase price between cattle and a maintenance agreement, finding that the fair market value of the cattle was less than the basis claimed. In both cases the tangible assets was susceptible to valuation without the intangible agreements, the agreements did not represent standard industry practice and the fair market value of the tangible assets was significantly below the basis claimed. In the instant case there is no showing of sales of transponders without the availability of spare components, and the existence of spares is standard industry practice. Thus the existence and access to the spare components does not constitute a separate intangible asset under the facts presented here.

Conclusions:

No portion of the purchase price of the satellite transponders acquired by the Company in the sale/leaseback arrangements referenced herein may be allocated to separate intangible assets identified as "Neighborhood Effect" or "Protected Status" under the fact presented.

A copy of this technical advice memorandum is to be given to the Taxpayer. Section 6110(j)(3) of the Code provides that it may not be used or cited as precedent.

1    All references to the Internal Revenue Code, Income Tax Regulations, or sections thereof refer to provisions applicable during the and tax year.

Section 6110(j)(3) of the Internal Revenue CodeThis document may not be used or cited as precedent. .

TAM 9317001 (IRS TAM), 1993 WL 134598

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.



This document may not be used or cited as precedent. Section 6110(k)(3) of the Internal Revenue Code.

Private Letter Ruling 201214007

PLR 201214007; 2012 PLR LEXIS 11

January 3, 2012

[*1]

**SUBJECT MATTER:** Depreciation Deduction

**SUMMARY:**

Taxpayer acquired wind energy facilities and certain power purchase agreements (PPAs) from an unrelated party. Each of the PPAs required the producer of the electricity generated by a specific wind energy facility to sell, and the buyer to purchase, all, or a specified cap amount, of the output of that specific facility for a specified price for a specified term of years. Under the terms of each PPA, there were no circumstances under which the producer could produce or obtain capacity, energy, or environmental attributes required to fulfill its obligations under the PPA from sources other than the specific wind energy facility designated in the PPA. The IRS ruled that where Taxpayer acquired wind energy facilities subject to facility-specific PPAs, no portion of its purchase price would be allocated to the PPAs and the purchase price of such wind energy facilities that was attributed to such PPAs would be taken into account in determining the adjusted basis of the wind energy facilities for depreciation purposes under I.R.C. § 167(c). The specific-facility PPA should not be treated as an asset separate from the wind energy facility subject to such PPA.

**APPLICABLE SECTIONS:**

Section 167 -- Depreciation Deduction

Index Number:

**UI LIST:**

167.07-00

Refer Reply To: CC:ITA:7 - PLR-128349-11

**TEXT:**

Third Party Communication: None
Date of Communication: Not Applicable
Person To Contact: * * *, ID No. * * *

PLR 201214007; 2012 PLR LEXIS 11, *1

Telephone Number: * * *

Release Date: 4/6/2012

Index Number: 167.07-00

Date: January 3, 2012

Refer Reply To: CC:ITA:7 - PLR-128349-11

Re: Request for Private Letter Ruling Regarding § 167

LEGEND:

Taxpayer = * * *
A = * * *
B = * * *
C = * * *
D = * * *
E = * * *
F = * * *
G = * * *
H = * * *
I = * * *
J = * * *

Dear * * *:

This letter responds to a letter dated June 30, 2011, submitted by Taxpayer requesting a letter ruling on whether any of the consideration paid to acquire the assets of a wind generation trade or business is allocated to facility-specific power purchase agreements as separate assets.

FACTS

Taxpayer represents that the facts are as follows:

Taxpayer is an electric company. Through its subsidiaries and affiliates, Taxpayer generates, markets, transmits, and distributes electricity.

On A, Taxpayer, using a chain of entities that are disregarded as separate from their owners for federal income tax purposes ("disregarded entities"), acquired all of the membership interests in B, an unrelated party (the "Transaction"). At the time of the Transaction, B was a holding company  [*2]  whose assets consisted of all of the membership interests of C disregarded entities and interests in D partnerships. Each of these E entities owned and operated one or more wind energy facilities or was in the process of constructing a wind energy facility that it intended to own and operate. As of the date of the Transaction, all of the D partnerships had in place elections under section 754 of the Internal Revenue Code.

Each wind energy facility consisted of various items of tangible property including land, wind turbines, towers, pads, transformers, on-site power collection systems, monitoring and meteorological equipment and site improvements such as roadways and fencing.

Prior to the date of the Transaction, the E entities had entered into approximately F separate power purchase agreements ("PPAs"), pursuant to which the selling entity committed to sell some or all of the output of its wind

facilities to a counterparty in accordance with the terms and conditions of the PPA. While the F PPAs are not identical in every respect, they do share certain relevant characteristics. The key shared characteristic is that all of the PPAs are facility-specific. That is, such PPAs obligate the  [*3]  producer of the electricity generated at a specific wind energy facility to sell, and the buyer to purchase, a specified amount of the output of that specific wind facility. Under each of these PPAs, there are no circumstances under which the producer can produce or obtain capacity, energy, or environmental attributes required to fulfill its obligations under the PPA from sources other than the specific wind energy facility designated in the PPA. A transfer of a PPA without a transfer of the related wind energy facility would leave the transferee with no means of satisfying the PPA.

At the time of the Transaction, a number of the PPAs still had significant periods remaining. Due to fluctuations in the price of energy since the inception of many of these PPAs, the pricing they incorporated had, by the time of the Transaction, become favorable by reference to the market price of power on that date. In other words, the price that Taxpayer is entitled to charge under the PPAs is greater than the market price of power on the date of the Transaction.

Taxpayer engaged G to value the assets it purchased in the Transaction for financial reporting purposes. As part of that process, G evaluated  [*4]  all the acquired property, plant, and equipment, including facilities under construction, owned by each of the E entities, as well as each of the F PPAs. Based on its analysis, G determined a total value of approximately $H million to the property, plant, and equipment, and approximately $I million to the PPAs.

