**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALTA WIND I OWNER LESSOR C, | ) | |
| | ) | |
| *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Nos. 13-402, 13-917, 13-972, 13-935, |
| | ) | 14-174, 14-93, 14-175, and 14-47 |
| v. | ) | |
| | ) | Judge Wheeler |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT'S PRETRIAL MEMORANDUM OF FACTS AND LAW**

---

*s/ Michael J. Ronickher*
MICHAEL J. RONICKHER
*Attorney of Record*
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Tel:  (202) 616-9085
Fax: (202) 514-9440
Michael.J.Ronickher@usdoj.gov

CAROLINE D. CIRAOLO
Acting Assistant Attorney General
DAVID I. PINCUS
Chief, Court of Federal Claims Section
G. ROBSON STEWART
Assistant Chief, Court of Federal Claims Section
MIRANDA BUREAU
Trial Attorney, Court of Federal Claims Section
MARGARET E. SHEER
Trial Attorney, Court of Federal Claims Section

*s/ G. Robson Stewart*
*Of Counsel*

Dated:  April 22, 2016            *Counsel for Defendant*

**TABLE OF CONTENTS**

**Page**

**Contentions of Fact** ........................................................................................................... 4

I.    Origins of the Alta Wind Energy Center ........................................................... 4

    A.    Oak Creek Development, Funding by Allco, and SCE's Transmission Investment ...... 4

    B.    The Acquisition of Allco's U.S. Wind Energy Business by Terra-Gen ........................ 8

    C.    The Appraisal of the Allco Assets ................................................................. 10

II.    Terra-Gen's Subsequent Development Work on the Alta Projects ................................. 12

    A.    Terra-Gen's Development Efforts ................................................................. 12

    B.    Terra-Gen's Use of "Turbine Blending" ........................................................ 13

III.    The Sale-Leasebacks and Sale of the Alta Projects (the "Alta Transactions") ............. 14

    A.    The Sale-Leasebacks of Altas II-V ................................................................. 15

    B.    The Sale-Leaseback of Alta I ........................................................................ 17

    C.    The Sale of Alta VI ....................................................................................... 18

IV.    Plaintiffs' Section 1603 Claims ........................................................................ 19

**Proposed Conclusions of Law** ...................................................................................... 21

I.    Background on Section 1603 and Its Applicability to Plaintiffs' Projects ..................... 22

II.    The *De Novo* Standard of Review ..................................................................... 24

III.    The Purchase Prices of the Alta Projects Do Not Establish the Cost Basis of the
Section 1603-Eligible Property ............................................................................... 25

    A.    The Alta Purchase Prices Encompass More than Eligible Property and Require an
Allocation ............................................................................................................ 26

        1.    Section 1603 Payments Are Available Only for Eligible Property ......................... 27

        2.    The Alta Purchase Prices Encompass More than Eligible Property ..................... 29

            a.    The Purchase Price for Each of the Alta Transactions Reflected the Value of
Both Eligible and Ineligible Assets ..................................................................... 30

                i.    Alta I .................................................................................................... 30

                ii.    Altas II-V ............................................................................................. 30

                iii.    Alta VI ................................................................................................ 32

            b.    The Alta Projects Include *Ineligible Real and Tangible* Property ..................... 32

            c.    The Alta Projects Include *Ineligible Intangible* Property ................................. 33

        3.    A Determination of the Value of the Eligible Property Is Thus Required ................ 36

i

B.   The Alta Transactions Were Not Arm's-Length and Include "Peculiar Circumstances" 37

    1.   The Purchase Prices in the Alta Sale-Leaseback Transactions Were Not Set Independent of Other, Related Transactions .................................................................... 38

    2.   The Alta Transactions Featured Side Agreements That Created Peculiar Circumstances ................................................................................................................. 39

    3.   Indemnities Guaranteeing the Amount of Section 1603 Payments Constitute Peculiar Circumstances ................................................................................................... 41

IV.   Defendant's Expert's Valuation of the Eligible Property Properly Determines Plaintiffs' Eligible Cost Basis ................................................................................................ 42

  A.   Dr. Parsons Valued the Eligible Property ....................................................... 43

  B.   Dr. Parsons' Approach Aligns with the Residual Method and Section 1060 ............... 49

  C.   The Market Approach Is Not Appropriate in this Case ................................................. 55

  D.   The Income Approach Is Not Appropriate in this Case Because It Values the Businesses As a Whole, not the Eligible Property, and Ignores the Presence of Intangibles 56

  E.   The Purchase Price Mark-Up Over Cost Is Not Properly Attributable to Turnkey Premium and Eligible Developer Profit ................................................................................ 61

V.   Defendant Is Entitled to Judgment on Its Counterclaims ................................................. 62

CONCLUSION ................................................................................................................................ 62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

2001 WL 1555306 (Fed. Cl. Nov. 30, 2001) ................................................................................ 4

*Alpha I, L.P. ex. rel. Sands v. United States*,
    83 Fed. Cl. 279 (2008) ........................................................................................................ 25

*Alta Wind I Owner-Lessor C, et al. v. United States*,
    125 Fed. Cl. 8 (2016) .......................................................................................................... 24

*Alta Wind I Owner-Lessor C, et al. v. United States*,
    117 Fed. Cl. 369 (2014) ............................................................................. 27, 29, 40, 53, 54

*Banc One Corporation v. Comm'r*,
    84 T.C. 476, 505 (1985), *aff'd,* 815 F.2d 75 (6th Cir. 1987) ............................................ 62

*Barnes Grp. Inc. v. United States*,
    872 F.2d 528 (2d Cir. 1989), *decision on remand in,* 724 F.Supp. 37 (1989), *aff'd,*
    902 F.2d 1114, 1116 (2d Cir. 1990)................................................................................... 42

*BB&T Corp. v. United States*,
    523 F.3d 461 (4th Cir. 2008) .............................................................................................. 32

*Bixby v. Comm'r*,
    58 T.C. 757 (1972)............................................................................................................... 38

*Capital Blue Cross v. Comm'r,*
    431 F.3d 117 (3d Cir. 2005)................................................................................................ 25

*Citizens and Southern Corporation v. Comm'r*,
    91 T.C. 463 (1988), *aff'd sub nom. Citizens & S. v. Comm'r*, 900 F.2d 266 (11th Cir. 1990),
    *and aff'd*, 919 F.2d 1492 (11th Cir. 1990) ....................................................................... 53

*Coast Fed. Bank FSB, v. United States*,
    323 F.3d 1035 (Fed. Cir. 2003)..................................................................................... 29, 36

*Colorado Nat'l Bankshares, Inc., & Subsid. v. Comm'r,*
    60 TCM 771 (T.C. 1990), *aff'd sub nom. Colorado Nat. Bankshares, Inc. v. Comm'r*,
    984 F.2d 383 (10th Cir. 1993) ........................................................................................... 53

*Comm'r v. Court Holding Co.,*
    324 U.S. 331 (1945)............................................................................................................ 32

*Computing and Software, Inc. v. Comm'r*,
    64 T.C. 223 (1975)............................................................................................................... 37

*Cook v. United States*,
    46 Fed. Cl. 110 (2000) ....................................................................................................... 25

*Cooper v. Comm'r,*
    88 T.C. 84 (1987)......................................................................................................... 37, 54

*Deseret Management Corp., v. United States*,
    112 Fed. Cl. 438 (2013) ............................................................................................... 28, 36

*D'Avanzo v. United States*,
    54 Fed. Cl. 183 (2002) ....................................................................................................... 25

*Frank Lyon Co. v. United States*,
    435 U.S. 561 (1978)............................................................................................................ 32

*G.U.R. Co. v. Comm'r,*
  41 B.T.A. 223 (1940), *aff'd sub nom. G.U.R. Co. v. Comm'r of Internal Revenue,*
  117 F.2d 187 (7th Cir. 1941). .......................................................................................... 38
*Gregory v. Helvering,*
  293 U.S. 465 (1935)......................................................................................................... 32
*Halle v. Comm'r,*
  83 F.3d 649 (4th Cir. 1996) ............................................................................................. 32
*Jack Daniel Distillery v. United States,*
  379 F.2d 569 (Ct. Cl. 1967) ...................................................................................... 29, 36
*Kraft Foods Co. v. Comm'r,*
  21 T.C. 513 (1954).......................................................................................................... 37
*Langdon v. Comm'r,*
  59 F. App'x 168 (8th Cir. 2003)....................................................................................... 53
*Lemmen v. Comm'r,*
  77 T.C. 1326 (1981)....................................................................................... 26, 37, 40, 41
*Lorvic Holdings, Inc. v. Comm'r,*
  76 T.C.M. (CCH) 220 (T.C. 1998) .................................................................................. 53
*Massey-Ferguson, Inc. v. Comm'r,*
  59 T.C. 220 (1972) .......................................................................................................... 37
*Mountain Wholesale Co. v. Comm'r,*
  17 T.C. 870 (1951).......................................................................................................... 38
*Peco Foods, Inc. v. C.I.R.,*
  103 T.C.M. (CCH) 1120 (T.C. 2012),*aff'd*, 522 F. App'x 840 (11th Cir. 2013) ............... 50, 52
*Philip Morris Inc. & Consol. Subsidiaries v. Comm'r,*
  96 T.C. 606 (1991), *aff'd sub nom. Philip Morris Inc. v.* Comm'r, 970 F.2d 897
  (2d Cir. 1992).................................................................................................................. 50
*R.M. Smith, Inc. v. Comm'r,*
  591 F.2d 248 (3d Cir. 1979)............................................................................................. 25
*Richard S. Miller & Sons v. United States,*
  537 F.2d 446 (Ct. Cl. 1976) ............................................................................................. 53
*Solitron Devices, Inc. v. Comm'r,*
  80 T.C. 1 (1983), *aff'd sub nom. Solitron Devices v.Comm'r*, 744 F.2d 95
  (11th Cir. 1984)............................................................................................................... 52
*Standard Conveyor Co. v. Comm'r,*
  25 B.T.A. 281 (1932)....................................................................................................... 37
*Utilicorp United, Inc.& Subsidiaries v. Comm'r,*
  73 T.C.M. (CCH) 1835 (T.C. 1997) .......................................................................... 55, 56
*Vons Cos., v. United States,*
  51 Fed. Cl. 1 (2001), *order modified on other grounds*, No. 00-234T, 2001 WL1555306
  (Fed. Cl. Nov. 30, 2001) .................................................................................................. 25
*W. Covina Motors, Inc. v. C.I.R.,*
  98 T.C.M. (CCH) 615 (2009) .......................................................................................... 52
*Waddell v. Comm'r,*
  86 T.C. 848 (1986), *aff'd*, 841 F.2d 264 (9th Cir. 1988)................................................... 37

*W.E. Partners II, LLC v. United States*,
   119 Fed. Cl. 684 (2015), *aff'd per curiam*, No. 2015-5054, 2016 WL 463580
   (Fed. Cir. Feb. 5, 2016) ................................................................................. 23, 24, 28
*Wells Fargo & Co. & Subsidiaries v. United States*,
   91 Fed. Cl. 35 (2010), *aff'd sub nom. Wells Fargo & Co. v. United States*, 641 F.3d 1319
   (Fed. Cir. 2011) ................................................................................................... 32

**Statutes**

Am. Recovery & Reinvestment Tax Act, Pub. L. No. 111-5 (2009), § 1603,
   as amended by Tax Relief, Unemployment Insurance Reauthorization, and Job Creation
   Act of 2010, P.L. 111-312 (2010), § 707 ..................................................................*passim*
26 U.S.C. § 45 ...................................................................................................... 23, 24
   26 U.S.C. § 45(a) ............................................................................................... 24
   26 U.S.C. § 45(d)(1) ...................................................................................... 20, 24
   26 U.S.C.  § 45(d)(1)-(11) ................................................................................ 24
26 U.S.C. § 48 ...................................................................................................... 23, 24
   26 U.S.C. § 48(a)(5) ........................................................................................... 24
   26 U.S.C. § 48(a)(5)(D) ..................................................................................... 27
   26 U.S.C. § 48(a)(5)(D)(i) ................................................................................. 28
26 U.S.C. § 197 ...................................................................................................*passim*
26 U.S.C. § 263A .................................................................................................... 47
26 U.S.C. § 338(b)(5) .............................................................................................. 52
26 U.S.C. § 1060 ..................................................................................................*passim*

**Regulations and Administrative Decisions**

Special Allocation Rules for Certain Asset Acquisitions, T.D. 8215,
   1988-2 C.B. 304, 53 Fed. Reg. 27035-01 (July 18, 1988) ................................ 36, 52
Treas. Reg. § 1.1060-1 ............................................................................................. 53
   Treas. Reg. § 1.1060-1(b)(2)(i) ......................................................................... 51
   Treas. Reg. § 1.1060-1(b)(2)(i)(B) .................................................................... 51
   Treas. Reg. § 1.1060-1(b)(2)(ii) ........................................................................ 37
   Treas. Reg. § 1.1060-1(b)(2)(iii) ....................................................................... 51
   Treas. Reg. § 1.1060-1(b)(5) ............................................................................. 52
Treas. Reg. § 1.197-2(b)(6) ..................................................................................... 35
Treas. Reg. § 1.197-2(b)(8) ..................................................................................... 36
Treas Reg. § 1.263(a)-4(d)(6)(i)(A) ....................................................................... 36
Treas. Reg. § 1.263(a)-4(c)(1)(xiii) ........................................................................ 36
Treas. Reg. § 1.48-1(c) ............................................................................................ 28
Treas. Reg. § 1.48-1(d) ............................................................................................ 28

**Treatises And Other Materials:**

15 Mertens Law of Fed. Income Tax'n § 59:76 ....................................................................... 50, 52
15 Mertens Law of Fed. Income Tax'n § 59:80 .............................................................................. 52
Bittker & Eustice, Fed. Income Tax'n of Corps. &Shareholders, ¶ 10.40[2] (6th ed. 1994) ....... 51
Black's Law Dictionary 1737 (10th ed. 2014) ................................................................................ 24

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 13-402, 13-917, 13-972, 13-935, 14-174, 14-93, 14-175, and 14-47

(Judge Thomas Wheeler)

ALTA WIND I OWNER-LESSOR C, *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S PRETRIAL MEMORANDUM OF FACTS AND LAW

Through the Section 1603 Program, Union Bank of California, General Electric Capital Corporation, Citibank, Google, and British private-equity firm Terra Firma have received over half a billion dollars from the United States Department of the Treasury ("Treasury") to subsidize their purchases of the Alta Projects, six wind-power generating businesses in California. Plaintiffs, the controlled entities that carried out the purchases, have filed suit seeking an additional $208 million, yet defendant's expert valuation shows that they have already received almost $59 million more than they are entitled to.

