**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALTA WIND I OWNER LESSOR C, | ) | |
| | ) | |
| *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Nos. 13-402, 13-917, 13-972, 13-935, |
| | ) | 14-174, 14-93, 14-175, and 14-47 |
| v. | ) | |
| | ) | Judge Wheeler |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

---

**APPENDIX TO DEFENDANT'S**
**PRETRIAL MEMORANDUM OF FACTS AND LAW**

---

*s/ Michael J. Ronickher*
MICHAEL J. RONICKHER
*Attorney of Record*
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Tel:  (202) 616-9085
Fax: (202) 514-9440
Michael.J.Ronickher@usdoj.gov

CAROLINE D. CIRAOLO
Acting Assistant Attorney General
DAVID I. PINCUS
Chief, Court of Federal Claims Section
G. ROBSON STEWART
Assistant Chief, Court of Federal Claims Section
MIRANDA BUREAU
Trial Attorney, Court of Federal Claims Section
MARGARET E. SHEER
Trial Attorney, Court of Federal Claims Section

*s/ G. Robson Stewart*
*Of Counsel*

Dated:  April 22, 2016                    *Counsel for Defendant*

# TABLE OF CONTENTS

**Page**

**Statutes**

26 U.S.C. § 197.................................................................................................................. 1
26 U.S.C. § 263A............................................................................................................. 10
26 U.S.C. §338................................................................................................................ 19
26 U.S.C. §1060.............................................................................................................. 27

**Regulations and Administrative Decisions**

Special Allocation Rules for Certain Asset Acquisitions, T.D. 8215,
    1988-2 C.B. 304, 53 Fed. Reg. 27035-01 (July 18, 1988)......................................... 30

**Other Materials**

15 Mertens Law of Fed. Income Tax'n § 59:76............................................................ 48
15 Mertens Law of Fed. Income Tax'n § 59:80............................................................ 52
Bittker & Eustice, Fed. Income Tax'n of Corps. &Shareholders, ¶ 10.40 (6th ed. 1994)............ 55
Black's Law Dictionary 1737 (10th ed. 2014)............................................................... 63



UNITED STATES CODE SERVICE
Copyright © 2016 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

\*\*\* Current through PL 114-143, approved 4/11/16 \*\*\*

TITLE 26. INTERNAL REVENUE CODE
SUBTITLE A. INCOME TAXES
CHAPTER 1. NORMAL TAXES AND SURTAXES
SUBCHAPTER B. COMPUTATION OF TAXABLE INCOME
PART VI. ITEMIZED DEDUCTIONS FOR INDIVIDUALS AND CORPORATIONS

**Go to the United States Code Service Archive Directory**

*26 USCS § 197*

§ 197.   Amortization of goodwill and certain other intangibles.

(a) General rule.   A taxpayer shall be entitled to an amortization deduction with respect to any amortizable section 197 [*26 USCS § 197*] intangible. The amount of such deduction shall be determined by amortizing the adjusted basis (for purposes of determining gain) of such intangible ratably over the 15-year period beginning with the month in which such intangible was acquired.

(b) No other depreciation or amortization deduction allowable.   Except as provided in subsection (a), no depreciation or amortization deduction shall be allowable with respect to any amortizable section 197 [*26 USCS § 197*] intangible.

(c) Amortizable section 197 [*26 USCS § 197*] intangible.   For purposes of this section--
   (1) In general.   Except as otherwise provided in this section, the term "amortizable section 197 intangible" means any section 197 [*26 USCS § 197*] intangible--
      (A) which is acquired by the taxpayer after the date of the enactment of this section, and
      (B) which is held in connection with the conduct of a trade or business or an activity described in section 212 [*26 USCS § 212*].
   (2) Exclusion of self-created intangibles, etc.   The term "amortizable section 197 intangible" shall not include any section 197 intangible--
      (A) which is not described in subparagraph (D), (E), or (F) of subsection (d)(1), and
      (B) which is created by the taxpayer.
   This paragraph shall not apply if the intangible is created in connection with a transaction (or series of related transactions) involving the acquisition of assets constituting a trade or business or substantial portion thereof.
   (3) Anti-churning rules.
   For exclusion of intangibles acquired in certain transactions, see subsection (f)(9).

(d) Section 197 intangible.   For purposes of this section--
   (1) In general.   Except as otherwise provided in this section, the term "section 197 intangible" means--
      (A) goodwill,
      (B) going concern value,
      (C) any of the following intangible items:
         (i) workforce in place including its composition and terms and conditions (contractual or otherwise) of its employment,

(ii) business books and records, operating systems, or any other information base (including lists or other information with respect to current or prospective customers),

(iii) any patent, copyright, formula, process, design, pattern, knowhow, format, or other similar item,

(iv) any customer-based intangible,

(v) any supplier-based intangible, and

(vi) any other similar item,

(D) any license, permit, or other right granted by a governmental unit or an agency or instrumentality thereof,

(E) any covenant not to compete (or other arrangement to the extent such arrangement has substantially the same effect as a covenant not to compete) entered into in connection with an acquisition (directly or indirectly) of an interest in a trade or business or substantial portion thereof, and

(F) any franchise, trademark, or trade name.

(2) Customer-based intangible.

(A) In general. The term "customer-based intangible" means--

(i) composition of market,

(ii) market share, and

(iii) any other value resulting from future provision of goods or services pursuant to relationships (contractual or otherwise) in the ordinary course of business with customers.

(B) Special rule for financial institutions. In the case of a financial institution, the term "customer-based intangible" includes deposit base and similar items.

(3) Supplier-based intangible.   The term "supplier-based intangible" means any value resulting from future acquisitions of goods or services pursuant to relationships (contractual or otherwise) in the ordinary course of business with suppliers of goods or services to be used or sold by the taxpayer.

(e) Exceptions.   For purposes of this section, the term "section 197 intangible" shall not include any of the following:

(1) Financial interests.   Any interest--

(A) in a corporation, partnership, trust, or estate, or

(B) under an existing futures contract, foreign currency contract, notional principal contract, or other similar financial contract.

(2) Land.   Any interest in land.

(3) Computer software.

(A) In general. Any--

(i) computer software which is readily available for purchase by the general public, is subject to a nonexclusive license, and has not been substantially modified, and

(ii) other computer software which is not acquired in a transaction (or series of related transactions) involving the acquisition of assets constituting a trade or business or substantial portion thereof.

(B) Computer software defined. For purposes of subparagraph (A), the term "computer software" means any program designed to cause a computer to perform a desired function. Such term shall not include any data base or similar item unless the data base or item is in the public domain and is incidental to the operation of otherwise qualifying computer software.

(4) Certain interests or rights acquired separately.   Any of the following not acquired in a transaction (or series of related transactions) involving the acquisition of assets constituting a trade business or substantial portion thereof:

(A) Any interest in a film, sound recording, video tape, book, or similar property.

(B) Any right to receive tangible property or services under a contract or granted by a governmental unit or agency or instrumentality thereof.

(C) Any interest in a patent or copyright.

(D) To the extent provided in regulations, any right under a contract (or granted by a governmental unit or an agency or instrumentality thereof) if such right--

(i) has a fixed duration of less than 15 years, or

(ii) is fixed as to amount and, without regard to this section, would be recoverable under a method similar to the unit-of-production method.

(5) Interests under leases and debt instruments.   Any interest under--

(A) an existing lease of tangible property, or

(B) except as provided in subsection (d)(2)(B), any existing indebtedness.

(6) Mortgage servicing.   Any right to service indebtedness which is secured by residential real property unless such right is acquired in a transaction (or series of related transactions) involving the acquisition of assets (other than rights described in this paragraph) constituting a trade or business or substantial portion thereof.

(7) Certain transaction costs.   Any fees for professional services, and any transaction costs, incurred by parties to a transaction with respect to which any portion of the gain or loss is not recognized under part III of subchapter C [*26 USCS §§ 351* et seq.].

(f) Special rules.

(1) Treatment of certain dispositions, etc.

(A) In general. If there is a disposition of any amortizable section 197 intangible acquired in a transaction or series of related transactions (or any such intangible becomes worthless) and one or more other amortizable section 197 intangibles acquired in such transaction or series of related transactions are retained--

(i) no loss shall be recognized by reason of such disposition (or such worthlessness), and

(ii) appropriate adjustments to the adjusted bases of such retained intangibles shall be made for any loss not recognized under clause (i).

(B) Special rule for covenants not to compete. In the case of any section 197 intangible which is a covenant not to compete (or other arrangement) described in subsection (d)(1)(E), in no event shall such covenant or other arrangement be treated as disposed of (or becoming worthless) before the disposition of the entire interest described in such subsection in connection with which such covenant (or other arrangement) was entered into.

(C) Special rule. All persons treated as a single taxpayer under section 41(f)(1) [*26 USCS § 41(F)(1)*] shall be so treated for purposes of this paragraph.

(2) Treatment of certain transfers.

(A) In general. In the case of any section 197 intangible transferred in a transaction described in subparagraph (B), the transferee shall be treated as the transferor for purposes of applying this section with respect to so much of the adjusted basis in the hands of the transferee as does not exceed the adjusted basis in the hands of the transferor.

(B) Transactions covered. The transactions described in this subparagraph are--

(i) any transaction described in section 332, 351, 361, 721, 731, 1031, or 1033, [*26 USCS § 332*, *351*, *361*, *721*, *731*,*1031*, or *1033*] and

(ii) any transaction between members of the same affiliated group during any taxable year for which a consolidated return is made by such group.

(3) Treatment of amounts paid pursuant to covenants not to compete, etc.   Any amount paid or incurred pursuant to a covenant or arrangement referred to in subsection (d)(1)(E) shall be treated as an amount chargeable to capital account.

(4) Treatment of franchises, etc.

(A) Franchise. The term "franchise" has the meaning given to such term by section 1253(b)(1) [*26 USCS § 1253(b)(1)*].

(B) Treatment of renewals. Any renewal of a franchise, trademark, or trade name (or of a license, a permit, or other right referred to in subsection (d)(1)(D)) shall be treated as an acquisition. The preceding sentence shall only apply with respect to costs incurred in connection with such renewal.

(C) Certain amounts not taken into account. Any amount to which section 1253(d)(1) [*26 USCS § 1253(d)(1)*] applies shall not be taken into account under this section.

(5) Treatment of certain reinsurance transactions.   In the case of any amortizable section 197 [*26 USCS § 197*] intangible resulting from an assumption reinsurance transaction, the amount taken into account as the adjusted basis of such intangible under this section shall be the excess of--

(A) the amount paid or incurred by the acquirer under the assumption reinsurance transaction, over

(B) the amount required to be capitalized under section 848 [*26 USCS § 848*] in connection with such transaction. Subsection (b) shall not apply to any amount required to be capitalized under section 848 [*26 USCS § 848*].

(6) Treatment of certain subleases.   For purposes of this section, a sublease shall be treated in the same manner as a lease of the underlying property involved.

(7) Treatment as depreciable.   For purposes of this chapter [*26 USCS §§ 1* et seq.], any amortizable section 197 intangible shall be treated as property which is of a character subject to the allowance for depreciation provided in section 167[*26 USCS § 167*].

(8) Treatment of certain increments in value.   This section shall not apply to any increment in value if, without regard to this section, such increment is properly taken into account in determining the cost of property which is not a section 197 intangible.

(9) Anti-churning rules.   For purposes of this section--

(A) In general. The term "amortizable section 197 intangible" shall not include any section 197 intangible which is described in subparagraph (A) or (B) of subsection (d)(1) (or for which depreciation or amortization would not have been allowable but for this section) and which is acquired by the taxpayer after the date of the enactment of this section, if--

(i) the intangible was held or used at any time on or after July 25, 1991, and on or before such date of enactment by the taxpayer or a related person,

(ii) the intangible was acquired from a person who held such intangible at any time on or after July 25, 1991, and on or before such date of enactment, and, as part of the transaction, the user of such intangible does not change, or

(iii) the taxpayer grants the right to use such intangible to a person (or a person related to such person) who held or used such intangible at any time on or after July 25, 1991, and on or before such date of enactment.

For purposes of this subparagraph, the determination of whether the user of property changes as part of a transaction shall be determined in accordance with regulations prescribed by the Secretary. For purposes of this subparagraph, deductions allowable under section 1253(d) [*26 USCS § 1253(d)*] shall be treated as deductions allowable for amortization.

(B) Exception where gain recognized. If--

(i) subparagraph (A) would not apply to an intangible acquired by the taxpayer but for the last sentence of subparagraph (C)(i), and

(ii) the person from whom the taxpayer acquired the intangible elects, notwithstanding any other provision of this title--

(I) to recognize gain on the disposition of the intangible, and

(II) to pay a tax on such gain which, when added to any other income tax on such gain under this title, equals such gain multiplied by the highest rate of income tax applicable to such person under this title,

then subparagraph (A) shall apply to the intangible only to the extent that the taxpayer's adjusted basis in the intangible exceeds the gain recognized under clause (ii)(I).

(C) Related person defined. For purposes of this paragraph--

(i) Related person. A person (hereinafter in this paragraph referred to as the "related person") is related to any person if--

(I) the related person bears a relationship to such person specified in section 267(b) [*26 USCS § 267(b)*] or *section 707(b)(1)* [*26 USCS § 707(b)(1)*], or

(II) the related person and such person are engaged in trades or businesses under common control (within the meaning of subparagraphs (A) and (B) of section 41(f)(1) [*26 USCS § 41(f)(1)*]).

For purposes of subclause (I), in applying section 267(b) or 707(b)(1) [*26 USCS § 267(b)* or *707(b)(1)*], "20 percent" shall be substituted for "50 percent".

(ii) Time for making determination. A person shall be treated as related to another person if such relationship exists immediately before or immediately after the acquisition of the intangible involved.

(D) Acquisitions by reason of death. Subparagraph (A) shall not apply to the acquisition of any property by the taxpayer if the basis of the property in the hands of the taxpayer is determined under section 1014(a) [*26 USCS § 1014(a)*].

(E) Special rule for partnerships. With respect to any increase in the basis of partnership property under section 732, 734, or 743 [*26 USCS § 732*, *734*, or *743*], determinations under this paragraph shall be made at the partner level and each partner shall be treated as having owned and used such partner's proportionate share of the partnership assets.

(F) Anti-abuse rules. The term "amortizable section 197 intangible" does not include any section 197 intangible acquired in a transaction, one of the principal purposes of which is to avoid the requirement of subsection (c)(1) that the intangible be acquired after the date of the enactment of this section or to avoid the provisions of subparagraph (A).

(10) Tax-exempt use property subject to lease.   In the case of any section 197 intangible which would be tax-exempt use property as defined in subsection (h) of section 168 [*26 USCS § 168*] if such section applied to such intangible, the amortization period under this section shall not be less than 125 percent of the lease term (within the meaning of section 168(i)(3) [*26 USCS § 168(i)(3)*]).

(g) Regulations.   The Secretary shall prescribe such regulations as may be appropriate to carry out the purposes of this section, including such regulations as may be appropriate to prevent avoidance of the purposes of this section through related persons or otherwise.

**HISTORY:**

26 USCS § 197

(Added Aug. 10, 1993, P.L. 103-66, Title XIII, § 13261(a), 107 Stat. 532; Oct. 22, 2004, P.L. 108-357, Title VIII, Subtitle B, Part III, § 847(b)(3), Subtitle D, § 886(a), 118 Stat. 1602, 1641.)

### HISTORY; ANCILLARY LAWS AND DIRECTIVES

Amendments:

In 2004, P.L. 108-357, Sec. 847(b)(3) (applicable as provided by Sec. 849 of P.L. 108-357, which appears as a note to Code Sec. 470), amended subsec. (f) by adding para. (10).

--P.L. 108-357, Sec. 886(a) (applicable to property acquired after 10/22/2004, as provided by Sec. 886(c)(1) of P.L. 108-357, which appears as a note to this section), amended subsec. (e) by deleting para. (6), which read: "(6) Treatment of sports franchises. A franchise to engage in professional football, basketball, baseball, or other professional sport, and any item acquired in connection with such a franchise.", and redesignating paras. (7) and (8) as paras. (6) and (7), respectively.

In 1993, P.L. 103-66, Sec. 13261(a) (applicable as provided by Sec. 13161(g) of such Act, which appears as a note to this section), added this section.

Other provisions:

**Applicability of amendments made by § 13261 of Act Aug. 10, 1993.** Act Aug. 10, 1993, P.L. 103-66, Title XIII, § 13261(g), 107 Stat. 540; Act Aug. 20, 1996, P.L. 104-188, Title I, Subtitle G, § 1703(l), 110 Stat. 1877 (effective as if included in the provision of P.L. 103-66 to which the amendment relates, as provided by Sec. 1703(o), which appears as *26 USCS § 39* note), provides:

"(1) In general. Except as otherwise provided in this subsection, the amendments made by this section [adding this section, among other things; for full classification, consult USCS Tables volumes] shall apply with respect to property acquired after the date of the enactment of this Act.

"(2) Election to have amendments apply to property acquired after July 25, 1991.

(A) In general. If an election under this paragraph applies to the taxpayer--

"(i) the amendments made by this section [adding this section, among other things; for full classification, consult USCS Tables volumes] shall apply to property acquired by the taxpayer after July 25, 1991,

"(ii) subsection (c)(1)(A) of *section 197 of the Internal Revenue Code of 1986* (as added by this section) (and so much of subsection (f)(9)(A) of such section 197 as precedes clause (i) thereof) shall be applied with respect to the taxpayer by treating July 25, 1991, as the date of the enactment of such section, and

"(iii) in applying subsection (f)(9) of such section, with respect to any property acquired by the taxpayer or a related person on or before the date of the enactment of this Act, only holding or use on July 25, 1991, shall be taken into account.

"(B) Election. An election under this paragraph shall be made at such time and in such manner as the Secretary of the Treasury or his delegate may prescribe. Such an election by any taxpayer, once made--

"(i) may be revoked only with the consent of the Secretary, and

"(ii) shall apply to the taxpayer making such election and any other taxpayer under common control with the taxpayer (within the meaning of subparagraphs (A) and (B) of section 41(f)(1) of such Code) at any time after August 2, 1993, and on or before the date on which such election is made.

"(3) Elective binding contract exception.

(A) In general. The amendments made by this section [adding this section, among other things; for full classification, consult USCS Tables volumes] shall not apply to any acquisition of property by the taxpayer if--

"(i) such acquisition is pursuant to a written binding contract in effect on the date of the enactment of this Act and at all times thereafter before such acquisition,

"(ii) an election under paragraph (2) does not apply to the taxpayer, and

"(iii) the taxpayer makes an election under this paragraph with respect to such contract.

**5**

"(B) Election. An election under this paragraph shall be made at such time and in such manner as the Secretary of the Treasury or his delegate shall prescribe. Such an election, once made--

"(i) may be revoked only with the consent of the Secretary, and

"(ii) shall apply to all property acquired pursuant to the contract with respect to which such election was made.".

**Application of amendments made by § 886 of Act Oct. 22, 2004.** Act Oct. 22, 2004, P.L. 108-357, Title VIII, Subtitle D, § 886(c), 118 Stat. 1641, provides:

"(1) In general. Except as provided in paragraph (2), the amendments made by this section [amending *26 USCS §§ 197(e)*, *1056*, *1253*, and the part analysis preceding *26 USCS § 1051*] shall apply to property acquired after the date of the enactment of this Act.

"(2) Section 1245. The amendment made by subsection (b)(2) [amending *26 USCS § 1245*] shall apply to franchises acquired after the date of the enactment of this Act.".

**NOTES:**

Code of Federal Regulations:

This section is referred to in *26 CFR 1.162-11*, *1.167(a)-3*, *1.167(a)-6*, *1.167(a)-14*, *1.197-1T*, *1.197-2*, *1.263(a)-4*, *1.338-6*, *1.338-11*, *1.381(c)(22)-1*, *1.446-1*, *1.755-1*, *1.954-2*, *1.1016-3*, *1.1060-1*, *1.1502-13*.

Related Statutes & Rules:

This section is referred to in *26 USCS §§ 167*, *170*, *179*, *470*, *642*, *848*, *1060*.

Research Guide:

Forms:

2 *Rabkin & Johnson, Current Legal Forms, §§ 3.04*, *3.11*, *3.17*, *3.19*, Patents, Copyrights and Trademarks.

3 *Rabkin & Johnson, Current Legal Forms, §§ 3A.01*, *3A.06*, Business Franchises.

4 *Rabkin & Johnson, Current Legal Forms, § 3B.07*, Computer Agreements.

5 *Rabkin & Johnson, Current Legal Forms, § 4.10*, Sale of Goods.

7 *Rabkin & Johnson, Current Legal Forms, §§ 5.06*, *5.08*, Sales of Stock and Business Assets.

Intellectual Property:

4 Nimmer on Copyright (Matthew Bender), ch 19B, Taxation §§ 19B.02, 19B.07.

3 Milgrim on Trade Secrets (Matthew Bender), ch 11, Taxation § 11.02.

Federal Taxation:

2 Rabkin & Johnson, Federal, Income, Gift and Estate Taxation (Matthew Bender), ch 3, Deductions: Expenses § 3.16.

3 Rabkin & Johnson, Federal, Income, Gift and Estate Taxation (Matthew Bender), ch 16, Partnerships §§ 16.02, 16.09.

3A Rabkin & Johnson, Federal, Income, Gift and Estate Taxation (Matthew Bender), ch 23, Complete Liquidation § 23.06.

3A Rabkin & Johnson, Federal, Income, Gift and Estate Taxation (Matthew Bender), ch 34, Capital Transactions §§ 34.01, 34.03.

3B Rabkin & Johnson, Federal, Income, Gift and Estate Taxation (Matthew Bender), ch 42, Acquisition of Real Estate § 42.04.

3B Rabkin & Johnson, Federal, Income, Gift and Estate Taxation (Matthew Bender), ch 45, Depreciation and Credits on Real Estate § 45.02.

1 Federal Income Taxation of Corporations Filing Consolidated Returns (Matthew Bender 2nd ed.), ch 23, Other Consolidated Computations and Special Rules § 23.07.

