UNITED STATES COURT OF FEDERAL CLAIMS

ALTA WIND I OWNER LESSOR C,        )
et al.,                            )   Case Nos. 13-402,
        Plaintiffs,                )   13-917, 13-972, 13-935,
     vs.                           )   14-174, 14-93, 14-175,
THE UNITED STATES,                 )   and 14-47
          Defendant.               )
---------------------------------)

Courtroom 5

Howard T. Markey National Courts Building

717 Madison Place, N.W.

Washington, D.C.

Monday, May 9, 2016

9:30 a.m.

Trial Volume 1

BEFORE:   THE HONORABLE THOMAS C. WHEELER

Susanne Bergling, RMR-CRR-CLR, Reporter

2

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

      STEVEN J. ROSENBAUM, ESQ.

      DENNIS B. AUERBACH, ESQ., OF COUNSEL

      THOMAS BRUGATO, ESQ.

      MARGARET BRENNAN, ESQ.

      Covington & Burling LLP

      One CityCenter

      850 Tenth Street, N.W.

      Washington, D.C.  20001-4956

      (202) 662-5568

      srosenbaum@cov.com


ON BEHALF OF THE DEFENDANT:

      MICHAEL J. RONICKHER, ESQ.

      MIRANDA BUREAU, ESQ.

      MARGARET E. SHEER, ESQ.

      U.S. Department of Justice

      Tax Division

      P.O. Box 26, Ben Franklin Station

      Washington, D.C.  20044

      (202) 616-9085

      michael.j.ronickher@usdoj.gov

3

Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

ALSO PRESENT:

     Pierre Kressman, IT

     Tyrone Bowie, IT

4

Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

                          I N D E X

WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS   VOIR

PAGANO              46

EXHIBITS              FOR ID        IN EVID

Plaintiffs'

Number1                              160

Number2                              160

Number5                              208

Number10                             212

Number11                             211

Number13                             214

Number19                             234

Number20                             241

Number21                             255

Number23                             260

Number25                             263

Number27                             268

Number29                             270

Number30                             265

Number31                             272

Number32                             273

5

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

| EXHIBITS | FOR ID | IN EVID |
|----------|--------|---------|
| Plaintiffs' | | |
| Number33 | | 266 |
| Number71 | | 266 |
| Number195 | | 264 |
| Number196 | | 210 |
| Number197 | | 209 |
| Number221 | | 82 |
| Number222 | | 189 |
| Number223 | | 90 |
| Number224 | | 92 |
| Number225 | | 63 |
| Number226 | | 65 |
| Number227 | | 67 |
| Number228 | | 69 |
| Number229 | | 70 |
| Number230 | | 226 |
| Number231 | | 132 |
| Number232 | | 133 |
| Number233 | | 134 |
| Number235 | | 135 |
| Number236 | | 136 |
| Number237 | | 138 |
| Number238 | | 138 |
| Number239 | | 138 |

6

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

| EXHIBITS | FOR ID | IN EVID |
|----------|--------|---------|
| Plaintiffs' | | |
| Number 240 | | 139 |
| Number 241 | | 139 |
| Number 242 | | 140 |
| Number 244 | | 140 |
| Number 245 | | 141 |
| Number 247 | | 141 |
| Number 248 | | 142 |
| Number 249 | | 142 |
| Number 251 | | 143 |
| Number 252 | | 144 |
| Number 253 | | 144 |
| Number 254 | | 145 |
| Number 255 | | 145 |
| Number 256 | | 146 |
| Number 257 | | 146 |
| Number 258 | | 147 |
| Number 259 | | 147 |
| Number 260 | | 148 |
| Number 261 | | 148 |
| Number 262 | | 149 |
| Number 263 | | 149 |
| Number 264 | | 149 |
| Number 266 | | 150 |

7

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

| EXHIBITS | FOR ID | IN EVID |
|---|---|---|
| Plaintiffs' | | |
| Number267 | | 151 |
| Number268 | | 151 |
| Number269 | | 152 |
| Number270 | | 153 |
| Number271 | | 153 |
| Number272 | | 154 |
| Number277 | | 154 |
| Number279 | | 101 |
| Number280 | | 156 |
| Number281 | | 177 |
| Number282 | | 179 |
| Number283 | | 179 |
| Number284 | | 180 |
| Number285 | | 180 |
| Number286 | | 183 |
| Number287 | | 226 |
| Number288 | | 228 |
| Number294 | | 52 |
| Number295 | | 89 |
| Number296 | | 101 |
| Number298 | | 127 |

8

Trial

Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

Defendant's

None


Joint

Numbers1 through                                          10

        2040*




OPENING STATEMENT:

        BY MR. ROSENBAUM - 11

        BY MR. RONICKHER - 31













*All exhibits premarked for identification prior to trial.

*See full attached list of admitted exhibits following transcript.

*Due to the volume of the joint exhibits, electronic submission only will be made to the Court, per Judge Wheeler.

9

Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

P R O C E E D I N G S

- - - - -

(Proceeding called to order, 9:30 a.m.)

THE COURT: We are on the record this morning for the beginning of trial in the Alta Wind cases. I'll call them, Docket Number 13-402T, et al.

Are there any -- let's see, let's start with introductions of counsel. For the Plaintiff?

MR. ROSENBAUM: For the Plaintiffs, Your Honor, Steven Rosenbaum, and with me is Thomas Auerbach, Thomas Brugato, and Maggie Brennan; and also with us at the table is our designated representative, Mr. James Pagano, who will be our first witness.

THE COURT: Welcome, sir. Welcome to all of you.

And for the United States?

MR. RONICKHER: Good morning. Again, Michael Ronickher for the United States, and with me are my colleagues Miranda Bureau and Margaret Sheer. And Tyrone Bowie is helping out with the electronics.

THE COURT: No corporate representative?

MR. RONICKHER: We did designate Ellen Neubauer, who is the program director for the program, but I don't see her currently.

THE COURT: Okay. Maybe she'll be here later.

Are there any preliminary matters before we start

10

Trial

Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

with opening statements?

MR. ROSENBAUM:  I think we're ready to go, Your Honor.

THE COURT:  Okay.

MR. RONICKHER:  There's one I was going to raise. The parties have joint exhibits that both sides have agreed to, so I thought for efficiency purposes, it might make sense to move those into evidence as an initial matter.

THE COURT:  Sure, we can do that.  Can you designate them somehow for the record?

MR. RONICKHER:  Certainly.  The joint exhibit numbers are sequential, so it's JX 1 through JX 2040.

THE COURT:  Okay.  By agreement, then, Joint Exhibits 1 through 2040 are admitted.

(Joint Exhibit Numbers 1 through 2040 were admitted into evidence.)

MR. RONICKHER:  Thank you.

THE COURT:  Mr. Ronickher, would you like to begin?

MR. ROSENBAUM:  May it please the Court.

Your Honor, at an earlier hearing, the Government, I believe, made the remark in words to the effect of "the case is complicated."  The Government may want it to seem that way, we think it is not that

11

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

complicated a case, that there are only a handful of factual and legal propositions that lead to the conclusion that the Government underpaid my clients with respect to the cash grants to which they are entitled. If we can go to slide 1, please.

The formula by which cash grants are determined is straightforward.  One takes each Plaintiff's basis in its energy-producing wind energy facility and multiplies that number by 0.3.  It's a simple calculation.  The property here are different facilities that make up a substantial portion of the largest wind farm in North America and perhaps the largest wind farm in the entire world, which is called the Alta Wind Farm, which is located in Tehachapi, California.  As I say, the calculation is simple and comes down to the question, what is Plaintiffs' basis?  The rest is mechanical.  If we can go to the next slide, please.

"Basis" is a defined term.  Absent special circumstances, basis is the amount paid by the taxpayer for the property in cash or other property.  So, in other words, cash plus the assumption of liabilities, that makes up a taxpayer's basis.  In every case before you involving all the Plaintiffs, they paid money to buy the facilities, and that is what they are claiming to be their basis, and that is the number that they believe,

12

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                5/9/2016

multiplied times 0.3, provides the amount of the cash
grants to which they were entitled.  A simple
calculation.

We do not believe there are any special
circumstances here, Your Honor, that would cause the
Court to conclude that it should define "basis" as
anything other than what these taxpayers paid for their
properties.  The test is, were these willing buyers and
willing sellers both reasonably informed, neither under
a compulsion to act?  We will present lots of evidence
on that question, Your Honor.

The seller in all cases is a company called
Terra-Gen Power.  Mr. Pagano is the chief executive
officer of Terra-Gen Power, and he will describe each of
the transactions in some detail.  The buyers, Your
Honor, in every case is -- either directly or through
statutory trusts, who are the actual buyers in some
cases -- well-informed buyers relying either on their
own experience and sophistication or that of
well-informed advisors or both, and these are well-known
companies, the actual -- not the statutory trusts, but
the actual beneficiaries of those trusts.  EverPower,
Google, Union Bank, Citibank, these are the buyers
through the statutory trusts or in some cases directly.

We will present testimony from both sides, from

13

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

the buy side and the sell side, who will establish that these transactions were arm's length and that the price arrived at will demonstrate basis and that there is no special circumstance to conclude otherwise.  If we can go to the next slide.

There have been questions raised by the Government about the fact that some of these transactions were sale-leasebacks, and they have raised the question whether that suggests that there are special or peculiar circumstances that would indicate that the price paid should not be expected to establish basis, as it normally is.

This slide, we think, comprehensively rebuts that, and you will hear testimony about it.  Essentially what it shows is that there were eight transactions, three outright purchases and five sale-leasebacks.  The prices paid are essentially identical in all of them. I'll repeat that.  The prices paid are identical in all of them.

This is a key point in our case, obviously, because if people buying in a sale-leaseback paid the same as people who were engaged in outright purchases, then obviously there's no special circumstance, and for those -- for that reason, we believe you will conclude that the purchase prices do establish basis and no

special circumstances exist.  Next slide.

The cash grant program provides for cash grants on the what's called eligible -- which you can equate with energy-producing -- components of the facility. The ineligible component does not qualify for a cash grant.  Essentially, the ineligible components are the transmission facilities because they're not energy-producing; they're energy-conveying.

So, one must take the purchase price paid for the entire facility and exclude the portion that relates to the transmission lines, in essence.  That's not hard to do.  There are well-established mechanisms to do it, and everyone does it the same way.

KPMG does it that way and Deloitte does it that way and Ernst & Young does it that way, and you'll hear testimony about that.  It's not that challenging an undertaking.  It's got a lot of sort of accounting work behind it, but fundamentally, it's straightforward.  And the next slide.

And this is an important point, which is that almost all of the properties eligible -- in this slide, which you will hear testimony on, everything in blue is eligible.  It's the wind turbines, it's the connectors between the wind turbines, it's the roads to the wind turbines, which are counted as eligible.  The red are

15

Trial

Alta Wind I Owner Lessor C, et al. v. USA                     5/9/2016

the transmission lines and a few other noneligible components of the facility, but it is almost all eligible.

And you'll hear testimony that the Government's experts from the National Renewable Energy Laboratory took the position that roughly 95 percent of the facility relates to eligible and 5 percent to ineligible. That's the Government's own rule of thumb. And our rule of thumb and our actual calculations are very much in keeping with that.

Now, there's also a requirement that you exclude the land, which is ineligible, and we have excluded the land. It is not a big part of the expense. There's a little bit of fee land, which comprises roughly 0.2 percent of the total cost of these facilities, and there's some lease land, too. We'll talk about that. Those are excluded.

So, once one has done that exclusion of ineligible property, one essentially has the part of the purchase price that relates to the eligible property, which is how the cash grant is calculated. Next slide.

I would point out that there are many drivers of value besides the mere cost of buying a turbine or the mere cost of buying the cable that connects the turbine to something else which goes into value. For example,

there's what's known as turnkey value; turnkey value, which this Court has defined as the increased value of individual assets because they've all been assembled, integrated, tested and put into operating order.

The Court went on to say that that is part of the value of the facility itself, of the tangible assets. That is not an intangible. That's part of the value of the facility. Next slide.

There also is value in the fact that the tangible assets are subject to income tax attributes, both positive and negative, as well as the cash grant itself. The law is also clear that all of that is considered part of the value of the asset itself. These are not separate assets.

Third, there was tremendous effort made -- if we can go on to the next slide -- that led to the development and construction of these facilities. We had to get building permits, zoning variances, permit fees, et cetera. Developing projects in California is probably the most difficult place to develop projects in the entire United States because of their extreme sensitivity to environmental concerns.

There were tremendous efforts made there, but the law is that those are all deemed indirect costs which are deemed part of the value of the facility itself.

THE COURT: Just a basic question I have. Was this project conceived because of the 1603 program or was it going to be built anyway regardless of the 1603 program?

MR. ROSENBAUM: I would say it would not have been built but for some kind of government support program. That's the plainest way to put it, not necessarily the cash grant program but something like it, and we'll talk a bit -- we'll have the witness talk a bit about that issue.

THE COURT: Good.

MR. ROSENBAUM: But -- of course, the cash grant program was intended to encourage the construction of these facilities, and it certainly had that impact here, but all of these activities are included as part of it.

So, when we have a purchase price that should be respected, and all of these key drivers of value are deemed part of the value of the facility itself as a matter of law, the Government has to scramble to find something to which they would attribute value other than what I've just described.

And under their case -- let me make clear -- they have to find 8 -- more than $800 million of value in something else to justify what they've done and what they say in this case should be done. That's the delta

in value between our case and their case, well over $800 million.

So, when the Government stands here, as I'm sure they will, and says, "Well, gee, you had a maintenance contract," first of all, we'll show the maintenance contract was not more favorable than others available in the market, and the law is clear if that's the case, you don't attribute separate value to it. It's a market-based value contract. There is no value attributable to it as an allocation matter. But they have got $800 million to prove to you, and I don't think they'll prove any of it. Next slide.

One of their arguments is that some of the value should be attributed to the power purchase agreement. There are agreements in place by which these facilities sell their electricity, and those are called power purchase agreements, and the Government argues that value should be attributed to it. We believe that we will demonstrate that, as a matter of law, no value should be attributed to the power purchase agreement once Your Honor hears testimony and accounting testimony relating to the nature of the power purchase agreement.

The law is clear that, for example, if there's a lease on an office building and you buy the office building, no value is attributed to the lease. It's

19

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                5/9/2016

just considered to be part of the office building.  We will have testimony that will compare the power purchase agreements to leases and explain why the Court should conclude that the power purchase agreement should be considered like a lease and should not be considered separate and apart from the facility itself.  That's argument number one on the PPA.  If we can go to the next slide.  One more slide.

But in addition, the law is also clear that a power purchase agreement would be given separate value only to the extent that it's more favorable to the seller than the market as a whole.  If all you're doing is selling at a price that others are also getting in the marketplace, you don't attribute separate value to the agreement.

And we will demonstrate that, in fact, the PPAs of the Plaintiffs are not above market, and we have extraordinarily good evidence as to that because the State of California commissioned a study of all the PPAs in the state, and there's a published report, and our expert's going to talk about that.  These PPAs are not above market.  Next slide.

So, if the PPAs are not above market, the Government has to find some other contracts that are above market.  By "above market," I mean more favorable

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Alta Wind I Owner Lessor C, et al. v. USA                      5/9/2016

to the Plaintiffs than are available in the marketplace in general because that's the standard before you attribute value to a contract.  This particular example here is a real one.  If a clothing manufacturer has a contract for the supply of yarn, you only attribute value to that contract if the yarn is being supplied at lower than market prices; otherwise, no value is attributed to it.

The Government I think will point to a number of contracts -- and there are a number of contracts out there -- but you will hear testimony about each one that we feel will establish, indisputably, that none of them have any value that is above market.  They are market-based agreements.  We have a contract to -- for example, there's a contract for the maintenance of the turbines, but it's at market -- it's at market terms. It's not at above-market terms.  So, no separate value is attributed to it.  And that will be the case, as we will show -- demonstrate, for every single contract. Next slide.

Now, the Government has also argued -- and they argued this in their proposed findings of fact and conclusions of law -- that it can't be that the facility should be deemed to have more value because it happens to be in a nice windy location.  We disagree with that

entirely.  There is no support in the law for that proposition, and this slide I think demonstrates the concept quite plainly.

The Government's view would be that if you had two hotels which are identical, one in Manhattan, New York, and one in Manhattan, Kansas, those hotels have the same value because they were built out of the same lumbar.  Well, is there any possibility that you could buy a hotel in Manhattan, New York, for what you would pay for one in Manhattan, Kansas?  Of course not.

That -- and that value is reflected in what you would pay for it in Manhattan, New York, and that becomes your basis.  It's as simple as that.  There is no such thing as a location value that is treated as an intangible, separate and apart from the value of the facility itself.  There is no -- no basis in the case law, no basis in the accounting principles, no precedent for this concept, and, you know, we have a hotel there.

And on the next slide, just to make the point plainly, the same thing would be with respect to a house.  I mean, if basis is what you paid for a house, which it would be for property tax or other purposes, obviously you're going to pay more for a house in Beverly Hills, California, than in Beverly Hills, Oklahoma.

THE COURT:  Is there actually a Beverly Hills, Oklahoma?

MR. ROSENBAUM:  I believe there is, but I'm taking someone else's word for it, so I'll pass the blame on if it's erroneous.

But the fact that the lumbar may have cost the same for both houses does not mean both houses are worth the same.

When it comes to a wind farm, the value of a wind farm is in its ability to produce electricity.  That's what makes a wind farm valuable.  The more wind there is in the location where you've built it, the more electricity you produce.  Go to the next slide.

We have here a pictorial of two wind farms, identical, except the one on the right is intended to be shown as having a lot of wind as compared to the one on the right [sic].  There is no question the one on the right is more valuable.  What the fair market value is, what a reasonable person would pay for that wind farm, is higher on the right because it produces more electricity, just like you would pay more for a hotel in Manhattan, New York, than a hotel in Manhattan, Kansas.

And this is -- seems to be the -- you know, a major component of the Government's case, and yet it -- everyday experience tells us it's wrong.  Indeed, it's

particularly noteworthy that to have a cash grant, you don't get a cash grant because you bought a bunch of wind turbines.  You have to have -- this is a requirement of the cash grant program.  The facility -- the property has to have been installed, tested, and be ready to produce electricity.  These are all demonstrations that we are valuing here, completed facilities whose value is in their ability to produce electricity.  That's their purpose.  That's their required purpose.  The next slide.

The Government also argues that there may be some goodwill here, that some of the value of the purchase price should be attributed to goodwill.  There is no goodwill here, Your Honor.  This Court has held that goodwill is not merely -- has to have content, substantive meaning, and permanent dimensions, meaning it's not just a free-floating, well, maybe there's something out there.

There has to be something in the nature of the transaction that would indicate that there is goodwill, and goodwill, of course, you know, means that you've developed some relationships with -- that have caused you to have the ability to attract more customers. You've established a reputation over time so people will come to you.  None of these things are here.  These

properties were sold brand new, brand new.  Next slide.

They had not yet gone into service.  So, the Government is arguing that even though the facility has not even begun operation, it somehow has goodwill.  That is not a reasonable proposition.

In addition, there were -- next slide -- no workforce was transferred.  Sometimes the existence of a trained, experienced workforce can be thought of as goodwill if that is transferred as part of the transaction.  That didn't happen.  None of these had workforces transferred as part of the transaction.  Next slide.

Obviously, the fact that these facilities had not yet been placed in service meant they had little, if any, earnings history at the time of the purchase -- next slide -- and finally, if goodwill is thought of as an ability to garner new customers, the reality is that these PPAs, which are ones under which the facilities sell all their electricity to the utility, that means there's no ability to get new customers.  There's no ability to expand these plants.  They are physically locked in.  They have used up all the space.  There's no ability to increase the amount of electrical production. They have maxed out on their rights to deliver electricity to the transmission grid.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

These facilities are stand-alone electrical production facilities, and what was paid for them was the ability of these facilities to produce electricity. It's that simple. There is no goodwill here. Next slide.

Now, if the Court were to conclude, which we think it shouldn't, that purchase price does not establish basis, which the Court could only conclude if it thought there were somehow special circumstances, it would still -- it would then be the Court's task itself to answer the question, what would a willing buyer pay a willing seller for these facilities?

In other words, normally we rely upon actual market transactions to answer that question. If there's an actual sale, we know what a willing buyer would pay a willing seller to actually happen, and we just rely on that; we don't look behind it. Only if this Court found special circumstances, which we think it won't, would the Court itself be tasked to answer the question, what would a willing buyer pay a willing seller for this facility?

We will address that issue purely as a backup approach, not one we urge, because we think the purchase price does govern, but we will demonstrate that if one engages in normal valuation techniques, one would

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

establish a -- that what a willing buyer would pay a willing seller is at least as much as what was actually paid in these transactions.  We will examine the income that these facilities produce and demonstrate -- and this is the comparison -- that if you use the income approach to valuation, you actually come up with values somewhat higher than what was actually paid for these facilities.

Next, we will also -- next slide, please -- we will also demonstrate that if you used a market approach, asked the question, what will people -- what were comparable sales for, you would conclude that, once again, the value equals or exceeds the actual purchase prices.

Finally, we do not support the use of the so-called cost approach to valuation.  The cost approach is one in which you add up the seller's out-of-pocket costs and then perhaps add something on top for a return for what they did and say that's value.  Very few things in this world transact on that basis.

When I bought my house, did I ask what it cost the contractor to build it?  Would he even have told me? Of course not.  I bought based upon what I thought the value was on other bases.  It's no different.

Actually, when I say it's no different, it

actually is a little different here, because in this case every one of the buyers knew what the seller's costs were.  When I bought a house, I had no idea, obviously, what it cost to build the facility, but because of the nature of these transactions, in every case, the seller -- the buyers knew.

So, they knew what the costs were, and they knew what they were paying on top of that when it came to the purchase price.  That shows you how the market works and what a reasonable markup would be if you were going to take this approach to value.

Finally -- and this gets a little more technical or accounting -- but if one were going to go down the road of looking at goodwill and if anyone thought there were goodwill, there is a mechanism under the Code which provides that you allocate value based -- asset class by asset class, and we will demonstrate you would never get -- and you -- only if anything's left over can you attribute it to goodwill, and we will show there's nothing left over.

Let me talk a little bit about our witnesses, Your Honor.  We will start with Mr. Pagano, as I said, from Terra-Gen Power, and he will be up on the stand for quite a while because we have eight transactions to describe to Your Honor, and he is going to describe

Trial

Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

them.

He's also going to talk about the development of the project and its history, and you will, we believe, conclude from all of that that the purchase prices should be respected as establishing basis.

You will hear from many of the buyers who will describe what they did to analyze how much they wanted to pay and how they came to their purchase price, and it's all going to sound exactly like what it is: willing buyers and willing sellers engaging in a normal transaction that establishes basis.

You'll hear from the accountants who separated between eligible property and ineligible property, who carved out value for the transmission facilities, which are ineligible, and you will hear how they did it and how they properly attributed value to that, and that became ineligible, and it's not part of our claim.

You'll hear from accounting experts and valuation experts who will confirm the correctness of the bases claimed and the allocations made, and you'll hear from two government witnesses -- hostile witnesses, if you will, but we're calling them -- who will talk about how the allocation method used is consistent with what they were seeing in the 1603 program overall.

Your Honor, as I say, we will be here for a

Trial
Alta Wind I Owner Lessor C, et al. v. USA                     5/9/2016

while, I appreciate that, but we do think ultimately these are not particularly complicated concepts and that the entitlement of the Plaintiffs to recover cash grants based upon what they paid for the properties will be clear.

Thank you.

THE COURT:  Thank you, Mr. Rosenbaum.  Do you have a hard copy of the slides that you've been using?

MR. ROSENBAUM:  We can print one out, Your Honor.

THE COURT:  Whenever it may be convenient, I'd like to have a hard copy.

By the way, before I get to Mr. Ronickher, we spoke about the possibility of working a little bit late on Thursday.

MR. ROSENBAUM:  Yes.

THE COURT:  I don't think that's going to be possible because I have an important meeting to go to that evening.

MR. ROSENBAUM:  All right.

THE COURT:  So, if there needs to be a little juggling, I just wanted to give you a heads-up about that.

MR. ROSENBAUM:  Well, I appreciate that, Your Honor.  We will see where we are.

THE COURT:  Okay, very good.

Mr. Ronickher?

MR. RONICKHER:  Thank you.

I do actually have hard copy of a few slides, if I can approach to provide that?

THE COURT:  Sure.  That would be great.

(Pause in the proceedings.)

THE COURT:  Mr. Ronickher, you may proceed.

MR. RONICKHER:  Thank you, Judge.

At its heart, this is a valuation case.  It's a case about the value of Plaintiffs' investment in eligible property under 1603.  That's not the same as their tax basis in the overall businesses that they're purchasing.  I know Your Honor is well versed in Section 1603, thanks to several other cases -- perhaps more than you might like --

THE COURT:  They all seem to be different, though.

MR. RONICKHER:  We try to keep things interesting.

So, just a few comments.  It obviously provides a direct payment in lieu of a tax credit for certain specified energy property --

(Brief interruption.)

MR. ROSENBAUM:  Sorry.

MR. RONICKHER:  You're out of time.  That means I

still have 30 minutes, actually.  Sorry.

So that the reimbursement is for 30 percent of the eligible cost basis for the wind facility property at issue here.  Now, it's important to note that 1603 reimburses you for 30 percent of what you paid to create tangible energy property.  It's not a subsidy for an overall stand-alone energy production business.

Thus, despite apparently what I said a few months ago, we actually, upon further reflection, think the case is also quite simple.  It's the value of the property that is eligible, and the rest of the story, which will unfold here over the next two or three weeks, is just not as important.

Now, sometimes determining the eligible cost basis is relatively simple.  To take a wind turbine as an example, you could have a business or even an individual who invests in installing a wind turbine for their own use.  They take the power that's generated. When they do that, their basis is what they paid to have the turbine installed.

Other times, like here, it's more complex.  You have a developer who's creating a power generation business that uses wind turbines to generate power for sale to a customer over the electrical grid.  In that case, the investment in the clean energy property which

is eligible is part of an overall larger effort to build a power generation business, much of which is not eligible.

Now, if the developer keeps and operates the business itself, its basis is still relatively easy to determine.  It's still what it paid to have the eligible property installed, but what we have here is a developer who sold off the completed power generation businesses, and the price paid for those businesses is based on their overall capacity to earn income, and that ability to earn income by generating and selling power is tied to all of the assets of the business.  It's not just the eligible property.

So, in short, this is not a case about how much the Plaintiffs paid for the Alta Wind projects in the transactions that will be discussed here at trial because of how much income these overall projects could generate.  It is instead about how much of that purchase price was actually an investment in eligible property.

And there's no dispute that Plaintiffs are entitled to 30 percent of that investment.  So, the question is, what portion of the overall purchase price was actually an investment in eligible property?  You'll hear the answer to that question from Defendant's expert at the end of trial, but, of course, as Mr. Rosenbaum

Trial
Alta Wind I Owner Lessor C, et al. v. USA                               5/9/2016

mentioned, there's a lot of testimony between now and then.

So, to provide a little bit of a framework as we go through the case, I think the important thing to keep in mind is this key distinction that I keep mentioning, the wind farms as a whole, as a business, versus the part of the property used in that business that's actually eligible for reimbursement under Section 1603.

Wind farms, as I've said, are income-producing businesses.  They generate a product, electricity, which they sell to a customer, in the case here the electric utility, Southern California Edison.  Like any business, a working wind farm requires a lot of pieces to produce and sell electricity, but a lot of those pieces are not eligible.

You can see the various pieces that work together to create an working overall wind farm on the slide that was created by Plaintiffs to market projects for financing, and that's the -- I have finally come to my PowerPoint, the first slide here -- these are the pieces -- you see the twin projects in the center. These are the pieces that they thought were important to market the projects.

Now, on the outside of this slide, you'll see the providers of the various key assets.  So, I'll move to

the next slide which puts the emphasis on what the assets themselves are.

You'll see here, to the create the overall Alta Wind projects, you need tangible assets, like turbines to generate electricity, foundations to put the turbines on, meteorological towers that test wind speed; you need roads that connect all of this together.  All of that is eligible.  You also need transmission equipment to prepare your power and send it to the grid.

What you also need, however, are a lot of different contracts.  You need a customer agreement to sell power, in this case the PPA, the power purchase agreement; you need transmission and interconnection rights which allow you the access to the electrical grid in order to sell your power; you need operation and maintenance contracts to keep everything running; you need permits to let you build; and as you see in the lower right, you need land.  You need a place to put your turbines, preferably with a good wind resource that lets you generate a lot of power and in a location that's close to a good market to sell that power.

But let's take a look at which of these pieces are actually eligible.  That's set out by Section 1603, which as you know relies on tax law rules from the investment tax credit, that's Section 45 and 48, and the

Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

various Treasury regulations.

There's actually no real dispute -- although we might be able to come up with one -- between the parties here about which items are eligible under 1603.  The dispute is about the value that should be assigned to each of the items.  So, working from the prior slide, here are the pieces of the overall wind farm that are actually eligible.

So, this is slide 4.  I've grayed out or light-greened out the boxes that are associated with assets that are not eligible.  So, only the turbines, a portion of the balance of plant, which is essentially a term that refers to the rest of the equipment outside of the main power equipment, and so any balance of plant that's associated with electricity production is eligible, and then the construction management work is obviously eligible because that pertains to the tangible energy property.

Now, on the next slide you'll see the components of the wind farm, again working from Plaintiffs' own breakdown of the various important aspects.  Any value associated with any of these items that you see on slide 5 is not eligible for reimbursement under Section 1603.  So, that includes anything associated with the power purchase agreement, interconnection and transmission

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

rights, as well as the physical transmission assets, asset management, operations and maintenance contracts, any value or cost associated with the land, and the balance of plant associated with electricity transmission rather than production is also ineligible.

In addition to that, other intangibles are ineligible under 1603.  So, you're not entitled to reimbursement for any value associated with goodwill or going concern value.  Essentially, the value of having all of these pieces put together into a working business, that additional value is not eligible under 1603.

So, over the course of the case, as Mr. Rosenbaum also described, you will hear the story of the development of the wind farms and the transactions involving them, and throughout that, it's critical to keep the distinction in mind between the overall business and the value of the eligible property itself.

I think, actually, Mr. Rosenbaum's hotel example actually speaks to this.  If you put it in the context of 1603, the reimbursement that you would -- so, 1603 is concerned with the value of the eligible property.  In the hotel example, that would be the building.  The building probably does not cost that much different to construct in those two hotels or in those two hotel

locations.  The overall -- the value of the overall hotel business, if you're selling the hotel as a going business, that obviously would have a lot greater value depending on the income that that business can produce. So, the distinction there, I think, clarifies the example.  And that framework is the way to view the whole case here, and that ultimately is why it's a valuation case, because it's about the value of the eligible property.

So, turning to the next slide, I have a brief timeline for the Alta projects, and there are five key points on the chronology that I'll try to move through relatively quickly since, as we all know, we will be spending a lot of time on this over the next few weeks.

At each stage of this timeline, the evidence will show the difference between the investment in the eligible property itself and the increasing overall value of the wind farms, as Terra-Gen, the developer, succeeds in putting together a profitable wind energy production business.

