**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALTA WIND I OWNER LESSOR C, | ) | |
| | ) | |
| *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Nos. 13-402, 13-917, 13-972, 13-935, |
| | ) | 14-174, 14-93, 14-175, and 14-47 |
| v. | ) | |
| | ) | Judge Wheeler |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

---

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

Steven J. Rosenbaum
(srosenbaum@cov.com)
*Counsel of Record*
Dennis B. Auerbach
Thomas R. Brugato
Margaret H. Brennan

One CityCenter
850 10th Street, NW
Washington, DC  20001-4956
(202) 662-5568
(202) 778-5568 fax

July 25, 2016                                      *Counsel for Plaintiffs*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

CONTENTIONS OF FACT AND LAW ............................................................................ 8

I.     Trial Witnesses.......................................................................................................... 8

       A.     Professor Colin Blaydon. ............................................................................... 8

       B.     Professor Edward Maydew. ........................................................................... 11

       C.     James Pagano. ................................................................................................. 13

       D.     George Revock................................................................................................ 14

       E.     Lance Markowitz. ........................................................................................... 14

       F.     James Spencer.................................................................................................. 15

       G.     Damon Huplosky. ........................................................................................... 15

       H.     Anthony Johnston. .......................................................................................... 16

       I.     Ellen Neubauer................................................................................................ 16

       J.     Donald Edward Settle. .................................................................................... 17

       K.     Judson Jaffe.................................................................................................... 17

II.    The Section 1603 Program, the Tehachapi Region, and the Alta Wind Facilities. .......... 17

       A.     The Section 1603 Cash Grant Program. ......................................................... 17

       B.     California's Support for Renewable Energy..................................................... 21

       C.     The Tehachapi Region. ................................................................................... 23

       D.     Terra-Gen Power LLC. ................................................................................... 25

       E.     The Alta Wind Energy Center. ....................................................................... 26

       F.     Initial Development Efforts. ........................................................................... 27

       G.     Terra-Gen's Acquisition of Allco's Interests.................................................. 29

       H.     Terra-Gen's Subsequent Development of the Alta Facilities. ......................... 31

I.      Terra-Gen Had to Sell the Alta Wind Lawsuit Facilities for the Section
        1603 Cash Grant Program to be Utilized. ............................................. 38

III.    The Purchase Price Paid for Each Alta Wind Facility Conclusively Establishes Its
        Basis. ................................................................................................... 40

        A.      Plaintiffs' Purchases of the Alta Wind Lawsuit Facilities. .................................. 40

        B.      Plaintiffs' Bases In the Properties Are Determined By the Prices They
                Paid to Purchase the Facilities. ............................................................... 44

        C.      The Altas II-V Transactions Were Heavily Negotiated By Sophisticated
                Parties, and the Purchase Prices Paid By the Plaintiff Purchasers Is
                Determinative of Basis. ........................................................................ 50

        D.      The Alta I Transaction Was Heavily Negotiated By Sophisticated Parties,
                and the Purchase Price Paid by the Plaintiff Purchasers Is Determinative of
                Basis. ............................................................................................... 64

        E.      The Alta VIII Outright Purchase Was Heavily Negotiated By
                Sophisticated Parties. .......................................................................... 79

        F.      The Alta VI Transaction Was Heavily Negotiated By Sophisticated
                Parties, and the Purchase Price Paid By the Plaintiff Purchaser Is
                Determinative of Its Basis. ................................................................... 81

        G.      The Alta IX Outright Purchase Was Heavily Negotiated By Sophisticated
                Parties. ............................................................................................. 88

        H.      The Black Letter Rule that Each Plaintiff's Basis Is the Purchase Price It
                Paid Is Not Subject to Any Applicable Exception. ..................................... 89

        I.      Plaintiffs Purchased Qualified, Energy Producing Facilities. ........................... 99

        J.      A Buyer's Basis Includes the Value of Any Tax Benefits or Other
                Government Benefits Associated with the Assets It Acquires. ....................... 102

IV.     The Purchase Prices Were Appropriately Allocated between Eligible Tangible
        Property and Ineligible Tangible Property. ................................................... 106

        A.      What Constitutes Eligible and Ineligible Property. ...................................... 106

        B.      The Vast Majority of the Costs at a Wind Farm Are Eligible. ........................ 108

        C.      KPMG's Certifications of Eligible Costs for the Alta Facilities. ..................... 109

                1.      The certification regarding the costs incurred to build the facilities. ..... 110

                2.      The pro rata method used to allocate the Alta purchase prices. ............ 114

iii

3.       KPMG's certifications of eligible basis. .............................................. 121

V.      Plaintiffs Are Entitled to the Award of Damages. ........................................................ 123

VI.     There Is No Reason to Look Beyond the Purchase Prices to Determine Plaintiffs'
        Bases. ................................................................................................................................ 126

VII.    The Income Method of Valuation Establishes a Value In Excess of the Claimed
        Bases. ................................................................................................................................ 127

        A.      If the Purchase Prices Are Not Viewed as Dispositive of Basis, the Income
                Approach Is the Best Method for Determining the Fair Market Value of
                the Facilities. ....................................................................................................... 127

        B.      The Income Method Establishes Values that Fully Support the Bases
                Claimed for the Alta Wind Facilities. ................................................................. 130

VIII.   The Market Method Establishes Values that Fully Support the Bases Claimed for
        the Alta Wind Facilities. ................................................................................................. 142

        A.      The Only Truly Comparable Sales Are the Other Altas Themselves. ................ 142

        B.      The Prices Paid For Altas VIII and IX Establish Values Consistent With
                the Prices Paid for the Alta Wind Lawsuit Properties. ....................................... 149

IX.     The Cost Method Is of Limited If Any Relevance in Valuing the Alta Facilities,
        But If It Were Applied, It Would Fully Support the Purchase Prices. ............................ 150

        A.      The Cost Method Is of Limited If Any Relevance In Valuing the Alta
                Facilities. ............................................................................................................ 150

        B.      If It Were Employed, The Cost Method Would Support Plaintiffs'
                Claimed Bases. .................................................................................................... 155

                1.       The KPMG Cost Certifications Accurately Reflect the Direct and
                         Indirect Costs Incurred on the Projects. ................................................. 156

                2.       A Turnkey Fee and Developer Fee Must Be Added to Those Direct
                         and Indirect Cost In Order to Determine Total Costs. ............................ 156

X.      None of the Purchase Prices Should Be Allocated to the PPAs, Any Other
        Contracts Goodwill, Going Concern Value, or a "Locational Value" Intangible. ......... 161

        A.      None of the Purchase Price Should Be Allocated to the PPAs. .......................... 161

                1.       The Terms of the PPAs. .......................................................................... 161

                2.       Any PPA Value Should Be Allocated to the Facility's Hard Assets. ...... 164

iv

B.    Even If the Alta PPAs Could Be Treated as Separable Assets, They Would Have Value Only Insofar as They Were Above Market, and They Were Not................................................................................................................ 170

    1.    The Alta PPAs Would Have Value Only Insofar as They Were Above Market. ................................................................................... 170

    2.    The Alta PPAs Were Not Above Market................................................ 172

C.    None of the Purchase Prices Should Be Allocated to Any Other Contracts....... 175

D.    None of the Purchase Prices Should Be Allocated to the Indemnities Provided by Terra-Gen to the Buyers ................................................................ 179

E.    None of the Alta VI Purchase Price Should Be Allocated to Wake Payments. ............................................................................................................ 181

F.    None of the Purchase Prices Should Be Allocated to Goodwill or Going Concern Value. .................................................................................................. 182

G.    No Allocation Should Be Made to a So-Called "Locational Value" Intangible. .......................................................................................................... 188

XI.    No Allocation Should Be Made to the Land, With a De Minimis Exception. ............... 193

A.    The Rented Land Is a Cost Item in the Discounted Cash Flow Analyses, and Any Value of the Land Is Reflected in that Cost. ....................................... 193

B.    A Small Amount of Fee Land Was Made Available to the Purchasers at No Separate Charge, and the Small Value of that Land Should Be Attributed to It............................................................................................... 194

XII.    Even If There Were Any Intangibles, the Entire Purchase Prices Would Still Be Allocated to the Tangible Assets Because the Fair Market Value of the Tangible Assets Equaled or Exceeded the Purchase Prices. .......................................................... 195

XIII.    The Government's Calculation of Plaintiffs' Basis Is Inconsistent and Inequitable. ...... 198

XIV.    Defendant's Counterclaims Should Be Denied. ............................................................ 201

A.    The Counterclaims Fail for a Lack of Proof. ..................................................... 201

B.    The Government Improperly Excludes Certain Costs. ....................................... 202

    1.    Interest During Construction.................................................................. 205

    2.    Development Costs. ................................................................................ 207

    3.    The Oak Creek Development Fee........................................................... 211

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.B. Joint Venture v. United States*,
No. 04-1719 C, 2008 WL 4415054 (Fed. Cl. Sept. 24, 2008).......................................180

*ABE Schrader Corp. v. Town of Secaucus*, 8 N.J. Tax 390 (1986) ...................................204

*Am. Express Fin. Advisors, Inc. v. Cty. of Carver*, 573 N.W.2d 651 (Minn. 1998) .........................204

*AMF Inc. v. United States*, 476 F.2d 1351 (Ct. Cl. 1973)................................................166

*Antisdale v. City of Galesburg*, 362 N.W.2d 632 (Mich. 1984) ........................................105

*ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12 (2011).............................................44, 45

*Bixby v. Commmissioner,* 58 T.C. 757, 1972 WL 2458 (1972).......................................120

*In re Barracuda Tanker Corp.*, 281 F. Supp. 228 (S.D.N.Y. 1968) ....................................94

*Brandon Bay, Ltd. P'ship v. Payette Cty.*, 132 P.3d 438 (Idaho 2006) .............................106

*C.D. Johnson Lumber Corp. v. Commissioner,* 12 T.C. 348, 1949 WL 166 (1949) .........................120

*Calhoun Realty Co. v. Commissioner*,
No. 7057, 1946 WL 7218 (T.C. July 29, 1946) ..........................................................189

*Cane Tennessee, Inc. v. United States*,
71 Fed. Cl. 432 (2005), *aff'd*, 214 F. App'x 978 (Fed. Cir. 2007) ......................127, 129, 143, 150

*Carty v. Commissioner*, 38 T.C. 46 (1962)..................................................................151

*Childers v. United States*, 116 Fed. Cl. 486 (2013) ......................................................143

*Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971)........................166

*Christensen v.Commissioner*,
No. 96-70741, 1998 U.S. App. LEXIS 7576 (9th Cir. Apr. 10, 1998)..........................47

*CIT Grp./Equip. Fin., Inc. v. Condere Corp.*,
65 F. App'x 509, 2003 WL 1922992 (5th Cir. Apr. 3, 2003).......................................94

*Consol. Coke Co. v. Commissioner*, 70 F.2d 446 (3d Cir. 1934) .....................................47

*In re Cont'l Airlines, Inc.*, 932 F.2d 282 (3d Cir. 1991)..................................................94

*Corbin West Ltd. P'ship v. Commissioner*, T.C. Memo. 1999-7 (Jan. 15, 1999)....................208, 212

*Country Club Estates v. Supervisor of Assessments of Montgomery Cty.*,
No. 1894, 1986 WL 3416 (Md. Tax Ct. Apr. 24, 1986)................................................106

*In re Creekside Sr. Apartments, LP*, 477 B.R. 40 (B.A.P. 6th Cir. 2012) .........................................104

*Crispin v. Commissioner*, 708 F.3d 507 (3rd Cir. 2013) ......................................................46

*Crowley, Milner & Co. v. Commissioner*,
76 T.C. 1030 (1981), *aff'd*, 689 F.2d 635 (6th Cir. 1982) ...........................................151

*In re De Leon*,
No. 11-56921–ASW, 2013 WL 3805733 (Bankr. N.D. Cal. July 18, 2013)................................105

*Deseret Mngt Corp. v. United States,* 112 Fed. Cl. 438 (2013).........................................183

*Dominion Resources, Inc. v. United States*, 681 F.3d 1313 (Fed. Cir. 2012)....................................206

*Driscoll v. Edison Light & Power Co.*, 307 U.S. 104 (1939) ............................................204

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002).........................................136

*Fairfield Gardens, Inc. v. United States*, 306 F.2d 167 (9th Cir. 1962) .............................................190

*Fed. Home Loan Mortg. Corp. v. Commissioner*,
T.C. Memo. 2006-153 (July 25, 2006) ............................................................171, 175

*\*Fieland v. Commissioner*, 73 T.C. 743 (1980) ...............................................165, 171, 175

*\*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) ......................................95, 98, 102

*Estate of Franklin v. Commissioner,* 544 F.2d 1045 (9th Cir 1976) ...................................47

*G.M. Shupe, Inc. v. United States,* 5 Cl. Ct. 662 (1984) ...................................................201

*Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221 (1981) .......................................179, 180

*Hawaiian Indep. Refinery, Inc. v. United States*, 697 F.2d 1063 (Fed. Cir. 1983).............................17

*Hermes Consol. Inc. v. United States*, 14 Ct. Cl. 398 (1988) ...........................................128

*Estate of Hillebrandt v. Commissioner*, T.C. Memo. 1986-560 (Nov. 24, 1986) ...........................189

*Houchins v. Commissioner,* 79 T.C. 570 (1982)......................................................179, 180

*\*IT&S of Iowa, Inc. v. Commissioner*, 97 T.C. 496 (1991) ...........................................102

*\*Ithaca Indus., Inc. v. Commissioner*,
97 T.C. 253 (1991), *aff'd*, 17 F.3d 684 (4th Cir. 1994) .......................................170, 175

vii

*Kennedy v. Washington Cty. Assessor*
070115D, 2007 WL 4463493 (Or. Tax. Ct. Dec. 14, 2007) ........................................204

*Koch v. Commissioner*, 71 T.C. 54 (1978) ......................................................................164

*Leisure Time Cruise Corp. v. Town of Barnstable,* 62 F. Supp. 2d 202 (D. Mass. 1999)................186

*Lemmen v. Commissioner*, 77 T.C. 1326 (1981) ..................................................92, 93, 126

*In re Lewis & Clark Apartments, LP*, 479 B.R. 47 (B.A.P. 8th Cir. 2012) ................................104, 105

*Little v. Commissioner*, T.C. Memo 1996-270, 1996 WL 315771 (June 12, 1996) ...........................47

*Lua v. United States,* 123 Fed. Cl. 269 (2015)....................................................................8, 123

*MacKenzie v. United States*, 714 F. Supp. 268 (E.D. Mich. 1989) ...................................46, 90, 126

*Malik v. Falcon Holdings, LLC*, 675 F.3d 646 (7th Cir. 2012) ..............................................48

*Matheson v. Commissioner*, 31 B.T.A. 493 (1934), *aff'd*, 82 F.2d 380 (5th Cir. 1936)......................47

*Mathis v. Commissioner*, T.C. Memo. 1989-254 (May 24, 1989)........................................190

*McShain v. Commissioner*, 71 T.C. 998 (1979)..................................................................128

*Meredith Corp. v. Commissioner*, 102 T.C. 406 (1994) ......................................................105

*Miami Valley Broad. Corp. v. United States*, 499 F.2d 677 (Ct. Cl. 1974) ....................100, 187, 188

*Moore v. Commissioner,*
T.C. Memo. 2013-249, 2013 WL 5827653 (Oct. 30, 2013) ..........................................89

*Moore v. Dep't of Revenue*, 12 Or. Tax 282 (1992) ............................................................190

*Muserlian v. Commissioner*, 932 F.2d 109 (2d Cir. 1991) ..................................................46

*New England Elec. Sys. v. United States*, 28 Fed. Cl. 720 (1993)......................................107

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993) ..................................182

*Ohana v. Commissioner*, T.C. Memo 2014-83 (May 8, 2014)..............................................208

*Oxford Paper Co. v. United States*, 86 F. Supp. 366 (S.D.N.Y. 1949) ................................47

*Pabst Brewing Co. v. Commissioner,*
T.C. Memo. 1996-506, 1996 WL 655710 (Nov. 12, 1996)..........................................135

*Pac. Far E. Line, Inc. v. United States*, 544 F.2d 478 (Ct. Cl. 1976)..................................17, 44, 46

*Peoples Bancorporation* v. *Commissioner*,
T.C. Memo. 1992-285, 1992 WL 103657 (May 18, 1992) ........................................105

*Peters v. Commissioner*, 4 T.C. 1236 (1945)......................................................................165

*Philip Morris, Inc. & Consol. Subsidiaries v. Commissioner*,
96 T.C. 606 (1991), *aff'd without op.*, 970 F.2d 897 (2d Cir. 1992) ...............................46

*Pine Pointe Hous., L.P. v. Lowndes Cty. Bd. of Tax Assessors*,
561 S.E.2d 860 (Ga. Ct. App. 2002)...................................................................................105

*PPL Corp. v. Commissioner,* 135 T.C. 304 (2010)..............................................................12

*Regan v. Commissioner*, T.C. Memo 1982-733, 1982 WL 11024 (Dec. 23, 1982) ...................93, 126

*Reichel v. Commissioner*, 112 T.C. 14 (1999)...........................................................208, 212

*Residents of Buckingham Springs v. Bucks Cty. Assessment Office*,
60 A.3d 883 (Pa. Commw. Ct. 2013) .................................................................................189

*In re Robinson*,
No. BR 14-11559-BAH, 2015 WL 5309513 (Bankr. D.N.H. Sept. 10, 2015)............................143

*RP1 Fuel Cell, LLC v. United States*, 120 Fed. Cl. 288 (2015)...........................................107

*Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995) ....................................................95, 105

*Sage v. Bernards Twp.*,
5 N.J. Tax 52 (1982), *aff'd*, 6 N.J. Tax 349 (Super. Ct. App. Div. 1984) .................................190

*Salomon Inc. v. United States*, 976 F.2d 837 (2d Cir. 1992) ..............................................18

*In re San Francisco Indus. Park, Inc.*, 307 F. Supp. 271 (N.D. Cal. 1969) ........................94

*Schubert v. Commissioner*,
33 T.C. 1048 (1960), *aff'd*, 286 F.2d 573 (4th Cir. 1961) .........................................................165

*Schwam v. Twp. of Cedar Grove*,
9 N.J. Tax 406 (1987), *aff'd*, 228 N.J. Super. 522 (App. Div. 1988) ...........................................191

*In re Shri Saibaba, LLC*, No. 14-01403-5–DMW, 2015 WL 1518666
(E.D.N.C. Bankr. Ct. Mar. 27, 2015).................................................................................151

*Sirovatka v. Commissioner*, T.C.M. 1983-634 (Oct. 12, 1983).........................................183

*Smith v Commissioner*, No. 19044, 1949 WL 7486 (T.C. Nov. 30, 1949)......................189

*Solitron Devices Inc. v. Commissioner*, 80 T.C. 1 (1983) ...........................46, 89, 167, 182

*Southgate Master Fund, LLC v. United States*, 659 F.3d 466 (5th Cir. 2011) ....................................46

*Spring Hill, L.P. v. Tennessee State Bd. of Equalization*, No. M2001–02683–COA–R3–CV, 2003
     WL 23099679 (Tenn. Ct. App. Dec. 31, 2003) .............................................................................191

*Stallworth Timber Co. v. Triad Bldg. Supply,* 968 F. Supp. 279 (D.V.I. 1997) ................................186

*People ex rel. State Pub. Works Bd. v. Talleur*, 79 Cal. App. 3d 690 (1978)....................................190

*Suzy's Zoo v. Commissioner*, 273 F.3d 875 (9th Cir. 2001) ..............................................................208

*Symington v. Commissioner*, 87 T.C. 892 (1986) ..............................................................................135

*Utilicorp United, Inc. v. Commissioner*, T.C. Memo. 1997-47, 1997 WL 28654 (Jan. 27, 1997)
     ....................................................................100, 105, 127, 151, 156,157,171, 175, 188, 196, 206

*Van Duzer v. Commissioner*,
     T.C. Memo. 1991-249 (June 5, 1991), *aff'd*, 9 F.3d 1555 (9th Cir. 1993) .........102, 105, 126, 171

*Velander v. Garner,* 348 F.3d 1359 (Fed. Cir. 2003) .........................................................................123

*Victor Meat Co. v. Commissioner,* 52 T.C. 929, 1969 WL 1734 (1969)............................................120

*Von-Lusk v. Commissioner*, 104 T.C. 207 (1995)........................................................................203, 208

*W.E. Partners II, LLC v. United States,* 119 Fed. Cl. 684 (2015) ..................................................8, 123

*Washington Mutual, Inc. v. United States*,
     996 F. Supp. 2d 1095 (W.D. Wash. 2014)......................................................................................120

*Wineman v. Commissioner*, T.C. Memo. 2000-193 (June 28, 2000).................................................189

**Statutes**

15 U.S.C. § 790a(a)(3).........................................................................................................................133

15 U.S.C. § 790f(b)..............................................................................................................................133

26 U.S.C. § 38(a) ...................................................................................................................................18

26 U.S.C. § 38(b)(1) ..............................................................................................................................18

26 U.S.C. § 45(d)(1) ..............................................................................................................21, 100, 106

26 U.S.C. § 46(a)(2) (1982) ...................................................................................................................18

*26 U.S.C. § 48(a)(1)...............................................................................................................................44

*26 U.S.C. § 48(a)(5)(D) .....................................................................................................18, 21, 100, 106

26 U.S.C. § 167(c)(2)..................................................................................................165

26 U.S.C. § 263A(f)(2)(A)(i).......................................................................................206

*26 U.S.C. § 1012..................................................................................................44, 45

42 U.S.C. § 7135(a)(1)...............................................................................................133

*American Recovery and Reinvestment Act of 2009,

 Pub. L. No. 111-5, 123 Stat. 115 ..............................................1, 18, 20, 39, 40, 44, 204

California Senate Bill 107 § 17 (Sept. 26, 2006)...............................................................21

California Senate Bill 1078 § 3 (Sept. 12, 2002)...............................................................21

Energy Policy Act of 1992, Pub. L. No. 102-486, § 1914(a), 106 Stat. 2776 ......................18

Energy Tax Act of 1978, Pub. L. No. 95-618, § 301, 92 Stat. 3197....................................18

*I.R.C. § 48......................................................................18, 19, 20, 21, 44, 46, 106, 107

*I.R.C. § 263A......................................................112, 202, 203, 205, 206, 207, 208, 209, 211, 212

I.R.C. § 1060...................................................................................................195, 196

## Regulations

26 C.F.R. § 1.263(a)-4(b)(3)........................................................................................164

26 C.F.R. § 1.263A-1(c)(3)..........................................................................................203

26 C.F.R. § 1.263A-11................................................................................................206

*26 C.F.R. § 1.1012-1(a) ..............................................................................................45

26 C.F.R. § 1.1060-1.............................................................................................195, 196

Treas. Reg. § 1.48-1(d)(4)......................................................................................106, 107

Treas. Reg. § 1.148-5(d)(6) ........................................................................................128

Treas. Reg. § 1.167(a)-5 .............................................................................................121

Treas. Reg. § 1.170A-1(c)(2).......................................................................................127

Treas. Reg. § 1.197-2(b)(1).........................................................................................182

Treas. Reg. § 1.197-2(b)(2).........................................................................................183

Treas. Reg. § 1.1060(b)(2)(ii) ...................................................................................182, 183

Treas. Reg. § 1.338-6(b)(2)..............................................................................................195

Treas. Reg. § 1.704-4(a)(3) .............................................................................................128

Treas. Reg. § 1.897-1(o)(2) .............................................................................................128

**Treasury & IRS Authorities**

53 Fed. Reg. 27040 (July 18, 1988)..................................................................................196

\*I.R.S. Joint Committee on Taxation, General Explanation of Tax Legislation Enacted In The 111th
Congress 109-110 (Mar. 2011), JCS-2-11 NO 6, 2011 WL 940372.................................19, 21, 44

I.R.S. Chief Counsel Advisory, IRS CCA 201040004, 2010 WL 3937045 (June 24, 2010)...........171

I.R.S., Depreciation Frequently Asked Questions, FAQ 3 ................................................121

I.R.S. Field Service Advisory, 1992 WL 1355768 (Feb. 11, 1992) ...............................................170

I.R.S. Notice 2013-29, § 4 (May 13, 2013) .................................................................................107

I.R.S. Priv. Ltr. Rul. 200215037, 2002 PLR LEXIS 42 (Apr. 12, 2002) .........................................170

I.R.S. Priv. Ltr. Rul. 201214007, 2012 PLR LEXIS 11 (Apr. 6, 2012) ..........................................168

I.R.S. Priv. Ltr. Rul. 201249013, 2012 PLR LEXIS 1325  (Dec. 7, 2012) .....................................169

I.R.S. Priv. Ltr. Rul. 201515007, 2015 WL 1579258 (Apr. 10, 2015).............................................208

I.R.S. Tech. Adv. Mem. 9317001, 1993 WL 134598 (Apr. 30, 1993)....................................166, 188

I.R.S. Tech. Adv. Mem. 200326034, 2003 WL 21483117 (June 27, 2003).......................................47

I.R.S. Tech. Adv. Mem. 200907024 (Feb. 13, 2009) ................................................................101, 187

\*U.S. Department of Treasury, Payments for Specified Energy Property
In Lieu of Tax Credits under the American Recovery and
Reinvestment Act of 2009 (2011).......................................21, 40, 98, 99, 100, 107, 120, 184, 203

U.S. Department of Treasury, Payments for Specified Energy Property in Lieu of Tax Credits Under
the American Recovery and Reinvestment Act of 2009:  Frequently Asked Questions and
Answers, Question 40 ........................................................................................................204

**Other Authorities**

Appraisal Institute, *The Appraisal of Real Estate* (13th ed. 2008) ...........................................151, 204

Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* (2d ed. 2002) ................................................................................................................. 104

Aswath Damodaran, Stern School of Business, *The Value of Synergy* (Oct. 2005) .......................... 103

Cal. Exec. Order No. S-14-08 § 1 (Nov. 17, 2008) .......................................................................... 22

Donald E. Kieso, Jerry J. Weygandt, and Terry D. Warfield, *Intermediate Accounting* (15th ed. 2013) John Wiley & Sons, Inc ...................................................................................... 182, 183

Joe B. Hoyle, Thomas F. Schaefer, and Timothy S. Doupnik, *Advanced Accounting* (10th ed. 2011) McGraw Hill/Irwin .................................................................................................... 182

Michael Cole, *Using Governmental Incentives to Finance Solar Renewable Energy Projects: Alternative Investments for High-Net-Worth Individuals* ................................................... 94

Shannon P. Pratt & Alina V. Niculita, *Valuing a Business*: *The Analysis and Appraisal of Closely Held Businesses* (5th ed. 2008) ............................................................................................. 153

*The PTC and Wind Energy*, 11 Hous. Bus. & Tax L.J. 455 (2011) ...................................................... 19

**INTRODUCTION**

1.        In order to encourage renewable energy development, Section 1603 of the American Recovery and Reinvestment Act of 2009 mandated that the Department of Treasury pay cash grants equal to 30 percent of the owner's "basis" in newly constructed renewable energy production facilities.  This lawsuit relates to six such facilities, which are all part of North America's largest wind energy center, the Alta Wind Energy Center located in Tehachapi Pass, 100 miles north of Los Angeles, California.  The six lawsuit facilities are known as Alta Wind Facilities I through VI, and are collectively referred to herein as the "Alta Wind Lawsuit Facilities," and individually as a "Facility."[1]

2.        Each Plaintiff owns an interest in one of the Alta Wind Lawsuit Facilities. Each Plaintiff purchased its Facility brand new, shortly before it had gone into service.  Each Plaintiff applied for a cash grant for its Facility, claiming as its "basis" the amount it paid to buy the Facility from Terra-Gen Power, LLC ("Terra-Gen"), an independent company that had developed and constructed all of the Facilities.  Plaintiffs' applications thus followed faithfully the exceedingly well-established legal principle that, absent peculiar circumstances (not present here), the amount paid for a property establishes its basis, without further inquiry.

3.        The Section 1603 cash grant program set the grant amount at 30% of the basis of the electricity-producing components of a wind energy facility.  Plaintiffs' cash grant applications accordingly reflected precise calculations that excluded the small portion of the purchase prices that related to non-energy producing components — chiefly high voltage

---

[1]        Paragraphs 101, 298, 299, 311, 365, and 372 refer to information that was designated as confidential or attorney's eyes only pursuant to the protective order issued in these cases, Rec. Doc. 42.  Accordingly, the protected information in those paragraphs has been filed under seal. The two filings are otherwise identical.

transmission lines at the "tail end" of a facility that deliver the electricity to the utility interconnection.  The Government's rule of thumb was that roughly 5% of the value of a wind energy facility relates to such non-energy producing components, and Plaintiffs' much more precise calculations were all consistent with that rule of thumb.  KPMG, LLP ("KPMG"), a leading accounting firm, after more than one thousand hours of review, certified that Plaintiffs' allocations between eligible and ineligible property were appropriate.

4.　　　　Having appropriately allocated the purchase prices, the work necessary properly to determine the cash grant was finished.  The basis of each energy-producing Facility was established, and the only remaining step was for the Government to multiply that eligible basis by 30% and pay Plaintiffs that amount.

5.　　　　However, rather than paying cash grants equal to 30% of Plaintiffs' purchase prices for the eligible property, Treasury paid grants equal to 30% of seller Terra-Gen's out of pocket costs to construct and develop that property.  This approach defied the bedrock legal principle that the amount paid for property establishes its basis.

6.　　　　Treasury's approach also violated the well-established legal principle that, even in the limited circumstances (inapplicable here) where the amount paid for property is not recognized as establishing basis, such basis is established by the property's fair market value. Copious evidence demonstrates that the fair market values of the Facilities were equal to, if not greater than, the purchase prices paid by Plaintiffs, based on well-established valuation methods. Thus, the applied-for cash grants were entirely warranted, even if the purchase prices were not used to establish basis.

7.　　　　In addition to its legally improper approach to determining a property's basis, Treasury speculated that the assets acquired through the purchases might have included cash

2

grant ineligible intangibles such as going concern value, goodwill, or "locational value" (arising from the Facility's location in an area with premier wind conditions, near a major metropolitan area, in a State that encourages renewable energy). But Treasury never attempted to determine, either at the time of the awards or through its work on this case, whether these purported intangibles actually exist, or what value they purportedly have.

8.        In fact, none of these intangibles exist here. Each Plaintiff purchased its property before it had even gone into service, thoroughly belying any notion of a "going concern value" on the purchase date. In addition, there was no opportunity to attract additional customers, given that all of the Facilities' output had already been contracted for sale for the next approximately 24 years of each Facility's useful life. The Facilities also could not be physically expanded or otherwise expand electrical production, and in any event they had no right to deliver additional electricity to the utility grid. No goodwill can exist under those circumstances.

9.        Finally, as best can be determined, "locational" value has never been recognized as an intangible in the annals of tax accounting. A brand new hotel in Manhattan, New York is worth more than a brand new hotel in Manhattan, Kansas, but the law requires that any value associated with a property's location be reflected in the basis of the property itself — the value associated with the location is not some separate asset.

10.        The Facilities' purchase prices did reflect that Plaintiffs were not buying congeries of uncoordinated physical assets, like turbines and transformers, and cable wires stacked in a warehouse. Plaintiffs purchased fully constructed, fully tested, fully operational, wind energy power facilities, each of which had gone through a laborious and risky development process, been constructed and assembled through a massive effort, and was ready to produce prodigious amounts of electricity. All of the considerable value associated with seller Terra-Gen

having surmounted these formidable risks and producing fully developed, assembled, tested, and operational Facilities, capable of performing per design, is reflected in the purchase prices paid *and is by law deemed part of the basis of the assets themselves*.

11. The Government also speculated that some of the purchase prices could be allocated to contracts associated with the Facilities, but it presented no evidence supporting that speculation.

12. Plaintiffs are accordingly entitled in these lawsuits to awards totaling the $206,833,644 difference between the cash grants they were awarded and the cash grants they should have been awarded applying correct legal principles.

13. The remainder of this document proceeds as follows. First, Plaintiffs describe the Section 1603 program, the Tehachapi region where the six Alta Wind Lawsuit Facilities are located, and the development of those Facilities.

14. Second, Plaintiffs describe the purchase of the Alta Wind Lawsuit Facilities by the Plaintiffs, including the incontrovertible evidence demonstrating that each purchase was negotiated at arm's-length between willing, well-informed parties, all of whom were independent of Terra-Gen and none of whom was under compulsion to buy or sell. These elements establish that the purchase prices must be respected as determining basis, without resort to further valuation efforts.

15. Third, Plaintiffs demonstrate that the fact that five of the Facilities were sold in sale-leaseback transactions does not amount to a "peculiar circumstance" that could justify ignoring the purchase prices for purposes of determining basis. The sale-leaseback has long been recognized as an entirely legitimate and appropriate business structure. Indeed, Treasury's

own Section 1603 Guidance explicitly assumes that this structure would be used with respect to wind facilities for which Section 1603 cash grants were sought.

16.      Nothing about the sale-leasebacks for any of the five Alta Wind Lawsuit Sale-Leaseback Facilities qualifies as "peculiar" so as to call into question the legitimacy of the purchase prices paid.  Indeed, one simple fact belies that concern: Plaintiffs' purchase prices with respect to the five Alta Wind Lawsuit Facilities that were sold in sale-leaseback transactions were actually on average *lower than* both the purchase price paid in the outright purchase of the sixth Alta Wind Lawsuit Facility, *and* the purchase prices paid in the outright purchases of two other Alta Wind Energy Center facilities not at issue in this lawsuit.  Thus, there can be no suggestion that the purchase prices in the sale-leaseback transactions were somehow manipulated and should be rejected on that ground.

17.      Fourth, Plaintiffs show that even if the purchase prices were not used to establish basis (as they should be), the three traditional methods of determining fair market value (and hence basis) in the absence of a purchase price – the income approach, the comparable sales approach, and the cost approach – all establish a basis equal to or greater than that established by the purchase price.  Thus, the use of these valuation methods would still justify entirely Plaintiffs' claims in this lawsuit.  Specifically, Plaintiffs demonstrate that:

— The income method is widely utilized to value income-generating assets such as the Alta Wind Lawsuit Facilities.  The income method projects future net cash flows arising from the sale of electricity generated by the Facilities, and applies a discount rate to translate those cash flows into a present value.  This valuation methodology results in a value for each Alta Wind Lawsuit Facility in excess of its purchase price, and thus in excess of the basis claimed in the cash grant application.

— The comparable sales method determines value based on the purchase prices paid for other comparable properties. The only other wind facilities that are truly comparable to the six Alta Wind Lawsuit Facilities are the Alta VIII and Alta IX Wind Facilities, two non-lawsuit wind facilities located at the Alta Wind Energy Center that were sold in outright purchase transactions during the same general time period. The purchase prices paid for these comparable properties establish a value for each of the six Alta Wind Lawsuit Facilities in excess of its purchase price, and thus in excess of its claimed basis.

— As discussed in greater detail below, courts and valuation experts have found the cost method to be the least accurate method to value income-generating assets such as the Alta Wind Lawsuit Facilities. Nevertheless, the cost approach also establishes values for those Facilities as great as their purchase prices. The cost method establishes value by taking the costs to construct the facility and adding markup to reflect the return to the builder/developer for having constructed a fully functioning, ready-to-operate facility, and for having borne the burdens and risks of loss if development were unsuccessful. Each Plaintiff knew Terra-Gen's projected cost to build its Alta Wind Lawsuit Facility before agreeing on a purchase price, and each Plaintiff thus willingly paid a markup to Terra-Gen equal to the difference between those costs and the purchase prices. The same is true for the purchasers of non-lawsuit Alta Wind facilities Alta VIII and Alta IX. The markups in all of these transactions are quite comparable. These real world, market-derived markups establish the appropriate markup amounts, were the cost method of valuation to be employed. Those markups result in values equal to the purchase prices, and thus equal to Plaintiffs' claimed bases.

18.     Fifth, we demonstrate that Plaintiffs rigorously applied a straightforward, commonly used method for allocating the purchase prices between the eligible energy producing

6

portion of the Alta Wind Lawsuit Facilities and the small percentage of the Facilities consisting of non-eligible, non-energy producing property (such as high voltage transmission lines). The results of those allocations were entirely consistent with the Government's own rule of thumb that only five percent of a wind power facility consists of non-eligible property.

19.      Sixth, we demonstrate that no viable factual or legal predicate exists for the Government's suggestion that a portion of the purchase prices should be allocated to alleged intangible assets such as goodwill, going concern value, locational value, the power purchase agreements by which the electricity produced by the Facilities is sold to the local utility, or to any of the other ancillary agreements relating to the Facilities. As indicated, the law is that no value is allocated to such contracts unless their terms are more favorable to the Plaintiffs than the terms of contracts generally available in the market, and the evidence establishes that none of them were. And in any event, no separate value can be allocated to the power purchase agreements because none of the agreements can be sold or assigned separately from the specific Facility to which it relates.

20.      Finally, we show that the Government's purported calculation of the bases of the Alta Wind Lawsuit Facilities is inequitable and inconsistent. For purposes of calculating the taxes owed by Terra-Gen's owners upon the sale of the Facilities, the basis/fair market value for each Facility must be deemed to be the price for which it was sold, triggering hundreds of millions of dollars in taxable gain. But for purposes of determining the Section 1603 grant amounts payable to the Plaintiffs, the Government asserts that the basis for each facility is only the substantially lower amount of Terra-Gen's out-of-pocket costs to construct the facility. This inconsistent approach not only violates basic tax principles, but is also fundamentally inequitable.

21.    The foregoing demonstrates that the Government underpaid the cash grants due to Plaintiffs by more than $206 million.  As an adjunct to that demonstration, Plaintiffs also show why the Government's counterclaims, asserting that it overpaid the cash grants, have no support in fact or law.

22.    The Court's review in this case is *de novo* — no deference is owed to Treasury's cash grant award decisions.  *W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 690 (2015); *see also, e.g.*, Op. and Order on Def.'s Mot. to Amend Pleadings to Assert Countercl., at 2 (Feb. 8, 2016) (Rec. Doc. 87) (noting that "[t]he Court must determine *de novo* the proper cost basis for the wind power facilities").  Plaintiffs need only prove their case "by a preponderance of the evidence."  *Lua v. United States*, 123 Fed. Cl. 269, 273 (2015) (collecting cases).  Plaintiffs have satisfied that standard here.  The Government, by contrast, has failed to offer any proof in support of its counterclaims, which, in any event, fail as a matter of law. Accordingly, judgment should be entered in Plaintiffs' favor.

## CONTENTS OF FACT AND LAW

**I.    Trial Witnesses.**

### A.    Professor Colin Blaydon.

23.    Professor Blaydon is a Professor at the Tuck School of Business at Dartmouth, and has been on the Dartmouth faculty for 32 years.  Blaydon, Tr. 1506:12-19.  He holds a Ph.D. from Harvard in applied mathematics, and a bachelor's degree in electrical engineering.  Blaydon, Tr. 1519:7-11, 1520:4-6; PX-0299.003 ¶ 1, Blaydon Initial Expert Report (Oct. 23, 2015).  He is a tenured professor, and holds an endowed chair – he is the William and Josephine Buchanan Professor of Management.  Blaydon, Tr. 1506:20-25; PX-0299.003 ¶ 1.  He has been the dean of the Dartmouth business school twice.  Blaydon, Tr. 1507:4-7.  He also was the founder and director of the Center for Private Equity and Entrepreneurship at Dartmouth,

which conducts research and other activities in the field of private equity.  Blaydon, Tr. 1507:8-25.  He has taught private equity finance for the last 20 years, at the MBA level, and one of the subjects addressed extensively in that course is valuation.  Blaydon, Tr. 1508:1-13.  Professor Blaydon has also taught corporate finance at Harvard Business School, Harvard College, and Duke University.  Blaydon, Tr. 1512:15-1513:12, 1513:21-24; PX-0299.003 ¶ 2 Blaydon Initial Expert Report (Oct. 23, 2015).  Professor Blaydon has taught courses in finance and valuation for more than 40 years.  Blaydon, Tr. 1514:6-8.

24.    Professor Blaydon's course on private equity finance covers the energy industry and power markets, and looks at issues concerning the acquisition of assets by private equity investors on a daily basis, including how to assess the fair market value of assets in the context of acquisitions, and the dynamics of competitive auctions.  Blaydon, Tr. 1510:10-24.  Professor Blaydon has addressed the issue of whether a transaction establishes fair market value approximately 30-40 times in his professional and academic career.  Blaydon, Tr. 1550:13-20.  He has also taught regulatory economics, which focuses on the economics of regulated industries, primarily the energy industry and telecommunications.  Blaydon, Tr. 1514:9-18.

25.    Professor Blaydon is a member of the board of the Journal of Private Equity, which publishes papers by both academics and practitioners.  Blaydon, Tr. 1515:1-11.  He has authored numerous articles on valuation issues, Blaydon, Tr. 1515:12-1516:1; PX-0300.005-.009, Blaydon Curriculum Vitae, and on power markets, Blaydon, Tr. 1517:23-1518:19.

26.    Professor Blaydon also has extensive non-academic experience in finance and valuation issues.  He has served on the board of directors of nearly twenty companies, and on the board of another twenty entities, such as non-profits.  Blaydon, Tr. 1522:16-1523:4; PX-0299.004 ¶ 4, Blaydon Initial Expert Report (Oct. 23, 2015).  He served on the Board of

9

Consolidated Power which, like Terra-Gen, is a developer of independent power projects. Blaydon, Tr. 1523:5-22. In that role, Professor Blaydon became familiar with the process required to develop power facilities, regulatory issues relating to the development of power facilities, power purchase agreements, project economics and valuation of power facilities. Blaydon, Tr. 1524:5-24; 1526:22-1527:14.

27. Professor Blaydon was also on the board of LTV Corporation, a conglomerate, for 15 years. Blaydon, Tr. 1527:25-1528:9. Professor Blaydon was on LTV's audit committee, and LTV engaged in about 20 acquisitions and divestitures when he was on the Board. Blaydon, Tr. 1528:12-21. Some of LTV's acquisitions or sales involved the sale or acquisition of assets in different depreciation classes for a lump-sum price, which required LTV to allocate the purchase price between the assets in the different depreciation classes. Blaydon, Tr. 1531:21-1532:7.

28. Professor Blaydon has also been personally involved in leading negotiations involving the sale or acquisition of assets, as the CEO of a systems integration company and as the lead board member for a group that owned a software company. Blaydon, Tr. 1531:2-14.

29. Professor Blaydon was a director of the Public Utility Institute, a not-profit organization that published studies and white papers on issues facing utilities. Blaydon, Tr. 1532:12-24. He also performed consulting work for Pacific Gas and Electric, a major California utility, Blaydon, Tr. 1533:3-13, and, for three years, was a leader of a team that developed a planning support system used by the utility for planning in connection with future demand, Blaydon, Tr. 1533:3-1535:2. Professor Blaydon's work for Pacific Gas and Electric over the course of three years required him to become familiar with the economics of developing and

10

operating power facilities in California and the regulatory environment relevant to such development and operation.  Blaydon, Tr. 1535:8-15.

30.     Professor Blaydon also has worked with the other two major utilities in California, Southern California Edison and San Diego Gas and Electric.  Blaydon, Tr. 1539:1-9. In addition, Professor Blaydon has been an expert witness in cases involving power purchase agreement ("PPA") issues.  Blaydon, Tr. 1535:16-1538:21.  One of those cases involved a California PPA, and the case required Professor Blaydon to become familiar with the power market in California.  Blaydon, Tr. 1538:2-4.  Professor Blaydon is otherwise familiar, based on his professional experience, with the economics of PPAs and with how independent power producers like Terra-Gen use PPAs to sell electricity.  Blaydon, Tr. 1552:18-24.

31.     Professor Blaydon has testified for utilities in rate-setting cases, where cost of capital and valuation were at issue.  Blaydon, Tr. 1539:13-1540:15.  He has been qualified as an expert by a court or regulatory body as an expert on valuation-related issues approximately 80 times.  Blaydon, Tr. 1547:11-22.  More than 20 of these related to issues regarding the power industry or power markets.  Blaydon, Tr. 1547:23-1548:2.  No court or regulatory body has ever declined to qualify him as an expert.  Blaydon, Tr. 1548:3-5.

32.     Professor Blaydon was qualified as an expert on issues of valuation concerning the Alta Wind Facilities, without objection by the Government.  Tr. 1560:19-24. Among his other work in the case, Professor Blaydon has visited the Alta Facilities.  Blaydon, Tr. 1556:7-11.

###   B.     Professor Edward Maydew.

33.     Plaintiffs' accounting expert, Professor Edward Maydew,  holds an endowed chair at the University of North Carolina, the David E. Hoffman Distinguished Professor of Accounting, and serves as the director of the UNC Tax Center.  PX-0326.003 ¶ 1, Maydew

Initial Report (Oct. 23, 2015); Maydew, Tr. 1335:21-1336:9. The UNC Tax Center was established to promote cross-disciplinary research in tax, and hosts two conferences each year attended by students from the top ten Ph.D. programs in the country. Maydew, Tr. 1336:10-1337:5. Professor Maydew was previously a faculty member at the University of Chicago. PX-0326.003 ¶ 1; Maydew, Tr. 1337:12-13.

34. Professor Maydew received his Ph.D. from the University of Iowa, and his research and teaching focus on accounting, taxation, and the intersection and interplay between the two. PX-0326.003 ¶¶ 2-3; Maydew, Tr. 1340:8-9. Prior to commencing his doctoral studies, Professor Maydew was employed by Price Waterhouse & Co. (now part of PricewaterhouseCoopers, or PwC) in Chicago. PX-0326.003 ¶ 3.

35. Professor Maydew is a co-author of a leading graduate-level textbook on tax accounting, *Taxes and Business Strategy*: *A Planning Approach*, and is widely published in the leading journals in his field. PX-0326.003-.004 ¶¶ 4-5; Maydew, Tr. 1340:16-1342:1. Professor Maydew serves as an editor at *The Accounting Review*, the premier academic journal of the American Accounting Association, and has also served on the editorial boards of many other top journals in the accounting field. PX-0326.004 ¶ 6; Maydew, Tr. 1342:25-1345:7. Professor Maydew has won numerous awards for his widely cited research. PX-0326.004-.005; PX-0326.003-.004 ¶ 7; Maydew, Tr. 1342:3-24, 1346:19-1349:2.

36. Professor Maydew was previously recognized as an expert in the United States Tax Court on the subject of U.S. tax and accounting, specifically as it compares with United Kingdom tax and accounting rules. Maydew, Tr. 1349:12-21; *see PPL Corp. v. Commissioner*, 135 T.C. 304 (2010).

37.    Based upon his depth of knowledge and expertise, Professor Maydew was qualified by the Court as an expert in tax accounting, financial accounting, the interrelation between the two, and how taxes affect economic decision-making.  Maydew, Tr. 1355:13-17, 1374:23-1375:3.   Financial accounting involves the process of recording transactions under generally accepted accounting principles, typically involving the preparation of financial statements for public consumption.   Maydew, Tr. 1338:15-22 (providing the example of preparing financial statement for the Securities and Exchange Commission). Tax accounting is a similar process, albeit with somewhat different rules, that involves recording transactions for the purpose of preparing and filing tax returns.  Maydew, Tr. 1338:23-1339:2.

### C.    James Pagano.

38.    James Pagano is Terra-Gen's Chief Executive Officer, and has held this position since the company's inception in 2008.  Pagano, Tr. 46:22-47:5.

39.    Mr. Pagano has extensive experience in energy project development, as well as project finance.  Upon graduating from the University of Virginia Law School, Mr. Pagano worked as a project finance associate at a major New York law firm for three years.  Pagano, Tr. 55:9-56:5.   After leaving the firm and spending one year at the Deerpath Group, a project financing and leasing firm, Mr. Pagano began working for an independent power developer, Cogentrix Energy, where he spent 12 years.  Pagano, Tr. 56:20-23.  While at Cogentrix Mr. Pagano's development efforts focused primarily on fossil fuel development, and after serving in various roles Mr. Pagano was ultimately named the company's Chief Financial Officer.  Pagano, Tr. 57:2-13.  Mr. Pagano next went to Caithness Energy, where he was the senior vice president responsible for development and acquisitions with a focus on both fossil fuel and renewable energy.  Pagano, Tr. 57:16-24.  Mr. Pagano then spent one year as the president of development

at a private equity firm before he was asked to take the CEO position at the newly-formed Terra-Gen.  Pagano, Tr. 58:11-15.

### D.     George Revock.

40.     George Revock is a former director in the Asset Finance and Alternative Energy Groups at Citibank, who oversaw Citibank's negotiations to acquire four of the Alta Wind Lawsuit Facilities:  the Alta II-V Facilities.  Revock, Tr. 643:23-24, 646:1-6.  Mr. Revock left Citibank in 2013 to become a Managing Director at CapitalOne, where he founded and leads the Alternative Energy and Project Finance Group.  Revock, Tr. 642:24-643:11.

41.     Mr. Revock has an undergraduate background in mechanical engineering.  Revock, Tr. 647:12-14.  He worked at Citibank for 14 years, where he structured lease and tax equity transactions involving power plants.  Revock, Tr. 644:1-9, 647:13-24.  Before joining Citibank, Mr. Revock was a Senior Manager in the valuation group at Deloitte & Touche for six years, where his work primarily involved valuing power plants for acquisitions, sale-leasebacks, and general financial statements.  Revock, Tr. 646:8-647:3.  While at Deloitte, Mr. Revock also performed purchase price allocations, in the context of sale-leaseback transactions and otherwise.  Revock, Tr. 647:6-11.  Mr. Revock has been involved in dozens of sale-leaseback transactions in his career, at both Citibank and Deloitte, totaling more than $50 billion.  Revock, Tr. 648:3-18; *see* Revock, Tr. 644:19-645:5 (estimating that he was involved in two dozen renewable energy transactions while at Citibank, including sale-leasebacks).  Of those transactions, around 20% (or $10 billion of investments) have specifically involved renewable energy.  Revock, Tr. 648:19-20.

### E.     Lance Markowitz.

42.   Lance Markowitz has a bachelor's degree in finance from the University of Colorado.  Markowitz, Tr. 918:16-19.  He is the Los Angeles-based president of Bankers Commercial Corporation, and the managing director at MUFG Union Bank ("Union Bank"), and

oversaw Bankers Commercial's acquisition of the Alta I Facility. Markowitz, Tr. 918:14-15, 919:22-23, 925:8-16, 950:2-3, 983:12-17. Bankers Commercial Corporation is a subsidiary of UnionBanCal Corporation and sister company of Union Bank. Markowitz, Tr. 918:3-10, 949:24-950:2, 984:2-9; Pagano, Tr. 227:17-21; PX-0288, Demonstrative: Purchase of Alta I. Mr. Markowitz became involved in the bank's financing of energy projects in 1990. Markowitz, Tr. 918:22-919:5. In 1998, he became a senior vice president, and leader of, the group within Union Bank dedicated to financing physical assets using lease structures, including sale-leasebacks. Markowitz, Tr. 919:7-21; *see* Markowitz, Tr. 924:24-925:4 (explaining that he has been involved in sale-leaseback transactions since the early 1990s). As the current managing director and group head, Mr. Markowitz oversees a team of approximately 70 employees that has acquired numerous renewable energy projects, both in California and around the country. Markowitz, Tr. 919:23-922:7.

### F. James Spencer.

43. James Spencer is the founder, president, and chief executive officer of EverPower Wind Holdings, Inc., and oversaw its purchase of the Alta VI Facility. Spencer, Tr. 824:24-825:2, 825:16-19, 827:18-22. EverPower is a developer, owner, and operator of onshore wind facilities, owning and operating seven U.S. wind power facilities, with a combined capacity of 752 megawatts. Spencer, Tr. 825:3-5, 825:22-826:4. EverPower's ultimate owner is Terra-Firma, a British private equity firm that is a major player in renewable energy in the United Kingdom. Spencer, Tr. 826:18-827:8; Pagano, Tr. 349:1-7.

### G. Damon Huplosky.

44. Damon Huplosky is Terra-Gen's director of tax, and has held that position since Terra-Gen's inception, in 2007. Huplosky, Tr. 1038:10-13. As director of tax, Mr. Huplosky oversees the day-to-day operations of Terra-Gen's tax group, including matters related

to income, property and sales tax returns.  Mr. Huplosky also oversees tax issues associated with Terra-Gen's purchases and sales of projects and other assets.  Huplosky, Tr. 1038:14-19.  Mr. Huplosky has a BA in accounting.  Huplosky, Tr. 1039:8-11.  He worked at Caithness Energy from 1995 to 2007, serving as its director of tax from 2000 to 2007.  Huplosky, Tr. 1038:20-1039:7.  He takes classes and seminars in various tax subjects to stay up current on tax issues. Huplosky, Tr. 1039:18-24.

### H. Anthony Johnston.

45.        Anthony Johnston, a KPMG audit partner, led the team responsible for fulfilling the Treasury requirement that an audit opinion be submitted certifying the claimed grant-eligible basis under the Section 1603 program.  Johnston, Tr. 1218:8-18.  Mr. Johnston is a certified public accountant, with a bachelor's degree in accounting and an MBA from Columbia University.  Johnston, Tr. 1213:22-1214:12.  He has worked at KPMG since 1994, and has been a partner since 2005.  Johnston, Tr. 1214:13-21.

### I. Ellen Neubauer.

46.        Ellen Neubauer is the Program Director of the Section 1603 program at the Department of Treasury.  Neubauer, Tr. 1777:21-22.  She has held that position since March 2009.  Neubauer, Tr. 1767:17-18, 1777:18-20.  Ms. Neubauer participated in the drafting of Treasury's Section 1603 Guidance document.  Neubauer, Tr. 1833:15-17.  Before becoming the director of the Section 1603 program, Ms. Neubauer did not have any background in any of the following areas: energy, renewable energy, valuation, appraisal, accounting, or tax.  Neubauer, Tr. 1778:7-24, 1799:19-1800:1.  Ms. Neubauer is a lawyer by training, and worked as an attorney for the Navy and the Federal Emergency Management Agency before joining Treasury in 2009.  Neubauer, Tr. 1767:5-18.

16

### J.      Donald Edward Settle.

47.      Donald Edward Settle is a senior project leader at the National Renewable Energy Laboratory ("NREL") in Golden, Colorado.  Settle, Tr. 1297:8-18.  NREL is part of the United States Department of Energy, and was contracted by Treasury to assist in its review of Section 1603 cash grant applications.  Settle, Tr. 1297:10-12, 1298:2-5.  Mr. Settle's primary responsibility at NREL since his employment began in 2009 has involved the review of Section 1603 applications, and he reviewed each of the applications for the Alta Wind Lawsuit Facilities. Settle, Tr. 1297:13-15, 1298:6-9, 1306:19-20, 1307:22-24.

### K.      Judson Jaffe.

48.      Judson Jaffe is an economist and fiscal affairs specialist at Treasury who was involved in reviewing the Section 1603 cash grant applications for the Alta Wind Lawsuit Facilities. Jaffe, Tr. 1950:14-17, 1967:3-9; *see* Jaffe, Tr. 1951:3-7 (Mr. Jaffe has a joint undergraduate degree in environmental science, public policy, and economics and a master's of philosophy in economics).  Mr. Jaffe took a position with Treasury's Office of Environment and Energy in 2009, and he was asked by Ellen Neubauer shortly thereafter to assist in the review of Section 1603 cash grant applications with regard to valuation issues that arose during the review process.  Jaffe, Tr. 1952:18-1953:6, 1955:7-15, 1961:22-24.

## II.      The Section 1603 Program, the Tehachapi Region, and the Alta Wind Facilities.

### A.      The Section 1603 Cash Grant Program.

49.      Since 1962, the United States has used the investment tax credit ("ITC") to promote capital investment in targeted industries and activities.  *Hawaiian Indep. Refinery, Inc. v. United States*, 697 F.2d 1063, 1064 (Fed. Cir. 1983); *Pac. Far E. Line, Inc. v. United States*, 544 F.2d 478, 483 (Ct. Cl. 1976) (the ITC was adopted "to encourage modernization and expansion of the Nation's productive facilities and to improve its economic potential by reducing

17

the net cost of acquiring new equipment" (quoting H.R. Rep. No. 87-2508, at 14 (1962) (Conf. Rep.))).

50.     An ITC provides a dollar for dollar reduction in income taxes otherwise owed by a taxpayer for a specified percentage (currently 30% for qualified wind energy properties) of every investment dollar the taxpayer expends on property eligible for the credit.  The ITC thus provides a powerful incentive for taxpayers to make capital investments in the industries and activities Congress has targeted.  *See* 26 U.S.C. §§ 38(a), (b)(1); *Salomon Inc. v. United States*, 976 F.2d 837, 839 (2d Cir. 1992) ("The investment tax credit reduce[s] dollar-for-dollar the tax due . . . .").

51.     Among the industries whose development the federal government has long sought to foster through the use of ITCs is renewable energy, including wind energy.  Congress first provided tax benefits specific to renewable energy in the Energy Tax Act of 1978, Pub. L. No. 95-618, § 301, 92 Stat. 3197, which provided a 10% ITC for investments in renewable energy facilities, including wind.  26 U.S.C. § 46(a)(2) (1982).  Congress next used tax credits to promote wind energy in the Energy Policy Act of 1992, Pub. L. No. 102-486, § 1914(a), 106 Stat. 2776, which provided for *production* tax credits based upon the amount of wind energy produced.  Then, in the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 1102(a), 123 Stat. 115, Congress added wind energy facilities to the kinds of renewable energy facilities (such as solar) that were already eligible for a 30% ITC under Section 48 of the Internal Revenue Code, 26 U.S.C. § 48(a)(5).

52.     While ITCs can provide a powerful incentive for investment in the targeted industry or activity, an ITC is of economic value to a taxpayer only insofar as it can be applied as a credit against income taxes otherwise owed by the taxpayer.  *See* PX-0326.008 ¶ 3, Maydew

Initial Expert Report (Oct. 23, 2015); Pagano, Tr. 108:20-109:19. A given wind energy developer may not have sufficient income tax liabilities itself to make use of an ITC. *Id.* In addition, the investments required to develop and run a wind energy facility are in the hundreds of millions of dollars, and wind energy developers routinely need to raise capital from third parties to support projects. *See, e.g.*, *The PTC and Wind Energy*, 11 Hous. Bus. & Tax L.J. 455, 459 (2011) ("The high start-up costs for wind facilities often cause wind developers to rely on equity investors to supply the necessary capital."). Thus, wind energy developers often seek the involvement in their projects of well-funded third party investors that both have the necessary capital and can take advantage of the ITC and other available tax benefits such as depreciation. *Id.*; *see also* PX-0329.014 ¶ 19, Blaydon Initial Expert Report (Oct. 23, 2015).

53.    While such arrangements have historically worked well, a sharp economic downturn hit the entire U.S. economy in 2008. Investors facing financial losses or even just significantly reduced profits had relatively little use for ITCs, given that these tax credits are of value only if one has income tax obligations that the credit will reduce. As Congress explained:

> The Congress understands that some investors in renewable energy projects have suffered economic losses that prevent them from benefitting from the renewable electricity production credit and the energy credit. The Congress further believes that this situation, combined with current economic conditions, has the potential to jeopardize investment in renewable energy facilities. The Congress therefore believes that, in the short term, allowing renewable energy developers to elect to receive direct grants in lieu of the renewable electricity production credit and the energy credit is necessary for the continued growth in this important industry.

Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in the 111th Congress 109-110 (Mar. 2011), JCS-2-11 NO 6 (I.R.S.), 2011 WL 940372, at *11 ("General Explanation"); *see* Pagano, Tr. 109:2-19 (describing the general concern during the 2008 financial crisis that potential investors would not have enough taxable income to utilize an ITC); PX-0326.008 ¶ 3, Maydew Initial Expert Report (Oct. 23, 2015).

54.    Congress addressed the situation through Section 1603 of the American Recovery and Reinvestment Act of 2009, entitled "Grants for Specified Energy Property In Lieu of Tax Credits."  Section 1603 created a temporary program under which those qualifying for an ITC under Internal Revenue Code Section 48 could elect to receive the same economic benefit as an ITC, but as an immediate cash grant, rather than as a tax credit.

55.    Section 1603 provided in relevant part:

(a) IN GENERAL.—Upon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b). . . .

(b) GRANT AMOUNT.—

(1) IN GENERAL.—The amount of the grant under subsection (a) with respect to any specified energy property shall be the applicable percentage of the basis of such property . . . [for wind projects, 30 percent of the basis]
[…]

(d) SPECIFIED ENERGY PROPERTY.—For purposes of this section, the term ''specified energy property'' means any of the following:
[…]

(1) QUALIFIED FACILITIES—Any qualified property . . . which is part of a qualified facility . . . described in paragraph (1) ["Wind facility"] . . . of section 45(d) of [the Internal Revenue] Code.
[…]

(h) DEFINITIONS.—Terms used in this section which are also used in section 45 or 48 of the Internal Revenue Code of 1986 shall have the same meaning for purposes of this section as when used in such section 45 or 48.
[…]

Pub. L. No. 111-5, § 1603, 123 Stat. 115 ("ARRA").

56.    Section 1603 provided that cash grants would be 30% of the basis of the "specified energy property," which the statute then defined as "qualified property" which is part of a wind facility.  Section 48 of the Internal Revenue Code, in turn, defines qualified property as

"tangible property . . . used as an integral part" of the wind energy facility. 26 U.S.C. § 48(a)(5)(D); *id.* § 48(a)(5)(C); *id.* § 45(d)(1). Further IRS and Treasury guidance establishes in essence that the entire facility is deemed eligible except for land, certain buildings, and high voltage transmission lines. This topic is discussed further in Section IV.A, *infra*.

57.     The Conference Report accompanying Section 1603 emphasized that "[i]t is intended that the grant provision mimic the operation of the credit under section 48 [of the Internal Revenue Code]." General Explanation, 2011 WL 940372, at *12. The basis of property under Section 1603 must thus be determined under the same well-established rules for determining basis under the ITC program, and under the Tax Code more generally. Ms. Neubauer, the Program Director of Treasury's Section 1603 program, agreed that most Section 1603 rules, including "concepts such as cost basis," "come from the Internal Revenue Code." Neubauer, Tr. 1771:12-1772:13, 1777:18-1778:1.

### B.    California's Support for Renewable Energy.

58.     Like the federal government, the State of California has long encouraged the development of renewable energy. As early as 1980, California had passed a 25% state investment tax credit for renewable energy facilities.

59.     In addition, going well beyond such tax credits, California in 2002 created a Renewable Portfolio Standard, which initially required that utilities in the state obtain 20% of their electricity from renewable resources, including wind, by 2017. Cal. Senate Bill 1078 § 3 (Sept. 12, 2002) ("Beginning on January 1, 2003, each electrical corporation shall . . . increase its total procurement of eligible renewable energy resources by at least an additional 1 percent of retail sales per year so that 20 percent of its retail sales are procured from eligible renewable energy resources no later than December 31, 2017."). In 2006, this timetable was shortened, such that the 20% target had to be met by 2010. Cal. Senate Bill 107 § 17 (Sept. 26, 2006)

21

("Each retail seller shall . . . increase its total procurement of eligible renewable energy resources by at least an additional 1 percent of retail sales per year so that 20 percent of its retail sales are procured from eligible renewable energy resources no later than December 31, 2010."). In 2008, the standard was further amended by executive order to require that utilities obtain 33% of their electricity from renewable sources by 2020. Cal. Exec. Order No. S-14-08 § 1 (Nov. 17, 2008) ("[T]he following Renewable Portfolio Standard target is hereby established for California: All retail sellers of electricity shall serve 33 percent of their load with renewable energy by 2020. State government agencies are hereby directed to take all appropriate actions to implement this target in all regulatory proceedings . . . ."); *see also* PX-0394.001, Cal. Public Utilities Comm'n, *California Renewable Portfolio Standard* (Oct. 2015) (California Public Utilities Commission's summary of California's renewable portfolio standard); PX-0299.087-.088 ¶ 169, Blaydon Initial Expert Report (Oct. 23, 2015); PX-0021.011, Alta I Confidential Information Memorandum (Oct. 2010) (describing California's 33% renewable portfolio standard requirement).

60.     These renewable energy requirements provided a very powerful incentive for the development of renewable energy in the state, given that utilities had to engage in whatever economic conduct was necessary to achieve the legislatively mandated levels. Pagano, Tr. 73:24-74:20 (describing the "large demand for renewable power" in California due to the renewable portfolio standard); Spencer, Tr. 829:1-12 (explaining that California is an attractive place to own a wind farm, in part due to the high renewable energy standard); Blaydon, Tr. 1573:4-10; *see also, e.g.,* JX-0012.006, Allco Confidential Information Memorandum (Mar. 2008) (describing California's "extremely aggressive" renewable portfolio standards); PX-0021.011 (marketing the "strong demand" for renewable energy generation in California);

22

Markowitz, Tr. 923:19-24 (explaining that California's renewable portfolio standard tends to increase energy prices).

61.    As part of its efforts to satisfy the Renewable Portfolio Standard requirements, public utility Southern California Edison filed an application in 2004 with the California Public Utilities Commission to construct the ambitious Tehachapi Renewable Transmission Project, which was subsequently approved.  The first phase of this project consisted of the construction of 173 miles of new and upgraded high-voltage transmission lines for the transmission of electricity from wind energy facilities and other sources in Kern County, California, to Los Angeles County, California.  The Project was the first major transmission project in California built specifically to access renewable generation in a wind-rich resource area.  Construction, which began in 2008, cost approximately $1.8 billion.  JX-0012.018.  The Project resulted in a high-voltage transmission system capable of delivering 4,500 megawatts ("MW") to the Los Angeles metropolitan area, located only 100 miles south of Tehachapi.  PX-0021.013, 018, Alta I Confidential Information Memorandum (Oct. 1, 2010); *see* PX-0229, SCE Map of Tehachapi Renewable Transmission Project; Pagano, Tr. 70:3-17.

### C.    The Tehachapi Region.

62.    The Tehachapi Region is a hilly area ranging from 2,500 to 8,000 feet in elevation.  The Mojave Desert lies to the east and the Los Angeles metropolitan area is approximately 90 miles south.  Pagano, Tr. 62:14-21; PX-0010.008, Altas II-V Garrad Hassan Wind Report (May 21, 2010) (site description); PX-0033.007, Alta I Garrad Hassan Wind Report (Nov. 1, 2010) (site description); PX-0225, NASA Photo of Los Angeles Region at Night; *see* PX-0226, Image of Tehachapi Pass.

63.    These geographical features render the Tehachapi region a uniquely valuable wind resource.  The desert to the east heats up in the morning, creating a thermal low pressure

region.  JX-0012.013; *see* Pagano, Tr. 64:10-25.  Cooler, higher-pressure air masses move in from the Pacific Ocean in the west to fill that thermal low.  JX-0012.013; DX0706-00008, 00009, Allco Management Presentation (Apr. 2008).  That west-to-east air flow naturally goes through various mountain passes in the Tehachapi region to reach the desert to the east.  JX-0012.013; PX-0021.013; PX-0201.008, Alta VII and IX Confidential Information Memorandum (June 2012).  It is this geography that creates high wind speeds in the area.  Even better, those winds are strongest at favorable times: during the day, when power demand is higher, rather than at night.  Pagano, Tr. 64:6-65:15, 72:19-73:3; Spencer, Tr. 830:2-7; Revock, Tr. 716:16-717:6; JX-0012.008; PX-0021.013; JX-0068.007, Alta I Confidential Information Memorandum Attached to Email to Prospective Bidders (Oct. 1, 2010).

64.     The Tehachapi's region's unique geographical features, combined with its proximity to the Los Angeles metropolitan area and its electricity needs, render the area an ideal place for a wind farm.  Pagano, Tr. 64:6-65:15, 72:19-73:3; *see* Revock, 734:23-735:5 (noting that the Alta II-V Facilities' ability to "sell power to Los Angeles" made them more valuable); Spencer, Tr. 829:20-830:12 (describing the features of the Tehachapi appealing to EverPower); Markowitz, Tr. 924:4-19 (describing the features of the Tehachapi, namely the proven wind resource and proximity to the Los Angeles load center, that impact value).

65.     Wind power development began in the Tehachapi area during the early 1980s. PX-0299.012 ¶ 14, Blaydon Initial Expert Report (Oct. 23, 2015). At the time, wind turbines produced far less electricity and were far shorter than they are today.  PX-232.001.  For instance, typical wind turbines in 1984 were less than 100 feet tall and produced a maximum output of 75 kW.  *Id.*  By contrast, modern turbines, such as a modern Vestas V90 turbine, stand 410 feet tall,

24

and a single turbine can produce three megawatts of electricity, 40 times the output of its 1984 predecessor.  PX-232.001; PX-233.001.

66.      The Tehachapi region has continued to be a prime location for wind energy development in California.  By 2009, over 3,500 wind turbines had been installed in the Tehachapi region, accounting for 5% of all wind power generation in the entire United States. PX-0299.012 ¶ 14, Blaydon Initial Expert Report (Oct. 23, 2015).

### D.      Terra-Gen Power LLC.

67.      Terra-Gen is a renewable energy company focused on developing, constructing, owning, and operating utility-scale wind, geothermal and solar electricity generation facilities.  Pagano, Tr. 47:6-9; Rec. Doc. 115, Stipulation of Facts ¶ 4.  At the time of the development of the Alta Wind Energy Center, Terra-Gen was owned by two private equity firms, ArcLight Capital and Global Infrastructure Partners.  Pagano, Tr. 53:16-24, 54:15-20.

68.      Terra-Gen is the only non-utility company in the United States with involvement in wind, geothermal *and* solar electricity renewable generating facilities.  Terra-Gen has owned, operated or developed a total of 36 renewable energy facilities, across six states. Pagano, Tr. 50:1-16; PX-0294, Demonstrative: Terra-Gen Renewable Energy Projects. The company has owned, operated or developed a total of 2,719 megawatts of renewable energy projects, 2,243 them wind power.  Pagano, Tr. 50:17-23; PX-0294.  These renewable energy facilities can provide electricity to over 800,000 homes.  PX-0294; Pagano, Tr. 52:2-6.

69.      As a developer of renewable energy projects, Terra-Gen takes a project from a high-risk, unproven concept to a "de-risked," financeable and achievable project.  Pagano, Tr. 47:23-48:1.  To "de-risk" a project, Terra-Gen performs numerous development tasks as described more fully in Section II.H, *infra*, including securing all necessary permits and approvals, negotiating various contracts, and putting a significant amount of capital at risk.

25

Pagano, Tr. 47:10-48:9. Terra-Gen as a developer risks losing some or all of its multi-million dollar investment in a development project. *See* Pagano, Tr. 110:17-111:3.

70.     As the constructor of renewable energy projects, Terra-Gen provides the oversight and coordination for the construction of the entire Facility. Pagano, Tr. 48:10-19. This role also carries significant risk, as it is Terra-Gen's responsibility to deliver on time a fully functioning Facility, and a failure to do so would expose Terra-Gen to substantial damages. Pagano, Tr. 48:20-49:1. As an operator of renewable energy projects, Terra-Gen oversees the actual production of electricity at the Facility. Pagano, Tr. 49:2-11.

### E.     The Alta Wind Energy Center.

71.     Terra-Gen developed the Alta Wind Energy Center, the largest wind energy center in North America, and one of the largest in the world. Pagano, Tr. 63:17-18, 72:14-18. NREL (which, as noted, is a national laboratory of the U.S. Department of Energy), has classified the wind power at the Center's location as "superb" — the highest of seven categories used by NREL to rate wind quality. PX-0227, NREL Wind Map of Southern California; *see also* Pagano, Tr. 65:23-67:20; Settle, Tr. 1297:7-12, 1297:24-1298:5; Neubauer, Tr. 1770:5-15; PX-0387.002.

72.     The Alta Wind Energy Center consists of approximately 1,550 megawatts of wind energy capacity, enough to provide power to 464,000 homes. Pagano, Tr. 72:8-13; PX-0294. Between 2010 and 2013, Terra-Gen developed and constructed eleven separate wind facilities at the Alta Wind Energy Center, sequentially numbered Alta I through Alta XI. The eleven facilities are largely adjacent to one another, and are each between 90 and 168 megawatts in size. PX-0221, Alta I-IX Overview Map; PX-0294; Pagano, Tr. 50:3-7, 70:23-72:7.

73.     Eight of the eleven facilities (including five of the six Alta Wind Lawsuit Facilities) use Vestas V-90 3 MW turbines. Pagano, Tr. 79:20-81:5; *see also, e.g.,* PX-0010.005,

Altas II-V Garrad Hassan Wind Report (May 21, 2010); PX-0099.006, Alta VI Garrad Hassan Wind Report (Mar. 29, 2011); PX-0115.005, Alta VIII Confidential Information Memorandum (Aug. 2011); PX-0201.013, Altas VII and IX Confidential Information Memorandum (June 2012). The other three, including Alta I, located on the steepest slope, use smaller General Electric turbines. Pagano, Tr. 79:20-81:5; PX-0021.010, Alta I Confidential Information Memorandum (Oct. 2010). Vestas and GE turbines are both considered "top-tier" in the industry, and were selected by Terra-Gen both because of their proven quality and to ensure that the Alta Facilities would use "investment-grade" turbines to the satisfaction of the project's financiers. Pagano, Tr. 78:9-79:19; *see also* Revock, Tr. 686:2-10 (noting that Vestas turbine technology made the Alta II-V Facilities appealing to Citibank); Spencer, Tr. 829:13-20 (explaining that "top-tier" turbines made the Alta VI Facility appealing to EverPower).

74.    Except for the facilities with the smaller-sized GE turbines, if one were standing at the Alta Wind Energy Center, one would not know where one facility began and another ended. They are essentially identical. Pagano, Tr. 82:24-83:7. The Alta Wind Energy Center was developed as eleven separate facilities in order to facilitate their construction, financing and ultimate sale, and to allow for sequential development. Pagano, Tr. 96:12-19; 396:11-20. It would have been impractical to finance and develop, or sell, all 1,550 megawatts of wind energy in a single transaction, or at one time. Pagano, Tr. 396:17-23.

### F.    Initial Development Efforts.

75.    As a regulated California utility, Southern California Edison needed to meet its obligations under California's Renewable Portfolio Standard to obtain a specified percentage of its electricity from renewable resources, including wind, by 2017. In early 2006, Allco Wind Energy ("Allco"), and Oak Creek Energy Systems ("Oak Creek"), a renewable energy developer, partnered to propose to Southern California Edison what would ultimately become the Alta Wind

Energy Center.  JX-0012.011, .014, Allco Confidential Information Memorandum (Mar. 2008); Rec. Doc. 115, Stipulation of Facts ¶ 5.

76.     In December 2006, Southern California Edison and an Oak Creek/Allco subsidiary entered into a Master Power Purchase and Wind Project Development Agreement (the "Master PPA"), which provided for the development by the Oak Creek/Allco subsidiary of multiple wind facilities totaling an aggregate capacity between 1,500 and 1,550 MW, with all of that output to be sold to Southern California Edison for a period of roughly 24 years.  Rec. Doc. 115, Stipulation of Facts ¶ 15; JX-0006.001, .007, Master PPA (Dec. 21, 2006); JX-0012.026; Pagano, Tr. 386:1-22.  In the Master PPA, Oak Creek/Allco agreed to construct at least 1,500 megawatts of wind generating capacity in Kern County, California (where Tehachapi is located), and to arrange for those facilities to sell their output to Southern California Edison.  JX-0006.007; JX-0012.026.  In exchange, Southern California Edison agreed to enter into a separate long-term PPA to purchase all electricity generated by each such facility, with the price to be set in accordance with a formula set forth in the Master PPA.  JX-0006.015, JX-0012.026; Pagano, Tr. 388:17-390:7.  The Master PPA was amended four times. JX-0009.001, Master PPA Amendment 1 (June 26, 2007); JX-0010.001, Master PPA Amendment 2 (Dec. 21, 2007); JX-0021.001, Master PPA Amendment 3 (July 15, 2008); JX-0023.001, Master PPA Amendment 4 (Aug. 4, 2009).

77.     Between December 2006 and July 2008, some progress was made by Allco/Oak Creek in developing the Alta Wind Energy Center.  For example, Allco/Oak Creek entered into a turbine supply agreement for the GE turbines ultimately used for the first of the Alta Wind Facilities (Alta I); acquired important wind data pertinent to locating wind turbines and assessing the economic viability of the project; acquired transmission queue rights to the

28

Tehachapi Renewable Transmission Project; acquired rights to some of the land that would ultimately be needed for the Center; began collecting environmental data necessary for the permitting process; and had begun that very extensive permitting process.  PX-0295.001-.004, Demonstrative: Allco Development Milestones; Pagano, Tr. 86:23-89:4, 119:23-120:10, 130:9-24; *see also* JX-0012.011, .031 (GE turbine supply agreement); JX-0012.027 (wind data); JX-0012.023-.024 (transmission rights); JX-0012.025 (land); JX-0012.029-.030 (permitting). However, no actual construction had begun during this period.  Pagano, Tr. 86:21-22.

### G.    Terra-Gen's Acquisition of Allco's Interests.

78.    In early 2008, Allco chose to cease its efforts and began a competitive process to sell its interests in what ultimately became the Alta Wind Energy Center.  Pagano Tr. 85:24-86:11.  Allco provided potential bidders a Confidential Information Memorandum regarding the project.  JX-0012.001.  Numerous companies expressed interest in acquiring those assets.  The auction process had two stages: an initial bid round, and then a second phase for those bidders whose initial bids were deemed by Allco to be sufficiently attractive.  Pagano, Tr. 117:11-118:25.

79.    On April 8, 2008, Terra-Gen submitted an initial bid range of $285-$335 million, with the range based upon the assumptions contained in the Allco Confidential Information Memorandum.  DX0019-2-00001, Letter from James Pagano to Ari Droga (Apr. 8, 2008).  Terra-Gen was invited to participate in the second phase, and ultimately increased its offer to $325 million.  Pagano, Tr. 85:21-86:11, 118:20-25; DX0706-00004, Allco Management Presentation (Apr. 2008) (explaining the Phase II process); JX-0015.016, Membership Interest Purchase Agreement (June 16, 2008) (reflecting $325M purchase price).  As part of its due diligence effort in the second phase bidding process, Terra-Gen retained both a wind consultant, Ron Nierenberg, and a financial consultant, J.P. Morgan.  Pagano, Tr. 118:20-119:9.

29

80.     Terra-Gen was selected as the winning bidder and completed its acquisition of assets from Allco on July 15, 2008, for approximately $394 million (consisting of approximately $390 million in equity and approximately $4 million in assumed liabilities).  Rec. Doc. 115, Stipulation of Facts ¶ 6; Pagano, Tr. 86:12-20.  The increase from Terra-Gen's prior bid of $325 million to $394 million primarily reflects a $55.875 million partial payment for the GE turbines that were ultimately used for the Alta I Facility, as well as certain closing costs and adjustments. *See* Pagano, Tr. 80:1-4, 86:14-16 (explaining that a portion of the $394 purchase price related to turbine payments).

81.     The assets Terra-Gen acquired from Allco included development rights (such as important wind data), transmission rights, some leased land, some fee land, and a separate non-lawsuit wind facility located outside the Alta Wind Energy Center (the Alite facility), which had a single commercial customer, to which electricity was to be supplied only on an as-needed basis.   Pagano, Tr. 119:22-121:7, 130:9-24; JX-0014.017-.039, Master SPA Disclosure Schedules (June 16, 2008).  Some of the land included with the Allco assets was acquired outright, but a majority came in the form of unperfected land rights, in which Allco had secured an option to lease the land, with the lease itself to be negotiated at a future date.  Pagano, Tr. 86:23-90:19, 457:8-24; JX-0014.029-.036; PX-0223, Alta I-VI Land Acquisition Map; PX-0295.001-.003, Demonstrative: Allco Development Milestones.

82.     Terra-Gen's acquisition of the Allco assets occurred in the midst of the 2008 international financial crisis.  Pagano, Tr. 111:8-24.  An enormous amount of development work remained to be done on the Alta Facilities, and success was far from assured, even assuming that Terra-Gen was able to obtain the billions of dollars in loans to carry out such development, at a time when credit markets were tightening dramatically.  Pagano, Tr. 111:4-24; JX-0022.006,

Terra-Gen CHiPs Deep Dive Presentation (Dec. 18, 2008). The financing risk created by the international financial crisis was exacerbated by the absence of any precedent for financing a wind farm of this scale. Pagano, Tr. 115:12-21.

83. Had Terra-Gen been unable to obtain the permits, environmental approvals, land rights, easements, financing, or other requisites, due to the financial crisis or otherwise, it risked losing most and perhaps all of its $394 million investment. Pagano, Tr. 110:19-115:21. Had the construction gone poorly, slowly or unsuccessfully, serious losses would also likely be incurred. *See* Pagano, Tr. 112:12-113:5, 131:1-5; *see also* Pagano, Tr. 48:20-22 (describing a constructor's risk generally). Moreover, Terra-Gen faced the risk that the Government might cease providing incentives to invest in renewable energy before the Alta Facilities were completed, thus diminishing their value. Pagano, Tr. 108:2-111:3; JX-0022.006.

### H. Terra-Gen's Subsequent Development of the Alta Facilities.

84. The buyers of the Alta Wind Lawsuit Facilities paid what they did to acquire them because Terra Gen overcame these risks and succeeded in developing operational wind farms that were capable of producing and selling power in a valuable market. *See, e.g.,* Revock, Tr. 733:17-735:19; 737:18-738:4.

85. While Allco and Oak Creek had made a highly valuable start, the vast majority of the work to develop and construct the Alta Wind Energy Center remained to be performed by Terra Gen after the date of its purchase. Terra-Gen had to secure a variety of required permits (such as environmental permits and Federal Aviation Administration permits); negotiate and enter into turbine and construction contracts; execute interconnection and crossings agreements; obtain additional land rights; obtain interconnection rights; obtain construction financing; and oversee and implement the actual construction of the massive Alta Wind Energy Center. Pagano, Tr. 110:19-115:21. The substantial work remaining to be done is underscored

by the fact that even Allco's own promotional materials indicated that commercial operations were not expected on the first phase until the second quarter of 2010, the second phase until the fourth quarter of 2010, and the remaining phases in the third quarter of 2011 and beyond – long after the summer 2008 sale.  JX-0012.016, Allco Confidential Information Memorandum (Mar. 2008).

86.    **Permits & Approvals**:  Terra-Gen had to obtain a variety of permits and regulatory approvals, some of the most significant of which were:

- **Re-Zoning Application**.  Terra-Gen had to secure Kern County resolutions approving amendments to the zoning plan, in order to be able to construct wind turbines.  This required securing three separate zoning ordinances and one zoning resolution from the Kern County Board of Supervisors, which were not obtained until December 15, 2009.  PX-0296.001, Alta I-VI Development Milestones; PX-0279, Demonstrative: Alta Project Environmental Mitigation Requirements; Pagano, Tr. 101:8-15.  The three ordinances had to be amended again in September 2010 to allow for the construction of Alta VI.  PX-0296.008.  These changes were far from guaranteed, and final approval was obtained only after Terra-Gen agreed to give up development rights to a number of land parcels acquired from Allco due to public opposition.  Pagano, Tr. 98:10-99:9 (describing parcels and phases that were not developed due to environmental obstacles and public opposition).

- **California Environmental Quality Act (CEQA) Review.**  As every witness to address the subject testified, California is one of the most, if not the most, environmentally protective states in the country.  Pagano, Tr. 73:8-12, 98:6-9; 103:1-11; Revock, Tr. 734:2-22; Markowitz, Tr. 922:15-16.  The rezoning application for the project triggered the need for a comprehensive environmental review under CEQA, including the preparation of a

comprehensive environmental impact report. JX-0012.029, Allco Confidential Information Memorandum (Mar. 2008); *see* Pagano, Tr. 111:25-112:6; JX-0022.006. The notice of preparation of the environmental impact report was not filed until December 2008, and a draft was not complete until the third quarter of 2009. PX-0296.001; PX-0279; Pagano, Tr. 92:11-93:12, 101:8-20.

The CEQA review was the largest wind power CEQA review in California's history. PX-0279; Pagano, Tr. 92:20-25, 101:8-20. There was no certainty that the CEQA review process would be successfully completed. Had the CEQA review not been completed, or been completed erroneously or inadequately, suit could have been brought by third parties to enjoin development of the project pending completion of the environmental impact report. Pagano, Tr. 102:24-103:25; *see* JX-0022.006 (noting risk that the appeal period for the environmental impact report "creates uncertainty should interveners emerge"). As part of the CEQA process, Terra-Gen was ultimately required to implement over 100 mitigation measures that were imposed by Kern County and covered various areas. Pagano, Tr. 101:8-102:23; PX-0279.

- **California Department of Fish & Game Permits**. Terra-Gen had to obtain "incidental take permits" relating to the desert tortoise and the Bakersfield cactus, which were issued in May 2010. Pagano, Tr. 93:16-94:3, 94:17-95:2, 101:8-20, 103:19-25; PX-0296.001; PX-0279. Both of these are California endangered species, meaning that such permit applications are given rigorous environmental scrutiny and their grant is subject to a wide variety of restrictions and mitigation provisions designed to eliminate or minimize the adverse impact of development on those species. Pagano, Tr. 93:16-95:2. As part of its requisite mitigation effort, Terra-Gen had to spend over $13 million installing temporary tortoise-proof fencing to prevent tortoises from entering the wind turbine sites during construction. Pagano, Tr. 94:4-16, 101:8-

33

20; PX-0279.  Terra-Gen spent an additional $17 million on land mitigation efforts, including the creation of a conservation easement for the protection of the desert tortoise and the relocation of affected Bakersfield cacti.  *Id.*  Additional cacti and tortoises were encountered after construction was underway on Alta I, and the need to address these species with additional mitigation efforts caused construction efforts on the Alta I Facility to be placed on hold for several weeks.  Pagano, Tr. 94:17-95:2.  Terra-Gen informed its owners that these delays could well place the schedule at risk and have a budget impact.  JX-0022.006.  Indeed, if such permits were not secured, those turbines simply could not have been installed and operated.  Pagano, Tr. 94:17-95:2.

- **Federal Aviation Administration Permits.**  Terra-Gen had to obtain an FAA determination of no hazard to air navigation for each turbine it planned to construct.  Pagano, Tr. 95:5-15, 97:21-98:5, 101:8-20; PX-0296.001, .003, .008; PX-0279.  Terra-Gen would not have been authorized to construct the Facilities without such FAA authorizations, given the area's proximity to Mojave Airport and Edwards Air Force Base.  *Id.*

87.     If Terra-Gen had not been able to secure the above permits and approvals, it would not have been able to construct the Alta Facilities and would have lost its $394 million investment.  Pagano, Tr. 103:8-104:5.

88.     **Real Estate**:  Terra-Gen had to obtain a number of real estate rights in order to have land on which to construct and operate the Alta Facilities.

- **Perfection of Allco land rights.**  A majority of the land acquired from Allco came in the form of unperfected land rights, in which Allco had secured options to lease certain lands, but for which the actual leases needed to be negotiated and finalized at a later date. Pagano, Tr. 86:23-90:19, 95:16-96:3; PX-0223 (*see* "Unperfected Land Rights"); PX-0295.001-.003, Demonstrative: Allco Development Milestones; PX-0296.001-.011.  Many of these

34

unperfected land rights involved CalPortland Cement Company, with respect to which Terra-Gen acquired a base "master lease" from Allco, but needed to meet a number of requirements before it could finalize parcel-specific leases or even finance the land. PX-0295.001-.003; PX-0296.001-.011; Pagano, Tr. 86:23-89:4, 95:16-96:3.

- **Land acquisition/leases.** The acquisition from Allco did not entail sufficient land to construct even Alta I, much less the additional Alta Facilities. Terra-Gen had to acquire large blocks of additional land in order to develop these Facilities. PX-0223 (map identifying the "Additional Land Secured"); PX-0296.001-.011; Pagano, Tr. 89:16-90:19.

- **Rights of way and Easements.** Terra-Gen had to obtain numerous rights of way and easements necessary to construct or support the wind turbines, to allow for access roads, electricity collection systems, and similar access. PX-0296.002-.011; Pagano, Tr. 91:15-21.

89. **Other Development Activities:** Terra-Gen had to engage in a variety of other development tasks, including the following:

- Negotiate and execute construction contracts for construction of the Facilities. PX-0296.002, .007, .011; Pagano, Tr. 92:11-19.

- Negotiate and execute turbine supply agreements to obtain the turbines for Facilities other than Alta I. *Id.*

- Negotiate and execute interconnection agreements. PX-0296.002, .007; Pagano, Tr. 96:21-97:15. While Terra-Gen had acquired transmission queue rights to the Tehachapi Renewable Transmission Project from Allco, it had to negotiate with Southern California Edison to divide those rights between the various Alta phases and facilities and enter into actual interconnection agreements. PX-0295.004; PX-0296.002, .007; Pagano, Tr. 96:21-97:15.

35

- Obtain construction financing to fund construction of the Facilities in the extremely difficult financing environment created by the international financial crisis. Pagano, Tr. 111:4-18.

- Construct the Facilities, which for Altas I through VI was an immense effort that involved, *inter alia*, digging and constructing 340 massive, rebar reinforced concrete foundations; building crane pads; installing 340 turbines and hundreds of transformers; cutting over 80 miles of roads; installing meteorological towers to gauge wind characteristics; digging over 119 miles of cable trenches and laying that many miles of cable wiring; building control centers, and much, much more:

| | Number of Turbines | Miles of Roads Built | Miles of Cable Trenches Dug and Cable Laid | Tons of Steel Used for Foundation | Cubic Yards of Concrete Poured in Foundation | Number of Concrete Truck Loads (Based on average of 8 cubic yards per truck) | Total Tons of Rebar (Based on minimum of 30 per turbine) |
|---|---|---|---|---|---|---|---|
| **Alta I** | 100 | 22 | 22 | 1,200 | 18,500 | 2,312 | 3,000 |
| **Alta II** | 50 | 10.3 | 14.7 | 1,502.5 | 23,830 | 2,978 | 1,500 |
| **Alta III** | 50 | 10.4 | 19.5 | 1,502.5 | 23,830 | 2,978 | 1,500 |
| **Alta IV** | 34 | 7 | 11.5 | 1,021.7 | 16,204.4 | 2,025 | 1,020 |
| **Alta V** | 56 | 11.6 | 16.3 | 1,682.8 | 26,689.6 | 3,336 | 1,680 |
| **Alta VI** | 50 | 20.5 | 35.8 | 1,487.5 | 21,775 | 2,721 | 1,500 |
| **Altas I - VI Total** | **340** | **81.8** | **119.8** | **8,397** | **130,829** | **16,350** | **10,200** |
| **Alta VIII** | 50 | 10.2 | 17.1 | 1,487.5 | 21,775 | 2,721 | 1,500 |
| **Alta IX** | 44 | 17.4 | 16.5 | 1,309 | 19,162 | 2,395 | 1,320 |

PX-0280, Demonstrative: Construction Metrics; PX-0224, Map: Project Roads; PX-231-33, 235-42, 244-45, 247-49, 251-64, 266-72, 277 (construction photos); Pagano, Tr. 91:2-92:2, 131:15-156:1.

90.   To accomplish all these necessary development tasks, Terra-Gen increased its development group from a single individual to more than 25 in-house development

36

professionals, staffed a finance team of five professionals, and added a construction management group, hiring nine construction management professionals to oversee the project construction. Pagano, Tr. 60:14-24, 124:4-17; PX-0298, Demonstrative: Terra-Gen Employees and Consultants.   All of Terra-Gen's new hires had extensive experience in energy project acquisition and development.   Pagano, Tr. 60:25-61:17.   Terra-Gen also engaged the construction firm Blattner Energy, which staffed the Alta projects with 1,225 full time construction workers and 766 part time workers, and engaged 23 additional third party consultants.  Pagano, Tr. 60:14-24, 124:4-127:10; PX-0298.

91.        There was substantial risk that the project could be derailed — and Terra-Gen's investment wiped out — if necessary real estate, permits, or other development requirements were not obtained.  Pagano, Tr. 103:8-104:5.   Terra-Gen contemporaneously identified numerous risks, several of which it categorized as "fatal flaws."  JX-0022.006, Terra-Gen CHiPs Deep Dive Presentation (Dec. 18, 2008).  Terra-Gen described these "fatal flaws" and other risks in a "risk matrix" submitted to its owners in December 2008.  *Id.*  The "fatal flaws" described by Terra-Gen were described in detail by Mr. Pagano, Pagano, Tr. 108:2-114:3, who testified that if any of these terminal risks came to fruition, the project would fail entirely and Terra-Gen would lose almost all of its $394 million investment.  Pagano, Tr. 110:19-111:3.

92.        Indeed, the head of the development team of NextEra Energy, a major renewable energy company, told Terra-Gen that he thought the development would never happen, and that not a single generating megawatt would ever be constructed.  Pagano, Tr. 114:6-13.   There was no certainty that the Alta Facilities would be successfully completed. Pagano, Tr. 115:9-11.

93.      These kinds of risks resulted in a high "mortality rate" for development projects in California.  Utility Southern California Edison for planning purposes assumed a mortality rate of over 50% in 2010, even for projects that had secured an interconnection agreement.  Pagano, Tr. 76:15-78:4.  EverPower, the buyer of the Alta VI Facility, had tried unsuccessfully to develop a wind facility in California.  Spencer, Tr. 828:1-20; *see also* Markowitz, Tr. 922:17-18 (explaining that it is "much harder to develop projects in the state of California" than in other states).

94.      The Alta Wind Energy Center was ultimately successfully developed, but as a result of California's stringent permitting requirements, and especially its environmental permitting requirements, not all planned phases were developed.  Pagano, Tr. 98:10-13; 156:9-11.  Some land originally dedicated to wind turbines was set aside for the desert tortoise, as described above, and some was not utilized because of potential proximity to the California condor, an endangered species.  Pagano, Tr. 98:10-24.  In addition, other land parcels were not ultimately developed because of local opposition due to their proximity to the town of Tehachapi.  Pagano, Tr. 98:25-99:9 (describing local concerns about "viewshed" issues).

95.      Terra-Gen ultimately spent over $2 billion to develop and construct the six Alta Wind Lawsuit Facilities, and over $4 billion developing all eleven facilities at the Alta Wind Energy Center.  Pagano, Tr. 115:22-116:1, 121:15-22.  This amount was many multiples of Terra-Gen's initial cost to acquire the Allco assets.

**I.      Terra-Gen Had to Sell the Alta Wind Lawsuit Facilities for the Section 1603 Cash Grant Program to be Utilized.**

96.      Section 1603 prohibits any "pass-thru entity" from receiving a cash grant if any "holder of an equity or profits interest" in the pass-thru entity is a nonprofit organization.

38

ARRA § 1603(g)(4).  This is a somewhat unusual limitation in that the ITC, by contrast, allows nonprofit ownership and merely reduces the ITC proportionately.  Pagano, Tr. 157:9-24.

97.  During the relevant time period, Terra-Gen was a pass-through entity owned by ArcLight Capital and Global Infrastructure Partners, each of which had a small percentage of non-profit owners.  Pagano, Tr. 53:16-54:20, 157:1-8, 166:15-17.  Accordingly, while Terra-Gen's preference was to develop the Alta Facilities and to retain ownership, it could not do so and receive a cash grant under the law as written.  Pagano, Tr. 157:1-8, 166:15-17.  Terra-Gen sought a legislative solution through its trade association, but without success.  Pagano, Tr. 156:23-160:15; PX-0001.001, Joint Letter to House Leadership re: Section 1603 (June 8, 2009); PX-0002.001, Joint Letter to Senate Leadership re: Section 1603 (June 8, 2009).

98.  In the absence of any legislative fix, Terra-Gen could have become eligible for a grant only if it had established a C corporation blocker entity between Terra-Gen and each individual Alta project entity, but the effect would have been to impose a very costly double layer of income taxation.  Pagano, Tr. 161:1-19; Huplosky, Tr. 1133:9-14.  By the 2010 to early 2011 time frame, approximately 80% of the $2.1 billion in acquisition costs relating to the legacy assets that Terra-Gen acquired upon its formation had already been depreciated.  This meant that there would have been a "tremendous amount of taxable income" because most of the tax shield relating to those legacy acquisition costs had been depleted.  Huplosky, Tr. 1132:9-1133:7.

99.  Terra-Gen therefore needed to sell the Alta Wind Lawsuit Facilities, which it did.  Mr. Pagano explained that Terra-Gen opted to sell the first five Facilities, Altas I-V, in the form of sale-leaseback transactions because, while Section 1603 precluded Terra-Gen from keeping ownership of the Facilities, Terra-Gen wanted to maintain a strong presence in the Tehachapi area.  Pagano, Tr. 166:18-167:17, 186:3-16.  Terra-Gen's desire was motivated, in

part, by the fact that Terra-Gen was still developing the later Alta phases and maintaining a presence within the Alta Facilities as a lessee and operator would help facilitate those development efforts. *Id.* Mr. Pagano noted that Terra-Gen proceeded with the sale-leaseback transactions based on representations from Treasury, both in the form of Treasury guidance and representations of Treasury employees, that sale-leasebacks were acceptable under the Section 1603 Program. Pagano, Tr. 167:18-168:17; JX-0126.009, U.S. Department of the Treasury, Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009 (Apr. 2011) (hereafter "Treasury Guidance").

### III. The Purchase Price Paid for Each Alta Wind Facility Conclusively Establishes Its Basis.

#### A. Plaintiffs' Purchases of the Alta Wind Lawsuit Facilities.

100.    As noted, the Alta Wind Energy Center is comprised of eleven separate wind facilities, six of which – the Altas I, II, III, IV, V, and VI (which is also known as Mustang Hills) Facilities – are at issue in these consolidated lawsuits. As also noted, the eleven facilities are largely indistinguishable.

101.    Terra-Gen developed and constructed the six Alta Wind Lawsuit Facilities, which were ultimately placed in service between the end of 2010 and May 2012. *See* Pagano, Tr. 156:9-22, 508:23-511:14; *see also* [redacted]. Prior to each Facility being placed in service, Terra-Gen sold the Facility in an arm's-length transaction with one or more well-informed third-party buyers, each unrelated to Terra-Gen, after engaging in lengthy negotiations and competitive processes to secure a competitive price — a process detailed further below.

102.     Five of the Alta Wind Lawsuit Facilities (Altas I through V) were sold in sale-leaseback transactions, in which Terra-Gen sold the Facilities and then leased back the sold property for approximately 24 years.  Pagano, Tr. 221:21-223:5, 423:8-15; Revock, Tr. 682:8-15; Markowitz, Tr. 925:5-7 *see, e.g.,* JX-0209.039, Alta I Facility Lease (OL C) (Dec. 31, 2010); JX-0245.059, Alta II Facility Lease (OL C) (Dec. 30, 2010); JX-0306.059, Alta III Facility Lease (OL C) (Apr. 13, 2011); JX-0361.060, Alta IV Facility Lease (OL A) (May 20, 2011); JX-0421.060, Alta V Facility Lease (OL A) (June 13, 2011); Pagano, Tr. 424:1-9.  Alta VI (Mustang Hills) was sold outright, with no leaseback.  Pagano, Tr. 348:4-6; Spencer, Tr. 827:23-25; JX-0467.001, Alta VI Purchase and Sale Agreement (Mar. 31, 2012).  The Facilities were conveyed at a point when construction was complete or near complete, and the purchasers thus did not face any meaningful development risk when they acquired the Facilities.  Pagano, Tr. 156:9-22, 508:23-511:14; *see* Revock, Tr. 737:23-738:4 (noting that "Terra-Gen took on significant risks on the project development side").

103.     A wind energy facility's value lies in the amount of electricity it can produce and then sell.  Pagano, Tr. 105:24-106:7 (explaining that a wind facility's value is determined by the cash flows derived from the generation of electricity); Revock, Tr. 722:17-21 (testifying that the projected cash flows used to value the Alta II-V Facilities derive from the sale of power); Markowitz, Tr. 986:11-14 (same).  As Professor Blaydon testified: "the value is . . . can you generate electricity, can you deliver and sell it, and can you get revenue and income from it, and that is what then creates the economic value."  Blaydon, Tr. 1574:2-5.

104.     The value of a wind energy facility is commonly expressed on a per-kilowatt basis (*i.e.*, the purchase price divided by the "rated" maximum amount of electricity the facility can produce based on its size and type of turbine), adjusted for capacity factor (*i.e.*, adjusted for

41

differences in actual electrical output versus rated capacity due to variations in the windiness of the individual facility location or other factors).  Pagano, Tr. 173:22-25 (noting that the typical metric in the wind industry is a dollar-per-kilowatt); Pagano, Tr. 175:6-9 (explaining adjustment for net capacity factor); PX-0299.031-.032 ¶ 56, Blaydon Initial Expert Report (Oct. 23, 2015) (explaining the rationale for, and mechanics of, a capacity factor adjustment).  Per-kilowatt values, adjusted for capacity factor, allow for apples-to-apples comparisons between facilities (subject to the existence of any other distinguishing characteristics).  Blaydon, Tr. 1598:1-22, 1599:19-1601:1.  This method of expressing value – dollars per unit of capacity – is the normal way to compare transaction prices in the industry.  Blaydon, Tr. 1600:15-21.

105.    The purchase prices paid for each of the five Alta Wind Lawsuit Facilities sold in a sale-leaseback transaction were essentially the same on a per kilowatt basis (after adjusting for differences in electrical generating capacity), *and* essentially the same as the price paid for the outright purchase of the Alta VI (Mustang Hills) Lawsuit Facility.  Blaydon, Tr. 1596:9-1597:7, 1601:2-14; Pagano, Tr. 173:14-174:1, 175:10-176:1, 176:23-25; PX-0281, Demonstrative: Purchases Prices Paid for Eight Alta Facilities.  *Moreover,* all six of those purchase prices were essentially the same as the purchase prices paid for two Alta Wind Center facilities that are not the subject of this litigation.  Those two non-lawsuit facilities (the Alta VIII and Alta IX Facilities) were the subject of outright-purchase transactions in January and November 2012, respectively, by unrelated third parties without any leaseback.[2]  *Id.*; PX-

---

[2]    A ninth Alta Wind Energy Center facility, the Alta VII Facility, was also sold in an outright purchase transaction, at a price essentially the same as the capacity-adjusted sale price for the other Alta Facilities.  Pagano, Tr. 383:21-384:2.  However, Alta VII is somewhat difficult to make fully comparable because it contains unique transmission assets.  Pagano, Tr. 383:14-20; PX-0299.017 ¶ 23 & n.30, Blaydon Initial Expert Report (Oct. 23, 2015).  Two other developed and constructed facilities, Altas X and XI, were also sold, but (a) they were sold, along with other valuable assets, for a single lump sum, such that determining the price paid for each or (continued…)

0299.033 ¶ 57, Blaydon Initial Expert Report (Oct. 23, 2015); PX-0154.001, Brookfield Alta VIII Bid Letter (Jan. 11, 2012) (referring to "our recent transaction" for Alta VIII).

106.     Thus, eight separate Alta Wind Facilities were purchased, by seven separate purchasers:[3] five through sale-leasebacks and three through outright purchases.  Pagano, Tr. 171:17-172:8.  The capacity-adjusted price for each was essentially the same.  Blaydon, Tr. 1596:9-1597:7, 1601:2-14.  The average price paid for the five sale-leaseback Facilities was actually a bit *less* than the average price for the three outright purchases, demonstrating that the sale-leaseback mechanism did not somehow result in inflated values:

| Transaction | Capacity Adjusted Price, $ / kw |
|---|---|
| **Outright Purchase Transactions** | |
| Alta VI | $2,929 |
| Alta VIII | $3,018 |
| Alta IX | $3,157 |
| **Average** | **$3,035** |
| **Sale-Leaseback Transactions** | |
| Alta I | $2,906 |
| Alta II | $2,926 |
| Alta III | $2,835 |
| Alta IV | $2,971 |
| Alta V | $2,989 |
| **Average** | **$2,926** |

---

even both facilities is challenging if even possible, and (b) their purchase date (2014) was materially later than the purchase dates for the six Alta Wind Lawsuit Facilities, rendering a comparison less useful.  Pagano, Tr. 384:3-16.

[3]     In this context, "purchaser" refers to the purchaser or its parent or ultimate beneficial owner, specifically: Brookfield Renewable Power, Inc.; Citibank, N.A.; EverPower Wind Holdings, Inc.; General Electric Company; Google Inc.; Mid-American Energy Company; and UnionBanCal Corporation.  PX-0281, Demonstrative: Purchases Prices Paid for Eight Alta Facilities; Pagano, Tr. 171:19-172:8, 175:15-20.

PX-0281, Demonstrative: Purchase Prices Paid for Eight Alta Facilities; Pagano, Tr. 171:2-176:25; PD-061, Demonstrative: Comparison of Sale-Leaseback and Outright Sale Prices; Blaydon, Tr. 1957:8-10; PX-0299.032-.033 ¶ 57, Blaydon Initial Expert Report (Oct. 23, 2015).

**B.**      **Plaintiffs' Bases In the Properties Are Determined By the Prices They Paid to Purchase the Facilities.**

107.      Under Section 1603, the cash grant payable to the owner of a wind power generating facility is 30 percent of "the basis of such property." ARRA § 1603(b)(1). Section 1603 provides generally that "[t]erms used in this section which are also used in [Internal Revenue Code] section 45 or 48 . . . shall have the same meaning for purposes of this section as when used in such section 45 or 48." ARRA § 1603(h). Indeed, as noted above, Congress intended that "the grant provision mimic the operation of the credit under section 48 [of the Internal Revenue Code]." General Explanation, 2011 WL 940372, at *12. Nothing in Treasury's Section 1603 guidance indicates that the term "basis" used therein should be interpreted any differently than the meaning already provided by the tax code and associated case law. *See* Maydew, Tr. 1379:20-1380:2, 1410:22-1411:15. Indeed, the Program Director of the Section 1603 program, Ms. Neubauer, acknowledged that most Section 1603 rules, including "concepts such as cost basis," "come from the Internal Revenue Code." Neubauer, Tr. 1771:12-1772:13, 1777:18-1778:1.

108.      Section 48, to which Section 1603 refers, provides that the ITC for renewable energy property is calculated as a percentage of such property's "basis." *See* 26 U.S.C. § 48(a)(1). Basis under Section 48 is, in turn, determined in accordance with the general rules for determining basis under the Internal Revenue Code. *See, e.g.*, 26 U.S.C. § 1012; *Pac. Far E. Line, Inc. v. United States*, 544 F.2d 478, 485 (Ct. Cl. 1976); *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 21 (2011).

109.     As explained by Professor Maydew, from a tax accounting perspective, "basis" is the cost of an asset to its owner.  Maydew, Tr. 1376:6-9; PX-0326.008 ¶ 1.  The Internal Revenue Code explicitly provides:  "The basis of property shall be the cost of such property, except as otherwise provided …."  26 U.S.C. § 1012.

110.     Basis is used for many purposes under the tax code, including computing depreciation, amortization, and depletion, as well as taxable gain or loss when an asset is later sold.  Maydew, Tr. 1377:24-1379:19; PX-0326.009 ¶ 2.  In the context of an asset that has been purchased, a fundamental concept in tax accounting is that the asset's basis is "what it cost the buyer to purchase the asset."[4]  PX-0326.009 ¶ 3; Maydew, Tr. 1376:6-9, 1377:15-23 ("if you have an actual arm's-length purchase price, that establishes the fair value").

111.     Accordingly, by regulation, when the taxpayer has purchased property from another, the taxpayer's basis is "the amount paid [by the taxpayer] for such property in cash or other property."  26 C.F.R. § 1.1012-1(a).  *See also ARRA Energy*, 97 Fed. Cl. at 21 ("Under the IRC, the term 'basis' is generally used to refer to the cost of the property to the taxpayer," citing 26 U.S.C. § 1012).  Treasury's Section 1603 Program Director Ms. Neubauer admitted that, in general, a buyer's basis in property is the cost to acquire the property.  Neubauer, Tr. 1780:9-15.  She further agreed that if there is an arm's-length sale between a willing buyer and a willing seller, the transaction price establishes the buyer's tax basis in the property acquired, absent unusual circumstances.  Neubauer, Tr. 1785:2-8.

---

[4]     A similar concept holds in in financial accounting, in which the book value of an asset (the accounting analog to basis) equals the cost to acquire it.  PX-0326.009 ¶ 3; Maydew, Tr. 1376:20-1377:5.  "In both tax and financial accounting, the general idea is that when a transaction is conducted at arm's length, the purchase price establishes the asset's fair market value."  PX-0326.009 ¶ 3; Maydew, Tr. 1377:15-23.

45

112. The Court of Claims, in a controlling decision, held that a taxpayer's acquisition cost for assets constitutes its basis in those assets as a matter of law, for purposes of calculating the ITC due under Internal Revenue Code Section 48: "The cost of property to the taxpayer is the amount of money that he paid to acquire the property, whatever the source of the money." *Pac. Far E. Line*, 544 F.2d at 485.

113. The notion that a taxpayer's basis in property is equal to its acquisition cost is so well established that the Tax Court has described it as "[o]ne of the verities of tax law." *Solitron Devices Inc. v. Commissioner*, 80 T.C. 1, 23 (1983). Numerous other decisions are to the same effect. *See*, *e.g.*, *Crispin v. Commissioner*, 708 F.3d 507, 510 n.3 (3d Cir. 2013) ("taxpayer's basis in property is generally equal to the purchase price paid by the taxpayer"); *Southgate Master Fund, LLC v. United States*, 659 F.3d 466, 471 (5th Cir. 2011) ("ordinarily, the taxpayer takes a cost basis in a piece of property equal to the property's purchase price"); *Muserlian v. Commissioner*, 932 F.2d 109, 114 (2d Cir. 1991) (basis is equal to "the cost to the taxpayer of acquiring the asset"); *Philip Morris, Inc. & Consol. Subsidiaries v. Commissioner*, 96 T.C. 606, 623 (1991) (taxpayer's basis in stock it purchased "equals the purchase price of such stock"), *aff'd without op.*, 970 F.2d 897 (2d Cir. 1992).

114. As Professor Maydew explained, that purchase price determines basis is a central tenet in accounting. Maydew, Tr. 1376:13-25, 1387:3-6, 1388:20-22.

115. Indeed, the purchase price establishes basis even if objective evidence indicates that the purchaser overpaid for the asset. *See Solitron Devices*, 80 T.C. at 23 (whether the taxpayer paid a "premium" for the asset is irrelevant to a determination of the proper basis); *Accord MacKenzie v. United States*, 714 F. Supp. 268, 271-72 (E.D. Mich. 1989) ($150,000 purchase price established basis even where a jury found the fair market value of the property to

46

be only $60,000, noting that purchase price established basis regardless of whether the price paid was a "sensible bargain[] from the buyer's, but exceptionally good from the seller's point of view," and even if "the purchaser pays too much" and the purchase price was a "[b]ad bargain[] from the buyer's point of view" (quoting *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir 1976))); *Matheson v. Commissioner*, 31 B.T.A. 493, 495-96 (1934) (taxpayer's basis in stock was its $130,700 acquisition cost, notwithstanding clear indications that the stock's fair market value was $19,500 less), *aff'd*, 82 F.2d 380 (5th Cir. 1936).

116.    As Professor Maydew testified and as case law reiterates, if the purchase price includes both cash and the assumption of liabilities, the basis is the combination of both, *i.e.*, the combination of the "cash and other property given in exchange for the property and any liabilities [the buyer] assumed or to which the property is subject." *Little v. Commissioner*, T.C. Memo 1996-270, 1996 WL 315771, at *15 (June 12, 1996) (citing *Commissioner v. Tufts*, 461 U.S. 300, 307 (1983)), *aff'd*, *Christensen v. Commissioner*, No. 96-70741, 1998 U.S. App. LEXIS 7576 (9th Cir. Apr. 10, 1998); Maydew, Tr. 1387:16-1388:22; PX-0326.032-.034 ¶¶ 1-5; PD-036, Maydew Demonstrative; *see also Consol. Coke Co. v. Commissioner*, 70 F.2d 446, 447-49 (3d Cir. 1934) (basis of purchased plant includes debt assumed by taxpayer); *Oxford Paper Co. v. United States*, 86 F. Supp. 366, 367-68 (S.D.N.Y. 1949) (basis of purchased plant includes assumed lease obligation); I.R.S. Tech. Adv. Mem. 200326034, 2003 WL 21483117, at *3 (June 27, 2003) ("Under general tax law principles, the amount paid for property generally includes the amount of the seller's liabilities assumed by the buyer.").

117.    The *seller's* cost has no relevance in determining the *buyer's* basis. Maydew, Tr. 1380:15-1382:1, 1383:11-23; PD-034, Maydew Demonstrative. Accordingly, the purchase price establishes the buyer's basis, regardless of whether, or the extent to which, the seller earns

a profit or suffers a loss on the sale.  Maydew, Tr. 1382:2-13; PX-0326.009-.010 ¶¶ 5-6; PD-034.

As an example, if a buyer pays $500,000 to acquire property, its basis in that property is

$500,000, regardless of whether the seller's construction costs were $400,000 or $600,000.

Maydew, Tr. 1381:16-1382:13; PD-034.

118.     The fact that multiple parties may earn a profit on an asset's sale — for

instance, where multiple contractors and subcontractors are involved in the construction of a

house — also has no impact on the purchaser's basis.  Maydew, Tr. 1384:10-1386:12; PX-

0326.010 ¶ 7; PD-035, Maydew Demonstrative.

119.     Consistent with the fundamental principle that the purchase price establishes

basis regardless of the seller's costs, the amount paid by a seller to a company that started

development of a project is irrelevant to the determination of the buyer's basis.  Maydew, Tr.

1385:14-1386:12; PD-035.  Terra-Gen's cost to buy out Allco is thus irrelevant to the Plaintiffs'

bases in the Alta Wind Lawsuit Facilities.  Maydew, Tr. 1386:13-1387:2.

120.     In short, the case law uniformly holds that the courts "should not reject actual

transactions prices when they are available," given that "what a willing buyer will pay a willing

seller in an arms'-length transaction . . . is the gold standard of valuation; other measures are

approximations."  *Malik v. Falcon Holdings, LLC*, 675 F.3d 646, 648 (7th Cir. 2012).  That is so

because "[t]he value of a thing *is* what people will pay. . . .  [When] we have a willing buyer and

willing seller dealing at arms'-length[,] the price they agree on *is* the value of the asset."  *Id.*

121.     This is consistent with both tax and financial accounting principles, which

reflect that the fair market value of property is determined by the price for which the property is

sold in an arm's-length transaction.  PX-0326.009 ¶ 3 ("when a transaction is conducted at arm's

length, the purchase price establishes the asset's fair market value").  Indeed, when there is an

48

"actual arm's-length purchase price[] that establishes the fair value" there is "no choice" but to use the purchase price as the measure of basis. Maydew, Tr. 1377:20-23.

122.    That conclusion is also consistent with how fair market value is determined as a matter of finance and economics. Professor Blaydon explained that, from an economic perspective, fair market value is the price that would be paid between a willing buyer and a willing seller, acting at arm's-length in an open and unrestricted market, neither under compulsion to buy or sell, and both having reasonable knowledge of the relevant facts. PD-058, Demonstrative: Fair Market Value Definition; Blaydon, Tr. 1577:1-1578:8; PX-0299.007 ¶ 12(a), Blaydon Initial Expert Report (Oct. 23, 2015). Where there is an *actual* sale of an asset or group of assets, there is no need to consider what the assets would sell for in a *hypothetical* sale. If the conditions for an arm's-length sale are met, that is "valuation's gold standard because the market has spoken," and the transaction price thus establishes fair market value. Blaydon, Tr. 1578:8-20; *see also* Blaydon, Tr. 1521:15-1522:2.

123.    Based upon these principles, each Plaintiff's basis is what it paid for its interest in its Alta Wind Lawsuit Facility. Maydew, Tr. 1382:14-19; Blaydon, Tr. 1780:9-12, 1785:2-7; *see also* Blaydon, Tr. 1609:16-19, 1627:18-1628:5. The Government's calculation of Plaintiffs' cash grant awards based on Terra-Gen's *construction* costs rather than Plaintiffs' *acquisition* costs was inconsistent with the proper determination of basis. Maydew, Tr. 1382:20-1383:10.

124.    We now turn to each of the purchase transactions, in the order in which they occurred. We show that each of these transactions was negotiated at arm's-length and that the purchase prices thus establish each buyer's basis in the property it acquired.

   C.    **The Altas II-V Transactions Were Heavily Negotiated By Sophisticated Parties, and the Purchase Prices Paid By the Plaintiff Purchasers Is Determinative of Basis.**

125.    The Alta II Facility is comprised of 50 Vestas wind turbines, which together comprise 150 Megawatts of rated capacity.  PX-280, Demonstrative: Construction Metrics; Pagano, Tr. 154:19-156:1; PX-0011.011, .028, Altas II-V Independent Engineer Report (June 10, 2010).  The Alta III Facility is comprised of 50 Vestas wind turbines, which together comprise 150 Megawatts of rated capacity.  *Id.*  The Alta IV Facility is comprised of 34 Vestas wind turbines, which together comprise 102 Megawatts of rated capacity.  *Id.*  The Alta V Facility is comprised of 56 Vestas wind turbines, which together comprise 168 Megawatts of rated capacity.  *Id.*

126.    The Alta II and III Facilities were sold through sale-leasebacks with  statutory trusts whose beneficial owner was Citibank, N.A.  The Alta IV and V Facilities were sold through sale-leasebacks to separate statutory trusts whose beneficial owners or their ultimate owners were Citibank, N.A. and Google Inc. ("Google").  PX-0282, Demonstrative: Purchase of Alta II; PX-0283, Demonstrative: Purchase of Alta III; PX-0284, Demonstrative: Purchase of Alta IV; PX-0285, Demonstrative: Purchase of Alta V; Pagano, Tr. 177:24-178:1, 178:16-180:16; Revock, Tr. 682:2-7.  Terra-Gen commenced the process for selling each of the Alta II through V Facilities in late 2009.  *See* JX-0029.001, Terra-Gen and Citibank Email Chain re: Project Overview Documents (Nov. 2009); Pagano, Tr. 186:17-188:13; Revock, Tr. 684:4-12.  Terra-Gen distributed information to at least 13 institutions relating to a potential purchase, including Barclays, Credit Suisse, ING, and others.  PX-0299.029 ¶ 51, Blaydon Initial Expert Report (Oct. 23, 2015); *see also* Revock, Tr. 684:18-22 (noting that he was aware that Terra-Gen had provided bidding materials to other institutions).

127.    Discussion with Citibank began in November 2009, when Terra-Gen sent Citi a financial model, nondisclosure agreement, and other materials. JX-0029.001, Terra-Gen and Citibank Email Chain re: Project Overview Documents (Nov. 2009); JX-0029-Attachment 1, Cash Flows Excel Spreadsheet (Nov. 2009); JX-0029-Attachment 2, Project Timeline (Nov. 2009); JX-0029-Attachment 3, Wind Resource Estimates (Nov. 2009); Pagano, Tr. 186:17-188:13, 189:15-204:17; Revock, Tr. 684:13-17, 686:11-13. As both Mr. Revock and Mr. Pagano testified, Citibank had considerable experience in the renewable energy industry. Revock, Tr. 682:22-683:20 (describing Citibank's renewable energy experience, dating back to 2005); Pagano, Tr. 181:15-24 (describing Citibank's experience with energy projects, noting the institution had been involved in the industry "from the beginning").

128.    The Terra-Gen financial model included in the materials provided to potential bidders reflected a $3,389/kw value for the Facilities, $3,259/kw of which related to eligible property. JX-0029.001; JX-0029-Attachment 1; Pagano, Tr. 186:17-188:13, 200:16-58, 204:8-17; Revock, Tr. 686:18-687:4. This value was the output of a detailed cash flow model that projected the net income to be derived from the sale of the Facilities' electricity, after accounting for all expenses, taxes and other deductions. Terra-Gen regarded this $3,259/kw as a reasonable value for the eligible property. JX-0029.001, JX-0029-Attachment 1, TGP Results Tab; Pagano, Tr. 200:20-202:12; *see* PX-0222, Alta I-VI Eligibility Map. Citibank, in turn, regarded that amount as Terra-Gen's asking price. Revock, Tr. 686:24-687:1.

129.    Citibank was well aware that Terra-Gen had issued a request for proposals to multiple parties, and that Citibank needed to put a fair price on the table to be competitive. Revock, Tr. 684:18-685:12. Citibank viewed the Alta Facilities as attractive assets for the reasons discussed in ¶¶ 62-66 & 73, *supra*, including their location in the unique Tehachapi

51

region and employment of top-tier Vestas turbines, features that increased the Facilities' value compared to other wind projects, including the Pacific Wind and Solano 3 wind projects also purchased by Citibank. Revock, Tr. 685:13-686:10, 705:4-706:9, 717:3-19, 717:20-719:13; JX-0068.007, Citibank Credit Approval Memorandum (May 24, 2010) (describing the Alta Facilities' location in "one of the world's premier wind resource areas"); JX-0068.018 (describing the Vestas V90 turbines used at Alta Facilities II-V as "one of Vestas' most technologically advanced in terms of efficiency, reliability and grid connection capabilities").

130.    Citibank proposed to Terra-Gen a purchase price of approximately $3,000 per kilowatt for eligible property, with the final price to be determined after confirmatory due diligence and appraisals of the Facilities. Revock, Tr. 687:5-688:16, 689:21-690:7; Pagano, Tr. 205:8-207:19 (describing Citibank proposal of $3,000 per kilowatt); PX-0005.016, Citibank Proposal for Phases 2-4 (Jan. 2010). This $3,000 per kilowatt proposal was approximately 8% less than the value Terra-Gen had placed on the property, *i.e.*, approximately 8% below Terra-Gen's $3,259/kw asking price.

131.    Citibank proposed a sale-leaseback transaction, rather than an outright purchase, because it did not have the operational expertise to operate the assets on its own. Revock, Tr. 690:11-15.

132.    Citibank would not agree to a determination of the exact price until the proposed price of approximately $3,000 per kilowatt had been subject to appraisal. Revock, Tr. 688:12-16, 708:4-21; *see* PX-0010.030, Equity Commitment Letter (June 18, 2010) ("The Equity Investor Purchase Price for an Alta Project will be set based on the projected fair market value of such Alta Project on its Lease Commencement Date, as estimated by the Appraiser on the Construction Closing Date."). This was important to Citibank to avoid overpaying for the

Facilities and to minimize Citibank's risk.  Revock, Tr. 708:15-21.  Professor Blaydon views this as evidence that the parties were acting at arm's-length, and not somehow cooperating to inflate the purchase price.  PX-0299.029 ¶ 52, Blaydon Initial Expert Report (Oct. 23, 2015).

133.    Citibank was only authorized by its management to acquire the Alta II-V Facilities subject to a requirement that the Bank "syndicate" at least 80% of its ownership interests in the Facilities, *i.e.*, Citibank had to re-sell at least 80% of the acquired interests to other parties.  Revock, Tr. 740:4-741:1.  This requirement to syndicate made Citibank particularly focused on ensuring that it purchased the Facilities from Terra-Gen at fair market value.  If Citibank paid *more* than fair market value, that would make the transactions "unsyndicable."  Revock, Tr. 741:19-21.  Citibank accordingly spent a great deal of time reviewing the valuation of the Facilities and working to ensure a conservatively-structured deal that would withstand scrutiny.  Revock, Tr. 741:2-18.  Citibank ultimately syndicated 90% of its ownership interest in the Alta II through V Facilities.  Revock, Tr. 740:10-14.

134.    Terra-Gen ultimately agreed to sell to Citibank because Citibank offered the highest purchase price.  But there continued to be negotiation of specific terms, and during this period, Citibank conducted extensive due diligence of the Facilities.  This due diligence included a review of hundreds of documents loaded to the data room for the site, such as the independent engineer's report, the wind study for the Facilities, the PPAs, interconnection agreements, turbine supply agreements, balance of plant agreement for construction of the Facilities, land leases and real estate deeds, and other documents material to the construction and operation of the Facilities.  Pagano, Tr. 209:6-210:9, 210:17-211:3, 211:11-25, 214:2-12; Revock, Tr. 687:18-688:4, 767:21-24; PX-0010.001, Altas II-V Garrad Hassan Wind Report (May 21, 2010); PX-0011.001, Altas II-V Independent Engineer Report (June 10, 2010); PX-0013.006, Equity

Commitment Letter, Section 8 (June 18, 2010) (describing materials provided to Citibank); PX-0196.001, Altas II-V Data Room Index (June 4, 2012) (describing data room contents); PX0197.001, Altas II-V Data Room User List (June 4, 2012) (showing that Citibank was provided access to the data room).  Citibank also conducted a site visit.  Revock, Tr. 767:25-768:2; Pagano, Tr. 217:3-5.

135.     Citibank's bid of approximately $3,000/kw was based on an internal valuation of the projected cash flows for the Facilities in question.  Revock, Tr. 691:4-13.  This analysis was memorialized in a May 2010 Credit Approval Memorandum, prepared by the Citibank project team seeking formal Bank approval of the transaction.  JX-0068.002, Citibank Credit Approval Memorandum (May 24, 2010); Revock, Tr. 691:16-692:18.  The Credit Approval Memorandum was provided to a number of Citibank managers, including the CEO of the commercial bank.  Revock, Tr. 714:12-22; JX-0068.002.

136.     The Credit Approval Memorandum reflects that Citibank conducted a discounted cash flow ("DCF") analysis of the Alta II-V Facilities to determine their values.  Revock, Tr. 692:19-693:2, 695:2-4; JX-0068.014.  Citibank determined that the discounted cash flow value of the Facilities was within a range, with a mid-point of $3,015.8 per kilowatt.  Revock, Tr. 695:10-18; JX-0068.014.  Citibank believed that this mid-point was the best measure of the fair market value of the Facilities, and justified a $3,000 per kilowatt purchase price.  Revock, Tr. 695:10-18, 704:19-705:3; *see* Revock, Tr. 693:10-12 (confirming that Citibank regarded the discounted cash flow analysis as the most reliable method to value the Alta Wind Facilities).

137.     Citibank's proposed purchase price of approximately $3,000 per kilowatt was based solely on this internal valuation of the Alta II-V Facilities.  Revock, Tr. 746:1-5; *see also*

Revock, Tr. 706:22-707:3 (confirming that Citibank's $3,000 per kilowatt bid was not based on any outside appraisal).

138.    The enterprise values calculated by Citibank's analyses included the value of tax benefits associated with the assets (deemed to constitute roughly a quarter of the value). Revock, Tr. 700:19-701:19. While the enterprise values for Altas II and III included the value of bonus depreciation benefits, the enterprise values for Altas IV and V did not because Citibank did not expect bonus depreciation to be available for Altas IV and V at the times those Facilities were sold. Revock, Tr. 703:2-11. It turned out that bonus depreciation *was* available at the time the Alta IV and V transactions closed, and Mr. Revock testified that parties to whom Citibank syndicated portions of its interests in the Alta IV and V Facilities ultimately took advantage of the bonus depreciation benefits. Revock, Tr. 703:12-17, 771:24-772:23. If Citibank's discounted cash flow valuation had included bonus depreciation benefits for Altas IV and V, the overall discounted cash flow value for Altas II-V would likely have been higher and the Facilities would have been deemed worth even more than $3,015.8 per kilowatt. Revock, Tr. 703:12-22.

139.    Terra-Gen and Citibank entered into an equity commitment letter on June 18, 2010, pursuant to which Citi agreed to purchase eligible property at the Altas II through V Facilities for the following amounts, subject to appraisal: Alta II, $450 million; Alta III, $450 Million; Alta IV, $306 million; Alta V, $504 million. PX-0013.001, .012, Equity Commitment Letter (June 18, 2010); Pagano, Tr. 212:8-214:1; Revock, Tr. 707:13-708:1.

140.    An independent appraiser, DAI Management Consultants, Inc. ("DAI"), subsequently conducted appraisals of the Alta II-V Facilities. Terra-Gen had preferred using the appraisal firm Duff & Phelps to perform the appraisals, but Citibank preferred DAI, and DAI

55

was selected.  JX-0038, Terra-Gen Email to Citibank re: Appraiser (Apr. 7, 2010); PX-0007, Citibank Email to Terra-Gen re: Appraiser (Mar. 25, 2010); Revock, Tr. 709:13-710:4 (explaining that Citibank preferred appraiser DAI, while Terra-Gen expressed a preference for Duff & Phelps).  In the appraisals, DAI concluded that the value of the eligible property was a few percent below $3,000/kW.  JX-0059.012, Alta II Appraisal (July 19, 2010) (showing appraised value of $2,935/kW);  JX-0062.012, Alta III Appraisal (July 19, 2010) (showing appraised value of $2,964/kW); JX-0060.012, Alta IV Appraisal (July 19, 2010) (showing appraised value of $2,831/kW); JX-0061.012, Alta V Appraisal (July 19, 2010) (showing appraised value of $2,905/kW);  Pagano, Tr. 215:18-216:21 (confirming that the DAI appraised values were "slightly lower" than $3,000/kW); Revock, Tr. 711:3-5 (same).

141.    The parties transacted at those lower appraised values, as agreed in the equity commitment letter.   Revock, Tr. 711:10-12; Pagano, Tr. 215:4-11; PX-0013.030, Equity Commitment Letter (June 18, 2010) ("The Equity Investor Purchase Price for an Alta Project will be set based on the projected fair market value of such Alta Project on its Lease Commencement Date, as estimated by the Appraiser on the Construction Closing Date."); *see* PX-0281, Demonstrative: Purchases Prices Paid for Eight Alta Facilities (showing purchase price per kilowatt); Pagano, Tr. 173:14-174:1 (describing PX-0281).

142.    Among other documents, the Independent Engineer's report for Altas II-V sets forth the projected construction costs for those Facilities.  PX-0011.028, Altas II-V Independent Engineer's Report (June 10, 2010).  Citibank thus had full knowledge of Terra-Gen's estimated construction costs and its markup over those costs at the time it agreed to the purchase prices for the Facilities.  Revock, Tr. 715:24-716:2; Pagano, Tr. 220:23-221:20

(agreeing that Citibank and Google knew what Terra-Gen's costs of construction were at the time they agreed to the purchase prices for Altas II-V).

143.    Citibank did not view Terra-Gen's markup over its estimated construction costs as unusually high; indeed, Mr. Revock, who negotiated the transactions for Citibank, had seen higher markups. Revock, Tr. 716:3-15. In purchasing the Facilities, Citibank placed value on Terra-Gen's successful efforts to permit and construct complete, fully integrated facilities ready to begin operations upon Citibank's purchase, and was willing to pay what it did as a result. Revock, Tr. 733:17-735:19.

144.    Construction of the Alta II-V Facilities was completed, and the transactions were consummated. Between the execution of the equity commitment letter and the consummation of the sale-leaseback transactions, a Google subsidiary stepped into Citibank's shoes with respect to the purchase of 50% of Alta IV and 50% of Alta V. Pagano, Tr. 172:5-7 (explaining that Google became involved shortly before commercial operations); Pagano, Tr. 182:15-24 (testifying that Google became involved in the transaction after negotiations with Citibank were completed and the master agreement entered); Pagano, Tr. 222:17-21 (50% of Altas IV and V was sold to Google); *see* Revock, Tr. 771:24-772:4, 774:5-7 (testifying that Google acquired its respective 50% ownership interest in Alta IV and Alta V from Terra-Gen); PX-0284, Demonstrative: Purchase of Alta IV; PX-0285, Demonstrative: Purchase of Alta V. Google was provided access to the data room of relevant materials, and conducted a site visit. Pagano, Tr. 210:17-211:3, 211:11-25, 217:3-7; PX-0197.001, Data Room User List (June 4, 2012) (showing access made available to Google).

145.    On December 30, 2010, Terra-Gen sold the eligible property at the Alta II Facility in a sale-leaseback transaction to statutory trusts Alta Wind II Owner Lessors A through

57

E for $440,249,843.61, or $2,935/kw.  PX-0286, Demonstrative: Altas II-V Purchase Dates and Amounts; Pagano, Tr. 183:1-4, 217:8-12 (describing PX-0286); PD-001, Revock Demonstrative: Alta II-V Purchase Prices; Pagano, Tr. 184:19-186:15 (describing sale of eligible property and sale-leaseback structure); Revock, Tr. 711:21-712:15 (providing details of the Alta II-V transactions); Rec. Doc. 115, Stipulation of Facts ¶ 18.  Citibank was the beneficial owner of each of the Owner Lessors.  PX-0282, Demonstrative: Purchase of Alta II; Pagano, Tr. 178:16-179:10 (describing PX-0282).

146.    Terra-Gen sold the eligible property to each of the Alta Wind II Owner Lessors A through E pursuant to a master Participation Agreement and other key agreements specific to each Owner Lessor, including a bill of sale, facility deed, facility lease (pursuant to which the owner lessor leases the Facility back to Terra-Gen), retained assets lease (pursuant to which Terra-Gen leases the ineligible property to the owner lessor), and retained assets sublease (owner lessor subleases the ineligible property back to Terra-Gen).  Pagano, Tr. 217:13-219:18; JX-0225.001, Alta II Participation Agreement (July 21, 2010); JX-0226.001, Alta II Participation Agreement Definitions (July 21, 2010); JX-0227.001-JX-0285.001, Primary Alta II Transaction Documents (Dec. 30, 2010); JX-0581.001-JX-0757.001, Additional Alta II Transaction Documents (July 21, 2010); JX-0758.001-JX-0937.001, Additional Alta II Transaction Documents (Dec. 30, 2010).  The purchase price was paid through $173,441,843.61 in cash and an assumption by the buyers of $266,808,000.00 in outstanding liabilities incurred by Terra-Gen to develop the Alta II Facility.  PX-0292, Demonstrative: Form of Payment Made by the Purchasers; Pagano, Tr. 419:1-14.

| Owner Lessor | Alta Wind II Owner Lessor A (Delaware Statutory Trust) | Alta Wind II Owner Lessor B (Delaware Statutory Trust) | Alta Wind II Owner Lessor C (Delaware Statutory Trust) | Alta Wind II Owner Lessor D (Delaware Statutory Trust) | Alta Wind II Owner Lessor E (Delaware Statutory Trust) |
|---|---|---|---|---|---|
| **% Interest in Alta II Wind Power Facility** | 25% | 25% | 20% | 15% | 15% |
| **Beneficial Owner of the Owner Lessor** | Citibank, N.A. | Citibank, N.A. | Citibank, N.A. | Citibank, N.A. | Citibank, N.A. |
| **Parent Corporation of the Beneficial Owner** | n/a | n/a | n/a | n/a | n/a |

PX-0282; Pagano, Tr. 178:16-179:10.

147.     On April 13, 2011, Terra-Gen sold the eligible property at the Alta III Facility in a sale-leaseback transaction to Alta Wind III Owner Lessors A through D for $444,534,902.68, or $2,964/kw.  PX-0286; Pagano, Tr. 183:1-4, 217:8-12 (describing PX-0286); PD-001; Revock, Tr. 711:21-712:15 (providing details of the Alta II-V transactions); Rec. Doc. 115, Stipulation of Facts ¶ 19.  Citibank was the beneficial owner of each of the Owner Lessors. PX-0283, Demonstrative: Purchase of Alta III; Pagano, Tr. 179:18-20 (describing PX-0283).

148.     Terra-Gen sold the eligible property to each of the Alta Wind III Owner Lessors A through D pursuant to a master Participation Agreement and the other key agreements specific to each Owner Lessor described in paragraph 146, *supra*.  Pagano, Tr. 217:13-219:18; JX-0286.001, Alta III Participation Agreement (July 21, 2010); JX-0287.001, Alta III Participation Agreement Definitions (July 21, 2010); JX-0288.001-JX-0343.001, Primary Alta III Transaction Documents (Apr. 13, 2011); JX-0938.001-JX-1117.001, Additional Alta III Transaction Documents (July 2010); JX-1118.001-JX-1307.001, Additional Alta III Transaction Documents (Apr. 13, 2011).  The purchase price was paid through $162,433,406.31 in cash,

together with an assumption by the buyers of $282,101,496.37 in outstanding liabilities incurred by Terra-Gen to develop the Alta III Facility.  PX-0292; Pagano, Tr. 419:1-14.

| Owner Lessor | Alta Wind III Owner Lessor A (Delaware Statutory Trust) | Alta Wind III Owner Lessor B (Delaware Statutory Trust) | Alta Wind III Owner Lessor C (Delaware Statutory Trust) | Alta Wind III Owner Lessor D (Delaware Statutory Trust) |
|---|---|---|---|---|
| % Interest in Alta III Wind Power Facility | 25% | 25% | 25% | 25% |
| Beneficial Owner of the Owner Lessor | Citibank, N.A. | Citibank, N.A. | Citibank, N.A. | Citibank, N.A. |
| Parent Corporation of the Beneficial Owner | n/a | n/a | n/a | n/a |

PX-0283; Pagano, Tr. 179:18-20.

149.    On May 20, 2011, Terra-Gen sold the eligible property at the Alta IV Facility in a sale-leaseback transaction to Alta Wind IV Owner Lessors A through D for $288,792,166.89, or $2,831/kw.  PX-0286; Pagano, Tr. 183:1-4, 217:8-12 (describing PX-0286); PD-001; Revock, Tr. 711:21-712:15 (providing details of the Alta II-V transactions); Rec. Doc. 115, Stipulation of Facts ¶ 20.  Citibank was the beneficial owner of Owner Lessor A and B, while a Google subsidiary was the beneficial owner of Owner Lessors C and D.  PX-0284, Demonstrative: Purchase of Alta IV; Pagano, Tr. 180:3-6 (describing PX-0284).

150.    Terra-Gen sold the eligible property to each of the Alta Wind IV Owner Lessors A through D pursuant to a master Participation Agreement and the other key agreements specific to each Owner Lessor described in paragraph 146, *supra*.  Pagano, Tr. 217:13-219:18; JX-0344.001, Alta IV Participation Agreement (July 21, 2010); JX-0345.001, Alta IV

Participation Agreement Definitions (July 21, 2010); JX-0346.001-JX-0401.001, Primary Alta IV Transaction Documents (May 20, 2011); JX-1308.001-JX-1459.001, Additional Alta IV Transaction Documents (July 21, 2010); JX-1460.001-JX-1643.001, Additional Alta IV Transaction Documents (May 20, 2011).  The purchase price was paid through $107,113,014.70 in cash, together with an assumption by the buyers of $181,679,152.19 in outstanding liabilities incurred by Terra-Gen to develop the Alta IV Facility.  PX-0292; Pagano, Tr. 419:1-14.

| Owner Lessor | Alta Wind IV Owner Lessor A (Delaware Statutory Trust) | Alta Wind IV Owner Lessor B (Delaware Statutory Trust) | Alta Wind IV Owner Lessor C (Delaware Statutory Trust) | Alta Wind IV Owner Lessor D (Delaware Statutory Trust) |
|---|---|---|---|---|
| **% Interest in Alta IV Wind Power Facility** | 25% | 25% | 25% | 25% |
| **Beneficial Owner of the Owner Lessor** | Citibank, N.A. | Citibank, N.A. | Climb IV LLC | Climb IV LLC |
| **Parent Corporation of the Beneficial Owner** | n/a | n/a | Google Inc. | Google Inc. |

PX-0284; Pagano, Tr. 180:3-6.

151.    On June 13, 2011, Terra-Gen sold eligible property at the Alta V Facility in a sale-leaseback transaction to Alta Wind V Owner Lessors A through D for $488,003,048.83, or $2,905/kw.  PX-0286; Pagano, Tr. 183:1-4, 217:8-12 (describing PX-0286); PD-001; Revock, Tr. 711:21-712:15 (providing details of the Alta II-V transactions); Rec. Doc. 115, Stipulation of Facts ¶ 21.  Citibank was the beneficial owner of Owner Lessor A and B, while a Google subsidiary was the beneficial owner of Owner Lessors C and D.  PX-0285, Demonstrative: Purchase of Alta V; Pagano, Tr. 180:14-16 (describing PX-0285).

152.     Terra-Gen sold the eligible property to each of the Alta Wind V Owner Lessors A through D pursuant to a master Participation Agreement and the other key agreements specific to each Owner Lessor described in paragraph 146, *supra*.  Pagano, Tr. 217:13-219:18; JX-0402.001, Alta V Participation Agreement (July 21, 2010); JX-0403.001, Alta V Participation Agreement Definitions (July 21, 2010); JX-0404.001-JX-0466.001, Primary Alta V Transaction Documents (June 13, 2011); JX-1644.001-JX-1805.001, Additional Alta V Transaction Documents (July 21, 2010); JX-1806.001-JX-2025.001, Additional Alta V Transaction documents (June 13, 2011).  The purchase price was paid through $197,447,915.21 in cash, together with an assumption by the buyers of $290,555,133.62 in outstanding liabilities incurred by Terra-Gen to develop the Alta V Facility.  PX-0292; Pagano, Tr. 419:1-14.

| Owner Lessor | Alta Wind V Owner Lessor A (Delaware Statutory Trust) | Alta Wind V Owner Lessor B (Delaware Statutory Trust) | Alta Wind V Owner Lessor C (Delaware Statutory Trust) | Alta Wind V Owner Lessor D (Delaware Statutory Trust) |
|---|---|---|---|---|
| **% Interest in Alta V Wind Power Facility** | 25% | 25% | 25% | 25% |
| **Beneficial Owner of the Owner Lessor** | Citibank, N.A. | Citibank, N.A. | Climb V LLC | Climb V LLC |
| **Parent Corporation of the Beneficial Owner** | n/a | n/a | Google Inc. | Google Inc. |

PX-0285; PX-0292; Pagano, Tr. 180:14-16, 419:1-14.

153.     Because the buyers only purchased the eligible property for Altas II-V, an allocation of the Facilities' values between eligible and ineligible property was performed by the appraisal firm DAI before the transactions were finalized.  Revock, Tr. 725:7-726:19  (describing how DAI determined the value of the eligible property).  DAI determined that 93.0% of the Alta

II property was grant-eligible, and that 93.1%, 90.7%, and 93.8% was grant-eligible for Alta III, Alta IV, and Alta V, respectively.   JX-0059.022, Alta II Appraisal (July 19, 2010);   JX-0062.022, Alta III Appraisal (July 19, 2010); JX-0060.022, Alta IV Appraisal (July 19, 2010); JX-0061.022, Alta V Appraisal (July 19, 2010); *see also* Revock, Tr. 726:13-24, 727:23-728:11. These eligible ratios were derived by dividing the estimated eligible construction costs of each Facility by its total estimated construction costs.   Revock, Tr. 726:20-24, 727:23-728:7; JX-0059.020-.022; JX-0062.020-.022; JX-0060.020-.022; JX-0061.020-.022.   The parties to the transactions applied these eligible ratios to the overall value of each Facility to derive the purchase prices for the eligible property alone.  Revock, Tr. 729:1-10.

154.     The average purchase price for eligible property at the Alta II-V Facilities was $2,915/kw — roughly 3% (or $49 million) below the $3,000/kw price that Citibank had initially proposed based on its internal valuation.  Revock, Tr. 712:11-21 (calculating average price of $2,915/kw); Revock, Tr. 713:10-12 (explaining that the final purchase prices were around 3% lower than Citibank's original bid); PD-001, Revock Demonstrative: Alta II-V Purchase Prices; PX-0281, Demonstrative: Purchases Prices Paid for Eight Alta Facilities (showing purchase price per kilowatt); Pagano, Tr. 173:14-174:1 (describing PX-0281).

155.     As described in paragraph 127, *supra*, Citibank had considerable experience in the renewable energy industry when it negotiated the Alta II-V transactions.  Pagano, Tr. 181:25-182:8.  Mr. Revock and Mr. Pagano confirmed that Citibank, Google and Terra-Gen are unrelated to each other.   Pagano, Tr. 180:24-181:14; Revock, Tr. 713:23-714:5.   Neither Citibank nor Google was under any compulsion to buy the Alta Wind Facilities, and Terra-Gen was not under any compulsion to sell.  Pagano, Tr. 182:9-14, 221:14-20; Revock, Tr. 714:6-11.

156.    Professor Blaydon concluded that the Altas II through V purchase prices establish the fair market value of the eligible property.  Blaydon, Tr. 1609:16-23; *see also* PX-0299.027 ¶ 47, Blaydon Initial Expert Report (Oct. 23, 2015) ("In my opinion, the Alta II-V sale prices likewise establish those facilities' fair market values."); *see also id.* ¶ 53;  ¶ 48 (noting that "the parties to the transactions were unrelated"); ¶ 49 ("the parties to the transactions had reasonable knowledge of the relevant facts"); ¶ 50 (Citibank "completed significant due diligence in connection with the Altas II-V transactions"); ¶ 51 ("the Altas II-V sales were the result of a competitive bidding process").

**D.    The Alta I Transaction Was Heavily Negotiated By Sophisticated Parties, and the Purchase Price Paid by the Plaintiff Purchasers Is Determinative of Basis.**

157.    The Alta I Facility is comprised of 100 General Electric wind turbines, each with a rated capacity of 1.5 Megawatts.  Pagano, Tr. 154:19-155:4, 227:10-12; PX-0280, Demonstrative: Construction Metrics.  The Facility as a whole comprises 150 Megawatts of rated capacity, enough to power 45,000 average U.S. households.  PX-0281, Demonstrative: Purchase Prices Paid for Eight Alta Facilities; Pagano, Tr. 51:24-52:1, 173:11-13.

158.    The Alta I Facility is built on the steep ridges and plateaus of the rugged Tehachapi Mountains, with an average elevation of 1,450 meters above sea level.  PX-0033.007, Alta I Garrad Hassan Wind Report (Nov. 1, 2010); Pagano, Tr. 226:16-227:6 (describing the Alta I terrain); PX-230, Google Earth image of Alta I turbines.  Alta I thus benefits from the windiest location of all the Alta Wind Lawsuit Facilities, and the projected electrical output per kilowatt of generating capacity for the Alta I Facility is 28% higher that of the Alta VI Facility.  Pagano, Tr. 83:8-84:8 (describing Alta I's superior net capacity factor); PX-0281 (showing the relative net capacity factors for Alta Facilities I and VI); Pagano, Tr. 171:2-176:25 (describing PX-0281).

159. The Alta I Facility was ultimately purchased by separate statutory trusts owned by Bankers Commercial Corporation (a sister corporation to Union Bank) and by a subsidiary of General Electric Capital Corporation ("GE"). PX-0288, Demonstrative: Purchase of Alta I; Pagano, Tr. 227:13-21; Markowitz, Tr. 918:4-6, 921:2-7, 925:20-24; 949:24-950:3, 983:22-984:9. Union Bank and GE each acquired an undivided 50% interest in the Alta I Facility. *Id.*

160. In the Spring and Summer of 2010, Terra-Gen had engaged in discussions with a number of entities, including Union Bank, GE, and others, about possibly purchasing Alta I upon completion of construction. Pagano, Tr. 233:5-234:19; JX-0063, Terra-Gen Email re: Potential Alta I Buyers (July 19, 2010); PX-0019, Terra-Gen Email to GE re: Alta I (Aug. 2, 2010). Terra-Gen had only a slight preference for proceeding with the transaction as a sale-leaseback compared to an outright sale, because Citibank had already agreed to the sale-leaseback transactions for Alta Facilities II-V and thus Terra-Gen had secured a foothold interest in the Tehachapi region (an important motivation behind those sale-leasebacks, as described in paragraph 99, *supra*). Pagano, Tr. 231:16-232:2.

161. Discussions between Union Bank and Terra-Gen began by mid-May 2010. Pagano, Tr. 232:3-24; JX-0041, Terra-Gen Email to Union Bank re: Alta I (May 10, 2010); *see* Markowitz, Tr. 926:13-18 (describing the May 10, 2010 email as "early on" in the Alta I negotiations). Union Bank was familiar with Terra-Gen and the Alta I Facility, because it had previously participated in construction financing for the Facility in March 2010. Pagano, Tr. 229:6-14.

162. An internal Union Bank memorandum dated May 26, 2010, discussed a potential sale-leaseback of the Alta I Facility, but no offer was made at that time. Markowitz, Tr.

931:16-932:10; JX-0042.002, Union Bank Alta I Leveraged Lease Memo (May 26, 2010). Union Bank did not consider an outright purchase because Union Bank was only interested in investing in — not operating — renewable energy projects.  Markowitz, Tr. 929:18-930:6, 1001:1-19.

163.     While the internal Union Bank memorandum references a $465 million purchase price, at the time it was prepared Union Bank had not yet run any economic analysis of cash flows or projected income.  JX-0042.002; Markowitz, Tr. 933:1-4, 934:14-19.  Discussion between Union Bank and Terra-Gen continued during the summer of 2010, and picked up pace in late August 2010, when Terra-Gen provided a draft term sheet to Union Bank laying out a proposed sale-leaseback structure for the transaction, without indicating a specific purchase price.  Pagano, Tr. 235:10-236:10; Markowitz, Tr. 935:15-24; JX-0065.001, .006. 008, Terra-Gen Email to Union Bank with Attached Draft Term Sheet (Aug. 23, 2010).

164.     Terra-Gen conducted an internal analysis of a reasonable purchase price for the grant-eligible property at the Alta I Facility.  Pagano, Tr. 236:11-237:11; PX-0020.001, Email re: Alta I Valuation (Sept. 1, 2010); PX-0020-Attachment, Alta I Valuation spreadsheet (Sept. 1, 2010).  The analysis indicated that the value of the grant-eligible property alone would be in the range of $3,312/kW, or $496.8 million, with an income approach valuation for the Facility coming in higher, at $3,455/kW or $518.25 million.  PX-0020.001, Email Between Terra-Gen and McManus & Miles (Sept. 1, 2010); PX-0020-Attachment ("Cash Flows" tab, cell I:81 for income approach valuation); Pagano, Tr. 237:12-241:10.

165.     Terra-Gen then provided pricing guidance to Union Bank on September 9, 2010, indicating that it sought an approximate purchase price of $502.5 million for the grant-eligible property only.  Pagano, Tr. 241:23-243:8, 262:9-14; Markowitz, Tr. 937:5-16; JX-0066,

66

Terra-Gen Email to Union Bank Attaching Alta I Project Model (Sept. 9, 2010); JX-0066-Attachment, Inputs Tab Cell E46, Alta I Project Model (Sept. 9, 2010).

166.     In parallel with its ongoing discussions with Union Bank over a possible sale-leaseback transaction, Terra-Gen solicited bids from third parties for a potential outright purchase of Alta I, in an effort to obtain the best possible price for the Facility.  Pagano, Tr. 243:9-15, 258:11-15.  Terra-Gen distributed bidding materials to and solicited first round bids from 10 parties (including GE) on October 1, 2010, and subsequently provided materials to three additional bidders.  Pagano, Tr. 243:9-245:18, 255:19-258:19, 268:24-269:22; JX-0067.001, .003, Terra-Gen Email Attaching Alta I Bidding Materials (Oct. 1, 2010), PX-0021.001, .003, Terra-Gen Email to GE Attaching Alta I Bidding Materials (Oct. 1, 2010); PX-0023.003, Terra-Gen Email to Brookfield re: Alta I (Oct. 8, 2010); PX-0029, Terra-Gen Email to Sumitomo Attaching Alta I Bidding Materials (Oct. 19, 2010).  The bidding materials consisted of a detailed 44-page confidential information memorandum with information about the Facility, as well as a financial model for the Facility.  Pagano, Tr. 243:9-245:18; JX-0067.006, Alta I Confidential Information Memorandum Attached to Email to Prospective Bidders (Oct. 1, 2010); PX-0021.005, Alta I Confidential Information Memorandum Attached to Email to GE (Oct. 1, 2010); PX-0021-Attachment, Alta I Project Model (Oct. 1, 2010).

167.     While this outright purchase bidding process was underway, and before any first-round bids had been received, Terra-Gen received a sale-leaseback proposal from Union Bank on October 8, 2010 with an assumed asset cost of $465 million for the eligible portion of the Facility.  Pagano, Tr. 260:6-261:23; Markowitz, Tr. 938:4-18, 939:4-8; JX-0069, Union Bank Email Attaching Alta I Proposal (Oct. 8, 2010); JX-0069-Attachment, Assumptions Tab Cell B10, Alta I Proposal Spreadsheet (Oct. 8, 2010).  The $465 million assumed asset cost was based

on Union Bank's prior internal memorandum and not on any detailed financial analysis of the cash flows from the Facility. Markowitz, Tr. 938:19-25.

168.         Terra-Gen viewed this October 8 Union Bank proposal as a first low ball offer, which, according to an internal Terra-Gen email, "wasn't the answer [Terra-Gen] [was] looking for." Pagano, Tr. 262:22-263:14; JX-0070, Terra-Gen Email re: Union Bank Offer (Oct. 11, 2010). Terra-Gen proceeded with the bidding process for an outright purchase, and in mid-October, received indications of interest from seven bidders. Terra-Gen invited four parties – Union Bank, GE, Brookfield, and Sumitomo – to participate in the second round of bidding, in which bidders were provided access to an extensive data room of relevant agreements and information, and the opportunity to conduct due diligence. Pagano, Tr. 263:15-266:16, 269:15-18, 270:5-272:20; PX-0025.001, Alta I Data Room Index (Oct. 12, 2010); PX-0195.001, Alta I Data Room User List (June 4, 2012); PX-0030.001, Terra-Gen Email to Brookfield re: Site Visit and Data Room Access (Oct. 20, 2010); PX-0033.001, Alta I Garrad Hassan Wind Report (Nov. 1, 2010); PX-0071.001, Alta I Independent Engineer Report (Dec. 31, 2010); PX-0031.001, Terra-Gen Email to Brookfield Attaching Management Presentation (Oct. 25, 2010); PX-0032.001, Terra-Gen and Brookfield Email re: Management Presentation Conference Call (Oct. 27, 2010).

169.         In mid-October 2010, Union Bank learned that Terra-Gen was engaging in this competitive process for a possible outright sale of Alta I. Markowitz, Tr. 939:22-940:11; Pagano, Tr. 266:24-268:8; PX-0027, Union Bank Email to Terra-Gen re: Alta I Sale (Oct. 13, 2010). Therefore, in late October, Union Bank conducted an economic analysis of the value to a buyer of an outright purchase of the entire Alta I Facility. Markowitz, Tr. 941:8-22; JX-0072, Union Bank Email Attaching PV Comparison Spreadsheet (Oct. 28, 2010); JX-0072-

68

Attachment, PV Comparison Spreadsheet (Oct. 28, 2010).  The analysis concluded that $550 million would be a reasonable price for an outright purchaser to pay.  JX-0072-Attachment, Cell L4; Markowitz, Tr. 942:1-943:16 (explaining that the analysis demonstrated that it was likely that a buyer would view $550 million as an attractive purchase price).  As a result of this analysis, Union Bank concluded that it needed to offer substantially more than $465 million to be competitive.  Markowitz, Tr. 946:1-20.

170.    Union Bank did not want to shoulder the entire purchase price, and in late October 2010, it and GE Energy Financial Services ("GE"), a unit of General Electric Company, began discussing a potential joint bid for a sale-leaseback of the Alta I Facility.  Markowitz, Tr. 926:19-927:10 (explaining that the Alta I transaction was "quite large" and that Union Bank accordingly approached GE).

171.    Both Union Bank and GE were sophisticated, experienced renewable energy investors.  Pagano, Tr. 228:20-229:3, 230:19-21; Markowitz, Tr. 920:13-922:7.  GE had been in the renewable industry "for as long as there's been an industry," with extensive experience in lending to, acquiring, and leasing energy projects.  Pagano, Tr. 230:23-231:7.  Union Bank had made its first renewable energy investment in 2003, and at the time of the Alta I transaction, at least 50% of the leasing group investments related to renewable investments.  Markowitz, Tr. 920:13-922:4.  Union Bank has made investments in renewable energy projects all over the United States.  Markowitz, Tr. 922:5-7.  Ms. Neubauer acknowledged that Treasury had no reason to believe that GE or UBOC was not sophisticated.  Neubauer, Tr. 1785:24-1786:2, 1787:2-8.

172.    Union Bank and Terra-Gen are unrelated to each other.  Pagano, Tr. 228:6-19, 229:15-230:18; Markowitz, Tr. 982:13-18.  Union Bank had no direct or indirect interests in

69

Terra-Gen.  Pagano, Tr. 228:6-19; Markowitz, Tr. 982:19-21.  GE had a small (3.4%) indirect interest in Terra-Gen, by virtue of its small equity stake in one of Terra-Gen's owners, but this small ownership interest had no bearing on the purchase price GE and Union Bank were willing to offer.  Pagano, Tr. 229:15-230:4.  Neither Union Bank or GE was under any compulsion to buy the Alta Wind I Facility, nor was Terra-Gen under any compulsion to sell.  Pagano, Tr. 231:8-10; Markowitz, Tr. 982:22-25.

173.  Before GE and Union Bank submitted their joint bid for the sale-leaseback of Alta I, Terra-Gen received second-round bids for the outright purchase of the Facility.  *See* Pagano, Tr. 271:10-18, 301:19-303:11 (describing the second round bidding process).  The two strongest bids were from Brookfield Renewable Power, Inc. ("Brookfield") and Sumitomo.  The Sumitomo bid, received on November 2, 2010, was for $566.5 million.  Pagano, Tr. 301:14-302:16; JX-0073.001-.002, Sumitomo Bid (Nov. 2, 2010).  The Brookfield bid, received two days later, was for $540 million, which Brookfield later increased to $550 million.  Pagano, Tr. 273:5-274:17 (describing $540 million bid); Pagano, Tr. 309:11-310:14 (describing increase to $550 million bid); JX-0075.003, Brookfield Letter re: Alta I Bid (Nov. 3, 2010); PX-0041.001, Terra-Gen Email Describing Increased Brookfield Bid (Nov. 16, 2010).

174.  Although the Sumitomo bid was somewhat higher than Brookfield's, Sumitomo's ultimate interest was harder to gauge.  Pagano, Tr. 302:17-303:11.  Neither Mr. Pagano nor Terra-Gen had done business with Sumitomo before, and Sumitomo required the approval of company leadership in Japan before it could commit to a deal, creating some uncertainty.  *Id.*  By contrast, Mr. Pagano had previously worked with both Brookfield and its CEO, and he felt that its offer was more reliable.  Pagano, Tr. 302:19-24.

175.     Brookfield is a large, sophisticated energy company familiar with wind projects both nationally and in California. Pagano, Tr. 299:16-22. Brookfield owns one of the world's largest renewable power portfolios, with close to $14 billion in assets and more than 4,500 MW of installed capacity. PX-0299.016 ¶ 23, Blaydon Initial Expert Report (Oct. 23, 2015). At the time, Brookfield owned the largest wind project in Canada, as well as the Coram wind project located near the Alta Facilities. Pagano, Tr. 299:16-22. Brookfield engaged in extensive due diligence, and Mr. Pagano deemed the bid to be well informed and credible. Pagano, Tr. 299:23-300:2. Brookfield later owned other wind power facilities in the Tehachapi area, and, indeed, it later won a similar competitive process to purchase the Alta VIII Facility in 2012. *See* Section III.E, *infra*.

176.     One day after Terra-Gen received Brookfield's bid, *i.e.*, on November 5, 2010, GE and Union Bank proposed to Terra-Gen a sale-leaseback of Alta I, with a purchase price of $510 million for the eligible property. JX-0076.001, GE & Union Bank Alta I Proposal Letter (Nov. 5, 2010); Markowitz, Tr. 946:21-947:19; Pagano, Tr. 303:12-304:2. This proposal represented a $45 million increase from Union Bank's initial assumed asset cost of $465 million set forth in its October 8, 2010 letter to Terra-Gen. *See* JX-0069-Attachment, Assumptions Tab Cell B10, Alta I Proposal Spreadsheet (Oct. 8, 2010) (showing assumed asset cost of $465 million).

177.     Three days later, GE and Union Bank revised their proposal, increasing the purchase price offer by another $10 million, to $520 million. JX-0077, Letter Attaching Revised GE & Union Bank Alta I Proposal (Nov. 9, 2010); JX-0077-Attachment, Summary Tab, Cell G9, Revised GE & Union Bank Alta I Proposal (Nov. 9, 2010); Markowitz, Tr. 947:21-949:10

71

(explaining that at this point GE and Union Bank were becoming more involved in negotiations with Terra-Gen); Pagano, Tr. 304:17-305:25.

178. Around November 16, 2010, Terra-Gen decided to pursue the sale-leaseback transaction with GE and Union Bank. Pagano, Tr. 311:13-312:25; PX-0041.002, Terra-Gen Email re: GE & Union Bank (Nov. 16, 2010) (describing Terra-Gen decision to pursue sale-leaseback with Union Bank and GE). Terra-Gen regarded the $520 million offer as applying to the eligible property only; this was equivalent to a roughly $560 million offer for the entire Facility. Pagano, Tr. 305:9-306:12, 313:1-7.

179. Terra-Gen decided to proceed with GE and Union Bank rather than Brookfield because their offer was slightly higher than Brookfield's proposed price, and a sale-leaseback had the advantage of allowing Terra-Gen to remain involved as the operator of the projects. Pagano, Tr. 313:1-21. Terra-Gen viewed that as important for ensuring continued good relations with private and public entities in the region, and for assisting with its future development efforts for other Alta Wind Facilities. *Id.*

180. On November 17, 2010, GE and Union Bank entered into non-binding mandate letters with Terra-Gen for a purchase price of $520 million. Pagano, Tr. 311:7-312:6; Markowitz, Tr. 955:20-958:13; PX-0044.002, Union Bank Mandate Letter (Nov. 17, 2010). Negotiations continued. *See* JX-0079, Terra-Gen Email to Union Bank and GE re: Asset Allocation (Nov. 23, 2010); Markowitz, Tr. 958:14-959:6. Union Bank and GE were given access to a comprehensive electronic data room in mid-November 2010, which contained hundreds of documents relevant to the transaction, such as the independent engineer's report, the wind study for the Facility, the power purchase agreement, interconnection agreements, the turbine supply agreements, the balance of plant agreement for construction of the Facilities, land

72

leases and real estate deeds, and other documents material to the construction and operation of the Facilities. Pagano, Tr. 306:21-309:2; Markowitz, Tr. 954:23-955:19; PX-0039.001, Terra-Gen Email to Union Bank re: Data Room Access (Nov. 16, 2010); PX-0040.001, Terra-Gen Email to GE re: Data Room Access (Nov. 17, 2010). PX-0025.001, Alta I Data Room Index (Oct. 12, 2010); PX-0195.001, Alta I Data Room User List (June 4, 2012).

181.    Union Bank and GE reviewed those documents as part of their due diligence efforts. Markowitz, Tr. 955:17-19 (confirming that Union Bank personnel reviewed the data room materials). Union Bank and GE also visited the Alta I site in person in late November to view the turbines and the site. Pagano, Tr. 313:22-314:14; Markowitz, Tr. 959:7-960:1; PX-0046.001, Terra-Gen Email re: Site Visit (Nov. 29, 2010). In addition, Union Bank and GE hired their own independent engineer (Sigma Energy Solutions), wind consultant (AWS TruePower), and transmission consultant (Navigant), to review independently the Facilities and agreements. Markowitz, Tr. 950:5-11, 953:16-19, 960:2-14; Pagano, Tr. 314:6-14; PX-0042.001, GE Email to Terra-Gen re: Data Room Access for Consultants Sigma and AWS (Nov. 18, 2010); PX-0046.001 (listing GE and Sigma site visit attendees); JX-0103.002, Alta I Project Memo re: AWS Review of Garrad Hassan Wind Resource Assessment (Dec. 30, 2010); JX-0103.005, Alta I Project Memo re: Sigma Technical Due Diligence Report (Dec. 30, 2010); JX-0103.008, Alta I Project Memo re: Navigant Assessment of Potential Transmission Congestion (Dec. 30, 2010); PX-0060.001, Sigma Technical Due Diligence Report for Alta I  (Dec. 20, 2010).

182.    Further discussions among GE, Union Bank and Terra-Gen led to the resolution that Union Bank and GE would purchase the entire Facility, both the eligible and the ineligible property, and the parties tentatively reached agreement on a roughly $560 million

73

purchase price.  Pagano, Tr. 315:17-317:7; JX-0083.001, Terra-Gen Email to GE & Union Bank re: Purchase of All Assets (Dec. 6, 2010); Markowitz, Tr. 961:3-962:3 (confirming that GE and Union Bank purchased all Alta I assets); *see* Markowitz, Tr. 962:16-19 (discussing $564 million valuation in JX-0083.001).   A December 31, 2010 closing date was targeted, as this would maximize the tax benefits of the transaction.  Pagano, Tr. 319:22-320:2; Markowitz, Tr. 944:5-21, 963:2-9.

183.    However, in late December 2010, Union Bank attempted to secure a purchase price reduction, based on a comparison between the Alta I Facility and the Alta III Facility. Pagano, Tr. 319:15-324:22 (explaining Mr. Markowitz's efforts to reduce to purchase price and his comparison of Alta I to Alta III); JX-0100.001, Union Bank Email to Terra-Gen re: Alta I Purchase Price Reduction (Dec. 30, 2010); JX-0104.003, Union Bank Email to Terra-Gen re: Alta I Purchase Price Reduction (Dec. 29, 2010)[5]; Markowitz, Tr. 965:3-966:10 (discussing JX-0104 and negotiations for a lower purchase price).  Union Bank made this effort at the end of December knowing that it was critical to Terra-Gen that the transaction close by year's end. Markowitz, Tr. 963:2-5.  Terra-Gen regarded this as an effort by Union Bank to negotiate aggressively for the best (lowest) possible price for the Alta I Facility.  Pagano, Tr. 322:17-323:5.  Mr. Markowitz likewise explained that the motivation behind the last minute negotiations was to ensure that Union Bank secured the best deal possible.  Markowitz, Tr. 963:10-22, 966:2-10.

184.    Union Bank argued that Alta III had a value approximately 14% lower than Alta I, because of its lower capacity factor, and that when one adjusted the Alta III purchase

---

[5]    JX-0100.001 and JX-0104.003 are the same email from Lance Markowitz to Jim Pagano and John O'Connor.  The date discrepancy is explained by the time zone change between Union Bank in Los Angeles and Terra-Gen in New York.

price of $477.8 million upwards by 14%, the implied value of Alta I was only $542 million, not the $560 million price to which the parties had tentatively agreed. Pagano, Tr. 324:9-22; Markowitz, Tr. 965:15-966:10; PX-0058, Terra-Gen Email to GE re: Alta I Negotiation (Dec. 26, 2010); PX-0061.001-002, Email Between Terra-Gen, GE, & UBOC re: Call to Discuss Purchase Price (Dec. 30, 2010); JX-0100.001; JX-0104.003.

185.   The negotiations grew somewhat heated, but Terra-Gen and its consultants were able to explain in detail why the Alta III purchase price was in fact comparable to the proposed $560 million purchase price for Alta I once appropriate adjustments were made. Pagano, Tr. 324:24-325:8, 326:7-329:4; Markowitz, Tr. 969:21-971:18, 972:7-973:4; JX-0102, Email from Terra-Gen Consultant Reconciling Alta I and Alta III Purchase Prices (Dec. 30, 2010). In addition, Vihang Dholakia, the senior person responsible for due diligence at GE, emphasized his confidence that the financial inputs supported a $560 million purchase price. Markowitz, Tr. 967:19-968:20; JX-0104.001, Email from GE to Union Bank re: Alta I Purchase Price (Dec. 30, 2010) (Mr. Dholakia asserting that the "market bids and comps support the 550-565 range"). As a result of these discussion, Union Bank ultimately dropped its last-minute request for a reduction of the Alta I purchase price. Markowitz, Tr. 973:1-7; Pagano, Tr. 328:16-329:4.

186.   Professor Blaydon, who has extensively studied the dynamics of competitive auctions, testified that these last-minute negotiations were noteworthy, because in a very competitive environment, the winner of a bidding process often comes back at the last minute to try to obtain a price concession. The fact that this occurred in the case of Alta I underscores that the bidding process was highly competitive and that the parties engaged in a bona fide arm's-length negotiation. Blaydon, Tr. 1592:3-1593:8.

187.     In mid-December 2010, amidst Union Bank's last-minute effort to reduce the purchase price, Terra-Gen re-engaged with Brookfield about a possible purchase of Alta I. Pagano, Tr. 325:9-23 (testifying that he called Brookfield CEO Harry Goldgut in mid-December in light of the changing dynamics of the Union Bank negotiations).  Brookfield explained that it was still interested in buying the Alta I Facility for $550 million, and that it would be able to close in the first quarter of 2011.  Pagano, Tr. 325:24-326:6.

188.     Ultimately, however, Union Bank and GE decided to proceed with a $560 million purchase price, and the transaction closed on December 31, 2010.  Pagano, Tr. 328:24-329:4; Markowitz, Tr. 973:5-7; Rec. Doc. 115, Stipulation of Facts ¶ 17.  Both GE and Union Bank believed that $560 million reflected the fair market value of the Alta I Facility, based upon the value of the income that the Facility would produce.  Markowitz, Tr. 968:9-18 (explaining that GE believed that the analysis supported a $560 million purchase price); Markowitz, Tr. 972:19-20 (explaining that he had concluded that a $560 million purchase price was reasonable before the efforts to lower the price); JX-0104.001, GE Email to Union Bank re: Alta I Purchase Price (Dec. 30, 2010) (expressing view that a purchase price range of $550 to $560 million was supported).  The transaction was accordingly approved by Union Bank's senior management, including the president and chief credit officer of the bank and Union Bank's parent company in Tokyo.  Markowitz, Tr. 973:10-974:10 (describing Union Bank's approval process for the Alta I purchase); JX-0094.001, Union Bank Credit Recommendation Summary (Dec. 20, 2010).

189.     Before the Alta I transaction closed, Terra-Gen provided GE and Union Bank with the draft of an independent appraisal prepared by DAI on December 14, 2010.  Pagano, Tr. 317:8-318:6; PX-0053.001, Terra-Gen Email to GE & Union Bank with Draft Alta I Appraisal (Dec. 14, 2010).  The appraisal provided an estimate of Terra-Gen's cost of construction for the

Alta I Facility, and both buyers thus had full knowledge of Terra-Gen's estimated construction costs and its markup over those costs at the time they agreed to the purchase price. Pagano, Tr. 317:12-318:16; PX-0053.019 (showing estimated construction costs of $435.1 million). Mr. Markowitz was familiar with DAI as an appraiser, knew that it had extensive experience in the power market, and was accordingly comfortable with the selection of DAI as the independent appraiser. Markowitz, Tr. 952:9-953:7. However, to ensure comprehensive due diligence, Union Bank had its consultants validate DAI's results. Markowitz, Tr. 952:25-953:7. Union Bank conducted significant analysis regarding the Alta I Facility's useful life and concluded that the remaining useful life was at least 30 years, and that it would likely last 40 years. PX-0060.020, Sigma Technical Due Diligence Report for Alta I (Dec. 20, 2010); Markowitz, Tr. 953:10-954:15.

190. On December 31, 2010, Terra-Gen sold the Alta I Facility for $560,000,000 to Alta Wind I Owner Lessors A, B, C, and D, four statutory trusts that each acquired a 25% undivided interest in the Facility. Rec. Doc. 115, Stipulation of Facts ¶ 17; PX-0281, Demonstrative: Purchase Prices Paid for Eight Alta Facilities; PX-0288, Demonstrative: Purchase of Alta I; Pagano, Tr. 227:13-21, 228:4-5, 329:16-330:4; Markowitz, Tr. 921:2-7, 925:20-24; JX-0205-224, Alta I Transaction Documents (Dec. 31, 2010).

| Owner Lessor | Alta Wind I Owner Lessor A (Delaware Statutory Trust) | Alta Wind I Owner Lessor B (Delaware Statutory Trust) | Alta Wind I Owner Lessor C (Delaware Statutory Trust) | Alta Wind I Owner Lessor D (Delaware Statutory Trust) |
|---|---|---|---|---|
| **% Interest in Alta I Project** | 25% | 25% | 25% | 25% |
| **Beneficial Owner** | EFS Alta Wind, LLC | EFS Alta Wind II, LLC | Bankers Commercial Corporation | Bankers Commercial Corporation |
| **Parent Corporation** | General Electric Capital Corporation | General Electric Capital Corporation | UnionBanCal Corporation | UnionBanCal Corporation |

PX-0288; Pagano, Tr. 227:13-20.

191.    This purchase price was consistent with the appraised value of the Facility, as determined by DAI in its independent appraisal.  JX-0112.013, Final Alta I Appraisal (Dec. 31, 2010) (providing a fair market value range between $545 million and $565 million); *see* Pagano, Tr. 329:5-15 (confirming that Terra-Gen had provided Union Bank and GE with sufficient information regarding the salient economic and physical characteristics of the Alta I Facility).

192.    The fact that Brookfield had made a competitive bid for the outright purchase of the Alta I Facility of $550 million, less than two percent below GE's and Union Bank's winning bid, further demonstrates that the purchase price was appropriate and that the sale-leaseback structure had not been not manipulated to artificially inflate the purchase price.  *See* Pagano, Tr. 325:9-326:6; *see also* PX-0299.027 ¶ 46, Blaydon Initial Expert Report (Oct. 23, 2015) ("[T]he presence of a competitive pure sale bid less than two percent below the winning bid supports that the sale-leaseback structure was not manipulated to artificially inflate the transaction price.").

193.    Professor Blaydon concluded that the Alta I transaction "satisfies the finance criteria . . . for a transaction that establishes fair market value."  PX-0299.023 ¶ 38, Blaydon Initial Expert Report (Oct. 23, 2015); *see also id.* ¶ 40 (noting that there was "arm's-length

negotiation between the parties"), ¶ 41 (noting that the buyers improved their bids based on competition with other bidders), ¶ 42 (concluding that the buyers were "highly sophisticated"); ¶ 43 (noting that the buyers "completed significant due diligence in connection with the Alta I transaction); ¶ 44 (noting that "the Alta I transaction was the result of a competitive bidding process").

### E.   The Alta VIII Outright Purchase Was Heavily Negotiated By Sophisticated Parties.

194.   The next Alta Wind sale transaction was the outright purchase of a non-lawsuit facility, Alta VIII.  Pagano, Tr. 331:12-14, 332:6-8.  Alta VIII is a 150 megawatt system comprised of 50 Vestas 3 megawatt turbines.  Pagano, Tr. 155:1-4, 173:11-13, 331:24-332:2; PX-0280, Demonstrative: Construction Metrics; PX-0281, Demonstrative: Purchase Prices Paid for Eight Alta Facilities; PX-0115.005, Alta VIII Confidential Information Memorandum (Aug. 2011).  Because Terra-Gen already had a strong presence in the Tehachapi region through the sale-leaseback transactions for Alta Facilities I through V, it had no preference regarding whether the Alta VIII transaction took the form of a sale-leaseback or an outright sale.  Pagano, Tr. 332:9-20.

195.   Alta VIII was sold through the familiar two-step bidding process, in which round one consisted of the submittal of indicative bids, based upon information set forth in a confidential information memorandum and other materials.  Pagano, Tr. 335:2-336:9, 339:17-22; PX-0115.001, Alta VIII Confidential Information Memorandum.  A selected group of bidders was then invited to participate in round 2, in which bidders made refined bids based upon data room materials, site visits, and other due diligence, followed by a negotiation of the final agreement with the winning bidder.  Pagano, Tr. 335:2-336:9, 340:15-342:19; PX-0117, Terra-Gen Email Attaching Alta VI and VIII Data Room Index (Aug. 24, 2011); PX-0117-Attachment,

Alta VI and VIII Data Room Index (Aug. 22, 2011); PX-0103.001, Alta VI and VIII Independent Engineer Report (May 26, 2011); PX-0118.001, Terra-Gen Email to EverPower Attaching Management Presentation and Confidential Information Memorandum Provided to Round 2 Bidders (Sept. 9, 2011).  These bidders included EverPower, the ultimate purchaser of the Alta VI Facility.  Pagano, Tr. 342:9-15; PX-0118.001; *see* Spencer, Tr. 830:13-24.

196.    Prior to the bidding process, Terra-Gen had analyzed the value of Alta VIII to a taxpaying purchaser in an outright purchase transaction, and concluded that the value would range from $436 million to $480 million for the entire Facility.  Pagano, Tr. 336:10-337:20; PX-0116, Email from Terra-Gen Consultant re: Alta VI and VIII Analysis (Aug. 23, 2011); PX-0116-Attachment, Alta VI and VIII Financial Model (Aug. 23, 2011).

197.    After a competitive bidding process, the 150 MW Alta VIII Facility was sold to Brookfield, the same entity that had previously submitted an unsuccessful bid for Alta I.  Pagano, Tr. 333:5-12.  The transaction closed in January 2012, for $439.834 million.  Pagano, Tr. 335:21-24, 343:2-344:6; PX-0281; PX-0194.001, Alta VIII Purchase Agreement (Dec. 7, 2011); PX-0438-0520, Additional Alta VIII Transaction Documents (Dec. 2011-May 2012); *see also* PX-0181, Terra-Gen Email Attaching Alta VI and VIII Closing Model (Mar. 30, 2011); PX-0181-Attachment, Alta VI and VIII Closing Model (Mar. 30, 2011); PX-0154.001, Brookfield Alta VIII Bid Letter (Jan. 11, 2012) (referring to "our recent transaction" for Alta VIII).

198.    As discussed in paragraph 175, *supra*, in connection with the Alta I bidding process, Brookfield was an experienced wind power company, which already owned wind power facilities in the Tehachapi region.  Pagano, Tr. 333:24-334:9.  Brookfield is and always has been completely unrelated to Terra-Gen.  Pagano, Tr. 333:22-23.  The companies did not share any common employees, officers, directors, or overlapping ownership.  Pagano, Tr. 333:16-21.  No

employees transferred from Terra-Gen to Brookfield as part of the transaction.  Pagano, Tr. 334:14-21.  Brookfield was not under any compulsion to buy the Alta Wind VIII Facility, nor was Terra-Gen under any compulsion to sell.  Pagano, Tr. 334:10-13.

199.    The confidential information memorandum provided to Brookfield and other bidders for the Alta VIII Facility detailed Terra-Gen's cost of construction for the Alta VIII Facility.  PX-0115.019, Alta VI and VIII Confidential Information Memorandum (Aug. 2011); Pagano, Tr. 346:5-15.  Brookfield thus had full knowledge of Terra-Gen's construction costs and its markup over those costs at time it agreed to the purchase price.  *See* Pagano, Tr. 346:16-25 (confirming that Terra-Gen provided Brookfield with sufficient information regarding the salient economic and physical characteristics of the Alta VIII Facility).

**F.    The Alta VI Transaction Was Heavily Negotiated By Sophisticated Parties, and the Purchase Price Paid By the Plaintiff Purchaser Is Determinative of Its Basis.**

200.    The next purchase transaction was of the Alta VI Facility (also known as Mustang Hills), which is comprised of fifty 3 megawatt Vestas wind turbines, for a total 150 Megawatts of rated capacity.    Pagano, Tr. 155:1-4, 173:11-13, 348:1-3.    PX-0280, Demonstrative: Construction Metrics; PX-0281, Demonstrative: Purchase Prices Paid for Eight Alta Facilities; PX-0099.006, Alta VI Garrad Hassan Wind Report (May 12, 2011).

201.    The Alta VI transaction was an outright purchase.  Pagano, Tr. 348:4-6; Spencer, Tr.  827:23-25.  Alta VI was sold using the familiar two-step bidding process, in which round one consisted of the submission of indicative bids, based upon information set forth in a confidential information memorandum and other materials.  A selected group of bidders was then invited to participate in round 2, in which bidders made refined bids based upon data room materials, site visits, and other due diligence.  This was followed by a negotiation of the final

81

agreement with the winning bidder.  Pagano, Tr. 352:23-354:12, 357:13-371:14; *see also* PX-0299.020-.021 ¶ 32, Blaydon Initial Expert Report (Oct. 23, 2015).

202.    Prior to initiating the bidding process, Terra-Gen had analyzed the value of Alta VI based upon the price negotiated for Alta VIII, and concluded that the equivalent price for Alta VI would be in the same range.  Pagano, Tr. 349:24-351:2; PX-0123.002, Alta VI Permanent Financing Scenarios Slide (Dec. 7, 2011).  Terra-Gen's analysis of the Alta VI Facility's value did not assume that the buyer would take advantage of the available bonus depreciation for the Facility, which would have increased the Facility's value.  Pagano, Tr. 351:3-17.

203.    Terra-Gen approached Brookfield, which had just agreed to purchase Alta VIII, but that company did not make an offer that Terra-Gen deemed acceptable.  Pagano, Tr. 352:22-357:4 (describing Brookfield negotiations and offer, and explaining that Brookfield's bid of $413 million was significantly less than Terra-Gen's internal valuation); *see* PX-0124.001, Terra-Gen Email to Brookfield with Alta VI Materials (Dec. 14, 2011); PX-0154.001-.002, Brookfield Proposal for Alta VI (Jan. 11, 2012); PX-0155.001, Terra-Gen Email Chain re: Brookfield Bid (Jan. 11, 2012) (expressing disappointment in Brookfield offer); PX-0157.001, Terra-Gen Email Chain re: Brookfield Bid (Jan. 12, 2012) (providing analysis of Brookfield valuation).

204.    Terra-Gen also engaged in discussions with Citibank regarding a potential leveraged tax equity partnership for the Alta VI Facility, which Terra-Gen did not elect to pursue in light of the offer made.  Pagano, Tr. 357:13-22 (testifying that Citibank's offer of $411 million was not attractive); PX-0160.001, Terra-Gen and Citibank Email re: tax equity partnership structure (Jan. 25, 2012).  Accordingly, Terra-Gen decided to approach a third company,

EverPower.  Pagano, Tr. 358:6-359:1; Spencer, Tr. 831:3-9; JX-0170.008, Alta VI, VII, & IX Financing Discussion Presentation (Jan. 27, 2012) ("Terra-Gen is currently pursuing EverPower … for a sale of Alta VI"); PX-0162.001, Terra-Gen Email to EverPower with Alta VI Materials (Jan. 26, 2012).  EverPower is a developer, owner, and operator of onshore wind facilities, owning and operating seven U.S. wind power facilities, with a combined capacity of 752 megawatts.  Spencer, Tr. 825:3-5, 825:22-826:4; *see* Pagano, Tr. 349:1-7.

205.    EverPower and Terra-Gen are, and have always been, completely unrelated companies, and have never shared employees, officers, directors, or owners.  Pagano, Tr. 348:15-25; Spencer, Tr. 860:3-8; *see also* PX-0299.019 ¶ 28, Blaydon Initial Expert Report (Oct. 23, 2015) ("The parties to the Alta VI transaction were not related.").  EverPower was not under any compulsion to buy the Alta Wind VI Facility, nor was Terra-Gen under any compulsion to sell.  Pagano, Tr. 349:8-11; Spencer, Tr. 860:9-13.  With the exception of a brief transitional period during which Terra-Gen helped EverPower take over operations of the Facility (for payment), Terra-Gen had no continued involvement with the Alta VI Facility after its sale.  Pagano, Tr. 349:12-20 (describing brief transitional period); Spencer, Tr. 865:4-8, 872:22-873:5, 912:25-913:6 (explaining that EverPower took over operations from Terra-Gen within 60 or 90 days).

206.    Terra-Gen sent bidding materials, including a confidential information memorandum, bidding instructions, and a financial model, to EverPower on January 26, 2012.  Pagano, Tr. 358:6-15; PX-0162.001, Terra-Gen Email to EverPower with Alta VI Materials (Jan. 26, 2012); PX-0162-Attachment, Alta VI Model (Jan. 26, 2012).  These materials, specifically the Alta VI Confidential Information Memorandum and cash flow projections contained in Appendix D to the memorandum, informed EverPower's decision regarding whether and how much to bid for Alta VI.  Spencer, Tr. 834:3-23 (noting that the discounted cash flow projections

83

were EverPower's primary factor in determining the purchase price and that EverPower determined the reasonableness of those projections); PX-0162.005, .036, Alta VI Confidential Information Memorandum (Jan. 2012).

207.    EverPower's initial non-binding purchase offer, in early February 2012, was $415 million.  Spencer, Tr. 835:2-20; PX-0164.001-.002, EverPower Indicative Offer Letter (Feb. 3, 2012); Pagano, Tr. 363:6-12.  Terra-Gen responded that the $415 million initial offer was too low.  Spencer, Tr. 835:21-22.

208.    EverPower believed that Alta VI was an attractive asset.  EverPower's CEO stated in an internal email that "in this market people are going to pay for an asset like this," reflecting his view that "there would probably be aggressive bidding for the asset."  Spencer, Tr. 832:25-833:13; JX-172, EverPower Email re: Alta VI (Jan. 28, 2012).  Based on this assessment, EverPower increased its offer to $420 million in response to Terra-Gen's request.  JX-0175.003, Email from James Spencer Attaching Indicative Offer (Feb. 13, 2012) (offering $420 million); Spencer, Tr. 837:3-10; *see also* Pagano, Tr. 363:20-364:8 (describing negotiations with Mr. Spencer); PX-0165.001, Terra-Gen Email re: EverPower Offer (Feb. 4, 2012).

209.    EverPower's purchase offer included the assumption of a "swap" liability associated with the Alta VI Facility, the amount of which would be determined on the closing date.  Interest rate swaps are commonly used to hedge interest rates or change the risk profile of existing debt, and their value changes over time as interest rates change.  *See* Spencer, Tr. 837:15-24.  EverPower's assumption of the swap liability would be additional consideration for the Alta VI Facility, over and above the $420 million.  Pagano, Tr. 364:9-18; Spencer, Tr. 837:11-838:6.  At the time of the Alta VI negotiations, the swap liability was assumed to be between approximately $15 and $20 million, and Terra-Gen thus regarded the value of

EverPower's offer as effectively around $440 million.  Pagano, Tr. 364:15-21; Spencer, Tr. 838:11-15.

210.    EverPower's offer was based on its assessment of the cash flows that the Alta VI Facility would generate over its operating life.  Spencer, Tr. 850:10-23; 855:13-23, 856:11-18; JX-0177.001, EverPower Email Attaching Project Serenity Deck and Model (Mar. 28, 2012); JX-0177-Attachment, EVP Output Tab Cell AJ43, Project Serenity Deck and Model (Mar. 28, 2012) (showing cash flow projections through 2042).  Using a discounted cash flow methodology, EverPower calculated that the Alta VI Facility was worth more than $437 million.  Spencer, Tr. 851:13-852:9; JX-0177-Attachment, EverPower Tab Cell H12, Project Serenity Deck and Model (Mar. 28, 2012).

211.    Before entering into a purchase agreement, EverPower required the approval of its ultimate owner, Terra Firma Capital Partners.  Spencer, Tr. 838:16-24; 848:3-6. EverPower accordingly made a presentation to Terra Firma regarding the potential acquisition of Alta VI.  Spencer, Tr. 838:16-839:17, 847:23-848:2; PX-0180.006, EverPower Project Serenity presentation (Mar. 29, 2012).  The presentation contemplated a purchase price of approximately $435 million (including an estimated $15 million in interest rate swap liability).  PX-0180.017; Spencer, Tr. 849:13-850:6.  Terra Firma gave EverPower its approval to move forward with the Alta VI transaction at that price.  Spencer, Tr. 850:7-9.  Terra-Firma would not have approved the transaction if it believed EverPower would be overpaying for the Alta VI Facility.  Spencer, Tr. 860:1-2.

212.    EverPower entered into an agreement for the purchase of the Alta VI Facility on March 31, 2012.  JX-0467.001, Purchase and Sale Agreement (Mar. 31, 2012); JX-0468-0469, Purchase and Sale Agreement Signature Pages (Mar. 31, 2012); JX-2026-2040, Additional

Alta VI Transaction Documents (Mar. 31, 2012). EverPower did so by acquiring Terra-Gen's membership interest in the pass-through entity that owned the Alta VI Facility, which the tax code deems equivalent to the purchase of the Facility itself. JX-0467.005-.006; Pagano, Tr. 372:17-374:15. The purchase price was $439,388,076. Stipulation of Facts ¶ 22, Rec. Doc. 115; JX-0467.001; .066, Agreement for Purchase of Membership Interests (Mar. 31, 2012); PX-0192, EverPower Email Attaching Alta VI Sources and Uses Spreadsheet (May 9, 2012); PX-0192-Attachment, Alta VI Sources and Uses Spreadsheet (May 9, 2012); PX-0193, Terra-Gen Email Attaching Alta VI Sources and Uses Spreadsheet (May 9, 2012); PX-0193-Attachment, Alta VI Sources and Uses Spreadsheet (May 9, 2012); Pagano, Tr. 369:25-371:9; Spencer, Tr. 858:7-8.

213. The $439.4 million in consideration that EverPower paid to acquire Alta VI included $19.4 million in the form of an assumption of the interest rate swap liability referenced above. Spencer, Tr. 857:1-3, 858:4-12; PX-0192-Attachment, Cell B12; PX-0193-Attachment, Cell B12. The ultimate swap value included in the purchase price increased from the original estimate because of a fall in interest rates. Spencer, Tr. 858:18-24.

214. EverPower's ability to close quickly was an important factor in its bid being selected by Terra-Gen. Spencer, Tr. 832:9-24; JX-0174, EverPower Email re: Citi Tax Equity Proposal (Feb. 7, 2012) (stating that "[o]ur ability to close quickly … is our biggest asset"); *see* Pagano, Tr. 372:9-16 (explaining that Terra-Gen was "running out of time" to sell the Facility before it went into service). This offset the fact that EverPower was unable immediately to use depreciation benefits associated with the Facility, and thus might not have valued Alta VI as highly as a party that was able to utilize such benefits. JX-0172, EverPower Email re: Alta VI (Jan. 28, 2012) (explaining that it could not "do as aggressive a deal as Brookfield"); Pagano, Tr. 371:18-372:13 (explaining that EverPower could not utilize depreciation benefits as efficiently

86

as other potential buyers); Spencer, Tr. 853:11-854:6, 855:9-12 (describing EverPower's taxpayer status and testifying that the ability to make use of depreciation would have made the Alta VI Facility more valuable); *see also* PX-0299.020-.021 ¶ 34, Blaydon Initial Expert Report (Oct. 23, 2015).

215.      EverPower considered the Alta VI transaction to represent "the most significant acquisition in EverPower history," and the Alta VI transaction represented the largest acquisition that EverPower had ever made.  PX-0191, EverPower Email to Terra Firma (May 9, 2012); Spencer, Tr. 873:20-25.   Given the size and import of the acquisition, EverPower conducted extensive due diligence of the transaction before entering into a purchase agreement. Spencer, Tr. 874:8-19.  Mr. Pagano testified that EverPower was "among the more thorough purchasers."  Pagano, Tr. 369:12-16.  Professor Blaydon remarked that EverPower "completed significant due diligence in the Alta VI transaction."  PX-0299.020 ¶ 31, Blaydon Initial Expert Report (Oct. 23, 2015).

216.      EverPower's due diligence included retaining the engineering firm Sigma Energy Solutions to prepare a Technical Due Diligence Report.  PX-0381.001, .008, .009, Sigma Technical Due Diligence Report (Mar. 15, 2012).   Sigma concluded that the cash flow projections for the Alta VI Facility were reasonable, and confirmed that an assumption of a 30 year useful life for the Facility was accurate.  PX-0381.008 (financial projections), .009 (estimated useful life); Spencer, Tr. 877:25-878:19.

217.      As part of its due diligence efforts, EverPower also provided Terra-Gen with at least 20 rounds of due diligence questions — at least 408 individual questions — in connection with its purchase of Alta VI.  PX-0177, EverPower Email with Due Diligence

Questions (Mar. 14, 2012); PX-0177-Attachment, Sale Process Q&A Form (Mar. 14, 2012); Pagano, Tr. 369:4-16.

218.    Professor Blaydon concluded that the Alta VI transaction "satisfies the relevant criteria for a transaction that establishes fair market value" and was "executed by a willing buyer and a willing seller, neither of whom was under a compulsion to buy or sell and each of whom had reasonable knowledge of the relevant facts."    PX-0299.018-.019 ¶ 27, Blaydon Initial Expert Report (Oct. 23, 2015).   Based on this, he concluded that the $439.4 million Alta VI transaction price reliably establishes the fair market value of the Alta VI Facility. *Id.*; Blaydon, Tr. 1595:17-20.

219.    NREL itself concluded that the Alta VI transaction was "a sale between unrelated parties at arm's-length," and that the parties to the transaction were sophisticated. Settle, Tr. 1322:6-19; 1324:2-6.

**G.    The Alta IX Outright Purchase Was Heavily Negotiated By Sophisticated Parties.**

220.    The next (and final) transaction was an outright purchase of a non-lawsuit property, Alta IX. Pagano, Tr. 375:6-11.  Alta IX was sold through the familiar two-step bidding process, in which round one consisted of the submission of indicative bids, based upon information set forth in a confidential information memorandum and other materials.  A selected group of bidders was invited to participate in round two, in which bidders made refined bids based upon data room materials, site visits, and other due diligence, followed by a negotiation of the final agreement with the winning bidder.  Pagano, Tr. 377:20-379:21; PX-0201.001, Alta VII and IX Confidential Information Memorandum (June 2012); PX-0173.001, AWS Alta IX Wind Assessment (Feb. 28, 2012); PX-0203, Alta IX project model (Aug. 7, 2012).  The confidential information memorandum provided to the bidders disclosed Terra-Gen's projected construction

88

costs for the Alta IX Facility, and each of the potential buyers thus had full knowledge of Terra-Gen's estimated construction costs and its markup over those costs before making a bid. Pagano, Tr. 376:15-377:1; PX-0201.018 (providing estimated project costs of $301.2 million).

221.     Upon completion of the competitive bidding process, the 132 MW Alta IX Facility was sold to Mid-American Energy Company ("MidAm"), a subsidiary of Berkshire Hathaway Energy. Pagano, Tr. 171:22-172:1, 173:11-13; 375:12-19; PX-0281, Demonstrative: Purchase Prices Paid for Eight Alta Facilities; PX-0204.001, Alta IX Purchase Agreement (Sept. 28, 2012); *see* PX-0201.005 (showing project is 132 MW). MidAm is a sophisticated renewable energy company that owns more wind-powered generation capacity than any other U.S. rate-regulated utility. Pagano, Tr. 375:12-19; PX-0299.016-.017 ¶ 23, Blaydon Initial Expert Report (Oct. 23, 2015). MidAm is and always has been completely unrelated to Terra-Gen. Pagano, Tr. 375:12-376:3. MidAm was not under any compulsion to buy the Alta Wind IX Facility, nor was Terra-Gen under any compulsion to sell. Pagano, Tr. 376:4-8.

222.     The Alta IX sale agreement was entered in September 2012, with a closing price of $416.097 million. Pagano, Tr. 381:13-382:1; PX-0217, Alta IX Sale Price Breakdown; PX-0204.001, PX-0521-0789, Alta IX Transactional Documents.

### H.     The Black Letter Rule that Each Plaintiff's Basis Is the Purchase Price It Paid Is Not Subject to Any Applicable Exception.

223.     As noted above, it is black letter law that a buyer's acquisition cost establishes its basis in property the buyer acquires. The only exception to the black letter rule that purchase price establishes basis arises when "peculiar circumstances" establish that the parties were not truly dealing at arm's-length or that the transaction lacked real economic substance. *See*, *e.g.*, *Solitron Devices,* 80 T.C. at 17; *Moore v. Commissioner*, T.C. Memo. 2013-249, 2013 WL 5827653 at *3-4 (Oct. 30, 2013). "Generally… in those cases in which courts limited the basis

of an asset to [a calculated] fair market value [rather than the purchase price], the courts found that the taxpayers were not dealing at arms-length, that there was not a real indebtedness, or that there was not a bona fide business purpose." *MacKenzie v. United States*, 714 F. Supp. 268, 271 (E.D. Mich. 1989).

224.    As detailed in Sections III.A through III.D and III.F, *supra*, no such peculiar circumstances exist here.    The Alta Wind Lawsuit Facilities purchase transactions were negotiated at arm's-length between well-informed, unrelated parties, none of whom was under a compulsion to buy or sell.    Those transactions were funded by cash consideration and the assumption of real debt.    The transactions all had a bona fide business purpose.

225.    Moreover, Professor Blaydon, who has studied the dynamics of competitive auctions, reviewed voluminous materials relating to each of the Alta Wind transactions. Blaydon, Tr. 1590:1-1595:20; *see also* PX-0302, Ex. 2 to Blaydon Initial Expert Report (list of materials considered).    Professor Blaydon concluded that the actual transactions established fair market value: the transactions were between unrelated parties, free of a compulsion to buy or sell, the parties that negotiated the transaction prices were sophisticated entities with reasonable knowledge of the relevant facts, and there was arm's-length negotiation of the transaction prices. PD-059, Demonstrative: When Transaction Price Establishes Fair Market Value; Blaydon, Tr. 1579:8-1580:11; *see also* PX-0299.007 ¶ 12(a), Blaydon Initial Expert Report (Oct. 23, 2015) ("The transactions here have all the indicia of true arm's-length transactions and the fair market value (or cost basis) of each facility thus is, by definition, its transaction price."); Blaydon, Tr. 1590:12-1593:4;1595:17-1596:2; PD-060, Demonstrative: Alta I-VI Sales Summary.

226.    The Government has suggested that the sale-leaseback structure used for the Alta I-V transactions was a peculiar circumstance, but there is no support for that claim.

227.     As noted above, the amount of the sales price for each Alta Wind Lawsuit Facility was in no way affected by whether the Facility was sold through an outright purchase or a sale-leaseback.   Pagano, Tr. 170:22-171:1.   The purchase prices in the sale-leaseback transactions were very close to — indeed, on average, a bit below — the purchase prices in the outright sale transactions, after adjusting for differences in electrical generating capacity.   This is demonstrated by the following table:

| Transaction | Transaction Price ($000s) | % Acquired | Capacity | $ / kw | Net Capacity Factor (NCF)[6] | Capacity Adjusted $ / kw |
|---|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] = [1] / ([2] * [3]) | [5] | [6] = [4] * ([5] / 26.64%) |
| **Outright Purchase Transactions** | | | | | | |
| Alta VI | $439,388 | 100.0% | 150 | $2,929 | 26.6% | $2,929 |
| Alta VIII | $439,834 | 100.0% | 150 | $2,932 | 25.9% | $3,018 |
| Alta IX | $416,097 | 100.0% | 132 | $3,152 | 26.6% | $3,157 |
| **Average** | | | | | | **$3,035** |
| **Sale Leaseback Transactions** | | | | | | |
| Alta I | $560,000 | 100.0% | 150 | $3,733 | 34.2% | $2,906 |
| Alta II | $440,250 | 93.0% | 150 | $3,156 | 28.7% | $2,926 |
| Alta III | $444,535 | 93.1% | 150 | $3,183 | 29.9% | $2,835 |
| Alta IV | $288,792 | 90.7% | 102 | $3,122 | 28.0% | $2,971 |
| Alta V | $488,003 | 93.8% | 168 | $3,097 | 27.6% | $2,989 |
| **Average** | | | | | | **$2,926** |

---

[6]     Net capacity factor for Altas II through V reflect the internal waking payments between these facilities.   Waking refers to the negative effect on one wind power facility's electrical production due to the effect on wind flow caused by a neighboring wind power facility. Payments are made by one facility to another to make up for any such waking.   Pagano, Tr. 414:10-16.

PX-0281, Demonstrative: Purchase Prices Paid for Eight Alta Facilities; Pagano, Tr. 171:2-176:25; PD-061, Demonstrative: Comparison of Sale-Leaseback and Outright Sale Prices; Blaydon, Tr. 1597:8-10; PX-0299.032-.033 ¶ 57, Blaydon Initial Expert Report (Oct. 23, 2015).

228.    As the table reflects, all of the Facilities were sold within a narrow price range – between $2,906 and $3,157 per kW.  The purchase prices paid in the sale-leaseback transactions for Altas I through V are thus entirely consistent with the purchase prices paid in the outright purchase transactions for Altas VI, VIII and IX on a per kilowatt basis, after adjusting for differences in production capacity.  Indeed, the average of the five sale-leaseback transaction prices is $109 per kW (about 3%) *lower* than the average of the three outright purchase transactions.

229.    This demonstrates that the sale-leaseback prices were not artificially inflated. If the sale-leaseback prices were somehow inflated by virtue of the sale-leaseback structure, one would expect the sale-leaseback prices to exceed the outright sale prices.  PX-0299.030-.031 ¶ 54, Blaydon Initial Expert Report (Oct. 23, 2015); Blaydon, Tr. 1597:1-5.  Because the sale-leaseback transaction prices were in fact *lower* on average than the outright sale prices, there is no basis to find that the sale-leaseback prices were inflated.  PX-0299.007 ¶ 12(b), PX-0299.033 ¶ 58; Blaydon, Tr. 1603:3-6.  This conclusion still holds true if one also adjusts for differences in the Facilities' PPA prices.  Blaydon, Tr. 1603:16-1604:1; PX-0299.033-.034 ¶ 59; PX-0303, Ex. 3 to Blaydon Report (Oct. 23, 2015).

230.    Courts in a few instances have found that a purchase price does not establish basis where the purchase price was clearly excessive and the parties entered into a separate agreement to which some of the purchase price should be allocated.  *See, e.g.*, *Lemmen v. Commissioner*, 77 T.C. 1326, 1348-49 (1981) (finding purchase price for cattle excessive, and

92

that part of price should be allocated to underpriced maintenance contract entered between same parties). In those situations, however, the purchase price was "highly inflated" in light of market evidence. *Lemmen*, 77 T.C. at 1348-49 ("it is clear that the stated price of herds was *highly inflated* above the market value of the animals" and that the simultaneously entered maintenance contract was "less than the cost of comparable service[s]" (emphasis added)); *Regan v. Commissioner*, T.C. Memo 1982-733, 1982 WL 11024, at *6 (Dec. 23, 1982) ("the … purchase price was *highly inflated* when compared to the . . . fair market value" (emphasis added)).

231.    There is no possible ground to reach that conclusion here, given that the average price paid by Plaintiffs in the Altas I through V sale-leaseback transactions was actually *lower* than the average price paid by the buyers in the Alta VI, VIII and IX outright purchase transactions (on a per kilowatt basis after adjusting for capacity factor). Thus, there is no ground to conclude that the Altas I through V purchase prices were inflated at all, much less that they were so "highly inflated" as to trigger application of the "peculiar circumstances" rule.

232.    That the sale-leaseback prices were not inflated — much less "highly inflated" — is further demonstrated by the fact that appraisals prepared by DAI at the times of the transactions determined that the transaction prices were consistent with fair market value. JX-0059.012, Alta II Appraisal (July 19, 2010); JX-0062.012, Alta III Appraisal (July 19, 2010); JX-0060.012, Alta IV Appraisal (July 19, 2010); JX-0061.012, Alta V Appraisal (July 19, 2010); JX-0112.013, Alta I Appraisal (Dec. 31, 2010).

233.    In addition, KPMG, the accounting firm retained to prepare certifications relating to each Facility (see Section IV.C, *infra*), tasked a valuation partner with experience in power plant valuations with reviewing DAI's work. He concluded that DAI's conclusions were reasonable. Johnston, Tr. 1235:4-1240:16; PX-0064.001, KPMG Evaluation of External Expert

93

for Alta I – DAI (Dec. 16, 2010); PX-0068.001, KPMG Evaluation of External Expert for Alta II – DAI (Dec. 12, 2010); PX-0076.001, KPMG Evaluation of External Expert for Alta III – DAI (Feb. 1, 2011); PX-0095.001, KPMG Evaluation of External Expert for Alta IV – DAI (Apr. 22, 2011); PX-0109.001, KPMG Evaluation of External Expert for Alta V – DAI (June 3, 2011).

234.    That the sale-leaseback prices were not artificially inflated is also demonstrated by the fact that the Alta I purchase price of $560 million was very close to the $550 million price offered by Brookfield to acquire the Alta I Facility in an outright purchase (without a leaseback).   PX-0299.026-.027 ¶ 44-45, Blaydon Initial Expert Report (Oct. 23, 2015).

235.    The sale-leaseback structure used for the Altas I-V transactions does not constitute a peculiar circumstance for the additional reason that the sale-leaseback has long been recognized as "a commercially acceptable device which affords significant advantages to both purchaser-lessor and seller-lessee." *In re S.F. Indus. Park, Inc.*, 307 F. Supp. 271, 276 (N.D. Cal. 1969); *see also, e.g.*, *In re Barracuda Tanker Corp.*, 281 F. Supp. 228, 231-32 (S.D.N.Y. 1968) ("The transaction between Barracuda and Union is similar to the 'sale-leaseback' arrangements commonly used in real estate transactions."); *In re Cont'l Airlines, Inc.*, 932 F.2d 282, 293 (3d Cir. 1991) ("Sale-leasebacks have been used in the transportation industry for some time."); Michael Cole, *Using Governmental Incentives to Finance Solar Renewable Energy Projects: Alternative Investments for High-Net-Worth Individuals*, 1 LSU J. Energy L. & Res. 67, 77 (2012) (sale-leasebacks are "common structures used in [renewable energy project] transactions"); *see also CIT Grp./Equip. Fin., Inc. v. Condere Corp.*, 65 F. App'x 509, 2003 WL 1922992, at *1 (5th Cir. Apr. 3, 2003) (describing sale-leaseback as "a common commercial transaction").

94

236.    There are multiple reasons for parties to use a sale-leaseback structure.  Most relevant to the renewable energy context, the structure allows a financial institution with capital but no development or operational expertise to provide capital to developers that have development and operational expertise but limited access to capital.  Revock, Tr. 690:11-691:3 (describing lack of operational expertise and reasons for engaging in sale-leasebacks).  In a sale-leaseback, the financial institution (buyer) can use its capital to purchase and own a power facility and, in turn, lease it back to the developer who has the expertise to operate it.

237.    Another important purpose of a sale-leaseback is to utilize more effectively tax benefits associated with the asset.  Many renewable energy developers are not able to efficiently make use of these substantial benefits.  Through the sale-leaseback structure, the tax benefits available to the owner of the renewable energy property can be used by the purchaser/lessor.  *See, e.g.*, *Frank Lyon Co. v. United States*, 435 U.S. 561, 580-81 (1978) (purchaser in sale-leaseback transaction is entitled to take depreciation deductions); *Sacks v. Commissioner*, 69 F.3d 982, 986 (9th Cir. 1995) (in a sale-leaseback, "the buyer-lessor may deduct depreciation and take tax credits").

238.    Terra-Gen viewed the sale-leaseback structure as providing a number of important benefits here for the initial Alta phases.  First, Terra-Gen was "anxious to maintain a presence in Tehachapi and maintain a very active role within the Alta franchise," in large part because that would help it build out the later phases of the Alta Wind Energy Center.  Pagano, Tr. 164:8-17, 186:3-11, 313:8-18.  By contrast, with outright sales Terra-Gen might not have maintained any presence at all, and even if it were selected as an operator it would have less of a firm presence than it would have under a fixed-term lease.  Pagano, Tr. 165:15-166:9, 167:2-4.  Maintaining a presence was of such importance to Terra-Gen that it would have preferred not

95

to sell the early Alta phases at all, if it would have been eligible to obtain a cash grant. Pagano, Tr. 166:15-17.

239.    Second, outright sales to a competitor for the initial Alta phases (instead of sale-leasebacks) could have resulted in additional development challenges for future phases – for instance, it would likely have been more difficult to obtain an easement from a direct competitor that purchased one of the Alta Facilities than from a financial institution like Citibank. Pagano, Tr. 167:8-17, 313:8-18. This was a "very important factor[]" in Terra-Gen's decisionmaking as to whether to sell the initial Alta phases outright or instead to use the sale-leaseback structure. Pagano, Tr. 167:5-17. An outright sale likely would have to have been to a competing energy company, because non-competitors, *i.e.*, financial institutions like Citibank, do not have the operational experience to operate wind farms themselves. Revock, Tr. 690:11-23; *see also* Markowitz, Tr. 929:24-930:6 (explaining why Union Bank would not want to purchase a wind farm outright); *see generally* Pagano, Tr. 171:17-24.

240.    Finally, if Terra-Gen was successful in operating the initial Alta phases, it would earn cash flows from operations, because Terra-Gen, as the lessee-operator, was entitled to any cash flows in excess of expenses and rent payments to the owner-lessors. Pagano, Tr. 530:3-7; *see also* Revock, Tr. 791:24-792:6.

241.    That the sale-leaseback prices were not artificially inflated is also demonstrated by the fact that the Alta II-V purchase prices were determined completely independently of the terms and conditions of the leasebacks. Revock, Tr. 745:23-747:25 (explaining that terms and conditions of the Alta II-V leases had no bearing on the purchase price determination).

96

242.     The rent prepayments that were part of the sale-leaseback transactions also do not render those transactions "peculiar." Sale-leaseback transactions often contain a rent prepayment, whereby the seller-lessee makes a significant rent payment to the buyer-lessor early within the lease term, often on the day the lease commences.  Revock, Tr. 748:22-749:16. Indeed, this is a standard feature of sale-leaseback transactions.  Revock, Tr. 749:17-750:4.  Rent prepayments typically range between 15 and 20 percent of a facility's purchase price where, as here, a facility's cash flows are the only source for rent payments, *i.e.*, where the lessor has no recourse to the lessee's other assets if the lessee defaults on its rent obligations.  Revock, Tr. 748:25-749:16, 752:2-5.  The prepayments for the Alta I-V Facilities all were within that typical 15-20 percent range.    Revock, Tr. 753:13-24; PD-002, Demonstrative: Alta II-V Lease Prepayments; PX-013.089, Alta II-V Equity Commitment Letter (June 18, 2010); JX-0209.093, Schedule 1 to Alta I Facility Lease (OL C) (Dec. 31, 2010).

243.     Rent prepayments serve a number of purposes.  One function is to ensure that the lessee operator has "skin in the game" so that it has a strong incentive not to walk away from its obligations under the lease if the project is less productive than anticipated.  Pagano, Tr. 531:1-532:17; Revock, 748:22-749:16, 791:10-792:6, 818:10-17; *see* Markowitz, 978:4-16.  This incentive exists because the lessee will forfeit the prepayment if it defaults on its obligations; it is only by continuing to make rent payments and operating the facility that it can earn back its prepayment and make a profit on facility revenues in excess of it ongoing lease payments. *Id.*  In this respect, rent prepayments are analogous to a tenant's payment of the first and last month's rent when leasing an apartment.  *See* Revock, Tr. 762:19-763:2; *see* Markowitz, Tr. 977:11-21 (analogizing lease prepayments to an upfront payment when leasing a car).    The tenant is

incentivized to keep the apartment in good condition because he will otherwise lose that last month's rent at the end of the lease term. Revock, Tr. 762:19-763:2.

244. Rent prepayments also lower the periodic lease payments due under a lease. Revock, Tr. 748:22-25. Because more rent is due up-front, less is due over time. Revock, Tr. 754:13-16. This increases the "coverage ratio," *i.e.*, the ratio of the expected income of the facility to the lease payments, and thus provides the lessor with greater confidence that the facility's cash flows from electricity sales will be sufficient to cover the rental payments that are due over time. Revock, Tr. 755:11-19 (defining coverage ratio); *see* Markowitz, Tr. 978:17-979:6 (a stronger coverage ratio helps ensure that the lessee will make its lease payments).

245. Accordingly, there was nothing at all peculiar about the rent prepayments for the Alta I-V Facilities. The existence and amounts of the prepayments had no bearing on the purchase prices, which as noted earlier were essentially the same for the five sale-leasebacks as for the three outright purchases. PX-0281, Demonstrative: Purchase Prices Paid for Eight Alta Facilities; Pagano, Tr. 175:10-176:1; Revock, Tr. 818:18-23.

246. Where, as here, a sale-leaseback has economic substance and legitimate business purposes, the transaction is fully respected, a conclusion that is unaffected by the tax benefits generated. *Frank Lyon Co. v. United States*, 435 U.S. 561, 580, 583-84 (1978) (sale leaseback held to have economic substance, with the Court noting that "[w]e cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.").

247. Indeed, Treasury's own Guidance for the Section 1603 program explicitly contemplated the use of the sale-leaseback structure. JX-0126.009, Treasury Guidance (2011). The Guidance even sets forth specific rules that, for example, decide when the "placed in service" date will be determined in a sale-leaseback transaction. JX-0126.009, Treasury

98

Guidance (2011).   Both Terra-Gen and Citibank testified that they relied on this Treasury

Guidance in concluding that sale-leaseback structure could be used under the Section 1603

program and would be respected in determining the basis of eligible property.   Pagano, Tr.

168:7-17; Revock, Tr. 743:12-24.

248.       For all of these reasons, there is no foundation for the Government's

suggestion that use of the sale-leaseback structure constitutes a peculiar circumstance that would

warrant looking beyond the purchase price to determine fair market value.

### I.       Plaintiffs Purchased Qualified, Energy Producing Facilities.

249.       Plaintiffs each purchased an undivided interest in a fully developed,

constructed, tested, ready-to-operate energy facility.   Pagano, Tr. 156:9-19 (facilities were

successfully constructed and sold), 179:2-7 (Plaintiffs purchased undivided interests), 223:13-15

(same), 330:19-22 (same); *see, e.g.* JX-0205.001, Alta I Bill of Sale (OL C) (Dec. 31, 2010); JX-

0227.001, Alta II Bill of Sale (OL A) (Dec. 30, 2010); JX-0291.001, Alta III Bill of Sale (OL C)

(Apr. 13, 2011) JX-0349.001, Alta IV Bill of Sale (OL C) (May 20, 2011); JX-0409.001, Alta V

Bill of Sale (OL C) (June 13, 2011); JX-0467.005-.006, Alta VI Purchase Agreement (Mar. 31,

2012).

250.       The basis of such a facility, like any other property, is determined by what the

purchaser actually paid to buy it, *see* Sections III.B, III.H, *supra*.   The basis is not what a

purchaser hypothetically would have paid to purchase its individual components.   As the Court

of Claims explained:

> [W]e agree with plaintiffs that fair market value would take into account the fact
> that this buyer received (and was entitled under its contract to receive) a put-
> together plant in good all-round working shape, not a congeries of uncoordinated
> physical assets liable as not to fail to work as a unit.   The 'turnkey' product was
> worth more than the sum of the untested and uncoordinated parts, even though
> they were all constructed and installed in place.   Normally a buyer would pay an
> increment for such an assurance that the plant and equipment would all work

together without need of costly and time-consuming adjustments and coordination.

*Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 680 (Ct. Cl. 1974).

251.    Thus, there is a value, often a quite considerable value, associated with a facility being already or soon to be capable of operation.  *Id.* at 681 (describing turnkey value as "the increased value of the individual tangible assets because they were assembled, installed, integrated, tested, coordinated, and in operating order"); *see also, e.g.*, *Utilicorp*, T.C. Memo. 1997-47, 1997 WL 28654, at 7 ("The turnkey risk is the risk inherent in promising a working facility."); *see* PX-0326.016-.017 ¶¶ 7-8, Maydew Initial Expert Report (Oct. 23, 2015); Maydew, Tr. 1430:15-20.  ***Courts have uniformly recognized that this turnkey value is an incident of the tangible assets themselves, not a separate and distinct intangible.***  *Miami Valley Broad. Corp.*, 499 F.2d 677 at 681; *Utilicorp,* T.C. Memo. 1997-47, 1997 WL 28654, at *6-7. Professor Maydew testified to the same effect, explaining that, as an accounting matter, turnkey value is deemed part of the value of the underlying property.  Maydew, Tr. 1430:21-1431:5; PX-0326.016-.017 ¶ 7.

252.    Viewing the property as a whole makes perfect sense in the context of Section 1603.  Eligible property for purposes of the Section 1603 program is defined as "tangible property . . . [*which is*] *an integral part of a [wind energy] facility*," 26 U.S.C. § 48(a)(5)(D) (emphasis added); *id.* § 48(a)(5)(C); *id.* § 45(d)(1).  Treasury Guidance makes explicit that, to be grant-eligible, the property must be "installed, tested, and [ ] ready and capable of being used for its intended purpose" (the production of electricity).  Moreover, the facility must have been "placed in service," *i.e.*, it must be "ready and available for its specific use."  JX-0126.005, 010, Treasury Guidance (2011).

253.      Mr. Settle of NREL confirmed that, in order to be eligible for a Section 1603 grant, the facility must be placed in service, meaning that all the equipment would need to be constructed, permitted, assembled, tested, and capable of producing electricity.   Settle, Tr. 1304:10-1305:9.  Likewise, Ms. Neubauer, the Program Director of the Section 1603 program, agreed that property is eligible for the Section 1603 cash grant only if it is part of an integrated, energy-producing facility.  Neubauer, Tr. 1792:18-21.  Accordingly, the eligible property here must be valued as an "integral part" of an installed, tested, ready-for-use wind energy facility — *not* as a mere collection of uncoordinated physical assets.

254.      Furthermore, a facility can have not only turnkey value, but "synergistic value."  The IRS has recognized that a group of interrelated assets may have value above and beyond the value of each individual asset considered in isolation, but that ***such value is treated as part of the value (basis) of the assets themselves:*** "case law supports a conclusion that it is appropriate to value interrelated assets in the aggregate and that the synergistic value of a collection of assets is attributable to those assets . . . ."  I.R.S. Tech. Adv. Mem. ("TAM") 200907024, at 9 (Feb. 13, 2009).

255.      The TAM makes plain that synergistic value applies in the same fashion to all assets, both physical or other:

> The Network … should be considered as a single asset rather than the sum of individual assets.  There are many examples of circumstances in which it is more reliable to view a collection of assets in this manner.  For instance, a business that purchases a new car does not treat a portion of the cost as goodwill to the extent the price of the car exceeds the sum of the values of the car's parts.  Likewise, the business does not depreciate the car's separate parts but rather the car as a whole.

TAM 200907024, at 6.

256.      As both Terra-Gen and the buyers testified, the buyers purchased fully integrated energy facilities that were installed, tested, and ready for operation for their intended

purpose: to produce energy and sell it to Southern California Edison. Pagano, Tr. 173:4-6, 185:9-10, 239:4-6; Revock, Tr. 737:1-17, 801:3-6; Spencer, Tr. 864:11-14. The buyers were willing to pay a premium for the Alta Facilities because they received fully integrated and operational facilities, rather than a mere collection of turbines and other individual assets. Revock, Tr. 735:9-19, 737:6-738:4; *see also* Spencer, Tr. 864:2-18 (EverPower was purchasing more than a collection of turbines; it was important to EverPower to acquire an integrated facility).

257.    The eligible bases of the Alta Wind Lawsuit Facilities, as captured by the purchase prices paid, thus include turnkey value and synergistic value, both of which make the eligible property as a coordinated whole worth considerably more than the sum of the individual parts.

**J.    A Buyer's Basis Includes the Value of Any Tax Benefits or Other Government Benefits Associated with the Assets It Acquires.**

258.    The eligible bases of the Alta Wind Lawsuit Facilities also include the value of tax benefits associated with that property. As the Tax Court has explained, "[t]he Supreme Court … has recognized that the tax savings generated by an asset can be an identifiable component of its value, and that sophisticated taxpayers may consider such savings in assigning a value to property. 'We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.'" *IT&S of Iowa, Inc. v. Commissioner*, 97 T.C. 496, 532 n.28 (1991) (quoting *Frank Lyon Co. v. United States*, 35 U.S. 561, 580 (1978)); *see also Van Duzer v. Commissioner*, T.C. Memo. 1991-249 (June 5, 1991) (courts have long recognized that "Federal income tax laws affect and shape every business transaction, and parties to such transactions are entitled to take into account and to maximize favorable tax results so long as the transaction has economic substance and a business purpose . . . ."), *aff'd*, 9 F.3d 1555 (9th Cir. 1993).

259.    Accounting literature also reflects that the tax benefits and government incentives associated with an asset must be considered in determining the asset's value. Professor Maydew's own widely used textbook explains that "when two assets give rise to identical pretax cash flows, but the cash flows from one asset are taxed more favorably than those from the other asset, taxpayers will bid for the right to hold the tax-favored asset. As a result, the price of the tax-favored asset will increase relative to the price of the tax-disfavored asset." PX-0429.003, Scholes, Wolfson, Erickson, Hanlon, Maydew, and Shevlin, *Taxes and Business Strategy: A Planning Approach*, at 90 (2015); PX-0326.024 ¶ 1 (same); Maydew, Tr. 1398:20-1399:7. In other words, when property has a favorable tax treatment, buyers are willing to pay more for it. Maydew, Tr. 1399:8-15; *see* PX-0429.003; PX-0326.024 ¶ 1.

260.    Professor Maydew's textbook explains that "[f]avorable tax treatment can come in many forms, including tax-exemption of returns on that asset (as in the case of municipal bonds), accelerated depreciation for tax purposes, and tax credits for the purchase of particular types assets." PX-0429.004; PX-0326.026 ¶ 6. The textbook goes on to state that tax credits, including the investment tax credit, are a type of "tax-favored status" that "[i]nvestments may enjoy." PX-0429.004; PX-0326.024-.025 ¶ 3; Maydew, Tr. 1401:25-1402:12 (discussing textbook excerpt).

261.    The value accompanying favorable tax treatment is not treated as a separate asset; rather, that "[t]ax treatment is simply one component of the value of the asset itself." PX-0326.024 ¶ 1; Maydew, Tr. 1399:16-1400:8; *see also, e.g.*, Aswath Damodaran, Stern School of Business, *The Value of Synergy* 3 (Oct. 2005) (tax benefits are important components of property value).

262.     Professor Blaydon explained that this holds true from a finance and economics perspective as well. Purchasers typically consider tax attributes in determining how much to pay for assets, and valuation treatises make the point that tax attributes should be considered in assessing value. Blaydon, Tr. 1619:19-1620:5. Excluding tax benefits would understate the fair market value of assets. Blaydon, Tr. 1645:22-1646:5. Indeed, a leading textbook explains that "[f]irms sometimes obtain tax subsidies from the government for investing in specified areas or types of businesses. These tax subsidies can either take the form of reduced tax rates or tax credits. Either way, these subsidies should increase the value of the firm." PD-067, Demonstrative: Discounted Cash Flow Analysis (excerpt Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* 255 (2d ed. 2002); Blaydon, Tr. 1645:9-13.

263.     Courts have thus explicitly recognized that one must include the value of tax benefits in determining basis, because "[a] willing buyer would most certainly consider the availability of . . . tax credits when determining the fair cash value of the property." *In re Creekside Sr. Apartments, LP*, 477 B.R. 40, 60 (B.A.P. 6th Cir. 2012) (citation and quotation marks omitted). This is because a buyer would consider "both the benefits and the burdens associated with property ownership." *Id.* Tax benefits can have "a significant impact on the value of the property and must, therefore, be analyzed when determining the fair value of the property." *Id.* at 58.

264.     Other decisions are to the same effect. *E.g.*, *In re Lewis & Clark Apartments, LP*, 479 B.R. 47, 53-54 (B.A.P. 8th Cir. 2012) ("In the same way that [price] caps and other restrictions on use of the property may affect its value negatively, the tax credits available to the owners as a result affect its value positively. For that reason, valuation without consideration of

104

the tax credits does not accurately reflect what a willing buyer would pay to purchase the property from the Debtor."); *Van Duzer*, T.C. Memo. 1991-249 (approving of valuation that included "the Federal and State tax benefits petitioners expected to receive from the windfarms"); *Sacks v. Commissioner*, 69 F.3d 982, 991 (9th Cir. 1995) (investors are entitled to "tak[e] depreciation deductions and tax credits [based on the purchase price] even though the investor paid more because [the investor] anticipated the benefit of the depreciation deductions" (citation and quotation mark omitted)); *Utilicorp United, Inc. v. Commissioner*, T.C. Memo. 1997-47, 1997 WL 28654, at *1 (Jan. 27, 1997) (approving valuation incorporating income tax considerations); *Meredith Corp. v. Commissioner*, 102 T.C. 406, 461-62 (1994) (where a party to a transaction included tax benefits "in determining a reasonable purchase price" and there was no "substantial doubt that such tax benefits would ultimately be allowed," inclusion of the tax benefits in the income approach to valuation was proper); *Peoples Bancorporation* v. *Commissioner*, T.C. Memo. 1992-285, 1992 WL 103657 (May 18, 1992) (approving taxpayers' inclusion as "part of the value the full tax benefit of amortization of the core deposits using a reasonable method."); *In re De Leon*, No. 11-56921–ASW, 2013 WL 3805733, at *9 (Bankr. N.D. Cal. July 18, 2013) (following *In re Lewis & Clark Apartments* and explaining that "an analysis of a property's fair market value . . . should take into account any tax credits which accrue to the owner of the property, because the existence of the tax credits have an impact on what a buyer would be willing to pay for the property"); *Pine Pointe Hous., L.P. v. Lowndes Cty. Bd. of Tax Assessors*, 561 S.E.2d 860, 863 (Ga. Ct. App. 2002) ("[When] tax credits are generated by a designated property, a third party would pay for the value as part of that property's sale price in a bona fide, arm's length transaction."); *Antisdale v. City of Galesburg*, 362 N.W.2d 632, 641 (Mich. 1984) ("To the extent that tax benefits to a typical owner affect the

105

'usual selling price' of property, they are properly included within the true cash value of the property."); *Country Club Estates v. Supervisor of Assessments of Montgomery Cty.*, No. 1894, 1986 WL 3416, at *5 (Md. Tax Ct. Apr. 24, 1986) ("We find that where income producing property has attached to it favorable financing and other tax related benefits yet income generating restrictions, the willing purchaser will be one wishing to obtain those benefits of ownership of such property.  Therefore, the approach to valuing the property for property tax purposes should include the consideration of those benefits.  Just as . . . the failure to consider contract rent of an income producing property is at odds with the willing seller-willing purchaser approach to market value, so too, the failure to consider the tax benefits of the property undermines this long recognized approach."); *Brandon Bay, Ltd. P'ship v. Payette Cty.*, 132 P.3d 438, 442 (Idaho 2006) ("When determining the market value of low-income housing developments, the value of [low income housing] tax credits should be included in the assessment.").

## IV.   The Purchase Prices Were Appropriately Allocated between Eligible Tangible Property and Ineligible Tangible Property.

### A.   What Constitutes Eligible and Ineligible Property.

265.   Section 1603 provides for cash grants equal to 30% of the basis of the "specified energy property," which Section 1603(d) defines in relevant part as "qualified property" that is part of a wind facility under Section 48 of the Internal Revenue Code.  Section 48 in turn defines qualified property as "tangible property . . . but only if such property is used as an integral part" of the wind energy facility.  26 U.S.C. § 48(a)(5)(D); *id.* § 48(a)(5)(C); *id.* § 45(d)(1).

266.   Property is "used as an integral part . . . if it is used directly in the activity and is essential to the completeness of the activity," Treas. Reg. § 1.48-1(d)(4), a definition

106

interpreted broadly by the Tax Court and the Court of Federal Claims. *See, e.g.*, *New England Elec. Sys. v. United States*, 28 Fed. Cl. 720, 724-25 (1993) (property "is used as an integral part of an activity if it is used directly in the activity and is essential to the completeness of [that] activity[,]" and "courts have interpreted these requirements quite broadly" (emphasis omitted)). As Mr. Settle, a Senior Project Leader with NREL, explained, the "activity" performed at a wind farm is the production of electricity. Settle, Tr. 1300:12-15.

267. IRS guidance issued in 2013 relating to the Section 48 ITC program provides that eligible property includes "property integral to the production of electricity," which includes "[r]oads that are integral to the facility," including "roads for equipment to operate and maintain the qualified facility." I.R.S. Notice 2013-29, § 4 (May 13, 2013), *available at* https://www.irs.gov/irb/2013-20_IRB/ar09.html. The IRS guidance further specifies that step-up transformers and similar power conditioning equipment are eligible, explaining that "physical work on a custom-designed transformer that steps up the voltage of electricity produced at the facility to the voltage needed for transmission is physical work of a significant nature with respect to the facility because power conditioning equipment is an integral part of the activity performed by the facility." *Id.* Treasury's Section 1603 program guidance adopted the same tests. JX-0126.011, Treasury Guidance (2011); *see also RP1 Fuel Cell, LLC v. United States*, 120 Fed. Cl. 288, 359 (2015) ("Treasury's guidance document issued for the Section 1603 program … happens to have been based on the language of Treasury Regulation § 1.48–1(d)(4)").

268. The Treasury Guidance goes on to explain:

Property is an integral part of a qualified facility if the property is used directly in the qualified facility and is essential to the completeness of the activity performed in that facility. Roadways and paved parking areas located at the qualified facility and used for transport of material to be processed at the facility or equipment to

107

be used in maintaining and operating the facility are integral to the activity performed there, but roadways or paved parking lots that provide solely for employee and visitor vehicle traffic are not an integral part [of] a qualified facility.  Property is considered used as an integral part of a qualified facility if so used either by the owner of the property or by the lessee of the property.

. . .

For qualified property that generates electricity, qualified property includes storage devices, power conditioning equipment, transfer equipment, and parts related to the functioning of those items but does not include any electrical transmission equipment, such as transmission lines and towers, or any equipment beyond the electrical transmission stage, such as transformers and distribution lines.

JX-0126.011-.012.

### B.      The Vast Majority of the Costs at a Wind Farm Are Eligible.

269.      For wind power facilities, the vast majority of total costs are typically eligible. As Mr. Settle of NREL explained, most items of equipment at a wind farm are eligible, including: the turbines, turbine towers, turbine foundations, turbine access and service roads, set pad transformers, electrical collection systems, step-up transformers, SCADA-related items, switchgears and J-boxes, and meteorological towers.  Settle, Tr. 1300:21-1301:24.  Ineligible property includes roads used solely for employee or visitor vehicle traffic, electrical transmission equipment, equipment beyond the electrical transmission stages, and raw land.  Settle, Tr. 1303:24-1304:9.

270.      Mr. Settle testified that both the industry and NREL accept, as a rule of thumb, that generally 95 percent of the construction costs of a wind farm are eligible.  Settle, Tr. 1305:15-1306:7.  Indeed, Mr. Settle noted that NREL "tested" this 95% ratio "early on multiple projects and determined that a good representation is 5 percent nonqualifying, 95 percent eligible out of total project costs."  Settle, Tr. 1309:3-1310:9, 1314:11-23.  Ms. Neubauer of Treasury

108

agreed that, given Mr. Settle's experience with the Section 1603 program, he should know the typical ratio of eligible to ineligible property.  Neubauer, Tr. 1783:2-15.

271.    With respect to the Alta I Facility specifically, Mr. Settle found it perfectly reasonable that it would cost $400 million to construct the Facility, and that he would except that "more than 95 percent of this cost is eligible."  Settle, Tr. 1318:18-1320:8.  Mr. Revock of Citibank also testified that he has typically seen at least a 95% eligible ratio in the dozens of wind farm transactions in which he has been involved.  Revock, Tr. 728:8-25.

### C.    KPMG's Certifications of Eligible Costs for the Alta Facilities.

272.    Treasury required companies applying for a Section 1603 grant to provide an opinion from an independent auditor validating the claimed grant-eligible costs.  KPMG was retained to examine, and prepare an opinion validating, the Plaintiffs' claimed eligible costs. Johnston, Tr. 1215:17-20, 1216:8-16.

273.    KPMG is one of the "Big 4" accounting firms that specializes in audit, tax, and advisory services.  Johnston, Tr. 1213:18-21.  KPMG has performed Section 1603 work for clients other than the Alta Wind Facilities.  Johnston, Tr. 1216:17-19.  Ms. Neubauer, the Section 1603 Program Director, acknowledged that KPMG (1) has performed a lot of work in the Section 1603 area, (2) generally does quality work, (3) is qualified to perform allocation work, and (4) would be expected to perform such allocation work in accordance with the generally high quality of the firm's work.  Neubauer, Tr. 1781:15-20, 1782:1-12.

274.    The KPMG team was led by Anthony Johnston, a KPMG audit partner, because the ultimate Treasury requirement under the Section 1603 program was that an audit opinion be submitted certifying the claimed grant-eligible basis.  Johnston, Tr. 1218:8-18; Huplosky, Tr. 1040:22-24 (noting that obtaining a certification was a condition of receiving a grant).  Mr. Johnston is a certified public accountant, with a bachelor's degree in accounting and

an MBA from Columbia University.  Johnston, Tr. 1213:22-1214:12.  Mr. Johnston brought in a variety of other specialists at KPMG to work on various aspects of the engagement, as discussed below.  Johnston, Tr. 1218:1-18.  Mr. Johnston and the other members of the KPMG team spent at least 1,000 hours working on the Altas I-V certifications alone.  Johnston Tr., 1245:4-13.

275.    KPMG worked with Terra-Gen to prepare the certifications, with Terra-Gen's Director of Tax, Damon Huplosky of Terra-Gen, serving as principal contact.  Huplosky, Tr. 1040:6-11.  Mr. Huplosky was involved both because the transaction documents provided that Terra-Gen would help Plaintiffs in the preparation of their cash grant applications, and because Terra-Gen possessed the needed data regarding its construction costs.  Huplosky, Tr. 1041:6-11.

276.    KPMG prepared two kinds of certifications for each of the Altas I-V facilities. The first certification addressed the costs incurred to build the facilities.  The second addressed the purchase price paid by the Plaintiffs to purchase the facilities, and the proper allocation of that purchase price between eligible and ineligible property.  Johnston, Tr. 1221:18-1222:6; Rec. Doc. 115, Stipulation of Facts ¶ 24.

### 1.    The certification regarding the costs incurred to build the facilities.

277.    Terra-Gen and KPMG first evaluated the costs incurred by Terra-Gen to construct each component of the Facility, and determined which of these  costs  were eligible and which were ineligible.  This involved assessing over 200 different categories of costs for each Facility.  Huplosky, Tr. 1038:12-24; *see also* JX-0168.001-.005, KPMG Alta I Cost Segregation Report (Dec. 29, 2010).

278.    The information concerning the costs incurred to construct each Facility was initially provided by Terra-Gen's accounting group.  Huplosky, Tr. 1041:12-21.  Both Terra-Gen and KPMG evaluated whether particular costs were eligible or ineligible.  Terra-Gen relied on Treasury's Section 1603 Guidance to determine what costs were eligible, and, in accordance

with that guidance, classified as eligible the items that were necessary to create electricity, and classified as ineligible items that were not.  Huplosky, Tr. 1041:22-1044:6.

279.    Members of KPMG's Fixed Assets team then reviewed these determinations. Johnston, Tr. 1229:18-1230:5, 1282:6-16; Huplosky, Tr. 1044:7-9.  Kevin Turk of KPMG headed that team.  Johnston, Tr. 1230:6-7.  Mr. Turk, an engineer, had extensive experience in performing cost segregations.  Indeed, Mr. Turk spent the vast majority of his time over a two or three year period working on Section 1603 cost segregation engagements.  Johnston, Tr. 1230:8-21; Huplosky, Tr. 1044:10-1045:1.

280.    In conducting his evaluations, Mr. Turk reviewed key documents, including the turbine supply agreement, balance of plant agreement, interconnection agreement, and project schematics, and also conducted a site visit to the Alta Wind Facilities.  Johnston, Tr. 1230:22-1231:2, 1232:4-21.

281.    While Terra-Gen and KPMG both evaluated whether costs qualified as eligible or ineligible, KPMG's view controlled.  Huplosky, Tr. 1045:2-5, 1078:10-15; Johnston Tr. 1221:3-17.  For example, Terra-Gen initially took the position that fencing to keep endangered tortoises away from the construction site was partially eligible, but KPMG advised that such costs were ineligible, and that was how the cost was treated.  Huplosky, Tr. 1133:21-1134:16.

282.    The costs evaluated by Terra-Gen and KPMG included both direct and indirect costs.  Direct costs are those that are easily traceable to an asset, and are sometimes called "hard costs."  For instance, costs for substation equipment or turbines would be direct costs.  Indirect costs, sometimes called "soft costs," are costs that relate to a number of different

111

assets.  For instance, interest during construction and certain permitting costs that relate to the entire Facility are indirect costs.  Huplosky, Tr. 1045:6-1046:5.

283.    Consistent with Treasury's Section 1603 Guidance and Internal Revenue Code Section 263A, Terra-Gen "capitalized" the indirect costs into the hard assets — meaning that the indirect cost effectively becomes part of the hard asset.  Huplosky, Tr. 1046:6-1048:17. In some instances, indirect costs were entirely eligible — for instance, if they were associated with only eligible assets, such as permits for the wind turbines.  Huplosky, Tr. 1049:15-19.  In other instances, indirect costs were entirely ineligible, such as costs related solely to electricity transmission.  Huplosky, Tr. 1049:20-23.

284.    Finally, some indirect costs, like interest during construction, related to the entire Facility and were thus partially eligible and partially ineligible.  Such indirect costs were apportioned pro rata among all of the direct costs.  To illustrate, if the Facility's eligible direct costs were twice as high as the Facility's ineligible direct costs, then the indirect costs were spread among the direct cost items using the same 2:1 ratio.  Huplosky, Tr. 1049:24-1050:21. This is a common method of allocating indirect costs, including in the wind industry, and was approved by KPMG, which made the final decision on how indirect costs for the Alta Wind Lawsuit Facilities should be allocated.  Huplosky, Tr. 1051:1-24, 1094:14-16.

285.    In addition to classifying costs as eligible or ineligible, KPMG also confirmed that the costs had actually been incurred, a process referred to as the "vouching" of the costs. Huplosky, Tr. 1202:15-24, 1282:16-19.  Similar to how KPMG would audit financial statements, KPMG requested Terra-Gen invoices to verify that the costs had actually been incurred. Huplosky, Tr. 1076:15-1077:11.   KPMG reviewed key agreements and obtained source

documentation "to make sure that the costs were actually being incurred," and that "the company was actually paying for these costs." Johnston, Tr. 1219:8-19, 1225:7-12.

286.    KPMG vouched 80 percent or more of the construction costs for each Alta Wind Lawsuit Facility.   Johnston, Tr. 1220:7-10; *see also* Johnston, Tr. 1226:12-1227:22; 1228:9-1229:17; JX-0086.003, KPMG Alta Wind I Memo Documenting Cost Basis Procedures (Dec. 14, 2010) (stating that KPMG vouched over 83% of the Alta Wind I costs); JX-0091.003, KPMG Alta Wind II Memo Documenting Cost Basis Procedures (Dec. 17, 2010)  (stating that KPMG vouched over 93% of the Alta Wind II costs); JX-0122.003, KPMG Alta Wind III Memo Documenting Cost Basis Procedures (Jan. 24, 2011) (stating that KPMG vouched over 96% of the Alta Wind III costs); JX-0138.002, KPMG Alta Wind IV Memo Documenting Cost Basis Procedures (Apr. 21, 2011) (stating that KPMG vouched over 95% of the Alta Wind IV costs); JX-0146.002, KPMG Alta Wind V Memo Documenting Cost Basis Procedures (May 24, 2011) (stating that KPMG vouched over 93% of the Alta Wind V costs); JX-0181.003, KPMG Alta Wind VI Memo Documenting Cost Basis Procedures (Apr. 14, 2012) (stating that KPMG vouched over 93% of the Alta Wind VI costs).  KPMG was not actually required to vouch at least 80 percent of the costs, but did so in order to be thorough.  Johnston, Tr. 1225:13-1226:9.

287.    Based on this vouching work, KPMG verified "that management's assertion of the eligible cost basis" for each Facility in respect of Terra-Gen's construction costs "is accurately stated." Johnston, Tr. 1227:23-1229:17.

288.    KPMG issued a certification, known as a cost segregation report, that certified the amount of eligible costs that Terra-Gen incurred to construct the Alta I project.  Huplosky, Tr. 1052:18-1053:7; Johnston, Tr. 1222:12-1223:1; JX-0168.001-.005, KPMG Alta I Cost Segregation Report (Dec. 29, 2010).  The certification covered not only direct and indirect

113

construction costs, but also costs unrelated to construction, which were classified as ineligible. Huplosky, Tr. 1054:1-25; *see also* Huplosky, Tr. 1051:19-1052:14 (noting various non-construction costs, such as public relations costs, that were classified as ineligible).

289.    Similar cost segregation reports were prepared for the Altas II through V facilities, following essentially the same procedure. Huplosky, Tr. 1077:12-1078:12, 1113:23-1114:6; *see also* JX-0168.007-.012, KPMG Alta II Cost Segregation Report (Dec. 20, 2010); JX-0168.014-.017, KPMG Alta III Cost Segregation Report (Feb. 16, 2011); JX-0168.019-.022, KPMG Alta IV Cost Segregation Report (Apr. 29, 2011); JX-0168.024-.027, KPMG Alta V Cost Segregation Report (June 2, 2011). For Alta VI, a somewhat different type of document was prepared. Huplosky, Tr. 1078:19-1079:2; JX-0192, Mustang Hills Grant Study FMV Spreadsheet (June 17, 2012), but the process of allocating costs for Alta VI was essentially the same as that for Alta I. Huplosky, Tr. 1079:3-8, 1117:6-9.

### 2.    The pro rata method used to allocate the Alta purchase prices.

290.    The KPMG cost segregation reports and the comparable document prepared for Alta VI reflected a ratio of the eligible direct and indirect construction costs for each Alta Wind Lawsuit Facility to the total direct and indirect construction costs for the Facility. For those properties that involved the purchase of both eligible and ineligible property (Altas I and VI), this ratio was utilized to allocate the purchase price between eligible and ineligible property. Huplosky, Tr. 1094:19-25, 1117:6-9. (No allocation of the purchase prices between eligible and ineligible property was required for Altas II-V because only eligible property was sold to the buyers in the Alta II-V transactions. Huplosky, Tr. 1114:7-23; Blaydon, Tr. 1609:6-19.)

291.    The portion of the Alta I and VI purchase prices allocable to the eligible property was determined by multiplying the purchase price paid for the Facility as a whole by the ratio of eligible construction costs to total construction costs. For example, for Alta I, KPMG

114

and Terra-Gen determined that approximately 93.1% of total construction costs were incurred in connection with grant-eligible assets. This figure was derived by dividing the eligible construction costs of $399,666,440 by the total construction costs of $429,112,977.[7] Huplosky, Tr. 1095:1-1100:5; PD-031, Huplosky Demonstrative. The 93.1% eligible property figure for Alta I was then applied to the $560 million purchase price, to derive a $521,360,000 value for the Alta I grant-eligible property. Huplosky, Tr. 1080:6-16, 1100:6-15; PD-031, Huplosky Demonstrative.

292.    The pro rata allocation methodology was also used to determine the eligible portion of the purchase price for the Alta VI Facility. The eligible value was determined first by taking the $439,388,076 Alta VI purchase price and subtracting from that $4,990,345 in working capital and deferred financing costs associated with the Alta VI Facility. This yielded a remainder of $434,397,731, representing the purchase price for the Facility's tangible assets. That $434,397,731 amount was then multiplied by 96.9% — the ratio of eligible construction costs to total facility construction costs for the Alta VI Facility. This resulted in a $420,874,334 allocation of the Alta VI purchase price to eligible property. *See* Huplosky, Tr. 1117:6-1119:23; PD-032; Spencer, Tr. 866:22-867:1.

293.    All of the evidence in the record indicates that this pro rata allocation methodology is reasonable and correct. No evidence in the record suggests that this allocation methodology is unreasonable, inappropriate, or incorrect.

---

[7]    The $399,666,440 is the figure that appears as the total eligible construction costs on the KPMG cost segregation report for Alta I. JX-0168.005, KPMG Alta I Cost Segregation Report (Dec. 29, 2010). The $429,112,977 is arrived at by taking the $437,719,639 in total construction costs reflected on the KPMG cost segregation report and subtracting out non-construction-related costs, including working capital, land acquisition costs, and various other non-construction costs such as public relations. Huplosky, Tr. 1095:7-1099:2; PD-031, Huplosky Demonstrative.

294.    *First*, KPMG is itself expert on tax issues and carefully reviewed and approved this allocation methodology.  Huplosky, Tr. 1101:2-13, 1104:13-20.  Individuals from KPMG's Washington National Tax Office reviewed the methodology, led by Katherine Breaks.  Johnston, Tr. 1233:10-23.  Ms. Breaks has expertise relating to both tax rules and Section 1603 projects, and has performed work for other KPMG clients on Section 1603 issues.  Johnston, Tr. 1234:5-16.  Ms. Breaks and the Washington National Tax team concluded that the allocations, including the purchase price allocation, was consistent with tax principles.  Johnston, Tr. 1234:17-1235:3.   Indeed, Ms. Breaks prepared a memorandum relating to Alta I, which evaluated the purchase price allocation methodology and explained: "[t]he purchase price was allocated among the assets … pro rata based on the construction cost of those assets.  This was a permissible method under longstanding tax rules."  JX-0162.004, Memorandum from Katherine Breaks to Alta Wind I Purchasers (June 21, 2011); *see also* Huplosky, Tr. 1104:23-1106:18.

295.    Section 1603 Program Director Ms. Neubauer acknowledges that KPMG is qualified to do allocation work, and that she would expect KPMG to perform allocations in accordance with the firm's generally high quality of work.  Neubauer, Tr. 1782:1-12.

296.    *Second*, the value of the eligible and ineligible tangible property is in their ability jointly to produce and deliver electricity to the customer.  It is therefore logical and appropriate to allocate the purchase price for those purchase transactions that involved both eligible and ineligible property based on the relative cost to construct each.  This is a reasonable approach because the eligible property does not generate cash flows independent of the ineligible property, and likewise the ineligible property does not generate cash flows independent of the eligible property.  The pro rata purchase price allocation methodology captures that the *relative*

value of the eligible and ineligible property is reflected in their relative share of the cost of the entire Facility. PX-0328.020 ¶ 40, Blaydon Rebuttal Report (Dec. 4, 2015).

297.    Indeed, the pro rata approach is conservative with respect to the amount of the purchase prices allocated to eligible property. That is because the eligible property has characteristics, such as the availability of accelerated depreciation, bonus depreciation, and the Section 1603 cash grant, that make it more valuable as a relative matter than the ineligible property. That increased value, however, is not captured by allocating the purchase prices pro rata based simply on the relative costs to construct the eligible and ineligible property. Blaydon, Tr. 1607:20-1609:5.

298.    *Third*, tax accounting expert Professor Maydew testified that KPMG's methodology of allocating purchase price between grant-eligible and ineligible assets is a reasonable and widely-accepted accounting practice. Maydew, Tr. 1415:21-1416:1; [redacted]. Professor Maydew explained the general practice of allocating a lump sum purchase price among assets based upon their relative value, stressing that the allocated basis of each asset must add up to the overall basis, *i.e.,* the purchase price. He further explained that when allocating between eligible and ineligible property in the context of the sale of a wind facility, the allocation of the purchase price to the specific assets based upon their relative construction cost is a reasonable methodology. Maydew, Tr. 1411:20-1414:9, 1415:1-15; PX-0326.027-.028 ¶¶ 2-4, Maydew Initial Expert Report (Oct. 23, 2015); PD-038, Maydew Demonstrative; PD-039, Maydew Demonstrative. Professor Maydew also reviewed the specific methodology used by the Terra-Gen, Plaintiffs and KPMG to allocate the purchase price of the respective Alta Facilities between eligible and ineligible property and concluded that the methodology used was reasonable. Maydew, Tr. 1415:21-1416:20; PX-0329.006-007 ¶ 7.

117

299.    *Fourth*, Professor Maydew analyzed the cost allocation methods used for five other wind power facilities, namely Windpower 1993, Vasco Winds, Montezuma II, Pacific Wind, and Shiloh IV. He found that the accounting firms that provided cost certifications for those facilities had likewise determined the basis of the eligible property by allocating the purchase price between eligible and ineligible property based upon the relative costs of constructing the eligible and ineligible property. Maydew, Tr. 1416:21-1418:20; [redacted]. The use of this allocation methodology for these other wind power facilities was reviewed and approved by both Deloitte and Ernst & Young. Professor Maydew thus concluded that at least three of the "Big 4" accounting firms have approved and utilized the pro rata allocation method to determine the basis of eligible property at a wind power facility. Maydew, Tr. 1418:21-1419:14; [redacted].

300.    *Fifth*, Damon Huplosky testified that the pro rata approach is a very typical allocation method that he has used during the course of his tax work, including in a variety of contexts outside of the Section 1603 program. Huplosky Tr. 1080:17-1081:25. Indeed, eligible property for purposes of the Section 1603 program largely corresponds to what is referred to as 5-year MACRS property, which is a category used for depreciation purposes. The allocation of a purchase price for Section 1603 purposes is therefore conceptually quite similar to an allocation for depreciation purposes, and in that context it is routine to allocate the purchase price based on the pro rata methodology discussed above. Huplosky Tr. 1082:1-1083:1. Mr. Huplosky explained that all of the Big 4 accounting firms (Pricewaterhouse, Deloitte, Ernst & Young, as well as KPMG) have signed off on this pro rata methodology. Huplosky, Tr. 1081:3-7.

118

301.     *Sixth*, Mr. Revock, who negotiated the Alta II-V transactions for Citibank, testified that he performed dozens of purchase price allocations during his time doing valuation work at Deloitte, and that he always used the pro rata allocation approach.  To Mr. Revock's knowledge, there is no other way to perform a purchase price allocation between different categories of tangible assets.  Revock, Tr. 729:11-16, 730:8-732:4.

302.     *Seventh*, this methodology is also supported by accounting publications.  A CCH publication, titled *The Practical Guide to Cost Segregation*, explains that it is appropriate to allocate a purchase price among depreciable assets pro rata based on relative construction cost, as determined by a cost segregation study.  Huplosky, Tr. 1106:19-1108:20.  This is consistent with what was done for the Altas.  Huplosky, Tr. 1108:6-8.

303.     *Eighth*, Professor Blaydon endorsed this allocation methodology as being appropriate from an economic standpoint.  Professor Blaydon was on the board of LTV Corporation for about 15 years, and during that time LTV made a number of acquisitions.  Blaydon, Tr. 1604:18-1605:13.   Based on his experience, allocations between different depreciation classes are almost always required in connection with the purchase of a package of assets.  Blaydon, Tr. 1604:8-17.  Professor Blaydon described the pro rata methodology as a "common rule that is generally used in the industry."  Blaydon, Tr. 1605:17-1607:2, 1719:12-1720:5; PX-0299.086-.087 ¶ 167, Blaydon Initial Expert Report (Oct. 23, 2015).  Professor Blaydon further testified that the pro rata allocation methodology "makes sound economic sense" because parties financing different pieces of the construction of a facility would demand ownership stakes in the completed facility consistent with the amount of their investments in proportion to the overall cost of building the facility.  Those ownership stakes based on relative contribution to the construction of the facility would then represent each investor's claim on the

sale proceeds if the facility were sold.  Accordingly, it is economically logical to allocate the purchase price to the constructed assets in proportion to the cost to construct those assets. Blaydon, Tr. 1606:1-1607:2.

304.    Treasury has endorsed the use of "reasonable" allocation methodologies in other Section 1603 contexts.  For instance, where an item of equipment generates both electricity and steam (which is not eligible), Treasury's Section 1603 Guidance provides that "the costs must be *reasonably allocated* between the nonqualifying and qualifying activities."   JX-0126.017, Treasury Guidance (Apr. 2011) (emphasis added).   The pro rata allocation methodology used to allocate the Alta purchase prices between eligible and ineligible property is far *more* than reasonable, and thus far more than sufficient.

305.    The pro rata allocation method also is consistent with applicable case law and regulations, which require that a lump-sum purchase price for a group of assets be allocated among assets based on their relative value:

> In transactions where one lump-sum purchase price is paid for a conglomeration of assets—as is the case here—the cost of each asset must be determined by apportioning the purchase price among the assets according to each asset's relative fair market value at the time of the acquisition.  *See, e.g.*, *Bixby v. Comm'r*, 58 T.C. 757, 785, 1972 WL 2458 (1972) (holding that "when a taxpayer buys a mixed group of assets for a lump sum, the purchase price will be allocated among the assets in accordance with the relative value that each item bears to the total value of the group of the assets purchased"); *Victor Meat Co. v. Comm'r*, 52 T.C. 929, 931, 1969 WL 1734 (1969) (holding that "when a taxpayer buys a mixed aggregate of assets for a lump sum, an allocation of the purchase price will be made to the separate items upon the relative value of each item to the value of the whole"); [*C.D. Johnson Lumber Corp. v. Commissioner*], 12 T.C. 348, 363, 1949 WL 166 (1949) (same).

*Wash. Mut., Inc. v. United States*, 996 F. Supp. 2d 1095, 1104 (W.D. Wash. 2014).

306.    Likewise, IRS regulations provide that, if an entity acquires "a combination of depreciable and nondepreciable property for a lump sum," the "basis for depreciation cannot

120

exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of the acquisition bears to the value of the entire property at that time." Treas. Reg. § 1.167(a)-5. The IRS has also explained that, if land and a building are purchased for a lump-sum purchase price in excess of their assessed values, the purchase price should be allocated based on the relative assessed values. The IRS provides an example where a building and land are purchased for $100,000, the assessed value of the building is $60,000, and the assessed value of the land is $20,000, *i.e.*, a ratio of 3:1. The IRS instructs that the relative assessed values should be used to determine the allocation of the purchase price, *i.e.*, that the purchase price should be allocated pro rata between the building and the land based on their relative assessed values. In this example $75,000 should be allocated to the building and $25,000 to the land, *i.e.*, the purchase price should be allocated using the same 3:1 ratio derived from comparing the assessed values of the building and the land. I.R.S., Depreciation Frequently Asked Questions, FAQ 3, *available at* https://www.irs.gov/pub/irs-regs/depreciation_faqs_v2.pdf.

### 3. KPMG's certifications of eligible basis.

307. In addition to certifying that Terra-Gen's breakdown of the construction costs for the Alta Wind Lawsuit Facilities into eligible and ineligible components was reasonably stated, KPMG also issued a certification regarding the amount of the purchase price for each Alta Wind Lawsuit Facility that was eligible for a cash grant under Section 1603, utilizing the methodology described above. These certifications are sometimes known as fair market value or FMV certifications. Johnston, Tr. 1223:6-13; JX-0194.001, Altas I-VI FMV Certifications. The FMV certifications accurately reflected KPMG's conclusions, and were based on all of the work performed by KPMG. Johnston, Tr. 1247:11-21. Each certification explained that KPMG had "conduct[ed] [its examination] in accordance with attestation standards established by the

121

American Institute of Certified Public Accountants" and explained that the eligible basis for each Facility "has been determined in accordance with the general rules for determining the basis of property" under the Section 1603 program.    JX-0194.001.    KPMG prepared completion memoranda for each of the Altas I-VI facilities, which summarize the work KPMG performed in preparing the certifications.    Johnston, Tr. 1242:10-1244:23; JX-0090.001, KPMG Alta I Completion Memo (Dec. 17, 2010); JX-0085.001, KPMG Alta II Completion Memo (Dec. 13, 2010); JX-0123.001, KPMG Alta III Completion Memo (Jan. 31, 2011); JX-0137.001, KPMG Alta IV Completion Memo (Apr. 21, 2011); JX-0145.001, KPMG Alta V Completion Memo (May 24, 2011); JX-0180.001, KPMG Alta VI Completion Memo (Apr. 14, 2012).

308.    Accordingly, for Alta I, for instance, four separate certifications were issued by KPMG to each of the four Owner-Lessor purchasers (each of whom purchased a 25% undivided interest), certifying $130,340,000 in eligible costs, for a total of $521,360,000. Johnston, Tr. 1246:3-16; Huplosky, Tr. 1101:14-1102:12; JX-0194.001.[8]

309.    After Treasury declined to pay cash grants in the amounts requested for Alta I, KPMG took a second look at its conclusion regarding the eligible basis of the Alta Wind I Facility.    Johnston, Tr. 1250:11-1251:7, 1252:7-9; PX-0120.001, KPMG Letter to Ellen Neubauer (Sept. 19, 2011).    KPMG reviewed all of the correspondence with Treasury, including Treasury's explanation about why the grant amount sought was purportedly too high.    KPMG determined that its initial conclusion was correct and issued a letter recertifying that conclusion. Johnston, Tr. 1252:15-1253:1, 1253:12-1254:2; PX-0120.001.

---

[8]    The certifications for Altas II-VI are also contained in Joint Exhibit 194.  Huplosky, Tr. 1115:2-11, Johnston Tr. 1247:22-1248:12; *see also* JX-0194 (Alta Wind I-VI FMV Certifications).

**V.      Plaintiffs Are Entitled to the Award of Damages.**

310.      As demonstrated above, Plaintiffs' bases in the Facilities are determined by the purchase prices they paid.  The Alta II-V Plaintiffs purchased only eligible property so no allocation of the purchase prices between eligible and ineligible property was necessary.  For the Alta I and VI Plaintiffs (which purchased both eligible and ineligible property), the purchase prices were properly allocated between those two types of properties to establish the basis of each, pursuant to the methodology described in Section IV.C.2, *supra*.

311.      Each Plaintiff properly and timely applied to Treasury for a cash grant equal to 30% of the basis of its eligible property.  JX-0195.001, All Plaintiffs' Cash Grant Applications (2011-2012); Rec. Doc. 115, Stipulation of Facts ¶¶ 36-37.  [redacted]

312.      However, instead of paying the Plaintiffs cash grants equal to 30% of the basis of the eligible property as provided by Section 1603, the Government paid the cash grants based upon Terra-Gen's cost to construct each Facility.  JX-0196.001, Alta I-VI Cash Grant Award Letters (2011-2012); Pagano, Tr. 418:16-20.  *See also* Jaffe, Tr. 2014:12-18 (noting that all of the Alta awards were based on the schedule provided by Terra-Gen summarizing Terra-Gen's construction and development costs).

313.      For all the reasons stated above, Plaintiffs' applications were correct and the Government's methodology is wrong.  *See also* Maydew, Tr. 1455:16-1456:19 (Plaintiffs' applications were based on the correct methodology and the Government's awards were not).  Plaintiffs need only prove their case "by a preponderance of the evidence," *Lua v. United States*, 123 Fed. Cl. 269, 273 (2015) (collecting cases); *see also W.E. Partners*, 119 Fed. Cl. at 690 (analogizing Section 1603 suits to tax refund suits), meaning that "the existence of a fact is more probable than its nonexistence," *Velander v. Garner*, 348 F.3d 1359, 1370 (Fed. Cir. 2003) (citation omitted).  Plaintiffs have satisfied that standard here.

314.    Each Plaintiff is accordingly entitled to recover the difference between the cash grant it requested, and the cash grant Treasury actually awarded, as summarized in the following table. [The figures for eligible basis, cash grant to which each Plaintiff is entitled, and cash grant shortfall (damages) in the table have been adjusted downwards slightly to reflect a small allocation of value to land that Professor Blaydon has determined is appropriate, as further explained in Section XI.B, *infra*]:

| Plaintiff | Basis of Eligible Property | Cash Grant To Which Plaintiff is Entitled | Cash Grant Paid | Cash Grant Shortfall (Damages) |
|---|---|---|---|---|
| Alta I Owner Lessor C | $130,300,750 | $39,090,225 | $29,974,983 | $9,115,242 |
| Alta I Owner Lessor D | $130,300,750 | $39,090,225 | $29,974,983 | $9,115,242 |
| Alta II Owner Lessor A | $110,043,250 | $33,012,975 | $22,791,621 | $10,221,354 |
| Alta II Owner Lessor B | $110,043,250 | $33,012,975 | $22,791,621 | $10,221,354 |
| Alta II Owner Lessor C | $88,034,600 | $26,410,380 | $18,233,297 | $8,177,083 |
| Alta II Owner Lessor D | $66,025,950 | $19,807,785 | $13,674,973 | $6,132,812 |
| Alta II Owner Lessor E | $66,025,950 | $19,807,785 | $13,674,973 | $6,132,812 |
| Alta III Owner Lessor A | $110,993,750 | $33,298,125 | $23,093,966 | $10,204,159 |
| Alta III Owner Lessor B | $110,993,750 | $33,298,125 | $23,093,966 | $10,204,159 |
| Alta III Owner Lessor C | $110,993,750 | $33,298,125 | $23,093,966 | $10,204,159 |

| | | | |
|---|---|---|---|
| Alta III Owner Lessor D | $110,993,750 | $33,298,125 | $23,093,966 | $10,204,159 |
| Alta IV Owner Lessor A | $72,058,000 | $21,617,400 | $15,482,478 | $6,134,922 |
| Alta IV Owner Lessor B | $72,058,000 | $21,617,400 | $15,482,478 | $6,134,922 |
| Alta IV Owner Lessor C | $72,058,000 | $21,617,400 | $15,482,478 | $6,134,922 |
| Alta IV Owner Lessor D | $72,058,000 | $21,617,400 | $15,482,478 | $6,134,922 |
| Alta V Owner Lessor A | $121,860,750 | $36,558,225 | $25,649,674 | $10,908,551 |
| Alta V Owner Lessor B | $121,860,750 | $36,558,225 | $25,649,674 | $10,908,551 |
| Alta V Owner Lessor C | $121,860,750 | $36,558,225 | $25,649,674 | $10,908,551 |
| Alta V Owner Lessor D | $121,860,750 | $36,558,225 | $25,649,674 | $10,908,551 |
| Mustang Hills | $418,774,000 | $125,632,200 | $86,905,263 | $38,726,937 |

PD-069, Cash Grant Value and Treasury Payment Shortfall; Blaydon, Tr. 1627:16-1629:1; PX-0328.023-.024 ¶ 47, Blaydon Rebuttal Report (Dec. 4, 2015); Rec. Doc. 115, Stipulation of Facts ¶ 39.

125

**VI.    There Is No Reason to Look Beyond the Purchase Prices to Determine Plaintiffs' Bases.**

315.    For the reasons discussed above, one need not — indeed, under governing law, cannot — look beyond the purchase prices to determine the eligible bases of the Alta Wind Lawsuit Facilities.  Absent "peculiar circumstances," purchase price is dispositive of basis, and as shown above, there are no peculiar circumstances in connection with any of the Alta Wind Lawsuit Facilities.  Most of the remaining sections of these proposed findings of fact and conclusions of law are rendered irrelevant if the Court accepts this proposition.

316.    If the Court were to reject reliance on purchase price to establish basis, then basis would be determined by the Facilities' fair market values, as determined by traditional valuation methodologies (although all methods are not equally suited to the task, as explained below).  *See generally, e.g.*, *MacKenzie*, 714 F. Supp. at 271 ("Generally, … in those cases in which courts limited the basis of an asset to its fair market value, the courts found that the taxpayers were not dealing at arms-length, that there was not a real indebtedness, or that there was not a bona fide business purpose."); *Van Duzer*, T.C. Memo. 1991-249 (if basis is not established by the purchase price, then "the basis of property for tax purposes may be limited to its fair market value at the time of purchase"); *Regan*, T.C. Memo 1982-733, at *7-8 (same); *Lemmen*, 77 T.C. at 1348 (same).

317.    There is no need to resort to any of these methodologies because "the market spoke.  It set a fair value, and the allocation methods to what is eligible is appropriate for those where it was required," and so that should be "the end of the story right there."  Blaydon, Tr. 1629:2-9.

126

318.    Nevertheless, if one were to apply any of the three valuation methods (the income approach, the comparable sales approach, and the cost approach,  Blaydon, Tr. 1631:14-20), they would all fully support Plaintiffs' claimed cost bases.

319.    The income approach determines fair market value based on the "earnings that reasonably could be expected to be derived from the property, discounted for risks and other variables, to arrive at a present value." *Cane Tenn., Inc. v. United States*, 71 Fed. Cl. 432, 438 (2005), *aff'd*, 214 F. App'x 978 (Fed. Cir. 2007) (citation and quotation marks omitted).  The comparable sales approach determines fair market value based on a comparison of the property at issue to other comparable properties that have been sold.  *Id.*  The cost approach determines value based on an estimate of "the cost to replace the property, less depreciation, at a different but comparable site."  *Id.* at 438-39 (citation and quotation marks omitted).  This includes a "turnkey fee and developer's profit," which "represent different components of the reproduction cost." *Utilicorp*, T.C. Memo 1997-47, at *7.

320.    All of these valuation methodologies support values equal to, or higher than, the basis claimed in Plaintiffs' cash grant applications.   These methodologies accordingly support in their entirety Plaintiffs' claims to an award of the difference between the cash grants they seek and the grants they were awarded.

## VII.  The Income Method of Valuation Establishes a Value In Excess of the Claimed Bases.

### A.    If the Purchase Prices Are Not Viewed as Dispositive of Basis, the Income Approach Is the Best Method for Determining the Fair Market Value of the Facilities.

321.    Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  Treas. Reg. § 1.170A-1(c)(2); *see also*

Treas. Regs. §§ 1.148-5(d)(6), 1.704-4(a)(3), *and* 1.897-1(o)(2); *McShain v. Commissioner*, 71 T.C. 998 (1979); PX-0299.017 ¶ 25, Blaydon Initial Expert Report (Oct. 23, 2015).

322.     Where the purchase price is not dispositive of the basis of property, the Court of Claims has said that "the next strongest evidence is the property's projected earnings," known as the income approach (sometimes referred to as a "discounted cash flow" approach). *Hermes Consol. Inc. v. United States*, 14 Cl. Ct. 398, 412 (1988). Indeed, Professor Blaydon testified that, in those circumstances where there is no purchase price that establishes basis, the income approach is the "gold standard" valuation methodology, and the most reliable. Blaydon, Tr. 1631:21-1632:4. For instance, McKinsey's treatise on valuation explains that the income approach "is the most accurate and flexible method for valuing projects, divisions, and companies." PD-070, Demonstrative: Discounted Cash Flow Analysis; Blaydon, Tr. 1632:20-1633:4.

323.     Mr. Pagano, Mr. Revock, Mr. Markowitz, and Mr. Spencer, all of whom (as described herein) have extensive experience with valuation, also testified that the income or discounted cash flow approach is the preferred method to determine a property's value. Pagano, Tr. 201:11-202:12 (the discounted cash flow method is "[v]irtually always" used in the real world and is the favored method); Revock, Tr. 693:10-694:2 (discounted cash flow valuation approach is the one that he has typically used to value investments over his career, at both Citibank and CapitalOne); Markowitz, Tr. 980:9-25 (discounted cash flow analysis is the "fundamental way" to determine a reasonable purchase price); Spencer, Tr. 834:13-19 (the "discounted cash flow for the [Alta VI] project" was the "primary factor in determining the price that [EverPower was] willing to pay").

128

324.     Under the income approach, "the value of a particular piece of property is shown by calculating the present value of the income the property could be expected to generate over its useful economic life." *Cane Tenn.*, 71 Fed. Cl. at 438 (citation and quotation marks omitted).

325.     The income approach is particularly important and appropriate where a property is an income-producing asset, because "it speaks to the fundamentals of what creates value; namely . . . expectations of future income in the marketplace." Blaydon, Tr. 1632:11-16; *see also* PX-0299.034-.035 ¶ 61, Blaydon Initial Expert Report (Oct. 23, 2015) (the income approach is "based on the fundamental principle of modern finance that the value of an asset is equal to the present value of the cash flows that it is expected to generate in the future"). This is the principal and most appropriate valuation method used for the kinds of properties at issue in this lawsuit because their value is derived from their ability to generate income and is the method that parties to transactions to buy and sell income-producing property (including the parties here) typically use in assessing value. That all of the buyers here used the income approach to value the facilities is what one would expect, because that is how income-generating assets are valued in the marketplace. Blaydon, Tr. 1594:19-1595:5; PX-0299.035-.036 ¶ 62, Blaydon Initial Expert Report (Oct. 23, 2015). Indeed, as Ms. Neubauer, the Section 1603 Program Director, admitted, the income approach is the only approach to valuation that captures the value associated with the Altas being located in an area that is a proven wind resource. Neubauer, Tr. 1791:9-14.

326.     Valuations of the Alta Wind Lawsuit Facilities need to be of the facilities as a whole, because it is each facility as an integrated plant that creates and transmits the electricity that results in the income. Blaydon, Tr. 1562:10-19, 1563:11-17. It would be inappropriate to

perform a valuation by adding up the separate values of various components of a facility – for instance, in valuing a house, one would not add up the separate values of the shingles and floor tiles and pipes, but rather would value the house as a whole. Blaydon, Tr. 1564:20-1565:2.

327.    Valuing the facility as an integrated whole is also appropriate given the Section 1603 requirement that a facility be installed, assembled, in working order, and capable of generating electricity, *see* ¶¶ 252-253 *supra*. It would be fundamentally inconsistent to require that a facility be an integrated, operational facility, but then value it as though it were a series of disconnected, uncoordinated, unassembled parts. *See* Blaydon, Tr. 1566:5-9 (explaining that this requirement dictates that the facility be valued as an integrated facility). *See generally* Section III.I *supra*.

**B.    The Income Method Establishes Values that Fully Support the Bases Claimed for the Alta Wind Facilities.**

328.    Professor Blaydon applied the income approach as an external test for his conclusion that the purchase prices for the Alta Wind Lawsuit Facilities reliably establish their fair market values. Blaydon, Tr. 1633:5-14; PX-0299.008 ¶ 12(c), Blaydon Initial Expert Report (Oct. 23, 2015). The income approach involves determining the expected cash flows of the asset, discounted to present value at a rate that reflects the riskiness of the cash flows. PD-071, Demonstrative: Discounted Cash Flow Analysis; Blaydon, Tr. 1633:15-24; PX-0299.035 ¶ 61. The net cash flows are determined based on projected revenues, expenses, and subsidies and tax benefits; the discount rate is derived based on the cost of equity, the cost of debt, and the mix of debt and equity used (the capital structure). PD-072, Demonstrative: DCF Analysis Requires To Key Inputs; Blaydon, Tr. 1634:9-16. The key components of the analysis include electrical output, electricity prices, operations and maintenance costs, and tax considerations. PX-

0299.036 ¶ 64.  Plaintiffs' expert Professor Blaydon valued the Alta Wind Lawsuit Facilities through the income approach, as follows.

329.     **Electricity production**.   Electricity production estimates are based on a combination of wind study reports and independent engineering reports.   Garrad Hassan prepared the wind study reports for each of the Alta Wind Lawsuit Facilities, which are based on data collected at the sites since July 2001.   Garrad Hassan is the world's largest dedicated renewable energy consultancy.   As of 2012, it had provided due diligence services for over 25% of the world's project financed wind energy facilities and independent engineering services to over 45% of U.S. facilities.   PX-0299.040-.041 ¶¶ 71, 73, Blaydon Initial Expert Report (Oct. 23, 2015).

330.     An independent engineer was retained to review each of the Alta Wind facilities.   Garrad Hassan served as the independent engineer for Altas II through V, while E3 served as the independent engineer for Altas I and VI.   Like Garrad Hassan, E3 is a leading wind energy expert.   *See* PX-0011.001, Altas II-V Independent Engineer's Report (June 2010); PX-0071.001, Alta I Independent Engineer's Report (Dec. 2010); PX-0103.001, Alta VI Independent Engineer's Report (May 2011).

331.     The independent engineers prepared extensive, 100-plus page reports regarding various aspects of each Facility, after conducting a technical due diligence review. The independent engineers reviewed project design documents, construction plans, turbine specifications, project agreements, permits and licenses, site assessment documents, and the wind studies, to project how much electricity would be produced by the facilities.   The conclusions were set forth in an independent engineer's report for each Facility, which in each case confirmed that the model's calculations were consistent with the energy production

131

estimates contained in the Garrad Hassan wind studies, and that revenues were appropriately calculated based on the energy production estimates and PPA prices. PX-0011.030, Altas II-V Independent Engineer's Report (June 2010); PX-0071.010, Alta I Independent Engineer's Report (Dec. 2010); PX-0103.023, Alta VI Independent Engineer's Report (May 2011). The independent engineers also reviewed operating and maintenance cost projections for the facilities and determined that they were reasonable. PX-0011.031; PX-0071.010; PX-0103.158, Alta VI.

332.    For purposes of Professor Blaydon's income approach valuation, energy production estimates are based on the "P50" estimates from the Garrad Hassan wind study reports. Blaydon, Tr. 1634:17-1635:23; PD-073, Demonstrative: Discounted Cash Flow Analysis. A P50 scenario corresponds to a 50% probability that actual wind power will be at least that specified level over the long run. It is typical to use the average case – *i.e.*, the P50 case – in conducting valuations; using a higher or lower figure will bias a DCF valuation to be either below or above expected wind production levels. Blaydon, Tr. 1635:13-16; PD-073, Demonstrative: Discounted Cash Flow Analysis; PX-0299.039-.040 ¶ 71, Blaydon Initial Expert Report (Oct. 23, 2015). As Garrad Hassan puts it, P50 values "are the best estimate of the long term mean values to be expected from the project." JX-0576.029-.030, Alta Wind I Wind Study (Nov. 1, 2010). Notably, other Section 1603 applicants have applied for Section 1603 grants based on P50 case. PX-0299.040 ¶ 71 n.110.

333.    The reasonableness of Garrad Hassan's conclusions for Alta I were confirmed by AWS Truepower, which was retained by the Alta I purchasers to independently review the wind estimates for the Alta I Facility. Markowitz, Tr. 950:8-11. AWS's conclusions were within 2.2% of Garrad Hassan's. JX-0103.002, AWS Alta I Memo (Dec. 2010).

334.    **Electricity prices**.  Electricity prices are based on the PPA pricing for each of the Alta Wind Lawsuit Facilities, including the PPA time of day and seasonality adjustments, for the period of time when each PPA is in effect (approximately 24 years).  Blaydon, Tr. 1635:24-1636:1.  All electricity production is sold under the PPAs during this approximately 24-year period.  PX-0299.037-.038 ¶ 67, Blaydon Initial Expert Report (Oct. 23, 2015).

335.    Each Facility is assumed to continue in operation for an additional approximately six years after the expiration of its PPA, consistent with the minimum 30-year projected life for each Facility discussed below.  PX-0299.038 ¶ 68, Blaydon Initial Expert Report (Oct. 23, 2015).  The electricity prices for this approximately six-year period are based on the "reference case" projections contained in the U.S. Energy Information Administration's Annual Energy Outlook Report.  Blaydon, Tr. 1636:2-6; PX-0299.038 ¶ 68.  The Energy Information Administration was established by Congress to implement "a central, comprehensive, and unified energy data and information program," and is charged by statute with developing forecasts and providing information to other government agencies with "energy-related policy decisionmaking responsibilities."   42 U.S.C. § 7135(a)(1); 15 U.S.C. §§ 790a(a)(3), 790f(b).  Energy Information Administration projections are regularly used by valuation professionals.  Blaydon, Tr. 1636:12-14.  The Energy Information Administration's "reference case" projection is often referred to as the "base case" – it essentially projects prices under a "business as usual" scenario, as opposed, for instance, a projection that assumes changes in environmental regulation.  Blaydon, Tr. 1636:15-1637:6.  Accordingly, using a base case projection does not involve an aggressive pricing assumption.  Blaydon, Tr. 1637:7-9; PX-0299.038 ¶ 69.

133

336.     **Cash Grant**.  In calculating the discounted cash flows for the Alta Wind Lawsuit Facilities, the value of the cash grant is included.  PD-075, Demonstrative: Discounted Cash Flow Analysis; Blaydon, Tr. 1645:3-5; PX-0299.041-044 ¶¶ 74-79, Blaydon Initial Expert Report (Oct. 23, 2015).  It is entirely appropriate to include this value, as it is an economic component of the facilities.  PX-0299.044 ¶ 79.  Indeed, it is required to include tax benefits and government incentives in a discounted cash flow analysis in order to make it accurate.  Blaydon, Tr. 1644:22-1645:2; *see also* Blaydon, Tr. 1645:22-1646:5.

337.     **Depreciation benefits**.  A taxpayer that receives a Section 1603 cash grant is allowed to take tax depreciation on 85% of its eligible basis in a wind power facility.  Depreciation thus provides the taxpayer a deduction from its income taxes, in recognition of the fact that assets deteriorate and become obsolete over time.

338.     Accelerated depreciation permits the property to be depreciated on an accelerated basis, rather than over the asset's useful life.  While the total amount of depreciation remains the same, accelerated depreciation allows the depreciation to take place earlier in the asset's life, and so is more valuable because of the time value of money.  Bonus depreciation refers to tax deductible depreciation in excess of what would otherwise be available, during the first year of the life of an asset.  For example, a taxpayer that acquires a $10,000 facility depreciable over five-years and is eligible for depreciation would be entitled to $8,500 of total depreciation ($10,000 times 85%), of which $5,100 in depreciation could be taken in the first year of the life of the asset (50% of $8,500, plus 20% of the remaining $4,250), and then $3,400 spread over the next four years.  PX-0299.042-.043 ¶¶ 76-77, Blaydon Initial Expert Report (Oct. 23, 2015).

339.     To be conservative, Professor Blaydon's valuations assume that only half of the legally available bonus depreciation would actually be available to the owner of the Facility, *i.e.*, that only half the available bonus depreciation would be realized by the seller in sales of the facilities.  Blaydon, Tr. 1646:6-23; PX-0299.043 ¶ 78 n.123, Blaydon Initial Expert Report (Oct. 23, 2015).  However, it would have been appropriate to assume that all bonus depreciation and other tax benefits would be available, because fair market value is to be established based on the "highest and best use to which the property could be put on the valuation date."  *Pabst Brewing Co. v. Commissioner*, T.C. Memo. 1996-506, 1996 WL 655710, at *11 (Nov. 12, 1996); *see also Symington v. Commissioner*, 87 T.C. 892, 896 (1986) ("The fair market value of property, by definition, should reflect the highest and best use to which such property could be put on the date of valuation.").

340.     **Operating costs.**  In calculating future cash flows for the Alta Wind Lawsuit Facilities, projected costs are subtracted from the revenue estimates.  Those costs are based on the cost estimates in the Terra-Gen financial models, which were in turn validated by the independent engineering studies conducted for the Alta Facilities described above.  PD-074, Demonstrative: Discounted Cash Flow Analysis; Blaydon, Tr. 1637:10-25; PX-0299.046 ¶ 82, Blaydon Initial Expert Report (Oct. 23, 2015).

341.     **Terminal value.**  Professor Blaydon's discounted cash flow analysis also includes a terminal value for each project, equal to three years of additional cash flows assuming a zero percent growth rate.  PX-0299.046-.047 ¶ 83, Blaydon Initial Expert Report (Oct. 23, 2015).

342.     Professor Blaydon includes a terminal value because the useful life for each Facility was determined to be *at least* 30 years, indicating that the facilities would continue to

135

operate for some time after 30 years.  PX-0299.047 ¶ 84, Blaydon Initial Expert Report (Oct. 23, 2015); PX-0381.001, 009, Sigma Technical Due Diligence Report for Alta VI (Mar. 15, 2012); PX-0060.020, Sigma Technical Due Diligence Report for Alta I (Dec. 20, 2010); Pagano, Tr. 423:8-12 (confirming that the Alta Wind Facilities have a minimum estimated useful life of 30 years); Spencer. Tr. 878:17-19 (EverPower's consultant Sigma concluded that Alta VI's estimated useful life was at least 30 years); Markowitz, Tr. 953:10-954:15 (a facility like Alta I can operate "well beyond 30 years").  Indeed, three of Terra-Gen's older wind projects, TGP Mojave, Ridgetop, and 251, were placed in service in 1986 and 1987, and based on recent independent engineering reports, are expected to have useful lives of 40 years.  PX-0299.047 ¶ 84; Pagano, Tr. 423:16-25.  Accordingly, it was reasonable, and indeed conservative, to only include three additional years of cash flow for each Facility in calculating a terminal value (*i.e.*, cash flows for years 31-33).  Moreover, the financial models for the Alta Wind Lawsuit Facilities include a variety of types of maintenance expenses, including a "major maintenance" program that was specifically designed to ensure that the projects would have a useful life in excess of 30 years.  PX-0299.047 ¶ 84.

343.     **Discount rate.**  The discount rate is the required rate of return that will attract investors to a project or company, which compensates investors for the time value of money and the risk associated with a particular investment.  *See Energy Cap. Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) (appropriate discount rate takes into account both the time value of money and adjusts to account for risk).

344.     The discount rate is calculated based on both the cost of equity and the cost of debt to the company – that is, the returns that must be achieved on equity financing and debt financing in order for the company to obtain that financing.  PD-076, Demonstrative: Discounted

136

Cash Flow Analysis; Blaydon, Tr. 1638:8-17. This is referred to as the cost of capital. The weighted average cost of capital refers to the weighted average cost of both debt and equity. Because debt and equity have different risk profiles (debt service is paid before distributions to equity holders, making debt less risky than equity), the cost of capital for each differs, hence the need to use a weighted average cost of capital, or "WACC." PX-0299.036-.037 ¶ 65, Blaydon Initial Expert Report (Oct. 23, 2015); *id.* .048-.049 ¶ 87.

345.    In calculating a discount rate for the Alta Wind Lawsuit Facilities. Professor Blaydon used the debt-to-capital ratio and the cost of debt from a 2012 NREL study of 15 wind projects completed in 2010 and 2011. That study found that debt-to-capital ratios ranged between 40% and 55%, with a baseline of 45%. PX-0387.030, M. Martin-Tretton et al., "Data Collection for Current US Wind Energy Projects: Component Costs, Financing, Operations, and Maintenance," National Energy Renewable Laboratory (Jan. 2012). The study also found that the cost of debt ranged between 6.75% and 8.0%, with a baseline of 7.125%. *Id.* Here, the baseline figures of 45% and 7.125% were used for purposes of calculating the discount rate. PD-076, Demonstrative: Discounted Cash Flow Analysis; Blaydon, Tr. 1642:11-17; PX-0299.050 ¶ 91, Blaydon Initial Expert Report (Oct. 23, 2015); *id.* .053 ¶ 100.

346.    Professor Blaydon calculated the cost of equity using the capital asset pricing model, which is the most commonly used financial model for estimating the cost of equity. PX-0299.054 ¶ 102, Blaydon Initial Expert Report (Oct. 23, 2015). Under the capital asset pricing model, the cost of equity is determined by starting with a risk-free rate of capital, determined by the rate of return for U.S. government securities. *Id.* ¶¶ 102-03. That risk-free rate is then adjusted to account for market risk. The first component of that market-risk adjustment is a general market risk premium that reflects the general risk associated with investing in equities.

Professor Blaydon uses the market risk premium from the Ibbotson yearbook in his discounted cash flow analysis, which is a standard source for this information.  Blaydon, Tr. 1643:23-1644:3.

347.     The second component of the risk adjustment is a premium associated with the particular investment being evaluated (or "Beta").  PX-0299.054 ¶ 102, Blaydon Initial Expert Report (Oct. 23, 2015); *id.* .055 ¶ 104.  Professor Blaydon calculates the Beta here based on five guideline public companies with risk profiles comparable to the Alta Wind Lawsuit Facilities.  PX-0299.055 ¶ 105.  He selected those five companies because they are renewable energy companies with operations in North America that own significant operating stage projects, but not significant non-renewable power generation assets.  PX-0299.059-.061 ¶¶ 109-110.  Professor Blaydon then adds a size premium in deriving the cost of equity for each Facility.  PX-0299.057 ¶ 108.  Based on this analysis, Professor Blaydon calculates costs of equity for the Alta Wind Lawsuit Facilities ranging between 10 and 11 percent.  PD-080, Demonstrative: Discounted Cash Flow Analysis Cost of Equity; Blaydon, Tr. 1638:21-23.

348.     Professor Blaydon's calculations are consistent with those of the NREL study referenced above.  The NREL study looked at the cost of equity for 15 wind projects developed in 2010 and 2011, and determined that it ranged from 8% to 13%, with a baseline of 10%.  The NREL study also found that the cost of equity is "lower if an equity holder were buying into an equity stake in an operating portfolio as compared to early stage, non-operating development portfolio."  PX-0387.029; *see also* PD-080, Demonstrative: Discounted Cash Flow Analysis; Blaydon, Tr. 1638:21-1640:4; PX-0299.063 ¶ 116, Blaydon Initial Expert Report (Oct. 23, 2015).  The fact that Professor Blaydon's cost of equity calculations were within the NREL range, and, indeed, a bit above the NREL 10% baseline number (notwithstanding that he was

138

valuing the facilities at a point when they had only operating risk), confirms that his cost of equity calculations are reasonable and, if anything, a bit high (and so conservative). Blaydon, Tr. 1640:21-1641:23. Had Professor Blaydon used the NREL 10% baseline cost of equity in his discounted cash flow analysis, it would have resulted in higher facility values. Blaydon, Tr. 1641:24-1642:3.

349.    Professor Blaydon in turn blends the cost of equity and the tax-adjusted cost of debt (based on the debt-to-capital ratio discussed above) to derive each Facility's WACC. Finally, Professor Blaydon adds a 1% premium to this WACC for the period after each Facility's PPA expired to reflect the arguably higher market risk associated with not having in place a contractually-fixed electricity price. PX-0299.061-.062 ¶¶ 112-114, Blaydon Initial Expert Report (Oct. 23, 2015).

350.    Professor Blaydon's approach to discount rates was conservative (*i.e.*, it tended to overestimate the appropriate discount rate and thus reduce the facility values), because: (a) the Alta Wind Lawsuit Facilities at the times of purchase faced only operating risk and using a set of comparable companies that also have development stage risk to calculate the cost of capital tends to overstate the discount rate, PX-0299.049 ¶ 90, Blaydon Initial Expert Report (Oct. 23, 2015); *id.* .052 ¶ 97 & n.145; *id.* .060-.061 ¶ 110; (b) the selected debt-to-capital ratio of 45% is conservative (*i.e.*, the projects could support more debt and therefore a lower weighted average cost of capital) based on the cash generating potential and the relatively low risk of the Alta Facilities, PX-0299.053 ¶ 101; (c) while four of the guideline companies Professor Blaydon uses to calculate the risk premium for the Alta Wind Lawsuit Facilities trade on a Canadian stock market, Professor Blaydon used an estimate of the U.S. market risk premium in his cost of equity calculations notwithstanding the relatively lower market risk premium observed for Canadian

139

stocks, PX-0299.056 ¶ 106 n.154; (d) the inclusion of a size premium is debatable, Blaydon, Tr. 1644:4-15; PX-0299.057 ¶ 108; and (e) adding a post-PPA risk premium is a conservative approach, because certain of the guideline companies that Professor Blaydon uses to calculate the risk premium applicable to the period when the PPAs are in effect have exposure to energy and commodity price fluctuations and this price-fluctuation risk is thus already partly reflected in Professor Blaydon's cost of equity calculations *before* adjusting for any post-PPA risk.  PX-0299.062-.063 ¶ 115.

351.    Based on the above calculations, Professor Blaydon determined a WACC for each Facility, as follows:

| Project | Valuation Date | WACC | Post-PPA WACC |
|---|---|---|---|
| Alta I | 12/31/10 | 7.65% | 8.65% |
| Alta II | 12/30/10 | 7.65% | 8.65% |
| Alta III | 2/24/11 | 7.83% | 8.83% |
| Alta IV | 5/20/11 | 7.76% | 8.76% |
| Alta V | 6/13/11 | 7.92% | 8.92% |
| Alta VI | 5/18/12 | 7.51% | 8.51% |

PD-083, Demonstrative: Discounted Cash Flow Analysis; Blaydon, Tr. 1642:21-1643:22; PX-0299.062 ¶ 114, Blaydon Initial Expert Report (Oct. 23, 2015).

352.    Professor Blaydon uses these WACCs to discount the income streams (less expenses) projected to be generated by the facilities based on the inputs described above.  That results in the following values for each of the Altas I through VI Facilities:

| Project | Valuation As Of | DCF Value | Purchase Price |
|---------|-----------------|-----------|----------------|
| Alta I | 12/31/10 | $633,170 | $560,000 |
| Alta II | 12/30/10 | $468,102 | $440,250 |
| Alta III | 2/24/11 | $468,581 | $444,535 |
| Alta IV | 5/20/11 | $306,295 | $288,792 |
| Alta V | 6/13/11 | $495,498 | $488,003 |
| Alta VI | 5/18/12 | $546,115 | $439,388 |

PD-084, Demonstrative: Discounted Cash Flow Analysis; Blaydon, Tr. 1646:24-1647:16, 1650:8-14; Blaydon, Tr. 1603:3-6; PX-0299.008 ¶ 12(c), Blaydon Initial Expert Report (Oct. 23, 2015); *id.* .064 ¶ 117.[9]

353.    For each Facility, the discounted cash flow value is higher than the transaction price. Blaydon, Tr. 1647:17-19. For Professor Blaydon, this confirms his conclusion that the transaction prices reliably establish the fair market value of the facilities and were not somehow artificially inflated. Blaydon, Tr. 1647:20-1648:8. If the sales prices for the facilities had been manipulated or inflated, they would exceed the anticipated discounted cash flows. However, the prices paid do not exceed the discounted cash flows values; in fact, the discounted cash flow value exceeds the transaction price for each Facility. PX-0299.064 ¶ 118, Blaydon Initial Expert Report (Oct. 23, 2015).

354.    Professor Blaydon performed various sensitivity analyses to test whether the discounted cash flow values remain consistent with the purchase prices, even if certain assumptions of the analysis are modified. He confirmed that they do. Blaydon, Tr. 1650:21-

---

[9]    The Alta VI DCF value is observably higher than the Alta VI purchase price. There are several possible reasons for this, including that EverPower was funded based on private equity (which has a higher cost of equity), and EverPower did not have sufficient income to take full advantage of the depreciation to which Alta VI was entitled. Blaydon, Tr. 1648:25-1649:17; PX-0299.021-.022 ¶ 34, Blaydon Initial Expert Report (Oct. 23, 2015); *id.* .064-.065 ¶ 119. In any event, the purchase price is more than justified by the DCF value.

141

1651:7. Specifically, the discounted cash flow values support the purchase prices under the following four sensitivity scenarios: (1) a scenario assuming a higher debt-to-capital ratio and a higher cost of debt; (2) a scenario assuming different projected electricity prices after the PPAs expire; (3) a scenario assuming zero terminal value for each Facility after 30 years of operation, and (4) a scenario assuming zero bonus depreciation benefit. PD-085, Demonstrative: Discounted Cash Flow Analysis; Blaydon, Tr. 1651:8-10; PD-086, Demonstrative: Discounted Cash Flow Analysis; Blaydon, Tr. 1652:6-1653:5; PX-0299.065-.069 ¶¶ 120-129, Blaydon Initial Expert Report (Oct. 23, 2015).

355.    As noted, Professor Blaydon applied the discounted cash flow methodology to test whether the transaction prices for the Alta Wind Lawsuit Facilities reliably establish their fair market values, and concluded that they do. There was no contrary evidence. Professor Blaydon further concluded that, if the transaction prices were deemed unreliable for any reason, then the discounted cash flow method would be the most reliable method to determine the fair market values of the facilities. Those values would be the "DCF Values" contained in the table in paragraph 352, *supra*. Blaydon, Tr. 1649:18-24; PD-084, Demonstrative: Discounted Cash Flow Analysis Baseline Valuation.

## VIII.  The Market Method Establishes Values that Fully Support the Bases Claimed for the Alta Wind Facilities.

### A.    The Only Truly Comparable Sales Are the Other Altas Themselves.

356.    The market method, also known as the comparable sales method, determines value based upon the sales prices paid in arm's-length transactions for assets that are sufficiently similar to the subject assets being valued and that were sold during a reasonably similar time period. The notion is that an asset can be valued by comparing it to other assets, but only if the assets are sufficiently similar in terms of salient characteristics for them to be comparable to one

142

another. *See Cane Tenn.*, 71 Fed. Cl. at 438 ("It is understood that the value of comparable sales data varies directly with the similarity of the comparable properties to the property [at issue]."); *see also* Blaydon, Tr. 1653:10-22; PX-0299.069 ¶ 130, Blaydon Initial Expert Report (Oct. 23, 2015) ("[I]dentifying appropriate comparables, particularly for unique and capital-intensive assets such as renewable energy projects, is a difficult process that is not always feasible. If the benchmark assets differ significantly from the subject assets along dimensions that can impact value, then the market comparables method is not a reliable valuation methodology.").

357.     Professor Blaydon conducted a comparable sales analysis. This was a challenging exercise because the Alta Wind Lawsuit Facilities "are very unique facilities." Blaydon, Tr. 1653:21-22. Professor Blaydon concluded that only other facilities at the Alta Wind Energy Center, specifically, Altas VIII and IX, are truly comparable to the Alta Wind Lawsuit Facilities. Blaydon, Tr. 1653:23-1654:8.

358.     Alta VIII and Alta IX are located in the same area, are part of the same wind energy center, use the same Vestas wind turbines, were placed into service at roughly the same time, have similar PPAs with the same utility purchaser, and are visually indistinguishable from the Alta Wind Lawsuit Facilities. PX-0299.075 ¶ 139, Blaydon Initial Expert Report (Oct. 23, 2015); *see* Pagano, Tr. 82:24-83:7. For these reasons, Altas VIII and Alta IX are, for all practical purposes, equivalent to the Alta Wind Lawsuit Facilities, and can appropriately be used for purposes of a comparable sales analysis. *See Childers v. United States*, 116 Fed. Cl. 486, 499 n.11 (2013) (focusing for purposes of comparable sales analysis on a "comparable sale that was more similar to the subject property than any of [the other valuation's] comparables"); *In re Robinson*, No. BR 14-11559-BAH, 2015 WL 5309513, at *8 (Bankr. D.N.H. Sept. 10, 2015)

(selecting one comparable for use as the "best indicator of value" because it was "the most similar to the Property" being valued).

359.     Three additional Alta Wind Facilities were sold, but none are appropriate comparables (and the Government has never taken the position that they should be used as comparables). The Alta VII Facility was sold during the same general period as the Alta Wind Lawsuit Facilities, but Alta VII is somewhat difficult to treat as a comparable because it includes transmission facilities that accommodate not only its own transmission needs, but also the transmission needs for other Alta Facilities that were to be constructed later. Pagano, Tr. 383:14-384:2; PX-0299.017 ¶ 23 n.30, Blaydon Initial Expert Report (Oct. 23, 2015). Accordingly, Professor Blaydon omitted Alta VII from his comparable sales analysis, although if it were included, the Alta VII purchase price, adjusted for net capacity factor, of $3,029/kW, would be fully consistent with the prices for the Alta Wind Lawsuit Facilities. Blaydon, Tr. 1655:19-1656:4.

360.     Finally, Alta X and Alta XI Facilities are not comparable to the Alta Wind Lawsuit Facilities. Alta X and XI were sold in August 2014, more than 2 years after the last of the purchases of the Alta Wind Lawsuit Facilities, so they are not comparable from a timing perspective. *See* Pagano, Tr. 384:3-11. In addition, Alta X and Alta XI were sold, together with other Terra-Gen assets, for a single lump sum, and no allocation of the purchase price between the various assets was performed. *See* Pagano, Tr. 384:12-16. For both those reasons, Alta X and Alta XI are not useful comparables.

361.     Professor Blaydon also considered whether any other wind facilities are valid comparables to the Alta Wind Lawsuit Facilities, but did not identify any sufficiently comparable facilities. Non-California facilities are not comparable because they are not subject to

144

California's stringent Renewable Portfolio Standard requirements and difficult permitting environment, which combine to dramatically increase the value of completed wind energy facilities. Other utility-scale (*i.e.*, 100 plus megawatt) California facilities sold during the same general period as the Alta Wind Lawsuit Facilities are not comparable because they vary in two or more salient characteristics that materially affect value: either they are not located in the uniquely valuable wind resource that is the Tehachapi region; or they are not located near a major metropolitan area with substantial electricity demand; or they use inferior turbines; and/or the circumstances under which they sell electricity are not comparable to those of the Alta Facilities. The specifics are as follows.

362.    As discussed in greater detail earlier, *see* ¶¶ 59-61, *supra*, California has adopted a stringent Renewable Portfolio Standard, which obligates utilities to ensure that 33% percent of their electricity comes from renewable resources by 2020, and creates an increased demand for renewable energy resources. Blaydon, Tr. 1571:18-1572:25. This is one of the highest Renewable Portfolio Standards in the country, trailing only Hawaii and Maine. These stringent requirements increase the demand for renewable energy projects in California, and hence their value. Blaydon, Tr. 1573:1-10; PX-0299.070 ¶ 131, Blaydon Initial Expert Report (Oct. 23, 2015).

363.    As discussed in paragraphs 86-94, *supra*, California also has a very challenging development environment, which places a premium value on those facilities that can successfully navigate this regulatory maze and reach fruition. PX-0299.070 ¶ 131, Blaydon Initial Expert Report (Oct. 23, 2015).

364.    The combination of these two factors means that California has a unique environment that increases the value of wind facilities in the state. The stringent renewable

145

portfolio standard and the relative difficulty of developing facilities in California mean that wind energy facilities sold in other states are not valid comparables for those in California. Blaydon, Tr. 1656:23-1657:6; PX-0299.070 ¶ 131, Blaydon Initial Expert Report (Oct. 23, 2015) (explaining that these two facts "mean[] that wind farms sold in other states are not valid comparables for a wind farm in California").

365.    Focusing on utility-scale wind energy facilities in California purchased during the same general period as the Alta Wind Lawsuit Facilities, there are only nine potentially comparable facilities, other than Alta VIII and Alta IX. However, these nine facilities were either not sold in arm's-length transactions, or vary significantly from the Alta Wind Lawsuit Facilities based two or more key value drivers, and so cannot be viewed as comparable. *See* [redacted]; Blaydon, Tr. 1656:18-22, 1657:14-1658:7; [redacted].

366.    A number of key value drivers are important for wind energy facilities located within California. *See* PD-056, Demonstrative: Key Value Drivers of Alta Facilities (summarizing the key value drivers of the Alta Facilities); Blaydon Tr. 1566:10-18. The Alta Wind Lawsuit Facilities, as well as Altas VIII and IX, exhibit each of these value drivers, and the buyers of the Alta Wind Lawsuit Facilities in fact considered these value drivers to be important. Blaydon, Tr. 1575:5-13.

367.    One key value driver is the turbine technology used. Turbines are particularly crucial because they are the moving pieces of equipment that actually generate electricity, which is "at the core of what any such generation facility is all about." Blaydon, Tr. 1567:6-9. Mr. Pagano and the buyers testified that the turbines used in the Alta Wind Lawsuit Facilities (GE and Vestas) were top-tier. Pagano, Tr. 78:9-79:19; Revock, Tr. 686:2-10; Spencer, Tr. 829:13-19; *see* ¶ 73, *supra*. Likewise, Professor Blaydon testified that based on the evidence and

146

materials he reviewed, the Alta Facilities definitely used top-tier turbines.  Blaydon, Tr. 1567:10-21; PX-0299.073-.074 ¶ 137, Blaydon Initial Expert Report (Oct. 23, 2015) .

368.    Wind speed is also an important value driver.  As Professor Blaydon testified, wind speed is important because that is the energy captured by the wind turbines and turned into electricity.  Blaydon, Tr. 1567:22-1568:14.  The Alta Wind Facilities are located in a wind area that NREL has found is "superb," which is the highest possible ranking for wind quality.  PD-057, Demonstrative: Alta Facilities Located in Highest Quality Wind Resource Area; Blaydon, Tr. 1568:15-1569:5; PX-0299.070 ¶ 132, Blaydon Initial Expert Report (Oct. 23, 2015).

369.    The wind flowing through the Alta areas is also predictable, based on an abundance of historic wind data.  This is a value driver because it provides assurance that the wind estimates are well-grounded and reliable, which provides assurance to developers and investors that the facilities will benefit from high wind speeds over the next 25 to 35 years. Blaydon, Tr. 1569:18-1570:12.

370.    Location near a major metropolitan area also increases the value of a facility. Blaydon, Tr. 1570:13-21.  Professor Blaydon explained that closer facilities are worth more for multiple reasons, including (1) because their energy is less likely to suffer from congestion charges or require upgrades to transmission infrastructure, and (2) there will be lower losses of electricity during transmission.  Blaydon, Tr. 1570:22-1571:14; PX-0299.072-.073 ¶ 135, Blaydon Initial Expert Report (Oct. 23, 2015).  The Alta Wind Facilities are located approximately 100 miles from Los Angeles, the second-largest metropolitan area in the United States, and so benefit from being close to very substantial energy demand.  Pagano, Tr. 62:14-63:5; *see also* PX-0227, NREL Wind Map of Southern California; Pagano, Tr. 65:23-67:20; Blaydon, Tr. 1571:15-17; Rec. Doc. 115, Stipulation of Facts ¶ 3 (stipulating that "The Alta

147

Wind Energy Center is located in Tehachapi, California, approximately 100 miles from Los Angeles.  It is the largest wind farm in North America, and one of the largest in the world. Among other wind power projects, the Alta Wind Energy Center includes the Alta I through VI wind power projects at issue in this litigation . . . .").

371.    The fact that the Tehachapi area is a well-proven peak wind resource located in an area with superb wind speeds is a major driver of value.  Moreover, the unidirectional nature of the wind flow allows a greater percentage of the prevailing winds to be harnessed by the wind facilities constructed there, and also reduces wear and tear on the facility, providing additional value beyond what is reflected by average wind speed without regard to direction. The fact that the wind tends to blow the most during periods of peak demand also enhances the value of wind facilities in the region because wind power generated during peak periods is more valuable than wind power generated during non-peak periods.  PX-0299.070-.072 ¶¶ 132-134, Blaydon Initial Expert Report (Oct. 23, 2015); DX0706-00011-00013, Allco Management Presentation (Apr. 2008).

372.    Three of the nine potentially comparable facilities were not sold in an arm's-length transaction and are not valid market comparables on that ground.  PX-0299.76 ¶ 142, Blaydon Initial Expert Report (Oct. 23, 2015).  The sale of one of the facilities was not consummated.  [redacted].  The other five facilities differ significantly from the Alta Wind Lawsuit Facilities with respect to two or more of the key value drivers described above, and so none can be considered comparable.  Specifically: (1) none of the other facilities are located in parts of California with a "superb" NREL wind quality rating; (2) two of the other facilities utilize second-tier turbines; (3) one of the other facilities is located in a remote part of northern California (and thus cannot viably be compared to facilities in close proximity to Los Angeles);

148

and (4) three of the other facilities have unusual power purchase agreements that render them not comparable to the Alta Wind Lawsuit Facilities.[10]  [redacted]; Blaydon, Tr. 1656:18-20, 1657:14-1658:11; PX-0299.076-80 ¶¶ 142-151, Blaydon Initial Expert Report (Oct. 23, 2015).[11]

**B.**    **The Prices Paid For Altas VIII and IX Establish Values Consistent With the Prices Paid for the Alta Wind Lawsuit Properties.**

373.    Based on the foregoing analysis, Professor Blaydon determined that only Altas VIII and IX are valid comparables that can be used in a comparable sales analysis for the Alta Wind Lawsuit Facilities.  As discussed in paragraphs 106 and 227-229, *supra*, and reflected in the table reproduced below, the prices paid in the outright purchases of Altas VIII and IX are consistent with the prices paid for Altas I through VI.

---

[10]    For example, the Alite Wind Facility has a unique PPA with a single industrial offtaker, California Portland Cement, under which California Portland Cement is only obligated to purchase the electricity as required for its operations.  Accordingly, the facility could face considerable periods where it is operating at less than full output, or even not operating at all, thus sharply reducing its revenue generation and value.  PX-0299.079-.080 ¶ 149, Blaydon Initial Expert Report (Oct. 23, 2015).

[11]    Mr. Revock's testimony confirms Professor Blaydon's opinion that the Pacific Wind and Solano 3 facilities (both of which were purchased by Citibank) are not valid comparables to the Alta Wind Lawsuit Facilities.  Revock, Tr. 717:20-719:4.

| Transaction | Transaction Price ($000s) | % Acquired | Capacity | $ / kw | Net Capacity Factor (NCF) | Capacity Adjusted $ / kw |
|---|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] = [1] / ([2] * [3]) | [5] | [6] = [4] * ([5] / 26.64%) |
| **Non-Lawsuit Transactions** | | | | | | |
| Alta VIII | $439,834 | 100.0% | 150 | $2,932 | 25.9% | $3,018 |
| Alta IX | $416,097 | 100.0% | 132 | $3,152 | 26.6% | $3,157 |
| **Average** | | | | | | **$3,088** |
| **Lawsuit Transactions** | | | | | | |
| Alta I | $560,000 | 100.0% | 150 | $3,733 | 34.2% | $2,906 |
| Alta II | $440,250 | 93.0% | 150 | $3,156 | 28.7% | $2,926 |
| Alta III | $444,535 | 93.1% | 150 | $3,183 | 29.9% | $2,835 |
| Alta IV | $288,792 | 90.7% | 102 | $3,122 | 28.0% | $2,971 |
| Alta V | $488,003 | 93.8% | 168 | $3,097 | 27.6% | $2,989 |
| Alta VI | $439,388 | 100.0% | 150 | $2,929 | 26.6% | $2,929 |
| **Average** | | | | | | **$2,926** |

PD-088, Demonstrative: Comparison of Transaction Prices Between Lawsuit and Non-Lawsuit Alta Properties; Blaydon, Tr. 1654:9-15, 1655:4-1656:14; PX-0281, Demonstrative: Purchase Prices Paid for Eight Alta Facilities; Pagano, Tr. 171:2-176:25; PX-0299.033 ¶ 57, Blaydon Initial Expert Report (Oct. 23, 2015).

374.    Accordingly, the comparable sales approach further shows that the purchase prices paid for the Alta Wind Lawsuit Facilities reliably establish their fair market values.

**IX.    The Cost Method Is of Limited If Any Relevance in Valuing the Alta Facilities, But If It Were Applied, It Would Fully Support the Purchase Prices.**

**A.    The Cost Method Is of Limited If Any Relevance In Valuing the Alta Facilities.**

375.    The cost approach "produces a valuation estimate by establishing the cost to replace the property, less depreciation, at a different but comparable site." *Cane Tenn.*, 71 Fed. Cl. at 438 (citation and quotation marks omitted). This includes a "turnkey fee and developer's

150

profit," which "represent different components of the reproduction cost." *Utilicorp*, T.C. Memo 1997-47, at \*7; *see also In re Shri Saibaba, LLC*, No. 14-01403-5–DMW, 2015 WL 1518666, at \*2 (E.D.N.C. Bankr. Ct. Mar. 27, 2015) ("The cost approach calculates the estimated value of the land, and estimates the reproduction or replacement cost of the improvements, other costs incurred after construction to bring the building to market condition, and entrepreneurial profit. The appraiser then adds all of these estimates together to arrive at a total cost of the main structure."); Appraisal Institute, *The Appraisal of Real Estate* 386-87 (13th ed. 2008) ("To develop cost estimates for the total [project], appraisers must consider direct (hard) and indirect (soft) costs . . . Because the entrepreneur provides the inspiration, drive and coordination necessary to the overall project, the cost approach should include an appropriate entrepreneurial profit or incentive . . ."); Blaydon, Tr. 1659:20-1660:2.

376.    Courts have disfavored the cost approach in many contexts. *See, e.g.*, *Crowley, Milner & Co. v. Commissioner*, 76 T.C. 1030, 1037 (1981) ("actual construction costs do not necessarily measure fair market value"), *aff'd*, 689 F.2d 635 (6th Cir. 1982); *Carty v. Commissioner*, 38 T.C. 46, 66 (1962) ("The replacement cost of the equipment, although some indication of fair market value, is by no means conclusive and in fact has been held to be of questionable weight as valuation evidence.").

377.    One fundamental flaw of the cost approach is that it is not directly tied to the income-producing capability of the property. Indeed, Ms. Neubauer, the Section 1603 Program Director, admitted that the cost approach would not capture the value associated with the Alta Facilities' location in a prime wind area. Neubauer, Tr. 1791:6-8. This is because the cost approach determines value as the cost to replace or reproduce an asset, without consideration of

151

the income an asset is expected to generate.  PX-0299.081 ¶ 153, Blaydon Initial Expert Report (Oct. 23, 2015).

378.     The cost approach thus fails to reflect that the Alta Facilities are in a prime wind area.  Indeed, according to the cost approach, two wind farms that cost the same amount to build will have the same value, even if one is located in a prime wind area and the other is not. PD-092, Demonstrative: Cost Approach Not Suitable for Alta Facility Assets; Blaydon, Tr. 1665:18-1666:4.

379.     The notion that identical wind farms have the same value regardless of whether one is located in a windy area and the other is located in a less windy area has no foundation in economic theory.  That is because the value of a wind farm is based on the generation and sale of electricity.  Accordingly, a willing buyer would pay more for a wind farm in a windy area than the same wind farm in a non-windy area.  Blaydon, Tr. 1573:17-1574:10. Fair market value is, by definition, the amount that a willing buyer would pay a willing seller to acquire property in an arm's-length transaction.  If one facility is generating more electricity than another because it is in a windier area, and a buyer would be willing to pay more for the facility on that ground, the facility in the windier area, by definition, has a higher fair market value (even if the cost to construct the facility is the same).  Blaydon, Tr. 1666:19-1667:8; PX-0299.081-.082 ¶ 154, Blaydon Initial Expert Report (Oct. 23, 2015).  As Professor Blaydon explained, this logic was in fact borne out in connection with the Alta Facilities, where the purchasers were not concerned with the cost to build the facility, but rather were focused on the fact that the facilities were located in one of the premier wind energy sites in the country.  Blaydon, Tr. 1574:17-1575:4.

152

380.     Valuation literature indicates that "[t]he cost approach is most often used to measure the fair values of both tangible and intangible assets that are not direct sources of cash flow generation for the entity.  These contributory assets tend to be less significant to the entity's overall value."  PD-090, Demonstrative: Cost Approach Not Suitable for Alta Facility Assets; Blaydon, Tr. 1660:13-1661:3.  Moreover, the cost approach is "appropriate only when neither the income nor the market approach is feasible."  PX-0328.007 ¶ 10, Blaydon Rebuttal Report (Dec. 4, 2015).  Here the eligible assets — the turbines, towers and other electricity-generating property — are critical sources of cash flow, and the income and market approaches are feasible, so it is not appropriate to use the cost method.  Blaydon, Tr. 1661:4-1662:6; PX-0328.008 ¶ 12, Blaydon Rebuttal Report (Dec. 4, 2015).  Notably, none of the buyers used the cost approach to value the facilities when they were considering whether to purchase the Alta Wind Lawsuit Facilities.  Blaydon, Tr. 1595:6-8.

381.     Another flaw with the cost approach is that it is only suited to value assets that are fungible or mutually interchangeable.  PX-0299.082 ¶ 155, Blaydon Initial Expert Report (Oct. 23, 2015).  However, if the "subject asset is unique in one or more respects, the cost approach may not be a viable valuation approach."  Shannon P. Pratt & Alina V. Niculita, *Valuing a Business*: *The Analysis and Appraisal of Closely Held Businesses* 358 (5th ed. 2008).  Professor Blaydon explained that the eligible property at the Alta Facilities is not readily replaceable.  The eligible property is not comprised of assets that are "on wheels that you can wheel in, wheel out."  Blaydon, Tr. 1662:19-1663:21.

382.     As demonstrated in paragraphs 86-94, *supra*, the Alta Wind Facilities are far from fungible.  Before construction can even begin, a facility in California must first achieve compliance with the various permitting requirements imposed by the California Environmental

Quality Act, the California Department of Fish & Game, and any additional federal requirements. Compliance is costly and far from assured. After the proper permitting is in place, construction is an immense effort, involving the construction of miles of road, the excavation of hundreds of foundations (each of which can involve digging 30 feet into the ground and pouring hundreds of cubic yards of concrete per turbine) and the installation of each individual turbine component. After the turbines are installed, each must be connected to a transformer and then through hundreds of miles of cabling to a newly constructed substation and additional transformers which, in turn, must be connected to the electrical grid through a high voltage transmission line. Before the substation can interconnect with the grid, the facility must meet many requirements, including appropriate synchronization and other steps. Finally, the electrical grid itself must be prepared for connection with the wind facility. It is only after all of these steps have been completed that a wind facility can become operational.

383.    The cost approach is also flawed because it does not take into account any of the tax benefits that have an impact on the cash flows of the facility. According to the cost approach, two wind facilities that cost the same amount to build will have the same value, even if one has substantial tax benefits associated with it and the other does not. PD-092, Demonstrative: Cost Approach Not Suitable for Alta Facility Assets; Blaydon, Tr. 1666:5-10, 1668:5-14; PX-0299.083 ¶ 158, Blaydon Initial Expert Report (Oct. 23, 2015); PX-0328.010 ¶ 16, Blaydon Rebuttal Report (Dec. 4, 2015). This ignores the fact that a willing buyer will pay more for a wind facility that has valuable tax benefits associated with it than for an otherwise identical wind facility that does not, and that the facility with the valuable tax benefits thus has a higher fair market value based on the standard definition of that term. Blaydon, Tr. 1667:16-1668:14. Ignoring a wind facility's tax benefits in determining its value also runs directly

154

counter to the copious case law demanding that tax benefits and credits be included in determining a property's fair market value, *see* Section III.J, *supra*.

384.    The cost approach also does not capture the fact that a coordinated group of assets can have a value that exceeds the value of the individual parts.  Blaydon, Tr. 1668:15-24.

385.    Finally, the cost approach is of limited use because, in applying the cost approach, it is essential to include a markup over construction cost for developer and builder profit, but the profits earned by developers and builders vary from project to project and are largely a function of what the market will bear.  Blaydon, Tr. 1670:3-8.

386.    In short, as Professor Blaydon testified, the cost approach is not a reliable indicator of value for the Alta Wind Lawsuit Facilities.  Blaydon, Tr. 1660:3-7,  1603:3-6; PX-0299.009 ¶ 12(e), Blaydon Initial Expert Report (Oct. 23, 2015) ("The cost approach has very limited application in valuing properties like the Alta Facilities because it fails to capture essential and significant components of their value (e.g., location in a peak wind resource area, cash grant and tax benefits).").

### B.    If It Were Employed, The Cost Method Would Support Plaintiffs' Claimed Bases.

387.    If one were nonetheless to apply the cost approach, it would support Plaintiffs' claimed bases.  One would first determine the direct and indirect costs incurred by Terra-Gen to construct the Alta Wind Lawsuit Facilities, and add to that an appropriate return to the developer.  PX-0299.083-.084 ¶ 161, Blaydon Initial Expert Report (Oct. 23, 2015). Applying that approach results in values equivalent to Plaintiffs' claimed bases, as discussed below.

### 1. The KPMG Cost Certifications Accurately Reflect the Direct and Indirect Costs Incurred on the Projects.

388. KPMG reviewed and certified all direct and indirect cost incurred in the construction and development of the Alta Wind Lawsuit Facilities. *See* Section IV.C, *supra*. There is no evidence in the record suggesting that any of the costs listed on the KPMG certifications were not incurred in connection with the construction and development of the Alta Wind Lawsuit Facilities.

### 2. A Turnkey Fee and Developer Fee Must Be Added to Those Direct and Indirect Cost In Order to Determine Total Costs.

389. If the cost method were to be employed, it is necessary to include a turnkey fee and a developer fee in determining the cost to develop a turnkey facility. A developer profit/fee "represents the risk inherent in constructing a facility that cannot be sold for the price asked by the developer." *Utilicorp*, T.C. Memo. 1997-47, 1997 WL 28654, at \*7; *see also* Blaydon, Tr. 1669:5-18 (noting that a developer profit takes into account both placing capital at risk as well as all the risks of what can go wrong in developing a facility). A turnkey fee is designed to compensate the builder for "the risk inherent in promising a working facility." *Utilicorp*, T.C. Memo., 1997 WL 28654, at \*7. The developer fee and turnkey fee accordingly compensate for different risks. The developer fee compensates for the risk of not being able to sell the facility for a certain price (or at all), while the turnkey fee compensates for the risk that the facility might not be operational, that there might be costly overruns, or that there might be construction delays. Pagano, Tr. 128:2-5; *see* Pagano, Tr. 103:8-104:5, 131:1-5.

390. Accordingly, where one company takes on both of those risks, both a developer fee and a turnkey fee should be added. As *Utilicorp* explained:

> Respondent cites no authority prohibiting both a turnkey fee and a developer's profit, and petitioner has convinced us that the two address different economic risks. The turnkey risk is the risk inherent in promising a working facility. The

> developer's profit represents the risk inherent in constructing a facility that cannot be sold for the price asked by the developer.  Insofar as the turnkey fee and the developer's profit address different components of reproduction cost, we see no logical reason why they cannot coexist.

*Utilicorp*, T.C. Memo. 1997-47, 1997 WL 28654, at *7.  Professor Maydew confirmed that a turnkey fee is appropriately included in a property's basis, regardless of the developer's profit. Maydew, Tr. 1431:11-1432:8.

391.    Here, Terra-Gen bore the risks entitling it to both a turnkey fee and a developer fee.  As described in ¶¶ 78-83, *supra*, Terra-Gen expended an enormous sum, $394 million, acquiring the initial building blocks of the Alta Facilities in July 2008, with no guarantee it would ever be able to develop the Alta Wind Energy Center and recoup that expenditure. Then, it spent billions of dollars developing the Center.  Accordingly, Terra-Gen took on the kinds of risk that form the basis for a developer fee.

392.    Terra-Gen also took on the types of the risks that give rise to a turnkey fee. Under its contract with each Plaintiff, Terra-Gen was obligated to deliver a working facility, one that had been certified by the independent engineer to have commenced commercial operations, to have passed operational testing, to have acquired all necessary permits and government approvals, and to be in compliance with law and contract requirements necessary for the operation of the facility.  While Terra-Gen had retained multiple contractors to assist in the effort, the facilities did not have a turnkey contractor, and Terra-Gen bore the risk of delay or nonperformance by one contractor as it affected another contractor, and any claims it might have against the contractors and suppliers were typically capped at a fraction of the contracted-for price.  Pagano, Tr. 131:1-14; *see* Pagano, Tr. 129:8-16.

393.     Moreover, the fact that California presents greater risks in developing a wind project and, indeed, has been a graveyard for over 50% of contracted for projects (*see* ¶ 93, *supra*) supports a higher developer and turnkey markup then might be appropriate elsewhere.

394.     In a valuation analysis, there is no one-size-fits all profit (comprised of a turnkey and developer fee) that can be generically applied to project costs in applying the cost approach to valuation.  Instead, the profit is determined by what the market will bear at a given time considering a variety of factors, such as the economic benefits, the efficiency of the developer, etc.  Ultimately, the best measure of an appropriate profit or "markup" for a given project is what a buyer is willing to pay in an arm's-length transaction.  PX-0299.084-.085 ¶ 162-163, Blaydon Initial Expert Report (Oct. 23, 2015); PX-0328.011 ¶ 18, Blaydon Rebuttal Report (Dec. 4, 2015) ("[i]n a market system, a developer's profit is determined by market forces; it is not dictated by the government").

395.     The notion of using some sort of "fair" or governmentally-determined profit is particularly inappropriate here.  That concept is typically used only in connection with regulated utilities, which have a *guaranteed* return due to their monopoly operation.  Terra-Gen, by contrast, had no guaranteed return and, in fact, risked a substantial loss of capital if its development efforts failed.  Blaydon, Tr. 1540:6-1541:22, 1673:8-1674:13; PX-0328.011-.012 ¶ 19, Blaydon Rebuttal Report (Dec. 4, 2015); *see also id.* .012 ¶ 21.

396.     All of the Plaintiffs were aware, before agreeing to a purchase price, of Terra-Gen's estimated costs to construct its Alta Wind Lawsuit Facility, from information such as the confidential information memoranda, DAI appraisal reports, independent engineering reports, and financial models.  Pagano, Tr. 220:23-221:20, 317:8-318:16, 385:6-8; Revock, Tr. 715:24-716:2; Blaydon, Tr. 1671:4-8; PX-0005.016, Citibank Proposal for Phases 2-4 (Jan. 2010)

158

(detailing Terra-Gen's costs to construct the eligible property for Alta Facilities II-V); PX-0011.028, Altas II-V Independent Engineer's Report (June 10, 2010) (setting forth projected construction costs);  PX-0053.019, Terra-Gen Email to GE & Union Bank with Draft Alta I Appraisal (Dec. 14, 2010) (detailing projected construction costs for Alta I); PX-0162.024, Terra-Gen Financial Summary Provided to EverPower (Jan. 26, 2012) (providing estimated construction costs for Alta VI).  For example, in a preliminary evaluation of the Alta Wind I grant-eligible assets, GE observed that the cost to construct grant-eligible property was $402 million, with a preliminary grant-eligible estimate of $522 million, resulting in a markup of $120 million.

397.    Given that the buyers knew Terra-Gen's estimated construction costs, the purchase prices they paid implicitly reflect an agreed-upon markup over Terra-Gen's costs to construct the facilities, determined at arm's-length between the parties.  PX-0299.007 ¶ 12(e), Blaydon Initial Expert Report (Oct. 23, 2015); *id.* .085 ¶ 164.

398.    Seven different buyers of the Alta Wind Facilities all agreed to pay markups over Terra-Gen's estimated construction costs in the same general range.  Moreover, the "markups" for the three outright purchases of the Altas VI, VIII and IX Facilities were quite comparable to the markups for the sale-leasebacks of the Altas I through V Facilities:

| Transaction | Transaction Price ($000s) [1] | Estimated Cost (Known by the Purchasers) ($000s) [2] | Markup Over Estimated Cost [3] = ([1] / [2]) − 1 |
|---|---|---|---|
| **Outright Purchases** | | | |
| Alta VI | 439,388 | 322,279 | 36.3% |
| Alta VIII | 439,833 | 313,795 | 40.2% |
| Alta IX | 416,097 | 301,200 | 38.1% |
| **Average** | | | **38.2%** |
| **Sale Leaseback Transactions** | | | |
| Alta I | 560,000 | 430,279 | 30.1% |
| Alta II | 440,250 | 321,171 | 37.1% |
| Alta III | 444,535 | 325,647 | 36.55% |
| Alta IV | 288,792 | 214,974 | 34.3% |
| Alta V | 488,003 | 361,686 | 34.9% |
| **Average** | | | **34.6%** |

PD-089, Demonstrative: Cost Approach, Delta Between Sale Prices and Developer Cost for Alta Facilities; Blaydon, Tr. 1670:9-1672:16; Pagano, Tr. 384:17-385:9; PX-0290, Demonstrative: Implied Mark-Up of Purchase Price; PX-0299.086 ¶ 165, Blaydon Initial Expert Report (Oct. 23, 2015).

399.     Based on this information, Professor Blaydon concluded that the markup percentages negotiated at arm's-length between the Alta buyers and Terra-Gen establish the appropriate market level of profit that should be utilized if the cost approach were applied. Blaydon, Tr. 1672:6-20, 1681:3-9; PX-0299.085 ¶ 164, Blaydon Initial Expert Report (Oct. 23, 2015); *id.* .086 ¶ 166.  Thus, the proper level of markups is determined by the markup actually set by the market.  Those markups, when added to the underlying direct and indirect costs of construction, establish bases equal to the purchase prices.

400.     Accordingly, all three of the standard approaches to valuation confirm that the purchase prices Plaintiffs paid reliably establish the fair market values of the assets they acquired.  Blaydon, Tr. 1681:10-18.

**X.     None of the Purchase Prices Should Be Allocated to the PPAs, Any Other Contracts Goodwill, Going Concern Value, or a "Locational Value" Intangible.**

401.     None of the purchase prices for the Alta Wind Lawsuit Facilities should be allocated to intangibles like the PPAs, any other contracts, goodwill, going concern value, or a "locational value" intangible, because no such intangibles with separate value exist here.

**A.     None of the Purchase Price Should Be Allocated to the PPAs.**

**1.     The Terms of the PPAs.**

402.     At the time of the Allco acquisition, a "Master PPA" was in place for the first phases of the Alta Wind Energy Center.  JX-0006.001, Master PPA (Dec. 21, 2006); Pagano, Tr. 386:1-7.  The Master PPA was essentially a framework agreement, under which utility Southern California Edison agreed to enter into facility-specific PPAs for each of the Alta Wind Facilities once they were closer to being developed.  JX-0006.014; Rec. Doc. 115, Stipulation of Facts ¶ 15.  The Master PPA framework was used to establish the facility-specific PPAs for the Alta Wind Lawsuit Facilities.  Pagano, Tr. 87:14-15 (explaining that Terra-Gen derived daughter PPAs from the Master PPA).

403.     The Master PPA established a two-step procedure for determining electricity prices under the daughter PPAs.  First, an energy price would be calculated, based upon a formula whose principal inputs were the prices of the wind turbines installed at the facility and the prevailing interest rate.  Pagano, Tr. 389:3-390:21; JX-0006.147-.154, Ex. H (Energy Price Calculation).  Second, that price would be compared to the market price referent established by the California Public Utilities Commission.[12]  Pagano, Tr. 390:22-392:25; JX-0006.147-.154.  If

---

[12]     The market price referent is the price that the California Public Utility Commission deems a reasonable price for renewable energy within the state.  Utility payments to renewable power producers pursuant to contract pricing at or below the market price referent may be recovered through the rates charged to the utility's customers, without further justification. (continued…)

the formula's price was above the market price referent, Southern California Edison had the option of rejecting the price, in which case the market price referent price would be used, provided, however, that if the price was below a minimum threshold referred to as the energy price minimum, the developer had the option of requiring that the energy price minimum be used.  Pagano, Tr. 391:14-392:25; JX-0006.020-.021.

404.    The price for each of the Altas I through V PPAs calculated under the first step of this process was $121.22, but Southern California Edison rejected that price as exceeding the market price referent.  Pagano, Tr. 391:22-392:5.  The price was thus reduced to the market price referent level of $117.30/MW, and the separate Altas I through V PPAs were then entered into at that price on November 13, 2009.  *See* JX-0024.096, Alta I PPA & Amendments (Nov. 2010) (execution date), .125 (defining the final energy price as $117.30); JX-0025.096, Alta II PPA & Amendments (Nov. 2010) (execution date), .125 (defining the final energy price as $117.30); JX-0026.096, Alta III PPA & Amendments (Nov. 2010) (execution date), .125 (defining the final energy price as $117.30); JX-0027.096, Alta IV PPA & Amendments (Nov. 2010) (execution date), .125 (defining the final energy price as $117.30); JX-0028.096, Alta V PPA & Amendments (Nov. 2010) (execution date), .125 (defining the final energy price as $117.30).

405.    The price for the Alta VI PPA using the first step of this process was $129.24, but Southern California Edison likewise rejected that price as exceeding the market price referent, and the price was thus reduced to the market price referent level of $121.26/MW.  Pagano, Tr. 395:14-17.  The Alta VI PPA was entered into at that price on March 9, 2010.  JX-

---

Pagano, Tr. 392:19-25; *see also* Energy Division Resolution E-4214 (Dec. 18, 2008), available at http://docs.cpuc.ca.gov/Published/Final_resolution/95553.htm

0034.096, Mustang Hills PPA & Amendments (Mar. 2011) (execution date), .125 (defining the final energy price as $121.26).

406.    At the time that the daughter PPAs were entered into, Terra-Gen understood that the prices set by the PPAs were no higher than prices generally available in California. Pagano, Tr. 394:9-395:7.

407.    Each PPA is subject to "time-of-day" and seasonality adjustments, under which the price actually paid for generated electricity is adjusted up or down from the base PPA price depending on the time of day and the season of the year. The projected time-of-day adjusted price for the Alta I Facility was $116.62 per MWh for Alta I, $115.50 per MWh for Altas II-V, and 120.04 per MWh for Alta VI. PX-0299.090 ¶ 174, Blaydon Initial Expert Report (Oct. 23, 2015); PX-0071.059, Alta I Independent Engineer's Report (Dec. 2010) (noting that the time-of-day adjustment for Alta I is .6 percent); PX-0011.030, Alta II-V Independent Engineer's Report (June 2010) (noting that the time-of-day adjustment for Altas II-V is 1.5%); PX-0103.014, Alta VI Independent Engineer's Report (May 2011) (noting that the independent engineer has confirmed that the time-of-day adjustment was correctly calculated and reflected in Terra-Gen's financial model); JX-0169, Alta VI Model (tab "Project AW-6", Row 40, Cells H and above, reflecting 1% time-of-day adjustment). These time-of-day adjusted levels are between 98.47% and 99.42% of the base values specified in the PPA.

408.    Pursuant to each Alta Wind Lawsuit Facility's PPA, the entire electrical output from that Facility must be sold to Southern California Edison through December 31, 2035. Pagano, Tr. 221:21-222:4. The PPA for each of Alta Wind Lawsuit Facilities is facility-specific, meaning that each one provides solely for the sale of electricity generated by the facility identified in the PPA; it does not apply to power generated from any other source. PX-0326.019

163

¶ 1b, Maydew Initial Expert Report (Oct. 23, 2015); Maydew, Tr. 1439:3-4.  Accordingly, as a practical matter, none of the PPAs may be sold or assigned separate and apart from the specific facility to which it attaches, nor may such facility be sold or assigned separate from its PPA. Pagano, Tr. 393:24-394:5; Maydew, Tr. 1439:8-9; Spencer, Tr. 869:17-20; PX-0326.019 ¶ 1c.

### 2.      Any PPA Value Should Be Allocated to the Facility's Hard Assets.

409.       A contractual or other right constitutes a separate intangible property interest only when it can be separately sold or assigned.  A Treasury regulation defines "separate and distinct intangible asset" to mean property "the possession and control of which is intrinsically capable of being sold, transferred, or pledged (ignoring any restrictions imposed on assignability) separate and apart from a trade or business."  26 C.F.R. § 1.263(a)-4(b)(3).  If a contractual or other right lacks that character, it may not be treated separately from the property to which it is tied.

410.       This rule has been specifically applied by courts in the context of property leases.  When a taxpayer leases land or space in a building it owns, the lease obviously is specific to that property.  It is not an asset, intangible or otherwise, that may be sold or assigned separate and apart from the land or the building itself.  Moreover, a lease encumbers the property — during the lease term, the property may only be used in the manner provided in the lease.

411.       Accordingly, courts have held that leases do not qualify as separate and distinct property interests.  For instance, where a taxpayer acquires property subject to a lease, its "right to the rent is not a separate and distinct item of property but is a part of the bundle of rights incident to the ownership of the fee.  That bundle of rights and its related obligations are inextricably . . . wrapped up in the fee simple interest."  *Koch v. Commissioner*, 71 T.C. 54, 66

164

(1978); *Fieland v. Commissioner*, 73 T.C. 743, 755-56 (1980) ("a right to receive rents under a lease is not a depreciable asset separable from ownership of real property").[13]

412.    This is true even where a lease contains favorable terms not available in the current market.  In such instances, the Tax Court has explained that "[w]e see no justification for the separability of the favorable lease value from the many elements that determine the entire value of realty."  *Schubert v. Commissioner*, 33 T.C. 1048, 1053 (1960), *aff'd*, 286 F.2d 573 (4th Cir. 1961); *see also Peters v. Commissioner*, 4 T.C. 1236, 1240 (1945) ("[I]t is immaterial whether the lease was advantageous or detrimental to the fee owner.  If advantageous . . . the value of the property as a whole would be increased; if detrimental, the value would be depressed.").

413.    As Professor Maydew testified and as explained in his expert report, the Alta PPAs share the salient substantive characteristics of a lease and so, like leases, should not be treated as separate and distinct intangible assets.  Maydew, Tr. 1434:6-1436:24, 1438:12-1439:23; PX-0326.018-.022 ¶¶ 1-10, Maydew Initial Expert Report (Oct. 23, 2015); PD-050, Maydew Demonstrative; PD-051, Maydew Demonstrative.  All of the Alta PPAs are facility-specific — that is, each PPA only provides for the sale of power generated from its corresponding Alta Facility, and not from any other source.  Maydew, Tr. 1435:9-18, 1438:21-1439:13; PX-0326.019 ¶1b; PD-050; PD-051.  As such, and as a number of witnesses also testified, they are not contracts that can be sold or assigned separate and apart from the Facility to which each relates.  Maydew, Tr. 1439:8-9; Pagano, Tr. 393:7-394:5; Spencer, Tr. 869:17-20; PD-051; PX-0326.019 ¶ 1c.  Nor may any Alta Wind Lawsuit Facility be sold or assigned

---

[13]    In 1993, Congress codified the rule articulated in these cases, amending the Internal Revenue Code to provide that "[i]f any property is acquired subject to a lease . . . no portion of the adjusted basis shall be allocated to the leasehold interest."  26 U.S.C. § 167(c)(2).

separate and apart from its PPA. *Id.* Because of these characteristics, Professor Maydew concluded that the PPAs are inexorably tied to the underlying power producing assets and cannot be allocated any separable value. Maydew, Tr. 1438:21-22; PX-0326.018 ¶ 1; PD-051.

414.    The rule set forth in the lease cases has been applied in other contexts, further supporting its application to the Alta PPAs.

415.    The lease rule has been applied to the conversion feature of a convertible debenture. A convertible debenture is a financial instrument that the owner may elect either to treat as debt, *i.e.*, as a right to collect principal and interest, or to convert to equity. In *Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971), the Second Circuit considered whether a convertible debenture's conversion feature could be treated as an item of property separate from the debenture. The court held that it could not, explaining that a "convertible debenture is an indivisible unit" and that "the conversion feature of a bond is not assignable apart from the bond itself," and so no separate allocation to the value of the conversation feature may be made. *Id.* at 305; *accord AMF Inc. v. United States*, 476 F.2d 1351, 1353 (Ct. Cl. 1973).

416.    The rule articulated in the lease cases has also been applied in the context of satellite transponders (the device that receives and retransmits incoming signals). The IRS has considered whether a portion of the amount paid by a taxpayer to acquire transponders should be allocated to purported intangible benefits associated with the tangible assets — the "neighborhood effect," *e.g.*, the value derived from the taxpayer's access to others using the same satellite, or "protected status," *e.g.*, "the existence and availability of … spare components" in case the transponder failed. I.R.S. Tech. Adv. Mem. 9317001, 1993 WL 134598, at *4-6 (Apr. 30, 1993).

417.        While acknowledging that "[t]he [p]rice paid by the [taxpayer] for transponders aboard [the] Satellite … reflects the added value [the "neighborhood effect"] creates," *id*. at \*4, *see also id.* at \*5 (regarding "protected status"), the IRS reasoned that "such added value, by itself, does not give rise to a separate and distinct intangible asset." *Id.* at \*4; *see also id.* at \*5 ("It would be difficult to argue that the existence and availability of the spare components in this case represents a separate and distinct asset rather than its value being part of the purchase price of the equipment."). The IRS ruled that no amount of the purchase price could be allocated to such intangibles because they were attributes of the transponders themselves — not "separate and distinct" property interests. *Id*. at \*5. In so determining, the IRS relied on cases holding that, where a taxpayer acquires property subject to a favorable lease, no separate value may be attributed to that lease because it may not be separately sold or assigned. *Id*. at \*4-5.

418.        In *Solitron Devices*, the Tax Court rejected the petitioner's assertion that a portion of the amount paid to purchase a company's stock should be attributed to an indirect benefit petitioner realized from the ownership of such stock, in the form of a more positive company image after the purchase. The Tax Court disagreed, holding that even if petitioner paid a premium for the stock, "such premium would still be allocable to petitioner's cost basis in the . . . stock rather than to the enhanced value of petitioner's own corporate entity indirectly resulting from the acquisition." 80 T.C. at 23-24. The indirect benefit associated with the stock could not be sold or assigned separately from the stock itself, and thus must be treated as a component of the stock's own value rather than as a separate and distinct intangible. *See id*. at 22-24.

419.     The IRS specifically resolved in a Private Letter Ruling the very question presented here: that no separate value may be attributed to a wind facility PPA if the PPA cannot as a practical matter be sold or assigned separate from a specific wind facility.  *See* I.R.S. Priv. Ltr. Rul. 201214007, 2012 PLR LEXIS 11 (Apr. 6, 2012) (PX-0183.001).  The IRS analogized the PPA to a lease (*id.* at *6-*7) and ruled that, upon the wind facility's sale, "the . . . facility [specific] PPA should not be treated as an asset separate from the wind energy facility subject to such PPA."  *Id.* at *8.  Rather, "the portion of the purchase price of the wind energy facility that is attributable to [its] facility-specific PPA is taken into account *as part of the basis of the wind energy facility* for depreciation purposes."  *Id.* (emphasis added).  *See* PX-0326.021-.023 ¶¶ 8-9, Maydew Initial Expert Report (Oct. 23, 2015).

420.     Mr. Settle of NREL specifically found that "the [Alta I] PPA probably fits within the [Private Letter Ruling] summary provided by the IRS."  PX-0163.001, Email from Edward Settle to Ellen Neubauer (Jan. 31, 2012); *see also* Neubauer, Tr. 1794:20-1795:10, 1796:16-25.

421.     Shortly after the PLR was issued, Ms. Neubauer, the Section 1603 Program Director, requested a meeting with the IRS to discuss the PLR's impact on Treasury's Section 1603 program, suggesting a meeting on April 23, 2012.  Neubauer, Tr. 1797:18-1798:8, 1798:14-17, 1801:16-20; PX-0188.001, Email from Ellen Neubauer (Apr. 16, 2012).  According to an IRS log, there was a meeting with Treasury attorneys to discuss the PLR on April 23, 2012, just as Ms. Neubauer had suggested.  Neubauer, Tr. 1800:11-1801:20; PX-0220.001, Case History.  A second meeting with Treasury attorneys took place on June 15, 2012.  Neubauer, Tr. 1801:21-24; PX-0220.001.

168

422.    Treasury held these meetings with the IRS regarding the impact of the PLR on the Section 1603 program, despite the fact that the IRS — not Treasury — is the expert on tax issues, and the IRS has more expertise on such issues than Ms. Neubauer. Neubauer, Tr. 1797:1-6, 1779:5-8. Indeed, Ms. Neubauer testified that the IRS has "very deep" expertise with tax issues, and that she would consult with the IRS if she did not know the answer to a tax question. Neubauer, Tr. 1811:9-22; *see also* Jaffe, Tr. 1966:3-9 (Treasury would consult with IRS regarding "legal issues around the issue of what is eligible basis and what's ineligible"). Based on this evidence, the only reasonable inference is that Treasury lobbied the IRS to revoke the PLR, not because it was at odds with tax law, but rather because of the financial impact the PLR would have on the Section 1603 program.[14]

423.    The IRS decided to revoke the PLR 13 days after the second meeting with Treasury attorneys. Neubauer, Tr. 1801:25-1802:3; PX-0220.001; *see also* I.R.S. Priv. Ltr. Rul. 201249013, 2012 PLR LEXIS 1325 (Dec. 7, 2012). However, the IRS revoked the ruling only prospectively and without any substantive explanation.

424.    Professor Maydew testified that the IRS's original reasoning and conclusion was correct. Maydew, Tr. 1437:20-21, 1439:16-17. While a PPA and a lease are not identical in every respect, they share many of the same attributes and should be treated similarly with regard to their treatment when acquired with other property. Maydew, Tr. 1429:18-23; *see* Maydew, Tr. 1434:20-1436:24, 1438:21-1439:21 (describing reasoning behind his analogy).

---

[14]    This inference is supported by the fact that Defendant's privilege log contains multiple references to a document titled **"Fiscal Implications of PLR"** that was withheld on attorney-client privilege grounds. *See* Def.'s Privilege Log (May 8, 2015), Entries 106, 204, 328, 338, 354, 357 (attached as Exhibit A).

169

**B.** **Even If the Alta PPAs Could Be Treated as Separable Assets, They Would Have Value Only Insofar as They Were Above Market, and They Were Not.**

**1.** **The Alta PPAs Would Have Value Only Insofar as They Were Above Market.**

425. Even if the PPAs were deemed to be distinct intangible assets for tax purposes, they would be allocated value only to the extent their prices were above market. Maydew, Tr. 1442:14-1446:18; PX-0326.023 ¶ 1, Maydew Initial Expert Report (Oct. 23, 2015); PD-052, Maydew Demonstrative. Professor Maydew explained that when an at-market contract is acquired along with the purchase of other property, the contract is not attributed any value. Maydew, Tr. 1444:12-16. Professor Maydew emphasized that the rule is unambiguous in the accounting field, and noted that transactions, especially those involving multiple parties, frequently involve numerous contracts and that most of those are never allocated value because they are at market. Maydew, Tr. 1444:22-1445:3. Professor Maydew further explained that because at-market contracts are easy to enter into, a practice of allocating value to at-market contracts would result in "creating assets out of thin air." Maydew, Tr. 1448:11-17.

426. Consistent with Professor Maydew's testimony, the Tax Court has held that value may be attributed to a raw material supply contract only to the extent the contract prices are favorable compared to market prices. *Ithaca Indus., Inc. v. Commissioner*, 97 T.C. 253, 276-77 (1991), *aff'd*, 17 F.3d 684 (4th Cir. 1994). Other decisions and guidance are to the same effect. *See* I.R.S. Priv. Ltr. Rul. 200215037, 2002 PLR LEXIS 42, at *18-19 (Apr. 12, 2002) (explaining that the value of the PPA (if any) was to be "determined by [a comparison to] prevailing market rates"); I.R.S. Field Serv. Advisory, 1992 WL 1355768, at 3 (Feb. 11, 1992) (stating that value should be allocated to a PPA only if "at the time of the purchase the purchaser could not have entered into" a PPA at all or if the terms of such a PPA "would have been less favorable," and explaining that "[w]e suspect, therefore, that if the purchaser did not buy the

170

[electricity] contract from [seller] (but only bought the cogeneration facilities), it could have gone to [the utility] and received a long-term contract with terms very similar to the [electricity] contract that [the seller] received.  If this is true, then the [electricity] contract has little, if any, value"); *Utilicorp*, T.C. Memo 1997-47, at *2 (noting that "[t]he power purchase agreement was not significant to [buyer's] decision to purchase [the company owning the power generation facility], since the power purchase agreement was a market rate contract," and rejecting expert's position that value should be allocated to the PPA as part of a group of intangible assets).

427.      Other contracts are similarly only allocated value if they are above-market. For example, the Tax Court has remarked that while leases are not an "asset separable from ownership of real property" and so have no value separate from the real property to which they attach, even if they were separable, they would only be allocated value to the extent they were "favorable" or "premium" leases.  *See*, *e.g.*, *Fieland v. Commissioner*, 73 T.C. 743 (1980).  Debt instruments are similarly only allocated value if they provide for "favorable financing."  *Fed. Home Loan Mortg. Corp. v. Commissioner*, T.C. Memo. 2006-153, at 9 (July 25, 2006) (the value of the favorable financing was "based on the difference between the interest payments on an existing debt obligation and the interest payments made at the prevailing market rate.  The value of the favorable financing benefit equals the present value of this difference.").  Likewise, contractual warranties that "are offered as the standard practice of an industry" are not allocated value because "such warranties generally add little or nothing to the value of the warranted asset."  *Van Duzer*, T.C. Memo. 1991-249.  Finally, governmental licenses and permits may only be allocated value if there is a "showing of some clear premium."  I.R.S. Chief Couns. Advisory, IRS CCA 201040004, 2010 WL 3937045 (June 24, 2010).

### 2.    The Alta PPAs Were Not Above Market.

428.    Professor Blaydon conducted an analysis of whether the Alta PPA prices were above market, and he concluded that they were not. Blaydon, Tr. 1610:6-8. The Government presented no contrary evidence. Accordingly, none of the Alta purchase prices are properly allocated to the PPAs. Blaydon, Tr. 1619:2-5; PX-0299.010 ¶ 12(f), Blaydon Initial Expert Report (Oct. 23, 2015); *id*. .087 ¶ 169.[15]

429.    In California, PPAs must be approved by the California Public Utilities Commission ("CPUC"). *See* Pagano, Tr. 392:21-393:4. A California wind facility developer typically will have a CPUC-approved PPA in place before it obtains the financing needed to begin construction, and it typically takes 6-12 months after that to construct a wind facility. PX-0299.088-.089 ¶ 170, Blaydon Initial Expert Report (Oct. 23, 2015). Accordingly, in assessing whether the PPA price for one of the Alta Wind Lawsuit Facilities was above the prices of other PPAs that could hypothetically have been procured for the facility, Professor Blaydon considered the prices of PPAs approved by the CPUC 6-12 months before the in-service date of the Alta Wind Lawsuit Facility at issue. Blaydon, Tr. 1614:11-1615:2; PX-0299.088-.089 ¶ 170, Blaydon Initial Expert Report (Oct. 23, 2015).

430.    The Alta I through V Facilities went into service between December 2010 and June 2011. Accordingly, PPAs approved by the CPUC in 2010 are the relevant universe of PPAs

---

[15]    Although they did not have certain information regarding the pricing of PPAs in California available to them at the time of the transactions (primarily the Padilla Report, discussed below), Mr. Pagano, Mr. Revock, and Mr. Markowitz all testified that they did not consider the PPAs to be above market at the time of the Alta I-V transactions. Pagano, Tr. 399:2-5; Revock, Tr. 779:3-14 (Alta II-V PPAs were market-based); Markowitz, Tr. 979:7-10 (Union Bank did not consider the Alta I PPA to have terms more favorable than those available in the California market). Mr. Spencer testified that EverPower was not aware of whether the Alta VI PPA was more or less favorable than other California PPAs at the time. Spencer, Tr. 908:7-15.

to consider in determining whether the Alta I-V PPA prices were above market.  Blaydon, Tr. 1614:1-9; PX-0299.088-.089 ¶ 170, Blaydon Initial Expert Report (Oct. 23, 2015).

431.    PPAs are not commodities and there thus is no single "market" PPA price in California during a particular period.  PX-0299.089 ¶ 171, Blaydon Initial Expert Report (Oct. 23, 2015).  PPA prices during a particular period rather fall within a market range.  *Id.*

432.    An annual report compiled pursuant to California law and issued in March 2013, known as the Padilla Report, provides PPA pricing data, summarizing the average prices for PPAs approved by the CPUC during each calendar year from 2003 to 2012.  The data compiled in the Padilla Report can readily be used to assess whether the prices under the Alta Wind Lawsuit Facility PPAs were above market.  Blaydon, Tr. 1610:20-1611:7, PX-038.001, Padilla Report (Mar. 2013); PX-0299.089-.090 ¶ 179.  The Padilla Report provides much better information than is typically available concerning PPA prices, which are generally considered competitively sensitive information.  Blaydon, Tr. 1612:17-25.  Because the Padilla Report was issued in March 2013, it was not available to DAI at the time it conducted its appraisals of the Alta Wind Lawsuit Facilities.  Blaydon, Tr. 1611:14-20.

433.    The Padilla Report provides pricing information for both wind facilities and for all renewable energy facilities, and does so using time-of-day-adjusted prices.[16]  According to the Padilla Report, the average time-of-day-adjusted PPA price for wind PPAs approved by the CPUC in 2010 was $117.40 per Megawatt Hour (MWh).  The average time-of-day-adjusted PPA price for all renewable energy PPAs approved by the CPUC in 2010 was $124.63 per

---

[16]    The time of day adjustment refers to price adjustments based on whether the electricity is being provided during peak use or off peak use periods, as specified in the contracts.  Blaydon, Tr. 1617:3-9.  The figures reflected in the Padilla Report, as well as Professor Blaydon's description of the Alta PPA prices, are both TOD-adjusted, so the comparison is apples-to-apples.  Blaydon, Tr. 1617:3-9.

MWh.  PD-064, Demonstrative: Alta PPA Price Comparison; Blaydon, Tr. 1615:14-25; PX-0324, Blaydon Report Exhibit 7; PX-0389.015-.017, Padilla Report; Blaydon, Tr. 1616:19-1617:2; PX-0299.090 ¶ 173, Blaydon Initial Expert Report (Oct. 23, 2015).  Both amounts are *above* the $116.62 per MWh time-of-day-adjusted PPA price for Alta I and the $115.50 per MWh time-of-day-adjusted PPA price for Altas II-V.  PD-064, Demonstrative: Alta PPA Price Comparison; Blaydon, Tr. 1616:1-18.  Accordingly, the Alta I through V PPA prices were not above market.  Blaydon, Tr. 1616:15-18; PX-0299.0890 ¶ 174, Blaydon Initial Expert Report (Oct. 23, 2015).

434.    The conclusion that the Alta I-V PPA prices were not above market is further supported by publicly-available information relating to two specific PPAs (for the Windstar 1 and Coram Brodie facilities), both of which were approved by the CPUC in 2010 and had pricing comparable to that of the Altas I-V PPAs.  PX-0299.090-.091 ¶¶ 175-176, Blaydon Initial Expert Report (Oct. 23, 2015).

435.    The Alta VI PPA price was likewise not above market.  The Alta VI Facility was placed in service in May 2012.  Accordingly, PPAs approved by the CPUC in 2011 (*i.e.*, 6-12 months before the Alta VI in-service date) are the relevant universe of PPAs to consider in determining whether a hypothetical replacement contract would have had a lower price than the actual Alta VI PPA.  Blaydon, Tr. 1617:15-1618:1; PX-0299.088-.089 ¶ 170, Blaydon Initial Expert Report (Oct. 23, 2015).

436.    The time-of-day adjusted Alta VI PPA price is $120.04 per MWh.  That is slightly above the $117.70 per MWh time-of-day-adjusted average price for wind PPAs approved in 2011, but below the $124.27 per MWh time-of-day-adjusted average price under PPAs for all renewable projects approved in 2011.  PD-066, Demonstrative: Alta PPA Price

Comparison; Blaydon, Tr. 1618:5-19; PX-0299.091-.092 ¶ 177, Blaydon Initial Expert Report (Oct. 23, 2015); PX-0324, Blaydon Report Ex. 7.  Because the $120.04 per MWh Alta VI price is only slightly above the $117.70 wind average; because market PPA prices fall within a range around the average; and because the Alta VI price is *below* the $124.27 average PPA price for all renewables, Professor Blaydon concluded that there is no reasonable basis to conclude that the Alta VI PPA price was above market.  Blaydon, Tr. 1618:20-1619:1; PX-0299.091-.092 ¶ 177, Blaydon Initial Expert Report (Oct. 23, 2015).

437.    The Alta I Confidential Information Memorandum contained language indicating that the Alta I PPA contained curtailment and liquidated damages provisions that were more favorable than those available in the market at the time.  PX-0021.010, Alta I Confidential Information Memorandum (Oct. 1, 2010).  However, Mr. Pagano testified that comparing the actual terms of the Alta Wind Lawsuit Facilities PPAs to those of other California PPAs in the market at the time (which only became publicly available after the Alta transactions) reveals that the curtailment and liquidated damages provisions of the Alta Wind PPAs actually were not more favorable than those in other PPAs.  Pagano, Tr. 246:2-253:23.

438.    In short, no value should be attributed to any of the Alta Wind Lawsuit Facilities' PPAs.

### C.    None of the Purchase Prices Should Be Allocated to Any Other Contracts.

439.    Like the PPAs, other contracts would only be allocated value to the extent they had more favorable terms than contracts otherwise available in the market.  *See supra,* ¶¶ 425-427; *Ithaca Indus., Inc. v. Commissioner*, 97 T.C. 253, 276-77 (1991), *aff'd*, 17 F.3d 684 (4th Cir. 1994) (value may be attributed to a raw material supply contract only to the extent the contract prices are favorable compared to market prices); *see Utilicorp*, T.C. Memo 1997-47, at *2; *Fieland v. Commissioner*, 73 T.C. 743 (1980) (leases allocated value only to the extent they

are "favorable" or "premium"); *Fed. Home Loan Mortg. Corp.*, T.C. Memo. 2006-153, at 9 (debt instruments only allocated value if they provide for "favorable financing…based on the difference between the interest payments on an existing debt obligation and the interest payments made at the prevailing market rate.").

440.    As described in more detail in paragraph 425, *supra*, Professor Maydew testified that when a contract is "at-market" it is not allocated any value as a matter of both tax and financial accounting.  Maydew, Tr. 1447:8-1448:17, 1449:2-1450:1; PD-052; *see* PX-0326.023 ¶ 1, Maydew Initial Expert Report (Oct. 23, 2015).  This is because "at-market" contracts, those whose terms are no more favorable than those available in the market, can be readily replaced.  Maydew, Tr. 1448:7-17.

441.    The Plaintiffs acquired various contracts in connection with their purchases of the Alta Wind Lawsuit Facilities, including a shared facilities agreement, turbine service and maintenance agreement, asset management agreements, and interconnection agreements.  *See, e.g.*, PX-0180.011, EverPower Project Serenity Presentation (Mar. 29, 2012).  As detailed below, the uncontroverted testimony by both the seller and the buyers was that none of these contracts had better than market terms.  Likewise, Mr. Settle testified that he did not recall that any contracts were better than market.  Settle, Tr. 1325:9-14.

442.    Mr. Huplosky testified that the shared facilities agreement did not contain any above-market components and that the other miscellaneous contracts associated with the Alta Facilities likewise did not have any above-market features, and so were not allocated any value.  Huplosky, Trial Tr. 1110:6-10, 1110:23-1111:3, 1112:23-1113:2.  Mr. Pagano testified that none of the contracts transferred with the Alta Wind Lawsuit Facilities, including the turbine service and maintenance agreement, operating and maintenance agreement, asset management

176

agreement, interconnection agreements, and balance of construction contract with Blattner & Sons, contained any above-market terms. Pagano, Tr. 399:19-400:8, 401:23-402:2, 404:14-405:10. Mr. Pagano also explained that the balance of plant construction contract was largely finished by the time the Alta Facilities were sold and provided no value to the buyers. Pagano, Tr. 404:20-405:10.

443.    Mr. Revock testified that Citibank did not deem any of the contracts acquired in the Alta II-V transactions, including the PPAs, to provide additional value because all were nontransferable and were at market, and thus easily replaceable. Revock, Tr. 723:1-16, 816:10-21, 817:2-5. Mr. Markowitz similarly explained that he did not recall considering any of the agreements acquired with the Alta I Facility, including the transmission agreement and interconnection agreement, to be more favorable than other contracts or agreements available in California at the time. Markowitz, Tr. 979:11-21. Mr. Spencer likewise testified that EverPower did not view any of the contracts accompanying the Alta VI Facility as being more favorable than what would otherwise be available in the market. Spencer, Tr. 872:14-17; *see also* Spencer, Tr. 910:11-14 (EverPower did not assign additional value to the acquired contracts; the purchase price was based entirely on the projected cash flows).

444.    Mr. Spencer also explained that EverPower was able to operate the Alta VI Facility for *less* than Terra-Gen was charging under the asset management agreement and the operations and management agreement. This means that EverPower regarded those contracts as actually having *negative* value. Spencer, Tr. 873:6-14; *see also* Markowitz, Tr. 1003:17-22 (explaining that Union Bank could have entered into an operations and management agreement with a number of other operators).

177

445.    Moreover, neither Treasury nor NREL ever identified any of the Alta Wind Lawsuit Facility contracts as being better than market — and even admitted that the turbine supply and construction contracts were at market. Specifically, Mr. Settle of NREL could not recall identifying any contract relating to Alta VI as being at other than market rates, including O&M contracts, transmission agreements, or any other contracts. Settle, Tr. 1325:9-14. Mr. Jaffe of Treasury admitted that "Terra-Gen, you know, paid a market price to the turbine supplier for the turbines. They paid a market price to the EPC contractor to -- sorry. EPC is engineering, procurement and construction. It's basically the construction of the facility. They paid a market price to that contractor to build the facility." Jaffe, Tr. 1981:22-1982:2.

446.    In addition, the buyers of the Alta Wind Lawsuit Facilities included payments relating to the operating contracts for the Alta Wind Lawsuit Facilities, *e.g.*, the O&M contracts, in the discounted cash flow valuations they performed in determining how much to pay for the Facilities. For example, the EverPower financial model reflected turbine warranty expenses, interconnection expenses, and maintenance expenses, totaling $187 million. Blaydon, Tr. 1626:12-1627:3. If those expenses had been excluded from the model, the discounted cash flow value of the Facility would have increased. Blaydon, Tr. 1627:4-8. But by (correctly) including those expenses in the model, EverPower captured the impact of the contractual expenses, and reduced the value of the Facility accordingly in assessing how much to pay to acquire it. Because EverPower already factored in the expenses associated with the operating contracts in determining how much to pay for the Alta VI Facility, it would be improper double counting to then allocate part of the purchase price to those contracts. Blaydon, Tr. 1627:9-15.

447.    Both Mr. Revock and Mr. Spencer similarly explained that payments made pursuant to the turbine service and maintenance agreement were included as expenses in the

178

discounted cash flow valuation of the Facilities their companies purchased.  Revock, Tr. 820:3-6 (explaining that the contractual payments were future expenses that would "decrease the DCF" for Alta Facilities II-V); Spencer, Tr. 875:15-23 (confirming that EverPower's service and maintenance agreement payments were reflected in the Alta VI cash flow projections); Spencer, Tr. 909:21-910:3 (stating that the payments made pursuant to the operating contracts assigned to EverPower were treated as operating expenses).

448.    Accordingly, none of the Alta Facility purchase prices should be allocated to these various contracts.

449.    Likewise, no value should be allocated to the contractual warranties provided to the buyers because the Government presented no evidence that they offered anything beyond what was standard in the industry.  *See Houchins v. Commissioner*, 79 T.C. 570, 594 (1982) (because warranty related to the replacement of livestock was "a common practice in the industry" it "add[d] nothing to the established fair market value of the cows."); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1239 (1981) (same).

**D.    None of the Purchase Prices Should Be Allocated to the Indemnities Provided by Terra-Gen to the Buyers**

450.    The agreed-upon purchase price for each of the Alta Wind Lawsuit Facilities was based on a discounted cash flow analysis that included the value of tax benefits, including the Section 1603 cash grant.  Because the grant was an important piece of what the buyers were purchasing from Terra-Gen, the purchase agreements included indemnity provisions, requiring Terra-Gen to make the buyers whole in the event that the cash grant awarded by Treasury was less than anticipated.  Pagano, Tr. 219:19-220:3; Revock, Tr. 723:17-20; Markowitz, Tr. 982:1-3; Spencer, Tr. 870:21-871:10, 871:21-23.

451.     Neither Terra-Gen nor the buyers considered the indemnities to be separate intangible assets over and above the tangible assets conveyed in the transactions. Rather, like any indemnity, they simply provided the buyers assurance that they would receive the benefit of their bargains. Pagano, Tr. 220:4-9 (explaining that the indemnities did not provide any additional value to the owner lessors; they were rather an assurance that the owner lessors would get the full value of the Facilities as agreed by the parties); Revock, Tr. 724:13-20 (confirming that the indemnities provided by Terra-Gen did not bring any additional value to the Alta II-V transactions); Spencer, Tr. 871:25-872:6 (explaining that EverPower did not consider the indemnity a separate intangible, it was rather an assurance that EverPower would get the full benefit of its bargain for Alta VI).

452.     Each indemnity provided by Terra-Gen is conceptually identical to a warranty, which is defined by this Court as "an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *A.A.B. Joint Venture v. United States*, No. 04-1719 C, 2008 WL 4415054, at *6 (Fed. Cl. Sept. 24, 2008). Contractual warranties that are offered as the standard practice of an industry are not allocated value. *See Houchins v. Commissioner*, 79 T.C. 570, 594 (1982) (because warranty related to the replacement of livestock was "a common practice in the industry" it "add[d] nothing to the established fair market value of the cows."); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1239 (1981) (same).

453.     Tax indemnities are very common in energy transactions. The buyers here confirmed that indemnities are regularly utilized in their industry, with Mr. Revock observing

180

that tax indemnities have been provided in *every* lease transaction with which he has been involved.  Revock, Tr. 724:6-12; *see also* Revock, Tr. 811:6-10; Markowitz, Tr. 982:4-12 (testifying that Union Bank received indemnities with respect to other Section 1603 facilities and that they are "[q]uite common" in the context of sale-leaseback transactions, especially when dealing with a recently enacted government program); Spencer, Tr. 871:11-13 (confirming that, in his experience, indemnities are common in commercial transactions).

454.    Moreover, an allocation to the indemnities is improper because the only reason the indemnities were triggered is that Treasury failed to comply with its legal obligations and to pay the proper cash grant amounts.  It would be fundamentally unfair and illogical for Treasury to "create" value in the indemnities by mis-applying the law to underpay Plaintiffs, and then, in defense of its deficient grant amounts, rely upon indemnities that it had improperly caused to be triggered.

### E.    None of the Alta VI Purchase Price Should Be Allocated to Wake Payments.

455.    In the course of constructing the Alta VI Facility, Terra-Gen agreed to make "wake payments" to certain downwind Alta Facilities to compensate them for the adverse effect on their performance caused by the wake from Alta VI's upwind turbine rotors.  Pagano, Tr. 414:11-25.  These wake payments were the obligation of the developer, Terra-Gen, and not of the Alta VI purchaser.  Pagano, Tr. 414:20-25; Spencer, Tr. 911:17-24.  Because the wake payments were Terra-Gen's obligation, Terra-Gen did not satisfy a liability of the purchaser by making the wake payments — *i.e.*, Terra-Gen did not, in effect, refund a portion of the Alta VI purchase price by making wake payments on the purchaser's behalf.  Accordingly, none of the Alta VI purchase price is properly allocated to the wake payments.

181

**F.      None of the Purchase Prices Should Be Allocated to Goodwill or Going Concern Value.**

456.      There should also be no purchase price allocation to goodwill or going concern value for any of the Alta Wind Lawsuit Facilities.  Goodwill and going concern value are concepts to which Professor Maydew has afforded substantial attention in his teaching and research.  Maydew, Tr. 1420:6-17.  As Professor Maydew explained in detail in his testimony and expert report, the concepts of goodwill and going concern value are highly related.  Maydew, Tr. 1420:20-1421:4; PX-0326.010 ¶ 1, Maydew Initial Expert Report (Oct. 23, 2015).  Both involve value that can arise in an acquired business.  PX-0326.010 ¶ 1.  Both pertain to future economic benefits that the acquired business is expected to generate beyond the value represented by the individually identified and separately recognized assets.  *Id.*; *see also* PX-0326.012 ¶¶ 5-6; Maydew, Tr. 1421:25-1422:2; Kieso, Weygandt, and Warfield, *Intermediate Accounting*, 15th ed., 2013, John Wiley & Sons, Inc., at 659 ("Conceptually, goodwill represents the future economic benefits arising from the other assets acquired in a business combination that are not individually identified and separately recognized."); Hoyle, Schaefer, and Doupnik, *Advanced Accounting*, 10th ed., 2011, McGraw Hill/Irwin, at 46 ("Goodwill is defined as an asset representing the future economic benefits arising in a business combination that are not individually identified and separately recognized.  Essentially, goodwill embodies the expected synergies that the acquirer expects to achieve through control of the acquired firm's assets.").

457.      Thus, goodwill is "the value of a trade or business attributable to the expectancy of continued customer patronage."   Treas. Reg. § 1.197-2(b)(1); *see also id.* § 1.1060(b)(2)(ii).  The Supreme Court has described the concept as "a useful label with which to identify the total of all the imponderable qualities that *attract customers to the business*." *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555-56 (1993) (emphasis added);

*see also Solitron*, 80 T.C. at 18 ("More succinctly, [*goodwill*] *has been described as the probability that 'old customers will resort to the old place.'*" (citation omitted; emphasis added)).

458.    Importantly,  goodwill is a substantive concept, not simply a "residual" to be resorted to whenever it is asserted that a purchase price exceeded the purported value of the assets that were acquired.  This court has rejected the notion that goodwill is a "concept with no independent content, substantive meaning, or permanent dimensions"; rather goodwill can exist where — and only where — the definitions above are satisfied.  *Deseret Mgmt. Corp. v. United States*, 112 Fed. Cl. 438, 451 (2013).

459.    "Going concern value is the ability of an acquired business to generate sales without any interruption because of a takeover [by the buyer]," *Sirovatka v. Commissioner*, T.C.M. 1983-634, at 7 n.23 (Oct. 12, 1983) (citing *Winn-Dixie Montgomery, Inc. v. United States,* 444 F.2d 677, 685 n.12 (5th Cir. 1971)), *see* Treas. Reg. §§ 1.197-2(b)(2), § 1.1060(b)(2)(ii).  As Professor Maydew explains, goodwill and going concern value do not arise from the purchase of a single asset, or even a group of assets, that do not constitute a business.  PX-0326.013-.014 ¶ 1; *see* Kieso et al. (2013), at 659 (goodwill is "often called 'the most intangible of the intangible assets' because it is identified only with the business as a whole.").

460.    Professor Maydew considered whether either goodwill or going concern value (which, for ease of reference, he refers to collectively as "goodwill"[17]) were present at the time the Plaintiffs acquired their interests in the Alta Wind Lawsuit Facilities.  As detailed by Professor Maydew's testimony and report, the answer is no.  The key considerations leading to that conclusion are as follows.

---

[17]    Maydew, Tr. 1420:25-1421:4.

461.     First, the Plaintiffs acquired brand new facilities.  The sales of the Alta Wind Lawsuit Facilities were negotiated and consummated before the Facilities were even placed in service.  Pagano, Tr. 156:17-19[18]; Revock, Tr. 721:18-22; Maydew, Tr. 1423:17-1424:8; PX-0326.015-.016 ¶ 5*;* PD-041; PD-042, Maydew Demonstrative; Spencer, Tr. 885:1-16 (Alta VI was close to being ready to be placed in service when it was sold).  The Facilities had no reputation based on a history of successful operations, earnings history, or other hallmarks of goodwill at the times they were sold brand new.  Professor Maydew explained that brand new facilities like the Alta Wind Lawsuit Facilities at the times they were sold cannot have goodwill.  Maydew, Tr. 1421:15-18, 1422:15-21, 1423:17-1424:16.  As Professor Maydew testified, when a company purchases a brand new asset, the accounting treatment is very simple: "You would debit property, plant and equipment and you credit cash.  There's no goodwill.  It hasn't operated yet.  That's all there is."  Maydew, Tr. 1424:5-8.

462.     Second, the Alta Wind Lawsuit Facilities had no ability to expand their operations by attracting new customers or producing more electricity.  The Alta PPAs commit the Facilities to sell 100% of that electricity to a single customer, Southern California Edison, for the approximately 24-year terms of the PPAs.  There is thus no possibility for the Facilities to attract new customers, which is a key element of goodwill.  Rec. Doc. 115, Stipulation of Facts ¶ 16; JX-0006.007-.009, .165, Master PPA (Dec. 21, 2006); Pagano, Tr. 387:10-388:16; PX-0326.019 ¶ 1a, Maydew Initial Expert Report (Oct. 23, 2015).  The Alta Wind Lawsuit Facilities

---

[18]     Treasury's Guidance allows the entire wind energy facility to be treated as a single, unified unit for purposes of determining the in-service date.  JX-0126.008, Treasury Guidance (2011).  Furthermore, if new property is originally placed in service by a person, then sold through sale-leaseback within three months of the in-service date, such property shall be treated as originally placed in service not earlier than the date on which such property is used under the leaseback.  *Id.* at .009.

also cannot be physically expanded so as to generate more electricity, both because they have used up all of their physical space, and because the Alta Wind Energy Center has used up all of the Tehachapi Renewable Transmission Project transmission line allocated to it.  Pagano, Tr. 72:8-10, 203:23-204:3, 444:6-12; *see* Maydew, Tr. 1426:20-24.  Professor Maydew testified that no goodwill can exist in this scenario.  Maydew, Tr. 1425:25-1426:20.

463.    Third, no workforce was transferred to the buyers in conjunction with their purchases of the Alta Wind Lawsuit Facilities.  PX-0326.016 ¶ 5; Maydew, Tr. 1427:7-1428:6; PD-044, Maydew Demonstrative, *see* Revock, Tr. 719:19-22 (Citibank did not acquire any work force with the Alta II-V Facilities).  According to Professor Maydew, this is further evidence that only physical assets were conveyed to the buyers, not goodwill.  Maydew, Tr. 1427:14-17.

464.    Professor Maydew posited a spectrum that can be used in assessing whether goodwill can exist and can thus be conveyed to the buyer in a purchase-and-sale transaction.  On one end of the spectrum is the sale of a brand new asset with no earnings history, no associated workforce, and no capacity for growth over time.  On the other end of the spectrum is the sale of an operating business with a substantial earnings history, a trained workforce, and the potential to grow or expand into new markets.  While goodwill could potentially exist and be conveyed to the buyer in the latter scenario, goodwill could not possibly exist in the former scenario, and so no goodwill could possibly be conveyed to the buyer in that scenario.  Maydew, Tr. 1427:18-1428:24, 1473:15-1474:2, 1492:14-20.

465.    Professor Maydew determined that the sales of the Alta Wind Lawsuit Facilities were clearly on the end of the spectrum where no goodwill can exist, and no goodwill could thus have been conveyed to the buyers.  Maydew, Tr. 1427:18-1428:2, 1429:14-1430:5.

185

466. Professor Maydew concluded as follows concerning goodwill: "So my conclusion is that there can't be any goodwill in these transactions because, at the time they're sold, the income they generate is entirely attributable to the Facility itself, the assets and the Facility itself. There's no way to expand. There's no employees that were transferred, no room for growth. So the only thing we're getting here are the Facilities themselves, just like if you buy a building, you're getting the building, and there's no possibility for goodwill." Maydew, Tr. 1429:17-1430:2.

467. Because no goodwill can have existed at the times of the Alta Wind Lawsuit Facility transactions, none was conveyed to the purchasers, and none of the purchase prices can properly be allocated to goodwill. Maydew, Tr. 1422:22-1423:10.

468. Professor Maydew's testimony is consistent with the contemporaneous conclusion of KPMG "[t]hat none of the purchase price" for Alta I "should be allocated to goodwill or going concern" value. Huplosky, Tr. 1113:3-20.

469. Professor Maydew's testimony is also consistent with case law. Indeed, even when a business is purchased rather than just assets, courts have held that goodwill cannot arise if the purchase is of a *new* business. *Leisure Time Cruise Corp. v. Town of Barnstable*, 62 F. Supp. 2d 202, 211 (D. Mass. 1999) ("as a new business, plaintiff has not yet established goodwill…"); *Stallworth Timber Co. v. Triad Bldg. Supply*, 968 F. Supp. 279, 284 (D.V.I. 1997) ("Chief elements in determining goodwill are the length of the business' existence, average profits, and likelihood of continuing business under the same name . . . It follows, then, that a relatively new business would have little if any established goodwill." (internal citations omitted)).

470.    Professor Blaydon's discounted cash flow valuations of the Alta Wind Lawsuit Facilities further demonstrates that there should be no allocation of the purchase prices for the Facilities to goodwill.  In performing his valuations, Professor Blaydon assumed no growth over time based on building customer loyalty, or for any other reason.  He simply assumed electricity production from operation of the physical assets at a steady P50 level throughout each Facility's useful life.  This analysis resulted in a discounted cash flow value for each Facility in excess of the transaction price.  Accordingly, Professor Blaydon concluded that there is no need to assume the presence of goodwill in order to explain the transaction prices. Blaydon, Tr. 1681:23-1682:20.

471.    The expert testimony of Professor Maydew and Professor Blaydon that none of the purchase prices for the Alta Wind Lawsuit Facilities should be allocated to goodwill or going concern value is supported by the fact that neither Terra-Gen nor the purchasers attributed any of the value of the Alta Wind Lawsuit Facilities to goodwill or going concern value. Pagano, Tr. 415:13-416:6; Revock, Tr. 721:23-722:16; Spencer, Tr. 864:21-865:17, 866:11-17.

**G.    The Alta Wind Lawsuit Facilities Had Turnkey Value, but That Value Is Just Part and Parcel of the Physical Assets.**

472.    The Alta Wind Lawsuit Facilities did not have any goodwill or going concern value, but, as discussed in Section III.I, *supra*, they did have "turnkey" value on the dates they were sold.  Turnkey value is the value associated with a facility already or soon to be capable of operation. *Miami Valley*, 499 F.2d at  681 (describing turnkey value as "the increased value of the individual tangible assets because they were assembled, installed, integrated, tested, coordinated, and in operating order"); PX-0326.016-.017 ¶ 7, Maydew Initial Expert Report (Oct. 23, 2015); Maydew, Tr. 1430:15-20; PD-048, Maydew Demonstrative.  Turnkey value is distinct from goodwill or going concern value.  *See* I.R.S. Tech. Adv. Mem. 200907024 (group

187

of interrelated assets may have value above and beyond the value of each individual asset considered in isolation, and such value is conceptually distinct from goodwill or going concern value: "case law supports a conclusion that it is appropriate to value interrelated assets in the aggregate and that the synergistic value of a collection of assets is attributable to those assets rather than a conceptually distinguishable goodwill or going concern value element.").

473.   Purchasers pay a premium to acquire assets in turnkey form, as distinct from a series of untested uncoordinated parts.  *Miami Valley*, 499 F.2d at 681.  But courts have recognized that this turnkey value is an incident of the tangible assets themselves, not a separate and distinct intangible.  *Id.*; *Utilicorp,* T.C. Memo. 1997-47, 1997 WL 28654, at \*6-7.

474.   Professor Maydew similarly testified that, from an accounting perspective, turnkey value is not considered a separate asset but is rather deemed part of the value of the underlying property.  Maydew, Tr. 1430:21-1431:5; PX-0326.016-.017 ¶ 7.  The value that the buyer places on the property's turnkey value is reflected in the basis of the physical assets themselves.  Maydew, Tr. 1431:7-1431:10.  As Professor Maydew explained, "The basis in your house is what you paid for the house.  You don't try to disaggregate that into some value for it being assembled."  Maydew, Tr. 1431:8-10.

### G.   No Allocation Should Be Made to a So-Called "Locational Value" Intangible.

475.   The Government suggests that a portion of the purchase prices for the Alta Wind Lawsuit Facilities should be allocated to an intangible called "locational value," reflecting that the Facilities are located: (a) in a place (Tehachapi) that is especially suited to wind energy production, (b) near a major metropolitan area (Los Angeles) that has a large demand for electricity, and (c) in a state (California) that promotes renewal energy.  But no authority supports the notion that the location of an asset constitutes a separate asset (intangible or otherwise) to which value can be allocated.

188

476.    Indeed, the law is directly to the contrary: any "locational value" must be reflected in the basis of the property itself. *See, e.g.*, I.R.S. Tech. Adv. Mem. 9317001, 1993 WL 134598 ("there is no separate and distinct intangible asset attributable to favorable location/position"); *Wineman v. Commissioner*, T.C. Memo. 2000-193, at 13 (June 28, 2000) ("Considering the paramount importance of location in valuing real estate, [the appraiser's] failure to adjust for location in his report was material.  Our determination of fair market values takes into account his failure to adjust for location and for differences in zoning, irrigated land, water rights, and other factors for which he should have adjusted but did not."); *Calhoun Realty Co. v. Commissioner*, No. 7057, 1946 WL 7218 (T.C. July 29, 1946) (court "carefully considered" a number of factors including "the desirable location of the property" when determining its fair market value) (valuing a warehouse); *Smith v Commissioner*, No. 19044, 1949 WL 7486  (T.C. Nov. 30, 1949) ("[T]here was other testimony bearing upon the fair market value of the property, such as its desirable location, the well landscaped lot, the type of construction of the building and things of that sort which are relevant factors in the determination of the fair market value of residential property.") (valuing a house); *Estate of Hillebrandt v. Commissioner*, T.C. Memo. 1986-560, at 8 (Nov. 24, 1986) ("[The witness] indicated that the Hillebrandt farm, although zoned agricultural, was subject to 'urban influence,' which essentially meant buyers were willing to pay higher prices for land located closer into Kearney.  While urban influence may be a somewhat indefinable concept, location is always an important factor in valuing real estate. . . .  Proximity to land being sold for development, whether labeled 'urban influence' or the realtor's talismanic 'location, location, location, ' impacts on the value of the Hillebrandt farm and cannot be completely disregarded, as petitioner's experts chose to do.") (valuing a farm); *Residents of Buckingham Springs v. Bucks Cty. Assessment Office*, 60 A.3d

189

883, 886 (Pa. Commw. Ct. 2013) (affirming trial court's valuation that relied on trial testimony that "the location of any house will affect its fair market value; indeed, location is one of the most important elements in a valuation.  This is why two identical houses in two different locations may have very different values.") (manufactured housing); *Moore v. Dep't of Revenue*, 12 Or. Tax 282, 283 (1992) ("location affects not only the land value but all other aspects of the property's worth") (pizza parlor); *Mathis v. Commissioner*, T.C. Memo. 1989-254, at 7 (May 24, 1989) ("We agree with petitioner that location is an important factor in determining the fair market value of the subject property.  We conclude that [the appraiser] erred in disregarding the value of access to an interchange in valuing the subject property.") (valuing land).

477.    The Government's notion of "locational" value appears to relate in part to the policies of the State of California, which are simultaneously: (a) supportive of renewable energy, given the State's establishment of its Renewable Portfolio Standard for state utilities, yet (b) challenging to the actual construction of a new wind energy farm, due to the stringent state environmental review processes.  These factors combine to make wind facilities that can successfully be developed and built in the State more valuable than wind facilities elsewhere.  But those considerations are simply reflected in the fair market value of a California wind facility, given that they affect what a willing buyer would pay a willing seller for the property; they are not somehow separate from the property itself.  *Fairfield Gardens, Inc. v. United States*, 306 F.2d 167, 170 (9th Cir. 1962) ("All kinds of governmental action may directly affect the value of property, such as wartime price or rent controls, zoning regulations, etc."); *People ex rel. State Pub. Works Bd. v. Talleur*, 79 Cal. App. 3d 690, 698 (1978) ("evidence of the effect of the [California Coastal] Commission's regulations on the value of the property was relevant to the determination of the value of respondents' property," given that the property was excluded

190

from Coastal Commission regulations and "coastal lands of California which are free of the hindrance of the Coastal Commission and available for development are so scarce that they are going up at very rapid rates of increase in price."); *Sage v. Bernards Twp.*, 5 N.J. Tax 52, 68 (1982), (new zoning ordinance that liberalized the zoning restrictions for the property at issue must be taken in account "[i]n order to determine the full and fair market value of the lots [which turns on] the price a willing seller and a willing purchaser would agree upon."), *aff'd*, 6 N.J. Tax 349 (Super. Ct. App. Div. 1984); *Spring Hill, L.P. v. Tenn. State Bd. of Equalization*, No. M2001–02683–COA–R3–CV, 2003 WL 23099679, at *10 (Tenn. Ct. App. Dec. 31, 2003) (endorsing "longstanding policy of including the value of government incentives that make projects economically feasible, such as rent subsidies, mortgage interest subsidies, and government insured low-interest mortgages, as a factor in determining fair market value of real property."); *Schwam v. Twp. of Cedar Grove*, 9 N.J. Tax 406, 412-13 (1987) ("It is, of course, well settled that governmental restrictions may affect the value of real property for property tax purposes. Zoning regulations affect value; so do pinelands development controls, sewage disposal requirements, and flood zone regulations." (citations omitted)), *aff'd*, 228 N.J. Super. 522 (App. Div. 1988)).

478. Professor Blaydon testified that during his career, he has reviewed many balance sheets of companies, and has never seen locational value listed as a separate intangible asset on a balance sheet. Blaydon, Tr. 1619:10-18. Moreover, the notion of an allocation to locational value would have wide-ranging consequences for tax law, as it would mean that for many real property purchases, some of the purchase price would be allocated to an intangible with a 15-year depreciation period, as opposed to land, which is not depreciable, or buildings,

which are depreciated over 39 years. It is difficult to imagine that the Government seriously supports this proposition.

479.    Consistent with the law on the subject, Professor Maydew explained that there is no concept of "locational value" in either financial or tax accounting. Maydew, Tr. 1451:3-6. While a buyer would likely be willing to pay more for a hotel in Manhattan, New York than an identical hotel in Manhattan, Kansas, the additional value of the New York hotel is considered part of the underlying property and is not allocated to any "location" intangible. Maydew, Tr. 1450:10-1451:2, 1453:5-9; PD-053, Maydew Demonstrative.

480.    Thus, the fact that Plaintiffs were willing to pay more for the Alta Wind Lawsuit Facilities due to their desirable location in the Tehachapi Region, or due to their location in California with its high renewably energy demand, does not diminish the Plaintiffs' bases in the tangible property constituting the Facilities. Plaintiffs' bases are established by the purchase prices they paid, regardless of the fact that those purchase prices were informed by the favorable location of the Facilities. Maydew, Tr. 1451:14-1453:2.

481.    Consistent with the prevailing authority and practice, none of the buyers of the Alta Wind Lawsuit Facilities attributed value to any "location" intangible. Indeed, Mr. Revock of Citibank testified that in his many years of experience he has never seen a purchase price allocation to some sort of "locational" value intangible and that, while Citibank did pay more for the Alta II-V Facilities because of their desirable location, that value was simply considered part of the physical assets. Revock, Tr. 738:5-740:3.

482.    In short, none of the purchase prices should be allocated to the PPAs, goodwill, going concern value, or "locational value."

192

**XI.    No Allocation Should Be Made to the Land, With a De Minimis Exception.**

**A.    The Rented Land Is a Cost Item in the Discounted Cash Flow Analyses, and Any Value of the Land Is Reflected in that Cost.**

483.    To acquire a majority of the land for development of the Alta Wind Lawsuit Facilities, Terra-Gen entered into lease agreements with landowners providing for the landowners to receive royalties based on the revenues generated from the Facilities. Pagano, Tr. 89:24-90:2, 95:18-96:3, 407:11-408:10; PX-0296.001-.011, Alta I-VI Development Milestones; PX-0223, Alta I-VI Land Acquisition Map.   These royalty rates were agreed on after negotiations between Terra-Gen and the landowners. Pagano, Tr. 408:7-10.

484.    When compared to the royalty rates of other leases entered into by Terra-Gen during the same time period, the royalty rates paid for the land used for the Alta Wind Lawsuit Facilities were slightly higher, and thus less favorable to Terra-Gen, than what was generally available in the market. Pagano, Tr. 407:14-409:6.  Professor Maydew testified that in these circumstances no value should be ascribed to the leases. Maydew, Tr. 1466:14-22.

485.    In addition, the royalty payments to the landowners were among the operating expenses used by the buyers to calculate the discounted cash flow values of the Alta Wind Lawsuit Facilities, and thus to calculate how much they were willing to pay for the Facilities. Pagano, Tr. 406:23-407:10; Huplosky, Tr. 1097:8-21; Revock, Tr. 819:12-820:2.  For example, the discounted cash flow model that EverPower used to calculate the value of the Alta VI Facility reflected a total of $55.818 million in royalty payments in connection with the leased land. Blaydon, Tr. 1620:13-1621:8.

486.    As Professor Blaydon explained, the fact that the financial models reflect lease royalty payments as an expense *decreases* the discounted cash flow value of the Facilities. Blaydon, Tr. 1621:9-12.   Accordingly, these royalty expenses were already appropriately

193

accounted for by the parties in determining the values and the purchase prices for the Facilities. Blaydon, Tr. 1621:23-25; Pagano, Tr. 406:23-407:10; Huplosky, Tr. 1097:8-21; Revock, Tr. 819:12-820:2; PX-0299.092 ¶ 179, Blaydon Initial Expert Report (Oct. 23, 2015). Because the royalties were already accounted for in determining the purchase prices, it would be improper double counting to then allocate part of the purchase prices to the land giving rise to the royalty obligations. Blaydon, Tr. 1627:13-15; Pagano, Tr. 618:20-619:7.

> **B.** **A Small Amount of Fee Land Was Made Available to the Purchasers at No Separate Charge, and the Small Value of that Land Should Be Attributed to It.**

487.    The purchasers of the Alta Wind Lawsuit Facilities were allowed to use certain land owned by Terra-Gen without separate charge. Pagano, Tr. 409:7-17. The aggregate value of this land is approximately $4 million (less than two-tenths of one percent of the total consideration paid by the buyers to acquire the Facilities), as reflected in the table below.

| Transaction | Transaction Price ($000s) | Estimated Cost ($000s) | Rent-Free Land as Percentage of Transaction |
|---|---|---|---|
| Alta I | $  560,000 | $157 | 0.02% |
| Alta II | $  440,250 | $77 | 0.02% |
| Alta III | $  444,535 | $560 | 0.13% |
| Alta IV | $  288,792 | $560 | 0.19% |
| Alta V | $  488,003 | $560 | 0.11% |
| Alta VI | $  439,388 | $2,100 | 0.48% |
| Total | $2,660,968 | $4,014 | 0.14% |

PD-068, Demonstrative: Value of Land Made Available at No Separate Charge; Blaydon, Tr. 1625:1-10; PX-0219, Alta Fair Land Support File; PX-0218, Alta I-VI Land Analysis; Pagano, Tr. 409:7-24, 411:1-413:7; PX-0299.092-.093 ¶¶ 180-82, Blaydon Initial Expert Report (Oct. 23, 2015).

194

488.    These values are based on the acquisition costs incurred to acquire land for the Alta Wind Energy Center.  There were 49 such transactions, with an average cost per acre of $7,864.  Blaydon, Tr. 1622:12-1623:8, 1624:2-3; PX-0219; Pagano, Tr. 411:7-21.  Professor Blaydon concluded that 49 transactions was "a pretty comprehensive number covering that area," and that the sales data for those parcels could thus be reasonably relied upon to establish the fair market value of land in the area.  Blaydon, Tr. 1624:4-25.

489.    The $7,864 per acre land cost was multiplied by the number of acres made available for each Facility at no separate charge to determine the fair market value of that land. The only exceptions were two parcels of land that were purchased in the same time frame; for them, the actual sales prices were used to establish fair market value.  PX-0218; Pagano, Tr. 411:24-413:1.  The resulting amount is the amount of the purchase price for each Facility that should be allocated to the land made available to the buyers at no separate charge, and Professor Blaydon deducted that amount in performing the damages calculations set forth in ¶ 314, *supra*. This deduction appropriately accounts for the value of the land made available at no separate charge.  Blaydon, Tr. 1625:11-1626:4.

**XII.    Even If There Were Any Intangibles, the Entire Purchase Prices Would Still Be Allocated to the Tangible Assets Because the Fair Market Value of the Tangible Assets Equaled or Exceeded the Purchase Prices.**

490.    Section 1060 of the Internal Revenue Code and its implementing regulations, 26 C.F.R. § 1.1060-1, address how value should be allocated to different categories of assets conveyed in a purchase and sale transaction.  Section 1060 refers to seven different classes of assets.  Classes I to V consist of different kinds of tangible assets.  Class VI consists of intangible

195

assets other than goodwill and going concern value. And Class VII consists of goodwill and going concern value.[19]

491. Under Section 1060 of the Tax Code, purchase price is allocated to each class of assets conveyed in a transaction using a "waterfall" method, beginning with Class I assets and then proceeding through Class II, III, etc. through Class VII. For example, if Class I, II, V, and VII assets, with fair market values of $2 million, $1 million, $7 million, and $2 million, respectively, were sold for an aggregate purchase price of $10 million, then $2 million of the purchase price would be allocated to the Class I assets, $1 million would be allocated to the Class II assets, $7 million would be allocated to the Class V assets, and nothing would be allocated to the Class VII assets, because the entirety of the purchase price would already have been allocated to the other classes. *See* Maydew, Tr. 1454:18-1455:11 (describing the Section 1060 allocation method, also known as the waterfall approach); PD-055, Maydew Demonstrative; PX-0326.014-.015 ¶ 4, Maydew Initial Expert Report (Oct. 23, 2015).

492. As the *Utilicorp* court observed:

> Where assets are purchased and the fair market value of assets other than goodwill or going concern value equals or exceeds the purchase price, goodwill or going concern value is not generally attributable to the purchase price. [This is because] Sec. 1060 provides special allocation rules for certain asset acquisitions. Under the residual method described in sec. 1.1060–1T(d), Temporary Income Tax Regs., 53 Fed. Reg. 27040 (July 18, 1988), consideration is first allocated among cash and other items, including both tangible and intangible property (but not intangibles in the nature of goodwill and going concern value), before being allocated to goodwill and going concern value.

---

[19] The IRS has defined each class of assets as follows: Class I assets are cash and general deposit accounts; Class II assets are actively traded personal property; Class III assets are assets that a taxpayer marks-to-market at least annually for federal income tax purposes and debt instruments; Class IV assets are stock in trade or inventory of a taxpayer; Class V assets are all assets *other than* Class I-IV and VI-VII assets; Class VI assets are section 197 intangibles other than goodwill and going concern value; and Class VII assets are goodwill and going concern value. Treas. Reg. § 1.338-6(b)(2); IRS, Instructions for Form 8594.

*Utilicorp*, T.C. Memo 1997-47, at 7-8 n.1.

493.	Pursuant to Section 1060 and its implementing regulations, there would only be a purchase price allocation to any intangibles at the Alta Wind Lawsuit Facilities if and to the extent the purchase prices exceeded the value of the Class I through Class V assets (*i.e.*, the tangible assets). *See* PX-0325.014-.015 ¶ 4, Maydew Initial Expert Report (Oct. 23, 2015); Maydew, Tr. 1453:18-1455:11; PD-055, Maydew Demonstrative. If the fair market value of the Class I through Class V assets equaled or exceeded the purchase prices, then there would be nothing left over to allocate to Class VI or Class VII intangibles.

494.	Here, all of the physical components of the Facilities, such as the turbines, transmission assets, etc., are Class V assets. *See also* JX-0162.003, Memorandum from Katherine Breaks to Alta Wind I Purchasers (June 21, 2011) (noting that "[i]n this transaction, there are no assets in Class I-IV," and because the PPA was at market, there was no Class VI asset, nor was there any goodwill or going concern value, and so "the entire purchase price should be allocated to Class V"); Huplosky, Tr. 1109:3-15. For Alta VI, the working capital and deferred financing costs conveyed to EverPower, *see* JX-0183.006 n.1, Fair Market Valuation of Mustang Hills (May 21, 2012); PD-032, Demonstrative: Alta VI Purchase Price Allocation, are Class I and III assets, respectively.

495.	As explained in Section VII.B, *supra*, Professor Blaydon performed a discounted cash flow valuation of the Alta Wind Lawsuit Facilities based solely on the operation of the physical assets and generation of electricity from those assets at a steady P50 level during the useful lives of the Facilities. The discounted cash flow value of these Class I-V tangible assets, as determined by Professor Blaydon, equaled or exceeded the purchase price for each of the Alta Wind Lawsuit Facilities, as the following table illustrates:

| Facility | DCF Value of Class I-V Assets | Purchase Price |
| --- | --- | --- |
| Alta I | $633.170 million | $560 million |
| Alta II | $468.102 million | $440.2 million |
| Alta III | $468.581 million | $444.5 million |
| Alta IV | $306.295 million | $288.8 million |
| Alta V | $495.498 million | $488 million |
| Alta VI | $546.115 million | $439.4 million |

PX-0299.064 ¶ 117, Blaydon Initial Expert Report (Oct. 23, 2015).

496.    Accordingly, under Section 1060 of the Tax Code, the *entire* amount of the purchase prices for the Altas I-VI Facilities is used up by the allocations to Class I-V tangible assets.  That means there can be no allocation to Class VI or Class VII intangible assets, even assuming they existed.

497.    For all these reasons, Plaintiffs' eligible bases are as set forth in ¶ 314, *supra*, and Plaintiffs are entitled to damages equal to the difference between the cash grants calculated using those bases and the cash grants they were actually paid.

## XIII.    The Government's Calculation of Plaintiffs' Basis Is Inconsistent and Inequitable.

498.    In addition to being legally unsound, the Government's argument that basis should be determined by Terra-Gen's construction costs — and not by the purchase prices paid by the Plaintiffs — disregards the fact that taxable gain was determined based on the purchase prices.  Pagano, Tr. 427:4-21; Maydew, Tr. 1389:14-1392:13; *see* PX-0326.026-.027 ¶ 7, Maydew Initial Expert Report (Oct. 23, 2015) (explaining that favorable tax treatment affects both buyers and sellers in a transaction).

499.    As described in Section II.I, *supra*, Terra-Gen could not itself have applied for Section 1603 cash grants.  Hypothetically, if Terra-Gen had retained the Alta Wind Lawsuit Facilities and applied for the Section 1603 grants itself, Terra-Gen would have applied for each grant using its own basis in the property — its cost of construction.  Maydew, Tr. 1389:19-25; Pagano, Tr. 576:1-12; PD-037, Maydew Demonstrative.  While in this scenario Terra-Gen would have received a lower grant than Plaintiffs are entitled to here, Terra-Gen's owners would *also* have avoided a costly taxable gain.  Maydew, Tr. 1395:13-1396:23; PD-037; *see* Pagano, Tr. 427:3-11.

500.    However, because Terra-Gen sold the Alta Wind Lawsuit Facilities, Plaintiffs applied for the Section 1603 grants based upon *their* bases: what they paid to purchase the Alta Wind Lawsuit Facilities.  Maydew, Tr. 1391:4-13; PD-037.  The trade-off for these higher bases was that the sales were taxable transactions, triggering a huge taxable gain in the hundreds of millions of dollars for Terra-Gen's owners.  Maydew, Tr. 1395:13-1396:23; Pagano, Tr. 427:4-428:14, 428:23-429:7 (describing the taxable "step-up" incurred by Terra-Gen's owners); PD-037.



See PX-0299.094 ¶ 184, Blaydon Report (Oct. 23, 2015) (stating eligible basis for Alta VI as calculated by Professor Blaydon); Rec. Doc. 115, Stipulation of Facts ¶ 39 (listing grant award for Alta Wind VI in the amount of $86,905,263, thus indicating Treasury's calculation of an eligible basis of $289,684,210).

501.    The Government thus seeks to apply two different and inconsistent tax basis calculations arising out of the same transactions.  Pagano, Tr. 428:23-429:7.  The Government wants to use a *low* basis determined by Terra-Gen's construction costs for purposes of calculating Plaintiffs' Section 1603 applications, but then to use a much *higher* basis established by the purchase prices for the Alta Wind Facilities for purposes of calculating Terra-Gen's owners' income tax obligations.  *Id.*  As Professor Maydew's testimony demonstrates, the Government's inconsistent approach flies in the face of accepted accounting and tax principles.

200

Maydew, Tr. 1395:25-1396:19; *see generally* Maydew, Tr. 1390:8-1396:19 (describing relationship between basis and income tax calculation).

## XIV.  Defendant's Counterclaims Should Be Denied.

502.    The Government's counterclaims start from the false proposition that the Government was correct in rejecting the purchase prices to establish each Plaintiff's basis. The counterclaims then proceed to the false premise that it is appropriate to rely instead on seller Terra-Gen's out of pocket costs of construction. Because both of those premises are false, see Sections III.B, III.H, VI-IX, *supra*, the counterclaims fail for these reasons alone.

### A.    The Counterclaims Fail for a Lack of Proof.

503.    The Government's counterclaims also fail because there is no evidence in the record to support the Government's position as to the eligible bases of the Alta Wind Lawsuit Facilities. To recover purported overpayments, the Government must establish bases for the Facilities in amounts lower than those it used to calculate Plaintiffs' cash grants. The Government has asserted that basis should be determined by taking Terra-Gen's out-of-pocket costs to construct eligible property at the Alta Wind Lawsuit Facilities and adding to that an "expected return." *See* Rec. Doc. 85 at 11 (Government's brief explaining that the counterclaims rely on applying an "expected rate of return," such that the basis is the "hard costs plus expected return"); Rec. Doc. 122 at 48-49 (explaining that the Government's calculation of eligible basis includes a rate of return). The Government, however, presented no evidence for an appropriate "expected return," and thus failed in its burden to establish bases for the Alta Wind Lawsuit Facilities lower than those used to calculate Plaintiffs' cash grant awards. Accordingly, the Government cannot meet its burden of proof on its counterclaims. *See, e.g.*, *G.M. Shupe, Inc. v. United States*, 5 Cl. Ct. 662, 740 (1984) (in a breach of contract counterclaim alleging overpayment, the Government "must carry the burden of proof on its counterclaim. In sustaining

its burden, defendant must provide the court with a sufficient basis for determining the damages it seeks so that the court's determination will be more than sheer speculation," and that presenting "the court a figure for damages without adequate support" requires that the counterclaim to be rejected (citation omitted)).

### B.      The Government Improperly Excludes Certain Costs.

504.      The Government's counterclaims also fail because they improperly exclude three cost items (the "Three Cost Items") in determining the out-of-pocket costs Terra-Gen incurred to develop grant-eligible property at the Alta Wind Lawsuit Facilities.  The Three Cost Items are: (1) interest incurred by Terra-Gen during the construction of the Alta Wind Lawsuit Facilities (so-called interest during construction, or "IDC"); (2) amounts paid by Terra-Gen to the prior owner of the Alta Wind Energy Center (Allco) to acquire various permits, wind data, agreements and other development milestone achievements necessary to bring the Alta projects from a conceptual stage to operation (so-called "Development Costs" or "Oak Creek Development Rights"); and (3) a fee paid by Terra-Gen to a prior developer of the Alta Wind Facilities (the so-called "Oak Creek Development Fee" or "AIPC" Development Fee).

505.      The Government's proposition that the Three Cost Items should be excluded if basis were to be determined by the developer's costs is contrary to clearly established tax law.

506.      Section 263A of the Internal Revenue Code governs the treatment of indirect costs related to the construction of property, such as the Three Cost Items.  Ms. Neubauer, the Section 1603 Program Director, agreed that Section 263A focuses on what costs have to be capitalized to the basis of property.  Neubauer, Tr. 1832:12-21.

202

507.    Section 263A provides that in the case of a developer like Terra-Gen such indirect costs must be capitalized to, *i.e.*, included in the basis of,[20] the property constructed, rather than treated as operating expenses of the taxpayer. *See Von-Lusk v. Commissioner*, 104 T.C. 207, 214 (1995) (under Section 263A, proper share of indirect costs must be capitalized to property produced by taxpayer); PX-0326.029-.031 ¶ 3, Maydew Initial Expert Report (Oct. 23, 2015); Maydew, Tr. 1458:20-1459:21; PD-049, Maydew Demonstrative.  The requirement that such indirect construction costs be capitalized into basis rather than expensed generally benefits the Government: it means that such costs must be depreciated as a deduction against the taxpayer's taxable income over a period of years, rather than treated as an expense used as an immediate offset to that income.  *See Von-Lusk*, 104 T.C. at 207-08; Huplosky, Tr. 1046:18-1047:2 (noting that "if you are able to deduct it, you get to write it off immediately . . . it results in a lower tax immediately as opposed to depreciating it over the life of the asset and getting that deduction over time"); PX-0329.008 ¶ 2, Maydew Rebuttal Report (Dec. 4, 2015) ("By delaying the timing of deductions, requiring the capitalization of interest typically increases the present value of the government's tax revenue."); Maydew, Tr. 1459:22-1460:21 (agreeing that capitalization of costs benefits the Government "from the perspective of raising revenue").

508.    Treasury has recognized that basis under Section 1603 "includes all items properly included by the taxpayer in the depreciable basis of the property . . . ." JX-0126.016, Treasury Guidance (Apr. 2011).  Moreover, Treasury's "Frequently Asked Questions and Answers" for the Section 1603 program include the following question and answer:

Question: What costs qualify for a Section 1603 payment?

---

[20]    *See* 26 C.F.R. § 1.263A-1(c)(3) ("Capitalize means, in the case of property that is inventory in the hands of a taxpayer, to include in inventory costs and, *in the case of other property, to charge to a capital account or basis*."  (emphasis added)).

> Answer: The amount of the Section 1603 payment is a percentage of the eligible basis of the property. *The basis of property generally is its cost* (IRC section 1012), unreduced by any other adjustment to basis, such as that for depreciation, *and includes all items properly included by the taxpayer in the depreciable basis of the property*, such as installation costs and the cost for freight incurred in construction of the specified energy property.

U.S. Department of Treasury, Payments for Specified Energy Property in Lieu of Tax Credits Under the American Recovery and Reinvestment Act of 2009: Frequently Asked Questions and Answers, Question 40, *available at* https://www.treasury.gov/initiatives/recovery/Documents/A%20FAQs0411%20-%20general.pdf (emphasis added).

509.     These same principles regarding what costs are included in a property's basis apply when the cost approach to valuation is applied. *See, e.g.*, *Driscoll v. Edison Light & Power Co.*, 307 U.S. 104, 118 (1939) (affirming commission determination to include indirect costs in reproduction cost valuation, where the indirect costs "are of the character of interest, supervision, cost of financing, taxes and legal expense"); *Am. Express Fin. Advisors, Inc. v. Cty. of Carver*, 573 N.W.2d 651, 660 (Minn. 1998) ("Reproduction cost requires the consideration of all costs, including capital expenditures for direct costs such as labor and materials, and indirect costs such as financing and marketing costs. *The Appraisal of Real Estate*, at 345-47. Construction contingencies and construction period interest are indirect costs of construction which would be encountered in the construction of a new building and must be accounted for in the reproduction cost."); *Kennedy v. Wash. Cty. Assessor*, TC–MD 070115D, 2007 WL 4463493, at *6 (Or. Tax. Ct. Dec. 14, 2007) ("In addition to direct costs and entrepreneurial profit, a cost estimate for a structure must include indirect costs such as architectural and engineering fees, appraisal, consulting, accounting and legal fees, and other carrying costs including insurance, property taxes, and interest on construction loans."); *ABE Schrader Corp. v. Town of Secaucus*, 8

N.J. Tax 390, 394-95 (1986) ("The cost approach utilized by plaintiff's expert is not probative of the true value of the subject property. . . . [E]xcept for engineering and architect's fees, the expert failed to include indirect costs in his cost estimates. These costs are, in addition to engineering and architect's charges, financing, insurance and permits, taxes, management and other overhead and entrepreneurial profit.").

510.    Because Section 263A requires that indirect costs of construction be included in the depreciable basis of property, such costs must be included in basis under Section 1603. Ms. Neubauer – who participated in drafting the Section 1603 Guidance — agreed that "basis under Section 1603 includes all items properly included in the depreciable basis of property under Section 263(a) of the Tax Code." Neubauer, Tr. 1833:11-13.

511.    The law is clear that the developer, Terra-Gen, was required to capitalize the Three Cost Items under Section 263A.

### 1.    Interest During Construction.

512.    The first category of such costs is interest Terra-Gen incurred on the debt financing it obtained to construct the Alta Facilities. Terra-Gen borrowed over $2 billion to construct the Alta Facilities and, as with any other loan, Terra-Gen was required to pay interest on the amount borrowed. Pagano, Tr. 115:22-117:10. Terra-Gen's payment of such interest to its lenders during the course of construction (the payment of "interest during construction") was required to ensure the final completion of the Alta Facilities. *Id.*; *see also* Huplosky, Tr. 1061:14-1062:5.

513.    Only those interest payments incurred during construction were capitalized. Terra-Gen capitalized such payments into the assets, on a pro-rata basis. Huplosky, Tr. 1062:6-10.

514. Section 263A expressly provides that such interest must be capitalized. It states: "interest on any indebtedness directly attributable to production expenditures with respect to such property shall be assigned to such property." 26 U.S.C. § 263A(f)(2)(A)(i). Section 263A and its implementing regulations at 26 C.F.R. § 1.263A-11 plainly require capitalization into the tangible assets of "the portion of the total interest expense incurred during the construction period that could have been avoided if funds had not been expended for construction. Interest expense that could have been avoided includes interest costs incurred by reason of additional borrowings to finance construction, and interest costs incurred by reason of borrowings that could have been repaid with funds expended for construction." *Dominion Resources, Inc. v. United States*, 681 F.3d 1313, 1315-16 (Fed. Cir. 2012) (quoting S. Rep. No. 99-313, at 140, 144 (1986)) (emphasis omitted); *see also Utilicorp United*, T.C. Memo 1997-47, at *3 n.1, *5 (accepting basis of property that included "construction interest").

515. Interest costs incurred by the taxpayer in connection with property produced by that taxpayer may be capitalized so long as the costs were "paid or incurred during the production period," and either (1) the property has "a long useful life," (2) the property has "an estimated production period exceeding 2 years," or (3) the property has "an estimated production period exceeding 1 year and a cost exceeding $1,000,000." 26 U.S.C. § 263A(f)(1)(B). Here, the interest on loans was incurred during the construction period, and the second and third requirements were satisfied – each Facility had an estimated production period exceeding 2 years, and also a cost exceeding $1 million. *See, e.g.*, PX-0299.046-.047 ¶ 83, Blaydon Initial Expert Report (Oct. 23, 2015) (each Facility had an expected useful life of 30+ years); JX-0168, KPMG Altas I-V Cost Segregation Report (demonstrating costs for each Facility far in excess of $2 million); JX-0192, Mustang Hills Grant Study FMV Report ("Everpower Eligible Calc" Tab,

206

Rows 236-244, column E, demonstrating costs for Mustang Hills in excess of $300 million); ¶¶ 75-95, 101, *supra* (detailing development history and placed in service dates for the Facilities).

516. Ms. Neubauer, the Section 1603 Program Director, agreed that generally interest during construction must be capitalized into the depreciable basis of property under Section 263A. Neubauer, Tr. 1832:22-25.

517. KPMG reviewed and approved of the capitalization of the interest incurred during construction for the Alta Wind Lawsuit Facilities. Huplosky, Tr. 1062:11-12.

518. Professor Maydew explained that the capitalization of interest incurred during construction is not only required under Section 263A, it is also required generally in both financial and tax accounting. Maydew, Tr. 1359:22-1360:21, 1457:5-1458:10; PX-0329.008 ¶ 1, Maydew Rebuttal Report (Dec. 4, 2015). From the accounting perspective, interest during construction is capitalized into the asset because it is necessary for the construction of the asset. Maydew, Tr. 1457:25-1458:6. Professor Maydew accordingly testified that Terra-Gen's interest during construction was required to be capitalized into each Facility's basis. Maydew, Tr. 1458:7-10.

## 2. Development Costs.

### a) Development Costs and Rights Acquired From Allco Are Included in Basis.

519. The second cost category covers the amounts Terra-Gen paid Allco, the prior owner of the Alta site, to acquire the various work in progress (permits, wind data, agreements and other development milestone achievements) that were ultimately necessary to bring the projects from a conceptual stage to operation.

520.        Development costs incurred by a developer must be capitalized into the property being developed (and depreciated over time).  As the Tax Court has explained:

> While the pursuit of building permits and zoning variances, negotiating permit fees and similar activities may not readily spring to mind as examples of production activity, we think that upon reflection they are properly classifiable as such.  Such activities are ancillary to actual physical work on the land and are as much a part of a development project as digging a foundation or completing a structure's frame.  The project can not move forward if these steps are not taken.

*Von-Lusk*, 104 T.C. at 216; *see also Suzy's Zoo v. Commissioner*, 273 F.3d 875, 879 (9th Cir. 2001) (agreeing with *Von-Lusk*); *Corbin West Ltd. P'ship v. Commissioner*, T.C. Memo. 1999-7, at *5-6 (Jan. 15, 1999) (holding that fees incurred in developing an apartment building, including evaluating zoning requirements and ensuring compliance and preparation of an environmental report, should be capitalized into the property); I.R.S. Priv. Ltr. Rul. 201515007, 2015 WL 1579258 (Apr. 10, 2015) (following *Von-Lusk* and holding that easement relocation costs are allocable to a constructed residential building because such costs "directly benefit, or are incurred by reason of, the construction of the residential rental building and are capitalizable indirect costs").

521.        This is consistent with the case law interpreting Section 263A, which holds that "the term 'produce' is to be broadly construed," and includes all costs "from the moment of acquisition through production and disposition of the property." *Suzy's Zoo*, 273 F.3d at 879; *see also Reichel v. Commissioner*, 112 T.C. 14, 18 (1999) (holding that "[p]reproduction costs" are to be capitalized under section 263A).  Costs that must be capitalized under Section 263A even include costs like real estate taxes that relate to the ownership of land on which construction occurs.  *See Reichel,* 112 T.C. at 17 (explaining that "by its terms, the statute requires taxpayers to capitalize indirect costs, such as real estate taxes, that they incur in connection with property they develop"); *see also Ohana v. Commissioner*, T.C. Memo 2014-83, at *7 (May 8, 2014)

("[S]ection 263A requires the [taxpayer] to capitalize their direct and indirect costs related to building the [facility] . . . .  These expenses include property taxes, outside services expenses such as the architect's fees, and expenses for licenses, insurance, and utilities directly benefiting or incurred by reason of the [facility].").

522.    Consistent with the governing law, Professor Maydew explained that, as an accounting matter, certain costs incurred in connection with the construction of a wind facility must be capitalized into the facility itself.  Maydew, Tr. 1460:22-1461:5; PX-0326.030-.032 ¶¶ 3-5, Maydew Initial Expert Report (Oct. 23, 2015); PX-0329.009 ¶ 2, Maydew Rebuttal Report (Dec. 4, 2015).  The development efforts discussed by Professor Maydew include building permits, engineering studies, zoning variances, environmental approvals, meeting with government officials, and the actual construction of the facility.  Maydew, Tr. 1460:22-1461:5, 1463:5-15; PX-0326.030-.031 ¶¶ 4-5; PD-049, Maydew Demonstrative.

523.    Professor Maydew testified that these development costs may be considered intangibles during the course of construction, but that they become tangible assets after construction of the facility is complete and must be capitalized into the facility itself.  Maydew, Tr. 1461:1-5, 1463:5-1464:2.  Professor Maydew thus affirmed that the portion of the purchase price paid by Terra-Gen to Allco relating to such development efforts were properly capitalized into the tangible assets once the Alta Facilities were constructed.  Maydew, Tr. 1461:8-1462:8; PX-0326.031 ¶ 6; PX-0329.010 ¶ 3.

> **b)    The Development Costs and Rights Acquired from Allco Were Properly Calculated.**

524.    Less than half of the $394 million Allco acquisition cost was allocated to the Allco development rights, which represented the collection of permits, wind data, agreements, and other developmental work that had been done to develop the Alta Facilities at the time of the

Allco acquisition.  JX-0032.007, Duff & Phelps Valuation (July 15, 2008); JX-0014.017-039, Master SPA Disclosure Schedules (June 16, 2008); Pagano, Tr. 119:23-120:7; Huplosky, Tr. 1071:11-23.

525.    These development rights are entirely distinct from goodwill or going concern value.  As Professor Maydew's expert report explains, the development rights relate to items that are valuable only insofar as they are necessary to develop and place a project in service.  PX-0326.031 ¶ 7.  The rights were acquired before construction of the Alta Facilities, before operations commenced, with no accompanying workforce, no earnings history, and no customers, and so neither goodwill nor going concern value could possibly have existed.  *Id.*

526.    Duff & Phelps was retained by Terra-Gen to perform two appraisals of the assets acquired from Allco.  The first appraisal allocated the purchase price for the Allco assets between the various assets that were acquired, including the development rights and so-called transmission rights.  The second appraisal allocated the development rights and transmission rights amounts among the different Alta Facilities.  *See generally* JX-0032.002, Duff & Phelps Final Valuation Reports (July 15, 2008) (allocation of purchase price to the various assets acquired); JX-0032.078 (allocation between the different Alta Facilities); Rec. Doc. 115, Stipulation of Facts ¶¶ 9-13; *see also* Huplosky, Tr. 1069:9-1070:7 (explaining the two different appraisals); Huplosky, Tr. 1070:15-1071:10; Pagano, Tr. 120:11-15.

527.    Duff & Phelps determined that the Allco purchase price should be apportioned as follows:

$1.55 million to land

$34.6 million to the Alite Wind Facility

$78.93 million to construction work in progress

$77 million to transmission queue rights

$195 million to development rights

JX-0032.007, Duff & Phelps Valuation (July 15, 2008); Rec. Doc. 115, Stipulation of Facts ¶¶ 11-12.

528.    The Duff & Phelps appraisals were its independent work, and Terra-Gen did not in any way dictate the conclusions that Duff & Phelps reached.  Huplosky, Tr. 1204:14-19.

529.    Terra-Gen capitalized the development rights (except for a small amount deemed to relate to the Master PPA) into the tangible assets at the Alta Facilities on a pro-rata basis.  Huplosky, Tr. 1065:4-8.  These costs related to construction and thus were appropriately capitalized into the hard assets under Section 263A — for instance, the development rights included wind data that was important to appropriately locate turbines, and permitting costs necessary to develop the Facilities.  Huplosky, Tr. 1065:9-1066:6.

530.    KPMG reviewed and approved of the capitalization of these development costs.  Huplosky, Tr. 1066:7-13, 1205:7-10; JX-0082.008, Memorandum from KPMG to Damon Huplosky re: Alta I (Dec. 2010) ("[I]t is reasonable to treat the Development Rights as an indirect project cost and to allocate them pro rata based on the direct costs."); JX-0153.013, Memorandum from KPMG to Damon Huplosky re: Alta I (June 2011) ("It is more likely than not that the value associated with the Development Rights should be allocated across all of the tangible assets that make up the completed facility pro rata based on the cost of direct costs in each MACRS category.").

### 3.    The Oak Creek Development Fee.

531.    The third of the Three Cost Items is the so-called "Oak Creek Development Fee" — a fee Terra-Gen was required to pay a prior developer of the Alta Wind Facilities (Oak Creek) in acquiring basic but far from completed building blocks of the projects from the prior

211

owner.  That payment was required by a contract entered into before Terra-Gen acquired the Allco assets and took over development of the projects, and Terra-Gen viewed this obligation "basically as another acquisition cost."  Huplosky, Tr. 1062:17-1063:12; Pagano, Tr. 122:16-123:9 (explaining that Terra-Gen regarded the fee as "just another component" of the cash flows of the project).  This was because no matter who owned the entity that received the Oak Creek fee (an entity named Alta Innovative Power Company, or AIPC), the fee would have to be paid pursuant to the pre-existing contractual relationships that had been entered into before Terra-Gen acquired the assets from Allco.  *See* Huplosky, Tr. 1120:18-25; Pagano, Tr. 122:16-123:1. Terra-Gen capitalized the Oak Creek Development Fee into all of the assets (both eligible and ineligible) on a pro-rata basis.  Huplosky, Tr. 1062:6-10.

532.    The Tax Court has held that a development fee incurred in connection with acquiring property must be capitalized under Section 263A.  *See Corbin West*, T.C. Memo 1999-7, at *6 ("We conclude that the 'acquisition fee' and 'developer's fee' were incident to Corbin West's acquisition of the property, and they must be considered part of the property's acquisition cost.  We therefore conclude that Corbin West is entitled to capitalize both the 'acquisition fee' and 'developer's fee' into its basis in the property."); *see also Reichel*, 112 T.C. at 18 (noting that the legislative history of Section 263A requires capitalization "of costs of producing, *acquiring*, and holding property" (quoting S. Rept. 99-313, at 140 (1986) (emphasis added, other emphasis omitted))).

533.    KPMG reviewed Terra-Gen's capitalization of the Oak Creek Development Fee into the hard assets and approved that treatment.  KPMG was aware of the circumstances of the Oak Creek Development Fee before rendering its advice.  Huplosky, Tr. 1064:5-13; *see also*

212

JX-0084.001, Email from Damon Huplosky re: Alta II – Oak Creek Fee (Dec. 8, 2010) (email to individuals at KPMG explaining the Oak Creek Fee and attaching relevant documentation).

534.    In short, the Government's counterclaims are based on excluding the Three Cost Items from Terra-Gen's basis in the eligible property, but the law is clear that such exclusion is improper.  Even if the Government's (clearly incorrect) approach to valuing the eligible property at the Alta Wind Facilities based on Terra-Gen's construction costs were to be applied, the law precludes excluding the Three Cost Items from that value.

Respectfully submitted,

/s/ Steven J. Rosenbaum
(srosenbaum@cov.com)
*Counsel of Record*
Dennis B. Auerbach
Thomas R. Brugato
Margaret H. Brennan

One CityCenter
850 10th Street, NW
Washington, DC  20001-4956
(202) 662-5568
(202) 778-5568 fax

July 25, 2016                    *Counsel for Plaintiffs*

213

## CERTIFICATE OF SERVICE

I hereby certify that, on July 25, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to the following:

Michael J. Ronickher

/s/ Steven J. Rosenbaum
Steven J. Rosenbaum
*Counsel of Record*
Covington & Burling LLP
One CityCenter
850 10th Street, NW
Washington, D.C. 20001
Phone: (202) 662-5568
Fax: (202) 778-5568
Email: srosenbaum@cov.com