**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALTA WIND I OWNER LESSOR C, | ) | |
| | ) | |
| *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Nos. 13-402, 13-917, 13-972, 13-935, |
| | ) | 14-174, 14-93, 14-175, and 14-47 |
| v. | ) | |
| | ) | Judge Wheeler |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**
**[CORRECTED]**

<div style="margin-left:40%">

*s/ Michael J. Ronickher*
MICHAEL J. RONICKHER
*Attorney of Record*
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Tel:  (202) 616-9085
Fax: (202) 514-9440
Michael.J.Ronickher@usdoj.gov

CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General
DAVID I. PINCUS
Chief, Court of Federal Claims Section
G. ROBSON STEWART
Assistant Chief, Court of Federal Claims Section
MIRANDA BUREAU
Trial Attorney, Court of Federal Claims Section
MARGARET E. SHEER
Trial Attorney, Court of Federal Claims Section

*s/ G. Robson Stewart*
*Of Counsel*

</div>

Dated:  August 3, 2016                     *Counsel for Defendant*

**TABLE OF CONTENTS**

<div align="right">

**Page**

</div>

**Proposed Findings of Fact**................................................................................. 4

I.    Overview of the Alta Wind Projects ............................................................. 5

II.   Origins of the Alta Wind Energy Center .................................................... 7

    A.    Oak Creek Development, Funding by Allco, and SCE's Transmission Investment .......... 8

    B.    The Acquisition of Allco's U.S. Wind Energy Business by Terra-Gen ........... 11

    C.    The Appraisal of the Allco Assets ..................................................... 12

III.  Terra-Gen's Subsequent Development Work on the Alta Projects ................... 15

IV.   The Increasing Value of the Alta Projects ................................................ 15

    A.    Assembling the Complete Power-Generation Businesses Added Value .......... 15

    B.    Terra-Gen's Use of "Turbine Blending" ............................................ 16

    C.    Shifting Market Factors That Increased Value of Alta Projects ................. 18

V.    The Sale-Leasebacks and Sale of the Alta Projects ..................................... 19

    A.    The Sale-Leasebacks of Altas II-V .................................................... 20

    B.    The Sale-Leaseback of Alta I ........................................................... 24

    C.    The Sale of Alta VI ....................................................................... 26

VI.   The Indemnification of the Section 1603 Payments ..................................... 28

    A.    The Alta II-V Indemnities .............................................................. 29

    B.    The Alta I Indemnity ..................................................................... 30

    C.    The Alta VI Indemnity ................................................................... 31

VII.  Plaintiffs' Section 1603 Applications and Treasury's Review ....................... 32

    A.    Terra-Gen's Allocation of the Purchase Price ..................................... 33

    B.    KPMG's Attestations ..................................................................... 34

    C.    Reliance of KPMG-Certified Cost and Purchase Price Allocations on Duff and Terra-Gen Valuations ......................................................................... 37

    D.    Treasury's Review of and Determinations Regarding the Alta Applications ..... 39

VIII. Expert Testimony ................................................................................. 47

    A.    Plaintiffs' Expert Edward Maydew ................................................... 47

    B.    Plaintiffs' Expert Colin Blaydon ...................................................... 48

       1.   Unsupported Conclusions Regarding the "Independence" of the Sale Price .............. 48

       2.   Dr. Blaydon Did Not Value the Eligible Property ............................. 50

       3.   Dr. Blaydon's Reliance on Allocations by Terra-Gen and KPMG ............ 51

    C.    Defendant's Excluded Expert Testimony ............................................ 52

<div align="center">

i

</div>

**Argument** ...................................................................................................................... 55

I.      Background on Section 1603 and Its Applicability to Plaintiffs' Projects .......................... 57

II.     Plaintiffs Have Not Met Their Burden of Proof ................................................................. 58

III.    The Purchase Prices of the Alta Projects Do Not Establish the Cost Basis of the Section 1603-Eligible Property.......................................................................................................... 60

    A.    Section 1603 Payments Are Available Only for Eligible Property, But the Alta Purchase Prices Encompass Both Eligible and Ineligible Property ......................................................... 60

        1.    The Alta Purchase Prices Cover Some Tangible Property That Is Not Eligible .......... 63

        2.    The Alta Purchase Prices Include Real Property That Is Not Eligible ........................ 63

        3.    The Alta Purchase Prices Include Intangible Property, Which Is Not Eligible ............ 64

        4.    The Purchase Prices for All of the Alta Project Transactions Reflected this Combination of Value from Both Eligible and Ineligible Assets ....................................... 67

            a.    Alta I ............................................................................................................ 67

            b.    Altas II-V ..................................................................................................... 68

            c.    Alta VI ......................................................................................................... 69

    B.    Section 1060 Also Requires an Analysis of the Value of the Eligible Property............... 70

        1.    The Plaintiffs Were Required to Allocate the Assets In Accordance with Section 1060 71

        2.    Dr. Maydew Cannot (and Did Not) Provide an Expert Opinion on Whether the Alta Project Transactions Were Applicable Asset Acquisitions Under Section 1060................... 75

            a.    Dr. Maydew Ignored the Factors from the Relevant Treasury Regulation.............. 76

            b.    Dr. Maydew's Reasons for Determining No Goodwill Could Attach Are Unpersuasive....................................................................................................... 77

        3.    Section 1060 Requires the Residual Method, Which Requires Evaluating the Fair Market Value of the Eligible Property................................................................................ 80

    C.    The Alta Project Transactions Were Not Arm's-Length and Include "Peculiar Circumstances" ....................................................................................................................... 82

        1.    The Purchase Prices in the Alta Sale-Leaseback Transactions Were Not Set Independent of Other, Related Transactions......................................................................... 82

        2.    The Alta Project Transactions Featured Side Agreements That Created Peculiar Circumstances ..................................................................................................................... 86

        3.    Indemnities Guaranteeing the Amount of Section 1603 Payments Constitute Extremely Peculiar Circumstances...................................................................................... 88

IV.    Plaintiffs' Eligible Cost Basis Can Only Be Determined by a Valuation of the Eligible Property, Which Plaintiffs Have Not Presented ......................................................................... 90

    A.    Plaintiffs' Valuation Expert Merely Seeks to Support the Purchase Price, Not the Eligible Basis...................................................................................................................................... 90

B.  Plaintiffs' Expert Valuation Requires an Allocation to Reach a Value for the Eligible Property, but Plaintiffs Do Not Present an Independent Expert Allocation ............................ 92

   1.  Dr. Blaydon Does Not Provide an Allocation and Did Not Analyze KPMG's Work .. 93

   2.  Dr. Maydew Does Not Provide an Allocation and His Testimony That Plaintiff's Allocation Method Was "Reasonable" Is Based on Insufficient and Irrelevant Data and Is Unreliable ................................................................................................................................. 94

   3.  Plaintiffs Cannot Rely on KPMG's Allocation Work ................................................... 95

      a.  Terra-Gen's and KPMG's Allocation Work Is Not Expert Opinion, and Plaintiffs Offered No Supporting Testimony ..................................................................................... 96

      b.  KPMG's Review Was Limited and the Underlying Allocations Reflect Valuations and Are Riddled with Inaccuracies and Fatal Flaws ........................................................ 99

   4.  The Cost-Ratio Approach Should Not Be Used in These Cases in Any Event .......... 104

C.  The Missing Valuation: the Cost Approach ...................................................................... 111

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Barnes Grp. Inc. v. United States,*
872 F.2d 528 (2d Cir. 1989), *decision on remand in,* 724 F.Supp. 37 (1989), *aff'd,*
902 F.2d 1114, 1116 (2d Cir. 1990) .................................................................................. 88

*BB&T Corp. v. United States,*
523 F.3d 461 (4th Cir. 2008) ............................................................................................ 68

*Bishop Hill Energy LLC v. United States,* Case. No. 14-cv-00251, 2015 WL 9303044 at *4 ..... 94

*Biovail Corp. Intern v. Andrx Pharmaceuticals, Inc.,* 239 F.3d 1297 (Fed. Cir. 2001) ............... 97

*Bixby v. Comm'r,*
58 T.C. 757 (1972) ............................................................................................................ 82

*California Ridge Wind Energy LLC v. United States, No. 14-250 C, 2015 WL 9302944, at *1*
*(Fed. Cl. Dec. 21, 2015)* .................................................................................................. 58

*Charron v. United States,* 200 F.3d 785, 792 (Fed. Cir. 1999) ....................................................... 59

*Coast Fed. Bank FSB, v. United States,*
323 F.3d 1035 (Fed. Cir. 2003) ........................................................................................ 66

*Comm'r v. Court Holding Co.,*
324 U.S. 331 (1945) .......................................................................................................... 69

*Computing and Software, Inc. v. Comm'r,*
64 T.C. 223 (1975) ............................................................................................................ 79

*Cooper v. Comm'r,*
88 T.C. 84 (1987) .............................................................................................................. 70

*Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579 (1993) ............................................................ 97

*Deseret Management Corp., v. United States,*
112 Fed. Cl. 438 (2013) .................................................................................................... 66

*D'Avanzo v. United States,*
54 Fed. Cl. 183 (2002) ...................................................................................................... 95

*Ferguson v. Lurie,* 1991 WL 256869 (N.D. Ill 1991) .................................................................... 98

*Forward Communications Corp. v. United States,*
608 F.2d 485, 510-11 (Fed. Cir. 1979) ............................................................................ 98

*Frank Lyon Co. v. United States,*
435 U.S. 561 (1978) .......................................................................................................... 68

*Gregory v. Helvering,*
293 U.S. 465 (1935) .......................................................................................................... 69

*Halle v. Comm'r,*
83 F.3d 649 (4th Cir. 1996) .............................................................................................. 69

*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.,*
2008 WL 2441067 (E.D. Calif. 2008) .............................................................................. 98

*Kraft, Inc. v. United States,* 30 Fed. Cl. 739, 757 (1994) ............................................................. 59

*Kumho Tire Co, Ltd. v. Carmichael,* 526 U.S. 137 (1999) ............................................................ 97

*Lemmen v. Comm'r,*
77 T.C. 1326 (1981) ............................................................................ 70, 82, 84, 86

*Lewis v. Reynolds,* 284 U.S. 281 (1932) ................................................................... 59

*Massey-Ferguson, Inc. v. Comm'r,*
   59 T.C. 220 (1972) .................................................................................................. 79

*Miami Val. Broad. Corp. v. United States,* 499 F.2d 677, 683 (Ct. Cl. 1974) ............ 59

*Mike's Train House, Inc. v. Lionel, L.L.C.,* 472 F.3d 398 (6th Cir. 2007) .................. 97

*Miller v. United States,* 620 F.2d 812, 825, 223 Ct.Cl. 352 (1980) ........................... 59

*Mountain Wholesale Co. v. Comm'r,*
   17 T.C. 870 (1951) .................................................................................................. 82

*Newark Morning Ledger Co. v. United States,* 507 U.S. 546, 555-56 (1993) ............. 78

*Peco Foods, Inc. v. C.I.R.,*
   103 T.C.M. (CCH) 1120 (T.C. 2012),*aff'd*, 522 F. App'x 840 (11th Cir. 2013) ...... 80

*Philip Morris Inc. & Consol. Subsidiaries v. Comm'r,*
   96 T.C. 606 (1991), *aff'd sub nom. Philip Morris Inc. v.* Comm'r, 970 F.2d 897
   (2d Cir. 1992) ......................................................................................................... 80

*Solitron Devices, Inc. v. Comm'r,*
   80 T.C. 1 (1983), *aff'd sub nom. Solitron Devices v.Comm'r*, 744 F.2d 95 (11th Cir. 1984) .. 81

*Standard Conveyor Co. v. Comm'r,*
   25 B.T.A. 281 (1932) .............................................................................................. 79

*Tokio Marine & Fire Ins. Co. v. Norfolk & Western Railway Co.,*
   172 F.3d 44 (4th Cir. 1999) .................................................................................... 98

*United States v. Janis,* 428 U.S. 433, 440 (1976) ..................................................... 59

*Utilicorp United, Inc.& Subsidiaries v. Comm'r,*
   73 T.C.M. (CCH) 1835 (T.C. 1997) ................................................... 44, 45, 115, 116

*W. Covina Motors, Inc. v. C.I.R.,*
   98 T.C.M. (CCH) 615 (2009) ................................................................................. 80

*Waddell v. Comm'r,*
   86 T.C. 848 (1986), *aff'd*, 841 F.2d 264 (9th Cir. 1988) ......................................... 70

*W.E. Partners II, LLC v. United States,*
   119 Fed. Cl. 684 (2015), *aff'd per curiam*, No. 2015-5054, 2016 WL 463580
   (Fed. Cir. Feb. 5, 2016) ................................................................................ 58, 61, 94

*Wells Fargo & Co. & Subsidiaries v. United States,*
   91 Fed. Cl. 35 (2010), *aff'd sub nom. Wells Fargo & Co. v. United States*, 641 F.3d 1319
   (Fed. Cir. 2011) ...................................................................................................... 68

**Statutes**

Am. Recovery & Reinvestment Tax Act, Pub. L. No. 111-5 (2009), § 1603,
 as amended, P.L. 111-312 (2010), § 707 ........................................................................ *passim*
26 U.S.C. § 45 ................................................................................................................ 58
26 U.S.C. § 48 ........................................................................................................... 63, 64
26 U.S.C. § 197 ...................................................................................................... *passim*
26 U.S.C. § 263A ............................................................................................................ 47
26 U.S.C. § 338(b)(5) ..................................................................................................... 52
26 U.S.C. § 1060 ..................................................................................................... *passim*

**Regulations and Administrative Decisions**

Special Allocation Rules for Certain Asset Acquisitions, T.D. 8215,
 1988-2 C.B. 304, 53 Fed. Reg. 27035-01 (July 18, 1988) .................................... 36, 52
Treas. Reg. § 1.1060-1 ............................................................................ 71, 72, 74, 77
Treas. Reg. § 1.197-2 ................................................................................................ 65
Treas Reg. § 1.263(a) ............................................................................................... 65
Treas. Reg. § 1.48-1 ............................................................................................ 61, 63

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

Nos. 13-402, 13-917, 13-972, 13-935, 14-174, 14-93, 14-175, and 14-47

(Judge Thomas Wheeler)

ALTA WIND I OWNER-LESSOR C, *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

_____

DEFENDANT'S POST-TRIAL BRIEF
[CORRECTED]

_____

Whether plaintiffs are entitled to any additional Section 1603 payments turns on the amount they invested in that portion of the Alta Wind Projects that constitutes eligible energy property under Section1603.  It does not turn on the amount plaintiffs paid for the overall Alta Projects for the income they could generate.  Plaintiffs devoted their entire presentation at trial, including that of their valuation expert, in an effort to establish the value of the Alta Projects as whole.  Plaintiffs' presentation did not even address the issue for which plaintiffs bear the burden of proof:  the value of the Section 1603-eligible property transferred as part of the project transactions.  Accordingly, plaintiffs cannot meet their burden of proof, and their claims must be denied.  Treasury's original awards, based on plaintiffs' claimed costs of constructing the eligible property, inclusive of significant "development profit," should not be disturbed.

Plaintiffs' reliance on the purchase price as the eligible cost basis is riddled with flaws. One telling problem for plaintiffs is that each of the Project Transactions included indemnity

1

provisions whereby Terra-Gen, the seller, guaranteed for the buyers the amount of the Section 1603 payments that were priced into the purchase prices.

As will be discussed more fully below, in Section VI, in each deal, the parties agreed that the project would apply for a Section 1603 payment claiming the purchase price of the whole transaction, a subset of which is the Section 1603-eligible property, as the basis from which the award should be calculated. That basis derived from the purchase price was, in each case, much higher than Terra-Gen's costs of constructing the wind farms. A Section 1603 payment was available to the extent of Terra-Gen's actual costs to construct the eligible property, but the deal documents required the plaintiffs to apply based on their purchase price for acquiring the entire Alta Projects, a significantly higher amount.

Representatives for all six of the sale-leasebacks/sales of the Alta Projects (the "Alta Project Transactions") testified that they were uncertain if that position were correct. For Altas I-V, whose indemnity locked in for the buyers the higher claimed Section 1603 payment, the buyer representatives stated that they would not have paid as much as they did for the transactions if the indemnities had not been present.[1] For Alta VI, which was structured to pass the higher claimed Section 1603 payment back to Terra-Gen, the buyer representative testified that, without the indemnity, his company would not have taken the risk of claiming the higher amount.[2]

---

[1] Mr. Revock, who negotiated the purchases of Altas II-V, testified that the deal "may not have been doable" without the indemnity, and if so, only at a price that was "somewhat lower because of the risk, the risk transfer." (Tr. 813:15-24 [Revock].) Mr. Markowitz, who negotiated the purchase of Alta I, testified that "without the indemnity? Q. Uh-huh. A. I probably wouldn't have done the deal." (Tr. 1036:2-4, 9-14 [Markowitz].)

[2] Mr. Spencer, who negotiated the purchase of Alta VI, testified that "we relied upon the fact that we would get the cost basis [payment] and took risk on that amount, but any amount

(continued...)

2

The indemnities alone eviscerate plaintiffs' reliance on the purchase price to establish eligible cost basis.  The purchase prices cannot purport to represent "fair market value" when the buyers were only willing to pay that amount if they had a side provision that indemnified them if an inflated Section 1603 payment was not received.  The indemnities were a critical component of the purchase prices, but their value cannot be included in the cost basis of the eligible property transferred in the Alta Project Transactions for purposes of Section 1603.  Terra-Gen's financial guarantee to the buyers of their Section 1603 payments does not transmute the guarantees into eligible property.  Terra-Gen's sale of the Alta Projects at prices that include a guaranteed higher basis does not entitle the buyers to additional Section 1603 payments.

Beyond this telling flaw, there are three additional reasons that the Court cannot rely on the purchase prices to determine plaintiffs' basis in the eligible property that was transferred as part of the Alta Project Transactions.  First, those transactions also encompassed numerous ineligible assets, all of which contributed to the value that drove the purchase prices.  Second, those transactions are subject to Internal Revenue Code ("I.R.C.") § 1060, which requires that the parties to the transactions perform an allocation of the purchase price to various asset classes using the residual method, which relies on the fair market value of each type of asset.  Finally, the transactions featured "peculiar circumstances," which require the Court to look beyond purchase price to the value of the relevant assets (here, the eligible property).  Any one of these reasons would be enough to render the purchase prices in the Alta Project Transactions irrelevant to establishing the value of the eligible property.

---

(…continued)

between the 87 and I believe 126 [the stepped-up basis claimed], we weren't willing to take any risk on that."  (Tr. 870:21-871:10 [Spencer].)

Nonetheless, plaintiffs base their entire case on those purchase prices. Buried in one small paragraph of the nearly 100 pages of plaintiffs' valuation expert's initial report is the acknowledgement that his entire analysis *does not result* in a value for the eligible property. Instead, in an attempt to reach such a value, he (and plaintiffs) rely on work done by Terra-Gen, and reviewed by KPMG, that allocated the purchase prices based on an alleged ratio of the historical costs of the eligible and ineligible assets conveyed by the transactions. But plaintiffs cannot rely on that work, which is not independent expert opinion, to prove a valuation. Even if they could, it features numerous inaccuracies that render it untrustworthy and, most importantly, it ignores the critical fact, acknowledged by plaintiffs' valuation expert, that assets' historical costs do not always bear any relation to their fair market value.

To carry their burden of proof for additional Section 1603 payments, plaintiffs must establish a valuation of the eligible property alone. Plaintiffs, however, have not presented a valuation of the eligible property in each Alta transaction. Therefore, plaintiffs cannot meet their burden, and their claims fail. Treasury's original awards should not be disturbed.

## PROPOSED FINDINGS OF FACT

The story of the Alta Wind Projects is that of a developer investing time and money to create stand-alone power-generation businesses that were sold with huge returns. The prices paid by the plaintiffs for those businesses, however, were based on the businesses' capacity to earn income by generating and selling power, not on the value of the tangible, eligible property those businesses utilize. The transaction prices encompassed the value of eligible and ineligible assets. Moreover, the prices were arrived at in connection with indemnification provisions and other related transactions that make them an unreliable barometer of the market value of the eligible assets. Treasury's review of plaintiffs' Section 1603 applications accounted for these elements, and plaintiffs' expert testimony does not address it.

4

## I.    Overview of the Alta Wind Projects

The Alta Wind Projects, as with all utility-scale wind farms, are income-producing businesses.[3]  They generate a product – electricity – that they sell to a customer – the electric utility.  A working wind farm consists of numerous assets in order to produce, transmit, and sell electricity.[4]

Those key pieces include both tangible and intangible assets.  (Stipulation of Facts, Dkt. No. 115 ("SOF") ¶ 8.)  The key tangible assets involved in the Alta Projects are the following:[5]

1.    Turbines:  These harness the wind resource to generate electricity.

2.    Foundations:  These structures provide the support and site for installation of the turbines.

3.    Meteorological Towers (MET Towers):  These towers include equipment used to test wind speed.

4.    Roads:  The roads in question permit access for maintenance and operation of the turbines.

5.    Interconnection and Transmission Equipment:  This equipment prepares the power for transmission and sends it out of the wind farm for sale.

(*See, e.g.,* JX-0067.011, 17 (on turbines); Tr. 927:11-18 [Markowitz] (same); Tr. 686:2-5 [Revock] (same); JX-0067.011-12, 12 (on interconnection and transmission equipment).)

Examples of key intangible assets of the Alta Projects are the following:

1.    Power Purchase Agreement (PPA):  The PPA is an agreement with a utility customer (Southern California Edison, in this case) to sell the wind farm's power.

------

[3] Unless otherwise qualified, the terms project(s) and wind farm(s) refer to the entire power-generation business, including both eligible and ineligible property.

[4] As explained below, many of these assets are not eligible under Section 1603.

[5] Citations to JX-0067 are to the offering memorandum for Alta I, but the other Alta Projects shared the same features.

2.      Transmission and Interconnection Agreements:  These contracts provide the wind farms the right to access and use the wider electrical grid, which is necessary for them to sell their power to distant consumers.

3.      Operation and Maintenance ("O&M") Contracts:  Buyers who do not intend to operate the wind farms require O&M contracts to keep the facilities running.

4.      Shared Facilities and Wake Impact Agreements:  Specific to the Alta Projects, these provide the individual wind farms access to assets that are shared collectively among them, as well as provide protection against wake impacts (explained below).

(*See, generally,* JX-0067.011, 16 (on PPAs); Tr. 999:1-13 [Markowitz] (same); JX-0067.011-12, 12 (on transmission and interconnection agreements); Tr. 780:20-781:9 [Revock] (same); Tr. 992:25-996:4 [Markowitz] (on PPAs and transmission rights); JX-0067.011 (on O&M contracts); Tr. 930:7-15 [Markowitz] (same); JX-0067.018 (on shared facilities and wake impact agreements; Tr. 779:3-781:9 [Revock] (on key contracts).)

Finally, the Alta Wind Projects, like any wind farm, require access to land.  The land, of course, provides a place to put the turbines.  Ideally, that land also would be close to a good market for the sale of power, which tends to increase the value of the project (Tr. 881:11-14 [Spencer]; JX-0067.012), and would provide access to a good wind resource that results in generating high volumes of power.  (Tr. 924:4-19 [Markowitz]; JX-0067.011, 14-16, 18.)  All of these assets can be seen in the diagram on the next page, which Mr. Pagano agrees shows the key aspects of the wind farms (Tr. 523:18-20 [Pagano]; diagram modified from DX0236-00015):

6



All of these assets together are required to generate the cash flows that create the value of the overall wind project.  (Tr. 106:4-10 [Pagano]; Tr. 780:20-781:9; 785:6-12 [Revock]; Tr. 990:14-22 [Markowitz].)  As the CEO of Terra-Gen confirmed, a wind farm cannot function without them.  (Tr. 436:10-437:6 [Pagano].)

## II.    Origins of the Alta Wind Energy Center

The wind power development that ultimately became the Alta I, II, III, IV, V, and VI wind power projects at issue in this litigation (the "Alta Projects") was developed in two stages: (i) first by Oak Creek Energy Systems ("Oak Creek"), which began the development process and partnered with and sold the project assets to Allco Wind Energy Management Pty. Ltd. ("Allco") to finance the development (SOF ¶ 5; JX0001.007); and then (ii) by Terra-Gen, which acquired the Alta Projects from Allco during the course of their development, completed their development and construction, and sold the finished projects to the plaintiffs here.

### A.      *Oak Creek Development, Funding by Allco, and SCE's Transmission Investment*

Years before Terra-Gen's acquisition of what would become the Alta Projects, Oak Creek was busy developing wind power generation projects at that location. (SOF ¶ 5)  As part of this effort, in October of 2005, years prior to the enactment of Section 1603, Oak Creek submitted a proposal to Southern California Edison ("SCE") for the sale of up to 880 megawatts ("MW") of electricity to SCE from new wind farms that Oak Creek proposed to build in the Tehachapi region.[6]  What become the Alta Projects were among these projects, originally known as the "Tehachapi Projects".  (*See* JX0001.001-.002; JX0013.001.)

To finance the projects that it had proposed to SCE, Oak Creek entered into a Joint Development Agreement in March 2006 with Allco Asset Finance Limited, ("AAFL") which was subsequently amended and restated ("ARJDA") on June 30, 2006, to replace AAFL with Allco Wind Energy Management Pty. Ltd. ("Allco").  (JX0001.001-.002.)  Under the terms of the ARJDA, the parties created Alta Innovative Power Company, LLC ("AIPC"), as the vehicle for facilitating Allco and Oak Creek's joint venture to develop, construct, and finance the Tehachapi Projects, as well as a distinct project in that region named Alite, and any future projects in California.  (*See* SOF ¶ 5; JX0001.007.)  AIPC was owned 50% by Oak Creek and 50% by an Allco affiliate.  (SOF ¶ 5; JX0001.007.)

The Alta Projects represent just a subset of the Tehachapi Projects that AIPC was to develop.  Under the terms of the ARJDA, Oak Creek agreed to sell and transfer to AIPC all of its development rights in the Tehachapi Projects, which AIPC was to then sell and transfer to a

---

[6] The size of wind farms is often described in terms of how many megawatts of electricity they can produce at peak output.  This is dictated by the number and capacity of wind turbines installed at the wind farm.

special-purpose development entity (the "Allco project company").  (*See* JX0001.002.)  In return for selling these rights, Oak Creek received a reimbursement of approximately $2 million in documented internal and external development costs for the Tehachapi Projects incurred up to the time of the transfer and an agreement that it would receive a share of royalties on revenue generated by the Tehachapi Projects.  (JX0001.009-.010.)  Under the ARJDA, Allco was to provide the financing for Oak Creek's development work.  (*See* JX0001.009-.010.)