There were no related parties (related buyer and seller) that were parties to the same PPA at the time prior to, on, or after the date of the Transaction.

Taxpayer provided a copy of a Wind Generation Purchase Agreement ("Sample PPA") that is similar in nature to each of the PPAs subject to Taxpayer's letter ruling request. Under the terms of the Sample PPA, the producer of the electricity generated at a specific wind energy facility agreed to sell all of: (1) the output potential of that wind energy facility (the "Capacity"); (2) the actual number of megawatt-hours (MWh) generated by that wind energy facility during the term of the Sample PPA less any generating output in MWh used by the producer to operate the wind energy facility and distribution losses as measured by meters installed (the "Net Energy"); and (3) all attributes (environmental or otherwise) that are created or  [*5]  otherwise arise from that wind energy facility's generation of electricity using wind as a fuel, including but not limited to, tags, certificates, or similar products or rights associated with wind as a "green" or "renewable" electric generation resource (the "Green Tags"). Further, under the terms of the Sample PPA, the price used as the basis for determining payments by the buyer to the producer for the Capacity, Net Energy, and Green Tags of the wind energy facility is $J per MWh during the term of the Sample PPA (the "Guaranteed Price").

While many of the PPAs subject to Taxpayer's letter ruling request require the producer to sell, and the buyer to purchase, all of the electricity produced by a specific wind energy facility during the term of the PPA, a few of the subject PPAs require the producer to sell, and the buyer to purchase, a specified cap amount of the specific wind energy facility's output, which, in a given year, may be less than all of that facility's output. A PPA of this type may provide for a pricing adjustment to account for market pricing for the output delivered in excess of the cap amount. Under both types of PPAs, Taxpayer can satisfy its obligations under  [*6]  the PPAs only with the power produced at the specific wind energy facility designated in the PPA.

RULING REQUESTED

Taxpayer requests the Internal Revenue Service issue the following ruling:

Where Taxpayer acquired wind energy facilities subject to facility-specific PPAs, no portion of its purchase price shall be allocated to the PPAs and the purchase price of such wind energy facilities that is attributed to such PPAs shall be taken into account in determining the adjusted basis of the wind energy facilities.

LAW AND ANALYSIS

Section 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business, or in the production of income.

Section 167(c) provides the rules for determining basis for depreciation purposes. Pursuant to section 167(c)(1), the basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property is the adjusted basis provided in section 1011, for the purpose of determining the gain on the sale or other disposition of such property. If any property is acquired subject to a lease, section 167(c)(2) provides that (A)  [*7]  no portion of the adjusted basis is allocated to the leasehold interest, and (B) the entire adjusted basis is taken into account in determining the depreciation deduction (if any) with respect to the property subject to the lease.

In this case, Taxpayer acquired wind energy facilities and certain PPAs from an unrelated party. Taxpayer represents that each of the PPAs subject to its letter ruling request require the producer of the electricity generated by a specific wind energy facility to sell, and the buyer to purchase, all, or a specified cap amount, of the output of that specific facility for a specified price for a specified term of years. In the cases where the PPA requires the producer to sell, and the buyer to purchase, a specified cap amount of a specific wind energy's facility output, the PPA may provide a pricing adjustment to the specified price when output is delivered in excess of the cap amount. Taxpayer also represents that under the terms of each PPA subject to its letter ruling request, there are no circumstances under which the producer can produce or obtain capacity, energy, or environmental attributes required to fulfill its obligations under the PPA from sources  [*8]  other than the specific wind energy facility designated in the PPA. Moreover, Taxpayer represents that if a facility-specific PPA at issue is transferred to another party without a transfer of the related wind energy facility to that same party, the transferee would have no means of satisfying its obligations under the PPA. All of these representations are material representations. In such a case, we believe the specific-facility PPA should not be treated as an asset separate from the wind energy facility subject to such PPA. Accordingly, where Taxpayer acquired a wind energy facility subject to a facility-specific PPA at issue, the portion of the purchase price of the wind energy facility that is attributable to that facility-specific PPA is taken into account as part of the basis of the wind energy facility for depreciation purposes.

CONCLUSION

Based solely on Taxpayer's representations and the relevant law and analysis set forth above, we conclude that where Taxpayer acquired wind energy facilities subject to facility-specific PPAs, no portion of its purchase price shall be allocated to the PPAs and the purchase price of such wind energy facilities that is attributed to such PPAs  [*9]  shall be taken into account in determining the adjusted basis of the wind energy facilities.

Except as specifically set forth above, no opinion is expressed or implied concerning the tax consequences of the facts described above under any other provisions of the Code (including other subsections of section 167).

This ruling is directed only to the taxpayer requesting it. Section 6110(k)(3) provides that it may not be used or cited as precedent.

In accordance with the power of attorney, we are sending a copy of this letter to Taxpayer's authorized representatives. We are also sending a copy of this letter to the appropriate operating division director.

Sincerely,

Kathleen Reed
Chief, Branch 7
Office of Associate Chief Counsel
(Income Tax and Accounting)

Enclosures (2):
copy of this letter

PLR 201214007; 2012 PLR LEXIS 11, *9

copy for section 6110 purposes



This document may not be used or cited as precedent. Section 6110(j)(3) of the Internal Revenue Code.