Section 1603 provides that plaintiffs may be reimbursed for 30% of their investments in eligible energy property. But when plaintiffs acquired the interests in the various Alta Projects (whether outright or through sale-leasebacks), they obtained more than just eligible energy property. Each Project also includes non-qualifying assets such as ineligible tangible property, land rights, and various intangible assets, all of which combined to form a stand-alone business that commanded the increased price paid by plaintiffs. The purchase prices that plaintiffs paid

1

for the Alta Projects are not attributable solely to eligible property. When the eligible property alone is valued, as defendant's expert has done, it is clear that a significant portion of each of the purchase prices is attributable to that Alta Project's ineligible assets.

Plaintiffs conducted no such valuation. Indeed, by not directly valuing the eligible property and ignoring some of the ineligible assets, plaintiffs in effect gross up the value of the eligible property to a new, much higher value, based on the overall purchase price. In doing so, plaintiffs essentially argue that the tangible, eligible energy property installed at these wind farms – facilities that were already built at the time of their purchase by plaintiffs – wondrously became significantly more valuable because they were sold as part of a stand-alone business.

Had Terra-Gen Power, LLC ("Terra-Gen"), the developer of the Alta Projects, been eligible for and applied for Section 1603 payments, it would have received those payments based on the amount it expended to procure and install the tangible, eligible energy property. The developer, owned and operated by private equity funds, instead sold the completed projects for a huge mark-up to plaintiffs, each of which grossed up those costs of building the wind farms and claimed a Section 1603 payment based on that much higher amount it paid for the collection of eligible and ineligible assets conveyed in the transactions. Moreover, the developer guaranteed through indemnity provisions that the purchasers would receive Section 1603 based on the premium purchase prices. Thus, the buyers were more than happy to pay that premium, knowing that the benefits of the claimed higher Section 1603 payment were locked in for them. In short, plaintiffs would have the Treasury subsidize the developer's profit, including unexpected windfalls, from packaging the eligible property as a business that includes both eligible and ineligible assets.

Of course, the proper approach is to recognize that the underlying value of the tangible, eligible energy property itself does not change despite financial engineering or the particular characteristics of the business in which the property happens to be deployed. Wind turbines, and their associated qualifying equipment, have a certain market-based value that it is determined by the costs, including profit attributable to that equipment alone. Just as a truck used in a trucking business does not have a higher market value just because the trucking company happens to have a beneficial contract or a particularly profitable market, the wind farm equipment itself does not become more valuable simply because it is used in a particularly profitable financial arrangement or because the business of which it is a part is resold.

Defendant's expert has conducted a valuation of the equipment itself, separate from these business dealings and circumstances, and has isolated the value of the eligible property alone – which is the proper value for the Court to adopt as the appropriate eligible cost basis for plaintiffs' Section 1603 payments. That valuation includes not only all of the eligible costs, but the profit on the construction and turbine supply contracts associated with the eligible property, as well as an aggregate return for the developer and other financiers of the project that amounts to approximately $98 million. What defendant's expert valuation excludes, and thus what is at issue here, is the remaining $1 billion of padded premium that the developer secured by packaging the eligible property in profitable businesses, through various financial and contractual maneuvers, and successfully selling them to plaintiffs. Defendant's expert's rigorous analysis of the basis of the eligible property indicates that plaintiffs have been overpaid by $59 million, and the Court should enter judgment for the United States in that amount.

3

**CONTENTIONS OF FACT**

**I.      Origins of the Alta Wind Energy Center**

The wind power development that ultimately became the Alta I, II, III, IV, V, and VI wind power projects at issue in this litigation (the "Alta Projects") was developed by two different companies: (i) Oak Creek Energy Systems ("Oak Creek"), which began the development process and partnered with Allco Wind Energy Management Pty. Ltd. ("Allco") to finance the development; and then (ii) Terra-Gen, which acquired the Alta Projects from Allco during the course of their development, completed their development and construction, and sold the finished projects to the plaintiffs here.

*A.   Oak Creek Development, Funding by Allco, and SCE's Transmission Investment*

Years before Terra-Gen's acquisition of what would become the Alta Projects, Oak Creek was busy developing wind power generation capability at that location.  Oak Creek's involvement began at least as early as 2005, four years prior to the enactment of Section 1603. Since the 1980s, Oak Creek has been an active wind energy developer in the Tehachapi region of California, in which the Alta Projects are located.

In October of 2005, through its subsidiary Tehachapi Holdings LLC, Oak Creek submitted a proposal to Southern California Edison ("SCE") for the sale of up to 880 megawatts ("MW") of electricity to SCE from new wind farms that Oak Creek proposed to build in the Tehachapi region.[1]  By that time, Oak Creek had, among other things, collected years of wind data, secured control of large tracts of land, begun certain permitting-related activities, and prepared an application for interconnection to the electric grid.

---

[1] The size of wind farms is often described in terms of how many megawatts of electricity they can produce at peak output.  This is dictated by the number and capacity of wind turbines installed at the wind farm.

To finance the projects that it had proposed to SCE, Oak Creek entered into a Joint Development Agreement ("JDA") in March 2006 with Allco Asset Finance Limited ("AAFL"), which was subsequently amended and restated ("ARJDA") on June 30, 2006, to replace AAFL with Allco Wind Energy Management Pty. Ltd. ("Allco"). Allco was an Australian business entity. At the time the ARJDA was executed, Oak Creek had acquired land rights options throughout the Tehachapi/Mojave area and was short-listed for power purchase agreements with Southern California Edison and San Diego Gas and Electric. Under the terms of the ARJDA, the parties created Alta Innovative Power Company, LLC ("AIPC"), as the vehicle for facilitating Allco and Oak Creek's joint venture to develop, construct, and finance the projects under development in the Tehachapi region (the "Tehachapi Projects") — including those that would become the Alta Projects — as well as a distinct project in that region named Alite, and any additional, unspecified, future projects in California. AIPC was owned 50% by Oak Creek and 50% by AllCapital Wind Energy Management, LLC ("AWEM"), an Allco affiliate.

Under the terms of the ARJDA, Oak Creek agreed to sell and transfer to AIPC all of its development rights in the Tehachapi Projects, which AIPC was to then sell and transfer to a special-purpose development entity (the "Allco project company"). In return for selling these rights, Oak Creek received a reimbursement of approximately $2 million in documented internal and external development costs for the Tehachapi Projects incurred up to the time of the transfer and an agreement that AIPC, of which Oak Creek owned 50%, would receive royalties on revenue generated by the Tehachapi Projects. Under the ARJDA, Allco was to provide the financing for Oak Creek's development work.

AIPC and the Allco project company entered into a related Development Services Agreement, under which AIPC agreed to perform "all usual and necessary wind power project

5

development activities" for the Tehachapi Projects through the close of construction financing, and the Allco project company agreed to reimburse AIPC's development costs other than certain overhead costs.  The royalties that AIPC would receive for its development efforts associated with each of the successfully completed Tehachapi Projects would be either 5% of the project's annual operating revenue, or a one-time lump sum upfront payment of $97,000 per megawatt of turbine capacity installed at the project, payable at the close of permanent financing.  The lump sum payment was later amended to equal a calculated present value of the expected 5% annual royalty, rather than the fixed amount of $97,000 per megawatt.  Under AIPC's structure, 50% of these royalties would be distributed to Oak Creek, the project's original developer, and 50% would be distributed to Allco, the partner that was financing the Tehachapi Projects' development.

Following Oak Creek's October 2005 proposal to SCE and the execution of the ARJDA between Oak Creek and Allco, the Tehachapi Projects secured a Master Power Purchase and Wind Project Development Agreement ("Master PPA") with SCE in December 2006.  This agreement established the overall contractual framework for the development of 1,500 to 1,550 MW of capacity in the Tehachapi region.  Under the agreement, as individual phases (also referred to as projects) of the Tehachapi Projects were ready to be built, each would enter into project-specific daughter PPAs for the sale of electricity to SCE, subject to the pricing formula established in the Master PPA.

The Tehachapi Projects were to be among the first projects to interconnect to California's long-planned Tehachapi Renewable Transmission Project ("TRTP"), which over time was expected to allow for transmission of a total of 4,500 MW of new electricity generation from the Tehachapi region to customers in Southern California.  Beginning in early 2006, Oak Creek and

6

Allco submitted interconnection applications and secured queue positions for 3,110 MW of capacity. To secure the right to connect to (or interconnect with) transmission infrastructure such as TRTP, applicants must join an interconnection queue and go through a series of studies that culminate in the execution of an interconnection agreement. The applicant's queue position, among other factors, influences its relative priority in securing an interconnection agreement, and 1,710 MW of the Tehachapi Projects' queue positions were in an accelerated "First Cluster."

At the time of Terra-Gen's acquisition of Allco's U.S. wind energy business in 2008, described below, the First Cluster applications were undergoing the last of three studies that had to be completed before executing an interconnection agreement. Terra-Gen recognized that the Tehachapi Projects' rights to connect to the TRTP were a significant asset because, in its words, "new transmission builds in California are difficult and a lengthy process; TRTP is here and now."

In addition to executing the Master PPA and holding the First Cluster interconnection queue positions, by 2008 Oak Creek and Allco owned or controlled the use of more than 32,000 acres of land in the Tehachapi region, which they believed would allow for construction of about 2,100 MW of wind projects. They were also in negotiations for control of another 10,000 acres of land. Thus at the time of Terra-Gen's acquisition of Allco, the majority of the land for Alta I had been secured. Terra-Gen would later describe land ownership and control, such as that obtained through the contracts that Oak Creek and Allco had secured, as a major value driver of its Alta Projects.

Thus, by June 2008, completed development work on what was to become the Alta Projects included (1) environmental studies; (2) the securing of key transmission and interconnection queue requests in the TRTP, which SCE began constructing in March 2008; (3)

7

the securing of valuable land rights; (4) permitting, including beginning the zone change process with Kern County; (5) site analysis for turbines and major equipment; (6) the purchase of GE turbines and the execution of certain turbine related contracts; (7) the construction of MET towers and collection of wind data; and (8) the securing of the Master PPA with SCE.

### B.   The Acquisition of Allco's U.S. Wind Energy Business by Terra-Gen

In July 2008, Allco's U.S. wind energy business, including its interest in what became the Alta Projects, was acquired by Terra-Gen.  Terra-Gen, formed in 2007, was owned by ArcLight Capital Partners.[2]

Terra-Gen first learned about the opportunity to acquire Allco's United States wind energy business in 2008.  After receiving a Confidential Information Memorandum in approximately March 2008, Terra-Gen participated in a two-stage auction process, over the course of which it submitted multiple bids.

A key component of Allco's U.S. wind energy business was its ownership of the in-development Tehachapi Projects, which Allco described as a 3,100 MW project that was "one of the largest wind development projects in the world and the largest in California."  What became known as the Alta Projects were part of the Tehachapi Projects.  As noted previously, this ownership interest had previously been transferred from Oak Creek to AIPC, and then to Allco project companies under the ARJDA in return for the above-described consideration.  Allco described the assets for sale as the development rights to the Tehachapi Projects, as well as ownership or control over land parcels, the Master PPA with Southern California Edison, and transmission queue positions for the TRTP associated with at least 3,100 MW of electricity.  Of

---

[2] Currently, Terra-Gen has two private equity owners, referred to as sponsors: ArcLight and Global Infrastructure Partners.

that 3,100 MW, the first 1,550 MW of the Tehachapi Projects would be sold to SCE through the Master PPA, while the remaining 1,550 MW were uncontracted. Allco's U.S. wind energy business also included the Alite project and Allco's interest in AIPC, the development services joint venture with Oak Creek that had been carrying out the development of the Tehachapi Projects.

To evaluate the opportunity to buy Allco's U.S. wind business, Terra-Gen hired consultants, including both wind consultants to evaluate available wind data and JP Morgan to evaluate whether the acquired projects could attract investors. Terra-Gen wanted to acquire Allco's wind energy business because Terra-Gen had a presence in California and wanted to develop and construct the projects.

After participating in two rounds of bidding, Terra-Gen was selected as the winning bidder. In coordination with ArcLight Capital Partners, Terra-Gen created an entity called California High Wind Power, LLC ("CHiPS"), to carry out the acquisition. On or around June 16, 2008, certain Allco entities entered into various agreements with CHiPs that would execute the sale, which would close a month later. Specifically, AllCapital Energy Holdings, LLC ("AEH"), and AllCapital Energy Management, LLC ("AEM"), entered into a Membership Interest Purchase Agreement with CHiPS, known as the Master SPA (or Sale Purchase Agreement).

Pursuant to the Master SPA, AEH and AEM sold certain interests, described as the ATPC Membership Interests and ATM Membership Interests, to CHiPs. AEH also sold its 10% interest in AllCapital Wind Energy Tehachapi Coinvestment No.1, LLC ("AWET"). The remaining interests in AWET were acquired from other entities through related agreements referred to as the Military Sale Purchase Agreement and the SIF SPA. The parties closed the sale on July 15,

9

2008. The final sale price was approximately $394 million, including $390 million in equity and $4 million in assumed liabilities. The Master SPA also required the parties to allocate the purchase price pursuant to Section 1060 of the Internal Revenue Code, using the residual method.

As a condition of closing, the Master SPA required CHiPS to assume the ARJDA described above. In particular, this meant that CHiPS, or any companies that subsequently acquired any of the Tehachapi Projects, were still required to pay the 5% royalty or one-time lump-sum upfront payment to AIPC, even though AIPC had not completed the associated development work at the time that Terra-Gen acquired Allco's interest. After the acquisition, Oak Creek (the non-Allco member of AIPC) remained involved in development efforts until approximately the end of 2008. At that point, Terra-Gen continued Oak Creek's work.

### C.    The Appraisal of the Allco Assets

In 2010, Duff & Phelps ("Duff"), an appraisal firm, prepared two reports for Terra-Gen in connection with Terra-Gen's acquisition of Allco's U.S. wind energy business.

One report, the "Fair Value Report," dated January 19, 2010, is a report of Duff's estimation of the fair market value of certain identifiable tangible and intangible assets of CHiPS at the time of, and arising from, Terra-Gen's July 2008 acquisition of Allco's assets. Duff prepared the Fair Value Report at the request of Terra-Gen for the purpose of allocating the purchase price among the acquired assets.

In the Fair Value Report, Duff estimated that approximately $36 million of the $394 million purchase price should be allocated to the value of the Alite wind farm that was nearly complete at the time of the acquisition, that approximately $68 million of the purchase price reflected payments that Allco had made for turbines that would be used in the Alta Projects, and that an additional few million dollars was allocable to a few hundred acres of land that the Allco

10

entities owned fee simple, as well as other assets.  Duff estimated that the remaining $282 million of the purchase price reflected the acquisition of certain rights and assets for the Tehachapi Projects.  Of this amount, only $10.4 million reflected actual documented costs that Allco had incurred in association with developing the Tehachapi Projects, including, among other things, its initial reimbursement of Oak Creek's development costs prior to the ARJDA, as well as Oak Creek salaries and permitting costs.