1 Federal Income Taxation of Corporations Filing Consolidated Returns (Matthew Bender 2nd ed.), ch 31, Intercompany Transactions §§ 31.04, 31.05, 31.08.

1 Federal Income Taxation of Corporations Filing Consolidated Returns (Matthew Bender 2nd ed.), ch 32, Stock of Members § 32.01.

1 Federal Income Taxation of Corporations Filing Consolidated Returns (Matthew Bender 2nd ed.), ch 34, Prior Period Intercompany Transactions §§ 34.03, 34.11.

2 Federal Income Taxation of Corporations Filing Consolidated Returns (Matthew Bender 2nd ed.), ch 42, Special Limitations on Losses § 42.03.

2 Federal Income Taxation of Corporations Filing Consolidated Returns (Matthew Bender 2nd ed.), ch 51, Stock Basis Adjustments § 51.06.

3 Federal Income Taxation of Corporations Filing Consolidated Returns (Matthew Bender 2nd ed.), ch 71, Acquisitions and Dispositions of Subsidiaries: A General Review and Specific Analysis of Relevant Consolidated Return and Related Considerations § 71.02.

3 Federal Income Taxation of Corporations Filing Consolidated Returns (Matthew Bender 2nd ed.), ch 72, The Consolidated Return Loss Disallowance Rule §§ 72.02, 72.03.

3 Federal Income Taxation of Corporations Filing Consolidated Returns (Matthew Bender 2nd ed.), ch 73, The Consolidated Return Anti-Loss Duplication Rule § 73.03.

Annotations:
Inclusion of Intangible Asset Values in Tangible Property Tax Assessments.  *90 ALR5th 547.*

Texts:
3 Banking Law (Matthew Bender), ch 63, Tax Treatment of Bank Expenses § 63.07.
3 Banking Law (Matthew Bender), ch 64, Leasing § 64.08.
3 Banking Law (Matthew Bender), ch 65, Transitional Corporate Entities §§ 65.01, 65.03.

Interpretive Notes and Decisions:
1. Acquired subscriber relationships 2. Covenant not to compete 3. Intangible assets of proprietorship 4. Purchase price allocation

### 1. Acquired subscriber relationships

Acquired subscriber relationships are amortizable intangible assets; fair market value of subscriber base is determined by Tax Court to be reasonably based upon projection of cash flows that subscriber base would generate.  *Meredith Corp. v Commissioner (1994) 102 TC 406,* 94 TNT 50-29, amd (1994, TC) 94 TNT 66-13.

### 2. Covenant not to compete

Where taxpayer obtained covenant not to compete in connection with redemption of 75 percent of its stock, although taxpayer continued its same business, acquired no new assets, and redeemed its own stock, covenant was intangible asset covered by *26 USCS § 197*, and taxpayer must amortize it over 15 years under § 197. *Frontier Chevrolet Co. v Comm'r (2003, CA9) 329 F3d 1131, 2003 CDOS 4425, 2003 Daily Journal DAR 5674, 2003-1 USTC P 50490, 91 AFTR 2d 2338.*

Covenant not to compete (CNC) entered into by petitioner corporation in connection with redemption of former shareholder's shares was *I.R.C. § 197* intangible and corporation had to amortize payments made under CNC over 15 years under § 197(a), and not over CNC's duration; Congress' concerns for overstating CNCs costs and understating stock values strongly suggested that Congress intended § 197(d)(1)(E) to be applied to such CNCs regardless of whether

they constituted substantial portion of corporation's total stock. *Recovery Group, Inc. v Comm'r (2011, CA1) 652 F3d 122, 108 AFTR 2d 5437.*

Covenant not to compete entered into in connection with bootstrap acquisition of corporation in which purchaser initially purchased 25 per cent of stock of target, and target subsequently redeemed remaining 75 per cent of stock is amortized under 15 year period under § 197, rather than 5 year term of covenant; corporate redemption of its own stock can constitute acquisition for purposes of § 197. *Frontier Chevrolet Co. v Comm'r (2001) 116 TC 289,* affd (2003, CA9) *329 F3d 1131, 2003 CDOS 4425, 2003 Daily Journal DAR 5674, 2003-1 USTC P 50490, 91 AFTR 2d 2338.*

Where former employee entered into agreement with company whereby he sold his stock and entered into covenant not to compete, consideration paid was long-term capital gain to employee under *26 USCS §§ 1221*, *1222*, and *1223*, and not subject to amortization deduction by purchasing company pursuant to *26 USCS § 197* and *26 C.F.R. § 1.167(a)-3*, because, under both Danielson rule and mutual intent test, none of consideration could be allocated to covenant not to compete; purchase documents repeatedly reflected unambiguous allocation of entire consideration to employee's stock, and testimony of those involved in transaction, coupled with purchase documents' explicit allocation of 100 percent of consideration to employee's stock, clearly demonstrated that there was no mutual intent to allocate portion of consideration to covenant not to compete. Becker v Comm'r (2006) *TC Memo 2006-264, 92 CCH TCM 481.*

S corporation's redemption of 23 percent of its stock was acquisition of interest in trade or business; covenant not to compete was thus *I.R.C. § 197* intangible, and corporation had to amortize $ 400,000 cost of covenant over 15 years under § 197; 23-percent stock interest was substantial. Recovery Group, Inc. v Comm'r (2010) *TC Memo 2010-76, 99 CCH TCM 1324.*

When Congress wrote "an interest in trade or business or substantial portion thereof," it referred to substantial portion of trade or business (not substantial portion of interest in trade or business); *I.R.C. § 197(d)(1)(E)* thus presents duality-acquisition of stock interest and acquisition of substantial portion of assets; this duality was explicit in Congress's purpose. Recovery Group, Inc. v Comm'r (2010) *TC Memo 2010-76, 99 CCH TCM 1324.*

Congress's purpose in enacting *I.R.C. § 197(d)(1)(E)* was to impose 15-year amortization both when stock acquisition includes covenant not to compete and when substantial asset acquisition includes covenant not to compete; acquisitions that trigger § 197 encompass not only assets of trade or business but also stock in corporation that is engaged in trade or business. Recovery Group, Inc. v Comm'r (2010) *TC Memo 2010-76, 99 CCH TCM 1324.*

"Thereof" does not modify "an interest"; and therefore interest need not be "substantial" to trigger application of *I.R.C. § 197(d)(1)(E)*. Recovery Group, Inc. v Comm'r (2010) *TC Memo 2010-76, 99 CCH TCM 1324.*

"An interest" in *I.R.C. § 197(d)(1)(E)* may consist of portion, all or part, of ownership interest in trade or business. Recovery Group, Inc. v Comm'r (2010) *TC Memo 2010-76, 99 CCH TCM 1324.*

"An interest in trade or business" in *I.R.C. § 197(d)(1)(E)* included 23-percent minority interest acquired by S corporation; moreover, "thereof" referred not to "an interest" but rather to "trade or business." Recovery Group, Inc. v Comm'r (2010) *TC Memo 2010-76, 99 CCH TCM 1324.*

Antecedent of "thereof" is "trade or business," so that 15-year amortization is required when covenant is entered into in connection with acquisition of either interest (i.e., entire or fractional stock interest) in trade or business or assets constituting substantial portion of trade or business; *I.R.C. § 197(d)(1)(E)* does not include words "assets constituting" that is interpolate in text above, but those words are implicit there. Recovery Group, Inc. v Comm'r (2010) *TC Memo 2010-76, 99 CCH TCM 1324.*

### 3. Intangible assets of proprietorship

Although licenses for cellular services were amortizable, mere grant of licenses did not alone satisfy requirement under *I.R.C. § 197(c)(1)* for trade or business activity to allow amortization of licenses from date of acquisition rather than date business activity commenced. *Broz v Comm'r (2011) 137 TC 46.*

*I.R.C. § 197(c)(1)* contains active rather than passive trade or business requirement for amortization of intangible assets. *Broz v Comm'r (2011) 137 TC 46.*

Deduction claimed by software developer for expenses ostensibly incurred in purchasing customer lists was properly disallowed by IRS because customer lists are generally considered to be *26 USCS § 197* intangibles that must

**8**

be amortized over 15-year period and thus were not eligible for deduction as expense. Rudnick v Comm'r (2009) *TC Memo 2009-133, 97 CCH TCM 1758.*

Taxpayers were entitled to *IRC § 197* amortization deductions in connection with husband's repurchase of certain intangibles that he had earlier sold as part of sale of his accounting practice because husband established that their original sale, which was impelled by husband's illness, and husband's repurchase, which occurred only because third party to whom they had been sold himself became seriously ill, were not "related transactions" and that rules generally disallowing amortization did not apply. Fitch v Comm'r (2012) *TC Memo 2012-358, 104 CCH TCM 828.*

Surviving spouse who receives interest in proprietorship held as community property upon death of husband is entitled to depreciate intangible assets of proprietorship, consisting of goodwill, going concern value, workforce in place, and like, attributable to deceased husband's one-half interest in proprietorship. *Private Letter Ruling 199949037.*

Combined licenses issued by federal regulatory Commission for nuclear units were *I.R.C. § 197* intangibles under *I.R.C. § 197(d)(1)(D)* as license granted by governmental unit or agency; each license was not excepted from definition of *I.R.C. § 197* by reason of *Treas. Reg. § 1.197-2(c)(3)* because it did not include interest in land. *Private Letter Ruling 200922003, 2009* PLR LEXIS 6122; *Private Letter Ruling 200922005, 2009* PLR LEXIS 6121.

### 4. Purchase price allocation

Purchaser of assets has burden of proving purchase price allocation; allocation of 25 million dollars to employment contract which was terminable by employee after three years is not respected; allocation of 4.6 million dollars to non-competition agreements is not respected where asset purchase agreement declared that consideration for non-competition agreement was far less.  *Meredith Corp. v Commissioner (1994) 102 TC 406,* 94 TNT 50-29, amd (1994, TC) 94 TNT 66-13.

Tax court responded to IRS's and Federal Home Loan Mortgage Corporation's (FHMLC) cross-motions for summary judgment in FHMLC's contest of IRS's proposed deficiencies for years 1985-1990 and FHLMC's claimed income tax overpayments for years 1987-1990 by concluding and ordering, under § 177(d)(2)(A)(ii), 98 Stat. 711, of Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, § 177, 98 Stat. 709, (1) that FHLMC's January 1, 1985 favorable financing (FF) was intangible asset, (2) that FHLMC's adjusted basis of FF was to be its fair market value as of January 1, 1985, and (3) that FF could be amortized if FHLMC could establish its fair market value and its limited useful life as of January 1, 1985. *Fed. Home Loan Mortg. Corp. v Comm'r (2003) 121 TC 254.*

Under § 177(d)(2)(A)(ii), 98 Stat. 711, of Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, § 177, 98 Stat. 709, tax court analogized Federal Home Loan Mortgage Corporation's (FHLMC) favorable financing (FF) to bank's core deposits and to favorable leasehold, both of which could be intangible assets subject to amortization, and rejected IRS's arguments based upon FF (1) not having been acquired in purchase transaction, (2) being debt not asset, (3) violating interest deduction, original issue discount, and *I.R.C. § 197* rules, and (4) not being shown as asset on FHLMC's financial statements. *Fed. Home Loan Mortg. Corp. v Comm'r (2003) 121 TC 254.*

Subchapter C corporation that bought customer accounts and covenant not to compete from non-affiliated competitor could amortize acquisition cost per *I.R.C. § 197* as they were "customer-based intangibles" per *I.R.C. § 197(d)(2)(A)* and eligible for § 197 deduction; however, no ruling was made on issues of timing of deduction or tax basis of asset. *Private Letter Ruling 200616015, 2006* PLR LEXIS 42.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 26. Internal Revenue Code (Refs & Annos)
        Subtitle A. Income Taxes (Refs & Annos)
            Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
                Subchapter B. Computation of Taxable Income
                    Part IX. Items Not Deductible (Refs & Annos)

26 U.S.C.A. § 263A

§ 263A. Capitalization and inclusion in inventory costs of certain expenses

Effective: December 18, 2015
Currentness

**(a) Nondeductibility of certain direct and indirect costs.--**

**(1) In general.**--In the case of any property to which this section applies, any costs described in paragraph (2)--

**(A)** in the case of property which is inventory in the hands of the taxpayer, shall be included in inventory costs, and

**(B)** in the case of any other property, shall be capitalized.

**(2) Allocable costs.**--The costs described in this paragraph with respect to any property are--

**(A)** the direct costs of such property, and

**(B)** such property's proper share of those indirect costs (including taxes) part or all of which are allocable to such property.

Any cost which (but for this subsection) could not be taken into account in computing taxable income for any taxable year shall not be treated as a cost described in this paragraph.

**(b) Property to which section applies.**--Except as otherwise provided in this section, this section shall apply to--

**(1) Property produced by taxpayer.**--Real or tangible personal property produced by the taxpayer.

**(2) Property acquired for resale.--**

**(A) In general.**--Real or personal property described in section 1221(a)(1) which is acquired by the taxpayer for resale.

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 13 of 67

**(B) Exception for taxpayer with gross receipts of $10,000,000 or less.**--Subparagraph (A) shall not apply to any personal property acquired during any taxable year by the taxpayer for resale if the average annual gross receipts of the taxpayer (or any predecessor) for the 3-taxable year period ending with the taxable year preceding such taxable year do not exceed $10,000,000.

**(C) Aggregation rules, etc.**--For purposes of subparagraph (B), rules similar to the rules of paragraphs (2) and (3) of section 448(c) shall apply.

For purposes of paragraph (1), the term "tangible personal property" shall include a film, sound recording, video tape, book, or similar property.

**(c) General exceptions.--**

**(1) Personal use property.**--This section shall not apply to any property produced by the taxpayer for use by the taxpayer other than in a trade or business or an activity conducted for profit.

**(2) Research and experimental expenditures.**--This section shall not apply to any amount allowable as a deduction under section 174.

**(3) Certain development and other costs of oil and gas wells or other mineral property.**--This section shall not apply to any cost allowable as a deduction under section 167(h), 179B, 263(c), 263(i), 291(b)(2), 616, or 617.

**(4) Coordination with long-term contract rules.**--This section shall not apply to any property produced by the taxpayer pursuant to a long-term contract.

**(5) Timber and certain ornamental trees.**--This section shall not apply to--

**(A)** trees raised, harvested, or grown by the taxpayer other than trees described in clause (ii) of subsection (e)(4)(B) (after application of the last sentence thereof), and

**(B)** any real property underlying such trees.

**(6) Coordination with section 59(e).**--Paragraphs (2) and (3) shall apply to any amount allowable as a deduction under section 59(e) for qualified expenditures described in subparagraphs (B), (C), (D), and (E) of paragraph (2) thereof.

**(7) Coordination with section 168(k)(5).**--This section shall not apply to any amount allowed as a deduction by reason of section 168(k)(5) (relating to special rules for certain plants bearing fruits and nuts).

**(d) Exception for farming businesses.--**

**(1) Section not to apply to certain property.--**

**(A) In general.**--This section shall not apply to any of the following which is produced by the taxpayer in a farming business:

**(i)** Any animal.

**(ii)** Any plant which has a preproductive period of 2 years or less.

**(B) Exception for taxpayers required to use accrual method.**--Subparagraph (A) shall not apply to any corporation, partnership, or tax shelter required to use an accrual method of accounting under section 447 or 448(a)(3).

**(2) Treatment of certain plants lost by reason of casualty.--**

**(A) In general.**--If plants bearing an edible crop for human consumption were lost or damaged (while in the hands of the taxpayer) by reason of freezing temperatures, disease, drought, pests, or casualty, this section shall not apply to any costs of the taxpayer of replanting plants bearing the same type of crop (whether on the same parcel of land on which such lost or damaged plants were located or any other parcel of land of the same acreage in the United States).

**(B) Special rule for person with minority interest who materially participates.**--Subparagraph (A) shall apply to amounts paid or incurred by a person (other than the taxpayer described in subparagraph (A)) if--

**(i)** the taxpayer described in subparagraph (A) has an equity interest of more than 50 percent in the plants described in subparagraph (A) at all times during the taxable year in which such amounts were paid or incurred, and

**(ii)** such other person holds any part of the remaining equity interest and materially participates in the planting, maintenance, cultivation, or development of the plants described in subparagraph (A) during the taxable year in which such amounts were paid or incurred.

The determination of whether an individual materially participates in any activity shall be made in a manner similar to the manner in which such determination is made under section 2032A(e)(6).

**(3) Election to have this section not apply.--**

**(A) In general.**--If a taxpayer makes an election under this paragraph, this section shall not apply to any plant produced in any farming business carried on by such taxpayer.

**(B) Certain persons not eligible.**--No election may be made under this paragraph by a corporation, partnership, or tax shelter, if such corporation, partnership, or tax shelter is required to use an accrual method of accounting under section 447 or 448(a)(3).

**(C) Special rule for citrus and almond growers.**--An election under this paragraph shall not apply with respect to any item which is attributable to the planting, cultivation, maintenance, or development of any citrus or almond grove (or part thereof) and which is incurred before the close of the 4th taxable year beginning with the taxable year in which the trees were planted. For purposes of the preceding sentence, the portion of a citrus or almond grove planted in 1 taxable year shall be treated separately from the portion of such grove planted in another taxable year.

**(D) Election.**--Unless the Secretary otherwise consents, an election under this paragraph may be made only for the taxpayer's 1st taxable year which begins after December 31, 1986, and during which the taxpayer engages in a farming business. Any such election, once made, may be revoked only with the consent of the Secretary.

**(e) Definitions and special rules for purposes of subsection (d).--**

**(1) Recapture of expensed amounts on disposition.--**

**(A) In general.**--In the case of any plant with respect to which amounts would have been capitalized under subsection (a) but for an election under subsection (d)(3)--

**(i)** such plant (if not otherwise section 1245 property) shall be treated as section 1245 property, and

**(ii)** for purposes of section 1245, the recapture amount shall be treated as a deduction allowed for depreciation with respect to such property.

**(B) Recapture amount.**--For purposes of subparagraph (A), the term "recapture amount" means any amount allowable as a deduction to the taxpayer which, but for an election under subsection (d)(3), would have been capitalized with respect to the plant.

**(2) Effects of election on depreciation.--**

**(A) In general.**--If the taxpayer (or any related person) makes an election under subsection (d)(3), the provisions of section 168(g)(2) (relating to alternative depreciation) shall apply to all property of the taxpayer used predominantly in the farming business and placed in service in any taxable year during which any such election is in effect.

**(B) Related person.**--For purposes of subparagraph (A), the term "related person" means--

**(i)** the taxpayer and members of the taxpayer's family,

**(ii)** any corporation (including an S corporation) if 50 percent or more (in value) of the stock of such corporation is owned (directly or through the application of section 318) by the taxpayer or members of the taxpayer's family,

**(iii)** a corporation and any other corporation which is a member of the same controlled group described in section 1563(a)(1), and

**(iv)** any partnership if 50 percent or more (in value) of the interests in such partnership is owned directly or indirectly by the taxpayer or members of the taxpayer's family.

**(C) Members of family.**--For purposes of this paragraph, the term "family" means the taxpayer, the spouse of the taxpayer, and any of their children who have not attained age 18 before the close of the taxable year.

**(3) Preproductive period.--**

**(A) In general.**--For purposes of this section, the term "preproductive period" means--

**(i)** in the case of a plant which will have more than 1 crop or yield, the period before the 1st marketable crop or yield from such plant, or

**(ii)** in the case of any other plant, the period before such plant is reasonably expected to be disposed of.

For purposes of this subparagraph, use by the taxpayer in a farming business of any supply produced in such business shall be treated as a disposition.

**(B) Rule for determining period.**--In the case of a plant grown in commercial quantities in the United States, the preproductive period for such plant if grown in the United States shall be based on the nationwide weighted average preproductive period for such plant.

**(4) Farming business.**--For purposes of this section--

**(A) In general.**--The term "farming business" means the trade or business of farming.

**(B) Certain trades and businesses included.**--The term "farming business" shall include the trade or business of--

**(i)** operating a nursery or sod farm, or

**(ii)** the raising or harvesting of trees bearing fruit, nuts, or other crops, or ornamental trees.

14

For purposes of clause (ii), an evergreen tree which is more than 6 years old at the time severed from the roots shall not be treated as an ornamental tree.

**(5) Certain inventory valuation methods permitted.**--The Secretary shall by regulations permit the taxpayer to use reasonable inventory valuation methods to compute the amount required to be capitalized under subsection (a) in the case of any plant.

**(f) Special rules for allocation of interest to property produced by the taxpayer.--**

**(1) Interest capitalized only in certain cases.**--Subsection (a) shall only apply to interest costs which are--

**(A)** paid or incurred during the production period, and

**(B)** allocable to property which is described in subsection (b)(1) and which has--

**(i)** a long useful life,

**(ii)** an estimated production period exceeding 2 years, or

**(iii)** an estimated production period exceeding 1 year and a cost exceeding $1,000,000.

**(2) Allocation rules.--**

**(A) In general.**--In determining the amount of interest required to be capitalized under subsection (a) with respect to any property--

**(i)** interest on any indebtedness directly attributable to production expenditures with respect to such property shall be assigned to such property, and

**(ii)** interest on any other indebtedness shall be assigned to such property to the extent that the taxpayer's interest costs could have been reduced if production expenditures (not attributable to indebtedness described in clause (i)) had not been incurred.

**(B) Exception for qualified residence interest.**--Subparagraph (A) shall not apply to any qualified residence interest (within the meaning of section 163(h)).

**(C) Special rule for flow-through entities.**--Except as provided in regulations, in the case of any flow-through entity, this paragraph shall be applied first at the entity level and then at the beneficiary level.

**(3) Interest relating to property used to produce property.**--This subsection shall apply to any interest on indebtedness allocable (as determined under paragraph (2)) to property used to produce property to which this subsection applies to the extent such interest is allocable (as so determined) to the produced property.