So, somewhere in 2005, Oak Creek, the original developer, begins development of these projects.  They carry it on through 2008, at which point the development is acquired by Terra-Gen, who continues the development over the next -- I said 2008 to 2012, but it's doing the

Trial
Alta Wind I Owner Lessor C, et al. v. USA                     5/9/2016

development in phases, so at the same time, it begins selling off phases as they're completed to the Plaintiffs who are at issue here.

So, in that first phase, in the early development, as I mentioned, the development was started by Oak Creek.  This was actually several years prior even to the formation of Terra-Gen.  Oak Creek later brought in Allco as a financing partner to essentially bankroll this development process, and Oak Creek spent at least two years developing crucial pieces of the wind farm.

What did they achieve in that time?  They put together a package with a lot of the land rights; the interconnection agreement; a master power purchase agreement, which is essentially an overall contract that set the formula that would determine the pricing for the PPAs for each individual Alta project.  They also signed the turbine supply agreement for the first phase of Alta.

Importantly, that turbine supply agreement, that's the only piece of tangible property or eligible property -- the turbines hadn't actually been provided at that point, but -- so the only piece of eligible property that's actually in the development at the point that Terra-Gen gets involved.

So, in 2008, Terra-Gen acquires this early development which has, as I said, a lot of the rights in place that we were talking about on the earlier slide, and we will hear evidence in this case that Terra-Gen put a huge value on the work that had been done even though there were minimal tangible assets at that point.

And there was a valuation conducted by an appraiser, Duff and Phelps, at Terra-Gen's behest at this point, and it recognized that the purchase price of this development-stage project far exceeded the value of the tangible assets. So, there was an extra amount, and what they did was they used the waterfall method that you saw on the last slide of Plaintiffs' production and determined that they could allocate the purchase price up to the value of the tangible assets, which, again, was mostly the turbines, which was around $75 million.

The remainder of this almost $400 million acquisition cost Duff identified as intangibles, which it called development rights and transmission rights. These obviously are not eligible, and as a side note, as you'll hear later from Defendant's expert, removing the value of these intangibles from the claimed eligible value of the property is one of the big drivers behind Defendant's counterclaims in this case.

So, after Terra-Gen took over the development,

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                5/9/2016

they poured a lot of time and money into the projects, but, again, it's important to think about it in terms of what was eligible and what was not.  Their eligible development work pertained to the tangible energy property, getting the turbines, building the plant, digging foundations, the big construction work.  A lot of their other work was ineligible, work pertaining to getting the power purchase agreements locked down for each individual project, securing additional land control, and other operating agreements.

In the testimony we'll also hear evidence of other value being created during this time period. There are market shifts.  The price for power in California is changing.  The Section 1603 program has been created.  Your Honor asked earlier, and as you can see from the timeline, the projects were conceived several years before 1603 was even passed.  The land in wind development areas, partly because of these other market shifts, was becoming more expensive to lease, and transmission lines that were required to carry the power from the wind farms to the customers were going from the planning stage to completion, where they could actually be used.

We'll also hear testimony about something called turbine blending, which is essentially a clever use of

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

contract provisions that are in the power purchase agreement that allow Terra-Gen to get -- to secure a higher price for power than they otherwise would have gotten, and that's without making any physical change to the wind farms.

Finally, as Mr. Rosenbaum made clear, we'll hear a lot of testimony about the huge value of the overall wind farm businesses that the Plaintiffs engaged in transactions to acquire. That value, as I've been saying, results from the interaction of numerous assets that generate cash flows, that commanded the large payments made by the Plaintiffs. These cash flows, though, are based on the use of all of the assets in the wind farm, not just the eligible property.

Terra-Gen earned a large profit from that value when they engaged in these transactions, but you won't hear anything in the testimony about the value of the eligible property itself increasing. In fact, the market value of turbines was actually dropping during this time period.

We'll also hear testimony about an additional value that was created by the transactions themselves. So, when the sale-leaseback agreement, such as you have in five of the six Alta transactions that are in this case, there's a facility lease as a component of this by

which Terra-Gen operates the facility and, in return, gives guaranteed rental payments -- lease payments back to the new owners. So, this is a guaranteed rental stream that the owners don't have to do any work to maintain.

There were also indemnities provided in the contracts that guaranteed certain financial aspects of the transactions. Notably, this included an indemnity for the amount of the 1603 payment that the developer told the purchaser they ought to get from the Treasury.

So, after the transactions were executed, as the deal documents required, the Plaintiffs applied for Section 1603 payments based on the purchase price of the facilities, essentially with a few adjustments, but the evidence will show that that amount is not the value of their investment in eligible property. In fact, the facts will show that these are massive efforts to put together wind generation businesses that cost hundreds of millions of dollars to assemble, required a great deal of effort over a lot of time to construct the eligible property and piece together the other necessary parts of the business that are not eligible.

The overall price of the transaction more than compensates Terra-Gen for its investments in the eligible property, but it also provides them -- as I

said, they earn a big profit on the -- due to the fact that they have sold profitable businesses to the Plaintiffs.  Importantly, the Court does not need to decide what the values of the various types of eligible -- sorry, of not eligible property are.  The evidence will make quite clear that that ineligible property is contributing to the overall value, leaving the question, what is the value of the eligible assets alone?

Now, obviously you'll hear expert testimony from both sides in this case, but we believe that only Defendant's expert offers a valuation that is targeted at the eligible property itself.  He uses the cost approach, which permits him to isolate the value of the eligible assets from the overall value of the business.  This approach aligns with the long-standing residual method of valuation.  It's very logical.  It's also required by Section 1060.  This results in the waterfall approach that you saw in Plaintiffs' final slide.

And Defendant's expert comes up with a value of the eligible property of $1.5 billion.  That includes profit to the various entities who were involved in creating the eligible property, and it results in a subsidy that's not in question under Section 1603 of almost $500 million.  That valuation excludes all of the

intangibles and other property that is not eligible under 1603.

The remainder of the value, we believe the evidence will show, is attributable to those assets, including some additional items that are not eligible that were not removed by Treasury when they provided the original awards in this case.

Plaintiffs' valuations, on the other hand, start with a value of the entire business.  They look at the cash flows generated from all of these assets working together, and you'll hear some testimony that even these valuations and the purchase prices that they seek to support are not necessarily consistent with arm's length valuations of those cash flows.

Now, focusing on cash flows is exactly the right approach if you're trying to value a business, because the income production from a business is exactly what buyers care about, and that's what Plaintiffs do.  They value the overall Alta Wind Farms as businesses.  They then claim to rule out the possibility that certain ineligible assets could possibly exist or contribute to this value, and they do that generally with relatively -- either they assume it away or, in the case of goodwill and going concern, they actually use very narrow definitions of those two concepts.

I think what we've heard already today is they're trying to have it both ways. They say there's value in the fact that these are turnkey facilities, that everything is ready to go, but at the same time, they say there can't be any going -- there can't be any goodwill or going concern value because these businesses weren't operating. Well, if there's value with them being ready to operate, how can you also say there's no value because they're not operating? Those two stand in opposition.

Similarly, they've said there can't be any goodwill because there's a power purchase agreement. That's one customer. So, on their narrow definition of goodwill, there's no customer base, and, therefore, goodwill can't exist. But at the same time they say that PPA, which locks in a customer so that no customer base is required, they say that PPA can't have any value. Again, it can't be both ways.

So, in sum, Defendant's operation -- sorry, Defendant's expert offers a valuation of the eligible property, whereas Plaintiffs' valuation concerns the overall income of the business as a whole, both eligible and not eligible property. So, at the conclusion of trial, we will ask you to find that the appropriate valuation of the eligible property is not only much

Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

lower than Plaintiffs claim but is also lower than what was used by Treasury to give Plaintiffs their half a billion dollars in Section 1603 subsidies.  So, we will ask you to enter judgment denying Plaintiffs' claims and allowing Defendant's claims.

THE COURT:  Thank you, Mr. Ronickher.

(Pause in the proceedings.)

THE COURT:  All right, I think we are ready to call our first witness.

MR. ROSENBAUM:  Your Honor, as our first witness, we call Mr. Pagano.

THE COURT:  All right, please come forward.

Whereupon--

JAMES R. PAGANO

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROSENBAUM:

Q.  Good morning.  Could you please state your full name for the record?

A.  James Robert Pagano.

Q.  And where are you employed, Mr. Pagano?

A.  Terra-Gen Power.

Q.  And what is your position with that company?

A.  I'm the chief executive officer.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                     5/9/2016

Q.   Is that the most senior position in the company?

A.   Yes, it is.

Q.   And how long have you held that position?

A.   Since inception, January of 2008, so about a month after the formation of the entity.

Q.   And what business is Terra-Gen Power in?

A.   We're in the renewable energy business.  We develop, construct, finance, and operate and own renewable energy projects.

Q.   All right.  And when you say that you develop it, what does TG -- what does Terra-Gen do as a developer?

A.   We permit -- we locate the project in many cases, and in this instance we actually had an acquisition to start the location of the project, but then we permit it, work through the various regulatory agencies.  In California, that would be people like the Department of Environmental Quality, the Fish and Game Division to Protect Endangered Species.  We work with them to make sure that those species are protected and that we are able to receive permits.

We negotiate the contracts around the project itself, the construction contract, the interconnection agreement, the power contract.  We essentially work through taking a project from a very high-risk position of an idea, if you will, to a financing -- to a

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

financeable project which has been derisked.  All along, we ask our developers to carefully manage the development expenditures, because they are in a high-risk position, and to not spend what isn't necessary, but at the same time, what's necessary is often substantial sums of money.

Q.   And does Terra-Gen put capital at risk when it does the development efforts?

A.   Yes, we do.

Q.   Okay.  And what does -- what does Terra-Gen do as a constructor or a builder of renewable energy facilities?

A.   We essentially provide the oversight, the wrap, if you will, of the whole construction project.  We will contract with a turbine supplier, contract with a balance of plant constructor.  We will coordinate with the interconnection facilities being constructed, often by the utility, sometimes by us, and we coordinate that effort, make sure that it's done on a timely basis.

In many instances, if it's not done on a timely basis, you can suffer damages.  You can even lose your power contract in a worst case scenario.  So, we manage that process and take the risk, if you will, that everyone's going to do their respective jobs in a timely fashion, in a way that allows each of the other parties

to do their job.

Q.    And what does it mean to be an operator?

A.    As an operator you're responsible for the actual operations of the facility, the safety of the facility, the generation of energy from the facility.  So, we are onsite at times perhaps managing the production of the turbine to be consistent with the grid requirements, being -- maintaining the facility so that it is available to produce electricity on an as-needed basis, when the wind is blowing, and we operate it for -- for the production of electricity.

Q.    Okay.  And what kinds of renewable energy facilities has Terra-Gen constructed, developed, or operated?

A.    We have, over the years, developed, constructed, operated, or owned each type of primary renewable energy project, and by that I mean we have within our portfolio geothermal projects that were acquired at the inception of the project in 2007, late 2007; we have solar projects which we own in concert with NextEra Energy; and we have wind projects like we are discussing today.

We are, in fact, the only domestic IPP -- independent power producer -- nonutility that has expertise and specializes in all three renewable generating services.

50

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.   Okay.   If we could look at Plaintiffs' Exhibit 294, please.

Okay.   Mr. Pagano, Exhibit 294 is a one-page document.   Can you tell us what that is showing?

A.   Yes.   That is essentially all of our projects, where they're located, as well as the number of megawatts associated with each of the projects.

Q.   Okay.  And how many states do you have operations in?

A.   We have operations in a total of six states.   We own projects in six states, and we operate facilities in four of those six.

Q.   Okay.  And in what states -- can you name those states, please?

A.   California, obviously; Colorado, Texas, Wyoming, Minnesota, Nevada.   I think I've hit them all there.

Q.   Okay.   And how many megawatts of wind power has Terra-Gen constructed, developed, or operated?

A.   A total of 2243.   And, again, some of this is our assets that we did not develop but we owned, we acquired at the start of the entity from Caithness Energy, but all 2200 megawatts are assets that we currently, you know, either operate or have an ownership interest in.

Q.   Okay.   And what is it -- you mentioned geothermal energy.   What is a geothermal facility?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

A.  A geothermal facility extracts or utilizes the heat from a geothermal resource deep within the earth to essentially provide steam, in our case to turn a steam turbine, and from that point it's very similar to a gas plant, a coal plant, a fossil-fired plant that generates electricity and provides it to the grid.

Q.  And which geothermal facilities does Terra-Gen own?

A.  We have three.  We have the Coso Geothermal project, which is our largest; the Beoware project, which is our smallest; and the Dixie Valley project, and that's in the middle and that's in Nevada and serving California.

Q.  What's the total megawattage?

A.  Across those three, it is 387 megawatts.

Q.  And does Terra-Gen operate those facilities?

A.  We do.

Q.  Okay.  And what solar facilities does Terra-Gen own?

A.  We have the SEGS VII and IX projects, which are on the bottom of the chart, they're each 89 megawatts.  We own 50 percent of those projects, and those are, in fact, operated by NextEra Energy.

Q.  Okay.  Now, how many homes can one megawatt provide power to?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.    About 300.

Q.    So, if you look at the wind, solar, and geothermal facilities that Terra-Gen has developed, owned, constructed, or operated, how many homes can you provide electricity to?

A.    It's about 820,000.

MR. ROSENBAUM:  Your Honor, I would move Exhibit 294 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  All right.  Plaintiffs' Exhibit 294 is admitted.

(Plaintiffs' Exhibit Number 294 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.    How did Terra-Gen come into existence, Mr. Pagano?

A.    There was an entity called Caithness Energy, very active in California, had many of the assets outside of the Altas on the sheet we just reviewed.  That entity sold its asset base to ArcLight Capital, which is a private equity firm, and that closing occurred, like I said, in December of 2007.

Q.    All right.  And what was Terra-Gen's involvement?

A.    Terra-Gen was an entity that was simply formed by ArcLight, and the assets were moved over along with a

good portion of the workforce.

Q.   Okay.  To Terra-Gen?

A.   To Terra-Gen.

Q.   And what business does ArcLight concentrate on?

A.   It's a private equity firm.

Q.   And in what business lines?

A.   Energy, broadly speaking.  So, they're in, you know, both the power generation business, the transmissions business, the oil and gas, all forms of energy.

Q.   And about how large of a company are they?

A.   Fifteen billion of capital under management.

Q.   And who are their investors?

A.   Some high net worth individuals, some sovereign wealth funds, some pension funds.

Q.   Now, did ArcLight at the beginning hold 100 percent of Terra-Gen Power?

A.   It did.

Q.   Did that change later?

A.   It did.  It changed in December of 2009.

Q.   And what happened at that point?

A.   At that point GIP, which is Global Infrastructure Partners, acquired a roughly 40 percent interest in Terra-Gen from ArcLight.

Q.   And how large a company is GIP?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.  Again, it's a private equity firm, slightly larger than the ArcLight fund.  It has about 23 billion under management.

Q.  Okay.  And what kind of businesses do they concentrate on?

A.  They focus more on infrastructure.  So, they have an energy component to infrastructure, like generation, but they own airports, own toll roads, all sorts of infrastructure projects.

Q.  And who are their investors?

A.  The same type of investor, high net worth individuals, sovereign wealth funds, pension funds, people like that.

Q.  Okay.  What does the term "sponsor" mean?

A.  "Sponsor" is a term we use to really mean the equity, the equity owner, if you will, of the -- of the project -- of the portfolio company.  So, we're a portfolio company of ArcLight and GIP in this instance, during this time period, and our sponsor would be ArcLight and GIP.

Q.  Okay.  And who owns -- who owns Terra-Gen today?

A.  Today, it's own by Energy Capital Partners.  It was sold late last year, September of last year.

Q.  Okay.

A.  They, too, are a private equity firm with

substantial sums under management investing, again, in the energy industry, more similar I'd say to ArcLight than GIP.  They don't invest broadly across infrastructure.  They are more focused on energy and maybe even more focused than ArcLight on energy production facilities.

Q.  Okay.  I want to have you tell us a little about yourself.  What's your educational background?

A.  I graduated from the University of Virginia and then attended law school at the University of Virginia and graduated from law school as well.  My undergraduate studies were in economics.

Q.  Okay.  And what did you do after you left law school?

A.  After I left law school, I practiced for about three years at the law firm of Simpson Thacher & Bartlett, in the project finance/corporate department.

Q.  What is project finance?

A.  Project finance is a -- the financing term used for capital provided to an entity and lending to an entity where the only form of repayment is -- would be the cash flows of that entity.  So, it's very -- it's what all power projects essentially consist of that are financed on a project-finance basis.

The lender makes a loan to the project and looks

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

to the cash flows of the project for repayment.  If the cash flows don't turn out to be what they were projected to be, they're at risk of not being repaid.

Q.   Okay.  And what did you do after that stint at Simpson Thacher?

A.   I spent about a year at the Deerpath Group.  Deerpath -- this was the 1992 time frame.  They were actually a project financing and leasing firm, advisor.  They advised people like GE, Philip Morris, some of the utilities, folks that were active at that point in project financing, in partnership structures and project financings and leasing structures.

Q.   And what did you do there?

A.   I was a vice president.  I was responsible for finding opportunities and then structuring them, advising the ultimate equity investor on the structure, and bringing it to closing.  I was not an attorney at that point.

Q.   Okay.  And what did you do after Deerpath?

A.   After Deerpath, I went to an independent power develop, Cogentrix Energy.  They are located in Charlotte, where I spent my next 12 years, performed various roles for them.  I initially came in as assistant general counsel.  I only spent about seven or eight months there, transitioned over to the finance

side.

I was vice president of finance -- project finance for a period of time, then transitioned ultimately into the CFO role.  I was the chief financial officer for a period, and then went into the development side of the business, where I was responsible for our development efforts.

Q.  Okay.  And what kind of efforts were those?

A.  Primarily fossil fuel development.  We looked a little bit at waste energy projects, but at that point most of the focus in the industry, because it was the early nineties to early 2000s time frame, most of the focus was on fossil-fired development.

Q.  Okay.  And what did you do after you left Cogentrix?

A.  I went to Caithness Energy, which is really what led to the opportunity at Terra-Gen.  As I mentioned earlier, the assets of Caithness Energy really formed the beginning of Terra-Gen, much of the beginning of Terra-Gen.  There, I was a senior vice president of development and responsible for development, looked at acquisitions and development.  In that case, most of the focus was -- well, the focus was both on renewable and on fossil-fired generation, gas-fired at that point.

Q.  Okay.  And what did you do after you left

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Cogentrix?

A.  I went to Ellis Power, which is a private equity firm.  I spent about a year there.  I was the president of their development group and a member of their investment committee responsible for our development effort, which was a mixed effort at that point.  There was some renewable generation that was under development, solar and wind, and there were some fossil plants under development, gas and coal.

Q.  Okay.  And what -- and what did you do next?

A.  Next, I was approached by Dan Revers, the founder of ArcLight, about coming over or coming back, if you will, to the assets that I had left when I was with Caithness and performing the function that I currently perform with Terra-Gen.

Q.  Okay.  And you've said that ArcLight created Terra-Gen in 2007.  Exactly what was done?

A.  Again, it was -- it was -- ArcLight created an entity, a special-purpose entity, and then populated that entity with the assets of Caithness Energy, the renewable assets, which included the -- many of what we just looked at but not the Altas and not one or two of the other assets that were on that sheet.  The Mojave 3, 4, and 5, and Mojave 16, 17, 18, were subsequently acquired, and they populated with those assets a good

portion of the workforce.

Q.  Okay.  So, we previously looked at Plaintiffs' Exhibit 294.  Were those -- other than the ones you just got through listing, those all came over from Caithness. Is that what you're saying?

A.  Everything other than the Altas.  Mojave 16, 17, 18, Mojave 3, 4, and 5, and I believe that's the list of those assets that were acquired or developed subsequent to the acquisition by ArcLight in 2007.

Q.  Okay.  And what were Terra-Gen's goals when you started with them in January 2008?

A.  It was to grow an entity using our expertise, because we had -- I had come over and brought one of -- one of my -- one of the people that I had worked with at Cogentrix, Steve Doyon, to run the development group, and we were going to grow the entity through development, through acquisitions, focusing primarily on renewable generation.

At that time, there was a pretty intense focus on geothermal, in fact, because gas was, I think, 10 or 12 dollars minimum Btu, and it was before the shale revolution, and geothermal was very competitive.  It was a unique area of expertise that we had, and we were initially going to focus on that but then realized, you know, let's look at wind very hard as well, and we were

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

-- and that led to the Altas.

Q.  Okay.  And at the time you began with it, what divisions did Terra-Gen have?

A.  Well, they had an operating group, a substantial operating group, operated the geothermal assets as well as the wind assets, did not have a development group, accounting group, not a real finance group to speak of in terms of project financing expertise.  That's pretty much -- asset management and accounting and operations.

Q.  Okay.  Roughly how many employees did Terra-Gen have when you started with them?

A.  Probably about 250.  It was largely -- the operating group would make up that 250.

Q.  Okay.  And at the time the Alta Wind facilities were later being constructed and developed, how much of an increase was there in Terra-Gen's development team?

A.  It went from zero to 25 people, I think, at the peak.  That's not including some of the support functions, like finance, which would bring it up, you know, closer to 35, 40.  We didn't really have a construction management group, which we added as well. So, you know, the areas that were most heavily utilized during the development and construction of Alta were added.

Q.  Okay.  And what kind of experience did these

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

various people who came in have in energy project acquisition and development?

A. Really extensive experience. We have tried to remain small. In order to do that, you want to hire as experienced individuals as you possibly can, and in most, if not all instances, you know, people came from backgrounds -- extensive backgrounds in the power industry, often with the fossil-fired background.

I think, in total, there was about 25,000 megawatts of development or acquisition experience embedded in the group, and roughly 25 billion or so of capital experience, if you will, in the group, in terms of what those assets would cost to construct or to acquire, whatever the case may be.

Q. Okay. And that's the experience they brought as they came to the company?

A. Yes.

Q. Okay. So, I'm going to show you some photos relating to the Alta Wind facility. Can you start just by telling us what your role has been in the selection of these photos?

A. I oversaw the selection and reviewed them.

Q. Okay. Let's start with Exhibit 225, Plaintiffs' Exhibit 225. Can you tell us what that is?

A. Yes. It's a photo from the NASA website. It's

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

an aerial view, a satellite view of the Los Angeles Load Center.

Q.   Okay.  And what -- give us a sense of what dimensions we're looking at here.

A.   You can see it's about 61 miles across the bottom, about 42 miles across the top.

Q.   And where is the Alta Wind facility compared to this?

A.   Across the side.  I apologize.

Q.   Sorry?

A.   Across the side.  I apologize.  Go ahead.

Q.   Where is the Alta Wind facility?

A.   It's due north.

Q.   Okay.  And from your perspective and background, what is the -- what's the significance of this map?

A.   Well, it demonstrates just what type of load you're trying to manage within the Los Angeles Load Center.  It's one of the largest load centers in the country, if not the world, and the Alta has nice access to it.  It's only 90 miles north of it, and it provides power to service that load center.

Q.   Okay.  You've used the term "load center."  Can you just define that, please?

A.   Oh, I'm sorry.  "Load center" would be a term in the utility industry for the center of concentration, if

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

you will, of consumption of electricity.  So, you can see all the lights.  You can see -- the implication is there are a lot of people there.  A lot of electricity is being consumed within that pocket of 60 miles by 42 miles.

MR. ROSENBAUM:  Your Honor, I would move Exhibit 226 -- 225 into evidence.  Excuse me.

MR. RONICKHER:  I don't know if I see the relevance of the photo itself, but I have no objection.

THE COURT:  All right.  Plaintiffs' Exhibit 225 is admitted.

(Plaintiffs' Exhibit Number 225 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  If we could look now at Plaintiffs' Exhibit 226. Can you tell us what that is showing us?

A.  It shows you the Tehachapi Pass, which is where the Alta projects were built, and gives you a sense of the terrain as well as, you know, perhaps gives you an overview of really the dynamics of what drives that wind region.  It's one of the most developed wind regions in the country, if not the world.  It's been studied for years.

It is driven fundamentally by the Mojave Desert heating up and pulling cool air off of the Pacific.

That cool air is pulled through the Tehachapi Pass. That creates wind energy, and that wind energy has been harnessed now for really decades.

Q.   And where is the Mojave Desert on this map?

A.   To the left, to the left side of the pass.

Q.   Okay.  Is it a good place to have a wind farm?

A.   It's an ideal place to have a wind farm.  It's got proximity to the load, which we discussed, with the Los Angeles Load Center being only 90 miles south from the -- from the Tehachapi Pass.  It has unidirectional wind because of the fundamental nature of the wind source.  It produces at -- when I say unidirectional, it means it blows primarily in one direction, which is positive because it means there's not as much wear and tear on the turbines from an O&M perspective because they are not constantly shifting and battling the wind to catch it.  They are not stationary, but they are largely stationary, especially compared to other wind resources throughout the country.

As importantly, it produces power when you need it.  It produces often during the peak period because the Mojave Desert is heating up during the day, and you might arrive at Tehachapi at 2:00 in the afternoon and you have to be very careful about how the wind is blowing.  If you open both sides of the car doors,

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

you're going to lose everything that's in the car because it blows right through and blows everything out, and that's going to occur when you need the power the most.

At 2:00 in the afternoon, air conditioners are running, the utility wants that power, and it's producing it. A lot of other resources -- Wyoming, Texas, elsewhere -- you'll find that they blow primarily during the night. That's not a good profile because at that point the utility has less load and has less of a need for power. So, the fact that it blows when you need it, the fact that it blows unidirectionally, the fact that it's been well studied and it's close to the load center are all very positive attributes when it comes to the Tehachapi wind resource.

MR. ROSENBAUM: Your Honor, I would move Plaintiffs' Exhibit 226.

MR. RONICKHER: No objection.

THE COURT: Plaintiffs' Exhibit 226 is admitted.

(Plaintiffs' Exhibit Number 226 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  If we could look at Plaintiffs' Exhibit 227, please, and tell us what that is.

A.  That's an NREL map, which is --

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.  Just to interrupt you, what is NREL?

A.  I'm sorry, the National Renewable Energy Labs. It's a governmentally sponsored entity.

Q.  Of the Federal Government?

A.  Of the Federal Government, yes.

Q.  All right.

A.  And it is the entity that will help developers like ourselves identify wind regions, wind resources. You can see in this instance the Alta Wind Energy Center is located in dark blue, which is a superb resource, Class 7.  Again, it goes to the quality of the wind resource within Tehachapi relative to other places.

Q.  Okay.  Just focusing on that legend in the lower right-hand corner, is that NREL's legend?

A.  It is.

Q.  Okay.  And there are seven classes of wind power shown, correct?

A.  Yes.

Q.  And which one is -- which one does -- fits the Alta Wind?

A.  It's in class 7, superb.

Q.  Okay.  And just on the map, just to orient us, can you just tell us where the Alta Wind Energy Center is?

A.  It's upper right-hand corner with a star,

identified as the Alta Wind Energy Center.

Q.  Okay.  And in the lower left-hand corner, there's a small map.  Tell us what that red box represents.

A.  That's essentially the portion that's been blown up.

Q.  Okay.  So, it gives you a sense of where the facility is compared to Los Angeles?

A.  It does.

Q.  Okay.

Your Honor, I would move Plaintiffs' Exhibit 227 into evidence.

MR. RONICKHER:  Just one point of clarification. I know the witness said it was an NREL map.  I was wondering if perhaps you can elicit from the witness about the location of the various wind farms marked on there and what the source of that was.

BY MR. ROSENBAUM:

Q.  Do you know?

A.  Sure.  We overlaid it based upon the -- the GPS data points.

MR. RONICKHER:  No objection.  Thank you.

THE COURT:  Plaintiffs' Exhibit 227 is admitted.

(Plaintiffs Exhibit Number 227 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Okay.  Let's look at, if we could, Plaintiffs' Exhibit 228.  That's a photo.  Could you tell us what that's a photo of?

A.  That's standing within and among the turbines at Tehachapi, and it shows the terrain -- I mean, it's probably taken near the Alta Wind project, looking out, and in the far distance you can see some of the later phases of the Altas shown in the background.

Q.  Okay.  Is this a photo of the Alta Wind facilities themselves?

A.  No.  A lot of the projects that are in the foreground, you can see all the turbines are on lattice towers, they're not really the Alta project.  As I said earlier, within Tehachapi, there are a number of generations, if you will, of wind turbines since it was built out starting in the early eighties, but in the distance you can see some of the later generations, which include us.

Q.  So, just to help orient us and create the record, sort of, there is a reference to "Tehachapi Pass Wind Turbines" at the top, and then as you come down, you see in the distance some turbines there.  Are those Alta Wind?

A.  Yes.  I mean, the project itself is on roughly 35 square miles.  So, the pass itself is pretty large, and

Trial
Alta Wind I Owner Lessor C, et al. v. USA                           5/9/2016

so it's -- this is a picture.  It would be difficult to show the turbines and see the project.  So, that's why you see what you see.

Q.  Okay.  Let's just -- 35 square miles describes what?

A.  That's the Alta projects, and if you just count -- we'll see a picture or a graphic later which will show the layout of the Altas by phase.  Each square within that layout is a square mile, and it touches, I'd say, approximately 35 square miles.  It touches more than 35 of those squares, but if you try and eyeball it, it looks like about 35 square miles.

Q.  And that's the Alta Wind Farm that your company developed?

A.  Yes.  That's inclusive of all the phases, so it's not just the phases that we're discussing here, but it's the project that we developed.

MR. ROSENBAUM:  Your Honor, I would move Exhibit 227 into evidence.

THE COURT:  Wait, this is 228.

MR. ROSENBAUM:  Not -- 228, I'm sorry.  I appreciate that.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 228 is admitted.

(Plaintiffs' Exhibit Number 228 was admitted into

70
Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

evidence.)

BY MR. ROSENBAUM:

Q.  Let's look at Plaintiffs' Exhibit 229, and could you tell us what that is?

A.  It's a depiction of the Tehachapi Renewable Transmission Project by Southern California Edison, which is a transmission buildout in excess of $4 billion to supply really renewable energy from Tehachapi into the Los Angeles Load Center.

Q.  Okay.  And this was built by whom?

A.  Southern California Edison.

Q.  Okay.  And do the Alta Wind facilities hook up to that?

A.  We do.

Q.  Okay.

Your Honor, I would move Exhibit 229 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 229 is admitted.

(Plaintiffs' Exhibit Number 229 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And let's look now at Plaintiffs' Exhibit 221, and could you tell us what this is?

A.  This is the graph I was referring to earlier or

the graphic I was referring to earlier.  Starting from the left, you see the brown area which is the Alta Wind I project.  That project is in rougher terrain, hillier terrain than the other phases of the Altas, and it's depicted in brown.  That was the first of the group of Alta I through V projects that we built out.

Q.  And that's one of the projects in the litigation, correct?

A.  It is, yes.

Q.  All right.

A.  Moving to the right, Alta II is in gray, and on the lower half of the next set of colored boxes, Alta III is the darker green phase of the Altas.  You're now on the flats.  You're not in the terrain -- not in the rough terrain, so it's the Vestas machines that were utilized there.

You then move to the right.  The lime green, if you will, the lighter green boxes are Alta IV.  Moving upward, in the purple is Alta Wind V.  Alta Wind VI is what we refer to as an infill project.  It's the light blue that you see scattered throughout the graphic.  We went back, after having built I through V, and were able to permit some incremental land and develop the Alta VI phase.  It's all tied together and doesn't really make any impact -- have any impact on that phase to speak of,

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

but that's how it is -- that is why it's scattered throughout.