AIPC was to perform "all usual and necessary wind power project development activities" for the Tehachapi Projects and the Allco project company agreed to reimburse AIPC's development costs.  (JX0001.012-.014.)  The royalties that AIPC would receive (to be divided 50/50 between Oak Creek and Allco) for its development efforts would be either 5% of each completed project's annual operating revenue, or a one-time lump sum upfront payment of $97,000 per megawatt of turbine capacity installed at the project, payable at the close of permanent financing.[7]  (JX-0003.007-008; JX-0001.007-.012; Tr. 1165:17-1166:1.)

The Tehachapi Projects secured a Master Power Purchase and Wind Project Development Agreement ("Master PPA") with SCE in December 2006.  (SOF ¶ 15; JX0006.)  This agreement established the overall contractual framework for the development of 1,500-1,550 MW of capacity in the Tehachapi region.  (JX0006; JX-0012.026.)  Under the agreement, as individual Tehachapi Projects were ready to be built, each would enter into project-specific daughter PPAs for the sale of electricity to SCE, subject to the pricing formula established in the Master PPA. (SOF ¶ 15; JX0006; JX-0012.026.)

---

[7] The lump sum payment was later amended to equal a calculated present value of the expected 5% annual royalty, rather than the fixed amount of $97,000 per megawatt.

The Tehachapi Projects were to be among the first projects to interconnect to California's long-planned Tehachapi Renewable Transmission Project ("TRTP"), which over time was expected to allow for transmission of a total of 4,500 MW of new electricity generation from the Tehachapi region to customers in Southern California. (JX0012.018.) Beginning in early 2006, Oak Creek and Allco submitted interconnection applications and secured queue positions for 3,110 MW of capacity. (*See* JX0012.018-026.) To secure the right to interconnect with and use transmission infrastructure such as TRTP, applicants must join an interconnection queue and go through a series of studies that culminate in the execution of an interconnection agreement. (JX0012.022-026.) The applicant's queue position, among other factors, influences its relative priority in securing an interconnection agreement, and 1,710 MW of the Tehachapi Projects' queue positions were in an accelerated "First Cluster." (DX0706.00016.)

By 2008 Oak Creek and Allco owned or controlled the use of more than 32,000 acres of land in the Tehachapi region, which they believed would allow for construction of about 2,100 MW of wind projects. (DX0706.00010.) They were also in negotiations for control of another 10,000 acres of land. (*Id.*)

Thus, by June 2008, completed development work on what was to become the Alta Projects included (1) environmental studies; (2) the securing of key transmission and interconnection queue requests in the TRTP, which SCE began constructing in March 2008; (3) the securing of valuable land rights; (4) permitting, including beginning the zone change process with Kern County; (5) site analysis for turbines and major equipment; (6) the purchase of GE turbines and the execution of certain turbine related contracts; (7) the construction of MET towers and collection of wind data; and (8) the securing of the Master PPA with SCE. (JX0012.010-026. JX0006, SOF ¶ 15.)

10

### B.    *The Acquisition of Allco's U.S. Wind Energy Business by Terra-Gen*

In July 2008, Allco's U.S. wind energy business, including its interest in the Tehachapi Projects, was acquired by Terra-Gen.[8] (SOF ¶ 6)  A key component of Allco's U.S. wind energy business was its ownership of the in-development Tehachapi Projects, which Allco described as a 3,100 MW project that was "one of the largest wind development projects in the world and the largest in California." (JX0012.006; Tr. 443:12-23 [Pagano].)  Allco described the assets for sale as the development rights to the Tehachapi Projects, as well as ownership or control over land parcels, the Master PPA with Southern California Edison, and transmission queue positions for the TRTP associated with at least 3,100 MW of electricity.[9]  (JX-0012.007.)  Of that 3,100 MW, electricity generation from the first 1,550 MW of the Tehachapi Projects would be sold to SCE through the Master PPA, while the remaining 1,550 MW were uncontracted. (JX-0012.006.)  Terra-Gen described land ownership and control, such as that obtained through the contracts that Oak Creek and Allco had secured, as "a major value driver" of its Alta Projects.  (DX0274-2-00010; Tr. 560:13-24 [Pagano] (agreeing).)

Terra-Gen recognized that the Tehachapi Projects' rights to connect to the TRTP were a significant asset because, in its words, "new transmission builds in California are difficult and a lengthy process; TRTP is here and now."  (DX0110-2-00069; Tr. 443:12-23 [Pagano].) Access

---

[8] Terra-Gen, formed in 2007, was initially owned by ArcLight Capital Partners ("ArcLight"). By December of 2009, Global Infrastructure Partners had acquired a roughly 40 - percent interest in Terra-Gen from ArcLight.  (Tr. 53:16-24 [Pagano].)  Currently, Terra-Gen has two private equity owners, referred to as sponsors:  ArcLight and Global Infrastructure Partners. (Tr. 54:21-23 [Pagano].)

[9] Allco's U.S. wind energy business also included the Alite project and Allco's interest in AIPC, the above-referenced development services joint venture with Oak Creek.  (JX0012.007.)

11

to the TRTP was a "significant asset", and having that right gave Terra-Gen a "head start" on development. (Tr. 482:8-12 [Pagano]; Tr. 451:19-452:2 [Pagano].)

In coordination with ArcLight Capital Partners, Terra-Gen created an entity called California High Wind Power, LLC ("CHiPS"), to carry out the acquisition. On or around June 16, 2008, certain Allco entities entered into various agreements with CHiPs that would execute the sale, which would close a month later, on July 15, 2008. (JX0016; JX0017; JX0018.) The final sale price was approximately $394 million, including $390 million in equity and $4 million in assumed liabilities. (SOF ¶ 6.) This reflected roughly a $270 million premium over the development cost of the Tehachapi Projects. (Tr. 465:23-466:9 [Pagano].) The sales agreement also required the parties to allocate the purchase price pursuant to § 1060 of the I.R.C., using the residual method. (JX0007.034; JX0015.038; JX0016.0038; JX0017.018.)

By stepping into Allco's shoes, Terra-Gen assumed the requirement to pay the 5% royalty, or one-time lump-sum upfront payment, to AIPC. After the acquisition, Oak Creek (the non-Allco member of AIPC) remained involved in development efforts until approximately the end of 2008. (Tr. 122:2-6 [Pagano].) At that point, Terra-Gen continued Oak Creek's work.

## C.    *The Appraisal of the Allco Assets*

In 2010, Duff & Phelps ("Duff"), an appraisal firm, prepared two reports at Terra-Gen's request about its acquisition of the Allco assets. (SOF ¶¶ 9-13) These assets form the underpinnings of the Alta Projects, and the reports were relied upon by KMPG when it conducted its allocations of the purchase prices in the Alta Project Transactions. (*See, e.g.,* Tr. 1159:8-1160:23 [Huplosky] (discussing use of Duff & Phelps development rights allocation in KPMG work paper); JX0139.007.)

The first report, the "Fair Value Report," dated January 19, 2010, describes Duff's estimation of the fair market value of the identifiable tangible and intangible assets acquired by

12

Terra-Gen, as of the acquisition date of July 2008, for the purpose of allocating the purchase price among the acquired assets.  (SOF ¶ 9; JX0032; Tr. 120:11-18 [Pagano].)  Duff allocated approximately $36 million of the $394 million purchase price to the Alite wind farm and a few million dollars to a few hundred acres of land owned by Allco, as well as other assets. (JX0032.03-04; Tr. 1136:3-8 [Huplosky].)  Duff estimated that the remaining $350 million pertained to the Tehachapi Projects.  It broke that number out as follows:

1.  $68 million of the purchase price reflected payments that Terra-Gen had made for GE turbines that would be used in what became Alta I.  (JX0032.35; Tr. 1137:24-1138:14 [Huplosky].)

2.  $282 million reflected the acquisition of certain rights and intangible assets for the Tehachapi Projects.  (JX0032.35.)

Of the second amount, $10.4 million reflected actual documented costs that Allco had incurred in developing the Tehachapi Projects, as well as interest accounting for opportunity cost.  (JX0032.35; Tr. 1138:15-1139:7 [Huplosky]).

The remaining $272 million of the purchase price, reflected the appraiser's judgment regarding the value (well above the cost) of the two intangible assets associated with the Tehachapi Projects and identified by Terra-Gen.   Duff placed the highest value on "Development Rights" acquired by Terra-Gen, which it estimated to have a fair market value of $195 million. (SOF ¶ 11; JX0032.45.)  Duff described the Development Rights as the "collection of permits, wind data, agreements, and other development milestone achievements which are necessary to bring a development project from conceptual stage to operation" including but not limited to the Tehachapi Projects' "contractual framework with SCE that will allow for future power purchase agreements for approximately 1,550 MW of capacity."  (SOF ¶ 10, JX0032.45.)

Duff allocated the remaining $77 million to the TRTP transmission rights acquired in the transaction.  (SOF ¶ 12.)  In its valuation procedures, Duff described the value of the

13

transmission rights as arising from the elimination of risk of interconnection delay.  (JX0032.37; Tr. 1137:3-15 [Huplosky].)

According to a balance sheet depicting the assets before and after the acquisition, Allco did not provide Terra-Gen with any estimated value for the transmission rights or the development rights – these intangible items were not present on Allco's balance sheet, or otherwise included in the data Allco provided to Terra-Gen in its data room.  (JX0032.45; Tr. 1142:2-1143:3 [Huplosky].)  Duff's asset summary included a total value of tangible assets of only$116 million of the $394 million purchase price.  (JX0032.46.)

Crucially, for the purposes of this case, Duff's valuation numbers were determined as of the transaction date of July 2008.  (JX0032.02.)  As a result, they did not reflect either the values at he time of the appraisal, in early 2010, or at the times of the subsequent transactions involving the completed Alta projects.

In its second report, dated February 3, 2010, and called the "Allocation of Phases Report," Duff's took its previous estimate of the value of the transmission and development rights determined in the Fair Value Report and exercised its judgment to allocate these values across a subset of the different Tehachapi Project phases, referred to by then as Altas I-XI.  (SOF ¶ 13.)

In this report, Duff allocated the intangible assets – including the entire $195 million of estimated development rights value and $77 million of transmission rights value – among these eleven project phases, (of which the Alta Projects were only six) even though the eleven phases were projected to have a combined capacity that would account for only half of the overall development opportunities that were acquired from Allco.  (*See* SOF ¶ 14.)

14

### III.    Terra-Gen's Subsequent Development Work on the Alta Projects

As Terra-Gen pursued additional development efforts, described below, it began to divide the Tehachapi Projects into various projects – the Alta I, Altas II-V, and Alta VI Projects at issue here, as well as other, later projects.  (SOF ¶ 7.)  These projects were broken out as slices of generation capacity (the number of megawatts that could be generated, and thus the expected income), to facilitate development, execution of the PPAs, construction financing, sale-leaseback execution, and syndication.

During its period of development, Terra-Gen continued to acquire land rights in the area and continued Oak Creek's work in obtaining the permits necessary to build and operate the wind farms.  (Tr. 89:13-90:4 [Pagano]; PX-0296.)  Terra-Gen's work included completing the process of obtaining various environmental and geotechnical reviews, executing interconnection agreements, completing the process of obtaining crossing agreements, and obtaining permits.  (PX-0296.)  Terra-Gen also obtained construction financing and oversaw the construction of the projects.  (*Id.*) Although Oak Creek and Allco had already executed turbine supply agreements and acquired GE turbines for Alta I, Terra-Gen negotiated and entered into turbine contracts for Altas II-VI with Vestas, a different supplier.  (*Id.*)

### IV.    The Increasing Value of the Alta Projects

During this several year period of development, the Alta Projects' expected income-generation capability greatly increased.  Some of this increase was attributable to Terra-Gen's work to turn the Alta Projects into the complete power-generation businesses they became, and some to market factors outside of Terra-Gen's control.

#### A.    *Assembling the Complete Power-Generation Businesses Added Value*

Terra-Gen's work to convert these projects from development-stage projects to functioning power-generating businesses added value to the projects.  Terra-Gen assembled the

15

necessary tangible assets, along with the set of coordinated contracts that permitted them to generate and deliver the power to a contractually locked customer.  These assets include not just the tangible, eligible assets like the turbines, but all of the tangible assets shared among the Alta Projects.  The assets also include all the intangible assets of the projects, like the operating contracts for selling power (power purchase agreements, or PPAs) and transmitting it to the customer (interconnection rights), as well as land rights.

As numerous witnesses testified, all of these items were necessary for the projects to generate income.  (Tr. 735:6-12 [Revock] (permits critical to having an integrated facility); Tr. 780:20-781:22 [Revock] (discussing what an integrated facility required); Tr. 785:6-12 [Revock]; Tr. 788:23-789:14 [Revock]; Tr. 820:17-821:12 [Spencer]; Tr. 990:14-22 [Markowitz]; Tr. 991:14-992:22 [Markowitz]; JX0081.)  Had any been missing, the value of the individual Alta Projects would necessarily have been lower.  (Tr. 882:13-20 [Spencer].)  Moreover, by assembling them into a complete power-generation business, Terra-Gen created a whole that would have value that was greater than the sum of the costs of the various parts.  (Tr. 1668:15-17 [Blaydon] (acknowledging group of coordinated assets can have value that exceeds the value of its individual parts).)

### B.    Terra-Gen's Use of "Turbine Blending"

The Projects' value also increased when Terra-Gen was able to cleverly utilize two contractual provisions of the Master PPA to increase the price at which it was able to sell power from Altas I-VI, and hence the total income generated by the projects.  (Tr. 503:1-5 [Pagano]; DX 105-00002 (blending "maximize[s] revenue").)

First, the power price for each of the project-specific daughter PPAs was tied to the cost of the turbines used to generate power, subject to a price cap.  (JX00006.147-154.)  In particular, the daughter PPA prices were determined using a formula that was dependent, in part, on the

16

ratio of the project's turbines' cost to their rotor-swept area ("RSA").  (*Id.*)  The RSA is the area of the circle within which the turbine blades turn.  The longer the turbine's blades are, the bigger the turbine's RSA.  Under the formula, turbines that cost more per RSA yield a higher PPA price.  (*Id.*)  Therefore, a turbine that cost the same as another turbine, but that had a smaller RSA, would yield a higher PPA price.

Second, if desired, the Master PPA permitted the developer to rely on an average of the cost and RSA characteristics of turbines used across multiple specific projects in determining the PPA price for each of those projects.  Terra-Gen took advantage of this latter provision – referred to as "turbine blending" – for all of the Alta Projects.  In effect, and as explained below, this allowed Terra-Gen to substantially increase the PPA price for Alta I without decreasing the PPA prices for Altas II-V.  (Tr. 503:1-5 [Pagano].)

The GE turbines slated for Alta I had a relatively low cost-per-RSA and thus would yield a low PPA price under the formula.  (Tr. 502:18-25 [Pagano].)  In comparison, the Vestas turbines used for Altas II-V were more expensive, due to having twice the electrical generating capacity.  (Tr. 502:11-14 [Pagano].)  Their RSA was larger, but not proportionately, so they had a higher cost-per-RSA, which in turn would generate a higher PPA price.  Indeed, the Vestas turbines' cost-per-RSA was high enough that the corresponding electricity price exceeded the price cap specified in the Master PPA, and thus would be reduced to the cap amount.  By using "turbine blending," Terra-Gen was able to increase the PPA price that the Alta I project received simply by basing the Alta I PPA price on the blended turbine cost and RSA characteristics of Altas I-V, rather than basing Alta I's PPA price solely on the characteristics of the Alta I turbines.  (Tr. 503:1-5 [Pagano].)

17

Without the blending, the Alta I PPA price would have been calculated based on the characteristics of the GE turbines that were actually used in the project, and the Alta II-V PPA prices would have been calculated based on Vestas turbines and then reduced to the contractual price cap amount. (Tr. 503:19-504:18 [Pagano].) Instead, using "turbine blending", Terra-Gen was able to have all of Alta I-V's PPA prices set by the blended average characteristics of the Vestas and GE turbines, increasing Alta I's PPA price up to the contractual cap without bringing Altas II-V's PPA prices down below the cap. (Tr. 503:1-5; 505:20-23 [Pagano].)

Importantly, Terra-Gen did not need to actually include Vestas turbines within the Alta I project in order to receive this advantage. (Tr. 503:10-18 [Pagano].) In other words, "turbine blending" increased the value of the Alta I project based on the characteristics of turbines used in Altas II-V, without requiring a physical change in the Alta I project. (Tr. 504:8-506:8 [Pagano].) That is, the increased power sale price for Alta I and project value was not based on the eligible property actually installed at Alta I.

### C.     *Shifting Market Factors That Increased Value of Alta Projects*

The value of the Projects also increased due to several factors outside of Terra-Gen's control. (Tr. 475:5-12 [Pagano] (first permitting phase, aka, Altas I-VI, "clearly went up").) As Terra-Gen's CEO put it, "After the acquisition, there were a number of things that I think broke our way, if you will." (Tr. 474:13-14 [Pagano].)

First, California instituted and then increased its Renewable Portfolio Standards, which dictated that utilities purchase a certain percentage of their electricity from renewable sources. (Tr. 73:19-74:20 [Pagano].) The increased requirement for renewable use led to an increased demand for renewable power, which then increased the power price for renewables, including wind. (Tr. 74:15-20 [Pagano]; Tr. 471:8-17 [Pagano]; Tr. 829:1-12 [Spencer] (high RPS "will sustain higher power prices"); Tr. 995:2-10 [Markowitz]; Tr. 995:11-996:4 (Markowitz); JX

18

94.0029.)  Additionally, changing market conditions led to an increase in the calculated cap on prices established in the daughter PPAs of the Alta Projects.  Accordingly, the Alta Projects' income-generating capacity increased.

Second, the passage of Section 1603 added additional value to the Alta Projects.  Prior to Section 1603, the Alta Projects would have had to seek tax benefits from the already-available Production Tax Credits, which were less advantageous for these particular projects.[10]

Third, the transmission lines over which the Alta Projects would sell their power were financed and built out by the California utilities.  This multi-billion-dollar construction project coming to fruition meant that the Alta Projects would be in a position to sell their power without delay as soon as they were ready to go online.  (*See* Tr. 113:14-114:3 [Pagano]; Tr. 484:11-18 [Pagano].)  This also added value to the Alta Projects.

## V.      The Sale-Leasebacks and Sale of the Alta Projects

During its development work, Terra-Gen also began to ready the Alta Projects for sale. Relevantly, Section 1603 disqualifies any entity from qualifying for funds if that entity has any upstream owner that is tax-exempt.  § 1603(g)(4).  ArcLight, the owner of Terra-Gen, wanted Terra-Gen to be an LLC so that it would remain a flow-through or pass-through entity, but ArcLight is owned, in part, by tax-exempt pension funds.  (Tr. 157:1-8 [Pagano]; Tr. 161:23-162:18 [Pagano]; Tr. 1131:16-1132:1 [Huplosky].)  Terra-Gen therefore was prohibited from applying for a Section 1603 award, unless it created a taxable corporation to hold them.  Terra-Gen, however, did not want to create a layer of taxation in its ownership structure, so it began to

---

[10] In responding to questions from banks, Terra-Gen recognized that the grant could be nearly double the Production Tax Credit.  (Tr. 1192:1-19 [Huplosky].)  The relative value of each depended on what would be claimed as basis under Section 1603 and production levels under the Production Tax Credit.

look for "takeout" strategies that would allow it to transfer the projects to other companies that could qualify for the award. (Tr. 166:15-167:1 [Pagano].) In its (and plaintiffs') view, doing so would also greatly increase the amount of Section 1603 payment that it could claim.

### A.    The Sale-Leasebacks of Altas II-V

The first of the transactions involving an Alta Project (collectively, the "Alta Project Transactions") that Terra-Gen closed was the set of sale-leasebacks of Altas II-V to Citigroup ("Citi") and additional investors. These Projects were a quartet of wind farms with capacities of 150 MW, 150 MW, 102 MW, and 168 MW, respectively. After receiving proposals for various deal structures from a number of bidders, Terra-Gen ultimately entered into an agreement with Citi under which Citi provided a portion of the necessary project financing in addition to committing to the leveraged sale-leasebacks of all four projects.[11] (Tr. 740:4-12 [Revock]; Tr. 771:24-772:14 [Revock]; Tr. 774:1-4 [Revock].) To carry out the sale-leasebacks, the parties created multiple owner-lessor entities (now plaintiffs in this case). These entities, all trusts, were initially wholly owned by Citi; each acquired an undivided percentage interest in the applicable Alta Project. (*See generally* JX0225; JX0286; JX0344; JX402 (Participation Agreements for Altas II-V).)

Citi and Terra-Gen then began the process of individually closing each of the four project transactions, with Citi divesting some or all of its interest in each individual phase to other potential investors either by recruiting a co-investor before closing (as with Google) or divesting its interest in an owner-lessor entity after closing. (Tr. 740:4-741:1 [Revock]; Tr. 773:17-774:4 [Revock]; Tr. 707:11-19 [Revock]; *see generally* PX0013 (setting forth Citi's commitment to

---

[11] A sale-leaseback transaction is considered leveraged where, to complete the purchase portion of the transaction, the purchasing party issues debt to raise funds.

consummate" the Alta II-V transactions.)  For its work syndicating the transactions, Terra-Gen paid Citi a "tax equity fee". (Tr. 801:18-802:21 [Revock])

On paper, the sale-leasebacks of Altas II-V involved the sale of only the eligible energy property to the purchasers (or owner-lessors).  The actual deals, however, also involved a circular lease-out and lease-back that gave the buyers access to assets that were not nominally covered by the sale-leaseback (the "retained assets").  (Tr. 185:6-10 [Pagano]; Tr. 784:18-21 [Revock] ("Presumably, what we're paying for the excluded assets . . . is we're paying fair value for the rights to those assets."); *see also e.g.*, JX 259; JX 264 (examples of the retained assets lease and sublease used for each of the owner-lessor entities in Altas II-V).)  The retained assets were crucial to the operation of the wind farm for profit, and thus the owner-lessors required access to them as part of the overall deal.  (Tr. 792:17-793:8 [Revock]; Tr. 820:17-821:9 [Revock].)  The owner-lessors also received access to them at the end of the leaseback term.  (Tr. 425:8-17 [Pagano]; Tr. 603:9-23 [Pagano].)

The transaction documents established total purchase prices paid to transfer Section 1603-eligible property for each Alta phase:  $440.25 million for Alta II, $444.5 million for Alta III, $288.8 million for Alta IV, and $488 million for Alta V.  (*See generally* JX0225; JX0286; JX0344; JX402 (Participation Agreements for Altas II-V).)

Critically, the sales of ownership interests in the Alta II-V projects to Citi, Google, and other investors occurred in the context of a related leaseback of that property by Terra-Gen.  (*See e.g.*, JX 259; JX 264 (examples of the lease and leaseback documents for Altas II-V).)  Moreover, the sales occurred alongside the execution of a number of additional agreements providing for leases and subleases of the ineligible tangible project assets and land, and also

21

providing for other project assets to be offered as collateral to the purchasers.[12]  Together with

the sale of the Section 1603-eligible property, these various agreements between Terra-Gen and

the Alta II-V plaintiffs created an overall project transaction in which the owner-lessors obtained

the right to receive the cash flows generated over time by the integrated use of all of the real

property, as well as tangible and intangible assets that comprised the Alta II-V Projects.  (Tr.

735:9-19; 785:6-12 [Revock].)  Together with the core sale-leaseback agreements, these side

deals economically transferred benefits to the buyers that were attributable to the combined use

of the entire wind farm, comprising all assets.  (Tr. 517:3-518:3 [Pagano].)  This ensured that

Citi acquired "an integrated facility," which had all of the necessary rights and contracts in place

to allow it to generate power.  (Tr. 780:20-781:9 [Revock]; Tr. 785:6-12 [Revock].)

---

[12] The complexity of the Alta II-V sale-leaseback transaction is made clear by the volume
of transactional documents required to complete the deal in its entirety.  In addition to the
Participation Agreement setting forth the overall transaction, the parties entered into a welter of
side and other related agreements memorializing various deal terms, including:

- Bills of Sale;
- Facility Leases;
- Retained Assets Leases and Subleases;
- Site Leases and Subleases;
- LCD Cash Grant Agency Agreements between Terra-Gen and each owner-lessor;
- Certificates regarding Grant Shortfall;
- PPA Assignment Agreements;
- PPA Use Agreements;
- Project Document Assignment Agreements;
- Project Document Use Agreements;
- SCE Joinder Agreements;
- Intermediate Holdco Pledge and Guaranty Agreements;
- Various Lease Collateral Documents as defined in the Participation Agreement;
- Support Services Agreements; and
- Support Services Conditional Use Agreements.

(*See e.g.*, JX0259; JX0264, JX0273, JX 0278 (examples of the retained assets lease and sublease
used for each of the owner-lessor entities in Altas II-V); *see generally* JX0225-JX0466 and
JX0581-JX02025 (representing the literal hundreds of side agreements involved in the Alta II-V
Project Transactions).)

George Revock negotiated the terms of the Alta II-V sale-leaseback transactions on behalf of Citi.  Mr. Revock testified in great detail related to the terms of the "sale" and the "leaseback."  (Tr. 682:8-21; 690:4-691:3 [Revock].)   He explained the terms and transaction by way of the computer software used to negotiate the transaction.  Mr. Revock explained that this software, the ABC computer program, was used in the "big ticket leasing industry" on a number of transactions, including sale-leasebacks.  (Tr. 746:10-11 [Revock].)  Mr. Revock explained that the program "is used by lessors who input a host of constraints and the program itself then optimizes the outputs, which are essentially the rental stream with a certain objective, usually an optimization objective."  (Tr. 746:13-16 [Revock].)  Purchase price, Mr. Revock testified, is set "based on a projected income stream," which is based on the sale of power, which create cash flows that make up the rental payment.  (Tr. 784:22-786:12 [Revock].)

Mr. Revock further explained that the constraints input to optimize the Alta II-V transactions included the projected cash flows of the project, purchase price, debt rating information, coverage ratio constraints on the rents, debt rate, tenor of the debt, length of lease terms, depreciation, and the amount of the cash grant.  (Tr. 746:13-747:14 [Revock].)  With all of these inputs, the ABC program calculated "an output rental stream that would enable us to hit our required return as lessor and meet the optimization objective that Terra-Gen wanted to meet."  (Tr. 747:15-17 [Revock].)  As explained by Mr. Revock, the ABC program used to develop the Alta II-V transactions optimized each transaction among the numerous terms of both the "sale" and the "leaseback."  (Tr. 746:10-11 [Revock].)

In addition to explaining the sale-leaseback transactions at a micro level, Mr. Revock explained that the investors on both sides of a sale-leaseback value the overall deal based on cash flows.  (Tr. 746:18-747:17; 810:5-18 [Revock].)  According to Mr. Revock, investors are

23

interested in items like target yield, residual value of the asset, length of the lease term, purchase price and accounting treatment among other things. (Tr. 776:23-777:18 [Revock]; Tr. 784:22-785:1 [Revock].) Mr. Revock explained that the terms of the sale-leaseback deal need

> to work for both parties. So, yes, we're looking for the right profile for us from a yield perspective, after-tax cash perspective, average life of investment, et cetera, make sure it hits all the tax tests. I'm sure from Terra-Gen's perspective, they are looking to optimize the payment of rents, proceeds under the lease, and then look at the -- their purchase options and hopefully get the best deal that they can relative to other alternatives that they can proceed with.