Private Letter Ruling 200215037

PLR 200215037; 2002 PLR LEXIS 42

January 14, 2002

[*1]

**SUBJECT MATTER:** Section 1221 -- Capital Asset;
Section 1222 -- Capital Gains Definitions;
Section 1231 -- Trade or Business Property

**REFERENCE:**    Refer Reply To: CC:ITA:3 PLR-143906-01

**UI LIST:**

UI No. 1221.00-00
UI No. 1222.00-00
UI No. 1231.00-00

**TEXT:**

Release Date: 4/12/2002

Taxpayer = * * *
Utility = * * *
Purchaser = * * *
State A = * * *
Region = * * *
Noteholder 1 = * * *
Noteholder 2 = * * *
Date 1 = * * *
Date 2 = * * *
Date 3 = * * *
Date 4 = * * *
Date 5 = * * *
a = * * *
b = * * *

c = * * *

X = * * *

Dear * * *

[1] This is in response to a letter dated August 16, 2001, submitted on behalf of Taxpayer requesting a ruling that consideration received for rights to sell power to an electric utility at above-market rates qualifies as gain from the sale or exchange of property within the meaning of 1221, 1222, and 1231 of the Internal Revenue Code. The information submitted in that request and in later correspondence is summarized below.

FACTS

[2] Taxpayer, an S corporation (as defined in 1361(a)(1) of the Code)/1/, owns an electrical generation facility (the "Facility"), which it operates for the production of electricity and steam. The Federal Energy Regulatory Commission ("FERC") has certified the Facility as a qualifying facility ("QF")  [*2]  under the Public Utility Regulatory Policies Act of 1978 ("PURPA"), P.L. 95-617, 92 Stat. 3117. Taxpayer uses the accrual method of accounting and files its federal income tax return on a fiscal year.

[3] Congress enacted PURPA as part of the national energy plan and thereby sought to stimulate the development of the QF industry by requiring utilities to interconnect with QFs and purchase QFs' output pursuant to the ratemaking standard contained in PURPA. PURPA directed FERC to promulgate rules implementing the statute. PURPA also requires state public utility regulatory bodies to implement the statute's provisions and the FERC rules, including the requirement to set rates for the sale of QF output. Under PURPA, electric utilities are required to purchase the electrical output generated by interconnected QFs at a rate determined by the state public utility regulatory body equal to the utility's "avoided cost", that is, the cost the utility would have incurred had it produced or procured an equivalent amount of power. PURPA mandates the purchase of QF power either on an as available basis (priced at short-term avoided cost rates) or for a specified term (usually priced at long-term avoided  [*3]  cost rates). Power from a QF in excess of the amount committed for sale at long-term rates can be sold on an as-available basis at short term rates or pursuant to any other power sales arrangement entered into by the QF and the purchaser.

[4] On Date 1, the State A Public Utilities Commission (the "Commission"), as part of its PURPA implementation responsibilities, issued an order requiring a State A electric utility company (the "Utility") to purchase energy from Taxpayer at long-term rates specified by the order for a period of a years (the "Order"). These rates were predetermined and fixed for each year of the a year term starting on Date 1. The Order, as subsequently clarified by an agreement dated Date 2, executed by the Commission, Utility, and Taxpayer (the "Settlement Agreement"), obligates Utility to purchase from Taxpayer at the long-term rates established in the Order all energy produced by Taxpayer up to a b kilowatt capacity level. Since Date 1, Taxpayer has been selling energy generated by the Facility to Utility pursuant to the Order.

[5] The Order's long-term rates were based on certain 30-year forecasts of the Utility's energy prices created during Date 3. Due to a variety  [*4]  of factors, the rates fixed by the Order using those forecasts and assumptions are significantly above the energy price forecasts today, and the Order provides long-term rates for the sale of energy from the Facility that significantly exceed today's market prices for energy. Today, Taxpayer (or any other QF), could not obtain a Commission order or a contract for the sale of its energy from the Facility at the long-term rate levels contained in the Order.

[6] From time to time, Taxpayer sells energy from the Facility in excess of the energy committed to the Utility by the Order. These sales may be to the Utility or to other purchasers and may be at the PURPA short-term avoided cost rate periodically set by the Commission or pursuant to such other rate as agreed to by the purchaser and Taxpayer.

[7] As noted above, PURPA also requires electric utilities to interconnect QFs to the utility's  [*5]  electric system, thus enabling the QF to sell electricity to the directly connected electric utility or to other indirectly connected electric utilities. The Order approved the form of an interconnection agreement between Taxpayer and Utility, permitting

Taxpayer to interconnect the Facility with Utility's electric system, and ultimately, Taxpayer and Utility executed this agreement effective Date 1 (the "Interconnection Agreement"). The Interconnection Agreement includes long-term rates approved by the Order. The Interconnection Agreement also sets forth the method of billing by Taxpayer, payment by Utility for the sale of energy, and a study performed by Utility. This study describes the physical and operating requirements of the interconnection between the Facility and the Utility and identifies, the metering and delivery points for the sale of energy from the Facility.

The Interconnection Agreement can be assigned by Taxpayer upon the receipt of written consent by the Utility, which consent cannot be unreasonably withheld. Utility cannot terminate the Interconnection Agreement during such time as its obligations set forth in PURPA remain unchanged and in force, unless Taxpayer fails  [*6]  to perform substantially in accordance with the terms of the Agreement. As a result, unless the Interconnection Agreement is terminated earlier by Taxpayer, the term of the Interconnection Agreement corresponds to the year term of the rates approved by the Order.

[8] On Date 4, Taxpayer and Purchaser entered into a purchase agreement (the "Purchase Agreement') by which, subject to Commission approval and certain other conditions not relevant to this letter, Taxpayer will sell and assign to Purchaser all of its rights, interests, and obligations under the Order, including the Interconnection Agreement, but excluding the Interconnection Agreement's study. The interconnection study and the Facility will remain the property of Taxpayer. Hereinafter, the Order and the interconnection Agreement are referred to as the "Existing Power Agreement."

[9] As a condition to closing the sale and assignment of Taxpayer's rights under the Order to Purchaser, Taxpayer and Utility each will deliver to the other a consent and mutual release, releasing each other from potential claims arising out of, or in connection with, the execution, performance or nonperformance, or assignment of the Existing Power  [*7] Agreement, rate petition, and the sale of electric energy from the Facility.