Duff attributed the remaining $272 million to the value, above and beyond the cost, of the various contractual rights associated with the Tehachapi Projects that AIPC had already developed, or was in the process of developing, at the time of the acquisition.  As noted above, these included a Master PPA with SCE; TRTP transmission queue positions necessary to secure rights to interconnect with the electric grid; various forms of land rights in the Tehachapi region; and the permitting-related activities that Oak Creek and Allco had begun.

Of this amount, Duff estimated the fair market value of "Development Rights" acquired by Terra-Gen to be $195 million.  Duff described the Development Rights as the "collection of permits, wind data, agreements, and other development milestone achievements which are necessary to bring a development project from conceptual stage to operation" including but not limited to the Tehachapi Projects' "contractual framework with SCE that will allow for future power purchase agreements for approximately 1,550 MW of capacity."  Duff allocated the remaining $77 million to the TRTP transmission rights acquired in the transaction.

A second Duff report, dated February 3, 2010, and called the "Allocation of Phases Report," takes Duff's previous estimate of the total fair market value of the transmission and development rights determined in the Fair Value Report and allocates the value of those rights among a subset of the different Tehachapi Project phases, now referred to as Altas I-XI.

11

In the Allocation of Phases Report, Duff allocated the $195 million of estimated development rights value and $77 million of transmission rights value among these project phases, projected to have a combined capacity that would account for only 1,550 MW of the overall development opportunities that were acquired from Allco, including those arising from the 3,100 MW of transmission queue positions and tens of thousands of acres of land rights under control or in negotiation.

## II.    Terra-Gen's Subsequent Development Work on the Alta Projects

Duff's Allocation of Phases report was undertaken as Terra-Gen pursued certain additional development efforts, described below.  As this work progressed, Terra-Gen began to tranche the Allco acquisition into various projects or phases – the Alta I, Altas II-V, and Alta VI Projects at issue here, as well as other, later projects.  These tranches were broken out as slices of generation capacity (the number of megawatts that could be generated, and thus the expected PPA income), which allowed the projects to be aggregated or disaggregated as necessary to facilitate, among other things, development, execution of the PPAs, construction financing, sale-leaseback execution, and syndication.

### A.    Terra-Gen's Development Efforts

Terra-Gen continued to acquire land rights for the Alta I-XI Projects.  Terra-Gen also continued Oak Creek's work in obtaining permits.  Terra-Gen's work included completing the process of obtaining a comprehensive environmental review required by Kern County that was necessary to get land rezoned for wind energy, obtaining California Environmental Quality Act review, obtaining geotechnical analyses, executing interconnection agreements, completing the process of obtaining crossing agreements, obtaining California Department of Fish and Game Permits, and obtaining FAA permits for each turbine constructed.  Terra-Gen also obtained construction financing and oversaw the construction of the facilities.

12

Although Oak Creek and Allco had already executed turbine supply agreements and acquired GE turbines for Alta I, Terra-Gen negotiated and entered into turbine contracts for Altas II-VI with Vestas, a different supplier. As described below, this decision would provide an important benefit to the Alta Projects that was based on the peculiar terms of the Alta Projects' PPA.

### B.  Terra-Gen's Use of "Turbine Blending"

Terra-Gen was able to increase the price at which it was able to sell power from Altas I-VI, and hence the total income generated by the projects, in one case without making any physical change to the facilities, by invoking two key provisions of the Master PPA.

First, the power price for the project-specific daughter PPAs was tied to the cost of the turbines used to generate power, subject to a price cap. At least in part, this provision was intended to allow pricing under the Master PPA to be flexible in the face of changes over time in the market price of turbines — and hence changes in the each project's construction cost. The specific formula employed, however, had additional implications for the value of each of the Alta Projects. In particular, the project-specific daughter PPA prices were determined using a formula that was dependent, in part, on the ratio of the project's turbines' cost to their rotor-swept area ("RSA"). The RSA is the area of the circle that the turbine blades rotate through when they turn. The longer the turbine's blades are, the bigger the turbine's RSA. Under the formula, turbines that cost more per RSA yield a higher PPA price. Therefore, a turbine that cost the same as another turbine, but that had a smaller RSA, would yield a higher PPA price.

Second, the Master PPA permitted the developer to rely on an average of the cost and RSA characteristics of turbines used across multiple specific projects in determining the PPA price for each of those projects. By using this latter provision, referred to as "turbine blending," Terra-Gen was able to increase the PPA price that the Alta I project received simply by basing

13

the Alta I PPA price on the blended turbine cost and RSA characteristics of Altas II-V, rather than basing Alta I's PPA price solely on the characteristics of the Alta I turbines.

The GE turbines slated for the Alta I project had a relatively low cost-per-RSA and thus would yield a low PPA price under the formula.  In comparison, the Vestas turbines used for Altas II-V were more expensive, due to having twice the electrical generating capacity, but their RSA was not proportionately larger.  As a result, they had a higher cost-per-RSA, which in turn would generate a much more favorable (that is, higher) PPA price for Terra-Gen.  Indeed, the Vestas turbines' cost-per-RSA was high enough that it exceeded the contractually-specified cap on the PPA price under the Master PPA.

Without the blending, the Alta I PPA price would have been calculated based on the characteristics of only the GE turbines (which were actually used in the project), and the Alta II-V PPA prices would have been calculated based on Vestas turbines and would have been subject to the contractually-specified price cap.  Instead, using the terms of the PPA, Terra-Gen was able to have Alta I-V's PPA prices dictated by the blended average characteristics of the Vestas and GE turbines, increasing Alta I's PPA price up to the contractual cap without bringing Altas II-V's PPA prices down below the cap.  Terra-Gen did not, however, need to actually locate Vestas turbines within the Alta I project.  In other words, this blending increased the value of the Alta I project based on the characteristics of turbines used in Altas II-V, without requiring a physical change in the Alta I facility.  That is, the increased power sale price for Alta I was not based on the eligible property actually installed at Alta I.

## III.    The Sale-Leasebacks and Sale of the Alta Projects (the "Alta Transactions")

During its development work, Terra-Gen also began to ready the Alta Projects for sale.  As a private equity fund investment, Terra-Gen did not intend to hold and operate the projects long term.  In addition, Section 1603 disqualifies any entity from qualifying for funds if that

14

entity has any upstream owner that is tax-exempt. Terra-Gen's parent entities are owned, to a small extent, by tax-exempt pension funds. Since Terra-Gen therefore could not qualify for the Section 1603 award for any of Altas I-VI (or beyond) if it owned them outright (*i.e.,* without inserting a taxable corporation into the ownership structure, a strategy known as a C-Corp blocker), it needed to look for "takeout" strategies that would allow it to transfer the projects to other companies that could qualify for the award. In its (and plaintiffs') view, doing so would also greatly increase the amount of Section 1603 payment that it could claim, as explained below.

### A.    The Sale-Leasebacks of Altas II-V

The first such takeout for an Alta Project that Terra-Gen closed was the set of sale-leasebacks of Altas II-V to Citigroup and additional investors. These Projects were a quartet of wind farms with capacities of 150 MW, 150 MW, 102 MW, and 168 MW, respectively. After receiving proposals for various deal structures from a number of bidders, Terra-Gen ultimately entered into an agreement with Citigroup under which Citigroup provided a portion of the necessary project financing in addition to committing to the leveraged sale-leaseback of all four phases (II, III, IV, and V).[3] To carry out the sale-leaseback, the parties created multiple owner-lessor entities (now the plaintiffs in this case) for each of Altas II, III, IV, and V. These entities, all trusts, were initially wholly owned by Citigroup; each acquired an undivided percentage interest in the applicable Alta Project.

Citigroup and Terra-Gen then began the process of individually closing each of the four phases, with Citigroup divesting some or all of its interest in each individual phase to other

---

[3] A sale-leaseback transaction is considered leveraged where, to complete the purchase portion of the transaction, the purchasing party issues debt to raise funds.

15

potential investors either by recruiting a co-investor before closing (as with Google) or divesting its interest in an owner-lessor entity after closing.  In other words, having agreed to the sale-leaseback of Altas II-V in their entirety and negotiated the terms of the overall deal, Citigroup bore the onus of recruiting other parties to acquire a share of Citigroup's interest either before or after the sale-leaseback transaction closed.

On paper, the sale-leasebacks involved the sale of only the eligible energy property to the purchasers (or owner-lessors).  However, the actual complexity of the Alta II-V sale-leaseback transaction is made clear by the volume of transactional documents required to complete the deal in its entirety.  In addition to the Participation Agreement setting forth the overall transaction, the parties entered into a welter of side and other related agreements memorializing various deal terms, including:

- Bills of Sale;
- Facility Leases;
- Retained Assets Leases;
- Site Leases;
- Site Subleases;
- LCD Cash Grant Agency Agreements between Terra-Gen and each owner-lessor;
- Certificates regarding Grant Shortfall;
- PPA Assignment Agreements;
- PPA Use Agreements;
- Project Document Assignment Agreements;
- Project Document Use Agreements;
- SCE Joinder Agreements;
- Intermediate Holdco Pledge and Guaranty Agreements;
- Various Lease Collateral Documents as defined in the Participation Agreement;
- Support Services Agreements; and
- Support Services Conditional Use Agreements.

The transaction documents established total purchase prices paid to transfer Section 1603-eligible property for each Alta phase:  $440.25 million for Alta II, $444.5 million for Alta III, $288.8 million for Alta IV, and $488 million for Alta V.

16

Critically, the sales of ownership interests in Alta II-V property to Citigroup, Google, and other investors occurred in the context of a related leaseback of that property by Terra-Gen. Moreover, as noted above, the sales occurred alongside the execution of a number of additional agreements providing for leases and subleases of the ineligible tangible project assets and land, and also providing for other project assets to be offered as collateral to the purchasers. Together with the sale of the Section 1603-eligible property, these various agreements between Terra-Gen and the Alta II-V plaintiffs created an overall transaction in which the owner-lessors obtained the right to receive the cash flows generated over time by the integrated use of all of the real property, as well as tangible and intangible assets that comprised the Alta II-V Projects.

In addition, the sale-leaseback terms included indemnification provisions that financially insulated the owner-lessors from the financial risk posed by the possibility that Treasury could award less than the claimed amount of the Section 1603 application. So long as Treasury's award amounted to at least 28.5% of Terra-Gen's own claimed eligible costs of developing and constructing the property (which were substantially below the purchase-price-based claims that plaintiffs actually submitted), Terra-Gen would take the financial risk of the reduced award. The owner-lessors were thus indemnified (subject to a cap) against a financial loss from a Section 1603 award reduction.

### B.    The Sale-Leaseback of Alta I

After negotiation of the Alta II-V transaction, Terra-Gen brought the 150-MW Alta I facility to the market, again looking to divest itself of the project through a sale or sale-leaseback transaction. Unlike the Alta II-V transactions, however, construction and term financing was already in place. Terra-Gen received responses from several parties, including Union Bank of California ("Union Bank"), General Electric Capital Corporation ("GE"), Brookfield, and Sumitomo, variously proposing both sale and sale-leaseback structures. Terra-Gen finally

17

accepted a joint bid from Union Bank and GE, which had formed a consortium to participate as equal co-investors in a sale-leaseback transaction. The deal was, like the Alta II-V sale-leaseback, accomplished through the use of owner-lessor trusts, two of which were wholly owned by Union Bank, and two by GE.

Unlike the Alta II-V transaction, even on paper, the sale portion of the Alta I transaction transferred both Section 1603-eligible and ineligible property, for a purchase price of $560 million. However, just like the Alta II-V transactions, the Alta I sale-leaseback included a number of related agreements beyond the overarching Participation Agreement, including Facility Leases, Site Leases, Site Subleases, various collateral agreements and pledges, and Tax Indemnity Agreements. In total, the various agreements between Terra-Gen and the Alta I plaintiffs created an overall transaction in which the owner-lessors obtained the right to receive the cash flows generated over time by the integrated use of all of the real property, as well as the tangible and intangible assets that comprised the Alta I project.

Moreover, Terra-Gen's Section 1603 indemnity as to Alta I included no outer limit to Terra-Gen's liability for a reduction in Section 1603 payment: Union Bank and GE are indemnified no matter how great the difference between the Section 1603 payment that they claimed and what they actually received.

### C.   The Sale of Alta VI

Terra-Gen brought Alta VI to market not only after the conclusion of the Alta II-V and Alta I sale-leasebacks, but after the outright sale of Alta VIII. Terra-Gen had marketed Alta VIII, a 150-MW project, to a number of bidders as an outright sale and ultimately closed with Brookfield. As a result of that process, Terra-Gen was aware of EverPower as a potential buyer.

EverPower purchased Alta VI outright for $489.388 million. As with the Alta I sale-leaseback, Terra-Gen provided EverPower with an unlimited indemnity as to the amount of the

Section 1603 award; that is, EverPower would be indemnified for any reduction, no matter how large.

Despite the seemingly straightforward nature of the transaction, this sale was also tied to other related agreements, including a separate Shared Facilities Agreement. Under that agreement, the owner of Alta VI is required to make certain "wake payments," typically intended to compensate downwind Alta projects for the adverse effect on their performance caused by the wake from Alta VI's upwind turbine rotors. Before the Alta VI sale closed, however, Terra-Gen made over $5 million in wake payments to other Alta projects and provided EverPower with an additional indemnity, this time against any future wake-related obligation that Alta VI would otherwise have had to pay the affected Alta projects. In other words, as part of the transaction with EverPower, Terra-Gen relieved EverPower of certain of Alta VI's financial obligations under the Shared Facilities Agreement, which reduced the value of the project to Terra-Gen below the stated purchase price and increased the value of the project to EverPower.

## IV.   Plaintiffs' Section 1603 Claims

As contemplated in Terra-Gen's takeout strategies for Altas I-VI and reflected in the transaction documents, each of the twenty plaintiffs in this case applied for funds under Section 1603 of the American Recovery and Reinvestment Tax Act ("ARRTA"), P.L. 111-5 (2009), as amended by § 707 of the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, P.L. 111-312 (2010) ("Section 1603"). Specifically, plaintiffs here applied for Section 1603 payments alleging they were owners of qualified wind facilities under § 1603(d)(1) and 26 U.S.C. § 45(d)(1) (definition of wind facility). Under the statute, they are entitled to payments equal to 30% of their eligible cost basis in the projects. § 1603(b)(2)(A).

The plaintiffs each submitted a Section 1603 application based on their project's claimed eligible basis, or a proportional amount thereof where there were multiple owners of a single

19

project.[4]  Under the terms of the transactional documents surrounding the sales-leaseback of Altas I-V and the sale of Alta VI, Terra-Gen spearheaded this application process for all of the plaintiffs.[5]  Thus, for each of the six Alta Projects, Terra-Gen drafted the initial applications and acted as the primary point of contact for Treasury's questions as to each set of Section 1603 applications.  Terra-Gen was the primary drafter of the grant applications (and was the addressed recipient of the award letters), provided the primary interface with the Section 1603 program team, and was the point of contact for discussions with Treasury personnel.  Under the terms of the transaction documents related to the sale-leasebacks (or in the case of Alta VI, the sale) of each Alta Project, the parents of the owner-lessors, including GE, Union Bank, and Citigroup, also participated in such discussions, but in a secondary and review capacity.