**(4) Definitions.**--For purposes of this subsection--

**(A) Long useful life.**--Property has a long useful life if such property is--

**(i)** real property, or

**(ii)** property with a class life of 20 years or more (as determined under section 168).

**(B) Production period.**--The term "production period" means, when used with respect to any property, the period--

**(i)** beginning on the date on which production of the property begins, and

**(ii)** ending on the date on which the property is ready to be placed in service or is ready to be held for sale.

**(C) Production expenditures.**--The term "production expenditures" means the costs (whether or not incurred during the production period) required to be capitalized under subsection (a) with respect to the property.

**(g) Production.**--For purposes of this section--

**(1) In general.**--The term "produce" includes construct, build, install, manufacture, develop, or improve.

**(2) Treatment of property produced under contract for the taxpayer.**--The taxpayer shall be treated as producing any property produced for the taxpayer under a contract with the taxpayer; except that only costs paid or incurred by the taxpayer (whether under such contract or otherwise) shall be taken into account in applying subsection (a) to the taxpayer.

**(h) Exemption for free lance authors, photographers, and artists.**--

**(1) In general.**--Nothing in this section shall require the capitalization of any qualified creative expense.

**(2) Qualified creative expense.**--For purposes of this subsection, the term "qualified creative expense" means any expense--

**(A)** which is paid or incurred by an individual in the trade or business of such individual (other than as an employee) of being a writer, photographer, or artist, and

**(B)** which, without regard to this section, would be allowable as a deduction for the taxable year.

Such term does not include any expense related to printing, photographic plates, motion picture films, video tapes, or similar items.

**(3) Definitions.**--For purposes of this subsection--

**(A) Writer.**--The term "writer" means any individual if the personal efforts of such individual create (or may reasonably be expected to create) a literary manuscript, musical composition (including any accompanying words), or dance score.

**(B) Photographer.**--The term "photographer" means any individual if the personal efforts of such individual create (or may reasonably be expected to create) a photograph or photographic negative or transparency.

**(C) Artist.--**

**(i) In general.**--The term "artist" means any individual if the personal efforts of such individual create (or may reasonably be expected to create) a picture, painting, sculpture, statue, etching, drawing, cartoon, graphic design, or original print edition.

**(ii) Criteria.**--In determining whether any expense is paid or incurred in the trade or business of being an artist, the following criteria shall be taken into account:

**(I)** The originality and uniqueness of the item created (or to be created).

**(II)** The predominance of aesthetic value over utilitarian value of the item created (or to be created).

**(D) Treatment of certain corporations--**

**(i) In general.**--If--

**(I)** substantially all of the stock of a corporation is owned by a qualified employee-owner and members of his family (as defined in section 267(c)(4)), and

**(II)** the principal activity of such corporation is performance of personal services directly related to the activities of the qualified employee-owner and such services are substantially performed by the qualified employee-owner,

this subsection shall apply to any expense of such corporation which directly relates to the activities of such employee-owner in the same manner as if such expense were incurred by such employee-owner.

**(ii) Qualified employee-owner.**--For purposes of this subparagraph, the term "qualified employee-owner" means any individual who is an employee-owner of the corporation (as defined in section 269A(b)(2)) and who is a writer, photographer, or artist.

**(i) Regulations.**--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section, including--

**(1)** regulations to prevent the use of related parties, pass-thru entities, or intermediaries to avoid the application of this section, and

**(2)** regulations providing for simplified procedures for the application of this section in the case of property described in subsection (b)(2).

**CREDIT(S)**

(Added Pub.L. 99-514, Title VIII, § 803(a), Oct. 22, 1986, 100 Stat. 2350; amended Pub.L. 100-647, Title I, § 1008(b)(1) to (4), Title VI, § 6026(a) to (c), Nov. 10, 1988, 102 Stat. 3437, 3438, 3691 to 3693; Pub.L. 101-239, Title VII, § 7816(d)(1), Dec. 19, 1989, 103 Stat. 2420; Pub.L. 106-170, Title V, § 532(c)(2)(B), Dec. 17, 1999, 113 Stat. 1930; Pub.L. 108-357, Title III, § 338(b)(2), Oct. 22, 2004, 118 Stat. 1481; Pub.L. 109-58, Title XIII, § 1329(b), Aug. 8, 2005, 119 Stat. 1020; Pub.L. 114-113, Div. Q, Title I, § 143(b)(6)(H), Dec. 18, 2015, 129 Stat. 3064.)

Notes of Decisions (51)

26 U.S.C.A. § 263A, 26 USCA § 263A
Current through P.L. 114-115 approved 12-28-2015

---

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle A. Income Taxes (Refs & Annos)
      Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
        Subchapter C. Corporate Distributions and Adjustments (Refs & Annos)
          Part II. Corporate Liquidations (Refs & Annos)
            Subpart B. Effects on Corporation

26 U.S.C.A. § 338

§ 338. Certain stock purchases treated as asset acquisitions

Effective: October 23, 2004
Currentness

**(a) General rule.**--For purposes of this subtitle, if a purchasing corporation makes an election under this section (or is treated under subsection (e) as having made such an election), then, in the case of any qualified stock purchase, the target corporation--

**(1)** shall be treated as having sold all of its assets at the close of the acquisition date at fair market value in a single transaction, and

**(2)** shall be treated as a new corporation which purchased all of the assets referred to in paragraph (1) as of the beginning of the day after the acquisition date.

**(b) Basis of assets after deemed purchase.--**

**(1) In general.**--For purposes of subsection (a), the assets of the target corporation shall be treated as purchased for an amount equal to the sum of--

  **(A)** the grossed-up basis of the purchasing corporation's recently purchased stock, and

  **(B)** the basis of the purchasing corporation's nonrecently purchased stock.

**(2) Adjustment for liabilities and other relevant items.**--The amount described in paragraph (1) shall be adjusted under regulations prescribed by the Secretary for liabilities of the target corporation and other relevant items.

**(3) Election to step-up the basis of certain target stock.--**

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 22 of 67

**(A) In general.**--Under regulations prescribed by the Secretary, the basis of the purchasing corporation's nonrecently purchased stock shall be the basis amount determined under subparagraph (B) of this paragraph if the purchasing corporation makes an election to recognize gain as if such stock were sold on the acquisition date for an amount equal to the basis amount determined under subparagraph (B).

**(B) Determination of basis amount.**--For purposes of subparagraph (A), the basis amount determined under this subparagraph shall be an amount equal to the grossed-up basis determined under subparagraph (A) of paragraph (1) multiplied by a fraction--

    **(i)** the numerator of which is the percentage of stock (by value) in the target corporation attributable to the purchasing corporation's nonrecently purchased stock, and

    **(ii)** the denominator of which is 100 percent minus the percentage referred to in clause (i).

**(4) Grossed-up basis.**--For purposes of paragraph (1), the grossed-up basis shall be an amount equal to the basis of the corporation's recently purchased stock, multiplied by a fraction--

    **(A)** the numerator of which is 100 percent, minus the percentage of stock (by value) in the target corporation attributable to the purchasing corporation's nonrecently purchased stock, and

    **(B)** the denominator of which is the percentage of stock (by value) in the target corporation attributable to the purchasing corporation's recently purchased stock.

**(5) Allocation among assets.**--The amount determined under paragraphs (1) and (2) shall be allocated among the assets of the target corporation under regulations prescribed by the Secretary.

**(6) Definitions of recently purchased stock and nonrecently purchased stock.**--For purposes of this subsection--

    **(A) Recently purchased stock.**--The term "recently purchased stock" means any stock in the target corporation which is held by the purchasing corporation on the acquisition date and which was purchased by such corporation during the 12-month acquisition period.

    **(B) Nonrecently purchased stock.**--The term "nonrecently purchased stock" means any stock in the target corporation which is held by the purchasing corporation on the acquisition date and which is not recently purchased stock.

[**(c) Repealed.** Pub.L. 99-514, Title VI, § 631(b)(2), Oct. 22, 1986, 100 Stat. 2272]

**(d) Purchasing corporation; target corporation; qualified stock purchase.**--For purposes of this section--

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 23 of 67

**(1) Purchasing corporation.**--The term "purchasing corporation" means any corporation which makes a qualified stock purchase of stock of another corporation.

**(2) Target corporation.**--The term "target corporation" means any corporation the stock of which is acquired by another corporation in a qualified stock purchase.

**(3) Qualified stock purchase.**--The term "qualified stock purchase" means any transaction or series of transactions in which stock (meeting the requirements of section 1504(a)(2)) of 1 corporation is acquired by another corporation by purchase during the 12-month acquisition period.

**(e) Deemed election where purchasing corporation acquires asset of target corporation.--**

**(1) In general.**--A purchasing corporation shall be treated as having made an election under this section with respect to any target corporation if, at any time during the consistency period, it acquires any asset of the target corporation (or a target affiliate).

**(2) Exceptions.**--Paragraph (1) shall not apply with respect to any acquisition by the purchasing corporation if--

**(A)** such acquisition is pursuant to a sale by the target corporation (or the target affiliate) in the ordinary course of its trade or business,

**(B)** the basis of the property acquired is determined wholly by reference to the adjusted basis of such property in the hands of the person from whom acquired,

**(C)** such acquisition was before September 1, 1982, or

**(D)** such acquisition is described in regulations prescribed by the Secretary and meets such conditions as such regulations may provide.

**(3) Anti-avoidance rule.**--Whenever necessary to carry out the purpose of this subsection and subsection (f), the Secretary may treat stock acquisitions which are pursuant to a plan and which meet the requirements of section 1504(a)(2) as qualified stock purchases.

**(f) Consistency required for all stock acquisitions from same affiliated group.**--If a purchasing corporation makes qualified stock purchases with respect to the target corporation and 1 or more target affiliates during any consistency period, then (except as otherwise provided in subsection (e))--

**(1)** any election under this section with respect to the first such purchase shall apply to each other such purchase, and

**(2)** no election may be made under this section with respect to the second or subsequent such purchase if such an election was not made with respect to the first such purchase.

**(g) Election.--**

**(1) When made.**--Except as otherwise provided in regulations, an election under this section shall be made not later than the 15th day of the 9th month beginning after the month in which the acquisition date occurs.

**(2) Manner.**--An election by the purchasing corporation under this section shall be made in such manner as the Secretary shall by regulations prescribe.

**(3) Election irrevocable.**--An election by a purchasing corporation under this section, once made, shall be irrevocable.

**(h) Definitions and special rules.**--For purposes of this section--

**(1) 12-month acquisition period.**--The term "12-month acquisition period" means the 12-month period beginning with the date of the first acquisition by purchase of stock included in a qualified stock purchase (or, if any of such stock was acquired in an acquisition which is a purchase by reason of subparagraph (C) of paragraph (3), the date on which the acquiring corporation is first considered under section 318(a) (other than paragraph (4) thereof) as owning stock owned by the corporation from which such acquisition was made).

**(2) Acquisition date.**--The term "acquisition date" means, with respect to any corporation, the first day on which there is a qualified stock purchase with respect to the stock of such corporation.

**(3) Purchase.--**

  **(A) In general.**--The term "purchase" means any acquisition of stock, but only if--

    **(i)** the basis of the stock in the hands of the purchasing corporation is not determined (I) in whole or in part by reference to the adjusted basis of such stock in the hands of the person from whom acquired, or (II) under section 1014(a) (relating to property acquired from a decedent),

    **(ii)** the stock is not acquired in an exchange to which section 351, 354, 355, or 356 applies and is not acquired in any other transaction described in regulations in which the transferor does not recognize the entire amount of the gain or loss realized on the transaction, and

    **(iii)** the stock is not acquired from a person the ownership of whose stock would, under section 318(a) (other than paragaraph [1] (4) thereof), be attributed to the person acquiring such stock.

22

**(B) Deemed purchase under subsection (a).**--The term "purchase" includes any deemed purchase under subsection (a)(2). The acquisition date for a corporation which is deemed purchased under subsection (a)(2) shall be determined under regulations prescribed by the Secretary.

**(C) Certain stock acquisitions from related corporations.--**

**(i) In general.**--Clause (iii) of subparagraph (A) shall not apply to an acquisition of stock from a related corporation if at least 50 percent in value of the stock of such related corporation was acquired by purchase (within the meaning of subparagraphs (A) and (B)).

**(ii) Certain distributions.**--Clause (i) of subparagraph (A) shall not apply to an acquisition of stock described in clause (i) of this subparagraph if the corporation acquiring such stock--

**(I)** made a qualified stock purchase of stock of the related corporation, and

**(II)** made an election under this section (or is treated under subsection (e) as having made such an election) with respect to such qualified stock purchase.

**(iii) Related corporation defined.**--For purposes of this subparagraph, a corporation is a related corporation if stock owned by such corporation is treated (under section 318(a) other than paragraph (4) thereof) as owned by the corporation acquiring the stock.

**(4) Consistency period.--**

**(A) In general.**--Except as provided in subparagraph (B), the term "consistency period" means the period consisting of--

**(i)** the 1-year period before the beginning of the 12-month acquisition period for the target corporation,

**(ii)** such acquisition period (up to and including the acquisition date), and

**(iii)** the 1-year period beginning on the day after the acquisition date.

**(B) Extension where there is plan.**--The period referred to in subparagraph (A) shall also include any period during which the Secretary determines that there was in effect a plan to make a qualified stock purchase plus 1 or more other qualified stock purchases (or asset acquisitions described in subsection (e)) with respect to the target corporation or any target affiliate.

**(5) Affiliated group.**--The term "affiliated group" has the meaning given to such term by section 1504(a) (determined without regard to the exceptions contained in section 1504(b)).

**(6) Target affiliate.--**

**(A) In general.**--A corporation shall be treated as a target affiliate of the target corporation if each of such corporations was, at any time during so much of the consistency period as ends on the acquisition date of the target corporation, a member of an affiliated group which had the same common parent.

**(B) Certain foreign corporations, etc.**--Except as otherwise provided in regulations (and subject to such conditions as may be provided in regulations)--

(i) the term "target affiliate" does not include a foreign corporation, a DISC, or a corporation to which an election under section 936 applies, and

(ii) stock held by a target affiliate in a foreign corporation or a domestic corporation which is a DISC or described in section 1248(e) shall be excluded from the operation of this section.

**[(7) Repealed.** Pub.L. 100-647, Title I, § 1006(e)(20), Nov. 10, 1988, 102 Stat. 3403]

**(8) Acquisitions by affiliated group treated as made by 1 corporation.**--Except as provided in regulations prescribed by the Secretary, stock and asset acquisitions made by members of the same affiliated group shall be treated as made by 1 corporation.

**(9) Target not treated as member of affiliated group.**--Except as otherwise provided in paragraph (10) or in regulations prescribed under this paragraph, the target corporation shall not be treated as a member of an affiliated group with respect to the sale described in subsection (a)(1).

**(10) Elective recognition of gain or loss by target corporation, together with nonrecognition of gain or loss on stock sold by selling consolidated group.--**

**(A) In general.**--Under regulations prescribed by the Secretary, an election may be made under which if--

(i) the target corporation was, before the transaction, a member of the selling consolidated group, and

(ii) the target corporation recognizes gain or loss with respect to the transaction as if it sold all of its assets in a single transaction,

then the target corporation shall be treated as a member of the selling consolidated group with respect to such sale, and (to the extent provided in regulations) no gain or loss will be recognized on stock sold or exchanged in the transaction by members of the selling consolidated group.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**(B) Selling consolidated group.**--For purposes of subparagraph (A), the term "selling consolidated group" means any group of corporations which (for the taxable period which includes the transaction)--

  **(i)** includes the target corporation, and

  **(ii)** files a consolidated return.

    To the extent provided in regulations, such term also includes any affiliated group of corporations which includes the target corporation (whether or not such group files a consolidated return).

**(C) Information required to be furnished to the Secretary.**--Under regulations, where an election is made under subparagraph (A), the purchasing corporation and the common parent of the selling consolidated group shall, at such times and in such manner as may be provided in regulations, furnish to the Secretary the following information:

  **(i)** The amount allocated under subsection (b)(5) to goodwill or going concern value.

  **(ii)** Any modification of the amount described in clause (i).

  **(iii)** Any other information as the Secretary deems necessary to carry out the provisions of this paragraph.

**(11) Elective formula for determining fair market value.**--For purposes of subsection (a)(1), fair market value may be determined on the basis of a formula provided in regulations prescribed by the Secretary which takes into account liabilities and other relevant items.

**[(12) Repealed.** Pub.L. 99-514, Title VI, § 631(e)(5), Oct. 22, 1986, 100 Stat. 2273]

**(13) Tax on deemed sale not taken into account for estimated tax purposes.**--For purposes of section 6655, tax attributable to the sale described in subsection (a)(1) shall not be taken into account. The preceding sentence shall not apply with respect to a qualified stock purchase for which an election is made under paragraph (10).

**[(14) Repealed.** Pub.L. 108-27, Title III, § 302(e)(4)(B)(i), May 28, 2003, 117 Stat. 763]

**(15) Combined deemed sale return.**--Under regulations prescribed by the Secretary, a combined deemed sale return may be filed by all target corporations acquired by a purchasing corporation on the same acquisition date if such target corporations were members of the same selling consolidated group (as defined in subparagraph (B) of paragraph (10)).

**(16) Coordination with foreign tax credit provisions.**--Except as provided in regulations, this section shall not apply for purposes of determining the source or character of any item for purposes of subpart A of part III of subchapter N of this chapter (relating to foreign tax credit). The preceding sentence shall not apply to any gain to the extent such gain is includible

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 28 of 67

in gross income as a dividend under section 1248 (determined without regard to any deemed sale under this section by a foreign corporation).

**(i) Regulations.**--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section, including--

**(1)** regulations to ensure that the purpose of this section to require consistency of treatment of stock and asset sales and purchases may not be circumvented through the use of any provision of law or regulations (including the consolidated return regulations) and

**(2)** regulations providing for the coordination of the provisions of this section with the provision of this title relating to foreign corporations and their shareholders.

**CREDIT(S)**

(Added Pub.L. 97-248, Title II, § 224(a), Sept. 3, 1982, 96 Stat. 485; amended Pub.L. 97-448, Title III, § 306(a)(8)(A)(i), Jan. 12, 1983, 96 Stat. 2402; Pub.L. 98-369, Div. A, Title VII, § 712(k)(1) to (5)(D), (6), (7), July 18, 1984, 98 Stat. 948-952; Pub.L. 99-514, Title VI, § 631(b), (e)(5), Title XII, § 1275(c)(6), Title XVIII, §§ 1804(e)(8)(A), 1899A(7), Oct. 22, 1986, 100 Stat. 2272, 2273, 2599, 2804, 2958; Pub.L. 100-647, Title I, §§ 1006(e)(20), 1012(bb)(5)(A), 1018(d)(9), Nov. 10, 1988, 102 Stat. 3403, 3535, 3581; Pub.L. 101-508, Title XI, § 11323(c)(1), Nov. 5, 1990, 104 Stat. 1388-465; Pub.L. 108-27, Title III, § 302(e)(4)(B)(i), May 28, 2003, 117 Stat. 763; Pub.L. 108-357, Title VIII, § 839(a), Oct. 22, 2004, 118 Stat. 1597.)

Notes of Decisions (4)

Footnotes

1       So in original. Probably should be "paragraph".

26 U.S.C.A. § 338, 26 USCA § 338

Current through P.L. 114-115 approved 12-28-2015

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 29 of 67

> United States Code Annotated
>   Title 26. Internal Revenue Code (Refs & Annos)
>     Subtitle A. Income Taxes (Refs & Annos)
>       Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
>         Subchapter O. Gain or Loss on Disposition of Property
>           Part IV. Special Rules

26 U.S.C.A. § 1060

§ 1060. Special allocation rules for certain asset acquisitions

Currentness

**(a) General rule.**--In the case of any applicable asset acquisition, for purposes of determining both--

**(1)** the transferee's basis in such assets, and

**(2)** the gain or loss of the transferor with respect to such acquisition,

the consideration received for such assets shall be allocated among such assets acquired in such acquisition in the same manner as amounts are allocated to assets under section 338(b)(5). If in connection with an applicable asset acquisition, the transferee and transferor agree in writing as to the allocation of any consideration, or as to the fair market value of any of the assets, such agreement shall be binding on both the transferee and transferor unless the Secretary determines that such allocation (or fair market value) is not appropriate.

**(b) Information required to be furnished to Secretary.**--Under regulations, the transferor and transferee in an applicable asset acquisition shall, at such times and in such manner as may be provided in such regulations, furnish to the Secretary the following information:

**(1)** The amount of the consideration received for the assets which is allocated to section 197 intangibles.

**(2)** Any modification of the amount described in paragraph (1).

**(3)** Any other information with respect to other assets transferred in such acquisition as the Secretary deems necessary to carry out the provisions of this section.

**(c) Applicable asset acquisition.**--For purposes of this section, the term "applicable asset acquisition" means any transfer (whether directly or indirectly)--

**(1)** of assets which constitute a trade or business, and

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 30 of 67

**(2)** with respect to which the transferee's basis in such assets is determined wholly by reference to the consideration paid for such assets.

A transfer shall not be treated as failing to be an applicable asset acquisition merely because section 1031 applies to a portion of the assets transferred.

**(d) Treatment of certain partnership transactions.**--In the case of a distribution of partnership property or a transfer of an interest in a partnership--

**(1)** the rules of subsection (a) shall apply but only for purposes of determining the value of section 197 intangibles for purposes of applying section 755, and

**(2)** if section 755 applies, such distribution or transfer (as the case may be) shall be treated as an applicable asset acquisition for purposes of subsection (b).

**(e) Information required in case of certain transfers of interests in entities.--**

**(1) In general.**--If--

**(A)** a person who is a 10-percent owner with respect to any entity transfers an interest in such entity, and

**(B)** in connection with such transfer, such owner (or a related person) enters into an employment contract, covenant not to compete, royalty or lease agreement, or other agreement with the transferee,

such owner and the transferee shall, at such time and in such manner as the Secretary may prescribe, furnish such information as the Secretary may require.

**(2) 10-percent owner.**--For purposes of this subsection--

**(A) In general.**--The term "10-percent owner" means, with respect to any entity, any person who holds 10 percent or more (by value) of the interests in such entity immediately before the transfer.

**(B) Constructive ownership.**--Section 318 shall apply in determining ownership of stock in a corporation. Similar principles shall apply in determining the ownership of interests in any other entity.