Right above Alta V is Alta VIII, and that's in the light brown.  Alta VII is on the top, the yellowish color.  And then Alta IX, again, it's concentrated in a couple areas, but you can see, like Alta VI, it's somewhat of an infill, somewhat scattered throughout.

Q.  All right.  And how many megawatts did TGP -- did Terra-Gen construct and develop at the Alta Wind Farm?

A.  It's approximately 1550.

Q.  And roughly how many homes can that provide power to?

A.  Just under half a million.

Q.  Okay.  And how does the Alta Wind Farm compare in size to other wind farms?

A.  It's the largest in North America.  I believe there is some debate about whether it's the largest in the world.  There may be one in China that is larger.

Q.  Okay.  Now, are there things about the Alta Wind facilities that make them unique?

A.  Yes, a lot of which I highlighted when you asked me about the quality of the wind resource.  The fact that it's in Tehachapi, the fact that it enjoys unidirectional wind, it enjoys a wind pattern that runs when the utility needs it most or includes that time

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

period as well, which many wind projects do not.

It is located close to the load center, which is an advantage to the project. It's located in the primary renewable energy development -- renewable market in the U.S. California has made a large commitment to renewable energy, so it -- it is situated in a market where the demand for renewable energy is very high.

It has some drawbacks. It's in California as well, as I said, and that means it's hard to develop and it's unpredictable and it's more costly to develop, but, you know, clearly if you can get a project done, it's a great place to be.

Q. Okay.

THE COURT: Mr. Rosenbaum, let's take our morning break. We will reconvene at 11:15.

(Court in recess.)

THE COURT: Thank you, please be seated.

BY MR. ROSENBAUM:

Q. Mr. Pagano, before we broke, you were talking a bit about how California is a good place to have a renewable energy facility if you can get one built. What is it that makes it a good place to have a renewable energy facility?

A. There's a large demand for renewable power, largely due to the renewable portfolio standard that's

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                      5/9/2016

set out by the legislature within California and implemented by the Public Utility Commission of California, and that standard, at the time the Altas were built, is about 30 percent of the energy that a utility utilized or consumed by way of supplying to their ratepayers had to be sourced from renewable generators, such as the Altas, and that 30 percent requirement had to be in place by 2020.

So, initially they had targeted 20 percent, they increased it to 30 percent, and actually, today, it's a 50 percent requirement, that by 2030, 50 percent of the power that is consumed, if you will, in California, has to be generated from renewable generators such as the Alta project, the Coso project, things like that.

Q.   And what does that do to the demand for renewable energy?

A.   It increases it dramatically.

Q.   And what does it do to the value of a renewable energy facility?

A.   It increases it dramatically.

Q.   You mentioned briefly the challenges of developing in California, and we will get into that in some greater detail, but can you give us a sense as to what the success rate is for people who, you know, start the effort to develop a renewable energy facility and

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

how many actually get the job done?

A. Yeah, it depends on how you define "start." You can look at a couple of data points for that determination. You can look at the amount of interconnection requests that are made in a given year and then actually how many get constructed.

Q. Let's just pause. So, what's an interconnection request?

A. An interconnection request is a request put to the California ISO to interconnect to the grid a certain amount of megawatts and utilizing a certain type of technology.

Q. And you said ISO. What's an ISO?

A. A California independent system operator. So, a California ISO is how we refer to it in the industry.

Q. Is there a limit to how much can be hooked up to the grid?

A. Yes. It's constrained by the laws of physics in terms of what can be transmitted over any given transmission line. It can be expanded, but that's costly. And so there's a process of submitting a request -- queueing, if you will, we'll talk about that in connection with the Altas -- and then actually entering into an interconnection agreement.

So, if you look at 2009, there were about 66

requests made that year, only 13 of which were actually built. The others were either abandoned or are still on hold. I think there are five that are still outstanding. So, on an interconnection request basis, that success rate or that completion rate is 20 percent or less than 20 percent.

And it's not costly to -- to submit the request. The request requires at least $250,000, that's just to put the request in. And if you don't have land control, you have to show that you are a good faith developer, intending to get land control, and so you have to put another 250,000 up. Once you get that land control, you get that back, or if you abandon your position, you get it back as well.

The other way to look at it would be by way of the success rate that the utilities assume when they contract for renewable energy. In this time frame, Southern California Edison utilized, depending upon the year, a 40 to 50 percent failure rate. So, they would overcontract for capacity, recognizing that there would be problems along the development phase or always -- or there often are -- there always are. It's just a matter of whether or not you can manage through those problems.

Some projects will go forward. Some projects will fail. That process is more costly. It's usually a

security requirement because a utility wants to know that you can actually deliver and you're not just getting an option on delivering where you have a power contract but have no intention to really build it out or no -- don't have the wherewithal to build it out.

In that instance, it's $60 a KW of security, so for a 100-megawatt project, that's $1,600.  So, it's substantial.  Now, you may negotiate offramps, if you will, for when that security does not have to be paid, but once you get to the power contract stage, you have spent a fair amount on permitting, you have spent a fair amount on the security requirements both on the interconnection side and on the power contract side, put a lot of time and effort into it in terms of internal resources, overhead, et cetera.  So, a failure rate of that amount is -- is something that you have to grapple with when you decide to develop within California.

Q.  So, you're saying people who had actually gotten to that point, there's still a 50 percent failure rate?

A.  According to the Edison assumptions.  I have not looked at -- and I don't think we even really could look at -- the success rates, but we can find from their public filings what they assumed when they were contracting as a failure rate.

Q.  Okay.  And this is -- I'm sorry, Edison, you're

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

referring to?

A.   Southern California Edison, the offtaker.

Q.   They're the buyer.

A.   Yes.

Q.   Tell us what the word "offtake" means.

A.   The offtaker is essentially the utility that takes the power generated by the renewable generator. So, I refer to that as our offtaker.

Q.   Okay.  Now, this all started with my questions about whether there were things about the Alta Wind facilities that made them unique.  Tell me about the turbines themselves.

A.   The turbines themselves are really first-class turbines.  We knew we were going to need to raise a substantial amount of capital for these phases, over 2 billion for the whole project, up to 4, so we needed to have --

Q.   I'm sorry, tell us what you mean by that.  What's the 2 billion relate to and what's the 4 billion relate to?

A.   I'm sorry.  The 2 billion of capital or the in excess of 2 billion is the amount of capital required to build out the first six phases.  That's debt equity, et cetera.  Once you're constructing that project, what does it cost to build it?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

The 4 billion of capital is what it costs to build out -- in excess of 4 billion, what it costs to build out the entire Alta Wind Farm, phases I through XI, and, you know, the -- the amount of capital that's required is very substantial.

So, you need to try and make sure that you can get everyone to participate in the project that is willing to lend capital, and certain lenders will only lend if the turbines are what we call, you know, class one turbines, investment-grade turbines, however you want to characterize it.  And those would largely be GE, Vestas, and Siemens, but Siemens has not had a lot of success within California.

The second-tier turbines, which some lenders just simply won't lend against, people like REpower or Gamesa, et cetera, they just are not proven, don't have as many turbines that have been employed.  They're not as high quality as the -- as the turbines that were used at the Altas.

Q.   What turbines were used at the Altas?

A.   For Alta I, it is the GE 1.5-megawatt machines. Those were machines that we actually acquired in the acquisition of the Alta project itself.  Part of our acquisition cost was the assumption of the GE turbine supply arrangement.  I think roughly 70-ish million had

been spent under that.  And so the 394 million, a portion of that was just for the repayment, if you will, of the turbine prices -- the turbine payments that had been made.

In addition, we used Vestas 3.0 machines.  Those are three megawatts, so they're twice the size of the GE machines, and it was important to us because land is scarce, and although we cover a lot of land area, we needed a lot of land area, and we needed a large machine that allows you to make -- make the -- if you will, the -- at a given percentage of land or a given amount of land, make the most energy from that resource.

So, we went with the Vestas machines both because of the scale of them and the quality of them in terms of being able to get a financier comfortable with the quality of the machine.

Q.  Okay.  And which of the Altas has the GE machines?

A.  Alta I.

Q.  And is there a particular reason why those machines are suited for that particular facility?

A.  Yeah, twofold.  First, they were the machines that we acquired with the acquisition.  Perhaps we could have put them in other areas, but it made most sense to put them with Alta I because that was the area of rough

terrain. So, just maneuvering with a smaller machine when you're constructing in rough terrain is easier to do, whereas on the flats, which is where the other Alta phases are built, we utilize a larger machine to maximize the energy capture.

Q. Okay. Now, your interconnection is with what utility?

A. Southern California Edison.

Q. Did that mean that they had to be the buyer of your electricity?

A. No, it does not. You can sell, within California, to any of the IOUs, is how we refer to it. Once you're into the Cal ISO, the California Independent System Operator System, and you interconnect into that system, you can -- you can sell to PG&E, you can sell to San Diego Gas & Electric, you can sell to Sacramento Municipal Utility District, whoever you want to sell to.

Q. It's all hooked together?

A. It's all hooked together.

Q. All right. So, let's go back, if we could, to Plaintiffs' Exhibit 221, which is the map that's already been entered into evidence of the Alta Wind Farm and --

THE COURT: Mr. Rosenbaum, I don't believe it's been offered into evidence, Plaintiffs' Exhibit 221.

MR. ROSENBAUM: All right, then I will do so now.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

THE COURT:  All right.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 221 is admitted.

(Plaintiffs' Exhibit Number 221 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  So, there are -- let's just take the purple in the middle, the Alta Wind II as an example, in terms of what we're looking at.  There are these various, if you will, round dots.  What are those?

A.  Each round dot is a Vestas 3.0 machine.

Q.  Okay.

A.  It's a turbine, wind turbine generator.

Q.  All right.  And then there's sort of blue linkage, if you will.  What is that?

A.  That we refer to as the collection system, all done at low voltage.  So, you tie the turbines together, you collect the output from each turbine, and you feed it into the substation, which then steps it up to the voltage required for transmission onto the grid.

Q.  Okay.  And does each Alta have its own collection system?

A.  Yes.

Q.  Okay.  If you were physically present there today and weren't as knowledgeable perhaps as you, could you

Trial
Alta Wind I Owner Lessor C, et al. v. USA                        5/9/2016

tell where one facility ends and another one begins?

A. No, even I can't, and I have been there multiple times. It's -- you know, on the -- on the fringes, you don't really see one segueing into another. If you're on one far side or the other far side, you might know, well, this is Alta II and this is Alta IX, but they are basically indistinguishable.

Q. Okay. Now, is there any difference in how much electrical output there is, one location versus the other?

A. Each particular turbine has the same electrical output, but each project will vary in terms of production.

Q. And what -- based upon what?

A. The number of turbines.

Q. Okay. And what about the wind conditions? Are they identical everywhere?

A. No, they are not identical everywhere. The wind conditions will vary meaningfully throughout the park. I say "meaningfully" on a relative basis, but they all enjoy the same basic characteristics of what drives the wind resource, when the wind's likely to blow, et cetera.

Q. Okay.

A. You get -- and you get -- you get a better NCF,

net capacity factor, at Alta I than you do at the Alta II through -- really II through XI phases, but it's harder to construct.  So, it's harder to construct but better to be there once you've constructed it.

Q.  And why is it better at Alta I?

A.  Because you're in the -- on the ridges, is how we refer to it, and often with altitude, wind speeds increase.

Q.  Okay.  So, let's take a step back and talk about how Terra-Gen became involved in the Alta Wind Farm. First of all, we have been calling it the Alta Wind Farm.  Is there another name that was used for it earlier on?

A.  Yeah.  Early on, California Highwind Power, CHiPS.  I'm not sure where the "S" comes from, but that was the acronym we often used.

Q.  Okay.  Are you familiar with a company known as Oak Creek Energy System?

A.  I am.

Q.  And who were they?

A.  They were the original developer of the project.

Q.  And when did they start?

A.  Roughly 2004.

Q.  Okay.  And are you familiar with a company called Alta Innovative Power Company?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.  I am.

Q.  Is its acronym AIPC?

A.  Yes.

Q.  And who is AIPC?

A.  Essentially a joint venture between Allco, who is, if you will, the money partner, and Oak Creek, a 50/50 partnership.

Q.  All right.  And at the time that Terra-Gen became involved, who owned the development project?

A.  At the time we became involved, it was owned by Allco --

Q.  Okay.

A.  -- or they were owned by Allco.

Q.  Okay.  And what did -- what did Terra-Gen do?

A.  We acquired the -- the rights to develop -- we acquired AICP, basically acquired Allco's interest in AICP, but we acquired the opportunity from Allco.

Q.  Okay.  And what was your role in that buyout?

A.  I oversaw the buyout, was involved in the negotiations of the document, et cetera.

Q.  Okay.  How did Terra-Gen become aware of the opportunity?

A.  It first came through Matt LaBlanc at ArcLight Capital.  Matt had a relationship with Allco.  Allco was experiencing some difficult financial times, and they

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

were making decisions about whether they wanted to remain in the U.S. market, decided they wanted to exit from this opportunity, and Matt had tried initially to pursue the opportunity on a negotiated basis without having to go through an auction process, and so that began but never really concluded. It concluded with an auction process which we participated in.

Q. Okay. And what time frame are we talking about here?

A. That would be 2008. We actually closed the transaction July, I think, of 2008.

Q. Okay. And ultimately, how much did Terra-Gen pay in the buyout of Allco?

A. Total purchase price was 394 million, and as I said earlier, a portion of that related to the turbine payments. Do you want me to go through what -- the portion was -- the Alite project, we acquired development rights, and we acquired transmission queue positions, a small amount of land, that all comprised the value of the acquisition.

Q. Okay. Had construction yet begun?

A. No.

Q. All right. Let's look at Plaintiffs' Exhibit 295, which is a document entitled "Allco Development Milestones Prior to Terra-Gen Acquisition." Can you

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

tell us what this document is?

A. Yeah. It outlines the -- what had been developed and, therefore, what we inherited, if you will, at the time of the acquisition. You know, the ultimate objective is to get to construction, and you asked if it had started at that point, and it really -- it couldn't have started. There are a lot of steps that you need to satisfy and go through before you can actually begin construction.

But some of them had been started. There were some real property rights that were acquired in terms of some fee land. You can see those in the box. There was a master PPA that was in place between Alta and Southern California Edison. From that master PPA, we derived what they call daughter PPAs. There was a start to the permitting.

A lot of the -- you know, some of the biologic work had been done, some of it had to be redone, and there was a turbine sales arrangement in place, which was with GE. What's not listed here, I don't believe, is the -- you know, some of the wind data and --

Q. If we go to the next page, I think this is -- yeah, keep going. Yes.

A. So, there were leases, one of the most important of which was with CalPortland Cement Company. There

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

were met towers in place which critically gave you insight into the wind, and the reason I say it's critical is because in order to finance, you need to have your wind data, and the more data you have, the -- the more -- the more you can be confident in the projections or at least, you know, be able to track the capital necessary for the projections.  They had, you know, literally years of wind data through their met towers.  I think there were 36 of them in total.

Q.  What's a met tower exactly?

A.  A meteorological tower.

Q.  Okay.

A.  It measures the wind speed and meteorological conditions.  So, that's part of any -- really any wind project.  You want to install a met tower to get a better insight into how the wind is going to perform.

Q.  Okay.  If we keep going, and I think we're now at the wind monitoring mast there.  Is that what you were talking about?

A.  Yes, exactly.

Q.  That's page 4.

A.  That is.

Q.  Yes, okay.  Now, were these things that Allco had done prior to acquisition by TGP, were they necessary to the ultimate development of the project?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.   Yes.

Q.   Okay.

A.   The last set is the interconnection requests, 3100 megawatts of interconnection requests.

Q.   Okay.

Your Honor, I would move Exhibit 295 into evidence.

MR. RONICKHER:   No objection.

THE COURT:   Plaintiffs' Exhibit 295 is admitted.

(Plaintiffs' Exhibit Number 295 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   Okay.  And if we could now look at Exhibit -- Plaintiffs' Exhibit 223, can you explain what that exhibit is?

A.   It's, again, the Alta phases, this time without an indication of which phase is which, but what it is trying to demonstrate is the land that was, if you will, perfected, which is the -- the dark green, at the time that we acquired the opportunity from Allco; and the land that's unperfected, which is the lighter green; and finally, the land that really wasn't even under lease in any fashion, which is the brown.

So, you had -- you still had requirements, other than the dark green, for -- for perfecting, for actually

getting control of that leasehold interest.  That was part of our development process.  You also had crossings that you had to obtain as part of our development process, streambed crossings, permitting, et cetera.

Q.  Okay.

I'd move Exhibit 223 -- 223 into evidence.

MR. RONICKHER:  Just a provisional objection. I'm not sure we have enough foundation as to the source of the information in the exhibit.

BY MR. ROSENBAUM:

Q.  Well, can you tell us what the source is of this information?

A.  Yes.  It was Terra-Gen, our San Diego office, who has extensive GPS capabilities, along with the entity that -- or the group that is responsible for finding the land for any project that we develop, who put this together.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 223 is admitted.

(Plaintiffs' Exhibit Number 223 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And now let's look at -- at the time that -- that Terra-Gen acquired Allco's interest, had the -- had the roads been built yet?

A.   No.

Q.   Okay.  If we look at Exhibit 224, please, what is -- what does that show?

A.   That's the road network for Alta Wind I through VI.

Q.   Okay.  What's in blue?

A.   Yes.

Q.   Okay.  And -- okay.  And is it your understanding that the construction of roads is part of eligible property?

A.   It is, as long as it leads to an eligible asset.

Q.   Okay.

Your Honor, I would -- so, were these all built by Terra-Gen?

A.   Yeah, they were all built.  The easements necessary in many instances -- we don't own the land in fee, so we had to receive easements in order to construct the road.  All that was developed by Terra-Gen in coordination with the various landowners.  I think the project itself has over 500 parcels and a couple hundred landowners.

It's -- it's a matter of sitting down with folks, often in their, you know, living room, and talking through what you want to do and having them get comfortable with you doing it.  So, we had to get the

easements, and then we had to actually construct the roads.

Q.   Okay.

Your Honor, I would move Exhibit 224 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 224 is admitted.

(Plaintiffs' Exhibit Number 224 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   Okay.  Let's look now at Exhibit 296, Plaintiffs' Exhibit 296, which I think is a multipage document, but let's start with the first page, and just tell us in general -- the title is "Alta I Development Milestones Post Terra-Gen Acquisition."  So, tell us what this is.

A.   So, it is a listing of the development activities that we had to undertake in order to bring the project from where we acquired it to the point where it could actually be constructed.  One of the most important is the second grouping of bullets.  That represents the obtaining of a California Environmental Quality Act permit.  It's a conditional use permit.  It -- for this particular initiative, it was the largest wind initiative that was reviewed under CEQA, and it was an extensive period.

We actually provided notice in December of 2009, I believe -- I'd have to go back and confirm that -- and then it wasn't actually issued until the first quarter in -- notice in 2008 and then it was issued in 2010. So, it's an extensive process. I couldn't even begin to tell you how many pages of documentation is involved in this.

You have to be certain that the environmental impact of the project -- and it's an extensive project -- is being properly mitigated, properly monitored, that you're being good stewards of the environment as you go through the construction process.

Q. Okay. Let's look at some of the other permits. We'll talk about that one maybe a little bit. Tell us about some of the other ones.

A. California Fish and Game, that is the entity responsible for protecting endangered species, so we had the desert tortoise and Bakersfield cactus, both of which are endangered species by the California Department of Fish and Game.

We needed to negotiate an incidental take permit so if there was a mishap during construction or during administration of the project, there wasn't a take where people could literally go to jail for it. If it was inadvert, it was incidental, it was not something

that was going to be a violation under -- under the Endangered Species Act that governed species like the desert tortoise and the Bakersfield cactus.

You know, there are a couple of issues with the desert tortoise. I mean, we had to negotiate and enter into pretty substantial mitigation measures. We had to fence the whole area, which cost about $13 million. We also had to purchase land, essentially, that was -- or grant land over to the desert tortoise that was going to be there for their habitat, not develop it.

Some of it included parcels we acquired with the acquisition, but in order to get the permit and in order to provide adequate mitigation, gifted that over, if you will, and that was about a $17 million cost. So, in total, on the desert tortoise, we had to spend about $30 million.

The Bakersfield cactus, the other endangered species, we unfortunately encountered that during the construction process of Alta I, which caused really the process to come to a halt. We needed to relocate some of the cacti and had to identify -- because it's not all that clear what's endangered and what isn't. So, that was, again, an extensive process that we, you know, had to manage through the -- through the endangered species aspects of the project, but we couldn't even begin

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

construction until we received the incidental take permits that are outlined here.

Q.  Okay.  And tell us about the -- if we go back to the main document, tell us about the -- the --

A.  Yeah, the FAA requirements.  The FAA requirements, there's three airports in the region, and you can't interfere with flight patterns or the radar. You have to receive what's called an FAA permit, nonhazard permit, and we did receive those determinations of nonhazard.

We had to re-apply in some instances because during construction you might jockey the exact location of a turbine -- it's just unavoidable -- and you have to re-apply for the FAA permit.  But those have to be received for each of your turbines.

Q.  Okay.  And let's go -- at the bottom, you start listing some real estate.

A.  It involves really the perfecting -- as I mentioned earlier, a lot of the real estate rights were unperfected, so perfecting those rights, working through the easement issues, working through the crossing issues, those type of issues.

Q.  Okay.  And let's just page forward, if we could.

A.  We see different leases that are being highlighted here.  We had leases with GE Energy.  We had

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

leases with Oak Creek Energy System.  There were a number of leases that were negotiated throughout the development process by us.

Q.  Okay.  And this initial listing is for Alta I. If we can go forward, the next page -- yes, page 3 -- tell us, what do we have here?

A.  You start the same exercise on Alta II, much of which, you know, we covered in terms of our discussion of Alta I, but it has to be done for each phase, although the -- the CEQA permit was for the first five phases, so it was 720 megawatts.

We really treated the first five phases to some extent as our first effort, right?  How we divided them up was a function of the financing community in terms of what could be absorbed in terms of capital needs, but we permitted the first 720 megawatts.  We got the turbines for the first 720 megawatts.  We took down the power contracts for the first 720 megawatts.  We did all that really as a unit.

So, a lot of these things are repetitive with the earlier phase.  One thing we didn't discuss, I guess, was the interconnection agreements.  We had a -- we had queue rights when we acquired the position from Allco. We had to actually enter into what's called an LGIA, large generator interconnection agreement.

That involved some creativity because we needed to essentially establish a mechanism where even though the interconnection rights might have been for more megawatts than we were going to utilize currently, we could, you know, subdivide the interconnection rights among the various phases that we felt were necessary in order to finance them in a way that was -- that was comfortable to the financing communities.

So, that was an exercise, negotiating those interconnection rights, negotiating the interconnection agreement, working with the utility, that they'll get the actual substation and facilities that are necessary to interconnect constructed on time, negotiating whether or not we constructed or they constructed, and all that's part of the interconnection process.

Q.   Okay.   If we can go to the next page, and keep going to page 00 -- no, keep going, if you would, please.   One more.   The next page, page 8.

Okay, now we're up to Alta VI.   So, tell us about that.

A.   Again, the permitting requirements for Alta VI are laid out here.   The CEQA requirement, obviously separate building permits, and there might have -- there might be desert tortoise on some phases but not on others, so you have the same issue of endangered species

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

that you need to manage around; the FAA determination, no hazard for all 50 turbines on Alta VI.  It's a 150-megawatt project, so you have that issue to manage around.  It's the same process, but it's now done for Alta VI.

Q.  Okay.  Was there certainty that you could get all of these necessary permits?

A.  No, not really by any stretch just given that it was California.

Q.  And given these mitigation measures you had to engage in, were you ultimately able to develop all of the places you had hoped to be able to develop?

A.  No.  Certain parcels, as I mentioned, were utilized for the desert tortoise.  Some phases were -- you know, there might have been an eagle nest nearby. We didn't really feel comfortable with the VI turbines and needing to avoid that area to keep the Fish and Game Department comfortable.

We had condor issues.  You needed to make sure that you weren't really at risk of injuring condors because it's an endangered species as well.  So, that requires mitigation measures, some of which included the abandonment of certain phases.

Q.  Okay.

A.  Viewshed issues, I can't recall if it was in

these phases or later phases.  There were people that felt that certain phases were too close to the town of Tehachapi.  If you drive out to Tehachapi, you will see the wind farm is pretty much segregated from the town. It's expansive, it's massive, but if you're having lunch in town, you don't see it.  And there were some phases that folks were concerned might actually be visible and would impact the viewshed.  So, those phases weren't developed, couldn't be developed.

Q.  All right.

Your Honor, I would move Exhibit 296 into evidence.

MR. RONICKHER:  I hesitate to subject everyone to it, but Plaintiffs' counsel skipped over several pages of the exhibit.  There is no testimony laying a foundation for any of that information.

BY MR. ROSENBAUM:

Q.  Okay.  Well, I didn't want to read all -- every page.  Can you just summarize what's on all the pages here?

A.  Yeah.  We talked through the permitting efforts. We talked through the interconnection efforts.  We talked through the PPA efforts.  We don't -- I don't think I've really touched on that in terms of taking down the daughter PPAs, negotiating with California

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Edison to have a viable project in terms of the power price.

There was -- there was some -- as I said, all 720 megawatts were taken down initially, where we -- where we blended the phases, the turbines, if you will, to come up with a power price.  We submitted for 720 megawatts, which is the entire first five phases, some of which used GE turbines, some of which used Vestas turbines.

Just like we didn't, you know, distinguish turbine pricing between Alta II and Alta III and Alta IV and Alta V when we negotiated with Vestas, we don't distinguish power pricing between Alta I, II, III, IV, V.  The turbines are used as they're used, as it makes the most sense, but the power price is derived in one fell swoop, and that's outlined in the pages that we just covered.

THE COURT:  Mr. Pagano, is this a document that you prepared for use at trial?

THE WITNESS:  Yes.  I oversaw the production of it and reviewed it.

THE COURT:  It's a summary of the events?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

MR. ROSENBAUM:  Your Honor, I would move it into

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

evidence.

MR. RONICKHER:  No objection.

THE COURT:  All right.  Plaintiffs' Exhibit 296 is admitted.

(Plaintiffs' Exhibit Number 296 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  So, let's look at Plaintiffs' Exhibit 279, and can you tell us what that document is?

A.  It's a listing of the mitigation measures that were required in order to receive approval from the California Environmental -- under the California Environmental Quality Act, under the rezoning application with Kern County, and under the California Department of Fish and Game requirements.

Under the Fish and Game, you can see the numbers that I referred to earlier as it relate to the desert tortoise; 13 million for the fencing and 17 million for a conservation easement.  It is something that I oversaw the production of and am familiar with.

MR. ROSENBAUM:  Your Honor, I would move Exhibit 279 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 279 is admitted.

(Plaintiffs' Exhibit Number 279 was admitted into

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

evidence.)

BY MR. ROSENBAUM:

Q.   And under the heading "California Environmental Quality Act" -- and that's CEQA, correct?

A.   That is.

Q.   -- there's a statement, "Over 100 mitigation measures imposed by Kern County covering the following areas," and then there's a list of various items.  Can you just give us a sense what that was about?

A.   You have to make sure that the noise is not going to be problematic, so there is requirements to -- for setbacks, for noise mitigation in terms of how the project lays out.

You obviously have hazardous materials at times that would be used during the construction process or even during the operations.  You have to, you know, follow certain procedures when handling those hazardous materials.

Cultural resources, if you were to, in the midst of the construction, discover something of cultural significance, you would have a responsibility to alert Kern County and the various authorities about that find, et cetera.

Q.   Okay.  And was there a certainty you would get through the CEQA process successfully?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.  No.  CEQA is -- CEQA is a very rigorous process. It's at least as rigorous as the federal process, some would say it's more rigorous, and most states don't have a separate process.  Most states rely on a federal process if there's federal nexus.  If there isn't, you know, there's a review, but it's not -- it's not nearly as rigorous as it is in California.

Q.  And what would have happened had you been unable to get CEQA approval?

A.  We would not have been able to construct the project.

Q.  And had any part of the CEQA review started at the time TGP took over the project?

A.  Some of the biological studies, I think, were commenced, but, no, the actual notice was filed by us afterwards.

Q.  And were these steps necessary to the ultimate development of the project?

A.  They were.  You cannot begin construction on a wind project in California without a CEQA review and approval.  You cannot finance a wind project in California unless you've managed and studied carefully the endangered species that might be encountered and then obtain an incidental take permit with respect to those species.

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

So, everything on the -- you can't finance a project either without the FAA determinations of no hazard.  Each of these measures really had to be in place in order to receive the permits necessary to begin construction.

Q.  Let's look at Joint Exhibit 126, please.  Can you tell us what this is?

A.  That's the guidance for the 1603 program.

Q.  Okay.  And if we can turn to page 10, please, and if you look under the heading "Placed in Service," do you see a reference to a requirement that an applicant for a 1603 grant has to provide documentation that the property is placed in service?  Do you see that?

A.  Yes.

Q.  And can you just read the sentence that begins with the words "A report..."

A.  "A report provided by the project engineer, or the equipment vendor, or an independent third party that certifies that the equipment has been installed, tested, and is ready and capable for being used for its intended purpose."

Q.  Now, could that state have been reached absent the things that Allco had done prior to the purchase and Terra-Gen did afterwards?

A.  No, it -- you had to have -- as I said, to -- to

Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

actually build the project, to build the turbines, to construct and interconnect to the grid, you had to have all the permits that we talked about and incidental take permits that we spoke of before we could begin that process.

Q.  And let's take as an example, you say you got information from Allco relating to wind information, correct, because they had these various met towers, correct?

A.  Yes.

Q.  Could -- was that undertaken by Allco necessary to the ultimate development and construction?

A.  Yes.  It was important because it allowed us to use that wind data to accelerate the process, the process that we would have -- if we did not have that wind data, we would have been constructing this at a later time because we wouldn't be able to attract the capital necessary without a history of wind data from the met towers.

Q.  Okay.  Now, the last phrase in this quotation is that the equipment has to be capable of being used for its intended purpose.  Do you see that?

A.  Um-hum.

Q.  What is the intended purpose of a wind facility?

A.  To generate electricity and to collect it and

Trial
Alta Wind I Owner Lessor C, et al. v. USA                     5/9/2016

step it up in voltage and sell it to the transmission --
put it onto the transmission grid and meet your
requirements under your power contract.

Q.  And what is it that determines a wind facility's
value?

A.  The cash flows.  I mean, what you can get paid
for doing that.  So, you look at the revenues that
you're going to receive from that production, which will
vary with both your price under your power contract and
the production, the wind production at the facility.

You net from that your costs.  You'll have land
royalties that you pay to your landowners.  You'll have
operating costs that have to be paid for things like
insurance, property taxes.  All those items must first
be paid out of those revenues.  You'll have to staff
your facility.  You'll have to pay that operating cost
as well.

And then you have what we sometimes refer to as,
you know, cash flow available, you know, for debt
service or cash flow before -- before depreciation.
There's many different acronyms, but then that cash flow
can be utilized to attract capital to the project.