(Tr. 809:8-18 [Revock].) Notably, Mr. Revock characterized Terra-Gen's interest as "proceeds under the lease" (i.e., reflecting the benefits of the sale as offset by the burdens of the accompanying lease terms) rather than simply "proceeds under the sale." (Tr. 810:13-15 [Revock].)

In addition, as discussed in more detail in Section VI below, the sale-leaseback terms included indemnification provisions that financially insulated the owner-lessors from the financial risk posed by the possibility that Treasury could award less than the claimed amount of the Section 1603 application.

### B.     The Sale-Leaseback of Alta I

After negotiation of the Alta II-V transactions, Terra-Gen brought the 150-MW Alta I project to the market. Unlike the Alta II-V transactions, however, construction and term financing was already in place. Terra-Gen received responses from several parties, including Union Bank of California ("UBOC"), General Electric Capital Corporation ("GE"), Brookfield, and Sumitomo, variously proposing both sale and sale-leaseback structures. Terra-Gen finally accepted a joint bid from UBOC and GE, which had formed a consortium to participate as equal co-investors in a sale-leaseback transaction. (Tr. 925:17-927:22 [Markowitz].) The deal was,

24

like the Alta II-V sale-leasebacks, accomplished through the use of owner-lessor trusts, two of which were wholly owned by UBOC, and two by GE.

Like the Alta II-V transactions, the Alta I transaction transferred both Section 1603-eligible and ineligible property, for a purchase price of $560 million. (*See, e.g.*, JX0212 (example of Alta I participation agreement).) Unlike the Alta II-V transactions, however, the Alta I sale-leaseback did so explicitly, as part of the primary sale-leaseback transaction. (*See generally* JX0212 (Alta I Participation Agreement, setting out terms); Tr. 991: 3-992:22 [Markowitz] (discussing deal structure).) That is, the use of the site was still conveyed via separate "Site Leases" and "Site Subleases" as was done in the Alta II-V transactions; unlike Altas II-V, however, there were no side leases for the project's other ineligible tangible property through "Retained Assets" leases and subleases. (*See generally* JX0205-JX0224 (key Alta I transaction documents).) That ineligible tangible property was instead part of the principal sale-leaseback for Alta I.

In total, the various agreements between Terra-Gen and the Alta I plaintiffs created an overall transaction in which the owner-lessors obtained the right to receive the cash flows generated over time by the integrated use of all of the real property, as well as the tangible and intangible assets that comprised the Alta I project. (Tr. 990:14-22 [Markowitz ] (noting that the terms of the deal included collateral arrangements that in even of lease default, gave UBOC everything it needed to run the project).)

At trial, Lance Markowitz, who was UBOC's lead negotiator, testified about the terms of the deal. (*See* Tr. 983:12-21 [Markowitz].) He offered testimony consistent with that of Mr. Revock. Mr. Markowitz explained that a number of variables or levers can be altered within a sale-leaseback to achieve particular returns, ratios, or payment amounts. These items included

25

adjustment to the lease terms including the prepayment amount, purchase price on the "sale," and target return. (Tr. 1004:12-1016:24 [Markowitz]; Tr. 992:1-22 [Markowitz]; Tr.985:13-21 [Markowitz].) Mr. Markowitz testified that the lease prepayment (which he described as a closing date rent payment) could increase UBOC's return, and that a lease payment structure can be used to meet a target return on investment in a sale-leaseback given a chosen purchase price (*See* Tr. 1006:25-1007:17 [Markowitz]; Tr. 1008:11-15 [Markowitz].) For example, given an increased purchase price for Alta I, UBOC could maintain a particular target rate of return by either (1) increasing the rent payments over time, or (2) increasing the lease prepayment. (Tr. 1007:25-1008:10 [Markowitz]; DX 363 (illustrating this exercise in the context of Alta I negotiations); DX 364 (same).)

Just like the Alta II-V transactions, the Alta I deal also included an indemnity, discussed below, that ensured the buyer was guaranteed the promised amount of Section 1603 payment. (*See, e.g.*, JX0223 (example of Alta I indemnity).)

### C. *The Sale of Alta VI*

Terra-Gen brought Alta VI to market in 2012, a significant time after the conclusion of the Alta II-V and Alta I sale-leasebacks. (*See, e.g*., JX0175-0177 (marketing presentations and indicative offers for Alta VI).) Alta VI was purchased outright by EverPower for $489.388 million. (*See* JX0467 (Alta VI Purchase and Sale Agreement).) EverPower was paying for the ability of the wind farm to produce income, which required the tangible assets as well as the collection of necessary contracts. (Tr. 850:21-23 [Spencer]; Tr. 864:7-18 [Spencer]; Tr. 885:11-22 [Spencer]; PX0162.) For example, Mr. Spencer testified that if the transmission interconnection agreement or PPA were missing, it would have led to a different (lower) purchase price. (Tr. 882:13-882:20 [Spencer].)

26

Despite the seemingly straightforward nature of the project transaction, this sale was also tied to other related agreements.  For example, it included land agreements that provided EverPower with some of the project land free of charge, which increased the value of the project. (Tr. 890:4-6 [Spencer]; Tr. 895:25-896:3 [Spencer]; Tr. 896:19-22 [Spencer]; Tr. 897:3-6 [Spencer]; Tr. 900:23-25 [Spencer].)

The Alta VI transaction also included the Shared Facilities Agreement.  (*See* JX1093 (Shared Facilities Agreement).)   Under that agreement, Alta VI is required to make certain "wake payments," typically intended to compensate downwind Alta projects for the adverse effect on their performance caused by the wake from Alta VI's upwind turbine rotors.  (JX1093.) Before the Alta VI sale closed, however, Terra-Gen made over $5 million in wake payments on Alta's behalf to other Alta projects and provided EverPower with an additional indemnity, this time against any future wake-related obligation that Alta VI would otherwise have had to pay. (Tr. 900:23-25 [Spencer]; PX0177.)  In other words, Terra-Gen relieved EverPower of certain of Alta VI's financial obligations under the Shared Facilities Agreement, which reduced the value of the project to Terra-Gen below the stated purchase price and increased the value of the project to EverPower.  (Tr. 535:24-536:3 [Pagano]; PX0177.)  The Shared Facilities Agreements also provided a contractual benefit for each of the Alta projects, by "provid[ing] protection against wake impacts from future development by Terra-Gen affiliates."  (JX067.018.)

As with the Alta I sale-leaseback, Terra-Gen provided EverPower with a valuable indemnity that meant EverPower would not be liable for a reduced Section 1603 grant.  (Tr. 886:9-17 [Spencer], Tr. 886:21-25 [Spencer].)  In this case, it also provided that if the project received more than an amount calculated on Terra-Gen's claimed costs, the excess amount would go back to Terra-Gen.  (*Id.*)  The parties called the deal with this indemnification the

27

"fixed Section 1603 scenario." (Tr. 888:17-889:9 [Spencer]; JX0175.) In fact, when Treasury paid EverPower less than Terra-Gen had warranted to EverPower, this indemnity was actually called on by EverPower. (Tr. 887:4-6 [Spencer].)

As part of the transaction, Terra-Gen required EverPower to change the name of Alta VI to Mustang Hills. (Tr. 904:17-25 [Spencer].) Terra-Gen did so because it thought that if the name of the project were changed, Treasury would not know that it was an Alta project, and would not lower the requested grant for Alta VI. (Tr. 1211:9-22 [Huplosky].) Terra-Gen's and plaintiffs' (theoretically) independent accountant, KPMG, found this to be "[f]rankly … an intriguing idea" and helped investigate the logistics necessary to accomplish this. (DX0630.00002; (*see* Tr. 1211:9-22 [Huplosky].)

## VI.     The Indemnification of the Section 1603 Payments

As mentioned, among the agreements making up each of the Alta Project Transactions were indemnity provisions insuring the amount of the Section 1603 payments the parties intended to seek from Treasury. In each case, the buyers, concerned about the risk that Treasury would reduce the payment amount below the amount claimed in an application, negotiated provisions that required Terra-Gen to compensate the buyers for any shortfall. relative to that assumed in pricing the transactions In every case, the indemnity was negotiated because the buyers were aware of the possibility that Treasury could determine that the fair market value was not accurately represented by the purchase price.

In addition to the indemnities in the deal documents, the CEO of Terra-Gen and plaintiffs' counsel both admitted for the first time at trial that the parties to the transactions entered into a series of other agreements that shored up these indemnification provisions. (Tr. 291:19-292:5 [Pl. Counsel]; Tr. 292:21-25 [Pl. Counsel]; Tr. 293:11-20 [Pl. Counsel]; Tr. 600:6-

28

20 [Pagano].)  As a result, none of the plaintiffs – the actual owners and owner-lessors of the Alta Projects – face any potential financial consequences of this litigation.

### A.    The Alta II-V Indemnities

In the Alta II-V transactions, the indemnification provisions specifically provided that Terra-Gen would take the financial risk of any difference between the payments requested at the stepped-up, purchase-price-based basis and any actual reduced payment, all the way down to an award based on 95% of Terra-Gen's own claimed eligible costs of developing and constructing the property.  (Tr. 724:18-20 [Revock].)  The owner-lessors were thus indemnified against a financial loss from a Section 1603 award reduction attributable to Treasury rejecting (as it ultimately did) plaintiffs' increased basis.  And the presence of an indemnity was sufficiently important that it was raised as a provision in Citi's bid submission.  (JX0076.)

George Revock, who negotiated the deals for the owner-lessors, testified that at the time of the deal, Citi was aware that the majority of 1603 payments made since July 2009 had been made on the basis of cost-to-build.   (Tr. 797:6-12 [Revock]; JX0068.004.)  Moreover, because Citi lacked experience with a sale-leaseback receiving a section 1603 payment using purchase price, it specifically negotiated the indemnity, rather than take on the risk.[13]  (Tr. 798:1-9 [Revock]; Tr. 724:23-25 [Revock]; see also JX0068.004.)  Put slightly differently, Citi required an indemnity as a part of negotiating the deal in order to ensure that its return on investment did not change, regardless of the amount Treasury actually awarded.  (Tr. 793:24-794:5 [Revock].)  That risk was left with Terra-Gen.

---

[13] As context for this requirement, more than a year prior to submission of the Alta applications, Citi stated its view that the fair market value of wind energy property for most transactions is generally only 10 to 15 percent above construction costs.  (Tr. 805:6-806:1 [Revock]; DX0154.00018.).

29

Given the guarantee offered by the indemnity, Citi structured the Sectionclaimed 1603 payment into its calculations of cash flows that it used to prepare its bid and, ultimately, set the negotiated purchase price. (Tr. 811:11-812:10 [Revock].) Had the indemnity not been included in the deal, Mr. Revock testified, the offered price would have been lower, and the deal may no longer have been "doable" from Citi's perspective. (Tr. 813:15-24 [Revock].)

### B.    The Alta I Indemnity

In the Alta I transaction, Terra-Gen provided a similar indemnity as to the Section 1603 payment. It had one relevant difference, however: the Alta I indemnity included no limit to Terra-Gen's liability for a reduction in Section 1603 payment. (*See, e.g.*, JX0223 (example of the Alta I tax indemnity agreement and terms).) In other words, UBOC and GE are indemnified no matter how great the difference between the Section 1603 payment that they claimed and what they actually received, even if it were based on using less than 95% of Terra-Gen's claimed cost basis. (*Id.*)

Lance Markowitz testified that at the time he negotiated the transaction for UBOC, he was aware of the possibility that Treasury might not issue a Section 1603 payment based on the amount the parties had agreed upon, which led, in part, to the desire for the indemnity. (Tr.1020:12-1021:4 [Markowitz]; DX0363.)

Mr. Markowitz testified that the Alta I indemnity was intended to offset the differential, if any, between the actual Section 1603 payment and the amount on which the application was based. (Tr. 1020:1-8 [Markowitz]; JX0076.) UBOC wanted to insure that its investment was stable, and without the indemnity, the risk of the deal would have increased substantially. (Tr. 1021:13-19 [Markowitz]; Tr. 1033:10-24 [Markowitz]; JX0094.) Without the indemnity, therefore, Mr. Markowitz testified, "[he] wouldn't have done the deal" and the change in value "would have been enormous." Tr. 1036:2-4, 9-14 [Markowitz].)

### C.      *The Alta VI Indemnity*

Alta VI also had an indemnity as part of the deal documents.  EverPower's CEO, James Spencer, testified at trial that based on their observations, his company was not "willing to take the risk" associated with claiming a Section 1603 payment based on stepped-up basis, rather than cost basis.  (Tr. 870:21-871:10 [Spencer]; JX0094.)  Accordingly, the structure of the Alta VI indemnity differed from the other indemnities in one key respect.  Whereas the Alta sale-leasebacks transferred the value of the claimed 1603 payment to Terra-Gen through the purchase price and then featured indemnities guaranteeing the claimed 1603 payment, in Alta VI the same result was achieved through a different form.

First, the transaction documents provided an indemnity that would reimburse EverPower for any amount of Section 1603 award that was lower than an amount ($87 million) set by the parties based on Terra-Gen's claimed eligible basis (rather than the stepped-up basis used in the other deals).  (JX2039.)  Thus, the economics of the transaction price are based on only this lower, guaranteed amount.  (Tr. 886:2-4 [Spencer].)

Second, the transaction documents nonetheless provided that EverPower would apply for a Section 1603 award based on the purchaser's stepped-up basis, as in the other deals.  This claimed award totaled $126 million.  (JX2039.)  The transaction documents set out, however, that EverPower would pay Terra-Gen any amount of award that they received from Treasury based on this claim above the guaranteed amount of $87 million.  (Tr. 849:9-12 [Spencer]; PX0180.)  In other words, EverPower was guaranteed a minimum of $87 million, based on Terra-Gen's claimed costs, but it was required to apply for $126 million, based on its claimed higher basis.  To the extent that application succeeded in securing funds from Treasury beyond the $87 million, EverPower transferred them to Terra-Gen.  (Tr. 886:9-17 [Spencer].)

31

Despite the difference in the structure of the Alta VI indemnity, the result is the same: the risk of a payment shortfall is placed squarely on Terra-Gen's shoulders. (Tr. 888:17-889:9 [Spencer]; JX0175.) Without the indemnification, EverPower testified that it would simply have applied for Section 1603 payments on a cost basis – and that it had done so for five other non-Alta projects. (Tr. 889:21-890:9 [Spencer]; Tr. 891:12-892:3 [Spencer].)

## VII.    Plaintiffs' Section 1603 Applications and Treasury's Review

As required by the transaction documents, each of the twenty plaintiffs in this case applied for funds under Section 1603 of the American Recovery and Reinvestment Tax Act ("ARRTA"), P.L. 111-5 (2009), as amended by § 707 of the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, P.L. 111-312 (2010) ("Section 1603"). Specifically, plaintiffs here applied for Section 1603 payments alleging they were owners of qualified wind facilities under § 1603(d)(1) and 26 U.S.C. § 45(d)(1) (definition of wind project). Under the statute, they are entitled to payments equal to 30% of their eligible cost basis in the projects. § 1603(b)(2)(A). The plaintiffs each submitted a Section 1603 application based on their project's claimed eligible basis, or a proportional amount thereof where there were multiple owners of a single project.[14] How they arrived at their claims is explained below.

Under the terms of the transactional documents surrounding the sale-leasebacks of Altas I-V and the sale of Alta VI, Terra-Gen spearheaded this application process for all of the plaintiffs. For each of the six Alta Projects, Terra-Gen prepared draft applications and work papers underlying the claimed basis; it also acted as the primary point of contact for Treasury's questions as to each set of Section 1603 applications. (Tr. 1040:6-11 [Huplosky]; Tr. 1053:13-

---

[14] For example, each of the four owner-lessors for Alta I submitted an application seeking funds equal to 25% of the overall eligible cost basis of Alta I as a whole. (*See, e.g.*, JX-526 (example of Alta I cash grant application).)

32

23 [Huplosky]; Tr. 1313:1-4 [Settle].)  Damon Huplosky of Terra-Gen was involved in the development of the applications and testified as to the processes.  (Tr. 1040:3-5 [Huplosky].) Under the terms of the transaction documents related to the sale-leasebacks (or in the case of Alta VI, the sale) of each Alta Project, the parents of the owner-lessors, including GE, UBOC, and Citi, also participated in such discussions, but in a secondary and review capacity.  (*See, e.g.,* JX0249 (example of terms under which agency in cash grant process, here, for Alta II.)

### A.    *Terra-Gen's Allocation of the Purchase Price*

Terra-Gen prepared cost schedules for the Alta Projects that broke down its total "construction costs"[15] into various components, including both Section-1603-eligible and ineligible costs.  (Tr. 1041:12-25 [Huplosky]; Tr. 1052:18-1053:23 [Huplosky]; Tr. 1077:15-1079:8 [Huplosky].)

Drawing on these "construction cost" schedules (including the eligibility classifications) Terra-Gen was also involved in preparing cost schedules that set forth plaintiffs' claimed allocations of the purchase prices that were paid for each Alta Project. (Tr. 1079:20-1080:5 [Huplosky].)  Specifically, with respect to Alta I, the purchase price was "allocated … based on the percentage of … Terra-Gen's eligible construction costs over the total construction costs." (Tr. 1080:6-13 [Huplosky].)  Terra-Gen "just multiplied [plaintiffs'] purchase price … times the eligible percentage and got to the eligible basis." (Tr. 1080:14-16 [Huplosky].)  For Alta VI, Terra-Gen also worked with EverPower and KPMG on allocating the purchase price of Alta VI

---

[15] Plaintiffs have repeatedly referred to Terra-Gen's payments to develop and construct the Alta Projects, including the substantial premium (*i.e.,* profit) it paid to acquire the projects from the projects' original developers, as "construction costs."  To avoid confusion while emphasizing the distinction between these amounts and what are typically considered construction costs, such usage of the term will be denoted by quotation marks.

between eligible and ineligible property, going through "essentially the same process" as for Alta I.  (Tr. 117:2-9 [Huplosky].)

Terra-Gen did not conduct an allocation of the Alta II-V purchase prices between eligible and ineligible basis because the transaction purported only to transfer Section 1603-eligible property (although, as noted above, this was in form only).  (Tr. 1114:7-18 [Huplosky].) However, the purchase prices were allocated among individual eligible assets based on the underlying ratio of the assets' claimed construction costs to total claimed eligible construction costs.  (Tr. 1114:19-23 [Huplosky].)

### B.    KPMG's Attestations

Terra-Gen retained KPMG to review its claimed "construction costs" for the Alta Projects, as well as the allocations among eligible and ineligible assets of those costs and of the plaintiffs' purchase prices.  (Tr. 1216:8-12 [Johnston]; Tr. 1217:4-25 [Johnston]; Tr. 1289:8-15 [Johnston].)  KPMG provided independent accountant's certifications of the cost schedules for Terra-Gen's "construction costs" for all but Alta VI, and of the schedules of plaintiffs' purchase price allocations for all of the Projects.[16]  (*See, e.g.*,  SOF ¶¶ 24-35 (citing JX0093; JX0096; JX0098; JX0099; JX0124; JX0127; JX0139; JX0140; JX0151; JX0152; JX085); JX0194 (KPMG purchase price certifications).)

KPMG's certifications did not reflect a definitive determination that either Terra-Gen or plaintiffs' claims were correct.  KPMG's work involved "sampling" and "testwork" of reported costs and eligibility classifications originating from Terra-Gen.  (Tr. 1224:22-1225:16

---

[16] While the Alta II-V cost schedules of all of Terra-Gen "construction costs", including ineligible property, did not influence the Alta Projects' purchase price allocations, they were relied on by Dr. Blaydon in reaching the conclusion that those purchase prices reflected the value of eligible property alone (as will be described later).

[Johnston]; JX0098.01-02.)[17]  In making its certifications, KPMG had to get to a "should prevail level" regarding their assessment of the applicant's claim, not a more definitive assessment. (Tr. 1040:25-1041:5 [Huplosky]; JX0162.003.)

The KPMG-certified schedules of Terra-Gen's "construction costs" include dollar values for various line items that are segregated into various claimed Section-1603-eligible, Section-1603-ineligible, and partly eligible assets and activities.  (Tr. 1223:2-4 [Johnston].)  The accuracy of these schedules therefore necessarily depends on the correctness of the dollar values; of their classifications among eligible, ineligible, and partly eligible property; and, as applicable, of the percentage of the costs in certain line items that were allocated to eligible versus ineligible property. From these documents, "cost allocation percentages" for each of the Alta Projects could be calculated that reflected the claimed total eligible "construction costs" as a percentage of total project or construction "costs," where the latter included both eligible and ineligible costs.  (Tr. 1187:1-13 [Huplosky].)

Huplosky's testimony, together with selective excerpts from the beginning and end of a KPMG memo referenced therein, could give the false impression that KPMG provided a categorical certification of the Alta I purchase price allocation solely on the grounds that the allocation reflected a "pro rata" allocation of the purchase price in accordance with Terra-Gen's "construction costs", and that this approach to purchase price allocation was categorically a

---

[17] Mr. Huplosky's testimony that "the determination of which costs were eligible versus ineligible was ultimately decided by KPMG…" overstates KPMG's role.  (Tr. 1101:2:7)  As is made clear by KPMG's cost segregation memo for Terra-Gen's Alta I "construction costs" (on which Alta I's purchase price allocation was based), Terra-Gen provided KPMG a "grant study" that had already segregated costs into grant-eligible and non-eligible, and KPMG's role was limited to performing "testwork" on Terra-Gen's eligibility classifications of hundreds of line items of costs, with reference to only three source documents. (JX098.01-02)

"permissible method under longstanding tax rules."[18]  (Tr. 1104:13-1106:22 [Huplosky];

JX0162.004.)

While that testimony addressed a paragraph on each of the first and last pages of the

KPMG memo, it did not address certain content in between, which stated:

> The purchase price is allocated using a 'waterfall' approach,
> assigning value to various categories of property pursuant to an
> ordering rule.  Code sec. 1060(a). . . . [A] third-party appraisal
> was performed by a reputable valuation firm that used IRS-
> approved methodologies for determining the fair market value. . . .
> . *[T]he valuation report supported a finding that the value of the
> tangible assets was at least equal to the purchase price, so there
> was no residual to allocate to Class VI [intangible assets]. . . .*
> Thus, we found that the entire purchase price should be allocated
> to Class V [tangible assets]. The purchase price was allocated
> among the assets in Class V pro rata based on the construction cost
> of those assets.  This was a permissible method under longstanding
> tax rules.

(JX0162.002.004 (emphasis added).)

Thus, it was only upon concluding, based on a valuation, that the value of the tangible

assets was at least equal to the Alta I purchase price, that KPMG concluded that no residual

value should be allocated to intangible assets, and that the entire purchase price could be pro rata

allocated among the tangible assets according to the construction cost of those assets.[19]

(JX0162.003-.004.)  KPMG's review did not state that the appropriate way to determine the total

value of the tangible assets was to apply a pro rata allocation to the purchase price, regardless of

the circumstances.  Rather, KPMG stated that a pro rata allocation could be applied *because* a

---

[18] Mr. Huplosky defines a pro rata allocation at Tr. 1050:7-15.  In the case of the purchase price allocations, it amounted to allocating the overall purchase price to each asset in accordance with that asset's share of Terra-Gen's total "construction costs".

[19] Plaintiffs have not presented any expert testimony on the referenced "third-party appraisal" of the completed Alta I project, nor is that appraisal expert testimony that could be relied on by the Court.

36

separate determination had been made that the total value of the tangible assets was at least equal to the purchase price.[20]  (*Id.*)

### C. Reliance of KPMG-Certified Cost and Purchase Price Allocations on Duff and Terra-Gen Valuations

The dollar amounts of some key line items in the KPMG-certified cost schedules of Terra-Gen's "construction costs" actually reflect valuation judgments from the previously referenced Duff appraisal, rather than specific dollar values that can be tied back to invoices.  For example, $40 million of the Terra-Gen "construction costs" for Alta I, included in the "Development Cost Allocation" and "Development Cost Allocation (related to PPA)" line items, were based on Duff's allocation to Alta I of $40 million of intangible "Development Rights" of the total purchase price that Terra-Gen paid Allco in 2008 for its U.S. wind energy business ("Allco purchase price").[21]  (Tr. 1068:22-1069:11 [Huplosky]; Tr. 1071:15-1072:15 [Huplosky]; JX0168.003; JX0032.)  Similarly, $14 million of the total "construction costs" were based on Duff's allocation to Alta I's "Transmission Rights" of $14 million of the Allco purchase price. (Tr. 1073:5-19 [Huplosky]; JX0168.003; JX0032.)

Using just Alta I as an example, the accuracy of $54 million (or more than 12%) of Terra-Gen's $437.7 million in total Alta I "construction costs" therefore depends on the accuracy of Duff's valuation-based allocations of the Allco purchase price.  (JX0168.003-.005.)  These Duff allocations were, in turn, based on its income valuations.  (JX0032.095-.098.)  The accuracy of these elements of Terra-Gen's "construction costs" therefore necessarily depends on the

---

[20] While the defendant disagrees with many of the assumptions and arguments on which KPMG's opinion was based, this discussion is being provided to establish the fact that KPMG did not categorically certify the pro rata allocation, as might be suggested in the testimony.

[21] See below for a quotation of how Duff characterized these "Development Rights".

propriety of Duff's valuation framework, and a host of assumptions feeding into Duff's income valuations.   Moreover, these allocations reflect the estimated value of the various assets acquired from Allco as of July 2008, not as of any more recent year in which other costs that appear in the Terra-Gen "construction cost" schedules were being incurred.  (JX0032; Tr. 1076:15-19 [Huplosky].)

Terra-Gen classified the "Development Cost Allocation" line item (representing a portion of the Development Rights that Duff & Phelps defined as intangible) as largely allocable to eligible basis (as addressed in more detail below) and the "Transmission Cost" line item as wholly ineligible.  (JX0168.003.)  Consequently, the precise value of these valuation estimates directly affected the above-referenced "construction cost" eligible cost allocation percentages that were used to allocate the Alta Projects' purchase prices among eligible and ineligible basis. (Tr. 1073:20-1074:24 [Huplosky].)

While Duff developed its own valuation of the transmission rights for each phase, it did not decompose the intangible Development Rights value into specific individual rights or contracts.  Duff simply described those rights as the "collection of permits, wind data, agreements, and other development milestone achievements which are necessary to bring a development project from conceptual stage to operation" including but not limited to the Tehachapi Projects' "contractual framework with SCE that will allow for future power purchase agreements for approximately 1,550 MW of capacity."  (SOF ¶ 10; JX0032.45.)  In addition to the PPA, this value includes the value of the use rights for tens of thousands of acres of land that the original developers had negotiated (*e.g.*, via land lease options) by the acquisition date, and the ten thousand additional acres under negotiation at the time, as the report only separately valued the 596 acres of land that had already been acquired outright.  (JX0032.013, .041.)