[10] In exchange for the sale and assignment of all of Taxpayer's rights, interests, and obligations under the Existing Power Agreement, Purchaser will pay X (the "Purchase Price"), a lump sum, directly to Taxpayer at closing, and Taxpayer will no longer have the right to sell power to Utility under the Existing Power Agreement. The Purchase Price is the only consideration that Taxpayer will receive (either from Purchaser or any other person or entity) with respect to Purchaser's acquisition of the Taxpayer's rights. Interests, and obligations under the Existing Power Agreement. Purchaser has represented to Taxpayer that Purchaser intends to finance the Purchase Price from the sale of notes pursuant to note purchase agreements between Purchaser and anticipated Noteholder 1 and Noteholder 2 (the "Noteholders"). The Noteholders are independent third parties. The Purchaser intends to pledge all of its assets, including the rights to payment under the Amended and Restated Interconnection Agreement from Utility (as defined below), as security for its obligations to the Noteholders.

[11] Simultaneous with Purchaser's  [*8]  acquisition of the Existing Power Agreement, Utility and Taxpayer will enter into a "Replacement Interconnection Agreement," which will provide for the continued interconnection and operation of the Facility with Utility's electrical system pursuant to the original Interconnection Agreement's interconnection study. The Replacement Interconnection Agreement will have the same terms and conditions as the Interconnection Agreement, except that sales will not be made pursuant to the Order and will not be at the long-term rates contained in the Order. Instead, these sales will occur under either the current avoided cost for obligatory purchases by Utility under PURPA or such other power sales arrangements as may be agreeable to Taxpayer and Utility. Future power sales may also occur from the Facility to purchasers other than Utility upon such terms as are agreed to by Taxpayer and such purchaser.

[12] On or after the closing of the transaction under the Purchase Agreement, Taxpayer intends to liquidate and transfer all of its remaining assets and obligations (including the Facility) to a successor entity in a nontaxable transaction for federal income tax purposes. The successor entity will  [*9]  seek to operate the Facility under the Replacement Interconnection Agreement and market the Facility's electrical output under such arrangements for sale as are contained in the Replacement Interconnection Agreement or under such other arrangements it negotiates with

purchasers. Purchaser, and parties affiliated with Purchaser, will not be the successor entity to Taxpayer.

[13] On Date 5,Purchaser and Utility entered into an "Execution Agreement" under which the parties agreed to amend and restate the Existing Power Agreement immediately upon Purchaser's acquisition of Taxpayer's rights and obligations under the Existing Power Agreement (the "Amended and Restated Interconnection Agreement"). Concurrent with the request for approval of the sale and assignment of the Order to Purchaser, Utility has submitted the Amended and Restated Interconnection Agreement to the Commission and requested approval of it to allow Purchaser to make wholesale sales of power to Utility.

[14] The Amended and Restated Interconnection Agreement will provide for the purchase by Utility and the sale by Purchaser of energy at rates less than those contained in the Existing Power Agreement, but nonetheless greater   [*10] than could be obtained by Purchaser if it entered into a power sales arrangement with Utility in the absence of Purchaser's acquisition of the rights under the Existing Power Agreement. This is the case because the Commission no longer issues orders for long-term avoided cost rates for Utility and instead allows Utility to competitively procure its power supply needs. Today's market prices for such power are significantly less than the long-term avoided costs rates approved by the Order.

[15] Purchaser has represented to Taxpayer that under the Amended and Restated Interconnection Agreement:

(i) On an annual basis, Purchaser intends to sell a substantially similar amount of energy  to Utility as historically received by Utility under the Existing Power Agreement. Purchaser intends to meets its power supply obligation under the Amended and Restated Interconnection Agreement from a wholesale supplier or from market purchases.

 (ii) Purchaser has no present intent to sell, terminate, or extinguish the rights it will acquire from Taxpayer to sell energy to Utility, as modified by the Commission and set forth in the Amended and Restated Interconnection Agreement.

 (iii) The term during which Purchaser   [*11]  will have the right to sell energy to Utility under the Amended and Restated  Interconnection Agreement will be substantially similar to the term remaining under the Existing Power Agreement.

 (iv) The rates at which Utility will be required to purchase energy from Purchaser under the Amended and Restated Interconnection Agreement are presently above-market.

(v) The amount of energy Purchaser will have the right to sell to Utility in the future under the Amended and Restated Interconnection Agreement will be substantially similar to the amount of energy Taxpayer had the right to sell under the Existing Power Agreement.

 (vi) Purchaser has no intent of physically interconnecting to Utility's electric system, and, in fact, Purchaser is physically incapable of such interconnection; thus these aspects of the Interconnection Agreement have no market value to Purchaser. Power sold by Purchaser to Utility is

expected to be delivered at various Region power pool transmission facilities' points. The Amended and Restated Interconnection Agreement covers the sale of wholesale power and does not provide for Purchaser to interconnect with Utility.

(vii) Purchaser will only be compensated under the Amended and Restated  [*12]  Interconnection Agreement for energy actually delivered to Utility.

LAW AND ANALYSIS:

[16] In order for proceeds from the disposition of an asset to qualify as long-term capital gain, the asset must be a capital asset as defined by 1221, the disposition must be a "sale or exchange," and the asset must have been held for more than one year. Section 1222. Under 1231, capital gain also may result from the sale or exchange of real or depreciable property used in the taxpayer's trade or business and held for more than one year, if 1231 gains exceed 1231 losses for the year.

[17] In the present case, the Existing Power Agreement was an asset held by Taxpayer for more than one year. Whether the Purchase Price received from Purchaser was long-term capital gain therefore depends on two factors: the nature of the asset and the nature of the transaction.

Nature of the Asset: Existing Power Agreement as "Property"

[18] Section 1221 defines the term "capital asset" as property held by the taxpayer, regardless of whether it is connected with the taxpayers trade or business, unless the property meets one of five listed exceptions: (1) inventory; (2) property of a character which is subject to the allowance  [*13]  for depreciation provided in 167 or real property used in a trade or business; (3) certain intangible property; (4) accounts receivable acquired in the ordinary course of a trade or business; and (5) certain publications of the United States Government.