As required, each application for Section 1603 funds included a breakdown of eligible costs, including all costs and components related to cost basis.  Each application also included an independent accountant's certification of the claimed allocation between eligible and ineligible costs, here provided by KPMG in every case.  That certification was based on information provided by Terra-Gen to KPMG, including Terra-Gen's assertion as to the correct allocations between eligible and ineligible costs and Terra-Gen's own cost figures.  For each of Altas I through V, KPMG prepared the certification after performing two different cost segregation studies that reviewed the categorization of eligible and ineligible costs, one based on Terra-Gen's claimed development and construction cost, and one that effectively grossed up these amounts based on the sale price for the sale-leaseback transaction.  For Alta VI, KPMG only performed a

---

[4] For example, each of the four owner-lessors for Alta I submitted an application seeking funds equal to 25% of the overall eligible cost basis of Alta I as a whole.

[5] As discussed, for each of the Alta Projects, Terra-Gen entered into indemnification agreements that placed the risk of a lower-than-requested Section 1603 award on Terra-Gen.

cost segregation based on the sale price for the sale-leaseback transaction. KPMG's attestations say nothing as to whether the sale price for the sale-leaseback transaction provides the correct foundation for an allocation among eligible and ineligible costs. In performing that exercise, KPMG's cost segregation analyst did not review the underlying accuracy or correctness of the costs as provided to KPMG by Terra-Gen.

Treasury and NREL engaged in extensive review of plaintiffs' Section 1603 applications, including continued dialogue with Terra-Gen. In each case, Treasury awarded each plaintiff an amount that Treasury concluded was more consistent with 30% of the eligible cost basis than were plaintiffs' claims. That is, Treasury's award represented a downward adjustment from the amount claimed in the plaintiff's application. In the case of Altas II-VI, Treasury's award letters specifically stated that the amount actually awarded could still represent an overestimate of the project's eligible cost basis. Discontent with these awards, the plaintiffs filed complaints as to each of Altas I-VI over the course of 2013 and 2014, which have been consolidated into the instant proceeding.[6]

## PROPOSED CONCLUSIONS OF LAW

These consolidated cases require the Court to determine the cost basis to be used to calculate plaintiffs' Section 1603 payments for the eligible, tangible, depreciable energy property of the Alta Projects. That determination requires looking beyond the purchase prices used in the Alta Transactions, which included more than just eligible energy property and which featured peculiar circumstances. Defendant's expert has examined the value of the *eligible* energy property alone and has determined that the original Section 1603 payments from Treasury were

---

[6] GE, 50% owner of Alta I, did not file suit, and thus its award is not directly at issue in this litigation.

too high, leading to defendant's counterclaims for the erroneous excess payments, which total $58,884,336.

Across all of the Alta Projects in question, defendant's expert's valuation incorporates nearly $1.7 billion in actual costs incurred by the project's developers to develop and construct the projects. While that $1.7 billion already includes profit earned by those companies that supplied turbines to, or constructed, the tangible energy facilities, defendant's expert's valuation also includes millions of additional dollars in management fees, salaries, and other internal costs of the projects' developers, as well as another nearly $100 million representing a return (or profit) on the investment required to fund the development and construction of the eligible portion of the Alta Projects up to the point of their completion.

Plaintiffs claim that they were underpaid by $208 million, basing their assertion on approximately $1 billion in additional development profit that they believe should be included in their claimed cost basis. Not only is plaintiffs' approach incorrect under the law, but plaintiffs' experts do not provide a valuation of the tangible, eligible, depreciable energy property alone.

## I.    Background on Section 1603 and Its Applicability to Plaintiffs' Projects

Each plaintiff here is an owner of an undivided interest in an Alta Project. Each plaintiff applied for funds under Section 1603, received the majority of those funds, and filed suit seeking additional payments.

Section 1603 was enacted as part of ARRTA to create a temporary program offering a cash payment in lieu of a tax credit for certain qualified investments in clean energy property. The program, like the existing tax credits, was designed to "reimburse such person for a portion of the expense of such property." § 1603(a). Under the program, as amended, upon application

22

to Treasury,[7] any eligible applicant placing into service "specified energy property" was entitled to a cash payment equivalent to a percentage of the eligible cost basis of the property (for wind, 30%). § 1603(a), (b). By directly reimbursing a portion of a project's expense, the program created an investment incentive.

Under Section 1603, property eligible for cash payments in lieu of tax credits is called "specified energy property." § 1603(a). Specified energy property is defined by explicit cross-reference to the Internal Revenue Code. § 1603(d). The definition of "specified energy property" contained in § 1603 relies on definitions from 26 U.S.C. § 45 (the Production Tax Credit) and § 48 (the Investment Tax Credit).[8] § 1603(d); *see also* § 1603(h).

Upon enactment of Section 1603, which also made certain amendments to the existing Investment Tax Credit available under 26 U.S.C. § 48, large wind projects became eligible for a Section 1603 payment or Investment Tax Credit in lieu of a Production Tax Credit under 26 U.S.C. § 45. *See* § 1603 (b)(2)(A); 26 U.S.C. § 48(a)(5). Under 26 U.S.C. § 45, the amount of the tax credit to which a wind project was entitled was based on the project's electricity production. *See* 26 U.S.C. § 45(a). By contrast, a Section 1603 payment, like the Investment Tax Credit, provided for an upfront cash payment based on a percentage of eligible cost basis. Thus, the 2009 enactment of Section 1603 marked a change in the incentive for wind projects.

Each of the Alta Projects qualifies for a Section 1603 payment through the definitions imported from § 45, which provides a credit for facilities generating electricity from certain

---

[7] Treasury administers the Section 1603 program. Under an interagency agreement with the Department of Energy ("DOE"), DOE's National Renewable Energy Laboratory ("NREL") assists Treasury in reviewing applications.

[8] Section 1603 payments are also limited by the "limitations on eligible cost basis found in the Treasury Guidance." *W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 690 (2015), *aff'd per curiam*, No. 2015-5054, 2016 WL 463580 (Fed. Cir. Feb. 5, 2016).

23

qualifying fuel sources, including wind.  § 1603(d)(1); 26 U.S.C. § 45(d)(1)-(11).  Thus, the Alta

Projects are entitled to a Section 1603 payment in the amount of 30% of their eligible cost basis.

§ 1603(b)(2)(A); 26 U.S.C. § 45(d)(1) (definition of wind facility).

## II.    The *De Novo* Standard of Review

The Court must determine the value of plaintiffs' eligible cost basis in the Alta Projects.

As the Court has previously noted, it will make that determination *de novo*.  *Alta Wind I Owner-*

*Lessor C v. United States*, 125 Fed. Cl. 8, 9, 11 (2016) (Order on Def.'s Mot. to Amd. Pleadings)

(Dkt. No. 87); *W.E. Partners II, LLC v. United States*, 119 Fed. Cl. at 690 (2015).

Under this *de novo* standard of review, the Court determines both questions of fact and

issues of law "anew"; it will give no consideration to any action or determination at the federal

administrative level.  *See D'Avanzo v. United States,* 54 Fed. Cl. 183, 186 (2002) ("[A tax refund

suit] is not an appellate review of the administrative decision that was made by the IRS; instead,

the Court must make an independent decision as to whether the taxpayer is due a refund.")

(internal citation omitted).  In other words, the Court will not consider the factual findings or

legal determinations made by Treasury or NREL in their consideration of the Alta Projects'

applications, just as in a tax refund suit the Court may not consider the factual or legal

conclusions made by the Internal Revenue Service.  *See Vons Cos.,v. United States,* 51 Fed. Cl.

1, 5-6 (2001), *modified*, No. 00-234T, 2001 WL1555306 (Fed. Cl. Nov. 30, 2001), *abrogation on*

*other grounds recognized by Alpha I, L.P. ex. rel. Sands v. United States*, 83 Fed. Cl. 279 (2008),

*order modified on other grounds,* 2001 WL 1555306 (Fed. Cl. Nov. 30, 2001); *Cook v. United*

*States*, 46 Fed. Cl. 110, 113 (2000).

In short, the Court here will make an independent decision as to plaintiffs' eligible cost

basis.  In doing so, the Court may adopt the valuation put forward by an expert witness or reach a

valuation determination of its own.  In the latter instance, it may elect to adjust certain aspects of

24

the valuations put forward by an expert witness.  *See R.M. Smith v. Comm'r,* 591 F.2d 248, 251 (3d Cir. 1979); *Capital Blue Cross v. Comm'r,* 431 F.3d 117, 130 (3d Cir. 2005).

### III.    The Purchase Prices of the Alta Projects Do Not Establish the Cost Basis of the Section 1603-Eligible Property

In this case, even if the purchase prices for the Alta Projects may set the owners' tax basis in the overall Alta Projects, the purchase prices certainly do not provide an answer to the question before the Court.  That question is:  What is each plaintiff's cost basis in the portion of the Alta Projects that is tangible, depreciable property that is eligible as specified energy property under Section 1603?

Unlike the determination of plaintiffs' tax basis in the Alta Projects as a whole, which might look to the purchase prices in the Alta Projects' respective sale-leasebacks and/or sales, the determination of eligible cost basis under Section 1603 requires the Court to conduct a different analysis, for two independent reasons.

First, to appropriately determine plaintiff's eligible basis, the court must isolate the portion of purchase price attributable to the eligible specified energy property alone (hereafter referred to as "eligible property").  The purchase prices were established in the context of transactions involving more than just eligible property.  Any value that ineligible property contributed to the overall transaction value results in a purchase price that does not reflect the value of eligible property alone.  Here, the Alta Transactions encompassed far more than just eligible property: they included ineligible transmission assets, land rights, power purchase agreements, interconnection and shared facilities agreements, various other contracts, and other intangibles.  As a result, the overall purchase price is relatively meaningless when trying to determine what portion of the plaintiffs' overall basis in the Alta Projects is actually basis in eligible, tangible, depreciable energy property.

Second, even if the purchase price were only for the eligible assets (which it was not), that purchase price would only provide information as to a buyer's cost basis in those assets if (i) the price was set at "arm's-length" and (ii) the transaction was not "based upon 'peculiar circumstances' that influence the purchaser to agree to a price in excess of the property's fair market value." *Lemmen v. Comm'r,* 77 T.C. 1326, 1347-48 (1981). All of the Alta Transactions involved multiple related transactions that contributed to the presence of peculiar circumstances. Additionally, five of the Alta Transactions were sale-leasebacks, which present the opportunity for parties, even those with interests that are adverse with respect to the *overall* transaction, to agree to a range of potential purchase prices by adjusting the leaseback terms accordingly. Moreover, the transactions contained a unique provision — a guarantee of the amount of the Section 1603 payment the purchasers would receive.

In summary, purchase price is only determinative of eligible cost basis under Section 1603 when two things are both true: (i) the price encompasses — in substance, and not just in form — only assets that constitute eligible specified energy property under Section 1603 and (ii) the price was set at arm's length and in the absence of peculiar circumstances. *See* Order Granting Def. Mot. to Stay Sum. J. (Dkt. 37), *reported as Alta Wind I Owner-Lessor C v. United States,* 117 Fed. Cl. 369, 374 (2014). Here, neither condition is met. Thus, the Court must look beyond the purchase price to determine the value of the eligible property.

### A. The Alta Purchase Prices Encompass More than Eligible Property and Require an Allocation

Because the purchase prices in the Alta Transactions include the value of ineligible assets (that is, assets that do not meet the definition of eligible property for the purposes of Section 1603), valuations are required to determine the portion of each purchase price that is properly allocable to plaintiffs' eligible cost basis.

26

### 1. *Section 1603 Payments Are Available Only for Eligible Property*

Basis is a familiar concept in the tax world, but *eligible cost basis* for purposes of Section 1603 payments has a different and more restrictive definition. It is not synonymous with the owner's overall tax basis. Instead, as the Court has previously noted in this case, eligible cost basis is limited to the portion of the owner's tax basis that is actually eligible to be included in the cost basis for calculating the Section 1603 payment. *Alta Wind I Owner-Lessor C,* 117 Fed. Cl. at 374. Under the terms of 26 U.S.C. § 48(a)(5)(D), relied upon by Section 1603, only certain tangible property is eligible for the payment. For purposes of determining eligible cost basis under Section 1603, "qualified facility property" includes only tangible, depreciable property that is an integral part of the qualifying facility. § 48(a)(5)(D)(i); *see also* Treas. Reg. § 1.48-1(c), (d); U.S. Treasury Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the ARR[T]A of 2009 (rev. April 2011) ("Treasury Guidance"); *W.E. Partners II,* 119 Fed. Cl. at 693 (2015).

For the purposes of valuing the eligible property at issue here, these rules essentially exclude three types of property from eligible cost basis. First, eligible cost basis does not include property that, although tangible and depreciable, nonetheless does not fall within the statutory definition of the specified energy property. Most prominently, this first category excludes property associated with the transmission, rather than the generation, of electricity, such as transmission and interconnection equipment that links the production equipment (which is deemed eligible) to the wider electrical grid.

Second, eligible cost basis excludes most real property, *e.g.*, interests in land and any improvements thereto. Treas. Reg. § 1.48-1(d). Like the value of transmission equipment, any portion of the project's value attributable to land or certain improvements, and any associated

27

value, including from better-than-market interests in land, is not eligible for a Section 1603 payment.

Third, eligible cost basis does not include property that is not tangible. This final restriction, by definition, excludes from eligible cost basis any value associated with any intangible asset. Clean-energy projects can include any number of intangible assets, and thus this category requires close scrutiny by the Court in reaching its ultimate determination as to eligible cost basis. Certain intangibles can arise in the creation or sale of a business like a power generation project, most notably goodwill and going concern value. Neither is part of eligible cost basis. *See e.g.*, *Deseret Management Corp., v. United* States, 112 Fed. Cl. 438, 449 (2013) (describing goodwill as an intangible that is described quantitatively as "the excess of cost over the fair value of the identifiable net assets acquired") (citing *Coast Fed. Bank FSB, v. United States,* 323 F.3d 1035, 1039 (Fed. Cir. 2003)); *see also Jack Daniel Distillery v. United States,* 379 F.2d 569, 579 (Ct. Cl. 1967)). Other ineligible intangible assets include any value attributable to contracts held by the project, like interconnection rights, power purchase agreements, or any other valuable contracts. *See* 26 U.S.C. § 197 (d)(1)(C)-(F), (d)(2), (d)(3); Treas. Reg. § 197-2(b)(7).