**(3) Related person.**--For purposes of this subsection, the term "related person" means any person who is related (within the meaning of section 267(b) or 707(b)(1)) to the 10-percent owner.

**(f) Cross reference.--**

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 31 of 67

For provisions relating to penalties for failure to file a return required by this section, see section 6721.

**CREDIT(S)**

(Added Pub.L. 99-514, Title VI, § 641(a), Oct. 22, 1986, 100 Stat. 2282; amended Pub.L. 100-647, Title I, § 1006(h)(1), (2), (3)(B), Nov. 10, 1988, 102 Stat. 3410; Pub.L. 101-508, Title XI, § 11323(a), (b)(1), Nov. 5, 1990, 104 Stat. 1388-464; Pub.L. 103-66, Title XIII, § 13261(e), Aug. 10, 1993, 107 Stat. 539.)

Notes of Decisions (6)

26 U.S.C.A. § 1060, 26 USCA § 1060
Current through P.L. 114-115 approved 12-28-2015

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.



DEPARTMENT OF THE TREASURY

Internal Revenue Service

AGENCY: Internal Revenue Service, Treasury.

26 CFR Parts 1 and 602

Special Allocation Rules for Certain Asset Acquisitions

[T.D. 8215]

*53 FR 27035*

July 18, 1988

ACTION: Temporary regulations.

SUMMARY: This document contains temporary regulations relating to allocation rules for certain asset acquisitions under *section 1060 of the Internal Revenue Code of 1986* ("Code"). The temporary regulations provide guidance concerning the application of section 1060 and also modify certain rules relating to stock purchases treated as asset purchases under section 338 of the Code. In addition, the temporary regulations coordinate the application of section 755 with the rules of section 1060. The text of the temporary regulations set forth in this document also serves as the text of the proposed regulations cross-referenced in the notice of proposed rulemaking in the proposed rules section of this issue of the Federal Register.

EFFECTIVE DATE: These regulations are effective July 18, 1988. These temporary regulations under section 1060 generally apply to asset acquisitions made after May 6, 1986. The reporting requirements apply to asset acquisitions (and to certain adjustments of consideration) occurring in a taxable year for which the due date (including extensions of time) of the income tax return or return of income is on or after September 13, 1988.

FOR FURTHER INFORMATION CONTACT: Judith C. Winkler of the Legislation and Regulations Division, Office of Chief Counsel, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington, DC 20224, Attention: CC:LR:T (Telephone 202-566-3458, not a toll-free number). For information concerning the temporary regulations under section 755, contact Robert E. Shaw of the Legislation and Regulations Division, Office of Chief Counsel, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington, DC 20224, Attention: CC:LR:T (Telephone 202-566-3297, not a toll-free number).

**TEXT:** SUPPLEMENTARY INFORMATION:

Paperwork Reduction Act

This regulation is being issued without prior notice and public procedure pursuant to the Administrative Procedure Act (*5 U.S.C. 533*). For this reason, the collection of information contained in this regulation has been reviewed and, pending receipt and evaluation of public comments, approved by the Office of Management and Budget (OMB) under control number 1545-1021. The estimated average burden associated with the collection of information in this regulation is 1.05 hours per respondent or recordkeeper.

53 FR 27035

For further information concerning this collection of information, and where to submit comments on this collection of information and the accuracy of the estimated burden and suggestions for reducing this burden, please refer to the preamble to the cross-reference notice of proposed rulemaking published elsewhere in this issue of the Federal Register.

Background

This document adds new temporary regulations §§ 1.167(a)-5T, 1.755-2T, 1.1031(d)-1T, and 1.1060-1T to part 1 of Title 26 of the Code of Federal Regulations and amends § 1.338(b)-3T. The new temporary regulations implement section 1060 of the Code. Section 1060 was added to the Code by section 641 of the Tax Reform Act of 1986 (Pub. L. No. 99-514; 100 Stat. 2282).

Explanation of Provisions

Introduction

For tax purposes, the sale of a going trade or business for a lump sum amount is viewed as a sale of each individual asset rather than a single capital asset. Both the purchaser and the seller must allocate the purchase price for the acquisition among the assets transferred. The seller must allocate the purchase price among the assets to determine the amount and character of its realized gain or loss on the sale. The purchaser's allocation determines its basis in each asset and will affect its amount of allowable depreciation, cost depletion, or amortization deductions, its realized gain or loss on a subsequent sale of those assets, and may have other tax consequences.

Section 1060(a) provides that, in the case of an applicable asset acquisition, the seller and the purchaser each must allocate the consideration among the assets transferred in the same manner as the amounts are allocated under section 338(b)(5) (relating to certain stock purchases treated as asset acquisitions). Thus, the seller and the purchaser are required to allocate consideration under the residual method in order to make the respective determinations of the amount of gain or loss from the transfer of each asset and the basis in each asset acquired.

Prior to the enactment of section 1060, there was considerable controversy between taxpayers and the Internal Revenue Service concerning the allocation of the purchase price among assets of a going business. The controversy principally was due to the difficulty in establishing the value of goodwill and going concern value. Section 1060, by mandating the application of the residual method of allocation as prescribed in the regulations under section 338(b)(5), alleviates this controversy since the residual method does not require a separate determination of the value of goodwill and going concern value. Instead, under the residual method any "premium" paid in excess of the total fair market value of the purchased assets (other than goodwill or going concern value) is treated as payment for goodwill or going concern value. The mandatory application of the residual method of allocation also eliminates disparities in purchase price allocations that existed, prior to the enactment of section 1060, between asset purchases and stock purchases treated as asset purchases under section 338.

Section 1060(b) requires the seller and the purchaser to report certain information in connection with an applicable asset acquisition. The information reporting requirements are intended to encourage compliance with the substantive rules of section 1060 and to assist the Internal Revenue Service in identifying returns which are likely to involve an attempt to amortize goodwill or going concern value.

The temporary regulations define the term "applicable asset acquisition," provide rules for allocating consideration under the residual method among the assets transferred (including increases or decreases in consideration occurring after the purchase date), and implement the reporting requirements of section 1060(b).

Applicable Asset Acquisition

An "applicable asset acquisition" is any transfer, whether direct or indirect, or a group of assets constituting a trade or business with respect to which the purchaser's basis is determined wholly by reference to the consideration paid for the assets. (However, a transfer does not fail to be an applicable asset acquisition solely because section 1031 (relating to like-kind exchanges) applies to a portion of the assets.) Under § 1.1060-1T(b), a group of assets constitutes a trade or business if the use of such assets would constitute an active trade or business for purposes of section 355 or if their character is such that goodwill or going concern value could under any circumstances attach to such assets. A group of

31

53 FR 27035

assets which constitutes a trade or business in the hands of the seller or the purchaser will constitute a trade or business for purposes of section 1060. Thus, for example, a purchaser cannot avoid the application of section 1060 by arguing that he will not use the assets of an acquired business in the same business. All the facts and circumstances surrounding the transaction are taken into account in determining whether a group of assets constitutes a trade or business. Factors to be considered include related transactions between the purchaser and seller such as a lease agreement, covenant not to compete, management contract, or other similar agreement between purchaser and seller (or managers, directors, owners, or employees of the seller); and the excess, if any, of the total consideration over the aggregate book value of the tangible and intangible assets (other than goodwill and going concern value) as shown in the purchaser's financial accounting books and records.

The temporary regulations provide rules for the allocation of consideration when a portion of the group of assets, which constitutes a trade or business under section 1060, is exchanged for other assets in a transaction to which section 1031 applies. The like-kind property and other property or money which is treated as transferred in exchange for the like-kind property are excluded from the allocation rules of section 1060. The temporary regulations include rules for determining the amount of the other property or money which is treated as transferred in exchange for the like-kind property. A conforming amendment (new § 1.1031(d)-1T) is made to the section 1031 regulations. When finalized, the new paragraph will follow § 1.1031(d)-1(e). Rules relating to the transfer of a partnership interest are prescribed in new § 1.755-2T.

Allocation of Consideration

Section 1.1060-1T (d) and (e) prescribes the method by which the seller and purchaser must allocate consideration among the assets transferred. The method of allocation is substantially the same as the method of allocation prescribed in § 1.338(b)-2T (relating to the allocation of adjusted grossed-up basis among the assets of the target corporation when a section 338 election is made).

Section 1.1060-1T(d) identifies four classes of assets, which are identical to the four classes of assets identified in § 1.338(b)-2T. "Class I assets" are cash, deposits in banks, and similar items. "Class II assets" are certificates of deposit, U.S. government securities, certain marketable stocks and securities, foreign currency, and similar items. "Class IV assets" are intangible assets in the nature of goodwill and going concern value. All assets not described above, specifically including accounts receivable, are "Class III assets." As a general rule, a proportionate method of allocation is prescribed for the allocation of consideration within each class of assets, although a residual method of allocation is prescribed for allocation among the asset classes, allocation beginning with the lowest numbered class. After consideration is reduced by the amount of Class I assets, it is allocated among Class II assets in proportion to their fair market values as of the purchase date, and then among Class III assets in such proportion, and finally to Class IV assets. Thus, consideration is allocated within each of asset classes II and III to the extent of the fair market value of the assets in that class, with any remaining amount allocated to the next class of assets. The unallocated amount of consideration remaining after allocation among the Class III assets is allocated to Class IV assets, intangible assets in the nature of goodwill and going concern value.

The amount of consideration allocated to an asset, other than assets in the nature of goodwill and going concern value, cannot exceed its fair market value on the purchase date. The "fair market value" of an asset is its fair market value determined without regard to mortgages, liens, pledges, or other liabilities. However, the amounts assigned as fair market values by the seller, but not the purchaser, are subject to rules similar to section 7701(g) (relating to fair market value in the case of property subject to nonrecourse indebtedness).

The amount of consideration allocated to an asset is also subject to any applicable limitations under the Code or general principles of tax law. Thus, for example, the amount of the consideration allocated by a purchaser to a player contract described in section 1056 cannot exceed the limitation imposed by that section.

In connection with the examination of a return, the Internal Revenue Service may challenge the taxpayer's determination of the fair market value of any asset by any appropriate method and take into account all factors, including any lack of adverse tax interests between the parties. For example, in certain cases the Internal Revenue Service may make an independent showing of the value of goodwill and going concern value as a means of calling into question the validity of the taxpayer's valuation of other assets.

Subsequent Adjustments to Consideration

53 FR 27035

Section 1.1060-1T(f) provides rules for the allocation of increases or decreases in consideration of either the purchaser or seller that occur after the purchase date. Increases in consideration are allocated among the assets in accordance with the general allocation rules set forth in § 1.1060-1T(d), subject to the limitation rules contained in § 1.1060-1T(e). Thus, in general, the aggregate amount of consideration allocated to an asset may not exceed the asset's fair market value on the purchase date, except for assets in the nature of goodwill and going concern value.

The rule for decreases in consideration is similar to the one for increases, except that decreases are allocated to assets in the reverse of the order in which consideration is allocated under § 1.1060-1T(d). Thus, as a general rule, decreases are allocated first among assets in the nature of goodwill and going concern value to the extent of the consideration previously allocated to them, and then as a decrease in the consideration previously allocated to other acquired assets.

The regulations provide that, if an asset has been disposed of, depreciated, amortized, or depleted by the purchaser before an increase (or decrease) in consideration is taken into account, the increase (or decrease) in consideration otherwise allocable to such asset by the purchaser is properly taken into account under principles of tax law applicable when part of the cost of an asset (not previously reflected in its basis) is paid (or reduced) after the asset has been disposed of, depreciated, amortized, or depleted. For purposes of this rule, an asset is considered to have been disposed of to the extent that its allocable portion of a decrease in consideration would reduce the purchaser's basis in that asset below zero.

The regulations provide a special rule analogous to § 1.338(b)-3T(g) for allocating an increase (or decrease) in consideration that directly relates to the income produced by a particular intangible asset, such as a patent, copyright, or secret process ("contingent income assets"), as long as the increase (or decrease) in consideration is related to such contingent income asset and does not relate to other assets. Subject to the fair market value and other limitations in § 1.1060-1T(e), the increase (or decrease) in consideration is first allocated to the contingent income asset and then to other assets. Solely for purposes of applying the fair market value and other limitations to a contingent income asset, its fair market value shall be redetermined when the increase (or decrease) is taken into account. (For purposes of this redetermination, only those circumstances that resulted in the increase (or decrease) in consideration are taken into account.) In appropriate cases, the Internal Revenue Service may apply the principles of this provision to reallocate an increase (or decrease) in consideration among some of the assets to the extent such allocation is necessary to reflect properly the consideration that relates to each of those assets.

Reporting Requirements

Section 1.1060-1T(h) of the temporary regulations implements section 1060(b) by requiring that the seller and the purchaser in an applicable asset acquisition each report on Form 8594 specific information about the allocation of consideration among the assets transferred. Each must file Form 8594 with its income tax return or return of income for the taxable year that includes the purchase date. This reporting requirement applies to asset acquisitions occurring in a taxable year for which the due date (including extensions of time) of the income tax return or return of income is on or after September 13, 1988.

Information that must be reported on Form 8594 includes:

a. The name, address, and taxpayer identification number of the purchaser and the seller;

b. The purchase date;

c. The total consideration of the assets;

d. The amount of consideration allocated to each class of assets and the aggregate fair market value of assets of each class;

e. A statement as to whether the purchaser and seller agreed upon the fair market value of the assets in a sales contract;

f. The useful life of each Class III intangible, amortizable asset; and

g. A statement as to whether, in connection with the acquisition of the group of assets, the purchaser also obtained a license or covenant not to compete or entered into a lease agreement, an employment contract, a management contract, or similar arrangement with the seller (or managers, directors, owners, or employees of the seller).

53 FR 27035

The purchaser or seller is required to make a supplemental statement on Form 8594 concerning increases (or decreases) in the amount of consideration allocated to an asset if such increases (or decreases) in consideration occur after the end of its taxable year that includes the purchase date. Form 8594, reporting the increase (or decrease) in consideration, must be filed with the return for the taxable year in which the increase (or decrease) is taken into account if the due date of that return (including extensions of time) is on or after September 13, 1988.

Interim procedures provide that, if Form 8594 is not available to the general public, the purchaser and the seller must furnish the information required under § 1.1060-1T(h) by filing with their income tax returns acquisition statements (as the case may be) which include the information required under § 1.1060-1T(h)(3).

Coordination of Sections 1060 and 167

This document adds a new temporary regulation under section 167 to provide rules for computing the depreciable basis of any property which is included in an applicable asset acquisition under section 1060. The basis for depreciation of such a depreciable asset cannot exceed the amount of consideration allocated to that asset under section 1060 and § 1.1060-1T. When the final regulations are promulgated, this new paragraph will become part of § 1.167(a)-5.

Amendments to § 1.338(b)-3T

In response to public comment, this document amends § 1.338(b)-3T(g)(1)(ii), the special rule for allocating an increase (or decrease) in adjusted grossed-up basis that directly relates to the income produced by a "contingent income asset," such as a patent, and does not relate to other assets. For purposes of applying the various limitation rules to the contingent income asset, its fair market value is redetermined when the increase (or decrease) in adjusted grossed-up basis is taken into account. The rule has been amended to clarify that this redetermination is of the asset's fair market value on the purchase date and that, for purposes of this redetermination, only those circumstances that resulted in the increase (or decrease) in consideration are taken into account.

Coordination of Sections 1060 and 755

The principles of section 1060 apply to any transfer of an interest in a partnership to which section 743(b) or section 732(d) applies, but only for the purpose of determining the amount of the transferee partner's basis adjustment that must be allocated to goodwill and going concern value (hereinafter referred to as "goodwill") under section 755. Temporary regulation § 1.755-2T provides rules for determining the fair market value of partnership property and provides that these values must be used for purposes of allocating basis under § 1.755-1. Under § 1.755-2T(b)(1), the fair market value of partnership property other than goodwill is determined on the basis of all the facts and circumstances.

Section 1.755-2T(b)(2) provides that the fair market value of a partnership's goodwill is deemed to equal the amount (not below zero) which if assigned to partnership goodwill would result in a liquidating distribution to the transferee partner equal to such partner's basis for the transferred partnership interest if all partnership property were sold for its fair market value and the proceeds of that sale were distributed to the partners. The Service is currently studying whether to provide additional regulations to address any situations in which a different method of valuing goodwill would be more accurate, and invites comment on such situations and alternative rules for valuing goodwill.

Consistent with the purpose of section 1060, the temporary regulation is intended to overrule the decision in *United States v. Cornish, 348 F.2d 175 (9th Cir. 1965)*. Although the regulation provides a new procedure for determining the value of goodwill, § 1.755-2T(d) provides that the requirements of the temporary regulation will be deemed to be satisfied with respect to any transfer made before July 15, 1988 if the amount of any basis adjustment under section 743(b) or section 732(d) made as a result of such transfer that is allocated to each item of partnership property other than goodwill does not exceed the amount equal to the difference between the transferee partner's share of the partnership basis of such property and the partner's share of the fair market value of such property.

Except as provided in § 1.755-2T, section 1060 does not affect the determination of a transferee partner's share of the basis of partnership property or the determination of the basis of property distributed by the partnership.

Special Analyses

53 FR 27035

A general notice of proposed rulemaking is not required by *5 U.S.C. 553* for temporary regulations. Accordingly, these temporary regulations do not constitute regulations subject to the Regulatory Flexibility Act *(5 U.S.C. chapter 6)*. The Commissioner of Internal Revenue has determined that this temporary rule is not a major rule as defined in Executive Order 12291 and that a regulatory impact analysis therefore is not required.

Drafting Information

The principal author of the temporary regulations under sections 167, 338, 1031, and 1060 is Judith C. Winkler of the Legislation and Regulations Division of the Office of Chief Counsel, Internal Revenue Service. The principal author of the temporary regulations under section 755 is Robert E. Shaw of the Legislation and Regulations Division, Office of Chief Counsel, Internal Revenue Service. However, other personnel from the Internal Revenue Service and Treasury Department participated in developing the regulations, both on matters of substance and style.

List of Subjects

*26 CFR 1.61-1 -- 1.281-4*

Income taxes, Taxable income, Deductions, Exemptions.

*26 CFR 1.301-1 -- 1.383-3*

Income taxes, Corporations, Corporate distributions, Corporate adjustments, Reorganizations.

*26 CFR 1.701-1 -- 1.771-1*

Income taxes, Partnerships.

*26 CFR 1.1001-1 -- 1.1102-3*

Income taxes, Gain and loss, Basis, Nontaxable exchanges.

26 CFR PART 602

Reporting and recordkeeping requirements.

Adoption of Amendments to the Regulations

Accordingly, Parts 1 and 602 of Title 26 of the Code of Federal Regulations are amended as follows:

PART 1 -- INCOME TAX: TAXABLE YEARS BEGINNING AFTER DECEMBER 31, 1986

Paragraph 1. The authority citation for Part 1 is amended by adding the following citation:

Authority: *26 U.S.C. 7805*; * * * § 1.338(b)-3T is also issued under *26 U.S.C. 338*; * * * § 1.755-2T is also issued under *26 U.S.C. 755*; * * * § 1.1060-1T is also issued under *26 U.S.C. 1060*.

Par. 2. There is added in the appropriate place a new § 1.1060-1T. The new section reads as follows:

§ 1.1060-1T Special allocation rules for certain asset acquisitions (temporary).

(a) Scope -- (1) In general. This section prescribes rules relating to the requirements of section 1060, which, in the case of an applicable asset acquisition, requires the transferor (the "seller") and the transferee (the "purchaser") each to allocate the consideration paid or received in the transaction among the assets transferred in the same manner as amounts are allocated under section 338(b)(5) (relating to the allocation of adjusted grossed-up basis among the assets of the target corporation when a section 338 election is made). In the case of an applicable asset acquisition described in paragraph (b)(1) of this section, sellers and purchasers must allocate the consideration under the residual method, as described in paragraph (d) of this section, in order to determine, respectively, the amount realized from, and the basis in,

53 FR 27035

each of the transferred assets. Subsequent adjustments to the consideration for the transferred assets must be allocated under the residual method in the manner described in paragraph (f) of this section. For rules relating to an applicable asset acquisition that is the transfer of a partnership interest, see § 1.755-2T.

(2) Effective date. This section applies with respect to any acquisition of assets that occurs after May 6, 1986, unless it occurs pursuant to a binding contract in effect on May 6, 1986, and at all times thereafter. The reporting requirements of this section apply to asset acquisitions occurring in a taxable year for which the due date (including extensions of time) of the income tax return or return of income is on or after September 13, 1988. See paragraph (h) of this section for special effective dates for certain reporting requirements.

(3) Outline of topics. In order to facilitate the use of this section, this paragraph (a)(3) lists the paragraphs, subparagraphs, and subdivisions contained in this section.

(a) Scope.

(1) In general.

(2) Effective date.

(3) Outline of topics.

(b) Applicable asset acquisition.

(1) In general.

(2) Assets constituting a trade or business.

(3) Examples.

(4) Like-kind exchange.

(c) Definitions.

(1) Consideration.

(2) Fair market value.

(3) Purchase date.

(d) Allocation of consideration among assets under the residual method.

(1) Reduction in the amount of consideration for cash and other items designated by the Internal Revenue Service.

(2) Assets other than Class I assets.

 (i) Class II assets.

 (ii) Class III assets.

 (iii) Class IV assets.

(e) Certain limitations and special rules for consideration allocable to an asset.

(1) Allocation not to exceed fair market value.

(2) Other limitations.

(3) Liabilities taken into account in determining amount realized on subsequent disposition.

(4) Internal Revenue Service authority.

(f) Subsequent adjustments to consideration.

53 FR 27035

(1) In general.

(2) Allocation of increases in consideration.

 (i) In general.

 (ii) Effect of disposition or depreciation of assets by purchaser.

(3) Allocation of decreases in consideration.

 (i) In general.

 (ii) Effect of disposition of assets or reduction of basis below zero.

(4) Specific allocation of increases (or decreases) in consideration to certain contingent income assets.

 (i) Patents and similar property.

 (ii) Specific allocation.