Essentially taking your revenues, netting out
your expenses, you attract capital to the project, and
then you have cash flow available to the -- you know,

107

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

the ultimate owner of the project, and that cash flow is what demonstrates the value of the facility -- determines the value of the facility.

Q. Okay. Let's look at Joint Exhibit 22, and we'll start with the first page. Can you tell us what this document is?

A. Yeah. It's an overview that we provided to ArcLight at this time -- I think -- I'm trying to just get the date. So, it's pre-GIP, but it's post-acquisition, about six months, and we all collectively sat down and said, okay, let's think about what the risks are associated with this project. What do we, as a team, have to manage? What could go wrong? What needs to go right?

Q. Okay. And this is after you've bought out Allco, correct?

A. It is, by about six months.

Q. Okay.

A. Five months.

Q. And if we turn to page -- and there's a reference to CHiPS. I think you said that's another acronym for the Alta Wind Farm?

A. Yes, it is.

Q. Okay. And if we turn to page 6 of this document, there's something called a risk matrix, and tell us what

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

that document does.

A.   We're owned by sponsors.  We talked about earlier -- you know, in this instance only ArcLight was an owner at this point, and they've made a substantial investment.  We were aware of these risks when we were doing the acquisition -- I'm sure some of them, not necessarily all of them -- but we were sitting down roughly five months after the acquisition, after having expended the -- you know, the 394 million of capital, to provide the education to our sponsors, as well as collectively as a team, lay in front of each other what the risks were associated with this project and what needed to be managed as a result.

So, it goes through each type of risk that you might encounter.  The PTC risk, at this point we were now in the midst of the credit crisis, and, you know, the question was, was the PTC going to be extended?  Was it of any use if it was -- I'm sorry?

Q.   Yeah, explain what a PTC is.

A.   It's a production tax credit, which is the -- a tax credit that can offset taxes payable from the production of electricity.  So, it's a -- it's measured on a per-megawatt-hour basis.  In order to really utilize it, you have to owe taxes.  You have to have taxable income.

109

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.  Because it's a credit against taxes.

A.  It is a credit against taxes.  So, the issue at that point, since it was really the height of the credit crisis, will anyone have taxable income that can utilize the production tax credit?  And we recognized it as a risk.  It obviously occurred -- as I said, some of them were known at the closing; others were not.  This was one that was not known.

And thankfully, you know, the 1603 program was put in place, but prior to that, there was the concern that you could have a production tax credit, even an extension of the existing production tax credit, but not enough people could utilize that credit.  No one would have taxable or not enough people would have taxable income so that you could place that production credit with somebody that had, you know, a -- that was going to not charge you an exorbitant amount to be your equity investor and could actually use the -- the production tax credit against their tax basis.

Q.  Okay.  And then there's a column called "Likelihood of Impact."  Do you see that?

A.  Yes.  It assesses the risk of any -- it assesses the likelihood of any particular risk occurring, and so we assessed this likelihood at medium, which was indicative of, you know, it could end up being -- it

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

would likely end up as being a problem.  It would only be an impact -- it could be an impact either on the return that we received from the project or it could be an impact on not being able to get the project financed, not being able to attract as much capital as we needed because there weren't investors for the production tax credit.

Q.  And one of the -- and then there's a column called "Impact," too.  What does that mean?

A.  That gives you an indication of what could occur.  Would it impact your return?  Would it impact your schedule?  Would you delay construction until people regained tax benefit -- tax basis, rather, or was it just something that was going to be a fatal flaw and you weren't able to attract the capital that you needed?

Q.  And what does "fatal flaw" mean in this context?

A.  "Fatal flaw" means the project doesn't get developed and is essentially written off.

Q.  And so if that happens, what happens to the $394 million you had already spent?

A.  You might be able to recover some of it from the turbine purchase that you did, which I said earlier was about 70 million, but it's unlikely that, if this project couldn't get constructed, there would be many projects that could get constructed, and so the cents on

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

the dollar for the turbine prices would be pretty minor, and so you would write very close to the 394 million off, maybe 350.  I don't know.

Q.  Okay.  And there's another risk, the second one, "Financing/Tax Equity," where the description is "Capital market access is limited and/or pricey," and the likelihood of impact was high.  What does that mean?

A.  Well, since we were in the credit crisis, we knew it was going to be a challenge to finance the project, so there was certainly going to be a less favorable financing environment in December of 2009 than we thought would exist when we made the acquisition in July of 2009.  So, it was a high likelihood, it was a certainty, and it would impact our return, it could impact our schedule, it could actually end up with us not being able to develop all the project, only a portion, or if it was really a lingering crisis, it could mean that we didn't develop any of it.

Q.  Okay.  And what would happen to your $394 million?

A.  Most of it would be written off.  Again, only the portion that we could recover from the -- from the turbine payments, so call it 350 million, would be written off.

Q.  Okay.  Now, another one is "Timely Receipt of

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                5/9/2016

EIR."  What does that mean?

A.  Your environmental impact needed to be received. It's a major permit.  It, again, needed a good deal of environmental studies, and there was a risk that -- there was a high risk that it wouldn't be received on the schedule that we had hoped for.

It kind of goes to the point that I said earlier, some of the biological studies were -- were in need of being redone, and that created some schedule delays, and so you can see it's a high risk because we were needing to redo the biological studies.

Q.  And what -- the impact is listed as "Schedule." Tell us what that means.

A.  It would be delayed, and that would have consequences for return; it would have consequences for damages that might exist under the -- under the PPA; and, in fact, if it was delayed long enough, you know, it could actually cause the sunset date, which we refer to as a sunset date, to occur within the PPA, which means you lose your PPA.  So, it's a schedule impact.

It's not just, well, we'll get it done a year later and there's no real harm, no foul.  It has an impact across the board, and it has a downside risk that, you know, that could lead to potentially loss of the PPA.  In fact, I probably would have included a

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

fatal flaw notation here.  It might be that the concern -- and this is a while ago, so I -- the concern might have been more focused on certain parcels than across the whole project.  So, it would impact the schedule for particular parcels, for particular phases.

Q.  Okay.  On the next page, please, of this document, there is a -- let's look at the second line item, "TRTP - Segments 4-11," where there's a medium likelihood of impact, and the impact is listed as "Schedule and/or Fatal Flaw."  What is that all about?

A.  TRTP was the Tehachapi Renewable Transmission Project that Edison was doing, which was necessary for our project --

Q.  That's the transmission line?

A.  That's the transmission line.  That was necessary in order to get the power from Tehachapi to the load. They had run into some issues with opposition -- "they" being Edison -- and the concern at that point was if they don't actually get the approval to move forward with those segments, those phases, we wouldn't be able to transmit all of our power onto the line and, therefore, to the load center.

And, again, it would be a fatal flaw for particular phases, and it would -- it would -- it could very well result in a schedule delay.  In fact, it did.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

Phases X and XI were delayed as a result of some of the challenges that Edison had to deal with on their TRTP line.

Q.  Was skepticism expressed as to whether the Alta Wind project could be developed at all?

A.  Yes, there was.  We had a number of folks that -- that participated in the auction, some of which dropped out through the process.  You know, probably the premier wind developer in terms of number of megawatts and scale in the country today is NextEra Energy.  Their head of development, Michael Sullivan, said to me, at a point when we were lobbying in D.C., he said, "You guys are never going to see a megawatt out of that project."

Q.  Was navigating these risks just a matter of incurring costs?

A.  No.  It involved things going our way in terms of managing the process and having things come together. It involved creativity in terms of what types of mitigation measures we could offer the various permitting agencies to get them comfortable that our project was -- that we were being good stewards of the environment.

It's not, in many instances, a "money can fix" issue.  It's in many instances, you know, sitting down with people.  We didn't have any litigation on the Alta

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                5/9/2016

buildout, and that wasn't because we didn't have any opposition. It was that we sat down with people. We sat in their living room, their kitchen, and we talked to them about what their concerns were and what we might be able to do to address those concerns.

If they had filed a lawsuit, a lender doesn't lend over that risk. If that lawsuit in California goes on for years, you have a risk of losing your power contract. There was no certainty associated with actually being able to bring this project into construction.

Q. And how common is it in your experience for a development company to spend $390 million up front with the potential of losing it all?

A. I have been doing this for 30 years, and I have never seen it before, either any company I have been associated with or any company that I am familiar with. It was a very -- you know, a very bold move, and it indicated that ArcLight believed in the team that they had and that this team could manage some very meaningful risks.

Q. Now, you refer to obtaining financing for the projects. What kind of financing do you need to construct projects like this?

A. In terms of a dollar amount? $2 billion, I think

116

Trial

Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

I mentioned earlier, just to construct it, in excess of that. You need -- you know, project financing is the mode -- is the method. We talked earlier about my career and the time I spent at Simpson in project financing and then at Cogentrix in project financing.

Project financing is basically asset-based lending. It's lending to an asset that creates cash flows that those cash flows alone repay the debt. So, we needed to attract a substantial amount of project financing in order to bring this project into construction.

There are tax benefits associated with it, so we had to get people to utilize those tax benefits in order to make it economic. We did have the grant program, which was helpful in terms of making it less strenuous, if you will, in terms of locating folks with tax base, and it was an important component of the -- of the buildout.

So, all those things provide the financing -- the capital, if you will, necessary to build out the project.

Q. Did you -- were you successful in getting construction loans?

A. We were.

Q. And did you have to pay interest on those loans?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

A.   We did.

Q.   And what's the term for that?

A.   For the construction loans?  The construction loan will typically convert into a --

Q.   No, no, just the term for the interest that you're paying.

A.   Oh, interest on construction.  I apologize.

Q.   Okay.  And was that necessary in order to complete construction?

A.   Yes.

Q.   All right.  Let's -- you referred to this briefly before, but what was the actual process by which TGP acquired Allco's interest?

A.   It was an auction process.

Q.   Tell me how that worked, in general.

A.   Typically an auction process is utilized in the sale of assets.  We utilized it ourselves on a number of the phases.  It's a two-step process where you release what's called a CIM or a confidential information memorandum.  That lays out the salient points of the project.  It's pretty extensive.  It can be 50 pages, 100 pages.  It just depends on how much information you're going to convey.

It will provide the type of turbine you're utilizing, the location of the project, the quality of

the wind resource, an over -- cash flows, a model, often. So, you'll provide a broad list of bidders that type of information. They will put an initial bid in.

When that initial bid is received, that list will be culled down to a smaller list of participants. That's called your short list. You'll give that short-listed group access to a data room. Within that data room are all the project documents, all the project permits, all the wind studies, the independent engineer report, all the detailed information that provides, if you will, meat to the bones of what you told them in the confidential information memorandum.

People typically take six weeks or so -- maybe two months, it just depends -- to review some of that data. It can be done shorter. I have seen it done, you know, in three weeks. It's just a function of the project and the person doing the diligence, to review that information and then conclude what they want to put in as a final bid.

We went through both of those processes. We were short-listed on the first process, and then on the second process, we did our diligence, hired some consultants to help us sort through the information, wind experts, et cetera, and then put in a final binding bid.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

Q.   Okay.   And what -- do you recall which wind consultant you used when you were buying out Allco?

A.   I believe it was Ron Nirenberg.

Q.   Okay.   Did you have any financial consultants or --

A.   JP Morgan.

Q.   And you obviously were the winning bidder, correct?

A.   After a long process, yeah.

Q.   And let's pull up Joint Exhibit 15.   I'm just going to show you the first page.   This is a joint exhibit.   It's already in evidence.   What is this document?

A.   That's our purchase and sale agreement, essentially, where we acquire the membership interests from Allco through our entity that was formed, California Highwind Power project.

Q.   Is this basically the Allco buyout document?

A.   It is.

Q.   Okay.   And then Joint Exhibit 14, is that the disclosure schedules to that document?

A.   Yes, it is.

Q.   Okay.   Okay.   And in general terms, what did Terra-Gen acquire with the purchase that were of value?

A.   We acquired the development rights; the wind

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

data; the queue positions; the Alite project; the turbine supply arrangement, which we had to assume about $70 million or make a $70 million payment or reimbursement to them; some land; you know, the start to the permitting, because they had started the -- as I said, they had started the biological studies and began the -- began down the road of permitting.

Q.   Okay.

A.   I think there was a master PPA that was in place as well.

Q.   Okay.  And was there a study done to allocate the $394 million purchase price across those set of assets?

A.   Yes, there was.

Q.   And who did that, performed that?

A.   Duff and Phelps did that.

Q.   Okay.  And did some of that go to eligible property and some to ineligible property?

A.   Yes.

Q.   Now, one of the things -- one of the items you mentioned is the Alite facility.  Can you briefly tell us what that's about?

A.   So, Alite is a facility that's in Tehachapi.  It serves CalPortland Cement, so it sells in a fashion which we call inside the fence.  It's not to a utility. It's a wind project, a small wind project, just a

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

handful of Vestas machines, that sells to -- sells the output to CalPortland Cement Company.

Now, unlike a project that is connected to the grid where you sell everything you have whenever you can produce it in most instances, here, you didn't -- you weren't able to do that.  You had to sell when -- when CalPortland needed the energy.

Q.  Okay.  And is that part of the litigation, that project?

A.  No, it is not.

Q.  And did all of these rights you acquired, were they necessary to the ultimate construction of the facilities?

A.  Yes, they were.

Q.  Now, you've said that Terra-Gen paid $394 million to buy out Allco.  What was the ultimate total cost of the projects?

A.  Across all the phases, it was in excess of 4 billion.

Q.  Okay.  So, roughly what percentage of the total expenditures?

A.  About 7 percent, 7 or 8 percent.

Q.  Now, what role was it intended that Allco would have after the buyout?

A.  Initially, we -- Allco would have no role.  Oak

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Creek would have a role but not Allco.

Q. Okay. What was the intention as to what Oak Creek would do?

A. Oak Creek would develop the project, as they were doing for Allco. They would work with us in developing -- essentially on our behalf.

Q. And did that happen?

A. It did not.

Q. Why not?

A. Well, we had $400 million at risk or 394, and as we started to look at what needed to get done, we felt we were better equipped to do it. It's really a matter of controlling your own destiny, right? There was a lot of capital at risk, and we wanted to be the ones that actually made sure it wasn't written off.

Q. Okay. And how was Oak Creek going to be paid for being the developer?

A. They were going to receive a fee through the AIPC structure. AIPC, as you referred to earlier, was an entity that was owned 50 percent by Allco -- we acquired that interest in the acquisition -- and 50 percent by Oak Creek, and as phases were completed, Allco -- or AIPC, rather, would receive a fee for that completion. It could be a royalty stream; it could be the present value of that royalty stream; it could be a fixed

123

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

payment.

Q.   Okay.  Now -- but you ended up not using Oak Creek, correct?

A.   That's correct.

Q.   Did they nonetheless receive the fee?

A.   Yes.  I mean, the fee was -- we really viewed that as just another component of the potential ins and outs of cash flow for the project.  It was part of the acquisition.  It was an acquisition cost, if you will.

Q.   Did -- was Oak Creek going to put any capital at risk itself, even if it had served as developer?

A.   No.  That was part of the problem.  We put all the capital at risk, so we needed to control the project.

Q.   Okay.  And had Oak Creek served as developer, were they to be reimbursed for any -- for their out-of-pocket costs?

A.   Yes.

Q.   Okay.  Are the risks that Oak Creek would have performed -- would have -- let me start that question again.

Were the risks that Oak Creek, under the contract, would have assumed had it proceeded as developer the same as the risks that Terra-Gen itself undertook?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                      5/9/2016

A.  No, because Oak Creek would not have had capital at risk.  We had the capital at risk, so we would have been taking a different type of risk.

Q.  Okay.  Let's take a look at Plaintiffs' Exhibit 298, and can you tell us what this document is?

A.  Yes.  Again, it's a document prepared under my supervision, and I'm familiar with it.  It provides for the -- the buildout, if you will, of Terra-Gen to support the development of the Alta Wind facility.

We hired 25 development professionals.  We hired support staff to assist them, five finance professionals.  We -- nine construction management professionals, and then we contracted out, for the construction, a total of 1200 full-time construction workers and over 600 -- over 700, rather, part-time construction workers.  Those were, you know, largely through Blattner.

Q.  Okay.  And then go on down the list.

A.  We -- yeah, we had to have consultants as well for the permitting effort, the FAA permitting.  Aviation Systems, you know, CH2M Hill did a lot of the work for us on managing this -- the CEQA process, obviously at our direction, but, you know, we would tell them what we needed, and they would, you know, help compile it.  We had to do surveys.  We had experts there, et cetera.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.   Okay.  And then resource assessment, what's that about?

A.   You have a wind assessment.  So, in addition to Ron Nirenberg that I mentioned earlier, we had Garrad Hassan, who was really the most experienced wind consultant in the industry.  Just like Vestas has the most turbines deployed in the world, you know, Garrad Hassan has probably done the most wind assessments, both in Europe and in the U.S.

AWS Truewind also was involved in the wind assessment.  So, again, trying to take the data that you had from the met towers, process it, digest it, put it into a readable form for an entity that would -- was either going to be providing data directly to it, to the project was important, and those folks helped us process that.

Q.   Okay.  And then these other consultants?

A.   We had -- Gerry Mack did our crossings.  We had I think it was 231 crossings.  So, he was the person who interacted with the LA Department of Water and Power because they have transmission lines at the project, and we had to cross those lines, and you had to have certain clearances.  You had to have -- respect certain right-of-ways.

They also had an aqueduct on the project.  You

had to cross that aqueduct, and you had to do so in a fashion that they were comfortable with. You had railyards. So, you had a -- he had to coordinate with the railroad to receive that easement and that right to cross their -- their railyard. Again, height requirements, et cetera.

So, Gerry was our land consultant who spent several years, really, doing more than crossings during the -- during the build -- during the development of this project, to get it to a point where you can bring it into construction.

You had Global Energy Concepts, they were an important part of determining the power curve. You know, you know what your wind profile looks like. Now you have to project from that what your actual production will be from any given turbine.

You had Linda Parker, who worked -- I said earlier that we had to manage opposition, and, you know, Linda was helpful with outreach to various people. She's from Tehachapi. She understands the community, the dynamics. You always want someone who is able to work with you and guide you through that process so that you're hearing the concerns and you're addressing them, because the last thing you want is litigation, which can slow the project to the point where you could lose it.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

POWER Engineers, you know, kind of similar to our own in-house engineering, but they would -- we would leverage off of them for engineering support.  There's a lot of engineering that goes into the collection system, that goes into, you know, tying this all together to an integrated project.  They help us work that engineering out.

Z Global was a transmission expert.  Vestas, obviously, supplied the turbines.  I think that pretty much covers it.

Q.  Okay.  Are you --

I will move 298 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 298 is admitted.

(Plaintiffs' Exhibit Number 298 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Okay.  What was Terra-Gen's role with respect to construction?

A.  We oversaw the construction process, and we stood behind really the responsibilities of the various pieces of the construction process.

Q.  Okay.  Are you familiar with the term "turnkey project"?

A.  I am.

128
Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

Q.  What is that?

A.  That is when you pay to a particular entity a payment, a turnkey premium, to assure that everything is done properly, and at the end of the day, you have a project that you simply turn the key on and it works.

Q.  Okay.  And who was responsible for that?

A.  We were.

Q.  Okay.  Are you familiar with the term "EPC"?

A.  I am.

Q.  What does "EPC" stand for?

A.  That's engineering, procurement, and construction.

Q.  Are turnkey and EPC the same thing?

A.  No.  They're very different.

Q.  Explain that.

A.  Well, an EPC contract is what the title implies. It's someone who does the engineering, they procure the equipment, sometimes you assign the turbines to them, and they actually do the construction, the erection, if you will.  They don't say, okay, I'm going to make sure that this whole process is an integrated system and performs the way it needs to perform, because if they did that, then they're taking the risk that the turbine supply agreement meets its requirements or the -- there's not a delay in the schedule due to force majeure

129

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                5/9/2016

or weather that creates a problem.

What you have in these settings is a number of parties that are responsible for discrete components of the project, and you don't want, as a financier, someone pointing fingers at each other saying, look, this wasn't really my fault; it was because the turbine supply arrangement didn't meet their requirements.

Now, there are liquidated damages within the various contracts, but they're capped.  Twenty-five percent typically is a cap you'll see.  So, there's -- there needs to be someone who's saying, I'm going to build this out, make sure it's all constructed.  I'm going to coordinate it.  I'm going to put my equity at risk, that if, you know, it doesn't actually get constructed, you're going to draw that down.

Q.  Okay.

THE COURT:  Mr. Rosenbaum, should we take a lunch break here?

MR. ROSENBAUM:  Yes, that would be fine.

THE COURT:  Let's reconvene at 1:30.

(Lunch recess, 12:29 p.m. to 1:30 p.m.)

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

AFTERNOON SESSION

(1:30 p.m.)

THE COURT:  Thank you.  Please be seated.

MR. ROSENBAUM:  Your Honor, we now have a printed copy of the demonstratives from my opening statement, if I could give them to Your Honor.

THE COURT:  Yes.  Thank you very much.

BY MR. ROSENBAUM:

Q.  Mr. Pagano, you described development rights that were acquired from Allco.  Do you recall that?

A.  Yes, I do.

Q.  Did that include the wind data that you described having received from them?

A.  Yes, from their 36 met towers and their years of collection of that data, that was an important component of our development rights that we acquired.

Q.  All right.  And what about the efforts towards permitting that they had acquired, that they had already started taking?

A.  That's correct as well.  They had started some biological studies and had started down the path of rezoning.  They hadn't filed notice to begin the process on CEQA, but they had done some of the prepwork for that.  That was part of it as well.

Q.  Okay, thank you.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

Focusing now on the construction, if delay or nonperformance by one contractor affected the performance of another contractor, who bore the risk of that?

A.   Terra-Gen did.

Q.   And if a contractor failed to perform its own obligations, were there limits as to what damages they would owe to Terra-Gen as a result?

A.   Yes.  It was typically 25 percent liquidated damages.

Q.   Okay.  Of the what damages?

A.   Liquidated damages.  Twenty-five percent of the contract price as liquidated damages is frequently the formulation you'll see.

Q.   All right.  Let's talk about the actual construction of the facilities.  Let's start with Plaintiffs' Exhibit 231.  Tell us what this is depicting.

A.   So, this is a wind turbine.  It's a schematic -- the transformer is what we call pad-mounted, so it's at the base of the turbine.  That's true for the GE turbines, but the Vestas machines, the transformer is actually within the top of the turbine, which I'll get to in a moment.

You have then the tower, the long portion of the

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

turbine that allows you to gain altitude, because as I mentioned earlier, the wind is generally stronger at altitude.  You have the hub, where the rotor blades attach to, and then the nacelle, and the nacelle is what houses -- and there's a blowup of it -- it houses the gearbox, the generator, in the case of the GE machines the transformer.  Those items are all contained at elevation within the nacelle.

MR. ROSENBAUM:  Your Honor, I would move Exhibit 231 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 231 is admitted.

(Plaintiff's Exhibit Number 231 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And if we could look at Plaintiffs' Exhibit 232, and tell us what that is, please.

A.  That is a depiction of the evolution of wind turbines through the years.  You can see the first one is the Vestas 15 machine, which goes back to 1981.  It had a 55 KW capacity, and the production might have been, for that turbine, 217 megawatt hours per year.

Through time what happened is hub heights have been raised, blades have become longer, and you end up being able to capture more of the wind energy that's

available.  In this instance, it culminates with the V90 -- it's still progressing today, but the V90 is the Vestas machine that we used.  It's at a 90-meter hub height.  It has 3000 KW or three megawatts of capacity, and that turbine, as I was mentioning, can capture the most energy for a given parcel of land.

And so in this instance it's 9152 megawatt hours per year versus, as you move to the left, as low as 217 megawatt hours per year.  So, that is, you know, a big driver on why we selected Vestas given the ability to capture and utilize as much of the wind energy as was available as a result of scarcity of land.

MR. ROSENBAUM:  Your Honor, I would move Exhibit 231.

THE COURT:  232.

MR. ROSENBAUM:  232.  Thank you, Your Honor.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 232 is admitted.

(Plaintiffs' Exhibit Number 232 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Let's look at Plaintiffs' Exhibit 233.  Tell us what that depicts.

A.  Again, it's a depiction of the relative height of the wind turbine versus, say, the Statue of Liberty, so

you get a sense of just how large these turbines are, and the rotor height in this one is -- the tower height is at 80 meters.  The rotor diameter is about 90 meters, and your wind-swept area is about 1.57 acres.

Q.  Okay.

Your Honor, I would move Plaintiffs' Exhibit 233.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 233 is admitted.

(Plaintiffs' Exhibit Number 233 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  If we could look at Exhibit 235, please.  What is Exhibit 235 depicting?

A.  In this exhibit we're trying to give a sense of the collection system, how the turbines are really tied together.  This would really be an Alta I depiction because you have the -- again, the pad-mounted transformer, where on the Vestas machines, it will be up in the nacelle at elevation, but it also gives you some sense of the foundation.

The foundations for the Alta I machines, the GE machines, go down 30 feet.  So, in order to stabilize the turbine, it's a very deep foundation for the Alta I project.

Q.  Okay.  And then explain what is shown in --

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

beyond the turbines.

A.   So, you have the turbines, the collection system, which is the green and red lines, basically, taking the -- collecting the power at a very low voltage, feeding it into the substation.  As it gets fed into that substation, typically at 34.5 volts, it gets stepped up by way of a stepup transformer and then fed onto the transmission line.

Q.   Okay.  And then hooks up to the utility electrical grid, correct?

A.   Yes.

Q.   All right.

I would move Exhibit 235 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 235 is admitted.

(Plaintiffs' Exhibit Number 235 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   And do you have some photos relating to the actual construction?

A.   We do.

Q.   Okay.  And where do those come from?

A.   They were from Terra-Gen.  They were put together at my supervision.

Q.   Okay.  And are you personally familiar with the

136

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

construction process?

A. I am.

Q. Let's look at Exhibit 236, please. So, what is Plaintiffs' Exhibit 236?

A. So, this is obviously Alta I, because the terrain is hilly and we're beginning to cut roads. It gives you a sense of the type of machinery that's onsite and the types of roads that we need to construct in order to be able to access each of the turbines with a road.

Q. Okay.

I would move Exhibit 236.

MR. RONICKHER: No objection.

THE COURT: Plaintiffs' Exhibit 236 is admitted.

(Plaintiffs' Exhibit Number 236 was admitted into evidence.)

BY MR. ROSENBAUM:

Q. Exhibit 237, what is that, please?

A. So, this is a foundation drawing for the Patrick & Henderson foundation. Those foundations were used on Alta I. As I mentioned earlier, that's about 30 feet deep. There's an inner can and an outer can. In other words, we will see in later pictures how the foundation itself is constructed, roughly four feet, two on each side, between them, and concrete is poured between those two cans, with rebar, and then there's tension --

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

compression placed, rather, compression is placed on the concrete.

So, you stabilize that foundation in order to sustain the turbine, which as we talked about is at a fairly sub -- a fairly high hub height.  It's subject to the wind blowing pretty aggressively, and it needs to be solid in terms of how it attaches to the ground.  So, the foundation work is very important and very rigorous.  You don't see it as you drive around the site because it's all underground, but it's a key component.

You also have to add, in the case of the Altas, the fact that it is within an earthquake zone.  So, there are certain additional requirements for the foundations that we had to satisfy.  So, these foundations are, you know, very robust.

Q.  Okay.  Let's look at Exhibit 238, please.

A.  So, a blowup of the prior exhibit in terms of the data.  As I said, the height is 30 feet.  The outer can is the 16 and the inner can the 12, so four feet between them, with two feet on each side, and between those two, you have the -- you have the concrete which gets poured into place.  And I think we show that in a later picture.

MR. STEINBAUM:  All right, I will move Exhibits 237 and 238.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibits 237 and 238 have been admitted.

(Plaintiffs' Exhibit Numbers 237 and 238 were admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And you described this as being the foundation for Alta I.  Was a different kind of foundation used for the other ALTAs?

A.  It was.  It's a spread foundation, and we get to some pictures on that in just a short while.

Q.  Let's look at Exhibit 238, please.  What is that depicting?

A.  Again, depicting the foundation work to prep for the digging actually of the foundation.

Q.  All right.

I'll move Exhibit 239.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 239 is admitted.

(Plaintiffs' Exhibit Number 239 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And Exhibit PX 240, please.

A.  So, now we're beginning to dig the foundation. It's chalked out and then you're using a backhoe.

You'll see in a later picture, you also sometimes come across rock that has to be broken up, and you have to clear, you know, a very sizeable hole for the foundation itself.

Q.  All right.

I move Exhibit 240.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 240 is admitted.

(Plaintiffs' Exhibit Number 240 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Plaintiffs' Exhibit 241, please.  What's this?

A.  So, this is the piece of equipment that I mentioned just a moment ago.  It's used to break up any rock that might be encountered while you're digging the foundation hole.

Q.  Okay.

Move Exhibit 241.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 241 is admitted.

(Plaintiffs' Exhibit Number 241 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 242.

A.  The inner and outer can, so that you will see in

Trial
Alta Wind I Owner Lessor C, et al. v. USA                            5/9/2016

a picture or two that we will lower the cans into place, and that's what sets up the perimeter of the foundation and allows for the concrete to be poured between those two.

MR. ROSENBAUM:  I'll move Exhibit 242.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 242 is admitted.

(Plaintiffs' Exhibit Number 242 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Plaintiffs' Exhibit 244, please.

A.  So, there's the -- it looks to be the outer can being lowered into the hole that was dug, and the inner can will be lowered inside of that.

Q.  Okay.

I'll move Exhibit 244.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 244 is admitted.

(Plaintiffs' Exhibit Number 244 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 245.

A.  So, now we're pouring the concrete into -- in between the two cans, so that's depicting -- is a picture of that taking place.

141

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

MR. ROSENBAUM:  I move Exhibit 245.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 245 is admitted.

(Plaintiffs' Exhibit Number 245 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Okay.  Plaintiffs' Exhibit 247, please.

A.  So, here is the spread foundation for the non-GE turbines, the Vestas machines.  It's a different configuration, not nearly as deep but much wider, a lot of rebar, also a lot of concrete.  For one of these foundations, it would be about 435 cubic yards of concrete, which translates into, you know, roughly 50 concrete trucks.

So, each of the turbine pedestals that were poured for the 720 megawatts or for -- I'm sorry, for the 570 megawatts, the Vestas machines, required a foundation of this type.

MR. ROSENBAUM:  Move Exhibit 247.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 247 is admitted.

(Plaintiffs' Exhibit Number 247 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 248.

A.  Here we have the concrete poured.  We don't have the neck yet poured, that will be the next step in the process, but, again, that's a lot of cement, a lot of concrete.

MR. ROSENBAUM:  Move Exhibit 248.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 248 is admitted.

(Plaintiffs' Exhibit Number 248 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 249.

A.  Now you have the neck poured.  You're beginning to backfill the foundation, again, readying it for the access roads that will need to be around the foundation as well as the actual turbine tower itself.  It gets placed on those bolts.

MR. ROSENBAUM:  Move Exhibit 249.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 249 is admitted.

(Plaintiffs' Exhibit Number 249 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 251, please.

A.  So, that's the -- the arrival area, the lay-down area, or you can call it any number of things.  It's

where the pieces come in on rail.  In the case of the Vestas machines, the towers were constructed in Colorado, so they come directly from the factory by rail.  In the case of the GE machines, they were direct -- they were constructed or manufactured overseas.  So, they ultimately get to the site by rail, but they first take a nice boat ride.