While Duff did not further break down the "Development Rights" value, Terra-Gen broke it out in the "construction cost" schedules, separating it into two line items, "Development Cost Allocation" and "Development Cost Allocation (related to PPA)".  (JX0168; Tr. 1067:3-14 [Huplosky].)  The former was almost exclusively allocated to eligible basis; the latter was treated as wholly ineligible.  (*Id*.)  For Alta I, the $40 million Development Rights value was broken out into $38 million in eligible indirect cost, and $2 million in ineligible costs.  (*Id*.)  Therefore, the accuracy of these cost schedules depended on the accuracy of how this $40 million was broken out.

Inaccurate testimony was offered on how those "Development Rights" values were broken out.  Mr. Huplosky testified that, for Alta I, the $2 million reflected "the costs associated with negotiating and obtaining the power purchase agreement."  (Tr. 1067:3-1068:21 [Huplosky].)  In fact, the $40 million Development Rights value was broken out based on a subjective judgment that had nothing to do with any records of the costs of negotiating and obtaining the power purchase agreement.  According to a KPMG memorandum, the $38 million/$2 million split was proposed by Terra-Gen, and reflected Terra-Gen's application of a 95%/5% allocation to the $40 million Development Rights value "based on a number of publicly available sources that have stated that for wind farms, about 95% of total construction costs are grant eligible costs."  (JX0153.007.)

### D.    *Treasury's Review of and Determinations Regarding the Alta Applications*

Treasury's review of the Alta Projects' Section 1603 claims commenced with the January 2011 submission of applications by the Alta Wind I plaintiffs.[22]  (JX0115; JX0116.)  The review

---

[22]  Characterization of the review as "Treasury's review" incorporates review by staff of the National Renewable Energy Laboratory, who worked under contract with Treasury.

continued for six months until Treasury issued awards to the Alta I plaintiffs at reduced levels.[23] (JX0196.)  Even after these awards were issued, Treasury engaged in months of additional discussions with plaintiffs and their representatives, including Terra-Gen, in which Treasury provided them an opportunity to support their claims.  (Tr. 1974:17-1975:19 [Jaffe].)

In reviewing the Alta applications, Treasury involved individuals with substantial relevant expertise and experience.  Staff of the National Renewable Energy Laboratory (NREL) began the application review.  NREL staff who review Section 1603 applications under contract with Treasury have expertise in renewable energy and the energy industry in general.  (Tr. 1805:1-7 [Neubauer].)  One of the principal reviewers of the Alta applications, Edward Settle, estimated that he has reviewed thousands of Section 1603 applications, including "[i]n excess of a couple hundred" applications for wind property alone.  (Tr. 1325:21-1326:5 [Settle].)  Treasury also involved a staff member, Judson Jaffe, with substantial academic training and work experience relevant to valuation issues like those raised by the Alta applications.[24]  (Tr. 1955:11-25 [Jaffe].)  Mr. Jaffe estimated that he has been involved in the review of one hundred or more unique transactions associated with Section 1603 applications.  (Tr. 1962:20-25 [Jaffe].)  In addition to relying on their own expertise, these staff had access to others with expertise in tax law in Treasury's Office of Tax Policy and in the Internal Revenue Service.  (Tr. 1959:12-20; Tr. 1965:22-1966:14 [Jaffe].)

---

[23] Treasury applied the same logic and framework in reviewing all of the Alta applications.  (Tr. 2016:8-12 [Jaffe].)

[24] Prior to joining Treasury in 2009, Mr. Jaffe earned a graduate degree in economics from the University of Cambridge, served on the staff of the President's Council of Economic Advisers for two years, and was an economic consultant at a firm called Analysis Group for a six-year period in which he rose to the level of Vice President.  (Tr. 1951:1-1952:16 [Jaffe].)

In the initial stages of the Alta I application review, NREL staff identified that Alta I's claimed Section-1603-eligible basis was about $3,480 per kilowatt (kW) of capacity.[25] (Tr. 1311:12-14 [Settle].) The amount of eligible basis substantially exceeded NREL reviewers' expectation that, based on industry data, the cost of a wind farm generally falls in the range of $1,800 to $2,200 per kW. (Tr. 1311:5-9 [Settle].) As Treasury later stated in explaining its ultimate payment decision to plaintiffs:

> Treasury compared the dollar per kW value of Alta I's claimed basis with the approximately 150 wind projects larger than 2 megawatts that have received 1603 payments to date. Alta I's claimed basis significantly exceeds the eligible basis of every one of these other wind projects. Even the dollar per kW value implied by the reduced Section 1603 payments awarded to Alta I exceeds that of every other project's eligible basis, and significantly exceeds the average value for all of these other projects.

(DX0535-3.0018.)

With this context, the review of the Alta applications proceeded by addressing two general questions. (Tr. 1968:13-1969:2 [Jaffe].) First, "was there something that caused the overall purchase price [in the transactions at issue] to be elevated above the fair market value of what was acquired"? (*Id.*) Second, was the purchase price appropriately allocated among the acquired assets, and particularly between Section-1603-eligible and Section-1603-ineligible assets? (*Id.*) Treasury's ultimate decision to issue a reduced award focused on its assessment of the second question. (Tr. 1981:6-11 [Jaffe].)

To address these questions, the review team engaged in a substantial review of the applications. This included a back-and-forth with plaintiffs that involved soliciting additional documents, reviewing and analyzing these documents, and posing additional questions and

---

[25] A kilowatt is a unit of electrical power equal to one thousand watts, so a cost expressed in dollars per kilowatt will equal one thousand times the same cost measured in dollars per watt.

document requests that led to further document review, analysis, and discussion.  (Tr. 1312:8-25 [Settle]; Tr. 1315:9-12 [Settle]; Tr. 1972:1-6 [Jaffe]; PX0132; PX0205.)  Just one of the multiple staff members that were materially involved in this review estimated that he spent more than one hundred hours "immersed in the review of all the details" of the applications.  (Tr. 1972:8-16 [Jaffe]; Tr. 1973:1-12 [Jaffe].)  Treasury's review involved examining documents relating to, among other things, the development and ultimate sale of the Alta Projects to plaintiffs, actual construction costs and their relation to the claimed basis, and appraisals relied on by the applicants.[26]  (Tr. 1312:11-19 [Settle]; Tr. 1972:20-25 [Jaffe].)

Following more than six months of document review, analysis, and back-and-forth with plaintiffs, Treasury issued the Alta I awards at reduced levels on July 28, 2011.  (JX0196.)  The level of the Alta I awards was set to be consistent with what Terra-Gen characterized as its eligible "construction costs" for that project, but which, as described more fully below, included substantial development profit on top of actual construction costs.  (Tr. 2011:22-2012:16 [Jaffe].)  A similar framework was subsequently applied in issuing reduced awards for the other Alta Projects.  (Tr. 2016:8-12 [Jaffe].)  The award letters conveyed that the reduced awards reflected Treasury's judgment regarding an amount that Treasury believed more accurately reflected the eligible property's fair market value than did the value that was claimed.  (*See generally* JX0196 (award letters); Tr. 1815:16-21 [Neubauer].)  However, the letters noted that even the eligible

---

[26] Specific examples of these documents included:  the amended and restated joint development agreement between Oak Creek and Allco (Tr. 1988:11-1989:1 [Jaffe]); "participation" and lease agreements associated with the executed sale-leaseback transactions between Terra-Gen and plaintiffs (Tr. 2005:4-20 [Jaffe]); the two sets of cost schedules detailing Terra-Gen's "construction costs" and plaintiffs' purchase price allocations (Tr. 1978:8-1980:10 [Jaffe]); and appraisals that the plaintiffs submitted, including both the above-referenced Duff valuations and third-party appraisals of the individual completed projects.  (Tr. 1977:15-21 [Jaffe]; Tr. 1984:6-1988:8 [Jaffe].)

42

basis implied by the awarded amount could be overstated — that is, it could exceed the property's true eligible basis. (*See generally* JX0196 (award letters); Tr. 1815:16-21 [Neubauer].)

Soon after issuing the Alta I awards, Treasury provided plaintiffs with a multipage memo explaining its decision, with particular reference to Alta I ("the Memo").[27] (Tr. 1997:6-12 [Jaffe].) Consistent with plaintiffs' desire to continue discussions, after providing the Memo, Treasury solicited additional input from plaintiffs, including posing specific additional questions to them. (Tr. 1975:4-25 [Jaffe]; Tr. 2008:2-6 [Jaffe].) In the months that followed, plaintiffs provided a response to the Memo and to the specific follow-up questions that Treasury posed, and the parties engaged in additional back-and-forth. (DX0535-2; DX0535-3; Tr. 1997:13-1999:17 [Jaffe], Tr. 2006:21-2008:10 [Jaffe]; Tr. 1975:20-25 [Jaffe].) Notwithstanding Treasury's willingness to reconsider its award and its desire to see plaintiffs provide compelling responses to its questions, plaintiffs did not. (Tr. 1975:20-25 [Jaffe]; Tr. 2008:2-10 [Jaffe].) Therefore, following its review of their responses and further back-and-forth, Treasury did not issue any additional funds. (Tr. 1976:1-3 [Jaffe]; 2008:11-13 [Jaffe].)

---

[27] Because plaintiffs' objection to the introduction of this memo (marked for identification as DX0901) was sustained by the Court, the references to its contents herein cite of necessity to DX0535-3. That document, which was admitted, was a selective response by plaintiffs to certain, but not all, points made in DX0901.

Plaintiffs' counsel represented to the Court that "Treasury's position is set forth in [DX0535-3]. It's very clear point by point each position [Treasury] took [in DX0901]." (Tr. 2000:4-6 [Pl. Counsel]; *see also* Tr. 2002:17-19 [Pl. Counsel] ["Exhibit 535-3, contains bullet by bullet statements of what Treasury's position was and the response to each."].) That representation to the Court, however, which underlay plaintiffs' objections that DX0901 was needless, is demonstrably false. For example, one of Treasury's positions clearly stated in DX0901 was: "The comparison with other Alta Projects is uninformative because those projects present similar issues of purchase price allocation to eligible and ineligible basis." Given that plaintiffs' own expert, Dr. Blaydon, presents a similar comparison, this is a relevant position, yet DX0535-3 makes no reference to this statement by Treasury, nor does it offer any response.

43

The Memo explained that Treasury's awards reflected "a conclusion that the *project's* purchase price and the net present value (NPV) of the *project's* after-tax cash flows … reflect significantly more than the FMV of the *eligible property* alone." (DX0535-3-00005 (emphasis in original).) Treasury stated that the amount it awarded "reflect[s] a conclusion that some of the claimed eligible basis … reflects the value of intangibles and other ineligible property, such as the power purchase agreement and going concern value." (DX0535-3-.0001.)

Thus, Treasury conveyed that its award determination was grounded in its assessment of the second of the two above-described general questions guiding its review: whether the purchase prices in the Alta transactions were allocated appropriately among eligible and ineligible assets. As the above quotations indicate, Treasury concluded that those prices were not appropriately allocated. That is, Treasury's decision reflected its view that the KPMG-certified cost schedules on which plaintiffs' claims were based did not reflect a purchase price allocation consistent with the true economic value of the project's eligible and ineligible assets. With respect to the first of the two general questions guiding Treasury's review — whether there was something that caused the overall purchase price in the transactions at issue to be elevated above the fair market value of what was acquired — the Memo left that possibility open.[28] (DX0535-3.0008.) Because Treasury concluded that too much of the purchase price had been allocated to the subset of acquired assets that were eligible, the Memo explicitly did not address whether the chosen purchase price for the overall project was consistent with an accurate income valuation of the project's cash flows. (*Id*.)

---

[28] One example of such factors elevating the purchase price that was brought to light during the trial was the indemnity that Terra-Gen offered each plaintiff against a reduction in the Section 1603 payment, without which plaintiffs would not have paid the chosen purchase prices. (*See* Facts, Section VI.)

44

In explaining its assessment of the applicant's claimed basis, Treasury stated that it followed "a similar approach to that described in *Utilicorp United, Inc. & Subsidiaries v. Commissioner*", a case involving purchase price allocation in a hydroelectric project's sale-leaseback transaction. (DX0535-3.0007); *Utilicorp United, Inc. & Subsidiaries v. Commissioner,* 73 T.C.M. (CCH) 1835 (T.C. 1997). In response, plaintiffs' representatives stated that "[w]e agree that *Utilicorp* is controlling." (DX0535-3.0007.)

Consistent with the cost-based valuation approach that included both construction costs and profit that was approved in *Utilicorp* for valuation of a tangible energy property, Treasury expressed its view that Terra-Gen's "construction costs" (on which Treasury based its award) already included "nearly 20% in developer profit on top of actual construction costs" associated with "payments to [the project's earlier] developers in excess of actual development costs". (DX0535-3.0013.) In contrast, Treasury found that the $560 million purchase price from which Alta I's claimed eligible basis was derived "provides for more than 50% in developer profit above actual construction costs[.]" (DX0535-3.0015.) In a follow-up request, Treasury identified as a potential benchmark for appropriate development profit in valuing the energy property "the fee that the project's original developers expected and actually contracted for in return for their development services[, which] was a royalty of 5% of the project's revenues." (DX0535-3.0021.) Treasury went on to state that, "[i]n the case of Alta I, this appears to amount to about $22 million in present value terms … considerably less than Terra-Gen's total payments to developers of nearly $70 million" that were already embedded in its "construction costs" on which the reduced Alta I awards were based. (*Id*.)

In their response to Treasury, plaintiffs' representatives did not contest the relevance of a cost-based valuation, comprised of construction costs and appropriate profit, in determining the

45

fair market value of the eligible assets alone.  In fact, they devoted substantial text in their response to the question of how much profit should be included in such an approach.  (*See, e.g.*, DX0535-3.0007-15.)  Likewise, plaintiffs did not contest that Terra-Gen's "construction costs" included substantial development profit earned by the Alta Projects' original developers associated with the sale of the projects to Terra-Gen.  Rather, they simply argued that the amount of development profit already embedded in Terra-Gen's claimed "construction costs" was irrelevant.  (DX0535-3.0013.)  That is, plaintiffs took the position that additional profit should be layered on top of any already-embedded profit to arrive at an appropriate valuation of the eligible property alone, no matter how the level of the already-embedded profit compared, in the words of *Utilicorp,* to amounts "typically charge[d]" for (or consistent with "expectations of profit required to undertake") those development activities that the original developers completed prior to the sale to Terra-Gen.  Plaintiffs also argued that the royalty fees contractually established by the project's original developers as compensation for the Alta Projects' development were not an appropriate benchmark for the correct development profit to use in a cost-based valuation because those amounts "represented a developer's fee for service <u>in the absence of placing capital at risk.</u>"[29]  (DX0535-3.0021 (emphasis in the original).)  Treasury reviewed these arguments, and it determined not to make additional payments to the plaintiffs.  (Tr. 2006:21-2008:13 [Jaffe].)

---

[29] While we do not get into the substantive merits of plaintiffs' responses here, it should be emphasized that this characterization of the royalties as not compensating for placing capital at risk reflects only plaintiffs' judgment, not fact.  As described above, Allco, the entity that placed capital at risk in developing the projects, received an equal share of the AIPC royalty as Oak Creek, even though Oak Creek was the project's original developer that controlled all the project assets prior to bringing Allco in as a financing party.

Discontent with the amount of Treasury's payments, plaintiffs filed complaints as to each of Altas I-VI over the course of 2013 and 2014, which have been consolidated into the instant proceeding.[30]

## VIII.   Expert Testimony

### A.   *Plaintiffs' Expert Edward Maydew*

Plaintiffs called Dr. Edward L. Maydew, a tax professor, to testify as an expert on both financial accounting and tax accounting.  (Tr. 1338:15-1339:4 [Maydew].)  Dr. Maydew first testified by providing the court with an overview of the general concept of tax basis.  (Tr. 1376 [Maydew]).  Dr. Maydew acknowledged, however, that, for the purposes of a Section 1603 payment, the applicant's basis is not the basis of the entire wind project, but, generally, "only the energy-producing components that qualify for a cash grant[.]"  (Tr. 1413:12-18 [Maydew].)

Dr. Maydew testified that, in general, Terra-Gen and KPMG's use of the cost-ratio allocation method, which he referred to as the "lump sum allocation method", was a reasonable method, but he offered no opinion on, and did not decide, whether the assets purchased in the Alta acquisitions were subject to § 1060 of the I.R.C.  (Tr. 1471:21-25 [Maydew].).  He argued that it was proper for plaintiffs to claim a basis in energy producing property equal to the purchase price multiplied by a percentage of the cost of constructing the eligible property.  (Tr. 1416:11-17 [Maydew].)  But he offered no opinion on whether the precise percentage figures that the plaintiffs used to allocate construction costs between eligible and ineligible property was accurate or appropriate.  (Tr. 1359:9-11 [Maydew].)  Further, he testified to his assertion that

---

[30] GE, owner of 50% of Alta I, did not file suit, and thus its award is not directly at issue in this litigation.

none of the purchase prices paid for the Alta Projects should be allocated to goodwill or going concern value.  (Tr. 1423:6-10 [Maydew].)

Dr. Maydew was not asked to opine on whether any of the Alta transactions were arm's length.  (Tr. 1479:5-9 [Maydew].)  He did not conduct an allocation of the purchase prices in the Alta Project Transactions.  (Tr. 1359:19-21 [Maydew].)  He also did not opine on the eligibility classifications of line items in the cost breakdowns for Altas I through VI.  (*See* Tr. 1493:22-1494:2 [Maydew].)  He offered no opinion on whether the $195 million of estimated Development Rights acquired by Terra-Gen from Allco, and subsequently allocated to each of the Alta phases, were properly capitalized to eligible and ineligible property.  (Tr. 1499:4-8 [Maydew]; Tr. 1497:19-24 [Maydew].)  He also offered no opinion on the fair market value of the eligible assets conveyed in each of the Alta transactions.  (Tr. 1501:3-7 [Maydew].)

### B.    *Plaintiffs' Expert Colin Blaydon*

Plaintiffs also presented the expert testimony of Dr. Colin Blaydon, who was qualified as an expert in "valuation of the Alta Wind facilities." (Tr. 1560:22-24 [Blaydon].)  Dr. Blaydon's analysis focused on his testing of whether the Alta transaction prices reflected the fair market value of what was sold, as well as confirmatory valuations to support his conclusion that they did.  He did not conduct a valuation of the eligible property itself, but instead relied upon allocation work done by Terra-Gen and reviewed by KPMG to reach a number for the basis actually at issue in this case.

### 1.    Unsupported Conclusions Regarding the "Independence" of the Sale Price

Dr. Blaydon's primary conclusion was that the sales prices in the sale-leaseback transactions for Altas I-V and the sale price for Alta VI were at fair market value for the assets reflected in the sales price, which include both eligible and ineligible assets, as explained

48

elsewhere in this brief.  He based that conclusion on his belief that the project "transactions here have all the indicia of true arm's length transactions."  (PX0299.007.)  In his trial testimony, Dr. Blaydon explained that after he concluded that the sale portion of each transaction represented fair market value, there was no need for him to perform any further analysis.  He noted that "it could have been the end of the story right there."  (Tr. 1629:6-9 [Blaydon]; Tr. 1525:24-1526:5 [Blaydon].)

Dr. Blaydon acknowledged that it is possible to transfer value between the sale and lease portions of the transaction, and he understood that the software the parties used to negotiate the transaction allowed for many inputs to be manipulated beyond just the purchase price.  (Tr. 1699:14-1700:9 [Blaydon].)  Yet Dr. Blaydon did no analysis of the sale-leaseback transactions beyond the sale prices to, for example, determine if the selected sale price was actually consistent with Terra-Gen's proceeds under the sale-leaseback transaction as a whole.  He confirmed that he did not assess the impact of the lease payments (Tr. 1693:17-19 [Blaydon]), the retained asset lease and sublease payments (Tr. 1690:3-1691:3 [Blaydon]), the shared facilities agreement (Tr. 1691:4-18 [Blaydon]), or the lease prepayment amounts.  (Tr. 1694:1-9 [Blaydon].)

Instead, Dr. Blaydon performed a comparison of the sales price portion of the sale-leasebacks with those from the straight-sale transactions of Alta Projects.  Dr. Blaydon acknowledged at trial that such comparisons would have to control for differences in the value of each project that could explain purchase price differences, and he adjusted the transaction prices for variations in the wind performance across the projects; but his presentation at trial ignored differences in the PPA pricing and the percentage of property allegedly eligible for the 1603

49

program, both of which, he acknowledged, would alter the results of his comparison.  (Tr. 1702:23-1703:8 [Blaydon]; Tr. 1704:4-17 [Blaydon]; PX0303.)

### 2.       Dr. Blaydon Did Not Value the Eligible Property

As a back-up to his conclusions regarding the purchase price, Dr. Blaydon also presented a discounted cash flow (DCF) analysis to determine the income value of each Alta Project (including all their assets).  This analysis was extensive and in-depth, even though Dr. Blaydon indicated that it was only performed to support his conclusion that the sale prices were indeed fair market value.  (Tr. 1686:3-8 [Blaydon].)  Although Dr. Blaydon considered both the market and cost approaches to valuation, he did not rely on them.

At trial, Dr. Blaydon was asked what valuation issue he addressed, and he explained, "[t]he issue of the fair market value of the Alta facilities at the time they were sold." (Tr. 1548:12-13 [Blaydon] (emphasis added).)   Dr. Blaydon's analysis focused on "what was the value of these facilities, of the things that they [plaintiffs] were bidding on to acquire."  (Tr. 1629:12-22 [Blaydon].)  In other words, he conducted a valuation of the Alta Projects as a whole, including both eligible and ineligible property, rather than valuing just the eligible property.  He also did not attempt to value many of the project assets that were not eligible.  (Tr. 1705:8-14 [Blaydon].)

When pressed on this approach at trial, Dr. Blaydon confirmed that he was only looking at the Alta Projects as a whole, not at solely eligible property.  (Tr. 1686:9-12 [Blaydon].)  For example, Dr. Blaydon agreed that the cash flows that create value for the Alta II-V Projects depend on more than just the eligible assets.  (Tr. 1689:11-14 [Blaydon]; *see also* Tr. 914:18-25 [Spencer].)  He agreed that the Alta Projects need all of the ineligible assets as well. (Tr. 1689:18-20 [Blaydon].)  Thus, Dr. Blaydon acknowledged that his valuation of a wind turbine is a percentage of the income stream the project as a whole produces, rather than the actual cost or

market price of a wind turbine.  (Tr. 1739:5-13 [Blaydon].)   Yet Dr. Blaydon expected that turbines even for an operating wind farm would be procured at market price — not an amount set equal to a percentage of the income to be generated by the specific project in which it would be deployed.  (Tr. 1740:14-16 [Blaydon]; *see also* Tr. 902:10-903-4 [Spencer]; Tr. 556:3-9 [Pagano].)

In sum, Dr. Blaydon did not reach a conclusion regarding the value of the individual assets within the wind farm.  (Tr. 1687:12-16 [Blaydon].)   This necessarily includes the assets that comprise the eligible property.

### 3.      Dr. Blaydon's Reliance on Allocations by Terra-Gen and KPMG

Dr. Blaydon relied on the allocation work done by Terra-Gen at the time of its Section 1603 applications, which was attested to by KPMG, to get from the results of his valuation of the complete Alta Projects to an asserted value for the eligible property within those Projects.  Dr. Blaydon acknowledged that his income-based analysis could not distinguish cash flows for the eligible property versus the ineligible property, and thus he required some form of an "allocation rationale."  (Tr. 1607:13-16 [Blaydon].)   As Dr. Blaydon explained, the allocation takes the result of the DCF approach and allocates the entire project value to each individually identifiable asset category.  (Tr. 1606-07 [Blaydon].)

He did not, however, present his own allocation approach; instead, he relied exclusively on the work done by Terra-Gen and KPMG.  (Tr. 1688:8-16 [Blaydon].)  Dr. Blaydon did not independently assess the allocation rationale used by Terra-Gen and KPMG nor confirm that the specific allocation percentages used were correct.  (*Id.*)  At trial he confirmed that, given the limits of his analysis, he had to rely on the work of Terra-Gen and KPMG to get from his valuation result to a value of eligible assets.  (*Id.*)

As a result, Dr. Blaydon admitted, any adjustment to the allocation percentages provided by Terra-Gen and KPMG would directly impact the results of his analysis. (Tr. 1688:22-1689:1 [Blaydon].)  He agreed that if certain costs had been incorrectly classified as eligible, they would have incorrectly increased his conclusions about the value of the eligible property. (Tr. 1706:9-22 [Blaydon]; Tr. 1709:24-1710:7 [Blaydon].)  Moreover, Dr. Blaydon agreed that the allocation of his value to cost categories or assets as defined by KPMG is only valid if one assumes that the ratio of costs is exactly the same as the ratio of values. (Tr. 1718:17-1719:12 [Blaydon].)

## C.      Defendant's Excluded Expert Testimony

Defendant's expert witness, Dr. John E. Parsons, Head of the MBA Finance Track at MIT's Sloan School of Management and the Executive Director of MIT's Center for Energy and Environmental Policy Research, prepared a report and testimony that presented an analysis of the fair market value of just the eligible energy property at issue, as the law requires.  Dr. Parsons, however, was not permitted to offer this opinion to the Court.  Although defendant vigorously disputes both the propriety and the justifiability of plaintiffs' attack on Dr. Parsons and the Court's resulting evidentiary ruling, the issue is not currently open, and thus this brief does not discuss it.  Instead, defendant offers, for purposes of preservation of the arguments, a brief discussion of the testimony that Dr. Parsons should have been permitted to present to the Court.[31]

Defendant's expert, Dr. Parsons, would have offered his opinion of the fair market value of the eligible wind energy property associated with the Alta Projects, as of the date that each plaintiff acquired the company.  Dr. Parsons would have explained, as Dr. Blaydon also acknowledged, that the cost approach is one of the three widely recognized approaches to

---

[31] Defendant made an offer of proof, marked for identification as DX-900, regarding the contents of Dr. Parsons' testimony.  Attached to that offer of proof are Dr. Parsons' expert and expert rebuttal reports, marked for identification as DX-0783 and DX-0784.

valuation.  Dr. Parsons would have explained each of these approaches in turn and explained to the court why, as an analytical matter, the particulars of the income and market methods to valuation render them unable to answer the question presented in this case.  Specifically, the income approach cannot separate the value of the specific eligible and ineligible assets being used in the business enterprises at issue, and a market approach based on the reported values of other projects can suffer the same difficulty, as well as issues relating to the comparability of properties.  In other words, neither of those approaches can separate out the values of the eligible and ineligible assets that together comprise the Alta Projects.