[19] The term "section 1231 gain" includes the sale or exchange of property used in a taxpayer's trade or business, of a character which is subject to the allowance for depreciation under 167, and that does not fall within certain exceptions generally equivalent to the exceptions in 1221.

[20] In the present case, the Existing Power Agreement was an asset used in Taxpayer's trade or business that does not fall within any of the listed exceptions to capital gain treatment in 1221 or 1231. We do not decide whether it was a capital asset or a 1231 asset because, in either case, gain from the sale or exchange of such an asset would be capital gain for Taxpayer.

[21] In order for either 1221 or 1231 to apply, however, the asset sold must constitute "property. "/2/ Although 1221 appears to give broad meaning to this term, the Supreme Court has found it "evident that not everything which can be called property in the ordinary sense and which  [*14]  is outside the statutory exclusions [of 1221] qualifies as a capital asset"; rather, the term "capital asset' "is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time. . . . "  Commissioner v. Gillette Motor Co., 364 U.S. 130, 134, 80 S. Ct. 1497, 4 L. Ed. 2d 1617, 1960 C.B. 466, 1960-2 C.B. 466 (1960) (compensation for temporary seizure of business facilities is ordinary income). Similarly, in  Commissioner v. P.G. Lake, 356 U.S. 260, 265-67, 78 S. Ct. 691, 2 L. Ed. 2d 743, 1958-1 C.B. 516 (1958), the Court denied capital gain treatment on the disposition of certain mineral payments carved out of established oil and gas working interests, observing, "The lump-sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income. . . . In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property."

[22] On this basis, capital gain or loss treatment has been denied for transactions involving  [*15]  payments in return for interests carved out of, or related to, an interest retained by the taxpayer, see, e.g., Gillette and P.G. Lake; interests related to compensation for personal services rendered or to be rendered in the future, see, e.g.  Holt v. Commissioner, 303 F.2d 687 (9th Cir. 1962) (interest in films to be produced by taxpayer);  Vaaler v. United States, 454 F.2d 1120 (8th Cir. 1972) (agency contract with insurance company);  Foote v. Commissioner, 81 T.C. 930 (1983) (tenure rights); and interests relating to income already earned or about to be earned, see, e.g.,  Rhode's Estate v. Commissioner, 131 F.2d 50 (6th Cir. 1942) (right to dividend that was already declared).

[23] On the other hand, as the courts have noted, "[s]imply because the property transferred will produce ordinary income, and such income is a major factor in determining the value of the property, does not necessarily mean that the amount received for the property is essentially a lump-sum substitute for ordinary income./3/ in Guaggenheim, the court focused on whether substantial investment risks involved in holding the asset that was the source of the income were transferred. See  46 T.C. at 569. In  [*16]  Dresser, the court distinguished between proceeds from "the present sale of the future right to earn income [capital gain] and the present sale of the future right to earned income [ordinary income]."  324 F.2d at 59. In Ferrer, the court distinguished between cases involving "an 'estate' in, or an 'encumbrance' on, or an option to acquire an interest in property which, if itself held, would be a capital asset" and "an opportunity, afforded by contract, to obtain periodic receipts of income, by dealing with another, or by rendering services, or by virtue of ownership of a larger'estate'."  304 F.2d at 130-131 (cited cases omitted). See generally  Foy v. Commissioner, 84 T.C. 50, 70 (1985) (capital gain on transfer of franchise rights; summary of factors).

[24] In In Estate of Shea, a case particularly analogous to the present case, the court held that the transfer by the taxpayers' S corporation to a third party of a shipping charter, a contract to provide cargo space on the corporation's ships, was a sale of "property" under 1231, resulting in capital gain. The corporation had originally acquired the shipping charter along with the ship to which it was subject, later substituted a  [*17]  different ship, and eventually sold the charter as a separate asset. In its holding, the court stressed that the shipping charter was not a contract to perform personal services, that the taxpayer had been required to capitalize the acquisition cost of the charter, and that the value of the charter was primarily determined by its rate as compared to prevailing market rates. Thus, the court observed, the difference between the amount paid for the charter and the amount received upon its disposition represented appreciation in value over time, due purely to the action of market forces. This, according to the court, was precisely the type of profit for which capital gain treatment is intended, citing  Gillette. See 57 T.C. at 24-25.

[25] Based on the above, we conclude that the bundle of contract rights and obligations represented by the Existing Power Agreement in the present case was "property" within the meaning of 1221 and 1231. The Existing Power Agreement did not represent a right to compensation for personal services rendered or to be rendered; rather, it involved the sale of a product -- electricity. Nor was it a right to collect income already earned, as in Rhodes' Estate. Instead, [*18]  like the "exclusive" feature of the right to practice under the license at issue in Dresser, the Existing Power Agreement was itself an income-producing asset, a right to earn income in the future. As made clear by Dresser and Guggenheim, it is not dispositive that the income to be produced by the Existing Power Agreement would have been ordinary, nor that the value of the Existing Power Agreement was largely determined by the present value of that expected future income stream. Moreover, the Existing Power Agreement was not simply, in the words of the,Ferrer court, "an opportunity, afforded by contract, to obtain periodic receipts of income, by dealing with another." First, as a PURPA contract, mandated by federal and state statutes and regulations, the Existing Power Agreement reflected to some extent benefits created by governmental action, similar to other rights that have been treated as capital assets. See, p&.,  Rev. Rul. 66-58, 1966-1 C.B. 186 (cotton acreage allotments);  Rev. Rul. 70-644, 1970-2 C.B. 167 (milk allocation rights). Second, like the shipping charter at issue in Estate of Shea, the value of the Existing Power Agreement was largely determined by prevailing market  [*19]  rates and was subject to market fluctuations, outside of the control of Taxpayer, based on projections of economic factors over a significant period of time./4/. As stated in Gillette and Estate of Shea, such appreciation in value over time resulting from market fluctuations is the type of profit for which capital gain treatment is intended.