In summary, any portion of the value of a transaction attributable to assets that are not eligible, tangible, depreciable energy property must be excluded from the eligible cost basis used to calculate any Section 1603 payment. As this Court found earlier in this litigation:

> In accordance with the Recovery Act, Treasury issues cash grants
> to applicants only for their grant-eligible property, denoted as
> "specified energy property." § 1603(a). Ineligible property does
> not qualify.

*Alta Wind I*, 117 Fed. Cl. at 374. In other words, when asked to establish the appropriate award under Section 1603 for a transaction containing both eligible cost basis and ineligible assets, the

28

Court must, as a preliminary matter, consider the appropriate allocation of the overall purchase price, or overall tax basis, to the eligible and ineligible property (or assets) acquired in the relevant transaction.

### 2.    *The Alta Purchase Prices Encompass More than Eligible Property*

Because of the limitations on what can be included in eligible cost basis, the Court must look closely at plaintiffs' investments in the Alta Projects to determine what portion of that investment actually comprises eligible property.

In each of these cases, the purchase price was based not on the value of a single asset or piece of property, but rather on a suite of assets that collectively contributed to the cash flow created by the Alta Projects.  Because costs properly allocated to intangibles and other ineligible property transferred as part of the transactions are excluded from the eligible cost basis for a Section 1603 payment, the Court must determine, for each Alta Project at issue, what portion of the purchase price is eligible cost basis.

Plaintiffs have implicitly acknowledged the need for this analysis both in their filings and in their original applications.  Each of plaintiffs' claims here is premised on a supposed allocation of the purchase price between eligible and ineligible property (or, in the case of Altas II-V, is based on an allocation of an overall project valuation in order to determine a purchase price that would be used for what was purportedly eligible property alone).

Taking just one example, the Section 1603 payment sought by plaintiff Mustang Hills (Alta VI) recognizes that its basis was not simply its purchase price.  While the plaintiff purportedly paid an overall purchase price of $439 million, it claimed an eligible cost basis of $421 million.  The $18 million difference reveals that plaintiff Mustang Hills itself recognizes that an allocation between eligible and ineligible property is necessary.  While defendant disagrees with plaintiffs' allocation, it is clear that such an allocation is necessary.  Thus, the

Court must consider both (i) what portion of each Alta Project constituted eligible assets, and (ii) how much value should be allocated to just the eligible assets.[9]

### a.  The Purchase Price for Each of the Alta Transactions Reflected the Value of Both Eligible and Ineligible Assets

Each of the three subsets of Alta Transactions included value attributable to various ineligible assets and thus presents the same need for a valuation to allocate the portion of the purchase price attributable to the value of eligible property alone.

### i.  Alta I

By plaintiffs' own admission, Alta I included more than just eligible property.  (*See, e.g.,* Pl. Pretrial Memorandum ¶ 137.)  The sale-leaseback, along with associated side deals, included all the assets of the Alta I Project either directly or as collateral, such that all of the project's value was acquired and encompassed all the tangible and intangible assets discussed above.[10]  As a result, a valuation and allocation of the purchase price is required.

### ii.  Altas II-V

Plaintiffs' claim that only eligible property was acquired in the Alta II through V transactions ignores the substance of those transactions.  While the sale and leaseback were nominally only for eligible property, the specific level of cash flows that plaintiffs acquired through the sale-leaseback transactions depended on the integrated use of a suite of eligible and ineligible assets associated with operating the wind farms, not just on the eligible assets alone.

---

[9] As discussed below, the Court need not reach specific determinations of the values of ineligible assets.  A valuation of the eligible assets alone is sufficient.

[10] The rights to use the site on which the Alta I Project was located was leased out and subleased back, for offsetting rent payments.  In addition, plaintiffs' expert concluded that the Alta I transaction involved the acquisition of 100% of the value of the project's cash flows, which would reflect the contribution of all project assets to those cash flows.

These other assets were provided to, or made available as collateral to, the owner-lessors through a series of side agreements. These side agreements included PPA Assignment and Use Agreements, Site Leases and Subleases, and Retained Asset Leases and Subleases, and various collateral assignment and pledge agreements as well as other documents that provided for service and maintenance contracts, and other contractual rights.[11]

Thus, the plaintiffs' claim that they acquired only eligible assets merely reflects the *form* of these transactions. But "the substance, not the form, of a transaction determines its tax consequences," and thus courts must "look to the 'objective economic realities of a transaction rather than to the particular form the parties employed.'" *Wells Fargo & Co. & Subsidiaries v. United States*, 91 Fed. Cl. 35, 75 (2010), *aff'd* 641 F.3d 1319 (Fed. Cir. 2011), *citing Gregory v. Helvering,* 293 U.S. 465, 469-70 (1935) *and quoting Frank Lyon Co. v. United States*, 435 U.S. 561, 572 (1978)); *see also BB&T Corp. v. United States,* 523 F.3d 461, 471 (4th Cir. 2008) (taxpayer may not "claim tax benefits...by affixing labels to its transactions that do not accurately reflect their true nature."); *Halle v. Comm'r,* 83 F.3d 649, 655 (4th Cir. 1996) ("surrounding circumstances and economic realities" will overcome any "presumption" generated by the transaction's form).

In substance, the buyers here were paying for cash flows created by the entire Alta II-V Projects, and thus their overall purchase price was influenced by more than just eligible property. *See, e.g.*, *Comm'r v. Court Holding Co.,* 324 U.S. 331, 334 (1945) ("incidence of taxation depends upon the substance of a transaction"); *Gregory v. Helvering,* 293 U.S. at 467-468.

---

[11] The site lease and sublease, and the retained asset lease and sublease were both circular and featured no net cash flows; they merely provided rights of access for offsetting fees.

### iii. Alta VI

The Alta VI transaction (again, also known as Mustang Hills) explicitly encompassed all the assets of the Mustang Hills, LLC, entity, and it thus encompassed both eligible and ineligible property. As noted above, plaintiff Mustang Hills has acknowledged that the transaction included ineligible property. Thus, like the other transactions, an allocation of the purchase price is required.

### b. The Alta Projects Include *Ineligible Real and Tangible* Property

Both parties agree that the Alta Projects include *ineligible* tangible and real property. (*See, e.g.,* Pl. Pretrial Memorandum ¶ 137.) Any value attributable to these ineligible assets must therefore be excluded when determining the eligible cost basis.

Assets utilized for the transmission, not generation, of electricity, such as transmission and interconnection equipment, are not eligible property. Similarly, land and many land improvements are not eligible. Indeed, the KPMG Cost Segregation Memos that plaintiffs submitted with their applications for Altas I and VI exclude some of these items.[12] Specifically, they excluded, among others, costs associated with electrical substations, transmission and interconnection lines, and certain land improvements.

Additionally, the Alta Projects include rights to use a host of various land parcels, including under various leases, access to which was secured by the efforts of Oak Creek and Terra-Gen, over several years. These rights contribute ineligible value in several ways. First, the work of assembling a collection of land rights sufficient to support a wind farm at a

---

[12] In the case of Altas II-V, which purportedly involved the plaintiffs' acquisition of only eligible property, the ineligible assets were accounted for and excluded from the KPMG Cost Segregation Memo pertaining to Terra-Gen's claimed costs, and the presence of these ineligible assets influenced the determination of the appraised sale-leaseback purchase prices for the Alta II-V assets.

32

profitable scale necessarily added value beyond that of any of the individual land parcels.  That value contributes to an overall increase in the value of the business.  Second, the pricing terms of many of the Alta Projects' land leases were secured years before the Alta Projects were ultimately sold to plaintiffs, and the market pricing of land leases in the region increased over the period, adding to the value of the Alta Project's leases.  None of these additions to value are attributable to the tangible energy property that is eligible for Section 1603 payments.

While KPMG failed to exclude all the ineligible portions of the purchase price, as discussed in detail below, plaintiffs' submission of the KPMG reports indicates their agreement with the basic precept relevant here: that the purchases included tangible, but ineligible assets that must be excluded from eligible cost basis.  That by itself is sufficient to necessitate an independent valuation of the eligible property alone.

### c.   The Alta Projects Include *Ineligible Intangible* Property

The Alta Transactions also encompassed ineligible intangible assets.  As with certain real and tangible property, these intangible assets affect the overall purchase price and render it meaningless for ascertaining the value of the eligible property alone.  Instead, the Court must determine the eligible property's appropriate Section 1603 award value by determining the eligible cost basis exclusive of ineligible, intangible assets, as defendant's expert has done.

For purposes of finding that a valuation of the eligible property alone is necessary to determine eligible cost basis, the Court need not determine that specific intangibles are, in fact, present.[13]  Instead, it need only recognize that the circumstances of the transactions are such that they might be present.  If the intangibles are shown to be present — as they are here — then both

---

[13] As will be explained below, Dr. Parsons' valuation establishes that the presence of intangible assets contributes a large amount of value to the Alta Projects.

economics and the law require that the Court determine the fair market value of the (eligible) tangible property alone.  It need not, though, determine the value of the intangibles in order to determine the value of the eligible, tangible energy property, as will be discussed in more detail below.

As a matter of basic economics, if there are intangible assets present in the overall Alta Projects, then the value of those intangibles increases the purchase price.  Accordingly, the purchase price does not necessarily match the value of the tangible property (let alone the smaller slice that is both tangible and eligible).  Here, the Alta Projects include a number of intangibles.

Any value attributable to any of the project contracts is an intangible and thus ineligible for Section 1603 payments.  For example, power purchase agreements such as those present in the Alta Transactions, which lock in a long-term customer at a set price, add intangible value to a project.  For that reason, a power purchase agreement is a customer-based intangible asset under 26 U.S.C. § 197 and is thus excluded from the eligible cost basis of the specified energy property.  *See* § 197(d)(1)(C)(iv); (d)(2)(A)(iii) (defining customer-based intangible as "value resulting from future provision of goods or services pursuant to relationships (contractual or otherwise) . . ."); Treas. Reg. § 1.197-2(b)(6).  Indeed, that value was undoubtedly part of the reason that Terra-Gen paid hundreds of millions of dollars for the Allco assets, which included the "Master PPA" that dictated the terms of the individual project-specific subsequently-executed Daughter PPAs, long before any tangible assets had been installed.  Interconnection rights, which were sometimes referred to in plaintiffs documentation as "transmission rights," similarly can add tremendous value to a project (indeed, it is not possible without them), but are

34

ineligible for Section 1603 payments.  *See* § 197(d)(1)(D); Treas. Reg. § 1.197-2(b)(8); Treas

Reg. 1.263(a)-4(d)(6)(i)(A); Treas. Reg. 1.263(a)-4(c)(1)(xiii).

Plaintiffs' own applications for Section 1603 payments acknowledge the existence of

certain intangibles.  Their applications, or the documentation underlying them, excluded as

intangibles the appraised allocation, done by Duff, of what were referred to as transmission

rights acquired from Allco, and a share of the appraised allocation of what were referred to as

development rights related to the power purchase agreements.  Defendant does not necessarily

agree with those appraised values, but it makes the point plain: both parties agree that there are

intangibles that add value to the Alta Projects that are ineligible for Section 1603 payments.

Finally, any value associated with goodwill or going concern value is ineligible.  As

relevant here, goodwill and going concern value are simply the "'premium' paid in excess of the

total fair market value of the purchased assets."  Special Allocation Rules for Certain Asset

Acquisitions, T.D. 8215, 1988-2 C.B. 304, 53 Fed. Reg. 27035-01 (July 18, 1988) (issuing

temporary regulations under § 1060; later finalized).  "[G]oodwill is often described

quantitatively as 'the excess of cost over the fair value of the identifiable net assets acquired.'"

*Coast Fed. Bank, FSB,* 323 F.3d at 1039, *cited in Deseret Mgmt. Corp.,* 112 Fed. Cl. at 449; *see*

*also Jack Daniel Distillery*, 379 F.2d at 579 (Ct.Cl.1967).  In other words, "[g]oodwill is a

residual value after all tangible and identifiable intangible assets have been taken into account."

International Valuation Standards Council, *International Valuation Standards*, (London, 2011),

p. 43.  Similarly, "[g]oing concern value is the additional value that attaches to property because

of its existence as an integral part of an ongoing business activity."  Treas. Reg. § 1.1060-

1(b)(2)(ii).  Goodwill and going concern provide catch-all terms for any value encompassed in

35

the overall business that cannot be attributed to any individual specific asset in isolation.[14]  They

are, of course, ineligible, and if their presence is suspected, a valuation of the other assets is

required.

### 3.    *A Determination of the Value of the Eligible Property Is Thus Required*

In sum, no matter how plaintiffs may have tried to paper the transactions, in substance,

these transactions do not reflect the sale of eligible property alone.  Rather, they reflect the sale

of interests in cash flows from a business operation that deploys such property.  As with any

other business operation, the specific level of the cash flows acquired, and hence their value,

depends on the integrated use of several assets, including several unequivocally ineligible assets.

Thus, when determining the value of the eligible property, as the Tax Court has explained,

"[b]asis for purchased equipment is the amount paid for the equipment, not what is paid for

something else."  *Cooper v. Comm'r,* 88 T.C. 84, 111 (1987) (excluding value of intangible

contract rights from eligible cost basis for depreciation and investment and energy tax credits),

*citing Waddell v. Comm'r,* 86 T.C. 848 (1986); *Lemmen*, 77 T.C. 1326 (1981).  In other words,

the basis for eligible property must be "limit[ed]…to its fair market value."  *Waddell,* 86 T.C at

912.  To make such a determination, the Court needs to know the fair market value of the eligible

---

[14] Plaintiffs' attempt to re-brand these ineligible intangibles as "synergy" is futile.  The limited case law supporting the idea of "synergy" addresses a very different scenario from that present here: valuations "of a collection of similar assets," such as network franchises, patents, contracts creating a distribution network, and a collection of individual credit files.  *See Kraft Foods Co. v. Comm'r,* 21 T.C. 513 (1954) (patents); *Standard Conveyor Co. v. Comm'r*, 25 B.T.A 281, 283 (1932) (patents); *Massey-Ferguson, Inc. v. Comm'r*, 59 T.C. 220 (1972) (distribution network); *Computing and Software, Inc. v. Comm'r*, 64 T.C. 223, (1975) (credit files).  Under those circumstances, the enhanced value of the collection of assets is attributable to those collected assets and is not separate goodwill or going concern value.  The circumstances present in this case are the classic combination of a set of tangible and intangible assets that collectively constitute a business operation whose value as an integrated whole exceeds the sum of its individual parts.

property alone, not the overall business operation. That requires a valuation of the eligible property.

### B.    The Alta Transactions Were Not Arm's-Length and Include "Peculiar Circumstances"

Even if the Alta Transactions consisted *only* of eligible property (which they do not), the purchase prices paid in the relevant sale-leaseback or sale transaction do not establish basis because they were not established independently at arm's length, and because the transactions include "peculiar circumstances." The presence of either condition, let alone both, would require the Court to look beyond the purchase price. Numerous courts have held that purchase prices cannot determine basis if

> [the] transaction is not conducted at arm's-length by two economically self-interested parties or [if the] transaction is based upon 'peculiar circumstances' that influence the purchaser to agree to a price in excess of the property's fair market value.