(5) Internal Revenue Service authority.


(g) Examples.


(h) Applicable asset acquisition reporting requirements.

(1) In general.

(2) Time and manner of reporting.

 (i) In general.

 (ii) Additional reporting requirement.

(3) Interim procedures.

 (i) Asset acquisition statement.

 (ii) Supplemental asset acquisition statement.

 (iii) Taxpayer identification number.

(b) Applicable asset acquisition -- (1) In general. An "applicable asset acquisition" is any transfer, whether direct or indirect, of a group of assets if (i) the assets transferred constitute a trade or business in the hands of either the seller or the purchaser and (ii) except as provided in paragraph (b)(4) of this section, the purchaser's basis in the transferred assets is determined wholly by reference to the purchaser's consideration.

(2) Assets constituting a trade or business. For purposes of this section, a group of assets constitutes a trade or business if the use of such assets would constitute an active trade or business for purposes of section 355. Even though a group of assets may not qualify as an active trade or business for purposes of section 355, it will constitute a trade or business for purposes of this section if its character is such that goodwill or going concern value could under any circumstances attach to such group. In making this determination, all the facts and circumstances surrounding the transaction shall be taken into account. Factors to be considered include:

(i) The existence of an excess of the total consideration over the aggregate book value of the tangible and intangible assets purchased (other than goodwill and going concern value) as shown in the financial accounting books and records of the purchaser; and

(ii) Related transactions, including lease agreements, licenses, convenants not to compete, employment contracts, management contracts, or other similar agreements between the purchaser and seller (or managers, directors, owners, or employees of the seller) in connection with the transfer.

(3) Examples. Paragraph (b) (1) and (2) of this section may be illustrated by the following examples:

Example (1). S is a high grade machine shop that manufactures microwave connectors in limited quantities. It is a successful company with a reputation within the industry and among its customers for manufacturing unique, high qual-

37

53 FR 27035

ity products. Its tangible assets consist primarily of ordinary machinery for working metal and plating. It has not secret formulas or patented drawings of value. P is a company that designs, manufactures, and markets electronic components. It wants to establish an immediate presence in the microwave industry, an area in which it previously has not been engaged. P is acquiring assets of a number of smaller companies and hopes that these assets will collectively allow it to offer a broad product mix. P acquires the assets of S in order to augment its product mix and to promote its presence in the microwave industry. P will not use the assets acquired from S to manufacture microwave connectors. The assets transferred are assets which constitute a trade or business in the hands of the seller. Thus, P's purchase of S's assets is an applicable asset acquisition. The fact that P will not use the assets acquired from S to continue the business of S does not affect this conclusion.

Example (2). S, a sole proprietor who operates a restaurant, leases the building housing the restaurant and sells all its restaurant equipment to P. S's use of the building and the restaurant equipment constitute a trade or business. P begins operating a restaurant in the building it leases from S. Because the assets transferred together with the asset leased are assets which constitute a trade or business, P's purchase of S's assets is an applicable asset acquisition.

Example (3). The S corporation conducts various business enterprises including a retail store in State X that conducts activities that meet the active trade or business requirements for purposes of section 355. P is a minority shareholder of S. In complete redemption of P's stock in S held by P within the meaning of section 302(b)(3), S distributes to P all the assets of S used in S's retail business in State X. The distribution of S's assets in redemption of P's stock is treated as a sale or exchange, and P's basis in the assets transferred is determined wholly by reference to the consideration paid, the S stock. Thus, S's distribution of assets constituting a trade or business to P is an applicable asset acquisition.

(4) Like-kind exchange. Notwithstanding the fact that a portion of a group of assets which constitute a trade or business is exchanged for like-kind property, the transaction nevertheless may constitute an applicable asset acquisition. For purposes of this subparagraph (4), like-kind property means any property permitted by section 1031, 1035, or 1036 to be received without the recognition of gain or loss. For purposes of determining whether the transaction constitutes an applicable asset acquisition, (i) the fact that, by reason of section 1031(d), the purchaser's basis in the group of assets is not determined wholly by reference to the consideration paid is disregarded, and (ii) whether the assets transferred constitute a trade or business is determined by taking into account all the assets transferred (including the like-kind property). If an applicable asset acquisition includes like-kind property, then for purposes of allocating consideration among the assets under paragraph (d) of this section, the like-kind property exchanged and any other property or money which is treated as transferred in exchange for the like-kind property are excluded. The basis in and the gain or loss recognized from the like-kind property exchanged and the other property (if any) which is treated as transferred in exchange for the like-kind property is determined under section 1031. For purposes of this section, the amount of money and other property that is treated as transferred in exchange for the like-kind property is equal to so much of the amount of money and the fair market value of other property as does not exceed the difference between the fair market values of the like-kind properties exchanged. The money and other property that are treated as transferred in exchange for the like-kind property (and which are excluded from the assets to which section 1060 applies) are considered to come from the following assets in the following order: first from Class I assets, then from Class II assets, then from Class III assets, and then from Class IV assets. For this purpose, liabilities assumed (or to which the like-kind property or other property that is part of the like-kind exchange is subject) are treated as Class I assets. See Example (3) in paragraph (g) of this section for an example of the application of section 1060 to a single transaction which is, in part, a like-kind exchange.

(c) Definitions -- (1) Consideration. The purchaser's consideration is the cost of the assets acquired in the applicable asset acquisition. The seller's consideration is the amount realized from the applicable asset acquisition under section 1001(b).

(2) Fair market value. Generally, the fair market value of an asset is its gross fair market value (i.e., fair market value determined without regard to mortgages, liens, pledges, or other liabilities). However, for purposes of determining the amount of the seller's gain or loss, the fair market value of any property subject to a nonrecourse indebtedness shall be treated as being not less than the amount of such indebtedness. (For purposes of the preceding sentence, a liability that was incurred by reason of the acquisition of the property is disregarded to the extent that such liability was not taken into account in determining the seller's basis in such property.)

(3) Purchase date. The purchase date is the date on which the applicable asset acquisition occurs.

(d) Allocation of consideration among assets under the residual method -- (1) Reduction in the amount of consideration for cash and other items designated by the Internal Revenue Service. Consideration is first reduced by the amount

38

53 FR 27035

of Class I assets (if any) transferred by the seller. Class I assets are cash, demand deposits and like accounts in banks, savings and loan associations (and other depository institutions), and other similar items designated in the Internal Revenue Bulletin by the Internal Revenue Service. The amount of the consideration remaining after the reduction is to be allocated to the other assets transferred.

(2) Assets other than Class I assets. Subject to the limitations and other special rules of paragraph (e) of this section, consideration (as reduced by the amount of Class I assets) is allocated among Class II assets transferred by the seller in proportion to the fair market values of such Class II assets on the purchase date, then among Class III assets transferred by the seller in proportion to the fair market values of such Class III assets on that date, and finally to Class IV assets.

(i) Class II assets. Class II assets are certificates of deposit, U.S. government securities, readily marketable stock or securities (within the meaning of § 1.351-1(c)(3)), foreign currency, and other items designated in the Internal Revenue Bulletin by the Internal Revenue Service.

(ii) Class III assets. Class III assets are all assets (other than Class I, II, and IV assets), both tangible and intangible (whether or not depreciable, depletable, or amortizable), including furniture and fixtures, land, buildings, equipment, accounts receivable, and covenants not to compete.

(iii) Class IV assets. Class IV assets are intangible assets in the nature of goodwill and going concern value.

(e) Certain limitations and special rules for consideration allocable to an asset -- (1) Allocation not to exceed fair market value. The amount of consideration allocated to an asset (other than Class IV assets) shall not exceed the fair market value of that asset on the purchase date.

(2) Other limitations. The amount of consideration allocated to an asset is subject to any applicable limitations under the Code or general principles of tax law. For example, if the applicable asset acquisition is a transaction described in section 1056(a) (relating to basis limitation for player contracts transferred in connection with the sale of a franchise), the amount of consideration the purchaser may allocate to a contract for the services of an athlete shall not exceed the limitation imposed by that section.

(3) Liabilities taken into account in determining amount realized on subsequent disposition. In determining the amount realized on a subsequent sale or other disposition of property acquired by the purchaser, the entire amount of any liability included in determining the purchaser's consideration is considered to be an amount taken into account in determining the purchaser's basis in property which secures such liability for purposes of applying § 1.1001-2(a). Thus, if a liability is included in the purchaser's consideration, § 1.1001-2(a)(3) shall not prevent the amount of such liability from being treated as discharged within the meaning of § 1.1001-2(a)(4) as a result of the purchaser's sale or disposition of the property which secures such liability.

(4) Internal Revenue Service authority. In connection with the examination of a return, the Internal Revenue Service may challenge the taxpayer's determination of the fair market value of any asset by any appropriate method and take into account all factors, including any lack of adverse tax interests between the parties. For example, in certain cases the Internal Revenue Service may make an independent showing of the value of goodwill and going concern value as a means of calling into question the validity of the taxpayer's valuation of other assets.

(f) Subsequent adjustments to consideration -- (1) In general. If there is an increase or a decrease in consideration of either the seller or the purchaser after the purchase date that must be taken into account in order to adjust or redetermine, under applicable principles of tax law, the seller's amount realized with respect to, or the purchaser's cost of, the assets transferred, then such increase or decrease is allocated by the seller or the purchaser among the assets pursuant to this paragraph (f).

(2) Allocation of increases in consideration -- (i) In general. An increase in consideration is allocated under paragraph (d) of this section among the assets transferred. Amounts allocable to an asset (or with respect to an asset disposed of by the purchaser) are subject to the fair market value limitation and other limitations in paragraph (e) of this section. Except as provided in paragraph (f)(4)(ii) of this section, for the purpose of applying paragraph (e) of this section, the fair market value is the fair market value on the purchase date.

(ii) Effect of disposition or depreciation of assets by purchaser. If an asset has been disposed of, depreciated, amortized, or depleted by the purchaser before an increase in consideration is taken into account, the increase in consideration otherwise allocable to such asset by the purchaser shall be taken into account under principles of tax law applicable

**39**

53 FR 27035

when part of the cost of an asset (not previously reflected in its basis) is paid after the asset has been disposed of, depreciated, amortized, or depleted.

(3) Allocation of decreases in consideration -- (i) In general. A decrease in consideration is allocated in the following order: (A) first, as a reduction in the amount previously allocated to Class IV assets, (B) second, as a reduction in the amount previously allocated to Class III assets in proportion to their fair market values, and (C) finally, as a reduction in the amount previously allocated to Class II assets in proportion to their fair market values. Decreases in consideration allocated to an asset shall not exceed the amount of consideration previously allocated to that asset. Except as provided in paragraph (f)(4)(ii) of this section (relating to patents and similar property), the fair market value is the fair market value on the purchase date.

(ii) Effect of disposition of assets or reduction of basis below zero. If an asset has been disposed of, depreciated, amortized, or depleted by the purchaser before a decrease in consideration is taken into account, the decrease in the purchaser's consideration otherwise allocable to such asset shall be taken into account under principles of tax law applicable when the cost of an asset (previously reflected in basis) is reduced after the asset has been disposed of or depreciated, amortized, or depleted. For purposes of this subdivision (ii), an asset is considered to have been disposed of to the extent that its allocable portion of the decrease in consideration would reduce its basis below zero.

(4) Specific allocation of increases (or decreases) in consideration to certain contingent income assets -- (i) Patents and similar property. The specific allocation under paragraph (f)(4)(ii) of this section of an increase (or decrease) in consideration applies if (A) the increase (or decrease) is the result of a contingency that directly relates to income produced by a particular intangible asset ("contingent income asset"), such as a patent, a secret process, or a copyright, and (B) the increase (or decrease) is related to such contingent income asset and not to other assets. Consideration as initially determined, and any increase (or decrease) in consideration to which this specific allocation rule does not apply, are allocated among the assets (including contingent income assets) in accordance with the provisions of paragraph (f) (2) and (3) of this section.

(ii) Specific allocation. Subject to the fair market value and other limitations in paragraph (e) of this section, any increase (or decrease) in consideration to which this subdivision (ii) applies is allocated first, specifically to the contingent income asset to which the increase (or decrease) relates and, then, under paragraph (f) (2) (or 3)) of this section. Solely for purposes of applying the fair market value and other limitations to a contingent income asset, the fair market value of such asset on the purchase date shall be redetermined when the increase (or decrease) is taken into account. (For purposes of this redetermination, only those circumstances that resulted in the increase (or decrease) in consideration are taken into account.) This redetermination does not affect the fair market value limitations or other limitations as they apply to other transferred assets.

(5) Internal Revenue Service authority. In connection with the examination of a return, the Internal Revenue Service, in appropriate cases, may apply the principles of paragraph (f)(4) of this section to allocate an increase (or decrease) in consideration among particular assets to the extent such allocation is necessary to reflect properly the consideration that relates to each of those assets.

(g) Examples. The provisions of paragraphs (b), (d), (e), and (f) of this section may be illustrated by the following examples:

Example (1). (i) On January 1, 1987, S, a sole proprietor, sells to P, a corporation, a group of assets which constitute a trade or business under paragraph (b)(2) of this section. P pays S $2,000 in cash and assumes $1,000 in liabilities. Thus, the total consideration is $3,000.

(ii) Assume that P acquires no Class I assets and that on the purchase date, the fair market values of the Class II and III assets S sold to P are as follows:

| Asset class | Asset | Fair market value |
|---|---|---|
| II | Portfolio of marketable securities | $400 |
| | Total Class II | 400 |
| III | Furniture and fixtures | 800 |

53 FR 27035

| Asset class | Asset | Fair market value |
|---|---|---|
| | Building | 800 |
| | Land | 200 |
| | Equipment | 400 |
| | Accounts receivable | 100 |
| | Covenant not to compete | 100 |
| | Total Class III | 2,400 |

(iii) Under paragraph (d) (1) and (2) of this section, the amount of consideration allocable to the Class II, III, and IV assets is the total consideration reduced by the amount of any Class I assets. Since P acquired no Class I assets, the total consideration of $3,000 is next allocated first to Class II and then to Class III assets. Since the fair market value of the Class II asset is $400, $400 of consideration is allocated to the Class II asset. Since the remaining amount of consideration is $2,600 (i.e., $3,000-$400), an amount which exceeds the sum of the fair market values of the Class III assets ($2,400), the amount allocated to each Class III asset is its fair market value. Thus, the total amount allocated to Class III assets is $2,400.

(iv) The amount allocated to the Class IV assets (assets in the nature of goodwill and going concern value) is $200 (i.e., $2,600-$2,400).

Example (2). (i) Assume the same facts as in Example (1). Assume further that P and S each use the calendar year as the taxable year, and that, on June 1, 1989, P filed a claim against S alleging fraud in the sale of all the assets.

(ii) On January 1, 1991, S refunds $300 of the purchase price to P in a settlement of the 1989 lawsuit.

(iii) Under paragraph (f)(3)(i) of this section, both S and P take into account the $300 decrease in consideration and allocate it among the assets. First, since $200 of consideration previously was allocated to goodwill and going concern value, $200 of the decrease in consideration is allocated to that asset. The remaining decrease in consideration ($100) is allocated to the Class III assets in proportion to their fair market values on the purchase date as follows:

| Asset | Fair market value | Allocation fraction consideration | Decrease in (100 x Col. (2)) |
|---|---|---|---|
| Furniture and fixtures | $800 | 800/2,400 | $33.33 |
| Building | 800 | 800/2,400 | 33.33 |
| Land | 200 | 200/2,400 | 8.33 |
| Equipment | 400 | 400/2,400 | 16.67 |
| Accounts receivable | 100 | 100/2,400 | 4.17 |
| Covenant not to compete | 100 | 100/2,400 | 4.17 |
| Total | 2,400 | | 100.00 |

(iv) In summary, the redetermined consideration that S received for the gorup of assets is $2,700 after taking into account the decrease in consideration. After allocating the decreae, P's and S's redetermined consideration is as follows:

| Asset | Original consideration | Decrease in consideration | Redetermined consideration |
|---|---|---|---|
| Portfolio of marketable securities | $400.00 | $0.00 | $400.00 |
| Furniture and fixtures | 800.00 | 33.33 | 766.67 |
| Building | 800.00 | 33.33 | 766.67 |
| Land | 200.00 | 8.33 | 191.67 |
| Equipment | 400.00 | 16.67 | 383.33 |
| Accounts receivable | 100.00 | 4.17 | 95.83 |
| Covenant not to compete | 100.00 | 4.17 | 95.83 |

| Asset | Original consideration | Decrease in consideration | Redetermined consideration |
|---|---|---|---|
| Goodwill and going concern value | 200.00 | 200.00 | 0.00 |
| Total | 3,000.00 | 300.00 | 2,700.00 |

(v) Assume that, as a result of deductions under section 168, P's adjusted basis in the equipment immediately before the decrease in consideration is zero. P, therefore, treats the equipment as if it were disposed of before the decrease is taken into account. In 1991, P recognizes income of $16.67, the character of which is determined under the principles of *Arrowsmith v. Commissioner, 344 U.S. 6 (1952),* and the tax benefit rule.

Example (3). (i) On January 1, 1987, A transfers assets X, Y, and Z worth $1,000 to B in exchange for the assets D, E, and F, worth $100 plus $1,000 cash.

(ii) Assume the exchange of assets constitutes an exchange of like-kind property to which section 1031 applies. Assume also that goodwill or going concern value could under any circumstances attach to each group of assets and, therefore, each group constitutes a trade or business under section 1060.

(iii) Assume the fair market values of the assets and the amount of money transferred are as follows:

| Asset | Fair market value |
|---|---|
| By A | |
| X | $400 |
| Y | 400 |
| Z | 200 |
| Total | 1,000 |
| By B | |
| D | 40 |
| E | 30 |
| F | 30 |
| Cash (amount) | 1,000 |
| | 1,100 |

(iv) Under paragraph (b)(4) of this section, for purposes of allocating consideration under paragraph (d) of this section, the like-kind assets exchanged and any money or other property which are treated as transferred in exchange for the like-kind property are excluded from the application of section 1060.

(v) Since assets X, Y, and Z and like-kind property, they are excluded from the application of the section 1060 allocation rules.

(vi) Since assets D, E, and F are like-kind property, they are excluded from the application of the section 1060 allocation rules. In addition, $900 of the $1,000 cash B gave to A for A's like-kind assets is treated as transferred in exchange for the like-kind property in order to equalize the fair market values of the like-kind assets. Therefore, $900 of the cash is excluded from the application of the section 1060 allocation rules.

(vii) $100 of the cash is allocated under section 1060 and paragraph (d) of this section.

(viii) A, as transferor of assets X, Y, and Z, received $100 that must be allocated under section 1060 and paragraph (d) of this section. Since A transferred no Class I, II, or III assets to which section 1060 applies, the $100 is allocated to Class IV assets (assets in the nature of goodwill and going concern value).

(ix) A, as transferee of assets D, E, and F, gave consideration only for assets to which section 1031 applies. Therefore, the allocation rules of section 1060 and paragraph (d) of this section are not applied to determine the bases of the assets A received.

42

53 FR 27035

(x) B, as transferor of assets D, E, and F, received consideration only for assets to which section 1031 applies. Therefore, the allocation rules of section 1060 do not apply in determining B's gain or loss.

(xi) B, as transferor of assets X, Y, and Z, gave A $100 that must be allocated under section 1060 and paragraph (d) of this section. Since B received from A no Class I, II or III assets to which section 1060 applies, the $100 consideration is allocated by B to Class IV assets (assets in the nature of goodwill and going concern value).

Example (4). (i) On January 1, 1989, S, a sole proprietor, sells to P a group of assets which constitutes a trade or business under paragraph (b)(2) of this section. S, who plans to retire immediately, also executes a covenant not to compete in P's favor. P pays S $3,000 in cash and assumes $1,000 in liabilities. Thus, the total consideration is $4,000.

(ii) On the purchase date, P and S also execute a separate agreement that states that the fair market values of the Class II and III assets S sold to P are as follows:

| Asset class | Asset | Fair market value |
| --- | --- | --- |
| II | Portfolio of marketable securities | $500 |
| | Total Class II | 500 |
| III | Furniture and fixtures | 800 |
| | Building | 800 |
| | Land | 200 |
| | Equipment | 400 |
| | Construction contract | 200 |
| | Covenant not to compete | 900 |
| | Total Class III | 3,300 |

(iii) P and S each allocate the consideration in the transaction among the assets transferred under paragraph (d) of this section in accordance with the agreed upon fair market values of the assets, so that $500 is allocated to Class II assets, $3,300 is allocated to Class III assets, and $200 ($4,000 total consideration less $3,800 allocated to asset classes I, II and III) is allocated to the Class IV assets (assets in the nature of goodwill and going concern value).

(iv) In connection with the examination of P's return, the District Director, in determining the fair market values of the assets transferred, may disregrd the parties' agreement. Assume that the District Director correctly determines that the fair market value of the covenant not to compete was $100. Since the allocation of consideration among Class I, II, and III assets results in allocation up to the fair market value limitation, the $800 of unallocated consideration resulting from the District Director's redetermination of the value of the covenant not to compete is allocated to Class IV assets.

(h) Applicable asset acquisition reporting requirements -- (1) In general. The seller and the purchaser in an applicable asset acquisition each shall report information concerning the amount of consideration in the transaction and its allocation among the assets transferred. They also must report information concerning subsequent adjustments to consideration. For reporting requirements relating to the transfer of the partnership interest, see § 1.755-2T(c).

(2) Time and manner of reporting -- (i) In general. The seller and the purchaser each must file asset acquisition statements on Form 8594 with their income tax returns or returns of income for the taxable year that includes the purchase date. This reporting requirement applies to asset acquisitions that occur in a taxable year for which the due date (including extensions of time) of the income tax return or return of income is on or after September 13, 1988.

(ii) Additional reporting requirement. If the amount of consideration allocated to any asset by the seller or the purchaser is increased (or decreased) after the taxable year that includes the purchase date, the seller or purchaser making the increase (or decrease) shall file a supplemental asset acquisition statement on Form 8594 with the income tax return or return of income for the taxable year in which the increase (or decrease) is properly taken into account. This reporting requirement applies to an increase (or decrease) in the amount of consideration allocated to any asset that is properly taken into account in a taxable year for which the due date (including extensions of time) of the income tax return or return of income is on or after September 13, 1988, even if the seller or purchaser may not have been required to file an asset acquisition statement for the taxable year that included the purchase date because of the effective date rule in paragraph (h)(2)(i) of this section.