Q.  Okay.

I'll move Exhibit 241 -- 251, excuse me.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 251 is admitted.

(Plaintiffs' Exhibit Number 251 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Plaintiffs' Exhibit 252, please.

A.  Now, this is a lay-down area, so this is away from the railyard.  It's where we truck the pieces to. This particular one, I believe, is for the Alta I turbines, and it shows the blades; it shows sections of the towers, and the towers come in three sections; and the nacelles are the boxes that you see there, the white in color boxes.

But it gives you a sense of the coordination necessary in order to get everything from the railyard to an area that you're going to be able to access it

when needed during the construction process.

MR. ROSENBAUM:  Move Exhibit 252.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 252 is admitted.

(Plaintiffs' Exhibit Number 252 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Plaintiffs' Exhibit 253, please.

A.  The -- as I had mentioned earlier, the pieces are trucked from the railyard, where they're -- where there's -- where they land, to the lay-down area for each of the phases, and in this instance, they are Vestas machines.  You can see the "S" on the back of one of the blades, and it's a typical scene during the construction process that you'll see these -- these tractor-trailers, essentially, transporting the various turbine parts to the lay-down area.

MR. ROSENBAUM:  Move Exhibit 253.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 253 is admitted.

(Plaintiffs' Exhibit Number 253 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 254?

A.  A tower section.  It's -- it looks like the

midsection here that -- if I were guessing, I would say it was for one of the -- one of the Vestas machines.

Q.  All right.

I'll move Exhibit 254.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 254 is admitted.

(Plaintiffs' Exhibit Number 254 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 255.

A.  Now you're actually placing the section into the tower.  There's one more on top of that.  And given the terrain, it's actually Alta I, the GE machines that are being -- being erected here.

MR. ROSENBAUM:  Move Exhibit 255.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 255 is admitted.

(Plaintiffs' Exhibit Number 255 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 256.

A.  So, it's an erected turbine behind one that is being pieced together.  The Vestas -- this one is a Vestas.  The Vestas blades get assembled in the air, one at a time.  So, you have three trips up and down, if you

will, with the crane in order to put the blade onto the hub.  And the GE machine you'll see a little later is different in that you actually assemble the blades onto the hub on the ground.

MR. ROSENBAUM:  Move Exhibit 256.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 256 is admitted.

(Plaintiffs' Exhibit Number 256 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 257.

A.  That's a nacelle.  It looks to be a Vestas nacelle, and you really can't get a great sense of scale there, but we do have a later picture that will give you a sense of the scale of the -- of the nacelle itself.

Q.  Okay.

I'll move Exhibit 257.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 257 is admitted.

(Plaintiffs' Exhibit Number 257 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 258.

A.  So, that's the nacelle being placed on top of the tower.  You can tell this one is a GE tower because the

Trial

Alta Wind I Owner Lessor C, et al. v. USA                     5/9/2016

rotor on the ground is assembled into all three blades, so that will then be lifted -- and I do believe we have a picture of that happening -- and attached to the nacelle.

Q.   Okay.

Move Exhibit 258.

MR. RONICKHER:   No objection.

THE COURT:   Plaintiffs' Exhibit 258 is admitted.

(Plaintiffs' Exhibit Number 258 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   And Exhibit 259.

A.   So, it's the back of the nacelle.  It gives you a sense of the scale.  As I was saying earlier, it's hard -- it's really hard to get a sense of how large these are, especially today, when you drive around them, it -- they don't look nearly as massive as they are. But you can see, relative to the size versus a person, it's a large object that you're lifting with cranes to place on top of the tower.

MR. ROSENBAUM:   I'll move Exhibit 259.

MR. RONICKHER:   No objection.

THE COURT:   Plaintiffs' Exhibit 259 is admitted.

(Plaintiffs' Exhibit Number 259 was admitted into evidence.)

148

Trial

Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

BY MR. ROSENBAUM:

Q.  Exhibit 260.

A.  Just a series of blades in the lay-down area.

MR. ROSENBAUM:  Move Exhibit 260.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 260 is admitted.

(Plaintiffs' Exhibit Number 260 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 261.

A.  Here's a GE blade.  Again, it gives you a sense of scale, someone standing alongside of it.  You can get a flavor for just how massive they are.  Again, all of them have to be lifted and put in place 90 meters up.

MR. ROSENBAUM:  Move Exhibit 261.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 261 is admitted.

(Plaintiffs' Exhibit Number 261 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 262.

A.  That is the Vestas blade arriving from Colorado, and that is how it would arrive, on rail.

MR. ROSENBAUM:  Move Exhibit 262.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 262 is admitted.

(Plaintiffs' Exhibit Number 262 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 263.

A.  So, here's a GE turbine, assembled and being lifted as one piece onto the nacelle for the 1.5-megawatt machine.

MR. ROSENBAUM:  Move Exhibit 263.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 263 is admitted.

(Plaintiffs' Exhibit Number 263 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 264.

A.  Again, relocating a crane to take the next nacelle or next rotor and elevate it into place.  You can see you've got some assembled turbines.  You have two towers in the background.  They may be heading to that tower.  But there's a lot of cranes onsite.

MR. ROSENBAUM:  Move Exhibit 264.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 264 is admitted.

(Plaintiffs' Exhibit Number 264 was admitted into evidence.)

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

BY MR. ROSENBAUM:

Q.  Exhibit 266.

A.  Trenching, laying cable.  You can see the spool on the back of the device.  We lay cable, and we'll get into just how many miles of cable in a moment, but that's part of the collection system.  You have to tie each one of these turbines now together with cable and low-voltage transmission, if you will, and that is the process by which you do it.

You have a trenching machine.  You have a spool of cable on the back of it.  You have, on the side, some backfill occurring as the cable gets laid.

MR. ROSENBAUM:  Move Exhibit 266.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 266 is admitted.

(Plaintiffs' Exhibit Number 266 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 267.

A.  Those are the spools of cable that are onsite so that you can continue the collection process, to get a sense for just how much cable is involved on the buildout of this.

MR. ROSENBAUM:  Move Exhibit 267.

MR. RONICKHER:  No objection.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

THE COURT:  Plaintiffs' Exhibit 267 is admitted.

(Plaintiffs' Exhibit Number 267 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 268.

A.  That's the stepup transformer.  So, that would be located within the substation.  As I said, the collection occurs at a low voltage and then is stepped up to a higher voltage, 345 kV, and that then goes on to the transmission line.  So, that is your transformer which steps up the voltage.

Q.  Okay.  And operationally, is this where you pass from being eligible property to ineligible property?

A.  On the high side of that transformer, you pass to noneligible property.

Q.  Once it's installed, obviously.

A.  Once it's installed, yes.

MR. ROSENBAUM:  Move Exhibit 268.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 268 is admitted.

(Plaintiffs' Exhibit Number 268 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 269.

A.  That's the same transformer being transported.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

You can see it's transported with great care because it's pretty expensive.

Q. Okay.

Move Exhibit 269.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 269 is admitted.

(Plaintiffs' Exhibit Number 269 was admitted into evidence.)

BY MR. ROSENBAUM:

Q. Exhibit 270.

A. That's a substation.  So, the transformer sits in the middle of the substation.  The left side of the substation is the low-voltage side.  If you look closely on the bottom left corner of the picture, there's something coming out of the ground with wires sticking out of it.  That is essentially the collection system that then gets tied into the substation, goes to the transformer, it's stepped up, and then that goes on to the right side of the substation where you have wires coming out connecting to an overhead transmission line.

Q. Okay.  So, is it eligible property on the left-hand side up to the transformer and then ineligible after that?

A. Yes.

MR. ROSENBAUM:  I move Exhibit 270.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 270 is admitted.

(Plaintiffs' Exhibit Number 270 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And Exhibit 271.

A.  So, that's your transformer in place with low voltage coming in on the left, being stepped up, and high voltage going out on the right.  Cooling devices surround the transformer because -- there's a lot of heat that is emitted from that process as you step it up, and you have cooling devices that surround the transformer.  There's actually two transformers there.

MR. ROSENBAUM:  I move Exhibit 271.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 271 is admitted.

(Plaintiffs' Exhibit Number 271 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And Exhibit 272.

A.  The control room for the substation.  You know, relays, safety devices, communication devices, all that would be housed within the control room.

MR. ROSENBAUM:  Move Exhibit 272.

MR. RONICKHER:  No objection.

154

Trial

Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

THE COURT:  Plaintiffs' Exhibit 272 is admitted.

(Plaintiffs' Exhibit Number 272 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Exhibit 277?

A.  It looks like the end of the day, but it's really the beginning of our day.  We start with a safety orientation.  That's the people gathering for that safety orientation.  In terms of the folks that are -- you know, have worked at the site over the buildout, for these six phases, we had over a million person-hours of construction time.

MR. ROSENBAUM:  I'll move Exhibit 277.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 277 is admitted.

(Plaintiffs' Exhibit Number 277 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Plaintiffs' Exhibit 280.  Take a moment and take us through this document.

A.  Okay.  So, as I said, one -- one statistic that's not on here is, you know, how many person-hours were needed in order to get the construction of the Alta phases I through VI from start to finish, and that was in excess of a million.  I think it's 1,085,000.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

The number of turbines for I through V was -- I through VI, rather, was 340 turbines.  We'll talk some about VIII and IX, which had 50 turbines and 44 turbines, respectively.

As you look at the amount of roads that were built, it's 81 -- almost 82 miles of roads.  That's across the first six phases.  It's well in excess of 100 miles when you look across the entire project.  I think it's 160 or so.  The miles of cable laid and, therefore, the trenches that had to be dug in order to establish this collection system, 119.8.

Q.   That's miles?

A.   That's miles of cable laid and trenches dug.

Tons of steel for the first six phases, we -- in terms of steel for the rebar and the foundation, we utilized in excess of 8000 tons across the first six phases.

Cubic yards of concrete, we utilized in excess of 130,000 cubic yards of concrete, which based on an eight cubic yard truck, which is, you know, a reasonable estimate, that's about 16,000 cement trucks, all of which have to be coordinated in, moved out, the concrete has to be poured, and it's a lengthy, labor-intensive process.

And then, finally, the tons of -- the total tons

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

of rebar for the phases is 10,200 tons.

Q.   Okay.

Your Honor, I move Exhibit 280.

MR. RONICKHER:   No objection.

THE COURT:   Plaintiffs' Exhibit 280 is admitted.

(Plaintiffs' Exhibit Number 280 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   So, Mr. Pagano, did Terra-Gen successfully develop and build the various Alta Wind facilities?

A.   Yes, we did.

Q.   And did Terra-Gen sell those facilities?

A.   Yes, we did.

Q.   And did they sell Altas I through VI to the Plaintiffs in this case?

A.   Yes, we did.

Q.   Now, at the point that the facilities had been sold, had they been placed in service?

A.   No, they were not.

Q.   Okay.   And who were the owners of the facilities at the time the cash grants were sought?

A.   The various purchasers of the projects.

Q.   Now, did Terra-Gen ever consider holding on to the facilities and not selling them?

A.   We most certainly did.

157

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.   And why didn't that happen?

A.   We were prohibited from qualifying for a cash grant if we owned the asset, and the reason that is is because we have a small percentage of tax-exempt ownership in our ownership structure, about 10 percent, and that, in and of itself, disqualified us from any portion of the grant.  We lobbied hard to try and have that changed unsuccessfully.

Q.   Is that requirement of 100 percent tax-exempt ownership, is that unique to cash grants?

A.   It is.  I candidly think it was somewhat of an oversight.  I'm not sure, but typically in a -- in a setting where you have accelerated depreciation or production tax credits or something of a tax credit, what you would have is a pro rata reduction in the amount that you're entitled to based upon your tax-exempt ownership.

So, we would have expected that rather than be outright disqualified from the cash grant program, we would have only been entitled to our taxable portion of our ownership, which would have been 90 percent, which would have worked fine for us.  It would have not necessitated, you know, us to sell the transaction -- the assets.

You know, we're in the business.  As you can see

from I think the first depiction we went through or the first chart we went through, we like to own assets. We prefer to own them, to operate them, hold them long term, and then there is ultimately an exit.

But that would -- I think when the acquisition was done by ArcLight, they would have told you the exit would have been a corporate entity exit versus an asset exit. We would have exited as a corporation, in an IPO or in the sale of the entire entity. That was not an option.

Q. After some period of operation?

A. After some period of operation, because you significantly derisk the project through the development. We went through the risks that you encounter. You further derisk it through construction -- we talked about the risks of construction -- and then you prove out the operations.

You then have, you know, a -- a project that is pretty known and knowable given the operating history, et cetera. So, that's when you can get your most aggressive buyers. So, it's often in a sponsor's interest and a company's interest to hold that until it's fully derisked and then to sell it.

We weren't able to do that. We were able to take the development risk. We were able to take the

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

construction risk.  We were not able to hold that asset and qualify for the grant because of what I would call a quirk in the legislation.

Q.  Okay.  If we can look at Plaintiffs' Exhibit 1, please, what is that document?

A.  That is a letter written to House Ways and Means, I believe it is there, but it's certainly to Members of the House, to request some fix of the provision within the 1603 program that disqualified people like ourselves, someone with 1 percent, 2 percent, 10 percent tax-exempt ownership.  We felt like there was a better way to address this, and I'm sure in this letter we go into this pro rata treatment that we talk about in other contexts, and we had sent that letter to members of the House.

Q.  And if we look at Plaintiffs' Exhibit 2, is that the same letter but to the Senate?

A.  It is.

Q.  And is this being sent by a trade association of which Terra-Gen was a member?

A.  Yes.  We were a member of AWEA and the Geothermal Association.  We are not a member of SEIA, that's the solar foundation, or we're not -- and Terra-Gen is not a member of the Private Equity Council, but we were a member of AWEA.  We were very active in putting this

letter together in terms of trying to move this into a direction that we could then qualify for the grant.

Q.   And just tell us what AWEA stands for.

A.   AWEA is the America Wind Energy Association. It's the premier wind association on a national level.

Q.   Okay.  And were these efforts to get a legislative fix successful?

A.   No, they weren't.  People were clearly sympathetic, and we met with Joint Tax, we met with Members of the House, Members of the Senate.  We talked about the quirkiness of it.  You know, they were all scratching their head, but at the end of the day, to fix it, it was a legislative fix, which was not practical.

Q.   Okay.

A.   So, it was not fixed at all in legislation.

MR. ROSENBAUM:  Your Honor, I would move Plaintiffs' Exhibits 1 and 2.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibits 1 and 2 are admitted.

(Plaintiffs' Exhibit Numbers 1 and 2 were admitted into evidence.)

BY MR. ROSENBAUM:

Q.   Now, were there any other practical options by which TGP could maintain ownership?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.  To maintain ownership, we had one other alternative.  We could have subjected ourselves to two layers of taxation, and we would have to put in a C-corp, which would then block or -- I think they call it a C-corp blocker, which would then take all of the income that's generated from the asset and put it into a corporate level of taxation, which would have disadvantaged us as we moved forward with future phases of the Altas, just as a general matter, now subjecting the income to two levels, both at the corporate level, in the C-corp blocker, and then again at the partner level of the private equity firm.

It's not something you could block on an individual-by-individual basis.  We actually explored can you just block that 10 percent.  It was not an option.  Given the structure of the fund, given the structure of the entity, we had to block the entire asset and subject the entire asset to two levels of taxation.

Q.  All right.

THE COURT:  Mr. Rosenbaum, may I ask a question?

MR. ROSENBAUM:  Yes.

THE COURT:  Mr. Pagano, can you explain to me once more why it is that Terra-Gen was not eligible for the cash grant itself?

THE WITNESS:  Yes.  Terra-Gen's owned by ArcLight, and in this case it was ArcLight and GIP, both private equity firms, and part of their investor base, a small part of that investor base, were pension funds, people that are tax-exempt.

And under the legislation in 1603, Congress provided that this grant cannot go to people who have any ownership that is tax-exempt, which is unusual because typically they would have said you can get your grant, but if you have 50 percent tax-exempt ownership, you're only going to get 50 percent.

Here, maybe because of an oversight, maybe because of just poor drafting -- I don't know -- but what the legislation said is if you have one-tenth of 1 percent of tax-exempt ownership, you do not qualify to receive a 1603 grant.  And we have in our ownership structure, between our two sponsors, in total, about 10 percent tax-exempt ownership.

THE COURT:  When did you learn about your ineligibility?

THE WITNESS:  Oh, it was -- it was through the process, and I think it was -- you know, obviously, when the program itself came out, we thought, well, this is really helpful.  Congress has been responsive to the needs of the industry, because the PTC, as I said

earlier, would have been tough to realize value from given the credit crisis.  When we learned of the grant program, we were very happy that they had acted.

And I think it was Joe Mikrut who was a former staffer on Tax Ways and Means, you know, after reading and digesting and processing, who pointed out to us, well, wait a minute, do you guys have any tax-exempt ownership?  And we said yes.  And so we -- at this point, it's probably early 2010-ish, the exact date don't hold me to -- but I can remember the circumstances because obviously that was a bad day.

But it was described to us as something that, look, we should be able to fix this, and we were advised by counsel and by Joe, go to Joint -- to the Joint Committee on Taxation, talk to them about -- there's -- I can't remember the exact terminology, but there is a process that -- an interpretation process that you can go through in terms of how to -- how to deal with these types of issues that are just kind of quirky but not necessarily the intent of Congress.

And they said to us, you know, it really isn't that type of an issue.  The language is clear.  It says if you have any tax-exempt ownership, you can't -- you can't participate in the grant program.  So, we were at this point struggling with, okay, do we put the C-corp

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

blocker in?  Can we block just that 10 percent or do we have to block Terra-Gen?  And we concluded we absolutely have to block Terra-Gen.

You know, we were still struggling.  We were still struggling and, candidly, what happened was the guidance came out, and they said you can do a leveraged lease, and in the case of a leveraged lease, the lessor can make the application for the grant.  We were at that point anxious to maintain a presence in Tehachapi and maintain a very active role within the Alta franchise, if you will, because we had built out not even half of the megawatts we had hoped to build out.

And so we said, well, this can work.  We can do a transaction where we maintain the operating role, you know, where we are, you know, the lessee over a long period of time; not the whole useful life but enough of it so that we can build out the rest of the franchise.  And at that point we really thought, okay, well, it's not ideal because there's a lot of transaction costs associated with that, there's a lot of work that goes into that, but we had been told very clearly that a legislative fix was not going to happen because they weren't -- you know, this was the Congress of 2010, where there was still a lot of strife, if you will, within what could get done and what couldn't get done,

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

and we were told a legislative fix was just not in the cards.

THE COURT:  Thank you very much.

THE WITNESS:  My pleasure.

BY MR. ROSENBAUM:

Q.  Okay.  You touched upon this a bit, but in what form did the sale of the Alta Wind facilities take place?

A.  So, some of them took place as direct sales with no subsequent lease transaction.  Some of them took place as a direct sale followed with a lease transaction.

Q.  Okay.  Is that known as a sale-leaseback?

A.  It is.

Q.  And what's -- and what are the -- some of the advantages of a sale-leaseback versus an outright sale?

A.  A sale-leaseback allows you to maintain with a certainty a presence in the project, right?  Because if you are going to sell it and then be the lessee, you are not -- you are not just an operator.  You are not just someone that is here today, perhaps gone tomorrow. You're someone that will be a part of that project during the term of the lease.

Unless the wind doesn't blow properly or you don't perform your side of the operations properly,

things get away from you and you default on that lease -- and you could lose it in that instance -- but otherwise, you're going to be in that project for the term of the lease.

An outright sale, you may follow with an operations agreement; you may not.  A couple of them we did not do an agreement, and that's just a purely different role.  You're just an operator.  You don't have as strong a presence, if you will, in the project.

Q.  And given the fact that at the time you started the first sales, you were still developing other later phases, what influence did that have on your choice between sale-leasebacks and an outright sale of the early facilities?

A.  Yeah.  So, I would say our first priority, our first preference, if we had it, would have been to hold it and not have to suffer double taxation.

Our second preference would have been to be a lessee, because that would allow us the ability to -- the ability to maintain a strong presence.

And then a third preference would be the outright sale, which we did some outright sales but we did them with the later transactions, like when we sold to Berkshire Hathaway, when we sold to EverPower, you know, there were transactions, some of which are not part of

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

this litigation, where we did sell them outright.

Sometimes we operated.  Sometimes we didn't.  We didn't operate for Brookfield, we don't operate for EverPower, and we do operate for Mid-American Energy.

Q.  And you've talked about maintaining a strong presence.  I mean, what's the advantage of maintaining a strong presence?

A.  It -- you are going to have issues that come up as you build through subsequent phases, easements, access easements, things of that nature.  If you sold this to Brookfield, they're a direct competitor, and trying to get that easement, it might be more challenging than if you're leasing the asset back from someone like a Google or a GE or a Citibank.  And those were very important factors in our decision-making when we were deciding which way to go on that -- on the initial transactions.

Q.  Okay.  Let's go back to Joint Exhibit 126, which is the Treasury guidance you talked about previously, and if we turn to page 9, the second full -- the second full paragraph beginning with the word "If."  Can you just read that?

A.  It says, "If new property is originally placed in service by a person and is sold to an applicant and leased back to the person by the applicant within three

months after the date the property was originally placed in service by the person, unless the lessor and lessee elect otherwise, the applicant-lessor is considered the original user of the property and the property is considered to be placed in service not earlier than when it was used under the lease back."

Q.  Okay.  And what did that guidance tell Terra-Gen about the appropriateness of the sale-leaseback structure?

A.  That it was appropriate, I mean, that -- and it wasn't just this guidance.  There were meetings -- again, go back to Joe Mikrut and some of the folks that were advising us, specifically talking to Treasury about sale-leasebacks, where they indicated, yes, a sale-leaseback transaction is completely acceptable. It's sanctioned here as well, we can see, and the guidance was pretty clear.

Q.  Okay.  And what -- in terms of the particular guidance here being given as to what date would be considered the placed-in-service date, what option was actually chosen by --

A.  As our in-service date?

Q.  Yes.

A.  It was always the date that the lessor acquired the asset and placed it in service, other than the

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

direct sales.  We're talking about the sale-leasebacks, so I'm answering you in that context.

Q.  Yes.

A.  The direct sales obviously was separate.  The buyer would place it in service, right, in that instance as well.  They had to.  Otherwise, if we placed it in service, we were required to apply for the grant, and if we applied, we would have been told we can't get it because of our tax-exempt ownership.

Q.  Okay.  But if it was a sale-leaseback, you were allowed to treat the placed-in-service date as the date the --

A.  It's the date the transaction takes place, and it's just the vestige of how tax laws for sale-leasebacks work generally.  If you -- if you do that sale-leaseback within 30 days -- within 90 days of the facility being placed in service, you don't start your depreciation when you place the asset in service; you start it when the sale-leaseback occurred.

So, Congress, the IRS -- I can't tell you where it is, but I just know from experience -- gives you a 90-day window from the in-service date to actually place it in service, and the guidance here is saying, yeah, that 90-day window applies as well to the grant.  If you place it in service and then subsequently do a lease,

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

we're okay, you know, we're going to treat the in-service date as the start of that lease.

Q.   Okay, all right.  And if we look at page 8 of this document, the previous page, and the second paragraph, was guidance also provided as to the option as to when you would treat the in-service date if you had multiple units of property located at one location?

A.   It was, and this was an important piece of the guidance as well because under the production tax credit -- I could not tell you how it works under the ITC -- but under the production tax credit, you would qualify for the production tax credit beginning with each megawatt of production after a particular turbine was placed in service.

Under the grant program, you have to place the entire facility, the entire project into service, which means, you know, testing out the control system, testing out each turbine, getting certifications that the turbines are ready for their intended use and that the facility is ready for its intended use.

Q.   Okay, all right.  We can take down this exhibit.

Was it -- now, a critical question:  Was the amount of the sales price for the Alta Wind facilities affected by whether the facility was sold through an outright purchase as opposed to a sale-leaseback?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.   No, it wasn't.

Q.   Okay.  Let's look at Exhibit 281 which I put up during my opening statement.

THE COURT:  This is Plaintiffs' Exhibit?

MR. ROSENBAUM:  Plaintiffs' Exhibit 281, Your Honor.

BY MR. ROSENBAUM:

Q.   Okay.  What -- now, there are eight facilities listed here, correct?

A.   Yes.

Q.   Okay.  And are I through VI the facilities in this litigation?

A.   They are.

Q.   Okay.  And then VIII and IX are not in this litigation, correct?

A.   That is correct.

Q.   Okay.  Now, which of these eight facilities was sold in a direct sale without any lease?

A.   So, the -- the top three are direct-sale transactions.  It's Alta VI, which is a direct sale to EverPower, and that is part of the litigation; it's Alta VIII, which was a direct sale to Brookfield; and Alta IX, which was a direct sale to essentially Berkshire Hathaway, their utility sub, Mid-American Energy.

Q.   That's the famous Warren Buffett company?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

A.  That is the famous Warren Buffett entity.

Q.  And which ones were sale-leasebacks?

A.  The first five phases.  The first one was a single investor lease, if you will, that's a sale-leaseback; and Altas II through V were done with Citibank at the time.  Google subsequently came in just ahead of commercial operations.  And those were sale-leasebacks as well.

Q.  All right.  So, take us through the -- you've listed the buyers in column two, which you've talked about already.  What's in column three, the purchase price?

A.  It is the amount paid by way of cash transferred to Terra-Gen and debt and liabilities assumed by the buyer in each of the instances.

Q.  Okay.  And we will get to this in more detail, but did real money change hands?

A.  Yes.

Q.  All right.  The next column is called "% of Facility Acquired."  Explain what that means.

A.  In the sale-leaseback transactions done in Alta II through V -- not the Alta I sale-leaseback transaction -- what was transferred was essentially the power-producing component of the entire facility, the eligible property.  And we transferred -- you can see

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

the percentage that that makes up of the total cost of the purchase or of the -- of the asset is 93.8 percent on the high or 93 percent on the low.

Alta I, we sold the entire facility, the entire integrated power production facility to GE and Union Bank, and that's the case as well on Alta VI, Alta VIII, and Alta IX.

Q.   Those are the pure outright sales and you sold the whole facility.

A.   Sold the whole facilities.

Q.   And the next column, "Size of Facility in Megawatts," that's pretty self-explanatory.

A.   It is.

Q.   The "Purchase Price Per Kilowatt," what are you doing?

A.   So, you're taking the purchase price paid. You're grossing up, you know, in the instance of a sale of just the eligible property the amount paid to account for the fact that they were only buying a portion of the facility, you know, a large portion of the facility, but in some instances, you know, not 100 percent of the asset base, and then you're dividing that number by the number of megawatts that exist for that facility, to come up with what is a typical metric in the industry, which is a dollar-per-KW number.  And that's what we see

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                          5/9/2016

in column four.

Q.  So, these facilities obviously are not all the same size, correct?

A.  No.  They are as small as 102 megawatts and as large as 168 megawatts.  Most of them are about 150.

Q.  Okay.  And this column, "Purchase Price Per Kilowatt," you now adjust it for size?

A.  You now normalize it for size.

Q.  And you also adjust it for the fact that Altas II through V only purchased some of the assets for those purchase prices, so you have adjusted for that, too.

A.  We have.

Q.  Okay.  The next column is called "Net Capacity Factor."  Explain what that means.

A.  So, you have a percentage of time that the facility will actually generate power, generate electricity, and that will vary based upon the wind conditions of the site, and we need to normalize for that because a project that produces a lot more electricity is worth more than one that produces less because the cash flows will be greater and we value it based upon the cash flows generated from the asset.

So, you can see that Alta I has the highest NCF, and it also had the highest cost on a dollar-per-KW basis, but that needs to be normalized across the NCF,

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

the production of each of the facilities.

Q.   Okay.

A.   So, we took Alta VI as the NCF we were going to normalize across, and then we adjusted dollars per KW across the various Alta phases to account for varying NCFs.  And this is, again, something that's normally done when valuing a wind project.  Trying to account for a dollar per KW on an NCF-adjusted basis is how you refer to it.

Q.   And bottom line, looking at the last column, what does this show as to the average price paid for the three outright sales?

A.   It was slightly larger than the sale-leasebacks.

Q.   Can you give us the --

A.   Sure.  If you look at the average price paid by EverPower, Brookfield, and Berkshire Hathaway, they paid about $3,035 a KW, and if you look at the average price paid by Union Bank and GE on Alta I, Citibank and Citibank and Google on the Altas II through V, that average price is about $2,926 a kilowatt.

So, it -- it shows the fact that there was, if anything, a lower price received on the sale transactions followed with a lease than there was on the direct sales followed with either nothing at all or an operating agreement in the case of the Mid-American

Energy sale.

Q.   Okay, all right.   So, based upon this, did Terra-Gen attempt to utilize the sale-leaseback format to manipulate the purchase price and thereby increase the size of the cash grant?

MR. RONICKHER:   Objection, Your Honor.   To the extent that Mr. Rosenbaum is asking the witness to testify about analysis about the purchase price in the various transactions, that's really straying into expert witness testimony, which this witness has neither been disclosed for or qualified to do.

THE COURT:   I'll sustain the objection.   Maybe you can rephrase.

MR. ROSENBAUM:   Okay.

BY MR. ROSENBAUM:

Q.   You were the CEO of the company at the time, correct?

A.   Yes.   Yes, I was.

Q.   Was it your personal effort to use the sale-leaseback format in order to increase the purchase price?

A.   No, it was not.

Q.   And did the sale-leaseback purchase prices, in fact, end up slightly lower than the outright sales?

A.   They did.

Trial

Alta Wind I Owner Lessor C, et al. v. USA                        5/9/2016

Q.   Okay.

Your Honor, I move Exhibit 281.

MR. RONICKHER:  I would maintain the same objection to the exhibit as a whole.  Obviously, there are certain columns that are simple facts, but when you get into the analysis, the economic analysis, I think that's, again, straying into expert witness territory.

THE COURT:  I am going to overrule the objection. I will admit Plaintiffs' Exhibit 281.

(Plaintiffs' Exhibit Number 281 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   What was your role in the sale by Terra-Gen of the individual Alta Wind facilities?

A.   I oversaw the sales and was involved in the decision-making and the documentation to a lesser extent.

Q.   Okay.  Which were the first of the Alta Wind facilities to be sold?

A.   The first was Alta I, but -- oh, I'm sorry, let me -- I have been up here for a while, so let me just collect myself, please.

The first transaction we did was the financing for Alta I, which was not a sale.  What we sold first was phases II through V, which was the Citi/Google

178

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

transaction.

Q. Okay. Let's put up Exhibit 221, which is the map, and just orient ourselves as to where II through V are.

A. So, the gray or faded purple is Alta II; the green is Alta III; the lime green to the right, Alta IV; and the purple-purple, Alta V.

Q. All right. And if we could put up Exhibit -- oh, let me back up.

Were these facilities sold as part of one overall transaction?

A. They were.

Q. Were there then individual agreements reached to actually carry out the transactions?

A. Yes, there were.

Q. Okay. If we look at Plaintiffs' Exhibit 282, could you please tell us what this chart shows?

A. So, in the case of the Alta II wind facility -- one, two, three, four -- five statutory trusts were established by Citibank, and the reason it's set up that way is so Citibank can subsequently sell off the trusts, a piece of the trust. They keep some for themselves, and they sell some to people like Google and others that are involved now in the Alta II -- in the Alta II project or any of the Alta projects that were sold in

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

leaseback.