Dr. Parsons would have explained that, in contrast, the cost method provides a reliable analytical foundation for estimating the fair market value of the eligible assets alone under the circumstances presented in this case, and it can isolate the value of the eligible assets from the value of other assets that are elements of the total Alta Projects.  The cost method is effective here because the information available allows for the identification of specific costs incurred on each project, including information pertinent to determining an appropriate market-driven profit.

The cost approach estimates the value of eligible assets by determining the cost to reproduce or replace them.  The rationale behind this approach is simply that the value of an asset will not exceed the cost to reproduce or replace it, since no rational buyer would pay more for an asset than such a cost.  That cost is determined by evaluating the actual costs of construction — including market prices paid to third parties for the key eligible project assets — plus an applicable developer return or profit ("Capital Return").  To determine the appropriate amount of Capital Return here, Dr. Parsons applied what he concluded to be an appropriate market-driven rate of return derived from market data to the actual eligible costs of development and construction efforts over time.

53

As part of his explanation of the cost approach, Dr. Parsons would have explained the numerous types of costs incurred to develop a wind farm, including turbines and towers, costs of equipment, costs of construction and installation and costs for development. These costs could have been eligible or ineligible dependent on the definitions specified in the applicable statute relating to the eligibility of the associated assets. Dr. Parsons would have explained the categories of these various assets to the court.

Dr. Parsons would have also provided his assessment, from an economic perspective, of why certain amounts paid by Terra-Gen as part of the acquisition of the Allco assets, which had been treated by Terra-Gen as costs of the eligible assets needed to be recategorized because they did not represent eligible development costs. He also would have explained that the interest paid by Terra-Gen to debt lenders during construction and fees paid to AIPC are properly considered part of the developer profit on the transactions and should be removed from a cost-approach valuation before adding back in an appropriate level of profit that is agnostic to the degree to which the project is debt versus equity financed, and reflects profit associated with eligible assets only.

Dr. Parsons would have provided his conclusions that the total eligible basis for the six Alta Projects, inclusive of developer profit, was $1.63 billion, not $2.66 billion, as plaintiffs claim. He would have presented his opinion that the appropriate 1603 award for plaintiffs, calculated as thirty percent of $1.63 billion, is $490.32 million, approximately $59 million less than what they were already paid by Treasury.

After providing his direct opinion, Dr. Parsons would also have explained areas in which he disagreed with plaintiffs' experts. First, he would have explained why it is incorrect, as an economic matter, to allocate value pro rata using construction costs, as the plaintiffs do. Second,

54

he would have provided his opinion that plaintiffs are incorrect to dismiss the existence of valuable intangible assets within the Alta Projects. Third, he would have discussed the existence and proper treatment of value attributed to the location of the wind farms, and the fact that such value should never accrue to the tangible, reproducible assets (the eligible property). Finally, he would have disputed Dr. Maydew's waterfall demonstrative and the plaintiffs' discussion of the value of tax shields and subsidies.

## ARGUMENT

The question presented in these consolidated cases regarding plaintiffs' entitlement to Section 1603 payments can be simply described: what is plaintiffs' cost basis in the eligible, tangible, depreciable energy property of the Alta Projects?

Answering that question requires looking beyond the purchase prices used in the Alta Project Transactions, which included more than just eligible energy property and which featured peculiar circumstances, in order to determine the value of the eligible property alone, as I.R.C. § 1060 requires.

One significant aspect of the complex transactions that transferred the Alta Projects from Terra-Gen to the plaintiffs, the indemnities and other side agreements that plaintiffs and Terra-Gen have entered into to ensure that a specific amount of Section 1603 payment is guaranteed to the buyers, demonstrate that the purchase prices cannot be used to determine the eligible cost basis for Section 1603. All three testifying owner-affiliated witnesses indicated that the indemnification of the Section 1603 payment raised the price they were willing to pay for the property.[32] (Tr. 724:23-725 [Revock]; Tr. 793:24-794:5 [Revock]; Tr. 798:1-9 [Revock]; Tr.

---

[32] Because, as the buyers testified, these indemnities increased the purchase price, they also ensure that Terra-Gen receives the value of that Section 1603 payment, which is based on

(continued...)

813:15-24 [Revock]; Tr. 1020:1-8 [Markowitz]; Tr. 1021:12-19 [Markowitz]; Tr. 1033:10-24

[Markowitz]; Tr. 1036:2-4, 9-14 [Markowitz]; Tr. 889:21-890:9 [Spencer]; Tr. 891:12-892:3

[Spencer]; JX0068.004.; JX0094.)  In other words, the purchase prices that plaintiffs would have

the Court rely upon to determine its cost basis were inflated by side agreements between the

parties to the transactions that locked in the amount of the Section 1603 payment that would be

calculated from that cost basis.  Those prices are not trustworthy, and they must be rejected by

the Court.

Instead, the Court must look beyond the purchase prices and consider the actual value of

the eligible property that was acquired by plaintiffs.  Because defendant's expert witness was not

permitted to testify, the Court will not have the benefit of the considered opinion of an

experienced expert to aid its effort to properly determine the eligible cost basis, or to critically

assess the expert testimony provided by plaintiffs.[33]

At the outset of trial, plaintiffs' counsel promised the following:

> You'll hear from the accountants who separated between eligible
> property and ineligible property, who carved out value for the
> transmission facilities, which are ineligible, and you will hear how

---

(…continued)

plaintiffs' higher basis, even though Terra-Gen itself is not eligible for the Section 1603
Program.  What's more, those payments, if made by Treasury, would have been passed back to
Terra-Gen at the higher stepped-up bases of the owners, based, in part, on dubious cost
segregation work performed by Terra-Gen.  In that sense, the indemnity creates a situation in
which Terra-Gen is once again the grant applicant in everything but name.  Plaintiffs essentially
admit as much in their designation of Terra-Gen's CEO, Mr. Pagano, as the party representative,
despite the fact that Terra-Gen holds no ownership stake in any of the plaintiffs.  (Tr. 600:21-
601:3 [Pagano].)  His designation is entirely based on the fact that it is Terra-Gen that stands to
benefit from the outcome of this litigation.

[33] Defendant pleaded counterclaims in each of the consolidated cases (totaling $59
million) based on the valuation opinion prepared by defendant's expert.  Defendant does not
waive its arguments in support of those counterclaims.

> they did it and how they properly attributed value to that, and that became ineligible, and it's not part of our claim. You'll hear from accounting experts and valuation experts who will confirm the correctness of the bases claimed and the allocations made, and you'll hear from two government witnesses -- hostile witnesses, if you will, but we're calling them -- who will talk about how the allocation method used is consistent with what they were seeing in the 1603 program overall.

(Tr. 28:12-24 [Pl. Counsel].)  Yet none of that occurred.  The accountants in question did not testify, the experts referenced did not evaluate the allocations made, and the government witnesses referenced did not endorse a step-up of basis allocated based on historical cost-ratios.

Because plaintiffs failed to deliver – failed even to *offer* an analysis of the value of the eligible property – they have failed to support the amount that they claim as cost basis beyond what Treasury used to calculate their initial awards.  Instead, plaintiffs simply value the overall project transactions.  Then, without supporting expert testimony, they make the leap from that valuation to an arbitrary allocation of value based on an internally inconsistent ratio of historical "costs".  This leap is based on the unfounded and unsupportable assumption that the ratio of value must be the same as the ratio of historical cost.  Even if one were to accept their faulty premise, the underlying cost percentages they use are flawed, arbitrary, and incoherent.  Plaintiffs' claims must therefore be denied.

## I.    Background on Section 1603 and Its Applicability to Plaintiffs' Projects

Section 1603 was enacted to create a temporary program offering a cash payment in lieu of a tax credit for certain qualified investments in clean energy property.[34]  The program was designed to "reimburse such person for a portion of the expense of such property."  § 1603(a).  Under the program, upon application to Treasury, any eligible applicant placing into service

---

[34] In the interest of creating a self-contained brief, this filing repeats as necessary certain background information and arguments from defendant's pre-trial memorandum.

"specified energy property" was entitled to a cash payment equivalent to a percentage of the eligible cost basis of the property. § 1603(a), (b).

Under Section 1603, property eligible for cash payments in lieu of tax credits is called "specified energy property," which is defined by explicit cross-reference to the I.R.C., specifically 26 U.S.C. § 45 (the Production Tax Credit) and § 48 (the Investment Tax Credit). § 1603(a), (d), (h). Each of the Alta Projects qualifies for a Section 1603 payment in the amount of 30% of its cost basis in eligible property. § 1603(b)(2)(A); 26 U.S.C. § 45(d)(1) (definition of wind facility).

Prior to Section 1603 (and simultaneous amendments to the Investment Tax Credit), large wind projects like the Alta Projects were eligible only for a Production Tax Credit under 26 U.S.C. § 45. *See* § 1603 (b)(2)(A); 26 U.S.C. § 48(a)(5). Under § 45, the amount of the tax credit to which a wind project was entitled was based on the project's electricity production. *See* 26 U.S.C. § 45(a). By contrast, a Section 1603 payment provided for an upfront cash payment based on a percentage of eligible cost basis. § 1603(d)(1); 26 U.S.C. § 45(d)(1)-(11). Thus, the 2009 enactment of Section 1603 marked a change in the incentive for wind projects.

## II.    Plaintiffs Have Not Met Their Burden of Proof

Plaintiffs bear the burden of proof to demonstrate that they are entitled to funds in excess of what they were previously provided by Treasury. As the Court of Federal Claims has explained, the task before the Court in a Section 1603 case boils down to one basic inquiry:

> the court must determine whether plaintiff has met its burden to show that its cost basis was greater than the cost basis determined by Treasury.

*California Ridge Wind Energy LLC v. United States,* No. 14-250 C, 2015 WL 9302944, at *1 (Fed. Cl. Dec. 21, 2015). A Section 1603 case should present the same standard of review as a tax refund suit, in which "the Court reviews claims *de novo*, and the plaintiff bears the burden of

58

proof for each claim." *W.E. Partners II, LLC v. United States,* 119 Fed. Cl. 684, 690 (2015), *aff'd,* 636 F. App'x 796 (Fed. Cir. 2016) (citing *D'Avanzo v. United States,* 54 Fed.Cl. 183, 186 (2002)).[35]

Earlier in this case, the Court described the question presented here as "factual questions . . . regarding the valuation of the individual assets acquired." *Alta Wind I Owner-Lessor C v. United States,* 117 Fed. Cl. 369, 374 (2014). Yet despite bearing the burden of proof, plaintiffs have not answered the key question: what is the value of the eligible basis?

The primary reason for this failing is that plaintiffs spent their time and effort answering a different question. Plaintiffs' evidence and expert opinions are all targeted at demonstrating that the purchase prices establish the basis for the assets involved in the Alta Project Transactions. Plaintiffs' reliance on the purchase prices is flawed, for three independent reasons, explained further below:

1. The purchase prices include the value of more than just eligible assets, which have a different, lower basis.

2. Section 1060 of the I.R.C. requires a purchase-price allocation under the residual method, which requires valuing the individual assets.

3. The purchase prices themselves were not necessarily arm's length, and they were set in transactions involving peculiar circumstances, and thus the caselaw requires looking past the purchase price.

---

[35] Plaintiffs' bearing the burden of proof in tax cases, of course, is long-established, and the same rule applies to this case under Section 1603. *See United States v. Janis*, 428 U.S. 433, 440 (1976); *Lewis v. Reynolds,* 284 U.S. 281 (1932). That burden includes not just proving legal questions pertinent to their claims, but also the amount of the claims, including in valuation cases. *Charron v. United States*, 200 F.3d 785, 792 (Fed. Cir. 1999); *Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 757 (1994) ("what constitutes fair market value in a particular case is a factual matter and the burden of proof is on the taxpayer") (citing *Miller v. United States*, 620 F.2d 812, 825, 223 Ct. Cl. 352 (1980)); *see also Miami Val. Broad. Corp. v. United States*, 499 F.2d 677, 683 (Ct. Cl. 1974) (holding that "plaintiffs have failed to prove the existence of any excess value in the tangible assets" beyond their cost valuation).

Any one of these three reasons would be sufficient to show that the purchase prices cannot be relied on to prove eligible cost basis – and all of them are present.

On the actual question in the case – the valuation of the eligible property – plaintiffs are almost silent. They rely on work done by Terra-Gen and perused by KPMG prior to the applications for the Alta Projects, but they do not provide the expert opinion that would permit them to link their claimed valuation of the overall Alta Projects, including eligible and ineligible property, to the valuation of the Section-1603-eligible property. Indeed, they do not even offer fact testimony supporting those allocations or addressing their flawed assumptions and conclusions.

### III.    The Purchase Prices of the Alta Projects Do Not Establish the Cost Basis of the Section 1603-Eligible Property

Unlike the determination of plaintiffs' tax basis in the Alta Projects as a whole, which might look to the purchase prices in the respective sale-leasebacks and/or sales, the determination of plaintiffs' eligible cost basis under the circumstances in this case requires the Court to conduct a different analysis, for three independent reasons.

#### A.    *Section 1603 Payments Are Available Only for Eligible Property, But the Alta Purchase Prices Encompass Both Eligible and Ineligible Property*

First, because the purchase prices in the Alta Project Transactions include the value of ineligible assets, they do not determine plaintiffs' eligible cost basis under Section 1603.

Basis is a familiar concept in the tax world, but *eligible cost basis* for purposes of Section 1603 payments has a different and more restrictive definition. It is not synonymous with the owner's overall tax basis. Instead, as the Court has previously noted in this case, eligible cost basis is limited to the *portion of the owner's tax basis that is actually eligible* to be included in the cost basis for calculating the Section 1603 payment. *Alta Wind I Owner-Lessor C,* 117 Fed. Cl. at 374. Under the terms of 26 U.S.C. § 48(a)(5)(D), relied upon by Section 1603, only

60

tangible, depreciable property that is an integral part of generating electricity at the qualifying facility is eligible for the payment. § 48(a)(5)(D)(i); *see also* Treas. Reg. § 1.48-1(c), (d); *W.E. Partners II,* 119 Fed. Cl. at 693 (2015). The flip-side, of course, is that "[i]neligible property does not qualify." *Alta Wind I*, 117 Fed. Cl. at 374.

As the evidence plainly shows, the Alta Projects' purchase prices were established in the context of transactions involving more than just assets that meet the definition of eligible property for the purposes of Section 1603. Any value contributed by that ineligible property to the overall transaction value results in a purchase price that reflects more than the value of eligible property alone. Here, as numerous witnesses testified, the Alta Project Transactions encompassed far more than just eligible property: they included value associated with ineligible transmission assets, land rights, power purchase agreements, interconnection and shared facilities agreements, various other contracts, and other intangibles. (*See generally* Facts, Section V; *see also* Tr. 735:6-12 [Revock]; Tr. 779:3-781:9 [Revock]; Tr. 780:20-781:9 [Revock]; Tr. 930:7-15 [Markowitz]; Tr. 992:25-996:4 [Markowitz]; Tr. 999:1-13 [Markowitz].) As a result, the overall purchase price is relatively meaningless when trying to determine plaintiffs' more limited basis in eligible, tangible, depreciable energy property.

For the purposes of valuing the eligible property at issue here, these rules essentially exclude three categories of property from eligible cost basis, all of which are present in the Alta Projects. These are enumerated below, but they can be seen graphically by using the chart discussed at the outset of this brief. This chart visually depicts the key assets of the Alta Projects, just as the prior chart does, but it grays out the eligible assets and highlights the numerous assets whose value is not eligible property under Section 1603 (modified from DX0236.0015):

61

62

**Key Wind Farm Components that Are _Not_ Eligible under Section 1603**



(BOP for electricity transmission)

1.      **The Alta Purchase Prices Cover Some Tangible Property That Is Not Eligible**

Eligible cost basis does not include property that, although tangible and depreciable, does not fall within the statutory definition of the specified energy property. § 48(a)(5)(D)(i). Most prominently, this definition excludes property associated with the transmission, rather than the generation, of electricity, such as electrical substations, including transmission and interconnection equipment that links the production equipment (which is deemed eligible) to the wider electrical grid. All the Alta Projects had such assets. (*See* Facts, Sections I and V.) Indeed, these assets were required for them to sell and deliver electricity to their customers. (*Id.*)

2.      **The Alta Purchase Prices Include Real Property That Is Not Eligible**

Eligible cost basis also excludes most real property, *e.g.*, interests in land and any improvements thereto. Treas. Reg. § 1.48-1(d). As with the value of transmission equipment, any portion of the project's value attributable to interests in land (including land leases) or certain improvements (including value from interests in land at below market prices) is not eligible for a Section 1603 payment. The Alta Projects, of course, depended on land rights, which permitted them to site and build the wind farms.

Specifically, the Alta Projects include rights to use a host of various land parcels, under various leases, access to which was secured by the efforts of Oak Creek and Terra-Gen over several years. (*See* Facts, Sections IV.A and V.) These rights contribute ineligible value in several ways. First, the work of assembling a collection of land rights sufficient to support a wind farm at a profitable scale could add value beyond that of any of the individual land parcels. (Tr. 1732:6-11 [Blaydon] ("It might" add value).) That value contributes to an overall increase in the value of the business. Second, the pricing terms of many of the Alta Projects' land leases (which were an operating expense for the Projects) were secured years before the Alta Projects

63

were ultimately sold to plaintiffs, so to the extent that market lease pricing subsequently rose, it would add to the value of those Alta Project leases with better-than-market rates. (Tr. 637:19-24 [Pagano].) None of these additions to value are attributable to the tangible energy property that is eligible for Section 1603 payments. Finally, plaintiffs were provided access to some of the land rights at low- or no-cost by Terra-Gen (or its affiliates), which creates additional, ineligible, value.[36] (Tr. 411:22-412:22 [Pagano]; PX0218.)

### 3.     The Alta Purchase Prices Include Intangible Property, Which Is Not Eligible

Finally, eligible cost basis does not include property that is not tangible. § 48(a)(5)(D)(i). This final restriction, by definition, excludes from eligible cost basis any value associated with any intangible asset. Clean-energy projects can include any number of intangible assets, and thus this category requires close scrutiny by the Court in reaching its ultimate determination as to eligible cost basis. In particular, certain intangibles can arise in the creation or sale of a business like a power generation project, most notably goodwill and going concern value. Neither is part of eligible cost basis.

Simple logic makes clear that, if there are intangible assets present in the overall Alta Projects, then the purchase price may partly reflect the value of those intangibles. Accordingly, the purchase price may not match the value of the tangible property (let alone the smaller slice that is both tangible *and* eligible). Here, the Alta Projects include a number of intangibles, including but not limited to the power purchase agreements and transmission rights.

Other ineligible intangible assets include any value attributable to various contracts held by the project, like interconnection rights, power purchase agreements, or any other valuable

---

[36] Dr. Blaydon acknowledges this when he removes what he considers to be their value from his overall valuation of the Alta Projects. (Tr. 1625:13-19 [Blaydon].)

contracts. *See* 26 U.S.C. § 197 (d)(1)(C)-(F), (d)(2), (d)(3); Treas. Reg. § 197-2(b)(7). The Alta Project Transactions included all of these which added value to the overall power-generation business. For example, Mr. Spencer of EverPower testified that if any of the key contracts had been missing, the Alta VI project would have been less valuable. (Tr. 882:13-882:20 [Spencer].)

Any value attributable to any of the project contracts is an intangible and thus ineligible for Section 1603 payments. For example, interconnection rights, which were sometimes referred to in plaintiffs' documentation as "transmission rights," similarly can add tremendous value to a project (indeed, it is not possible without them), but are ineligible for Section 1603 payments. *See* § 197(d)(1)(D); Treas. Reg. § 1.197-2(b)(8); Treas Reg. 1.263(a)-4(d)(6)(i)(A); Treas. Reg. 1.263(a)-4(c)(1)(xiii).

Similarly, a PPA can add intangible value to a project by locking in a long-term customer at a set price. For that reason, a PPA is a customer-based intangible asset under 26 U.S.C. § 197 and is excluded from the eligible cost basis of the specified energy property. *See* § 197(d)(1)(C)(iv); (d)(2)(A)(iii) (defining customer-based intangible as "value resulting from future provision of goods or services pursuant to relationships (contractual or otherwise)"); Treas. Reg. § 1.197-2(b)(6). Indeed, that value was undoubtedly part of the reason that Terra-Gen paid hundreds of millions of dollars for the Allco assets, which included the "Master PPA" that dictated the terms of the project-specific subsequently-executed Daughter PPAs, long before any tangible assets had been installed.

Plaintiffs' own applications for Section 1603 payments acknowledge the existence of certain intangibles. Their applications, and the documentation underlying them, excluded as intangibles the appraised allocation, performed by Duff, of what were referred to as Transmission Rights acquired from Allco, and also excluded a share of the appraised allocation

65

of what were referred to as Development Rights that were characterized as related to the power purchase agreements. (*See, e.g.,* Tr. 1159:8-1160:23 [Huplosky] (discussing use of Duff & Phelps development rights allocation in KPMG work paper); JX0139.007.) While plaintiffs have not sought to prove that these appraised values were accurate, and they are certainly out of date, they reveal that there are intangibles that add value to the Alta Projects that are ineligible for Section 1603 payments.

Finally, any value associated with goodwill or going concern value is ineligible. As relevant here, goodwill and going concern value are simply the "'premium' paid in excess of the total fair market value of the purchased assets." Special Allocation Rules for Certain Asset Acquisitions, T.D. 8215, 1988-2 C.B. 304, 53 Fed. Reg. 27035-01 (July 18, 1988) (issuing temporary regulations under § 1060; later finalized). "[G]oodwill is often described quantitatively as 'the excess of cost over the fair value of the identifiable net assets acquired.'" *Coast Fed. Bank, FSB,* 323 F.3d at 1039, *cited in Deseret Mgmt. Corp.,* 112 Fed. Cl. at 449; *see also Jack Daniel Distillery*, 379 F.2d at 579 (Ct.Cl.1967). In other words, "[g]oodwill is a residual value after all tangible and identifiable intangible assets have been taken into account." International Valuation Standards Council, *International Valuation Standards*, (London, 2011), p. 43. Similarly, "[g]oing concern value is the additional value that attaches to property because of its existence as an integral part of an ongoing business activity." Treas. Reg. § 1.1060-1(b)(2)(ii). Goodwill and going concern provide catch-all terms for any value encompassed in the overall business that cannot be attributed to any individual specific asset in isolation.[37] The circumstances present in this case are the classic combination of a set of tangible and intangible

---

[37] Plaintiffs attempt to define both of these with specific, lay definitions, but it is the broader, simple mathematical concepts of residual value that are relevant here.

66

assets that collectively constitute a business operation whose value as an integrated whole exceeds the sum of its individual parts.  That portion of the value is, of course, ineligible.

For purposes of finding that a valuation of the eligible property alone is necessary to determine eligible cost basis, the Court need not determine that specific intangibles are, in fact, present.[38]  Instead, it need only recognize that the circumstances of the transactions are such that they might be present.  If so, then the law requires that the Court determine the fair market value of the (eligible) tangible property alone.  It need not, though, determine the value of the intangibles.

As with certain real and tangible property, the value of these intangible assets is embodied in the overall purchase price and renders the purchase price meaningless for ascertaining the value of the eligible property alone.  Instead, the Court must determine the eligible property's appropriate Section 1603 award value by determining the eligible cost basis exclusive of ineligible, intangible assets.

### 4.   The Purchase Prices for All of the Alta Project Transactions Reflected this Combination of Value from Both Eligible and Ineligible Assets

All the Alta Project Transactions included value attributable to various ineligible assets. In each one, the purchase price was based not on the value of a single asset or piece of property, but rather on the whole suite of assets that collectively contributed to the cash flow created by the Alta Projects.

### a.   Alta I

By plaintiffs' own admission, Alta I included more than just eligible property.  (*See, e.g.,* Pl. Pretrial Memorandum ¶ 137.)  The sale-leaseback, along with associated side deals, included

---

[38] Dr. Parsons' valuation would have established that the presence of intangible assets contributes a large amount of value to the Alta Projects.

all the assets of the Alta I Project either directly or as collateral, such that all of the project's value was acquired and encompassed all the tangible and intangible assets discussed above.[39] (Tr. 990:14-22 [Markowitz].)

### b. Altas II-V

Plaintiffs' claim that only eligible property was acquired in the Alta II through V transactions ignores the substance of those transactions. While the sale and leaseback were nominally only for eligible property, the specific level of cash flows that plaintiffs acquired through the sale-leaseback transactions depended on the integrated use of a suite of eligible and ineligible assets associated with operating the wind farms, not just on the eligible assets alone. These other assets were provided to, or made available as collateral to, the owner-lessors through a series of side agreements, discussed above. (*See generally* Facts, Section V. A.; *see also* Tr. 780:20-781:9 [Revock]; Tr. 785:6-12 [Revock]; Tr. 520:16-521:4 [Pagano].)

Thus, plaintiffs' claim that they acquired only eligible assets merely reflects the *form* of these transactions. But "the substance, not the form, of a transaction determines its tax consequences," and thus courts must "look to the 'objective economic realities of a transaction rather than to the particular form the parties employed.'" *Wells Fargo & Co. & Subsidiaries v. United States*, 91 Fed. Cl. 35, 75 (2010), *aff'd* 641 F.3d 1319 (Fed. Cir. 2011) (citing *Gregory v. Helvering,* 293 U.S. 465, 469-70 (1935) and quoting *Frank Lyon Co. v. United States*, 435 U.S. 561, 572 (1978)); *see also BB&T Corp. v. United States,* 523 F.3d 461, 471 (4th Cir. 2008) (taxpayer may not "claim tax benefits...by affixing labels to its transactions that do not accurately

---

[39] The rights to use the site on which the Alta I Project was located were leased out and subleased back, for offsetting rent payments. In addition, plaintiffs' expert concluded that the Alta I transaction involved the acquisition of 100% of the value of the project's cash flows, which would reflect the contribution of all project assets to those cash flows, as all of those assets were necessary to create the cash flows. (*See* PX0299, Table 2.)

reflect their true nature."); *Halle v. Comm'r,* 83 F.3d 649, 655 (4th Cir. 1996) ("surrounding circumstances and economic realities" will overcome any "presumption" generated by the transaction's form).

In substance, the buyers here were paying for cash flows created by the entire Alta II-V Projects, and thus their overall purchase price was influenced by more than just eligible property. (Tr. 780:20-781:9 [Revock]; Tr. 785:6-12 [Revock].)  *See, e.g.*, *Comm'r v. Court Holding Co.,* 324 U.S. 331, 334 (1945) ("incidence of taxation depends upon the substance of a transaction"); *Gregory v. Helvering,* 293 U.S. at 467-468.  Indeed, Mr. Pagano described the overall project transaction, including the retained assets agreements, as providing the buyers with "a fully integrated power production facility at the end of the day that they control."  (Tr. 185:6-10 [Pagano].)  Without those retained assets, there would not be project cash flows.  (Tr. 640:16-21 [Pagano].)