[26] We reach the conclusion that Taxpayer sold "property" within the meaning of 1221 and 1231 even though it

retained its ownership of the Facility, and therefore might be viewed as transferring the contract while retaining an underlying, related income-producing asset. Cf. Gillette; P.G. Lake. As discussed above, while the Existing Power Agreement was clearly related to the Facility, it was separately transferable and, in the context of the regulatory environment in which the transaction occurred, was an income-producing asset in its own right, one that had a value independent of Taxpayer's Facility. In this respect, it was similar to the shipping charter in Estate of Shea, which -- while it was clearly related to a ship in a generic sense -- was not linked to any specific ship; it could be, and was, transferred from ship to ship and sold as a   [*20]  separate asset. As noted above, unlike the charter in Estate of Shea, Taxpayer had not acquired the Existing Power Agreement through purchase and had no basis in the contract;  however, the contract was certainly an asset as to which costs would have to be capitalized in appropriate circumstances, separate from the source of the electricity that was the subject of the contract. Except for the inter-connection study, Taxpayer transferred its entire interest in the Existing Power Agreement and, after the transaction, the operation of the power plant had no economic effect on the Existing Power Agreement or vice versa in fact, Taxpayer has retained the right to sell power to the Utility or other purchasers under such terms and arrangements as are agreed upon by such parties.

Nature of the Transaction: "Sale or Exchange"

The "Sale or Exchange" Doctrine in General

[27] Even though we conclude that the Existing Power Agreement was "property" within the meaning of 1221 and 1231, in order for the proceeds received by Taxpayer to be capital gain they must result from the "sale or exchange" of the Existing Power Agreement, within the meaning of 1222 and 1231. The transaction was clearly a "disposition" [*21]  of property, within the meaning of 1001, since Taxpayer parted with all substantial rights and obligations in the contract in return for a cash payment./5/

Contract Rights and the "Extinguishment Doctrine"

[28] One limitation on the "sale or exchange" doctrine holds that, in certain circumstances, amounts received for the cancellation or termination of contractual or similar rights or claims do not qualify for capital gain or loss treatment because the rights are not sold to, or exchanged with, the payor; instead, they simply cease to exist. This doctrine -- variously termed the "extinguishment," 'disappearing asset," or "vanishing asset" doctrine -- is normally applied in two-party situations; however, there is precedent for applying it in a three-party situation, such as the present case, if the substance of the transaction is found to constitute a cancellation, rather than a sale.

[29] In an early case,  Commissioner v. Starr Bros., Inc., 204 F.2d 673 (2d Cir. 1953), the Second Circuit held that payment to a distributor for terminating its exclusive contract with a manufacturer was ordinary income. Drawing an analogy to a situation in which the holder of the note surrenders it to the   [*22]  maker for a payment, the court found that the payment and release "not only ended the promisor's previously existing duty but also destroyed the promisee's rights. They were not transferred to the promisor; they merely came to an end and vanished."  204 F.2d at 674.

[30] Another early case,  General Artists Corp. v. Commissioner, 205 F.2d 360 (2d Cir. 1953), aff'g  17 T.C. 1517 (1952), cert. denied,  346 U.S. 866 (1953), dealt with a three-party situation. In General Artists, the taxpayer, a booking agent, had entered into contracts with Frank Sinatra entitling the taxpayer to represent Sinatra exclusively and receive a percentage of Sinatra's earnings. The taxpayer purported to sell the contracts to another booking agent, MCA, under an agreement, endorsed by Sinatra, that provided that MCA would enter into new contracts with Sinatra. Shortly after, the new contracts were signed and General Artists later received a payment from MCA, which it treated as capital gain. Although the Tax Court relied in part on a finding that the taxpayer had not parted with "property," the sole basis of the Second Circuit's affirming opinion was that, while the transaction was a sale in form, in substance  [*23]  it was a cancellation:

It might be suggested that the instant case differs from that of
Starr Bros. because the latter involved a release of a binding

negative covenant to the obligor, whereas here there was a
transfer to a third person of the rights under the covenant. But
we think the correct view is that here there was a release to
the obligor [i.e., Sinatra, the counterparty] of a
negative covenant in order to allow a new covenant to be made
with the third party [MCA]. . . . The agreement provided that
such new contracts should be made and "be deemed to supersede,
cancel, and take the place of" taxpayer's contracts with the
singer.

    205 F.2d at 361.

[31] Two cases decided in 1958 are significant for present purposes because they involve long-term supply contracts. In Commissioner v. Pittston, 252 F.2d 344 (2d Cir. 1958), rev'g 26 T.C. 967 (1956), nonacq., 1957-2 C.B. 8, cert. denied, 357 U.S. 919 (1958), the taxpayer, a coal company, received a lump-sum payment in return for cancellation of its exclusive contract to purchase the output of a coal mine. Upholding the Commissioner's determination that the payment was ordinary income, the Second Circuit rejected the Tax Court's rationale -- [*24] that the counter-party to the contract, by making the cancellation payment, had reacquired "the right to sell its coal to whomsoever it chose at whatever terms it could arrange." 26 T.C. at 970. According to the Second Circuit, "it would be more in accord with common understanding to say that the payment is solely for the termination of the right- duty relationship between the two parties to the agreement." 252 F.2d at 347.