*Lemmen,* 77 T.C. at 1347-48 (1981), *citing Bixby v. Comm'r*, 58 T.C. 757, 776 (1972). If either circumstance is present, then cost basis is limited to the property's fair market value. *Lemmen*, 77 T.C. at 1348, *citing Mountain Wholesale Co. v. Comm'r,* 17 T.C. 870, 875 (1951); *G.U.R. Co. v. Comm'r*, 41 B.T.A. 223 (1940), *aff'd* 117 F.2d 187 (7th Cir. 1941).

Each of the Alta Transactions was comprised of a set of transactions that provided numerous ways to adjust the purchase price without altering the overall economics of the deal, disqualifying them from being deemed arm's length, and a number of peculiar circumstances were present. As a result, the purchase price cannot determine cost basis. This constitutes a second, *independent* reason that the Court must determine the value of the eligible property rather than relying solely on the purchase prices.

37

### 1.    *The Purchase Prices in the Alta Sale-Leaseback Transactions Were Not Set Independent of Other, Related Transactions*

Sale-leasebacks, while relatively common transactions, require close scrutiny because they create an ongoing relationship between the parties. Moreover, even assuming the overall economics of the sale-leaseback are negotiated at arm's-length by the two parties, no single aspect of the deal can be relied upon in isolation as an independent term. Because sale-leasebacks are inherently composed of multiple simultaneous transactions, with cash flowing in both directions between the parties, individual component transactions can be adjusted without altering the overall economics of the entire transaction.

In a sale-leaseback transaction, a project developer sells the project and then immediately leases it back from the buyer. Because the project developer is both the seller and the lessee in such transactions, the opportunity exists to adjust the sale price by adjusting the lease payments in the transactions. In particular, in sale-leasebacks, purchase prices can be set to almost any value because the level of lease payments that the seller agrees to make to the buyer during the leaseback term — and particularly the upfront lease "prepayment" that the seller makes on the day that it sells the project — can be adjusted to support a nearly limitless range of potential purchase prices while still providing the buyer its targeted return on its investment. For example, the seller can raise the purchase price in a sale-leaseback simply by agreeing to give the buyer a higher lease prepayment while holding all other aspects of the leaseback terms constant.

In the Alta sale-leaseback transactions, the overall return on investment that the plaintiffs received was presumably negotiated at arm's length because Terra-Gen and those investors had adverse interests when negotiating it. However, because the opportunity existed to alter either the amount of the lease payments that the investor would receive as lessor, or the purchase price it would pay, or both, to achieve a particular target return on the investor's investment, the

parties did not have adverse interests with respect to the purchase price alone.  For example, on a clean sale, a buyer responding to changes in the expected economics of a project may require a lower purchase price to achieve a particular target return on its investment.  Yet, in a sale-leaseback, that return can be achieved by increasing the lease payments rather than reducing the purchase price.

Thus, the purchase price in a sale-leaseback reflects something different from a directly negotiated, arm's-length purchase price.  Because of the influence of the rest of the deal's economics, the purchase price for the sale portion of a sale-leaseback may be higher or lower than a stand-alone negotiation would have produced.  As the Court found earlier in this case, this "arrangement provides the opportunity to adjust terms to yield a higher purchase price without lowering the buyer's targeted return on investment." *Alta Wind I*, 117 Fed. Cl. at 373 (2014).  As a result, "a sale-leaseback agreement's potential for value transfers across transactions mirrors the value shifts found in *Lemmen*, where the U.S. Tax Court found 'peculiar circumstances' were present." *Id., citing Lemmen,* 77 T.C. at 1349.  Put another way, in a sale-leaseback transaction, there can be a disconnect between the stated purchase price and the true value of the overall transaction to the parties.

### 2.    *The Alta Transactions Featured Side Agreements That Created Peculiar Circumstances*

All of the Alta Transactions, including the outright sale of Alta VI, involved the execution of multiple related transactions and/or agreements between the parties to the overall transaction.  These side agreements impacted the purchase price by removing aspects that would otherwise have been priced into it.

As detailed earlier, all of the Alta Transactions involved side agreements that permitted access to the necessary land rights.  For example, plaintiffs and their expert both acknowledge

39

that value was shifted to EverPower, the Alta VI buyer, by Terra-Gen's providing some of the project land free of charge.  These side deals elevate purchase price and demand extra scrutiny in determining the appropriate cost basis of eligible property.  Plaintiffs admit as much when they suggest that an allocation needs to be made for this value-shifting, which was exactly the kind of "peculiar circumstance" at the heart of *Lemmen v. Comm'r,* 77 T.C. 1326.  However, plaintiffs and their expert fail to account for the more substantial effect on the value of the Alta Projects arising from their use of pre-existing land leases with third parties at favorable rates.[15]

These related transactions or agreements also include various indemnifications against potential losses or adverse outcomes, and releases from certain financial obligations to parties affiliated with, or related to the seller, that would otherwise impose a cost on the buyer or on the project companies that the buyer acquired.

Additionally, the Alta Projects had wake impact agreements that required payments to be made between projects to offset the impact that an upwind projects' turbines might have on the quality of the wind available to the downwind project.  These payments, which often ran into the millions, are ineligible to be included in cost basis under Section 1603.  Any such payment that Terra-Gen made prior to the sale of a project would necessarily boost that project's value by reducing its future obligation to make those payments.  For example, a project that faced a wake payment of $1 million would necessarily be worth $1 million more if Terra-Gen made that payment before selling the project to the ultimate buyer.  Accordingly, when Terra-Gen made wake payments prior to sale, they increased the value of the transaction to the buyer, even though

---

[15] These favorable leases trigger both reasons a court should look beyond purchase price: they would require allocation of the executed purchase price to the favorable leases, and they also constitute a peculiar circumstance influencing the executed purchase price itself.

that wake payment is not explicitly reflected in the purchase price contained in the sale agreement.  For example, the $5.3 million in wake payments made by Terra-Gen on behalf of Alta VI to Alta III and Alta V increased the value of Alta VI to EverPower, because EverPower was not required to make the payment.[16]

If purchase price alone is used to establish the cost basis in the eligible assets, or if none of the purchase price is allocated to any of these side agreements that affected the purchase price, as plaintiffs propose, then Terra-Gen would have successfully converted an ineligible item (*e.g.*, the wake payment obligation) into a part of eligible cost basis (the resulting higher purchase price).  *Cf. Barnes Grp. Inc. v. United States,* 872 F.2d 528, 532 (2d Cir. 1989), *decision on remand in,* 724 F.Supp. 37 (1989), *aff'd,* 902 F.2d 1114, 1116 (2d Cir. 1990) ("no reason why the acquiring company should receive a tax benefit from having such contracts executed instead by the to-be-acquired company").  This simple example makes clear that even the purportedly straightforward sale of Alta VI included peculiar circumstances that require looking beyond the purchase price.

### 3.    *Indemnities Guaranteeing the Amount of Section 1603 Payments Constitute Peculiar Circumstances*

Terra-Gen locked the value that plaintiffs would claim as a Section 1603 payment into the purchase price of the Alta Projects, by providing indemnities that essentially insulated the buyers from any deviation from the promised Section 1603 payment, another peculiar circumstance that requires looking beyond the purchase price.  Because of these indemnities, the buyers paid more for the Alta Projects based on the value of the guaranteed Section 1603 payments.  If the project were to receive more than specified, Terra-Gen received the excess

---

[16] To ensure that no additional wake impact would affect the buyer, Terra-Gen indemnified EverPower against further wake payments.

payment.  If the project received less than Terra-Gen specified, Terra-Gen made up the difference.[17]

Thus, in either scenario, from the buyer's perspective, there was a locked-in Section 1603 payment amount: if the buyer received more than expected, it was passed to Terra-Gen, and if they received less, Terra-Gen would make up the difference.[18]  Unlike in a typical arm's-length transaction, the buyer in these instances did not have the same incentive to critically scrutinize the Section 1603 payment claim or to factor any perceived risks into the purchase price.  In the economic sense, Terra-Gen is the real party in interest in these cases, which constitutes peculiar circumstances requiring extra scrutiny.

## IV.  Defendant's Expert's Valuation of the Eligible Property Properly Determines Plaintiffs' Eligible Cost Basis

Because both peculiar circumstances are present *and* more than just eligible assets were purchased (though either one alone is sufficient), the Court must look beyond the stated purchase

---

[17] For example, Section 2.7 of the Agreement for Purchase of Membership Interests for the Alta VI transaction requires EverPower to file a Section 1603 application prepared by Terra-Gen.  EverPower was required to remit to Terra-Gen any amount of Section 1603 payment that EverPower received over an "Assumed Grant Amount", which was less than the amount actually requested in the Section 1603 application.  If EverPower received less than that "Assumed Grant Amount", as in fact happened, Terra-Gen was required to reimburse EverPower for the difference.  In addition, EverPower was required to permit Terra-Gen to conduct litigation on their behalf to seek the full applied-for amount.

[18] In the Alta I and Alta VI transactions, the buyers are indemnified from any reduction in 1603 payment, no matter how large.  The Alta II-V transactions provide similar indemnities, but they provide a bottom outer limit on the indemnity, set at 28.5% of Terra-Gen's claimed eligible costs.  (*See* Alta II Participation Agreement, Section 5.9 Cash Grant Purchase Price Rebate, JX 225, at WF0042984; Alta II Participation Agreement Definitions, JX 226, at WF0043974.)  Treasury paid an award of 30% of Terra-Gen's claimed eligible costs, so the Alta II-V plaintiffs were indemnified by Terra-Gen for the full amount they claim in this suit, but defendant's counterclaims exceed the indemnification amount.

price to determine the fair market value of plaintiffs' investments.  Defendant's expert, Dr.

Parsons, prepared a report of the fair market value of the eligible energy property at issue.

### A.   Dr. Parsons Valued the Eligible Property

After considering the three standard approaches to valuation — cost, income, and market

— Dr. Parsons determined the cost approach was the only feasible approach for determining the

value of the tangible, eligible property.  The cost approach can best isolate the value of the

eligible assets from the value of other assets that are elements of the total Alta Projects.  As

explained below, the income approach cannot separate the value of eligible from ineligible

assets, and a market approach based on the reported values of other projects can suffer the same

difficulty, as well as issues relating to the comparability of properties.  Thus, the cost approach

provides the most accurate valuation under the circumstances.

The cost approach estimates the value of eligible assets by determining the cost to

reproduce or replace them.  The rationale behind this approach is simply that the value of an

asset will not exceed the cost to reproduce or replace it, since no rational buyer would pay more

for an asset than such a cost.  It is also consistent with the purpose of the Section 1603 program,

which was "to reimburse eligible applicants for a portion of the expense of [specified energy]

property." (Treasury Guidance at 1.)

Specifically, to assess the fair market value of the eligible property, Dr. Parsons' cost

approach began by adding up the actual expenditures incurred to develop each eligible asset,

including both direct and indirect costs.  While often referred to as costs, these expenditures

actually include prices paid to major project contractors, such as the turbine supplier and

construction contractor, and hence include not just the costs to those contractors to supply and

construct the eligible property, but also the profits required by those contractors.  On top of these

expenditures, the cost approach adds an additional estimate of capital return or profit (which is

43

sometimes referred to as entrepreneurial profit) for the developers that coordinated and paid for the development and construction of the properties leading up to their completion and sale to plaintiffs. Such return or profit would be expected to be included in the cost of reproducing or replacing the assets. This profit, hereafter referred to as "Capital Return," is meant to reflect the fact that, in addition to its out-of-pocket costs incurred over the course of a project, a developer building such assets would require a return as compensation for upfront development efforts, capital deployed over time, and the risk involved. Thus, this return must be factored into the cost approach in order to reflect the real costs of replacing the asset.

To determine the appropriate amount of Capital Return here, Dr. Parsons applied what he concluded to be an appropriate rate of return to the actual eligible costs of development and construction efforts over time. It is perhaps superficially appealing to simply assume that the appropriate profit should be whatever the developer actually earned on the sale to plaintiffs, rendering Dr. Parsons' approach unnecessary. However, even if those purchase prices were established in fully arm's-length transactions, the fact that the purchase prices paid reflected compensation for a suite of eligible and ineligible assets — and, in fact, for an overall stand-alone business — and not just for eligible assets, make it clear why Dr. Parsons' approach is needed. His approach determines the appropriate level of Capital Return or profit to include in the value of the eligible property alone.[19]

---

[19] Notably, Dr. Parsons' cost approach includes the full profit actually earned by the turbine supplier on selling turbines to the project—which is embedded in the price that Terra-Gen paid for those turbines. This is the case because the turbines are entirely eligible property, and therefore no steps need to be taken to determine how much of that profit is associated with eligible versus ineligible assets.

Dr. Parsons used a standard approach known as the Capital Asset Pricing Model to arrive at a reasonable rate of return of 9%, as discussed in his report. The eligible share of development and construction costs were provided a 9% return from the point in time that those development and construction costs were incurred through to the completion of the project.

In conducting his cost approach valuation, Dr. Parsons relied upon plaintiffs' certified cost schedules of Terra-Gen's costs, which accounted for what Terra-Gen paid for each asset, and additional documentation that indicated when those out-of-pocket costs were incurred.[20] Although those cost schedules included Terra-Gen's allocation of costs as either eligible or ineligible, two important corrections needed to be made to these schedules prior to adding in an overall entrepreneurial profit.

First, certain amounts paid by Terra-Gen as part of the acquisition of the Allco assets, which had been treated by Terra-Gen as costs of the eligible assets needed to be recategorized because they did not represent eligible development costs. This adjustment by Dr. Parsons was appropriate on multiple counts. These amounts do not reflect any actual development costs incurred by Allco on the Alta Projects. Instead, they are simply an allocated portion of the purchase price paid for all of the Allco assets, eligible and ineligible, that Terra-Gen acquired, where that purchase price was based on an anticipation of future income from the Alta Projects and reflected a substantial premium relative to Allco's actual development costs.[21]

---

[20] The Terra-Gen cost schedules were used because they reflected actual development and construction costs, including any profit earned by third-party contractors and suppliers embedded in those amounts. These cost schedules were therefore chosen instead of the plaintiffs' cost schedules that included amounts that had been grossed up to reflect plaintiffs' purchase prices of the Alta Projects.

[21] 26 U.S.C. § 263A requires capitalization of development costs, but is not relevant to this analysis. First, the development amounts paid to Allco here are Terra-Gen's costs, and thus

(continued...)