53 FR 27035

(3) Interim procedures -- (i) Asset acquisition statement. If Form 8594 has not been made available to the general public, an asset acquisition statement prepared by the seller or purchaser (as the case may be) shall be filed in lieu of Form 8594. This statement must:

(A) Be identified prominently as an "ASSET ACQUISITION STATEMENT UNDER SECTION 1060".

(B) State the name, address, and taxpayer identification number of the purchaser and the seller.

(C) State the purchase date.

(D) State the total amount of consideration for the assets.

(E) List the amount of Class I assets and list separately the aggregate fair market values of the Class II and the Class III assets.

(F) State whether the amount of Class I assets and the fair market values listed for asset Classes II and III were agreed upon in a sales contract or in some other written document signed by both parties.

(G) List for each of asset Classes I, II, III, and IV the aggregate amount of consideration allocated to the assets in the class.

(H) State whether the purchaser and seller provided for an allocation of the purchase price in the sales contract or in some other written document signed by both parties.

(I) List each Class III intangible amortizable asset, its fair market value, its useful life, and the amount of consideration allocated to it.

(J) State whether, in connection with the acquisition of the group of assets, the purchaser also obtained a license or a covenant not to compete or entered into an employment contract, a lease agreement, management contract, or similar arrangement with the seller (or managers, directors, owners, or employees of the seller). Specify the type of such agreement, and state the maximum amount of consideration (exclusive of interest) paid or to be paid pursuant to the agreement. The maximum amount of consideration paid (or to be paid) pursuant to the agreement is determined by assuming that any contingencies contemplated by the agreement are met or otherwise resolved in a manner that will maximize the consideration paid or to be paid. If the maximum amount of consideration cannot be determined as of the close of the taxable year in which the applicable asset acquisition occurs, then state the manner in which the amount of consideration is to be computed and the period over which it is to be paid.

(ii) Supplemental asset acquisition statement. If Form 8594 is not available to the general public, a supplemental asset acquisition statement prepared by the seller or purchaser (as the case may be) shall be filed in lieu of that form. This statement must:

(A) Be identified prominently as a "SUPPLEMENTAL ASSET ACQUISITION STATEMENT UNDER SECTION 1060 FOR [insert name of purchaser or seller]".

(B) Contain the information required under paragraph (h)(3)(i) (B), (C), and (D) of this section.

(C) List for each of asset Classes I, II, III, and IV the aggregate amount of consideration previously allocated to the assets in the class.

(D) State the amount of and the reason for the increase (or decrease) in the consideration.

(E) List for each of asset Classes I, II, III, and IV the redetermined aggregate amount of consideration allocated to the assets in each class.

(F) State the form number of the return and tax year or years for which the original and any supplemental asset acquisition statements were filed. (If an original or supplemental asset acquisition statement was not filed because the reporting requirements were not in effect, so state.)

(iii) Taxpayer identification number. For provisions concerning the requesting and furnishing of identifying numbers, see section 6109 and the regulations thereunder.

Part. 3. Immediately after § 1.167(a)-5, there is added a new § 1.167(a)-5T to read as follows:

§ 1.167(a)-5T Application of section 1060 to section 167 (temporary).

53 FR 27035

In the case of an acquisition of a combination of depreciable and nondepreciable property for a lump sum in an applicable asset acquisition to which section 1060 applies, the basis for depreciation of the depreciable property cannot exceed the amount of consideration allocated to that property under section 1060 and § 1.1060-1T.

§ 1.338(b)-3T [Amended]

Par. 4. Section 1.338(b)-3T is amended as follows:

1. The second sentence in paragraph (g)(1)(ii) is amended by removing the words "may be redetermined as of the time" and by adding in their place the words "at the beginning of the day after the acquisition date shall (may, in the case of qualified stock purchases for which the aquisition date is before September 16, 1988 be redetermined".

2. A new sentence is added after the second sentence of paragraph (g)(1)(ii). The new sentence reads as set forth below.

3. Example (6) (v) in paragraph (j) is revised to read as set forth below.

4. Example (7) (iii) in paragraph (j) is amended by adding the following new sentence at the end thereof: "(For purposes of this redetermination, only those circumstances that resulted in the decrease to AGUB are taken into account.)"

5. A new Example (8) is added to paragraph (j) to read as set forth below.

§ 1.338(b)-3T Subsequent adjustments to adjusted gross-up basis (temporary)

* * * * *

(g) Special rule for allocation of increases (or decreases) in adjusted grossed-up basis to specific assets -- (1) Patents and similar property. * * *

(ii) Specific allocation. * * * (For purposes of this redetermination, only those circumstances that resulted in the increase (or decrease) to adjusted grossed-up basis are taken into account.) * * *

* * * * *

(j) Examples. * * *

Example (6). * * *

(v) Assume that on January 1, 1990, the fair market value of the secret process is redetermined to be $52. (For purposes of this redetermination, only those circumstances that resulted in the increase to AGUB are taken into account.)

* * * * *

Example (8). The facts are the same as in Example (6) except that the intangible Class III asset is a patent instead of a secret process. The redetermination of the fair market value of the patent on January 1, 1990, is made without regard to the decrease in the remaining life of the patent because that is not a circumstance that resulted in the increase in AGUB.

Par. 5. Immediately after § 1.755-1, there is added a new § 1.755-2T to read as follows:

§ 1.755-2T Coordination of sections 755 and 1060 (temporary).

(a) Coordination with section 1060 -- (1) In general. If there is a basis adjustment to which this section applies --

(i) The fair market value of each item of partnership property must be determined under this section; and

(ii) The rules of § 1.755-1 must be applied using the values so determined.

(2) Application of this section. This section applies to any basis adjustment made under section 743(b) (relating to certain transfers of interests in a partnership) or section 732(d) (relating to certain partnership distributions), if assets of the partnership constitute a trade or business for purposes of section 1060(c).

45

(b) Determining the fair market value of partnership property -- (1) Property other than that in the nature of good-will or going concern value. For purposes of this section, the fair market value of each item of partnership property (other than property in the nature of goodwill or going concern value) shall be determined on the basis of all the facts and circumstances.

(2) Property in the nature of goodwill or going concern value. For purposes of paragraph (a) of this section, the fair market value of partnership property in the nature of goodwill or going concern value (referred to hereinafter in this section as goodwill) shall be deemed to equal the amount (not below zero) which if assigned to such property would result in a liquidating distribution to the transferee partner equal to such partner's basis for the transferred partnership interest immediately after the transfer (reduced by the amount, if any, of such basis that is attributable to partnership liabilities) if --

(i) All partnership property were sold immediately after such transfer for an amount equal to the fair market value of such property (as determined under this section), and

(ii) The proceeds of that sale were, after the payment of all partnership liabilities (within the meaning of section 752 and the regulations thereunder), distributed to the partners.

(c) Cross-reference. See §§ 1.732-1(d)(3) and 1.743-1(b)(3) for rules requiring a transferee partner to attach a statement to such partner's return showing the computation of the special basis adjustment and the partnership properties to which the adjustment is allocated under section 755.

(d) Effective date. This section applies to any basis adjustment under section 743(b) made as a result of any transfer of a partnership interest made after May 6, 1986, unless such transfer is made pursuant to a binding contract that was in effect on May 6, 1986, and at all times thereafter prior to such transfer. However, the requirements of this section shall be deemed to be satisfied with respect to any transfer made on or before July 15, 1988, if the amount of any basis adjustment under section 743(b) or section 732(d) made as a result of such transfer that is allocated to each item of partnership property (other than goodwill) does not exceed the amount equal to the difference between the transferee partner's share of the partnership basis of such property and such partner's share of the fair market value of such property.

(e) Example. The provisions of this section may be illustrated by the following example which assumes that the assets of the partnership constitute a trade or business under section 1060 and that the partnership has an election in effect under section 754 at the time of the sale of the partnership interest.

Example (1). A is a member of partnership ABC. ABC has three assets: a building with a fair market value of $2,000,000, equipment with a fair market value of $800,000 and goodwill. ABC has no liabilities. A has a one-third interest in partnership capital and profits. A sells his partnership interest to D for $1,000,000. Under paragraph (b)(2) of this section, the fair market value of goodwill is deemed to equal the value that must be assigned to goodwill in order for the partnership to distribute $1,000,000 to D if it were to sell all of its property at fair market value (in the case of goodwill, its assigned value) and completely liquidate after D's purchase of A's partnership interest. In order for D, a one-third partner, to receive a liquidation distribution of $1,000,000, the partnership would have to sell all partnership property for a total of $3,000,000. The fair market value of partnership property other than goodwill is $2,800,000. Therefore, goodwill must be assigned a value of $200,000 ($3,000,000 - $2,800,000) in order for D to receive a liquidating distribution of $1,000,000. Accordingly, D's section 743(b) basis adjustment must be allocated under § 1.755-1 using a fair market value of $200,000 for goodwill.

Par. 6. Immediately after § 1.1031(d)-1, there is added a new § 1.103(d)-1T to read as follows:

§ 1.1031(d)-1T Coordination of section 1060 with section 1031 (temporary).

If the properties exchanged under section 1031 are part of a group of assets which constitute a trade or business under section 1060, the like-kind property and other property or money which are treated as transferred in exchange for the like-kind property shall be excluded from the allocation rules of section 1060. However, section 1060 shall apply to property which is not like-kind property or other property or money which is treated as transferred in exchange for the like-kind property. For application of the section 1060 allocation rules to property which is not part of the like-kind exchange, see § 1.1060-1T (b), (d), and (g) Example (3).

PART 602 -- OMB CONTROL NUMBERS UNDER THE PAPERWORK REDUCTION ACT

Par. 7. The authority citation for 26 CFR Part 602 continues to read as follows:

53 FR 27035

Authority: *26 U.S.C. 7805*.

§ 602.101(c) [Amended]

Par. 8. Section 602.101(c) is amended by inserting in the appropriate place in the table "1.1060-1T . . . 1545-1021".

There is a need for immediate guidance with respect to the provisions contained in this Treasury decision. For this reason, it is found impracticable to issue this Treasury decision with notice and public procedure under subsection (b) of *section 553 of Title 5 of the United States Code* or subject to the effective date limitation of subsection (d) of that section.

Lawrence B. Gibbs,

Commissioner of Internal Revenue.

Approved: July 8, 1988.

O. Donaldson Chapoton,

Assistant Secretary of the Treasury.
[FR Doc. 88-16095 Filed 7-15-88; 8:45 am]

BILLING CODE 4830-01-M

**47**

15 Mertens Law of Fed. Income Tax'n § 59:76

Mertens Law of Federal Income Taxation
April 2016 Update
Chapter 59. PROBLEMS OF VALUATION
Revised by Edward J. Smith, J.D., LLM, of the North Carolina Bar
VI. Going-Concern Value

Correlation Table

§ 59:76. General

**West's Key Number Digest**
**West's Key Number Digest, Internal Revenue 4533**

Going-concern value is an intangible, non-amortizable capital asset that is often considered to be part of goodwill. Goodwill has been defined as the expectancy of both continuous excess earning capacity, and also of competitive advantage in continuing patronage. [1] In contrast, going-concern value has been described as related less to business reputation and customer loyalty than to the operating relationship of assets and personnel. Going-concern value has been defined as the additional element of value that attaches to property by reason of its existence as an integral part of a going-concern. [2] Going-concern value is manifested by a business's ability to resume activity without interruption and to continue generating sales after an acquisition. [3] While courts have blurred the distinctions between goodwill and going-concern value, due to treating both as capital assets, they are different conceptually. [4]

The three most prevalent and useful methods of computing going-concern value are: [5]

> (1) the bargain method;
>
> (2) the residual method; and
>
> (3) the capitalization method.

Bargain Method

The bargain method allows courts to recognize the parties' arm's length bargain as the appropriate measure of intangible value. To use the bargain method, however, the parties must have specifically bargained for the various items of intangible value from adverse tax positions in arm's length negotiations. If the parties have not bargained a transfer price for going-concern value, the bargain method is not available. [6]

Residual Method

The most well-known method of computing going-concern value is the residual method. Also frequently employed in computing the value of goodwill, the residual method subtracts the value of cash, cash equivalents, and tangible assets from the purchase price, and the remainder constitutes aggregate intangible value. The residual method can only be used where the value of the intangible assets acquired and the value of the business as a whole are ascertainable with reasonable certainty. [7] Regulations provide that the residual method is used to value all Section 197 intangibles, not just goodwill and going-concern value, but only Section 197 intangibles, not other partnership assets. [8]

Capitalization Method

The third method of valuing intangibles is the capitalization method. [9] Also labeled as the "excess earning method," the capitalization method compares the earning potential of the tangible assets to that of an industry average. To the extent that the purchased asset generates greater earnings than the industry average, the difference is considered to be going-concern value.

The capitalization method is allowed if there is not a better method available to determine the value of intangible assets. [10] Under the capitalization method a percentage return on the average annual rate of the tangible assets used in a business is determined using a period of years (preferably five or more years) immediately prior to the valuation date. [11] The amount of the percentage return on tangible assets is deducted from the average earnings of the business for the period and the remainder, if any, is considered to be the amount of the average annual earnings from the intangible assets of the business. This amount, capitalized at a percentage of, say 15 to 20%, is the value of the intangible assets of the business determined under the capitalization method.

For tax purposes, the sale of a going trade or business for a lump sum amount is viewed as a sale of each individual asset rather than a single capital asset. [12] Both the purchaser and the seller must allocate the purchase price for the acquisition among the assets transferred. [13] The seller must allocate the purchase price among the assets to determine the amount and character of its realized gain or loss on the sale. The purchaser's allocation determines its basis in each asset and will affect its amount of allowable depreciation, cost depletion, or amortization deductions; its realized gain or loss on a subsequent sale of those assets; and may have other tax consequences.

In general, a seller benefits if a larger portion of the purchase price is allocated to capital gain assets such as goodwill or going-concern value or, subject to recapture of depreciation, to Section 1231 assets. On the other hand, a buyer has generally benefited from an allocation that resulted in a higher basis for inventory and other assets that would generate ordinary income if resold, or to depreciable assets.

A business that lacks goodwill may nevertheless have going-concern value. [14]

Applicable Asset Acquisition

Section 1060(a) [15] provides that, in the case of an applicable asset acquisition, the seller and the purchaser each must allocate the consideration among the assets transferred in the same manner as the amounts are allocated under Section 338(b)(5), relating to certain stock purchases treated as asset acquisitions. [16] Thus, the seller and the purchaser are required to allocate consideration under the residual method in order to make the respective determinations of the amount of gain or loss from the transfer of each asset and the basis of each asset acquired. [17]

Under the residual method, any "premium" paid in excess of the total fair market value of the purchased assets is treated as payment for goodwill or going-concern value. [18] The mandatory application of the residual method of allocation eliminates disparities in purchase price allocations between asset purchases and stock purchases treated as asset purchases under Section 338.

Going-Concern Value Distinguished from Goodwill

Going-concern value may be determined separate and apart from goodwill. Going-concern value is the additional element of value that attaches to property by reason of its existence as an integral part of a going-concern. [19] It has been said to be manifested by "the ability of the acquired business to generate sales without any interruption because of the takeover." [20]

Defined

An operating business has been said to have a value for the element that attaches to property by reason of its existence as part of a going-concern. [21] The ability of a business to continue to function and generate income without interruption resulting from a change in ownership is a vital part of the value of a going-concern. [22] Going-concern value is manifested by the ability of an acquired business to generate sales without any interruption because of the take-over. [23]

Westlaw. © 2016 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1    Wilmot Fleming Engineering Co. v. Commissioner of Internal Revenue, 65 T.C. 847, 1976 WL 3615 (1976), acquiescence recommended, AOD-1976-286, 1976 WL 39484 (I.R.S. AOD 1976). The petitioner bears the burden of proof by a preponderance of the evidence. Welch v. Helvering, 290 U.S. 111, 54 S. Ct. 8, 78 L. Ed. 212, 3 U.S. Tax Cas. (CCH) P 1164, 12 A.F.T.R. (P-H) P 1456 (1933).

2    VGS Corp. v. Commissioner of Internal Revenue, 68 T.C. 563, 1977 WL 3758 (1977), acquiescence recommended, AOD-1978-186, 1978 WL 43885 (I.R.S. AOD 1978) and acq., 1979-2 C.B.1; Conestoga Transp. Co. v. C. I. R., 17 T.C. 506, 1951 WL 237 (T.C. 1951).

3    Computing & Software, Inc. v. Commissioner of Internal Revenue, 64 T.C. 223, 1975 WL 3186 (1975), acq., 1976-2 C.B. 1.

4    U.S. v. Cornish, 348 F.2d 175, 65-2 U.S. Tax Cas. (CCH) P 9508, 16 A.F.T.R.2d 5022 (9th Cir. 1965); Computing & Software, Inc. v. Commissioner of Internal Revenue, 64 T.C. 223, 1975 WL 3186 (1975), acq., 1976-2 C.B. 1; Winn-Dixie Montgomery, Inc. v. U.S., 444 F.2d 677, 71-1 U.S. Tax Cas. (CCH) P 9488, 28 A.F.T.R.2d 71-5012 (5th Cir. 1971).

5    Concord Control, Inc. v. Commissioner of Internal Revenue, 78 T.C. 742, Tax Ct. Rep. (CCH) 38972, 1982 WL 11085 (1982), acquiescence recommended, AOD-1984-28, 1984 WL 270673 (I.R.S. AOD 1984) and acq., 1984-2 C.B.1.

6    212 Corporation v. Commissioner of Internal Revenue, 70 T.C. 788, 1978 WL 3405 (1978); Philip Morris Inc. and Consol. Subsidiaries v. C. I. R., 96 T.C. 606, Tax Ct. Rep. (CCH) 47289, Tax Ct. Rep. Dec. (P-H) 96.23, 1991 WL 51559 (1991), aff'd, 970 F.2d 897 (2d Cir. 1992).

7    R.M. Smith, Inc. v. Commissioner of Internal Revenue, 69 T.C. 317, 1977 WL 3741 (1977), aff'd, 591 F.2d 248, 79-1 U.S. Tax Cas. (CCH) P 9179, 43 A.F.T.R.2d 79-526 (3d Cir. 1979); Jack Daniel Distillery v. U.S., 180 Ct. Cl. 308, 379 F.2d 569, 67-2 U.S. Tax Cas. (CCH) P 9499, 19 A.F.T.R.2d 1627 (1967); Northern Natural Gas Co. v. U.S., 470 F.2d 1107, 73-1 U.S. Tax Cas. (CCH) P 9152, 31 A.F.T.R.2d 73-492 (8th Cir. 1973); Solitron Devices, Inc., v. Commissioner of Internal Revenue, 80 T.C. 1, Tax Ct. Rep. (CCH) 39801, 1983 WL 14785 (1983), judgment aff'd, 744 F.2d 95 (11th Cir. 1984).

Banc One Corporation v. Commissioner of Internal Revenue, 84 T.C. 476, Tax Ct. Rep. (CCH) 41985, 1985 WL 15327 (1985), judgment aff'd, 815 F.2d 75 (6th Cir. 1987) (to use the residual method, the purchase price must reflect the fair market value of the business); Florida Publishing Co. v. Commissioner of Internal Revenue, 64 T.C. 269, 1975 WL 3034 (1975), aff'd, 552 F.2d 367 (5th Cir. 1977) (purchase price derived from arm's length negotiations ordinarily reflects fair market value); R. M. Smith, Inc. v. C. I. R., 591 F.2d 248, 79-1 U.S. Tax Cas. (CCH) P 9179, 43 A.F.T.R.2d 79-526 (3d Cir. 1979) (purchase price of less than asset value does not reflect fair market value).

See § 59:80 for further discussion of the residual method.

8    See Reg § 1.755-1(a)(2).

9    Concord Control, Inc. v. Commissioner of Internal Revenue, 78 T.C. 742, Tax Ct. Rep. (CCH) 38972, 1982 WL 11085 (1982), acquiescence recommended, AOD-1984-28, 1984 WL 270673 (I.R.S. AOD 1984) and acq., 1984-2 C.B.1.

In the case of UFE, Inc. v. C.I.R., 92 T.C. 1314, Tax Ct. Rep. (CCH) 45793, Tax Ct. Rep. Dec. (P-H) 92.88, 1989 WL 66542 (1989), the Court found that the petitioner did not acquire going-concern value.

10   Revenue Ruling, 1968-2 C.B. 327, Rev. Rul. 68-609, 1968 WL 15211 (1968); Banc One Corporation v. Commissioner of Internal Revenue, 84 T.C. 476, Tax Ct. Rep. (CCH) 41985, 1985 WL 15327 (1985), judgment aff'd, 815 F.2d 75 (6th Cir. 1987).

The capitalization method was employed in Philip Morris Inc. and Consol. Subsidiaries v. C. I. R., 96 T.C. 606, Tax Ct. Rep. (CCH) 47289, Tax Ct. Rep. Dec. (P-H) 96.23, 1991 WL 51559 (1991), aff'd, 970 F.2d 897 (2d Cir. 1992).

11   Revenue Ruling, 1968-2 C.B. 327, Rev. Rul. 68-609, 1968 WL 15211 (1968).

12   Williams v. McGowan, 152 F.2d 570, 46-1 U.S. Tax Cas. (CCH) P 9120, 34 A.F.T.R. (P-H) P 615, 162 A.L.R. 1036 (C.C.A. 2d Cir. 1945).

13   See IRC § 1060.

14   Tele-Communications, Inc. and Subsidiaries v. C.I.R., 95 T.C. 495, Tax Ct. Rep. (CCH) 46970, Tax Ct. Rep. Dec. (P-H) 95.36, 1990 WL 170429 (1990), decision aff'd, 12 F.3d 1005, 94-1 U.S. Tax Cas. (CCH) P 50020, 73 A.F.T.R.2d 94-778 (10th Cir. 1993), acquiescence recommended, AOD-1996-5, 1996 WL 390084 (I.R.S. AOD 1996) and acq., 1996-2 C.B.1.