It's an undivided interest, so it's indistinguishable.  It's just basically the purchase of an undivided interest owned by the trust, which the beneficial owner is Citibank, or if it's transferred to Google, it's Google, or if it's MetLife, it's MetLife, et cetera.

Q.  Okay.  But does Exhibit 282 depict who the owners were at the time of the actual sale transaction?

A.  Yes, it does.  Citibank.

Q.  Okay.

Your Honor, I move Exhibit 282.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 282 is admitted.

(Plaintiffs' Exhibit Number 282 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And looking at Exhibit 283, does this depict the same information with respect to Alta III?

A.  It does.

MR. ROSENBAUM:  Your Honor, I would move Exhibit 283.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 283 is admitted.

(Plaintiffs' Exhibit Number 283 was admitted into

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

evidence.)

BY MR. ROSENBAUM:

Q.   And showing you Plaintiffs' Exhibit 284, does this depict the same information with respect to Alta IV?

A.   It does.

Q.   And if we look at --

Your Honor, I would move Exhibit 284.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 284 is admitted.

(Plaintiffs' Exhibit Number 284 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   And if we look at Exhibit 285, does this depict the same information but with respect to Alta V?

A.   Yes, it does.

MR. ROSENBAUM:  Your Honor, I would move Exhibit 285.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 285 is admitted.

(Plaintiffs' Exhibit Number 285 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   Mr. Pagano, at the time of the sale transaction, did Terra-Gen and Citi have any overlapping ownership?

181

Trial

Alta Wind I Owner Lessor C, et al. v. USA                      5/9/2016

A.  No, we did not.

Q.  Did they share any common employees, officers, or directors?

A.  No, we did not.

Q.  Were they related parties in any way?

A.  They were not.

Q.  At the time of the sales transaction, did Terra-Gen and Google have any overlapping ownership?

A.  No, we did not.

Q.  Did they share any common employees, officers, or directors?

A.  No, they did not.

Q.  Were they related parties?

A.  They were not.

Q.  Was Citi experienced in energy projects?

A.  Very much so, yes.

Q.  How so?

A.  They had been in the industry really from the beginning when the focus was on fossil-fire generation. They were active on lending to and advising fossil-fire developers, as we moved to more of a renewable energy industry.  They were one of the first entities to start focusing on renewable power and performed those same roles for renewable developers such as ourselves.

Q.  And what was Google's approach to getting

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

involved in renewable energy?

A.   Google was obviously a late entrant.  You know, the industry has been around for decades, the power -- the independent power industry, and so they essentially hired the expertise from folks that had extensive experience within the power industry.

Q.   Okay.  Hired advisors?

A.   Yes.

Q.   Was Citi under any compulsion to buy?

A.   No, they were not.

Q.   Was Google under any compulsion to buy?

A.   No, they were not.

Q.   Was Terra-Gen under a compulsion to sell?

A.   No, we were not.

Q.   Okay.  And when was the commitment to sell Altas II through V entered?

A.   II through V, the commitment was in the summer of 2010.

Q.   Okay.  Was that the master agreement?

A.   It was July, yes.

Q.   And at that point -- okay.  And was Google involved at that point in time or not until later?

A.   No, they were not.  It was just Citi at that point, and Google was brought in subsequently.

Q.   Okay.  Okay.  And if we put up Exhibit --

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

Plaintiffs' Exhibit 286, what does that document show?

A.   It shows the closing dates for phases II through V and the amount of the purchase price for phases II through V.

MR. ROSENBAUM:   Your Honor, I move Exhibit 286.

MR. RONICKHER:   No objection.

THE COURT:   Plaintiffs' Exhibit 286 is admitted.

(Plaintiffs' Exhibit Number 286 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   Okay.   And I think you've said this already, but was there ultimately a separate sales agreement for each one?

A.   Yes.   There was a separate set of documents for each of the phases.

Q.   Okay.   Now, let's look at Plaintiffs' Exhibit 222.   Could you please tell us what that exhibit demonstrates?

A.   The blue represents the turbines, the roads, the collection system, the eligible property; and the red represents the high-voltage transmission and the O&M building, some of those buildings that you see little boxes of, which is the ineligible property.

Q.   Okay.   Now, if you look, for example, in the center, do you see the one where it says "11 N 13 W 30"?

184

Trial

Alta Wind I Owner Lessor C, et al. v. USA                           5/9/2016

A.  Yes.

Q.  Okay.  There is, in the upper right-hand corner -- did I do that?  Oh, that was a mistake.  How do you undo that?  Okay, great.  I won't touch it again.

In the upper right-hand corner, there's, like, a box that's sort of partly blue and partly red.  Do you see that?

A.  Yes.

Q.  Do you know what that represents?

A.  That's probably a substation at that point because it's a -- once you get to the high voltage, you can -- it is a substation because you can see the transmission line coming out of it.  So, the low-voltage side of the substation, as we were talking about earlier, the left side, if you will, or the lower side here, is low voltage and, therefore, eligible property; and the upper portion, once it's stepped up to the higher voltage, it becomes ineligible property.

Q.  All right, okay.  Now, did you -- did Terra-Gen sell to Citi and Google the entire Altas II through V facilities or only the eligible property?

A.  Only the eligible property.

Q.  And why was that?

A.  The eligible property had the five-year depreciation associated with it.  It was more important

185

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

for them to actually utilize that depreciation, less so for the property that was outside of that asset depreciation category, and it was the bulk of the facility. So, they had requested, I'm relatively confident, to just purchase that portion.

Now, we had retained assets which were subsequently leased to them and then subleased back by us, so you get to the same spot in terms of -- you know, they have a full -- a fully integrated power production facility at the end of the day that they control. At the end of the lease, they can -- we can either lease those retained assets from them, buy them at fair market value, and control the asset in its entirety, but in terms of the front-end structuring of the lease, that's how it was done in that instance.

Q. Okay. Did it matter to Terra-Gen whether it sold everything or just the eligible property?

A. No. We would have been happy to sell everything; in fact, we did on Alta I.

Q. Okay. So, I think you may have covered this, but talking about the negotiations leading to the master agreement, which you said took place in the summer of 2010, was Google involved in any way in that negotiation?

A. No, they were not.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

Q.   Okay.  Was it all Citi?

A.   Yes, it was.

Q.   Okay.  And why did you decide, with respect to these particular properties, to do a sale-leaseback rather than an outright sale?

A.   We favored a sale-leaseback over the outright sale not followed by a lease simply because it allowed us to maintain, as I said earlier, our presence within Tehachapi, and that was, in the early phases, something that we -- it was one of our objectives in the early phase.

I could tell you that if we weren't able to accomplish it and had no other choice but to sell directly, we would have to have done that because of the way the grant program was established, or set up the blocker, which created a whole host of other issues.

Q.   Okay.  Let's look at Joint Exhibit 29, which -- the middle part of it, which is an email from Jeff Cast to various people.  Do you see that?

A.   Yes.

Q.   And is Mr. Cast a Terra-Gen employee?

A.   Yes, he is.

Q.   And did Terra-Gen provide Citi and other potential buyers information relating to the Alta facilities?

187

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A. We did.

Q. Okay. And is this among the things that were provided?

A. Yes, it is.

Q. Okay. And if we go back to the email itself, it describes three attachments: CHiPS financing presentation, California Highwind Power Project Timeline Estimate, and some other materials. Do you see that?

A. I do.

Q. And were those materials that were provided to potential buyers?

A. Yes, they were.

Q. And if we go to page 4 of the document -- and by that I mean the fourth page, so the one that -- I am always going to be using the Bates numbers in the lower left-hand corner. So, by -- when it says 004, that's what I'm referring to.

Is this among the information that was provided to potential buyers?

A. Yes, it is.

Q. And if we go to the next page of the document, page 5, which is the table of contents -- and I'm not going to take you through the whole thing -- but give us a sense of what kind of information is being provided here to potential buyers.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.  So, it's the typical information that you would provide in an overview document in order to orient someone and familiarize them with your project.  So, we talk about the project on an overview basis, serving California, et cetera; then we go through the wind resource, the Tehachapi wind resource we talked about earlier in terms of the quality of that wind resource; how we are going to actually sell our power onto the grid; goes through the transmission; talks about the power purchase agreement; land control; the turbine procurement arrangement; and the engineering procurement and construction arrangement; the permitting and development timeline; and then, finally, the economics.

Q.  Let's look at the next --

THE COURT:  Mr. Rosenbaum, I apologize.  I need to go off the record and have a discussion with counsel.

(Discussion off the record.)

THE COURT:  We are going to take an early afternoon break to allow counsel to discuss an issue I raised off the record.  So, let's reconvene at 3:00.

(Court in recess.)

THE COURT:  Thank you, please be seated.  We can stay off the record.

(Discussion off the record.)

MR. ROSENBAUM:  Your Honor, I neglected to enter

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Plaintiffs' Exhibit 222 into evidence.  That's the map showing the eligible and ineligible property.

THE COURT:  Yes.

MR. ROSENBAUM:  So, I now move it.

THE COURT:  Mr. Ronickher, Plaintiff just moved the admission of Plaintiffs' Exhibit 222.  Do you have any objection?

MR. RONICKHER:  No objection, Your Honor.

THE COURT:  Plaintiffs' Exhibit 222 is admitted.

(Plaintiffs' Exhibit Number 222 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  All right.  Before us now -- well, let me start that question again.

Mr. Pagano, before we broke, I had shown you Joint Exhibit 29, which was an email going to potential bidders for Altas II through V.  Do you recall that?

A.  Yes.

Q.  And do you recall that one of the attachments to that email that went to these prospective bidders was a financial analysis that had been prepared by Terra-Gen?

A.  Yes.

Q.  And that is -- which I had referenced as being attachment 1.  Is that the document that is now on the screen?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.   Yes, it is.

Q.   Okay.  And did -- did Terra-Gen evaluate, in this document, what it believed would be an appropriate sales price for Altas II through V?

A.   Yes, we did.

Q.   Okay.  If we can start with the inputs page, the page that says "Inputs (2)," and go to cell E69.

Your Honor, I can explain what I mean by that. There are columns that have letters and then the rows have numbers.  So, E69 would be column E, going down to row 69.

THE COURT:  It's and Excel spreadsheet basically.

MR. ROSENBAUM:  Exactly, Your Honor.

BY MR. ROSENBAUM:

Q.   So, in that particular document it shows a gross plant capacity, 570 megawatts.  Do you see that, Mr. Pagano?

A.   Yes, I do.

Q.   Okay.  And what does that tell you as to whether this spreadsheet is, in fact, examining the economics of what ultimately became Altas II through V?

A.   It says it's examining II through V, and that total is 570 megawatts.

Q.   Okay.  Now, if we go to the tab that says "Cash Flows (2)," is that a cash flow analysis -- projections,

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

if you will, relating to the Altas II through V
facilities?

A. Yes, it is.

Q. Okay. And if we -- the column, starting with
column G, are a series of time periods. Is that
correct?

A. It is.

Q. Okay. What I'd like you to do is take us through
what it is that Terra-Gen is examining in this document
using column G as an example for that initial time
frame.

A. Okay. So, we're projecting cash flows on a
quarterly basis. So, you can see the first column, G,
ends June 30th, 2011; H ends in September of 2011; and
then I in December of 2011, and so on, across the page.

We start with, in addition to the quarter, the
year to identify which calendar year we're referring to.
We have an operating year indication, so for the first
four quarters, it's operating year one, and then in
subsequent quarters, it's two through 24.

We have the quarter number, which is just
identifying the quarter of the life of the project, and
then quarter type, which is the calendar quarter. So,
quarter two ends June 30th, 2011.

We then have an inflation assumption of --

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.   That's row 13?

A.   Yes, row 13, looks like it's running about 2 percent per year, and then an O&M real inflation where you project slightly greater than the general inflation rate for the actual O&M costs for the facility.

Q.   And what does "O&M" stand for, by the way?

A.   That's operations and maintenance costs.

Q.   All right.

A.   Then you move down, after you have kind of oriented the calendars, the quarters -- and they're important because the actual production will vary based upon your quarter.  The facility itself will produce more during the summer months than it will during the winter months.  So, you have 570 -- now you're trying to calculate just how many megawatt hours are produced on a quarterly basis.

So, you start with the 570 megawatts.  We have that capacity factor that we talked about earlier in terms of the percentage of time that you're actually generating electricity --

Q.   You are on row 18, correct?

A.   I am in row 18.

Q.   And we do see that that varies from G to H to I to J.

A.   It does, and it varies, as I mentioned, due to

193

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

the facility producing during the summer months more meaningfully than during the cooler months because you don't have the Mojave Desert heating up the way you do in the summer, and so you will get less production, steady-state, during those months than you would during the warmer months.

Q.   And is that a good thing?

A.   It is.  It's positive because it ends up producing power when people are running their air conditioning units, and California is a state that has a summer peak, if you will.

Q.   Peak what?

A.   Peak usage.

Q.   Okay.

A.   You have an availability factor, which is really just used in the early years of the projection to account for what we call a shake-down period; in other words, when you start these turbines up, you'll run into shake-down issues, so that you may not have as high an availability the first quarter as you'll have the eighth quarter.  And that number will ultimately go to 100 percent because we have, in our capacity factor number, an assumed availability which drives the amount of output that you'll see quarter by quarter.

The time-of-use adjustment factor is just a

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

methodology for adjusting the megawatts to account for the time-of-use payment within the power contract.  We receive a payment based upon production during the peak periods.  You can see this one is very close to a 1 percent time-of-use factor, which essentially says it's producing, you know, both on and off on an equal basis, roughly.

If this were a wind project in Texas or Wyoming where it's producing mostly at night, you might see 60 percent.  So, that's a penalty, if you will, to the economics if you are at a low time-of-use factor.

Q.  So, is 100 percent good?

A.  Yes.

Q.  Okay.  And is 98.7 good?

A.  Yes.

Q.  Okay.

A.  Very good.

Q.  Okay.

A.  For a wind project, it's very good.

Q.  And that's because the utility wants the electricity during the daytime and especially the afternoon?

A.  Yes.

Q.  Keep going, please.

A.  Then you have annual hours, 8760, and that's just

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                5/9/2016

the number of hours in a year.  You do the math, and you come up with a quarterly production for the project.  It starts at 384,000 megawatt hours, dips down during the second period slightly, not dramatically, and then that third quarter or that fourth quarter, really, is substantially lower.  And then the first quarter of the year beginning in January, running through March, is lower as well because you haven't yet picked up in terms of production.

So, the profile is, as I explained earlier, being driven thermodynamically by the heating up of the Mojave Desert and the pooling of the cool air off of the Pacific running during the hot periods.  There are storm-related production periods that you can experience primarily in April and that time frame, but fundamentally, you have a facility that's producing power during periods where the utility cares about the power, on a relative basis.  If it were -- you know, again, a wind project in another area would produce much differently.

You then have energy revenues to -- your PPA price, the 1730.  You multiply that times your megawatt hours of production --

Q.  And that PPA price, that's the price provided for under your power purchase agreement?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

A. Yes, for the first five phases.

Q. Okay.

A. You then have PPA revenues, 45 million for the first quarter, and then these next lines aren't relevant. Merchant generation, we don't have any merchant generation, but it's in part of our standard model. We have a land royalty payment, which is calculated at 3.77 percent, which is just the weighted average of land payments for Altas II through V. Alta I I think is, like, 6 percent. And this blended rate, which includes the fee, the land-owning fee, is 3.77 percent. So, your land royalty payments are $1.7 million annually -- quarterly, quarterly.

Q. So, that's what you're paying for the land that you've rented, basically?

A. Yes, exactly.

Q. All right.

A. You next have your fixed O&M expenses that run on a turbine-by-turbine basis, and you have your substation maintenance expenses, your electrical interconnection fees, you know, all of the, if you will, turbine-related expenses. You come up with a total fixed O&M relating to the turbines on a quarterly basis. You see that inclusive of the royalty fee.

And then you go down --

Q.  And what's that amount?

A.  2.5 million for the first quarter.

Q.  All right, um-hum.

A.  And then you go down to some of your additional O&M expenses -- really, your fixed O&M, non-O&M-type expenses.  So, your operator fee, your PPA letter of credit, L/C fee, your property tax basis calculation, and so you come up with an annual property tax.  You can see at the bottom of those set of lines, line 83, that's $2.6 million per quarter.

You sum up your total fixed non-O&M expenses --

Q.  Tell us what line you're at.

A.  At 85, and you have yet another amount that you would reduct -- reduce your energy revenues by because those revenues are going first and foremost to pay your operating expenses.

Q.  All right.

A.  We have capital expenditures, which really don't occur until very late in the project.  You have working capital of $2.2 million.  You can see that on line 92. And then once you net your expenses, your land royalties, your turbine expenses, and your nonturbine/ fixed O&M expenses, you come up with really cash flow available for debt service.  That is the amount that you can utilize to do project financing or to do any type of

financing, really.  You then have debt service, and we -- in this instance, we really don't have any debt because we were doing this valuation predebt.

Next you have your tax advantages associated with the project.  In the early years, you have a tax shield that is generated because your depreciation is substantial.  In the later years, you have taxable income that is generated.  So, you can see on the first quarter, once you net your depreciation, you can -- you have taxable income of negative $98 million.  That provides a tax shield, if you will, of $39 million.

You sum your pretax cash with your after-tax cash, because you're trying to derive after-tax cash flow, and you come up with 74 million for quarter one, 72 for quarter two, 65 for quarter three, and then 62 for quarter four.

Q.  And so that's your -- and those are all millions of dollars, correct?

A.  That is correct.

Q.  Okay.  And tell us what the number -- the three million ninety seven thousand -- excuse me.

Tell us what the 3,097,325,000 figure is in E129.

A.  That's your undiscounted pretax cash flow -- I'm sorry.  That's your undiscounted after-tax cash flow. If you go up above, you can see that same number for

Trial
Alta Wind I Owner Lessor C, et al. v. USA                     5/9/2016

your pretax cash flow.

Q.   Okay.  And bottom line, is that the sum of the -- is $3,097,325,000, is that the total undiscounted after-tax cash flows projected for the Altas II through V?

A.   Yes, it is.

Q.   Okay.  Now, let's go to the tab that's called "TGP Results (2)" --

A.   Okay.

Q.   -- and go to line 41.

Is this also tracking after-tax cash flows?

A.   It is, but it -- at this point it has accounted for the grant payment that is projected to be received from Altas II through V, and then it has really the same cash flows, with one nuance on an after-tax basis for the remaining 20 years or 80 quarters, 25 years or 75 quarters -- or 100 quarters.

Q.   Okay.  And let's look then at tab -- at cell F42, which is the "Project FMV at COD" of $1,932,119,000.

A.   Yes.

Q.   What does that represent?

A.   That is the present value, at 9 percent, of the after-tax cash flows, plus the grant, over the life of the project.

Q.   Okay.  And you said at 9 percent.  Is 9 percent

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

the discount rate?

A.  Nine percent is the discount rate.

Q.  Okay.  And we'll have a lot of testimony from experts on this, too, but just in basic terms, what does a discount rate do?

A.  A discount rate brings future cash flows to a present value and assumed discount rate.  So, if you had it today, it's worth more than if you have to wait for it for five years, and your discount rate implies what you're willing -- what you're -- you would discount that future cash flow by in order to receive it today.

Q.  Okay.  Does the $1,932,119,000 figure, does that represent the fair market value of Altas II through V, using this -- these assumptions?

A.  It does.

Q.  All right.  And you've testified previously that this is based upon 570 megawatts of facilities in Altas II through V.  So, can you please tell us what the value is on a per kilowatt basis?

A.  So, I'm doing that math so I don't misspeak.  So, it's 300 -- I'm sorry, $3,389 -- really, rounding up, it's $3,390 per KW.

Q.  Okay.  And does that reflect a value for the entire facility or just the eligible property?

A.  That's the entire facility.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                               5/9/2016

Q.   Okay.  And do you regard that as a realistic value?

A.   Yes.  I mean, it's -- it's really just -- in terms of how you value, it's math.  You have to assume a discount rate that you're comfortable with.  You have to project things based upon your own experience and reasonable expectations, all of which we did here, because it was -- it reflects all the experience of the individuals at Terra-Gen to come up with a valuation for the projects.

Q.   Okay.  And what valuation method are you using here?

A.   Discounted cash flow.

Q.   Okay.  And in your experience, how --

A.   Sometimes referred to as the income method, I guess, in appraisal settings.

Q.   Okay.  And from your experience, how commonly is that method used in valuing facilities or --

A.   Virtually always.  When you're -- when you're buying an asset that has cash flows associated with it, those cash flows are really not subject to price variations in terms of the market price for the output, not related to technology risk that you're going to invent a widget that ten years from now is gone.  That's the favored -- that is the only method I've ever used,

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

you know, that -- I've seen people put, like, an EBITDA multiplier and things like that on it, but it is really the message which everyone comes back to.

Q.   Okay.  And have you personally bought and sold facilities?

A.   Yes, I have.

Q.   Other than the Altas?

A.   Yes, many throughout my career.

Q.   And what methodology do you use to come up with a fair market value for those facilities?

A.   I have always used the discounted cash flow of the asset.

Q.   Okay.  Now, was the value you established through this methodology on this particular exhibit, Joint Exhibit 29, attachment 1 --

A.   Again, I'll add -- I just want to add, I have seen people look with other metrics as, okay, well, let me use an EBITDA metric, things like that, but the metric that is used, the metric that people have always returned to, is a discounted cash flow.

Q.   Okay.  And looking at this particular document, which is Joint Exhibit 29, attachment 1, was the value calculated here dependent on whether the transaction would be a sale-leaseback or whether it would be an outright sale?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.   No, it was not.

Q.   Now, was this valuation predicated in any way on the assumption that the buyer would be able to physically expand the facility after acquisition?

A.   No, it was not.

Q.   Was it predicated in any way on the assumption that the buyer would be able to grow the business in any way?

A.   No, it was not.

Q.   Was the valuation predicated in any way on the assumption that the buyer would be able to increase production levels?

A.   No.  I mean, it -- at this stage of the life cycle of the project, where you are ready to bring it into construction, all those factors are not -- not available.  You've contracted out the output, you've built what you can or you're planning to build what you can, and that's why you use a discounted cash flow basis on the valuation.

Q.   Okay.  Was this valuation predicated on the assumption that the buyer would secure additional customers after acquisition of the project?

A.   No.  It had its customer, which was Southern California Edison, and under a power contract with Southern California Edison we could only sell to them

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

and we couldn't sell to anyone else.  We couldn't expand
the facility physically to sell to somebody else.  It
was -- all the output had to go to Edison.

Q.  Okay.  Now, you testified that the
$3,390-per-kilowatt value is for the entire facility,
both eligible and ineligible, correct?

A.  Yes.

Q.  Okay.  If we look at the "Inputs" page and go to
cell V45 -- yes -- do you see a figure of 96.18 percent,
which is described as being qualifying?

A.  I do.

Q.  What does that represent?

A.  That would be the eligible property.

Q.  Okay.  And if $3,390 was your valuation for
everything, what is the equivalent number if you are
only focusing on eligible?

A.  $3,260 a KW.

Q.  Okay, all right.  Now, this document, we
established, is dated November 17, 2009, at least that's
the date that was provided with the email.  Let's look
at Plaintiffs' Exhibit 5.  Is this an email that Citi
sent to Terra-Gen?

A.  Yes, it is.

Q.  And who was Mr. Revock?

A.  Mr. Revock was the individual from Citi that was

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

leading the effort for the sale and then the lease transaction.

Q.   And the first sentence of the email says, "As discussed, please see Citi's revised financing proposal for the CHiPS project in the attached."

Do you see that?

A.   I do.

Q.   And if we look at the attached proposal, is that -- is that the proposal that Citi provided to Terra-Gen?

A.   Yes, it is.

Q.   And if we go to page 16, do you see in the upper left-hand corner, for gross plant capacity, something that says 402 megawatts?

A.   I do.

Q.   Okay.  And why is that the number in this document?

A.   So, at this point we have evolved into identifying the phases how they were actually constructed.  So, you have phases II through IV.  There was some uncertainty about whether or not Citi and -- internally they were going to be comfortable with absorbing the full II through V phases, which is 570 megawatts.  So, if you look underneath, the largest of those phases, which is 168 megawatts, that gets you down

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

to 402.  So, their proposal was based upon a smaller transaction than we ultimately ended up doing.

Q.  Okay.  You ultimately ended up doing the whole 570 with them?

A.  We did.

Q.  Okay.  Now, there is a -- underneath that gross plant capacity, there's a project cost, the latter of which says $1,206,000,000, including step-up.  Do you see that?

A.  I do.

Q.  And if you're talking about 402 megawatts, what does that $1,206,000,000 transfer to on a per kilowatt basis?

A.  $3,000 a KW, exactly.

Q.  Okay.  And what did you understand that $1,206,000,000 to represent?

A.  So, based upon how the transaction progressed, that was for the eligible property only.

Q.  Okay.  And so that -- you mentioned --

A.  And you can actually derive it probably down below.  I think there's a 361.  Yes, it's essentially for the eligible property.

Q.  Okay.  And now, you had done a calculation that showed that -- which you testified to a minute ago -- that Terra-Gen's valuation suggested a value for the

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

eligible property only of $3,260 per kilowatt, correct?

A.  Yes.

Q.  And Citi is now proposing instead to pay 3,000. Is that right?

A.  That's correct.

Q.  Okay.  And it shows a cash grant -- if you go under "Lease Equity," it shows a cash grant of $361.8 million.  Is that correct?

A.  It does, which is 30 percent of the 1.2 billion that we talked about earlier.

Q.  And is that what leads you to conclude that this is for eligible property only?

A.  Yes.

Q.  Because everything is being treated as cash grant eligible?

A.  Yes.  If you take the box off and look at the $1.2 billion, 1.206 times 0.3 is equal to the cash grant of approximately 361.8.  So, that's how you know that it's all eligible.

Q.  Okay.  And by roughly what percent is the value Citi is indicating lower than the value TGP had indicated in its prior analysis?

A.  Roughly 10 percent.

Q.  Okay.  Now, in the "Project Cost" row, the second row, there is a -- the figure we've been talking about,

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

which is the $1,206,000,000, including step-up, but there is also a figure that says $933.1 million excluding stepup.  Do you see that?

A.  Yes.

Q.  And what do you understand the $933.1 million figure to be?

A.   That would be the eligible basis or the eligible -- the cost to construct the eligible equipment.

Q.  So, Terra-Gen's cost to construct the eligible property?

A.  Um-hum.

Q.  You need to say yes or no.

A.  Oh, yes.  I apologize.

Q.  Okay, okay.  So, was Citi aware, at least in rough terms, what Terra-Gen's out-of-pocket costs were?

A.  Yes.

MR. ROSENBAUM:  Your Honor, I would move Plaintiffs' Exhibit 5 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 5 is admitted.

(Plaintiffs' Exhibit Number 5 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Let me show you Plaintiffs' Exhibit 197.  Now,

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

you'll need to make that bigger, if you can.

So, you discussed previously a mechanism by which there would be typically a data room set up for potential buyers.  Is that right?

A.  Yes.

Q.  And was a data room, in fact, set up with respect to the sale of Altas II through V?

A.  Yes, it was.

Q.  And what is Plaintiffs' Exhibit 197?

A.  It's a listing of those people who had access to the data room.

Q.  Okay.  And it includes quite a number of people from Citi.  Is that right?

A.  It does.

MR. ROSENBAUM:  Your Honor, I would move Plaintiffs' Exhibit 197.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 197 is admitted.

(Plaintiffs' Exhibit Number 197 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And let's look at Plaintiffs' Exhibit 196, please, which is even smaller, but if we enlarge that, can you tell us what Plaintiffs' Exhibit 196 is?

A.  196 is the documents that you'll see in the data

room.  So, once given access, people can access the various documents that are outlined here.

Q.  Okay.  Is this an electronic data room?

A.  It is.

Q.  Okay.  And were these materials ones made available to potential buyers of Altas II through V?

A.  Yes, they were.

Q.  Including Citi?

A.  Including Citi.

Q.  All right.  Let's look at --

Your Honor, we would move Exhibit 196.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 196 is admitted.

(Plaintiffs' Exhibit Number 196 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And let me show you Plaintiffs' Exhibit 11, please.  Could you please tell us what that document is?

A.  That is the report for the engineering on Vestas phases II through IV --

Q.  II through IV?

A.  II through V -- I apologize, I misread that -- done by Garrad Hassan.

Q.  Okay.  And who commissioned this study?

A.  We would have commissioned it.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

Q.  And was it provided to potential buyers, including Citi?

A.  Yes, it was.

Q.  Okay.

Your Honor, I would move Plaintiffs' Exhibit 11.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 11 is admitted.

(Plaintiffs' Exhibit Number 11 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And if we show -- let's move to Plaintiffs' Exhibit 10.  What is this document?

A.  It's an assessment of the production for phases II through V of the Alta project which captures the quality of the wind resource and availability assumption, what one would expect to see produced from the various phases.

Q.  Okay.  And who commissioned this study?

A.  We did.

Q.  And was it provided to Citi as part of their due diligence?

A.  Yes, it was.

Q.  Okay.  And were these documents also made available to Google at some point?

A.  They were.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.  Okay.

Your Honor, I would move Plaintiffs' Exhibit 10.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 10 is admitted.

(Plaintiffs' Exhibit Number 10 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Plaintiffs' Exhibit 13, please.

Did Citi and Terra-Gen enter into a commitment of equity agreement?

A.  They did -- we did.

Q.  And can you just tell me, in basic terms, what does that agreement provide for?

A.  It's a commitment by Citi to purchase the transaction at completion, in-service date, and it also outlines the lease transaction and provides for, you know, the salient points on those two transactions.

Q.  Okay.  And, I mean, to look at the middle, it talks about the purchase of wind generation assets.  Is that correct?

A.  It does.

Q.  And is that what this transaction was about?

A.  Yes, that's what it was about.

Q.  Okay.  And it identifies specifically Alta II, which is an approximately 150-megawatt wind generation

213

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

facility, correct?

A.   It does, yes.

Q.   And then it describes Alta Wind III, Alta Wind IV, and Alta Wind V as well, correct?

A.   That's correct.

Q.   Okay.  And if you go to page 11, was this document signed by Citi?

A.   Yes, it was.

Q.   And if we -- and was it also signed -- and it's also countersigned by California Highwind Power, LLC. Do you see that?

A.   Yes, it was.

Q.   And is that a Terra-Gen Power company?

A.   It is.

Q.   And if we go to page 12, do you see a line that says "Equity Investor Purchase Price"?

A.   I do.

Q.   And what does that line represent?

A.   That represents the purchase price for each of the phases from II through V.

Q.   And what is the --

A.   An assumed purchase price of $3,000 a KW.

Q.   All right.  And was the -- okay.

And does this relate to the entire facility or just the eligible property?

214

Trial

Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

A.   It's just the eligible property.

Q.   Okay.  And on page 6, Section 8(a), it states, "The Company and its affiliates have provided Citi with information, data, memoranda, financial models, consultant reports and existing documentation regarding the Projects..."

Do you see that?