### c.    Alta VI

The Alta VI (Mustang Hills) project transaction explicitly encompassed all the assets of the Mustang Hills, LLC, entity, and it thus encompassed both eligible and ineligible property. Mr. Spencer acknowledged this at trial.[40]  (Tr. 914:18-25 [Spencer].)

*        *        *

No matter how plaintiffs may have tried to paper them, the project transactions do not in substance reflect the sale of eligible property alone.  Rather, they reflect the sale of interests in cash flows from a business operation that deploys such property.  As with any other business

---

[40] Also, the Section 1603 payment sought by plaintiff Mustang Hills (Alta VI) recognizes that its basis was not simply its purchase price.  While the plaintiff purportedly paid an overall purchase price of $439 million, it claimed an eligible cost basis of $421 million.  (Tr. 575:3-10 [Pagano].)  The difference reveals that plaintiff Mustang Hills itself recognizes that an allocation between eligible and ineligible property is necessary.

69

operation, the specific level of the cash flows acquired, and hence their value, depends on the integrated use of several assets, including several unequivocally ineligible assets.  Thus, when determining the value of the eligible property, as the Tax Court has explained, "[b]asis for purchased equipment is the amount paid for the equipment, not what is paid for something else." *Cooper v. Comm'r,* 88 T.C. 84, 111 (1987) (excluding value of intangible contract rights from eligible cost basis for depreciation and investment and energy tax credits) (*citing Waddell v. Comm'r,* 86 T.C. 848 (1986)); *Lemmen*, 77 T.C. 1326 (1981).  In other words, the basis for eligible property must be "limit[ed]…to its fair market value."  *Waddell*, 86 T.C. at 912.  To make such a determination, the Court needs a valuation of the eligible property alone, not of the overall business operation or project.[41]

### B.    *Section 1060 Also Requires an Analysis of the Value of the Eligible Property*

Section 1060 of the I.R.C. requires a taxpayer to allocate assets according to its requirements in any "applicable asset acquisition."  26 U.S.C. § 1060(a).  This method is sometimes described as the residual method.  Section 1060(c) defines an applicable asset acquisition as follows:

> (c) Applicable Asset Acquisition. – For purposes of this section, the term "applicable asset acquisition" means any transfer (whether directly or indirectly)–
>
> (1) of assets which constitute a trade or business, and
>
> (2) with respect to which the transferee's basis in such assets is determined wholly by reference to the consideration paid for such assets.

---

[41] As noted above, Dr. Parsons prepared such a valuation, which was described in the offer of proof, marked as DX-900, as well as Dr. Parsons' expert and expert rebuttal reports, marked for identification as DX-0783 and DX-0784.

70

> A transfer shall not be treated as failing to be an applicable asset acquisition merely because section 1030 applies to a portion of the assets transferred.

The regulations to § 1060, in turn, define "assets which constitute a trade or business." Treas. Reg. § 1.1060-1(b)(2). A group of assets constitutes a trade or business if such assets would constitute an active trade or business under § 355; or if its character is such that goodwill or going concern value *could under any circumstances* attach to the group of assets.[42] Treas. Reg. § 1.1060-1(b)(2)(i)(A), (B) (emphasis added). The determination of goodwill and going concern looks to all the fact and circumstances in a transaction. Treas. Reg. § 1.1060-1(b)(2)(iii). The regulations provide non-exhaustive factors to consider that indicate goodwill or going concern value. Treas. Reg. § 1.1060-1(b)(2)(ii), (iii). Factors indicating goodwill or going concern value include: the presence of any intangible assets; the existence of an excess of the total consideration over the aggregate book value of the tangible and intangible assets purchased; and related agreements, including lease agreements, licenses, or other similar agreements between the purchaser and seller. Treas. Reg. § 1.1060-1(b)(2)(iii)(A), (B) and (C).

### 1. The Plaintiffs Were Required to Allocate the Assets In Accordance with Section 1060

The owners of each of the Alta I-VI Projects were required to allocate the assets acquired pursuant to Section 1060, because plaintiffs' purchases were applicable asset acquisitions in which the seller directly transferred a group of assets that constitute a trade or business in the hands of either the seller or purchaser. Treas. Reg. § 1.1060-1(b)(1). The character of the assets is such that goodwill or going concern could attach to the group of assets purchased in each Alta transaction under any circumstances. Taking into account all the facts and circumstances of this

---

[42] Arguably, the Alta Projects meet the standards of § 355, but because their qualification under the other prong is so evident, we limit our current discussion to that.

71

transfer, including the enumerated factors in Treas. Reg. § 1.1060-1(b)(iii), it is clear that the character of the group of assets is such that goodwill or going concern value could attach under any circumstance.

First, as described above, each of the Alta Project Transactions included more than just the tangible assets that are eligible under Section 1603; they also conveyed other assets that are not tangible: transmission rights, land rights, power purchase agreements, interconnection agreements[43] and shared facilities agreements. (Tr. 864:7-18 [Spencer]; Tr. 895:25-896:3 [Spencer]; Tr. 896:19-22 [Spencer]; Tr. 897:3-6 [Spencer]; Tr. 914:18-25 [Spencer]; Tr. 735:6-12 [Revock] (permits critical to having an integrated facility); Tr. 780:20-781:22 [Revock] (discussing what an integrated facility required); 785:6-12 [Revock]; Tr. 788:23-789:14 [Revock]; Tr. 820:17-821:12 [Revock]; Tr. 990:14-22 [Markowitz]; JX0081.) Thus, intangibles were present, satisfying Treas. Reg. § 1.1060-1(b)(2)(iii)(A).[44]

Second, each of the plaintiffs paid a premium over the cost of the assets acquired. (Tr. 863:2-9 [Spencer] (acknowledging that EverPower was aware that the purchase price for Alta VI was around 35 to 40 percent above Terra-Gen's estimated construction costs); Tr. 716:3-8 [Revock].) This premium represents a clear "excess of the total consideration over the aggregate book value of the tangible and intangible assets purchased . . . ," an enumerated factor in Treas. Reg. § 1.1060-1(b)(2)(iii)(B).

---

[43] Each project was also allocated a portion of the intangible "Development Rights" described as a "development cost allocation" on the KPMG cost allocations.

[44] Notably, the Regulation does not require that the intangibles necessarily have any value. It triggers the application of §1060 whenever intangibles are *present.* Treas. Reg. § 1.1060-1.

72

Finally, as discussed in the fact section at length, Altas I-VI all include related agreements, another factor under the regulations.  Altas I-V were sale-leaseback transactions and, as such, were inherently composed of multiple simultaneous agreements.  In the case of Altas II-V, the transactions putatively involving the sale of the smallest subset of assets, these transactions nonetheless were accompanied by a host of related agreements, as elaborated earlier, associated with the operation of those projects as a business enterprise.  Alta VI, structured as a sale, similarly included side deals that constitute related agreements.  Thus, each and every one of the Alta Project Transactions included a bundle of numerous related agreements.  (*See generally* Facts, Section V.)

In sum, the facts and circumstances of the Alta Project Transactions conclusively indicate that goodwill and/or going-concern value could attach to the transferred assets.  When "goodwill or going concern value could under any circumstances" be present, the transfer of a group of assets is an applicable asset acquisition under § 1060.

Additional facts and circumstances that indicate § 1060 should apply can be found in the fact that, when Terra-Gen acquired Allco's wind energy business, the parties to that transaction allocated the assets purchased in accordance with § 1060.[45]  This treatment was correct: like the later Alta Project Transactions, the character of the acquisition was such that goodwill or going concern value could attach to the group of assets.  Specifically, the total consideration exceeded the aggregate book value of the tangible and intangible assets purchased, and intangibles were

---

[45] Indeed, the parties put the requirement for § 1060 allocation into the transaction documents, along with setting out the responsibilities for filing necessary IRS forms. (JX0007.034; JX0015.038; JX0016.0038; JX0017.018.)

present, as detailed in appraisal reports commissioned by Terra-Gen.  *See* Treas. Reg. § 1.1060-1(b)(2)(iii)(A) & (B).

In purchasing Allco's U.S. wind energy business, Terra-Gen paid a premium of over $270 million over book value/hard assets and costs, thus satisfying (B) of Treas. Reg. § 1.1060-1(b)(2)(iii)(B).  (JX0032.045.)[46]  The Duff valuation report that estimated the fair market value of the assets Terra-Gen acquired also evaluated the excess consideration that Terra-Gen paid.  (JX0032.045-.046.)  Generally, the intangible asset that arises after acquiring a company, in an amount over that company's book value, is goodwill.  Indeed, a draft of Exhibit I of the Duff report describes goodwill in the amount of $260 million (DX0516-0003.)[47]  Arguably the development rights, transmission rights, or a portion of each could have been more properly characterized as goodwill.  Regardless of how Duff characterized these intangible assets, however, it determined that these intangible assets must be allocated among each of the Alta phases at issue in this litigation, given that it wrote an entire report conducting that allocation.  (*See* SOF ¶ 13.)

Because § 1060 applied to Terra-Gen's acquisition of some of the assets that would later become part of Alta I-VI, the application of § 1060 to the plaintiff's transactions (which involved many more assets related to the ultimate wind energy businesses) is consistent with the prior treatment of those assets.  And, as discussed above, the facts and circumstances of the Alta I-VI transactions conclusively indicate that goodwill or going concern could attach to the assets transferred in each of the Alta transactions.  Thus, they were applicable asset acquisitions under

---

[46] Duff & Phelps Exhibit I displays a balance sheet of the Allco assets both before and after the sale at JX0032.04545.

[47] This draft was part of a larger document sent to Treasury during its review of the Alta I application.

§ 1060.  *See* Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 10.40[2] (6th ed. 1994) ("this term ['applicable asset acquisition'] is so broadly defined as to make the section quite extensive in its reach").  Therefore, since § 1060 applies, pursuant to § 1060(a)(2) and Treas. Reg. § 1.1060-1(c), the plaintiffs were required to use the residual method to allocate their purchases of Alta I-VI.[48]

### 2. Dr. Maydew Cannot (and Did Not) Provide an Expert Opinion on Whether the Alta Project Transactions Were Applicable Asset Acquisitions Under Section 1060

Plaintiffs called Dr. Maydew, a tax professor, to testify as an expert on both financial accounting and tax accounting.[49]  (Tr. 1338:15-1339:4 [Maydew].)  With regard to § 1060, Dr. Maydew specified that he did not decide whether the assets purchased in the Alta transactions were subject to § 1060.  (Tr. 1471:21-25 [Maydew].)  Dr. Maydew testified, however, that no goodwill could attach to the Alta Projects at the time of their purchase by plaintiffs, for two reasons: (1) because the Alta Projects were brand new; and (2) because they had not yet been placed into service.  (Tr. 1422:22-1423:5; Tr. 1423:6-1424:16. [Maydew].)

---

[48] KPMG's memo to Terra-Gen describing its attestation report for Alta I acknowledges this requirement, citing to § 1060 and describing its allocation as following the residual method. (JX-0162.002.)  As discussed below, however, the allocation was not truly done in accordance with that approach.

[49] Defendant moved to exclude Dr. Maydew from testifying because, to the extent he testified about tax accounting, that is impermissible testimony on the law, and his testimony about financial accounting is irrelevant, because it applies different rules than the tax code (and § 1603) that govern this case.  The Supreme Court recognized long ago that GAAP accounting is different from tax law, and serves its own peculiar purposes. *Thor Power Tool Co. v. Comm'r,* 439 U.S. 522, 538-44 (1979). Although the Court permitted Dr. Maydew to testify, he did not offer any helpful opinions on the specific facts of the Alta Project Transactions.  Further, to the extent his testimony either ignores or does not apply under the tax law applicable in this case, it is irrelevant.  Moreover, Dr. Maydew did not review several key documents in this litigation, and as a result his testimony is based on insufficient data and incomplete analysis.  As a result, his limited opinions, to the extent they have any relevance at all, are not reliable.

a.      **Dr. Maydew Ignored the Factors from the Relevant Treasury Regulation**

Tellingly, although Dr. Maydew is familiar with the § 1060 regulations describing goodwill or going concern value, he steadfastly avoided any analysis bearing on the factors set forth in those regulations. (Tr. 1474:11-17 [Maydew] (testifying that he is "generally" familiar with the regulations under § 1.1060(b), and acknowledging that one factor to determine whether goodwill or going concern is present is whether an intangible is present).)

With regard to factor (A) of the regulations, the presence of any intangible assets, Dr. Maydew did not evaluate whether intangible assets were present. On cross-examination, Dr. Maydew acknowledged the presence of intangibles at the time of the Allco acquisition – the intangibles identified by Duff as development rights and transmission rights, which were later allocated to each of the Alta phases. (Tr. 1474:25-1475:20 [Maydew].)  Although Dr. Maydew described the assets conveyed in the Alta transactions as "property, plant, and equipment," he admitted that he did not review many of the contracts involved in the transactions, including the Balance of Plant contract and interconnection agreements. (Tr. 1491:23-1492:1 [Maydew]; Tr. 1492:21-25 [Maydew]; Tr. 1479:14-23 [Maydew].)  Moreover, the plaintiffs' valuation expert, Dr. Blaydon, recognized that there is a difference between merely property, plant, and equipment, and the additional contracts included as part of the suite of assets covered by the Alta transactions. (Tr. 1711:4-1712:9 [Blaydon].)  Thus, Dr. Maydew's assertion that the plaintiffs only acquired property, plant, and equipment is incorrect, and the assertion was based on insufficient data.  To the extent that his opinions were based on a faulty assumption about the nature of the assets transferred, his opinions are unreliable.

Similarly, Dr. Maydew did not address factor (B), the existence of an excess of the total consideration over the aggregate book value of the tangible and intangible assets purchased, or

76

conduct any analysis bearing on whether there was such an excess.  Dr. Maydew offered no opinion on the fair market value of the eligible assets in the Alta transactions.  (Tr. 1501:3-7 [Maydew].)  He also did not review the cost breakdowns for Alta I through VI to determine whether certain line items were truly eligible; did not review Terra-Gen's general ledger or the financial accounting books and records for any of the plaintiffs; and, as stated above, he did not review many of the contracts that were part of the Alta transactions.  (Tr. 1491:23-1492:1 [Maydew]; Tr. 1492:21-25 [Maydew]; Tr. 1479:14-23 [Maydew]; Tr. 1493:22-1494:2 [Maydew]; Tr. 1494:16-21 [Maydew].)  Finally, Dr. Maydew did not evaluate whether any related agreements, described in factor (C), were a part of the Alta transactions.

### b.    Dr. Maydew's Reasons for Determining No Goodwill Could Attach Are Unpersuasive

Dr. Maydew cited two reasons for his assertion that no goodwill could attach to the transactions – that the Alta Projects were brand new and that they had not yet been placed into service – but neither is relevant for determining goodwill under the § 1060 regulations.  Neither of these reasons bears upon a factor described in the § 1060 regulations, and indeed a key phrase in the regulation blunts this entire argument.

The regulation makes plain that § 1060 applies to assets that constitute a trade or business in the hands of *either the seller or purchaser*.  Treas. Reg. § 1.1060-1(b)(1) (emphasis added).  That the regulation looks at the assets from both perspectives underscores the irrelevance of Dr. Maydew's argument.   Plaintiffs, through Dr. Maydew, argue that no goodwill could attach because they were not yet operational power-generation plants.  In the hands of the purchaser, who intended to (and did) immediately cause them to operate, however, they are operational, and thus are businesses. Supporting this point, case law makes it clear that goodwill is not a restrictive label, and that it can materialize in a variety of forms.  For example, the Supreme

77

Court has described goodwill as "a useful label with which to identify the total of all the imponderable qualities that attract customers to the business." *Newark Morning Ledger Co. v. United States,* 507 U.S. 546, 555-56 (1993).

Although Dr. Maydew tried to argue that the fact that the Alta wind farms were brand-new was somehow compelling, there is no bright-line rule that a brand-new business cannot have goodwill. Nor is there a rule that a wind farm that is about to be placed into service cannot have goodwill.  Justice Story's definition of goodwill, articulated over 100 years ago, provides interesting context:

> the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices.

*Metropolitan Bank v. St. Louis Dispatch Co.,* 149 U.S. 436, 446 (1893) (quoting J. Story, Partnerships §99 (1841)).

The Alta Projects embody many types of advantages or "benefits" akin to those in Justice Story's description.  The Alta Projects were highly important to California's – and the country's – drive to to better utilize renewable energy sources such as wind and solar. Moreover, in part based on its excellent windy location, the early developers of the Alta Projects expected each project to be a highly productive wind farm and were thus able to secure a "constant" customer – Southern California Edison, through the Master PPA.[50]

---

[50] Although Dr. Maydew tried to paint each project's PPA as a limiting factor, his limited analysis clearly ignores the value to the project that locking in a favorable PPA price provided to the owners of the Alta wind projects.  Arguably, the existence of the PPAs themselves

(continued...)

Plaintiffs try to cloak these admitted benefits as "synergy" of the eligible assets, but that is a futile attempt to avoid the label of goodwill. The limited case law supporting the idea of "synergy" addresses a very different scenario from that present here: it relates to valuations "of a collection of similar assets," such as network franchises, patents, contracts creating a distribution network, or a collection of individual credit files. *See Kraft Foods Co. v. Comm'r,* 21 T.C. 513 (1954) (patents); *Standard Conveyor Co. v. Comm'r,* 25 B.T.A 281, 283 (1932) (patents); *Massey-Ferguson, Inc. v. Comm'r,* 59 T.C. 220 (1972) (distribution network); *Computing and Software, Inc. v. Comm'r,* 64 T.C. 223, (1975) (credit files). Under those circumstances, the enhanced value of the collection of assets is attributable to those collected assets and is not separate goodwill or going concern value. The circumstances present in this case, by contrast, are the classic combination of a set of tangible and intangible assets that collectively constitute a business operation whose value as an integrated whole exceeds the sum of its individual parts.

Further, Dr. Maydew's opinion that none of the purchase price paid for the Alta Projects should be allocated to goodwill or going concern value is unhelpful and conclusory because (1) he offered no opinion bearing on the factors set forth in applicable regulations about whether goodwill "could" attach; (2) he did not review a number of documents that clearly should have been evaluated in making a determination of whether goodwill could apply, under either tax accounting or financial accounting; and (3) to the extent that his analysis is based on financial accounting, it is irrelevant to the analysis of whether plaintiffs' allocation method was in

---

(…continued)

demonstrates the expectancy of continued patronage for the Alta wind farms. (*See, e.g.*, Tr. 993:12-999:13 [Markowitz] (discussing importance of PPA in the context of Alta I's expected life); JX0094.021, .028-.029, .030, .039 (Union Bank's evaluation of PPA stability).)

accordance with tax law.  Thus, Dr. Maydew's limited testimony regarding goodwill and the plaintiff's allocation method is unreliable and unhelpful in determining the issues in this case.

### 3.   Section 1060 Requires the Residual Method, Which Requires Evaluating the Fair Market Value of the Eligible Property

When § 1060 applies to a transaction, as it does here, it requires that the purchase price be allocated pursuant to what is sometimes called the waterfall or residual method, as set out in § 338(b)(5).  *See Peco Foods*, 103 T.C.M. 1120 (2012); Treas. Reg. § 1.1060-1(c)(2); Treas. Reg. § 1.338-6 and § 1.338-7.  Essentially, the purchase price is allocated to each category of assets in order, up to the determined fair market value of the asset.  *See, e.g., W. Covina Motors, Inc. v. Comm'r,* 98 T.C.M. (CCH) 615 (T.C. 2009) (allocating all consideration to class II and class V assets, where no class I, III, or IV assets were present).  Any excess purchase price spills over into the next higher category of acquired assets until the whole purchase price has been allocated.  *See* 15 Mertens Law of Fed. Income Tax'n §§ 59:76; 59:80 (explaining the application of the residual method to allocating purchase price among the asset classes); *see also* Special Allocation Rules for Certain Asset Acquisitions , 53 Fed. Reg. 27035-01 (July 18, 1988) ("[U]nder the residual method any "premium" paid in excess of the total fair market value of the purchased assets [other than goodwill or going concern value] is treated as payment for goodwill or going concern value.").

The residual method acknowledges that, as here, a purchaser's purchase price can greatly exceed the fair market value of the identifiable assets that it acquired.  In that instance, the values of the assets are not grossed up, as plaintiffs effectively would do.  Rather, the excess purchase price is allocated to an unidentifiable intangible such as goodwill or going concern value.  *See, e.g., Philip Morris Inc. & Consol. Subsidiaries v. Comm'r,* 96 T.C. 606, 625 (1991), *aff'd* 970 F.2d 897 (2d Cir. 1992) ("Under the residual method, the value of intangibles is determined by

80

subtracting the value of cash, cash equivalents, and tangible assets from the purchase price.”);

*Solitron Devices, Inc., v. Comm'r,* 80 T.C. 1, 24 (1983), *aff'd* 744 F.2d 95 (11th Cir. 1984) (the

residual method of valuation is the proper method for determining value of intangible assets in

purchased business that possessed goodwill and going-concern value); 15 Mertens Law of Fed.

Income Tax'n § 59:76.  In short, under the residual method, an unallocated portion of the

purchase price can remain after the price is allocated to all the identified real, tangible, and

intangible assets, and that unallocated portion must be classified as goodwill or going concern

value.

Application of the residual method, therefore, requires conducting a valuation of the

identifiable assets.  Here, the key asset that must be valued is the eligible energy property itself.

As the Court has already held in this case, the “total purchase price cannot serve as the cost basis

where Treasury Regulation § 1.1060-1 requires an allocation of an amount of the purchase price

to goodwill and going concern value.”  *Alta Wind I,* 117 Fed. Cl. 369, 374 (2014).  Thus, the

Court must

> identify the amount of the purchase price that constitutes goodwill
> and going concern value. Ultimately, this calculation contributes to
> the total amount of ineligible property contained within the
> purchase price, altering the amount that may serve as the cost
> basis.

*Id*. at 374.  To make that allocation between eligible and ineligible property requires a valuation

of the eligible property, so that purchase price can be allocated to it up to its fair market value.[51]

---

[51] The Court need not decide a specific value for the ineligible property, let alone
subdivide it into its component assets.

81

### C.      The Alta Project Transactions Were Not Arm's-Length and Include "Peculiar Circumstances"

A third, independent reason that the purchase prices paid in the relevant sale-leaseback or sale transaction do not establish basis (even if they comprised only eligible assets, which they do not) is that they were not established independently at arm's length, and because the transactions include "peculiar circumstances."  The presence of either condition, let alone both, would require the Court to look beyond the purchase price.  Numerous courts have held that purchase prices cannot determine basis if

> [the] transaction is not conducted at arm's-length by two
> economically self-interested parties or [if the] transaction is based
> upon 'peculiar circumstances' that influence the purchaser to agree
> to a price in excess of the property's fair market value.

*Lemmen,* 77 T.C. at 1347-48 (1981) (citing *Bixby v. Comm'r*, 58 T.C. 757, 776 (1972)).  If either circumstance is present, then cost basis is limited to the property's fair market value.  *Lemmen*, 77 T.C. at 1348 (citing *Mountain Wholesale Co. v. Comm'r,* 17 T.C. 870, 875 (1951)); *G.U.R. Co. v. Comm'r*, 41 B.T.A. 223 (1940), *aff'd* 117 F.2d 187 (7th Cir. 1941).

Each of the Alta Project Transactions was comprised of a set of transactions that provided numerous ways to adjust the purchase price without altering the overall economics of the deal, disqualifying them from being deemed arm's length, and that had a number of peculiar circumstances present.  As a result, the purchase price cannot determine cost basis. This constitutes a third, *independent* reason that the Court must determine the value of the eligible property rather than relying solely on the purchase prices.

### 1.      The Purchase Prices in the Alta Sale-Leaseback Transactions Were Not Set Independent of Other, Related Transactions

Sale-leasebacks, while relatively common transactions, require close scrutiny because they create an ongoing relationship between the parties.  Moreover, even assuming the overall

82

economics of the sale-leaseback are negotiated at arm's-length by the two parties, no single aspect of the deal can be relied upon in isolation as an independent term. Because sale-leasebacks are inherently composed of multiple simultaneous transactions, with cash flowing in both directions between the parties, individual component transactions can be adjusted without altering the overall economics of the entire transaction.

In a sale-leaseback transaction, a project developer sells the project and then immediately leases it back from the buyer. Because the project developer is both the seller and the lessee in such transactions, the opportunity exists to adjust the sale price by adjusting the lease payments in the transactions. (*See generally* Fact Section V, discussing same.) In particular, in sale-leasebacks, purchase prices can be set to almost any value because the level of lease payments that the seller agrees to make to the buyer during the leaseback term — and particularly the upfront lease "prepayment" that the seller makes on the day that it sells the project — can, in the absence of other constraints, be adjusted to support a nearly limitless range of potential purchase prices while still providing the buyer its targeted return on its investment. For example, the seller can raise the purchase price in a sale-leaseback, without the buyer paying more, simply by agreeing to give the buyer a higher lease prepayment while holding all other aspects of the leaseback terms constant. (Tr. 1007:25-1008:10 [Markowitz]; DX0363 (illustrating this exercise in the context of Alta I negotiations); DX0364 (same).)

In the Alta sale-leaseback transactions, the overall return on investment that the plaintiffs received was presumably negotiated at arm's length because Terra-Gen and those investors had adverse interests when negotiating it. However, because the opportunity existed to alter either the amount of the lease payments that the investor would receive as lessor, or the purchase price it would pay, or both, to achieve a particular target return on the investor's investment, the

83

parties did not have adverse interests with respect to the purchase price alone.  For example, on a clean sale, a buyer responding to changes in the expected economics of a project may require a lower purchase price to achieve a particular target return on its investment.  Yet, in a sale-leaseback, that return can be achieved by increasing the lease payments rather than reducing the purchase price.  (*See* Facts, Section V, above; Tr. 1007:25-1008:10 [Markowitz]; DX0363 (illustrating this exercise in the context of Alta I negotiations); DX0364 (same).)

Thus, the purchase price in a sale-leaseback reflects something different from a directly negotiated, arm's-length purchase price.  Because of the influence of the rest of the deal's economics, the purchase price for the sale portion of a sale-leaseback may be higher or lower than a stand-alone negotiation would have produced.  As the Court found earlier in this case, this "arrangement provides the opportunity to adjust terms to yield a higher purchase price without lowering the buyer's targeted return on investment." *Alta Wind I*, 117 Fed. Cl. at 373 (2014).  As a result, "a sale-leaseback agreement's potential for value transfers across transactions mirrors the value shifts found in *Lemmen*, where the U.S. Tax Court found 'peculiar circumstances' were present." *Id.* (citing *Lemmen,* 77 T.C. at 1349).  Put another way, in a sale-leaseback transaction, there can be a disconnect between the stated purchase price and the true value of the overall transaction to the parties.