[32] In the second case, Leh v. Commissioner, 260 F.2d 489 (9th Cir. 1958), aff'g 27 T.C. 892 (1957), a corporation that held a long-term requirements contract with a supplier for the purchase of petroleum products entered into a similar arrangement with the taxpayer's partnership, reselling the products to the partnership at a slightly higher price. Subsequently, because of a shortage in the supply of gasoline, the partnership's contract right had substantial value, see 27 T.C. at 897, and the partnership accepted a payment from the counterparty in termination of the contract. The Tax Court held that the contract was "property used in the trade or business" in the partnership's hands, and the circuit court accepted this finding. However, both courts rejected [*25] the taxpayer's argument that the effect of the termination agreement was to resell the contract rights to the counterparty; rather, relying on the line of authority represented by Starr, Pittston, and General Artists, both courts held that the payment was ordinary income. In the words of the circuit court, the "principal object, result, and 'effect'" of the termination agreement was "to terminate rights, not continue them, nor transfer them -- nor sell them -- nor exchange them." 260 F.2d at 494.

[33] In 1962, the Second Circuit, despite its role in developing the extinguishment doctrine, cast doubt on its continuing validity in Commissioner v. Ferrer, 304 F.2d 125 (2d Cir. 1962), rev'g in part and remanding 35 T.C. 617 (1961), ac.q., 1961-2 C.B. 4. In that case, the taxpayer, actor Jose Ferrer, had acquired from Pierre LaMure, the author of a novel, certain rights connected with the novel, including the stage rights and the right to prevent disposition of the movie rights. After the director John Huston expressed an interest in producing a movie based on the novel and starring Ferrer, a series of agreements were signed pursuant to which Ferrer surrendered his rights, Huston acquired [*26] the movie rights, and the taxpayer received a series of payments from Huston's company, Moulin, some of which Ferrer reported as capital gain.

[34] Analyzing prior case law, the Ferrer court decided that more recent cases had "moved away from the distinction, relied upon to some extent in Starr and General Artists, between a sale to a third person that keeps the 'estate' or 'encumbrance' alive, and a release that results in its extinguishment." 304 F.2d at 131 [footnotes omitted]. Describing this as a "formalistic distinction," the court continued:

In the instant case we can see no sensible business basis for
drawing a line between a release of Ferrer's rights to LaMure
for a consideration paid by Moulin, and a sale of them, with

LaMure's consent, to Moulirt or to a stranger who would then
release them. . . . Tax law is concerned with the substance,
here the voluntary passing of "property" rights allegedly
constituting "capital assets," not with whether they are passed
to a stranger or to a person already having a larger "estate."

[35] Focusing instead on the nature of the asset, the Court concluded that the holdings in cases such as Starr, General Artists, Pittston, and Leh, could be justified  [*27]  as involving assets that weren't "property," rather than on the basis of the extinguishment doctrine.  304 F.2d at 130-131. Following this approach, the court, "unbundling" the various rights given up by Ferrer, held that Ferrer received capital gain upon surrender of his right to produce a play and his negative rights to prevent disposition of film rights, because they represented equitable interests, but ordinary income with respect to termination of his rights to receive a stated percentage of film proceeds.

[36] In  Bisbee-Baldwin Corporation v. Tomlinson, 320 F.2d 929 (5th Cir. 1963), the court employed a "substance over form" analysis to convert a two-party cancellation into a three-party sale, effectively reversing the approach in General Artists. In Bisbee-Baldwin, the taxpayer assigned mortgages to investors who then employed the taxpayer to service those mortgages. Some of the investors later cancelled their contracts with the taxpayer and gave the business to other agents, over the taxpayer's objection. The investors paid the taxpayer a standard percentage termination fee, for which they were reimbursed by the new agents. The court, following Ferrer's "unbundling" approach,  [*28]  determined that a portion of each fee was allocable to capital assets. With respect to these amounts, the court held that in substance the rights had been sold to the new agents:

The investors were conduits: Bisbee-Baldwin received the
payments; the transferees paid through the investors. Something
was transferred. What Bisbee-Baldwin transferred was a bundle of
rights under its contracts to service certain mortgages. For a
price, the transferees stepped into Bisbee-Baldwin's shoes. It
is irrelevant that the investors' approval was required, . . .
and
that instead of assignment the transfer was effected by
termination of the old contracts and execution of new contracts.

320 F.2d at 936.

[37] Although Ferrer did not eliminate the extinguishment doctrine altogether, it has ameliorated its impact to some extent. First, the case clearly shifted the primary thrust of the analysis away from the nature of the transaction and towards the nature of the asset. Second, and related to the first point, the Ferrer case has come to stand for a "substance over form" approach to the "sale or exchange" determination -- exemplified by the Bisbee-Baldwin case-in which rights are more likely to be viewed as having,  [*29]  in substance, survived a transaction, even though the transaction took the form of a cancellation or termination./6/

[38] In transactions involving three parties, the question then becomes whether there is a sufficient nexus and similarity -- between the rights given up by the taxpayer and the rights acquired by a third party -- to permit the conclusion that the rights survived, in substance, in the hands of the third party. Courts, as well as the Service, have recognized that the rights acquired by the third party or parties need not be identical to those given up, in order to be viewed as surviving the transaction.

Application to the Present Case/7/

[39] Taxpayer points to certain formal aspects of the transaction -- chiefly the purchase agreement whereby Purchaser purported to purchase Taxpayer's entire interest in the Existing Power Agreement, in return for a cash

payment -- as evidence that the transaction was a sale of the Existing Power Agreement for capital gains purposes. Taxpayer also argues that its tax treatment should not depend on what Purchaser chose to do, as a result of separate negotiations, after Purchaser acquired the Existing Power Agreement. However, as discussed  [*30]  above, there is ample precedent in this context for looking beyond the form of the transaction. This is especially true when, as in the present case, the separate steps of the transaction are so clearly interrelated. Whether or not there were separate negotiations leading up to the transactions that were executed on Date 5, it is clear that on that date each step of the transaction was dependent on the others, and that Taxpayer knew that Purchaser had no intention of performing under the Existing Power Agreement, and would terminate the Existing Power Agreement simultaneously with -- not "after"---its acquisition from Taxpayer. By the same token, however, the execution of mutual releases as between Taxpayer and Utility -- a common precaution in a complex legal transaction -- does not necessarily establish that the transaction was a cancellation rather than a sale. See, e.g.,  Leh, 260 F.2d at 493, n. 5;  Turzillo v. Commissioner, 346 F.2d 884, 889 (6th Cir. 1965). The tax consequences turn on the substance of the transaction.