45

Specifically, the transaction between Terra-Gen and Allco in July 2008 was priced based, at least in part, on the anticipated income streams from the Alta Projects once they were fully developed. That price substantially exceeded the actual development expenditures that had been made by Allco. After the acquisition of the Allco assets, Terra-Gen commissioned Duff to perform a valuation of the tangible and intangible assets Terra-Gen had acquired. In that valuation, Duff made a series of judgments regarding the allocation of the overall purchase price to the different Alta phases, and to two broadly defined assets: Development Rights and Transmission Rights.

The values for Development Rights and Transmission Rights that were assigned to each phase therefore did not reflect any actual development costs incurred by Allco or Terra-Gen on the Alta Projects. The Duff report found that those identified development costs were equal to just a few percentage points of the concluded value of the Development Rights and Transmission Rights. The Development and Transmission Rights values instead reflected Duff's judgment regarding an allocation among the various phases of the step-up in value arising from the Allco wind energy business.[22] While Terra-Gen's cost schedules did not include the intangible

---

(…continued)

it is Terra-Gen, not the plaintiffs, which would capitalize them under 263A. Rather, the task here is to determine the fair market value of the eligible energy property. That task required this step prior to applying the Capital Return in order to arrive at a correct, internally consistent, valuation. Second, these items are not actually costs of development, some of which are eligible; instead, they are an allocated portion of the purchase price of the Allco wind energy business, and particularly of the purchase price *premium* above Allco's costs, which Terra-Gen argues should be capitalized to eligible basis. But, the matter of how much of the Allco purchase price reflects eligible basis of the properties is one of the key valuations issues before the Court. It is not an undisputed eligible amount, such as the cost of the turbines or certain actual costs of development.

[22] The Duff valuation also valued certain tangible assets. Dr. Parsons has correctly left in these eligible assets in his approach.

Transmission Rights among their claimed eligible costs, the amount of Development Rights value that Terra-Gen treated as eligible basis reflected its own judgment about how much of the Development Rights amount should be treated as eligible basis, uninformed by any independent valuation of the composition of those Rights.  In Dr. Parsons' view, a large portion of the amounts paid is for intangible assets, and thus needed to be reallocated.

Second, Dr. Parsons also did not include among the base of eligible costs to which the Capital Return was applied the upfront lump-sum royalty fees (the "AIPC Lump Sum Development Fees") that were included in the plaintiffs' certified cost schedules of Terra-Gen's costs.  This was necessary in order to calculate an appropriate total Capital Return (or profit) that would, in part, encompass the eligible portion of those fees.  Those fees were compensation for the development of the Alta Projects, which necessarily involved the development of both eligible and ineligible assets.[23]  The appropriate level of such compensation that should be allocated to eligible, rather than ineligible, assets is precisely the issue that Dr. Parsons' cost approach addresses with its inclusion of a Capital Return.  Therefore, those fees were appropriately not included in the base cost before applying the Capital Return.

For the same reasons, Dr. Parsons also did not include among the base of eligible costs to which the Capital Return was applied those amounts associated with interest paid to lenders for the portion of development and construction costs financed by debt.  This was appropriate because his Capital Return was determined by applying a rate of return to all development and construction costs, irrespective of whether they were financed by debt or equity.  Consequently,

---

[23] In some cases the fee in the cost schedule reflected just Oak Creek's share of the AIPC Lump Sum Fee, and in other cases it reflected the entire Lump Sum Fee, half of which accrued to Terra-Gen through its ownership of Allco's former half of AIPC.

adding this Capital Return to a base that already includes interest (*i.e.,* that already includes a rate of return) on the large share of project costs that were debt-financed would constitute double counting.[24]  Through this step, Dr. Parsons' approach also yields an overall Capital Return and valuation that is independent of the specific choices that Terra-Gen made in how much of the project costs to fund via debt versus equity.  Like the fees, interest costs on eligible property are encompassed by the total Capital Return amount.

After making these appropriate adjustments to the plaintiffs' certified cost schedules, Dr. Parsons plotted the approximate dates that eligible development and construction costs occurred during the development and construction of each project.  These schedules over time were used to calculate the appropriate Capital Return.  This timing information was necessary for the rate-of-return analysis because the rate of return is a return per unit of time; the longer money was at stake, the higher the Capital Return.

Dr. Parsons added the amount that resulted from the 9% rate of return calculation to the eligible development and construction costs to arrive at a total eligible cost amount which included the Capital Return.  In short, he took the development and construction costs to approximate the cost of the eligible energy property (inclusive of profit to entities such as the turbine supplier and construction contractor), then added a return to account for expected profit

---

[24] For example, if the project were entirely funded by equity, there may have been no interest costs amounts in the cost schedules.  But, the overall Capital Return and property valuation should not be affected by this, and should be no different than if 90% of the project costs were funded by debt, such that a material amount of interest would be included in the cost schedules.  It is only through Dr. Parsons' approach that one would arrive at the same valuations under each set of circumstances.

48

on the development of the tangible energy property.[25]  This cost approach valuation is straightforward, and it accounts for each asset eligible for a Section 1603 payment.  For each Alta Project, the resulting figure reflects a fair market value of the eligible property alone.  Thus, plaintiffs are entitled to a Section 1603 payment equal to 30% of these figures.

### B.   Dr. Parsons' Approach Aligns with the Residual Method and Section 1060

The use of the cost approach by Dr. Parsons aligns with the residual method mandated by 26 U.S.C. § 1060.  Under the residual method, the overall purchase price is allocated to individual identifiable assets up to their fair market values, and then any residual is an unidentified intangible asset, such as goodwill or going concern value, and cannot be allocated to the separately identified assets.  *See, e.g., Philip Morris Inc. & Consol. Subsidiaries v. Comm'r*, 96 T.C. 606, 625 (1991), *aff'd* 970 F.2d 897 (2d Cir. 1992) ("Under the residual method, the value of intangibles is determined by subtracting the value of cash, cash equivalents, and tangible assets from the purchase price."); 15 Mertens Law of Fed. Income Tax'n § 59:76.

Section 1060 applies to so-called "applicable asset acquisitions."  26 U.S.C. § 1060(a); *see Peco Foods, Inc. v. Comm'r,* 103 T.C.M. (CCH) 1120 (T.C. 2012), *aff'd*, 522 F. App'x 840 (11th Cir. 2013).  Under § 1060(c), an applicable asset acquisition is any transfer of assets that constitute a trade or business, defined in the Regulations as any group of assets with a character "such that goodwill or going concern value could *under any circumstances* attach to such group."  Treas. Reg. § 1.1060-1(b)(2)(i)(B) (emphasis added).  Goodwill or going concern value are defined quite broadly by Treas. Reg. § 1.1060-1(b)(2)(i), which provides factors that indicate

---

[25] This latter return is inclusive of all expected entrepreneurial profit, *i.e.*, both development profit and any turnkey premium.  It also aligns with market information about the amount of return typically required by wind developers, taking into account that such returns available in market information reflect compensation for both eligible and ineligible assets.

their presence.  At least, two of the three possible factors are present in the Alta Transactions, namely:

> (A) The presence of any intangible assets (whether or not those assets are section 197 intangibles) . . .
>
> (C) Related transactions, including lease agreements, licenses, or other similar agreements between the purchaser and seller (or managers, directors, owners, or employees of the seller) in connection with the transfer.

Treas. Reg. § 1.1060-1(b)(2)(iii).  An additional indication that the acquired assets constituted a trade or business is that the purchasers paid a substantial premium over the amounts that Terra-Gen paid various third parties for the underlying acquired assets.

As explained above, the Alta Transactions feature both intangible assets and related transactions, specifically including lease agreements.  As a result, the Alta Transactions easily meet the low bar of the Regulations, which require only that goodwill or going concern value could attach "under any circumstances."  *See* Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 10.40[2] (6th ed. 1994) ("this term ['applicable asset acquisition'] is so broadly defined as to make the section quite extensive in its reach").  Accordingly, §1060 applies to these transactions.[26]

When § 1060 applies, it requires that the purchase price be allocated pursuant to what is sometimes called the waterfall or residual method, as set out in § 338(b)(5).  *See Peco Foods,* 103 T.C.M. 1120 (2012).  Essentially, the purchase price is allocated to each category of assets

---

[26] Plaintiffs' purported limitation of the Alta II-V sales to "eligible property" does not alter this result.  The relevant Treasury regulations explicitly provide that "[w]hether the assets transferred constitute a trade or business is determined by aggregating all transfers from the seller to the purchaser in a series of related transactions."  Treas. Reg. § 1.1060-1(b)(5).  As explained above, those related transactions make clear that the Alta II-V buyers were obtaining access to the entire project and all of its benefits, including all identified (and unidentified) assets.

in order, up to the determined fair market value of the asset. *See, e.g., W. Covina Motors, Inc. v. C.I.R.,* 98 T.C.M. (CCH) 615 (T.C. 2009) (allocating all consideration to class II and class V assets, where no class I, III, or IV assets were present). Any excess purchase price spills over into the next higher category of acquired assets until the whole purchase price has been allocated. *See* 15 Mertens Law of Fed. Income Tax'n §§ 59:76; 59:80 (explaining the application of the residual method to allocating purchase price among the asset classes); *see also* Special Allocation Rules for Certain Asset Acquisitions , 53 Fed. Reg. 27035-01 (July 18, 1988) ("[U]nder the residual method any "premium" paid in excess of the total fair market value of the purchased assets [other than goodwill or going concern value] is treated as payment for goodwill or going concern value.").

The residual method acknowledges that, as here, a purchaser's purchase price can greatly exceed the fair market value of the identifiable assets that it acquired. In that instance, the values of the assets are not grossed up, as plaintiffs effectively would do. Rather, the excess purchase price is allocated to an unidentifiable intangible such as goodwill or going concern value. *See Solitron Devices, Inc., v. Comm'r*, 80 T.C. 1, 24 (1983), *aff'd* 744 F.2d 95 (11th Cir. 1984) (the residual method of valuation is proper method for determining value of intangible assets in purchased business that possessed goodwill and going-concern value). In short, under the residual method, an unallocated portion of the purchase price can remain after the price is allocated to all the identified real, tangible, and intangible assets, and that unallocated portion must be classified as goodwill or going concern value.[27]

---

[27] In this context, goodwill and going concern value are largely mathematical. In the residual method, goodwill is simply "the purchase price remaining, if any, after amounts have been allocated to the liabilities and all other assets of the acquired [business]." *Colorado Nat'l Bankshares, Inc., & Subsid. v. Comm'r*, 60 TCM 771 (T.C. 1990*), aff'd sub nom. Colorado Nat.*

(continued...)

51

Application of the residual method, therefore, requires conducting a valuation of the identifiable assets.[28]  Here, the key asset that must be valued is the tangible eligible energy property itself.  As the Court has already held in this case, the "total purchase price cannot serve as the cost basis where Treasury Regulation § 1.1060-1 requires an allocation of an amount of the purchase price to goodwill and going concern value."  *Alta Wind I*, 117 Fed. Cl. 369, 374 (2014).  Thus, the Court must

> identify the amount of the purchase price that constitutes goodwill and going concern value. Ultimately, this calculation contributes to the total amount of ineligible property contained within the purchase price, altering the amount that may serve as the cost basis.

*Id.* at 374.  To make that allocation between eligible and ineligible property requires a valuation of the eligible property such as that performed by defendant's expert.[29]

---

(…continued)

*Bankshares, Inc. v. Comm'r*, 984 F.2d 383 (10th Cir. 1993).  In other words, "[u]nder [the residual] method, the value of goodwill and going concern value equals the difference between the total purchase price and the value of the other known assets*." Citizens and Southern Corporation v. Comm'r*, 91 T.C. 463 (1988), *aff'd sub nom. Citizens & S. v. Comm'r*, 900 F.2d 266 (11th Cir. 1990), and aff'd, 919 F.2d 1492 (11th Cir. 1990); *cf. Richard S. Miller & Sons v. United States*, 537 F.2d 446, 450 (Ct. Cl. 1976) ("Goodwill sometimes is used to describe the aggregate of all of the intangibles of a business, including such items as patents, trademarks, leases, contracts, and franchises.").

[28] Parties to a transaction may agree in writing to specific allocations under § 1060, but it does not appear that they did so in the Alta I-V transactions.  In any case, agreed-upon allocations are disregarded if they do not reflect the actual fair market values of the assets, and thus the Court must look to the fair market value in any event.  In a circumstance like the one presented here, where both parties to a transaction are motivated to allocate heavily to Section-1603-eligible property, the Court should be particularly suspicious.  *Langdon v. Comm'r,* 59 F. App'x 168, 170 (8th Cir. 2003) ("if . . . the parties do not have adverse tax interests, the tax court will strictly scrutinize the allocation agreement"), *citing Lorvic Holdings, Inc. v. Comm'r,* 76 T.C.M. (CCH) 220 (T.C. 1998).

[29] Even if § 1060 did not apply, the residual method of allocation would still be the economically and legally sound approach to determining the value of the eligible property.

By utilizing the cost approach to determine the fair market value of the eligible property alone, Dr. Parsons acknowledges that the remaining value may be allocated among ineligible assets in the same class (Class V) and then spill over into the category Class VI identified intangibles — such as the interconnection agreement, power purchase agreement, and other contractual rights — and then into Class VII unidentified intangibles that these cases describe as goodwill and going concern value. Whatever the label, and whatever the value, ascribed to each of these various intangible assets, it is clear that this portion of the overall Alta Project value is *not* part of eligible cost basis.[30] As in the *Cooper* case, "only a part of the purchase price was fairly allocable to the equipment." 88 T.C. at 111.

Dr. Parsons' approach is also consistent with the framework endorsed in *Utilicorp United, Inc. v. Comm'r*, T73 T.C.M. (CCH) 1835 (T.C. 1997) — that is, using a cost approach valuation, including an appropriate profit, to determine the value of assets acquired in a sale-leaseback transaction. That case turned on the question of the taxpayer's basis in the bill of sale assets in a sale-leaseback transaction that included the sale of a broader set of assets than Section 1603-eligible property. To resolve the question, the court considered whether any of the

---

[30] In applying the residual method to this case, the Court need not actually make a determination as to the precise value of any of the intangibles, including goodwill or going concern, that were acquired. This is because, under the residual method, one does not start with the total value of the transaction and subtract the value of intangibles to arrive at the value that should be ascribed to tangible property. Rather, one proceeds in the opposite direction. The residual method requires that, after allocating purchase price to earlier Class I through IV assets, as appropriate, the value of the Class V assets, which include the eligible energy property, be determined and purchase price be allocated to those Class V assets up to their fair market value. Purchase price is only then allocated to Class VI and VII intangibles to the extent that residual purchase price remains. That is, given the limited scope of this litigation, the only element of the allocation of the overall purchase price or transaction value that is necessary is the allocation to the eligible energy property. Allocation of any residual value among Class VI and VII intangibles is unnecessary.

purchase price should be allocated to goodwill or going concern by considering the reproduction cost of the bill of sale assets, inclusive of associated development profit.[31]  *Id.* at *6-7.  The expert that the court found more credible concluded that this reproduction cost was within 0.2% of the purchase price, and the court determined that there was therefore no goodwill or going concern acquired.  *Id.*

Like the Tax Court in *Utilicorp,* this Court must consider whether going concern or goodwill was acquired in sale-leaseback transactions involving renewable energy projects (as well as in the straight sale of Alta VI).  Like the Tax Court, this Court should focus on the reproduction cost approach to value certain identified assets and thereby determine whether some of the purchase price might instead be appropriately attributable to other assets, including going concern or goodwill.  Unlike in *Utilicorp,* however, the valuation question is even narrower:  Dr. Parsons uses a cost approach to determine how much of the Alta Projects' purchase prices should be allocated to an even more restrictive set of project assets than those contemplated in *Utilicorp* — specifically the narrow set of assets that Section-1603-eligible.