15   IRC § 1060.

16   IRC § 1060(a).

17   See §§ 59:78 to 59:85.

18   General Explanation of the Tax Reform Act of 1986, prepared by the Staff of the Joint Committee on Taxation 358 (1987). In addition, Congress is aware that the allocation of the purchase price among the assets of a going business has been a troublesome area of the tax law that the Service lacks the resources to review effectively.

19   VGS Corp. v. Commissioner of Internal Revenue, 68 T.C. 563, 591, 1977 WL 3758 (1977), acquiescence recommended, AOD-1978-186, 1978 WL 43885 (I.R.S. AOD 1978) and acq., 1979-2 C.B.1.

20   Winn-Dixie Montgomery, Inc. v. U.S., 444 F.2d 677, 71-1 U.S. Tax Cas. (CCH) P 9488, 28 A.F.T.R.2d 71-5012 (5th Cir. 1971); Philip Morris Inc. and Consol. Subsidiaries v. C. I. R., 96 T.C. 606, Tax Ct. Rep. (CCH) 47289, Tax Ct. Rep. Dec. (P-H) 96.23, 1991 WL 51559 (1991), aff'd, 970 F.2d 897 (2d Cir. 1992).

21   VGS Corp. v. Commissioner of Internal Revenue, 68 T.C. 563, 1977 WL 3758 (1977), acquiescence recommended, AOD-1978-186, 1978 WL 43885 (I.R.S. AOD 1978) and acq., 1979-2 C.B.1; Philip Morris Inc. and Consol. Subsidiaries v. C. I. R., 96 T.C. 606, Tax Ct. Rep. (CCH) 47289, Tax Ct. Rep. Dec. (P-H) 96.23, 1991 WL 51559 (1991), aff'd, 970 F.2d 897 (2d Cir. 1992).

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 53 of 67

22      Los Angeles Gas & Elec. Corp. v. Railroad Commission of Cal., 289 U.S. 287, 313, 53 S. Ct. 637, 77 L. Ed. 1180, Pub. Util. Rep. (PUR) 1933C-229 (1933), cited in Tele-Communications, Inc. and Subsidiaries v. C.I.R., 95 T.C. 495, Tax Ct. Rep. (CCH) 46970, Tax Ct. Rep. Dec. (P-H) 95.36, 1990 WL 170429 (1990), decision aff'd, 12 F.3d 1005, 94-1 U.S. Tax Cas. (CCH) P 50020, 73 A.F.T.R.2d 94-778 (10th Cir. 1993), acquiescence recommended, AOD-1996-5, 1996 WL 390084 (I.R.S. AOD 1996) and acq., 1996-2 C.B.1.

23      Philip Morris Inc. and Consol. Subsidiaries v. C. I.R., 96 T.C. 606, Tax Ct. Rep. (CCH) 47289, Tax Ct. Rep. Dec. (P-H) 96.23, 1991 WL 51559 (1991), aff'd, 970 F.2d 897 (2d Cir. 1992).

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

15 Mertens Law of Fed. Income Tax'n § 59:80

Mertens Law of Federal Income Taxation
April 2016 Update
Chapter 59. PROBLEMS OF VALUATION
Revised by Edward J. Smith, J.D., LLM, of the North Carolina Bar
VI. Going-Concern Value

Correlation Table

§ 59:80. Residual method

**West's Key Number Digest**
**West's Key Number Digest, Internal Revenue 4533**

Section 1060 requires taxpayers to apply the residual method in allocating basis to goodwill and going-concern value to all purchases of already established businesses. [1] In addition, Regulations governing basis adjustments by partnerships under Sections 734(b) and 743(b), in order to implement Section 1060(d), provide that the residual method is used to value all Section 197 intangibles, not just goodwill and going-concern value. It is important to keep in mind that the residual method is used only to value Section 197 intangibles and not other partnership assets. [2] For further analysis of these Regulations and how they relate to Section 1060(d), see § 35:131. Under Section 338 Regulations, the adjusted grossed-up basis of the asset is allocated among the various classes of assets. In general, the adjusted grossed-up basis of each class of assets is equal to the purchase price plus the liabilities assumed or to which the property is subject.

Class I Assets

The total adjusted grossed-up basis is first reduced by the amount of Class I assets. Class I assets are cash, demand deposits and similar accounts in banks, savings and loan associations and other items designated by the Service. [3]

Class II Assets

The remaining adjusted grossed-up basis is next reduced by the amount of Class II assets. Class II assets are certificates of deposits, United States government securities, readily marketable stock or securities, foreign currency, and other items designated by the Service. [4]

Class III Assets

Then the adjusted grossed-up basis is reduced by the amount of Class III assets. Class III assets are assets that the taxpayer marks to market at least annually, and debt instruments, including accounts receivable. Class III assets do not include: debt instruments issued by persons related at the beginning of the day following the acquisition date to the target under Section 267(b) or 707; contingent debt instruments subject to Regulation §§ 1.1275-4 or 1.483-4, or Section 988, unless the instrument is subject to the non-contingent bond method of Regulation § 1.1275-4(b) or is described in Regulation § 1.988-2(b)(2)(i)(B)(2); or debt instruments convertible into the stock of the issuer or other property. [5]

Class IV Assets

Then the adjusted grossed up basis is reduced by the amount of Class IV assets. Class IV assets include inventory (if on hand at the end of the year) or property held by the taxpayer for sale to customers in its trade or business. [6]

Class V Assets

Next, the adjusted grossed up basis is reduced by the amount of Class V assets. Class V assets are all assets other than Class I, II, III, IV, VI, and VII. [7]

Class VI Assets

Then the adjusted grossed up basis is reduced by the amount of Class VI assets. Class VI assets are all Section 197 intangibles, except goodwill and going-concern value. [8]

Class VII Assets

Finally, the remaining adjusted grossed up basis is allocated among the Class VII assets, which are goodwill and going-concern value—regardless of whether the goodwill and going-concern value qualify as a Section 197 intangible. [9]

Example

An example set out in the Regulations illustrates the allocation of assets. [10]

T owns 90% of the outstanding T1 stock. P purchases 100% of the outstanding T stock for $2,000. There are no acquisition costs. P makes a Section 338 election for T and, as a result, T1 is considered acquired in a qualified stock purchase. A section 338 election is made for T1. The grossed-up basis of the T stock is $2,000 (i.e., $2,000 × 1/1).

The liabilities of T as of the beginning of the day after the acquisition date (including the tax liability for the deemed sale tax consequences) that would, under general principles of tax law, properly be taken into account at that time, are as follows:

| | |
|---|---|
| Liabilities (nonrecourse mortgage plus unsecured liabilities) | $ 700 |
| Taxes Payable | 300 |
| Total | $1,000 |

The AGUB (adjusted grossed-up basis) of T is determined as follows:

| | |
|---|---|
| Grossed-up basis | $2,000 |
| Total liabilities | 1,000 |
| AGUB | $3,000 |

Assume that ADSP (aggregate deemed sale price) is also $3,000.

Assume that, at the beginning of the day after the acquisition date, T's cash and the fair market values of T's Class II, III, IV, and V assets are as follows:

| Asset Class | Asset | Fair market value |
|---|---|---|
| I | Cash | $ 200 |
| II | Portfolio of actively traded securities | 300 |
| III | Accounts receivable | 600 |
| IV | Inventory | 300 |
| V | Building | 800 |
| V | Land | 200 |
| V | Investment in T1 | 450 |
| | Total | $2,850 |

Note that under Regulation § 1.338-6(b)(1), the amount of ADSP and AGUB allocable to T's Class II, III, IV, and V assets is reduced by the amount of cash to $2,800, i.e., $3,000 – $200. $300 of ADSP and of AGUB is then allocated to actively traded securities. $600 of ADSP and of AGUB is then allocated to accounts receivable. $300 of ADSP and of AGUB is then allocated to the inventory. Since the remaining amount of ADSP and of AGUB is $1,600 (i.e., $3,000 – ($200 + $300 + $600 + $300)), an amount which exceeds the sum of the fair market values of T's Class V assets, the amount of ADSP and of AGUB allocated to each Class V asset is its fair market value:

| | |
|---|---|
| Building | 800 |
| Land | 200 |
| Investment in T1 | 450 |
| Total | $1,450 |

T has no Class VI assets. The amount of ADSP and of AGUB allocated to T's Class VII assets (goodwill and going-concern value) is $150, i.e., $1,600 – $1,450.

The grossed-up basis of the T1 stock is $500, i.e., $450 × 1/.9.

The liabilities of T1 as of the beginning of the day after the acquisition date (including the tax liability for the deemed sale tax consequences) that would, under general principles of tax law, properly be taken into account at that time, are as follows:

| | |
|---|---|
| General Liabilities | $ 100 |
| Taxes Payable | 20 |

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 56 of 67

|  |  |
|---|---|
| Total | $ 120 |

The AGUB of T1 is determined as follows:

|  |  |
|---|---|
| Grossed-up basis of T1 Stock | $ 500 |
| Liabilities | 120 |
| AGUB | $ 620 |

Assume that ADSP is also $620.

Assume that at the beginning of the day after the acquisition date, T1's cash and the fair market values of its Class IV and VI assets are as follows:

| Asset Class | Asset | Fair Market Value |
|---|---|---|
| I | Cash | $ 50 |
| IV | Inventory | 200 |
| VI | Patent | 350 |
| | Total | $ 600 |

Note the amount of ADSP and of AGUB allocable to T1's Class IV and VI assets is first reduced by the $50 of cash.

Because the remaining amount of ADSP and of AGUB ($570) is an amount which exceeds the fair market value of T1's only Class IV asset, the inventory, the amount allocated to the inventory is its fair market value ($200). After that, the remaining amount of ADSP and of AGUB ($370) exceeds the fair market value of T1's only Class VI asset, the patent. Thus, the amount of ADSP and of AGUB allocated to the patent is its fair market value ($350).

The amount of ADSP and of AGUB allocated to T1's Class VII assets (goodwill and going-concern value) is $20, i.e., $570 – $550.

Westlaw. © 2016 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

| | |
|---|---|
| 1 | IRC § 1060(a). See §§ 59:76 to 59:84; §§ 22:201 to 22:216 for a detailed discussion of allocation required by IRC § 1060. |
| 2 | See Reg § 1.755-1. |
| 3 | Reg § 1.338-6(b)(1). |
| 4 | Reg § 1.338-6(b)(2)(ii). |
| 5 | Reg § 1.338-6(b)(2)(iii). |
| 6 | Reg § 1.338-6(b)(2)(iv). |
| 7 | Reg § 1.338-6(b)(2)(v). |
| 8 | Reg § 1.338-6(b)(2)(vi). |
| 9 | Reg § 1.338-6(b)(2)(vii). |
| 10 | Reg § 1.1060-1(d), Example 1. |

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

¶ 10.40 ASSET TRANSACTION RELATED TO STOCK..., Fed. Income Tax'n of...

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 57 of 67



Fed. Income Tax'n of Corp. & Shareholders ¶ 10.40
**\*1**  Federal Income Taxation of Corporations and Shareholders
Current Through 2016
James S. Eustice [a], Thomas Brantley [b]

Copyright (c) 2016 Thomson Reuters Tax and Accounting
Chapter 10. Liquidations, Sales, and Other Corporate Asset Transactions
Part D Taxable Stock Transactions Treated as Asset Transactions

¶ 10.40 ASSET TRANSACTION RELATED TO STOCK ACQUISITIONS: HISTORY AND BACKGROUND

### ¶ 10.40[1] Kimbell-Diamond Doctrine and Former § 334(b)(2)

As noted in Part A, upon liquidation of a subsidiary under § 332, § 334(b)(1) provides that the property received by the parent retains the basis that it had in the hands of the liquidated subsidiary. [554]  Avoidance of a carryover basis is one reason why parent corporations occasionally maneuver, sometimes successfully, to remove a liquidation from the clutches of § 332. [555]

If the carryover rule of § 334(b)(1) is rigorously applied, it would create a dichotomy between two otherwise similar methods of acquiring the assets of another ("target") corporation: If the purchasing corporation purchases the assets from the target, the purchasing corporation's basis in the assets is their cost under § 1012; but if the purchasing corporation acquires those assets by first purchasing stock of the target, and then liquidating the target, the purchasing corporation would have to carry over the basis of the target's assets.

This inherited (or "inside") basis might, of course, be substantially greater or less than the price paid for the stock (the "outside" basis) because, even though (as discussed later in this Part D) the price paid for the stock may be adjusted up or down to some extent because of the potential tax consequences of gain or loss built into the subsidiary's assets, the price primarily reflects the market value of the target's assets rather than the assets' basis in the hands of the target.

This dichotomy was thought to be unjustified under pre-1954 law in the entirely possible event that the purchasing corporation bought assets from the shareholders of a liquidated target that had successfully pursued the *Cumberland Public Service Co.* route of liquidating first and then having the shareholders sell the corporate assets (as opposed to having the corporation effect the asset sale before its liquidation, as in *Court Holding Co.*). [556]  Under Cumberland, the General Utilities doctrine permitted any gain built into the assets in the target's hands to escape corporate-level taxation on liquidation and allowed the purchasing corporation to obtain a new cost basis. As compared to a corporation's purchasing the stock of the target and liquidating the target under the predecessor of § 332, the Cumberland approach was superior in a way that made form appear to triumph over substance.

 **\*2**  For this reason, in a line of pre-1954 cases, the courts adopted the position that the purchase by one corporation of the stock of another corporation in order to obtain the other corporation's assets through a prompt liquidation should be treated by the purchaser as a single transaction (i.e., a purchase of the assets), producing a basis equal to the assets' cost rather than producing a carryover of basis by focusing on the stock purchase. In the leading case, *Kimbell-Diamond Milling Co. v. CIR*, [557] the single-transaction doctrine was applied at the behest of the IRS so as to deny the purchasing corporation the right to carry over an inside basis in excess of the price paid for the stock; instead of being reserved for exclusive use by the IRS, however, the Kimbell-Diamond principle was treated as a two-way street, and was also applied to give the acquiring corporation the benefit

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 58 of 67

¶ 10.40 ASSET TRANSACTION RELATED TO STOCK..., Fed. Income Tax'n of...

of its stock cost as the basis of the assets acquired from the target upon liquidation, where that cost exceeded the acquired corporation's inside basis. [558]

Thus, corporate acquirers could take advantage of the Kimbell-Diamond doctrine when the doctrine benefited them and ignore it when it did not, hoping that they would not be challenged. Another fault of the doctrine was that its application to convert a stock purchase into an asset purchase depended on the fact-driven issue of buyer "intent," which was distressingly unpredictable. This potential for manipulation was enhanced by the unavoidable fact that demonstrating the requisite "intent" depended on the credibility of the taxpayer, the only party with access to all the relevant facts. [559]

Congress responded to the Kimbell-Diamond doctrine in 1954 by enacting former § 334(b)(2), which treated a parent corporation's purchase and liquidation of a subsidiary as, in substance, a purchase of the subsidiary's assets resulting in a new cost basis for the assets if:

   1. At least 80 percent of the stock in the subsidiary was acquired "by purchase" (as defined);

   2. The purchase occurred within a twelve-month period; and

   3. The subsidiary was liquidated pursuant to a plan of liquidation adopted within two years after the qualifying stock purchase was completed. [560]

The requirement of purchase of 80 percent of the target within a twelve-month period would be repeated in several reincarnations of § 334(b)(2) that followed. This regime of former § 334(b)(2) continued from 1954 to 1982.

### ¶ 10.40[2] Section 338: 1982 to 1986

An accumulation of objections to former § 334(b)(2) led to its replacement in 1982 by § 338. The objections included:

   1. Complications in computing the basis of assets because of events occurring subsequent to the stock purchase if the liquidation was delayed, and inconsistency of delayed liquidation with the Kimbell-Diamond theory that the stock purchase was "really" an asset purchase;

   *3  2. The automatic nature of the rule, even if the acquirer had not intended to buy assets rather than stock;

   3. The fact that an actual liquidation was required, when the acquirer might prefer to keep the subsidiary alive, and the possibility that a reincorporation of the assets would invoke the reorganization rules and thereby oust § 334(b)(2);

   4. Confusion about handling contingent liabilities of the subsidiary in determining the stock price that was to be applied to the assets' basis;

   5. Uncertainty about how to spread the stock price across the target's assets to assets such as goodwill; and

   6. The ability of the acquirer to arrange selectivity in tax results (stepped-up basis for some assets and survival of tax history for others) through a variety of pre-acquisition or post-acquisition planning techniques.

Against this background, Congress repealed § 334(b)(2) in 1982 and replaced it (along with any nonstatutory equivalent, such as the Kimbell-Diamond doctrine [561] ) with § 338. Under § 338, in the case of a "qualified stock purchase" (defined by § 338(d)(3) as, roughly speaking, the purchase of at least 80 percent of the target corporation's stock in one or more transactions within a twelve-month acquisition period), a purchasing corporation can elect to treat the target (1) as having sold all its assets in a

¶ 10.40 ASSET TRANSACTION RELATED TO STOCK..., Fed. Income Tax'n of...

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 59 of 67

single transaction on the date of the qualified stock purchase for the assets' fair market value and (2) as if the target were a new corporation purchasing the assets for a similar amount on the following day. The effect of this deemed sale is that the target's assets acquire a new basis equal to their fair market value, which, assuming a qualified purchase of all of the target's stock, is normally identical to the amount paid by the purchasing corporation for the stock plus the target's liabilities.

The hypothetical rebirth of the target as a new corporation at dawn on the day following the hypothetical sale of its assets does not affect its status under state law; the born-again corporation is the same legal entity that it was on the previous day. [562] For tax purposes, however, the corporation is a new entity not only because of the statutory change in the basis of its assets but also because it is not burdened with its historic earnings and profits and other old tax attributes. In honor of this change, the regulations sometimes refer to the "old target" or the "new target," depending on whether pre-acquisition or post-acquisition tax attributes or other matters are involved, although there is only a single corporation as far as state law is concerned.

In 1982, when § 338 was enacted and General Utilities still reigned, the target corporation recognized neither gain nor loss on the deemed sale (except for recaptures, inventory and installment obligations) because the sale satisfied the requirements of the then-current rules of former § 337. As discussed previously, [563] former § 337 reflected the General Utilities doctrine and generally permitted a corporation to sell its assets without recognizing gain or loss within a twelve-month period after adopting a plan of liquidation. Thus, when enacted, § 338—like § 334(b)(2) before it—treated the purchase of a subsidiary and its deemed liquidation as tantamount to a direct purchase by the acquiring corporation of the subsidiary's assets in a § 337 liquidating sale, since the target generally did not recognize gain or loss under pre-1987 law in either case.

### ¶ 10.40[3] Section 338: Current

**\*4**  The nonrecognition rule of former § 337 was repealed in 1986 along with the General Utilities doctrine. Although § 338 changed very little in 1986, in practical application, what had been a single-level-of-tax route to obtaining a cost basis for the assets of an acquired target corporation under § 338 became a double-level-of-tax route (i.e., the sellers of the stock as well as the target corporation recognized gain or loss). These changes deprived regular § 338 elections of virtually all their allure. Because of this dramatic alteration of the environment within which § 338 now operates, an election under § 338(g) is likely to be advantageous only if the target also has either net operating losses or other built-in losses to offset gains on the deemed sale of appreciated assets, or if there is some other reason to cleanse the target's tax history.

Thus, § 338 has achieved parity with an actual asset purchase since the repeal of General Utilities. The choices facing the potential corporate (or noncorporate) acquirer of most or all of the stock of a target corporation having substantially appreciated assets are stark: Either pay full value for assets and obtain a cost basis that will yield commensurate tax benefits in the future (through basis offset upon later disposition or by annual depreciation deductions), or try to buy the stock at a price discounted from the target's inside asset value to reflect the potential corporate tax on the built-in gain. [564]

### EXAMPLE 10-20

*A* owns 100 percent of the stock (basis $200) of *X*, which owns one asset, a rented machine with a value of $1,000 and a basis of $200. *X* has no goodwill. Assume the applicable tax rate on all taxpayers is 25 percent. If *X* sells the machine to corporation *Z* for $1,000 and liquidates, *Z* will take a $1,000 basis in the machine, *X* will pay tax of $200 on gain of $800, and *A* will receive $800 in the liquidating distribution, will recognize gain of $600, and will pay tax of $150, netting $650. *A* and *X* together will have paid $350 in tax.

If *Z* buys the stock for $1,000 (on the mistaken assumption that the stock is worth the value of the corporate assets) and liquidates *X* under § 332, *Z* will hold the machine at a basis of $200 under § 334(b)(1). If *Z* argues that it paid extra for goodwill, which it should at least be allowed to deduct on abandonment, *Z* will lose. If *Z* then sells the machine for $1,000,

57

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 60 of 67

¶ 10.40 ASSET TRANSACTION RELATED TO STOCK..., Fed. Income Tax'n of...

it will pay $200 tax and net $800. Thus, Z will have lost $200 economically because it paid too much for the stock, failing to account for the built-in tax liability (which can be viewed as the potential tax on disposition of the machine, or as the potential loss from lack of depreciation on $800 of basis that Z will not enjoy). Z will not have a tax loss to accompany its economic loss, because its $1,000 basis in the X stock disappeared in the § 332 liquidation of X.

**\*5**  If Z buys the X stock for $1,000 and makes a § 338 election, X will be deemed to sell the machine for its value of $1,000. [565]  X will pay $200 in tax. If X is then liquidated, Z will receive net value of $800 and again will have lost $200. Z will hold the machine with a $1,000 basis so that it stands to save an additional $200 over the life of the machine (assuming the tax rate remains at 25 percent) through tax savings from depreciation on the new $1,000 basis rather than the former $200 basis. The problem with this approach is that the discounted present value of $200 in tax savings over the depreciable life of the machine is less than the $200 excess paid currently in the form of a § 338 tax bill. In other words, it is not worth spending one dollar today to save one dollar in tax in the future. Moreover, Z literally will be charged with a separate asset of "goodwill" under the regulations' residual-allocation rule, having a basis of $200. [566]  Since there is actually no goodwill, however, it is unclear when, if ever, Z can write off this excess basis amount.