A.   I do.

Q.   And the reference to "the Company" is to whom?

A.   Terra-Gen.

Q.   And had Terra-Gen, in fact, done those things?

A.   Yes, we had.

Q.   Okay.

Your Honor, I would move Exhibit 13 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 13 is admitted.

(Plaintiffs' Exhibit Number 13 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   Now, had the $3,000 indicative purchase price -- strike that.

Was an appraisal eventually done for Altas II through V?

A.   Yes, it was.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.  And had the $3,000-per-kilowatt indicative purchase price been established before the appraisal?

A.  Yes, it had been.

Q.  Okay.  And if we go back to the equity commitment letter and page 2, did it, in fact, provide that there would be an appraisal?

A.  Yes, it did.

Q.  Okay.  And under the agreement, what would happen if the appraised value came in less than $3,000?

A.  The purchase price would be adjusted downward to reflect the appraised value.

Q.  And how was the appraiser selected?

A.  It was an appraiser that Citi selected.  We were familiar with him.  They're a nationally known firm, but Citi made the call on it.

Q.  Okay.  And what appraiser was it?

A.  DAI.

Q.  Okay.  And if we look at Joint Exhibit 59, is that the appraisal for Alta Wind II?

A.  Yes, it is.

Q.  And Joint Exhibit 62, is that the appraisal for Alta III?

A.  Yes, it is.

Q.  And Joint Exhibit 60, is that the appraisal for Alta IV?

216

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.   Yes, it is.

Q.   And Joint Exhibit 61, is that the appraisal for Alta V?

A.   Yes, it is.

Q.   Okay.  And are these the final appraisals?

A.   They are.

Q.   Okay.  And going back to Exhibit 59, Alta II, page 12, if you look at the fair market value, nominal value as of December 31, 2010, at what per watt value did the appraisal conclude?

A.   Per kilowatt is $2,935.

Q.   Okay.  And is that slightly less than the $3,000 indicative value that had been set in the equity commitment letter?

A.   Yes, it is.

Q.   Okay.  And are there similar pages for each of the other facilities as well?

A.   There are.

Q.   Okay.  And were the appraised values in all cases slightly lower than the $3,000?

A.   They were.

Q.   And we've put up another chart already as to what those final numbers were on a per kilowatt basis, so I won't repeat those.  I will ask, though, to confirm, were these numbers for the entire facility or just the

217
Trial
Alta Wind I Owner Lessor C, et al. v. USA                      5/9/2016

eligible property?

A.  Just the eligible property.

Q.  Okay.  Did Citi conduct a site visit prior to the -- its purchase of the facilities?

A.  Yes, they did.

Q.  Did Google do so as well?

A.  Google did as well.

Q.  Okay.  And if we go back to Plaintiffs' Exhibit 286, which has already been admitted, does that indicate the purchase price for the eligible property for each of Altas II through V?

A.  Yes, it does.

Q.  Okay.  And were separate agreements entered into for each of Altas II through V?

A.  Yes.

Q.  And to make life even more complicated, did each statutory trust have its own separate agreement?

A.  Yes, it did.

Q.  Okay.  So, let's just -- to get a sense of the documentation, if we look at Joint Exhibit 225, what is that document?

A.  That's the participation agreement, which is really the -- if you will, the master agreement, contains as exhibits things like the bill of sale, the lease agreement, the definitions, et cetera.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                           5/9/2016

Q.   Okay.  And this particular agreement relates to which of the Altas?

A.   Alta Wind II.

Q.   Okay.  And this particular agreement is with Alta Wind II Owner Lessor A.  Is that correct?

A.   Yes, it is.

Q.   And is there a similar set of documents for owners B, C, D, and E?

A.   There are.

Q.   Okay.  And just to look briefly at some other key agreements, Joint Exhibit 226, what is that document?

A.   That's the definitions that I referred to.

Q.   Okay.  If we look at Exhibit 227, what is that?

A.   That's the bill of sale.

Q.   And if we look at -- these are Joint Exhibits -- if we look at Joint Exhibit 238, what is that?

A.   The facility deed.

Q.   Joint Exhibit 243?

A.   And the lease agreement.

Q.   Okay.  And is that the agreement by which the new owner, Alta Wind II Owner Lessor A, leases the facility back to a Terra-Gen-related entity?

A.   Yes, it is.

Q.   And Joint Exhibit 259, what is that document?

A.   It's the asset where we lease the noneligible

Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

property to Citi.

Q. And Exhibit 264 is what?

A. It's a sublease where they lease it back to us.

Q. Okay. And were similar agreements entered into between Terra-Gen and the other owner lessors of Alta II?

A. Yes.

Q. And are there a similar set of exhibits with respect to all of the Altas II through V?

A. There are.

Q. Okay. And I don't know whether you have an exhibit list with you.

A. I don't.

Q. I'm handing you the joint exhibit list, and can you just, if you would, confirm that the transaction -- all the transaction documents for these transactions run from Joint Exhibit 205 through 2040?

A. Yes, they do.

Q. Okay. Now, did Terra-Gen provide any indemnities as part of the transaction?

A. We did.

Q. What did you indemnify?

A. We indemnified the owner lessors that the grant would be what they had planned on it being.

Q. Which was what?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.   Thirty percent of the eligible property calculated based upon their basis, which was their purchase price.

Q.   Okay.  And was that indemnity something in addition to the value of the facility itself?

A.   No.  I mean, it was a -- it was a way of assuring them -- like a representation of title, if you will -- a way of assuring them that they will get what they paid for.

Q.   Had Terra-Gen provided information to Citi sufficient to inform Citi as to the economic and physical characteristics of the facilities?

A.   Yes.

Q.   Had you done the same for Google?

A.   We had.

Q.   Okay.  Had you provided the buyers copies of the final appraisals?

A.   We did.

Q.   And were those available before the purchase agreements were -- the final purchase agreements were signed?

A.   They were.

Q.   Okay.  And if we go to Joint Exhibit 47, which is the appraisal for Alta II, and go to page 21, do you see a box that says "Facility Construction Cost"?

221

Trial

Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

A.  I do.

Q.  And what amount is shown there?

A.  It's $321,172,000.

Q.  Okay.  And did -- accordingly, did the buyers know what Terra-Gen's costs of construction were --

A.  They did.

Q.  -- at the time they were agreeing as to what amount they would pay for the facilities?

A.  Yes, they did.

Q.  Okay.  And were they in a position, if they wanted to, to calculate what the markup was between the cost of construction and purchase price?

A.  They were.

Q.  Did these buyers willingly enter into a transaction at the agreed-upon purchase price?

A.  Yes, they did.

Q.  Okay.  Did the same information appear regarding the cost of construction in the appraisals for Altas III, IV, and V?

A.  Yes, it did.

Q.  Okay.  Now, was there an individual power purchase agreement for each of the Altas?

A.  There was.

Q.  And who was the buyer?

A.  The buyer was Southern California Edison in all

Trial

Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

instances.

Q.   Okay.  How long did the power purchase agreement last?

A.   Through 2035.

Q.   If we look at Joint Exhibit 25, is that the power purchase agreement for Alta II?

A.   Yes, it is.

Q.   Okay.  And is Joint Exhibit 26 the power purchase agreement for Alta III?

A.   Yes, it is.

Q.   And is Joint Exhibit 27 the power purchase agreement for Alta IV?

A.   Yes, it is.

Q.   And is Joint Exhibit 28 the power purchase agreement for Alta V?

A.   Yes.

Q.   Okay.  Now, you've testified that Terra-Gen sold the eligible property in the case of Altas II and III to Citi, and in the case of Altas IV and V, half to Citi and half to Google, correct?

A.   Yes, that's correct.

Q.   And in the lease part of that transaction, Terra-Gen leased those properties back.  Is that correct?

A.   Yes.

223

Trial

Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

Q.   And how long did that lease last?

A.   Twenty-four years.

Q.   Okay.  And what was the estimated minimum useful life of the facility?

A.   As a minimum, 30 years.

Q.   Okay.  So, let's look at Plaintiffs' Exhibit 287, which is called "Sale-Leaseback of Alta Wind Facilities IV and V," and can you please explain to us what this document shows at the top, under the heading "The Sale"?

A.   Okay.  So, it's a depiction of the sale as well as the leaseback.  The first set of boxes shows that Google and Citi pay a purchase price of roughly 50 percent each to TGP.  We transfer the eligible assets to Citi and Google.  They get undivided interests in those assets.  Those assets would be, you know, essentially the power production facility, the -- and everything that comes along with that, right?  The right to receive the grant, the right to take the depreciation.  They have the hard asset; they own it at that point.

The leaseback transaction is where we, Terra-Gen, enter into a lease with Citi and Google for the eligible assets.  We then utilize those assets to meet our obligations under the power contract to serve the -- to serve Southern California Edison.  We receive payments for electricity.  Those payments then get netted against

224
Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

the expenses that we talked about in our valuation, things like royalties, O&M expenses, turbine maintenance expenses, property taxes, insurance, et cetera.

The cash that is left over is available to pay lease payments, and that's really all that the lease payments can get made from.  They don't get made out of anything from Terra-Gen.  They don't come -- you know, there is no subsidy in terms of where the sources of funds come from.  It has to be made exclusively from the project itself, the assets themselves.

Q.  Okay.  And if the wind stops blowing or there's a fire and the facility is damaged and you're not producing much electricity, what happens with respect to the lease payments?

A.  We could run short.  The lease payments are dependent upon the production being there and the revenues being there.  If you entered into either a particularly nonwindy period or had inflation run very high -- because we're getting a fixed power price of 117.30.  So, in year 20, if inflation -- if we had an inflationary period and our O&M expenses are higher than we projected, because we used a 2 percent inflation assumption, that reduces cash flow to the point where it can't satisfy the amount due under the lease, and the lease is not paid.

225

Trial

Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

Q.   Okay.  And is the -- is the amount paid under the power purchase agreement fixed for the entire term?

A.   It is.

Q.   Is it subject to inflation?  Strike that.

Is it subject to an escalation clause?

A.   There is no escalation.

Q.   Okay.  What was the next -- what was the next facility that sold?

A.   Alta I.

Q.   Okay.  If we can go back to Plaintiffs' Exhibit 22 --

I'm sorry, I need to move -- can I move Plaintiffs' Exhibit 287 into evidence, please?

MR. RONICKHER:  I would actually object on the grounds that it's not complete based on the witness' prior testimony just now.  The ineligible assets were subject to the retained assets lease and sublease, so they actually were passing through the purchasers, and I think, as is, the exhibit is misleading.

THE COURT:  Mr. Rosenbaum?

MR. ROSENBAUM:  Well, he is accurately describing that.  I am not going to dispute that that's the case, that -- that the chart is a little complicated to begin with, and that component of it is not reflected, but we are not disputing that that is part of the transaction.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

THE COURT:  Yeah, I think that the fact the chart is not as complete as Defendant would like it doesn't render it inadmissible.  So, I am going to admit Plaintiffs' Exhibit 287.

(Plaintiffs' Exhibit Number 287 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Okay.  So, let's go back to Plaintiffs' Exhibit 221, which is the map, and just begin by telling us -- since we're now going to be talking about Alta I, just orient ourselves to which part of that is Alta I.

A.  Yes.  It's the far right area covered in brown.

Q.  Okay.

A.  Far left.  I apologize.

Q.  Thank you.  All right.

And if we could look at Plaintiffs' Exhibit 230, what is Plaintiffs' Exhibit 230?

A.  It shows the placement of the turbines for Alta I.

MR. ROSENBAUM:  Your Honor, I would move Exhibit 230 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 230 is admitted.

(Plaintiffs' Exhibit Number 230 was admitted into evidence.)

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

BY MR. ROSENBAUM:

Q.   You may have covered this a bit already, but what is something unique about Alta I compared to the other Altas?

A.   Yeah, the Alta I phase was constructed on the ridges.  So, it's at higher altitude, rougher terrain.

Q.   And what effect does that have on building costs?

A.   Building costs would be higher and production would be greater.

Q.   Okay.  And remind us what kind of turbines were used for Alta I.

A.   We used the GE 1.5-megawatt machines.

Q.   And if we could see Plaintiffs' Exhibit 288, what does this document show?

A.   Again, it's the trusts that were set up for the sale and then the leaseback.

Q.   And does it indicate that the ultimate -- the parent corporations of the beneficial owners are General Electric Capital Corporation for two of the four trusts and UnionBanCal Corporation for the other two?

A.   Yes, it does.

MR. ROSENBAUM:  Your Honor, I would move Plaintiffs' Exhibit 288 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 288 is admitted.

228
Trial
Alta Wind I Owner Lessor C, et al. v. USA                      5/9/2016

(Plaintiffs' Exhibit Number 288 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  And do you recall when this sale closed?

A.  Yes.  This closed at the end of December in 2010.

Q.  All right.  At the time of this transaction, did Terra-Gen and -- let me back up.

Is Union Bank sometimes referred to as UBOC?

A.  It is.

Q.  Okay, let me use that rather than keep having to spell out the name every time.

At the time of the sales transaction, did Terra-Gen and Union Bank have any overlapping ownership?

A.  No, we did not.

Q.  Did they share any common employees, officers, or directors?

A.  No, we did not.

Q.  Were they related parties?

A.  No, they were not.

Q.  Did Union Bank have experience in energy projects?

A.  Yes, they did.

Q.  What was that experience?

A.  They had been a lender to energy-producing projects for a while.  I can't tell you exactly how

long.  They lent on both the fossil side and the renewable side, had extensive experience on the -- on both sides.

Q.  Okay.  Was UBOC under any compulsion to buy?

A.  They were not.

Q.  Now, did UBOC have any prior involvement in the Alta Wind project prior to buying the interests in Alta Wind I?

A.  They were the construction lender.  So, as I said, they -- in addition to the group that does the acquisitions, they have a lending group, and the construction lending group made the loan on Alta I.  And that was an area of the bank that we interacted more frequently with than the folks on the leasing side.

Q.  Okay.  Now, let's switch to GE.  At the time of the sales transaction, did Terra-Gen and GE have any overlapping ownership?

A.  They had a small overlapping ownership in Terra-Gen by way of their investment in Global Infrastructure Partners, GIP, which is one of our sponsors, and that interest was, I think, 3.4 percent.

Q.  Okay.  And did that ownership interest affect whether the sale was arm's length from your perspective?

A.  No, it did not.

Q.  Okay.  And you had no ownership overlap with

Trial
Alta Wind I Owner Lessor C, et al. v. USA                          5/9/2016

UBOC, correct?

A.  We had no ownership overlap with UBOC or GE -- well, with UBOC.  We had the small one with GE.  I apologize.

Q.  Okay.  Now, from your perspective, did the -- were the nature of the negotiations affected by the fact that these were turbines that were made by General Electric?

A.  No.  We had acquired the turbines long before this transaction.  So, we acquired them in connection with the Allco transaction.  So, there was no relationship between the two transactions.

Q.  Okay.  And did General Electric and Terra-Gen share any common employees, officers, or directors?

A.  No, we did not.

Q.  Did UBOC and Terra-Gen share any common employees, officers, or directors?

A.  No, we did not.

Q.  This may be a broad question, but is General Electric experienced in energy projects?

A.  Very.  Do you really want me to elaborate?

Q.  In summary fashion.

A.  Yeah.  They have been in the industry for as long as there's been an industry.  They make a good bit of the equipment utilized both on the fossil side as well

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

as the renewable side.  They have a group which is identified here as EFS, Energy Financial Services.  They have lent to projects.  They have acquired projects outright.  They have acquired partnership interests in projects.  They have acquired projects and then leased them back.  They have done everything there is to do on the power side.

Q.  Okay.  And were GE or UBOC under any compulsion to buy?

A.  They were not.

Q.  Was Terra-Gen under any compulsion to sell?

A.  No, we were not.

Q.  Now, at the time that you -- obviously, this transaction ended up being a sale-leaseback, correct?

A.  It did.

Q.  But at the time you began considering selling Alta I, did TGP have -- Terra-Gen have any preconceived preference for an outright sale versus a sale-leaseback?

A.  Again, we -- at this point, we had accomplished a foothold interest, if you will, through the II through V lease, and we were able to sell it and get -- and receive the grant as a result of the sale and then maintain a strong presence through the lease.  So, there was a smaller preference for a lease than II through V. It -- I would say we were slightly more inclined to a

232

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

lease than an outright sale but pretty close to indifferent.

Q. All right, okay. Let's look at Joint Exhibit 41, which is a May 10, 2010, email from Alex Wernberg of Union Bank to John O'Connor, with a copy to Lance Markowitz. Do you see that?

A. I do.

Q. And other recipients of the email are listed as well -- or I should say that differently. Mr. O'Connor then forwards the email to other people. So, who was Mr. O'Connor?

A. He's our chief financial officer.

Q. Okay. And the email from Mr. Wernberg says, "Do you have 15 to 20 minutes tomorrow to get on the phone with Lance and myself to discuss the possibility of Union Bank doing the lease equity on Alta I?"

Do you see that?

A. I do.

Q. And what does that mean, "lease equity"?

A. That is the purchase of the -- of the acquisition -- purchase of the facility.

Q. Okay. And is this roughly when discussions along those lines began?

A. Roughly, yes.

Q. Okay. And there's a -- as I say, the document is

Trial
Alta Wind I Owner Lessor C, et al. v. USA                     5/9/2016

copied to a Lance Markowitz.  Who is he?

A.  Lance is the individual within Union Bank of California that was leading the transaction from their side.

Q.  Okay.  So, let's now look at Joint Exhibit 63. So, you're obviously engaged in these discussions with Union Bank or UBOC.  Was -- was Terra-Gen also in discussions with other potential buyers of the facility?

A.  Yes, we were.

Q.  Okay.  And what does this list relate to?

A.  Some of those people that we were speaking with, UBOC, GE, Lloyds, KeyBanc, et cetera.

Q.  And are you familiar with those efforts?

A.  I am.

Q.  And if we look at Plaintiffs' Exhibit 19, which is an email -- the bottom email is an email from Mr. DiMarco to Mr. Mras.  Do you see that?

A.  I do.

Q.  And who is Mr. DiMarco?

A.  DiMarco was a vice president of finance within Terra-Gen.

Q.  And who was Mr. Mras?

A.  Jim Mras is a -- I believe a vice president within GE.

Q.  And in this email, Mr. DiMarco states, "I believe

Jim Pagano and John O'Connor will be visiting with Kevin and Alex this Thursday up in Stamford."

    Do you see that?

A.  I do.

Q.  Okay.  And who is Kevin?

A.  Kevin Walsh and Alex Urquhart, senior members of the EMS team.

Q.  Okay.  That's within General Electric?

A.  Yes.

Q.  And did you, in fact, have such a meeting?

A.  We did.

Q.  And what was their reaction to --

A.  They were interested in the opportunity.  They expressed a willingness to take a look at it and an interest in trying to move forward and be part of the process.

Q.  Now, at this point in the process, were GE and UBOC working together?

A.  Not at all.

Q.  Okay.

    Your Honor, I would move Plaintiffs' Exhibit 19 into evidence.

    MR. RONICKHER:  No objection.

    THE COURT:  Plaintiffs' Exhibit 19 is admitted.

    (Plaintiffs' Exhibit Number 19 was admitted into

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

evidence.)

BY MR. ROSENBAUM:

Q.  If we look at Joint Exhibit 65.

A.  Yes.

Q.  Going forward -- I'm sorry, let me back up.

Before we go on, Joint Exhibit 65 -- I'm sorry, the previous one, Joint Exhibit 19 was dated August 2nd, 2010.  Is that right?

A.  Yes.

Q.  Okay.  And if we go forward to Joint Exhibit 65, this is now August 23rd, 2010.  Is that right?

A.  Yes.

Q.  And is this an email from Mr. DiMarco of Terra-Gen to individuals at UBOC?

A.  It is.

Q.  And the subject is "Alta Wind I equity term sheet."  Do you see that?

A.  I do.

Q.  Okay.  And if you go forward in this document -- perhaps it's an attachment -- no, there it is.  Is this a draft term sheet?

A.  Yes, that's the term sheet.

Q.  Okay.  And this would be a term sheet for what?

A.  That's for the Alta Wind I lease transaction that Lance and ourselves had been discussing.

236

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

Q.    Okay.  And does this relate to a sale-leaseback?

A.    Yes.

Q.    And if we look at page 8 in this document, if you look in sort of the middle, there is a reference to the purchase price, but the amount is blank.  Do you see that?

A.    I do.

Q.    And was any purchase price indicated in this document?

A.    No.

Q.    All right.  Let's go forward, then, to Plaintiffs' Exhibit 20, and we're now up to September 1, 2010.  Do you see that?

A.    Yes, I do.

Q.    And is that an email from -- between a company called McManus & Miles and people at Terra-Gen?

A.    Yes, it is.

Q.    Who is McManus & Miles?

A.    They are an advisory firm that worked with us on these transactions.  They've had experience in the power industry.

Q.    Okay.  And if you look at the top -- I'm sorry, if you look at the first page, the bottom email, the first sentence states, "Attached is the revised model in which we attempted value AW-1 applying DAI's appraisal

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

methodology for AW-2-5."

Do you see that?

A.  I do.

Q.  Okay.  "AW" stands for?

A.  Alta Wind.

Q.  Okay.  So, at this point, DAI had done its appraisals for Altas II through V.  Is that right?

A.  Yes, it had.

Q.  Okay.  And are you familiar with the attached analysis?

A.  I am.

Q.  If we could turn to that, please, the attached spreadsheet.  So, we're now looking at Plaintiffs' Exhibit 20, attachment 1, and if we could go to the tab that says "Cash Flows" and go to cell F80.  What does this indicate as being the enterprise value for Alta I?

A.  $560 million.

Q.  Okay.  And what does the term "enterprise value" mean?

A.  That's the value of the entire enterprise.  It's derived here by the free cash flow to equity, plus the post-PPA free cash flow to equity.  So, first you look at cash flows received during the PPA.  You apply one discount rate to that because it's more certain than the cash flows after the PPA.  You come up with a small

238

Trial

Alta Wind I Owner Lessor C, et al. v. USA                     5/9/2016

amount there because it's so far out.  You have an assumed debt-to-cap ratio, and I think in this instance it was 30 percent debt, and you, you know, total that up.

Q.  Okay.  And what -- now, this was prepared by McManus & Miles.  Was this analysis consistent with Terra-Gen's view of the value of Alta I?

A.  Yes, it was.

Q.  And if you look at cell F81, does that provide a value of the facility on a per kilowatt basis?

A.  Yes, it does.

Q.  And what is that value?

A.  $3,735.

Q.  Okay.  And is that a value for the entire facility or just the eligible basis?

A.  I'm pretty confident that's the value for the entire facility.

Q.  Now, is this valuation dependent on the transaction being a sale-leaseback?

A.  In fact, now that the cursor was moved up, it is a -- it is for the value of the facility because it's -- 155 million in grant or ITC is not 30 percent of 560, it's 30 percent of some smaller number.  So, the 560 is the entire facility.

Q.  All right.  And was this $560,251,815 value

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

dependent upon whether the sale would be a
sale-leaseback as opposed to an outright sale?

A.   No, it was not.

Q.   Okay.  So, what is it that's being valued here?

A.   The entire facility.  The integrated power
production facility, those assets.

Q.   Okay.  As well as whatever transmission
facilities you had built, correct?

A.   Eligible and ineligible, the entire --

Q.   Okay.  Oh, yes.  And the -- if we go to cell I81,
do you see that -- something called a five-year MACRS
value of $3,456 per kilowatt?

A.   I do.

Q.   And what does that represent?

A.   That is the dollar per KW for the property which
is MACRS, which I assume here they're using as a proxy
for eligible property.

Q.   So $3,456 per kilowatt is the value for eligible
property.  Is that right?

A.   That's correct.

Q.   Now, you took us at some length through the
valuation that Terra-Gen had done for Altas II through
V, what you called the income approach, the discounted
cash flow approach, correct?

A.   I did.

240

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

Q.   Is that the methodology that's being employed here as well?

A.   Yes, it was.

Q.   Now, were these values predicated in any way on the assumption that the buyer would be able to physically expand the facility?

A.   No, they were not.

Q.   Was the valuation predicated on the assumption the buyer would be able to increase production?

A.   They could not.

Q.   Was the valuation predicated on the assumption the buyer could secure additional customers?

A.   They could not during the term of the PPA --

Q.   Okay.

A.   -- which is 25 years, 24 years.

Q.   Okay.  Was the valuation predicated on the assumption the buyer could grow the business in any way?

A.   No, it was not.

Q.   Or grow the facility in any way?

A.   No, it wasn't.

Q.   Okay.  And was this a sales transaction that was going to take place before, in fact, the system -- the facility went into service?

A.   Yes, it was.

Q.   Okay.  If we go to cells F81 and I81, the two

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

we've looked at, the $3,735 per kilowatt for the entire facility and $3,456 per kilowatt for eligible only, can you just calculate for us what percentage of the total value is assumed to be estimated in that calculation?

A.    You're killing me.  I'm just -- I'm almost there. So, I've got 7.4 percent as ineligible, 7.5 percent as ineligible.

Q.    Okay.  So, 92.5 percent is eligible?

A.    92.5 percent would be eligible.

Q.    Thank you.

Your Honor, I would move Plaintiffs' Exhibit 20 and its attachment into evidence.

MR. RONICKHER:  We have no objection to it coming in as a reflection of the historical valuation work that was done at the time, but obviously we would just want the proviso that this is not admitted in the way of expert testimony in the case.

THE COURT:  That's fine.  Plaintiffs' Exhibit 20 is admitted.

(Plaintiffs' Exhibit Number 20 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.    Let me show you Joint Exhibit 66.  Now, is that an email that -- let me back up just for a second.

The analysis we just got through looking at was

242

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

dated September 1, 2010.

A. Okay.

Q. So, now we're eight days later, September 9, 2010. Do you see that?

A. I do.

Q. And this is an email from Terra-Gen to UBOC. Do you see that?

A. I do.

Q. They are one of the potential buyers, right?

A. They are.

Q. And is that -- and was that email, in fact, sent?

A. Yes, it was.

Q. And in the text of the email, does Terra-Gen place a value on the facility?

A. We do.

Q. And what is the amount?

A. $3,350 per KW for the five-year MACRS, which I think is an indicator of -- basically synonymous with the eligible property at this point.

Q. Okay. So, a little less than the $3,456 that had been calculated in the McManus & Miles analysis, correct?

A. That is correct.

Q. Okay. And if we -- and if we look at the attachment to this exhibit, is this a net present value

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

calculation that Terra-Gen provided to UBOC along with that email?

A. Yes, it is.

Q. And what method is being used to value the facility?

A. Once again, the discounted cash flows --

Q. Okay.

A. -- or the income method.

Q. Okay, all right. Let's now go to Joint Exhibit 67. We're now moving forward to October 4, 2010, so less than a month later. Now, at the same time you were discussing the sale-leaseback of Alta I with UBOC, were you also discussing the possible outright sale of Alta I?

A. We were.

Q. Okay. And this email discusses distributing a CIM. What is a CIM?

A. It's a confidential information memorandum.

Q. Okay. And there are ten or so entities listed. Do you see those?

A. I do.

Q. And did -- were they perceived by Terra-Gen as potential buyers, outright buyers of Alta I?

A. Yes, they were.

Q. Okay. And did the CIM go to all these companies?

244

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

A.    Yes, it did.

Q.    And was one of them General Electric?

A.    Yes, one of them was General Electric.

Q.    And how were these companies selected by Terra-Gen?

A.    We would identify those folks that were active in the industry based upon publications that we were reading and knowledge that we had within the industry as to who was acquiring assets, who was in the business. You know, some of them are obvious. AES has been a long-term participant in the wind industry. The same is true for Duke and Exxon, GE, Goldman probably in and out, and the rest very -- very steady in terms of wind. So, we had knowledge of these folks and we knew who was active at any given time. You would always learn about other people that became active, and then you would contact them.

Q.    Okay. Now, let's go to Plaintiffs' Exhibit 21. Now, is that the version of these materials that went to General Electric?

A.    Yes, it is.

Q.    And attached -- the attachments are the -- include the CIM -- C-I-M -- and bidding instructions. Is that right?

A.    That's correct.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.   And then there's also a model, correct?

A.   Yes.

Q.   And did these things all go to all the prospective bidders?

A.   They did.

Q.   So, if we -- if we go to page 5 of Plaintiffs' Exhibit 21, is that the beginning of the confidential information memorandum?

A.   Yes, it is.

Q.   And looking at the index on page 8, do these table of contents show various issues upon which you were providing information?

A.   Yes.

Q.   And how did you select those -- those pieces of information?

A.   Again, it's the information that a buyer of the facility would want to know about in order to conduct a valuation.

Q.   Okay.  Now, if you go to page 10, under "Investment Highlights," there's a statement that I'll read.  "In certain key respects, such as limitations on curtailment and liquidated damages payable to the buyer, the terms of the PPA are more favorable to the seller than would be available in the market today."

     Do you see that?

246

Trial

Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

A.   I do.

Q.   Is that an accurate statement?

A.   At the time we made it, we thought it was, but since that, we've been given a greater database of PPAs within the California market, and I think it was inaccurate.

Q.   Okay.  Well, let's start with the curtailment. First of all, tell us what curtailment is.

A.   Curtailment is the right of the utility to cease production from the output -- from the project.

Q.   Cease production or --

A.   Yes.  It could -- it could -- the utility could give you a dispatch order to tell you to not produce for a period of time, curtail production.

Q.   Okay.  And what were -- was the utility's rights in that respect with respect to the Alta facilities?

A.   They had the ability, for 200 hours per year, to curtail the production of the projects.

Q.   Okay.  And --

A.   And "cease" can also mean reduce, it can -- basically, it's generate less than the facility is capable of generating.  Whether that's down to zero or down to a reduced generation level will depend upon the curtailment order that is provided.

Q.   Okay.  And how does that compare to other

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

facilities?

A.   What I've learned subsequently is that it actually -- we didn't get paid for those 200 hours. There were contracts that were executed at the same time which don't -- which aren't public at the time that they're executed.  You're not aware of what the market is -- is providing for obvious reasons, right?  The utilities want to maintain a competitive atmosphere within their contracting sphere, but after a period of time, I think it's five years, these all become public.

And so having gone back now and looked at some of these contracts, there was a Coram project adjacent to our project.  It had a take-or-pay obligation.  So, the utility could curtail the production, but they had to pay the generator as if they had taken the -- produced it.  So, it's called "deemed generation."  That was the case for the Coram contract.

There was a contract -- and that was with PGE versus SCE.  The SWAN 03 (phonetic) contract was with SMUD, which is the Sacramento Municipal Utility Department, and that also had take-or-pay provisions, essentially.  You had a -- if they curtailed you and you were capable of producing, you still were paid.  They didn't have the 200 hours of curtailment that we had.

Similarly, they had a Shiloh IV contract with

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

PGE.  Once again, they could curtail you, but the curtailment would still result in what was characterized in the contract as "deemed generation," and you would still be paid.  So, unfortunately, you know, it was -- it was not accurate within the market of California.  I still think it's an accurate statement on a broader market.

There was -- and the reason we made it probably had to do with the fact that on a nationwide basis, people were becoming more concerned with curtailment rights within a utility contract.  Transmission was getting full, and there was a concern that you would have the utility reduce your generation.  So, you might have had a capacity factor expectation based upon wind availability of 35 percent, but you were curtailed due to nonavailability of the transmission, and you wouldn't be compensated.