As explained above, all of the parties that were involved in the actual negotiation of the Alta Project Transactions at the time that they took place understood that the terms of the sale-leaseback transaction were hopelessly comingled among the "sale" and the "leaseback."  Mr. Revock and Mr. Markowitz, both of whom negotiated sale-leasebacks, indicated that it was possible to adjust any of the terms of the transaction in concert with some of the others; Mr. Markowitz, in particular, testified that certain emails reflect that Union Bank undertook precisely

this exercise during its evaluation of the Alta I transaction.  (Tr. 809:8-809:18 [Revock]; Tr. 1007:25-1008:10 [Markowitz]; DX0363 (illustrating this exercise in the context of Alta I negotiations); DX0364 (same).)  This ability to adjust, *e.g.,* the purchase price upward while offsetting it by an increased lease prepayment means that the purchase price cannot be viewed as having been independently negotiated at arms' length.

Mr. Pagano made similar points when discussing the nature of the sale-leaseback transactions for Altas I-V.  Regarding Alta I, Mr. Pagano was presented with documents that were part of the negotiation over the specifics of the sale-leaseback transactions, and he was asked about a proposal (set out in the document referred to) that had a higher sale price, and yet lower net proceeds to the seller.  (Tr. 525:11-25 [Pagano]; DX0305.)  Mr. Pagano explained that the rent prepayment and purchase price are interlinked: he indicated that there can be "a higher prepayment because of the rent streams necessary from a higher purchase price."  (Tr. 527:16-18 [Pagano].)  Setting aside these specifics, it is clear that the CEO of Terra-Gen understands that a higher lease prepayment is necessary because of a higher purchase price.  This is definitive confirmation that the "sale" price of a sale-leaseback is not independent of the lease terms.

In summary, Mr. Pagano of Terra Gen, Mr. Revock of Citi and Mr. Markowitz of UBOC all understand that no specific term of a sale-leaseback can be reviewed in isolation.[52]  The sale price cannot be trumpeted as an independent indication of fair market value.

---

[52] The only individual with a different opinion is Dr. Blaydon, who believes that the "sale" price of a sale-leaseback can be independently set at arm's length.  This belief has no foundation in the facts or testimony of other witnesses, and even Dr. Blaydon admits that it is possible to adjust the value of the purchase price without changing the overall economics of the deal.

**2.    The Alta Project Transactions Featured Side Agreements That Created Peculiar Circumstances**

All of the Alta Project Transactions, including the outright sale of Alta VI, involved the execution of multiple related transactions and/or agreements between the parties to the overall transaction. These side agreements impacted the purchase price by removing aspects that would otherwise have been priced into it.

As detailed earlier, all of the Alta Project Transactions involved side agreements that permitted access to the necessary land rights. For example, plaintiffs and their expert both acknowledge that value was shifted to EverPower, the Alta VI buyer, by Terra-Gen's providing some of the project land free of charge. (Tr. 890:4-6 [Spencer]; Tr. 895:25-896:3 [Spencer]; Tr. 896:19-22 [Spencer]; Tr. 897:3-6 [Spencer]; Tr. 900:23-25 [Spencer].) These side deals elevate purchase price and demand extra scrutiny in determining the appropriate cost basis of eligible property. Plaintiffs admit as much when they state that an allocation needs to be made for this value-shifting, which was exactly the kind of "peculiar circumstance" at the heart of *Lemmen v. Comm'r,* 77 T.C. 1326. However, plaintiffs and their expert fail to account for the more substantial effect on the value of the Alta Projects arising from Terra-Gen allowing the projects' purchasers to benefit from pre-existing land leases with third parties at rates that Terra-Gen (and Allco and Oak Creek before it) had locked in years earlier under necessarily different market conditions.[53] These land leases covered far more land than that explicitly addressed by Dr. Blaydon.[54]

---

[53] A portion of the executed purchase price must be allocated to these favorable leases, which fact constitute an additional peculiar circumstance influencing the purchase price itself.

[54] For example, Dr. Blaydon's analysis of how much of the Alta I project value should be attributed to land provided free of charge accounted for only 20 acres of land, yet the Alta I

(continued...)

86

The Alta Project Transactions' related agreements also include various indemnifications against potential losses or adverse outcomes, and releases from certain financial obligations to parties affiliated with, or related to the seller, that would otherwise impose a cost on the buyer or on the project companies that the buyer acquired.[55] (*See, e.g.*, JX0223 (example of the Alta I tax indemnity agreement and terms); JX0068.004 (describing Alta II-V indemnity provisions); Tr. 794:9-789:9 [Revock] (same).)

For example, under the Shared Facilities Agreement, certain Alta Projects were required to make, and certain Alta Projects received, wake impact payments between projects to offset the impact that an upwind projects' turbines might have on the quality of the wind available to the downwind project. Terra-Gen understood that these payments, which often ran into the millions, are ineligible to be included in cost basis under Section 1603. (Tr. 1097:22-1098:10 [Huplosky].) Any such payment that Terra-Gen made on behalf of a project prior to its sale would necessarily boost that project's value to the buyer by reducing its future obligation to make those payments, even though the wake payment is not explicitly reflected in the purchase price. For example, the $5.3 million in wake payments made by Terra-Gen on behalf of Alta VI to Alta III and Alta V increased the value of Alta VI to EverPower, because EverPower was not required to make the payment.[56] (Tr. 535:24-536:3 [Pagano].)

---

(…continued)

project used 4,120 acres (more than 200 times as much land) including under "three long-term wind energy site leases." (PX0325; JX0067.0018.)

[55] They also include a major indemnity locking in the value of the Section 1603 payment, as discussed below.

[56] To ensure that no additional wake impact would affect the buyer, Terra-Gen indemnified EverPower against further wake payments.

If purchase price alone is used to establish the cost basis in the eligible assets, or if none of the purchase price is allocated to any of these side agreements that affected the purchase price, as plaintiffs propose, then Terra-Gen would have successfully converted an ineligible item (*e.g.*, the wake payment obligation) into a part of eligible cost basis (the resulting higher purchase price). *Cf. Barnes Grp. Inc. v. United States,* 872 F.2d 528, 532 (2d Cir. 1989), *decision on remand in,* 724 F.Supp. 37 (1989), *aff'd,* 902 F.2d 1114, 1116 (2d Cir. 1990) ("no reason why the acquiring company should receive a tax benefit from having such contracts executed instead by the to-be-acquired company"). This simple example makes clear that even the purportedly straightforward sale of Alta VI included peculiar circumstances that require looking beyond the purchase price.[57]

### 3. Indemnities Guaranteeing the Amount of Section 1603 Payments Constitute Extremely Peculiar Circumstances

As explained above in Section VI of the Facts, Terra-Gen locked the value of the claimed Section 1603 payment into the purchase price of the Alta Projects by providing indemnities that insulated the buyers from any deviation from the promised Section 1603 payment, another particularly peculiar circumstance that requires looking beyond the purchase price. The practical effect of the indemnity provisions was to eviscerate any of the discipline on the purchase price and associated Section 1603 claim that one would expect in a truly arm's-length transaction

---

[57] Additionally, the Shared Facilities Agreements' contractual protection to each project from the financial consequences of any wake impact that might arise from Terra-Gen-affiliated projects developed nearby in the future would necessarily alter a buyer's valuation of the project compared to that in a transaction with no such side agreement. (JX0067.018.) Yet despite this clearly valuable protection, Mr. Huplosky testified that no value could be allocated to the Shared Facilities Agreement because it "didn't convey any rights," which is plainly incorrect. (Tr. 1110:6-10 [Huplosky].) Mr. Huplosky, of course, carried out Terra-Gen's initial allocations of the purchase prices.

where the buyer's return on its investment at its chosen purchase price actually depended on the accuracy of their Section 1603 claim.

As noted above, all the buyers explained that the indemnities influenced the purchase prices. By tying the claimed eligible basis of each eligible project asset to the overall project's purchase price through their pro-rata allocation method, plaintiffs fold a portion of the value of the Section 1603 indemnity into the value of each eligible asset, giving that asset an increase in value wholly disconnected from the particular asset's fair market value. The buyer, insulated from potential injury by the indemnity, is indifferent to any potential over-valuation of the eligible assets, and even to simple errors in the calculation of the claimed basis. Plaintiffs' valuation expert, Dr. Blaydon, agreed that there is $206 million of cash flow for these Alta Projects that has been guaranteed by Terra Gen to the buyers. (Tr. 1707 [Blaydon].) Such a guarantee clearly adds value to the purchase price but does not meet the definition of eligible basis.

The effect of the indemnity provision on the purchase prices is another reason that claimed bases mechanically linked to those prices through plaintiffs' pro rata allocations cannot possibly be the fair market value of the eligible assets alone. The indemnity provision allowed the buyers of Alta I-VI to treat the 1603 award as a certainty regardless of any errors that may exist in their Section 1603 claim. (*See* Facts, Section VI.) The risk that the actual § 1603 award would be lower than Terra-Gen's estimate was borne by Terra-Gen even after they sold the project. (*Id.*) Each buyer had locked in a specific amount for the § 1603 award at the closing of the sale, and the existence of that guarantee elevated the purchase price, skewing that number still farther from an accurate representation of fair market value. Yet, that purchase price is the number Terra-Gen then used to support its eligible basis allocations.

### IV.    Plaintiffs' Eligible Cost Basis Can Only Be Determined by a Valuation of the Eligible Property, Which Plaintiffs Have Not Presented

The three separate reasons above each independently mean that, despite plaintiffs' lengthy discussion and analysis of the purchase prices, the Court cannot rely on them to determine each plaintiff's cost basis in the portion of the Alta Projects that is eligible energy property.  Instead, the Court must look beyond the purchase price of each Alta Project to determine the value of the eligible property alone.  Yet plaintiffs did not even present an expert analysis of the value of the eligible property in the Alta Project Transactions.  At best, they value the overall Alta Project and then make an unsupported leap to an asserted value for the eligible property, without any supporting expert testimony.  Without this critical support, plaintiffs cannot prove their claims.

#### A.    *Plaintiffs' Valuation Expert Merely Seeks to Support the Purchase Price, Not the Eligible Basis*

Dr. Blaydon focused his analysis on whether the purchase prices accurately reflected the fair market value of *all* of the assets encompassed in the Alta Project Transactions, including both eligible and ineligible assets.[58]  Thus even assuming, for the sake of argument, that he were correct that the purchase price was the proper measure of the basis in the collected transaction assets, this portion of his analysis still does not address the key question of the value of the *eligible* property.

His income-based valuations also focus on the value of the entire Alta Projects.  As Dr. Blaydon explained in his expert report, the discounted cash flow analysis "determines the present

---

[58] For Altas II through V, he analyzes the overall project value implied by the purchase prices that were putatively for eligible assets alone, assuming the same flawed and unsubstantiated mechanical relationship between the value of the eligible property and the value of the total project that is addressed.

value of a property based upon the expected cash flows it will produce." (PX0299.008.)  These cash flows, of course, are generated by the Alta Projects as a whole, including both eligible and ineligible property.

When pressed on this approach at trial, Dr. Blaydon confirmed that he was only looking at the Alta Projects as a whole.  (Tr. 1686:9-12 [Blaydon].)  Dr. Blaydon agreed that the cash flows that create value for the Alta Projects depend on more than just the eligible assets.  (Tr. 1689:11-14 [Blaydon].)  He agreed that they depend on the ineligible assets as well.  (Tr. 1689:18-20 [Blaydon].)

Dr. Blaydon agreed that he did not reach a conclusion regarding the value of the individual assets within the wind farm project.  (Tr. 1687 [Blaydon].)  In other words, he did not conduct an income valuation of the eligible property alone.  He did not even attempt to separately value all the identifiable assets that were not eligible, like the various project contracts that do not constitute eligible property, and subtract those values from the valuation of the entirety.[59]  (Tr. 1705:8-14 [Blaydon].)  He looked only at the value of the whole project.

Even if he had valued each of the identifiable, ineligible assets contributing to the Alta Projects' overall income valuation, and subtracted these amounts from that overall valuation, the result would still not necessarily reflect the value of the eligible property alone.[60]  This is because, as he acknowledged, a group of coordinated assets can have a value that exceeds the

---

[59] The exceptions that prove the necessity of this, of course, are the small amount of land that Dr. Blaydon claimed to determine a value for and then subtracted from his overall valuation, and his consideration of the PPA contracts, which are just two of several ineligible assets that contribute to the total project value.

[60] Such an approach of starting with the total project value and removing various intangible and other ineligible asset values to get to a valuation of a tangible asset is also inconsistent with the approach required by § 1060 under the residual method.

91

value of the sum of the individual parts.[61] (Tr. 1668:15-17 [Blaydon].) As a result, while Dr.

Blaydon may have sought to value the coordinated group of assets, he never considered or

presented a valuation of the eligible property alone, which is exactly the issue the Court needed

expert testimony on to decide this case.

     **B.**       ***Plaintiffs' Expert Valuation Requires an Allocation to Reach a Value for the Eligible Property, but Plaintiffs Do Not Present an Independent Expert Allocation***

Dr. Blaydon acknowledges that his income-based analysis could not distinguish cash

flows for the eligible property versus the ineligible property, and thus he required some form of

an allocation. (Tr. 1607:13-16 [Blaydon].) As Dr. Blaydon explained, the necessary allocation

would take the result of the DCF approach and allocate the entire project value to each

individually identifiable asset category. (Tr. 1606-07 [Blaydon].) This step is required to get

from Dr. Blaydon's valuation conclusions, which concern the value of the overall Alta Projects,

to an asserted value for the eligible property alone, yet neither of plaintiffs' experts conducted

these allocations or even analyzed those done by Terra-Gen and KPMG. Given the importance

of this step, not to mention the presentation of Dr. Maydew as an expert in the area of

accounting, this is a critical failure.

---

[61] This acknowledgment was clearly intended to support plaintiffs' position that the value of the overall eligible energy property can exceed the sum of the market prices that Terra-Gen paid for each of its underlying components (their "turnkey" argument). However, their position necessarily also implies that the overall project's value can exceed the sum of the value of each of its eligible and ineligible parts. Plaintiffs cannot simultaneously argue that there is incremental "turnkey" value from integrating the individual components into the whole eligible energy property, while also arguing that there is no incremental value from integrating the individual eligible and ineligible assets into a whole business enterprise.

### 1.    Dr. Blaydon Does Not Provide an Allocation and Did Not Analyze KPMG's Work

Dr. Blaydon did not present his own allocation approach or any analysis of one done by others.  Instead, he relied exclusively on the work done by Terra-Gen at the time of the Section 1603 applications, which was attested to by KPMG.[62]  (Tr. 1688:8-16 [Blaydon]; *see* Facts, Section VII.B.)

Dr. Blaydon makes only cursory mention of this prior allocation, even though he relies on their work to get from the results of his valuation of each complete Alta Project to an asserted value for the eligible property within those Projects.  Dr. Blaydon's entire discussion of this critical leap, from valuation of the whole Project (which he conducts and discusses at length) to the result for the eligible property (for which he relies on KPMG-reviewed, Terra-Gen-produced allocations), occupies only a single paragraph of the 95-page report that presents his expert valuation conclusions.  (PX0299 ¶ 167.)  More notably, only two sentences of that paragraph are not simply recitations of his assumptions.  (PX0299 ¶ 167; Tr. 1710:11-14 [Blaydon] (use of "I understand" indicates an assumption).)  The issue similarly occupies only a single paragraph in his rebuttal report.  (PX0328 ¶ 40.)

Dr. Blaydon admitted that he did not, in any way, independently assess the allocation rationale or calculations used by Terra-Gen and KPMG.  (Tr. 1688:8-16 [Blaydon].)  Dr. Blaydon neither independently determined the appropriate allocation of the overall value of the wind farm between the eligible and ineligible property that comprises it; nor did he confirm that the allocation percentages used were correct; he instead just "took the KPMG numbers."  (Tr. 1688:14-16.)

---

[62] While characterized as KPMG cost allocation percentages at times in testimony, as noted above, the calculations originated from Terra-Gen.

As a result, as Dr. Blaydon admitted, any adjustment to the allocation percentages provided by KPMG — either due to conceptual flaws in the allocation approach or simple eligibility classification or calculation errors — would directly impact the results of his analysis. (Tr. 1688:22-1689:1 [Blaydon].)  For example, he agreed that if certain costs had been incorrectly classified as eligible, they would have incorrectly increased his conclusions about the value of the eligible property.  (Tr. 1706:9-22 [Blaydon]; Tr. 1709:24-1710:7 [Blaydon].)  Yet he nonetheless did not review those allocations for accuracy.[63]

### 2.    Dr. Maydew Does Not Provide an Allocation and His Testimony That Plaintiff's Allocation Method Was "Reasonable" Is Based on Insufficient and Irrelevant Data and Is Unreliable

Dr. Maydew did not conduct his own valuation of the eligible property or any allocation of the purchase price to the various assets acquired.  He also offered no opinion of his own on whether the specific allocation percentages that the plaintiffs used to allocate between eligible and ineligible property were accurate or appropriate.  (Tr. 1416:11-17 [Maydew]; Tr. 1359:9-11 [Maydew].)

He only provided a cursory endorsement of the plaintiffs' use of the "lump sum allocation method" (calling it "reasonable"), yet he did not review the details of their approach or consider in any detail whether it was appropriate under the specific circumstances of this case. (Tr. 1416:18-1419:14 [Maydew].)  He offered no support for his limited opinion aside from his review of some documents provided by other Section 1603 applicants in support of their applications.  (*Id.*)  But in this *de novo* case, neither the allocation methods of other Section 1603 applicants, whether correct or incorrect, nor the issuance (or non-issuance) of amounts those

---

[63] Dr. Blaydon also explicitly does not rely upon any analysis done by Professor Maydew.  (Tr. 1709:14-18 [Blaydon].)

applicants requested, bear in any way on the plaintiffs' argument that the allocation method used to support plaintiffs' Section 1603 applications was appropriate.[64] (Tr. 1418:21-25 [Maydew].) *See Bishop Hill Energy LLC v. United States,* Case. No. 14-cv-00251, 2015 WL 9303044 at *4 ("[t]he parties' arguments on cost basis must rely on facts relevant to plaintiff's Section 1603 application to be persuasive.") (Dec. 21, 2015); *see also W.E. Partners II, LLC,* 119 Fed. Cl. at 693 (noting that a prior favorable reimbursement is not binding for future Treasury interpretations of Section 1603) (internal citations omitted); *D'Avanzo,* 54 Fed. Cl. at 186 (in a tax refund suit, stating that the court must make an independent decision in the context of a tax refund suit).

Here, Dr. Maydew did not evaluate the proper allocations between eligible and ineligible property in the Alta Projects. He simply provided a generic opinion, without explanation, about the cost-ratio approach (and even that, as demonstrated below, is incorrect).[65] (Tr. 1416:18-1419:14 [Maydew].) That does not constitute an expert allocation – or even a review of one.

### 3.   Plaintiffs Cannot Rely on KPMG's Allocation Work

With no allocation put forward by their independent experts, plaintiffs instead attempt to rely upon allocation work done by Terra-Gen and KPMG. But they cannot. Plaintiffs offered no

---

[64] Nor does the statement that Deloitte, Ernst & Young, and KPMG have, in other cases with unrelated applicants, certified other cost allocations bear on the propriety of the allocation method plaintiffs' used in this case. Even if these other applications did support plaintiffs' arguments, a far more in-depth review of those applications would be required to understand the specific circumstances of each and how, if at all, those circumstances inform any analysis.

[65] Importantly, as demonstrated in this brief, § 1060 clearly required the plaintiffs to allocate the purchase prices in the Alta Project Transactions using the residual method because the transactions met all three factors for applicable asset acquisitions outlined in the Treasury Regulations. Treas. Reg. § 1.1060-1(b)(2)(ii), (iii). Thus, Dr. Maydew's opinion about the lump sum allocation, which uses a ratio of costs rather than considering fair market value, as the residual method requires, was irrelevant.

expert testimony on the accuracy of the cost schedules and the resulting cost allocation percentages.  Those allocations are not themselves expert opinion, they were not supported by testimony at trial, and they are, in any event, riddled with inaccuracies that render them untrustworthy.

> a.    **Terra-Gen's and KPMG's Allocation Work Is Not Expert Opinion, and Plaintiffs Offered No Supporting Testimony**

The fair market value of the eligible property is a question that requires expert analysis and specialized knowledge.  *See* Fed. R. Evid. 702.  The allocation work done by Terra-Gen and the certification work done by KPMG are historical factual matters in this case, but they are not admissible as independent expert opinion that could be relied upon by plaintiffs to establish a value for the eligible property.

Plaintiffs made a precautionary disclosure of two potential KPMG fact witnesses under 26(a)(2)(C), but that disclosure does not transmute the underlying work of KPMG into admissible expert opinion.  (*See* Jt. Mot. for Enlargement of Time to Complete Expert Discovery, Dkt. 73, p. 2 n. 1, *citing* Pl. Disclosure of Rule 26(A)(2)(C) Witnesses.)  First, the disclosures were "merely precautionary" and related to "their testimony as fact witnesses concerning their historical activities." (*Id.*)  In addition, the disclosures did not relate to the certifications of allocation work that KPMG conducted; instead, they were made under 26(a)(2)(C), which pertains to witnesses not required to provide a report.

Second, the witnesses identified, Kevin Turk and Katherine Breaks, were not called by plaintiffs to testify.  In fact, the only witness from KPMG whom plaintiffs did call, Anthony Johnston, testified solely as a fact witness.  Plaintiffs did not attempt to qualify or offer him as an expert – nor could they have done so.  Mr. Johnston testified he lacks expertise in valuation, tax, and cost segregations, and lacks familiarity with Section 1603's requirements regarding, for

96

example, the treatment of intangible assets. (Tr.1259:16-25 [Johnston]; Tr. 1262:3-12 [Johnston].) His function within KPMG was to serve as the oversight partner responsible for bringing together a project team. (Tr. 1218:8-18 [Johnston]; Tr. 1223: 21-24 [Johnston].)

At best, Johnston was able to testify to his limited, high-level, second-hand knowledge of what Kevin Turk reviewed in producing the attestations.[66] (Tr. 1229:1-1232:21 [Johnston].) When pressed, Mr. Johnston repeatedly deferred to Kevin Turk as the individual responsible for the categorization of eligible costs – that is, the person who did the work that reached KPMG's conclusions; Mr. Johnston himself could not recall details. (Tr. 1282:6-16 [Johnston]; Tr. 1284:19-24 [Johnston]; Tr. 1286:6-8 [Johnston]; Tr.1286:16-25 [Johnston].) But Mr. Turk did not testify.

As a result, this Court had no need, or opportunity, to exercise its "gate-keeping" role, and test the reliability of the allocation work done by KPMG, and the United States had no reason to seek to exclude any opinions in the KPMG's work-product as not meeting the requirements of Fed. R. Evid. 702. *See Biovail Corp. Intern v. Andrx Pharmaceuticals, Inc.,* 239 F.3d 1297, 1303 (Fed. Cir. 2001) (citing *Kumho Tire Co, Ltd. v. Carmichael,* 526 U.S. 137 (1999) and *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579 (1993)); *Mike's Train House, Inc. v. Lionel, L.L.C.,* 472 F.3d 398 (6th Cir. 2007) (reversing trial court for failure to perform gate-keeping role, and make findings regarding reliability).

---

[66] KPMG's review, moreover, was not as comprehensive in scope as plaintiffs may suggest. Mr. Johnston testified that a team of people, performing all three functions –audit, tax, and valuation, spent approximately 167 hours on average per project – or an average a little more than two eight-hour work days per person. That work was not entirely evenly distributed – Mr. Johnston likewise testified that the first projects to be audited received somewhat more attention; the later projects somewhat less. (Tr. 1256:7-1257:20 [Johnston].).

Thus, plaintiffs cannot rely in any way on any opinions of KPMG (let alone Terra-Gen) that might be reflected in their allocation work-product in order to prove a valuation of the eligible property.  A witness may provide admissible and competent opinion evidence only if "qualified as an expert," if the opinions are based on sufficient facts and reliable principles, and if the witness is identified pursuant to RCFC 26(a)(2).  *See* Fed. R. Evid. 701, 702 and Advisory Notes to 2000 Amendments to 701 ("any part of a witness' testimony that is based upon scientific, technical or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules"); RCFC 26(a)(2); *Forward Communications Corp. v. United States,* 608 F.2d 485, 510-11 (Fed. Cir. 1979) (excluding appraisal report even under pre-2000 amendments to Fed. R. Evid. 701 and 702: author must testify as "expert"); *Tokio Marine & Fire Ins. Co. v. Norfolk & Western Railway Co.,* 172 F.3d 44 (4th Cir. 1999); *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.,* 2008 WL 2441067 (E.D. Calif. 2008); *Ferguson v. Lurie,* 1991 WL 256869 (N.D. Ill 1991); Saltzburg, Federal Rules of Evidence Manual, Vol. 3, 8th Ed., § 701.02[7] (2002).

Because the lone KPMG witness (who had not even done the work in question) did not testify as an expert witness, the work-product cannot serve as a substitute, to provide admissible, competent opinion evidence.[67]  *See Forward Communications*, 608 F.2d at 510-11 and other authorities cited *supra*.

---

[67] The experts that plaintiffs did put forward at trial, Dr. Maydew and Dr. Blaydon, as noted above, did not offer independent expert opinions regarding the allocations.  They cannot act as mouthpieces for the opinions in KPMG's work-product.  *See, e.g.,* Fed. R. Evid. 702; *Tokio Marine*, 1999 WL 12931 at *4; *Forward Communications*, 608 F.2d at 510-11 - 11.

**b.      KPMG's Review Was Limited and the Underlying Allocations Reflect Valuations and Are Riddled with Inaccuracies and Fatal Flaws**

Even setting aside these obstacles to plaintiffs' attempt to rely upon the KPMG work-product, it also lacks any persuasive force and should be given no weight.  KPMG's certification of Terra-Gen's cost schedules and associated cost allocation percentages was limited.  Although Kevin Turk prepared cost segregation memos based on Terra-Gen's documents, these memos explicitly state that the scope of the cost segregation memos did not include "a review of the accuracy of all costs" claimed by Terra-Gen.  (JX0098.)

Anthony Johnston of KPMG testified that KMPG's own allocations were derived from data provided to KPMG from Terra-Gen both as a part of the attestation process and during preliminary grant study work.  (Tr. 1255:13-22 [Johnston]; Tr. 1267:9-1268:16 [Johnston]).  He stated that KPMG performed "vouching procedures" to test the accuracy of "80 percent or more of … construction costs."  (Tr. 1220:4-10 [Johnston].)  However, most of the tested amount related to the price that Terra-Gen paid for turbines.  (Tr. 1278:18-1279:22 [Johnston].)  The dispute in this litigation relates to the eligibility of certain amounts claimed by plaintiffs in excess of the price that Terra-Gen paid for the turbines (and for other eligible equipment).  KPMG tested less than half of Terra-Gen's claimed eligible costs above the price it paid for turbines.  (Tr. 1280:18-1281:9 [Johnston].)  In addition, the cost allocation percentage for each project, on which Dr. Blaydon relies, reflected "total eligible construction costs … compared to [or divided by] the total construction costs", where total construction costs would include both eligible and ineligible construction costs.  (Tr. 1187:5-22 [Huplosky].)  If any of the eligible or ineligible costs going into this calculation were inaccurate, "it would change the calculation" of the cost allocation percentage.  (Tr. 1187:11-22 [Huplosky].)  KPMG did not vouch, or test, the

99

ineligible costs, yet the level of these ineligible costs necessarily determines just how far below 100% these cost allocation percentages to eligible property are.  (Tr. 1274: 14-25 [Johnston].)