   [40] Accordingly, the question to be decided is whether the present transaction was, in substance, a sale of Taxpayer's rights in the Existing Power Agreement  [*31]  to the Purchaser. On these particular facts, we conclude that it was. Although as part of the integrated transaction the Existing Power Agreement was terminated and ceased to exist, this was not done directly, or indirectly, by Utility simply to eliminate what had become a burdensome contract. Nor did the Purchaser, once it had acquired the Existing Power Agreement, terminate it in return for cash or debt from Utility -- which might lead to the conclusion that, in substance, the transaction was an indirect means for Utility to eliminate the contract.  Rather, the consideration for the acquisition of the Existing Power Agreement came from the Purchaser, not Utility.

   [41] Moreover, while the Amended and Restated Interconnection Agreement was not identical to the Existing Power Agreement, the two contracts were similar in several respects. First, the remaining term of the Amended and Restated Interconnection Agreement will be substantially similar to the Existing Power Agreement. Second, while the source of the electricity differs, the amount of energy to be furnished under the Amended and Restated Interconnection Agreement will be based on the historical amounts furnished under the Existing  [*32]  Power Agreement. Finally-although the Purchaser is not a QF, and the price terms under the Amended and Restated Interconnection Agreement are not as favorable to the Purchaser as the terms under the Existing Power Agreement are to Taxpayer the Amended and Restated Interconnection Agreement has been approved by the regulatory authorities as a substitute for the Existing Power Agreement, because the Amended and Restated Interconnection Agreement, while still a long-term contract at above-market rates, is more favorable to Utility and the rate-paying public than the Existing Power Agreement.

   [42] In substance, therefore, the Purchaser's payment to Taxpayer is intended to result in the acquisition of valuable rights by Purchaser, in the form of a long-term, above-market power supply contract, of a type no longer favored in the new, deregulated environment, and similar in many significant respects to the rights given up by Taxpayer in the transaction. In this sense, the Purchaser "stepped into the shoes" of Taxpayer. Thus, we conclude that the nature of the transaction is a sale or exchange of Taxpayer's rights in the Existing Power Agreement to Purchaser.

   CONCLUSION

   [43] Accordingly, the consideration  [*33]  received by Taxpayer for its rights to sell power to Utility at above-market rates qualifies as gain from the sale or exchange of property, within the meaning of 1221, 1222, and 1231.

   [44] This ruling is based upon information and representations submitted by the Taxpayer and accompanied by a penalty of perjury statement. While this office has not verified any of the material submitted in support of the ruling request, it is subject to verification on examination.

   [45] We express no opinion about the tax treatment of the proposed transaction under other provisions of the Code and regulations or about the tax treatment of any conditions existing at the time of, or effects resulting from, the

proposed transaction that are not specifically covered by the above rulings. In particular, we express no opinion as to the applicability of the hedging transactions regulations, under 1.1221-2, to the proposed transaction.

[46] Under the powers of attorney on file in this office, a copy of this ruling is being sent to your authorized representative.

[47] This ruling is directed only to the taxpayer who requested it. Section 6110(k)(3) provides that it may not be used or cited as precedent.

Sincerely  [*34] yours,

DOUGLAS FAHEY
Assistant to the Branch Chief,
Branch 3
Office of the Associate Chief
Counsel (income Tax and
Accounting)

FOOTNOTES

/1/All references are to the statutes and regulations as in effect for the year at issue.

/2/The term has the same meaning under 1221 as it  has under 1231. See  Hollywood Baseball Assoc. v. Commissioner, 423 F.2d 494 (9th Cir.), cert. denied,  400 U.S. 848 (1970).

/3/  Guggenheim v. Commissioner, 46 T.C. 559, 569 (1966), acq.,  1967-2 C.B. 2 (sale of syndicated interests in a racehorse). See also  United States v. Dresser Industries, 324 F.2d 56, 59 (5th Cir. 1963) (transfer of "exclusive" feature of a patent contract);  Commissioner v. Ferrer, 304 F.2d 125, 132-33 (2d Cir. 1962) (various rights in a literary work); Estate of Shea v. Commissioner, 57 T.C. 15, 25 (1971), acq.,  1973-2 C.B. 3 (shipping charter).

/4/In this connection, note the length of the contract -- approximately a years, with c remaining at the time of the present transaction.

/5/See  Bailey v. Commissioner, 90 T.C. 558, 607-14 (1988), aff'd in part and vacated in part on a different issue, 912 F.2d 44 (2d Cir. 1990); cf.  Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981).   [*35]

/6/For a similar example of the evolution of the "sale or exchange" doctrine, see the line of cases represented by Yarbro v. Commissioner, 737 F.2d 479 (5th Cir. 1984), cert. denied,  469 U.S. 1189 (1985), in which the courts found a "sale or exchange," resulting in capital loss, in certain transactions traditionally viewed as lacking that element, such as abandonments of mortgaged properties.

/7/Taxpayer represents that the hedging transaction regulations, under 1.1221-2, do not apply to the Order, Supplemental Agreement, or Interconnection Agreement.

END OF FOOTNOTES

## CERTIFICATE OF SERVICE

I hereby certify that, on March 31, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to the following:

Michael J. Ronickher

/s/ Steven J. Rosenbaum
Steven J. Rosenbaum
*Counsel of Record*
Covington & Burling LLP
One CityCenter
850 10th Street, NW
Washington, D.C. 20001
Phone: (202) 662-5568
Fax: (202) 778-5568
Email: srosenbaum@cov.com