---

[31] While that case considered two elements of profit associated with development and construction, one labeled a turnkey premium and one labeled a developer profit, plaintiffs' own appraiser acknowledges that the two items are often indistinguishable parts of overall profit on the development and construction of a wind farm.  It is this overall profit for which Dr. Parsons' Capital Return accounts, when taken together with profit already incorporated in contract prices with key suppliers and construction contractors that contribute to the base to which he adds the Capital Return.  The specific level of profit assumed in the reproduction cost approach in that case is not directly informative because, among other considerations, the case pertained to a development of a hydroelectric facility, rather than a wind farm, in a time period — the 1980s — with a far higher interest rate environment.  In addition, the case was not seeking to determine how much of the purchase price was allocable to only eligible assets as defined under the Section 1603 program, but rather, it examined  how much was allocable collectively to the entire set of bill of sale assets in the relevant sale-leaseback, where those assets included land and certain intangible assets, and not just the hydroelectric facility itself.

### C.    *The Market Approach Is Not Appropriate in this Case*

An approach based on market data was generally rejected by both Dr. Parsons and plaintiffs' valuation expert, Dr. Blaydon. Not only are there insufficient market comparables,[32] but Dr. Parsons additionally determined that the market approach was not reliable for estimating the value of the eligible assets alone. The overall purchase prices of market comparables suffered from the same problems as the Alta Transactions. That is, they may encompass assets beyond simply eligible property, and it was therefore not feasible to use them as a measure of eligible cost basis.

Nonetheless, as Dr. Parsons noted, data that Dr. Blaydon examined for his market approach highlights the core dispute in this litigation — namely, how much of Terra-Gen's profit on the development of the Alta Projects should be allocated to eligible property rather than to other ineligible assets of the Projects. In particular, Dr. Blaydon primarily discounted the market approach on the grounds that the Alta Projects were uniquely geographically situated and used high-quality turbines, making comparisons with many of other properties inappropriate. Yet, two properties that Dr. Blaydon considered — Coram California Development LP ("CCDLP") and Manzana — were located in the same area as the Alta Projects and used the same turbines. Their claimed eligible cost bases to the Section 1603 program were generally consistent with the range of Terra-Gen's own claimed eligible costs to develop and construct the Alta Projects, excluding developer profit, but far below plaintiffs' claimed cost basis. While not determinative of the Alta Projects' bases, the fact that other projects in the same location using the same

---

[32] Moreover, many of the possible comparables have salient differences that make comparison difficult, or they are other Alta projects that are inherently suspect as comparisons, as they would share many of the complicating features that are what necessitate a valuation in the first place.

turbines claimed such amounts as their eligible cost basis underscores that the core issue in this litigation is how much of Terra-Gen's enormous profit for selling the Alta Projects is really attributable to the value of eligible property, rather than being associated with ineligible assets.

### D.   The Income Approach Is Not Appropriate in this Case Because It Values the Businesses As a Whole, not the Eligible Property, and Ignores the Presence of Intangibles

The income approach, although relied upon by plaintiffs' expert, is not useful in this case because it is incapable of estimating the fair market value for the eligible assets alone.  The income approach assesses the value of the overall wind project by projecting the future revenues and expenses of the entire project.  While this approach can be very useful for assessing the value of a business, and therefore may be useful in establishing an upper bound on the combined value of all that business's assets, it is not helpful in determining a fair market value for a subset of assets like eligible property.

The income method uses the forecasted revenues and costs for each Alta Project as a whole — arising from the integrated use of eligible and ineligible, and real, tangible, and intangible assets — and has no further itemization to specific assets.  In addition, the value of the whole may be more than the cost, or stand-alone value, of the parts.  That is typically true for any business enterprise, such as the development of projects like the Alta Projects, which integrate a suite of assets including turbines, transmission rights, a PPA, and so on.  Depending upon the facts and circumstances, changes in the value of the project may accrue only to some specific assets and not others, or it may accrue to unspecified intangible assets.

This results in a fatal flaw for the income approach in this case.  To measure the value of eligible property in this case accurately with the income approach would require nearly perfect information, since one would need to be able to determine precisely what portions of the expected revenue are attributable to ineligible property in order to exclude that property's

56

contribution to value from the overall result. In short, income attributable to ineligible assets should be excluded from the valuation of eligible cost basis.

But of course it is essentially impossible to parse income streams to that degree. It is also impossible to use the income approach to determine the degree to which interactions among assets are adding to the overall value of the business in a way reflective of goodwill and going concern value — that is, the additional value (above and beyond the standalone value) that attaches to assets due to their use as an integral part of a specific business operation.[33]

Nonetheless, plaintiffs' expert, Dr. Blaydon, employs the income approach as the main driver of his valuation and denies the possibility of using a cost-based approach to isolate the value of only the eligible assets. Because the income approach does not and cannot provide a reliable indicator of the fair market value of the eligible property alone, Dr. Blaydon fails to assess whether or not eligible assets in the Alta Transactions had distinct values. Rather, his analysis necessarily lumps together all eligible and ineligible assets, including any value created by their interaction in the context of a particular integrated business. Dr. Blaydon claims that because a collection of eligible and ineligible assets were combined to produce a cash flow stream, he cannot isolate these assets to determine the value of only the eligible assets.

That, of course, is precisely the problem with utilizing the income approach: it does not yield the value of the eligible property alone because it reflects all contributions to value from all of the business' assets, not merely eligible ones. For example, the economics of these wind

---

[33] Another difficulty with applying the income approach in this case arises because there are many assets being used without which the projects would not generate any revenue at all. Without the wind turbines, the Alta Projects obviously generate no revenue, but the same is true of the interconnection agreement and the land on which the turbines are located. It is nearly impossible to separate the cash flows attributable to individual assets under these circumstances.

projects changed favorably during their development and, as a result, the value of the overall wind projects increased. The income projected at the date of completion of the wind project was much higher than the income projected at the start of development, which, in turn, could lead to a higher valuation using an income approach than a cost approach.

But only some of this increase in value reflected an increase in the market value of the eligible energy property itself. For example, the cost of turbines did increase somewhat during part of the relevant period between when development began and when the turbines were acquired, and this is captured in Dr. Parsons' approach, which uses the actual price paid to turbine manufacturers for the Alta Projects' turbines. The rest of the increase in project value reflected a change in the value of the other assets of the businesses that are these wind projects. This increase in value was not removed from Dr. Blaydon's income approach, though it should have been: the increase in value is separate from the value of the individual eligible assets and should therefore accrue to the ineligible assets.

Multiple such increases in value occurred during the development of the Alta Projects, for a number of reasons. For example, federal government subsidies changed in ways that could not have been anticipated, becoming very favorable during this time period. The power prices also increased substantially during this time period. Both of these increases in value are incorrectly included in a valuation using an income-based approach like Dr. Blaydon's. These increases in value do not directly increase the market value of the eligible assets themselves; instead, they simply increase the value of the overall business, and are thus properly viewed as accruing to ineligible, intangible assets.[34] The value created was largely due to the timing of

---

[34] To the extent that either of these changes would have had an indirect effect of increasing the market value of certain of the Alta Projects' eligible assets, such as by increasing

(continued...)

changes in government subsidies and rising power prices and had nothing to do with the cost of installing specified energy property.

The turbine blending described earlier provides another good example of the problems with using the income method in this case as determinative of the fair market value of the tangible eligible energy property.  Under the income approach, the fair market value of Alta I's turbines are higher because of the turbine blending and specifically because of the characteristics of turbines used in distinct projects owned by different parties (i.e., Altas II-V), which increased the PPA price for Alta I, and thus its cash flows.  Yet this had nothing to do with the characteristics of the tangible property actually used in Alta I.  In other words, under plaintiffs' income approach, the turbines' market value somehow depends on Terra-Gen's clever utilization of PPA contractual provisions that allowed them to extract a higher PPA price, rather than on anything to do with the tangible property itself.  More generally, any change in the project economics would affect the concluded fair market value of the tangible eligible energy property, no matter how detached those changes are from the market value of the eligible property itself.[35]

Plaintiffs and Dr. Blaydon try to avoid some — but not all — of the above criticisms by simply asserting that the small subset of intangibles they choose to discuss cannot be present in the Alta Projects.  Their assertions ring hollow, based as they are on narrow, extraordinarily

---

(…continued)

the demand for and the market price of wind turbines, that would be reflected in the market prices that Terra-Gen paid for those assets.  Such an effect on the market value of turbines would be accounted for in Dr. Parsons' approach because the prices that Terra-Gen paid for those assets serve as components of the base of his cost approach.

[35] For example, an increase in the projected annual cost of tax filing and accounting services for the project or the annual cost of insurance would reduce its cash flows and, under an income approach, would directly lower the concluded fair market value of the tangible eligible energy property — that is, the turbine and associated eligible assets — itself.

literal readings of some traditional definitions of goodwill and going concern value that ignore the definition of those concepts under the tax code.  The definitions relevant here are the ones called for by the residual method: that is, goodwill and going concern value are the excess of the purchase price above the fair market value of the identified assets.  Plaintiffs attempt to invert that approach: they value the whole business, baldly assert that no intangibles are present, and thus attribute all the value to the identified assets.  But that is not how the residual approach works, legally or economically.[36]

Plaintiffs also attempt to brush off some of these concerns by taking the percentages of total costs from the KPMG cost certifications of Terra-Gen's reported costs that were purportedly eligible and simply multiplying their income-based valuation by these percentages to arrive at their claim regarding the fair market value of eligible property.  They conduct no analysis, however, of whether the eligible percentage of the much lower *costs* (even assuming that eligible percentage is accurately calculated) is, in fact, equivalent to the eligible percentage of the much higher purchase price.  Rather, plaintiffs simply assume that a step-up based on that assumed equivalence is appropriate.  *See Banc One Corporation v. Comm'r,* 84 T.C. 476, 505 (1985), *aff'd,* 815 F.2d 75 (6th Cir. 1987) (rejecting contention that "the aggregate purchase price should be allocated among all of the acquired assets in proportion to their fair market values").  As has been demonstrated here and in Dr. Parsons' valuation, this approach is incorrect.[37]

---

[36] Moreover, plaintiffs' claim is internally inconsistent with their implicit recognition that some of the Alta Projects' value should be allocated to favorable land lease terms — though this allocation is inadequate — and to intangible interconnection or transmission rights — though this allocation was based on a legacy valuation of those rights as of 2008, rather than being based on an updated valuation by any of plaintiffs' experts.

[37] Moreover, some of the "costs" that factor into this percentage are actually legacy valuations of certain rights as of 2008, rather than truly costs. Thus, their approach involves an

(continued...)

60

Plaintiffs' income approach has other perverse implications.  To take a simple example, in plaintiffs' view, two neighboring wind farms that were identical except for the expected wind-speed available for the turbines would get very different Section 1603 payments.  The more profitable wind farm, which is plainly more valuable, would thus, in plaintiffs' erroneous view, have more valuable turbines.  But these identical turbines would have been bought from the same supplier and installed for the same price.  They must therefore have the same fair market value.  The income approach, however, would inaccurately allocate the value of the business's increased cash flow to the eligible property and give it a higher value.  The cost approach, on the other hand, would avoid such a counterintuitive result.

In short, the income approach tells us about the profitability (and thus the value) of the overall Alta Projects, but it says nothing about the fair market value of the eligible property.

### E.    The Purchase Price Mark-Up Over Cost Is Not Properly Attributable to Turnkey Premium and Eligible Developer Profit

Plaintiffs' position, that all of the excess of *project* purchase price over the cost of the eligible assets is simply developer profit that is part of the cost basis of the tangible assets, and is therefore eligible, is untenable.  That position says nothing about the value of the eligible assets alone, because the profit reflects the value of the Project as a whole.  Their position not only gives no consideration to what assets are actually driving that value, it also makes no distinction between three types of profit earned by the developer:  (1) profit earned or realized on the eligible property; (2) profit earned or realized on the identifiable ineligible assets; and (3) additional profit earned or realized as additional value to any of the project's many intangible

---

(…continued)

internally inconsistent consideration of the relative historical cost of some assets and the purported value at one time of other assets.

61

assets, including potential goodwill or going concern. Only the first is reflective of the entrepreneurial profit that the cost approach should include in the fair market valuation of the eligible property.

## V. Defendant Is Entitled to Judgment on Its Counterclaims

Under the *de novo* standard, resolution of this case turns on the Court's determination of the fair market value of the tangible, eligible, depreciable energy property that constitute plaintiffs' eligible cost basis under Section 1603. Only defendant's expert has provided the appropriate analysis to support such a determination. By using the cost approach, defendant's expert accurately assessed the value of the eligible cost basis separate and apart from the other ineligible assets that contribute to the purchase prices paid by the plaintiffs in the Alta Transactions. His conclusions demonstrate that plaintiffs have been overpaid, and thus that defendant is entitled to judgment on its counterclaims.

Even if the Court were to deny defendant's counterclaims, it should find that plaintiffs are not entitled to the additional Section 1603 payments that they seek. For the reasons set out herein, the purchase prices of the Alta Transactions are not reflective of the plaintiffs' eligible cost basis for Section 1603 payment purposes. Accordingly, plaintiffs cannot succeed in their claims.

### CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs the relief requested in their complaints and enter judgment in favor of defendant in the amount of its counterclaims in each case.

Respectfully submitted,

April 22, 2016

*s/ Michael J. Ronickher*
MICHAEL J. RONICKHER
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Tel:  (202) 616-9085
Fax: (202) 514-9440
Michael.J.Ronickher@usdoj.gov

CAROLINE D. CIRAOLO
  Acting Assistant Attorney General
DAVID I. PINCUS
  Chief, Court of Federal Claims Section
G. ROBSON STEWART
  Assistant Chief, Court of Federal Claims Section
MIRANDA BUREAU
  Trial Attorney, Court of Federal Claims Section
MARGARET E. SHEER
  Trial Attorney, Court of Federal Claims Section

April 22, 2016

*s/ G. Robson Stewart*
  Of Counsel

63