Therefore, Z will want to pay only $800 for the stock, in which event A will have effectively "paid" the $200 built-in-gains tax of X and again will net only $650 after A's own tax of $150, the same as if X had sold the machine for $1,000, paid its $200 tax, and liquidated. If Z makes a § 338 election in this case, X will be deemed to sell the machine to itself for $1,000 (the $200 built-in-gains tax referred to above is counted as a liability of X that increases the $800 stock purchase price to a $1,000 deemed sale price for the machine) and will pay $200 in tax. Therefore, $350 in tax will have been paid, the same as if X had sold its assets to Z in the first place.

Ironically, the statutory changes bringing about the reduced importance of § 338 were enacted less than a year after the Treasury promulgated the most voluminous regulations in history to explain the operation of § 338. [567]  Virtually obsolete shortly after their arrival, these bloated and extraordinarily complex temporary regulations were finally re-proposed, in greatly simplified form, in early 1992, [568] and those regulations were adopted without any significant material change in 1994. [569]  The rest of the § 338 regulations were updated in proposed form in August 1999, and then in temporary form on January 5, 2000, effective January 6, 2000. [570]  Final regulations were adopted, with minor changes, on February 13, 2001. [571]  These regulations have continued in effect, with minor changes, since then.

### ¶ 10.40[4] Revision of the § 338 Regulations

### ¶ 10.40[4][a] In General

As noted in the preceding history, proposed regulations under § 338 were issued in August 1999 and temporary regulations were issued in January 2000 and finalized in 2001. The final regulations are reorganized in a more logical order, and harmonized the deemed sale rules of § 338 to the rules concerning allocation of purchase price in connection with actual sale of § 1060. [572]  In addition, the final regulations take into account changes in the law that occurred since the initial promulgation of regulations under § 338 in 1986. The major changes effected by the revised regulations are the following:

**\*6**  1. The former regulation's "linkage" between an old and new target's tax accounting treatment was severed; [573]

2. The treatment of assumed liabilities was revised and clarified;

3. An installment method structure was added for § 338(h)(10) elections; [574]

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 61 of 67

4. The residual allocation rules were revised and clarified (including the addition of an anti-abuse rule to block distortions of the allocation system);

5. A complete standard "model" was provided for deemed asset sales under § 338 and deemed liquidations under § 338(h)(10); and

Other substantive modifications were also made in various parts of the regulations.

The final regulations adopted on February 13, 2001, made very few changes in the temporary regulations (all of which minor changes were set out in the preamble to the final regulations), [575] and these will be noted in the following pages.

### ¶ 10.40[4][b] Restructure of the Regulations

As a result of the reorganization and reordering of the final § 338 regulations effected in 2001, Regulations § 1.338-1 [576] contains a statement of "general principles," the status of old and new target provisions, and a new general anti-abuse rule; Regulations § 1.338-2 [577] reiterates the nomenclature and definitions of the former regulations, and the rules for electing § 338; and Regulations § 1.338-3 [578] contains the qualification requirements, including rules relating to qualified stock purchases (QSP), which also remain essentially unchanged except for their location.

The core of the revised regulations is contained in Regulations §§ 1.338-4 through 1.338-7 [579]:

1. Section 1.338-4 [580] deals with the determination of "aggregate deemed sale price" (ADSP);

2. Section 1.338-5 [581] covers adjusted grossed-up basis (AGUB);

3. Section 1.338-6 [582] provides the regime for allocating ADSP and AGUB among the classes of assets deemed sold and repurchased; and

4. Section 1.338-7 [583] deals with reallocations of ADSP and AGUB when subsequent events change those amounts after the close of new target's first taxable year.

The asset and stock consistency rules of the prior Regulations in § 1.338-4 were moved to Regulations § 1.338-8 without change, and the international aspects of § 338 were moved to Regulations § 1.338-9. The return filing rules of former Regulations § 1.338-1 Regulations § 1.338-10 [584] (again without change). The rules for Regulations § 1.338(h)(10)-1 [585] elections retain their same location, but several significant substantive changes were made. [586]

### ¶ 10.40[4][c] The Standard Model: Deemed Asset Sales Treated As Actual Asset Sales

**\*7** Regulations § 1.338-1(a) sets out the general principle that § 338 deemed sale (and, in the case of § 338(h)(10) elections, deemed liquidation) transactions are treated as if those transactions had in fact taken place. This model is to be used as a guide to interpreting various portions of the regulations, and it will control in keeping those interpretations on the "correct" path. Some slight deviations are allowed, but they are few and far between, and all doubts are to be resolved in favor of actual asset sale treatment for the deemed sale transaction.

¶ 10.40 ASSET TRANSACTION RELATED TO STOCK..., Fed. Income Tax'n of...

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 62 of 67

## ¶ 10.40[4][d] General "Anti-Abuse" Rule

The final regulations added a general anti-abuse rule. [587] Under the anti-abuse rule, for example, in calculating ADSP and AGUB, and in allocating these amounts among assets, the IRS will have authority to reallocate various temporary asset shift transactions into or out of the target's allocable asset pool if the transfer or withdrawal transaction does not continue in place for two years. One is reminded of § 482 here, but the § 338 anti-abuse rule does not require a bad state of mind or purpose—its application is automatic (at the discretion of the IRS). The apparent focus is on various asset-shifting transfers that are designed to distort the otherwise "pure" residual allocation system envisioned by the regulations. The two examples in Regulations § 1.338-1(c)(2) [588] are not very helpful in explicating the parameters of this provision—apparently its very vagueness is intended to discourage pre-transaction tailoring of the target's asset pool in order to manipulate the allocation formula results. [589]

## ¶ 10.40[4][e] Delinking of ADSP and AGUB Timing

As in the case of actual sales of assets, § 338 deemed sales are linked computationally in the determination of the seller's amount realized and the buyer's basis figures when applying the rules of §§ 1001 and 1012. Unlike actual assets sales, however, § 338 deemed sales also were linked as to timing by the former regulations. [590] The final regulations sever this timing linkage, and require current recognition of gain or loss by the target on its deemed asset sales in the same manner as if an actual sale had occurred.

## ¶ 10.40[4][f] Changes to the § 338(h)(10) Regulations

The 2001 regulations under § 338(h)(10), which section is considered in greater detail below, [591] now provide as follows:

1. The standard model is a Court Holding Co. sequencing regime, that is, deemed asset sales by the target come first, followed by deemed distribution of the sale proceeds (in the case of tiered targets, the parent's deemed sale comes first—"top down"—but the deemed liquidation flows "bottom up");

2. The deemed liquidation will not qualify for § 332 treatment if the target is insolvent (as is the case with actual liquidations); and

**\*8** 3. The possibility for limited § 453 installment sale deferral is added, if, and to the extent that, it would be available in the case of an actual asset sale by the target.

Footnotes

a    The late James S. Eustice was the Gerald L. Wallace Professor of Taxation at New York UniversitySchool of Law and is counsel to the New York City law firm of Kronish, Lieb, Wiener and Hellman.

b    ThomasBrantley, who authors the supplements for this treatise, is a member of the Massachusetts, New York and Wyoming bars, and is Of Counsel to the lawfirm of Rubin and Rudman, LLP, Boston, Massachusetts.

554    See ¶ 10.14[1].

555    See ¶ 10.11[2].

556    See ¶ 10.21[4].

557    Kimbell-Diamond Milling Co. v. Comm'r, 14 TC 74 (1950), aff'd per curiam, 187 F2d 718 (5th Cir. 1951), cert. denied, 342 US 827 (1951). A modern version of the Kimbell-Diamond principle has been revived for two-step double mergers so long as the first step passes continuity of interest limits. See Rev. Rul. 2001-46, 2001-42 IRB 321; see Blanchard, "Reflections on Rev. Rul. 2001-46 and the Continued Vitality of Kimbell-Diamond," 93 Tax Notes 1875 (Dec. 31, 2001); ¶ 12.63[2][a].

558    See United States v. M.O.J. Corp., 274 F2d 713 (5th Cir. 1960).

¶ 10.40 ASSET TRANSACTION RELATED TO STOCK..., Fed. Income Tax'n of...

Case 1:13-cv-00402-RTH     Document 122-1     Filed 04/22/16     Page 63 of 67

See Griswold v. Comm'r, 400 F2d 427 (5th Cir. 1968) (stock purchase and recapitalization held not to be an asset purchase). But see Security Indus. Ins. Co. v. United States, 702 F2d 1234 (5th Cir. 1983) (stock purchase, liquidation, and reincorporation transfer held to be § 334(b)(2) stepped-up basis liquidation; no mention of *Griswold* in opinion); Kraft, Inc., v. United States, 30 Fed. Cl. 739, 1994-1 USTC ¶ 50,080 (1994) (applied even though there was a ten-year to twenty-year delay in liquidating purchased subsidiaries; found integrated asset acquisition intent). See also Rev. Rul. 2001-46, 2001-42 IRB 321 (Kimbell-Diamond principle applied to turn integrated two-step double merger into direct § 368(a)(1)(A) reorganization (P acquired T stock for 70 percent P stock and 30 percent cash, followed by integrated upstream merger per step-transaction doctrine)); see ¶ 12.63[2][a]. Cummings, " Rev. Rul. 2001-46 Revisited," 94 Tax Notes 641 (Feb. 4, 2002); Blanchard, "Revisiting Rev. Rul. 2001-46 Once Again," 94 Tax Notes 1707 (Mar. 25, 2002). But see Regs. § 1.338(h)(10)-1(c)(2) (2006), which modified Rev. Rul. 2001-46 by allowing a § 338(h)(10) election if the first step stock acquisition is a stand-alone qualified stock purchase.

See generally S. Rep. No. 1662, 83d Cong., 2nd Sess. 257 (1954). For more extensive treatment of § 334(b)(2), see ¶ 11.44 and ¶ 11.45, fourth and fifth editions of this treatise.

See Rev. Rul. 90-95, 1990-2 CB 67 (stock purchase treatment dominant here despite planned liquidation; no asset acquisition treatment via step transaction argument after 1982 enactment of § 338 if acquisition is a qualified § 338 purchase transaction). See also Regs. § 1.338-3(d) (effective Mar. 16, 2001) (stock acquisition dominant where qualified purchase; post-acquisition intra-group asset transfers can qualify for § 368 reorganization treatment, rejecting Yoc Heating doctrine). But see Rev. Rul. 2001-46, 2001-42 IRB 321.

Moreover, the hypothetical liquidation of the target occurs only at the corporate level; the shareholders of the target (both the purchasing parent and holders of any unacquired minority shares) are unaffected by this event.

For the pre-1987 version of § 337, see ¶ 10.21[7]. For the very different post-1986 provision bearing the same number—an inexcusably confusing drafting deficiency—see ¶ 10.12.

For an effort to quantify the discount, see Kotlarsky, "Stepping Up Basis: Purchase of Stock or Purchase of Assets," 39 Tax Notes 1101 (May 30, 1988). For estate and gift tax stock valuation effects from General Utilities repeal, see Estate of Davis v. Comm'r, 110 TC 530 (1998); Eisenberg v. Comm'r, 155 F3d 50, 1998-2 USTC ¶ 60,322 (2nd Cir. 1998) (valuation discount allowed in determining stock value in order to reflect potential corporate capital gain tax on its appreciated assets for gift tax purposes, though not for full amount of potential tax).

The deemed sale price of the machine as a non-goodwill going-concern value § 197 asset is limited to its fair market value. Regs. § 1.338-6T(d), Ex. (1) (2000) (effective January 6, 2000). If the elective aggregate deemed-sale-price formula is not used, a zero appraised value of goodwill prevents any sale gain thereon. See Regs. §§ 1.338-4T(h)(3), Q&A; see ¶ 10.41[3].

The aggregate basis derived from the $1,000 stock cost and the $200 tax liability will be allocated, in part, to goodwill without regard to its fair market value. But such amount, even though a "mistaken" overpayment, now (after 1993) should be amortizable under § 197. See ¶ 10.31

Temp. Regs. §§ 1.338-1T– 1.338-5T (1986).

The temporary regulations continued in effect, and the proposed regulations did not become effective until finalized, with the "acquisition date" being the relevant date. Regs. § 1.338(i)-1.

Promulgated by TD 8515 on January 20, 1994 (but electively effective back to January 14, 1992, the date of the proposed regulations). See Brode, "Significant Liberalization of Final Section 338 Regulations Makes That Section More Useful," 63 Tax Notes 873 (May 16, 1994); Keyes, "Application of Carryover Basis Rule to Nonconsolidated Groups Clarified by Consistency Regulations," 80 J. Tax'n 338 (1994); Rizzi, " Section 338 Revisited: The Section That Will Not Die," 21 J. Corp. Tax'n 255 (1994).

See ¶ [10.41[5]]; MacNeil et al., "Allocation of Purchase Price in Deemed and Actual Asset Acquisitions Under New Prop. Regs.," 91 J. Tax'n 261 (Nov. 1999).

TD 8940 (effective March 16, 2001). MacNeal et al., "Final Regs. on Allocation of Purchase Price to Assets Affect Actual and Deemed Sales," 95 J. Tax'n 15 (July 2001).

See ¶ 10.31.

See ¶ 10.41[1].

See ¶ 10.41[6].

TD 8940 (effective March 16, 2001).

Regs. § 1.338-1 (2001).

Regs. § 1.338-2 (2001).

Regs. § 1.338-3 (2001). In one of the rare substantive changes to the proposed regulations, Regs. § 1.338-3(b)(2) dropped the earlier "nominal payment" limitation on qualified stock purchases, and now there can be a purchase even though nothing paid for the target stock.

Regs. §§ 1.338-4 through 1.338-7 (2001).

¶ 10.40 ASSET TRANSACTION RELATED TO STOCK..., Fed. Income Tax'n of...

Case 1:13-cv-00402-RTH    Document 122-1    Filed 04/22/16    Page 64 of 67

Regs. § 1.338-4 (2001).

Regs. § 1.338-5 (2001).

Regs. § 1.338-6 (2001).

Regs. § 1.338-7 (2001).

Regs. § 1.338-10 (2001).

Regs. § 1.338(h)(10)-1 (2001).

See ¶ 10.42.

Regs. § 1.338-1(c) (2001).

Regs. § 1.338-1(c)(2) (2001), Ex. 1, 2.

The final regulations modified slightly Ex. 2. The regulations state that IRS adjustments should avoid duplication or omission. Final regulations also added a new "next day" rule in § 1.338-1(d) (effect of postclosing transactions under § 1.1502-76(b) allocation rules; must use next-day rule for extraordinary business transactions).

See ¶ 10.31[4].

See ¶ 10.42.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

THOMSON REUTERS
CHECKPOINT

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Black's Law Dictionary (10th ed. 2014), trial

TRIAL

Bryan A. Garner, Editor in Chief

Preface | Guide | Legal Abbreviations

**trial** (15c) A formal judicial examination of evidence and determination of legal claims in an adversary proceeding.

- **abortive trial** See MISTRIAL.

- **bellwether trial** See BELLWETHER TRIAL.

- **bench trial** (1954) A trial before a judge without a jury. • The judge decides questions of fact as well as questions of law. — Also termed *trial to the bench*; *nonjury trial*; *court trial*; *trial before the court* (TBC); *judge trial.*

- **bifurcated trial** (1945) A trial that is divided into two stages, such as for guilt and punishment or for liability and damages. — Also termed *two-stage trial.* Cf. SEVERANCE (2).

- **closed trial** (1942) A trial that is not open to the public, usu. because of some overriding concern such as a need to protect a child's anonymity or for security.

- **court trial** See *bench trial.*

- **ex parte trial** (1814) A trial in which only one side of the case is heard, usu. because the opposing party is not present. See *trial in absentia.*

- **fair trial** See FAIR TRIAL.

- **joint trial** (18c) A trial involving two or more parties; esp., a criminal trial of two or more persons for the same or similar offenses.

- **judge trial** See *bench trial.*

- **jury trial** (18c) A trial in which the factual issues are determined by a jury, not by the judge. — Also termed *trial by jury.*

- **mock trial** See MOCK TRIAL.

- **new trial** (16c) A postjudgment retrial or reexamination of some or all of the issues determined in an earlier judgment. • The trial court may order a new trial by motion of a party or on the court's own initiative. Also, when an appellate court reverses the trial court's judgment, it may remand the case to the trial court for a new trial on some or all of the issues on which the reversal is based. *See* Fed. R. Civ. P. 59; Fed. R. Crim. P. 33. See MOTION FOR NEW TRIAL; REMAND.

> "A new trial, as the term is used in law, is a retrial. Just why the less definite term 'new trial' is used, it would be difficult and, at present, without profit, to explain. The statutory definitions in the various states will be found substantially the same. Upon comparison with the common-law definition the only differences consist in differences of phraseology. The definition given in the California Code of Civil Procedure is as follows: 'A new trial is a re-examination of an issue of fact in the same court after a trial and decision by a jury or court or by referees.' The only perceptible reason for using the word 're-examination' in preference to the word 'retrial' is that the former is a more euphonious expression. In this instance exactitude and clearness have been sacrificed to rhetorical effect. New trial is the statutory, and therefore the exclusive and appropriate, method of re-examining issues of fact." 1 Thomas Carl Spelling, *A Treatise on New Trial and Appellate Practice* 2 (1903).

- **nonbinding minitrial** See *summary jury trial.*

- **nonbinding summary jury trial** See *summary jury trial.*

- **nonjury trial** See *bench trial.*

- **perfect trial** A trial free from all error.

- **political trial** (18c) A trial (esp. a criminal prosecution) in which either the prosecution or the defendant (or both) uses the proceedings as a platform to espouse a particular political belief; a trial of a person for a political crime. See SHOW TRIAL.

- **public trial** (16c) A trial that anyone may attend or observe.

- **separate trial** (18c)  **1.** *Criminal procedure.* The individual trial of each of several persons jointly accused of a crime. Fed. R. Crim. P. 14. **2.** *Civil procedure.* Within a single action, a distinct trial of a separate claim or issue — or of a group of claims or issues — ordered by the trial judge, usu. to conserve resources or avoid prejudice. Fed. R. Civ. P. 42(b). Cf. SEVERANCE (2).

- **short-cause trial** See *short cause* under CAUSE (3).

- **show trial** See SHOW TRIAL.

- **speedy trial** See SPEEDY TRIAL.

- **state trial** (17c) A trial for a political offense.

- **stipulated bench trial** (1971) A nonjury trial, usu. in a criminal case, in which the judge considers only facts that are agreed to by the parties.

- **summary jury trial** (1984) A settlement technique in which the parties argue before a mock jury, which then reaches a nonbinding verdict that will assist the parties in evaluating their positions. — Abbr. SJT. — Also termed *nonbinding summary jury trial*; *nonbinding minitrial.* Cf. MOCK TRIAL.

- **trial at bar** (17c) *Hist.* A trial before all the judges of the court in which the proceedings take place. — Also termed *trial at the bar.*

- **trial at nisi prius** (**nI**-sI **prI**-#s) (17c) *Hist.* A trial before the justices of assize and nisi prius in the county where the facts are alleged to have occurred, and from which county the jurors have been summoned.

- **trial before the court** See *bench trial.*

- **trial by battle** See TRIAL BY COMBAT.

- **trial by certificate** (16c) *Hist.* A trial in which the issue is decided on evidence in the form of witnesses' certificates of what they individually know.

- **trial by combat** See TRIAL BY COMBAT.

- **trial by duel** See TRIAL BY COMBAT.

- **trial by inspection** (18c) *Hist.* A trial in which the judge decided the dispute by individual observation and investigation, without the benefit of a jury.

- **trial by jury** See *jury trial.*

- **trial by ordeal** See ORDEAL.

- **trial by record** (18c) *Hist.* A trial in which, a record having been pleaded by one party and denied by the other, the record is inspected in order to decide the dispute, no other evidence being admissible. See NUL TIEL RECORD.

- **trial by the country** See *trial per pais.*

- **trial by the record** (17c) A trial in which one party insists that a record exists to support its claim and the opposing party denies the existence of such a record. • If the record can be produced, the court will consider it in reaching a verdict — otherwise, it will rule for the opponent.

- **trial by witnesses** *Hist.* A trial in which the contesting parties are required to appear in court with witnesses assembled to give evidence before one or more judges, as opposed to a jury.

> "The *trial by witnesses* is in very few instances legally competent. It seems, however, that it is still applicable (as anciently) to an issue *arising on the death of the husband in an action of dower*, and in some other cases. In case of trial by *witnesses*, the court, upon issue joined, awards that both parties produce in court at a given day their respective witnesses. The judges examine and decide, and the judgment is pronounced accordingly. It is, however, laid down, that, if after the evidence, the judges are still unable to satisfy themselves on the fact, they have a discretion then to send the parties *to the country*." Henry John Stephen, *A Treatise on the Principles of Pleading in Civil Actions* 102–03 (Samuel Williston ed., 8th Am. ed. 1857).

- **trial de novo** (dee *or* di **noh**-voh) (18c) A new trial on the entire case — that is, on both questions of fact and issues of law — conducted as if there had been no trial in the first instance.

- **trial in absentia** (1946) A trial held without the accused being present. • In the United States, a trial may be held *in absentia* only if the accused has either voluntarily left after the trial has started else has so disrupted the proceedings that the judge orders the accused's removal as a last resort.

- **trial on the merits** (18c) A trial on the substantive issues of a case, as opposed to a motion hearing or interlocutory matter.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

- **trial per pais** (p#r **pay** *or* **pays**) [Law French "trial by the country"] (17c) Trial by jury. — Also spelled *trial per pays.* — Also termed *trial by the country.* Cf. CONCLUSION TO THE COUNTRY; GOING TO THE COUNTRY; PATRIA (3).
- **trial to the bench** See *bench trial*.
- **trifurcated trial** (1959) A trial that is divided into three stages, such as for liability, general damages, and special damages.
- **two-stage trial** See *bifurcated trial*.

Westlaw. © 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.