So, on a national level, I would say probably a true statement, although I haven't gone back and re-educated myself, but certainly on the relevant market level, California, it appears that it was not a true statement.

Q.  Okay.  Meaning that the Alta PPAs --

A.  Were slightly inferior.  It had the 200 megawatt -- 200 hours of dispatch right.  So, it was

249

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

slightly less favorable than market.

Q. Okay. And what about with respect to the other provision that you reference in this CIM; namely, liquidated damages?

A. So, liquidated damages is a bit more complicated. I should first probably outline how the Alta contract itself worked. We had the possibility for liquidated damages in three scenarios. The first was a two-year test, a two-year contract test. You had to produce 140 percent of the P50 levels for two years. If you didn't produce that, regardless of why you didn't produce it, you had liquidated damages.

So, if you had horrific wind years back to back -- and that's what it would take -- or if you weren't available because you didn't maintain the facility properly and you didn't hit your 100 and -- basic 70 percent of P50, so 140 percent over two years, you had liquidated damages, and those damages could range anywhere, in the case of Alta, from $20 a megawatt hour to $50 a megawatt hour, and it would depend, within that range, on where the market was for replacement power.

In other words, the utility lost the opportunity to take your generation either because the wind didn't blow or you didn't maintain the facility properly, so

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

you have to pay liquidated damages.  How you calculate those damages will depend on what it cost for them to replace it.  You have a cap of 50 and a floor of 20. So, there was going to be a penalty.  It's a question of where within that $30 range it would fall.

Q.   And that's a penalty per what?

A.   Per megawatt hour.

Q.   Okay.

A.   That was the first guarantee.  The second guarantee was a one-year availability guarantee at 85 percent.  If you didn't maintain that level of availability, you had damages, and those damages ranged, again, from zero to $10 a megawatt hour.  Once again, it depended upon the market itself in terms of the replacement cost for the power.

And the second availability guarantee you have -- we have in the Alta contracts is a long-term availability, which is measured in two five-year periods, the first five years of operations and the second five years of operations.  If you don't maintain in that instance an availability of 90 percent, you would end up with a penalty, and, again, that penalty could range anywhere from zero to $10 a megawatt hour. So, you had a band of liquidated damages in all three instances.

251

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

What I've learned subsequently, again, for the same reasons as the curtailment, is there really is a range of outcomes here, some of which I would say are better, some of which I would say are slightly worse than the Alta contract.  If you look at Coram, I'd say that contract is slightly better.  They traded away -- they have the 140 percent guarantee as well for two years.  So, it's identical in that respect to the Altas, but the damages could be anywhere from $20 a megawatt hour to no cap.  So, they didn't have a cap.  That aspect of it is less favorable than the Altas.

So, I would say ours is better, but what they traded for that is no availability guarantees.  So, you have no long-term availability guarantee, you have no one-year availability guarantee.  So, looking at how the market looks today, clearly that's a better structure for the developer and is a more favorable contract than our contract.

The Solano contract is absolutely better because if the availability wasn't there, it was a prepaid contract, again, with SMUD, Sacramento Municipal Utility District, and if they didn't have sufficient availability to produce, they had to repay the money that was already paid to them.  So, there's really no penalty; it's just we paid you and we shouldn't have.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

And it goes without saying, in our contract, if we don't produce, we don't get paid --

Q.  And you pay the liquidated damages.

A.  -- and we pay the liquidated damages for not maintaining the level of availability that's in the contract.

Q.  So, does that make it better or worse?

A.  That one's better.  The Coram contract, I would say, you know, slightly better.  And then there's one that was worse, and I would say the one that was worse is the Shiloh IV contract.  I referred to that on the curtailment provisions as well, where it was take or pay, better in that area.  But in this area I would say we were slightly better.

And the reason I say that is it was a two-year guarantee, but instead of being at 140 percent of the P50 production, it was at 160 percent of the P50 production, so a higher standard.  You still had to have bad back-to-back wind years, but you didn't have as much cushion as we have in our contract.

There are no availability guarantees, so that is better than ours.  We have the availability guarantees I outlined; they don't.  I think what breaks the tie, if you will, is the fact that, you know, they have a 20 to no cap liability for that shortfall.  So, it's a -- you

know, their contract is slightly worse than ours.

Q. Okay. Now, you've talked about your guarantees being in terms of what you call the P50 case. Tell us what that term means.

A. P50 is essentially a hundred-year average. So, you take a look at -- you know, wind varies year to year, and it can vary dramatically. It can be very good one year. The next year, it can be extremely bad. But the expectation is, on a probability factor of 50, that over that 100-year period, it will produce X number of megawatt hours, it will have this NCF, and that is what -- what P50 means.

Q. The "P" in P50 is probability?

A. It's probability.

Q. Okay.

A. So, if you look for P90, that is going to be a lower production level, right, because you're going to have a higher level of confidence that -- so, P90, probability of 90 percent -- that it will produce at least this much. If you're looking for a P10, that means you're going to have enough really good years, more than the average, to produce that level of generation over the 100-year period.

Q. Okay. Let's go back to the negotiations over Alta I, and we have been -- we have been looking at the

Trial
Alta Wind I Owner Lessor C, et al. v. USA                      5/9/2016

CIM that's attached to PX 21.  If we could look at the attachment, the spreadsheet, which has now been pulled up, can you tell us just generally what this document is?

A.  It's the same methodology for calculating the value of a project, but in this instance we aren't -- we aren't really providing that discounted cash flow because we have a buyer that will set their own discount rate.  So, you can just plug in the purchase price, and what will come out is your after-tax IRR, the 9 percent that we utilized in the case of the Alta II through V analysis.

Q.  So, let's just look at this more specifically. We're in the tab -- the "Inputs" page, and looking at cell E8, where it says "Purchase Price," it shows zero, correct?

A.  Yes.

Q.  But then there's the instructions on top.  Is that instructions from Terra-Gen?

A.  Yes.

Q.  "Input purchase price in yellow box to drive after-tax IRR calculation," correct?

A.  That's correct.

Q.  So, the buyer could put in a purchase price and, based upon the various cash flow projections, figure out

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

what rate of return they would get for that purchase price, right?

A. Yes. I mean, the return is just the flipside of the discount rate. It's just what -- what return do I need to achieve on my investment, is essentially what rate can I discount these cash flows at to achieve -- to -- and pay to the buyer. If I pay this amount, with this discount rate, that's my return, that discount rate.

Q. Okay.

Now, Your Honor, I would move Plaintiffs' Exhibit 21 and its attachment into evidence or attachments into evidence.

MR. RONICKHER: No objection.

THE COURT: Plaintiffs' Exhibit 21 is admitted.

(Plaintiffs' Exhibit Number 21 was admitted into evidence.)

BY MR. ROSENBAUM:

Q. So, you have talked about how there were, if you will, parallel purchases from Alta I, one a sale-leaseback, which you were talking to UBOC about, and the other an outright sale to various other companies. Is that right?

A. Yes, that's correct.

Q. So, on the outright sale side of things, how did

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

it work procedurally?

A.  On the outright sale, no differently.  I mean, people would look at the data room, and they would look at the confidential information memorandum.  GE at one point was considering both outright sale -- outright purchase without following it with a leaseback and doing a leveraged lease.  So, it's the same process.

Q.  Okay.  And what about this -- you've talked previously about there being a round one and a round two.  Did that exist for this facility?

A.  Yes, it did.  You had a process where you would short-list people and then decide who you were going to go forward with.  The quirk, if you will, was that UBOC got involved, as you can see from the earlier emails, as early as May, which was prior to us starting the process, and then we started the process because we weren't happy with the offers we were getting from UBOC. And it was a two-step process.  It was an initial round with a confidential information memorandum, and then a short list, and then a selection.

Q.  Okay.  Let's look at Plaintiffs' Exhibit 23. Now, this is an email -- if we look at the -- the earliest email, so this would be the -- if you go to the next page, I think -- keep on going, if you would.  The next page, sorry.  Okay, go back.  Sorry.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

So, yeah, at the very bottom of that page, this is page 3, Mr. Cast is sending an email to Mr. Rank, Ralf Rank and others.  Who is Mr. Rank?

A.   He is the chief investment officer at Brookfield.

Q.   And what is Brookfield?

A.   Brookfield is an infrastructure fund.  They have many megawatts of renewable energy, a lot of which is hydro, but they also owned at this time an interest in the Coram project, which I was just referring to, the project adjacent to ours, as well as the -- a project in Canada, outside of Ontario, and I think it was called the Prince Project, and it was about 250 megawatts using the GE 1.5-megawatt machines.

Q.   Okay.  So, the Alta I facility you're talking about uses GE 1.5-megawatt turbines?

A.   They do.  It does.

Q.   And did Brookfield already own its own wind farm with that exact same turbine?

A.   Yeah, they actually had the Prince Project, and it was a larger project than the Alta I, was about 130 or -- I'm sorry, 230 megawatts, but it -- all of which were GE 1.5-megawatt machines.

Q.   Okay.  Now, Mr. Cast in his email is asking -- you know, explaining that Terra-Gen is running a sale process, and, you know, let me know if it's something

258

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

your company is interested in.  Do you see that?

A.  Yes, I do.

Q.  I'm paraphrasing.

Then if we go back to the main email, there's an email back, later that same day, from -- no, I'm sorry, go back to the -- yeah.  The second email from the bottom on page 3, Mr. Rank says, "Appreciate the email, we are most definitely interested."

Do you see that?

A.  I do.

Q.  And did you, in fact, have further discussions with Brookfield about potentially buying Alta I?

A.  We did.

Q.  And would that have been an outright purchase?

A.  In that instance, yes, it would have been.

Q.  And who did you deal with at that company?

A.  Ralf Rank, who, as I said, was the chief investment officer, and Harry Goldgut, who was their CFO.

Q.  Okay.  Now, obviously, we know they ultimately didn't buy Alta I, correct?

A.  That's correct.

Q.  But did they later buy a different Alta?

A.  They bought Alta VIII.

Q.  Okay.  And at the time you were dealing with them

259
Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

with respect to Alta I, what was your perception of their seriousness?

A.   They were very interested.  They spent a good bit of time in the data room.  They expressed interest in terms of receiving the materials, and they put forth a very attractive offer, just not attractive enough.

Q.   Okay.  If we can close out of that email, and then -- I'm sorry, I didn't mean out of the whole document.  Go to the very first email on that -- go to page 1, if we could.

If you look at the attachments -- well, that's an email from Mr. Cast to Mr. Rank on October 8, 2010.  Is that correct?

A.   Yes, it is.

Q.   So, these are all emails all on one day, I think.  Attached to that email are the Alta Wind I CID -- excuse me, CIM, the process instructions, as well as the Excel spreadsheet that we have just gotten through looking at, correct?

A.   Yes, that's correct.

Q.   Okay.  And were those things all provided to them?

A.   Yes.

MR. ROSENBAUM:  Your Honor, I would move Plaintiffs' Exhibit 23 into evidence.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 23 is admitted.

(Plaintiffs' Exhibit Number 23 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Okay.  So, this is October 8th, 2010.  Now let's look at another document with the same date, Joint Exhibit 69.  Now, this is an email from Mr. Markowitz, correct?

A.  Yes, it is.

Q.  And who was he with?

A.  UBOC.

Q.  Okay.  And this goes to Terra-Gen, correct?

A.  It does.

Q.  And his first sentence states, "Please find the attached economic proposal for the Alta I facility."

Do you see that?

A.  I do.

Q.  And if we look at the attachment, which is a spreadsheet, there is something in the "Assumptions" tab called "Asset Cost."  Do you see that?  Line 10.  Row 10.

A.  I do.

Q.  And --

A.  465, yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

261

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

Q.   I'm sorry.  And looking at cell B10, what is the asset cost listed?

A.   465.

Q.   That's 465 million?

A.   465 million, yes.  I apologize.

Q.   Okay.  Now, if you look at cell B17, there's a grant amount shown of 139.5 million.  Do you see that?

A.   Yes, I do.

Q.   Okay.  And based upon that, can you tell whether the $465 million asset cost listed is for the whole facility or only the eligible portion?

A.   It's only the eligible portion because it's 30 percent of the 465 million.

Q.   And what do you understand the term "asset cost" to mean in this context?

A.   The cost of the eligible property.

Q.   Is this what -- is this a -- is this a -- what he would be willing to pay for it?

A.   In this instance, yes.  He's saying the purchase price --

Q.   Okay.

A.   -- for the eligible property that I am proposing is 465 million.

Q.   Okay.  Now, you had -- we had -- it's been a few minutes now, but you had previously calculated that in

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

the McManus & -- I'm sorry, you previously calculated that in the -- let me take that back, just -- okay.

So, they're talking about $465 million for eligible property.  If we go back to Joint Exhibit 66, Mr. Cast, in an email to the very same people, Mr. Markowitz and others, had provided guidance of $3,350 for the eligible property, correct?

A.  Yes, that's correct.

Q.  So, what did that come to -- since it's a 150-megawatt facility, what's the total value here?

A.  502,500,000.

Q.  Okay.  So, you had indicated a value of 502 1/2 million, correct?

A.  Yes.

Q.  They were responding to you with a value of 465 million?

A.  Yes, that is correct.

Q.  All eligible?

A.  All eligible in both instances.

Q.  Only eligible, correct?

A.  Yes.

Q.  And what was TGP's reaction to that?

A.  Obviously not -- not happy with it and not willing to accept it.

Q.  Okay.  Let's look at Joint Exhibit 70.  The top

263

Trial

Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

email is from Mr. DiMarco to several people, correct?

A.  Yes.

Q.  He's a Terra-Gen employee?

A.  He is.

Q.  What's his position?

A.  He's a vice president of finance.

Q.  And he says, "Geoff, Eugene, we've heard from UBOC but it really wasn't the answer we were looking for."

Do you see that?

A.  I do.

Q.  And what does that mean?

A.  It's an indication that we're not happy with the UBOC offer and we need to explore other options.

Q.  Okay, all right.  Let's look at Plaintiffs' Exhibit 25.  Can you tell us what that document is?

A.  That's the index for the data room for the Alta I wind facility.

Q.  Okay.

I would move Plaintiffs' Exhibit 25.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 25 is admitted.

(Plaintiffs' Exhibit Number 25 was admitted into evidence.)

BY MR. ROSENBAUM:

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.   And if you could look at Plaintiffs' Exhibit 195, and if you could blow that up for us a little bit.  What is that document?

A.   Those are the individuals that had access to the data room.

Q.   Okay.  And if we page down, do we -- are there individuals from General Electric and UBOC listed here?

A.   There's clearly individuals from General Electric.  I don't see UBOC, but I'm sure they're on the list because they were participants.

Q.   Okay.  Is there a second page to this or --

A.   There it is, UBOC, yep.

Q.   Okay.  Just going back to the first page, just to get a sense of things, if we look at the bottom, the part that relates to General Electric, I mean, how many individuals at General Electric were requested and given access to the data room?

A.   Thirteen, by my count.

Q.   Okay.

     Your Honor, I would move Plaintiffs' Exhibit 195.

     MR. RONICKHER:  No objection.

     THE COURT:  Plaintiffs' Exhibit 195 is admitted.

     (Plaintiffs' Exhibit Number 195 was admitted into evidence.)

     BY MR. ROSENBAUM:

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q. Let's look at Plaintiffs' Exhibit 30, please. This is an email from Mr. Cast to Mr. Rank. Do you see that?

A. I do.

Q. And if you look at the second paragraph, there's a sentence at the end that says, "The balance of your team will receive dataroom access first thing tomorrow morning."

Do you see that?

A. I do.

Q. Was Brookfield, in fact, provided access to this same data room?

A. Yes, they were.

MR. ROSENBAUM: Your Honor, I would move Plaintiffs' Exhibit 30.

MR. RONICKHER: No objection.

THE COURT: Plaintiffs' Exhibit 30 is admitted.

(Plaintiffs' Exhibit Number 30 was admitted into evidence.)

BY MR. ROSENBAUM:

Q. If we look at Plaintiffs' Exhibit 71, tell us what that document is, please.

A. That's the independent engineer's report for Alta Wind I.

Q. Okay, all right. And was that document provided

to potential bidders?

A. Yes, it was.

MR. ROSENBAUM: Your Honor, I would move Plaintiffs' Exhibit 71.

MR. RONICKHER: No objection.

THE COURT: Plaintiffs' Exhibit 71 is admitted.

(Plaintiffs' Exhibit Number 71 was admitted into evidence.)

BY MR. ROSENBAUM:

Q. And if we look at Plaintiffs' Exhibit 33, what is that document?

A. That's a wind assessment for Alta Wind I.

Q. Okay. And was that provided to potential bidders, including General Electric, UBOC, and Brookfield?

A. Yes, it was.

MR. ROSENBAUM: Your Honor, I would move Plaintiffs' Exhibit 33.

MR. RONICKHER: No objection.

THE COURT: Plaintiffs' Exhibit 33 is admitted.

(Plaintiffs' Exhibit Number 33 was admitted into evidence.)

BY MR. ROSENBAUM:

Q. Okay. Now, let's look at Plaintiffs' Exhibit 27. So, the -- the first email chronologically, which is at

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

the bottom, is from Lance Armstrong [sic] to Mr. O'Connor and Mr. DiMarco.  Do you see that?

A.   Yes, I do.

Q.   So, he's with UBOC, right?

A.   Yes, Lance is with UBOC.

Q.   And the recipients are people at Terra-Gen, correct?

A.   Yes.  John's our CFO.

Q.   And Mr. Markowitz says, "Hi John, I am hearing that Alta I is up for sale.  Can you please advise us on this matter?  Sorry for the informality but we have a significant effort ongoing on the structure.  Thanks, Lance."

Do you see that?

A.   Yes, I do.

Q.   And what is your understanding of what is meant by Alta I being up for sale?

A.   So, Lance had started his process with us in May, not made very attractive offers to us.  We started to explore other options, put this thing together for auction, and Lance has now gotten wind, if you will.  He has heard in the marketplace that other people are looking at the Alta Wind I facilities.  He's not happy because he's thinking, "I have got to negotiate a deal where I can name my price," and we're doing what a

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

diligent buyer -- seller does and exploring other options, and he's realizing that this could be moving away from me.

We never misled him and told him it was his, we didn't, but we also didn't go to him and say, "Lance, you know, this is ridiculous, we're going to do an auction."  We went out and started the auction process, and Lance is now hearing about that.

THE COURT:  Mr. Rosenbaum, I think you may have said Lance Armstrong before.  Did you mean Markowitz?

MR. ROSENBAUM:  If I did, it was a mistake.  I am not aware of his participation.

BY MR. ROSENBAUM:

Q.  Lance Markowitz, is that the right name?

A.  Yes, that's correct.

THE COURT:  Thank you.

MR. ROSENBAUM:  All right.  Your Honor, I would move Plaintiffs' Exhibit 27.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 27 is admitted.

(Plaintiffs' Exhibit Number 27 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Let's now look at Plaintiffs' Exhibit 29.  This is an email from Mr. Cast at Terra-Gen to a gentleman at

Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

Sumitomo Corporation, providing, once again, the confidential information memorandum, Excel spreadsheet, and a nondisclosure agreement for Alta Wind I.  Is that correct?

A.  Yes, it is.

Q.  Okay.  And how is it that Sumitomo became involved?

A.  Sumitomo was active in the marketplace.  We had read about them participating in other transactions. They were really a new entrant, someone who was not that active traditionally.  They were someone who had come in and out of the marketplace, but when they were back in, we felt, let's offer them the confidential information memorandum and the information package.

Q.  And who did Terra-Gen invite to participate in round two?

A.  In round two, you had GE, you had UBOC, Sumitomo was part of the round two process, obviously Brookfield was part of the round two process.  I can't recall -- I'm kind of getting my processes a little bit mixed up, but I think at that point we -- we may have also had Duke in there and perhaps TransAlta.

Q.  Okay.

Your Honor, I would move Plaintiffs' Exhibit 29.

MR. RONICKHER:  No objection.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                     5/9/2016

THE COURT:  Plaintiffs' Exhibit 29 is admitted.

(Plaintiffs' Exhibit Number 29 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Okay.  If we look at Plaintiffs' Exhibit 30, which is an email from Mr. Cast to Mr. Rank, what does this document relate to?

A.  So, it's a second round bid instruction letter. After you select your short list, you then go to those folks and you tell them that here's the process that we're going to run from this point forward.  You will be given access to the data room.  We'll let you know -- we'll do a management presentation to further educate you on the project.  You'll have the opportunity to ask questions.  We are going to run a due diligence process where you submit questions via email.  Here's your contact person to submit those questions to, et cetera.

Q.  Okay.  And what about a site visit?

A.  A site visit is typical on the round two process.

Q.  And did these materials, in fact, get sent to Brookfield?

A.  Yes, they did.

Q.  And did they also go to other -- the other round two bidders?

A.  They did.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

Q.  And were they all offered the opportunity for an onsite visit?

A.  They were all offered that opportunity.

Q.  Okay.

Your Honor, I would move Plaintiffs' Exhibit 30.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 30 is admitted.

(Already admitted.)

BY MR. ROSENBAUM:

Q.  Okay, Plaintiffs' Exhibit 31.  You mentioned previously that in round two, there's a management presentation.  Is that what's being provided with this email?

A.  Yes.  That's what's being provided.

Q.  Okay.  And did the same information go to other round two bidders?

A.  It went to all the bidders that were in round two.

Q.  Okay.  And if we look at the attachment itself, is that the management presentation starting on page 2?

A.  Yes, it is.

Q.  And just -- if we look at the -- go to the next page -- go one more page, yeah.

What information is being provided in this presentation?

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

A.   An overview of the project, including things like the environmental and the contractual arrangements, a transactional review in terms of what -- what type of closing period, you know, that people were expecting, et cetera.

Q.   Okay.

Your Honor, I would move Exhibit 31.

MR. RONICKHER:  No objection.

THE COURT:  Plaintiffs' Exhibit 31 is admitted.

(Plaintiffs' Exhibit Number 31 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.   And now let's look at Plaintiffs' Exhibit 32. Was there a subsequent conference call in which Terra-Gen went over this management presentation with Brookfield?

A.   Yes, there was.

Q.   Did you participate personally in that?

A.   Yes, I did.

Q.   Okay.

Your Honor, I would move Plaintiffs' Exhibit 32 into evidence.

MR. RONICKHER:  No objection.

THE COURT:  All right, Plaintiffs' Exhibit 32 is admitted.

Trial
Alta Wind I Owner Lessor C, et al. v. USA                         5/9/2016

(Plaintiffs' Exhibit Number 32 was admitted into evidence.)

BY MR. ROSENBAUM:

Q.  Okay.  Now let's look at Plaintiffs' Exhibit 75. I'm sorry, Joint Exhibit 75.  Excuse me.

Now, the -- Mr. O'Connor, in the cover email, provides an attachment, "Terra-Gen Letter" it says.

Do you see that?

A.  I do.

Q.  And it says, "Bid letter from Brookfield."  Do you see that?

A.  I do.

Q.  So, let's go to the next page.  Is that Brookfield's round two bid?

A.  Yes, it is.

Q.  And would this be for an outright purchase?

A.  Yes, it was.

Q.  Okay.  And on the third page -- well, let me just ask, would they be buying the entire facility or just the eligible property?

A.  Yes.  They would be buying all of the assets.

Q.  Okay.  And on the third page, under "Purchase Price and Key Assumptions," he states -- Mr. Rank of Brookfield states, "Our indicative purchase price for 100% of the equity interests of Alta Wind I is US$175

Trial
Alta Wind I Owner Lessor C, et al. v. USA                              5/9/2016

million payable in cash on closing, which represents a total enterprise value in the range of $540 million and is subject to those assumptions and transaction mechanisms [sic] outlined below."

Do you see that?

A.  Yes, I do.

Q.  So, in what sense -- well, let me see, what does the term "total enterprise value" mean?

A.  So, that's all the assets, both eligible and ineligible.  It includes any assumption of debt.  At this point, we had done a construction financing for the Alta I project.  As I said earlier, that was really the first transaction we did prior to the sales, and the enterprise value is both the payment to us of $175 million and the assumption of debt.

Q.  Okay.  Those two things combine to 540 million?

A.  That's correct.

Q.  Okay.

THE COURT:  Mr. Rosenbaum, would this be a good place to break for the day?

MR. ROSENBAUM:  It would, Your Honor.

THE COURT:  This has been a full day for Mr. Pagano.

MR. ROSENBAUM:  It has.

THE COURT:  We will reconvene tomorrow at 9:30.

275

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

(Whereupon, at 4:57 p.m., the proceedings were adjourned.)

276

Trial
Alta Wind I Owner Lessor C, et al. v. USA                5/9/2016

CERTIFICATE OF TRANSCRIBER

I, Susanne Bergling, court-approved transcriber, certify that the foregoing is a correct transcription from the official digital sound recording of the proceedings in the above-titled matter.

DATED:   5/24/2016     s/Susanne Bergling
                       SUSANNE BERGLING, RMR-CRR-CLR

277

Trial

Alta Wind I Owner Lessor C, et al. v. USA                        5/9/2016

ADMITTED EXHIBITS

| PX | PAGE | DESCRIPTION |
|---|---|---|
| 1 | 160 | Joint Letter to House Committee Chairs Ranking members and leadership Final |
| 2 | 160 | Joint Letter to Senate Committee Chairs Ranking members and leadership Final |
| 5 | 208 | Email from George Revock re: Revised Citigroup CHiPs Proposal |
| 10 | 212 | Altas II-V Garrad Hassan Wind Report |
| 11 | 211 | Altas II-V Independent Engineer Report_2010.6.10 |
| 13 | 214 | Fully Executed Equity Commitment Letter |
| 19 | 234 | Email from Jim Mras Re: Alta Wind I |
| 20 | 241 | Email from Christian O'Mara re: Alta I DAI DCF Valuation, with attachment |
| 21 | 255 | Email from Jeff Cast re: Alta Wind I: First Round Process Documents - GE EFS, with attachments |
| 23 | 260 | Email from Jeff Cast re: Alta Wind I: Sale Process |
| 25 | 263 | 10.12 index - 2010 Sale Process - Alta Wind I |
| 27 | 268 | Email from Jeff Cast re: Alta I |

278

Trial
Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

| 29 | 270 | Email from Jeff Cast re: Alta Wind I Materials |
| 30 | 265 | Email from Jeff Cast re: Alta Wind I: 2nd Round Process Overview, with attachment |
| 31 | 272 | Email from Jeff Cast re: Alta Wind I Management Presentation Oct. 2010 |
| 32 | 273 | Email from Jeff Cast re: Management Presentation Timing Request |
| 33 | 266 | Alta I Wind Report |
| 71 | 266 | Alta I IE Report |
| 195 | 264 | Entire Users Groups List |
| 196 | 210 | Dataroom Index |
| 197 | 209 | Entire Users Groups List |
| 221 | 82 | Map 01: Alta 1-9 Overview Map |
| 222 | 189 | Map 02: Alta 1-6 Eligibility Map |
| 223 | 90 | Map 03: Alta 1-6 Land Acquisition Map |
| 224 | 92 | Map 04: Alta 1-6 Project Roads |
| 225 | 63 | Photo 01: LA and surrounding area at night (aerial) |
| 226 | 65 | Photo 02: Map of Tehachapi Pass |
| 227 | 67 | Photo 03: NREL Map re Wind Power |
| 228 | 69 | Photo 04: Tehachapi Pass (wind turbines) |

279

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

| | | | |
|---|---|---|---|
| 229 | 70 | Photo 05: Tehachapi Renewable Transmission Project (SCE) | |
| 230 | 226 | Photo 06: Google Earth Image of Alta I | |
| 231 | 132 | Photo 07: Turbine Anatomy Diagram | |
| 232 | 133 | Photo 08: Evolution of wind turbines | |
| 233 | 134 | Photo 09: Turbine compared to Statue of Liberty | |
| 235 | 135 | Photo 11: Alta I Wind Farm Diagram | |
| 236 | 136 | Photo 12: Cutting of roads | |
| 237 | 138 | Photo 13: Alta I Pier Foundation Drawing | |
| 238 | 138 | Photo 14: Alta I Pier Foundation Drawing (Dimensions Call Out) | |
| 239 | 138 | Photo 15: Turbine pier foundation excavation | |
| 240 | 139 | Photo 16: Turbine pier foundation excavation | |
| 241 | 139 | Photo 17: Turbine pier foundation excavation | |
| 242 | 140 | Photo 18: Outer can transport | |
| 244 | 140 | Photo 20: Outer can installation | |
| 245 | 141 | Photo 21: Pouring cement | |
| 247 | 141 | Photo 23: Rebar installation | |
| 248 | 142 | Photo 24: Completed pier foundation | |
| 249 | 142 | Photo 25: Completed spread foundation | |

280

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

251    143    Photo 27: Aerial view of site: Tower
              Storage
252    144    Photo 28: Aerial view of turbine
              component storage
253    144    Photo 29: Truck progression carrying
              towers
254    145    Photo 30: Tower construction progress -
              Crane installing tower
255    145    Photo 31: Tower construction progress
256    146    Photo 32: Tower construction progress
257    146    Photo 33: Tower construction progress
258    147    Photo 34: Tower construction progress
259    147    Photo 35: Hub internal
260    148    Photo 36: Blade storage
261    148    Photo 37: Blade close up
262    149    Photo 38: Blade transport
263    149    Photo 39: Crane installing blade
264    149    Photo 40: Cranes and completed turbines
266    150    Photo 42: Laying cable
267    151    Photo 43: Cable spools
268    151    Photo 44: Transformer transport
269    152    Photo 45: Transformer transport
270    153    Photo 46: Substation area
271    153    Photo 47: Substation area
272    154    Photo 48: Substation internal

281

Trial

Alta Wind I Owner Lessor C, et al. v. USA                    5/9/2016

277    154    Photo 53: Large number of workers on
              site

279    101    Demonstrative 01: Alta Project
              Environmental Mitigation Requirements

280    156    Demonstrative 02: Construction Metrics

281    177    Demonstrative 03: Purchase Prices Paid
              for Eight Alta Facilities

282    179    Demonstrative 04: Purchase of the Alta
              Wind II Facility

283    179    Demonstrative 05: Purchase of the Alta
              Wind III Facility

284    180    Demonstrative 06: Purchase of the Alta
              Wind IV Facility

285    180    Demonstrative 07: Purchase of the Alta
              Wind V Facility

286    183    Demonstrative 08: Purchase Date and
              Amounts, Alta II – V Facilities

287    226    Demonstrative 09: Sale-Leaseback of
              Alta Wind Facilities IV and V

288    228    Demonstrative 10: Purchase of the Alta
              Wind I Facility

294     52    Demonstrative 16: Renewable Energy
              Projects Developed, Owned, or Operated
              by Terra-Gen

282

Trial

Alta Wind I Owner Lessor C, et al. v. USA                                    5/9/2016

295    89    Demonstrative 17: AllCo Development
Milestones Prior to Terra-Gen
Acquisition

296    101    Demonstrative 18: Alta I-VI Development
Milestones Post Terra-Gen Acquisition

298    127    Demonstrative 20: Employees and
Consultants Hired by Terra-Gen to
Assist in the Development and
Construction of the Alta Wind Facility

| JX | PAGE | DESCRIPTION |
|---|---|---|
| 1-204 | 10 | Joint Exhibits (voluminous) |
| 205-2040 | 10 | Deal Documents |

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555