Moreover, the segregations of costs into eligible and ineligible classifications originated from Terra-Gen, and KPMG's role was described as performing "testwork."  (JX0098.001-.002.)[68]  While not necessarily indicative of a thorough review of Terra-Gen's Alta IV cost schedule, the fact that KPMG used more than twice as many source documents in reviewing Terra-Gen's Alta IV cost schedule in April 2011 than it did in reviewing Terra-Gen's Alta I cost schedule four months earlier in December 2010 indicates inconsistencies in the depth of KPMG's reviews.  (JX0139.002; JX0098.002.)

The cost schedules and resulting cost allocation percentages also reflected valuation judgments, and not just accounting exercises.  As noted previously, $54 million of Terra-Gen's Alta I "construction costs" reflected Duff's valuation judgment regarding how much of the purchase price that Terra-Gen paid to acquire Allco's U.S. wind energy business should be allocated not only to the entire Alta wind development effort (of which the Alta Wind Projects were just a few of many) rather than to other assets, but to Alta I in particular, and specifically to two intangible assets relating to Alta I:  Development Rights and Transmission Rights.  (JX0168.003-005; JX0032.)  No expert testimony was offered in support of these valuations that heavily influence the cost schedules and cost allocation percentages.

_____

[68] Mr. Huplosky's testimony that "the determination of which costs were eligible versus ineligible was ultimately decided by KPMG" overstates KPMG's role.  (Tr. 1101:2:7 [Huplosky].))  As is made clear by KPMG's cost segregation memo for Terra-Gen's Alta I "construction costs" (on which Alta I's purchase price allocation was based), Terra-Gen provided KPMG a "grant study" that had already segregated costs into grant-eligible and non-eligible, and KPMG's role was limited to performing "testwork" on Terra-Gen's eligibility classifications of hundreds of line items of costs, with reference to only three source documents. (JX0098.001-.002.)

Moreover, a key valuation judgment that affected the cost allocation percentages was not even made by a valuation expert or appraiser, but rather by Terra-Gen itself.  Terra-Gen simply applied a 95% rule of thumb "based on a number of publicly available sources that have stated that for wind farms, about 95% of total construction costs are grant eligible costs." (JX0153.007.)

Even putting aside the flaw in using ratios of a project's costs to develop ratios of the project's value, which is addressed later, this rule of thumb suffers from an even more fatal flaw. The Development Rights, an estimated value of an intangible asset, reportedly pertained to the claimed value of the development work that the prior developers had done before Terra-Gen's acquisition of the projects, not to the cost of any actual equipment.  (*See* Tr. 1203:2-19 [Huplosky]; JX0032.045.)  Yet, the 95% figure for total construction costs is presumably driven by Terra-Gen's claimed costs of actual eligible *equipment*, like turbines, which make up the vast majority of construction costs.  (*See e.g.*, the cost breakdown in JX0168.003.005.)  So, applying this 95% ratio to other types of costs, including a value estimate that is allegedly related to the value of pre-construction development work, as Terra-Gen did, would be akin to assuming that 95% of the cost of developing architectural and development plans for a skyscraper reflects the cost of steel because 95% of the total cost of constructing the skyscraper reflects the cost of steel.

In fact, a review of Terra-Gen's own cost schedules shows that Terra-Gen treated a relatively small share of its development costs as eligible when one focuses only on work associated with developing or managing the project, and not the cost of the actual equipment itself.  As just one example, a subset of costs related to salaries paid to Terra-Gen employees associated with the project's development and construction were broken down into separate categories based on the particular individuals and work involved, and "that specific subset of

101

costs, the way that just broke down … required a smaller allocation to eligible….” that was less than 50 percent.  (Tr. 1161:19-1162:5 [Huplosky]; Tr. 1162:15-25 [Huplosky]; Tr. 1163:18-1164:2 [Huplosky]; Tr. 1206:3-18 [Huplosky]; JX0139.018.)

In addition to the above issues, a review of the cost schedules highlights many internal inconsistencies that suggest inaccuracies and flaws in the cost allocation percentages.  For example, as noted above, the salaries of Terra-Gen employees associated with the project's development and construction were broken out into separate line items with less than 50 percent of the total deemed eligible.  Yet, there was no similar breakdown of salaries paid to Oak Creek, the original project developer, to determine whether a smaller allocation to eligible basis was appropriate for that specific subset of costs; instead more than 95% of those salaries were simply assumed to be eligible based on the overall share of project costs that were eligible.  (Tr. 1162:6-14 [Huplosky]; Tr. 1163:1-4 [Huplosky]; Tr. 1161:5-10 [Huplosky]; JX0139.0018.) Documentation in Terra-Gen's possession shows that much of the development activity in which Oak Creek and Allco engaged prior to Terra-Gen's acquisition of the project related to ineligible activities such as securing land control, the power purchase agreement, and transmission rights. (Tr. 1143:4-1144:11 [Huplosky]; DX0094.001, .002; JX0032.049.)

Similarly inconsistent treatment can be seen in comparing the breakout of the "CHiPS developer fee" (which reflected "bonuses paid to some Terra-Gen employees that had to do with the construction of the project for reaching certain milestones") and the lack of such a breakout for the Oak Creek Development Fee that is immediately adjacent in the cost schedule.  (Tr. 1164:3-23 [Huplosky]; Tr. 1166:9-21 [Huplosky]; JX0139.018.)  The Oak Creek development fee was a payment to Oak Creek for its work prior to Terra-Gen becoming the owner of the

102

projects and was based on the projected revenue of the project. (Tr. 1166:9-21 [Huplosky]; JX0139.018.)

Moreover, as just one example of the additional issues that may have been uncovered with a more thorough review of Terra-Gen's cost schedules and underlying source documents, embedded within some of Terra-Gen's line items for financing fees that it deems to be almost exclusively allocated to eligible basis are substantial "tax equity fees" that are categorized as ineligible when presented as their own individual line item in the broader cost schedules. In Alta IV, many of the financing fees were broken out into various categories, with some whole categories treated as entirely ineligible. One line item, however, for "Transaction Costs Capitalized and Amortized During Construction" in the amount of $6.5 million, (95.8 percent of which was treated as eligible basis) was itself comprised of many different individual transaction costs. (Tr. 1167:5-1171:1 [Huplosky]; JX0139.018; JX0128.) The transaction costs were itemized in a spreadsheet that Mr. Huplosky (who did not prepare the spreadsheet) provided to KPMG. (Tr. 1170:7-15 [Huplosky].) Based on the information and formulas in the spreadsheet, one can see that nearly half of the various fees and costs embedded in the $6.5 million "Transaction Costs Capitalized and Amortized During Construction" amount reflected "Tax Equity Fee(s)" paid to Citigroup, who was one of the investors in the project. (JX0128.) However, in the Alta IV cost schedule that was included in KPMG's cost segregation memo, a separate line item for tax equity fees, with no dollar value assigned, was categorized as a wholly ineligible line item that was part of the "INT" (or "Intangibles") category. (JX0139.014, .018.) Plaintiffs have not met their burden to establish that 95.8 percent of the over $3 million in tax equity fees that were embedded in the "Transaction Costs Capitalized and Amortized During Construction" line item were eligible, particularly given that the line item specifically

103

attributable to tax equity fees in the Alta IV cost schedule was treated as ineligible. Nor have they offered any testimony to explain how such fees represented costs for tangible, eligible costs.

### 4.    The Cost-Ratio Approach Should Not Be Used in These Cases in Any Event

Even if plaintiffs could rely upon the work done by Terra-Gen and KPMG, their approach of allocating the purchase price based on historical costs is severely flawed: it is not in accordance with the residual method required by § 1060, and it has logical flaws that plaintiffs cannot explain away.

First, this method is contrary to the residual method set out in § 1060.  The residual method, as explained above, requires allocating purchase price to each category of assets up to that category's fair market value.  *See Peco Foods*, 103 T.C.M. 1120 (2012); Treas. Reg. § 1.1060-1(c)(2); Treas. Reg. § 1.338-6 and § 1.338-7.  Then, if any purchase price remains, it moves down the waterfall to the next asset category.  (*Id.*)  Whether part of the purchase price is allocated to intangibles, therefore, depends on the fair market value of the tangible property.  In fact, as noted above, KPMG's certification of the pro rata allocation of the Alta I purchase price was premised on a "valuation report [that] supported a finding that the value of the tangible assets was at least equal to the purchase price, so there was no residual to allocate to Class VI [intangible assets]." (JX0162.003.)  Plaintiffs have not offered a valuation of the tangible assets alone.

Instead, plaintiffs' approach turns this exercise into a circle.  They simply assert that intangibles are not present and thus allocate the purchase price to tangible property.  Then, they assert that since the entire purchase price was used up by tangible property, there is no value to

104

allocate to intangibles, and therefore there are not any intangibles.  But this is a circle, not a waterfall.[69]

Second, the cost-ratio method does not account for the fact, which Dr. Blaydon admitted at trial, that sometimes assets are worth far more than their cost, and sometimes barely more. (Tr. 1718:17-23 [Blaydon].)  An allocation based on historical costs, however, would not capture such shifts in relative value.  Dr. Blaydon agreed that the assumption inherent in the allocation of his value to costs categories as defined by KPMG is that the ratio of costs is exactly the same as the ratio of values.  (Tr. 1718:17-1719:12 [Blaydon].)   If this assumption is incorrect, as it often is, the resulting value would be incorrect.

Dr. Blaydon acknowledged this on direct testimony, when discussing the eligible property, when he indicated that the cost-based allocation should change if one asset were a "relatively higher value contributor[] to the integrated income stream than would be represented just by their original cost".  (Tr. 1608:7-13 [Blaydon].)  Numerous examples of this shortcoming can be drawn from the testimony, including examples Dr. Blaydon himself put forward.  For example, when asked whether, if one of the Alta Project turbines needed to be replaced, he would expect that a replacement turbine would be procured at market price, Dr. Blaydon agreed that it would have been.  (Tr. 1740:14-16 [Blaydon].)  Dr. Blaydon's answer to this simple question undermines his analysis in totality.  Dr. Blaydon's valuation method and allocation rationale result in values for wind turbines that are totally disconnected from the market price for

---

[69] This approach is also internally incoherent, because plaintiffs' allocations already allocate value to the intangible transmission rights that were identified and valued as of 2008 by Duff.  (Tr. 1072:2 to 1073:23; JX0168.003).  They simply assume that no *additional* intangibles can be present.

a turbine.  Instead, they would vary depending on the specific income generated by the particular business in which the turbine happened to be installed.

Dr. Blaydon admitted that his valuation of a wind turbine is a percentage of the income stream the project as a whole produces, not the actual cost of the wind turbine.  (Tr. 1739 [Blaydon].)  That is disconnected from the point of valuing the *eligible* property, which is to determine its value *alone*, not as an arbitrary percentage of the cash-flows of the power-generation business of which it is a part.

Terra-Gen's use of turbine blending provides another example of why a cost-ratio allocation is nonsensical.  That blending permitted Terra-Gen to increase the income of the Alta Projects (and thus their value) without any change in the cost of the tangible assets.  (*See* Facts, Section IV.B.)  Because plaintiffs' rationale requires mechanical changes to the value of the tangible assets whenever the value of the whole project changes, they would have received a lower Section 1603 payment had they not taken advantage of that contractual structure.  The PPA price would have been lower, and therefore the turbines would have been worth less.  That is illogical.

Both sides agree that the Alta wind farms are very valuable.  Where the two sides disagree is on the fair market value of certain eligible assets, primarily the wind turbines.  Dr. Blaydon's proposed value of the wind turbines is disconnected from reality.

The eligible assets in this case are, by definition, all tangible and reproducible.  If any individual part of a turbine were to fail, the owner would pay a market price to replace it.  If the entire turbine failed, the owner would pay the market price to replace it.  (Tr. 1740:14-16 [Blaydon]; *see also* Tr. 902:10-903:4 [Spencer]; Tr. 556:3-9 [Pagano].)  If access to a roadway that has been deemed eligible were washed away, a new access road would be built and the

owner would pay market rates.  The value of a tangible and reproducible asset can never be more than the cost to replace it.  The plaintiffs have not offered any explanation as to why the Treasury should reimburse them for more than it cost to originally purchase (or would cost to subsequently replace) the assets.

Therefore, when the discounted cash flow of a project results in a value that is significantly above the cost of replacing all of the tangible assets, there must be an additional "intangible" value.  This extra value is part of the value of the entire project, but it is not part of the tangible assets.  Said differently, the fair market value of a business or project can go up while the fair market value of specific component tangible assets (*i.e.,* trucks or turbines) do not change.  Plaintiffs' proposed pro-rata allocation rule runs contrary to this simple fact.[70]

Further, the plaintiffs have employed the pro-rata allocation inconsistently.  For the PPA, there are specific costs incurred to create the PPA, so accordingly it should have value based on plaintiffs' pro-rata allocation.  Nevertheless, the plaintiffs use an entirely different valuation framework for that individual asset, testing the PPA against market prices and arguing that it has a value of zero.  (PX0299 ¶169.)

For the land values, Professor Blaydon attributes some of the value of the overall Alta Projects to those land rights based on market prices that Terra-Gen paid for land claimed to be comparable.  (Tr. 1625:13-19 [Blaydon].)  He does not, however, factor these market prices into a pro-rata calculation of what percentage of total project value should be attributed to land – because he does not perform one (or even adjust KPMG's).  That is, he does not gross-up the

---

[70] The pro-rata allocation rule could be used as a last resort when no better alternative is available.  In this case, the expenditures on eligible assets are known. Therefore, the pro-rata allocation proposed by the Plaintiffs represents a complete disconnect from market prices of eligible assets.

amount of project value that is attributed to land above the market prices that Terra-Gen paid based on the pro-rata allocation of total project value. This failure to gross-up is inconsistent with his grossing up of the market prices that Terra-Gen paid for all of the eligible assets based on the pro-rata allocation of overall project value (*e.g.*, the grossing up of the turbine market price that Terra-Gen paid).

Dr. Blaydon's assumption that the ratio of a seller's costs of various assets is exactly equal to the ratio of values of those assets when acquired by a buyer is also internally inconsistent with how some of the very amounts factoring into the cost allocation percentages were first calculated. The cost allocation percentages were significantly affected by Duff's appraisal allocation of the purchase price that Terra-Gen paid to Allco (the "Allco purchase price") to Development Rights and Transmission Rights for each of the Alta Projects. For example, these amounts respectively comprise $40 million and $14 million of the Terra-Gen "costs" factoring into the Alta I cost allocation percentages. (Tr. 1072:2-1073:23 [Huplosky]; JX0168.003.) Dr. Maydew opined that the transmission rights are intangibles. (Tr. 1475:6-7 [Maydew].) Yet, the percentage amount of the Allco purchase price that Duff allocated to the Development Rights and Transmission Rights bore no relationship to those rights' share of costs or value on Allco's balance sheet prior to the sale to Terra-Gen. (Tr. 1141:14-1142:24 [Huplosky]; JX032.045.) Thus, through his reliance on the cost allocation percentages, Dr. Blaydon is relying on a Duff allocation of the earlier Allco purchase price whose conceptual approach differs from the percentage allocation that Dr. Blaydon deems appropriate.

The use of a pro-rata allocation method is convenient for the plaintiffs' experts in that it allows them to completely ignore the existence of intangible assets. Plaintiffs' experts deny that any of the Alta wind farms' value is attributable to intangible assets, whether they are operating

108

agreements, locational profits, PPAs, going concern value, goodwill or something else.[71]  (Tr. 1709:9-13 [Blaydon].)  The pro-rata allocation used by Dr. Blaydon allocates almost 100% of the claimed fair market value of the project as a whole to items that have been deemed eligible (and therefore tangible) by Terra-Gen and KPMG without checking Terra-Gen and KPMG's work for accuracy.  This leaves no value for intangibles.

That this position is illogical is made clear by two examples Dr. Blaydon discussed at trial.  First, when discussing two identical hotels, one located in Manhattan, New York, and one in Manhattan, Kansas, Dr. Blaydon posited that the New York hotel would have a higher value. (Tr. 1734:1-8 [Blaydon].)  That much is obvious.  But Dr. Blaydon also argued that the kitchen equipment within the New York hotel would have a higher value.  (Tr. 1734:9-24 [Blaydon].) That plainly cannot be the case.  Simple logic dictates that kitchen equipment's value would be determined by its cost to purchase, not by some percentage of the value of the overall hotel business.  While a kitchen equipment supplier might like to charge the New York hotel more for the same equipment because it will be used in a more valuable hotel, the New York hotel would not be willing to pay more than the prevailing market price (which is available to the less valuable hotels as well).

Second, when discussing two identical homes, only one of which is in a high value location, Dr. Blaydon argued that the kitchen equipment in one house could be worth more (despite it being identical).  (Tr. 1737:12-15 [Blaydon].)  When asked whether, if it were in a

---

[71] Inconveniently for plaintiffs, their allocations already concede the presence of at least one intangible asset associated with the transmission rights, which, through the interconnection agreement, gives them the right to use another party's tangible property (*i.e.,* the broader electrical grid) in order to transmit power.  They appear to downplay the presence of this intangible by trying to treat it as part of the cost of their own transmission property that they built to reach that broader electrical grid.

mobile home, its value would instead be limited to its cost (*i.e.*, market price), he stated that it probably would.  (Tr. 1737:16-1738:5 [Blaydon].)  Evidently, for Dr. Blaydon, whether an asset has wheels is a critical factor in determining whether the location in which the asset happens to be placed can cause its market value to exceed the market price that one would have to pay to replace it.[72]

Dr. Blaydon's own analysis of certain land parcels that were provided to the buyers at no cost by Terra-Gen leads to the conclusion that a DCF approach and subsequent pro rata allocation of value to assets is not a reliable method to determine eligible cost basis in thiss case. Dr. Blaydon testified that he found it appropriate to separately value the land associated with the Alta Projects because "the availability of that [land] at no cost is potentially something that would enhance the value of the facility, and it would not be caught in the cash flows."  (Tr. 1622:8-11 [Blaydon].)  Dr. Blaydon testified that he did not personally appraise the land.  Instead he relied on Terra-Gen to determine its fair market value, which they did based on historical land *cost* figures.  (Tr. 1622:15-19 [Blaydon]; Tr. 1725:17-1726:22 [Blaydon].)  Dr. Blaydon explained that he subtracted the value of the land from the value of the overall transaction. (Tr. 1625 [Blaydon].)  Otherwise he would have overstated the value of the eligible property.  (Tr. 1727:7-10 [Blaydon].)  This acknowledgment is correct, but it is insufficient; the same rationale would apply to the values of all ineligible assets, including intangibles, that are encompassed

---

[72] At another point, he testified that he would not expect an asset like a water heater to receive a mark-up based on the market value of the home in which it was installed.  (Tr. 1762:3-10.)

110

within the Alta Projects, which he did not separately analyze to determine whether they had value.[73]

### C. The Missing Valuation: the Cost Approach

Both the *Utilicorp* case and Dr. Blaydon's own testimony support the conclusion that a direct valuation of the eligible property through a cost approach would have been the best approach in the circumstances of this case, but plaintiffs did not offer one.[74]

*Utilicorp* endorsed the framework approach that should have been followed here: using a cost approach valuation, including an appropriate profit, to determine the value of assets acquired in a sale-leaseback transaction. 73 T.C.M. 1835 (1997). That case turned on the question of the taxpayer's basis in the bill of sale assets in a sale-leaseback transaction that included the sale of a broader set of assets than Section 1603-eligible property. To resolve the question, the court considered whether any of the purchase price should be allocated to goodwill or going concern by considering the reproduction cost of the bill of sale assets, inclusive of associated development profit. *Id*. at *6-7. The expert that the court found more credible concluded that this reproduction cost was within 0.2% of the purchase price, and the court determined that there was therefore no goodwill or going concern acquired. *Id*.

Like the Tax Court in *Utilicorp*, this Court must consider whether going concern or goodwill was acquired in sale-leaseback transactions involving renewable energy projects (as well as in the straight sale of Alta VI). Like the Tax Court, this Court should focus on the reproduction cost approach to value certain identified assets and thereby determine whether some

---

[73] While this shows Dr. Blaydon's approach is insufficient, even a more comprehensive approach under this framework would be inconsistent with the residual method required under § 1060.

[74] Defendant's excluded expert, Dr. Parsons, used this approach in his report.

of the purchase price might instead be appropriately attributable to other assets, including going concern or goodwill, or any of the various assets in the Alta Projects that are not eligible to be included in cost basis for the purposes of Section 1603.

As Dr. Blaydon described it, a cost approach to determining eligible property would have entailed a summation of the actual costs of construction, and then adding an expected return to the developer. (Tr. 1716:21-24 [Blaydon].) Dr. Blaydon indicated that the cost approach would not capture any value that a group of coordinated assets had above-and-beyond its individual parts.[75] (Tr. 1668:15-19 [Blaydon].) Said differently, Dr. Blaydon agreed that if one wanted to only understand the value of individual eligible assets, the cost approach was appropriate. According to Dr. Blaydon's own testimony, the cost approach would have allowed one to reach a value conclusion on the individual assets within a wind farm. Moreover, Dr. Blaydon agreed that the cost approach is an accepted method in valuation textbooks. (Tr. 1716:14-20

---

[75] As noted previously, plaintiffs clearly intended for this testimony to suggest that the cost approach is inadequate because it does not capture any "turnkey" value associated with the eligible energy property arising from its component parts being combined into one working whole eligible energy property. However, it also necessarily implies that the overall integrated project of which that eligible property is a part can have value above and beyond the sum of the values of its identifiable eligible and ineligible property. This incremental value would be captured in the overall purchase price or income valuation of the project, but, contrary to his allocation approach, is not properly allocable to each of the individual assets of the project. Dr. Blaydon also does not explain how the costs and profit amounts in a cost valuation approach cannot reflect any incremental market value from integrating component parts into a single piece of eligible property. For example, a hotel would pay a plumber a price that provides for the labor costs and profit associated with integrating individual pipes into a working plumbing system for their kitchen. While this integration may affect the total costs and profit to be used in a cost valuation of the plumber's work, common sense dictates that this integration of plumbing components into a whole does not then mean that the market value of the plumber's work must equal a percentage allocation of the value of the hotel's business, as Dr. Blaydon's approach implies.

112

[Blaydon].)  Nonetheless, he has never done an analysis in which he relied upon the cost approach to valuation.[76]  (Tr. 1560:11-14 [Blaydon].)

Additional support for the idea of applying a cost approach here is Dr. Blaydon's agreement that the Alta Projects consisted of heavy investments in tangible assets, which one learned treatise he cited indicates makes the cost approach preferable.  (Tr. 1756:13-1757:5 [Blaydon].)  Moreover, Dr. Blaydon opined that the cost approach is best for items that are "easily replaceable."  (Tr. 1662:7-18 [Blaydon].)  Dr. Blaydon agreed that one could determine the cost of reconstructing or replacing the turbines in the Alta Wind Farms.  (Tr. 1756:13-17 [Blaydon].)

Nonetheless, Dr. Blaydon did not believe that it was appropriate to apply a cost approach to the valuation of the Alta Projects' tangible eligible energy property alone.[77]  He asserted that he did not believe that the eligible assets were easily replaceable.  Instead, Dr. Blaydon explained that something was only easily replaceable if it happened to be easily transferable on wheels.  (Tr. 1663:12-21 [Blaydon].)  When presented with Dr. Maydew's example of a trucking company, Dr. Blaydon explained that he would not allocate a portion of the business's value to

---

[76] This is unsurprising, given that Dr. Blaydon's previous valuations have focused on the value of businesses, rather than of individual tangible assets used by businesses, but it is precisely the latter that is at issue here.

[77] It is important to note that, although Dr. Blaydon asserts that he considered the cost approach, he did not perform one.  Instead, he simply asserted that Terra-Gen's estimated construction costs were known to the buyers and that the buyers' purchase prices therefore must reflect the appropriate mark-up over cost.  (PX0299.085.)  Yet even according to his own descriptions, the cost approach should include an estimate of expected developer return, not a backwards-looking description of how much a developer actually earned, which may reflect the particularities of the business and/or assets being sold, as well as the transactions that effected the sale.  Dr. Blaydon has performed no such assessment.

the individual trucks.  (Tr. 1749:7-24 [Blaydon].)  Yet he would do so with turbines.  The only

difference between those assets and the turbines here is that trucks have wheels:

> Q. So, because the trucks clearly could just be driven off, your
> answer is different than if you were valuing the turbines that we're
> talking about in this case?
>
> A. Yes.

(Tr. 1750:3-7 [Blaydon].)  The trucks are just as critical to the trucking company in which they

are used as turbines are to a wind farm.  Blaydon cannot explain the distinction without resorting

to the presence of wheels, and that opinion does not withstand logical scrutiny.

Another benefit to the cost approach is that it could yield the same eligible basis for all

Section 1603 program applicants with identical tangible eligible energy property.  As Dr.

Blaydon explained, "if you applied the cost approach, you would get the same valuation for

something that is in a poor wind area as in a prime wind area."  (Tr. 1666:1-4 [Blaydon].)  As far

as eligible property is concerned, that is exactly how the 1603 Program is supposed to work.

What Dr. Blaydon described as "a critical shortcoming of the cost approach" – that "it is not

directly tied to the fair market value of the income producing capability of the property, which

would reflect expected cash flows, tax benefits and risk" (PX0299.081) – is actually consistent

with Section 1603's operation, which reimburses applicants for cost basis, not the value that a

particular business is able to realize from deploying particular property in a particular

application.

114

**CONCLUSION**

For the reasons explained above, plaintiffs are unable to carry their burden of proof in this case.  Accordingly, their claims must be denied and Treasury's original award should be left undisturbed.

Respectfully submitted,

*s/ Michael J. Ronickher*
MICHAEL J. RONICKHER
*Attorney of Record*
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Tel:  (202) 616-9085
Fax: (202) 514-9440
Michael.J.Ronickher@usdoj.gov

CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General
DAVID I. PINCUS
Chief, Court of Federal Claims Section
G. ROBSON STEWART
Assistant Chief, Court of Federal Claims Section
MIRANDA BUREAU
Trial Attorney, Court of Federal Claims Section
MARGARET E. SHEER
Trial Attorney, Court of Federal Claims Section

*s/ G. Robson Stewart*
*Of Counsel*

Dated:  August 3, 2016                    *Counsel for Defendant*

115